## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHEAST DIVISION

| | | |
|---|---|---|
| **HEATHER WATTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:06-cv-1149-MEF** |
| **HOSPITALITY VENTURES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S SUPPLEMENTAL BRIEF
## AND EVIDENTIARY SUBMISSION
## IN OPPOSITION TO DEFENDANT'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Plaintiff and, pursuant to the FRCP 56(b), files this supplemental brief in opposition to Defendant's motion for partial summary judgment.

Defendant has filed its motion for partial summary judgment alleging that Plaintiff is not an "eligible employee" to assert a claim for violations of the Family and Medical Leave Act ("FMLA"), specifically alleging that it, the employer, employed fewer than fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site. Further, Defendant has alleged that Plaintiff cannot claim equitable estoppel because the Eleventh Circuit has never applied the doctrine of

estoppel to FMLA claims.  (See Doc. 19 – Defendant's Reply Brief, pp. 1, 4).

Plaintiff became employed with Hospitality Ventures, LLC, in June 2004 and continued employment until she took maternity leave on August 11, 2005, to deliver her baby on August 12, 2005.  Plaintiff was informed by Roger Miller, Vice President of Sales of Marketing at Hospitality Ventures, that she could take the leave and no one contested Plaintiff's right to take FMLA/Maternity Leave continuing through November 9, 2005.  (See Doc. 18 - Plaintiff's Response in Opposition, Ex. 10; Plaintiff's depo., pp. 142-146; DX22, DX23).[1]

Plaintiff tendered her leave request for six to eight weeks, depending on the delivery and health of her child and further stated that she would not be out more than the allotted time of 12 weeks under the FMLA.  (Plaintiff's depo., DX24, DX25 and DX33).  Roger Miller, Plaintiff's supervisor, agreed that he approved for Plaintiff to take eight to twelve weeks off, come back as quick as she could and continue with her job.  (Miller depo., pp. 43-44).[2]  Miller stated he hired temporary contract labor, Tandi Mitchell, to fill in for Plaintiff.  *Id.* at 44.  Miller, employed as Vice President of Sales and Marketing for Hospitality Ventures Management,

---

[1]  Plaintiff's deposition and exhibits are attached hereto as Exhibits 1 and 2.

[2]  Roger Miller's deposition and exhibits are attached hereto as Exhibits 3 and 4.

Inc., further admitted he interviewed and hired Watts from the Atlanta office of Hospitality Ventures. (Miller depo., pp. 6, 28-29; see also Watts depo., pp. 65, 355).

During her leave, Plaintiff continued working for Defendant from home until November 2, 2005, one week before Plaintiff was to return from her maternity leave. On November 2, 2005, Plaintiff was called by the new hotel Manager, Tammy Dominguez, and asked if Plaintiff was returning to her job on a full-time basis. Plaintiff responded, "Yes." (*Id.* at ¶ 9, see also Plaintiff's depo., DX34). Dominguez called Plaintiff again on the same day and told Plaintiff that the option of returning to work was no longer available and Plaintiff could either resign or she would be terminated. (Plaintiff's depo., DX35).

On November 3, 2005, Plaintiff returned to her place of employment to collect her final paycheck and to clean out her office. (Plaintiff's depo., p. 11). Dominguez called Plaintiff later and stated that she (Dominguez) had made a mistake and could not terminate Plaintiff because she was on FMLA leave and offered to reassign her to a receptionist position, but not her former position as Director of Sales. (Plaintiff's depo., pp. 319-320; 202). Plaintiff was thereafter replaced by a young woman, not married and at a higher salary. (Miller depo., pp. 81-82). *Id.* at ¶ 11.

3

In *Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352, (5th Cir. 2006),[3] this same issue was addressed by the Fifth Circuit:  Minard requested leave for surgery, was granted leave, but on the day she was scheduled to return to work, ITC terminated her employment rather than restoring her to her former or equivalent position as required by the FMLA.  After Minard had taken leave an undergone surgery, ITC discovered that Minard was not an "eligible employee" under the FMLA at the time she had requested leave in that ITC employed less than fifty (50) employees at or within 75 miles of the work site of which Minard was employed.  *Id.* at 354.

Minard filed suit alleging that ITC was ethically estopped to deny that she was an eligible employee under FMLA when she requested leave because she had relied to her detriment on ITC's representation that she was, at the time, an eligible employee under the Act and, therefore, entitled to reinstatement upon returning from her medical leave.  *Id.*

The Fifth Circuit denied summary judgment to ITC relying on the recent Supreme Court decision in *Arbaugh v. Y & H Corporation, d/b/a Moonlight Café*, 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) and on the doctrine of equitable estoppel.  The Court ruled that in light of the Supreme Court's decision

---

[3]  The case is attached as Exhibit 5.

in *Arbaugh*, the term "eligible employee" is a substantive ingredient of a Plaintiff's claim for relief, not a jurisdictional limitation. The Court ruled that the fifty (50) employee threshold appears in the definition section of the Act separate from the jurisdictional section and does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts. *Id.* at 356. The Fifth Circuit concluded that applying the Supreme Court's *Arbaugh* bright line rule, the threshold number of employees for application of FMLA is an element of a Plaintiff claim for relief, not a jurisdictional limitation. *Id.* at 357.

The Fifth Circuit also addressed Minard's equitable estoppel issue, rejecting the Defendant's assumption that the doctrine of equitable estoppel does not apply. *Id.* at 358. The Court cited that because it had subject matter jurisdiction, it would address the equitable estoppel question and concluded that ITC should be equitably estopped to assert a "non eligible employee" coverage defense. *Id.*

The Fifth Circuit stated, "The Supreme Court has recognized that, under federal law, [e]stoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). In *Heckler* the Court quoted and adopted the elements of estoppel set forth in §894(1) of The Restatement (Second) of Torts as follows: "If one person makes a definite

5

representation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act...the first person is not entitled...(b) to regain property or its value that the other acquired by the Act (if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position it would be unjust to deprive him of that which he thus acquired." *Id.* at 358, citing Restatement (Second) of Torts, §894(1) (1979); citing also Restatement (Second) of Agency, §8B (1958). "Accordingly, an employer who without intent to deceive makes a definite but erroneous representation to his employee that she is a "eligible employee" and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of noncoverage, if the employee reasonably relies on that representation and takes action thereon to her detriment. *Id.* at 359. (internal citations and footnotes omitted).

Defendant has alleged that Hospitality Ventures never employed the Plaintiff, Heather Watts. Specifically, Roger Miller, submitted his affidavit that he was employed by Hospitality Ventures Management and that Montgomery Ventures, LLC owns and operates the hotel, not Hospitality Ventures. (Doc. 13 - Exhibit 1, ¶¶ 1-3, Miller depo., pp. 71-75).

While Miller provided in his affidavit to this Court that Hospitality Ventures

did not own or operate the Montgomery Fairfield Inn, documents produced during Miller's recent deposition fully contradict his affidavit. For instance, Plaintiff's Exhibit 9, 10 and 11 represent the executive summary by Marriott which depict that Hospitality Ventures, LLC, not only managed, but owned, the Montgomery Fairfield Inn facility. (Miller depo., PX9, PX10, and PX11). Miller could not explain the discrepancy between the documents and his affidavit. (Miller depo., pp. 74-75). Miller further explained that the situation with the Plaintiff had become "a sticky mess." (Miller depo., PX12).

Miller also agreed that during the twelve weeks that Plaintiff was off work she was not to be paid, with the exception of seven hours a week she worked developing the marketing plan for Defendant. Plaintiff delivered the marketing plan on October 31, 2007, having worked on the project for months and was fired two days later. (Plaintiff's depo., p. 360; Miller depo., pp. 48-49).

Miller also testified that he never received any training from human resources and only learned after the termination of Plaintiff that it was illegal to discriminate against pregnant women or a worker on FMLA leave. (Miller depo., pp. 69-70).

WHEREFORE, THESE PREMISES CONSIDERED, the Plaintiff provides to the court that Hospitality Ventures, LLC, was the Plaintiff's employer, not

Montgomery Ventures, LLC as provided by Roger Miller and in Defendant's Brief in Support of Partial Motion for Summary Judgment).  Further, Plaintiff has shown that the Defendant should be equitably estopped from now alleging that Plaintiff was not an "eligible employee" when she took FMLA leave sanctioned by Hospitality Ventures.

While on maternity leave, Plaintiff continued working for Defendant developing an extensive marketing plan to enable the Defendant to increase sales productivity.  Two days after Plaintiff delivered the marketing plan, she was terminated while on FMLA leave.  (Plaintiff's depo., p. 360).

Plaintiff was not returned to her former or an equivalent position.  Plaintiff relied on Defendant's assurances she would have her former position with Defendant when she returned from leave, otherwise Plaintiff could have enjoyed her new baby without the interruption of continuing to work for Defendant during her leave.  Defendant should be equitably estopped from now claiming a contrary position after reaping the rewards of Plaintiff's continued employment during her maternity leave but now claiming Plaintiff is not an "eligible employee" under the FMLA.

Plaintiff further incorporates her previous response  (Doc. 18) in further support of her motion to deny Defendant's Partial Motion for Summary Judgment.

8

Respectfully submitted,


/s/ Alicia K. Haynes
Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama   35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Daniel S. Fellner
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326

Jeffrey Allen Lee
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203-2618

R. Jason D'cruz
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326

/s/ Alicia K. Haynes
OF COUNSEL

1

```
1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4


5    HEATHER WATTS,

6          Plaintiff,

7    vs.                    CASE NO. 2:06CV1149-MEF

8    HOSPITALITY VENTURES, LLC,

9          Defendant.

10

11

12

13          * * * * * * * * * *

14          DEPOSITION OF HEATHER GODFREY WATTS,

15   taken pursuant to stipulation and agreement

16   before Heather Barnett, Court Reporter and

17   Commissioner for the State of Alabama at Large,

18   in the Law Offices of Maynard, Cooper & Gale,

19   100 North Union Street, Suite 650 RSA Tower,

20   Montgomery, Alabama, commencing at approximately

21   10:32 a.m., on Thursday, July 19, 2007, and

22   continuing on Friday, July 20, 2007.

23          * * * * * * * * * *
```

Page 2

```
 1          APPEARANCES
 2 FOR THE PLAINTIFF:
 3 Ms. Priscilla Black Duncan
   P.B. DUNCAN & ASSOCIATES, LLC
 4 Attorneys at Law
   472 South Lawrence Street
 5 Suite 204
   Montgomery, Alabama  36104
 6
   FOR THE DEFENDANT:
 7
   Mr. Daniel S. Fellner
 8 MORRIS, MANNING & MARTIN, LLP
   Attorneys at Law
 9 1600 Atlanta Financial Center
   3343 Peachtree Road, NE
10 Atlanta, Georgia  30326-1044
11 ALSO PRESENT:
12 Mr. Roger Miller
   Mr. Austin McCarthy (July 20 only)
13
14      * * * * * * * * * * *
15      EXAMINATION INDEX
16 HEATHER GODFREY WATTS
      BY MR. FELLNER         4
17    BY MS. DUNCAN        345
      BY MR. FELLNER      379
18    BY MS. DUNCAN        406
      BY MR. FELLNER      408
19
20      * * * * * * * * * * *
21      STIPULATIONS
22      It is hereby stipulated and agreed by
23 and between counsel representing the parties that
```

Page 3

```
 1 the deposition of HEATHER GODFREY WATTS is taken
 2 pursuant to the Federal Rules of Civil Procedure
 3 and that said deposition may be taken before
 4 Heather Barnett, Court Reporter and Commissioner
 5 for the State of Alabama at Large, without the
 6 formality of a commission; that objections to
 7 questions other than objections as to the form of
 8 the questions need not be made at this time but
 9 may be reserved for a ruling at such time as the
10 deposition may be offered in evidence or used for
11 any other purpose as provided for by the Federal
12 Rules of Civil Procedure.
13       It is further stipulated and agreed by
14 and between counsel representing the parties in
15 this case that said deposition may be introduced
16 at the trial of this case or used in any manner
17 by either party hereto provided for by the
18 Federal Rules of Civil Procedure.
19      * * * * * * * * * * *
20
21
22
23
```

Page 4

```
 1      HEATHER GODFREY WATTS
 2      The witness, having first been sworn to
 3 speak the truth, the whole truth and nothing but
 4 the truth, testified as follows:
 5          EXAMINATION
 6 BY MR. FELLNER:
 7 Q. Could you please state your name?
 8 A. Heather Watts.
 9 Q. Do you have a middle name?
10 A. Heather -- a maiden name.
11 Q. Maiden name.
12 A. Heather Godfrey Watts.
13 Q. Okay.  You have no middle name?
14 A. Not that I'm married now, but I mean --
15 Q. Your middle name --
16 A. Was Lynn.
17 Q. Okay.  And it became Godfrey.
18 A. Yes.
19 Q. Got you.  Thank you.  Ms. Watts, my name is
20    Dan Fellner.  I represent Hospitality
21    Ventures, LLC.  This deposition is being
22    taken in the case of Heather Watts versus
23    Hospitality Ventures, LLC, which is pending
```

Page 5

```
 1 in the United States District Court for the
 2 Middle District of Alabama, the Northern
 3 Division.  It's for Civil Action Number
 4 206:CV1149-MEF.  It's being taken pursuant to
 5 notice and for all purposes allowed by law.
 6      Your counsel has already stated that you
 7 would like to read and sign your deposition
 8 at the end of it.
 9      As you notice, there's a court reporter
10 here that's transcribing everything that we
11 say -- or trying to transcribe everything
12 that we say.  Both you, myself, and
13 Ms. Duncan need to do a little bit to help
14 the court reporter out in that regard.  One
15 of the things that we need to do is we need
16 to make sure that we don't talk over one
17 another or at the same time as one another.
18 So I will try to give you an opportunity to
19 fully answer any questions or say anything
20 that you want to say.  And if you would try
21 to wait until I finish my question before you
22 begin responding, that will be helpful for
23 the court reporter; and I would appreciate it
```

Page 6

1    as well.
2        Another thing that we need to do is you
3    may want to answer questions at some times
4    with an uh-huh or an unh-unh, meaning in the
5    affirmative or in the negative; but those are
6    difficult sometimes for the court reporter to
7    transcribe and tell the difference between
8    the two. So if you could respond with either
9    a yes or a no in the appropriate places, it
10   will be helpful to the court reporter. Okay?
11   A. Uh-huh.
12   Q. Also, you may want to respond by nodding or
13       gesturing. It's difficult for the court
14       reporter also to transcribe nodding and
15       gesturing. So if you can try to keep your
16       responses to be audible, spoken, that will be
17       helpful as well. Any questions about any of
18       that?
19   A. No.
20   Q. If at any time you don't understand one of my
21       questions, let me know. I'll be happy to do
22       what I can to help you understand what I'm
23       asking. But if you do answer my question,

Page 7

1    it's going to indicate that you did
2    understand the question at least. Okay?
3    A. Okay.
4    Q. And if at any time, you want to take a break,
5        just let me know. If there's a question
6        pending at that time, I may ask you to go
7        ahead and answer the question before we do
8        take a break; but we'll take a break as
9        needed. Okay?
10   A. Okay.
11   Q. Just a couple of housekeeping issues. Unless
12       I state otherwise, during the course of
13       deposition today, when I say Montgomery
14       Ventures, that's going to mean Montgomery
15       Ventures, LLC. Okay?
16   A. Okay.
17   Q. And unless I state otherwise, when I say
18       Hospitality Ventures, I'm going to be
19       referring to Hospitality Ventures, LLC.
20   A. Okay.
21   Q. And unless I state otherwise, when I say the
22       Fairfield Inn, it means whatever entity it
23       was that employed you while you worked at the

Page 8

1    Fairfield Inn located in Montgomery,
2    Alabama. Okay?
3    A. Okay.
4    Q. Are you presently taking any medications?
5    A. No.
6    Q. Have you taken any medications within the
7        past 24 hours?
8    A. Tylenol.
9    Q. Anything else?
10   A. Every morning I take a Claritin.
11   Q. Anything else?
12   A. No, sir.
13   Q. So you took a Claritin this morning?
14   A. Yes, sir.
15   Q. Do any of those medications -- the Tylenol,
16       the Claritin -- do they affect your ability
17       to answer questions truthfully today?
18   A. No, sir.
19   Q. Any other reason why you cannot testify
20       truthfully today?
21   A. No, sir.
22   Q. Where do you live?
23   A. In Montgomery.

Page 9

1    Q. Where? What's your address?
2    A. 6976 Eastern Shore Road.
3    Q. What's the zip there?
4    A. 36117.
5    Q. Who else lives there?
6    A. My husband and my two children.
7    Q. What is your husband's name?
8    A. Mickey Watts.
9    Q. And your children's names?
10   A. Taylor Watts and Tanner Watts. And I have
11       animals.
12   Q. Okay. So you have some pets that live there
13       as well?
14   A. Yeah.
15   Q. How long have you been married to Mickey?
16   A. It will be seven years in November.
17   Q. Have you had any previous marriages?
18   A. No.
19   Q. What's your husband's occupation?
20   A. He is portfolio manager in commercial
21       lending.
22   Q. For whom?
23   A. Colonial Bank.

Page 10

1 Q. How long has he been working at Colonial
2   Bank?
3 A. Since June of 2006.
4 Q. And before that?
5 A. Guilford Capital, which it has been sold.
6   It's under a new name now.
7 Q. But he worked there until June of '06?
8 A. Yes, sir.
9 Q. Do you know approximately how long he worked
10   there?
11 A. He was hired right after we were married, so
12   whatever time line that is. So I think he
13   started in November of us -- after we got
14   married, right after we got married.
15 Q. So it would be approximately November 2000?
16 A. Yes, sir.
17 Q. Is he employed full-time?
18 A. Yes, sir.
19 Q. Has he always been employed full-time?
20 A. Yes, sir.
21 Q. Taylor. Now, that's a daughter, right?
22 A. Yes.
23 Q. What is Taylor's date of birth?

Page 11

1 A. December 28th, 2001.
2 Q. Where was she born?
3 A. Here in Montgomery.
4 Q. And Tanner was also born in Montgomery,
5   Alabama?
6 A. Yes, sir.
7 Q. Tanner's date of birth?
8 A. August the 12th, 2005.
9 Q. Do you have any relatives that live in
10   Alabama?
11 A. A lot of relatives that live in Alabama.
12 Q. Did you grow up in Montgomery?
13 A. Yes, sir.
14 Q. Do your parents live in Montgomery still?
15 A. Well, they live in Wetumpka, which is just
16   right outside of Montgomery, but yes.
17 Q. And what are your parents' names?
18 A. My patients are divorced, so I have a
19   stepfather and a mother. So they are Sam and
20   Ginny Hancock, and they're the ones that live
21   in Wetumpka.
22 Q. Okay. And your father?
23 A. He lives here in Montgomery. And it's Rouse,

Page 12

1   R-O-U-S-E, Godfrey.
2 Q. Remarried?
3 A. No, sir.
4 Q. Did your husband grow up in Montgomery as
5   well?
6 A. No, sir.
7 Q. Does his family live nearby?
8 A. No, sir.
9 Q. Where does his family live?
10 A. Texas. And they are both deceased.
11 Q. How long have Sam and Ginny Hancock lived in
12   Wetumpka?
13 A. Just recently. They moved there in September
14   of last year, of 2006.
15 Q. Before moving to Wetumpka, where did they
16   live?
17 A. They lived here in Montgomery.
18 Q. For how long?
19 A. They married when I was two, so they --
20 Q. A long time?
21 A. Yes.
22 Q. More than 10 years?
23 A. Yes, sir.

Page 13

1 Q. And Rouse Godfrey lives here in Montgomery?
2 A. Yes, sir.
3 Q. How long has he lived in Montgomery?
4 A. All of his life.
5 Q. What did you do to prepare for this
6   deposition?
7 A. In regards --
8 Q. Anything.
9 A. Personally? Just slept, got plenty of rest,
10   reviewed with my attorney.
11 Q. So did you meet with your attorney?
12 A. Yes.
13 Q. Okay. How many times?
14   MS. DUNCAN: Objection.
15 Q. Okay. How many times? And just to be clear,
16   I don't want to know what you talked about.
17 A. There was numerous times. I mean, are you --
18 Q. Just to prepare for this deposition, that's
19   all.
20 A. Yesterday and this morning.
21 Q. Okay. Any other times to prepare for the
22   deposition?
23 A. No.

Page 14

1  Q.  Did you review any documents to prepare for
2      the deposition?
3  A.  Yes.
4  Q.  Okay.  Did you review any of the pleadings in
5      this case?  Do you know what I mean when I
6      say pleadings?
7  A.  I was going to ask.  No, sir.
8  Q.  Okay.  That's fine.  Any of the documents
9      that have been filed with the court.
10  A.  Yes, I did review them.
11  Q.  What pleadings did you review?
12  A.  All that were given to me.
13  Q.  Do you know, did you review the complaint?
14  A.  Was that what I signed this morning?
15  Q.  No.  I think what you signed this morning
16      were supplemental interrogatory responses.
17  A.  Okay.
18  Q.  The complaint was the first thing that
19      initiated the case.  It was the claims that
20      you filed against Hospitality Ventures.
21  A.  Yes, I did.
22  Q.  So you reviewed the complaint?
23  A.  Yes, sir.

Page 15

1  Q.  Did you review Hospitality Ventures' answer?
2  A.  No, not the complaint.
3  Q.  Okay.  Did you review the charge of
4      discrimination that you filed?
5  A.  Yes.
6  Q.  Did you review the affidavit that was
7      attached to the charge of discrimination?
8  A.  That's just all confusing to me, all the
9      terminology, so -- I reviewed everything,
10      again, that I had in my hand.  As far as
11      exactly what they were, I could show you; but
12      I don't know as far as what terminology you
13      were talking about.  I reviewed every
14      document that I was able to review.
15  Q.  Okay.  Maybe we'll ask those questions a
16      little bit differently.  Did you review any
17      e-mails, though?
18  A.  Yes.
19  Q.  These were e-mails between yourself and other
20      folks?
21  A.  Yes.
22  Q.  Were they e-mails that have been produced in
23      this case?

Page 16

1  A.  What do you mean?
2  Q.  Well, your attorneys have sent over a bunch
3      of documents to us, and we've sent over a
4      bunch of documents.
5  A.  No.  It was just the prior e-mails during my
6      employment.
7  Q.  From during your employment?
8  A.  Yes.
9  Q.  When you said that you reviewed the e-mails,
10      did you review those e-mails while you were
11      with your attorney?
12  A.  No.
13  Q.  Separately on your own?
14  A.  You said to prepare for this morning?
15  Q.  Correct.
16  A.  Yes.
17  Q.  All I'm talking about -- all I'm asking about
18      right now -- I'm sorry.  If I wasn't clear,
19      all I'm asking about is just what you did to
20      prepare for today.  Okay?
21  A.  I reviewed every document that I was able to.
22  Q.  Okay.  And with respect to the e-mails --
23  A.  Yes.

Page 17

1  Q.  -- those are documents that you reviewed
2      specifically to prepare -- the e-mails --
3      that you specifically reviewed to prepare for
4      the deposition today, right?
5  A.  Yes.
6  Q.  Okay.  And I guess what I'm just trying to
7      make sure, that to the extent that there were
8      any e-mails that you reviewed, that they've
9      been produced in this case.  That's all.
10  A.  Yes.
11  Q.  Did you review any audiotapes?
12  A.  Today?
13  Q.  To prepare for this deposition.
14  A.  To prepare?  Yes.
15  Q.  And that's the audiotape that you've just
16      provided to us?
17  A.  Yes.
18  Q.  Any other audiotapes?
19  A.  No, sir.
20  Q.  Okay.  Did you review any other documents?
21      We've talked about e-mails.  We've talked
22      about the pleadings in this case.  Anything
23      else document-wise?

Page 18

1  A.  No.
2  Q.  Okay.  Other than your attorney, who did you
3      speak to, to prepare for this deposition?
4  A.  My husband.
5  Q.  Anyone else?
6  A.  Well, my mother called just to let me know
7      she was thinking of me, but no one directly
8      as far as that, no.
9  Q.  Okay.  When did you speak to your mom?
10  A.  Last night.
11  Q.  And what did you speak to her about with
12      respect to preparing for the deposition?
13  A.  Nothing was spoken about.  She just wanted to
14      let me know she was thinking of me today.
15  Q.  Okay.  And you said the only other person you
16      spoke to about preparing for the deposition
17      other than your attorneys was your husband
18      Mickey, right?
19  A.  Correct.
20  Q.  What did you talk to Mickey about?  Or,
21      actually, before I ask that, when did you
22      talk to Mickey about preparing for the
23      deposition?

Page 19

1  A.  It was since I was given the notice that I
2      was supposed to be here.
3  Q.  How many times did you speak to your husband
4      about preparing for the deposition?
5  A.  About five times maybe.
6  Q.  When was the first time?
7  A.  Excuse my pause.  I'm thinking.  The -- it's
8      just been over a course of maybe two or three
9      weeks, you know, just mentally preparing.  So
10      I would say about two weeks ago, we --
11  Q.  All five times were during the course of that
12      two to three weeks?
13  A.  Yes.
14  Q.  What specifically did you discuss with your
15      husband about --
16      MS. DUNCAN:  Objection.  We're not
17          waiving the marital privilege
18          here.
19      MR. FELLNER:  Marital privilege?
20      MS. DUNCAN:  Yeah.
21      MR. FELLNER:  All right.  Let me go
22          ahead and get my question on the
23          record, and then you can get your

Page 20

1      objection on the record, and then
2      we can move on.  Okay?
3      MS. DUNCAN:  Okay.
4  Q.  What specifically did you discuss with your
5      husband about preparing for this deposition?
6      MS. DUNCAN:  And I object because this
7          is covered by the marital
8          privilege.  She's not required to
9          reveal conversations with her
10          spouse.
11      MR. FELLNER:  You're instructing her
12          not to answer the question?
13      MS. DUNCAN:  I'm instructing her not to
14          answer.
15  Q.  Other than your conversations that you've had
16      with your husband and other than the
17      discussions that you've had with your
18      attorneys, have you told me everything you've
19      done to prepare for this deposition?
20  A.  Yes.
21  Q.  Have you ever been a party to a lawsuit other
22      than this one?
23  A.  No.

Page 21

1  Q.  Have you ever testified or been deposed
2      before?
3  A.  No.
4  Q.  Other than this lawsuit, have you ever filed
5      any kind of a complaint, a grievance, a
6      charge, anything?
7  A.  Can you explain that?
8  Q.  Sure.  Any kind of a complaint, either with
9      the courts, court system, with any government
10      agency.
11  A.  No, sir.
12  Q.  Regardless of whether you filed any kind of a
13      complaint or charge and other than whatever
14      has to do with this particular lawsuit, have
15      you ever been discriminated against?
16  A.  No.
17  Q.  Have you ever been arrested?
18  A.  No.
19  Q.  Convicted of a crime?
20  A.  No.
21  Q.  And haven't pled guilty to anything ever?
22  A.  No.
23  Q.  What's the highest level of education you

Page 22

1 received?
2 A. I have a Bachelor of Business, a BBA.
3 Q. From where?
4 A. Faulkner University here in Montgomery.
5 Q. When did you get that?
6 A. Completed it in 1998.
7 Q. Do you have any other schooling or education?
8 A. Prior to the degree, I got an associate's in
9    child care. It was a management program;
10   because I did direct child care, worked with
11   KinderCare, and I was a director. So it was
12   some extra accreditation that I had to have.
13 Q. When did you get that?
14 A. I'd have to pull my resume to look at that
15   date exactly, but I can do that.
16 Q. It was sometime before '98, though?
17 A. Yes. Yes.
18 Q. Any other schooling or education?
19 A. Besides what I did within the hotels, no.
20 Q. And when you say what you did in the hotels,
21   was that just training courses?
22 A. It was extensive training and courses that I
23   had to do, yes.

Page 23

1 Q. Why don't you tell me about those training
2    courses.
3 A. Upon being hired with Marriott, which was --
4    again, I'll have to look up that date. You
5    had to go through a bunch of beginner
6    training classes that kind of they built up
7    to a Sales EDGE. And the EDGE was a very
8    intense, about a seven-day training course.
9    And I do recall that was right after I was
10   married. I was in D.C. to do that. And it's
11   a pass-or-fail kind of thing, and I did
12   pass.
13     And then there was just ongoing training
14   with sales efforts that I had to maintain.
15 Q. What type of ongoing training?
16 A. There was always reviewing sales techniques
17   or any type of new marketing tool that
18   Marriott would come up with that you always
19   had to either attend a training class or a
20   refresher class. So I willingly always
21   participated. Those were -- some of them
22   were not mandatory, but I always willingly
23   participated in extra training that I needed

Page 24

1    to do.
2 Q. Were they always here in Montgomery?
3 A. Not necessarily. They were in Orlando. Some
4    were in Atlanta and again in Washington, D.C.
5 Q. Did you get any kind of certification or
6    anything like that?
7 A. I received a certificate each time that I
8    completed something.
9 Q. Who paid for you to attend these training
10   classes?
11 A. Depending on which class and which part of
12   Marriott that I worked for, they --
13   everything was paid by the company.
14 Q. Whatever company you were employed by at the
15   time?
16 A. Yes.
17 Q. Okay. So other than this Marriott training
18   that you got, the associate's in child care,
19   and the Bachelor of Business, have you told
20   me about all of your education and training?
21 A. Besides like currently now, I do some
22   photography classes, you know; but they are
23   training for my business; but I am currently

Page 25

1    doing that.
2 Q. Okay. Tell me about this photography
3    training.
4 A. I just -- it's a photography course and
5    training.
6 Q. Where is the course through?
7 A. Some of it is online, but some of it is at a
8    local college here.
9 Q. What college?
10 A. AUM.
11 Q. I'm sorry?
12 A. AUM. AUM, which stands for Auburn University
13   of Montgomery. And I'm on the list to
14   complete that this fall. So.
15     Can I interrupt one second? Is there
16   any way to close that blind? It's
17   distracting with people walking around. I'm
18   sorry.
19     (Brief recess)
20 Q. Just before we took a break, we were talking
21   about the photography training course, the
22   one photography training course you're taking
23   online at Auburn University at Montgomery and

Page 26

1   that you're scheduled to complete it this
2   fall?
3  A.  Yes.
4  Q.  Any other training that you're taking with
5   respect to this photography?
6  A.  No.
7  Q.  Is there any other training that you have
8   taken with respect to the photography?
9  A.  No.
10  Q.  So other than the photography training, the
11   hotel training courses, the associates in
12   child care, and the bachelor's of business,
13   have you told me all of the education and
14   training that you have received?
15  A.  Yes.
16  Q.  Who is your current employer?
17  A.  I am working with -- you need a name or the
18   business?  I'm sorry.
19  Q.  Let's start with the business.
20  A.  Business?  Montgomery Parents, Montgomery
21   Journey.  And that's a magazine.
22  Q.  How long have you been working for Montgomery
23   Parents, Montgomery Journey?

Page 27

1  A.  Just started this month.
2  Q.  So you started in?
3  A.  July.
4  Q.  July.  Before working for Montgomery Parents,
5   Montgomery Journey, who was your employer?
6  A.  I'm still currently -- there's two others I'm
7   still currently working for.
8  Q.  Okay.
9  A.  Okay.
10  Q.  Who else?
11  A.  Affiliate Marketing.  And I'm just their
12   independent contractor as a photographer.
13  Q.  How long have you been an independent
14   contractor for Affiliate Marketing?
15  A.  Since -- I'm trying to think back because we
16   have printed dates.  March -- let me take
17   that back.  It will be April of this year,
18   April 2007.
19  Q.  Have you been anything other than an
20   independent contractor for Affiliate
21   Marketing?
22  A.  No.
23  Q.  And you said that there are several companies

Page 28

1   that you are working for right now?
2  A.  Yes.
3  Q.  Who are the other ones?
4  A.  ASPECT.
5  Q.  ASPECT Foundation?
6  A.  Yes.
7  Q.  How long have you -- are you an employee
8   there?
9  A.  I don't know how they label that; but I've
10   been there since June of last year, of '06.
11   I'm an independent -- I mean an international
12   coordinator.
13  Q.  So Montgomery Parents, Montgomery Journey,
14   Affiliate Marketing, ASPECT Foundation.  Is
15   that all of the companies that you're working
16   for right now?
17  A.  Besides my own.
18  Q.  What's your own?
19  A.  My own photography business, Capture the
20   Moment.
21  Q.  When did you go into business for yourself
22   with Capture the Moment?
23  A.  June of this year.

Page 29

1  Q.  Any other companies, self-employment,
2   independent contractors, that you're doing
3   right now?
4  A.  Currently, no.
5  Q.  Other than these four employers or companies
6   that you're doing work for, what was the last
7   company that you did work for?
8  A.  Taylor Road Baptist.
9  Q.  When did you work there?
10  A.  November of 2006.
11  Q.  Was that the end date?
12  A.  I'm sorry.  That's the beginning date.
13  Q.  Okay.
14  A.  Until April of 2007.
15        (Brief recess)
16  Q.  Right before we took a break, we were talking
17   about Taylor Road Baptist.  And you said that
18   you worked there from -- was it November 2006
19   through April 2007?
20  A.  Yes.
21  Q.  Okay.  Did you work for anybody else while
22   you worked for Taylor Road Baptist Church
23   other than what we've already discussed?

Page 30

1  A.  No.
2  Q.  Who did you work for before you worked for
3     Taylor Road Baptist?
4  A.  Well, if you'll see the date, I still was
5     with ASPECT Foundation and still did that
6     along with the Taylor Road.
7        MS. DUNCAN:  Do you have the
8          supplemental document that we gave
9          you this morning?
10       MR. FELLNER:  Yeah.  I'm just trying to
11         get her recollection.
12 Q.  Other than what you've already told me --
13 A.  Right.
14 Q.  -- did you have any employers or companies
15    you did work for previous to Taylor Road
16    Baptist?
17 A.  No.
18 Q.  No.  So from whenever it was that you were
19    terminated at the Fairfield Inn until
20    November of 2006 -- excuse me -- June of
21    2006, when you went to work for ASPECT
22    Foundation --
23 A.  Uh-huh.

Page 31

1  Q.  -- you didn't work for anybody?
2  A.  Correct.
3  Q.  Okay.  Now, for Montgomery Parents,
4     Montgomery Journey, did you say you were an
5     employee or an independent contractor there?
6  A.  Yes.
7  Q.  Which was it?
8  A.  I'm an independent contractor.
9  Q.  What do you do for Montgomery Parents?
10 A.  I'm an account representative.
11 Q.  What does that mean?
12 A.  I think -- I'm sorry.  I think they word it
13    account executive.  Sorry.
14 Q.  What does that mean?  What do you do?
15 A.  Sell ads, ad space for their magazine.
16 Q.  How many hours a week do you work?
17 A.  20.
18 Q.  I guess you just started, so it's always been
19    the case 20 hours a week, right?
20 A.  Correct.
21 Q.  With respect to Affiliate Marketing --
22 A.  Yes.
23 Q.  -- what did you do for Affiliate Marketing?

Page 32

1  A.  Just a photographer.
2  Q.  And did they give you -- was it task based,
3     or was it -- how did that work?
4  A.  She -- actually, she goes to my church.  So
5     it was -- I did all of her photography work,
6     layout for her magazine.  So whatever her
7     stories are for that month, if she needed a
8     shot of, example, the Capitol of Montgomery,
9     I would go take a picture of that and provide
10    that for her.  Does that make sense?
11 Q.  Yes.  So was it steady work or was it --
12 A.  As needed.
13 Q.  As needed.
14 A.  And it still is as needed if she calls.
15 Q.  How do you get compensated for that work?
16 A.  It was for trade for advertisement for my
17    photography business.
18 Q.  So it was sort of a barter thing?
19 A.  Yes.  And if I did sell an ad, she would give
20    me 20 percent commission; but I only sold one
21    ad for her.  I don't actively pursue to do
22    that.
23 Q.  Do you know how much it would have cost you

Page 33

1     to place this ad for your business in her
2     magazine?
3  A.  For a full page ad, yes, about $2,000.
4     That's just an estimate.  I don't have that
5     right offhand, but that was about what it
6     would be.
7  Q.  And you had a full page ad?
8  A.  Yes.
9  Q.  Approximately how many hours a week do you do
10    work for Affiliate Marketing?
11 A.  There's no set hours.  It's an as-needed per
12    job.
13 Q.  For ASPECT Foundation?
14 A.  Uh-huh.
15 Q.  Oh, excuse me.  What type of magazine is
16    Affiliate Marketing?
17 A.  It's called Future City Guide of Montgomery.
18 Q.  What is that?
19 A.  It's just -- it's a new magazine that's
20    targeting the downtown development.
21 Q.  And Montgomery Parents, Montgomery Journey,
22    what kind of magazine is that?
23 A.  It's a parent magazine.

Page 34

1 Q. ASPECT Foundation, what do they do?
2 A. They place international students with host
3    families so they can attend high school in
4    the local area.
5 Q. You said that your role with them is
6    international coordinator?
7 A. Correct.
8 Q. What is that?
9 A. My goal is to recruit -- or actually look for
10   host families in the Montgomery and River
11   Region area for the students to come here for
12   either a semester or a full year.
13 Q. How many hours a week do you work for them?
14 A. For which company?
15 Q. Excuse me. ASPECT Foundation. How many
16   hours a week do you work for them?
17 A. There are no set hours. It's whatever you
18   put into it. But I average anywhere between
19   10 and 20 hours.
20 Q. And how do you get compensated by ASPECT
21   Foundation?
22 A. It's per student, per student that I place
23   with a host family.

Page 35

1 Q. How much is the compensation for each student
2    placed?
3 A. It's $400 for each student, but I also have
4    to manage that student on a monthly basis if
5    they're here for a semester to the nine
6    months. And then it's paid -- each student
7    is paid either in January and June. It's a
8    $100 additional per student.
9 Q. So it's a total of up to $600?
10 A. $600 per student during their time here,
11    correct.
12 Q. How many students have you placed?
13 A. We are in the process of placing for this
14    year, and I only have one currently.
15 Q. So you're trying to place somebody now?
16 A. Every day, yes, sir.
17 Q. Okay.
18 A. This is our busiest time. We have a deadline
19    of mid August based on when school starts, so
20    every day.
21 Q. Was that student that you placed -- you said
22    you've only placed one student so far?
23 A. For this coming year.

Page 36

1 Q. For this coming year?
2 A. Yes.
3 Q. What about for last year?
4 A. Six.
5 Q. Six students?
6 A. Yes, sir.
7 Q. So for last year, you would have received
8    $400 for each of the six students plus the
9    $200?
10 A. So 600 per student, that's correct.
11 Q. So that's a total of $3600. Plus in '07, at
12    the moment you've definitely placed one --
13 A. Correct.
14 Q. -- and trying to place a few more?
15 A. Exactly.
16 Q. And for that one that you've definitely
17    placed, it's -- you will receive -- I guess
18    when they get here?
19 A. I have received. Once the -- there is a long
20    string of paperwork, of course, that has to
21    be done. So, as soon as that process is
22    done, you are paid prior to the student
23    arriving.

Page 37

1 Q. And what you're paid is the $400?
2 A. Correct.
3 Q. And then over time while they're here, you
4    get the other additional payments?
5 A. You get paid in January and then June.
6 Q. Got you. Capture the Moment.
7 A. Yes.
8 Q. You said you launched this in June of 2007.
9 A. Correct.
10 Q. How much time per week do you spend working
11    for Capture the Moment?
12 A. An average per week? Ten to 15 maybe.
13 Q. Okay. What do you do for Capture the Moment?
14 A. Photographer.
15 Q. Anything else?
16 A. Just manage the business. I mean, I'm owner
17    of the business.
18 Q. And how much has the business brought in so
19    far?
20 A. Currently, because of the down season, I'm
21    booking for September, October, November,
22    December. So I have things on the books, but
23    I have not --

Page 38

1  Q. So you haven't brought in or been paid any
2     money yet --
3  A. Correct.
4  Q. -- but you have bookings for the fall?
5  A. Correct. I've been a photographer all my
6     life, so I don't want you to think I just
7     jumped out there and started doing it.
8  Q. What had you been doing in the photography
9     world beforehand?
10 A. Just as a hobby.
11 Q. Anything professionally?
12 A. I've shot friends' weddings as a gift, my
13    children's birthdays, family birthdays. I've
14    donated time for charitable events.
15 Q. Anything else?
16 A. No, sir.
17 Q. All right. At Taylor Road Baptist, what did
18    you do while -- you were an employee there?
19 A. Correct.
20 Q. What did you do while you were an employee
21    there?
22 A. I was their resource teacher.
23 Q. What did that mean?

Page 39

1  A. Created and implemented the curriculum for
2     infants through right at four-year-olds for
3     their Mother's Day Out program. Can you give
4     me that date again?
5  Q. For Taylor Road?
6  A. Correct.
7  Q. I think you said November 2006 through April
8     2007.
9  A. I believe I started in October.
10 Q. October.
11 A. I'm sorry. Yes, sir.
12 Q. So Taylor Road Baptist, you started as a
13    resource teacher --
14 A. Correct.
15 Q. -- in October 2006 and worked there through
16    April 2007?
17 A. Correct.
18 Q. How many hours a week did you work at Taylor
19    Road Baptist Church?
20 A. Right at 30.
21 Q. How many days a week?
22 A. Four.
23 Q. All right. And what were you paid for

Page 40

1     working at Taylor Road Baptist?
2  A. $8 an hour.
3  Q. Anything else?
4  A. No, sir.
5  Q. Okay. So far, since your employment at
6     Fairfield Inn terminated --
7  A. Correct.
8  Q. -- have we discussed all of your employers
9     and all the work that you've done for
10    compensation so far?
11 A. Yes.
12 Q. So the only -- since your termination at
13    Fairfield Inn, you've worked only for
14    Montgomery Parents, Montgomery Journey,
15    Affiliate Marketing, ASPECT Foundation,
16    Capture the Moment, and Taylor Road Baptist?
17 A. Correct. Not in that order.
18 Q. Okay. Yes. But those are the only ones
19    you've worked for?
20 A. Correct.
21 Q. And before your employment at Fairfield Inn?
22 A. Correct.
23 Q. Who was the employer that you worked for

Page 41

1     immediately before it?
2  A. Wynngate Inn.
3  Q. What did you do there?
4  A. Director of sales.
5  Q. How long did you work there?
6  A. Can you pull my resume? That would be very
7     helpful.
8  Q. You can look at it.
9  A. Thank you. From September of 2003 to June of
10    2004.
11 Q. Director of sales. What were you paid?
12 A. I started at 28.
13 Q. 28,000?
14 A. Correct.
15 Q. Annually?
16 A. Yes.
17 Q. And you finished at?
18 A. Finished at and left for the reason that I
19    was not given my raises and bonuses. So that
20    stopped at that, correct.
21 Q. So your finishing salary was $28,000?
22 A. Correct.
23 Q. And that's why you left?

Page 42

1  A.  Because they owed me money.
2  Q.  What did they owe you?
3  A.  My bonuses.  It was about $3,000.
4  Q.  And you quit?
5  A.  Yes.
6  Q.  Who did you report to there?
7  A.  The Patels.
8  Q.  What are their first names?
9  A.  Mike and Rita.
10  Q.  What did they do at the Wynngate?
11  A.  Not sure if they were owners, but I know they
12      were managers.
13  Q.  Before Wynngate, who did you work for?
14  A.  Marriott International, which was -- this
15      gets a little sticky; but I first started
16      working with Residence Inn, Courtyard, and
17      Fairfield Inn.
18  Q.  Now, you mentioned three separate things:
19      Residence Inn, Courtyard Inn, Fairfield Inn.
20  A.  Correct.  They called it multi-brand.  So I
21      was under all -- I sold for all three of them
22      under the position of sales manager.
23  Q.  Was this position here in Montgomery?

Page 43

1  A.  Correct.  Yes.
2  Q.  Was Wynngate Inn here in Montgomery?
3  A.  Yes.
4  Q.  When you say that you were multi-brand sales
5      manager for Residence Inn, Courtyard Inn, and
6      Fairfield Inn in Montgomery, was that the
7      same Fairfield Inn that you worked at?
8  A.  Yes.  They were under a different ownership
9      at the time.
10  Q.  Okay.
11  A.  I believe they were corporate owned.  So it
12      was before franchise owned.
13  Q.  Okay.  When did you work for Marriott?
14  A.  From November of 2000 to September of 2003.
15  Q.  What was your pay?
16  A.  I'm trying to think.  It was also -- it was
17      split up between three different
18      properties -- so I apologize -- how I was
19      paid.
20  Q.  You received paychecks from each of three
21      properties?
22  A.  At first I did, and then they ended up
23      combining it, and that's the reason of the

Page 44

1      confusion.  32,000.
2  Q.  Is that the ending salary?
3  A.  No, sir.  38.
4  Q.  So you started at 32?
5  A.  Correct.
6  Q.  And that was salary, correct?
7  A.  Correct.
8  Q.  Anything else you got paid?
9  A.  Bonuses.
10  Q.  What were your bonuses based on?
11  A.  Sales revenue.
12  Q.  How much did you earn in bonuses?
13  A.  It varied from quarter to quarter, so do you
14      want me to give you an average?
15  Q.  Sure.
16  A.  Anywhere from 500 to $3,000 quarterly.
17  Q.  That's a big average.
18  A.  I know, but it was each -- it was on each
19      property, so it was whatever my potential for
20      the sales of each property was.  So I could
21      get 500 at one or they could average all
22      together at 3,000.  I know.  That's so
23      confusing.

Page 45

1  Q.  Yeah.  I'm just trying to understand.
2  A.  Yeah.
3  Q.  So you start at 32,000.  And what was your --
4      including bonuses, what was your total
5      compensation for your starting year?
6  A.  I'd have to pull the tax record because it --
7      again, it was -- each quarter was different.
8      It was based on whatever my sales production
9      was, whatever I was able to produce.
10  Q.  What was your recollection of -- at the end
11      of your employment with Marriott
12      International, what was your total
13      compensation including bonuses?
14  A.  My regular --
15  Q.  You said salary was 38.
16  A.  Right.  So about 42, if that's what you're
17      asking.
18  Q.  Why did you leave Marriott?
19  A.  They were working me 45 hours.  And I was
20      offered the position with Wynngate to work
21      less hours.
22  Q.  You mean 45 hours a week?
23  A.  Yes.

Page 46

1  Q.  Okay.  And you wanted a position where you
2      worked less?
3  A.  Correct.
4  Q.  So you quit?
5  A.  Yes, I did.  I gave notice.  I didn't just
6      walk out.
7  Q.  So you gave them some sort of advance notice,
8      then?
9  A.  Correct.  Yes.
10 Q.  And then left to go to the Wynngate Inn?
11 A.  Correct.
12 Q.  Now, it seems like you took a significant pay
13     cut leaving Marriott International.
14 A.  Uh-huh.
15 Q.  Why is that?
16 A.  I had family.
17 Q.  At that time --
18 A.  During --
19 Q.  -- had your daughter been born?
20 A.  Yes.
21 Q.  Was one of the reasons that you left Marriott
22     International was because you wanted to spend
23     more time with your daughter?

Page 47

1  A.  That.  And my husband was making more money,
2      so -- correct.
3  Q.  So you sought a job that required fewer
4      hours?
5  A.  Correct.
6  Q.  What was the expectation of hours going into
7      Wynngate Inn?
8  A.  Thirty.  And it did have bonuses, too.  I
9      don't know if you made a note of that.
10 Q.  What kind of bonuses did you earn?
11 A.  It was based on sales production, too.
12 Q.  And you said they never paid?
13 A.  Never paid me for it, no.
14 Q.  You were there for a little bit less than a
15     year, right?
16 A.  Correct.
17 Q.  But they only required you to work 30 hours a
18     week?
19 A.  Correct.
20 Q.  And that's why you took the pay cut that you
21     took?
22 A.  Correct.
23 Q.  And at least two of the reasons that you said

Page 48

1      that you were willing to change jobs and take
2      the pay cut was to work reduced hours so you
3      could spend more time with your daughter and
4      your husband.
5  A.  Uh-huh.
6  Q.  And because your husband was earning more
7      money?
8  A.  Correct.
9  Q.  Were there any other reasons why you decided
10     to leave Marriott International and go to
11     Wynngate Inn?
12 A.  Yeah.  Less stress.  You can add that.  It
13     was going from one property sales to -- from
14     three.
15 Q.  Before Marriott International, who did you
16     work for?
17 A.  Muscular Dystrophy Association.
18 Q.  When was that?
19 A.  I started in March of '99 and ended in
20     October of 2000.
21 Q.  Was Marriott International your first job in
22     the hospitality industry?
23 A.  Correct.

Page 49

1  Q.  Did you ever have a gap in employment between
2      Muscular Dystrophy Association and Marriott
3      International?
4  A.  About -- it was probably only about three
5      weeks.
6  Q.  But when you left Muscular Dystrophy, did you
7      already have the job at Marriott
8      International?
9  A.  No, I did not.
10 Q.  Why did you leave Muscular Dystrophy
11     Association?
12 A.  I was preparing to get married, and I was
13     doing extensive travel.  I covered 27
14     counties.
15 Q.  So they were asking you to travel a lot?
16 A.  Every day.
17 Q.  And you decided to quit?
18 A.  Yes.
19 Q.  So the travel was too much?
20 A.  Correct.
21 Q.  And how long was there a gap in your
22     employment between Muscular Dystrophy
23     Association and Marriott?

Page 50

1  A.  About three weeks.
2  Q.  Did you collect any unemployment during that
3      period of time?
4  A.  No, sir.
5  Q.  Okay.  Was there any gap in employment
6      between Marriott and Wynngate?
7  A.  There may have been a week or two, but no.
8  Q.  All right.  And was there any gap in
9      employment between Wynngate and Fairfield
10     Inn?
11 A.  No, sir.
12 Q.  All right.  So from the period -- hold on one
13     second.
14        All right.  So going back though, the
15     period from November 2005, when your
16     employment at Fairfield Inn had terminated,
17     to June 2006, you did no work for any kind of
18     compensation or remuneration, right?
19 A.  Correct.
20 Q.  What did you do?
21 A.  Actively looked for another job.
22 Q.  Anything else?
23 A.  No.

Page 51

1  Q.  During that period of time, who took care of
2      your children?
3  A.  Could you tell me the dates again?
4  Q.  I'm sorry.  From November 2005 to June 2006,
5      who took care of your children?
6  A.  Taylor Road Baptist.  And I had a grandmother
7      and my father and the other set of
8      grandparents.
9  Q.  And when you say father, you meant Rouse
10     Godfrey?
11 A.  Correct.
12 Q.  Grandmother is who?
13 A.  Actually, it's my grandmother, their great
14     grandmother, Frances Taylor.
15 Q.  Anyone else that took care of your children
16     during the period from November 2005 to June
17     2006?
18 A.  They have an aunt that would on last minute
19     notice, but not on a consistent basis, no.
20 Q.  So it was Taylor Road Baptist, Frances
21     Taylor, and your father that took care of the
22     children between November --
23 A.  My parents also.

Page 52

1  Q.  Oh, your parents?
2  A.  Yes.
3  Q.  Meaning your mother and your stepfather?
4  A.  Correct.
5  Q.  What about you?
6  A.  Well, yes.
7  Q.  Did you also?
8  A.  Yes.
9  Q.  Okay.  Were you the person who primarily took
10     care of your children during that time frame,
11     or was somebody else taking care of them?
12 A.  Well, my husband.
13 Q.  During your employment at Fairfield Inn, did
14     you ever look for another job?
15 A.  During my employment?
16 Q.  Yes.
17 A.  I didn't actively seek, but people sought me.
18 Q.  Who?
19 A.  There were other hotels.
20 Q.  Which ones?
21 A.  They're under a different name now; but at
22     the time, it was Holiday Inn.
23 Q.  Any others?

Page 53

1  A.  Through the Chamber.  Well, the Chamber asked
2      me to come work for them.
3  Q.  Anybody else who sought your services while
4      you were at Fairfield Inn?
5  A.  No.
6  Q.  So the Holiday Inn and the Chamber of
7      Commerce.  You mean the Montgomery Chamber of
8      Commerce?
9  A.  Correct, the visitors center.  There's two
10     different parts to it.
11 Q.  Who was it at Montgomery Visitors Center that
12     was seeking you to join them?
13 A.  I don't recall.  She's not there anymore.
14 Q.  What job did they want you to do at the
15     Montgomery Visitors Center?
16 A.  Sales.
17 Q.  What kind of sales?
18 A.  They had different divisions, so it was
19     probably the convention area.
20 Q.  Did you go on an interview?
21 A.  No.
22 Q.  Did you give them a resume?
23 A.  No.

Page 54

1  Q.  Tell me about the entire communications that
2      you had with the Montgomery Visitors Center
3      about this sales job.
4  A.  Well, it's through our -- we had hotel/motel
5      association meetings monthly.  And it's
6      always about -- you know, somebody would just
7      come up to you and say, hey, I'd really like
8      for you to come work for me or, you know, I'd
9      really like to see you come work for the
10     Chamber.  It's that kind of exchange of
11     interest.
12 Q.  And you were approached at one of these
13     meetings?
14 A.  Correct.
15 Q.  By this woman whose name you can't remember?
16 A.  Correct.
17 Q.  And she said that she wanted you to come work
18     for the Montgomery --
19 A.  Wanted me to pursue to work for them.
20 Q.  Excuse me?
21 A.  She didn't offer me the job.  She said there
22     were openings that if I was interested.
23 Q.  Oh, okay.  So she suggested you apply for

Page 55

1      one?
2  A.  Correct.
3  Q.  So she didn't offer you the job?
4  A.  Right.  No.
5  Q.  Have you told me everything you remember
6      about that?
7  A.  Correct.
8  Q.  What about the Holiday Inn?  Which Holiday
9      Inn was it?
10 A.  The one on the East Side.  I'm not sure of
11     their other name.
12 Q.  By East Side --
13 A.  I think they just call it Holiday Inn East if
14     I recall.
15 Q.  Who was it that spoke to you about a job at
16     Holiday Inn East?
17 A.  I'm trying to recall the lady's name.  I can
18     see her face.  Can we come back to that if I
19     think of it, please?
20 Q.  Sure.
21 A.  Thank you.
22 Q.  Tell me about your entire communications with
23     that woman.

Page 56

1  A.  She had just taken over the director of sales
2      position, and she was offering me more money
3      to come work for her.  So nothing was ever
4      exchanged; it was just a verbal conversation.
5  Q.  Tell me about that verbal conversation.
6  A.  Just as I said, she was offering me more
7      money to come be part of her sales team.
8  Q.  What did she offer you?
9  A.  About 5,000 more than I was making, so about
10     40,000.
11 Q.  What about bonuses?
12 A.  Nothing was ever stated.  Most sales places
13     do -- or hotel sales have bonuses.  But no,
14     that was never stated to me.  And it was more
15     hours.
16 Q.  More hours?
17 A.  Uh-huh.
18 Q.  How many hours was it?
19 A.  Forty.
20 Q.  Was this offer given to you in writing?
21 A.  No.  It was verbal.
22 Q.  Was this at one of the same meetings we were
23     discussing before?

Page 57

1  A.  Yes.
2  Q.  So at one of these industry meetings, someone
3      from the Holiday Inn East, a woman who had
4      just taken over the job as its director of
5      sales --
6  A.  Uh-huh.
7  Q.  -- approached you and asked you come work for
8      her.  In what type of position?
9  A.  Sales.
10 Q.  And offered you the job?
11 A.  Correct.
12 Q.  Did you have to apply for it?
13 A.  If I wanted it, but I didn't.
14 Q.  Could you have accepted it right then and
15     there?
16 A.  Probably not.
17 Q.  You would have still had --
18 A.  I'm sure there was probably some kind of
19     interview process, but I --
20 Q.  Why didn't you accept that job?
21 A.  Because where I was at the Fairfield Inn, I
22     strongly believed in what I had already
23     accomplished and established there at the

Page 58

1   hotel; and I was doing very well.
2  Q. What about the hours?  Was that a factor in
3     your decision-making?
4  A. In what decision?
5  Q. To not pursue or accept the job at Holiday
6     Inn East.
7  A. No.
8  Q. So the 40 hours per week that were going to
9     be required in that job was not a factor?
10 A. It weighed some, but it wasn't the main
11    factor.
12 Q. I was just asking whether it was a factor at
13    all.
14 A. Correct.  No.
15 Q. It was not?
16 A. I mean, yes, it was.
17 Q. It was a factor, but not the main factor?
18 A. A factor, correct.
19 Q. Let's talk about your job search which ended
20    up with you starting to work at the Fairfield
21    Inn.
22 A. Okay.
23 Q. What did you do for that job search?

Page 59

1  A. It was word of mouth from one of those
2     meetings.  Someone had said that Fairfield
3     Inn was looking for a director of sales.
4  Q. Do you remember who?
5  A. I don't.
6  Q. Do you remember who it was at Holiday Inn
7     East that was the new director of sales?
8  A. No.
9  Q. I figured I'd just try.
10 A. I know.  When I get a pen, if I think of it,
11    I'll jot it down.  I'm sorry.
12 Q. All right.  So somebody word of mouth in the
13    industry meeting said something to you about
14    Fairfield Inn might be seeking a director of
15    sales?
16 A. Right.
17 Q. And you said you didn't remember who it was
18    that had said that?
19 A. No, I didn't.  But I took the initiative of
20    calling the hotel directly.
21 Q. Were you looking for a new job at that time?
22 A. Just in working with the Indians and knowing
23    that I wasn't getting paid, I didn't feel

Page 60

1   very secure in my job.  There were a lot of
2   times I'd go and my office would be locked.
3   You know, it was just you kind of felt there
4   were some insecurities.  It's just how they
5   managed and ran their hotels.  So I kind of
6   felt that, so -- and it's very common in
7   being a director of sales or being in the
8   sales industry that directors move from hotel
9   to hotel based on where the competition is
10  and where -- which hotel is doing good or not
11  good or -- so that's very common.
12 Q. So at the time, you weren't formally looking
13    for another job?
14 A. I felt some insecurities, like I said, with
15    Wynngate; so I was always looking
16    to pursue -- I mean, to better myself, to
17    make more money or, you know, to act -- you
18    know, to grow in my -- in my field.  So I
19    think even today I still look.  You know, we
20    are always still looking for something
21    better.  So, yes.
22 Q. Had you sent out any resumes?
23 A. No.

Page 61

1  Q. Had you contacted any prospective employers?
2  A. Just calling the Fairfield Inn that day.
3  Q. Okay.  so the only company that you contacted
4     during this, I guess, job search --
5  A. From Wynngate?
6  Q. While you were at Wynngate.
7  A. Correct.
8  Q. -- was the Fairfield Inn?
9  A. Correct.
10 Q. So you called Fairfield Inn and spoke to
11    whom?
12 A. Jennifer Love, who was their main front desk
13    person, who I knew prior to working with
14    Marriott.  She was still there, so I knew
15    her.  I knew of her and knew her.
16 Q. What was the next thing that happened in the
17    process?
18 A. I directly asked her if they were looking for
19    a salesperson, and she said yes.  And I asked
20    her who did I need to contact, and she told
21    me Todd Epplin, but Todd was not there.  And
22    I asked her the best way to get in touch with
23    him, and she gave me his e-mail address.

Page 62

1 Q. Did you send him an e-mail?
2 A. I did.
3 Q. What happened next?
4 A. If I recall -- I don't remember if Roger
5   called me immediately or if it was Todd that
6   called. I don't -- one -- someone from the
7   company contacted me and asked me if I would
8   be interested in interviewing. And then I do
9   remember talking to Roger. So --
10 Q. Did you talk in person first?
11 A. I'm trying to recall if an e-mail -- a reply
12   was back from my e-mail, which it -- I mean,
13   if it's in the e-mails or if it was actually
14   a phone call. I don't recall which was
15   first.
16 Q. But at some point, you spoke with Roger and
17   Todd?
18 A. Correct.
19 Q. Did you speak to them together or separately?
20 A. Separately.
21 Q. Do you remember who you spoke to first?
22 A. I'm trying to remember. No.
23 Q. What do you remember about your communication

Page 63

1   with Todd?
2 A. He just looked -- seemed very anxious to have
3   someone on board that he wanted someone to
4   come work with them. And I think he was --
5   in my e-mail, I had put that I had previously
6   sold for the hotel; so he was very excited
7   about that. And I think what I recall from
8   that is he said he would either have Roger
9   Miller call me or e-mail me. And that's
10   where I'm unclear of what was next. And he
11   did ask me for a resume, so I sent that to
12   him.
13 Q. So Todd asked you for a resume, discussed
14   your previous experience working?
15 A. No. I mean, it just took -- he was answering
16   the question from the e-mail, that I had said
17   in that e-mail that I had previously sold for
18   Fairfield Inn Montgomery. But as far as my
19   personal, what I was doing now, he never
20   asked.
21 Q. Okay. Did Todd say anything about the job in
22   particular?
23 A. No.

Page 64

1 Q. All right. When did you speak to -- I'm
2   sorry. Have you told me everything about
3   your discussions with Todd that you remember?
4 A. That I remember.
5 Q. When did you speak to Roger?
6 A. I would say it would be the next couple of
7   days after that. I mean, it was very quickly
8   that I spoke to him.
9 Q. Telephonically or in person?
10 A. What I recall, it was on the phone.
11 Q. Okay. What do you remember about your
12   communication with Roger?
13 A. It was mainly setting up an interview.
14 Q. It was just setting up a time for an
15   interview?
16 A. He asked me if I was interested in the
17   position and that he would be interviewing.
18 Q. Okay. And did you set the time for the
19   interview?
20 A. I'm not sure if it was from that initial
21   phone call or if we spoke again, but we did
22   set up a time.
23 Q. Did you eventually have the interview?

Page 65

1 A. Yes, I did.
2 Q. What do you remember about that interview?
3 A. I traveled to Atlanta. I went to Hospitality
4   Ventures in Atlanta to interview for the
5   position.
6 Q. Who did you interview with?
7 A. Roger Miller.
8 Q. Anyone else?
9 A. Not personally interview, but I did meet
10   people within the company.
11 Q. Who did you meet?
12 A. Rob Flanders.
13 Q. Anyone else?
14 A. And Carol. And I'm not sure how to pronounce
15   her last name, but she's their administrative
16   person.
17 Q. Anyone else?
18 A. That was all that was there that day.
19 Q. What do you remember about your interview
20   with Roger?
21 A. It was very upbeat and positive. I feel that
22   he was very impressed with my background of
23   being a salesperson and being able to show

Page 66

1  him that I could produce numbers. He was
2  very enthusiastic that I already knew their
3  sales program, which was Sales Pro, that we
4  could jump right on and I could show him
5  that, you know, I knew what it was and -- and
6  how to use it. To me, it was an exciting
7  time because it was an event -- I mean, a new
8  position; so I felt, you know, it was very
9  enthusiastic and very upbeat.
10 Q. Okay. What do you remember about the
11    position?
12 A. From the interview?
13 Q. From the interview, yes.
14 A. He basically just went through what my --
15    what a -- what a salesperson does for their
16    company.
17 Q. What was that?
18 A. It was a list of things as far as producing
19    revenue, being able to telemarket, cold
20    calls, build client relationships, be able to
21    work with the staff, work with your GM. I
22    mean, it's -- it was the whole package of
23    being able to produce revenue.

Page 67

1  Q. Did he tell you about the hours that they
2    expected?
3  A. He didn't. He asked me what I wanted.
4  Q. What did you say?
5  A. 35 hours. And he felt that that was very
6    considerable, I guess is the word he used,
7    but that they could do that. I remember
8    that.
9  Q. What else did he say about the hours?
10 A. I don't -- I don't recall anything else.
11 Q. What else do you remember about your
12    interview with Roger Miller in Atlanta?
13 A. You know, he did show me about the hotel,
14    where the numbers were, how things were
15    going. He told me a little bit about the
16    general manager and what -- you know, the
17    staff that was there. Then from that
18    interview, I also met Carol. It was just an
19    introduction kind of thing. And I was -- I
20    was offered the job there. So --
21 Q. Okay. What was the offer?
22 A. 35,000 with 30 (sic) hours.
23 Q. For how many hours?

Page 68

1  A. Thirty-five.
2  Q. Per week?
3  A. Correct.
4  Q. Any other compensation you would be eligible
5    for?
6  A. What do you mean?
7  Q. Bonuses?
8  A. Oh, yes.
9  Q. What kind of bonuses?
10 A. That's where it was never -- he just told me
11    it was quarterly bonuses based on the
12    production of revenue, but I did not actually
13    see a breakdown of how that was to be broken
14    out.
15 Q. Like a bonus plan?
16 A. Correct.
17 Q. Did you ever see a bonus plan?
18 A. Later. I had to ask for it.
19 Q. What else was the offer? What else was
20    contained in the offer?
21 A. Insurance, health insurance.
22 Q. For you?
23 A. Myself, yes, and my daughter at the time.

Page 69

1    They were willing -- I -- I'm not sure if
2    they -- we negotiated that later, but it was
3    in an e-mail that they did offer to pay my
4    insurance. And then I did ask if Taylor
5    could be added and, if so, how would that
6    work. And they agreed to pay half of Taylor,
7    and I paid the other half out of my paycheck.
8  Q. So they completely paid for you and for half
9    of Taylor?
10 A. Correct.
11 Q. And your husband was not on Hospitality
12    Ventures' insurance?
13 A. No, sir. No, sir.
14 Q. What else was included in that offer?
15 A. That's all I recall.
16 Q. How did they give you the offer? Was it
17    verbal, written, e-mail?
18 A. It was in an e-mail, which I received very
19    quickly.
20 Q. Did it say anything about who was going to be
21    your supervisor?
22 A. I don't believe so in the offer. Not that I
23    recall.

Page 70

1 Q. Did anybody at -- did anybody explain to you
2    who was going to be your supervisor?
3 A. It was my understanding that it was Roger and
4    the general manager.
5 Q. So you reported to both?
6 A. Mainly to Roger on a weekly basis.
7 Q. What else do you remember about that job
8    offer?
9 A. Can I have a moment to think about it?
10 Q. Sure.
11 A. It's been a while.
12 Q. Absolutely.
13 A. It had a start date on it.
14 Q. What was that supposed to be?
15 A. I would have to pull it and see. I don't
16    recall. It was very -- within the next week
17    or so of the -- of the interview, so there
18    was a start date on there. And then I did
19    get in -- I asked for in writing about the
20    insurance, so that came on a separate
21    e-mail, because it was not included in the
22    offer from Roger, but Rob Flanders sent me an
23    e-mail about the insurance.

Page 71

1 Q. Okay.
2 A. That's all I recall at this time.
3     MS. DUNCAN: Can we stand up and walk
4       around a little bit?
5     THE WITNESS: I was going to ask for a
6       break, too.
7       (Brief recess)
8 Q. Have you told me everything you remember
9    about the job offer you received from
10    Fairfield Inn or to work at the Fairfield
11    Inn?
12 A. Do you mind reviewing what you --
13 Q. Sure. What you told us so far was that you
14    received the offer while -- first verbally
15    while you were in Atlanta meeting or
16    interviewing with Roger Miller and that,
17    subsequently, you received back an e-mail
18    confirmation. The offer was for $35,000
19    annually --
20 A. Uh-huh.
21 Q. -- to work 35 hours per week with a quarterly
22    bonus program that the bonus plan had not
23    been explained to you at that time or you

Page 72

1    hadn't seen a copy of it, actually.
2    Insurance was going to be provided for you.
3    Later on it was confirmed that half of your
4    daughter's insurance would be paid as well,
5    and you would pay the other half of your
6    daughter's insurance. And you understood
7    that you were going to be reporting to both
8    Roger Miller and the general manager at the
9    property, but mainly to Roger Miller. And
10    your start date was supposed to be in
11    approximately a week or so.
12 A. Correct.
13 Q. Okay. Was there anything else that you
14    remember about that job offer?
15 A. I didn't accept it on the spot, just to let
16    you know. I waited until I got the e-mail.
17    And he gave me -- there was a time line in
18    there of when to accept it. So I did not
19    accept the position in Atlanta. I waited
20    until I got the e-mail offer.
21 Q. Okay. And other than that, have you told me
22    everything that you now remember about the
23    offer?

Page 73

1 A. Correct.
2 Q. Why did you accept the job at Fairfield Inn?
3 A. I felt that -- I saw the potential there, the
4    clientele that I had been working with,
5    bringing in more groups, just knowing I had
6    known the staff from the past. There were
7    still a lot of staff members there. Just
8    seemed like a great opportunity moneywise,
9    benefits.
10 Q. Have you told me every reason why you
11    accepted the job at Fairfield Inn?
12 A. And the different Marriotts, each hotel has a
13    different clientele of business; so you sell
14    based on whatever -- do you understand what
15    I'm saying? -- whatever business is brought
16    in. I can give you examples.
17 Q. Sure.
18 A. So like Residence Inn is extended care, so
19    people you want to bring in for a very long
20    time. That's very hard to recruit that kind
21    of business. Courtyard is your business
22    travelers.
23     So one of the reasons that I did accept

Page 74

1 this position is it dealt with a group --
2 it's like the economy hotel. It was your in
3 and out, your groups. So it's a lot -- and
4 being in the Montgomery market and knowing
5 the market and knowing the events that take
6 place and knowing the product that they had
7 at the time, that was one of my reasons.
8    It was a lot -- it's a more presentable
9 property to sell for. I don't want to say it
10 was easy, but it was -- it was challenging
11 but it was a property that -- a product that
12 I enjoyed selling for. Prior to coming on,
13 when I would do the three, I really enjoyed
14 the Fairfield Inn product. So that was one
15 of the strong reasons, too.
16 Q. Okay. So now have you told me every reason
17    that you --
18 A. Yes.
19 Q. When did you begin working at Fairfield Inn?
20 A. The exact date, I would have to pull, but in
21    June, late June. I want to say around the
22    24th, if I recall.
23 Q. Okay. 2004?

Page 75

1 A. Correct.
2 Q. Do you remember the Fairfield Inn's address,
3    street address?
4 A. 56 -- I think it's 5604.
5 Q. What road?
6 A. I'm sorry. Carmichael Road.
7 Q. In Montgomery, right?
8 A. Montgomery, 36117.
9 Q. Okay. And what was your title when you
10    started working at the Fairfield Inn?
11 A. Director of sales and marketing.
12 Q. Did you ever have another title at the
13    Fairfield Inn?
14 A. No.
15 Q. What did you do in the role of director of
16    sales and marketing?
17 A. There's a long list of things.
18 Q. Let's hear it.
19 A. The first and foremost was to know the staff,
20    to realize that they're part of your team;
21    because if I didn't have a strong front desk
22    or housekeeping or even a general manager,
23    sales department that I could work with and,

Page 76

1 you know, a good product, then there was no
2 reason to be selling.
3    And I was responsible for telemarketing,
4 which meant calling and qualifying prospects
5 to determine potential business. I was --
6 had to be -- based on my prior training, in
7 training, you have to be able to present the
8 benefits of why you want your client to stay
9 at a Fairfield Inn compared to a Holiday Inn.
10 You have to be able to meet the client's
11 needs. Doing outside calls, appointments,
12 one on one or with a company or doing
13 presentations. Cold calling, just walking
14 into a business, introducing yourself, and
15 finding out, you know, if they had potential
16 travel business. It's proactively and
17 reactively selling the product with groups,
18 working with the Chamber of Commerce, any
19 type of sporting event or any big event in
20 Montgomery. At the time, we had the civic
21 center.
22    A lot of my job percentage-wise -- I'd
23 say 70 percent was outside the hotel,

Page 77

1 bringing the business in.
2 Q. You say was outside the hotel. What does
3    that mean?
4 A. Outside the hotel, meaning outside reaching
5    to customers and clients and groups and
6    corporations to target business.
7 Q. Was it meeting with folks outside the hotel?
8 A. Yes.
9 Q. What else was that?
10 A. Cold calls.
11 Q. What was the work that you were doing outside
12    the hotel?
13 A. Cold calls, set appointments, going to --
14 Q. I'm sorry for interrupting. But when you
15    said set appointments, was that appointments
16    that had been set for you?
17 A. I set them.
18 Q. Okay. Well, you set appointments and then
19    attended those appointments?
20 A. Correct.
21 Q. Okay. I'm sorry. Go ahead.
22 A. Through telemarketing. That was the point of
23    the telemarketing was to find out the

Page 78

1  companies -- if a company had potential
2  travel; and if so, you made an appointment
3  with that decision-maker.
4  Q.  What else was involved in that 70 percent
5    work outside the hotel?
6  A.  I worked directly with the visitors center,
7    keeping the visitors center stocked full of
8    marketing materials, attending Chamber of
9    Commerce meetings, groundbreakings, 60-minute
10   coffees, After Hours.  After Hours was an
11   after hour -- I guess a 5:30 monthly meeting
12   where all the business people in the area get
13   together and network.
14 Q.  What else was involved in that 70 percent
15   work outside the hotel?
16 A.  I'm thinking back over everything I said.  I
17   think that was -- that's all.
18 Q.  Okay.  So the work that you were doing
19   outside the hotel, just to make sure I
20   understand this -- and tell me if I have this
21   right.
22 A.  Correct.
23 Q.  -- was going on cold calls?

Page 79

1  A.  Uh-huh.
2  Q.  And what was cold calls again?
3  A.  Just knocking on a door.
4  Q.  Going on a cold call, just knocking on a door
5    of a business or something that might
6    possibly -- and seeing if they had need for
7    travel services --
8  A.  Correct.
9  Q.  -- that the hotel might be able to help them
10   with?
11 A.  Correct.
12 Q.  Going on appointments that you had previously
13   set?
14 A.  Correct.
15 Q.  Attending to the visitors center, making sure
16   that they had materials about the company?
17 A.  Right.
18 Q.  Attending Chamber meetings?
19 A.  Correct.
20 Q.  Going to 60-minute coffees?
21 A.  Correct.
22 Q.  Going to After Hours networking meetings?
23 A.  Correct.

Page 80

1  Q.  And that's it.  Was there anything else?
2  A.  Every week, I went to Maxwell and Gunter Air
3    Force Base, mainly Maxwell, for government
4    business.
5  Q.  To solicit the government business or to
6    attend to it?
7  A.  It's called build rapport; they do business
8    with who they know, which later became one
9    person and it was building rapport with her.
10   She -- she, with her business, directly
11   worked with Maxwell; so it was meeting on a
12   weekly basis with her.
13 Q.  Who was that?
14 A.  Tandi Mitchell.
15 Q.  When did you start going to the Maxwell and
16   Gunter Air Force Bases to build rapport?
17 A.  Immediately.  That was a big part of their
18   business.
19 Q.  Whose business?
20 A.  Fairfield Inn, Hospitality Ventures.
21 Q.  So the business from Maxwell and Gunter Air
22   Force Base that -- you said Tandi Mitchell?
23 A.  That was prior to Tandi.  She did some.  It

Page 81

1    was -- it used to be an open market where
2    anybody could walk in to Maxwell or Gunter.
3    And they had a travel department that you
4    went to, and they had individual, I guess --
5    I don't know exactly what their titles are,
6    but they would be like little travel agents.
7        So when they had a training for a
8    particular group -- I don't know all the
9    military terminology, so I apologize -- that
10   individual person would call the hotel list
11   and whoever had availability.  So if you
12   built rapport with that person or persons in
13   that office and brought goodies and, you
14   know, had marketing material on their desks
15   and pens, they did business with whoever
16   treated them right.  And that was one of my
17   big priorities is making sure that the
18   businesses were taken care of, which later
19   became Tandi.  They ended up -- that hub of
20   people ended up calling one person.  It got
21   to be too much government business in
22   Montgomery.
23 Q.  Okay.  So, on the day that you started at

Page 82

1    Fairfield Inn, the Fairfield Inn already was
2    receiving some business from the Air Force?
3  A.  Some business, correct.
4  Q.  Air Force bases.  Excuse me.
5  A.  Correct.
6  Q.  And you went immediately over there to try to
7    maintain and hopefully improve that
8    business --
9  A.  Correct.
10  Q.  -- or the level of business that the
11    Fairfield Inn was receiving?
12  A.  Correct.  Correct.  Along with their top ten
13    accounts.
14  Q.  Okay.  And you also went to the top ten
15    accounts?
16  A.  Correct.
17  Q.  So, have we now discussed everything that was
18    part of that 70 percent of the work that you
19    did outside the hotel?
20  A.  And anything else that was disclosed from
21    Roger or from Todd, the general manager, if
22    anything came across to get out and go do,
23    visit a restaurant site that was building or

Page 83

1    a construction site, you know, we were always
2    in any way working -- trying to work as a
3    team to -- to increase revenue.
4  Q.  So competitively shopping --
5  A.  Exactly.
6  Q.  -- and things like that?
7  A.  Correct.
8  Q.  Anything else?
9  A.  No.  Everything is in Sales Pro.  That's
10    documented, so --
11  Q.  That Sales Pro contains all your activities?
12  A.  I have to look at the dates of it, but they
13    did not -- initially, I did not have a
14    computer, and so there was some tension there
15    between getting a computer and being able to
16    get into the general manager's office when he
17    was not there.  For security reasons, they
18    only -- he had the key.  So I tried to
19    document it, go back as far as I could.
20  Q.  So at first, you couldn't use Sales Pro all
21    that much --
22  A.  Correct.
23  Q.  -- because you didn't have access to a

Page 84

1    computer?
2  A.  Correct.
3  Q.  Then eventually you got access to a computer
4    and you were able to use it more?
5  A.  Yes.  And I tried to go back and enter it.
6  Q.  How -- I'm sorry.  Go ahead.
7  A.  I tried to go back and enter the information
8    that I had already done from being hired
9    there.
10  Q.  Do you remember how long that period of time
11    was when you had limited access to a
12    computer?
13  A.  Honestly, I want to say it was almost three
14    months.
15  Q.  Does Sales Pro -- the entries that you have
16    in Sales Pro, does that capture all of the
17    activities that you did for Fairfield Inn?
18  A.  Probably not.
19  Q.  Why not?
20  A.  All of my activities or the activities of the
21    hotel?
22  Q.  Your activities.
23  A.  My activities?  I would say they would not.

Page 85

1    It would be booked business and contacts.
2    Yes, they were entered.  You didn't -- I
3    didn't enter a cold call -- I mean, you know,
4    like a contact for a cold call or something
5    like that.  But I would say that the majority
6    of -- on a daily basis, I did enter
7    information into Sales Pro of what I did that
8    day.
9  Q.  But you might have left some things out, cold
10    calls, whatever it might have been?
11  A.  Yeah.
12  Q.  Okay.
13  A.  Due to not having access to a computer would
14    be the only reason.
15  Q.  So, from whenever you got access to a
16    computer through the end of your employment
17    at Fairfield Inn, everything you did is in
18    Sales Pro?
19  A.  I would probably not agree with that.
20  Q.  Okay.  I'm not trying to put words in your
21    mouth.
22  A.  Okay.
23  Q.  I want to understand.

Page 86

1  A.  And it's because of not having the computer
2     again.  And it was still very new to the
3     company and new to -- that they were just
4     getting involved in it.  And they were
5     constantly changing or adding updates to
6     Sales Pro.  And at first I wasn't told about
7     doing some of the weekly downloads or uploads
8     to -- to make the program better.  So I would
9     say all the information that I could, yes, I
10    did put it in Sales Pro.
11 Q.  So I'm just trying to get an idea.  It seems
12    like you certainly used it.
13 A.  Yes.
14 Q.  But I'm trying to get an idea of whether it
15    contains some, most, all of your --
16 A.  Most, if not all.
17 Q.  Most of your activities, but not all?
18 A.  I want to say all because I gave it my all.
19    I gave it all the time that I could to get
20    stuff in there.  So yes, I will say all.
21 Q.  All.  Every cold call that you had, every
22    time you went to the visitors center that you
23    stocked, restocked?

Page 87

1  A.  I tried.
2  Q.  No.  I'm not saying that accusatorily.  I'm
3     just trying to understand.  That's all.
4     Everything single thing that you did for the
5     company is listed in Sales Pro?
6  A.  I will tell you that I put in everything
7     every week, what was required of me.
8  Q.  Okay.  So was everything that you did for the
9     company in Sales Pro or something less than
10    that in there?  I'm just trying to get an
11    understanding of what's there and what's
12    not.
13 A.  I guess I'm not understanding what.
14 Q.  Did you leave anything out?
15 A.  No.
16 Q.  Okay.  Did your pay at Fairfield Inn ever
17    change?
18 A.  Yes.
19 Q.  When?
20 A.  I do not recall the date, but I was given an
21    increase of $3,000.
22 Q.  Do you remember whether it was in 2004 or
23    2005?

Page 88

1  A.  I do not recall.
2  Q.  Were there any other changes in your pay plan
3     at that time?
4  A.  Besides quarterly changes of bonuses, no.
5  Q.  Just the fluctuation in the bonus amount?
6  A.  Correct.
7  Q.  But the bonus plan didn't change?
8  A.  No.
9  Q.  When you started working with Fairfield Inn,
10    who was your supervisor?
11 A.  Roger Miller.
12 Q.  Anyone else?
13 A.  When the general manager was there, it was
14    Todd Epplin.
15 Q.  During your employment, did you have any
16    other supervisors at Fairfield Inn?
17 A.  While I was on maternity leave, Tammy -- and
18    I'm not sure if I'll pronounce her last
19    name.  Dominguez?  There was a change of
20    general manager during the maternity leave.
21 Q.  So other than Roger Miller, Todd Epplin,
22    Tammy Dominguez, did you have any other
23    supervisors while you were at the Fairfield

Page 89

1     Inn?
2  A.  No.
3  Q.  Okay.  You mentioned that you received a pay
4     raise of about $3,000 a year --
5  A.  Uh-huh.
6  Q.  -- sometime during your employment, but you
7     don't remember when.  Did your pay ever
8     change again?
9  A.  No.  There's an e-mail that has that date of
10    change, the increase.
11 Q.  Okay.  Was there ever a period of time where
12    you were paid for only one-day-a-week's worth
13    of services?
14 A.  Can you repeat that question?
15 Q.  Sure.  Was there ever a period of time during
16    your employment at the Fairfield Inn that you
17    were paid for performing only one day's worth
18    of services per week?
19 A.  I don't know if you would list it as a day,
20    but maybe hours.  Yes.
21 Q.  Okay.  So there was a period of time where
22    you were paid for performing one -- what was
23    that?  What were you paid?

1  A.  Seven hours a week.  Is that what you're
2      referring to?
3  Q.  Yes.
4  A.  Okay.
5  Q.  When was that?
6  A.  During my maternity leave.
7  Q.  So your pay changed again when you went on
8      maternity leave?
9  A.  Correct.
10 Q.  To get paid seven hours per week?
11 A.  Yes.  That was at their request.
12 Q.  Were you working full-time for the property
13     at that time when you were on maternity
14     leave?
15 A.  Was I working for them?
16 Q.  Yeah.
17 A.  What do you mean?
18 Q.  Well, you were getting paid for seven hours a
19     week.  Were you working 35 hours a week?
20 A.  No.  I was working seven hours or more.  I
21     mean, I would get -- I mean, I always gave
22     more of my time, even being at home, yes.
23 Q.  And your pay changed because you went on

1      leave?
2  A.  Correct.
3  Q.  Whose idea was it for you to continue working
4      one day per week while you were on that
5      leave?
6  A.  Roger.
7  Q.  Did you want to continue working?
8  A.  Yes.  Can I explain why?
9  Q.  Sure.
10 A.  Realizing coming -- coming into the property,
11     I was told that they didn't meet some budgets
12     and that, you know, things were -- I don't
13     want to say very bad but they were not
14     meeting some revenue goals, or bottom line is
15     what they call it.  So through my sales
16     efforts and the revenue that I had brought
17     in, I felt that I had built that hotel up.  I
18     had built the clientele, the groups, the
19     military.  I had documented an amount of
20     booked business during my maternity leave.
21         And so I felt that during my maternity
22     leave and working with my intern was very
23     important to me.  It was important that I

1      keep the hotel where it was or better.
2      Because I worked very hard, sometimes even
3      more than that 35 hours a week, to get that
4      hotel where it was as far as revenue-wise.
5  Q.  Okay.  Any other reasons that you wanted to
6      continue working that seven hours or more per
7      week during your maternity leave?
8  A.  Just to keep my hands on it, you know, just
9      to -- I was working with an intern.  Even
10     though she was just doing military business,
11     Roger agreed with me that we didn't feel that
12     she would be, like, stealing any business;
13     but it just felt a comfort of knowing that I
14     was working directly with her and Roger.  And
15     the her I'm referring to is Tandi that was
16     the intern that we hired during maternity
17     leave.
18 Q.  Tandi Mitchell?
19 A.  Correct.  So it was very important to me.  I
20     loved my job.  I enjoyed what I did, and I
21     felt like I did a very good job at it.  So
22     keeping it where it was during that maternity
23     leave was important to me and important that

1      I came back and had that booked business
2      still there.
3  Q.  During your maternity leave, did you ever
4      work more than one day per week?
5  A.  Yes.
6  Q.  When?
7  A.  As needed.  I mean, I --
8  Q.  And maybe I didn't ask that question
9      properly.  Let me try it again.
10 A.  Sure.
11 Q.  During your maternity leave, did you ever
12     work more than seven hours per week?
13 A.  Yes.
14 Q.  Okay.  When?
15 A.  As much as I could.  As much as I was needed
16     to.  It was based on the needs of the hotel.
17     If Roger was to call or Tandi was to call or,
18     you know, any kind of e-mail that came across
19     or question on a group.  So some weeks it was
20     just seven and one week it may have been two;
21     but, you know, it was consistently seven
22     hours or more a week.
23 Q.  Did Tandi ever go on vacation while you were

Page 94

1    on maternity leave?
2 A.   Yes.
3 Q.   What happened when Tandi went on vacation?
4 A.   We asked Roger for approval for me to take
5      over during that time.  I think it was just a
6      two day, if I recall, to be on call that --
7      full-time those two days during maternity
8      leave.
9 Q.   So you worked those extra days while --
10 A.   Yes, I did.
11 Q.   Whose decision was that?  Who came up with
12      the idea for you to work those extra days?
13 A.   I presented it to Roger, because we didn't
14      want somebody not answering the phone, and
15      we -- and Roger knew about it upon hiring
16      Tandi, that she had some already scheduled
17      time for vacation.
18 Q.   When was this?
19 A.   During my maternity leave.  I don't have the
20      exact date, but it is in an e-mail.
21 Q.   Did you get paid for that extra work?
22 A.   Yes, I did.
23 Q.   When did your employment at Fairfield Inn

Page 95

1      terminate?
2 A.   On November the 2nd.
3 Q.   2005?
4 A.   Correct.
5 Q.   Why did your employment terminate?
6 A.   I received a call from Tammy.  Again, I
7      don't -- if somebody will tell me how to
8      pronounce her last name, I'll be glad to; but
9      I don't --
10 Q.   I think it's Dominguez.
11 A.   Okay.
12 Q.   That's who you're talking about, right?
13 A.   Correct.
14 Q.   Okay.
15 A.   I received a call from her; and she asked me
16      if I was returning to my full-time status,
17      which I said yes.  I'm sorry.  Will you
18      repeat the question and make sure I
19      understand?
20 Q.   Sure.  Why did your employment terminate?
21 A.   She said to me on the phone that she and
22      Roger were not giving me the option to come
23      back, that I was not going to dictate to them

Page 96

1      my hours of when I could work and when I
2      could not.
3 Q.   So you said you were going to return
4      full-time?
5 A.   Correct.
6 Q.   When you say -- I'm sorry.  I asked that
7      question -- I was about to ask that question
8      hopefully.  Did you tell Tammy Dominguez when
9      you would be able to return full-time?
10 A.   We had already settled that.
11 Q.   When was that?
12 A.   November the 9th.  So I didn't know there was
13      ever any question.
14 Q.   You were going to return full-time.  And what
15      did full-time mean?
16 A.   To me, it meant 35 hours.  At the time, she
17      did not know that I had a job description
18      with 35 hours and she was referencing to 40
19      hours a week.
20 Q.   And what else -- you told Tammy that you
21      would come back 35 hours, and what happened?
22 A.   She said to me -- well, that's where the
23      confusion was, that she was referring to 40

Page 97

1      hours.  And I told her, I said, no, that I am
2      35 hours.  And she said, Well, I'm now the
3      general manager, and I expect you to be here
4      from eight to six.  And I stated to her that
5      I would be back, but I would have to find
6      some other child care option since you're
7      wanting me there later.  And she said, Could
8      you let me know by 5 p.m. today?
9          And I told her I didn't feel that was
10      fair to let her know on such short notice.  I
11      did have family that could, you know, after
12      hours be there; but I tried to explain to her
13      that I had a job agreement from prior to
14      being hired or right at being hired, that I
15      was only 35 hours a week.  And she cut me off
16      pretty shortly.  And she said she would have
17      to call me back, which she did.
18 Q.   She called you back?
19 A.   Yes, she did.
20 Q.   Okay.  How long was it before she cut you
21      off?
22 A.   How long were we --
23 Q.   How long was your conversation before Tammy

Page 98

1    cut --
2  A.  Less than a minute.
3  Q.  Did she explain why she would have to call
4    you back?
5  A.  She said she needed to talk to Roger.
6  Q.  How long was it before -- I'm sorry.  This
7    minute and a half conversation --
8  A.  Minute conversation.
9  Q.  I'm sorry?
10  A.  It was only about a minute.
11  Q.  It was only about a minute?
12  A.  Correct.
13  Q.  What else transpired during this one-minute
14    conversation between you and Tammy?
15  A.  Nothing.
16  Q.  So just to make sure that I have everything
17    that happened during this conversation, Tammy
18    called you and asked you if you were going to
19    be returning full-time.  You said that you
20    would.  And you were expecting to return on
21    November 9th?
22  A.  Correct.
23  Q.  Who brought up the issue of hours?

Page 99

1  A.  She did.
2  Q.  She said that she wanted you full-time means
3    8 a.m. to 6 p.m.?
4  A.  Correct.  In her hotel.  She said that.
5  Q.  Why did she say that?
6  A.  I have no idea.
7  Q.  Okay.  Did you ask her what that meant?
8  A.  I did.
9  Q.  What did she say?
10  A.  She said that she was the new general
11    manager, and she expected her sales managers
12    to be in the hotel from eight to six.  And I
13    tried to explain to her what my definition of
14    a sales manager or -- excuse me -- a director
15    of sales and marketing does and that sales
16    managers don't work inside the hotel.
17  Q.  What did you explain?
18  A.  I explained to her my job description of what
19    Roger expected from me and what I did and
20    what Todd expected.
21  Q.  Did you ask her -- did you tell her where you
22    wanted to work?
23  A.  Where I wanted to work or when?

Page 100

1  Q.  Sure.  I mean, she said that she expected you
2    to be in the hotel.  What did you tell her
3    where you wanted to work instead of being in
4    the hotel?
5  A.  I asked her how she wanted me to sell the
6    hotel from inside the hotel, and she said on
7    the phone.  And I said, Well, that's not
8    meeting the needs of your hotel and your
9    clients; you have to be outside the hotel
10    and, you know, build a rapport with people.
11    And she said that she just -- and it ended by
12    her just saying that she does things
13    differently.
14  Q.  So, what else happened during this one-minute
15    conversation?
16  A.  Nothing.
17  Q.  How long was it between the time that Tammy
18    ended the conversation and the time that she
19    called you back?
20  A.  Within 15 minutes.
21  Q.  She called you back?
22  A.  Correct, on a cell phone.
23  Q.  Okay.  Tell me everything that happened

Page 101

1    during that conversation.
2  A.  She told me that -- again that her and Roger
3    were not giving me the option to come back,
4    that I was not going to dictate to them my
5    hours of when I could work and could not
6    work.
7  Q.  So, in the first conversation, she told you
8    she expected you to work 40 hours --
9  A.  Correct.
10  Q.  -- at the hotel?
11  A.  Correct.
12  Q.  And you told her that you were only going to
13    work 35?
14  A.  Correct.
15  Q.  And some of it was going to be at the hotel,
16    and some of it was going to be outside the
17    hotel?
18  A.  I just explained to her my pattern in the
19    past of what -- how I -- how the business --
20    how I was doing the position prior to
21    maternity leave.
22  Q.  Okay.
23  A.  And up to this conversation with Tammy, my

Page 102

1  hours were never questioned. My hours were
2  never -- I mean, I was expected to do the 35
3  hours a week; but it was never nine to four,
4  nine to five, whatever. My -- the
5  expectation was that I did my job. And I did
6  my job, and that was to bring in revenue and
7  to meet my sales goals.
8  Q. Did you tell Tammy that you would work the 40
9     hours?
10 A. That I would work the 40 hours?
11 Q. Yeah.
12 A. I told her I would be back.
13 Q. I'm sorry. I don't think you really answered
14    my question. Did you tell her that you would
15    work the 40 hours?
16 A. No, I did not.
17 Q. Did you tell her you would not work the 40
18    hours?
19 A. No, I did not.
20 Q. You just didn't respond about the 40 hours?
21 A. Correct.
22 Q. And you explained to her that your job was 35
23    hours?

Page 103

1  A. Correct.
2  Q. And you had this agreement that said that you
3     would only work 35 hours?
4  A. Correct.
5  Q. So when Tammy calls back, she tells you that
6     you are not going to dictate the hours of
7     when you would work?
8  A. Uh-huh.
9  Q. What else did Tammy say during that
10    conversation?
11 A. That you do not have a job, that I'm letting
12    you go.
13 Q. Is that what she said, letting you go?
14 A. I don't recall exactly. It was my
15    interpretation that I was being fired.
16 Q. What gave you that conclusion? What led you
17    to that conclusion?
18 A. Her tone and her coming across and saying
19    that I was not -- I'm trying to refresh my
20    memory.
21 Q. Okay. Take your time.
22 A. Can you repeat that for me, please?
23 Q. Sure. You said that when Tammy called you

Page 104

1  back, she said that she was not going to give
2  you the option to come back?
3  A. Uh-huh.
4  Q. And that you were not going to dictate the
5     hours of when you would work?
6  A. Uh-huh.
7  Q. And that was your interpretation, that you
8     were being fired?
9  A. Correct. See, I do not --
10 Q. Based upon her tone?
11 A. Correct.
12 Q. So what else did Tammy say?
13 A. And I asked her what did this mean. And she
14    said, you do not have a job or you were
15    fired. I don't remember exactly her
16    termonology of --
17 Q. You don't remember exactly what the words
18    were that she used?
19 A. Right.
20 Q. But what was it that led you to the
21    conclusion that you were being fired?
22 A. I'm not sure if it was the end of that
23    conversation or the next conversation. I

Page 105

1  asked her, she was just letting me go? Do I
2  get a severance? Or, you know, what does
3  this mean? I think I was trying to pull an
4  explanation. And she told me I would only be
5  paid my vacation time that was left. And
6  then she asked me to bring my stuff to the
7  hotel, stuff meaning laptop, any sales files,
8  personal property that belonged to the hotel.
9  Q. Okay. Anything else that happened during
10    that conversation?
11 A. Not that I can recall.
12    THE WITNESS: Am I allowed to look at
13       my notes or not?
14    MR. FELLNER: Sure.
15 A. She did ask me for -- she gave me -- she said
16    that I could either resign today or I would
17    be terminated.
18 Q. Anything else?
19 A. No, sir.
20 Q. What was it that you were looking at right
21    there?
22 A. Some of my personal notes and my affidavit.
23 Q. Great.

Page 106

1     MR. FELLNER: Can we get that marked as
2     Exhibit #1 and Exhibit #2?
3     MS. DUNCAN: Not that one, but you've
4     got --
5     MR. FELLNER: Yeah, we can. She just
6     refreshed her recollection with it
7     during the middle of a deposition.
8     MS. DUNCAN: Well, you can make a copy
9     of it, but you can't have her
10     copy.
11     MR. FELLNER: Then let's go off the
12     record and go ahead and make the
13     copy right now.
14     (Brief recess)
15 Q. Before we took a break, we were discussing
16     your telephone call with Tammy Dominguez on
17     November 2nd, 2005. You mentioned that you
18     had two telephone calls. And we were
19     focusing on the second of the two telephone
20     calls; is that correct?
21 A. Correct.
22 Q. All right. The second telephone call, have
23     we discussed everything you remember about

Page 107

1     that telephone call now?
2 A. Yes.
3 Q. Okay.
4     MR. FELLNER: I tell you what. Let's
5     go ahead and take the break now.
6 A. I would -- I would like to add one thing.
7 Q. Okay.
8 A. I will -- from that conversation, I always
9     felt that Tammy was pressuring me to come
10     back to work.
11 Q. She wanted you to come back to work?
12 A. Under her terms, yes. So back in October --
13     THE WITNESS: Is it okay to make a note
14     about this?
15     MS. DUNCAN: Sure.
16 A. Tammy tried -- and it's in the notes there.
17     Tammy tried to -- she was very -- she seemed
18     like she was going to be very flexible with
19     my working hours. Okay? She showed that.
20     And she tried to get me to come back during
21     my maternity leave to work three days at the
22     hotel and I could do the remaining work at
23     home. And then you asked me about the

Page 108

1     working seven hours.
2 Q. Yes.
3 A. That was not always at home. I did go to the
4     hotel on two occasions to do work during the
5     maternity leave.
6 Q. When you said that Tammy was pressuring you
7     to return to work under her terms, does that
8     mean at the hotel and the 40 hours?
9 A. No. I mean, she just -- during the maternity
10     leave, she kept trying to pull me back in.
11     And, you know, I felt very secure with my 12
12     hours under FMLA, that I had that security
13     there. So she was always trying to -- to get
14     me to come back earlier.
15 Q. You said 12 hours just a moment ago. I think
16     you meant to say 12 weeks. Am I wrong about
17     that?
18 A. Correct. Thank you. Twelve weeks.
19 Q. Okay. So you were saying during the 12 weeks
20     that you were on maternity leave?
21 A. Correct.
22 Q. So, when you said that she was trying to
23     pressure you to return to work, was it during

Page 109

1     your leave or was this during the November
2     2nd phone call -- November 2nd, 2005, phone
3     call?
4 A. It was during my leave.
5 Q. All right. Was she also pressuring you to
6     return to work during the November 2nd, 2005,
7     telephone calls?
8 A. I don't think it was -- I don't know why she
9     had any question to even ask that. You know,
10     I don't even know why the phone call took
11     place; because the week prior, in e-mails and
12     stuff, I kept saying I was returning. So I
13     don't know what led up to that conversation
14     of why she called me. And please ask your
15     question again.
16 Q. Sure. What I was trying to find out is that
17     you said that Tammy was pressuring you to
18     return to work under her terms.
19 A. Correct.
20 Q. And I was just trying to figure out
21     whether -- you certainly mentioned that -- I
22     think. Tell me if I'm wrong about this.
23     Tammy was pressuring you to return to work

Page 110

1  under her terms --
2  A. Correct.
3  Q. -- during October of 2005?
4  A. No, not during -- not during October.
5  Q. Oh. When?
6  A. She was -- not the 40 hours during October.
7     That was never mentioned until that November
8     conversation.
9  Q. When she was pressuring you to return to
10    work?
11  A. October.
12  Q. October. And what was she pressuring you to
13    do?
14  A. To come back and work three days a week at
15    the hotel.
16  Q. And why do you feel that she was pressuring
17    you to do that?
18  A. Just by constantly asking me, you know.
19  Q. Was she pressuring you to perform the work
20    that you were going to be doing at the hotel,
21    or was she pressuring you to work three days?
22  A. I don't understand your question.
23  Q. Sure. Were you expecting to work three days

Page 111

1  a week?
2  A. Was I expected to?
3  Q. No. Not were you expected to, but were you
4     planning on working three days a week?
5  A. No.
6  Q. Not at all?
7  A. No. I was doing my seven, whatever hours,
8     plus hours.
9  Q. And that's it?
10  A. Yes. Because we had an intern that was
11    taking care of the hotel that I worked with
12    her two days a week or more or as needed. So
13    I didn't feel there was any reason to come
14    back earlier during my maternity leave. And
15    Tandi was always willing to work, so -- and
16    she's the intern. Tandi -- Tandi -- excuse
17    me. Tandi Mitchell.
18  Q. Okay.
19  A. So Tandi had never said, I can't do this
20    anymore; I don't want to be here; I can't do
21    your job any more; you need to come back.
22    None of that was ever said. Tandi was there
23    to work through the terms of her -- she had

Page 112

1  an agreement, too. And it expired one week
2  upon my return. So --
3  Q. So Tammy was pressuring you to work three
4     days a week?
5  A. Uh-huh.
6  Q. And she was pressuring you to work at the
7     hotel during October of 2005?
8  A. Correct.
9  Q. Okay. What about on November 2nd, 2005, when
10    you had these two telephone calls with
11    Tammy? During the first telephone call, was
12    she pressuring you to come back to work
13    full-time?
14  A. I wouldn't say she -- she was pressuring me
15    then. She was questioning.
16  Q. What does that mean?
17  A. Questioning if I was coming back.
18  Q. Okay. So, did she just ask you if you were
19    coming back full-time?
20  A. Yes.
21  Q. What about during that second phone call?
22    Was she pressuring you at that point?
23  A. No. I would say questioning.

Page 113

1  Q. All right.
2     MR. FELLNER: Now is a good time to
3       take a break for lunch.
4       (Lunch recess)
5  Q. Ms. Watts, I'm handing you what's been
6     identified as Defendant's Exhibit #1. Can
7     you take a look at that and let me know when
8     you're ready to answer questions about it?
9  A. Sure.
10    (Witness reviews document)
11  A. Okay.
12  Q. What is Defendant's Exhibit #1?
13  A. You're asking me to --
14  Q. Yeah. What is it?
15  A. It's an affidavit.
16  Q. An affidavit from whom?
17  A. Myself.
18  Q. Now, it's unsigned; but at some point in
19    time, do you think you might have signed
20    something similar to this?
21  A. Yes.
22  Q. Was this one of the documents that you were
23    referring to earlier in the deposition to

Page 114

1  refresh your recollection?
2  A.  Yes.
3  Q.  And there's handwritten -- there's a bunch of
4      printed text on here and a bunch of -- and
5      some handwritten -- what appears to be
6      handwritten remarks on there.  Whose
7      handwritten marks are those?
8  A.  They're mine.
9  Q.  Is that true for all -- well, I guess there's
10     only handwritten marks on two pages.  Is that
11     true for both pages?
12 A.  Correct.
13 Q.  Can you also take a look at Defendant's
14     Exhibit #2 and let me know when you're ready
15     to answer questions about that?
16         (Witness reviews document)
17 A.  Okay.
18 Q.  You're ready now?
19 A.  Sure.
20 Q.  Okay.  What is Defendant's Exhibit #2?
21 A.  It's just my personal notes.
22 Q.  This is your handwriting?
23 A.  Correct.

Page 115

1  Q.  When did you write this document?
2  A.  This morning.
3  Q.  Why did you write this document?
4  A.  Just to refresh myself with dates.
5  Q.  When you started working at the Fairfield
6      Inn, what documents did you receive from the
7      Fairfield Inn?
8  A.  Upon hire?
9  Q.  Yes.
10 A.  The tax -- I guess the tax forms needed for
11     payroll.  Of course, prior to that, I had
12     received Roger's offer; so I did get that.
13     In fact, I got that at home from an e-mail,
14     the tax records.  I did fill out early on
15     about a payroll deduction, but it was never
16     done until several months down the road.  I
17     had to redo it again.  I think they were
18     having some -- it was new to the company
19     doing direct deposit.
20 Q.  When you say payroll deduction, you mean
21     direct deposit form?
22 A.  I'm sorry.  Yes, direct deposit.  I guess
23     it's a W-2.  That's all I recall.

Page 116

1  Q.  Did you receive any other documents like
2      company policies?
3  A.  No.
4  Q.  Did you receive any handbooks?
5  A.  No.  I did ask for one.
6  Q.  Who did you ask?
7  A.  Todd Epplin.  He told me that the handbook
8      that was on file or that they had, he
9      obviously couldn't pull one out to show me at
10     the time, but that was really for hourly
11     employees and that he would get me my
12     handbook.
13 Q.  Okay.  Did you ever receive a handbook?
14 A.  No.
15 Q.  At any time during your employment, did you
16     receive a handbook?
17 A.  No.
18 Q.  You said that Todd Epplin mentioned to you
19     something about a handbook for hourly
20     employees?
21 A.  When I asked him for a handbook, he said the
22     one that he had was for hourly employees.
23 Q.  Did he share that one with you?

Page 117

1  A.  No.
2  Q.  Did you ever receive any training about any
3      Fairfield Inn policies?
4  A.  No.
5  Q.  And I guess because you never received the
6      handbook and never any training about
7      policies, does the same go that you never
8      received any training about Fairfield Inn
9      handbook?
10 A.  Correct.
11     MR. FELLNER:  Could we get this marked
12         as Defendant's #3?
13 Q.  Ms. Watts, I'm handing you what's been marked
14     as Defendant's Exhibit #3.  Can you take a
15     moment to look at that and let me know when
16     you're ready to answer questions about it?
17         (Witness reviews document)
18 A.  I'm ready.
19 Q.  Okay.  Well, what is Defendant's Exhibit #3?
20 A.  It says Hospitality Ventures, LLC, Associate
21     Handbook for Hotel Personnel.
22 Q.  Okay.  Do you think that this might be a
23     handbook that was used at the Fairfield Inn?

Page 118

1  A.  It might have been, yes.
2  Q.  Do you see in the bottom right corner where
3      it's marked, it says, Watts versus
4      Hospitality INTDSCL/RFP 0170?
5  A.  Uh-huh.
6  Q.  Do you have any idea what that means?
7  A.  No.
8  Q.  Okay.  I'll let you know that this is a
9      document that your attorneys have produced to
10     us in this litigation.
11 A.  Yes.
12 Q.  Do you know where they got this from?
13 A.  I received it after I was terminated.
14 Q.  After you were terminated, you got a copy of
15     this handbook?
16 A.  Yes, I did.  Yes, I did.
17 Q.  Never before?
18 A.  No.  Correct.
19 Q.  And you've never seen any document that's
20     even remotely like this?
21 A.  A packet like this?  No.
22 Q.  Where did you get this handbook from?
23 A.  On November the 3rd, when I went in on my --

Page 119

1      the day I was told to go in and clean out my
2      office and collect my -- an expense check and
3      bonus check, Carrie Farrell, who was a
4      housekeeping supervisor -- I asked her for
5      one.  I asked her if knew where any
6      handbooks were and if I could get a copy.
7      And she gave me one.
8  Q.  So November 3rd, 2005?
9  A.  Correct.
10     MR. FELLNER:  Okay.  Let's go ahead and
11         have that marked as Defendant's
12         #4.
13 Q.  Ms. Watts, I'm showing you what's been marked
14     as Defendant's Exhibit #4.  Can you take a
15     look at that and let me know when you're
16     ready to answer some questions about that?
17         (Witness reviews document)
18 A.  I'm ready.
19 Q.  What is Defendant's Exhibit #4?
20 A.  It's an Associate Handbook Acknowledgment
21     Form.
22 Q.  Okay.  Who signed this Associate Handbook
23     Acknowledgment Form?

Page 120

1  A.  I did.
2  Q.  What's the date on this?
3  A.  6/04.
4  Q.  Did you sign it then?
5  A.  No, I did not.
6  Q.  When did you sign this?
7  A.  In October.
8  Q.  October when?
9  A.  2004.
10 Q.  So you signed this in October 2004?
11 A.  Uh-huh.
12 Q.  Now, you signed this.  Did you ever receive a
13     handbook in October 2004?
14 A.  No.
15 Q.  You just received this one page?
16 A.  Yes.
17 Q.  Okay.  Let's read that first photograph and
18     please read --
19 A.  Well, can I explain to you --
20 Q.  Okay.  Hold on.
21 A.  -- how I got the page?
22 Q.  Hold on one second.
23 A.  Sure.

Page 121

1  Q.  Read the first sentence of the first
2      paragraph.
3  A.  I have received a copy of Hospitality
4      Ventures Associate Handbook.
5  Q.  And it says that in the very first sentence
6      of the very first page, and you went ahead
7      and signed this?
8  A.  Correct.
9  Q.  Was that true?
10 A.  That I had received the handbook?
11 Q.  Yeah.
12 A.  No.  No.
13 Q.  Why did you sign this?
14 A.  Because if you'll note that Jeanie
15     Antonello -- of course, she did not date it
16     either, but she was not employed until
17     October.  And in the middle of that time, we
18     were in the middle of QA inspections, which
19     is quality assurance.  And that is a very
20     stressful and hectic time at a hotel.  We're
21     trying to meet all of the Marriott standards
22     and for the investors, and, you know, all the
23     requirements.  And Todd made Jeanie go around

Page 122

1   and make everyone sign these and that she was
2   having handbooks printed. And it was under
3   the understanding that -- I mean the guy was
4   in the hotel to do the QA, and they were
5   going around making people sign the forms.
6       And she said that they would get me --
7   they were having them printed at Kinko's and
8   they would have me a handbook by the end of
9   the day.
10  Q. So you didn't have a handbook when you signed
11  this?
12  A. Correct.
13  Q. How did you get this one page?
14  A. She made copies of it and was walking around
15  handing it to employees. She had a checklist
16  of employees that -- we had so many things
17  that had to be in the employee file. And if
18  it was missing from your file -- and then she
19  would tell you your hire date, and you had to
20  date it for that day.
21  Q. So not only did you sign something that
22  wasn't true --
23  A. Correct.

Page 123

1   Q. -- according to you, but you also signed
2   something and dated it on a date that wasn't
3   correct?
4   A. I was forced to date it.
5   Q. You were forced to date it?
6   A. Yeah.
7   Q. Could you have refused to sign this?
8   A. Not by my conversation with her.
9   Q. With who?
10  A. With Jeanie Antonello.
11  Q. What was Jeanie Antonello's position with the
12  company?
13  A. At first, she was hired as a -- I'm not sure
14  of the exact term, but a greeter at a social
15  that we had. But later, Todd Epplin, who was
16  the general manager, put her into management
17  duties. She was doing banking and deposits
18  and kind of almost like a filling in for a
19  general manager position -- assistant general
20  manager position which was not filled at the
21  time.
22  Q. Now, earlier today you told me that you
23  reported to Roger Miller.

Page 124

1   A. Correct.
2   Q. And you reported to Todd Epplin sometimes?
3   A. When he was there and available.
4   Q. Could Jeanie Antonello have fired you?
5   A. I don't know. I don't know all the authority
6   that Todd gave her, but --
7   Q. What I'm trying to understand is how were you
8   forced to sign this and forced to date this
9   on another date?
10  A. She came around and said, you know, Todd said
11  everybody had to sign this, that we have to
12  have it in the file for our QA inspection.
13  Q. Okay.
14  A. And understand that the -- again, the stress
15  of the -- what everybody was running around
16  going through to get the hotel ready that
17  day. It was a very stressful day. And I did
18  just sign it.
19  Q. So even though you never received a copy of
20  this handbook, you just went ahead and signed
21  it anyway --
22  A. Correct.
23  Q. -- saying that you had received a copy?

Page 125

1   A. Correct. Correct.
2   Q. All right. Did you ever read this
3   Defendant's Exhibit #4 before you signed it?
4   A. No.
5   Q. You just went ahead and signed it?
6   A. Again, understanding that what -- you know, I
7   had a pile of stuff I was doing, and there
8   was just so much chaos going on. And yes, I
9   did. I just signed it. Because she verbally
10  sat right there and, you know, Todd is two
11  steps behind her saying we're getting those
12  printed. So --
13      MR. FELLNER: Let's go ahead and get
14      this marked as well. I think
15      we're up to #5.
16  Q. Ms. Watts, this is Defendant's Exhibit #5.
17  Go ahead and take a look at this and let me
18  know when you're ready to answer questions
19  about that.
20  A. Is it the same thing? Can I look at the
21  other one, too? I mean --
22  Q. Sure. Yeah. It's right here.
23      (Witness reviews document)

Page 126

1  A.  Okay.
2  Q.  You ready to answer questions?
3  A.  Sure.
4  Q.  Okay.  Ms. Watts, what I handed you as
5      Defendant's Exhibit #5 is a copy of the
6      handbook that has been in use at the
7      Fairfield Inn.  I'll tell you that.  Did you
8      notice on the cover page that the two cover
9      pages are different?
10 A.  Yes.
11 Q.  Okay.  What's different about the two cover
12     pages?
13 A.  This one says Hospitality Ventures, LLC.
14     This one says Hospitality Ventures Management
15     and Company.
16 Q.  And the one that says Hospitality Ventures,
17     LLC, is the one that you were supposedly
18     handed after you claim to be terminated in
19     November of 2005, correct?
20 A.  Right.
21 Q.  Did you ever receive a copy of Defendant's
22     Exhibit #5 before?
23 A.  No, not that I remember.

Page 127

1  Q.  Okay.  Could you turn to the last page in
2      Defendant's Exhibit #3?  Does that look like
3      the same thing that you signed --
4  A.  Yes.
5  Q.  -- as Defendant's Exhibit #4?
6  A.  Yes.
7  Q.  Okay.  Could you turn to the last page?
8  A.  Except the page, I don't -- can't tell the
9      page numbers are the same, but --
10 Q.  Oh, that's a good point.  Well, let's take a
11     look at it.  Well, let's see.  For
12     Defendant's Exhibit #3, the one that you
13     claim to be given in November 2005, the first
14     page of that is page 170, right?  The first
15     page of that one?
16     MS. DUNCAN:  Yeah.
17 Q.  Witness?  The first page is 170, right?
18 A.  Yes.
19 Q.  And the last page is page 197, right?
20 A.  Yes.
21 Q.  By my math, that's 27 pages, right?
22 A.  Yes.
23 Q.  Okay.  If you look at Defendant's Exhibit #5,

Page 128

1      the first page is page 83.
2  A.  Correct.
3  Q.  And the last page is labeled 128?
4  A.  And also 45.  I don't know.
5  Q.  Right.  Right.  I'm talking about just where
6      it says MV --
7  A.  Correct.
8  Q.  -- and then a number after that.  So this
9      document, on my math, would be 45 pages,
10     right?
11 A.  Correct.
12 Q.  And this one is labeled 45 as the page number
13     in the bottom right-hand corner, right?
14 A.  Right.
15 Q.  Okay.  And the document that you signed as
16     Defendant's Exhibit #4 also has a 45 in the
17     bottom right-hand corner, right?
18 A.  Correct.
19 Q.  So, is it more likely than not that
20     Defendant's Exhibit #4 came from a document
21     that was similar -- more similar to
22     Defendant's Exhibit #5 than Defendant's
23     Exhibit #3?

Page 129

1  A.  I don't understand the question.
2  Q.  Well, this came as page 45.
3  A.  Okay.
4  Q.  Right?
5  A.  Yes.
6  Q.  And the document that you provided -- the
7      handbook that you provided only has 27 pages.
8  A.  Like I said, I don't know.  I mean, I wasn't
9      in charge of printing them or distributing
10     or -- that's just what was handed to me.
11 Q.  Okay.  How would you rate your performance at
12     Fairfield Inn?
13 A.  In what terms?
14 Q.  How would you rate it if you were going to
15     rate it?
16 A.  If I was to rate it?
17 Q.  Sure.
18 A.  Personally myself, I would say I was an
19     extremely aggressive and dependable,
20     flexible, meet and succeeded all of my sales
21     goals.  And I felt like I was a very good
22     employee.
23 Q.  If we wanted to -- if you wanted to evaluate

Page 130

1    your performance based on any kind of data,
2    what kind of data would you look at?
3  A.  Talking about the booked business that I
4    brought in, the revenue that I brought in,
5    the rapport that I built with clientele, the
6    relationship that I had with the staff.
7  Q.  Anything else?
8  A.  Can you repeat the question again?
9  Q.  Sure.  If you wanted to look at any kind of
10    data to try to figure out -- to assess your
11    performance at Fairfield Inn, what would you
12    look at?
13  A.  Letters from the company that I had received,
14    from the president or the owner of
15    Hospitality Ventures.  Roger sent weekly
16    updates showing sales increase and kudos and
17    praise and congratulations.  Todd did a lot
18    of verbal, Good job, way to go, keep it up.
19  Q.  Anything else?
20  A.  No.
21  Q.  Okay.  Why did you file this lawsuit?
22  A.  Because I truly feel that as a professional,
23    the experience that I had within the sales

Page 131

1    hotel industry, the relationships that I had
2    already built, that I could be a working
3    mother.  I felt that it was -- it is my right
4    to be able to work and help the company be
5    successful.  And that was what I was in for
6    it to do.  Even through my maternity leave,
7    when I was supposed to laying at home
8    recovering from having a baby, I had
9    Fairfield Inn on my mind; and that was to
10    make the hotel as successful as it could be
11    and to be -- again, to be a working
12    professional, a working mother that can
13    balance work life, family life, you know, my
14    social life.
15      You know, that was my goal.  I did it
16    with one child, and we had planned for the
17    second child.  We had planned to do the same
18    thing, to be able to -- to work and have that
19    balance.
20  Q.  Any other reasons?
21  A.  No.
22  Q.  What did you think that Fairfield Inn did
23    that was wrong?

Page 132

1  A.  Not allowing me to come back to work to prove
2    that I could balance my children being in
3    child care, to me being able to be a working
4    mother, to me being able to be a
5    professional.  That right was taken away from
6    me by them, especially with a company that I
7    felt so connected to.  Again, I had worked so
8    hard over the year.  And the records will
9    show my success and documentations of what I
10    had done for that hotel.
11  Q.  Is there anything else that Fairfield Inn did
12    that was wrong?
13  A.  No.  Well, not providing me a handbook.
14  Q.  Anything else?
15  A.  Of course, with any company, sometimes
16    there's communication problems.  As with
17    Todd, there was times where he wasn't
18    available, you know.  So I feel that -- I'm a
19    big communicator and communication.  So I
20    feel that through Fairfield Inn, that
21    communication kind of failed me.
22  Q.  Anything else?
23  A.  No.

Page 133

1  Q.  All right.  What claims are you asserting in
2    this lawsuit?
3      MS. DUNCAN:  I object.  That's a legal
4        question.  She's not a legal
5        person.
6  A.  I don't understand.
7  Q.  What are you suing the company about?
8  A.  My loss of income that I have sustained over
9    the two years.
10  Q.  Okay.  I'm not talking about damages just
11    yet.
12  A.  Okay.  Well, then, I don't understand the
13    question, then.
14  Q.  That's fine.  If you don't understand the
15    question, that's perfectly fine.  Just let me
16    know.
17  A.  Okay.  I misunderstood that.  I'm sorry.
18  Q.  Sure.  You're suing the company saying they
19    did something wrong.
20  A.  Uh-huh.
21  Q.  And you're accusing them of doing certain
22    things.  Do you have any idea what you're
23    accusing the company of doing?

Page 134

1 A. Of falsely terminating me.
2 Q. Falsely terminating you?
3 A. Yes.
4 Q. Okay.
5 A. It was my understanding that I was protected
6    under FMLA. I truly believed that in the
7    letter that I provided for my maternity
8    leave. It was never contested. It was never
9    told to me that I did not fall under FMLA,
10   that I didn't -- that the company didn't fall
11   under FMLA. That was never said to me in my
12   letter. I never got any response. So I felt
13   that I was protected. I -- to take -- I was
14   willing to come back early if I was able; but
15   I felt that I had that protection for 12
16   weeks, you know, of maternity leave. And it
17   was my intention to come back and to -- you
18   know, to go right back into doing my job
19   description.
20 Q. Anything else?
21 A. No.
22 Q. Did you assert -- are you bringing any claims
23    for sex discrimination against the company?

Page 135

1       MS. DUNCAN: Object to form.
2 Q. You can answer the question.
3 A. I don't understand what that means.
4 Q. Did you accuse the company of discriminating
5    against you on the basis of your sex or your
6    pregnancy, for that matter?
7 A. Yes.
8 Q. Yes. Okay. Anything else? Any other claims
9    against the company?
10 A. No.
11 Q. No. What about any claims for breach of
12    contract? I'm asking you.
13 A. I don't know.
14 Q. You don't know? Okay. If I showed you a
15    copy of the complaint, would it help you?
16 A. Yes.
17 Q. Okay. I'll be happy to.
18       MR. FELLNER: Let's have this marked as
19          #6.
20 Q. There's a copy of the complaint. Take a look
21    at this and let me know when you're ready to
22    answer some questions about that.
23 A. If I don't understand something, can I ask my

Page 136

1    attorney?
2 Q. We'll see.
3       (Witness reviews exhibit)
4 A. Okay.
5 Q. Okay. Before you reviewed Defendant's
6    Exhibit #6, were you aware of what claims
7    you're pursuing in this lawsuit?
8 A. Yes.
9 Q. Okay. Now I want to ask you again, are you
10    pursuing a claim for sex discrimination
11    against Fairfield Inn?
12 A. Yes.
13 Q. And you're pursuing a claim for violation of
14    the Family Medical Leave Act against
15    Fairfield Inn?
16 A. Correct.
17 Q. And you're pursuing a claim for breach of
18    contract; is that right?
19       THE WITNESS: I don't understand that.
20 A. Are you talking about my working agreement?
21       THE WITNESS: Is that what he's talking
22          about?
23 Q. Oh, I don't know. You can just read that.

Page 137

1    It's pretty self-explanatory.
2 A. Okay. Let me read this again.
3       (Brief pause)
4 Q. Okay. Are you pursuing some claim for breach
5    of contract against Fairfield Inn?
6 A. Yes.
7 Q. Let's start with the sex discrimination
8    claim. Who do you think at the Fairfield Inn
9    discriminated against you on the basis of
10    your sex?
11 A. Tammy.
12 Q. Tammy Dominguez? Anyone else?
13 A. No.
14 Q. I'm sorry?
15 A. No.
16 Q. Okay. And with respect to the violation of
17    the Family Medical Leave Act, who do you
18    think violated the Family Medical Leave Act
19    on behalf of the Fairfield Inn?
20 A. Todd Epplin, Roger Miller, and the company.
21 Q. Who is the company? I want to know who the
22    people are.
23 A. Hospitality Ventures, Fairfield Inn.

Page 138

1 Q. No, no, no, no, no. No, no, no. Company can
2   only act through people. Give me the names
3   of the people.
4 A. I did.
5 Q. So Todd Epplin and Roger Miller?
6 A. Correct.
7 Q. Anybody else?
8 A. No.
9 Q. Okay. Now, this breach of contract, who is
10   it that breached this contract with you?
11 A. Tammy Dominguez.
12 Q. Okay.
13 A. Roger Miller.
14 Q. Is this also breach the contract?
15 A. Yes.
16 Q. Okay. Anyone else?
17 A. No.
18 Q. And just to make sure I have it clear, for
19   your claim of sex discrimination, you think
20   that the only person who discriminated
21   against you on the basis of your sex was
22   Tammy Dominguez, right?
23 A. Yes.

Page 139

1 Q. Okay. And for your violation of the Family
2   Medical Leave Act claim, you think that the
3   only people at Fairfield Inn who violated the
4   Family Medical Leave Act were Todd Epplin and
5   Roger Miller?
6 A. And Tammy Dominguez.
7 Q. And Tammy Dominguez. Anybody else?
8 A. No.
9 Q. For your breach of contract claim, the only
10   people who breached a contract with you on
11   behalf of the Fairfield Inn were Tammy
12   Dominguez and Roger Miller, correct?
13 A. Repeat that question again.
14 Q. Sure. You have a breach of contract claim in
15   this case, right?
16 A. Correct.
17 Q. And I want to know who at the Fairfield Inn
18   breached this contract with you.
19 A. Okay. Explain to me what you mean by breach
20   of contract.
21 Q. Well, it's your claim. You tell me. What
22   contract did you have?
23 A. Okay. Go back to your question about the

Page 140

1   people you were asking me who on breach of
2   contract again.
3 Q. Yeah. You claim that somebody at Fairfield
4   Inn breached the contract with you?
5 A. Correct.
6 Q. Who was it that breached the contract with
7   you?
8 A. Roger and Tammy.
9 Q. Anybody else?
10 A. No.
11 Q. While we're on the topic of this contract,
12   what was this contract?
13 A. My employment with them.
14 Q. But what was the contract?
15   THE WITNESS: I don't understand what
16     he's talking about, contract.
17 Q. What agreement did you have?
18   MS. DUNCAN: Just read the section.
19   THE WITNESS: Read this?
20   MS. DUNCAN: Uh-huh.
21     (Brief pause)
22 A. A contract of my employment.
23 Q. Okay. What were the terms of that contract?

Page 141

1   I'm sorry?
2 A. I said I just feel confused. I'm just trying
3   to understand exactly what you're asking me.
4 Q. Absolutely. If I can, I will try to help to
5   clarify with you. What was the contract of
6   your employment? What I'm trying to get is,
7   what are the terms and conditions -- what
8   were the terms of this contract?
9 A. That I had a job working for them.
10 Q. Okay. For how long?
11 A. There was no date on it.
12 Q. No duration?
13 A. Not that I recall.
14 Q. And what were you supposed to get as part of
15   this contract?
16 A. Employment.
17 Q. Okay. And what?
18 A. Wages, compensation.
19 Q. Okay. Anything specific?
20 A. Can we take a break, please?
21 Q. No. I want to finish this line of
22   questioning first.
23 A. I just --

Page 142

1  Q.  I don't want you to get your answers from
2      your lawyer.
3  A.  Could you repeat the question again, please?
4  Q.  What I'm trying to understand is in your
5      complaint, in your allegations against the
6      company, your claims against the company,
7      you're saying that there was this contract
8      and that the company breached whatever
9      contract that was.  What I'm just trying to
10     find out is, what was that contract about?
11 A.  My FMLA leave.
12 Q.  So it was for you to take FMLA leave?
13 A.  Correct.  I was asked to put something in
14     writing when I told them I was pregnant with
15     Todd Epplin, so I did.  I put it in writing.
16 Q.  All right.
17 A.  Okay.  I mis -- I thought you were talking
18     about my job description and contract.  I'm
19     sorry for the confusion.
20 Q.  All right.  So you put something in writing
21     to Todd Epplin about your FMLA leave?
22 A.  He asked me to.
23 Q.  When was this?

Page 143

1  A.  In June.
2  Q.  2005?
3  A.  Uh-huh.  And I believe Roger and I verbally
4      talked about it, about my maternity leave, so
5      I did put everything in writing to them.
6  Q.  So you verbally discussed your leave with
7      Roger Miller?
8  A.  Uh-huh.
9  Q.  And Todd Epplin asked you to put something in
10     writing to him?
11 A.  Yes.
12 Q.  What was it that you put in writing to him?
13 A.  A letter.
14 Q.  Just a letter saying what?
15 A.  That I was requesting my maternity leave
16     under FMLA.
17 Q.  All right.  And you said that you had some
18     contract with Fairfield Inn about your
19     maternity leave.  All right.  I'm just trying
20     to understand, was that the contract, that
21     letter that you wrote to Todd?
22 A.  Yes.
23 Q.  Was there anything else that was part of this

Page 144

1      contract?
2  A.  No.
3  Q.  Just that.  And your discussion with Roger,
4      was that part of the contract?
5  A.  Yes.
6  Q.  What was the contract supposed to be?  What
7      were you entitled to?  What was the company
8      supposed to do; what were you supposed to do?
9  A.  I was requesting my maternity leave for a max
10     of 12 weeks under FMLA.
11 Q.  All right.  What were you supposed to do in
12     order to get that contract?  Were you
13     supposed to do anything for that contract?
14 A.  What do you mean?
15 Q.  I don't know.  I'm trying to figure out what
16     were the terms of the contract again.  You
17     were asking for maternity leave for up to 12
18     weeks?
19 A.  Uh-huh.
20 Q.  And in exchange for that, were you supposed
21     to do anything?  Was the company supposed to
22     do anything?  I'm just trying to understand
23     here.

Page 145

1  A.  As far as my job performance?
2  Q.  As far as anything.
3  A.  Repeat that question again.
4  Q.  Sure.  You were requesting maternity leave
5      for up to 12 weeks.
6  A.  Correct.
7  Q.  And that was part of the contract that you
8      were talking about?
9  A.  Or the letter, yes.
10 Q.  The letter.  Okay.  What else -- what was
11     supposed to happen in exchange for you
12     getting that leave?  Anything?
13 A.  Nothing.
14 Q.  Nothing.
15 A.  It was without pay.
16 Q.  What was your understanding about whether
17     Todd had the authority to enter that kind of
18     contract with you?
19 A.  He was the general manager.  And he told me
20     that he and Roger had talked about it and
21     that it was understood that I could take the
22     12 weeks.
23 Q.  Nobody ever told you that they had the

Page 146

1    authority to enter into a contract with you
2    about that, did they?
3  A.  I mean, he accepted it when I handed it to
4    him.  He never -- he nor Roger ever contested
5    it.  They never came back to me and said that
6    this is unacceptable, we -- you know, we
7    don't accept FMLA or whatever.  They never
8    came back and responded to my letter at all.
9  Q.  So they never told you, you couldn't take a
10   leave?
11 A.  Correct.
12 Q.  Did they ever tell you that you had a
13   contract?
14 A.  No.
15 Q.  And when I say -- when I was asking about
16   whether they ever told you that you had a
17   contract, I just want to be clear.  They
18   never told you that you had a contract that
19   entitled you to take 12 weeks of leave?
20 A.  Yes.  I mean, they told me that I could take
21   my 12 weeks.
22 Q.  That's a different question.  Listen
23   carefully.

Page 147

1      MS. DUNCAN:  Object to the form.
2  Q.  Listen carefully to my question.
3  A.  Okay.
4  Q.  I understand you just said that they told you
5    you could take 12 weeks of leave, correct?
6  A.  Correct.
7  Q.  Did they ever tell you that you had a
8    contract that entitled you to take 12 weeks
9    of leave?
10 A.  Meaning did they sign something, too?
11 Q.  Anything.  Did they sign something; did they
12   tell you something?
13 A.  No.  There were some e-mails from Roger
14   agreeing, you know, to that return from
15   maternity leave and that kind of thing.
16 Q.  About your return date?
17 A.  Yes.
18 Q.  Okay.  You just mentioned that there were
19   some e-mails about your maternity leave?
20 A.  Uh-huh.
21 Q.  Other than those e-mails, was there -- and
22   you mentioned a letter before, as well, that
23   you gave to Todd.

Page 148

1  A.  Yes, that I gave to Todd.
2  Q.  Was there anything else in writing about your
3    maternity leave?
4  A.  Besides just the communication back from
5    Roger and I about the plan of taking
6    maternity leave.
7  Q.  Was that all in e-mail?
8  A.  Yes.
9  Q.  Anything other than the e-mails and the
10   letter that you mentioned to Todd?  Were
11   there any other things in writing about your
12   maternity leave?
13 A.  No.
14 Q.  All right.  Are there any other witnesses or
15   other people who know about this contract?
16   You mentioned Todd so far and Roger Miller.
17   Is there anybody else who knows about this
18   contract?
19 A.  Jeannie was there during the time, so I don't
20   know if she knew about it.
21 Q.  Jeannie?
22 A.  Antonello.
23 Q.  Okay.

Page 149

1  A.  I don't know if I pronounced that correctly.
2    I mean she was there during that time.
3  Q.  But was she a part of the discussions or
4    communications about this contract, as you
5    call it?
6  A.  Not that I recall.
7  Q.  Was anybody else involved in the
8    communications about this contract?
9  A.  Besides my intern, Tandi.  She knew the
10   stipulations of it, about the term of how
11   long I would be gone.
12 Q.  Okay.  Anybody else?
13 A.  No.
14 Q.  All right.  Now, did Tandi -- was Tandi
15   involved in the communications that explained
16   what you were entitled to as far as this
17   contract goes?
18 A.  No.
19 Q.  In order to get this 12 weeks of leave, the
20   maternity leave that you were talking about,
21   what were you required to do under the
22   contract?
23 A.  I wasn't required; I was asked.

Page 150

1  Q.  Yeah.
2  A.  So Roger had asked me about that they were
3       willing to pay me seven hours a week and that
4       I, of course, agreed upon it, thought it was
5       a wonderful idea, that I could work directly
6       with the intern and the hotel and Roger and
7       Todd during my leave, again, to keep the
8       sales where it was.
9  Q.  What did this contract say about how long
10      your employment at Fairfield Inn was supposed
11      to last?
12 A.  My employment was supposed to last?
13 Q.  Yeah.
14 A.  It doesn't state the term of my employment.
15 Q.  Okay.  Did the contract allow you to quit
16      working at Fairfield Inn the next day?
17 A.  I don't understand your question.
18 Q.  Well, you had a contract about your maternity
19      leave, right?
20 A.  Correct.
21 Q.  Could you have quit the very next day after
22      you entered that contract with Fairfield
23      Inn?

Page 151

1  A.  I don't know.
2  Q.  You don't know?
3  A.  Are you talking about after the maternity
4       leave?
5  Q.  No.  I'm talking about you sent Todd this
6       letter, right?
7  A.  Correct.
8  Q.  And that's when you had your contract with
9       the Fairfield Inn about you taking this
10      maternity leave, right?
11 A.  I guess you're throwing me off by using the
12      word "contract."
13 Q.  Okay.
14 A.  Because one minute you're saying it's a
15      contract; the next minute you're saying it's
16      a letter.  So can you please tell me which
17      one you're talking about?
18 Q.  Sure.  Well, you said that the letter was the
19      contract.
20 A.  You said contract.  I don't believe I --
21 Q.  Okay.
22 A.  I referred to it as a letter.
23 Q.  I want to be clear.  You've got a claim in

Page 152

1       your complaint that says that the Fairfield
2       Inn breached a contract with you about your
3       maternity leave.
4  A.  Correct.
5  Q.  I'm trying to understand what that contract
6       is and what it's based upon.  You said it's
7       based upon --
8  A.  It's based upon --
9  Q.  -- a letter.
10 A.  -- the letter.
11 Q.  And anything else?
12 A.  No.
13 Q.  So that's why I keep calling it a contract.
14      You said that the letter was the contract.
15 A.  But then one minute you're saying letter.  I
16      just want to make sure that the letter and
17      the contract you're referring to is the same
18      thing.
19 Q.  Okay.  That's fair.
20 A.  Okay.
21 Q.  Yes.  When I say contract, I'm talking about
22      the letter that you gave to Todd Epplin about
23      you taking maternity leave.

Page 153

1  A.  And I guess what I -- besides the breach of
2       contract, there was a job description signed
3       that -- I look at that as a contract, so
4       that's where some of the confusion is.  So I
5       do apologize.  So we're just strictly talking
6       about -- not my job description contract,
7       we're talking about the FMLA right now,
8       correct?
9  Q.  Correct.
10 A.  Okay.
11 Q.  I appreciate you clarifying that for me.  The
12      contract that we're talking about, the one
13      where you sent to Todd about your taking
14      maternity leave.
15 A.  Correct.
16 Q.  Did that contract allow you to quit working
17      at the Fairfield Inn the very next day?
18 A.  Did it allow me to?
19 Q.  Sure.  Could you have?
20 A.  If I went into labor.
21 Q.  Could you have quit the very next day?
22 A.  Yes.
23 Q.  Could you have quit the next week?

Page 154

1 A. Yes.
2 Q. Could you have quit the next month?
3 A. Yes.
4 Q. Could you have quit right before you gave
5    birth to Tanner August of 2005?
6 A. Yes, but that wasn't my -- yes, but that was
7    not my intention.
8 Q. Could you have quit while you were on leave?
9 A. Yes, I could have.
10 Q. Did the contract allow the Fairfield Inn to
11    terminate your employment the very next day?
12 A. I don't understand.
13 Q. Could they have terminated your employment
14    the very next day?
15 A. If they wanted to.
16 Q. What about the next week?
17 A. I guess so.
18 Q. The next month?
19 A. I guess so. But, again, since they did not
20    contest to it or respond to it in any way, I
21    felt that I was protected by it. And the
22    e-mails --
23 Q. Did you -- I'm sorry. Go ahead.

Page 155

1 A. I was just saying that the e-mails show
2    Roger's communication with me about, you
3    know, it's our goal to get you back; we want
4    you to take six to eight weeks, enjoy your
5    family. You know, it was -- so it was my
6    understanding in the e-mails and my letter
7    that that was a form of contract for my
8    employment. I felt that I had that security
9    there.
10 Q. What would you have done if Fairfield Inn had
11    said that you can't take leave?
12 A. That I couldn't take leave to have a baby?
13 Q. Yeah.
14 A. Then I wouldn't have had a choice.
15 Q. What do you mean you wouldn't have had a
16    choice?
17 A. I mean, I would have had the baby. I mean,
18    you know, you -- you know, I would have --
19    you know, if they would have told me, I would
20    have -- I don't know.
21    MS. DUNCAN: Object. It calls for
22       speculation not relevant to the
23       facts.

Page 156

1 Q. Did you do anything different that you
2    otherwise would not have done based upon
3    your -- based upon this letter that you gave
4    to Todd?
5 A. Would I have done it differently?
6 Q. No. Did you do anything different?
7 A. No. If you can explain different. What do
8    you mean?
9 Q. Well, did you do anything that you otherwise
10    would not have done based upon your
11    communications with the company about you
12    taking maternity leave?
13 A. No.
14 Q. All right. Let's back up. We talked
15    previously about a claim for sex
16    discrimination. And I just wanted to get an
17    idea from you. Are there any non-pregnant
18    employees that you believe were treated more
19    favorably than you?
20 A. In what terms are you speaking?
21 Q. Any terms.
22 A. No.
23 Q. Okay. Are there any male employees you

Page 157

1    believe were treated more favorably than you?
2 A. There were no male employees besides Todd.
3 Q. So I guess the answer there is no.
4 A. Correct.
5 Q. Okay. Do you know how many employees were
6    employed at the Fairfield Inn during each
7    week in 2004?
8 A. Each week?
9 Q. Yes.
10 A. I wasn't in charge of operations. I can give
11    a general idea.
12 Q. If you gave that general idea, would it just
13    be guessing?
14 A. Yes.
15 Q. Go ahead and guess, but --
16 A. Because it's on shifts. I mean, again, I'm
17    not -- I wasn't in charge of scheduling, and
18    my schedule had nothing to do with their
19    schedule. It's two different departments.
20 Q. So you really didn't know how many employees
21    were working at the Fairfield Inn in 2004?
22 A. I can give you an estimate.
23 Q. Okay. What is that estimate? Each week, I

Page 158

1   mean. How many employees were working each
2   week?
3   A. I'm thinking.
4   Q. Okay.
5        (Brief pause)
6   A. 25.
7        MS. DUNCAN: I object to the question.
8   A. I have no idea.
9        MS. DUNCAN: You're still fishing for
10        speculative answers. She's
11        already said she wasn't in charge
12        of operations and didn't have
13        access to that information. I
14        move to strike any answer that she
15        gives.
16   Q. Do you know how many employees -- do you know
17        how many employees were employed at the
18        Fairfield Inn each week during 2005?
19   A. No.
20   Q. During 2004, did the Fairfield Inn have any
21        employees -- hold on. Back up. During 2004,
22        did either Hospitality Ventures, Montgomery
23        Ventures, or Fairfield Inn employ anyone to

Page 159

1   work anywhere within 75 miles of the
2   Fairfield Inn other than at the Fairfield
3   Inn?
4   A. Again, I wasn't in charge of operations. I
5        wouldn't know.
6   Q. Same question for 2005. During -- hold on.
7        Just let me ask the question.
8   A. Go ahead. Sure.
9   Q. During 2005, did either Hospitality Ventures,
10        Montgomery Ventures, or the Fairfield Inn --
11        did any of them employ anyone to work
12        anywhere within 75 miles of the Fairfield Inn
13        who did not work at the Fairfield Inn?
14   A. Again, I did not work in operations and I did
15        not know.
16   Q. Okay. Why do you think you should have been
17        eligible for leave under the Family Medical
18        Leave Act?
19   A. Because, again, I was asked to put my leave
20        in writing. And through the discussion with
21        Todd, it was never contested, it was never,
22        you know, said that we don't do this or this
23        isn't our policy. He never showed me or gave

Page 160

1   me any other reason not to believe that I was
2   under FMLA.
3   Q. Any other reasons?
4   A. Repeat the question one more time.
5   Q. Sure. Why do you think you should have been
6        eligible for leave from Fairfield Inn under
7        the Family Medical Leave Act?
8   A. I had a child under Marriott before and
9        under -- you know, I really just felt that it
10        was an -- again, through our conversation
11        with Todd, I felt that I was given that FMLA
12        right.
13   Q. Okay. When you had your child --
14   A. First child.
15   Q. -- first child, you were working for Marriott
16        International?
17   A. Correct.
18   Q. And that's a different employer than you had
19        when you had your second child, right?
20   A. Correct.
21   Q. Okay. So why did you think that having the
22        one child while you were employed by Marriott
23        International should be relevant to whether

Page 161

1   you were entitled to leave at a different
2   employer?
3   A. Well, it wasn't just Marriott -- excuse me --
4        Marriott International. I mean, it was
5        Residence Inn, Courtyard, and Fairfield Inn.
6        You know, so it was that company together.
7        So again --
8   Q. You understand this is a different company,
9        right?
10   A. Yes.
11   Q. Okay. So I'm just wondering why the one is
12        related to the other.
13   A. Just a feeling. And, again, it was never
14        told to me otherwise.
15   Q. Have you told me every reason that you think
16        you should have been eligible for leave from
17        the Fairfield Inn under the Family Medical
18        Leave Act?
19   A. Yes, sir. Can I take a break now?
20   Q. Sure.
21   A. Thank you.
22        (Brief recess)
23   Q. Ms. Watts, we've discussed this breach of

Page 162

1 contract claim. We've discussed this Family
2 Medical Leave Act claim. We've discussed
3 this discrimination claim. Other than those
4 that we've discussed, do you have any other
5 claims against the Fairfield Inn as you sit
6 here today?
7 A. No.
8 Q. Why did you sue Hospitality Ventures, LLC?
9 A. Because they were my employer, too.
10 Q. What made you think that it was Hospitality
11 Ventures, LLC, that was your employer?
12 A. Based on the -- who I was reporting to. My
13 pay stub also says it on the top of it.
14 Q. It does?
15 A. It says HV.
16 Q. Do you have a copy of your pay stub?
17 A. I believe so. I think it says HV Investors.
18 And it says it on the handbook.
19 Q. The one that you received after --
20 A. Yes.
21    MR. FELLNER: What is that?
22    MS. DUNCAN: What?
23    MR. FELLNER: That.

Page 163

1    MS. DUNCAN: That's the envelope that
2       the pay stub came in.
3    MR. FELLNER: How come that wasn't
4       produced?
5    MS. DUNCAN: I don't know. I thought
6       it was.
7    THE WITNESS: I think we did.
8    MS. DUNCAN: I think you got it.
9    MR. FELLNER: I don't think so.
10    MS. DUNCAN: Well, do you have this
11       one?
12    MR. FELLNER: That, I have. That, I
13       produced to you.
14 A. And then in my job description, it does say
15    Fairfield Inn, slash, Hospitality Ventures.
16 Q. Does it say Hospitality Ventures, LLC?
17 A. I'd have to look at it to recall, but I know
18    it says Hospitality Ventures.
19 Q. We'll take a look at the job description in
20    just a little bit.
21 A. Sure.
22 Q. So based upon -- the reason why you think
23    that Hospitality Ventures, LLC, was your

Page 164

1 employer is based upon the pay stub, who you
2 were reporting to, your job description.
3 Anything else?
4 A. And also who I was hired from.
5 Q. And who you were hired by.
6 A. Because I never interviewed locally. I was
7 interviewed in Atlanta directly with
8 Hospitality Ventures.
9 Q. And I want to be more specific about it.
10 Okay. Anything else, though?
11 A. No.
12 Q. Now I want to be more specific about it. I
13 understand that all that stuff led you to
14 believe that Hospitality Ventures was your
15 employer, but I want to focus on this because
16 it's important in this case. You have sued
17 Hospitality Ventures, comma, LLC, a limited
18 liability company. What I want to focus on
19 is why you think that Hospitality Ventures,
20 LLC, was the entity that employed you or the
21 entity that should be liable for whatever
22 things you're accusing them of.
23    MS. DUNCAN: Object to form. Calls for

Page 165

1    a legal conclusion.
2 Q. I'm just asking what facts lead you to that
3 conclusion. That's all.
4 A. I don't know.
5 Q. So other than your pay stub, who you reported
6 to, and your job description and who hired
7 you, we don't know anything?
8 A. Correct.
9 Q. Okay.
10    MR. FELLNER: Do you have that pay stub
11       thing? Can I take a look at that
12       for a second?
13       Thank you. What I would
14       like to do is go ahead and get a
15       copy of this so I can use it in
16       the case.
17    MS. DUNCAN: Sure.
18    MR. FELLNER: We'll do it in a few
19       minutes. All right?
20 Q. Beginning in August of 2005, what were your
21 child care arrangements for your daughter,
22 Taylor?
23 A. Taylor?

Page 166

1  Q.  Yes.
2  A.  She went to Taylor Road Baptist Church.
3  Q.  How many days a week?
4  A.  Four.
5  Q.  From what time until what time?
6  A.  7:30 to 2:30.
7  Q.  Which days?
8  A.  Monday through Thursday.
9  Q.  Okay.  And how long did that continue for?
10 A.  She just completed this year in May.
11 Q.  So she's been there this whole time?
12 A.  Sure.
13 Q.  So ever since August of 2005, she's been
14     going to -- Taylor, your daughter, has been
15     going to Taylor Road Baptist Church four days
16     a week, Monday through Thursday, 7:30 to
17     2:30.
18 A.  Uh-huh.
19 Q.  And that's never changed.
20 A.  No.  No.
21 Q.  When did you say she completed?  I'm sorry.
22 A.  Actually, she finished in April of this year,
23     the K-4 program.

Page 167

1  Q.  Let's talk about Tanner.  Beginning in August
2     of 2005, what were your child care
3     arrangements for Tanner?
4  A.  He was to also attend Taylor Road Baptist
5     Church.
6  Q.  When was he supposed to begin?
7  A.  Not until October.
8  Q.  October '05?
9  A.  Correct.
10 Q.  How many days a week was Tanner supposed to
11     go to Taylor Road Baptist Church?
12 A.  The same.
13 Q.  Four days a week?
14 A.  Correct.
15 Q.  Monday through Thursday?
16 A.  Correct.
17 Q.  What time?
18 A.  Same times.
19 Q.  7:30 a.m. to 2:30 p.m.?
20 A.  Correct.
21 Q.  When did he begin going to Taylor Road
22     Baptist Church for day care?
23 A.  In October.

Page 168

1  Q.  Do you remember what date?
2  A.  I do not.
3  Q.  Was it early October?  Later October?  Do you
4     have any idea?
5  A.  I would probably say mid October, but I
6     can --
7  Q.  Did that arrangement ever change?
8  A.  When he started in October, he only went one
9     day a week because he was still so young; but
10     I had to take that spot to guarantee him to
11     be able to have the four day starting when I
12     went back to work in November.
13 Q.  So for the month of October --
14 A.  Yeah.
15 Q.  -- to the extent that he went to day care in
16     October --
17 A.  Correct.
18 Q.  -- he only went one day a week?
19 A.  Yes.  I want to make sure I understood that
20     question.  Would you ask it again?
21 Q.  In October 2005, Tanner went to day care at
22     Taylor Road Baptist Church?
23 A.  Yes.

Page 169

1  Q.  How many days a week did he go?
2  A.  One.
3  Q.  Do you remember what day?
4  A.  No, I don't.
5  Q.  Do you remember what time he went on that one
6     day?
7  A.  The same time.
8  Q.  7:30 to 2:30?
9  A.  Uh-huh.
10 Q.  And that's 7:30 a.m. to 2:30 p.m., right?
11 A.  Correct.
12 Q.  When did it -- did his hours and days at
13     Taylor Road Baptist Church ever increase?
14 A.  It did as they had openings on the day that
15     he -- on any of those four days, if they
16     called and said they had an opening Monday,
17     Wednesday or Tuesday, Thursday.  It increased
18     as the openings came available.
19 Q.  When did that increase?
20 A.  Towards the end of October, but I was
21     guaranteed the spot for my return to go back
22     to work in November.  I was guaranteed the
23     four days the full time that they were open.

Page 170

1 Q. When were you guaranteed that spot in
2    November?
3 A. November 9th.
4 Q. So starting November 9, 2005, you were
5    guaranteed to have --
6 A. On my first day back to work, that he would
7    have day care.
8 Q. That Tanner would be going to day care four
9    days a week, Monday through Thursday --
10 A. Uh-huh.
11 Q. -- from 7:30 a.m. to 2:30 p.m.?
12 A. Correct.
13 Q. After 2:30 p.m. on Monday through Thursday,
14    who would care for your children?
15 A. My grandmother or my father.
16 Q. Every day?
17 A. Not every day. Again, my hours at the hotel
18    were based, of course, on the needs of the
19    hotel. And some days I did finish at two,
20    and I would take them that day. But I then
21    may have to return at 5:30 if we had a group
22    coming in. Or if I knew I had to work on a
23    Saturday or Sunday, then I adjusted my time

Page 171

1    accordingly with Todd Epplin. He never
2    had -- had a problem, you know, if I came in
3    later that morning to be able to work late
4    that night.
5       But no matter the lapse of time, there
6    was -- their child care was taken care of.
7 Q. Okay. But I'm just trying to understand. So
8    your grandmother -- it was your grandmother,
9    right?
10 A. Correct.
11 Q. Your grandmother -- and I think we have her
12    name, but what --
13 A. Frances Taylor.
14 Q. Frances Taylor.
15 A. Yes.
16 Q. Where does she live?
17 A. Here in Montgomery.
18 Q. Where?
19 A. Green Ridge.
20 Q. What's Green Ridge?
21 A. A drive.
22 Q. Green Ridge Drive?
23 A. Yes, ma'am -- I mean -- excuse me. Yes, sir.

Page 172

1 Q. Do you know what her address is?
2 A. Uh-huh. 930 -- I believe it's 939 or 932,
3    but I can verify that for you.
4 Q. 939 or 932?
5 A. Let me think. I believe it's 939.
6 Q. Montgomery, right?
7 A. Correct.
8 Q. Okay. And your father, Rouse?
9 A. Uh-huh.
10 Q. Godfrey, right?
11 A. Correct.
12 Q. What was his address?
13 A. He lives in an apartment. It's Peppertree
14    Apartments. I'm not sure of the house
15    number, but it's in Montgomery.
16 Q. Okay. How many days a week was your
17    grandmother, Frances Taylor, supposed to care
18    for your children after 2:30 p.m.?
19 A. Every day.
20 Q. Every day.
21 A. The arrangement was every day. And then if
22    my schedule allowed, I would just take them.
23    And then my -- my father was the backup.

Page 173

1 Q. Okay.
2 A. If I got held over in a meeting or in an
3    appointment or whatever.
4 Q. Was your grandmother supposed to pick them up
5    from day care?
6 A. Some days my dad picked them up and took them
7    to her, or I would take a late lunch and go
8    pick them up and take them to her. She did
9    not feel comfortable driving at times, but
10    she did. She would go get them.
11 Q. What about on Fridays? Who cared for your
12    children on Fridays?
13 A. My grandmother.
14 Q. And you're absolutely certain that that was
15    ready, in place; that November 9th, you would
16    be able to do that?
17 A. Yes. I mean it was guaranteed that he had
18    that spot.
19 Q. Okay. Who were Tanner's health care
20    providers from the time he was born until
21    January 1, 2006?
22 A. It was Partner -- I know this was all
23    provided, but Partners in Pediatrics. And

Page 174

1   his primary doctor was Dr. Elizabeth Dieble.
2   Q.  Dieble.  That's how it's pronounced?
3   A.  D-I-E-B-L-E.
4   Q.  Anyone else?
5   A.  If she wasn't available, then he would see
6       Dr. Blakeney or whatever doctor.  There's six
7       doctors in that office building of pediatric
8       care.
9   Q.  During your leave of absence from Fairfield
10      Inn, how was Tanner's health?
11  A.  It was good.
12  Q.  Did he have any illnesses?
13  A.  Typical, normal for an infant or any child to
14      have ear infections.  So he did have a few
15      ear infections.
16  Q.  How many?
17  A.  I think his first one was at six weeks old,
18      and I think he had another one just shortly
19      coming off of an antibiotic then, and he's
20      had them up until today.
21  Q.  Sorry to hear that.
22  A.  Yeah.
23  Q.  All right.  So he had at least one during the

Page 175

1   first six weeks?
2   A.  Yes.  Well, right at six weeks.  He was right
3       at six weeks old when he had his first one.
4   Q.  Did a health care provider treat Tanner for
5       those ear infections?
6   A.  Yes.
7   Q.  Dr. Dieble?
8   A.  Dieble.  Dieble.
9   Q.  What treatment did any health care provider
10      suggest for Tanner's health care conditions?
11  A.  They put him on just antibiotic.  And she did
12      ask if he was in day care at the time at six
13      weeks, and I said no, and she just -- she
14      knew I was on maternity leave.  She's also
15      Taylor's doctor, so she knew that I was on
16      maternity leave.  And she just suggested to
17      keep him out as long as I could during my
18      maternity leave before letting him go to day
19      care in November.
20  Q.  So she just suggested it?
21  A.  She suggested it.  She didn't give any doctor
22      orders or anything, no.  Just suggested it.
23  Q.  Did she say why?

Page 176

1   A.  It's just common for children with ear
2       infections to -- or colds -- that he was
3       constantly catching a cold that would drain
4       into his ears.  And that's just where germs
5       are born is what they say.  So with him being
6       so young, you know, waiting until he was a
7       couple of months old was going to be best for
8       him.
9   Q.  How long did she suggest that you keep Tanner
10      out of day care?
11  A.  Just during my -- I told her -- she asked if
12      I was taking a full leave of maternity; and I
13      said, Yes, the 12 weeks.  And she said, Well,
14      I would at least keep him out until that 12
15      weeks is over.
16  Q.  Did you follow those instructions?
17  A.  Yes.  Well, he -- I had to take that spot in
18      October or I wasn't going to have my child
19      care in November, but his ear infections did
20      clear up and seemed to be doing better.
21  Q.  Did you communicate these instructions or
22      these suggestions that you received about
23      keeping Tanner out of day care to Fairfield

Page 177

1   Inn?
2   A.  To Roger in e-mails, yes, I did.
3   Q.  What was the response?
4   A.  He just -- I believe that the response was,
5       hopefully, things will get better and you
6       will be returning with us soon, something to
7       that nature.  I mean, it was never anything
8       like that, but I don't remember exactly.
9   Q.  Okay.  Who took care of Tanner when he was
10      out of day care at that time?  You?
11  A.  Uh-huh.  Just during my maternity leave, yes,
12      or if I was out.
13  Q.  Who's Tandi Mitchell?
14  A.  Tandi?
15  Q.  Yeah.
16  A.  She is the owner of Hotel Solutions.
17  Q.  When did you meet Tandi?
18  A.  Oh, I've known her since I started with
19      Marriott.
20  Q.  Marriott International?
21  A.  Well, it was when I was employed by Residence
22      Inn and Courtyard and Fairfield, yes.
23  Q.  And that was in 2000?

Page 178

1   A.  Yes, in November of 2000.  I think we met
2       later.  The beginning of 2006, actually.
3   Q.  Did you do work with her before you came to
4       Fairfield Inn?
5   A.  She was -- I believe she was just starting
6       her company then.  We did some work, but
7       she's treated as a -- a travel agent and a
8       couple of the -- I know Courtyard, Residence
9       Inn, did not pay independent travel agents at
10      that time; so I did work with her some.
11  Q.  So back when you working for Marriott
12      International, you did some work with --
13  A.  Yes.
14  Q.  -- Tandi Mitchell?
15  A.  Yes.
16  Q.  And her company Hotel Solutions?
17  A.  Correct.
18  Q.  What kind of work?
19  A.  She -- again, she worked like a travel
20      agent.  So if she had a group or, again, if
21      it was Residence Inn, someone staying for an
22      extended period of time, she would refer that
23      business or she -- we would work as a partner

Page 179

1       with that company to take care of their
2       lodging needs; and she would get paid a
3       commission of their room nights.
4   Q.  So she would send business or book some
5       rooms --
6   A.  Correct.
7   Q.  -- or bookings of rooms over to particular
8       hotels, and you had happened to be a
9       beneficiary of some of that, right?
10  A.  Right.
11  Q.  Before you arrived at the Fairfield Inn, did
12      Hotel Solutions book rooms at the Fairfield
13      Inn?
14  A.  Yes.
15  Q.  How much?
16  A.  Without pulling sales documents, I don't -- I
17      really don't recall.  I don't know.
18  Q.  Okay.  Who do you believe replaced you at the
19      Fairfield Inn?
20  A.  Tandi and Tammy.
21  Q.  And Tammy?
22  A.  Uh-huh.
23  Q.  Dominguez?

Page 180

1   A.  Uh-huh.
2   Q.  Tandi Mitchell and Tammy Dominguez?
3   A.  Yes.  I know it's --
4   Q.  Anyone else?
5   A.  I know there were some others hired later on;
6       but immediately, those were the only two.
7   Q.  When did they replace you?
8   A.  When did they fire me?
9   Q.  No.  When did they -- you said that those
10      people replaced you, Tandi and Tammy.  When
11      did they replace you?  Immediately?  Sometime
12      thereafter?
13  A.  Tandi was the intern during my maternity
14      leave, so she was already working with me
15      during the maternity leave.
16  Q.  When -- after your employment at Fairfield
17      Inn terminated, did Tandi immediately stop
18      working for Hotel Solutions and start working
19      for Fairfield; or how did that work?  Did she
20      continue at Hotel Solutions?
21  A.  It's my understanding that she stayed under
22      the agreement that was already in writing
23      that we put together -- Roger, Todd and I and

Page 181

1       Tandi put together during my maternity
2       leave.  So it's my understanding that she
3       stayed in that position, which she did not
4       work at the hotel.  She worked directly from
5       her office.  So she was not at the hotel on a
6       daily basis.
7   Q.  Where was her office?
8   A.  At the LaQuinta.
9   Q.  Where is that in relation to the Fairfield
10      Inn?
11  A.  Less than a mile.  It's still on Carmichael
12      Road.
13  Q.  Was she a Fairfield Inn employee while you
14      were on leave?  Tandi, that is.
15  A.  According to things that she signed, she was
16      signed in as an intern.
17  Q.  Do you know one way or the other whether she
18      was an employee of Fairfield Inn?
19  A.  I think Roger and Todd gave her the option
20      about having -- being on the payroll and
21      having taxes taken out or was she going to
22      report that separately with her accountant
23      based on her business.  And I believe that

Page 182

1    she chose to do that separately.
2  Q.  So she was paid through her business?
3  A.  She was paid from Fairfield Inn to her
4    business.
5  Q.  What was the agreement with Tandi about what
6    she was supposed to be doing while you were
7    on maternity leave?
8  A.  She had a job description as well, so she was
9    to basically just follow right into my
10    shoes:  maintain accounts, maintain groups,
11    sales calls, telemarketing.
12  Q.  How many days a week was she supposed to be
13    working?
14  A.  Five.
15  Q.  Five?
16  A.  Five days.
17  Q.  Do you remember how many hours a day she was
18    supposed to be working?
19  A.  I do not know.
20  Q.  Anything else you remember about what her
21    agreement was with Fairfield Inn about her
22    work?
23  A.  I know that she was paid less than me.

Page 183

1  Q.  What was her pay?
2  A.  Five hundred a week.  And she was also single
3    with no children.
4  Q.  Why does that matter?
5  A.  I don't know.
6  Q.  Okay.  What else can you tell me about
7    Tandi's agreement with Fairfield Inn for
8    while you were on leave?
9  A.  I just truly feel that they wanted her in
10    that position because not only did she not
11    have any children and she was single and that
12    Tammy didn't have to deal -- to deal with
13    that, but Tammy herself was also single and
14    did not have custody of her own child.
15  Q.  So you think that Tammy fired you because you
16    had children and you were married?
17  A.  I think because she claims that I did not
18    have child care and that I had children, yes.
19  Q.  I'm sorry.  I'm not sure that I got a clear
20    answer; but my question was, do you think
21    that Tammy fired you because you were married
22    and had children?
23  A.  I don't know.

Page 184

1  Q.  Okay.  Do you think that Tammy fired you
2    because she wanted to hire Tandi?
3  A.  I don't know.
4  Q.  Why do you think Tammy fired you?
5  A.  I don't know.
6  Q.  And you mentioned something about Tammy being
7    single?
8  A.  Uh-huh.
9  Q.  Why do you think that's important?
10  A.  I guess so she wouldn't have to deal with
11    someone having a family.
12  Q.  I'm sorry.  I'm not really following that.
13    My question was you mentioned that -- my
14    question was that you had mentioned that
15    Tammy was single, and I asked you why you
16    thought that was important.  Did you
17    understand that?
18  A.  Yes, I did.
19  Q.  Okay.  And I'm not trying to be rude.  I was
20    just trying to understand why that's
21    important to this case.
22  A.  I'd like to come back to that.  I'm not sure
23    how to answer it right now.

Page 185

1  Q.  We can take -- we can wait.
2  A.  I'll just say I don't know.
3  Q.  And you also mentioned that Tammy didn't have
4    custody of her child.  How do you know that
5    Tammy had children?
6  A.  She told me.
7  Q.  Okay.  How do you know that she didn't have
8    custody of her children?
9  A.  She told me.
10  Q.  Why is that important to this case?
11  A.  I mean, that's just some inner thoughts and
12    feelings.  I mean, I don't have any -- I'll
13    just say I don't know.
14  Q.  What do you think that the Fairfield Inn
15    should have done differently in this case?
16  A.  In my case?
17  Q.  Yeah.
18  A.  I think that they should have given me the
19    opportunity to come back to work.  I've never
20    given them any reason up to that day that I
21    was not able to do my job, I wasn't capable
22    of doing my job, that I could not show a
23    balance of work and family.  And I never gave

Page 186

1  them any reason not to let me come back. I
2  mean, I was willing to work during my
3  maternity leave, you know. And I gave them
4  everything and worked with them and produced
5  for them on a daily basis, and I felt
6  strongly about my job.
7  Q. Anything else that they should have done
8  differently in this case?
9  A. I believe I've already answered that
10  question.
11  Q. Okay. What do you want from this lawsuit?
12  A. In terms of --
13  Q. I mean, you're suing for some sort of damages
14  in this case. What is it you want?
15  A. My loss of income.
16  Q. Okay. What's that?
17  A. My loss of stability and the flexibility that
18  I had with the job, my benefits that I had.
19  Q. So the income that you think you've lost as a
20  result of not being employed at Fairfield
21  Inn, right?
22  A. Correct.
23  Q. You said job flexibility?

Page 187

1  A. Uh-huh.
2  Q. And benefits?
3  A. Correct.
4  Q. The cost of whatever benefits you've had to
5  obtain?
6  A. Uh-huh.
7  Q. Anything else?
8  A. No.
9  Q. Okay. You said benefits. What benefits do
10  you think you've lost?
11  A. Insurance.
12  Q. Health care?
13  A. Health, yes.
14  Q. Anything else?
15  A. I don't recall, but I'm thinking of the whole
16  package of insurance. I think there was
17  dental and vision as well.
18  Q. So whatever benefits you had while you were
19  at Fairfield Inn?
20  A. Correct.
21  Q. Have you gotten dental insurance?
22  A. Yes. We're having to pay for that.
23  Q. Who do you have dental insurance through now?

Page 188

1  A. The whole health insurance? Is that what
2  you're asking?
3  Q. Well, okay. I was going to take them one at
4  a time.
5  A. Okay. They're all together.
6  Q. They're all together?
7  A. Yes, sir.
8  Q. What is all together? It's your health,
9  dental. Anything else?
10  A. I believe it's vision as well, yes.
11  Q. Anything else? Health, dental, vision.
12  A. That's it.
13  Q. Okay. Where do you get your health, dental,
14  and vision coverage?
15  A. My husband's employer.
16     MR. FELLNER: I'm not sure that we've
17        received documents about whatever
18        benefits she's paying for now.
19     THE WITNESS: I'll give them to Jenny.
20     MR. FELLNER: I'm sure that we'll
21        figure it out. And I would assume
22        that if I don't have it, then I'll
23        get it.

Page 189

1  Q. What income do you think you've lost?
2  A. Well, my current -- the income that I -- my
3  last income plus bonuses. Are you asking for
4  a total?
5  Q. Yeah.
6  A. Oh, okay.
7  Q. What was your last income?
8  A. It was the 38 plus the potential bonuses.
9  Q. $38,000 a year?
10  A. Correct.
11  Q. Plus bonuses?
12  A. Uh-huh.
13  Q. Do you remember roughly what your bonuses
14  were? They were quarterly, right?
15  A. Correct. Almost 15,000 a year.
16  Q. So the money that you've lost would be the
17  38,000 plus whatever bonuses you received?
18  A. And I did meet and exceed every quarter
19  during my time of employment.
20  Q. So the 38,000 in salary plus your bonuses?
21  A. Uh-huh.
22  Q. Minus whatever you've earned?
23  A. What do you mean minus?

Page 190

1  Q. Well, you've earned something, right, since
2     you left?
3  A. Yes. Yes. I'm sorry.
4  Q. So that's not lost income, then, right?
5  A. Correct.
6  Q. Okay. Anything else that goes into
7     calculating your lost income?
8  A. I don't recall at this time.
9  Q. All right. And job flexibility. How does
10    the Court give you that?
11 A. I don't know.
12 Q. I mean, how would you want the Court to make
13    up for that?
14       MS. DUNCAN: Object to form. Calls for
15          legal conclusions. She's --
16 A. I don't know.
17 Q. You don't know how you would want the Court
18    to make up for it?
19 A. How would they?
20 Q. I'm asking you.
21 A. I said I don't know.
22 Q. Okay. What do you think was -- in your
23    complaint, you've asked for punitive damages

Page 191

1     against Fairfield Inn. Why do you think
2     that -- what do you think that Fairfield Inn
3     did that entitled you to punitive damages?
4        MS. DUNCAN: Object to form again.
5           Calls for a legal explanation.
6  A. I don't know.
7  Q. Okay. Do you think that any of Fairfield
8     Inn's conduct was particularly egregious?
9  A. Will you explain that, please?
10 Q. Particularly bad?
11 A. Their conduct?
12 Q. Yeah. Anything they did.
13 A. Anything they did?
14 Q. Yeah.
15 A. Repeat the question again.
16 Q. Sure. Do you think anything that the
17    Fairfield Inn did with respect to you was
18    particularly bad?
19 A. By not letting me come back to my job.
20 Q. All right. But was there anything -- just
21    not letting you come back to your job, that
22    was the only thing?
23 A. Correct.

Page 192

1  Q. Okay. And was that -- do you think that was
2     either willful or malicious or anything like
3     that?
4  A. I mean, I do -- I feel like my right was
5     taken away.
6  Q. Okay. Do you think that there was anything
7     else that the Fairfield Inn did that was
8     either willful or malicious or anything like
9     that?
10 A. You know, going back to November 3rd, there
11    was a conversation. Tammy called me again at
12    home and asked me if I had called the hotel
13    asking about FMLA. And I told her no, that
14    when I turned in my -- my paperwork and
15    laptop and everything, I was asked to clean
16    out my personal files and folders and
17    everything on the 2nd of November -- in that
18    conversation, she said to me -- after the
19    question of asking did I call the hotel and
20    ask about FMLA and when I told her no, she
21    said, well, she did not realize that I was
22    under FMLA and that she had made a mistake.
23    And so the next day is when I received the

Page 193

1     offer to be in another position at the hotel.
2  Q. Okay. What was particularly either willful
3     or malicious or anything bad about that,
4     particularly bad about that?
5  A. Going against their word. I mean, she had
6     already fired me. You know, she realized
7     that she had messed up. She admitted to
8     that. And then she tried to come back and
9     offer me a front desk position, which, to
10    begin with, is an insult for a degree of my
11    kind to go from a director of sales and
12    management to a front desk clerk. And there
13    was no reason not to allow me back into
14    sales. I never gave her any reason that I
15    would not be a director of sales employee.
16 Q. Anything else?
17 A. No.
18 Q. Are there any other damages that you believe
19    you've incurred to date?
20 A. No.
21 Q. What about attorney's fees? Have you had to
22    pay attorney's fees up until now?
23 A. Yes.

Page 194

1  Q.  What kind of attorney's fees?  How much are
2     we talking about?
3  A.  I don't recall at this time.
4  Q.  Is it more than a thousand dollars?
5  A.  I don't recall.  I mean, I don't have a
6     total.
7  Q.  Is it less than a thousand dollars?
8  A.  I don't know.
9  Q.  Is it more than $5,000?
10 A.  I don't know.
11 Q.  Who wrote the check?  Did you write the
12    check?
13 A.  Yes, I did.
14 Q.  When did you write the check?
15 A.  There was one in November, and then there was
16    a filing fee for federal court.
17 Q.  Okay.  Anything else for fees or expenses
18    related to this case?
19 A.  I don't know any at this time.
20 Q.  Do you remember how much the check was for in
21    November?
22 A.  No, I don't.
23 Q.  Do you seek any other damages in this

Page 195

1     lawsuit?
2  A.  No, I don't.
3  Q.  Okay.  After your employment at the Fairfield
4     Inn terminated, when did you start looking
5     for work?
6  A.  Immediately.
7  Q.  Tell me everything you did to start looking
8     for work.
9  A.  When I went to apply for my unemployment,
10    you're automatically assigned a counselor and
11    given an access code or a password to any
12    computer system that you go to, if you use
13    theirs or a library or home.  And they showed
14    me how to use it, how to go in under my
15    specialties or my degree.  And I also filed
16    electronically as well.  I used their -- I
17    guess it's labeled as Alabama Unemployment
18    Services, if I'm correct.  So I used it on
19    almost a weekly, daily basis searching for
20    jobs, posting resumes directly through their
21    web -- through their website.
22 Q.  With whom?
23 A.  The Alabama State Employees Credit -- I'm

Page 196

1     sorry.  Alabama State Unemployment Offices.
2  Q.  That was the website you used, right?
3  A.  Yes.
4  Q.  Who did you post resumes with?  What
5     employers?
6  A.  There's a list.
7  Q.  What list?
8  A.  I mean, there's lot of people.  Of course,
9     any of the -- all the hotels here in
10    Montgomery.  I tried to get a job with --
11    through hcareers.com through -- with Embassy
12    Suites, back to Holiday Inn, the Courtyard
13    Marriott here in Montgomery.
14 Q.  Who else?
15 A.  Exact company names?
16 Q.  Anything you can remember.
17 Q.  Or just websites.  It doesn't matter?
18 Q.  Company names.  Let's start with company
19    names.
20 A.  Montgomery Advertiser.
21 Q.  And I'm going to assume that you sought the
22    jobs that you currently have that we've
23    already discussed earlier today, so we don't

Page 197

1     need to talk about those.  Okay?  Is that
2     fair?
3  A.  I didn't understand.
4  Q.  Earlier today we talked about some of your
5     employment history after Fairfield Inn,
6     right?
7  A.  The Affiliate Marketing and ASPECT, correct.
8  Q.  Right.  I'm going to assume -- you tell me if
9     this is wrong, but you sought employment with
10    all of those entities except for Capture the
11    Moment, which is your own business?
12 A.  Correct.
13 Q.  So other than all of those, which we've
14    already discussed --
15 A.  Okay.
16 Q.  -- tell me who else you looked for a job
17    with.
18 A.  Can I refer back to this?  I know I put it in
19    writing.  There was so many.  I mentioned
20    Embassy Suites, Holiday Inn, Lexington
21    Hotels, Montgomery Advertiser, Growing
22    Family, Hospitality Performance Network,
23    H Careers, JHG Hotels, Travel Quest.  And you

1    said not to mention the others.
2  Q.  Okay.  Who did you contact at Embassy Suites?
3  A.  It was not -- they have an -- I guess through
4      hcareers.com.  It was not someone directly at
5      the hotel.  I guess it was at their corporate
6      office.
7  Q.  Okay.  Did you speak to anybody there?
8  A.  No.  I just --
9  Q.  Sent them a resume?
10  A.  Sent them a resume.
11  Q.  And that's it?
12  A.  Yes.
13  Q.  Did you ever call to follow up?
14  A.  I did.
15  Q.  And?
16  A.  They were not accepting calls.  They only do
17      call backs on resumes.
18  Q.  Did you ever get a call back?
19  A.  No, I did not.
20  Q.  Any other communications with Embassy Suites
21      about you obtaining a job there?
22  A.  I tried to call Bob Gaddis, who used to be
23      the general manager there; and I sent him a

1      personal letter, which come to find out, he
2      was no longer there.  So someone had said he
3      was there.  And when I went to send the
4      letter or call to verify the address, I found
5      out he's no longer there.  So --
6  Q.  Now you also mentioned Holiday Inn?
7  A.  Yeah.
8  Q.  You mentioned Holiday Inn.  Was that Holiday
9      Inn East?
10  A.  Yes.
11  Q.  The one that we talked about before?
12  A.  Yes.
13  Q.  Didn't you work there previously?
14  A.  No.  They're the ones that --
15  Q.  Oh, I'm sorry.  They solicited you?
16  A.  Yes.  I know you're going to ask me that
17      name.
18  Q.  Do you remember the name?
19  A.  I can see her face.  I don't know.
20  Q.  Okay.  How did you contact the Holiday Inn?
21  A.  They had an ad in the Montgomery Advertiser,
22      so I mailed in a resume.
23  Q.  When was that?

1  A.  Huh?
2  Q.  When?
3  A.  They had several jobs.  And they still have
4      jobs posted.  So it was probably November, I
5      guess.  It was just ongoing.  They were doing
6      the -- that's why they're now called
7      Lexington Hotel.  They were posting jobs; but
8      when I called and followed up, they were
9      doing a hiring -- they actually were freezing
10      those until they were being bought over.
11      So --
12  Q.  When did they change over from Holiday Inn to
13      Lexington Hotels?  Do you know?
14  A.  Just in the past four to six months.
15  Q.  So you mailed the Holiday Inn your resume?
16  A.  Yes.
17  Q.  Any other communication that you had with the
18      Holiday Inn about employment?
19  A.  No.
20  Q.  When did you mail that resume?
21  A.  I don't recall.  I mean --
22  Q.  You also mentioned the Courtyard Inn?
23  A.  Uh-huh.

1  Q.  When did you contact the Courtyard Inn?
2  A.  The Courtyard Marriott?
3  Q.  I don't know.  You tell me.
4  A.  Yes.  You were saying Courtyard Inn.  It's
5      Courtyard Marriott.
6  Q.  Oh, okay.
7  A.  The general manager and I -- there -- Steve
8      Douglas -- are very good friends.
9  Q.  Okay.
10  A.  They at the time -- it was in probably
11      January of this year.  They were looking
12      expanding their sales department, but they
13      did not.  Instead, the salesperson that they
14      have is now selling for Courtyard and
15      Residence Inn, too.  So they decided just to
16      have one person do both positions, but he
17      knows that I'm available or I'm looking for a
18      job.
19  Q.  Okay.  When did you first contact the
20      Courtyard Marriott?
21  A.  In January.
22  Q.  Of 2007?
23  A.  No.  I mean, about that sales position, yes;

Page 202

1  but I called probably January 2006 or maybe
2  April 2006, just as they had a job. On
3  hcareers.com, they would have a lot of
4  postings of jobs. And even if they would
5  have housekeeping, I would still call and
6  make sure there wasn't a sales position. So
7  I tried to keep continual contact with Steve
8  to let him know that I was willing -- or that
9  I was looking for a job.
10      He did have a night audit position, but
11  that's not something that I wanted to do --
12  or was able to do at the time.
13 Q. What is a night audit position?
14 A. Someone who works from, say, 7 p.m. to maybe
15  7 a.m. And it's a very lower-end paying job
16  that just mainly sits there and runs reports
17  during the night, runs the audit reports and
18  does late check-ins for anyone that comes in.
19 Q. Is that essentially the same position at most
20  hotels?
21 A. They all have night audits, yes.
22 Q. And that was what you understood to be the
23  position at Courtyard Marriott?

Page 203

1 A. Correct.
2 Q. Any other positions you sought at Courtyard
3  Marriott?
4 A. Not besides that sales job this year.
5 Q. Other than what we have discussed, did you
6  have any other communications with Courtyard
7  Marriott about employment?
8 A. No.
9 Q. Montgomery Advertiser sales, have we already
10  discussed that?
11 A. No. They, I mean, every day have some type
12  of telemarketing leader position or direct
13  sales leader position or a route sales
14  person. So I did -- I've always sent a
15  resume or, actually, done it online. And
16  that's -- their online thing is called
17  careers.com. And I never got a call back
18  from them.
19 Q. When did you first start responding to the
20  advertisements for Montgomery Advertiser?
21 A. They were all about within the same time.
22 Q. What time is that?
23 A. November, December of 2005.

Page 204

1 Q. Did you ever speak to anybody at Montgomery
2  Advertiser about a job?
3 A. No.
4 Q. Have you told me everything about your
5  communications with Montgomery Advertiser
6  about a job?
7 A. Correct.
8 Q. Growing Family, what is that?
9 A. It is a company that works within the
10  hospitals here. They have different
11  hospitals, but it's a baby photographer
12  position and sales.
13 Q. When did you first contact Growing Family
14  about a job?
15 A. In May of this year.
16 Q. What job do you contact them about?
17 A. The photographer sales position.
18 Q. How did you contact them?
19 A. They had an ad in the paper, and I sent in a
20  resume.
21 Q. Have you had any communications other than
22  sending them a resume?
23 A. Yes. Yes, I did.

Page 205

1 Q. And what was the result?
2 A. I went on -- have been on two interviews and
3  actually one day of -- before you even
4  consider the position -- they call it
5  shadowing. So I went and spent a whole day
6  shadowing the position.
7 Q. When was that?
8 A. In May.
9 Q. Have they told you whether they plan on
10  making you an offer?
11 A. They did make me an offer, and it was paying
12  $10 an hour, but it was only giving you 25 --
13  or right at 20 hours a week, which I thought
14  would be great; that would be fine. Then the
15  bottom line at the end of the interview is
16  after three months, it was commission only.
17  So it wasn't going to be comparable enough to
18  the salary that I needed. So --
19 Q. So you declined that job offer?
20 A. Correct.
21 Q. When was that?
22 A. In June.
23 Q. Have you told me everything about your

Page 206

1  communications with Growing Family about a
2  job?
3  A.  Uh-huh.
4  Q.  Hospitality Performances Network, what kind
5    of company is that?
6  A.  It was listed on hcareers.com.  It didn't
7    give a lot of detail.  It seemed like it was
8    a management company, and it said new hotel
9    coming to Montgomery area.  We have several
10   that are being built here, one that -- well,
11   there's two that don't have a name on them
12   yet.  And I have just been sending out
13   resumes.  I sent -- and I have not received a
14   response.  That's one of the most recent ones
15   there.
16 Q.  When did you send out the resume to
17   Hospitality Performances Network?
18 A.  I probably did the first one back in February
19   when they started building.
20 Q.  Did you just send them a resume or a cover
21   letter as well?
22 A.  Just -- it asked just for a resume, yes.
23 Q.  How did you send that?  Electronically?

Page 207

1  A.  Yes.  Through hcareers.com.
2  Q.  Have you told me everything about your
3    communications with Hospitality Performances
4    Network about employment?
5  A.  Yes.
6  Q.  H Careers, director of catering, JHG Hotels.
7  A.  That actually was a typo.  That is actually,
8    I believe, a managing hotel for Embassy
9    Suites.  I believe that's all the same.
10 Q.  So that's Embassy Suites?
11 A.  Yeah.  That -- John -- I believe that --
12   because that position was a director of
13   catering that I was applying for.  So that --
14   actually, I could pen that if I need to, but
15   that should be the same company.
16 Q.  So we've already discussed the H Careers
17   director of catering, JHG Hotels?
18 A.  Correct.
19 Q.  Travel Quest, what is that?
20 A.  It is the in-room magazines for hotels.  It's
21   like a welcome guide.
22 Q.  When did you first communicate with Travel
23   Quest about employment?

Page 208

1  A.  I want to say December of '05.
2  Q.  And what type of position are you seeking?
3  A.  They were advertising sales.
4  Q.  What communications did you have with them
5    about that position?
6  A.  I spoke directly to Wayne Gobble, who is
7    their owner and operator.  And there was some
8    negotiating on salary, but he could never get
9    above 20,000, so it wasn't going to meet my
10   needs.
11 Q.  How many hours a week were they asking you to
12   work?
13 A.  Forty.  And there was some commission and
14   bonuses based on the ad sales with that.
15 Q.  What was the guaranteed pay?
16 A.  18,000.
17 Q.  What type of commissions would you have been
18   eligible for?
19 A.  They only had a 15 percent.  And then they
20   had a cap on it after about $9,000 for one
21   month.
22 Q.  Is that $9,000 in commissions or $9,000 in
23   sales?

Page 209

1  A.  In commissions.
2  Q.  So you could earn up to $9,000 a month in
3    commissions?
4  A.  Yeah.  But trying to sell -- I mean, just
5    knowing the product after -- I didn't feel
6    that that's something that I could even -- I
7    felt that was beyond what I could actually
8    do.  And I still didn't feel like it was
9    going to financially meet my needs.
10 Q.  Why did you feel that you wouldn't be able to
11   sell advertisements for Travel Quest?
12 A.  Because after looking at the magazine, I
13   mean, they're -- in what they're trying to
14   target, I did not -- I really personally
15   didn't see a strong area as far as what he
16   was asking me to do as far as I didn't feel
17   like there was enough new business to bring
18   into that.
19 Q.  What were they trying to target?
20 A.  Huh?
21 Q.  You said after knowing what they were trying
22   to target?
23 A.  Uh-huh.

Page 210

1  Q. What were they trying to target?
2  A. New businesses coming in.
3  Q. Have we discussed everything about your
4     efforts to obtain employment with Travel
5     Quest?
6  A. Yes.
7  Q. Future City Guide?  Did we discuss this
8     earlier today?
9  A. Yes.  That is the -- where I just do the
10    photography business.
11 Q. So we've already discussed all of your
12    efforts to obtain employment there, right?
13 A. Correct.
14 Q. All right.  Courtyard Marriott, have we
15    already discussed that?
16 A. Yes.  We just did.
17 Q. ASPECT Foundation, we talked about earlier
18    today.  Montgomery Parents, Montgomery
19    Journey, we talked about them earlier today
20    as well, right?
21 A. Correct.
22 Q. Are there any other companies or persons that
23    you sought employment with other than what

Page 211

1     we've already discussed?
2  A. No.
3  Q. Was there any period of time when you were
4     unavailable after your employment terminated
5     at Montgomery Ventures?
6  A. No.
7  Q. Okay.
8        MR. FELLNER:  What I'd like to do now
9           is take a break for a couple of
10          minutes.
11       THE WITNESS:  Sure.
12       MR. FELLNER:  It's just before four
13          o'clock.  So, probably start in
14          another five minutes or so.
15          (Brief recess)
16 Q. Ms. Watts, I'm handing you what's been
17    labeled Defendant's Exhibit #7.  Take a look
18    at that and let me know when you're ready to
19    answer questions about it.
20 A. Okay.
21 Q. What is Defendant's Exhibit #7?
22 A. It's actually the front of the envelope for a
23    paycheck, my personal paycheck.

Page 212

1  Q. From your employment at the Fairfield Inn?
2  A. Correct.
3  Q. Were all of your paycheck envelopes the same
4     as Defendant's Exhibit #7?
5  A. That I recall, yes.
6  Q. Do you still have other paycheck envelopes,
7     or is this the only one?
8  A. I'm sure I have others.  It wasn't just an
9     envelope.  It's hard to explain, but the
10    check was a part of that, you know.  There
11    was nothing to stuff in there.  It was just
12    all in one piece.  You see what I'm saying?
13 Q. So it was folded up and the check was
14    attached to it?
15 A. Yeah.  You just pull the check off.
16 Q. With a perforated edge?
17 A. Yes.  Yeah.  Make a note of the -- what the
18    check says on there.
19 Q. Pardon me?
20 A. I said, can we make a note of what the check
21    says?
22 Q. It is what it is.
23 A. It says on there that it's from HV

Page 213

1     Investments, LLC, d/b/a Montgomery Ventures,
2     LLC, with the Atlanta, Georgia, address for
3     Hospitality Ventures.
4  Q. Okay.  Ms. Watts, I'm handing you what's been
5     marked as Defendant's Exhibit #8.  Take a
6     look at that and let me know when you're
7     ready to answer some questions about it.
8  A. I'm ready.
9  Q. What is Defendant's Exhibit #8?
10 A. It is the quarterly incentive compensation
11    plan for the hotel sales department.
12 Q. Is that the bonus plan that you were under
13    that we were talking about before?
14 A. Yes.
15 Q. Can you turn to page 2 of Defendant's
16    Exhibit #8?  Is that your signature there?
17 A. Yes.
18 Q. Did you sign that in January of 2005?
19 A. Yes.
20 Q. Ms. Watts, I'm handing you what's been marked
21    as Defendant's Exhibit #9.
22 A. Uh-huh.
23 Q. Can you take a look at that and let me know

Page 214

1    when you're ready to answer questions about
2    it?
3    A.  Sure.  I'm ready.
4    Q.  What is Defendant's Exhibit #9?
5    A.  It is 2005 first quarterly bonus.  It's my
6       tracking results.
7    Q.  And that's what the first page says.  What
8       are the pages behind that are a part of
9       Defendant's Exhibit #9?
10   A.  On top, it says the same thing.  It says the
11      2005 Sales Marketing Department Bonus
12      Tracking Form, Budget Versus Actual.
13   Q.  So this is the math of how they calculated
14      what your bonus would be?
15   A.  It's an Excel program.  I believe it was
16      created from Roger that was given to me while
17      I entered the numbers.
18   Q.  So you did some of calculations?
19   A.  Some of them were already permanently there,
20      and then I added in based on the -- the
21      reports that are also attached.  Whatever
22      those numbers were, I plugged them; and
23      that's what calculated my bonus.

Page 215

1    Q.  So you prepared this first page of
2       Defendant's Exhibit #9?
3    A.  I had to prepare it, but it also had to be
4       approved.  Not only by Todd, but it -- then
5       it was approved by Roger before payment.
6    Q.  Okay.  So at the bottom of the first page of
7       Defendant's Exhibit #9, where it says total
8       payout $3500 --
9    A.  Yes.
10   Q.  -- that was your bonus that you earned for
11      the first quarter of 2005?
12   A.  Correct.
13   Q.  Take a look at Defendant's Exhibit #10.
14   A.  Uh-huh.  Okay.
15   Q.  What is Defendant's Exhibit #10?
16   A.  It is the second quarter bonus tracking
17      results that I submitted on 7/7 of '05.
18   Q.  Is that your signature on the first page of
19      Defendant's Exhibit #10?
20   A.  Yes, it is.
21   Q.  Okay.  Is this the calculations that you
22      prepared for the second quarter of 2005 for
23      your bonus?

Page 216

1    A.  Yes.
2    Q.  And your bonus that you earned for the second
3       quarter of 2005, you earned $3800?
4    A.  Correct.
5    Q.  Take a look at Defendant's Exhibit #11 and
6       let me know when you're ready to answer
7       questions about it.
8    A.  Okay.
9    Q.  You ready?
10   A.  I'm sorry.  Yes.
11   Q.  Okay.  What is Defendant's Exhibit #11?
12   A.  It is the third quarter bonus tracking
13      results that I submitted on October 11th,
14      2005.
15   Q.  Okay.  Is that your signature on the first
16      page of Defendant's Exhibit #11?
17   A.  Yes, it is.
18   Q.  And by this, did you calculate that your
19      total bonus that you earned for the third
20      quarter of 2005 was $3800?
21   A.  Yes, I did.
22   Q.  Okay.  I'm handing you what's been marked as
23      Defendant's Exhibit #12.

Page 217

1    A.  Uh-huh.
2    Q.  Can you take a moment and let me know when
3       you're ready to answer questions about that?
4    A.  I'm ready.
5    Q.  Okay.  What is Defendant's Exhibit #12?
6    A.  It is the Alabama Department of Industrial
7       Relations Unemployment Compensation
8       Division.  It's a doctor's certificate.
9    Q.  Okay.  Who does it relate to?
10   A.  Me.
11   Q.  Did you sign that?
12   A.  Yes, I did.
13   Q.  Okay.  Is this in relation to your claim for
14      unemployment benefits after your termination
15      from Fairfield Inn?
16   A.  Yes.  It was requested by them that it be
17      completed.
18   Q.  Okay.  Do you see that number one under the
19      first paragraph there in the middle of the
20      page?  It says dates and treatment?
21   A.  It's kind of scratchy, but yes.
22   Q.  Okay.  What was the dates and treatment
23      from-and-to dates?

Page 218

1  A. Not being the original, what I perceive it to
2    be is 12/15/2004 --
3  Q. To --
4  A. September 27th, 2005.
5  Q. And what was the condition that you were
6    receiving treatment for during that period?
7  A. Pregnancy, delivery, and postpartum recovery
8    and checkup.
9  Q. Is that accurate?
10 A. Yes.
11 Q. Could you skip down to number three. Could
12   you read what the question is for number
13   three?
14 A. Is this individual -- I'm sorry. If this
15   individual is -- is this the master?
16 Q. That's the best -- that's what you produced
17   to us. I'm sorry. I think what it is -- and
18   you tell me -- if this individual is able to
19   perform the duties of his/her usual
20   occupation, on what date did this individual
21   become able?
22 A. Okay.
23 Q. Is that right?

Page 219

1  A. Correct.
2  Q. And what date does it say that you became
3    able to return to your usual occupation?
4  A. September 24th, 2005.
5  Q. Is that right?
6  A. That's what the doctor said.
7  Q. Okay. Could you skip down to number five.
8    Could you read number five for us?
9  A. I guess PT they're abbreviating for
10   patient -- is to be --
11 Q. No. I meant the question. I'm sorry.
12 A. I'm sorry.
13 Q. We'll get to that in just a second.
14 A. Number five?
15 Q. Yeah.
16 A. If treatment is for pregnancy, enter expected
17   date of confinement. Did I read that
18   correct?
19 Q. I think you did.
20 A. Okay.
21 Q. And what are the dates of expected
22   confinement?
23 A. August the 12th, 2005, through September

Page 220

1    23rd, 2005.
2  Q. Okay. Was that the expected period that you
3    were basically getting postpartum treatment
4    after your pregnancy, after you delivered
5    Tanner?
6  A. Uh-huh. I wouldn't say treatment. It's
7    recovery.
8  Q. Recovery, then.
9  A. Thank you.
10 Q. I'm handing you Defendant's Exhibit #13. I
11   knew I wanted to do something else first.
12   Tell you what. Before we look at Defendant's
13   Exhibit #13, let's look at Defendant's #14.
14     I'm now handing you what's been marked
15   as Defendant's Exhibit #14. Can you take a
16   look at that and let me know what it is?
17 A. #14?
18 Q. Yes, please.
19 A. It is the ministry registration for Taylor
20   Road Baptist Church where Tanner was
21   enrolled.
22 Q. Okay. And I will let you know that we had
23   sent a subpoena over to Taylor Road Baptist

Page 221

1    Church.
2  A. I'm very aware of that.
3  Q. And these are the documents -- Defendant's
4    Exhibit #14 are the documents they produced
5    to us in response to that subpoena. Does the
6    first page of Defendant's Exhibit #14 look
7    like your handwriting was on it?
8  A. Yes.
9  Q. Okay. When did you fill out the first page
10   of Defendant's Exhibit #14?
11 A. It was just shortly after becoming pregnant,
12   because --
13 Q. There's a date down there at the bottom,
14   right?
15 A. I was fixing to say, yeah. 2/9 of '05.
16 Q. Do you think that's about accurate?
17 A. Yeah.
18 Q. What days were you signing -- I guess this
19   child's name here is Baby Watts. I guess he
20   was yet to be named.
21 A. Uh-huh.
22 Q. Eventually, this was Tanner, right?
23 A. Yes. And it shows --

Page 222

1  Q.  What days were you signing Tanner up for, for
2      child care at Taylor Road?
3  A.  All four days.
4  Q.  And were you signing him up for the Early
5      Bird, the Mother's Day Out, and the Extended
6      Session?
7  A.  Correct.
8  Q.  Could you turn to the last page -- excuse
9      me -- the last page, the one that lists
10     monthly tuition rates?
11 A.  Uh-huh.
12 Q.  Okay.  Do you know whether these are
13     currently the monthly tuition rates or were
14     these at the time you signed up Tanner?
15 A.  I can't recall.  There's no date, and they
16     change often.
17 Q.  Okay.  Well, can you turn, then, to the
18     second page of Defendant's Exhibit #14?
19 A.  Uh-huh.
20 Q.  Do you see there under the -- at the top, it
21     lists Taylor Road Baptist Church Mother --
22     that MDO, is that Mother's Day Out?
23 A.  Correct.

Page 223

1  Q.  And kindergarten?
2  A.  Uh-huh.
3  Q.  2005-2006.  And this is for Tanner Watts; is
4      that correct?
5  A.  Correct.
6  Q.  Okay.  Down there for the October tuition, it
7      lists an amount paid.
8  A.  Uh-huh.
9  Q.  But then next to it, it has a November.  Does
10     that say November?
11 A.  Yes.  But I didn't prepare this.  I don't
12     know.
13 Q.  Right.  Do you think that you paid $168 for
14     tuition at that time?
15 A.  I don't recall.
16 Q.  Do you know how much you paid for tuition for
17     Tanner at Taylor Road Baptist Church?
18 A.  Whatever was required.
19 Q.  I guess what I'm trying to figure out is what
20     did you pay for what services.  Okay.  Well,
21     can you turn back to Defendant's Exhibit #13?
22 A.  Uh-huh.
23 Q.  Now, you notice in the bottom right-hand

Page 224

1      corner, there's a marker there that has Watts
2      versus Hospitality, says INTDSEL/RFP 0202?
3  A.  Correct.
4  Q.  I will let you know that that indicates it
5      was a document that was produced to us by
6      your counsel.  Does that mean that it came
7      from you?
8  A.  This?
9  Q.  You provided this to your counsel?
10 A.  At the time, that's the only -- I think now
11     they're on a computer system, but this is the
12     record that I had for Tanner.  Yes, I did.
13 Q.  Okay.  So you had this record that at some
14     point, it looks like that you paid $168 for
15     either October or November tuition --
16 A.  Uh-huh.
17 Q.  -- with check number 1783?
18 A.  Where do you see check number?  Oh, okay.
19 Q.  In the next column over.
20 A.  I'm sorry.  I don't know why it says
21     November.  I didn't write that.
22 Q.  But if you paid -- if it says you paid $168,
23     do you think that's what you paid?

Page 225

1  A.  I don't recall.
2  Q.  Okay.  Where would you have records to figure
3      out exactly what services you were paying
4      for?
5  A.  I think there was a tax record that was
6      presented for the end-of-the-year taxes for
7      these.
8  Q.  Is this the only child care service that you
9      paid for, for Tanner during 2005?
10 A.  Yes.
11 Q.  So if this says that you paid $25 for the
12     supply fee, you paid $25 for the supply fee?
13 A.  Yeah.  It doesn't note that I paid some
14     registration, too.  So I don't -- I wouldn't
15     consider this an accurate document.
16 Q.  Do you think that you paid more than -- it
17     looks like at the bottom of Defendant's
18     Exhibit #13, it looks like there was payment
19     for $168 in October, $168 in November, and
20     $168 in December.  Does that seem accurate?
21 A.  I don't think that that shows that's what was
22     paid.  I think that was my handwriting making
23     some notes.  I don't --

Page 226

1  Q.  Oh, okay.
2  A.  Yeah.
3  Q.  Do you know what you paid for child care for
4     Tanner in 2005?
5  A.  No.
6  Q.  Was all of the child care that you paid for
7     in 2005 for Tanner paid to Taylor Road
8     Baptist?
9  A.  Yes.
10 Q.  You didn't pay anybody else?
11 A.  No.  Because my grandmother and my father
12    were keeping him.
13 Q.  Okay.  Did you pay significantly more than
14    this $168 a month?
15 A.  I don't recall.
16 Q.  I mean --
17 A.  I wouldn't consider this, you know,
18    completely accurate.  It would probably show
19    on the tax records.  Because here, it says
20    there was a $50 registration fee; and it's
21    not even noted on here.  So --
22 Q.  And there, referring to Defendant's
23    Exhibit #14?

Page 227

1  A.  Uh-huh.
2  Q.  On the first page of that, right?
3  A.  Yeah.
4  Q.  So that $50 registration fee --
5  A.  It's not even noted on here.  So --
6  Q.  Some sort of supply fee it looks like you
7     were paying?
8  A.  Yes.
9  Q.  And it looks like it was approximately $168 a
10    month.  Do you still have check stubs for
11    this?
12 A.  I don't receive them.  I mean, I just get
13    bank statements.
14 Q.  Just bank statements?
15 A.  Yeah.  I don't receive my checks back.
16 Q.  Do you have the carbon copy checks?
17 A.  I don't use carbon copy.
18 Q.  I guess what I'm trying to figure out is in
19    2005, I mean, were you paying for Tanner for
20    day care?
21 A.  Yes.
22 Q.  And what were you paying for Tanner for day
23    care in 2005?

Page 228

1  A.  Again, I don't feel that this is accurate.
2  Q.  Okay.  I'm just trying to figure out what is
3     accurate.  What's the number?
4  A.  I don't know.
5  Q.  Who would know?
6  A.  My tax records.
7  Q.  Okay.  Where else could we figure it out?
8  A.  I don't know.
9  Q.  Well, your bank statements would have all the
10    checks that you wrote to Taylor Road.
11 A.  Correct, unless I paid cash.  There were
12    times I paid cash.
13 Q.  Well, each of these says that you wrote a
14    check on Defendant's Exhibit #13.
15 A.  Yeah.
16 Q.  Adding this all up for Tanner, it seems to
17    come out to under $1,000.  Would you agree
18    that you paid, in 2005, under $1,000?
19 A.  Yes, I would agree to that.
20 Q.  Can you flip back to Defendant's Exhibit #14,
21    which is the big stack?
22 A.  Uh-huh.
23 Q.  Could you turn to -- there is a second page

Page 229

1     in here that is a Mother's Day Out
2     application.
3  A.  Uh-huh.
4  Q.  What is this?
5  A.  Each -- I would guess they would call it each
6     school year or each summer, you had to
7     re-fill out a registration form.
8  Q.  Okay.  And this is the form that you filled
9     out for 2006?
10 A.  Yes.
11 Q.  When did you fill this out?
12 A.  Well, it's dated January 15th of '06.
13 Q.  Is that when you think you filled it out?
14    You have no reason to doubt that that date is
15    right?
16 A.  Correct.
17 Q.  Is this your handwriting on here and your
18    signature at the bottom?
19 A.  Yes.
20 Q.  Who did you list as your employer?
21 A.  Ellis and Godfrey Real Estate.
22 Q.  Now, we didn't discuss them earlier today
23    when you were talking about who you had

Page 230

1   worked for, did we?
2  A.  No, I did not.
3  Q.  Okay.  Why not?
4  A.  That was my father's company, but I never
5      worked for them.  I don't know why we put
6      that on there.  I think that we were trying
7      to list for my father.  I don't know why
8      that's on there.  I never received payment or
9      worked for them.
10  Q.  Okay.  So that's incorrect, what's on there?
11  A.  Yes.
12  Q.  Will you take a look at what's marked as
13      Defendant's Exhibit #15?
14  A.  Uh-huh.
15  Q.  What is Defendant's Exhibit #15?
16  A.  It is showing my husband's, who is Colonial
17      Bank, his current employer -- it is showing
18      how much monthly we are paying for health
19      insurance.
20  Q.  Okay.  And this is the health care, vision,
21      short-term disability, long-term
22      disability --
23  A.  Well, actually, it's -- if you read it, it's

Page 231

1      just medical, dental and vision.
2  Q.  Okay.  So it's only the portion at the bottom
3      is what you're paying?
4  A.  That's underlined with my handwriting, yes.
5  Q.  So you paid $233.55 per month?
6  A.  Uh-huh.
7  Q.  Does that include coverage for your husband
8      as well?
9  A.  They pay for his.
10  Q.  So the $233.55 is purely for yourself and
11      your two children?
12  A.  To what I understand, even though here it
13      says employee plus two or more.  I don't --
14      it's my understanding that they pay for his
15      and we are paying for the family.
16  Q.  Handing you what's been marked as Defendant's
17      Exhibit #16.  Let me know when you're ready
18      to answer questions about that.
19  A.  Okay.
20  Q.  What is Defendant's Exhibit #16?
21  A.  It is a reservation that I made.
22  Q.  Where?
23  A.  To Stone Mountain, Georgia.

Page 232

1  Q.  Why is this significant in this case?
2  A.  I believe at first, we were showing that some
3      of my benefit of being an employee was being
4      able to have a discounted rate.
5  Q.  When did you make this reservation?
6  A.  It was done as an example.  The -- actually,
7      the reservation was canceled.
8  Q.  So you never took this trip?
9  A.  No, sir.  And the cancellation is on the last
10      page.
11  Q.  Okay.
12  A.  It was dated Wednesday, October the 12th.
13  Q.  Now, earlier today when I was asking you
14      about what types of damages you believe that
15      you've incurred, you didn't mention anything
16      about this, did you?
17  A.  No, I did not.
18  Q.  Do you think that this is part of your
19      damages as well?
20  A.  I don't want to say damage.  I think it's
21      loss to a benefit.  I mean, that was a -- you
22      had to have this privilege.  I mean, not --
23      you had -- I mean, even though you got a $49

Page 233

1      rate or whatever the rate was, I mean you
2      were under strict guidelines about staying at
3      a hotel.  So it is a privilege that is earned
4      and stayed with you as an employee.  You're
5      not just -- I mean, you're given it; but if
6      you, I guess, abuse it, it's taken away.
7      So --
8  Q.  So just being employed at the Fairfield
9      Inn --
10  A.  Or any Marriott.
11  Q.  -- or any Marriott --
12  A.  Correct.
13  Q.  -- you wouldn't necessarily be eligible for
14      this benefit?
15  A.  Not if you abuse it.  And sometimes you did
16      have to have -- it depends.  Sometimes you
17      would have to have approval of your general
18      manager.
19  Q.  And even if you did have the eligibility for
20      this, your general manager still had to
21      approve it?
22  A.  Well, you had a Marriott card.  They used to
23      have a form that had to be signed, and then I

Page 234

1   think they moved to having an employee card,
2   but first you had to have a travel release
3   form that your manager signed stating that,
4   you know, yes, I'm giving my employee the
5   right.  It's called a green -- green -- it's
6   a travel authorization form; but then I think
7   that they had moved into just giving you an
8   employee card.  And, you know, it's logged in
9   and, I guess, carefully watched.  And if you
10  abuse it, you lose that.  It's a benefit of
11  being an employee.
12 Q.  Do you still have to have the approval from
13  your general manager in order to use the
14  green card?
15 A.  I'm not sure.  I'm no longer there.
16 Q.  Okay.  While you were there, did you have to
17  obtain --
18 A.  We were issued cards probably about halfway
19  through my employment, but Todd did give me
20  an employment card.  And it expired every
21  year.
22 Q.  Could you automatically use that card to get
23  one of these reservations at a discounted

Page 235

1   rate?
2 A.  Right now?
3 Q.  While you were employed there.
4 A.  While I was employed, yes.
5 Q.  You didn't have to go through Todd?
6 A.  No, not if you had that card.
7 Q.  So the card was an automatic approval to get
8   that rate?
9 A.  And it was at the discretion of each hotel
10  that you went to and their general manager.
11  There were times when I traveled that the
12  general manager would still call and verify
13  that I was an employee, so -- just for
14  falsification of that card.
15 Q.  Sure.  Could the company have taken that card
16  away at any time it wanted?
17 A.  Oh, definitely.  Sure.
18 Q.  When did you plan to go to the Marriott Stone
19  Mountain Inn?
20 A.  When do I plan to?
21 Q.  When did you?
22 A.  I didn't.  I just did it as an example to
23  show that I could get that rate.

Page 236

1 Q.  This -- Defendant's Exhibit #16, on the first
2   page indicates that it was sent on Wednesday,
3   October 12th, 2005.
4 A.  Uh-huh.
5 Q.  Is that right?
6 A.  Uh-huh.
7 Q.  Why did you do this on October 12th, 2005?
8 A.  I don't recall.
9 Q.  Were you thinking about taking this vacation?
10 A.  I don't recall at the time.
11 Q.  So you don't recall whether you ever had any
12  plans of taking this vacation or staying at
13  the Marriott Stone Mountain Inn?
14 A.  Yes, I do.  Now, looking at the day, that was
15  my anniversary; but it was on a weekend.
16 Q.  All right.  So you were planning on going on
17  your anniversary to the Marriott Stone
18  Mountain Inn?
19 A.  Yes.
20 Q.  Then you canceled this when?
21 A.  Because I was terminated.  And I kept it to
22  show as an example that after I was
23  terminated, I still had this on file to show

Page 237

1   that that was a benefit of being a Marriott
2   employee.
3 Q.  Ms. Watts, I just handed you Defendant's
4   Exhibit #17.  If you could take a look at
5   that and let me know when you're ready to
6   answer some questions, that would be great.
7 A.  Okay.
8 Q.  What is Defendant's Exhibit #17?
9 A.  It's a tax return for 2003.
10 Q.  Okay.  And the first couple of pages look
11  like they're W-2s; is that correct?
12 A.  Correct.  The Oasis is referring to Wynngate.
13 Q.  All right.  Now, the second page of the tax
14  return, it's not signed.
15 A.  These were filed electronically, and these
16  were just our copies.
17 Q.  But these are the actual copies of what you
18  signed --
19 A.  Yes.  Yes, sir.
20 Q.  -- or what you filed with the government?
21 A.  Everything we did is electronically, so we
22  have just our copies on file.  Yes, sir.
23 Q.  Okay.  Did you prepare these yourselves?

Page 238

1  A.  My husband does it.
2  Q.  And you review them before they're filed?
3  A.  Yes, we do, together.
4  Q.  I've just handed you what's been marked as
5      Defendant's Exhibit #18.  Take a look at that
6      and let me know when you're ready to answer
7      questions about that.
8  A.  I'm looking for a year.  Okay.
9  Q.  I think actually, if you look on the first
10     page or the second page of it --
11 A.  It says 2005 inside.  Is it stapled right
12     there?
13     MS. DUNCAN:  Okay.
14     THE WITNESS:  Sorry.
15     MS. DUNCAN:  I'm on the wrong end.
16 Q.  Okay.  Can you tell me what Defendant's
17     Exhibit #18 is?
18 A.  It's my income tax return for 2005.
19 Q.  Okay.  And the documents are not -- the first
20     document is not sequentially numbered with
21     the rest of them.  I will let you know that I
22     took what I believe to be the first page
23     which is an -- is it a paycheck or a pay

Page 239

1      stub?  What is the first page?
2  A.  The first page?  By what I read of it, I
3      believe it was just a bonus payment, if I can
4      read that correctly, because there was very
5      little on the salary there.  So --
6  Q.  Do you see the date where it says check and
7      across the top?
8  A.  October 30th, 2005.
9  Q.  At that point in time, how many hours a week
10     were you working for Fairfield Inn?
11 A.  Seven.
12 Q.  And you were getting paid approximately --
13 A.  Seven hours a week.
14 Q.  Seven hours a week, right.
15 A.  Correct.
16 Q.  And you were getting paid -- how much did
17     that amount to?  Any idea?
18 A.  I don't recall.
19 Q.  You see on the salary line, it says this
20     period, $292.31?
21 A.  Uh-huh.
22 Q.  Do you think that's approximately the seven
23     hours a week?

Page 240

1  A.  I'd say so, but they took out insurance so I
2      don't remember exactly the amount.
3  Q.  But then the next line is the bonus.  That's
4      the bonus that you earned for that quarter?
5  A.  Yes.
6  Q.  Do you see on here who is listed as the
7      employer -- or the payor?  The payor, yes.
8  A.  Uh-huh.
9  Q.  Who is listed as the payor?
10 A.  Montgomery Ventures.
11 Q.  Okay.  Can you turn to the next page?
12 A.  Uh-huh.
13 Q.  Who is listed as your employer?
14 A.  A part of it is cut off.
15 Q.  Any idea who that might be?
16 A.  Montgomery -- it looks like just Montgomery
17     Ventures.
18 Q.  Okay.  And then going to page -- it's on the
19     bottom right-hand corner.  It's labeled 0060.
20 A.  I'm sorry.  I lost you.
21 Q.  You were on the correct page, I think.
22 A.  Okay.
23 Q.  0060 in the bottom right-hand corner.

Page 241

1  A.  Yes.
2  Q.  Okay.  What is this?
3  A.  It is the income tax return for 2005.
4  Q.  And, again, these are the ones that your
5      husband prepared?
6  A.  Yes.
7  Q.  And you reviewed with him --
8  A.  Yes.
9  Q.  -- to make sure they're accurate?
10 A.  Correct.
11 Q.  Can you turn to page 0063?
12 A.  Uh-huh.
13 Q.  Do you know what this schedule is?
14 A.  The Schedule 2 is?  The child and dependent
15     care expense form.
16 Q.  Okay.  Do you know what that is?
17 A.  Yes.
18 Q.  What is that?
19 A.  How much we paid in to child care.
20 Q.  Paid for child care?
21 A.  Yes, paid for child care.
22 Q.  Is that in 2005?
23 A.  Yes.

Page 242

1  Q.  Okay.  Can you flip down to part two of that
2     same page, where it lists each of your
3     children?
4  A.  Uh-huh.
5  Q.  Does it show how much you paid for each of
6     your children?
7  A.  How much I paid?
8  Q.  How much you paid for child care for each of
9     your children during 2005.
10  A.  That's not the amount.  That's the credit
11     that you receive.
12  Q.  Well, it says qualified expenses in
13     column C.
14  A.  I know.  But if you look at part two, based
15     on the number of dependents that you receive,
16     you receive a credit for each child or
17     dependant, which was a total of $6200.  That
18     doesn't mean that's the amount that I paid.
19     When you're married and have children, you
20     get credit.
21  Q.  For child care expenses?
22  A.  For child care expenses.
23  Q.  Are you sure about that?

Page 243

1  A.  As far as I know, yes.  The amount paid is at
2     the top, if you can see that.
3  Q.  Okay.
4  A.  There is an amount paid in part one, section
5     D.
6  Q.  Okay.  Handing you what's been marked as
7     Defendant's #19.  Let me know when you're
8     ready to answer questions.
9  A.  I'm ready.
10  Q.  What is Defendant's Exhibit #19?
11  A.  It is my income tax return for 2006.
12  Q.  Okay.  And for the first two pages are W-2s,
13     aren't they?  No.  Excuse me.  The first page
14     is a 1099.
15  A.  Correct.
16  Q.  And the second page is the W-2?
17  A.  I'm looking.  Yes.
18  Q.  Okay.  And then the third page is a tax
19     document with the State of Alabama?
20  A.  Correct.
21  Q.  And is that with respect to the unemployment
22     benefits --
23  A.  Yeah.

Page 244

1  Q.  -- that you received in 2006?
2  A.  Correct.
3  Q.  And then after that is your individual tax
4     returns that you and your husband filed
5     jointly with the Government?
6  A.  Correct.
7  Q.  Okay.  And same thing here, it's
8     self-prepared?
9  A.  Yes.
10  Q.  And you guys -- your husband prepared them?
11  A.  Yes.
12  Q.  And you guys reviewed them together to make
13     sure they're accurate?
14  A.  Correct.
15  Q.  And then filed electronically?
16  A.  Correct.
17  Q.  Can you turn to the second page of that
18     document?  It's page 0071 at the bottom.
19  A.  Uh-huh.
20  Q.  Do you see what it lists there as your
21     occupation?
22  A.  Uh-huh.
23  Q.  What does it list?

Page 245

1  A.  Housewife.
2  Q.  Is that accurate in 2006?
3  A.  It is because it's as prepared, at that
4     time.  And I know my husband called about
5     that.  Because I had a 1099, and that's being
6     an independent contractor, and that's what we
7     were told to put there.
8  Q.  Okay.  I'm handing you what's been marked
9     Defendant's Exhibit #20.  Take a look at that
10     and let me know when you're ready to answer
11     some questions about it.
12  A.  Okay.
13  Q.  Do you know what Defendant's Exhibit #20 is?
14  A.  No, I do not.
15  Q.  Okay.  Do you see your name listed on
16     Defendant's Exhibit #20?
17  A.  I do.
18  Q.  Do you see listings for salary and vacation
19     on Defendant's Exhibit #20?
20  A.  Yes, I do.
21  Q.  Do you think these might be -- do you see the
22     date listed right immediately under your name
23     on the first page of Defendant's Exhibit #20?

Page 246

1  A.  Yes.
2  Q.  What's that date?
3  A.  November 13th, 2005.
4  Q.  Okay.
5  A.  Are these in order?
6  Q.  Yes.  Could you flip to the second page of
7     Defendant's Exhibit #20?  Do you see your
8     name on that page?
9  A.  Yes.
10  Q.  Do you see the date immediately under that?
11  A.  Yes.
12  Q.  And you see what's that date?
13  A.  October 30th, 2005.
14  Q.  And to the right of that, it says check
15     date.  And what's the date there?
16  A.  11/04/2005.
17  Q.  Do you see the amount that it says your
18     earnings were?
19  A.  There's a gross amount, yes.
20  Q.  Do you see the salary?  What's the gross
21     amount of the salary?
22  A.  I don't see what you're talking about.
23  Q.  Right here.

Page 247

1  A.  Oh.
2  Q.  Yes.
3  A.  The 292.31.
4  Q.  Right.  Was that an amount that we were
5     talking about just a few moments ago?
6  A.  Yes.
7  Q.  With respect to --
8  A.  The seven hours.
9  Q.  -- the seven hours per week?
10  A.  Yes.
11  Q.  And right below that, is there also an amount
12     for the bonus to be paid to you?
13  A.  Yes.
14  Q.  Is that the $3800 we were just talking about
15     a few moments ago?
16  A.  Yes.
17  Q.  Do you think that these might be your pay
18     records for your time at Fairfield Inn?
19  A.  Yes.
20  Q.  Now, can you flip back to the first page of
21     Defendant's Exhibit #20?
22  A.  Yes.
23  Q.  Do you see the date of the payment?  It

Page 248

1     says -- immediately under name.
2  A.  Is that the PDD -- I mean, PPD?
3  Q.  Yeah.  Let's go through each those.  There's
4     a date that says PPD date.
5  A.  Uh-huh.
6  Q.  And what's that date?
7  A.  November 13th, 2005.
8  Q.  And then to the right of that, there's a
9     check date.  What's that date?
10  A.  I'm sorry.  November 18th, 2005.
11  Q.  Okay.  Do you think that the first date might
12     be the pay period ending date?
13  A.  Might be?
14  Q.  Could it be?
15  A.  It could be.
16  Q.  Do you think that the second date, the check
17     date is when the check was cut?
18  A.  Yes.
19  Q.  Okay.  And how much does it show being your
20     earnings on that check?
21  A.  Total earnings?
22  Q.  Let's go through each type of earnings.
23  A.  It showed I was paid for eight hours, and

Page 249

1     then I was paid for some vacation time.
2  Q.  Okay.  Can you flip back to the second page
3     of Defendant's Exhibit #20?
4  A.  Uh-huh.
5  Q.  Before, when we were looking at the first
6     page, we were looking at the PPD date field
7     where it said --
8  A.  Excuse me.
9  Q.  It had a different date listed there but this
10     field, it says it's October 30th, 2005.  Do
11     you think that's the pay period ending date
12     for this paycheck?
13  A.  If that's what it means.  I don't -- I didn't
14     prepare this.
15  Q.  Right.  I'm just trying to ask you whether --
16     if you have any understanding of this.
17  A.  My interpretation of it?
18  Q.  Yeah.  If you have any understanding about
19     this stuff.
20  A.  No, I don't.  I've never seen this before.
21  Q.  Okay.  Do you think this is accurate for your
22     pay records for this particular paycheck?
23  A.  At this time, I wouldn't -- I wouldn't know

Page 250

1    at this time.
2  Q.  Okay.  Well let's compare it to Defendant's
3    Exhibit #18, the first page of Defendant's
4    Exhibit #18.
5  A.  Uh-huh.
6  Q.  Does it look to be the same information?
7  A.  Hold on just a moment.
8  Q.  Sure.
9  A.  Yes.
10 Q.  Okay.  And on the first page of Defendant's
11   Exhibit #18, does it list an end date?
12 A.  Payroll end date?
13 Q.  Just end date.  It says end, right?
14 A.  Yes.  October 30th, 2005.
15 Q.  Does it list a check date or a check and then
16   has a date next to it?
17 A.  November 4th, 2005.
18 Q.  And now let's look back at the second page of
19   Defendant's Exhibit #20, where it says it has
20   a PPD date.
21 A.  Yes.
22 Q.  And that's October 30th, 2005, also, right?
23 A.  Correct.

Page 251

1  Q.  And then the check date is November 4th,
2    2005.  So do you think that matches up
3    with --
4  A.  Yes.
5  Q.  -- the other document?
6  A.  These two compare, yes.
7  Q.  Okay.  So before when you were telling me
8    that the first page of Defendant's
9    Exhibit #18 looks to be like your pay stub --
10 A.  Correct.
11 Q.  -- does it look like the second page of
12   Defendant's Exhibit #20 contains the same
13   information as what's on your pay stub --
14 A.  Yeah.
15 Q.  -- for that particular date?
16 A.  Yes.
17 Q.  Okay.  Let's flip back to the first page of
18   Defendant's Exhibit #20.  Do you have any
19   reason to doubt that this information
20   accurately represents what you were paid for
21   the pay period ending November 13th, 2005,
22   from the Fairfield Inn?
23 A.  Ask the question again.

Page 252

1  Q.  Sure.  Do you have any reason to doubt that
2    the first page of Defendant's Exhibit #20
3    accurately represents what you were paid by
4    the Fairfield Inn for the pay period ending
5    November 13, 2005?
6  A.  It looks accurate, but I don't have a pay
7    stub to compare it to, but --
8  Q.  Okay.  I'm just wondering if you have any
9    reason to doubt that it's accurate.
10 A.  Not at this point.
11 Q.  Okay.  Handing you what's been marked as
12   Defendant's Exhibit #21, if you could take a
13   moment to review it and let me know when
14   you're ready to answer some questions.
15 A.  Okay.  Just a second.
16        (Witness reviews document)
17 A.  Okay.
18 Q.  What is Defendant's Exhibit #21?
19 A.  It is an e-mail from Roger Miller.
20 Q.  To who?
21 A.  It came to my home address, so it does have
22   Mickey and Heather -- or came to -- it looks
23   like my address.  I mean, there's no address

Page 253

1    on here, so I don't know, but it says Mickey
2    and Heather.
3  Q.  Do you think this is an e-mail that Roger
4    Miller sent to you?
5  A.  It doesn't look like an e-mail.
6  Q.  Other than the formatting issues, do you
7    think that this is the text of an e-mail that
8    was sent to you by Roger Miller?
9  A.  I don't recall.
10 Q.  Okay.  Do you have any reason to doubt that
11   this is an e-mail that you would have
12   received from Roger Miller?
13 A.  I receive lots of e-mails.  I don't know.  I
14   don't remember this one.
15 Q.  Okay.  But that's not my question.  My
16   question is, do you have any reason to doubt
17   that this is an e-mail that you received from
18   Roger Miller?
19 A.  Not that I received.  I don't have a doubt
20   that it's an e-mail from Roger, but I don't
21   recall receiving it.
22 Q.  Okay.  Did you ever ask Roger whether you
23   could work from home in November of 2004?

Page 254

1  A.  I was on maternity leave.

2  Q.  November of 2004.

3  A.  2004.  I'm sorry.  There were some questions

4      of being asked to do that, yes.

5  Q.  Okay.  Can you read in the second -- excuse

6      me.  The third full sentence in this e-mail,

7      could you read it?  The one that says, As far

8      as working from home.

9  A.  Uh-huh, I can read it.  As far as working

10     from home in the morning, I have no problems

11     with it, although Todd is the one who will

12     make the final decision.

13 Q.  Does that sound like an e-mail that responds

14     to you about your concerns about working from

15     home or desire to work from home?

16 A.  Yes.

17 Q.  Okay.  Do you think this is an e-mail that

18     you received from Roger Miller?

19 A.  It could be, yes.

20 Q.  Okay.

21 A.  And the reason for -- can I give a reason

22     why?

23 Q.  Sure.

Page 255

1  A.  The working environment that I was given at

2      the hotel was very small, cramped quarters

3      and a very loud environment.  So one of the

4      reasons for asking him to work at home either

5      morning or afternoon was so I could focus not

6      only on my telemarketing calls, which were

7      directly communicating with the client, but

8      also doing Sales Pro.  Because it took some,

9      you know, concentration to enter the

10     information correctly.  Even -- you know, I

11     was in a workroom is where my office was.  I

12     didn't have a private office or a quiet place

13     that I could go.

14 Q.  Did you ever speak with Todd about whether

15     you could work from home after you received

16     this e-mail?

17 A.  Sure.

18 Q.  What did Todd say?

19 A.  He had no problem with it.  I mean, he was

20     always, as long as, you know, I met my goals.

21 Q.  Ms. Watts, I'm handing you what's been marked

22     as Defendant's Exhibit #22.  Please take a

23     moment to read it and let me know when you're

Page 256

1      ready to answer some questions.

2  A.  Okay.

3  Q.  Okay.  What is Defendant's Exhibit #22?

4  A.  It looks like an e-mail.  I mean, it -- to

5      me, it looks like somebody has typed or

6      copied an e-mail.  This doesn't look like

7      something I typed.

8  Q.  Aside from the formatting issues, does this

9      look like an e-mail that you sent to Roger

10     Miller or the text of an e-mail that you sent

11     to Roger Miller?

12 A.  Yes.

13     MR. FELLNER:  Could we go off the

14        record for just one second?

15        (Off-the-record discussion)

16 Q.  Ms. Watts, I'm not sure exactly where we

17     left, but let's start from the top about

18     Defendant's Exhibit #22.  Have you had an

19     opportunity to review Defendant's Exhibit

20     #22?

21 A.  Yes, I have.

22 Q.  What is Defendant's Exhibit #22?

23 A.  It is a -- excuse me -- an e-mail that I sent

Page 257

1      to Roger.

2  Q.  Okay.  What's the date on Defendant's

3      Exhibit #22?

4  A.  April 7th of 2005.

5  Q.  Can you read the first paragraph?

6  A.  After our conversation yesterday, I have

7      taken into consideration my new job offers

8      and I also consider what it would take to

9      make me comfortable in staying in my current

10     position at Fairfield Inn.

11 Q.  That's enough.  You mentioned you've taken

12     into consideration your new job offers.  What

13     new job offers were you referring to?

14 A.  As again, when I told you we had the

15     hotel/motel associations, I was approached to

16     take another job.

17 Q.  Was that the one at the Holiday Inn East?

18 A.  Yes.

19 Q.  Any other -- well, it said new job offers,

20     though.

21 A.  It should just say new job offer.

22 Q.  Okay.  So it was one job offer?

23 A.  Correct.

Page 258

1 Q. And from this paragraph, what I gather -- you
2    tell me if I'm wrong about this.
3 A. Uh-huh.
4 Q. What I gather is that you communicated to
5    Roger Miller that somebody had approached you
6    about employment elsewhere, and you were
7    making a pitch to him about what you wanted
8    in order to stay?
9 A. I'm not sure if it happened exactly like
10   that. I did turn in a notice to Todd.
11 Q. You turned in a notice of resignation?
12 A. Yes, I did.
13 Q. So you resigned. When did you resign?
14 A. During this April time. And Todd is like,
15   No, no, no, we can work this out; what will
16   it take to get you stay; I need you. And we
17   communicated that to Roger. And this is
18   where this came from.
19 Q. What was it that you were asking for in order
20   to stay?
21 A. Basically, more money. I was offered.
22 Q. And it seems that -- you see where it says
23   starting June 1st until maternity leave?

Page 259

1 A. Uh-huh.
2 Q. What were you asking for then?
3 A. To work as best that I could being pregnant.
4 Q. How many hours a week does this add up to,
5    about?
6 A. I would have to get a calculator.
7 Q. We can add this up real quick. I'm going to
8    assume no lunch for Monday through Thursday.
9 A. I mean, I never took, really, much of a
10   lunch. I'm just a go-go person. I may take
11   15 or 20 minutes just to refresh. No.
12 Q. All right. So, from Monday through Thursday,
13   from 8:30 a.m. to 2:00 p.m., is that what you
14   proposing?
15 A. I was proposing, yes.
16 Q. That's about five and a half hours a day,
17   right?
18 A. 8:30 -- yes.
19 Q. Okay. And for Friday, you were proposing
20   seven hours for a day, right?
21 A. Yes. Which I guess that's about, what, 29
22   hours?
23 Q. 29 hours. Okay. You were also -- below

Page 260

1    that, you were also asking for a $3,000 per
2    year salary increase?
3 A. Yes.
4 Q. Effective immediately. And the same bonus
5    plan?
6 A. Yes.
7 Q. What was the line immediately below that,
8    55.76 per week, what does that mean?
9 A. I think we were breaking it down of what it
10   would be for a week. The increase would be a
11   week. Roger had asked me, if that's correct,
12   what that 3000 would be per week by week and
13   the additional be each month.
14 Q. Okay. And then could you flip to the next
15   page. See where it says maternity leave?
16 A. Uh-huh.
17 Q. What does it say about maternity leave?
18 A. I was just in the early stages of planning
19   for maternity leave eight to 12 weeks, but I
20   had already given that letter to Todd.
21 Q. What letter are we talking about?
22 A. About the same time we gave the letter to
23   Todd in June -- or I gave him the letter in

Page 261

1    June to request the maternity leave.
2 Q. Now, this e-mail is dated April of 2005.
3 A. Yeah. It was way early in my maternity.
4 Q. This e-mail was early in maternity?
5 A. Yes.
6 Q. And then you were starting to make the plans
7    for your maternity leave, right?
8 A. Yes.
9 Q. You were asking for maternity leave of
10   somewhere between eight and 12 weeks?
11 A. Yes.
12 Q. And that you had planned to work up until the
13   day of delivery, right?
14 A. As much as I could, yes.
15 Q. All right. Can you review Defendant's
16   Exhibit #23?
17 A. Okay.
18 Q. Okay. What is Defendant's Exhibit #23?
19 A. It is Roger's reply to the first e-mail we
20   just did.
21 Q. Do you notice how on Defendant's Exhibit #23,
22   the "to" line --
23 A. I didn't hear your question.

Page 262

1  Q.  I'm sorry.  Do you notice how on Defendant's
2      Exhibit #23, in the e-mail "to" line --
3  A.  Uh-huh.
4  Q.  -- you see how the name Mickey and Heathe --
5      the R is cut off from Heather?
6  A.  Uh-huh.
7  Q.  And there's no e-mail address there?
8  A.  Correct.
9  Q.  Now, do you notice in the bottom right-hand
10     corner, it says Watts versus Hospitality?
11 A.  Yes.
12 Q.  Remember how we talked earlier today that
13     this is probably a document -- not probably.
14     It is a document that was produced by you or
15     your plaintiff through your attorneys?
16 A.  Correct.
17 Q.  Right?
18 A.  Uh-huh.
19 Q.  So this document that you produced, it has no
20     e-mail address for you and the R cut off from
21     your name, right?
22 A.  Yes.
23 Q.  And that's similar to Defendant's Exhibit

Page 263

1      #22, right?
2  A.  Yes.
3  Q.  And Defendant's Exhibit #21, right?
4  A.  Yes.  And the reason is, is that Roger nor
5      Todd set me up a personal e-mail; so I was
6      using my own personal e-mail from home.
7      That's why it says that.
8  Q.  All right.  Can you read for us the paragraph
9      that begins, Based on your past year's
10 A.  Based on your past year's hotel revenue --
11     and that word is revpar, R-E-V-P-A-R --
12     increases, we do feel that the annual
13     increase of $3,000 is in line effective upon
14     agreement, signature of this e-mail.  Next
15     salary review will be on April 10th -- or the
16     week would be April 10th through 14th, 2006.
17     This increase e-mail is not a contract for
18     employment.  Present future employment will
19     be based on consistent meeting, exceeding of
20     all budget, room revenues, and sales
21     department Hard Core, other sales,
22     administrative production goals and
23     implementation of goal -- excuse me -- of job

Page 264

1      description duties.
2  Q.  Okay.  So in this e-mail, do you think that
3      Roger agreed to your request for a $3,000
4      raise?
5  A.  He did.
6  Q.  And does he say anything about whether this
7      is a contract for employment in this e-mail?
8  A.  He says it's not.
9  Q.  Did you have any different understanding
10     based on that?
11 A.  No.
12 Q.  Can you look at Defendant's Exhibit #23 and
13     tell me where in Defendant's Exhibit #23, it
14     says anything about maternity leave?
15 A.  It doesn't.
16 Q.  Okay.  You see the paragraph --
17 A.  But note that this in April.
18 Q.  Right.  Do you see the paragraph that begins,
19     Due to your success?  It's right there.
20 A.  Yes.
21 Q.  Could you read that first sentence there?
22 A.  Due to your success and above-mentioned
23     efforts, results, we must maintain your

Page 265

1      current 35-hour work schedule as outlined in
2      your job description, which was signed on
3      July 5th, 2004.
4  Q.  Okay.  And read the next sentence as well.
5  A.  With increased -- can I have a piece of
6      paper?  I'm sorry.
7  Q.  Sure.
8  A.  I'm sorry.  Where were we?
9  Q.  With increased.  It's at the end of the
10     second line there.
11 A.  I lost it.  Okay.  I'm sorry.
12         With increased bookings revenue, follow
13     up Sales Pro work involved, increased
14     competition in our market and ever-changing
15     market economic conditions, 35 hours is
16     minimum needed to succeed.
17 Q.  Okay.  So remember in Defendant's Exhibit
18     #22, you were asking for 29 hours a week
19     approximately?
20 A.  Yes.
21 Q.  And Roger's response about that was in
22     Defendant's Exhibit #23, right?
23 A.  Yes.

Page 266

1 Q. And he rejected that, right?
2 A. Right.
3 Q. And he told you, you had to work a minimum of
4    35 hours a week.
5 A. Which I agreed to do after this e-mail.
6 Q. Okay. Did you communicate that to Roger at
7    any point?
8 A. There should be. I was asked to -- on here,
9    I believe, to give a response; and I did.
10 Q. All right. I've just handed you what's been
11    marked as Defendant's Exhibit #24. Could you
12    take a moment to read that and let me know
13    when you're ready to answer questions.
14 A. I'm ready.
15 Q. What is Defendant's Exhibit #24?
16 A. It is a letter that I wrote to Todd about my
17    maternity leave that he asked me to write to
18    him.
19 Q. Is this the letter contract that you were
20    discussing earlier today?
21 A. Yes.
22 Q. What does it say about you taking a leave of
23    absence?

Page 267

1 A. Please accept this letter as my official
2    notice of request for maternity leave. I am
3    planning on taking six to eight weeks
4    depending on my delivery and health of my
5    child. I will give you official notice of my
6    return after my six-week postpartum
7    appointment. I will not be out more than my
8    allotted time of 12 weeks under the FMLA.
9 Q. Okay.
10 A. Keep reading?
11 Q. No. That's good enough. Does this
12    Defendant's Exhibit #24 give any response by
13    the company about your entitlement or
14    eligibility for leave under the FMLA?
15 A. No. They never contested it either.
16 Q. Okay.
17 A. They never --
18 Q. Did anybody ever respond to you about your
19    eligibility for leave under the FMLA?
20 A. No. No. No.
21 Q. Handing you what's been marked as Defendant's
22    Exhibit #25. Could you please take a look at
23    it and let me know when you're ready to

Page 268

1    answer some questions.
2 A. Okay.
3 Q. What is Defendant's Exhibit #25?
4 A. It is a letter that I sent to Megan Carter,
5    who is with the CVB, which is the Chamber.
6 Q. Chamber of Commerce?
7 A. Yes.
8 Q. Convention Visitors Bureau?
9 A. Yes.
10 Q. Do you see in there where it says, I will be
11    on maternity leave I guess when my water
12    breaks, ha, ha, for about eight to 12 weeks?
13 A. Uh-huh.
14 Q. However, I will still work from home some and
15    will have access to e-mail?
16 A. Yes.
17 Q. So you didn't know this e-mail was sent on
18    July 20th, 2005, right?
19 A. Uh-huh.
20 Q. At the time you sent this e-mail in
21    Defendant's Exhibit #25, you didn't quite
22    know exactly how long you were planning on
23    being out, did you?

Page 269

1 A. No.
2 Q. It might have been as short as eight weeks;
3    it might have been as long as 12?
4 A. Not as long as 12, no.
5 Q. No, you were planning on being out less than
6    12?
7 A. Correct. I felt that I was protected under
8    FMLA, and I knew I had up to 12 weeks. My
9    goal was to be back between eight and 10
10    weeks or sooner.
11 Q. Okay.
12 A. And Megan -- the reason that e-mail was sent
13    to her is she's in charge of some of the
14    large conventions that came here, so I was
15    communicating to all of my contacts. And she
16    was pregnant at the time, too, so that was
17    the reason for the comment.
18 Q. I've just handed you what's been marked as
19    Defendant's Exhibit #26. Can you take a look
20    at that and let me know when you're ready to
21    answer some questions?
22 A. That's little.
23 Q. What is Defendant's Exhibit #26?

Page 270

1  A.  It was an e-mail that I sent to Todd Epplin.
2  Q.  You see in the second sentence, it's, I talk
3       to Tandi daily and she seems to -- it says
4       seemed, but I think you meant to say seems.
5  A.  Correct.
6  Q.  -- seems to have everything under control?
7  A.  Uh-huh.
8  Q.  At that time, when did you send this e-mail?
9  A.  It was sent on August the 16th.
10 Q.  So 2005?
11 A.  Uh-huh.
12 Q.  So this is after you gave birth to Tanner?
13 A.  Yes, or I came home.
14 Q.  You were on leave?
15 A.  Yes.
16 Q.  Were you talking to Tandi Mitchell daily at
17      that point?
18 A.  Yes, from the time Tanner was born.
19 Q.  Okay.  Who was calling who?
20 A.  She called me right after the baby was born.
21      I talked to her up to -- she came on as
22      intern prior to me leaving, because I trained
23      her and worked with her on a daily basis up

Page 271

1       to the day that I left on maternity leave.
2       So I talked to her up to that day, and she
3       actually called me after -- at the hospital
4       after I had Tanner.  And then we spoke right
5       before this e-mail.
6  Q.  Okay.  Did you talk about work, or was it
7       social?
8  A.  I always asked her how the hotel was doing,
9       how were things going.
10 Q.  Okay.  So you --
11 A.  Because that was my -- my responsibility to
12      Roger and to Todd was the communication with
13      Tandi.  It's almost like I managed her while
14      I was on maternity leave to make sure that
15      she was doing her part at the hotel.  And so
16      I did; I took the time to ask.
17 Q.  Okay.  Do you see that --
18 A.  Oh, I'm sorry.
19 Q.  Hold on one second.  No, quite all right.  Do
20      you see that the next sentence says, I heard
21      that Tammy is there as well?
22 A.  Uh-huh.
23 Q.  Tell her hello and please be sure to give her

Page 272

1       my contact information if she needs anything.
2  A.  Correct.
3  Q.  Why did you want Tammy to have your contact
4       information?
5  A.  Because I was working from home.
6  Q.  Okay.  Was that Tammy Dominguez?
7  A.  Yes.
8  Q.  The new general manager that was about to
9       take over, I guess, or taking over?
10 A.  I did not know that at the time, that she was
11      coming to be general manager.  I did not know
12      that.
13 Q.  You just knew that she was coming to work at
14      the Fairfield Inn?
15 A.  I knew she was coming to help, yes.
16 Q.  Got you.  I'm handing you what's been marked
17      as Defendant's Exhibit #27.  Take a moment to
18      look at that.
19 A.  Okay.
20 Q.  What is Defendant's Exhibit #27?
21 A.  It is an e-mail that I sent to Roger.
22 Q.  Okay.  Roger Miller.
23 A.  I'm sorry, yes, Roger Miller.

Page 273

1  Q.  When did you send this e-mail?
2  A.  On August the 21st.
3  Q.  2005?
4  A.  Yes.
5  Q.  Do you see in the second paragraph there, it
6       says, I have been keeping in touch with Tandi
7       almost daily and seems that all is going
8       well?
9  A.  Uh-huh.
10 Q.  At this point in time when you sent this
11      e-mail in Defendant's Exhibit #27, had you
12      been keeping in touch with Tandi almost
13      daily?
14 A.  Yes.
15 Q.  And who was calling who?
16 A.  It depended.  I mean, she lived right down
17      the street from me, too.  And we made a point
18      to call each other at least daily or every
19      other day.  I mean, she was running her own
20      business, too --
21 Q.  Right.
22 A.  -- on top of doing Fairfield Inn.
23 Q.  Was it social, work related?

Page 274

1  A.  No.  I mean, it was upon the agreement to be
2      the intern for the position.
3  Q.  So you called her about work and she called
4      you about work?
5  A.  Or we e-mailed, yes.  She had a -- Roger had
6      asked on a weekly basis that she turn in
7      reports or bring reports to me every Tuesday
8      or at least by every Thursday so that I could
9      let him know, too, or she was going to let
10     him know how things were going, because she
11     did not have access to Sales Pro.
12 Q.  Ms. Watts, I've just handed you what's been
13     marked as Defendant's Exhibit #28.  Let me
14     know when you're ready to answer some
15     questions about it.
16 A.  Sure.
17              (Witness reviews document)
18 A.  Okay.  Is there a second page?  I'm sorry.
19 Q.  Yes, there is.
20 A.  Okay.
21 Q.  And a third as well.
22 A.  Okay.  I recall.  Thank you.
23 Q.  Okay.  What is Defendant's Exhibit #28?

Page 275

1  A.  It is an e-mail that I sent to -- actually,
2      it went to Tammy at the -- just a general
3      e-mail account that was at the hotel.
4  Q.  Is that the FFI Montgomery GM e-mail account?
5  A.  Yes.  Yes.
6  Q.  So anyplace that we see an FFI Montgomery GM,
7      that was just a general e-mail box that was
8      used by whom?
9  A.  Todd or Tammy.  And then Tammy also still, I
10     think, had a Portland, Maine -- there may be
11     some documentation of that -- where she came
12     from.
13 Q.  Okay.
14 A.  So -- but this is Tammy Dominguez, yes.
15 Q.  And so the only way to tell would either
16     be -- the only way to tell whether it was
17     sent by -- whether the FFI Montgomery GM
18     e-mail box was used by Todd or Tammy would be
19     to look in the text of the e-mail or the date
20     of e-mail; is that right?
21 A.  Correct.
22 Q.  This one it looks like from the very first
23     line -- it says, Thanks, Tammy.

Page 276

1  A.  Yes.
2  Q.  So this one was sent to Tammy?
3  A.  Yes.
4  Q.  So you sent this e-mail to Tammy?
5  A.  Uh-huh.
6  Q.  Do you see in the third full paragraph,
7      Please let me know how things are going with
8      Tandi.  She has lots of responsibility while
9      I am gone, and I want to make sure that she
10     is doing what is expected.
11 A.  Uh-huh.
12 Q.  Why did you want to make sure that she was
13     doing what was expected?
14 A.  Because that was my expectation that was
15     given by Roger.  She had a job description,
16     and she communicated to -- to Tammy, too.
17     And I was just trying -- actually, I was
18     trying to combine the circle of us all three
19     communicating.
20 Q.  Okay.  You see in the fourth full paragraph,
21     it says, I know I am on maternity leave, but
22     I am willing to do what needs to be done.
23 A.  Yes.

Page 277

1  Q.  I have worked so hard over the years for our
2      business and I don't want to fail.
3  A.  Uh-huh.
4  Q.  I truly believe in our property.
5  A.  Correct.
6  Q.  Why did you write that?
7  A.  I was letting her know that even though I was
8      away, that I was dedicated to do my job.  I
9      mean, I physically could not be there.
10 Q.  Did you want to continue working during your
11     leave on this to try to help?
12 A.  Yeah.  Well, Roger gave me an option to
13     either let Tandi completely handle the
14     internship or to try to keep my hands in it,
15     meaning being able to put things in Sales Pro
16     or, you know, keeping, you know, the revenue
17     going.  So I opted -- when he said, well, we
18     can pay you the seven hours a week, but this
19     is what I expect of you is to make sure that
20     Tandi is keeping the hotel booked and
21     maintaining the business.
22 Q.  Okay.  And you chose the latter?
23 A.  I did.  I had worked so hard to get it where

Page 278

1    it was, so I felt strongly about that.
2  Q.  All right.  Handing you what's been marked as
3      Defendant's Exhibit #29.
4  A.  Uh-huh.
5  Q.  Take a moment to read that and let me know
6      when you're ready to answer some questions.
7  A.  Okay.
8  Q.  What is Defendant's Exhibit #29?
9  A.  It is an e-mail that I sent to Roger on
10     August the 29th -- I'm sorry -- yes, August
11     the 29th, '05.
12 Q.  2005?
13 A.  Yes.
14 Q.  Does this e-mail talk about when you would be
15     released to return to work?
16 A.  Let me refer again, please.
17 Q.  Sure.
18 A.  I didn't give any specific date.  I just told
19     him I had a follow-up appointment on
20     September 27th and, hopefully, all will go
21     well and I will be released to return to
22     work.
23 Q.  It says, If all goes well, I will be back on

Page 279

1      October 3rd or October 10th and sooner if I
2      can?
3  A.  Correct.
4  Q.  Was that what your goal was, to try to get
5      back October 3rd or 10th and possibly even
6      sooner?
7  A.  Yeah.
8  Q.  Okay.  Could you read the next paragraph for
9      us, please?
10 A.  We have one major issue, and that is child
11     care.  We have been on the waiting list since
12     January 3rd at three different schools.  We
13     have not been guaranteed a spot.  We are
14     waiting for an opening.  I may have to work
15     with you on my return -- return hours since I
16     can only find a Mother's Day Out program for
17     Tanner.  There is a good one that has an
18     opening three days a week Tuesday, Wednesday,
19     Thursday, from 8 to 2:30; and possibly they
20     will have an opening for Monday soon.  The
21     school is closed on Friday.
22 Q.  Okay.  So at this point in time on
23     August 29th, 2005, there -- the only child

Page 280

1      care that you have available to you for
2      Tanner when you were preparing to return to
3      work is this Tuesday, Wednesday, Thursday,
4      8 a.m. to 2:30 p.m., right?
5  A.  Besides my family.
6  Q.  Besides your family.
7  A.  But, again, this is early in August.
8  Q.  I'm just asking about this point in time.
9  A.  Correct.
10 Q.  Okay.  At this point in time, you said that
11     the day care that you have available to you
12     is three days a week from 8:30 a.m. to
13     2:30 -- from 8 a.m. to 2:30 p.m., right?
14 A.  Uh-huh.
15 Q.  Now, you said that your family was available,
16     too, just a second ago, right?
17 A.  Correct.
18 Q.  How was your family available to you on
19     August 29th, 2005, to help with the child
20     care?
21 A.  How were they?
22 Q.  Yeah.
23 A.  They volunteered.

Page 281

1  Q.  Okay.  What were they going to do?
2  A.  They knew that we were trying to find child
3      care; and they said, If things don't work
4      out, we'll take care of it.
5  Q.  Were they going to --
6  A.  My goal was to get me back to work.
7  Q.  Was your family going to be able to allow you
8      to work full-time?
9  A.  My 35 hours.
10 Q.  As of this date, August 29th, 2005, was your
11     family going to be able to --
12 A.  I would say yes.
13 Q.  You would say yes, but do you know for sure?
14 A.  Never turned me down or doubted me now.
15 Q.  Have you ever discussed it with them?
16 A.  Yes.
17 Q.  By August 29th, 2005, you had discussed it
18     with them that they were going to have to
19     provide child care all day on Monday, all day
20     Friday, and whatever other times after 2:30?
21 A.  My grandmother was very open to that.
22 Q.  That wasn't my question.  By August 29th,
23     2005, had you discussed with your family

Page 282

1  members that they were going to have to
2  provide child care for Tanner all day Monday,
3  all day Friday, and after 2:30 p.m. on
4  Tuesday, Wednesday, Thursday?
5  A.  Yes.
6  Q.  You had?
7  A.  Yes.
8  Q.  Which family member?
9  A.  My grandmother.
10  Q.  Which grandmother?
11  A.  Frances Taylor.
12  Q.  You realize I'm most likely going to depose
13     Frances Taylor now, right?
14  A.  Not a problem.
15  Q.  Okay.  But you realize also in this e-mail,
16     you don't say anything about Frances Taylor,
17     do you?
18  A.  I do.
19  Q.  You do?
20  A.  I mean, I realize that.
21  Q.  Okay.
22  A.  I'm just waiting on the next one.  Thank you.
23           (Witness reviews document)

Page 283

1  A.  Okay.
2  Q.  All right.  What is Defendant's Exhibit #30?
3  A.  It is an e-mail from Roger Miller to me.
4  Q.  Is it in response to an e-mail that you had
5     sent to him previously?
6  A.  I was trying to figure that out, but it -- it
7     seems from his conversation, yes.
8  Q.  Do you see at the bottom here, it says
9     original message?
10  A.  Yes.
11  Q.  And it looks like that's an e-mail from you
12     to Roger Miller with your signature block
13     there?
14  A.  Uh-huh.
15  Q.  Were you sending a document containing sales
16     goals to Roger Miller in that first e-mail?
17  A.  Okay.  I'm confused with your question, and I
18     needed to read it again.  I'm sorry.
19  Q.  In this, first, the original message that you
20     sent to Roger Miller?
21  A.  Uh-huh.
22  Q.  That looks like it's on Defendant's
23     Exhibit #30.  Do you have any idea what that

Page 284

1  e-mail was about?
2  A.  It was about them trying to get me to come
3     back to work.
4  Q.  The original e-mail.  That's all I'm talking
5     about.
6  A.  Oh.  I don't -- I don't recall.
7  Q.  Okay.  Is it possible that it was you sending
8     your sales goals for the Montgomery Fairfield
9     Inn?
10  A.  That's what the subject line says.
11  Q.  Okay.  Do you think that that's what it was?
12  A.  I assume.
13  Q.  Did you used to prepare sales goals for
14     Montgomery Fairfield Inn?
15  A.  Uh-huh.
16  Q.  Did you prepare them in Excel, Microsoft
17     Excel?
18  A.  It was something that I worked directly with
19     Roger or Todd, and I believe it was an Excel
20     file.
21  Q.  Is it possible that that original message
22     right there that you sent to Roger Miller on
23     Thursday, September 22nd, 2005, was those

Page 285

1  sales goals?
2  A.  Yes.
3  Q.  Okay.  And do you see above the e-mail
4     response that you received from Roger?
5  A.  Uh-huh.
6  Q.  Do you see in the second sentence, he says,
7     The above was submitted based on a
8     three-day/eight-hour work week?  Is that
9     what -- the sales goals you submitted to
10     Roger?
11  A.  I don't recall.
12  Q.  Okay.  Is it possible you submitted to Roger
13     sales goals of you working three days, eight
14     hours, a week?
15  A.  I think Tammy was asking me or trying to get
16     me to come back.  And we were trying to
17     negotiate what those goals would be if I was
18     able to come back working a three-day week.
19     That's all I remember.
20  Q.  Okay.  Do you have any reason to doubt that
21     you submitted sales goals to Roger Miller on
22     September 22nd, 2005, with you working three
23     days a week?

Page 286

1  A.  No.
2  Q.  You have no reason to doubt that, right?
3  A.  Unh-unh.
4  Q.  And Roger also said in response, As indicated
5     during our telephone conversation today, we
6     need the three days to return to five as soon
7     as possible.
8  A.  Uh-huh.
9  Q.  Do you see that?
10  A.  Yes.
11  Q.  Okay.  I'm handing you what's been marked
12     Defendant's Exhibit #31 to aid you a little
13     bit.  You'll notice that from the middle of
14     the first page on Defendant's Exhibit #31,
15     it's similar to -- it's actually the same as
16     the one that we were just looking at.
17  A.  Okay.
18  Q.  And then the things above it are follow-up
19     communication.
20  A.  Okay.
21  Q.  Please take your time to review it and let me
22     know when you're ready to answer some
23     questions about it.

Page 287

1          (Witness reviews document)
2  A.  So it would be best to read it this way, is
3     what you're saying, as how it's put together?
4     This was what --
5  Q.  My thought with e-mails is always, probably,
6     if it's a string of e-mails --
7  A.  To read it backwards.
8  Q.  -- it's always easiest to read it from the
9     bottom up.
10  A.  But Exhibit #31 is the same as what #30 was
11     from the bottom?
12  Q.  A portion of it is the same, yes.
13  A.  Okay.  Okay.
14  Q.  But if you believe otherwise, you can tell me
15     that.
16  A.  Okay.  Thank you.
17          (Witness reviews document)
18  Q.  Have you had a chance to review Defendant's
19     Exhibit #31?
20  A.  Yes.
21  Q.  What is Defendant's Exhibit #31?
22  A.  It's an e-mail -- a string of e-mails sent on
23     September 22nd.

Page 288

1  Q.  It's back and forth between yourself, Roger
2     Miller, Tammy Dominguez, and some other
3     folks, right?
4  A.  Mainly, I guess it's from me and Roger.
5  Q.  Okay.  Now, we were talking before about how
6     a portion of Defendant's Exhibit #31 --
7  A.  Uh-huh.
8  Q.  -- appears to be the same as what was in
9     Defendant's Exhibit #30; is that correct?
10  A.  Correct.
11  Q.  So when Roger was saying that your sales
12     goals were submitted based on a three-day,
13     eight-hour-per-day work week --
14  A.  That was during maternity leave.
15  Q.  Right.  And then you responded to that,
16     didn't you?
17  A.  Uh-huh.
18  Q.  How did you respond?
19  A.  I responded that I would work a 35-hour work
20     week.
21  Q.  Going full-time, right?
22  A.  Uh-huh.
23  Q.  And then up above that, Roger responded to

Page 289

1     you again, right?
2  A.  Yes.
3  Q.  And what did he say?
4  A.  You are correct.
5  Q.  Thirty-five hours, seven days -- seven hours
6     per day five days a week, right?
7  A.  Uh-huh.
8  Q.  And that was for when you got back to
9     full-time; is that correct?
10  A.  Yes.  Which was my understanding at the end
11     of my maternity leave.
12  Q.  Okay.  I'm handing you what's been marked as
13     Defendant's Exhibit #32.
14          (Witness reviews document)
15  Q.  What is Defendant's Exhibit #32?
16  A.  It is an e-mail from Tammy to me.
17  Q.  It's a string of e-mails actually, isn't it?
18  A.  Correct.
19  Q.  Okay.  And attached to this string of
20     e-mails -- if you could flip to page 0104 at
21     the bottom right-hand corner?
22  A.  Uh-huh.
23  Q.  -- what is that page and the page immediately

Page 290

1    following it?
2  A.  A Sales Pro activity.
3  Q.  Is this the sales goals that you were talking
4    about before?
5  A.  I don't recall.
6  Q.  Is it possible that it is?
7  A.  Yes.
8  Q.  Does this look like --
9  A.  It's not a goal; it's an activity report.
10  Q.  Okay.  That goes -- on this chart, it shows
11    three days for you; is that correct?
12  A.  Uh-huh.
13  Q.  And that's what we were talking about before,
14    right?
15  A.  Yes.
16  Q.  That you were going to be working three days,
17    right?  Does this look like it might have
18    been prepared in Microsoft Excel?
19  A.  No.  It's a Sales Pro.  Wait, wait, wait.
20    I -- it may be something that Carol produced,
21    or Roger.  So it does look like an Excel, I'm
22    sorry.  But the Sales Pro reports are very
23    similar.

Page 291

1  Q.  If you turn back to the second page of
2    Defendant's Exhibit #32, do you see that
3    first e-mail in this string, the second page
4    of Defendant's Exhibit #32?
5  A.  Yes.
6  Q.  That's an e-mail that's from you to FFI
7    Montgomery GM.  That's Tammy, right?
8  A.  Uh-huh.
9  Q.  And Roger Miller, right?
10  A.  Uh-huh.
11  Q.  And it's got revised sales goals as the
12    subject line?
13  A.  Correct.
14  Q.  Do you think that this e-mail is sending your
15    revised sales goals after the previous
16    comments you had received from Tammy and
17    Roger?
18  A.  I think I was proposing what to -- what could
19    be accomplished in a three-day work week.
20  Q.  At the bottom of the first page of
21    Defendant's Exhibit #32 --
22  A.  Uh-huh.
23  Q.  I'm sorry.  Are you reviewing that?

Page 292

1  A.  I was just making sure what it said.
2  Q.  At the bottom of the first point of
3    Defendant's Exhibit #32, do you see that last
4    full paragraph?
5  A.  Uh-huh.
6  Q.  It begins, I also need to talk.
7  A.  Uh-huh.
8  Q.  It says, I also need to talk to you about
9    your schedule as well.  You had mentioned you
10    were going to be working one and one half
11    days in the hotel and one and one half days
12    at home.  It is my understanding you are to
13    be working three full seven-hour shifts in
14    the hotel and not at home.  We need to
15    discuss this further.  If you will not be
16    working three seven-hour shifts in the hotel,
17    the company will not be paying you for three
18    days.  We will pay you for the time you
19    actually work in the hotel.  If you are not
20    able to come back three full days, we need to
21    consider where to go from here.  At this
22    point, I'm not willing to say Tandi is done
23    on September 30th unless you are going to be

Page 293

1    working three days in the hotel.
2        And that was Tammy writing that to you;
3    is that correct?
4  A.  Right.
5  Q.  Okay.  Was Tandi supposed to be finished at
6    the hotel on September 30th?
7  A.  My understanding and what we had agreed upon
8    was at the end of my 12 weeks.
9  Q.  Twelve weeks?  Why does Tammy think here that
10    Tandi might have been done as early as
11    September 30th?
12  A.  It may have been something that she
13    communicated to her.  I have no idea, not
14    that I recall.
15  Q.  You haven't been involved in any discussions
16    at this point that you were going to come
17    back early and Tandi was going to leave
18    early, possibly around September 30th?
19  A.  We had talked about it, yes.
20  Q.  Yeah?  Okay.  And at least at this point, it
21    was a possibility that you were going to be
22    coming back three days a week?
23  A.  That's what she was trying to get me to do,

Page 294

1    yes.
2 Q.  Well, you had actually proposed it earlier,
3    hadn't you?
4 A.  Right.
5 Q.  And that was going to be one and a half days
6    at the hotel and one and a half days at home?
7 A.  Correct.
8 Q.  But that was rejected.
9 A.  Correct.
10 Q.  Because they wanted you to work all three
11    days at the hotel, right?
12 A.  Correct.
13 Q.  Okay.  I'm handing you what's been marked as
14    Defendant's Exhibit #33.  Take at a moment to
15    review that and let me know when you're ready
16    to answer some questions.
17 A.  Okay.
18 Q.  What is Defendant's Exhibit #33?
19 A.  It was a letter to -- or excuse me -- an
20    e-mail to Tammy.
21 Q.  From who?
22 A.  From me.
23 Q.  When did you send this?

Page 295

1 A.  On September 27th.
2 Q.  2005?
3 A.  Correct.
4 Q.  And you say, Tammy, after our discussion on
5    Friday, there has been some change that I
6    would like to request in my schedule.  And
7    then the change is -- and I'm paraphrasing
8    here, but you tell me if I'm misunderstanding
9    it, but the change is that Tanner got another
10    ear infection.
11 A.  Correct.
12 Q.  And the doctor recommended that you keep him
13    out of day care.
14 A.  Uh-huh.
15 Q.  And you were requesting to extend your leave
16    of absence for 12 weeks?
17 A.  Up to 12.
18 Q.  Up to 12 weeks.  So rather than coming back
19    earlier, as you were previously discussing in
20    the couple of e-mails past that we just
21    reviewed, you now want to delay it out 12
22    weeks?
23 A.  I was requesting.

Page 296

1 Q.  You see that -- I guess it's the third full
2    paragraph that says, My original plan?
3 A.  Uh-huh.
4 Q.  It says, My original plan was to come back
5    between eight to ten weeks per my discussion
6    with Roger?
7 A.  Uh-huh.
8 Q.  Was that your original plan, to come back in
9    eight to ten weeks?
10 A.  My goal was to get back as soon as I was
11    able.
12 Q.  Okay.  The next sentence says, I will keep
13    you posted weekly if I am able to come back
14    sooner.
15 A.  Correct.
16 Q.  You were going to try and come back sooner if
17    possible?
18 A.  If possible, yes.
19 Q.  I'm still willing to do all I can at home as
20    in the original plan with Todd and Roger.  I
21    can still do my seven-plus hours a week,
22    continue to work on the marketing plan, and
23    continue to work directly with Tandi and

Page 297

1    maintain Sales Pro.  Do you see all that?
2 A.  Uh-huh.
3 Q.  Was that what your plan was at that point in
4    time?
5 A.  That was also my original plan.
6 Q.  Wait a minute.  The original plan says to
7    come back between eight to ten weeks.
8 A.  Right.
9 Q.  Okay.  That was the original plan, right?
10 A.  I'm sorry.  I thought that's what your
11    question was.
12 Q.  Okay.  The original plan was to come back
13    eight to ten weeks.
14 A.  Correct.
15 Q.  Then at this point, you wanted to change it
16    to come back at 12 weeks now?
17 A.  Right.
18 Q.  Okay.  But you still wanted to do your seven
19    hours a week at home?
20 A.  Correct.
21 Q.  And you would try to come back sooner if
22    possible.
23 A.  Correct.  But please note that, again, I felt

Page 298

1   that I was -- or I was under the assumption
2   that I was under FMLA and that I was
3   protected up to my 12 weeks.
4   Q.  Okay.  Handing you what has been marked as
5   Defendant's Exhibit #34.  Take a moment to
6   read that and let me know when you're ready
7   to answer some questions.
8   A.  Okay.
9   Q.  What is Defendant's Exhibit #34?
10  A.  It is an e-mail on November 2nd, 2005, that I
11     sent to Roger.
12  Q.  It's actually a string of e-mails, isn't it?
13  A.  Well, yes.  I didn't see the top.  Yes.
14  Q.  The first e-mail is an e-mail that you sent
15     to Roger Miller on November 2nd, 2005; and
16     then the second e-mail is an e-mail that you
17     sent to Roger Miller on November 3rd, 2005,
18     right?
19  A.  Correct.
20  Q.  And in that first e-mail, you say, Roger,
21     good evening.  My last conversation with
22     Tammy this afternoon at 4 p.m. 11/2/05, she
23     stated she was now no longer going to give me

Page 299

1   an option to return to my 35 hours a week
2   upon my return from maternity leave on
3   November 9th or my request to let her know by
4   Friday, November 4th, if I can return to my
5   full-time status.
6   A.  That's because she was trying to get me to
7     come back to 40 hours a week.
8   Q.  Okay.
9   A.  Because there is a typo in this e-mail.
10  Q.  What's the typo?
11  A.  In the second paragraph.  Just one second,
12     please.
13        I'm sorry.  That must be a prior --
14     another conversation.  No typo.
15  Q.  There's no typo.  Okay.  So in that first
16     paragraph, which is saying that Tammy is not
17     going to give you the option to return to 35
18     hours a week because she wants you to come
19     back full-time --
20  A.  Correct.
21  Q.  She's not going to let you -- and you had
22     asked -- is it correct, based on reading this
23     paragraph, that you did ask Tammy to let you

Page 300

1   tell her by Friday, November 4th, whether you
2   would be able to return to full-time status?
3  A.  And that full-time status was that she was
4     trying to get me to come back at 40 hours a
5     week in the conversation that I had with her.
6  Q.  Okay.  But you asked -- you asked her to
7     let -- that you -- hold on.  Let me get a
8     clear question for you.
9        You asked Tammy if you could let her
10     know by Friday, November 4th, whether you
11     would be able to return to full-time status,
12     meaning 40 hours a week?
13  A.  Correct.
14  Q.  Okay.
15  A.  She stated with her being the new general
16     manager, that that was her expectation.
17  Q.  Okay.  You see in the second paragraph there,
18     it says, Also, I requested from a prior
19     conversation this morning that I needed more
20     time than by 5 p.m. today to let her know --
21     and her being Tammy, right?
22  A.  Uh-huh.
23  Q.  -- let her know that I would be returning to

Page 301

1   my 35 hours on November 9th.  Excuse me.  I
2   misread that.  It says more time than by
3   5 p.m today to let her know if I would be
4   returning to my 35 hours on November 9th.  Do
5   you see that?
6  A.  Uh-huh.
7  Q.  So why would you need more than the end of
8     the day on November 2nd whether you would be
9     returning to your 35 hours on November 9th?
10  A.  Okay.  Repeat your question.
11  Q.  Sure.  The first sentence of that second
12     paragraph, you say that you would need more
13     time than by 5 p.m. on November 2nd in order
14     to let Tammy know whether you're going to be
15     able to work 35 hours a week starting
16     November 9th.
17  A.  And that's -- again, I apologize, that is the
18     typo.  It was that she was wanting me to do
19     the 40 hours a week.
20  Q.  Oh, that's a typo there?  You should have
21     written 40?
22  A.  40.
23  Q.  All of a sudden, now, that this is wrong;

Page 302

1  this is supposed to be 40 hours?
2  A. Not all of a sudden. It's just that that was
3    our conversation on the phone.
4  Q. Really? Because that's kind of an important
5    typo, don't you think? Don't you think you
6    would have gotten that right if that was the
7    real issue?
8  A. I think that this was the day that I was
9    terminated, and I was in shock that a company
10   would do this to me after what I had been
11   dedicated to them, that they would turn
12   around and terminate me.
13 Q. Okay. Anything else?
14 A. No.
15 Q. But you say 35 in that first paragraph, too.
16 A. Because that was my -- my hours of being --
17   or my job agreement was the 35.
18 Q. Well, you say down below here to let her know
19   if I would be returning to my 35 hours,
20   also.
21 A. And that's where I believe that I should have
22   wrote that I was trying to explain that he
23   was -- she was trying to tell me the 40 hours

Page 303

1  a week.
2  Q. Now, just before you started saying that it
3    was supposed to be 40 hours, your attorney
4    pointed out that she believed that that was a
5    typo, right?
6  A. There's something else.
7        MS. DUNCAN: It was another typo.
8  A. There was another typo.
9  Q. What was the other typo?
10       MS. DUNCAN: Should be "my" instead of
11          "by" boss in the next-to-the-last
12          line in the same paragraph.
13       MR. FELLNER: Okay.
14 Q. Anyway, so all of a sudden, now, these two
15   35s that talk about your hours at the
16   company, one of them is supposed to be 40 and
17   the other one is supposed to be 35?
18 A. Correct.
19 Q. Really?
20 A. I answered correct.
21 Q. Okay. But this says 35, doesn't it?
22 A. It does.
23 Q. All right. And here you wrote this and you

Page 304

1  wrote 35 hours. You were asking Roger
2  that -- you said she wouldn't let you know
3  whether you would be returning to 35 hours?
4  A. Correct.
5  Q. And what's the next sentence say? Read that
6    for us.
7  A. Which paragraph are you in?
8  Q. Same paragraph: I told her.
9  A. I told her that I would call my church and
10   family members to see if I could get some
11   additional -- I meant to put additional help
12   stating the 40 hours.
13 Q. But you didn't put that in there, did you?
14 A. Correct.
15 Q. You just said, I told her I would call my
16   church and family members to see if I could
17   get some help.
18 A. Correct.
19 Q. What's the next sentence say?
20 A. It was my understanding that she was going to
21   be able to work with me and my schedule.
22 Q. Continue on.
23 A. Just -- in parentheses, it says, Just last

Page 305

1  week in our in-house meeting, in hopes that I
2  could have full-time -- full-time child care
3  in January. Meaning --
4  Q. By January.
5  A. By January. Meaning that my grandmother
6    would not have to care for the children in
7    the afternoons and on Friday.
8  Q. This e-mail indicates that you don't have
9    full-time child care, right?
10 A. That would cover a 40-hour week.
11 Q. Okay. And continue on with the next
12   sentence.
13 A. And the reason I have not spoken to you about
14   this, because you told me several weeks ago
15   that you were no longer my boss and I needed
16   to speak directly to Tammy.
17 Q. Do you remember earlier today, we reviewed
18   another document about you working from
19   home?
20 A. Uh-huh.
21 Q. An e-mail between you and Roger Miller?
22 A. Yes.
23 Q. And what did Roger Miller say in that e-mail?

Page 306

1  A.  I don't recall.
2  Q.  Did he say that he was okay with you working
3     from home?
4  A.  Yes.
5  Q.  But who had to make the decision?
6  A.  Todd Epplin.
7  Q.  Who is Todd Epplin?
8  A.  He was the general manager.
9  Q.  So he told you that -- Roger Miller told you,
10    when you asked Roger whether you could work
11    from home, he didn't mind; but you had to get
12    it approved by the general manager of the
13    property, right?
14  A.  Right.
15  Q.  Okay.  And in this last sentence that you
16    just read, you said that you hadn't spoken to
17    him about any of these issues because he told
18    you that you had to work this out with Tammy,
19    right?
20  A.  Right.
21  Q.  And that Tammy was your boss, right?
22  A.  Right.
23  Q.  And Tammy, according to you, told you that

Page 307

1     you needed to work 40 hours a week, right?
2  A.  Correct.
3  Q.  But in this e-mail, you only say 35, right?
4  A.  Correct.
5  Q.  And in this e-mail, you say you don't have
6     full-time child care.
7  A.  I said that I was trying to get full-time
8     child care by January.  I had -- I have -- at
9     the time I had child care.
10  Q.  You had child care, but not full-time child
11    care, right?
12  A.  Well, I did, but it was using my grandmother.
13    My point was not to.
14  Q.  So why do you say in here, in hopes that I
15    could have full-time child care by January?
16  A.  That way, there would not be any question of
17    having to work from home or leave early or,
18    you know, any adjustment to my schedule.
19  Q.  I mean this e-mail says what it says, right?
20  A.  It does.
21  Q.  It says you didn't have full time child care,
22    right?
23  A.  But I did have full-time child care.

Page 308

1  Q.  Oh, you did?  But you just didn't decide to
2     tell that to Roger, right?
3  A.  I told Roger where my children were.
4  Q.  Where does it say in this e-mail --
5  A.  It doesn't say it in this e-mail.
6  Q.  Why not?  Don't you think that's important?
7     Wouldn't you put that in there?
8  A.  If you will notice, that it was written at
9     9:38 p.m. at night; and this was after the
10    fact that I had been terminated.
11  Q.  Well, it's important that you have the child
12    care, right?
13  A.  But that doesn't question my ability to do my
14    job.
15  Q.  Well, no, no, no.  It does, because --
16  A.  No, it doesn't.
17  Q.  Well, wait a minute.  Hold on.  You said that
18    you couldn't do this job because you didn't
19    have full-time child care.
20  A.  I didn't say that I couldn't do the job.
21  Q.  It says you don't have full-time child care,
22    right?
23  A.  But it did not say that I could not do my

Page 309

1     job.
2  Q.  It says you don't have full-time child care,
3     right?
4  A.  Correct.
5  Q.  Okay.  Now, and it says that, It was my
6     understanding she was going to be able to
7     work with me and my schedule in hopes -- I'm
8     going to skip the parentheses part -- in
9     hopes that I could have full-time child care
10    by January.  So what you were asking for was
11    an accommodation on your schedule because you
12    didn't have full-time child care at least
13    until January.
14  A.  No.
15  Q.  Am I misreading this?
16  A.  I guess everybody can interpret it how they
17    would like, but --
18  Q.  Well, how should we interpret this?
19  A.  I don't want to comment.
20  Q.  Well, I mean, this is your e-mail.
21  A.  I told you I didn't have another comment.
22  Q.  Okay.  So this e-mail just flat out says you
23    do not have full-time child care.  Is that

Page 310

1    what it says?
2  A. But I did have child care.
3  Q. I'm not asking you that.
4  A. The e-mail says that --
5  Q. What I'm asking you is the e-mail says you do
6    not have full-time child care until January,
7    right?
8  A. No.
9  Q. I'm just asking you what it says.
10    MS. DUNCAN: Listen, I'm going to be
11      objecting because you're
12      argumentative. You're repeating
13      questions that have already been
14      answered. If you've got something
15      further to ask about the e-mail,
16      please do.
17    MR. FELLNER: I just did.
18    MS. DUNCAN: But just don't continue to
19      argue back and forth.
20    MR. FELLNER: Okay. I just did.
21  Q. The e-mail says you didn't have full-time
22    child care until January, right?
23  A. I did have child care.

Page 311

1  Q. That's not what I asked you.
2  A. But that's my answer.
3  Q. You're still not answering my question.
4    MR. FELLNER: I'm going to object that
5      it's nonresponsive.
6    MS. DUNCAN: Go ahead.
7  Q. Now, try answering my question. And we can
8    ask it as many times as it takes until you
9    finally decide to answer it. Okay?
10  A. But I did answer the question.
11  Q. You have not answered my question. It's a
12    simple yes or no question. This question
13    says you do not have full-time -- this e-mail
14    says you do not have full-time child care
15    before January, right?
16  A. I've already answered the question.
17  Q. I don't think you have. I would just like to
18    get a clear simple answer. That's what the
19    e-mail says: in hopes that I could have
20    full-time child care by January.
21  A. I had full-time child care. So, yes, I had
22    full-time child care.
23  Q. That's not my question. My question is this

Page 312

1    simple. Okay?
2  A. I'm listening.
3  Q. Let's try it again. This e-mail says, in
4    hopes that I had full-time child care -- in
5    hopes that I could have full-time child care
6    by January. That's what it says, right?
7  A. It does say that.
8  Q. Okay. How is somebody supposed to understand
9    that you have full-time child care based upon
10    reading that?
11  A. I don't feel that I should be -- that my job
12    should be based on that, I mean.
13  Q. That's not what I asked you. How is somebody
14    supposed to understand from this e-mail that
15    you had full-time child care?
16  A. It's however they want to read it. I
17    don't --
18  Q. So this other person would have no way --
19  A. I can't answer for someone else.
20  Q. -- to know that you --
21  A. Well, I can't answer for someone else.
22  Q. Okay. Reading this, does anybody have any
23    way to know that you have or claim to have

Page 313

1    had full-time child care as of writing this
2    e-mail?
3  A. Through the documents that provided where my
4    children were.
5  Q. I'm talking about this e-mail here.
6  A. I know you are.
7  Q. Okay. So answer my question, then. It's
8    that simple. It's a simple question. Does
9    this e-mail provide the reader any reason to
10    believe that you have full-time child care as
11    of the writing of this e-mail?
12  A. Okay. Now you just turned the question
13    around.
14  Q. Again, does this e-mail provide the reader
15    any basis for understanding or believing that
16    you have full-time child care as of the time
17    you wrote this e-mail?
18    THE WITNESS: What if I don't want to
19      respond?
20    MR. FELLNER: I'll get the judge to
21      order you to respond.
22    MS. DUNCAN: She had already been
23      terminated. What difference does

Page 314

1    it make what she said to him after
2    she was terminated?
3    MR. FELLNER:  Please read the question
4    back, and let's get an answer.
5    (The court reporter read the
6    pending question.)
7  Q.  Okay.  Let me ask it again.  I want a clear
8    question and a clear response on the record.
9    Does this e-mail provide the reader any
10   reason to believe that you have full-time
11   child care as of the time that you wrote this
12   e-mail?
13  A.  I'm going to answer yes, because I had child
14   care.
15  Q.  Where is it in here that it says that you had
16   full-time child care?  In this e-mail, where
17   is it?
18  A.  It's not there.
19  Q.  It's not there.  Okay.
20  A.  But that doesn't mean that I did not have
21   full-time child care.
22  Q.  That's not what I'm asking.
23  A.  But that's for the record.

Page 315

1  Q.  Okay.  That's fine.  I don't mind if you want
2    to say something for the record.  I just want
3    to get a clear answer, and then you can go
4    ahead and explain whatever you want to
5    explain.  Okay?  That's how the process
6    works.
7  A.  I completely understand.  Thank you.
8  Q.  Apparently, you don't.
9    MS. DUNCAN:  You can improve your
10    temperament for everybody --
11    MR. FELLNER:  You can take your client
12    and ask her to make sure that she
13    answers the question.
14    MS. DUNCAN:  I can take my client home
15    if I think you're being abusive to
16    her.
17    MR. FELLNER:  You can do that if you
18    want to.  That's your right.  Go
19    ahead.
20    MS. DUNCAN:  How much longer are you
21    going on this?
22    MR. FELLNER:  A couple more documents.
23    Not much.

Page 316

1  Q.  I've just handed you what's been marked as
2    Defendant's Exhibit #35.
3    THE WITNESS:  Can I just please ask
4    what time it is?
5    MR. FELLNER:  Yeah.
6    MS. DUNCAN:  It's six o'clock.
7  Q.  There's just a few more documents.  Just two
8    more -- three more.
9  A.  I'm ready.
10  Q.  Okay.  What is Defendant's Exhibit #35?
11  A.  It is a letter from Tammy that I received on
12   11/3/05.
13  Q.  What is this letter?
14  A.  I read it as a termination letter, but it was
15   a letter that was left for me at the hotel
16   when I was, after the conversation on the
17   2nd, to go to the hotel on the 3rd to pick up
18   my -- or to return any belongings from
19   Fairfield Inn and get any of my personal
20   belongings.
21  Q.  Okay.  Did you see Tammy when you came to the
22   Fairfield Inn on November 3rd?
23  A.  No.  She was not there.

Page 317

1  Q.  Okay.  And who was Carrie?
2  A.  Carrie Farrell.  She was the housekeeping
3    supervisor.  And -- if I have his name
4    correct, and it was Ron -- is it --
5  Q.  Disbrow?
6  A.  Disbrow.  Yes.  He was there.  That's who I
7    turned the laptop in to, which I requested to
8    receive something in writing that that was
9    actually turned in.
10  Q.  I'm handing you what's been marked as
11   Defendant's Exhibit #36.  Take a moment to
12   read that, and let me know when you're ready
13   to answer some questions.
14  A.  Can we not for the record read what this
15   says?  I mean, this is --
16  Q.  I don't need to.
17    (Witness review document)
18  A.  Okay.
19  Q.  What is Defendant's Exhibit #36?
20  A.  It is an e-mail from Tammy on November the
21   7th, 2005.
22  Q.  To whom?
23  A.  To me.

Page 318

1 Q. What does the e-mail say?
2 A. It says, Please read the attached letter. I
3    want to make sure you have plenty of time to
4    make a decision, so --
5       I'm sorry. There's a string of e-mails.
6 I guess I should have read the first one.
7       The first one was on -- that's weird
8    that the dates are backwards. I don't know
9    if you noticed that. November 6th is one of
10   them, and then the next one is November 7th.
11 Q. Right.
12 A. Okay. I see it now.
13      The one on November 6th says, Please
14   read and respond the attached document. That
15   was sent from Tammy to me.
16 Q. Okay. And then the second e-mail says what?
17 A. Please -- again, it was on November the 7th.
18   It said, Please read the attached letter. I
19   want to make sure you have plenty of time to
20   make a decision, so I will give you until the
21   10th rather than the 8th. You may not have
22   received this e-mail as of yet because I'm
23   sending it to you -- which later on in that

Page 319

1    time, I did have a Marriott e-mail address;
2    and that's what she's referring to.
3 Q. And is this -- the page 2 of Defendant's
4    Exhibit #36, is that the attachment to --
5 A. Yes.
6 Q. -- that e-mail?
7 A. Yes.
8 Q. Okay. What does that attachment say? And
9    you can summarize it if you want.
10 A. I'll be happy to read it. It says, I'm sorry
11   we could not finish our phone call
12   yesterday. I wanted to send you this letter
13   so that you may have a chance to consider
14   what we were discussing at our -- excuse
15   me -- discussing at your own convenience. At
16   this time, we are prepared to offer you a
17   position at the front desk from 3 to 11 shift
18   or the night audit position from 11 to 7.
19   Both positions will require a 35-hour week
20   commitment. Either week -- either one of
21   these positions will be available starting
22   November --
23      And it's a little blurry to me. It

Page 320

1    likes like the 9th.
2       It is our intention to get you back to
3    work. We would be able to pay you at your
4    current rate of pay and your insurance
5    benefits will remain the same.
6 Unfortunately, at this time, this is the only
7    current position we have available. If any
8    other position comes available, we will have
9    the opportunity to be considered -- you will
10   have the opportunity to be considered for
11   it. We need to know your decision by
12   November the 8th or we will have to consider
13   that you have decided to resign from
14   employment at our hotel. If you have any
15   questions please contact me to discuss.
16 Q. So in this letter, Tammy offered you two
17   different positions at the company, right?
18 A. Correct.
19 Q. Both of them were 35 hours a week?
20 A. Correct.
21 Q. And both of them were going to be at your
22   same rate of pay?
23 A. Correct.

Page 321

1 Q. And your insurance was going to remain the
2    same?
3 A. Correct.
4 Q. Did you ever respond to this?
5 A. No, I did not.
6 Q. Why not?
7 A. Because the prior conversation that she's
8    referring to, it was on the 6th. She called
9    my home or called my cell phone and asked me
10   if I had called the hotel and asked about
11   FMLA, and I said no. She said that she did
12   not realize that I was under FMLA and that
13   she had made a mistake, so she was offering
14   me these other positions.
15 Q. Okay. And she offered you the positions,
16   right?
17 A. Correct.
18 Q. Did you ever respond about the offer?
19 A. No.
20 Q. Why not?
21 A. I didn't need to. She already fired me.
22 Q. But here she offered you a job.
23 A. Yeah. But she fired from my director of

Page 322

1    sales position that I was qualified for and
2    that I agreed to come back and work for with
3    my 35 hours.
4  Q.  Let me make sure I got this, now.
5  A.  Yes.
6  Q.  She offered you two different jobs at the
7     same pay and the same benefits, right?
8  A.  Correct.
9  Q.  Okay.  And you just never responded to her?
10 A.  I was fired the previous day.  Why should I
11    have to respond?
12 Q.  Okay.  But she offered you two jobs and you
13    never responded to that, right?
14 A.  Correct.
15 Q.  Okay.  You made some tape recordings of some
16    conversations that you had with certain
17    persons, right?
18 A.  Correct.
19 Q.  When did you begin tape-recording those
20    conversations?
21 A.  I think they were documented on the tape, the
22    dates.
23 Q.  I know.  I'm just asking for your

Page 323

1     recollection.
2  A.  It was after I was terminated.
3  Q.  After you were terminated?
4  A.  Yes.
5  Q.  Why did you start making tape-recorded
6     telephone conversations?
7  A.  Because I wanted to.
8  Q.  Was it your own idea?
9  A.  No.
10 Q.  Whose idea was it?
11 A.  My attorney.
12 Q.  How did you make those tape recordings?
13 A.  I just recorded them.
14 Q.  Just held a microphone up to the --
15 A.  Yes.
16 Q.  -- telephone?
17 A.  Correct.
18 Q.  Where did you get the microphone?
19 A.  I purchased it.
20 Q.  So you went out and purchased a device that
21    allowed you to tape-record conversations?
22 A.  Correct.
23 Q.  Why did you think you should tape-record

Page 324

1     conversations?
2  A.  Because I felt like I was fired illegally.
3  Q.  And what were you hoping to do in those
4     conversations?
5  A.  Just to prove my point.
6  Q.  What point was that?
7  A.  That I was fired.
8  Q.  Did you tell the people on the other end of
9     the line that you were tape-recording
10    conversations?
11 A.  No.  I didn't have to.
12 Q.  Okay.  Why did you not have to?
13 A.  I just didn't.
14 Q.  Did you think that that was right?
15 A.  I don't know.
16 Q.  Do you think it was fair to the other person
17    on the other end of the line?
18 A.  I don't know.
19 Q.  Did you ever think about that?
20 A.  Sure.
21 Q.  Did you ever discuss these tape recordings
22    with anybody other than your attorneys?
23 A.  No.  Well, my husband.

Page 325

1  Q.  What did you talk about with your husband
2     about these tape recordings?
3      MS. DUNCAN:  Object.  Same objection.
4      MR. FELLNER:  What objection is that?
5      MS. DUNCAN:  Privilege.
6      MR. FELLNER:  Okay.  So you're
7         instructing her not to answer the
8         question?
9      MS. DUNCAN:  That's right.
10     MR. FELLNER:  Based on the marital
11        privilege, right?
12     MS. DUNCAN:  That's right.  Invoking
13        the marital privilege.
14 Q.    Anybody else that you talked to about these
15    tape recordings, other than your attorney and
16    your spouse?
17 A.  No.
18 Q.  Did you talk to any family members about
19    them?
20 A.  No.
21 Q.  Do any family members know that you made the
22    tape?
23 A.  My grandmother.

Page 326

1  Q.  Okay.  What did you tell your grandmother
2     about it?
3  A.  I just told her I did it.
4  Q.  Okay.  What did she say?
5  A.  She didn't respond.
6  Q.  Handing you what's been marked as Defendant's
7     Exhibit #37, can you take a moment to review
8     that?  Let me know when you're ready to
9     answer some questions.  And in particular,
10    I'm going to be asking questions about the
11    affidavit that's attached to it.
12        (Witness reviews document)
13 A.  Okay.
14 Q.  Okay.  What is Defendant's Exhibit #37?
15 A.  It's my affidavit.
16 Q.  The whole thing, what is it?
17 A.  It's the --
18 Q.  Let me help you a little bit.  Is it the
19    charge of discrimination you filed with the
20    Equal Employment Opportunity Commission?
21 A.  Yes.  I was going to read that.
22 Q.  And is that your signature at the bottom of
23    the first page of Defendant's Exhibit #37?

Page 327

1  A.  Yes, it is.
2  Q.  Okay.  And what are pages 2 through 4 of
3     Defendant's Exhibit #37?
4  A.  Are you talking about 137, 138, 139?
5  Q.  Yes.
6  A.  It's the -- my actual affidavit.
7  Q.  This is the affidavit that you signed, right?
8  A.  Correct.
9  Q.  We had looked at a different copy of this
10    earlier today, right?
11 A.  Correct.
12 Q.  Okay.  Would you turn to paragraph nine?
13 A.  Number nine?
14 Q.  Yes.
15 A.  Okay.
16 Q.  See it says, On November 2nd, one week before
17    I was to return from maternity leave, I was
18    called by Ms. Dominguez --
19        Is that Tammy Dominguez?
20 A.  Yes.
21 Q.  -- and asked if I was going to be able to
22    return to my job full-time 35 hours a week.
23        Is that what she asked you?

Page 328

1  A.  In the first conversation, yes.
2  Q.  Okay.  And I said yes.
3         Is that what you said?
4  A.  Uh-huh.
5  Q.  She repeated the question, saying I need to
6     know by 5 p.m.; and I said yes.
7         Is that right?
8  A.  Yes.
9  Q.  Okay.  Where in here, in this affidavit, does
10    it say anything about returning to 40 hours a
11    week?
12 A.  It doesn't.  It was just a verbal
13    conversation that we had during the time.
14 Q.  Okay.  But that sounds kind of important to
15    you, the difference between 35 and 40 hours,
16    right?
17 A.  Not necessarily.  It was, was I going to
18    return to my job.
19 Q.  Well, earlier you made a big deal that there
20    was a typo in that other document about 40
21    hours versus 35.
22 A.  Correct.  Correct.
23 Q.  How come there's nothing in here about 40

Page 329

1     hours?
2  A.  I don't know.
3  Q.  So now we have a document from November 2005
4     immediately, the exact same day that you have
5     this conversation with Tammy, that doesn't
6     say anything about 40 hours, right?
7  A.  Correct.
8  Q.  And now we have a document -- when did you
9     sign this Defendant's Exhibit #37?
10 A.  December '05.
11 Q.  Right.  You signed it on December 8th, '05.
12    So a month later, we have another document
13    that you swore was true, right?
14 A.  Correct.
15 Q.  There's nothing in here about 40 hours, is
16    there?
17 A.  No.
18 Q.  Could you turn to paragraph 13?
19 A.  Yes.
20 Q.  Okay.  You see the second sentence there:
21    Other company officials had expressed concern
22    over my ability to get child care?
23 A.  Yes.

Page 330

1  Q. Who were those other company officials?
2  A. Roger.
3  Q. Anyone else?
4  A. I was also referring to Tammy. That's why it
5     says officials.
6  Q. Okay. So Tammy Dominguez, Roger Miller. Who
7     else? Anyone?
8  A. No.
9  Q. What did they say when they expressed concern
10    over your ability to get child care?
11 A. Just through the e-mails.
12 Q. Just the e-mails. That's it?
13 A. Uh-huh.
14 Q. No other conversations?
15 A. Not that I remember.
16 Q. Okay. And you also -- could you look at the
17    next sentence in paragraph 13? It says --
18    after you write other company officials have
19    expressed concern over my ability to get
20    child, the next sentence, it says, This was
21    the only expressed reason for terminating
22    me. You see that?
23 A. Uh-huh.

Page 331

1  Q. What was the reason expressed for terminating
2     you?
3  A. Of not having child care and returning to my
4     35 hours, and then Tammy was saying her 40
5     hours.
6  Q. Okay. So the only reason that they told you
7     they were firing you was because you didn't
8     have child care?
9  A. My understanding, correct.
10 Q. Okay. Who is Jennifer Love?
11 A. Front desk associate -- or was a front desk
12    associate.
13 Q. At Fairfield Inn?
14 A. Correct.
15 Q. What does she know about this case?
16 A. I don't know. I've never talked to her.
17 Q. You know that in your Rule 26 disclosures --
18    basically, it's disclosures that everybody
19    makes in a case just to provide information
20    back and forth. One of the things you're
21    required to do is identify all the people who
22    may have potentially relevant information or
23    discoverable information, one, about the

Page 332

1     case. You and/or your attorneys identified
2     Jennifer Love as somebody who may have
3     potentially relevant information about the
4     case or discoverable --
5  A. Not about the case, but, you know, about me
6     as an employee.
7  Q. Oh, okay. So what is it that Jennifer Love
8     may know about you as an employee that may be
9     relevant here?
10 A. Just my ability to perform my job. I mean, I
11    worked directly with her at the front desk
12    doing groups; and we had a pretty strong
13    relationship as far as, you know, doing the
14    job at the hotel.
15 Q. Okay.
16 A. So more or less of a personal reference.
17 Q. You also listed Tandi Mitchell as somebody.
18 A. Uh-huh.
19 Q. Other than what we've discussed today, what
20    would Tandi Mitchell know that might be
21    relevant to this case?
22 A. We've had some conversation, but not directly
23    about the case. Again, she lived in my

Page 333

1     neighborhood, and she moved. When I started
2     the photography business, I called to ask her
3     some potential business with some hotels.
4     And the only thing that she stated to me was
5     that she had been contacted by Roger.
6  Q. What did she say about that contact by Roger?
7  A. She got an e-mail from him, but she didn't
8     really care to respond. And that's all that
9     she said.
10 Q. What was the e-mail about?
11 A. I have no idea. I never saw it.
12 Q. Anything else that Tandi might know about
13    that might be relevant to this case?
14 A. Except that she knows there is a case, I
15    guess.
16 Q. And that's all?
17 A. From my part. I don't know what was
18    discussed from Tammy's end.
19 Q. That's fine. At least, as far as you know --
20 A. As far as I know.
21 Q. -- is there anything else? Anything else
22    that Tandi might know relevant to this case?
23 A. Not that I remember.

Page 334

1  Q.  You also identified Carrie Farrell.
2  A.  Uh-huh.
3  Q.  Who is Carrie Farrell again?
4  A.  Farrell.  She is or was a housekeeping
5     supervisor.
6  Q.  Okay.  Now, what would she know that might be
7     relevant to this case?
8  A.  I don't -- I don't know.
9  Q.  Okay.  Well, any idea why you might identify
10    her, then?
11 A.  Also as a personal reference, coworker.  We
12    worked together.
13 Q.  I don't need to make this an exhibit, but I
14    do want to show this to you and ask you some
15    questions about it.  I'm handing you a copy
16    of your responses to interrogatories that we
17    had originally served upon your counsel.  If
18    you could just flip to number 11.  It's
19    question number 11 on page 6.
20 A.  Page 6?
21 Q.  Yes.  If you could read the question and
22    answer there and then let me know when you're
23    ready.

Page 335

1  A.  Okay.
2  Q.  All right.  Question number 11, Identify by
3     name and title any and all company officials
4     who expressed concern over your ability to
5     obtain child care as alleged in paragraph 13
6     of your complaint.  Now, we just read a
7     similar provision that was in your affidavit,
8     which is actually identical to what's in
9     paragraph 13 in your complaint.  And your
10    response here is that other than Tammy
11    Dominguez as identified in paragraph 13, I
12    had conversations with Roger Miller, vice
13    president of sales and marketing.
14         Did you have conversations with Roger
15    Miller about your ability to obtain child
16    care?
17 A.  Of my inability?  Is that what you're
18    asking?
19 Q.  Ability, inability, whatever.  Did you have
20    conversations with Roger Miller --
21 A.  I don't recall any conversations.  Maybe in
22    e-mails.
23 Q.  Okay.

Page 336

1  A.  But his response was always that, we hope
2     that it will work out, everything will work
3     out.  So I felt like I had his support.
4     MR. FELLNER:  Tell you what.  Let me
5        make sure we're all done.  I think
6        we're done.  All right?  I just
7        want to go through my notes.
8     MS. DUNCAN:  I'm going to ask a few
9        questions in the morning.
10    MR. FELLNER:  Of your witness?
11    MS. DUNCAN:  Yes.  When I can get some
12       more documents produced, printed
13       up.
14       (Brief recess)
15    MR. FELLNER:  A couple of quick
16       questions, then we'll get out of
17       here.
18 Q.  Other than what we've already discussed
19    today, are there any other documents that
20    support your claim or claims against
21    Fairfield Inn?
22 A.  I don't recall at this time.
23 Q.  Who have you talked to about this case other

Page 337

1     than your attorneys?
2  A.  My family.
3  Q.  Anyone?
4  A.  My family.
5  Q.  Okay.  Who's that?  Mickey?
6  A.  Yes.
7  Q.  Who else?
8  A.  My mother, my grandmother.
9  Q.  And I forget.  I apologize about this, but
10    are both of your grandmothers still alive?
11 A.  No.
12 Q.  So it's only the one grandmother, right?
13 A.  Correct.
14 Q.  Okay.  Who else?
15 A.  Carrie knows about it.  There's not anything
16    that has been disclosed to her, but she knows
17    there is a case.
18 Q.  Anybody else?
19 A.  I'm thinking.
20 Q.  Tandi?
21 A.  Well, yes, Tandi.  No information has been
22    given; but Steve Douglas knows there's a
23    case, who's the general manager at

Page 338

1  Courtyard.  Nothing directly has been said to
2  him.
3  Q.  Have you communicated with Steve Douglas
4  about the case?
5  A.  Not in eight months or nine months or so.
6  He -- the last time I ran into him, he just
7  asked me how it was going.  I told him
8  everything was still being filed and in the
9  works.  So nothing was ever disclosed to him.
10 Q.  Was that the last time you had any
11 conversations or communications with Steve?
12 A.  Yeah.  I haven't talked to him in a long
13 time.
14 Q.  Who else have you communicated with about the
15 case?
16 A.  Besides Alicia and Jimmy, my attorney, that's
17 it.
18 Q.  The only people you've spoken to about this
19 case are your husband Mickey, your mother,
20 your grandmother, Carrie.  What was Carrie's
21 last name again?
22 A.  Farrell.
23 Q.  And Tandi Mitchell and Steve Douglas?

Page 339

1  A.  Correct.
2  Q.  Okay.  When did you communicate with your
3  mother about the case?
4  A.  As soon as it came about.  I mean, she's been
5  support -- support for me.
6  Q.  Have you been talking to her frequently about
7  the case?
8  A.  Just as things arise.
9  Q.  Okay.  Like what?
10 A.  Just if I've gotten a response to e-mail or,
11 you know, she's always just curious how
12 things are going.  I don't know that there's
13 been any discussion of detail or where we
14 exactly are.  She's helping with the later
15 day -- later time of child care, if needed.
16 So she has to be told what's going on to be
17 able to keep the children.
18 Q.  Anything else?
19 A.  Not that I can recall.
20 Q.  Anything about the substance of the case?
21 A.  I mean as far as like giving her anything to
22 read, I mean, she doesn't -- I think she
23 knows the summary of the case, not that she

Page 340

1  would know details and dates and incidents
2  and stuff like that, no.
3  Q.  Okay.  So you haven't given her anything to
4  read about the case?
5  A.  No.  No.
6  Q.  And you haven't talked to her about the
7  substance of the case?
8  A.  No.
9  Q.  What about your grandmother?
10 A.  No.
11 Q.  What have you talked to your grandmother
12 about?
13 A.  Basically the same as my mother.
14 Q.  Just that the case is going on?
15 A.  Uh-huh.
16 Q.  Anything else?
17 A.  No.
18 Q.  What stage the case is at?
19 A.  Because she used to work for an attorney, she
20 will ask big words that I may not
21 understand.  I may have called and gotten an
22 explanation of what that may mean, but
23 nothing in detail, no.

Page 341

1  Q.  Is there anything else that you've talked to
2  your grandmother about, about the case?
3  A.  No.
4  Q.  All right.  When was the first time you
5  talked to Carrie about the case?
6  A.  Right after I was terminated.
7  Q.  Is that one of the conversations that was
8  tape-recorded?
9  A.  If I recall, yes.
10 Q.  Okay.  What did you talk to Carrie about?
11 A.  I don't remember at the time.
12 Q.  Have you talked to Carrie at all about the
13 case since that tape-recorded conversation?
14 A.  She called me this week.
15 Q.  Okay.  Why?
16 A.  Just she -- we have children -- or she has a
17 grandchild about the same age as Tanner.
18 They're both about to turn two.  So she would
19 call frequently, every three to six months,
20 just to see how the kids were doing.  She
21 also has been -- I don't know if she was
22 fired or terminated or quit.  I'm not sure of
23 her status.  She -- I think she said she was

Page 342

1 fired, but I have a lot of connections still
2 within the hotel industry, and so I have been
3 helping her to try to find a -- she's been
4 the manager and stuff. So anytime I knew of
5 a hotel opening or something, I would just
6 make sure to let her know about it; so we've
7 had conversation that way.
8 Q. What have you talked to Carrie about the
9 case?
10 A. I don't recall in detail.
11 Q. Have you talked to Carrie about the case
12 other than the tape of her conversation that
13 we just discussed?
14 A. No. She just called me this week to tell me
15 about Tammy.
16 Q. What did she tell you about Tammy again?
17 A. She just asked me if I knew that she had been
18 subpoenaed, and I told her I wasn't aware of
19 anything, and then she started asking about
20 Tanner.
21 Q. Okay. What did she say about Tammy being
22 subpoenaed?
23 A. She -- she just said that she called her;

Page 343

1 Tammy called her.
2 Q. Tammy called Carrie?
3 A. Yes.
4 Q. Okay. What did Carrie tell you about her
5 conversation with Tammy?
6 A. That's all she said.
7 Q. Have you talked to Carrie or communicated
8 with Carrie in any other way about this
9 case?
10 A. Not that I recall.
11 Q. What about Tandi? What have you communicated
12 with Tandi about this?
13 A. I don't remember. There may be something on
14 the tape; but, again, that was a year and a
15 half ago; but recently, nothing. Again, I
16 contacted her when starting the photography
17 business about some potentials of taking
18 pictures of hotels and stuff. So I called to
19 get some leads or some suggestions about
20 that. That's all.
21 Q. Did you discuss anything with Tandi about the
22 case?
23 A. She asked me if we were still in the process,

Page 344

1 I guess is her term that she used; and I
2 said -- I just told her everything had been
3 filed in federal court and that's where we
4 were.
5 Q. Did you ever have any other conversations or
6 communications with Tandi about the case?
7 A. Not that I remember.
8 Q. Okay. Is there anybody else you communicated
9 with about this case other than your
10 attorneys and the people that we just
11 identified?
12 A. Not that I remember.
13 Q. Other than what we've discussed today, do you
14 have any other facts that support your claim
15 or claims against Fairfield Inn?
16 A. Not at this time.
17 Q. Other than what we've discussed today, are
18 there any other witnesses who would have any
19 information about this case or, more
20 particularly, your claims against Fairfield
21 Inn?
22 A. Not that I can remember at this time.
23 Q. Other than what has been produced between the

Page 345

1 parties, are there any other documents that
2 might support your claims against Fairfield
3 Inn?
4 A. I'm not sure at this time.
5 MR. FELLNER: Okay.
6 (Deposition recessed at
7 6:36 p.m. and resumed on
8 Friday, July 20, 2007, at
9 9:43 a.m., as follows:)
10 EXAMINATION
11 BY MS. DUNCAN:
12 Q. Ms. Watts, we just want to go over a few
13 things from yesterday that I thought were
14 either left kind of in the air or unclear.
15 And, first of all, I wanted to ask you was
16 there any doubt in your mind on November 2nd
17 that you were being fired by Tammy Dominguez?
18 A. No.
19 Q. And that happened -- did that happen on a
20 telephone call or in person?
21 A. A telephone call.
22 Q. And how many times did she call you that day?
23 A. It was about three times.

Page 346

1  Q.  And what was her offer to you at that time?
2  A.  Either to resign or an option to turn in a
3     notice.  I mean, either to be terminated or
4     an option to give a notice.
5  Q.  I think you said resign or be fired?
6  A.  Okay.
7  Q.  Were those her words?
8  A.  Yes.
9  Q.  Okay.  Now, your -- the birth of your child
10    took place what date?
11 A.  August the 12th, 2005.
12 Q.  Okay.  And in anticipating that birth, did
13    you recruit and train an intern to take your
14    position at the hotel?
15 A.  Yes.
16 Q.  And at any time during your employment at the
17    Fairfield Inn, did you -- did anyone say, no,
18    we're not going to give you maternity leave?
19 A.  No.
20 Q.  Did anyone say, no, you're not qualified for
21    FMLA?
22 A.  No.
23 Q.  And your -- the agreement with Tandi

Page 347

1     Mitchell, the intern, when was that to end?
2  A.  One week upon my return and the max of 12
3     weeks.
4  Q.  And that 12 weeks was up what date?
5  A.  November the 9th.
6  Q.  Okay.  Now, it's been stated that you -- you
7     had an agreement to work 35 hours a week for
8     Hospitality Ventures; is that correct?
9        MR. FELLNER:  Object to the form of the
10       question.
11 Q.  Go ahead and answer.
12 A.  Yes.
13 Q.  Okay.  And why was it you were working 35
14    hours?
15 A.  It was just an agreement that I came up with
16    Roger.
17 Q.  Right.  But why 35 and not 40, for example?
18 A.  Because, typically, when you have a 35 hour,
19    you end up working a 40; or if you end having
20    a 40-hour job, there's usually a 45-hour in
21    the hotel industry.  So just knowing I would
22    have a 35-hour would give me the leeway into
23    some more hours; but, you know, it was time

Page 348

1     that I had for family, too, you know.
2  Q.  And how -- did you frequently work overtime?
3        MR. FELLNER:  Object to the form of the
4        question.
5  A.  Yes, as needed.  I did my hours based on the
6     needs of the hotel, but then there were times
7     that I would adjust my schedule with Todd if
8     I needed to come in on a weekend to meet a
9     tour bus at nine o'clock at night or be there
10    on a Saturday afternoon to greet, you know, a
11    sports team.  If we were able to adjust my
12    schedule, we did.  But there were a lot of
13    times that I did work over the 35 hours.
14 Q.  So is it your -- my understanding, then, is
15    that your schedule was pretty flexible
16    because businesses require flexibility; is
17    that right?
18 A.  Correct.
19 Q.  All right.  Now, I believe we covered briefly
20    yesterday that no one else at the hotel had
21    had a pregnancy while you were there; is that
22    right?
23 A.  Correct.

Page 349

1  Q.  And do you know about what time Tammy
2     Dominguez was hired?
3  A.  I don't know when it actually became
4     official, because there was -- Todd was still
5     on vacation and she was taking over, but I
6     would estimate middle of September.
7  Q.  Okay.  After she was hired, was anyone -- did
8     she hire anyone who had a child?
9  A.  No.
10 Q.  Did she hire anyone who was married?
11 A.  Not that I know of.
12 Q.  Did she hire anyone who was pregnant?
13 A.  Not that I know of.
14 Q.  Okay.  After you left -- or after you were
15    fired, who took over your job?
16 A.  Tandi Mitchell, the intern that I had
17    originally hired.
18 Q.  And was she a mother?
19 A.  No.
20 Q.  And was she married?
21 A.  No.
22 Q.  And how long did Tandi Mitchell take that
23    job?

Page 350

1 A. It was my understanding until the end of
2    December, first of January.
3 Q. Okay. And was that a temporary position on
4    her part?
5       MR. FELLNER: Object to the form of the
6          question.
7 Q. Go ahead.
8 A. I'm sorry. Repeat --
9 Q. I said, how was she hired? Was she -- was
10    she a contractor, or was she an employee?
11 A. Well, there was an agreement that she did the
12    intern position; and after that, I don't know
13    if they offered her an employment there or
14    not. After I was fired, I don't know. I
15    just know that she continued to work in a
16    sales position.
17 Q. And there was an -- after Tandi Mitchell
18    left, who took her position? Who took that
19    position?
20       MR. FELLNER: Object to the form of the
21          question.
22 Q. If you know.
23 A. I was told it was Jennifer Middleton.

Page 351

1 Q. Jennifer Middleton. And was Jennifer
2    Middleton married?
3 A. No.
4 Q. Did she have children?
5 A. No.
6 Q. Where did Jennifer Middleton live?
7 A. I did not know at the beginning; but then I
8    had been told that she went to live with
9    Tammy, the general manager.
10 Q. Okay. And at a later point, was Tandi --
11    excuse me. Tammy Dominguez, was she demoted?
12 A. Yes.
13       MR. FELLNER: Object to the form of the
14          question.
15 Q. If you know.
16 A. Yes.
17 Q. Okay. And was that -- and then is she still
18    working at Fairfield Inn?
19       MR. FELLNER: Object to the form of the
20          question.
21 A. No.
22       MR. FELLNER: Is any of this based on
23          her personal knowledge?

Page 352

1       MS. DUNCAN: Yes.
2       MR. FELLNER: Oh, really.
3       MS. DUNCAN: I just asked.
4       MR. FELLNER: Good. I'm going to ask
5          her about it.
6       MS. DUNCAN: Go right ahead.
7       MR. FELLNER: I will.
8       MS. DUNCAN: I'm going to give a
9          chance.
10       MR. FELLNER: Okay.
11       MS. DUNCAN: All right.
12 A. No.
13 Q. She's not still working there?
14 A. No.
15 Q. Do you know if she was terminated?
16 A. I don't know exactly if terminated or quit or
17    fired. No, I do not know that.
18 Q. Did the hotel have a human resources
19    department?
20 A. Not that I was -- not that has ever been told
21    to me, no.
22 Q. Did Hospitality Ventures have a human
23    resources department?

Page 353

1       MR. FELLNER: Object to the form of the
2          question.
3 A. No.
4 Q. Did any related company that you did business
5    with on this job assignment have a human
6    resources person that you could talk to?
7 A. No.
8       MR. FELLNER: Object to the form of the
9          question. You can go ahead and
10          answer now.
11       THE WITNESS: I'm sorry for
12          interrupting.
13 A. No.
14 Q. Okay. So if you had a question about FMLA
15    maternity leave, benefits, insurance,
16    anything like that, who did you call?
17 A. I would try to call Roger. Well, first I
18    would talk to the general manager, if Todd
19    was available on property. Then I would be
20    told to go to Roger. Then Roger would tell
21    me to go back to Todd. So it was always a
22    circle of who to actually get a direct answer
23    from.

Page 354

1 Q. Did this cause problems at the hotel --
2 A. Yes.
3 Q. -- for employees?
4 A. Yes.
5 Q. Now, in your employment from June 2004 to
6    November 5th, other than your maternity
7    leave, your FMLA leave, did you ever miss a
8    day of work?
9       MR. FELLNER: Object to the form of the
10       question.
11 A. I had some vacation time that was approved
12    upon hire. I took a few days that Roger knew
13    and Todd approved for.
14 Q. But, I mean, did you ever have an unexcused
15    leave?
16 A. Not an unexcused leave, no.
17 Q. Were you ever sick?
18 A. There were probably a few times that I was
19    sick.
20 Q. Okay. Did you make the work up during
21    that -- during your work week?
22 A. Definitely, yes.
23 Q. Now, you were -- you were interviewed at

Page 355

1    Hospitality Ventures in Atlanta, were you
2    not?
3 A. Correct.
4 Q. And who hired you?
5 A. Roger Miller.
6 Q. Okay. Did Todd Epplin have anything to do
7    with your compensation?
8 A. No.
9 Q. Did he have anything to do with your sales
10    promotion or production?
11 A. No.
12 Q. Did anyone with Montgomery Ventures supervise
13    you in any way directly?
14 A. No.
15    THE WITNESS: These are in order, so
16       put those under there.
17 Q. Okay. Now, after you were fired by
18    Ms. Dominguez on November 2nd, did she call
19    you back a few days later to try to get you
20    to --
21 A. Actually, it was the next day.
22    MR. FELLNER: Hold on. Hold on.
23       Object to the form of the

Page 356

1    question. Now you can go ahead.
2    THE WITNESS: I'm sorry. I'll learn to
3       pause more. I apologize.
4 A. It was actually the next day.
5 Q. The next day. That was the --
6 A. On the 3rd.
7 Q. The 3rd. Okay. And what did she -- what did
8    she say to you?
9 A. She, first of all, asked me if I had been --
10    or if I had called the hotel to ask about
11    FMLA, and I said no. And she said she did
12    not realize that I was under FMLA and that
13    they had made a mistake and that they would
14    be offering me another job.
15 Q. And you had already -- had you already turned
16    in your equipment at this time?
17 A. Correct. That morning I went to the hotel
18    about 11, 11:15, and met Carrie, who was the
19    only manager on duty at that time. And
20    Carrie showed me where Tammy had left a
21    packet, which included a letter stating that
22    this was my final paycheck -- or, actually,
23    it was a bonus and a reimbursement check that

Page 357

1    was supposed to be given to me, that I needed
2    to turn in my personal files and laptop under
3    management supervision; so that's why Carrie
4    was there. And that in the packet also
5    included my COBRA insurance paperwork.
6 Q. Did they tell you, you had to turn this
7    equipment in before you could get your
8    final -- your check?
9 A. I was to turn it in that day. So I did not
10    feel comfortable giving it to Carrie just
11    because of the room we were in, which was,
12    again, my office and a work room. So Ron was
13    there. He's another corporate employee. And
14    I apologize. I don't know his last name.
15    But he was sitting in Tammy's office. And I
16    asked him could I give the laptop to him, and
17    he said yes.
18       And at that time, he -- I did ask him if
19    I could get something in writing for that
20    laptop, and he told me that he -- that was
21    not his job to do it, but he would leave a
22    note for Tammy. So I never got anything to
23    show that I did turn in that laptop.

Page 358

1  Q.  Okay.  Now, I believe in your affidavit,
2      which is -- your EEOC affidavit, which is
3      Exhibit #1, Defendant's Exhibit #1, you
4      stated that you were told by corporate
5      officials in Atlanta that your medical
6      coverage had been canceled three days before
7      you were terminated.  Who told you that?
8  A.  Correct.  On that same day, on the 3rd, I had
9      called and spoke to Amrita; and she had told
10     me that it was to be -- it would be cancelled
11     on October the 30th because that was the way
12     the payroll ended and that I would lose my
13     coverage on that -- that I had lost my
14     coverage on that day.
15 Q.  How did that make you feel?
16 A.  Pretty much like I -- I had been set up, that
17     I had been wanted to be fired all along, that
18     they had already decided not to let me come
19     back if they were canceling my insurance.
20 Q.  Now, was there some major project that you
21     concluded just before this termination?
22 A.  Correct.  I was -- throughout my maternity
23     leave, I was working on the marketing plan.

Page 359

1      And that's a very important thing that is
2      done on a yearly basis that is presented to
3      the investors, and it is something that the
4      director of sales does do.  It's pretty
5      intent research, shopping of other hotels.
6      There's a lot of numbers and things that have
7      to be plugged in.  So it's a full marketing
8      plan that I had to present.
9  Q.  And did you have to do this research while
10     you were on your maternity leave?
11 A.  Yes.  I did it at home or I would go to the
12     hotel, if needed, to pull information from
13     the computer or to make any copies.
14 Q.  And when did you turn that in?
15 A.  It was also that last week of October --
16     excuse me -- that Tammy called and asked me
17     to bring everything to the hotel.
18 Q.  Now, I'll ask you to take a look at
19     Plaintiff's #1 here.  What's the date on this
20     e-mail if you --
21 A.  It is October 31st, 2005.
22 Q.  And does this reflect a -- is this a true and
23     accurate reflection of the e-mail you

Page 360

1      received from Roger Miller?
2  A.  That I received from him?
3  Q.  Yes.
4  A.  Yes.  I'm sorry.  Yes.
5  Q.  And it says what?
6  A.  It is a string of e-mails; but the top one
7      says, Heather, thanks, I appreciate these;
8      have a super week.
9  Q.  Okay.  And what is the -- what is he thanking
10     you for?
11 A.  The marketing plan.
12 Q.  And you delivered that on October 31st?
13 A.  Correct.
14 Q.  And you were fired two days later?
15 A.  Correct.
16 Q.  Okay.  After you were fired, did you apply
17     for unemployment?
18 A.  I did.
19 Q.  And did the company attempt to deny you
20     benefits?
21 A.  They did.
22 Q.  And how did that resolve itself?
23 A.  I had to do a phone conversation with a

Page 361

1      lady -- a representative from there.  They
2      called and asked me a few questions.  Then it
3      was later turned around, and I did get the
4      unemployment.
5  Q.  So you're saying that the Department of
6      Industrial Relations overruled the company?
7  A.  Correct.
8  Q.  Okay.  Now, I'm showing you this document
9      labeled Plaintiff's Exhibit #2.
10 A.  Uh-huh.
11 Q.  And it shows that you have a salary -- total
12     salary of $41,614.35; is that correct?
13 A.  To my knowledge, yes.
14 Q.  Okay.  And that is your employee total for
15     the last -- for the last four quarters?
16 A.  Correct.
17 Q.  Correct?  Okay.
18     MR. FELLNER:  Was this produced to us,
19     Plaintiff's #2?
20     MS. DUNCAN:  Yes, it was.
21     MR. FELLNER:  Okay.  Because I just
22     didn't see any Bates number on
23     it.  I was just wondering.

Page 362

1    MS. DUNCAN: Well, I don't have a Bates
2       machine.
3    MR. FELLNER: Well, you labeled
4       something that you produced to us,
5       right?
6    MS. DUNCAN: It's in your documents.
7    MR. FELLNER: That's all I was asking.
8       And that's why I was asking,
9       because I didn't see any label on
10      it.
11   Q. Ms. Watts, if you'll take a look at
12      Plaintiff's Exhibit #3 here.
13   A. Uh-huh.
14   Q. This is a position statement from the
15      company -- your employer, anyway, although
16      it's listed as Montgomery Ventures.
17   A. Yes.
18   Q. Have you read this document before?
19   A. It has been a while.
20   Q. Okay.
21   A. Can I take a moment to read it?
22   Q. Yes.
23   A. Okay.

Page 363

1       (Witness reviews document)
2    A. Okay.
3    Q. Okay. I want to call your attention to the
4       second paragraph here where it states that,
5       Although not required to do so, Montgomery
6       Ventures allowed Ms. Watts to take a leave of
7       absence after giving birth.
8       Now, according to the Hospitality
9       Ventures handbook, which you signed an
10      acknowledgment form for, which I believe was
11      produced yesterday as Defendant's Exhibit #4.
12   A. Uh-huh.
13      MR. FELLNER: Just to clarify, it
14         wasn't produced yesterday; but it
15         was used as Defendant's Exhibit #4
16         yesterday in the deposition.
17      MS. DUNCAN: It was produced in the
18         deposition.
19   Q. Okay. Now, also, I'm going to show you
20      Defendant's Exhibit #3 again. And do you
21      recall if there is anything in this handbook
22      about maternity leave?
23   A. There is.

Page 364

1    Q. Okay. Can you find it for me, please?
2    A. Sure.
3       (Brief pause)
4    A. I found it. I'm sorry.
5    Q. Okay. And what page is that on?
6    A. I don't see a page number for the actual
7       handbook, but it was at -- stamped or
8       whatever at 0184.
9    Q. 0184. That's the Bates number?
10   A. Yes.
11   Q. Okay. And what does it say about maternity
12      leave?
13   A. Do you want me to read all of this?
14   Q. You can read the first paragraph if you would
15      like.
16   A. It is the policy of Hospitality Ventures to
17      grant a leave of absence to associates
18      whenever possible for justifiable reasons,
19      such as personal emergencies. All leaves
20      must be requested in writing and approved in
21      advance whenever possible. At a minimum, the
22      associate's department head, human resources
23      representative, or general manager must

Page 365

1       approve all leaves.
2    Q. Okay. Now, was your --
3    A. It's not -- there was another sentence. It
4       says, No open-ended leaves are approved.
5    Q. And your request for leave, was that put into
6       writing?
7    A. Yes.
8    Q. And was it approved?
9    A. It was not contested.
10   Q. It was not contested. You never got anything
11      formally saying you had it?
12   A. No. Just from e-mails about -- from Roger
13      about while you're gone on maternity leave.
14      So there was communication about it, yes.
15   Q. Okay. So there is a policy, therefore,
16      regarding maternity leave?
17   A. Yes.
18   Q. All right. The second sentence in this
19      second paragraph, back to the position
20      statement, says that the company terminated
21      Ms. Watts' employment because she refused to
22      work full-time after her leave of absence.
23      Is that true?

Page 366

1  A.  Yes.
2  Q.  You refused to return to work?
3  A.  Oh, no.  I'm sorry.  I misunderstood the
4     question.
5  Q.  They did terminate you, but did you --
6  A.  Yes, they did terminate me.  Yes.
7  Q.  Did you refuse to return to work full-time?
8  A.  No.  I told them that I would be willing to
9     return to my 35 hours a week.
10 Q.  Okay.  Now, on page 2, item B, the second
11    sentence -- excuse me -- the first sentence,
12    On November 2nd, 2005, Montgomery Ventures
13    general manager, Tammy Dominguez, told
14    Ms. Watts that the company needed her to
15    return to the director of sales and marketing
16    position full-time on November 9th.
17 A.  Correct.
18 Q.  And that -- had that been your plan all
19    along?
20 A.  Yes.
21 Q.  Ms. Watts, can you read the next sentence,
22    please?
23 A.  Ms. Watts replied that she could not return

Page 367

1     to work full-time because she did not have
2     child care arrangements that would allow her
3     to work full-time.
4  Q.  Is that true?
5  A.  No.  It also states here that the company
6     permitted me to extend my maternity leave as
7     requested, under A.
8  Q.  Yes.  Is that true?
9  A.  Yes.
10 Q.  Okay.  Ms. Watts, I want you to look at an
11    e-mail marked as Plaintiff's Exhibit #4.
12 A.  Uh-huh.
13 Q.  Do you recognize this e-mail?
14 A.  Yes, I do.
15 Q.  Okay.  And who is it from?
16 A.  Again, it's a string of e-mails, and the
17    first one is from Roger Miller.
18 Q.  And he says -- what's the date of this,
19    first?
20 A.  August the 2nd.
21 Q.  So this is -- this is before your pregnancy
22    or your -- before your delivery; is that
23    correct?

Page 368

1  A.  Correct.
2  Q.  And remind us again.  What date was that?
3  A.  August the 12th.
4  Q.  Okay.  So you're about ten days away from
5     delivering a baby?
6  A.  Yes.
7  Q.  And he's writing you about business?
8  A.  Yes.
9  Q.  Okay.  And he says what?
10 A.  Heather, thanks for all your time and
11    effort.  I know you have not felt well and
12    are pushing it.  Please take care of
13    yourself.  We appreciate your dedication and
14    hard work.  I talked to Tandi today and will
15    stay in touch, accessible to her at all
16    times.  Take care.
17 Q.  And that was in response to your e-mail
18    below; is that correct?
19 A.  Correct.
20 Q.  Stating that -- what were your plans there?
21 A.  I sent it to general manager the same day of
22    August the 2nd, to Todd; said, I am planning
23    in coming for a while this morning.  I'm at

Page 369

1     home working on two proposals for the CVB
2     family reunions and working with Tandi on
3     yesterday's bookings.  If you need anything
4     before I get there, do call my cell.
5  Q.  And you cc'd that e-mail to Roger Miller?
6  A.  Correct.
7  Q.  Okay.  Please take a look at Plaintiff's
8     Exhibit #5.  And can you identify that
9     document, please?
10 A.  Yes, I can.  I'm ready.  I'm sorry.
11 Q.  Okay.  What -- who is Robert Cole?
12 A.  The -- I believe his correct title is he was
13    the president of the company of Hospitality
14    Ventures.
15 Q.  All right.  And what is the substance of this
16    e-mail?
17 A.  The subject of it?
18 Q.  Substance of it.  Can you -- why is he
19    writing to you?
20 A.  He mainly was writing me just applauding my
21    successes, as a thank you.
22 Q.  Okay.  And he says that he wants to "express
23    to you my happiness in seeing more than 1,000

Page 370

1  group rooms on the books already for both
2  March and April"; is that correct?
3  A. Correct.
4  Q. And he says, also speaking on behalf of Roger
5     and Rob. Who are those people?
6  A. Roger Miller, who was -- he's the sales and
7     marketing manager or director president. I'm
8     sorry. And I believe he's referring to Rob
9     Flanders, and I believe he was over
10    operations at Hospitality Ventures.
11 Q. And he says, We want you on our team, and we
12    are very pleased with the revenue results of
13    late at this hotel. Is that correct?
14 A. Correct.
15 Q. Okay. And at this time and at all times
16    during your employment, did you believe that
17    you were being employed by Hospitality
18    Ventures?
19       MR. FELLNER: Object to the form of the
20          question. Go ahead and answer.
21 A. Yes.
22 Q. After you -- or during the -- well, let me
23    get one more document here. Take a look at

Page 371

1  Plaintiff's Exhibit #6. And do you recognize
2  this document?
3  A. Yes.
4  Q. And can you tell me what this is?
5  A. It is again a string of e-mails. So the
6     first one is from Roger Miller about Sales
7     Pro.
8  Q. Okay. And, now, the date on this document is
9     9/27; is that correct?
10 A. Correct.
11 Q. So were you already working on the marketing
12    plan at this time?
13 A. Yes.
14 Q. When you -- after you completed it, were you
15    expecting to discuss the plan?
16 A. Yes.
17 Q. With Roger?
18 A. Yeah. It's always reviewed by the
19    salesperson and general manager.
20 Q. And did he come to Montgomery to do that?
21 A. It was my understanding, yes.
22 Q. And did they -- did you discuss the plan with
23    him?

Page 372

1  A. No.
2  Q. Why not?
3  A. I wasn't informed about the meeting.
4  Q. And do you know when that meeting occurred?
5  A. It was my understanding it was about mid
6     October.
7  Q. Mid October?
8  A. Uh-huh.
9  Q. And that was after you had finished it?
10 A. No. I finished it at the end of October.
11 Q. So this was a meeting to finalize everything?
12 A. Yes.
13 Q. Did you ever question Roger or Tammy
14    Dominguez as to why you were not consulted?
15 A. I do not recall.
16 Q. You just continued to work on the plan; is
17    that correct?
18 A. Yes.
19 Q. Did they make you feel uncomfortable?
20 A. Yes.
21 Q. Tell me -- tell me what you were thinking at
22    that time.
23 A. Since they were, you know, asking for the

Page 373

1  materials without me being able to present
2  it, since a lot of the information came
3  directly from my observing other hotels or my
4  input of numbers and there was always -- in
5  the meeting, you're always supposed to
6  discuss why things have happened or why we
7  feel that this marketing plan will pull us
8  into the next year; but just not -- knowing
9  that I wasn't included in that conversation,
10 I mean, it really -- almost like a
11 back-stabbing, that I had worked so hard on
12 something during my maternity leave and not
13 being included in a meeting or even on the
14 phone, you know, to discuss, you know, how
15 well the plan had been coming along or how
16 hard I had worked on it.
17 Q. Yesterday Mr. Fellner asked you a number of
18    questions about your breach of contract
19    claim. And I want to -- I want to ask you
20    this, because this is -- your claim is for a
21    breach of contract for good faith and fair
22    dealing. What does good faith and fair
23    dealing mean to you?

Page 374

1  A.  That I was to be treated and respected as an
2     employee, that I had some job security.
3  Q.  So that's a phrase that you can relate to?
4  A.  Yes.
5  Q.  Right.  Okay.  Do you feel that Hospitality
6     Ventures treated you fairly?
7  A.  No, I do not.
8  Q.  Now, also, yesterday you mentioned the travel
9     perk to this job.  Did you and your husband
10    travel with company discounts or --
11  A.  Extensively.  We used it a lot during my time
12    of employment.
13  Q.  Can you tell me some of the places you went?
14  A.  Yearly, we go to the Grand Hotel that is in
15    Point Clear, Alabama.  We do have family in
16    Atlanta, but we would always stay at any of
17    the resorts that are up there.  We traveled
18    to Chattanooga a lot.
19  Q.  Okay.
20  A.  Excuse me.  If I can add, my husband's family
21    is also in Texas.  So going back and forth to
22    Texas and having to stay the night over, you
23    know, traveling with the children was nice to

Page 375

1     have a secure hotel to be able to do that.
2     So we stayed in several Fairfield Inns going
3     back and forth and during our stay visiting
4     Texas.
5  Q.  Okay.  And how long after you began work on
6     this job did you get your laptop?
7  A.  It was several -- probably a couple of
8     months.
9  Q.  And did you use that laptop at home?
10  A.  Yes.
11  Q.  And on the road as well?
12  A.  Yes.
13  Q.  Okay.  And was there a purpose in them giving
14    you a laptop?
15  A.  Yes.  To do my Sales Pro reports, to have
16    access to e-mail for presenting proposals or
17    meeting with -- you know, to --
18    correspondence back and forth to clients or
19    groups or tour buses.  So, yes.
20  Q.  So you could work around the clock if you
21    wanted to or had to, rather.
22  A.  Yes.  And e-mailing back and forth to Roger
23    as he traveled as well.

Page 376

1  Q.  So this was of benefit to the company in
2     having you instantly accessible?
3  A.  Correct.
4  Q.  I believe yesterday it was mentioned that you
5     had a stomach virus, but you were still
6     working.
7  A.  Correct.
8        MR. FELLNER:  Object to the form.
9  A.  Correct.
10  Q.  And that is on one of the Defendant's Bates
11    numbers 1150.
12        MS. DUNCAN:  Which I don't have a copy
13        of.
14  Q.  When was that?  Do you recall?
15  A.  It was during my maternity leave.  I don't
16    remember -- recall the exact date.
17  Q.  Do you know if it was significant that the
18    company never hired anyone after you who was
19    married or had a child?
20  A.  Yes.
21  Q.  And why is that?
22  A.  Because they wouldn't have to deal with
23    anybody that had child care concerns.

Page 377

1  Q.  Had Tammy Dominguez -- during your FMLA
2     leave, had she ever expressed to you a
3     concern about child care when you came back,
4     before she terminated you?
5  A.  No.
6  Q.  Had Roger Miller expressed any concerns to
7     you about child care?
8  A.  I believe there was just an e-mail that he
9     was just stating that everything would work
10    out.
11  Q.  And Todd Epplin was gone by that time, wasn't
12    he?
13  A.  If I recall, yes.
14  Q.  Has anybody else in the company ever
15    discussed child care with you?
16  A.  As far as my child care?
17  Q.  Yes.
18  A.  No.
19  Q.  Okay.  No one -- did anyone ask you what
20    accommodations you might need?
21  A.  Well, they knew where Taylor was going, you
22    know, and they knew that my grandmother was
23    taking care of the children.  Carrie did.  I

Page 378

1   mean, she knew.
2  Q.  Carrie is the housekeeper?
3  A.  Housekeeping supervisor, manager, yes.
4  Q.  I think yesterday, too, you mentioned that
5      Todd Epplin was frequently not on premises at
6      the hotel.  Is that -- where was Mr. Epplin
7      at that time?
8  A.  He traveled a lot.  He was -- sometimes he
9      was at the hotel, but he may have worked,
10     because of his position, shifts.  So he
11     was -- have to work the audit or late
12     nights.  So there were endless days that, you
13     know, if I came in at 7:30 or 8:30 that I
14     would not see Todd all day long because he
15     would not come in until five or six that
16     evening.  So there were a lot of days that he
17     was not easily accessible to communicate to.
18 Q.  You said he traveled a lot.  For the company
19     or was it for some other purpose?
20 A.  There was some company travel, but he did a
21     lot of personal travel.  I believe he was
22     gone to Europe for three weeks.
23 Q.  So was he basically there at night?

Page 379

1  A.  He lived at the hotel.
2  Q.  Right.
3  A.  Yes.  So if he came in either -- you know,
4      depending, again, on his schedule; but there
5      were times that he was there mainly at
6      night.  I was always leaving notes for him on
7      his desk from the prior day about what was
8      going on.
9  Q.  Did he direct you or supervise you in any
10     way?
11 A.  No.
12 Q.  Do you know any person connected with
13     Montgomery Ventures that supervised you --
14 A.  No.
15 Q.  -- or with whom you had regular contact?
16 A.  No.
17     MS. DUNCAN:  That's it for me.
18     MR. FELLNER:  I'd like to ask a few
19     questions.
20           EXAMINATION
21 BY MR. FELLNER:
22 Q.  Ms. Watts, you just testified that -- let's
23     see -- that Tammy Mitchell -- excuse me --

Page 380

1      Tandi Mitchell took over your job after you
2      left; is that right?
3  A.  She stayed in that position, yes.
4  Q.  She stayed in the intern?
5  A.  Again, after I was terminated and fired, I do
6      not know if they changed her title or
7      position.  I do not know that.
8  Q.  Okay.  So you really don't know what role she
9      stayed in, do you?
10 A.  I know she stayed in the sales department,
11     yes.
12 Q.  She stayed performing some services for the
13     Fairfield Inn, right?
14 A.  She continued to do the sales process.
15 Q.  Okay.  Do you know what she did on a
16     day-to-day basis for the Fairfield Inn?
17 A.  Yes.
18 Q.  What is it that she did?
19 A.  She was basically exactly what I did.  She --
20     we had a list of current clients, our top
21     clients, that she --
22 Q.  No.  I'm not asking what you did.  I'm asking
23     you what Tandi did.

Page 381

1  A.  That's what I was getting at.
2  Q.  Okay.  Go ahead.  I'm sorry.
3  A.  There was a list of our top clients that was
4      given to her during my maternity leave that
5      she was supposed to remain in contact with.
6      She continued to work with the current groups
7      that were coming in and contact -- and making
8      sure their contracts were completed.  She was
9      out soliciting new groups coming in.  She
10     worked directly with that military business.
11     We had a lot of military groups in and out,
12     so it was her responsibility to work with --
13     directly with the front desk in making sure
14     that their rooms and everything was taken
15     care of.
16 Q.  Okay.  And, again, you just listed a lot of
17     things that you claim that Tandi Mitchell
18     did.
19 A.  Uh-huh.
20 Q.  Did you personally observe her doing any of
21     these things after you were terminated?
22 A.  Not observing, no.
23 Q.  Did you hear her doing any of these things

Page 382

1    after you were terminated?
2  A.  She had told me that she was still doing the
3    position.
4  Q.  Okay.  So what exactly did Tandi -- hold on
5    before we even get to that.  So you didn't
6    hear her doing any of these things, actively
7    doing these things, did you?
8  A.  No.
9  Q.  Okay.  And you said you didn't hear her, you
10    didn't observe her doing any of these
11    things.  So the only way you have any
12    knowledge about her supposedly doing these
13    things after your employment terminated is
14    from what Tandi Mitchell personally told you?
15  A.  Correct.
16  Q.  Okay.  Exactly what did she tell you?
17  A.  I believe we spoke in January, and she told
18    me that she was no longer going to be able to
19    do the position with Roger and them and that
20    they still owed her some money for a group or
21    two.
22  Q.  Was this a telephone conversation or in
23    person?

Page 383

1  A.  Telephone.
2  Q.  And she said that she was no longer going to
3    be able to do what?
4  A.  The position.
5  Q.  What was the position?  Did she say?
6  A.  Well, it was the position that she was put
7    into for the internship.
8  Q.  Did she say what she was doing?
9  A.  She was booking the hotel.
10  Q.  No, no, no.
11  A.  Did she say it?
12  Q.  Did she say what she was doing?
13  A.  No.
14  Q.  So she didn't tell you what she was doing;
15    she just said the position?
16  A.  Which I knew what she was referencing it to,
17    yes.
18  Q.  Okay.  You understood it to mean something?
19  A.  Yes.
20  Q.  But she didn't tell you that, right?
21  A.  No.
22  Q.  Okay.  I'm not sure that the record is clear
23    on that point.  I just want to make sure.  So

Page 384

1    Tandi Mitchell -- during this conversation in
2    January, Tandi Mitchell never told you
3    exactly what she was doing while she was
4    supposedly working for Fairfield Inn after
5    your employment terminated?
6  A.  No.  She just told me she was finishing up --
7    well, was doing the position.
8  Q.  Okay.  She said she could no longer do the
9    position?
10  A.  The position, correct.
11  Q.  Whatever that meant.  And you understood it
12    to mean a certain thing.
13  A.  Correct.
14  Q.  Okay.  Any other conversations you had with
15    Tandi Mitchell about this position?
16  A.  No.
17  Q.  You also said that it was your understanding
18    that Jennifer Middleton took over the
19    position after Tandi Mitchell, right?
20  A.  Correct.
21  Q.  Okay.  How did you know that Jennifer
22    Middleton took over that position?
23  A.  I was told.

Page 385

1  Q.  By whom?
2  A.  I called the hotel.
3  Q.  Who did you call?
4  A.  The front desk.
5  Q.  And who did you speak to?
6  A.  I don't recall the lady's name.  I believe
7    her name is Joanne.
8  Q.  Joanne at the front desk?
9  A.  Yes.  Which I believe now she's the general
10    manager.
11  Q.  Okay.  So you speak to Joanne.  What's
12    Joanne's last name?
13  A.  I don't know.
14  Q.  When did you call Joanne?
15  A.  It was probably the end -- probably right at
16    January, the first of January.
17  Q.  Okay.  Sometime early January?
18  A.  Uh-huh.
19  Q.  2006?
20  A.  Correct.
21  Q.  Okay.  Early January 2006, you just randomly
22    call the hotel, the Fairfield Inn.
23  A.  Uh-huh.

Page 386

1  Q.  And you speak to whoever is at the front
2      desk.  How do you know who it was Joanne?
3  A.  Because they say -- when they answer the
4      phone, they tell us their name.
5  Q.  Okay.  And she gave you her name and she said
6      it was Joanne?
7  A.  Yeah.
8  Q.  And what did you -- tell me about that
9      conservation.
10 A.  Actually, I called to see if Carrie was there
11     just to have been her friend.  And like I
12     said, we knew each other's children.  And I
13     had not talked to her in a long time.  And I
14     don't remember at that time if she was said
15     she's no longer there.  And I asked her how
16     the sales was going.  And that's all I said,
17     how were the sales going.  And she said they
18     have a new salesperson.  And I said, oh, so
19     Tandi's not doing it anymore?  And she said,
20     no, that Jennifer Middleton, if I got the
21     last name correct, had been hired.
22 Q.  Okay.  So somebody told you, but you didn't
23     personally observe Jennifer Middleton doing

Page 387

1      this work, right?
2  A.  No.  Joanne told me.  I do know someone told
3      me.
4  Q.  Okay.  But you didn't personally observe
5      Jennifer Middleton doing this work.
6  A.  No.  No.
7  Q.  And you didn't personally hear Jennifer
8      Middleton doing this work, right?
9  A.  No.
10 Q.  No, that's incorrect or no, that's correct?
11     What I'm trying to confirm is that you -- is
12     it correct that you never heard Jennifer
13     Middleton doing this director of sales
14     position at the Fairfield Inn?
15 A.  Never heard her do it?
16 Q.  Yeah.
17 A.  No.
18 Q.  No, that's not correct?
19 A.  Okay.  Repeat your question.
20 Q.  Sure.  Did you ever hear Jennifer Middleton
21     performing the function of director of sales
22     at Fairfield Inn?
23 A.  I don't understand how you hear someone

Page 388

1      perform, but no.
2  Q.  Well, if you -- okay.  Your answer indicates
3      that you don't understand my question.
4  A.  Correct.
5  Q.  So I want to go ahead and try to clarify.
6      There's a couple of different ways -- we're
7      talking about basic senses here.  Okay.  You
8      can see something.  You can taste something.
9      You can --
10 A.  Correct.
11 Q.  -- smell something.  You can hear something.
12     Did you ever hear her performing those
13     services that amount to a director of sales
14     function at the Fairfield Inn?
15 A.  I never witnessed her.
16 Q.  Okay.  You never witnessed her, never heard
17     it, never saw it.
18 A.  Correct.
19 Q.  Okay.  You also testified that somebody told
20     you that your COBRA -- excuse me -- that your
21     health care coverage was cancelled on October
22     30th, 2005?
23 A.  Uh-huh.

Page 389

1  Q.  You made a tape recording of some telephone
2      conversations that you had, didn't you?
3  A.  Yes.
4  Q.  And one of those telephone
5      conversations was with BlueCross BlueShield
6      of Alabama, right?
7  A.  Correct.  That was after my conversation with
8      Amrita.
9  Q.  Okay.  And in that conversation with
10     BlueCross BlueShield of Alabama, what did
11     they tell you about whether your health care
12     was active or cancelled?
13 A.  I don't recall.
14 Q.  All right.  But if it says on that tape that
15     your health care had not been terminated, is
16     that your understanding of what it would have
17     been?
18 A.  Correct.  That was my purpose of calling.
19 Q.  Ms. Watts, I'm handing you what's been marked
20     as Defendant's Exhibit #5.  Could you take a
21     look at that and flip to the page that you
22     said had the policy relating to your leave of
23     absence?

Page 390

1 A. I'm looking. I didn't remember the page
2   numbers.
3 Q. Okay.
4 A. And it's not the same page number as that
5   one.
6     MS. DUNCAN: Is that his --
7     THE WITNESS: I don't know.
8     MS. DUNCAN: I've got 0184 was the page
9        that you --
10 A. This is 97.
11 Q. Okay.
12 A. 14?
13 Q. All right. And I'll be happy to switch with
14   you for convenience, because this is what you
15   were reading from before, but my
16   understanding is that these things -- now
17   you're looking at Defendant's Exhibit what?
18   Could you just look at the front page and --
19 A. #3.
20 Q. Defendant's Exhibit #3. Okay. On
21   Defendant's Exhibit #3, does it have a policy
22   about family medical leave there?
23 A. Yes, it does.

Page 391

1 Q. Could you read for us the first thing under
2   the -- where it says family medical leave?
3   What does that say?
4 A. Eligibility requirements.
5 Q. And could you read that first paragraph?
6 A. Yes. If you have -- excuse me. If you have
7   at least one year of service, have worked at
8   least 1250 hours during a 12-month
9   immediately prior to the date requested for
10   leave and are employed at a work site
11   which employs 50 or more associates within 75
12   miles of your work site, you will be eligible
13   for unpaid leave of absence in the event
14   of -- do you want me to read those?
15 Q. You can just read the first one. The birth
16   of a child?
17 A. Correct.
18 Q. Okay. Do you know whether you worked at a
19   work site that employed 50 or more associates
20   within 75 miles of your work site?
21 A. Again, I was not in operations, and I have no
22   idea how many people were employed.
23 Q. So you have no idea one way or the other?

Page 392

1 A. No.
2 Q. Ms. Watts, I'm handing you what's been marked
3   as Defendant's Exhibit #4. Could you take a
4   look at this, please?
5 A. Correct. Yes. Sorry. Yes.
6 Q. That's all right. That's the associate's
7   handbook acknowledgment form that you signed,
8   right?
9 A. Yes.
10 Q. Now, do you see in the first full paragraph
11   under the bullets on Defendant's Exhibit #4,
12   it says something about that the company
13   reserves the right to change, modify the
14   policies at any point. The first full
15   paragraph under the bullets?
16 A. This one?
17 Q. Yes.
18 A. I don't see that sentence. Yes, I do.
19 Q. Sure. Okay. It says that the company can
20   change, amend, or modify the policies at any
21   time, right?
22 A. Correct.
23 Q. Okay. Also, does it say that nothing in that

Page 393

1   handbook or on that handbook -- it says
2   nothing on the handbook acknowledgment form
3   creates a contract?
4 A. In that same paragraph?
5 Q. Yes.
6 A. Yes.
7 Q. Does the next paragraph say that your
8   employment would be at will?
9 A. Yes. Yes.
10 Q. Okay. Do you have any idea what that means?
11 A. At any time they choose.
12 Q. That they could fire you?
13 A. It says to terminate, yes.
14 Q. Or you could quit, right?
15 A. Correct.
16 Q. You mentioned before about some of the travel
17   that you did with your husband and your
18   family.
19 A. Uh-huh.
20 Q. When did you go to the Grand Hotel in Point
21   Clear, Alabama?
22 A. I just know we go every summer.
23 Q. Did you go during the summer of 2005?

Page 394

1  A.  No.
2  Q.  Did you go during the summer of 2004?
3  A.  I don't recall again.
4  Q.  Would you have records of that?
5  A.  Probably so, yes.
6  Q.  What records would you have?
7  A.  That we paid the employee rate.
8  Q.  Okay.
9  A.  And, again, sometimes that was given to me in
10    a comp if we did a trade, if there was any
11    type of advertising trade.
12 Q.  But you would have gone to the Grand Hotel
13    during 2004 while you were an employee at
14    Fairfield Inn?
15 A.  I don't recall exactly.  I just know that
16    that is somewhere that we travel often to.
17 Q.  So you have no idea whether you really went
18    there in the summer of 2004 while you were
19    employed by the Fairfield Inn?
20 A.  I don't recall.
21 Q.  During your employment at the Fairfield Inn,
22    how many times did you travel to Atlanta
23    other than for your interview in Atlanta?

Page 395

1  A.  Well, we stayed with family if -- I mean, to
2    visit family often.  I mean, I have family
3    that live near Roger all around the suburbs
4    of Atlanta.  So --
5  Q.  Okay.  How many times did you travel to
6    Atlanta during your employment with Fairfield
7    Inn?
8  A.  I don't recall.  I mean, we -- I can give you
9    an estimate, but I don't know the exact
10    number.
11 Q.  When did you go?
12 A.  I don't recall.
13 Q.  Would you have records about when you went?
14 A.  A lot of times we would just go on the
15    weekends, just a Saturday, Sunday; but I
16    don't recall exactly when that was, no.
17 Q.  Would you have records of when you went?
18 A.  If I stayed in a hotel, yes; but just to go
19    see family, no.
20 Q.  Okay.  You said before that normally when you
21    went to Atlanta, you would stay in a hotel.
22 A.  Correct.
23 Q.  If you went during your employment with the

Page 396

1    Fairfield Inn, would you have stayed in a
2    hotel?
3  A.  Yes.  I mean with my employment?  During my
4    employment.  It would depend if my family --
5    it depended on where we stayed in Atlanta.
6    If my family was able, we would stay there or
7    we would stay at a hotel near their home.
8  Q.  Okay.  What I'm trying to understand is
9    during your employment, how many times did
10    you travel to Atlanta?
11 A.  Does it matter?
12 Q.  Yes, it does.  You brought it up.  You said
13    it matters.  I want to know.
14 A.  I was just saying that it was a benefit of my
15    employment.
16 Q.  No, no, no.  You said it matters.  I want to
17    know how many times during your employment
18    you went to Atlanta.
19 A.  To visit family?
20 Q.  Yes.
21 A.  I don't recall.  That's my answer.
22 Q.  Okay.  What records would you have about your
23    trips to Atlanta during your employment with

Page 397

1    the Fairfield Inn?
2  A.  I mean, again, if I had -- if I stayed in a
3    hotel, I guess I could -- if the hotel still
4    kept their records, I guess they would have a
5    record of that.
6  Q.  How would you have gotten there?
7  A.  How would I have gotten there?
8  Q.  Yeah.  How would you have traveled to
9    Atlanta?
10 A.  In a car.
11 Q.  You would have drove?
12 A.  Yes.
13 Q.  Would there be credit card receipts for gas
14    receipts?
15 A.  I don't -- a lot of times we don't -- I mean,
16    we didn't really use a lot of credit cards,
17    but --
18 Q.  Okay.  Would you have paid for gas?
19 A.  Yes.
20 Q.  All right.  Would you have paid for gas with
21    a credit card?
22 A.  A debit card.
23 Q.  Okay.  So it would have been a debit to your

Page 398

1    account?
2  A.  Yeah.
3  Q.  What other expenses would you have incurred
4     in your trip to Atlanta?
5  A.  To visit family?
6  Q.  Uh-huh.
7  A.  Probably food.
8  Q.  So you would have maybe eaten out at a
9     restaurant?
10  A.  There were times, yes.
11  Q.  And paid for it how?
12  A.  Cash, debit card, yeah.
13  Q.  Possibly credit cards, debit cards?
14  A.  I don't recall, but yes.
15  Q.  Okay.  What about Chattanooga?  How many
16     times did you visit Chattanooga during your
17     employment at the Fairfield Inn?
18  A.  I don't recall if it was actually when I
19     worked for Fairfield Inn, but we have been
20     once.
21  Q.  Once.  Do you remember when that once was?
22  A.  I do not recall.
23  Q.  Where did you stay on the one time that you

Page 399

1     went to Chattanooga?
2  A.  At the Courtyard, downtown Courtyard.
3  Q.  How did you pay for that trip?  Credit card?
4     Debit card?
5  A.  I don't recall.
6  Q.  Okay.  Whose credit card or debit card would
7     you have used, yours or your husband's?
8  A.  We have joint accounts.
9  Q.  Okay.  Why did you go to Chattanooga?
10  A.  Family vacation.
11  Q.  What did you do while you were in Chattanooga
12     for the vacation?
13  A.  What all families do, spend family time
14     together, tourist attractions.
15  Q.  What tours?
16  A.  They have Rock City, the Incline Railroad.
17     There's a Discovery children's museum that we
18     like to visit.
19  Q.  Did you do all of those on your one trip to
20     Chattanooga?
21  A.  Yes, of course.
22  Q.  Okay.  What else?
23  A.  There's an IMAX and an aquarium.

Page 400

1  Q.  Okay.  How did you pay for each of those
2     activities?
3  A.  I don't recall.
4  Q.  Is it possible that you used a credit card or
5     a debit card to pay for them?
6  A.  Yes.
7  Q.  Okay.  Anything else that you did on your
8     trip to Chattanooga?
9  A.  Besides eating.
10  Q.  So you ate out?
11  A.  Yes, of course.
12  Q.  How did you pay for those meals?
13  A.  I don't recall.
14  Q.  Is it possible that you used a credit card or
15     a debit card?
16  A.  Yes.
17  Q.  How many trips did you take to Texas during
18     your employment at the Fairfield Inn?
19  A.  I'm trying to recall, because my father -- I
20     mean my husband lost a parent during that
21     time, so I'm trying to recall.  I believe it
22     was during that time.
23  Q.  I'm sorry.

Page 401

1  A.  So I'm trying to recall the date.  Because we
2     lost two.  And I know his father died in
3     April of 2006 and his mother died -- I know
4     Taylor was seven months old.  So I'm
5     trying -- if that's okay, I'm just trying to
6     figure out the date.  I know Taylor was seven
7     months old.  I can't -- I don't recall.  I'd
8     have --
9  Q.  What's Taylor birth date?
10  A.  December 28th, 2001.
11  Q.  Okay.  So it would have been July of 2002,
12     then?
13  A.  That's sounds about right, yes.
14  Q.  Okay.  So, when your husband's -- was it
15     mother --
16  A.  Yes.
17  Q.  -- that passed?
18  A.  Yes.
19  Q.  That was sometime in 2002?
20  A.  Yes.
21  Q.  So, that was before your employment at the
22     Fairfield Inn?
23  A.  Correct.

Page 402

1   Q.  His father died sometime in April of 2000 --
2       what year was that?
3   A.  And I know this is going to sound just off
4       the wall, but Tanner was seven months old,
5       too.  I know that sounds very sporadic,
6       but --
7   Q.  So that would have been -- Tanner was born in
8       August of '05?
9   A.  Right.  So it would have been in '06 that we
10      went?
11  Q.  So it was sometime in '06?
12  A.  Yes.
13  Q.  So it would have been after your
14      employment --
15  A.  Yes.
16  Q.  -- with Fairfield Inn?
17  A.  Correct.
18  Q.  Okay.  So you didn't travel to Texas for
19      either one of those occasions --
20  A.  Not under Fairfield Inn, right.
21  Q.  -- while you were employed at Fairfield Inn?
22  A.  No.
23  Q.  Okay.  How many times during your employment

Page 403

1       at Fairfield Inn did you travel to Texas?
2   A.  I do recall it was one other time.  It was
3       during the -- I believe it was Thanksgiving
4       of 2004.  I had just been hired.  I mean, I
5       know I had just started.  So if I started in
6       July -- I know that it was approved by Todd.
7       I remember -- I recall that.  So I did -- we
8       did go -- I believe it was Thanksgiving
9       during that year, yes.
10  Q.  So Thanksgiving 2004 --
11  A.  Uh-huh.
12  Q.  -- you went to Texas.  Where in Texas?
13  A.  It's south of Austin, in Luling, L-U-L-I-N-G.
14      That's where his family lives.
15  Q.  And where did you stay?
16  A.  I remember staying at a -- we always -- if we
17      were able to stay at a Fairfield Inn in -- I
18      believe it was -- it's Jackson, Mississippi.
19  Q.  How did you pay for that?
20  A.  I don't recall.
21  Q.  Is it possible that you used a credit card or
22      debit card?
23  A.  Yes.  And that was on the employee rate.  I

Page 404

1       recall that.  That was before the card, so I
2       had authorization for it.
3   Q.  Okay.  Earlier you testified that Fairfield
4       Inn hasn't hired anyone with children -- with
5       children, right?  Is that what you testified?
6   A.  With children?
7   Q.  Yeah.
8   A.  I don't recall.
9   Q.  Okay.  What is it that you testified about
10      Fairfield Inn's hiring practices with respect
11      to individuals with children?
12  A.  What did I testify about?
13  Q.  Yeah.  What did you say earlier?  You made a
14      statement earlier about the company's hiring
15      practices.  And I'm just trying to understand
16      what it was.
17      MS. DUNCAN:  We can go back and read
18          it.
19  A.  I believe I just answered yes or no.
20  Q.  Okay.
21      MR. FELLNER:  Let's go off the record
22          and get that read back.
23          (The court reporter read as

Page 405

1           requested.)
2   Q.  Ms. Watts, earlier today you testified that
3       to your knowledge, Tammy Dominguez has not
4       hired anyone with a child; is that right?
5   A.  Correct.
6   Q.  What did you do to investigate to determine
7       whether Tammy Dominguez has hired anyone with
8       a child?
9   A.  I just said not that I know of.
10  Q.  Okay.  So she could have hired people with
11      children; you have no idea?
12  A.  Correct.
13  Q.  Earlier today you testified that Tammy
14      Dominguez, to your knowledge, has not hired
15      anyone who was pregnant.
16  A.  I said not that I know of.
17  Q.  Okay.  So what did you do to investigate the
18      veracity of that statement?
19  A.  Nothing.
20  Q.  And earlier today you testified that Tammy
21      Dominguez has not -- to your knowledge, has
22      not hired anyone who is married, right?
23  A.  Correct.

Page 406

1 Q. What did you do to investigate the veracity
2   of that statement?
3 A. Nothing. And I stated not that I know of.
4      MR. FELLNER: Okay. For right now,
5         that's all the questions that I
6         have. I'm going to leave this
7         deposition open because you guys
8         have still not produced your son's
9         health care records, which I am
10        expecting to get in response to a
11        subpoena. And then we'll see if
12        we're going to redepose you about
13        those as well.
14     THE WITNESS: Sure.
15     MS. DUNCAN: I want to ask two more
16        questions on things that he
17        brought up here.
18        EXAMINATION
19 BY MS. DUNCAN:
20 Q. When BlueCross BlueShield told you that your
21   health insurance had in fact extended a month
22   in advance, did that mean that Amrita was
23   telling you a lie?

Page 407

1 A. Yes.
2 Q. Did you have difficulty getting compensation
3   and bonuses from Hospitality Ventures?
4 A. I constantly was having to e-mail Todd or
5   Roger or ask, you know, when would they be
6   paid or -- because in the beginning, it was
7   never clarified to me of how the process was
8   about being paid. My understanding is when a
9   quarter was over, it should be on -- after
10  approved, be on the next payroll check. And
11  sometimes it would go maybe two or three pay
12  periods. So I constantly just asked.
13 Q. In fact, the bulk of these e-mails that have
14  been produced are about trying to get paid?
15 A. Correct.
16     MR. FELLNER: Object to the form.
17 Q. Did the -- Mr. Fellner asked about changes in
18  policy in their personnel handbook. Did you
19  ever receive notice of any change in policy?
20 A. No.
21 Q. And I believe yesterday, you stated that you
22  never received the handbook until after you
23  were terminated; is that right?

Page 408

1 A. Correct. I had to ask for one.
2 Q. Okay. So, to your knowledge, the handbook
3   that you received after you were terminated
4   was the same one that you signed the release
5   for?
6 A. Correct.
7      MS. DUNCAN: I think that's it.
8      THE WITNESS: Can we take a break?
9      MR. FELLNER: I have absolutely, like,
10        three questions.
11        EXAMINATION
12 BY MR. FELLNER:
13 Q. I mean, this is ridiculous at this point.
14  Let's look at Defendant's Exhibit #4,
15  please. What is in the bottom right-hand
16  corner? It says 45, correct?
17 A. 45. Page 45, yes.
18 Q. Yeah, page 45. Let's look at Defendant's
19  Exhibit #3. Okay?
20 A. Yes.
21 Q. Now, Defendant's Exhibit #3 is the document
22  you claim to be the handbook you received,
23  right?

Page 409

1 A. Yes.
2 Q. Is that a 45-page document?
3 A. I would have to --
4 Q. Go ahead. Count them. Or you can just look
5   at the bottom right-hand number and --
6 A. And subtract them?
7 Q. Yeah, and do the math. We went through this
8   yesterday.
9 A. Well, then, it's noted.
10 Q. We went through this yesterday. And, you
11  know, you're muddying up the record now. I
12  want to be clear about this. Is that a --
13     MS. DUNCAN: Objection.
14 Q. Is Defendant's Exhibit #3 --
15 A. Yes, it is.
16 Q. Is Defendant's Exhibit #3 a 45-page
17  document?
18 A. Yes, it is.
19 Q. Oh, it is. Okay. Because it begins on page
20  170. And Defendant's Exhibit #3 ends on page
21  197. My math says that's 27 pages, is it?
22  Am I wrong here? Did you count this?
23 A. No.

Page 410

1 Q. Please count it.
2 A. Are you counting the cover page?
3 Q. Please do.
4        (Brief pause)
5 A. 27.
6 Q. Okay. So Defendant's Exhibit #3 is a 27-page
7     document, right? Could you look at
8     Defendant's Exhibit #5, please? How many
9     pages is Defendant's Exhibit #5?
10 A. 45.
11 Q. Okay. Now, if you signed a document that
12     says it's the 45th page for a handbook, do
13     you believe it's more likely that it's the
14     45th page of Defendant's Exhibit #5 or
15     Defendant's Exhibit #3?
16 A. I don't know. This is the one that was given
17     to me.
18 Q. After your employment terminated, right?
19 A. And they were copied in the hotel, so I can't
20     verify who made the copy and then if the
21     pages were correct.
22 Q. You really have no idea which handbook it
23     belongs to, right?

Page 411

1 A. No.
2 Q. Which handbook Defendant's Exhibit #4 belongs
3     to, right?
4 A. Correct.
5 Q. Okay. That's good enough.
6     MR. FELLNER: That's it. Again,
7         leaving this deposition open with
8         respect to the documents that we
9         still do not have.
10        (The deposition concluded at
11         10:59 a.m.)
12     * * * * * * * * * * *
13     FURTHER DEPONENT SAITH NOT
14     * * * * * * * * * * *
15
16
17
18
19
20
21
22
23

Page 412

1        REPORTER'S CERTIFICATE
2 STATE OF ALABAMA
3 AUTAUGA COUNTY
4    I, Heather Barnett, Court Reporter and
5 Commissioner for the State of Alabama at Large,
6 hereby certify that on Thursday, July 19, 2007, I
7 reported the deposition of HEATHER GODFREY WATTS,
8 who was first duly sworn or affirmed to speak the
9 truth in the matter of the foregoing cause, and
10 that pages 4 through 411 contain a true and
11 accurate transcription of the examination of said
12 witness by counsel for the parties set out
13 herein.
14    I further certify that I am neither of kin
15 nor of counsel to any of the parties to said
16 cause, nor in any manner interested in the
17 results thereof.
18    This 6th day of August, 2007.
19
20
    _____
21    HEATHER BARNETT, Court Reporter
    Commissioner for the
22    State of Alabama at Large
23    MY COMMISSION EXPIRES: 3/30/2011

Page 413

1        SIGNATURE OF WITNESS
2    I, HEATHER GODFREY WATTS, hereby certify
3 that I have read the transcript of my deposition
4 consisting of pages 4 through 411, and except for
5 the corrections listed below, certify that it is
6 a true and correct transcription.
7
8    _____
    HEATHER GODFREY WATTS
9
10 SWORN TO AND SUBSCRIBED before me
   this _____ day of _____, 2007.
11
12 _____
   NOTARY PUBLIC
13
14    * * * * * * * * * * *
15 Page   Line   Correction and reason therefor
16
17
18
19
20
21
22
23

**From:** Roger A Miller
**Sent:** 10/31/2005
**To:** Watts, HEATHER
**Cc:** Dominguez, Tammy
**Bcc:**
**Subject:** RE: Completed MK Plan Items from Heather 2 of 2 emails

---

Heather; Thanks. I appreciate these. Have a super week.

-----Original Message-----
From: Watts, HEATHER [mailto:Heather.G.Watts@marriott.com]
Sent: Sunday, October 30, 2005 9:36 PM
To: FFI, Portland Maine Mall GM (F)
Cc: Miller, Roger
Subject: Completed MK Plan Items from Heather 2 of 2 emails


Tammy,
Attached are the Action Plans- again I based alot of this from last
year. (all worked great) We can review together and add/delete items that
you wish to see happen within the Sales Department. Roger's notebook that
he sent had some great ideas. Just let me know

Thanks


Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

PLAINTIFF'S
EXHIBIT
1
PENGAD 800-631-6989

MV1000165

STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION AGENCY
MONTGOMERY, ALABAMA 36131

MONETARY DETERMINATION

DATE   11/15/05   PAGE 1
SSN XXX-XX-1193
CLAIM DATE  11/13/05
6001

HEATHER G WATTS
6976 EASTERN SHORE RD
MONTGOMERY          AL 36117 7612

BASE PERIOD WAGES

| MPLOYER | JUL-SEP 04 | OCT-DEC 04 | JAN-MAR 05 | APR-JUN 05 | EMP-TOT |
|---------|------------|------------|------------|------------|---------|
| OLE ROBERT 0-296290-30 SIC7011 | WAT 8,460.55 | WAT 9,423.05 | WAT 11,576.90 | WAT 12,153.85 | 41,614.35 |

| UARTER TOTALS | 8,460.55 | 9,423.05 | 11,576.90 | 12,153.85 | 41,614.35 |

==============
TOTAL WAGES

WEEKLY BENEFIT AMOUNT - 220.00    MAXIMUM BENEFIT AMOUNT - 5,720.00

MESSAGE

PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
2

AVERAGE OF TWO HIGH QUARTERS = $   11,865.37      MAILED    11/15/05
REDET DATE   00/00/00   REDET CODE 0
:**+*******************************************************************************************

FOR EXPLANATION OF THIS DETERMINATION AND APPEAL RIGHTS SEE 'YOUR BENEFIT
RIGHTS AND RESPONSIBILITIES' BOOKLET.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## BIRMINGHAM, ALABAMA DISTRICT OFFICE

| | | |
|---|---|---|
| Heather G. Watts | ) | |
| | ) | |
| Charging Party, | ) | |
| | ) | |
| v. | ) | |
| | ) | EEOC CHARGE NO. |
| Montgomery Ventures, LLC | ) | 130-2006-01283 |
| | ) | |
| Respondent. | ) | |

### POSITION STATEMENT

NOW COMES Montgomery Ventures, LLC ("Montgomery Ventures" or the "Company") and files its Position Statement.

### I.    Introduction

On December 20, 2005, Heather G. Watts filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Ms. Watts alleged that Montgomery Ventures violated Title VII of the Civil Rights Act of 1964, as amended, by terminating her employment on the basis of her pregnancy.[1]  Montgomery Ventures denies that it discriminated against Ms. Watts in any way, including on the basis of her pregnancy.

Although not required to do so, Montgomery Ventures allowed Ms. Watts to take a leave of absence after giving birth. The Company terminated Ms. Watts' employment because she refused to return to work full-time after her leave of absence. For all these reasons and as set forth more fully below, Montgomery Ventures respectfully requests that the EEOC issue a no cause determination and dismiss the charge.

---

[1] In her Charge of Discrimination, Ms. Watts also alleges that Montgomery Ventures violated the Family and Medical Leave Act ("FMLA"). Montgomery Ventures requests that the EEOC dismiss Ms. Watts' FMLA allegations because enforcement of the FMLA is outside of the EEOC's jurisdiction. The EEOC also should dismiss Ms. Watts' FMLA allegations because she was not "eligible" for leave under the FMLA because the Company had fewer than 50 employees within 75 miles of Ms. Watts' worksite. 29 U.S.C. §2611(2)(B)(ii); 29 C.F.R. §825.110(a).

PLAINTIFF'S EXHIBIT 3

## II.    Facts

Montgomery Ventures owns and operates the Marriott Fairfield Inn hotel in Montgomery, Alabama. On June 24, 2004, Montgomery Ventures hired Ms. Watts as the Company's Director of Sales and Marketing. Ms. Watts is the only employee who has taken a leave of absence from Montgomery Ventures.

### A.    Ms. Watts Takes Maternity Leave

On August 11, 2005, Ms. Watts began a maternity leave, and gave birth the following day. On September 27, 2005, Ms. Watts asked to extend her maternity leave until the first week of November. The Company permitted her to extend her maternity leave as requested.

### B.    The Company Terminated Ms. Watts' Employment Because She Refused To Return To Work Full-Time

On November 2, 2005, Montgomery Ventures' General Manager Tammy Dominguez told Ms. Watts that the Company needed her to return to the Director of Sales and Marketing position full-time on November 9. Ms. Watts replied that she could not return to work full-time because she did not have childcare arrangements that would allow her to work full-time. Accordingly, Ms. Dominguez told Ms. Watts that the Company would not continue to hold the Director of Sales and Marketing position available for Ms. Watts.

On November 6, 2005, Ms. Dominguez offered Ms. Watts two (2) additional available positions: front desk clerk and night shift audit. Both positions required Ms. Watts to work 35 hours per week, and paid the same compensation and benefits that Ms. Watts previously received as Director of Sales and Marketing. Ms. Dominguez asked Ms. Watts to notify the Company by November 10, 2005, which position she wanted. On November 10, 2005, the Company was forced to terminate Ms. Watts' employment because she failed to accept any of the positions offered, and failed to return to work on a full-time basis.

2                                                        1437098 v05

Montgomery Ventures denies all allegations of Ms. Watts' Charge of Discrimination not specifically admitted.

## III.    Conclusion

Montgomery Ventures, LLC did not discriminate against Heather Watts based on her pregnancy or any other reason. For all these reasons, Montgomery Ventures respectfully requests that the EEOC issue a no cause determination and dismiss the charge.

This ___ day of April, 2006.

MORRIS, MANNING & MARTIN, LLP

R. Jason D'Cruz
Daniel S. Fellner
Attorneys for Montgomery Ventures, LLC
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000

3    1437098 v05

**Watts, HEATHER**

| | | | |
|---|---|---|---|
| **From:** | Roger A Miller [rmiller@hospitalityventures.com] | **Sent:** | Tue 8/2/2005 8:30 PM |
| **To:** | Watts, HEATHER | | |
| **Cc:** | Robert Cole; tepplin872@aol.com | | |
| **Subject:** | RE: Heather Tuesday 8 2 05 | | |
| **Attachments:** | | | |

Heather; Thanks for all your time and efforts. I know you have not felt well and are pushing it. Please take care of your self. We appreciate your dedication and hard work. I talked with Tandi today and will stay in touch/accessible to her at all times. Take care.

-----Original Message-----
From: Watts, HEATHER [mailto:Heather.G.Watts@marriott.com]
Sent: Tuesday, August 02, 2005 9:16 AM
To: Epplin, Todd
Cc: Miller, Roger
Subject: Heather Tuesday 8 2 05


Todd,
    I am planning on coming in for a while this morning.  I am at home working on two proposals for the CVB-family reunions and working with Tandi on yesterday's bookings.

·     If you need anything before I get there do call my cell.

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117
334-270-0007 hotel phone/fax
334-354-2619 cell phone
334-244-8077 home fax
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

Eager to assist with corporate, group or special events.



PLAINTIFF'S
EXHIBIT
4

PENGAD 800-631-6989

**watts167@bellsouth.net**

| | |
|---|---|
| **From:** | Robert Cole [rcole@hospitalityventures.com] |
| **Sent:** | Friday, February 25, 2005 9:56 AM |
| **To:** | 'Mickey and Heathe' |
| **Cc:** | 'Roger A Miller'; 'Rob Flanders' |

**Subject:** Montgomery

Hi Heather,

First of all, let me express my sincere appreciation for all of your hard work and efforts in helping the property achieve some pretty terrific revenue and market share results of late. I also want to express to you my happiness in seeing more than 1000 group rooms on the books already for both March and April. I am very proud of your successes and I want to thank you.

Secondly, I know you are frustrated by some of the working aspects/environment at the hotel. I recognize certain things are not handled to your liking or your satisfaction. I respect your passion and your commitment to wanting things done right. We share this philosophy as we all want things done right as well. The guest must comes first, above all else—I know you know this. I do not want to come across as defending Todd, but you ought to know that Todd is under an enormous amount of pressure to succeed at this hotel, especially from an operations and guest score perspective. We have placed the burden on him to get the hotel out of the red zone "or else". Maybe this pressure is not fair, but it is reality and everybody reacts differently when under this kind of pressure. I have known Todd for a long time, and he is a good guy that does care about his job and the hotel he is at. Some of what you are experiencing might be just some of Todd's frustration as I'm sure he is somewhat tired and frustrated in his own right by separate and apart issues.

Having said that, speaking on behalf of Roger and Rob, we want you on our team and we are very pleased with the revenue results of late at this hotel. I have asked both Rob and Roger to help intervene and try to facilitate an acceptable solution going forward. I can only hope you are receptive to this; as always it takes all parties to work together and compromise. In the meantime, if you have any questions or comments for me, please don't hesitate to contact me direct. I look forward to your being a member of our team, long-term.

Robert Cole

**PLAINTIFF'S EXHIBIT**

S

PENGAD 800-631-6989

11/5/2005

**From:** Roger A Miller
**Sent:** 09/27/2005
**To:** Watts, HEATHER
**Cc:** Tammy Dominguez; Curtis Reitz; Robert Cole
**Bcc:**
**Subject:** RE: MGMFI SALES PRO

Heather, thanks. I will go through everyone's Sales Pro tomorrow now that I
have returned from Nashville. I'm sure you have the information discussed
and I appreciate it. We look forward to your return and sales efforts. The
hotel will continue to be extremely successful with Tammy
overseeing/insuring operational excellence and your selling/representation
of the hotel. Have a great evening. Take care.

-----Original Message-----
From: Watts, HEATHER [mailto:Heather.G.Watts@marriott.com]
Sent: Tuesday, September 27, 2005 2:28 PM
To: Miller, Roger
Cc: FFI, Montgomery GM
Subject: MGMFI SALES PRO


Roger,
When you have an opportunity, please take a look at Sales Pro and see
the Account Traces to date. I just want to make sure this is what your
intentions are for me to do as well as enter group bookings while on
maternity leave. If there is something else, please let me know. Again, I
am sorry there was miscommunication!
Tandi has sent what she has booked to date- I am entering these this
week.

Thanks!

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!



PENGAD 800-631-6989
**PLAINTIFF'S
EXHIBIT**

MV1000114

**From:**    Daniel S. Fellner

**To:**      Priscilla Black Duncan

**Cc:**      jlconnell@haynes-haynes.com; Alicia Haynes; Jeff Lee

**Date:**    7/19/2007 10:58:01 PM

**Subject:** Watts case

Priscilla,

Earlier today, on July 19, you stated to me that Plaintiff believes Hospitality Ventures' response to Plaintiff's First Request for Production is deficient because it did not identify the e-mail documents which were responsive to each Request. As you requested, we are endeavoring to identify to which Requests the e-mails are responsive before Roger Miller's deposition on July 20. On such short notice, we are unable to provide all of the information you requested by the start of Mr. Miller's deposition. However, attached is a list of the beginning document numbers and end document numbers for the e-mails responsive to Requests 7 and 8.

Please call if you have any questions.

Dan

PENGAD 800-631-6989

**PLAINTIFF'S EXHIBIT**

7

**Miller & Dominguez E-Mails**

| Beginning Document # | End Document # |
|---|---|
| MV1000114 | MV1000114 |
| MV1000116 | MV1000117 |
| MV1000118 | MV1000119 |
| MV1000120 | MV1000120 |
| MV1000121 | MV1000124 |
| MV1000125 | MV1000126 |
| MV1000127 | MV1000129 |
| MV1000131 | MV1000132 |
| MV1000142 | MV1000143 |
| MV1000149 | MV1000150 |
| MV1000151 | MV1000151 |
| MV1000162 | MV1000163 |
| MV1000164 | MV1000164 |
| MV1000165 | MV1000165 |
| MV1000166 | MV1000166 |
| MV1000191 | MV1000191 |
| MV1000192 | MV1000197 |
| MV1000198 | MV1000199 |
| MV1000200 | MV1000200 |
| MV1000396 | MV1000397 |
| MV1000398 | MV1000402 |
| MV1000403 | MV1000403 |
| MV1000453 | MV1000454 |
| MV1000511 | MV1000513 |
| MV1000514 | MV1000515 |
| MV1000686 | MV1000687 |
| MV1001691 | MV1001692 |
| MV1001697 | MV1001698 |
| MV1001753 | MV1001753 |
| MV1001853 | MV1001853 |
| MV1001854 | MV1001855 |
| MV1001856 | MV1001857 |
| MV1001865 | MV1001866 |
| MV1001867 | MV1001875 |
| MV1001876 | MV1001877 |
| MV1001885 | MV1001886 |
| MV1001890 | MV1001892 |
| MV1001895 | MV1001897 |

**Watts & Miller E-Mails**

| Beginning Document # | End Document # |
|---|---|
| MV1000040 | MV1000040 |
| MV1000042 | MV1000043 |
| MV1000044 | MV1000044 |
| MV1000052 | MV1000054 |
| MV1000114 | MV1000114 |
| MV1000116 | MV1000117 |
| MV1000118 | MV1000119 |
| MV1000120 | MV1000120 |
| MV1000121 | MV1000124 |
| MV1000125 | MV1000126 |
| MV1000127 | MV1000129 |
| MV1000130 | MV1000130 |
| MV1000131 | MV1000132 |
| MV1000140 | MV1000141 |
| MV1000142 | MV1000143 |
| MV1000151 | MV1000151 |
| MV1000164 | MV1000164 |
| MV1000165 | MV1000165 |
| MV1000166 | MV1000166 |
| MV1000191 | MV1000191 |
| MV1000192 | MV1000197 |
| MV1000344 | MV1000344 |
| MV1000358 | MV1000360 |
| MV1000361 | MV1000364 |
| MV1000365 | MV1000365 |
| MV1000366 | MV1000366 |
| MV1000367 | MV1000368 |
| MV1000369 | MV1000373 |
| MV1000374 | MV1000375 |
| MV1000376 | MV1000378 |
| MV1000379 | MV1000379 |
| MV1000570 | MV1000571 |
| MV1000626 | MV1000627 |
| MV1000686 | MV1000687 |
| MV1000696 | MV1000696 |
| MV1000697 | MV1000698 |
| MV1000699 | MV1000700 |
| MV1000704 | MV1000707 |
| MV1000716 | MV1000716 |
| MV1000718 | MV1000718 |
| MV1000836 | MV1000836 |
| MV1000838 | MV1000840 |
| MV1000845 | MV1000846 |
| MV1000847 | MV1000847 |
| MV1000848 | MV1000849 |
| MV1000850 | MV1000850 |
| MV1000853 | MV1000853 |
| MV1000854 | MV1000855 |
| MV1000859 | MV1000859 |

| | |
|---|---|
| MV1001160 | MV1001160 |
| MV1001161 | MV1001163 |
| MV1001164 | MV1001165 |
| MV1001172 | MV1001172 |
| MV1001178 | MV1001178 |
| MV1001183 | MV1001184 |
| MV1001185 | MV1001185 |
| MV1001186 | MV1001186 |
| MV1001198 | MV1001198 |
| MV1001235 | MV1001235 |
| MV1001238 | MV1001238 |
| MV1001250 | MV1001251 |
| MV1001374 | MV1001374 |
| MV1001555 | MV1001555 |
| MV1001556 | MV1001556 |
| MV1001667 | MV1001667 |
| MV1001676 | MV1001677 |
| MV1001678 | MV1001678 |
| MV1001679 | MV1001684 |
| MV1001685 | MV1001687 |
| MV1001688 | MV1001688 |
| MV1001690 | MV1001690 |
| MV1001693 | MV1001693 |
| MV1001694 | MV1001695 |
| MV1001696 | MV1001696 |
| MV1001702 | MV1001702 |
| MV1001703 | MV1001703 |
| MV1001803 | MV1001803 |
| MV1001861 | MV1001861 |
| MV1001862 | MV1001862 |
| MV1001863 | MV1001863 |
| MV1001864 | MV1001864 |
| MV1001865 | MV1001866 |
| MV1001867 | MV1001875 |
| MV1001878 | MV1001878 |

| | |
|---|---|
| MV1000860 | MV1000861 |
| MV1000863 | MV1000863 |
| MV1000864 | MV1000864 |
| MV1000869 | MV1000871 |
| MV1000872 | MV1000877 |
| MV1000878 | MV1000878 |
| MV1000879 | MV1000880 |
| MV1000885 | MV1000885 |
| MV1000888 | MV1000888 |
| MV1000892 | MV1000893 |
| MV1000896 | MV1000896 |
| MV1000898 | MV1000899 |
| MV1000900 | MV1000900 |
| MV1000901 | MV1000903 |
| MV1000904 | MV1000906 |
| MV1000908 | MV1000908 |
| MV1000909 | MV1000911 |
| MV1000912 | MV1000912 |
| MV1000913 | MV1000913 |
| MV1000914 | MV1000915 |
| MV1000916 | MV1000916 |
| MV1000917 | MV1000919 |
| MV1000931 | MV1000931 |
| MV1000939 | MV1000939 |
| MV1000940 | MV1000941 |
| MV1000942 | MV1000944 |
| MV1000953 | MV1000953 |
| MV1000954 | MV1000954 |
| MV1000955 | MV1000955 |
| MV1000958 | MV1000960 |
| MV1000965 | MV1000965 |
| MV1001015 | MV1001015 |
| MV1001078 | MV1001078 |
| MV1001079 | MV1001079 |
| MV1001081 | MV1001083 |
| MV1001085 | MV1001085 |
| MV1001086 | MV1001086 |
| MV1001087 | MV1001090 |
| MV1001094 | MV1001095 |
| MV1001096 | MV1001097 |
| MV1001098 | MV1001098 |
| MV1001114 | MV1001114 |
| MV1001115 | MV1001117 |
| MV1001118 | MV1001119 |
| MV1001131 | MV1001133 |
| MV1001134 | MV1001134 |
| MV1001138 | MV1001139 |
| MV1001140 | MV1001140 |
| MV1001146 | MV1001147 |
| MV1001153 | MV1001154 |
| MV1001155 | MV1001155 |
| MV1001156 | MV1001157 |

# EXHIBIT A



PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989

AFFIDAVIT OF ROGER MILLER

STATE OF GEORGIA     )
                     )
COUNTY OF FULTON     )

Personally appeared before the undersigned officer duly authorized by law to administer oaths, Roger Miller, who after first being duly sworn states, on oath:

I understand that this Affidavit will be submitted in the civil action styled, Heather Watts v. Hospitality Ventures, LLC, Civil Action No. 2:06CV1149-MEF, pending in the United States District Court for the Middle District of Alabama.

I am over twenty-one (21) years of age and am competent to testify to the matters contained herein. This Affidavit is based upon my personal knowledge.

1.   I am employed by Hospitality Ventures Management, Inc. I have overseen the sales and marketing functions at the Fairfield Inn by Marriott, located at 5601 Carmichael Road, Montgomery, Alabama, 36117 (the "Hotel").

2.   From June 24, 2004, through November 9, 2005, Heather Watts worked at the Hotel or was assigned work from the Hotel.

3.   Montgomery Ventures, LLC owns and operates the Hotel. Hospitality Ventures, LLC does not own or operate the Hotel.

1630766

FURTHER AFFIANT SAYETH NOT.

Roger A Miller
Roger Miller

Signed and sworn before me this $\underline{23rd}$ day of March, 2007.

Carol A Sendrek
Notary Public

My commission expires: 5-4-2008

(NOTARY SEAL)

## Montgomery
## Executive Summary



| Primary Contact: | Tammy Pratt Dominquez | Date: | Jul 12, 2006 |
|---|---|---|---|
| MARSHA Code: | MGMFI | Region: | Central |
| Unit Number: | 432A5 | City, State: | Montgomery, AL |
| Reviewed By: | Hickman, Randy | Managed By: | Hospitality Ventures, LLC |
| Review Type: | Semi Annual | Owned By: | Hospitality Ventures, LLC |

View Fairfield Inn NALO - Critical Items Success Plan
View Fairfield Inn NALO - Non-Compliant Items Success Plan
View Fairfield Inn Non-Compliant Condition Items

## The Hotel's Operations Review Grand Total Score is 86%.

You have missed 1 critical items, which must be addressed in your Critical Items Success Plan within 2 Weeks of your review date.

| CATEGORY | TOTAL POSSIBLE POINTS | TOTAL EARNED POINTS | PERCENTAGE OF TOTAL POINTS EARNED |
|---|---|---|---|
| **LEADERSHIP** | **82** | **79** | **96%** |
| Administration | 58 | 55 | 95% |
| Associate Development | 24 | 24 | 100% |
| **CLEANLINESS** | **562** | **526** | **94%** |
| Cleanliness of Exterior, Public Space & Functional Areas | 108 | 105 | 97% |
| Cleanliness of Back of the House | 12 | 12 | 100% |
| Cleanliness of Guest Rooms/Suites | 442 | 409 | 93% |
| **CONDITION** | **363** | **268** | **74%** |
| Condition of Exterior, Public Space & Functional Areas | 120 | 81 | 68% |
| Condition of Back of the House | 12 | 10 | 83% |
| Condition of Guest Rooms/Suites | 231 | 177 | 77% |
| **SAFETY AND SECURITY** | **216** | **207** | **96%** |
| Life Safety | 144 | 144 | 100% |
| Security | 72 | 63 | 88% |
| **STANDARDS** | **124** | **121** | **98%** |
| Food and Beverage | 17 | 17 | 100% |
| Exterior, Public Space & Functional Areas | 12 | 12 | 100% |
| Front Desk | 61 | 58 | 95% |
| Guest Rooms/Suites | 34 | 34 | 100% |
| **BRAND IMAGE** | **27** | **27** | **100%** |
| Uniforms | 27 | 27 | 100% |
| **CRITICAL ITEM VIOLATION(S)** | **0** | **-40** | **N/A** |
| Critical Item Point Deductions | 0 | -40 | N/A |
| **OPERATIONS REVIEW GRAND TOTAL SCORE** | **1374** | **1188** | **86%** |



**Note: Each non-compliant Critical Item will result in a 40 point deduction from the total points earned on the Operations Review (OR). This 40 point deduction will be in addition to the hotel not receiving 9 points for any such non-compliant Critical Item; and if the Critical Item Repeat Violation question on the OR is marked "no", there will be a one-time 100 point deduction from the total points earned on the OR.**

**The Hotel has been placed in the Clear OR Performance Classification. If the Hotel received a Red OR**

MV 00244

## CONFIDENTIAL

### Montgomery
### NALO Critical Items Success Plan



| Primary Contact: | Margaret Vito | Date: | Jan 9, 2007 |
|---|---|---|---|
| MARSHA Code: | MGMFI | Region: | Central |
| Unit Number: | 432A5 | City, State: | Montgomery, AL |
| Reviewed By: | Hickman, Randy | Managed By: | Hospitality Ventures, LLC |
| Review Type: | Semi Annual | Owned By: | Hospitality Ventures, LLC |

View Fairfield Inn NALO - Executive Summary
View Fairfield Inn NALO - Non-Compliant Items Success Plan

Action steps must be input against each item listed below in accordance with the criteria for completion set forth in the Action Plan column below, as soon as possible. Food Safety critical items must have an action plan completed within 48 hours, and all other items must have an action plan completed no later than two weeks after the Operations Review or Brand Standards Audit. By inserting a date in the Date Complete column, you hereby certify that the actions required for such Critical Item in the Action Plan column have been fully completed by such date, and you are in full compliance with the Critical Items associated with such Date Complete.

| Q# | PTS | ITEM DESCRIPTION | COMMENTS | Action Plan | RESPONSIBLE PERSON | DATE DUE | DATE COMPLETED |
|---|---|---|---|---|---|---|---|
| **CRITICAL ITEMS** | | | | | | | |
| There were no non-compliant Critical Items in this Operations Review. | | | | | | | |



PLAINTIFF'S EXHIBIT
10
PENGAD 800-631-6989

**CONFIDENTIAL**

MV 00236

## Montgomery
## Executive Summary



| Primary Contact: | Margaret Vito | Date: | Jan 9, 2007 |
|---|---|---|---|
| MARSHA Code: | MGMFI | Region: | Central |
| Unit Number: | 432A5 | City, State: | Montgomery, AL |
| Reviewed By: | Hickman, Randy | Managed By: | Hospitality Ventures, LLC |
| Review Type: | Semi Annual | Owned By: | Hospitality Ventures, LLC |

View Fairfield Inn NALO - Critical Items Success Plan
View Fairfield Inn NALO - Non-Compliant Items Success Plan

## The Hotel's Operations Review Grand Total Score is 80%.

| CATEGORY | TOTAL POSSIBLE POINTS | TOTAL EARNED POINTS | PERCENTAGE OF TOTAL POINTS EARNED |
|---|---|---|---|
| SAFETY AND SECURITY | 147 | 126 | 86% |
| Life Safety | 99 | 81 | 82% |
| Security | 48 | 45 | 94% |
| LEADERSHIP | 48 | 33 | 69% |
| Administration | 24 | 21 | 88% |
| Associate Development | 24 | 12 | 50% |
| CLEANLINESS | 370 | 319 | 86% |
| Cleanliness of Exterior, Public Space & Functional Areas | 87 | 81 | 93% |
| Cleanliness of Guest Rooms/Suites | 283 | 238 | 84% |
| CONDITION | 240 | 162 | 68% |
| Condition of Exterior, Public Space & Functional Areas | 99 | 63 | 64% |
| Condition of Guest Rooms/Suites | 141 | 99 | 70% |
| STANDARDS | 199 | 157 | 79% |
| Exterior, Public Space & Functional Areas | 12 | 12 | 100% |
| Front Desk | 75 | 72 | 96% |
| Food and Beverage | 66 | 48 | 73% |
| Guest Rooms/Suites | 46 | 25 | 54% |
| BRAND IMAGE | 27 | 27 | 100% |
| Uniforms | 27 | 27 | 100% |
| **OPERATIONS REVIEW GRAND TOTAL SCORE** | 1031 | 824 | 80% |

**Note: Each Non-compliant Critical Item will result in a 20 point deduction from the total points earned. This 20 point deduction will be in addition to the hotel not receiving 9 points for any such non-compliant Critical Item; and if the Critical Item Repeat Violation question is marked "No", there will be a one-time 40 point deduction from the total points earned.**

**The following information applies only to Operations Reviews and does not apply to Self Reviews or Non-Accountable Reviews:**
**The Hotel has been placed in the Yellow OR Performance Classification. If the Hotel received a Red OR Performance Classification, then the Hotel is in the Red OR Performance Classification for this tracking period and you must review the CFRST Program Guide in the Resources area of the LQA web site to determine the Hotel's status under the Quality Assurance Program and the consequence of the Hotel being placed in the Red OR Performance Classification for this tracking period.**

**Fairfield Inn Operations Review (OR) Performance Classification thresholds are as follows:**



## CONFIDENTIAL

MV 00234

**From:** Dominguez, Tammy
**Sent:** 11/08/2005
**To:** amrita@hospitalityventures.com
**Cc:**
**Bcc:**
**Subject:** FW: COBRA-HEATHER

---

Amrita:

I sent an email asking you not to call Heather. Please forward me answers to Heathers questions and I will respond to her. If you choose to respond to Heather that is fine. It has become a sticky mess with Heather and we need to be causious of our statements to her. Thanks have a great day.

Also, please read the attached letter to Heather, so you know what is happening with her at this time.

Tammy

---

From: watts167@bellsouth.net [mailto:watts167@bellsouth.net]
Sent: Mon 11/7/2005 9:34 PM
To: Dominguez, Tammy
Subject: COBRA-HEATHER

---

From: watts167@bellsouth.net [mailto:watts167@bellsouth.net]
Sent: Monday, November 07, 2005 6:30 PM
To: 'Amrita Parekh'
Cc: 'rcole@hospitalityventures.com'; 'Roger A Miller'; 'Dominguez, Tammy'
Subject: FW: Can you call me...Heather??
Importance: High

Amrita,



MV1000019

PLAINTIFF'S
EXHIBIT NO. 13
FOR IDENTIFICATION
DATE:        RPTR:

jennifer0505@ knology. net

# PERSONNEL ACTION FORM

Name _Middleton Jennifer Anne_

**(As it appears on SS Card)**   Last        First        Middle

Property _Montgomery Ventures dba FFI_

**Effective Date of Action** _1/9/06_    Job Title _DIRECTOR OF SALES_

**Date Prepared** _1/9/06_    Time Badge # _____

_(Attach time clock printout if new hire)_

**Check Appropriate Boxes**   ⊖ New Hire   ⊖ Change

⊖ Rehire   ⊖ Other _____

| | |
|---|---|
| **Associate Information** (New or Changed) | Name _Jennifer A. Middleton_ Soc Sec No. _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_ |
| | Street Address _1125 Beth Manor Drive_ |
| | City, State, Zip _Montgomery, AL 36109_ |
| **SOC SEC NO. VERIFICATION: INITIALS ____** | Telephone No. _(334) 356-3755_ ⊖ Male ⊠ Female Date of Birth _5-5-73_ |
| | ⊠ Single ⊖ Married Withholding Allowances: _____ Additional Withholding Per Check ____ |
| | EEO race code: ⊠ White ⊖ Black ⊖ Hispanic ⊖ Asian/Pacific Islander ⊖ Am. Indian/Alaskan Native |

| | |
|---|---|
| **New Hire/ Rehire** | Job Title _DIRECTOR OF SALES_ _____ Department No. _____ |
| | Hire Date _1/9/06_ _____ or Return from Lay-off Date _____ |
| | Work Status: ● FT ⊖ PT ⊖ Temp ⊖ Seasonal FT ⊖ Seasonal PT |
| | ⊖ Hourly: Rate of Pay (per hour) _____ ● Salary: Annual Salary _40.000_ |
| | Insurance Eligibility Date _4/9/06_ (hourly = 90 day wait / salaried = no wait) |

| | | |
|---|---|---|
| **Changes** | **FROM** | **TO** |
| ⊖ Review Increase | Job Title _____ | Job Title _____ |
| ⊖ Merit | Dept Number _____ | Dept Number _____ |
| ⊖ Promotion | Rate of Pay _____ Per _____ | Rate of Pay _____ Per _____ |
| ⊖ Adjustment | Work Status: ⊖ FT ⊖ Seasonal FT | Work Status: ⊖ FT ⊖ Seasonal FT |
| ⊖ Transfer | ⊖ PT ⊖ Seasonal PT | ⊖ PT ⊖ Seasonal PT |
| ⊖ Other | Next Review Date _____ | |

| | |
|---|---|
| **Absence** | ⊖ Vacation Pay  No. of days requested _____ From: _____ To: _____ |
| | ⊖ Sick Pay  No. of days requested _____ From: _____ To: _____ |
| | ⊖ Other  No. of days requested _____ From: _____ To: _____ |
| | ⊖ Leave of absence (FMLA) From: _____ To: _____ Reason: _____ |

| | |
|---|---|
| **Remarks** | **CONFIDENTIAL** |

**APPROVALS**

Department Head/Date _JP Dominguez 1/6/09_   General Manager/Date _____

Entered into payroll by _____   Date _____

MV 00199

## Mickey and Heathe

| From: | "Roger A Miller" <rmiller@hospitalityventures.com> |
|---|---|
| To: | "Mickey and Heathe" <watts167@charter.net> |
| Cc: | "Ronda Masters" <montgomerygm@earthlink.net>; "Robert Cole" <rcole@hospitalityventures.com>; "Rob Flanders" <rflanders@hospitalityventures.com> |
| Sent: | Friday, June 18, 2004 10:05 AM |
| Subject: | RE: Fairfield Inn By Marriott "Director Of Sales/ Marketing Position |

Heather; Hospitality Ventures is pleased to welcome you into our family of
hospitality professionals. Rob has forwarded the information requested in
your earlier e mail. This will meet your expectations. I will call you on
your arrival next Thursday and will visit the property that next week to
implement a 2 day Sales/ Marketing orientation. I would like to make 4-5
sales calls on potential new accounts you feel could be brought to the hotel
fairly soon. My presence should assist you in the credibility department
with these accounts. I will discuss this with you next week. If there are
any questions pertaining to the above please contact me. Welcome aboard. We
look forward to a successful working relationship for many years to come.

-----Original Message-----
From: Mickey and Heathe [mailto:watts167@charter.net]
Sent: Thursday, June 17, 2004 8:17 PM
To: Roger A Miller
Subject: Re: Fairfield Inn By Marriott "Director Of Sales/ Marketing
Position
Importance: High


Roger,
    Good Evening!  I would like to take this opportunity accept the
position of Director of Sales/Marketing for the Fairfield Inn Montgomery
upon written claification of insurance coverage will commence upon 30 days
from hire and that half of the monthly premium amount for family coverage
will be paid by hotel as per conversation with Rob. I would like to start
on Thursday, June 24th.
    Also per my discussion with Todd today,  I informed him of that I had
already previousouly scheduled the following days off with Wingate Inn:
August 11th (Dr's Appointment) and August 19-20 (family vacation) Todd
agreed that it would be fine to keep the same days as scheduled.  I do
realize that the days off are without pay.
    I am very excited about this opportunity and look forward to joining the
team.

Heather Watts

----- Original Message -----
From: "Roger A Miller" <rmiller@hospitalityventures.com>
To: <watts167@charter.net>
Cc: "Ronda Masters" <montgomerygm@earthlink.net>; "Kathe Lopez"
<klopez@maine.rr.com>; "Robert Cole" <rcole@hospitalityventures.com>; "Rob



6/18/2004

    I am very excited about this opportunity and look forward to joining the
team.

Heather Watts

 ---- Original Message -----
From: "Roger A Miller" <rmiller@hospitalityventures.com>
To: <watts167@charter.net>
Cc: "Ronda Masters" <montgomerygm@earthlink.net>; "Kathe Lopez"
<klopez@maine.rr.com>; "Robert Cole" <rcole@hospitalityventures.com>; "Rob
Flanders" <rflanders@hospitalityventures.com>
Sent: Wednesday, June 16, 2004 5:24 PM
Subject: Fairfield Inn By Marriott "Director Of Sales/ Marketing Position


> Dear Heather; Thank you for a most thorough and productive interview this
> week. It is obvious you have acquired productive  hotel Sales/ Marketing
> experience, a positive attitude and willingness to succeed. Based on your
> past "Director Of Sales/Marketing" positions with Marriott in Montgomery,
> recent Marriott reference checks focusing on; worth ethic, inter-intra
> personal communications skills, booking results and overall interview
> performance, Hospitality Ventures is offering you the position of
"Director
> Of Sales/ Marketing" for our 133 room Fairfield Inn/ Montgomery Al. Listed
> below are the specifics of our offer;
> Title/Director Of Sales& Marketing
> Start Date/ Two weeks from offer acceptance or upon termination of present
> employment within the two week period. (Estimated start date-Monday July
> 5th)
> Starting Salary/$35,000
> Quarterly Bonus/ Eligible for 4th Quarter Bonus (Structured/Will be
reviewed
> during my "Director Of Sales/Marketing" property   orientation)
  Insurance/ Provided by hotel
 Working Hours/ 35 weekly (Specific work hours to be identified in job
> description. To be finalized with my input, no later than 5 working days
> after first official day of employment)
> Misc/ All other specifics will be covered by our management team upon
> employment.(Vacation time,ect)
> If you wish to accept our above offer please e mail this correspondence
back
> with you noted acceptance within 48 hours of e mail receipt. If there are
> any questions pertaining the above than contact me at 678/360-8559.
> Hospitality Ventures is enthusiastic and excited about your potential
> employment and trust your efforts will continue to improve our Fairfield
Inn
> Montgomery revenue results and overall company success and growth. Have a
> great day. Look forward to your joining our team of hotel/ corporate
office
> professionals.
>

## Mickey and Heathe

| | |
|---|---|
| **From:** | "Robert Flanders" <rflanders@hospitalityventures.com> |
| **To:** | <watts167@charter.net> |
| **Cc:** | "'Rob Flanders'" <rflanders@hospitalityventures.com> |
| **Sent:** | Friday, June 18, 2004 9:36 AM |
| **Subject:** | FW: Fairfield Inn By Marriott "Director Of Sales/ Marketing Position |

Heather:

Pursuant to our discussion we will submit your application immediately upon
your starting with us. The application will include the necessary
information that will allow you to join the plan at the 30 day point. Blue
Cross and Blue Shield have the ultimate approval for any new members to the
plan. I have no reason to believe they will not approve your application as
submitted.

We have agreed to pay at least 50% of the coverage for your child. We will
deduct your portion (50%) from your bi-weekly pay check. This amount is
estimated to be $60 per paycheck or $1,560 annual.

Robert Flanders
VP of Operations
(404) 467-9299

-----Original Message-----
From: Roger A Miller [mailto:rmiller@hospitalityventures.com]
Sent: Friday, June 18, 2004 10:23 AM
To: Rob Flanders
Subject: FW: Fairfield Inn By Marriott "Director Of Sales/ Marketing
Position
Importance: High

FYI
-----Original Message-----
From: Mickey and Heathe [mailto:watts167@charter.net]
Sent: Thursday, June 17, 2004 8:17 PM
To: Roger A Miller
Subject: Re: Fairfield Inn By Marriott "Director Of Sales/ Marketing
Position
Importance: High



Roger,

# MORRIS, MANNING & MARTIN, LLP
## ATTORNEYS AT LAW

July 13, 2007

**Daniel S. Fellner**
404-504-5476
dsf@mmmlaw.com
www.mmmlaw.com

Alicia K. Haynes, Esq.
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226

Re:    Heather Watts v. Hospitality Ventures, LLC
       U.S. District Court, Middle District of Alabama
       Case No. 2:06-CV-1149-MEF

Dear Alicia:

Enclosed are:

- A compact disc containing documents MV 1000001 through MV 1001914;

- Documents MV 00027 and MV 00028; and

- Documents MV 00178 through MV 00455.

Please call if you have any questions.

Sincerely,

Daniel S. Fellner

Enclosures

Cc w/encl.:    Jeff Lee, Esq.
               Priscilla Black Duncan, Esq.



**PLAINTIFF'S**
EXHIBIT NO. 16
FOR IDENTIFICATION
DATE:        RPTR:

Atlanta          1600 Atlanta Financial Center        With offices in    Washington, D.C.
404.233.7000     3343 Peachtree Road, N.E.                               Charlotte, North Carolina
                 Atlanta, Georgia 30326-1044
                 Fax: 404.365.9532                                       1702857 v01

1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5     HEATHER WATTS,

6            Plaintiff,

7     vs.                    CASE NO. 2:06CV1149-MEF

8     HOSPITALITY VENTURES, LLC,

9            Defendant.

10

11

12

13              * * * * * * * * * *

14          DEPOSITION OF ROGER ALAN MILLER, taken

15    pursuant to stipulation and agreement before

16    Heather Barnett, Court Reporter and Commissioner

17    for the State of Alabama at Large, in the Law

18    Offices of Maynard, Cooper & Gale, 100 North

19    Union Street, Suit 650 RSA Tower, Montgomery,

20    Alabama, on Friday, July 20, 2007, commencing at

21    approximately 11:07 a.m.

22              * * * * * * * * * *

23

Page 2

1          APPEARANCES
2 FOR THE PLAINTIFF:
3 Ms. Priscilla Black Duncan
  P.B. DUNCAN & ASSOCIATES, LLC
4 Attorneys at Law
  472 South Lawrence Street
5 Suite 204
  Montgomery, Alabama 36104
6
  FOR THE DEFENDANT:
7
  Mr. Daniel S. Fellner
8 MORRIS, MANNING & MARTIN, LLP
  Attorneys at Law
9 1600 Atlanta Financial Center
  3343 Peachtree Road, NE
10 Atlanta, Georgia 30326-1044
11 ALSO PRESENT:
12 Ms. Heather Watts
   Mr. Austin McCarthy
13
14        * * * * * * * * * * *
15     EXAMINATION INDEX
16 ROGER ALAN MILLER
      BY MS. DUNCAN              4
17
18        * * * * * * * * * * *
19        STIPULATIONS
20    It is hereby stipulated and agreed by
21 and between counsel representing the parties that
22 the deposition of ROGER ALAN MILLER is taken
23 pursuant to the Federal Rules of Civil Procedure

Page 3

1 and that said deposition may be taken before
2 Heather Barnett, Court Reporter and Commissioner
3 for the State of Alabama at Large, without the
4 formality of a commission; that objections to
5 questions other than objections as to the form of
6 the questions need not be made at this time but
7 may be reserved for a ruling at such time as the
8 deposition may be offered in evidence or used for
9 any other purpose as provided for by the Federal
10 Rules of Civil Procedure.
11     It is further stipulated and agreed by
12 and between counsel representing the parties in
13 this case that said deposition may be introduced
14 at the trial of this case or used in any manner
15 by either party hereto provided for by the
16 Federal Rules of Civil Procedure.
17        * * * * * * * * * * *
18        ROGER ALAN MILLER
19     The witness, having first been sworn to
20 speak the truth, the whole truth and nothing but
21 the truth, testified as follows:
22
23

Page 4

1          EXAMINATION
2 BY MS. DUNCAN:
3 Q. Mr. Miller, have you given depositions
4    before?
5 A. No, ma'am.
6 Q. You have not?
7 A. No.
8 Q. Okay. Well, as you probably have figured out
9    by now, I'm counsel for Heather Watts, one of
10    two. My name is Priscilla Duncan. And we're
11    going to be talking today about your
12    responsibilities and roles and also about
13    Fairfield Inn and Hospitality Ventures,
14    Montgomery Ventures, and some of their
15    corporate arrangements. And I want you to
16    express yourself immediately if you don't
17    understand the question, and I'll try to
18    rephrase it for you or restate it for you.
19        Please try to give a sincere and honest
20    answer. If you don't know, you can say you
21    don't know. If you need to refer to any
22    documents, I'm sure Mr. Fellner can provide
23    them for you.

Page 5

1        And if you need to take a break at any
2    time, you can sign. And probably someone
3    else will be wanting to take one, too.
4        So, do you have any other questions?
5 A. No.
6 Q. All right. Can you give your full name
7    please?
8 A. Roger Alan Miller.
9 Q. How do you spell Alan?
10 A. A-L-A-N.
11 Q. Okay. And what's your age?
12 A. 55.
13 Q. And what's your date of birth?
14 A. ███████
15 Q. And what is your social security number?
16 A. ███████
17 Q. And where do you reside?
18 A. 7040 Grassmoor Grange Way, Kumming, Georgia.
19 Q. What's the zip code, please?
20 A. 30040.
21 Q. Okay. And how long have you been at that
22    address?
23 A. Three years.

Page 6

1    MR. FELLNER: Priscilla, I apologize
2        for interrupting. Just to be
3        clear, I want to designate the
4        portion of the transcript that has
5        just his social security number.
6        That is confidential. Okay.
7        Sorry.
8    MS. DUNCAN: It would be anyway, but --
9 Q. You've -- what is your job title, please?
10 A. Vice president of sales and marketing.
11 Q. And what company do you work for?
12 A. Hospitality Ventures Management, Inc.
13 Q. Is that also known as Hospitality Ventures,
14    or is there another company with the same
15    name?
16 A. No.
17 Q. You're Hospitality Ventures, Inc., is that --
18 A. Management, Inc.
19 Q. Management, Inc. Okay. And what is
20    Hospitality Ventures, LLC?
21 A. I have no idea.
22 Q. Is that not -- is that -- you say you are
23    unfamiliar with Hospitality Ventures, LLC?

Page 7

1 A. The legal name, yes.
2 Q. When did you start working for them?
3    MR. FELLNER: Object to the form of the
4        question.
5 Q. For Hospitality Ventures.
6 A. Four years ago.
7 Q. Four years ago. And that was 2003?
8 A. Yes, ma'am.
9 Q. And was it Hospitality Ventures Management,
10    Inc., at that time?
11 A. To the best of my recollection.
12 Q. Okay. So you're not familiar with the name
13    Hospitality Ventures, LLC?
14 A. No.
15 Q. Well, both of these documents, Defendant's
16    Exhibit #3 and #5, indicate they were updated
17    in 2002. Do you -- to your knowledge, is
18    there any difference between these companies?
19 A. Not to my knowledge.
20 Q. And is it your testimony that there is no
21    other company known as Hospitality Ventures
22    in your -- with relationship to your company?
23    MR. FELLNER: Object to the form of the

Page 8

1        question.
2 A. Hospitality Ventures Management, Inc., is who
3    I work for.
4 Q. Okay. And you don't know Hospitality
5    Ventures, LLC? Is that what your testimony
6    is?
7 A. I'm not a lawyer. I work for --
8 Q. No. I just asked if you ever -- if you have
9    ever worked for or seen any documents
10    relating to Hospitality Ventures, LLC, other
11    than this one in front of you?
12 A. Outside of those in front of me.
13 Q. And you are the corporate representative
14    today for this company?
15    MR. FELLNER: No, he is not.
16        Absolutely not. He is appearing
17        as an individual.
18    MS. DUNCAN: As an individual?
19    MR. FELLNER: Yes.
20    MS. DUNCAN: Okay.
21 Q. Who do you report to, Mr. Miller?
22 A. Robert Cole.
23 Q. And what is his title?

Page 9

1 A. CEO, president.
2 Q. Where does he live?
3 A. Atlanta, Georgia.
4 Q. Okay. Now, do you have a -- in your
5    Hospitality Ventures Management, Inc., can
6    you tell me some of the other executive
7    positions in that company? Got Mr. Cole as
8    president and CEO. Who else is in the
9    operational end of the company?
10 A. Karen Kisch.
11 Q. Karen with a K?
12 A. Yes, ma'am.
13 Q. And how do you spell Kisch?
14 A. K-I-S-C-H.
15 Q. Okay. And what does she do?
16 A. Accounting. Accounting. I don't know her
17    exact title, to be honest with you, but
18    accounting.
19 Q. All right. Who else?
20 A. Jay Molitor.
21 Q. Can you spell that, please?
22 A. M-O-L-I-T-O-R.
23 Q. Okay. What does he do?

Page 10

1  A.  Vice president of operations.
2  Q.  All right.
3  A.  Matt, M-A-T-T, Woodruff.  Don't know his
4     title, but it has to do with guest
5     satisfaction.
6  Q.  So is he a vice president, too?
7  A.  Oh, I'm sorry.  Vice president, no, ma'am.
8     I'm sorry.  No, he's not a vice president,
9     not that I'm aware of; because I don't --
10    he's new.  And I don't recollect his title to
11    be honest with you.
12 Q.  And Karen Kisch is not a vice president
13    either?
14 A.  No.  She's just a -- not to my knowledge.
15 Q.  Okay.  Who else is working there?
16 A.  Under vice president, there's -- I don't
17    recollect anyone else.
18 Q.  Just you and Mr. Molitor?
19 A.  Yes.
20 Q.  Okay.  Now, is Amrita Parekh -- is she still
21    there?
22 A.  No.
23 Q.  Okay.  And where -- do you know the

Page 11

1     circumstances of her leaving?
2  A.  She resigned.
3  Q.  She resigned.  And when was that?
4  A.  A couple of months ago.  I don't have the
5     exact date.
6  Q.  Did she take another job?
7  A.  That is my understanding.
8  Q.  Okay.  Now, who in this organization would be
9     responsible for human resources issues?
10 A.  Ron Disbrow.
11 Q.  Ron Disbrow?  D-I-S-B-R-O?
12 A.  Correct.
13 Q.  And what is his title?
14 A.  He is actually operations manager.  His first
15    title was general manager, general manager of
16    the Doubletree Guest Suites, Nashville,
17    Tennessee.
18 Q.  And how does he -- and how does he relate to
19    Hospitality Ventures?
20 A.  He is also designated as our HR resource
21    support tool.
22 Q.  How long has he been in that position?
23 A.  Four and a half years.

Page 12

1  Q.  Now, was he a resource to the employees or to
2     the management?
3  A.  I believe both.
4  Q.  Are you -- you sound like you're hesitant.
5  A.  I am.  I am vice president of sales and
6     marketing.  I'm not involved in HR.
7  Q.  Well, if you had any -- for example, if you
8     had an insurance question or a family leave
9     question, who would you call?
10    MR. FELLNER:  Object to the form of the
11       question.  You can go ahead and
12       answer.
13 A.  Personally?  Me?
14 Q.  Yeah.
15 A.  Directly related to the company?
16 Q.  Right.
17 A.  That would be Ron Disbrow.
18 Q.  Okay.  Are you aware of any change in the
19    personnel manual, personnel handbook, since
20    you've been with the company?
21 A.  Not until this.
22 Q.  Not until you -- have you ever attended any
23    seminars or meetings sponsored by the company

Page 13

1     related to human resources issues?
2  A.  Not that I can recall.
3  Q.  Now, who -- what was your previous job before
4     you came to work for Hospitality Ventures?
5  A.  Director of sales and marketing with the
6     Holiday Inn in -- Holiday Inn North Druid
7     Hills.
8  Q.  I used to live there.
9  A.  Oh.  Well, then, you can spell it better than
10    I can.
11 Q.  And how long were you in that position?
12 A.  Best of my recollection, about seven, eight
13    months.
14 Q.  Before that, where were you working?
15 A.  Discover Mills.  It's contract labor.
16 Q.  To do what?
17 A.  Marketing.  Sales and marketing.
18 Q.  What year was that?
19 A.  I don't recall.  You have --
20 Q.  Okay.  You came to Hospitality Ventures in
21    2003?
22 A.  Okay.  2002, I believe is the year that I --
23 Q.  Okay.  And then previous to that, where were

Page 14

1    you employed?
2  A.  I had a consulting company.  I did various
3      jobs for various companies.
4  Q.  Was that based in the Atlanta area?
5  A.  Yes, ma'am.
6  Q.  Okay.  And are you an Atlanta native?
7  A.  No, ma'am.
8  Q.  Where were you born?
9  A.  Born in Cincinnati, Ohio.
10 Q.  And where did you go -- did you have any
11     higher education?
12 A.  Graduate of William Carey College in
13     Hattiesburg, Mississippi.
14 Q.  What brought you to Mississippi?
15 A.  Basketball scholarship.
16 Q.  And have you lived in the South since that
17     time, or have you --
18 A.  No.
19 Q.  Where did you --
20 A.  I spent seven years in Mount Carmel,
21     Illinois.
22 Q.  And what did you do there?
23 A.  I was director of sales and marketing.

Page 15

1  Q.  For who?
2  A.  Barker, B-A-R-K-E-R, Enterprises.
3  Q.  And what did they do?
4  A.  Ownership, management of hotels.
5  Q.  And was that your first job in the field, in
6      the hotel field?
7  A.  First multi-unit job.
8  Q.  What type of related work were you doing
9      before that?
10 A.  Director of sales and marketing for the
11     Ramada Inn in Sharonville, Ohio.
12 Q.  Okay.  And after Barker Enterprises, where
13     did you go?
14 A.  Allen & O'Hare, Memphis, Tennessee.
15 Q.  Allen, A-L-L-E-N?
16 A.  Yeah, I believe so.
17 Q.  And O'Hare like the airport?
18 A.  Yes.
19 Q.  And was that a sales and marketing position?
20 A.  Yes, ma'am.
21 Q.  Was that in the hospitality industry?
22 A.  Yes, ma'am.
23 Q.  And how long were you there?

Page 16

1  A.  Approximately three years.
2  Q.  And then where did you go?
3  A.  I stayed -- lived in Memphis, but I worked
4      for a company AIRCOA.  I don't know.
5      A-I-R-C-O-A, something like that.  In Denver,
6      Colorado.
7  Q.  What type of business were they in?
8  A.  Hotels.
9  Q.  Okay.  Were you traveling quite a bit, or how
10     did you work for a company out of Denver by
11     living in Memphis?
12 A.  Traveling.
13 Q.  And what period are we up to now with
14     AIRCOA?  Do you remember what years that was?
15 A.  No, ma'am.
16 Q.  Do you remember where you went after AIRCOA?
17 A.  Yes, ma'am.  Car -- Cardinal.  Let me see
18     now.  I take that back.
19         Cardinal.  The bird, Cardinal.  Oh,
20     gosh.  Was it lodging?  I can't remember the
21     last part of that, but it's Cardinal out of
22     Columbus, Ohio.
23 Q.  Okay.  How long were you there?

Page 17

1  A.  That was three months.  They went broke,
2      filed bankruptcy.  I'm sorry.
3  Q.  Okay.  And then?
4  A.  Belz, B-E-L-Z, Hotels.
5  Q.  Okay.  Where are they?
6  A.  Memphis.
7  Q.  And how long were you there?
8  A.  Three years.
9  Q.  And then why did you leave them?
10 A.  Belz Hotels?
11 Q.  Yeah.
12 A.  I was terminated.
13 Q.  How many times have you been terminated in
14     your working career?
15 A.  My working career.  Let's see here.  I
16     believe twice.
17 Q.  Twice.  What was the other one?
18 A.  The very next one, Karena, K-A-R-E-N-A,
19     Hotels, Orlando.
20 Q.  And how long were you there?
21 A.  It was like six months.
22 Q.  What was the stated cause of these two
23     terminations?

Page 18

1  A.  Karena, there was nothing given.  There was
2      nothing stated.  In Belz, it was for seeking
3      employment, other employment outside their
4      company.
5  Q.  Okay.  So after Karena, where were you moving
6      off to?
7  A.  I worked with Robert Cole.  I believe, at the
8      time, it was Impac.
9  Q.  I-M --
10 A.  Uh-huh.
11 Q.  -- P-A-C?
12 A.  Uh-huh.
13 Q.  And how did you meet him?
14 A.  Through an ad in the newspaper.
15 Q.  What year was this?  Do you recall?
16 A.  I believe it was 1991.
17 Q.  Okay.  And how long did you stay with Impac?
18 A.  Seven years.  My recollection, seven years.
19 Q.  And was this when you found your -- founded
20     your own business or --
21 A.  Yes, ma'am.
22 Q.  Okay.  So now we're up to -- what's the name
23     of your consulting company?

Page 19

1  A.  That was just Miller Associates, Roger Miller
2      & Associates.
3  Q.  Easy to remember.
4  A.  Yes, ma'am.
5  Q.  And you did that for how long?
6  A.  I believe approximately five years.
7  Q.  Five years.  Why did you close your business?
8  A.  I had -- you know, I did leave a company out.
9      I had a good offer from Concord Hospitalies
10     of Cleveland, Ohio.  C-O-N-C-O-R-D.  And
11     Concord was in the middle of my consulting
12     years.  It was like a year and a half to two
13     years into it.  They were a client of mine.
14 Q.  Okay.
15 A.  And I worked for them right at about a year.
16 Q.  Have you -- and you heard these questions
17     yesterday, so I'm assuming you won't be
18     shocked.  Have you ever been arrested?
19 A.  No.
20 Q.  Okay.  No convictions, right?
21 A.  No, ma'am.
22 Q.  Have you ever been treated for substance
23     abuse?

Page 20

1  A.  No, ma'am.
2  Q.  And you're married; is that --
3  A.  Yes, ma'am.
4  Q.  And what is her name?
5  A.  Sandra Jean Miller.
6  Q.  And how long have you been married?
7  A.  35 years.
8  Q.  Okay.  Do you have children?
9  A.  Yes, ma'am.
10 Q.  How many?
11 A.  Three.
12 Q.  I understand you have grandchildren, too,
13     right?
14 A.  Yes, ma'am.
15 Q.  And how many of those?
16 A.  Five.
17 Q.  Okay.  Do they live near you?
18 A.  All but one.
19 Q.  Now, if you can, tell me what is your
20     understanding of the relationship between
21     Montgomery Ventures and Hospitality
22     Ventures.
23         MR. FELLNER:  Object to the form of the

Page 21

1          question.
2  A.  Montgomery Ventures is the official name and
3      ownership of that hotel.  Beyond that, I
4      don't know the direct relationship between
5      the other two, the other question.
6  Q.  In your position as vice president of sales
7      and marketing, are there anything -- any
8      duties that you have that specifically relate
9      to Montgomery Hospitality, Montgomery
10     Ventures?
11 A.  Yes, ma'am.
12 Q.  And what is that?
13 A.  Provide sales and marketing resources,
14     support and tools to the general manager and
15     sales department, in addition to monitoring
16     and providing input to their productivity.
17 Q.  Can you pull up the financial information for
18     the Fairfield Inn online at your office?
19 A.  Specify online.
20 Q.  Well, on your computer.  Does your computer
21     have access to the financial information for
22     Fairfield Inn?
23 A.  Yes.

Page 22

1  Q. Okay.  Who are the officers of Montgomery
2     Ventures?
3  A. I don't know.
4  Q. You don't know.  Okay.  Do you know who pays
5     the workers' comp insurance or health
6     insurance for Montgomery Ventures?
7  A. No, ma'am, I do not.
8  Q. Do you know if Hospitality Ventures handles
9     the health insurance for the properties that
10    it supervises?
11       MR. FELLNER:  Object to the form of the
12          question.
13 A. No, ma'am, I do not.
14 Q. Okay.  So why would Amrita be telling Heather
15    Watts when her health insurance was expiring?
16       MR. FELLNER:  Object to the form of the
17          question.
18 A. I do not know.
19 Q. Have you ever had reason to talk to anyone at
20    Hospitality Ventures about your health
21    insurance?
22       MR. FELLNER:  Object to the form of the
23          question.

Page 23

1  A. My personal health insurance?
2  Q. Yes.
3  A. It's been so long, I can't recall.
4  Q. Okay.  You've never had an illness that you
5     needed to address something with the company?
6  A. No.
7  Q. Do you know any -- do you know if the
8     companies, Montgomery Ventures and
9     Hospitality Ventures, have different tax ID
10    numbers?
11       MR. FELLNER:  Object to the form of the
12          question.
13 A. I don't know that.
14 Q. Do you know who pays the workers' comp
15    insurance for Montgomery Ventures?
16 A. No, ma'am.
17 Q. Okay.  Do you have any knowledge of the
18    financial arrangements between the two
19    entities?
20 A. No, ma'am.
21 Q. Okay.  What service does Hospitality Ventures
22    perform for Fairfield Inn?
23       MR. FELLNER:  Object to the form of the

Page 24

1        question.
2  A. Repeat the question, please.
3  Q. What services does Hospitality Ventures
4     perform for Fairfield Inn?
5        MR. FELLNER:  Same objection.
6  A. Hospitality management, consulting.
7  Q. Well, can you break that down a little bit
8     and tell us what kind of --
9  A. Providing -- providing resources, support and
10    tools in all facets of the hospitality
11    business.
12 Q. All right.  I got that.  Tell me what kind of
13    resources and tools we're talking about here.
14 A. Management, sales and marketing, guest
15    satisfaction, operations.
16 Q. Tell me about operations.  What does the
17    operations consist of?
18 A. I don't know.
19 Q. You're vice president of the company and you
20    don't know what operations is?
21 A. I'm vice president of sales and marketing.
22 Q. Right.
23 A. And that is what I know.

Page 25

1  Q. Do you ever meet with Mr. Cole and the other
2     vice presidents?
3  A. Yes.  Yes.
4  Q. Okay.  And do you discuss the business that
5     you're in?
6  A. Yes.
7  Q. And from these meetings, have you learned
8     anything about the operations of the company
9     beyond sales and marketing?
10 A. No.
11 Q. All right.  How are the e-mails distributed
12    in your company?
13       MR. FELLNER:  Object to the form of the
14          question.
15 A. The only thing that I'm aware of is that we
16    have a server that Nuvox manages for us; and
17    our e-mails go through that server,
18    distributed through there.
19 Q. Okay.  And does everyone at -- so when you
20    were -- when you were sending messages to
21    Tammy Dominguez, did she have a Hospitality
22    Ventures e-mail account?
23 A. Yes, ma'am.

Page 26

1    MR. FELLNER:  Object to the form of the
2        question.  I'm sorry.  I didn't
3        get it in in time.  Go ahead.
4  Q.  And Todd Epplin, did he have a Hospitality
5      Ventures e-mail account?
6    MR. FELLNER:  Object to the form of the
7        question.
8  A.  Yes, ma'am.
9  Q.  To your knowledge, was there any such thing
10     as a Montgomery Ventures e-mail account?
11 A.  I'm not sure.
12 Q.  I'm just -- to your knowledge, did you ever
13     see one or hear of one, use one?
14 A.  No.
15 Q.  Okay.  What other companies does Hospitality
16     Ventures own?
17    MR. FELLNER:  Object to the form of the
18        question.
19 A.  I'm not aware of any other companies.
20 Q.  And what companies do they manage?
21 A.  Each individual hotel is set up as an LLC.
22 Q.  And what -- do you know the purpose for that?
23 A.  No, ma'am.

Page 27

1  Q.  Did you ever ask?
2  A.  No, ma'am.
3  Q.  Is that typical in the business?
4  A.  Yes, ma'am.
5  Q.  Do you know whether that's a tax advantage or
6      not?
7  A.  No, ma'am.
8  Q.  When you ran your own business, did you
9      advise properties to set up their businesses
10     that way?
11 A.  No, ma'am.
12 Q.  You have no idea why each one of these hotels
13     would be set up as an LLC?
14 A.  No, ma'am.
15 Q.  How does Fairfield Inn pay holiday --
16     Hospitality Ventures?
17    MR. FELLNER:  Object to the form of the
18        question.
19 A.  I'm sorry.  I missed -- I need it repeated,
20     please.
21 Q.  How does Fairfield Inn pay Hospitality
22     Ventures for its services?
23    MR. FELLNER:  Object to the form of the

Page 28

1        question.
2  A.  Management fees.
3  Q.  They pay management fees.  Okay.  Does the
4      revenue from the Fairfield Inn in Montgomery
5      come into Hospitality Ventures directly?
6    MR. FELLNER:  Object to the form of the
7        question.
8  A.  I don't know that.
9  Q.  Okay.  Now, who does the manager of the
10     property in Montgomery report to?
11 A.  Vice president of operations.
12 Q.  Okay.  So, for example, when Tammy Dominguez
13     was the general manager at the Fairfield Inn,
14     did she have to report to you in any
15     capacity?
16 A.  No, ma'am.
17 Q.  If there was a problem at the Fairfield Inn
18     here, would you be notified by someone about
19     it?
20 A.  If it is in sales and marketing.
21 Q.  Okay.  I believe yesterday you heard
22     Ms. Watts testify that she went to Atlanta to
23     interview with you before she was hired; is

Page 29

1      that correct?
2  A.  Yes, ma'am.
3  Q.  And you did hire her.  And did you also set
4      her salary?  Did you agree upon a salary?
5  A.  Did both of us agree on a salary?
6  Q.  Right.  And did you -- were you able to grant
7      her salary request?
8  A.  The general manager, Todd Epplin, and myself
9      figured out the salary along with the -- a
10     gentleman that's not with us any longer, Rob
11     Flanders.  The three of us determined --
12 Q.  What was Mr. Flanders' position?
13 A.  He was -- oh, gosh.  Best -- to my
14     recollection, he was vice -- vice
15     president -- he was a controller.  He was a
16     vice president of the company.  I don't know
17     his exact title.  It's been three or four
18     years.
19 Q.  But you say he was a vice president?
20 A.  Yes, ma'am.
21 Q.  And is there a controller there now?
22 A.  That's Ms. Kisch, Karen Kisch.
23 Q.  Okay.  Is she a vice president or not?

Page 30

1  A.  I don't believe so.
2  Q.  You said she was accounting, so --
3  A.  I don't know her exact title.  She could be.
4     I just don't know her exact title.
5  Q.  Why did Mr. Flanders leave?  Do you know?
6  A.  Other opportunities came about for him, more
7     lucrative financially.
8  Q.  He was not terminated, was he?
9  A.  No, ma'am.
10 Q.  How did Todd Epplin -- what kind of input did
11    Todd Epplin have in hiring Ms. Watts?
12 A.  He was the one that approved her hiring.
13 Q.  Well, she said she had never -- she had never
14    interviewed with him.
15 A.  He contacted myself and said he was sending
16    up someone that he liked and that if we liked
17    her, you know, he would like to go ahead and
18    hire her.
19 Q.  Did you ask him why he liked her, what
20    attributes she had to --
21 A.  I'm sure I did.
22 Q.  Do you have any notes regarding that?
23 A.  No, I do not.

Page 31

1  Q.  Did you bring any documents with you today?
2  A.  No.
3  Q.  Okay.  Now, describe the -- the sales and
4     marketing efforts at the Fairfield Inn before
5     Ms. Watts took over.
6  A.  To my best recollection, they were mostly
7     done by the -- if they were done at all, they
8     were done by the general manager and some of
9     the front office people, front desk people.
10 Q.  No.  I mean what condition financially was
11    the hotel in?  Was is prosperous?  Was it
12    struggling --
13 A.  I don't know.
14 Q.  -- as far as the sales?
15 A.  Sales?
16 Q.  You were getting daily reports, were you not,
17    extremely detailed reports about the
18    profitability of this property?
19 A.  The overall --
20       MR. FELLNER:  Object to the form of the
21          question.
22 A.  The overall hotel had access to the P&L,
23    which is the entire hotel.  Individual sales,

Page 32

1     at that time, we were just getting Sales Pro
2     up; and I didn't have access as we did with
3     Sales Pro and going forward.
4  Q.  How many hotels were you handling at this
5     time for sales and marketing?
6  A.  Between five and seven.
7  Q.  So could you rate the Fairfield Inn in
8     Montgomery among those five or seven as far
9     as their success in getting business?
10 A.  No, ma'am.
11 Q.  Isn't this something that your officers would
12    pay attention to?
13 A.  We were just putting Sales Pro in all of our
14    hotels and putting a focus on those efforts
15    and results.
16 Q.  Well, I understand Sales Pro came along late,
17    but didn't you have any marketing tool at all
18    to gauge your success?
19 A.  Upon my entry into the company the second
20    time, we were just getting Sales Pro up.  And
21    until that time period, I did not gauge any
22    successes or failures at all.
23 Q.  And how did you motivate your people?

Page 33

1  A.  Providing resources and support tools.
2  Q.  Describe in detail how you would do that.
3  A.  Assist in their implementation of a marketing
4     plan and measure their activities.
5  Q.  Okay.  You were measuring their activities.
6     You had to have some tool to measure their
7     activities, did you not?
8  A.  As described.
9  Q.  Pardon?
10 A.  As described there.
11 Q.  Before you had Sales Pro, tell me about your
12    tools.
13 A.  Sales Pro came along right as I was coming
14    into the company, so we used Sales Pro within
15    a very short period of time.
16 Q.  That was 2003 --
17 A.  Yes.
18 Q.  -- you came in?
19 A.  Yes.  Mr. Flanders had actually begun prior
20    to my getting there of putting Sales Pro in.
21 Q.  Okay.  So Heather Watts did not start working
22    until June of 2004 for Fairfield Inn,
23    correct?

1 A.  Yes, ma'am.
2 Q.  So you would have had a year to assess the
3    success or failure at the Fairfield Inn.
4       MR. FELLNER:  Object to the form of the
5          question.
6 A.  I'm not aware of anybody that used the Sales
7    Pro system prior to Heather Watts.
8 Q.  Did you -- did the Fairfield Inn have
9    targeted sales figures?  Did they have a
10    plan, a certain amount of units or rooms to
11    be marketed during a period, during a
12    quarter?
13 A.  Of the sales staff?
14 Q.  Right.
15 A.  I don't remember.
16 Q.  You don't remember whether there was a
17    marketing plan for the hotel?
18 A.  It was four years ago.  No, ma'am.
19 Q.  Was there a marketing plan for any of your
20    other hotels?
21 A.  Yes, ma'am.
22 Q.  But you don't know whether there was one for
23    the Fairfield Inn or not?

1 A.  No, ma'am.
2 Q.  Who was in charge of the hotel at that time?
3 A.  General manager.
4 Q.  Who was that person?
5 A.  I believe Todd Epplin.
6 Q.  Okay.  Did Mr. Epplin ever talk to you about
7    the sales and marketing at the hotel?
8 A.  Some.
9 Q.  Did you have records of those meetings?
10 A.  I don't recall.
11 Q.  Okay.  Well, do you know whether you do or
12    not?
13 A.  I don't recall.
14 Q.  Okay.  So you're saying that you don't know
15    anything about what financial shape this
16    hotel was as far as revenue at the time
17    Ms. Watts took over?
18 A.  Yes.
19 Q.  Yes, you do know or, yes, you don't know?
20 A.  I do not remember.
21 Q.  Okay.  Now, did you have regular contact with
22    Tammy Dominguez?
23 A.  Yes.

1 Q.  And what was the subject of that contact and
2    communication?
3 A.  Normal conversations regarding sales and
4    marketing resources, tools, support and
5    production.
6 Q.  Well, can you be more specific?
7 A.  No.
8 Q.  No.  Did you talk to Ms. Dominguez about
9    terminating Heather Watts?
10 A.  Clarification of pre or post termination?
11 Q.  Well, we'll deal with pre first.
12 A.  No.
13 Q.  Did she express to you a reason for wanting
14    to terminate Heather Watts?
15 A.  We're still with pre?
16 Q.  Pre.
17 A.  No.
18 Q.  Since you had hired Ms. Watts, were you not
19    also involved in her termination?
20 A.  No.  Todd Epplin hired Ms. Watts.  I approved
21    of it, and that was where that was.
22 Q.  Well, you were managing the hotel, were you
23    not?

1 A.  No, ma'am.  No, ma'am.
2 Q.  Weren't you setting goals for the hotel,
3    documenting their sales?
4 A.  Strictly sales and marketing departments
5    only.
6 Q.  All right.  And was your approval required to
7    hire Ms. Watts?
8 A.  No.
9 Q.  Then, why would Todd Epplin even bother to
10    call you about it?
11 A.  Most managers look at me as being the last
12    person to interview and bless a hiring or
13    give input to why they should not.  He was
14    seeking my consultations.
15 Q.  And Ms. Watts -- after she was hired, did you
16    establish regular telephone and e-mail
17    contact with her?
18 A.  Yes, ma'am.
19 Q.  Okay.  And how often did you talk to
20    Ms. Watts?
21 A.  I don't remember.
22 Q.  You don't remember.  Well --
23       MS. DUNCAN:  You will recognize this,

Page 38

1    Mr. Fellner, as your e-mail from
2    eleven o'clock last night.
3        MR. FELLNER:  Okay.
4  Q.  If you'll turn to the second and third pages
5    of this e-mail, and fourth.  Have you
6    reviewed any of these e-mails that you sent?
7        MR. FELLNER:  Just for clarification,
8        this is not -- these are not
9        e-mails.
10       MS. DUNCAN:  This is Watts and Miller
11       e-mails.  It's a list --
12       MR. FELLNER:  Yeah.  It's a list of
13       e-mails.
14       MS. DUNCAN:  Right.
15       MR. FELLNER:  These are not e-mails,
16       though.
17       MS. DUNCAN:  Right.  And I'm asking him
18       if he reviewed these e-mails
19       before you came to this
20       deposition.
21       MR. FELLNER:  This is just a chart with
22       just Bates numbers on it.
23       MS. DUNCAN:  Right.

Page 39

1  A.  I've never seen this, what you've handed me,
2    in my life.
3  Q.  I understand that.  This is what your
4    attorney represents is a list of the
5    numbers -- numbered e-mails that you sent --
6    you and Ms. Watts sent to each other.  Would
7    you say that the number of these -- of these
8    numbers -- excuse me -- the size of these
9    numbers is approximate to what you have
10   corresponded with Ms. Watts?
11 A.  I have no reason to doubt what you've handed
12   me.
13 Q.  Have you been able to review any of the
14   e-mail traffic that you had with Ms. Watts
15   prior to this deposition?
16 A.  Yesterday, as you were handing them over, I
17   read through quite a few of them.
18 Q.  You have not reviewed them previously or been
19   supplied with them by anybody in the
20   corporation?
21 A.  Several of them I have.
22 Q.  Okay.  And would you say that your traffic --
23   e-mail traffic with Ms. Watts was fairly

Page 40

1    substantial?
2  A.  No.
3  Q.  You don't think three pages of e-mail
4    numbers -- I can --
5  A.  It is substantial, but I'm not sure it's any
6    more or any less than other hotels that I
7    deal with over a period -- a month or two
8    period of time.
9  Q.  Did you come to Montgomery to meet with
10   Ms. Watts and discuss any matters that she
11   was working on?
12 A.  What time period?
13 Q.  Well, during the time she worked there from
14   June --
15 A.  Yes, ma'am.
16 Q.  -- 2004.
17 A.  Yes, ma'am.
18 Q.  How often did you come to Montgomery?
19 A.  I tried coming every quarterly, every three
20   to four months.
21 Q.  Did she have a conversation with you when she
22   became pregnant as to her desire to take
23   maternity leave?

Page 41

1  A.  Yes.
2  Q.  And what did she tell you during that time?
3  A.  That she wanted to take between eight and
4    12 weeks off and would try to get back as
5    soon as possible.
6  Q.  And do you remember when that conversation
7    took place?
8  A.  No, ma'am.
9  Q.  Would it have been as early as January or
10   February?
11 A.  It was right when she knew she was pregnant
12   right after she knew she was pregnant,
13   whatever the date.
14 Q.  Okay.  If she had the baby on August 12th,
15   would that have been January or February?
16 A.  Could have been.
17 Q.  Would you think that it would have been
18   anytime before then?
19 A.  I don't recall.
20 Q.  Okay.  And so when she expressed the desire
21   to take eight to 12 weeks of maternity leave,
22   what was your response?
23 A.  I don't recall.  I think it's in an e-mail.

Page 42

1    It's already been entered yesterday.
2 Q.  Would you like to look at those documents and
3    see if you can identify that?
4        (Witness reviews documents)
5 A.  I don't see it.
6 Q.  But it's your recollection that there is such
7    an e-mail existing?
8        MR. FELLNER:  Object to the form.
9 A.  To my best recollection.
10 Q.  Do you think your attorney would be able to
11    produce that e-mail?
12        MR. FELLNER:  Is that directed to me or
13        to him?
14        MS. DUNCAN:  Well, either one of you.
15        MR. FELLNER:  If you're asking me if
16        there's an e-mail of that kind in
17        existence, either we already have
18        or, if we have not, I will produce
19        it to you.
20        MS. DUNCAN:  Well --
21 Q.  So it is your recollection that there is an
22    e-mail confirming Heather Watts' maternity
23    leave; is that correct?

Page 43

1        MR. FELLNER:  Object to the form of the
2        question.  That's not what he
3        testified.
4        MS. DUNCAN:  I believe it is.
5        MR. FELLNER:  I believe it is not.
6 Q.  Mr. Miller, what is your -- what --
7 A.  To my best recollection, there is
8    documentation of Heather saying she was going
9    out on pregnancy leave.
10 Q.  Saying she was.  Is there any
11    documentation -- what I asked was, is there
12    any documentation of Hospitality Ventures,
13    Montgomery Ventures, Fairfield Inn, or any
14    other entity approving that maternity leave?
15        MR. FELLNER:  Object to the form of the
16        question.
17 A.  I can't recall.
18 Q.  Okay.  What was your agreement with Ms. Watts
19    about the time that she was going to be
20    taking off?
21        MR. FELLNER:  Object to the form of the
22        question.
23 A.  My understanding with Ms. Watts was that she

Page 44

1    wanted to take eight to 12 weeks off, come
2    back as quick as she could and do her job.
3 Q.  And what, if any, arrangements did you make
4    during that period of time?
5 A.  We hired temporary contract labor to fill in.
6 Q.  Was that Tandi Mitchell?
7 A.  Yes, ma'am.
8 Q.  Okay.  Now, was that -- that temporary
9    contract labor, was that something Ms. Watts
10    suggested or was that something you
11    suggested?
12 A.  That was something I believe Heather
13    suggested.
14 Q.  Okay.  Were you concerned about the traffic
15    at the Fairfield Inn while Ms. Watts was
16    going to be on vacation?  Did you express any
17    concern to Ms. Watts about that?
18        MR. FELLNER:  Object to the form of the
19        question.
20 A.  Traffic meaning cars?
21 Q.  Sales, marketing, business.
22 A.  The handling of existing business was a
23    concern of mine.

Page 45

1 Q.  Okay.  So did you suggest to her that someone
2    needed to be handling her job temporarily?
3 A.  Possibly.
4 Q.  Have you hired temporary help in other
5    situations where the sales and marketing
6    manager was going to be off for a certain
7    number of weeks?
8 A.  Yes.
9 Q.  Okay.  Do you recall the other properties
10    where you did that, where you hired a
11    temporary person?
12 A.  We did it in Mount Arlington, New Jersey.
13 Q.  Okay.  Where else?
14 A.  Houston, Texas.
15 Q.  And where else?
16 A.  To my recollection, that's it.
17 Q.  Now, do you recall the incidents in Mount
18    Arlington, New Jersey, or Houston, Texas?
19    Were those maternity leaves or illnesses, or
20    can you recall a reason?
21 A.  No.  Arlington --
22        MR. FELLNER:  Hold on one second before
23        you answer.  Just one second.

Page 46

1      Priscilla, just -- I want it to be
2      clear on the record. I'm going to
3      let him answer about other
4      properties right now, but I'm
5      objecting to any responses about
6      any other properties because you
7      haven't shown that any other
8      properties are at issue here.
9   MS. DUNCAN: We're talking about
10      pattern and practice.
11   MR. FELLNER: There's no pattern and
12      practice allegation here.
13   MS. DUNCAN: Well --
14   MR. FELLNER: All there is, is a simple
15      claim of disparate treatment.
16      That's it. There's no pattern and
17      practice claim.
18          Now, I told you I'm going to
19      let you go ahead and ask these
20      questions, but I'm not waiving any
21      rights with respect to discovery
22      about other properties. If this
23      witness has information that he

Page 47

1      knows about any other properties,
2      depending upon what the question
3      is -- and this last question you
4      asked I'll let him answer. But I
5      want you to be aware that you guys
6      are pretty close to the line.
7   Q. Would you please just respond to the
8      question, please?
9   A. Mount Arlington?
10   Q. Right.
11   A. Sheer vacancy based on someone quitting.
12   Q. So you hired a temporary person there?
13   A. To fill in until we could hire a full-time
14      person.
15   Q. Okay.
16   A. In Houston, it was in order to bolster
17      part-time sales staff to get better results.
18   Q. Okay. Had you ever encountered an FMLA claim
19      before?
20   A. No, ma'am.
21   Q. Did you have any conversations with Ms. Watts
22      about family medical leave?
23   A. No, ma'am.

Page 48

1   Q. Okay. Was it your understanding that during
2      her time off, her 12 weeks, that she was
3      going to be paid or not?
4   A. Not.
5   Q. Not.
6   A. With exception of when she came back and did
7      the one day work.
8   Q. Okay. Was that something you asked her to
9      do?
10   A. That was something we both mutually agreed
11      to.
12   Q. Was this the seven days -- the seven hours a
13      week?
14   A. Yes, ma'am.
15   Q. Okay. And you asked her to do this marketing
16      plan; is that correct?
17   A. That again was something that Heather
18      showed -- wanted to do, and it was a mutual
19      understanding that we needed it done. She
20      wanted -- she told me she wanted to keep her
21      hands in it and had no problems completing
22      it.
23   Q. Was she paid any additional amount to do that

Page 49

1      plan?
2   A. At my recollection, it was supposed to be
3      part of that seven hours; but I couldn't tell
4      you beyond that.
5   Q. You don't -- did you approve overtime for
6      that period?
7       MR. FELLNER: Object to the form of the
8          question.
9   A. No. No, ma'am.
10   Q. Okay. What daily, weekly and quarterly
11      reports does the manager of Fairfield Inn
12      complete for Hospitality Ventures?
13       MR. FELLNER: Object to the form of the
14          question.
15   A. I'm not -- I don't know.
16   Q. Okay. What kind of reports did you get from
17      Ms. Watts?
18   A. Expense reports, bonus reports.
19   Q. Now, these are based on her sales?
20   A. Results of sales.
21   Q. Okay. Now, expense reports are what?
22   A. For any expenses she incurred, mileage.
23   Q. Is it personal expenses?

Page 50

1 A. Business-related --
2 Q. Right.
3 A. -- expenses.
4 Q. And these were the only reports you received
5    from her?
6 A. Yes, ma'am.
7 Q. Did you receive sales and marketing reports
8    from anyone else at Fairfield Inn?
9 A. No, ma'am, not that I recall.
10 Q. After the initial conversation with Ms. Watts
11    about her pregnancy and her leave, how many
12    times did you talk to her additionally about
13    her pregnancy?
14 A. I don't recall. I know -- while she was
15    pregnant or after she was pregnant?
16 Q. Well, first, while she was pregnant and then
17    afterwards.
18 A. While she was pregnant, I don't remember any
19    conversations that we had. Doesn't mean that
20    they weren't had; I just don't remember.
21 Q. Do you recall sending her any e-mails about
22    her pregnancy?
23 A. Yes.

Page 51

1 Q. Okay. And what were the circumstances of
2    those e-mails?
3 A. I believe one that was entered yesterday
4    congratulated her; and it showed concern
5    about her work and doing well, but working
6    while she's pregnant.
7 Q. Do you recall one where you said everything
8    will work out regarding her child care
9    issues?
10 A. Yes.
11 Q. Did you attempt to assist her in any way in
12    resolving that issue?
13 A. No.
14 Q. What was your basis for saying that?
15 A. We were going to do everything in our --
16    possible -- our opportunities to make it
17    work. That was my basis of that, was I
18    wanted it to work out.
19 Q. Who was we?
20 A. Todd and I -- or Tammy and I, I guess. I'm
21    sorry. Not Todd, but Tammy and I.
22 Q. Okay. And did you participate in the hiring
23    of Tammy Dominguez?

Page 52

1 A. No.
2 Q. You didn't interview her either?
3 A. No. She worked for another hotel.
4 Q. Well, how did she happen to come to Fairfield
5    Inn?
6 A. Promoted by our vice president of operations.
7 Q. Was this another hotel that Hospitality
8    Ventures was handling?
9      MR. FELLNER: Object to the form of the
10        question.
11 A. Yes.
12 Q. And where was that hotel?
13 A. Portland, Maine, Fairfield Inn.
14 Q. Where is Ms. Dominguez now? Do you know?
15 A. I personally do not know.
16 Q. Do you know if she's still working for
17    Hospitality Ventures' properties?
18      MR. FELLNER: Object to the form of the
19        question.
20 A. She's not working for our company at all.
21 Q. Is she working for any of your clients or any
22    of the properties that are managed by
23    Hospitality Ventures?

Page 53

1 A. No.
2 Q. You have no idea where she is? Is that what
3    you're saying?
4 A. No, I don't.
5 Q. Was she terminated?
6 A. Yes.
7 Q. And why was that?
8 A. I don't know.
9 Q. Did it have anything to do with
10    profitability?
11 A. I don't know.
12 Q. Okay. Were you aware that she was demoted --
13 A. No.
14 Q. -- at one time?
15 A. No, I wasn't.
16 Q. Do you know Jennifer Middleton? Did you meet
17    her?
18 A. Yes, ma'am.
19 Q. And did you participate in hiring Jennifer
20    Middleton?
21 A. Yes, ma'am.
22 Q. Okay. And what -- did she succeed Tandi
23    Mitchell as your salesperson at the Fairfield

Page 54

1  Inn?
2      MR. FELLNER:  Object to the form of the
3        question.
4  A.  To my best recollection, she did.
5  Q.  Okay.  How long did she stay in that
6    position?
7  A.  My best recollection, three, four months.
8  Q.  And what was the reason that she was -- she
9    is no longer there?
10  A.  I don't remember the circumstances.  I know
11    she no longer could drive a car.
12  Q.  Why is that?
13  A.  My understanding from the hotel was that she
14    had gotten too many tickets or whatever and
15    was not able to.
16  Q.  Do you know the reason for those tickets?
17  A.  No, ma'am, I don't.
18  Q.  After Jennifer Middleton -- was she
19    terminated?
20  A.  I don't remember if she was terminated or
21    just didn't show up one day.
22  Q.  Who took over sales and marketing at the
23    hotel after Jennifer Middleton?

Page 55

1  A.  I believe that's when we started having the
2    general manager oversee sales.
3  Q.  And where are we now as far as the --
4    Jennifer was hired in January.  You said
5    she -- you think she was gone March or April?
6  A.  That would be --
7  Q.  Three or four months?
8  A.  That would be around that time.
9  Q.  Okay.  So then would you say -- what time
10    would you say the general manager took over
11    sales?
12  A.  The week -- the day after she left.
13  Q.  Okay.  And who was that person?
14  A.  I believe -- I believe it was Greg LeMey.
15  Q.  Is he still working for --
16  A.  No, ma'am.
17  Q.  -- the hotel?
18  A.  No, ma'am.
19  Q.  Was he terminated, too?
20  A.  I don't -- that wasn't my area, so I don't --
21    I don't know.
22  Q.  Okay.  Well, your area is sales and
23    marketing, right?  Was he supposed to be

Page 56

1  doing that?
2  A.  That's part of his five jobs, six jobs.
3    That's part of his job.
4  Q.  So did you attempt to recruit a full-time
5    salesperson after Greg LeMey?
6  A.  I don't believe so.
7  Q.  Okay.  Now, who is handling the sales at the
8    hotel today?
9  A.  General manager Margie Vito.
10  Q.  And how do those sales at the Fairfield Inn
11    compare to when Heather Watts was doing that
12    job?
13  A.  At or higher.
14  Q.  And what do you base that on?
15  A.  I believe the P&L statements of the hotel.
16  Q.  Who prepares the P&L statements?
17  A.  Karen Kisch.
18  Q.  And she does that based on information
19    received from who?
20  A.  Margie Vito.
21  Q.  And how long has been Ms. Vito been in that
22    job?
23  A.  I believe close to a year.

Page 57

1  Q.  Do you have access to those P&L statements?
2  A.  Yeah.  Yes.
3  Q.  Okay.
4      MS. DUNCAN:  I will be requesting
5        those.
6      MR. FELLNER:  I think you have.
7      MS. DUNCAN:  Are they included in your
8        discovery?
9      MR. FELLNER:  Yeah.
10      MS. DUNCAN:  Where are they included in
11        your discovery?
12      MR. FELLNER:  Actually, I sent it by
13        e-mail to you Monday.
14      MS. DUNCAN:  They weren't identified.
15        That's why I --
16      MR. FELLNER:  There was a separate
17        e-mail that I sent to you on
18        Monday.
19      MS. DUNCAN:  I mean, they weren't
20        identified as being in response to
21        anything in particular, so I
22        don't --
23  Q.  What is the financial status of this hotel

Page 58

1    property right now?  Do you know?
2  A.  No, ma'am.
3  Q.  Do you know if it's up for sale?
4  A.  No, ma'am.
5  Q.  Would you be -- would you be notified if it
6      was going to be sold?
7  A.  No, ma'am.
8  Q.  Now, you were talking about conversations and
9      e-mails you had with Tammy Dominguez after
10     Ms. Watts was terminated.  Can you tell me a
11     little bit about that?
12 A.  Well, Tammy had went through the process that
13     she did, and we talked about necessities of
14     the position.
15 Q.  Can you be a little bit more detailed about
16     that?  What was the necessity of the
17     position?
18 A.  The only detail I remember is that it was --
19     that she and I talked about that we had to
20     have 35 hours to produce the job.
21 Q.  Had to have 35 hours.  Did she favor 40
22     hours?
23 A.  She never mentioned the 40 to me.

Page 59

1  Q.  Did she mention being in the office a certain
2      number -- in the hotel itself, staying in
3      hotel --
4  A.  Not to me.
5  Q.  -- a certain number of hours?
6  A.  Not to me.
7  Q.  Would you have recalled that if she did?
8  A.  More than likely.
9  Q.  If you were exchanging e-mails to Tammy
10     regarding Ms. Watts' termination, what else
11     besides 35 hours did you inquire about?
12 A.  That's the only topic that's clear to me
13     today that comes out of that conversation.
14     That is it.
15 Q.  Were you disturbed because Ms. Watts was
16     terminated?
17 A.  Not under the explanations that Tammy gave
18     me.
19 Q.  Did you feel those explanations were
20     credible?
21 A.  Yes.
22 Q.  And what explanation was that?
23 A.  That Ms. Watts refused to work 35 hours to

Page 60

1    come back.
2  Q.  Did you ever question Ms. Watts about that?
3  A.  Ms. Watts and I had a telephone conversation
4      sometime around that where she called to
5      plead with me to consider working with her on
6      less hours.
7  Q.  Less than 35?
8  A.  Yes, ma'am.
9  Q.  Or less --
10 A.  Less than 35.
11 Q.  Do you have any notes or documentation
12     regarding that telephone conversation?
13 A.  I don't believe so.
14 Q.  Had she ever expressed to you previously that
15     she would not be working 35 hours after she
16     got off her FMLA leave?
17 A.  No.  Not with the exception of the one e-mail
18     that we saw yesterday that explained that she
19     might have trouble and we might have to work
20     with her when she first came back.  That was
21     in an e-mail yesterday.  That was really the
22     first time that I had a heads up that 35
23     might be in contention.

Page 61

1  Q.  Were you aware that her child had already
2      been approved for the full-time child care on
3      the day that she was supposed to come off of
4      her leave?
5  A.  No, ma'am.
6  Q.  Was it your understanding, then, that
7      Ms. Watts was supposed to return to full-time
8      duty on November 9th?
9  A.  I don't remember the date.
10 Q.  Did you ask Ms. Dominguez why she fired
11     Ms. Watts before her leave was up?
12 A.  No, ma'am.
13 Q.  Did you have any discussion regarding that
14     termination at all?
15 A.  Only that who -- if Heather was going to be
16     able to work with us, she would have to do
17     the 35 hours.
18 Q.  Did you say Heather never did or did not say
19     that she couldn't work 35 hours?
20 A.  Heather, on the telephone conversation with
21     me, indicated that because she was having
22     trouble with child care, she could not any
23     longer do the 35.  And she pleaded and in

Page 62

1    some cases cried that we needed to work with
2    her.
3 Q. And is there any -- and when was it this
4    conversation take place?
5 A. It was right around the time that her and
6    Tammy were having their discussions on --
7 Q. Was it before or after she was terminated?
8 A. This was before. My recollection is it was
9    before.
10 Q. You don't know specifically what date this
11   was?
12 A. No, ma'am.
13 Q. But you recall her pleading and crying?
14 A. Yes, ma'am.
15 Q. Did Ms. Watts send you any e-mail stating
16   that she could not work 35 hours a week?
17 A. Not that I recall.
18 Q. I mean, was e-mail not your usual form of
19   communication with Ms. Watts?
20 A. Telephone and e-mails.
21 Q. So how many times would you telephone
22   Ms. Watts in a week?
23 A. I don't recall.

Page 63

1 Q. Average.
2 A. I don't recall. I can't average it.
3 Q. Okay. Did Ms. Dominguez have any performance
4    problems with Ms. Watts?
5 A. Not that I'm aware of. Not that I'm aware
6    of.
7 Q. Did you feel 35 hours a week was absolutely
8    required for this job?
9 A. Yes, ma'am, at a minimum.
10 Q. Okay. But then when she's terminated, you
11   have -- you've moved to Tandi Mitchell. How
12   many hours was she being paid for?
13 A. I don't remember.
14 Q. Okay. And then Jennifer Middleton, how many
15   hours was she working?
16 A. My recollection is 40.
17 Q. Do you recall what her salary was?
18 A. No, ma'am, I don't.
19 Q. Okay. But Ms. Middleton didn't work out, did
20   she?
21 A. Hard to do sales without a car. So, no,
22   ma'am, the answer is no.
23 Q. Do you know if she had lost her license

Page 64

1    because of alcohol use?
2 A. I don't remember the reason.
3 Q. Do you know if your employees are tested in
4    any way before they're hired?
5 A. I don't know if they are or not.
6 Q. Okay. And now you say the general manager
7    does sales work as one of five different
8    duties? Is that correct?
9 A. The general manager is responsible for the
10   sales of the hotel.
11 Q. And it's your contention that the sales
12   figures at Fairfield Inn are at or better?
13 A. My belief is that. I'd have to compare P&Ls.
14 Q. Your belief. Okay. Ms. Dominguez, if you
15   called -- called and e-mailed Ms. Watts after
16   she terminated her to offer her two -- one or
17   two other positions at the front desk, were
18   you aware of that?
19 A. Yes, ma'am.
20 Q. And why is that? Why were you aware of that?
21 A. Ms. Dominguez told me.
22 Q. Okay. And did she impart to you why she was
23   doing that?

Page 65

1 A. Let me see. Not during that conversation,
2    she didn't, I don't believe. She said she
3    was offering her a front -- second shift
4    front desk position and a night auditor's
5    position.
6 Q. Well, when did she tell you why she did that?
7 A. One or two subsequent calls afterwards.
8 Q. Okay. So you had a good number of calls with
9    Ms. Dominguez about this issue; is that
10   right?
11 A. Well, per the sheet, I would say so.
12 Q. Okay. And what did Ms. Dominguez then say
13   about --
14 A. Ms. Dominguez said that Mr. -- she talked to
15   Mr. Disbrow and Mr. Disbrow felt that we
16   needed to offer her some options of coming
17   back in other positions.
18 Q. So Mr. Disbrow was -- he was the one who --
19   had you ever talked to Mr. Disbrow about
20   this?
21 A. Not then, no.
22 Q. Well, did you talk to him later about it?
23 A. I reconfirmed that he had that conversation

Page 66

1   with Tammy. And that was it.
2  Q. And why did he -- why did he say that he had
3      suggested that Tammy offer her additional
4      jobs?
5  A. I don't remember asking him that question.
6      Mr. Disbrow, being in HR, I just felt that
7      was his decision based on his knowledge of
8      the case.
9  Q. Did Tammy Dominguez ever say to you, as she
10     did to Ms. Watts, according to Ms. Watts,
11     that she didn't realize she was on FMLA?
12 A. Repeat that again. I'm sorry.
13 Q. Did Ms. Dominguez say to you, as Ms. Watts
14     said she said to her, that Ms. Dominguez did
15     not realize that Ms. Heather was -- Heather
16     Watts was on FMLA?
17 A. I don't remember her ever saying that to me.
18 Q. Do you recall anybody mentioning FMLA during
19     these discussions?
20 A. A couple weeks after Mr. Disbrow mentioned
21     it.
22 Q. And what did he say?
23 A. He just mentioned exactly about the FMLA. I

Page 67

1      don't remember the exact conversation.
2      Again, it was too many years ago, but I do
3      remember him bringing that up.
4  Q. Do you recall if he said you can't fire
5      somebody that's on FMLA?
6  A. I don't believe he said that to me.
7  Q. What was his context in talking about FMLA?
8  A. He referred to FMLA and indicated that his
9      interpretation was that we, I guess -- I
10     don't know if he used the word "owed," but
11     for the lack -- it's been a long time to
12     figure out the exact words, but we owed her
13     options to come back. I left it at that.
14 Q. And this was -- this conversation was when?
15     Mid November?
16 A. It was after.
17 Q. A couple of weeks after she was terminated,
18     you mean?
19 A. Yes, ma'am. My best recollection, it was.
20 Q. Okay. Did you ask him what that meant?
21 A. No.
22 Q. Do you have any other sales marketing people
23     under your control who are married and have

Page 68

1      children?
2  A. I supervise several.
3  Q. Supervise at properties or supervise where?
4  A. There are several director of sales and
5      marketing that represent our hotels at the
6      hotels that have children.
7  Q. Are they small children?
8  A. Yes.
9  Q. And what happens when there's a problem with
10     child care?
11 A. That's something that the general manager of
12     each property and the director of sales try
13     to work out.
14 Q. Did Todd Epplin ever express to you any
15     problem with Ms. Watts obtaining child care?
16 A. I can't remember. I cannot remember that.
17 Q. You can't remember that he did?
18 A. Can't remember that he did or did not.
19 Q. Okay. Do you think that would register in
20     your mind if he did?
21 A. That many years back, with as many things as
22     I manage, it's not abnormal.
23 Q. Well, it's only a couple of years.

Page 69

1  A. The volume that I have, that's a lot.
2  Q. Okay. You say you've got five or six
3      properties?
4  A. Currently, we have 12.
5  Q. How many did you have back then?
6  A. Between five and seven.
7  Q. Okay. Have you received any training on
8      human resource --
9      MS. DUNCAN: If you want to take
10        lunch --
11     MR. FELLNER: I was going to ask you
12        when is a good time for you.
13     MS. DUNCAN: About two minutes.
14     MR. FELLNER: Okay.
15 Q. Have you received any training from
16     Mr. Disbrow or anyone else about human
17     resource policies or law regarding
18     employment?
19 A. No.
20 Q. Okay. Do you know that it's illegal to
21     discriminate against pregnant women?
22 A. Yes.
23 Q. Do you know that it's illegal to terminate

Page 70

1    someone on FMLA leave?
2        MR. FELLNER:  Object to the form of the
3            question.
4  A. Yes.
5  Q. How do you know these things?
6  A. Post -- post Heather, Ron Disbrow had told
7     me.
8  Q. So the company hasn't had any overall program
9     since Ms. Watts to educate its executives
10    about that, right?
11 A. We've had no problems.  Up to that, we've had
12    no programs.
13 Q. Okay.  Just Mr. Disbrow -- what else did he
14    say about it, about the legal aspects of his
15    actions?
16 A. I don't remember.
17        MS. DUNCAN:  Okay.  Let's break.
18            (Lunch recess)
19 Q. Mr. Miller, I'm going to show you this
20    document.  And regrettably, I don't have a
21    copy of it; but it's Mr. Fellner's Exhibit A
22    and document 25 filed with the court.  And
23    it's your affidavit.

Page 71

1        Now, I want you to look down -- read the
2     whole document and see if you agree with all
3     of that first.
4            (Witness reviews document)
5  A. Yes, ma'am.
6  Q. Okay.  Now, is that -- is that an accurate
7     statement?
8  A. To my knowledge.
9        MR. FELLNER:  What statement?
10        MS. DUNCAN:  His affidavit.  I'm going
11            to focus --
12        MR. FELLNER:  Generally?
13        MS. DUNCAN:  Generally.
14 Q. To your knowledge.  Now, it says Montgomery
15    Ventures -- number three down here.
16    Montgomery Ventures, LLC, owns and operates
17    the hotel.  Hospitality Ventures, LLC, does
18    not own or operate the hotel.  Is that a
19    truthful statement?
20 A. Let me look at it again, ma'am.
21        To the best of my knowledge, it is a
22    truthful statement.
23 Q. Well, what is the extent of your knowledge?

Page 72

1  A. Exactly what is in the affidavit, that
2     Montgomery Ventures, LLC, owns and operates
3     the hotel.  Hospitality Ventures, LLC, does
4     not own or operate the hotel.
5  Q. And you know that for a fact?
6  A. Yes.  I'm not a lawyer.  I guess to my best
7     knowledge.
8  Q. Well, I mean, it's not to the best of your
9     knowledge.  You swore that that was the truth
10    in that document.  If you've signed an
11    affidavit, you've made a sworn statement that
12    that is the truth, have you not?
13 A. Yes.
14 Q. Okay.  And I believe you said earlier you
15    didn't know what Hospitality Ventures, LLC,
16    was; is that correct?
17 A. Couldn't remember.
18 Q. Couldn't remember.  Well, I'm going to try to
19    jog your memory here.  I'm going to show you
20    Plaintiff's Exhibits #9, #10, and #11.
21        MR. FELLNER:  So could you just tell me
22            in which order these are exhibits?
23        MS. DUNCAN:  They're kind of all

Page 73

1        together.
2        MR. FELLNER:  I know.  Which one is #9,
3            #10, and #11?
4        MS. DUNCAN:  #9 is the short one.
5            Excuse me.  #10 is the short one.
6            #9 is July 12th.
7        MR. FELLNER:  July 12th.
8        MS. DUNCAN:  In the upper right-hand
9            corner.
10        MR. FELLNER:  That one is which?  July
11            12th is which?
12        MS. DUNCAN:  July 12th is #9.
13        MR. FELLNER:  Okay.  And then the other
14            one is #11?
15        MS. DUNCAN:  Yeah.
16 Q. There you go.  Now, Mr. Miller, I'd like to
17    call your attention to the upper right-hand
18    corner of these three documents, two of them
19    dated January 9th, 2007 and one of them dated
20    July 12th, 2006.  Are you with me?
21 A. Yes, ma'am.
22 Q. Okay.  Do you see up in the upper right-hand
23    corner a box where it says, Managed by?  And

Page 74

1    what does that say?
2  A.  Managed by.  Let me try to find the box here.
3  Q.  Right.  Upper right-hand corner, right below
4    Fairfield Inn Marriott.
5  A.  Oh, I'm sorry.  My apologies.  Yes, ma'am, I
6    see it.
7  Q.  And what does it say?
8  A.  It says managed by Hospitality Ventures,
9    LLC.
10  Q.  And what does it say below that?
11  A.  Owned by Hospitality Ventures, LLC.
12  Q.  Okay.  With those three documents in your
13    hand, do you still say you don't know
14    anything Hospitality Ventures, LLC?
15  A.  I've seen Hospitality Ventures, LLC, on
16    paperwork.
17  Q.  Today?
18  A.  Yes, ma'am.
19  Q.  Have you seen it before that?
20  A.  Yes, ma'am.
21  Q.  Well, you said you didn't know anything about
22    it.
23  A.  I don't know anything about Hospitality

Page 75

1    Ventures.
2  Q.  Do these documents not say that the hotel is
3    owned by Hospitality Ventures, LLC?
4  A.  That is what they say.
5  Q.  Okay.  So your statement that the hotel is
6    owned by Montgomery Ventures, LLC, is
7    incorrect, is it not?
8  A.  No, ma'am.  My statement is based on
9    licensing agreements with the franchise of
10    which I am basing that comment on.
11  Q.  Well, is this not a franchise document --
12    franchise or document from the Marriott?
13      MR. FELLNER:  Object to the form of the
14        question.
15  Q.  If you'll look down at the bottom of the URL
16    it says QA.Marriott.com.
17  A.  Oh, yes, ma'am.
18  Q.  So do you think this would be a franchise or
19    document?
20  A.  It would appear to be.
21  Q.  Now, these documents, who prepares them?  I
22    take it you've seen these before.
23      MR. FELLNER:  Object to the form of the

Page 76

1    question.  Priscilla, just for
2    clarity, you kind of asked two
3    questions there.
4  Q.  Well, okay.  I'm saying, first of all, have
5    you seen these documents before?
6  A.  The ones I'm holding in my hands, no, ma'am.
7  Q.  Have you seen similar documents?
8  A.  No, ma'am, I have not.
9  Q.  Okay.  The primary contact on the earlier one
10    is listed as Tammy Pratt Dominguez.  Do you
11    know Ms. Dominguez?
12  A.  Yes, ma'am.
13  Q.  Do you know Randy Hickman?
14  A.  No.
15  Q.  Okay.  Do you know Margaret Vito, who is
16    listed as the primary contact on the second
17    document?
18  A.  Yes, ma'am.
19  Q.  Do you have any explanation for these --
20  A.  No, ma'am, I don't.
21  Q.  -- documents at all?
22  A.  No, ma'am.
23  Q.  If you could, let me see those back, please.

Page 77

1  A.  Oh, yes, ma'am.
2  Q.  So would you agree these documents are at
3    odds with your affidavit?
4      MR. FELLNER:  Object to the form of the
5        question.
6  A.  It would appear.
7  Q.  Okay.  I want to show you this document
8    that -- an e-mail from Tammy Dominguez to
9    Amrita.  And she says, It has become a sticky
10    mess with Heather and we need to be
11    cautious -- which is misspelled -- of our
12    statements to her, on November 8th, 2005.  Do
13    you have any knowledge of why she used that
14    language?
15  A.  No, ma'am, I do not.
16  Q.  Did you receive this document?
17  A.  To best recollection, I don't remember ever
18    receiving it.
19  Q.  Okay.  Did Tammy Dominguez ever express to
20    you that the situation with Heather Watts had
21    become sticky?
22  A.  Yes.
23  Q.  Okay.  And what did she say?

Page 78

1   A.  During one of our conversations, she said
2       Ms. Watts refused to work 35 hours and was
3       very argumentative when she was talking to
4       her about what she expected out of her coming
5       back.
6   Q.  When did she say this conversation took
7       place?
8   A.  It was in one of the conversations prior to
9       Heather being let go.
10  Q.  Do you know when that was?
11  A.  Sometimes prior, but I don't remember.
12  Q.  When did you become aware that Heather Watts
13      was going to be terminated?
14  A.  Tammy called after she had talked to Heather,
15      and it was after the fact.
16  Q.  After the fact?
17  A.  Yes, ma'am.
18  Q.  Was there any reason, then, why you were
19      trying to get this report from Heather before
20      the end of the month?
21  A.  Which report?  I'm sorry.
22  Q.  This is the annual sales marketing plan.
23  A.  Deadlines were due.  And like with every

Page 79

1       other hotel, I was calling in all the
2       reports, calling in all the marketing plans
3       to get done.
4   Q.  Okay.  And was it your practice to meet with
5       the person who had authored the marketing
6       plan before it was finalized?
7   A.  To discuss or meet, yes.  Yes.
8   Q.  But you did not meet with Ms. Watts, did you?
9   A.  No.
10  Q.  And why was that?
11  A.  To my best recollection, she was on, still,
12      maternity leave.  I felt -- and that was --
13      you know, she had done so much, that was not
14      appropriate, to my best recollection.  Again,
15      it's been three years.  I remember making the
16      trip, and I remember that she wasn't there.
17      And I remember who was there, but I don't --
18  Q.  Did you notify her that you were coming?
19  A.  I don't remember.
20  Q.  You didn't -- so wouldn't you have been the
21      person who would have notified her?
22  A.  The majority of the time.
23  Q.  Well, you had only done -- she had only done

Page 80

1       one plan before, right?
2   A.  Uh-huh.
3   Q.  And you're sure that Tammy Dominguez did not
4       inform you prior to November 2nd that she was
5       going to terminate Heather?
6   A.  I do not recall her ever doing that.
7   Q.  What would make you recall that?
8   A.  I don't know.
9   Q.  Isn't it -- well, let me ask you this.  Do
10      general managers normally contact you when
11      they're going to fire your sales director?
12  A.  Normally.
13  Q.  Normally?
14  A.  Yes.
15  Q.  And so Tammy Dominguez did not call you this
16      time before she fired Heather?
17  A.  To my best recollection, I do not ever
18      remember ever discussing that prior.
19  Q.  But you're not saying it didn't happen?
20  A.  Correct.
21  Q.  Now, you said you did -- did or did not
22      interview Jennifer Middleton before she was
23      hired?

Page 81

1   A.  I believe I did.
2   Q.  Okay.  And what -- did you know that Jennifer
3       Middleton was a single female with no
4       children?
5   A.  No.
6   Q.  Was that a concern of yours?
7   A.  Wasn't a thought.
8   Q.  Was it a concern of Tammy Dominguez?
9   A.  No.
10  Q.  This is Plaintiff's #13.  It is the personnel
11      action form for the hiring of Jennifer
12      Middleton.  And you notice she is single; is
13      that correct?
14  A.  Yes, ma'am.
15  Q.  And what is her annual salary?
16  A.  Annual salary states here 40,000.
17  Q.  Okay.  Now, did you set that salary or did
18      Ms. Dominguez set that salary?
19  A.  I don't remember.
20  Q.  Well, I think it was Ms. Watts' testimony
21      that when she was hired, you set the salary.
22  A.  It was a combination of people with
23      Ms. Watts.

Page 82

1   Q.  Ms. Watts had never even interviewed with
2       Todd Epplin and had never talked to him.
3           MR. FELLNER:  Object to the form of the
4               question.
5   Q.  So --
6   A.  The general manager is responsible for the
7       budget of his hotel.  He or she has the final
8       say of what the person is paid.
9   Q.  But, now, you have access to that budget as
10      far as personnel matters, do you not?
11  A.  I have access, yes, ma'am.
12  Q.  And you know how much they have to spend?
13  A.  Yes.
14  Q.  Why did you pay Jennifer Middleton so much
15      more?
16  A.  I don't know.
17  Q.  You don't know.  Okay.  Now, you said when
18      you hired Ms. Watts, that the salary was
19      negotiated with Mr. Epplin.
20  A.  Mr. Epplin had input with several other
21      people.
22  Q.  Well, who is Susan Flemming, Mr. Miller?
23  A.  Susan was a director of sales and marketing

Page 83

1       at the hotel at one time.
2   Q.  Did she precede Heather Watts?
3   A.  I believe she did.
4   Q.  Okay.  And what happened to Susan Flemming?
5   A.  Susan, to my best knowledge, left one
6       afternoon and never came back.
7   Q.  And you have no idea why?  Do you have an
8       idea why?
9   A.  Speculation.
10  Q.  Well, feel free to speculate.
11          MR. FELLNER:  Object to the form.
12              There's no reason for him to
13              speculate.  If he knows, he
14              knows.  If he doesn't know, he
15              doesn't know.
16  Q.  Do you have -- is there some event that would
17      cause you to think that you might know why?
18  A.  No.
19  Q.  Did she take a laptop and never bring it
20      back?
21  A.  My recollection is that she did.
22  Q.  Now, this document that was presented
23      yesterday as Defendant's Exhibit #8 is a

Page 84

1       quarterly incentive compensation plan --
2   A.  Yes, ma'am.
3   Q.  -- for hotel sales department.
4   A.  Yes, ma'am.
5   Q.  And what does the HVMI stand for up there?
6   A.  Hospitality Ventures Management, Inc.
7   Q.  And, in fact, it was faxed from Hospitality
8       Ventures, was it not?
9   A.  I believe so.
10  Q.  Can you read the fax line at the top?
11  A.  December 2nd, '04, 4:35 p.m. Hospitality
12      Ventures, (404)467-1962, page 1.
13  Q.  Okay.  Now, did this document come out of
14      your office?
15  A.  It appears, yes, ma'am.
16  Q.  And, so, were the terms of this offer drawn
17      up by you or someone who works for you?
18  A.  It is our standard program for all the
19      hotels.
20  Q.  Your department?
21  A.  Yes, ma'am.
22  Q.  Okay.  I will show you this Exhibit #33 --
23      and that is a defense exhibit -- an e-mail

Page 85

1       from Heather Watts to you.  Do you recall
2       that e-mail?
3   A.  Yes, ma'am.
4   Q.  Okay.  And did you call Ms. Watts back, as it
5       asks you to, regarding her maternity leave?
6   A.  I don't -- I don't know.  I don't have a
7       recollection of it.
8   Q.  Do you think you might have sent an e-mail
9       back to her?
10  A.  Normally, I would.
11  Q.  And what would you normally say?
12  A.  That's -- I don't know.
13  Q.  You don't know about what?
14  A.  Since I can't -- don't remember what I said,
15      there's no way that I could speculate what I
16      would have said.
17  Q.  What does that e-mail ask you to do?
18  A.  It's asking me to plan Heather's return later
19      than she initially had said.
20  Q.  Okay.  So if you had any objection to that
21      extension on her return time, would you not
22      have e-mailed her back or called her?
23  A.  If I had understood FMLA at the time.

Page 86

1  Q.  If you had understood it?
2  A.  Yes, ma'am.
3  Q.  What do you understand about it now?
4  A.  Different states qualify -- different people
5      qualify for different things in different
6      states, and you have to work with your legal
7      teams in order to present the position
8      properly.
9  Q.  Okay.  Do you feel that the position was
10     presented properly in this case?
11 A.  I was not aware of the conditions of
12     Montgomery Ventures, LLC, and Ms. Watts'
13     position and when she requested for leave.
14 Q.  And then you've just looked at these
15     documents that say that the Fairfield Inn is
16     owned by Hospitality Ventures, LLC; is that
17     correct?
18 A.  I looked at them, yes, ma'am.
19 Q.  Okay.  Would that have affected anything in
20     Ms. Watts' case as far as her leave?
21 A.  I don't know.
22 Q.  Okay.  I want you to look at Defendant's
23     Exhibit #24 from yesterday.  This is a letter

Page 87

1      Ms. Watts wrote at the request of Todd
2      Epplin.  Did he copy that to you?
3  A.  He might have.  I don't remember.
4  Q.  Have you reviewed any files in preparation
5      for this deposition?
6  A.  Partial.
7  Q.  Okay.  What files have you reviewed?
8  A.  I don't remember.
9  Q.  Do you have a memory problem, Mr. Miller?
10 A.  Not normally.
11 Q.  Okay.  Are you taking any mind-altering
12     drugs?
13 A.  No, ma'am.
14 Q.  Are you on any medication of any kind?
15 A.  No, ma'am.
16 Q.  And when did you perform this review of
17     documents?
18 A.  We went through a few documents on Monday.
19 Q.  Okay.  And you can't remember from Monday
20     what you looked at?
21 A.  There was a lot for me to go through the
22     first time, and the papers were moved very
23     quickly.  And yesterday was the first day, as

Page 88

1      you were presenting, that I had really time
2      to take a look and learn a little bit more
3      about the paperwork.
4  Q.  Okay.  Now I want you to look again at this
5      Defendant's Exhibit #22, also refers -- this
6      is dated April 7th, 2005.  Do you recall that
7      document notifying you again of maternity
8      leave and also I think deals with a salary
9      increase that you approved for Ms. Watts; is
10     that correct?
11 A.  Yes, I approved it.  Yes, ma'am.
12 Q.  And do you see there, too, where she's
13     talking about her maternity leave?
14 A.  Yes, ma'am.
15 Q.  Okay.  And do you know if you responded to
16     that and had any concerns about her being
17     able to perform her duties or come back to
18     work?
19 A.  I'm sorry.  I need to have the question --
20 Q.  I said, did you respond with any concern when
21     she talked about her maternity leave?
22 A.  I don't remember responding.
23 Q.  Okay.  Now, how often did Ms. Watts report in

Page 89

1      to you during a week's time?
2  A.  No set time.
3  Q.  She didn't have a weekly report that she
4      posted to you every Tuesday?
5  A.  I don't remember requesting her report every
6      Tuesday.  I pulled all of her reports from
7      Sales Pro.  But if I got reports that were
8      sent in, then that was, you know, something
9      that I didn't -- I don't remember requesting.
10 Q.  Well, wouldn't she have to input the
11     information into Sales Pro for you to get the
12     report?
13 A.  Yes.
14 Q.  Okay.  So she got -- you got a report.  Was
15     it once a week?
16 A.  I pulled all information at my leisure.
17     Could be once a week; could be once every two
18     weeks.
19 Q.  Did she have a deadline to put that
20     information in?
21 A.  Yes.
22 Q.  And when was that deadline?
23 A.  The following Monday for the past week.

Page 90

1 Q. So, then, it would have been available to you
2   on Tuesday, would it not?
3 A. Yes, ma'am.
4 Q. Okay. Now, I think you said earlier that all
5   you got from her was bonus information?
6 A. All that she forwarded to me paperwise was
7   bonus information and expense reports, to the
8   best of my recollection.
9 Q. But you were getting this weekly update on --
10 A. I was pulling. That was my job to pull, not
11   her job. She didn't send me anything. It
12   was in there. I could have pulled it, not
13   pulled it. It was up to my discretion to go
14   in, to go out.
15 Q. Well, it wasn't up to her discretion to put
16   it in, was it?
17 A. No, ma'am.
18 Q. Okay. And what other reports did you get
19   from Ms. Watts or as a result of Ms. Watts'
20   work?
21 A. I pulled a sales recap form sporadically. I
22   pulled the definite booking business report
23   sporadically. And I pulled the future months'

Page 91

1   group bookings reports sporadically.
2 Q. Okay. And she was required to generate all
3   these reports?
4 A. And the sales recap backup report.
5 Q. Okay. And my question was, is she generating
6   all this information?
7 A. I personally generated it myself. She input
8   it. She and anybody else at the hotel that
9   would go in and input it.
10 Q. And if you saw something curious about any of
11   those reports, would you e-mail Ms. Watts to
12   find out -- to resolve any issues?
13 A. Yes.
14 Q. Okay. Now, this Defendant's Exhibit #10
15   contains -- it's Bates number 0021, a daily
16   report. Now, is that one of the reports that
17   Ms. Watts inputted information to?
18 A. Not unless she did this for Todd. This was
19   not a report that I required her to put any
20   information in; however, the property general
21   manager, I don't know what -- who they had
22   inputting this stuff. But that's not a
23   sales -- that's not a Sales Pro backup. It

Page 92

1   has nothing to do with Sales Pro.
2 Q. Okay. Well, if you'll flip over to the front
3   of it, though.
4 A. Yes, ma'am.
5 Q. This is part of the quarterly bonus tracking
6   results, right?
7 A. Correct.
8 Q. Did you require these reports before you
9   could give anyone a bonus?
10 A. Yes, ma'am. Yes, ma'am.
11 Q. Okay. So you are familiar with that daily
12   report, are you not?
13 A. I'm familiar with daily reports, yes, ma'am.
14 Q. All right. And were they pretty well
15   standardized between units?
16 A. I don't know.
17 Q. Okay. I'm going to show you Defendant's
18   Exhibit #7. It's the back of a pay stub
19   envelope.
20   MS. DUNCAN: Or what's the word for
21   this?
22   MS. WATTS: Perforated, I believe was
23   the term.

Page 93

1 Q. HV Investors, LLC. Are you familiar with HV
2   Investors?
3 A. I've seen the script.
4 Q. Do your paychecks come in an envelope like
5   that?
6 A. I believe.
7 Q. And what is HV Investors?
8 A. I don't know. I don't know.
9 Q. Okay. You worked for this company -- you've
10   worked for Hospitality Ventures Management
11   now for four years; is that right?
12 A. Yes, ma'am.
13 Q. And you've never asked anyone what these
14   other companies are?
15 A. No, ma'am.
16 Q. And why do you have such a lack of curiosity?
17 A. It's not my business.
18 Q. Well, it is your business, isn't it, if
19   you're working for Hospitality Ventures and
20   your paycheck comes on a stub that says
21   Hospitality HV Investments (sic), LLC?
22   MR. FELLNER: Object to the form of the
23   question. I'm unsure about that

Page 94

1    question.
2 Q. Is it not uncommon for you to be -- or
3    wouldn't it be common for you to be curious
4    because you're getting paid by one person and
5    think you're working for someone else?
6 A. No, ma'am.
7      MR. FELLNER: I'll object to the form
8        of the question. Go ahead and
9        answer.
10 A. No, ma'am.
11 Q. Are you saying you don't care who pays you?
12 A. Yes, ma'am.
13 Q. Well, who pays you?
14 A. Hospitality Ventures Management, to the best
15    of my knowledge.
16 Q. But you said your paycheck comes in from
17    another company, does it not?
18      MR. FELLNER: Object to the form.
19        That's not what he said.
20 A. I'm -- I have no explanation nor have I been
21    curious about it.
22 Q. Okay. Did you receive a copy of the
23    associate handbook, personnel handbook?

Page 95

1 A. Did I personally receive one?
2 Q. Yes.
3 A. No, ma'am.
4 Q. You did not. Okay. Did you -- did you sign,
5    if you recall, a form like that?
6 A. I can't recall. I can't recall.
7 Q. So what do you base your understanding of
8    your job benefits on?
9 A. Verbal understanding that I had initially
10    when I started.
11 Q. Okay. You don't have a contract with any --
12 A. No, ma'am.
13 Q. -- of these entities, then?
14 A. No, ma'am.
15 Q. So you are an at-will employee; is that
16    correct?
17 A. My understanding.
18 Q. Has anybody ever talked to you about
19    retirement benefits?
20 A. No, ma'am.
21 Q. Has anybody ever talked to you about your
22    vacation benefits?
23 A. Yes, ma'am.

Page 96

1 Q. And who was that person?
2 A. I believe I have asked Carol Twardoch, when I
3    first started, to reconfirm. We were using
4    the same schedule as we do with Impac Hotel
5    Group.
6 Q. And who is Carol Twardoch?
7 A. Company admin. I don't know her exact title.
8    I know what she calls herself.
9 Q. What? What does she call herself?
10 A. Mother ship.
11 Q. Mother ship?
12 A. Yeah.
13 Q. And why would she say that?
14 A. She's very valuable in all assets.
15 Q. Oh. Maybe I should be talking to her. I'm
16    going to show you Defendant's Exhibit #1,
17    which is the affidavit of Heather Watts that
18    was submitted through the EEOC.
19      MR. FELLNER: Hold on. I'm going to
20        object to this. This is not the
21        affidavit that was submitted to
22        EEOC. It's in the exhibits. If
23        we're going to talk about the

Page 97

1    affidavit that she submitted to
2    EEOC, let's get the affidavit that
3    she submitted.
4      MS. DUNCAN: All right. Let's go to
5        Defendant's #37.
6      MR. FELLNER: Okay. Good enough.
7 Q. You can skip on back to that affidavit.
8 A. Oh, I'm sorry.
9 Q. And if you would read that, please.
10 A. From top to bottom?
11 Q. Just to yourself. I mean, you don't have to
12    read it out loud.
13 A. Oh, I'm sorry.
14      (Witness reviews document)
15 Q. Okay. Mr. Miller, is there anything in that
16    affidavit that you disagree with from your
17    own knowledge?
18 A. To my own knowledge, I don't know that she --
19    she says here that I never had received a
20    company handbook. That, I have no knowledge
21    that that did not happen as what's stated.
22 Q. You don't know whether she did or she didn't?
23 A. Right. Right.

Page 98

1  Q.  What I'm asking is, is there anything you
2      know from your personal knowledge that you
3      think is false?
4  A.  Number six, it states that my employer,
5      however, continued to give me assignments
6      during this period.  My understanding of that
7      is that Ms. Watts had agreed to do the things
8      very willingly.  She was not given anything
9      and told to do it, but she had wanted --
10     actually wanted to do the sales and marketing
11     plan as well as the seven hours worth of
12     work.  I remember her talking on telephone
13     conversations and her thanking me.  That, you
14     know, she could use the pay; the seven hours
15     would be very nice because she could use the
16     money.
17 Q.  And that was an agreement that you and she
18     struck up, right?
19 A.  That was an agreement that the general
20     manager, myself, and her struck up.  General
21     manager also saw the benefit of her keeping
22     her hands in the pie, especially willingly,
23     and wanting to be part of the -- stay part of

Page 99

1      the team.
2  Q.  Do you know of any documents that exist to
3      show that Tammy Dominguez was involved in
4      this agreement?
5  A.  Documents?  I'm not aware of.
6  Q.  Okay.  So other than the e-mail from --
7      traffic between you and Heather Watts,
8      there's no independent verification of that?
9  A.  No independent verification?  No.  No.
10 Q.  Okay.
11 A.  Also, number seven here says, Typically, more
12     than half of my work had been performed at
13     home, outside the hotel, because of the
14     nature of my job.  Half had been performed at
15     home is inaccurate.  The hours that she spent
16     at the hotel and logged on Sales Pro, meaning
17     on sales calls and outside sales work that
18     she did extremely well, that was not --
19     that's not a true statement.  She couldn't
20     possibly have done what she did at the hotel
21     as well as what she did to get sales in the
22     hotel and half of it been at home.  That's
23     impossible.

Page 100

1  Q.  She couldn't access Sales Pro from her
2      laptop?
3  A.  She couldn't execute the duties in order to
4      put -- she couldn't execute the physical
5      activities in order to document it in Sales
6      Pro.  Sales Pro is strictly a documentation
7      of what you did for the day.  What Heather
8      had documented in Sales Pro was physical
9      activity, very aggressive, physical activity,
10     both inside the hotel as well as outside in
11     the marketplace, which, again, I am on record
12     saying she did very well.  But that statement
13     there, there's no way she could have done
14     that half at home.  No way.  Physically
15     impossible.
16 Q.  She couldn't do telemarketing calls from
17     home?
18 A.  She could.
19 Q.  And she -- and you say she could do the Sales
20     Pro from the laptop, right?
21 A.  Yes, ma'am.
22 Q.  Okay.  So the only other things that she
23     couldn't do from home would be actually go

Page 101

1      out and meet these chamber -- at these
2      Chamber of Commerce events and that sort of
3      thing, right?
4  A.  No, ma'am.
5  Q.  And coordinate with groups coming in and that
6      sort of thing.
7  A.  She couldn't do the vast majority of duties
8      that were -- that she was graded on through
9      Sales Pro, which are sales calls,
10     appointments, stuff of that nature, follow-up
11     work, inquiries, marketing plan items, sales
12     calls physically at offices of clients, et
13     cetera, et cetera.
14 Q.  Right.  Is she saying that she's doing that
15     from her home, or is she just saying she
16     didn't do it in the hotel?
17 A.  Number seven specifically says, Typically,
18     more than half of my work had been performed
19     at home and outside the hotel because of the
20     nature of my job.
21 Q.  That's -- outside the hotel is the other part
22     of it, is it not?
23 A.  Yes, ma'am.

Page 102

1  Q.  Okay.  And you still disagree with that?
2  A.  Yes, ma'am.
3  Q.  Do you think she would spend more than half
4     of her time working at the hotel?
5  A.  A combination of outside the hotel,
6     physically outside, of being in her house and
7     what she had to do to prepare for that in the
8     office.  It would have been very difficult.
9     I'm not saying someone is not a super woman,
10    but I'm saying it would have been very
11    difficult for her to accomplish that, but she
12    did a very solid job when she was there in
13    the hotel, and she did a very solid job when
14    she was out making sales calls and doing
15    that.
16        And from number 9, number 10, number 11,
17    number 12, number 13, number 15, and number
18    16, I have no knowledge of.  I mean, I was
19    not involved in; therefore, I cannot say yes
20    or no to.
21 Q.  And that's all we're asking -- we were asking
22    you about was what you had personal knowledge
23    of.

Page 103

1  A.  Yes, ma'am.
2  Q.  Okay.  So now I want you to look at this
3     Plaintiff's Exhibit #1.  This is an e-mail
4     from you to Ms. Watts on October 31st.
5  A.  Okay.
6  Q.  Did you receive any more e-mail from Heather
7     Watts between October 31st and the day she
8     was fired?
9  A.  I don't remember.  I don't remember.
10 Q.  And it's your statement today that you had
11    absolutely no knowledge that Tammy Dominguez
12    was going to fire her on November 2nd?
13 A.  To my knowledge, recollection, I do not
14    remember ever Tammy discussing that; because
15    I remember being extremely surprised, to put
16    it mildly, in my recollection.
17 Q.  How did Heather Watts rank as a sales manager
18    among your properties?  You said you had five
19    to seven at the time.
20 A.  She's very positive.
21 Q.  Was she the best you had?
22 A.  She was a strong performer.
23 Q.  I'm just trying to get some idea of where she

Page 104

1     stood in that line-up.
2  A.  Like every director, she would have months
3     where she was one of the, probably, top and
4     other months where she was average depending
5     upon the other -- not her performances, but
6     upon other people's performances.
7  Q.  Do you know what the maximum quarterly bonus
8     you ever paid to a sales marketing manager
9     was?
10 A.  No, ma'am.
11 Q.  Do you think $3800 is high for a bonus?
12 A.  I don't know.
13 Q.  Well, you had to approve the bonuses, did you
14    not?
15 A.  Yes, ma'am.
16 Q.  Okay.  Were there bonuses that were routinely
17    higher than that?
18 A.  I don't recall.
19 Q.  Do you recall offering Ms. Watts a salary at
20    the time she interviewed with you in Atlanta?
21 A.  I remember discussing a salary based on
22    multiple people's input.
23 Q.  How soon after that was it you e-mailed her

Page 105

1     the offer?
2  A.  I don't remember how soon.
3  Q.  Do you remember telling Heather Watts that
4     Todd, the general manager, was not the
5     decision-maker in hiring a sales position?
6  A.  No, ma'am, I do not remember that.
7  Q.  And that was why the interview was conducted
8     in Atlanta?
9  A.  No, ma'am, I do not remember that.
10 Q.  Okay.  Do you recall, at that interview with
11    Heather Watts in Atlanta, introducing her to
12    Rob Flanders, who offered her health
13    insurance?
14 A.  I remember introducing her to Rob Flanders to
15    spend a few minutes with to discuss -- to
16    talk.  I don't have a clue on what it was to
17    talk about.
18 Q.  How many times has Heather Watts been to
19    Atlanta to see you?
20 A.  To my knowledge, it was once.  From my
21    memory, it was once.
22 Q.  Just the initial interview; is that correct?
23 A.  From my memory, yes, ma'am.

Page 106

1 Q. Okay. Now, is Sales Pro an optional tool to
2    use at individual hotels, or is it the main
3    source of sales numbers and reports?
4 A. Main source of sales numbers and reports.
5 Q. Okay. What's an audit report, then?
6 A. I don't know what you're referring to.
7 Q. Well, you've got a night auditor, right? And
8    what does he do?
9 A. Works -- you know what? I don't know. I
10    think there was a job -- well, I started to
11    answer like I did. And I don't, so there's
12    no sense in saying I do. Is there a job
13    description for it? I'm not familiar with
14    the job description.
15 Q. Okay. And who reads the audit reports if you
16    don't?
17 A. General manager.
18 Q. Okay. I thought they were just -- the
19    general manager is the one who generates the
20    reports, are they not?
21 A. General managers -- I'm sorry.
22 Q. Excuse me. Where do the audit reports go
23    after they're generated at the local

Page 107

1    facility?
2 A. My understanding is that they go to the home
3    office, is my understanding.
4 Q. Do you work at the home office?
5 A. I work in the sales and marketing department
6    of the home office.
7 Q. That's a yes?
8 A. Yes.
9 Q. Okay.
10         (Brief recess)
11 Q. Okay. Now, if you'll notice -- can you read
12    the first line of that first e-mail?
13 A. First paragraph line?
14 Q. Yeah.
15 A. Yes, ma'am. Heather, Hospitality Ventures is
16    pleased to welcome you into our family of
17    hospitality professionals.
18 Q. Okay. You can stop there. Do you think that
19    would give Heather the understanding that
20    she's working for Hospitality Ventures?
21 A. I don't know.
22       MR. FELLNER: Object to the form of the
23         question. Go ahead and answer.

Page 108

1 Q. He just does that so he can put something on
2    the record.
3 A. I don't know.
4 Q. You don't know, but you're the one that
5    authored it, right?
6 A. Yes, ma'am.
7 Q. Okay. Do you know why you would say that if
8    it weren't true?
9       MR. FELLNER: Object to the form of the
10         question. Go ahead.
11 A. This was a line that I used quite frequently
12    to welcome people into the company.
13 Q. Okay. Now, on the second page -- and I
14    apologize for coupling these together, but
15    you can see the second e-mail on the first
16    page ends: And I am very excited about this
17    opportunity and looking forward to joining
18    the team, Heather Watts. And that is the
19    same line that starts page 2.
20       Okay? So now the first full e-mail on
21    page 2, is that from you, Mr. Miller?
22 A. I'm going to try to read it here for just a
23    second and make sure.

Page 109

1         (Witness reviews document)
2 A. Yes, ma'am.
3 Q. Okay. And you are quoting her starting
4    salary at $35,000; is that right?
5 A. Yes, ma'am.
6 Q. And working 35 hours a week?
7 A. Yes, ma'am.
8 Q. Okay. Now, that is cc'd to Ronda Masters.
9    Who is Ronda Masters? Who is she?
10 A. Ronda -- gosh. She was a general manager
11    there, I believe, at one time. I don't
12    remember.
13 Q. Was she the general manager when Ms. Watts
14    was hired? I thought Todd Epplin was.
15 A. No. Todd Epplin was. I don't know her
16    title. I don't remember Ronda's title.
17 Q. Well, I don't see Todd Epplin's name there in
18    the header area, do you?
19 A. No, ma'am.
20 Q. Okay. So if Mr. Epplin was hiring her,
21    wouldn't he be notified that you had quoted
22    this salary and these terms?
23 A. Normally.

Page 110

1    MS. DUNCAN: All right. the only thing
2        I've got left is just to make an
3        objection about the presentation
4        of the disk, so if you want to ask
5        your question -- any questions of
6        Mr. Miller.
7    MR. FELLNER: I don't have any
8        questions I want to ask him.
9    MS. DUNCAN: Okay. Then, please make
10       this #15.
11       (Brief pause)
12 Q. This is Plaintiff's Document #15. And if you
13    will take a look at that Mr. Miller. Do you
14    see the name Robert Flanders there?
15 A. Yes, ma'am.
16 Q. And have you already identified him as the
17    person who you introduced to Ms. Watts to
18    talk about insurance?
19    MR. FELLNER: I'll object to the form
20        of the question, but go ahead and
21        answer if you can.
22 A. Yes, ma'am.
23 Q. Okay. And does that document reflect that

Page 111

1    Hospitality Ventures is going to be paying
2    for Ms. Watts' insurance?
3    MR. FELLNER: Object to the form of the
4        question.
5 A. We have agreed to pay at least 50 percent of
6    the coverage for your child. We will deduct
7    your portion, 50 percent, from you biweekly
8    paycheck. This amount is estimated to be $60
9    per paycheck or $1,560 annually. I do
10   understand the contents of that paragraph.
11 Q. Okay. And I think it was gone over yesterday
12    that the insurance covered Ms. Watts entirely
13    and half of her child. The better half, one
14    would hope.
15 A. Yes, ma'am.
16 Q. So you recognize that as a guarantee of
17    coverage?
18    MR. FELLNER: Object to the form of the
19        question.
20 A. I recognize that as what Mr. Flanders wrote
21    on that date to Heather.
22 Q. And he works for Hospitality Ventures?
23 A. He did at the time.

Page 112

1 Q. He did at the time?
2 A. Yes, ma'am.
3    MS. DUNCAN: Okay. Now, I'm
4        introducing Defendant's Exhibit
5        #16 here for the purpose of
6        objecting to the presentation of
7        the compact disk in a manner that
8        is difficult, if not impossible,
9        to view the contents. And so I
10       would hope that we would come to
11       some terms with opposing counsel
12       to get these documents reproduced
13       in a readable fashion.
14   MR. FELLNER: Is there a question for
15       the witness?
16   MS. DUNCAN: No.
17   MR. FELLNER: What are we doing, then?
18   MS. DUNCAN: We're just putting these
19       comments on the record because
20       of -- I can't get something from
21       you that I can read. I'm going to
22       file an objection with the Court
23       and ask for an extension of time.

Page 113

1    MR. FELLNER: Is the deposition over?
2        Do you have any more questions for
3        the witness?
4    MS. DUNCAN: No.
5    MR. FELLNER: All right. We're done.
6        Thank you.
7        (Off-the-record discussion)
8    MR. FELLNER: If you would like to
9        discuss this, I'll be happy to
10       discuss it off the record. Is the
11       deposition over? Do you have any
12       more questions for the witness?
13   MS. DUNCAN: No, sir, I do not.
14   MR. FELLNER: Okay.
15   MS. DUNCAN: I just wanted to get my
16       objection onto the record.
17   MR. FELLNER: Okay.
18   MS. DUNCAN: I do, however, move to
19       incorporate all the documents in
20       the deposition.
21   MR. FELLNER: Excuse me? I just didn't
22       hear what you said.
23   MS. DUNCAN: Move to incorporate all



Page 114

1  the documents as a part of the
2  deposition. You've got to do that
3  or they don't get --
4      (The deposition concluded at
5      3:17 p.m.)
6  * * * * * * * * * * *
7  FURTHER DEPONENT SAITH NOT
8  * * * * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 116

1      SIGNATURE OF WITNESS
2      I, ROGER ALAN MILLER, hereby certify
3  that I have read the transcript of my deposition
4  consisting of pages 4 through 114, and except for
5  the corrections listed below, certify that it is
6  a true and correct transcription.
7
8  _____
9      ROGER ALAN MILLER
9
10  SWORN TO AND SUBSCRIBED before me
    this _____ day of _____, 2007.
11
12  _____
    NOTARY PUBLIC
13
14      * * * * * * * * * * *
15  Page   Line   Correction and reason therefor
16
17
18
19
20
21
22
23

Page 115

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  AUTAUGA COUNTY
4      I, Heather Barnett, Court Reporter and
5  Commissioner for the State of Alabama at Large,
6  hereby certify that on Friday, July 20, 2007, I
7  reported the deposition of ROGER ALAN MILLER, who
8  was first duly sworn or affirmed to speak the
9  truth in the matter of the foregoing cause, and
10  that pages 4 through 114 contain a true and
11  accurate transcription of the examination of said
12  witness by counsel for the parties set out
13  herein.
14      I further certify that I am neither of kin
15  nor of counsel to any of the parties to said
16  cause, nor in any manner interested in the
17  results thereof.
18      This 6th day of August, 2007.
19
20
    _____
21  HEATHER BARNETT, Court Reporter
    Commissioner for the
22  State of Alabama at Large
23  MY COMMISSION EXPIRES: 3/30/2011

AFFIDAVIT OF HEATHER WATTS

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY )

Personally appeared affiant, HEATHER WATTS, who being duly sworn, says:

1. This affidavit is given on the basis of the affiant having knowledge pertaining
   to sex/pregnancy discrimination and termination November 2, 2005.

2. My address is: 6976 Eastern Shore Road, Montgomery AL 36117 and my
   phone number (334) 244-8077.

3. I was employed at the Marriott Fairfield Inn from June 2004 as director of
   sales and marketing. General Manager Todd Epplin was told me the hotel
   had not made budget for 12-18 months before I was hired. From the first
   quarter, I brought in enough business to make the hotel profitable. I started at
   $35,000 per year and was earning $38,000 when I left, plus bonuses of
   $3,800 per quarter.          *JAN 2005*

4. When I first became pregnant, Roger Miller, vice president of sales and
   marketing at Hospitality Ventures, my employer, told me that I could take
   maternity leave. We worked on hiring an intern, Tandi Mitchell, to take over
   my job duties when I went on leave. Mr. Epplin agreed with Miller that I could
   be on maternity leave and gave Tandi and me training time up until the time I
   left. We talked about the length of my leave for several months.

5. My child was born on August 12, and I took unpaid maternity leave, starting
   Aug. 11. I never had received a company handbook, but I had requested the
   leave in writing. No one contested my right to FMLA/maternity leave. I took
   leave starting on August 11, 2005, and was not due to return to work until
   November 9.

DEFENDANT'S
EXHIBIT

1

6. My employer, however, continued to give me assignments during this period, paying me for seven hours a week. Tammy Dominguez, the new hotel manager, had tried to get me to come back to work three days a week at the hotel during my maternity leave, but my newborn developed an ear infection, and I was not able to work those hours during my maternity leave.

7. Typically, more than half of my work had been performed at home and outside the hotel, because of the nature of my job.

8. I was working on a marketing plan for the hotel while I was on maternity leave. Ms. Dominguez was asked on Wednesday October 19, to bring in all my work on the plan and to copy all of it, in her presence. Yet, when Roger Miller came to town to discuss the plan the following week, I was not invited to meet with him. I began to feel uneasy about my job status.

9. On Nov. 2, one week before I was to return from maternity leave, I was called by Ms. Dominguez, and asked if I was going to be able to return to my job fulltime, 35 hours a week. I said yes. She repeated the question, saying "I need to know by 5 p.m.," and I said yes.

10. She called back and said the company was not going to give me that option to come back, that I could resign today or she was terminating me.

11. I went to the hotel at 11:15 a.m. Nov. 3 and got my final check and an order to clean out my office. At 11:46, Ms. Dominguez, she called me again and questioned whether I had called the hotel and asked about FMLA. I said no. She began stating that she "made a mistake," and she could not terminate me due to FMLA. She said I should come in on Nov. 9, my original day back and prepare to work my 35 hours.

12. However I had been required to turnover my laptop and all sales files. The company locked me out of the SalesPro computer database. There was no doubt, that I was fired.

13. Ms. Dominguez does not have custody of her own child. Other company officials had expressed concern over my ability to get child care. This was the only expressed reason for terminating me.

14. The intern who is now assigned to do some of my work, works outside the hotel all but one day a week.

15. I also was told by corporate officials in Atlanta that my medical coverage had been canceled October 30, three days before I was terminated.

16. The company attempted to deny me unemployment benefits, but my employer was overruled.

_____
Affiant

STATE OF ALABAMA }
MONTGOMERY COUNTY }

Before me the undersigned, a Notary Public in and for said County and State, this day personally appeared affiant, who is known to me, and who being first duly sworn deposes and says that the matters and things alleged in the foregoing affidavit are true as therein averred.

_____
Affiant

Sworn and subscribed before me this 8th day of December, 2005.

_____
Notary Public
My commission expires _____

DEFENDANT'S
EXHIBIT
2

→ Hired- late June 2004
→ Pregnant Dec- 2004
→ Letter Jan - 2005    - Goal, 8-10 wks ⟩ at least 1:
→ Wurked until Aug, 11th 1/2 day
→ Birth Aug. 12th 2005

→ Wurked 7+ hrs from home during leave
    Went back / forth hotel when needed
→ Oct. Tammy- tried to get me to Wurk
    3 days @ hotel- remaining at home

→ Oct. 19th Tammy asked me to bring all
    Wurk-UKPlan - Roger Came- not invited into
    mgt.

→ Nov. 2nd/Tammy Called- yes coming back
    * She was wanting me to Wurk 40+ hrs all
    inside hotel - tried to explain my 35 hrs
    and wurking schedule.
    No severence
    * Bring everything to her
    Hotel - Letter @ Cobra/

Nov. 3rd Tammy Called- made a mistake
    FMLA

Nov. 6th Letter - Offering me another position

# HOSPITALITY VENTURES, LLC

## ASSOCIATE HANDBOOK
## FOR HOTEL PERSONNEL

### Updated June 2002

This handbook supersedes
all previous associate handbooks
distributed by Hospitality Ventures, LLC



DEFENDANT'S
EXHIBIT
3

Watts v. Hospitality
Int Discl/RFP 0170

## SECTION 1: **INTRODUCTION**

This Associate Handbook has been designed as a guide for new and existing Hotel Associates.

Each associate will receive a copy of the Associate Handbook. You will be asked to sign the enclosed Associate Acknowledgement Form indicating that you have read and understand its contents.

While you are expected to comply with its contents, all information you need during the course of your employment may not be contained in this handbook. It is not a legal document nor is it inclusive of all the rules, regulations, procedures, or policies that apply to associated of Hospitality Ventures, LLC.

From time to time, policies, procedures, and/or practices may be altered to meet the needs of the Company, its collective or individual associates, and/or to comply with legal requirements.

As well, this information is subject to changes, which supersede, modify, or eliminate the policies in this Handbook. While we will strive to announce changes, this may not always be feasible. Consequently, some changes may be made without notice. Hospitality Ventures (hereafter referred to as "Hospitality Ventures, LLC," "Hospitality Ventures", or "The Company") reserves the right to interpret, alter, suspend, or terminate this guideline in its entirety or any portion thereof at any time.

Many of Hospitality Ventures' voluntary benefits outlined in this handbook are mere summaries of the actual benefits provided to associates. Details about these benefits are provided in Hospitality Venture's Benefits Guide and other documents available to you.

Regarding any associates who are currently covered under a Collective Bargaining Agreement, the Agreement will prevail in any instances of significant difference between this Handbook and the Agreement.

Additionally, you should be aware that because Hospitality Ventures has properties in many states, the laws of the state in which you work will apply to your employment. Hospitality Ventures may present associates with a supplemental associate handbook or other materials that will apply to the laws of the state in which you work.

Your employment with Hospitality Ventures is at-will. As such, this Handbook is not intended to create an expressed or implied contract of employment or other legally enforceable promise between you and the Company, and you may not rely upon it as such.

In spite of any statement contained in the Handbook or any other document or statement issued by Hospitality Ventures, LLC or any of its representatives, you have the right to end your employment with the Company at any time and the Company reserves a similar right. Nothing stated in this Handbook shall be construed as impairing or altering such rights of you or the Company in any way.

Watts v. Hospitality
Int Discl/RFP  0171

# HOSPITALITY VENTURES, LLC

**To:** Hospitality Ventures Associates

**From:** Robert Cole

**Subject:** Welcome

It is my sincere pleasure to welcome you to the Hospitality Ventures team. You have joined Hospitality Ventures at a time of unprecedented change and great opportunity in the hospitality industry.

Hospitality Ventures is driven by the need to find the perfect balance between quality, associate satisfaction, guest satisfaction, and business success. Hospitality Ventures' management team believes emphatically in the correlation among the four.

Our management strategy is driven by the relentless pursuit of Operational Excellence with an emphasis on innovation and continuous improvement, which ultimately leads to exceeding our stakeholders' expectations. Without an intense drive to be the best in the industry, Hospitality Ventures would simply reach status quo. We do not intend to fall short of our goals.

I know you possess the drive and capabilities to play a significant role in Hospitality Ventures' growth and vision. I wish you every success in your career with Hospitality Ventures. Welcome aboard!

Sincerely,


Robert Cole
Chief Executive Officer

Watts v. Hospitality
Int Discl/RFP 0172

# SECTION 2: **COMPANY OVERVIEW**

## 2A. HOSPITALITY VENTURES' HISTORY

Watts v. Hospitality
Int Discl/RFP   0173

## 2B. MISSION STATEMENT

Our Mission is to exceed the defined expectations of our associates, our guests, and our shareowners, without compromising the balance of satisfaction between them. We will value the importance of each of these three stakeholders and recognize that their satisfaction is directly correlated.

## 2C. VISION STATEMENT

Guided by our principles, our vision is to become the premier owner and operator of hotels and a recognized leader in the entire hospitality industry.

## 2D. GUIDING PRINCIPLES

- Deliver Heroic Service

- Keep All Promises

- Build Strong Relationships

- Work With Passion

- Keep It Fun

- Continuously Improve

## 2E. TEN STANDARDS OF SERVICE

**While we all know our core business is to serve our guests, the following Ten Standards of Service are just some examples of what is expected of each Hospitality Ventures Associate.**

1. Each associate will know the Hospitality Vision Statement and understand the importance of always aligning his or her individual and departmental activities to it.

2. Each associate will know the Guest Satisfaction Guarantee. An associate who receives a complaint is empowered to resolve the complaint and to follow up within 30 minutes to ensure the problem has been resolved to the guest's satisfaction.

3. Each associate will participate in a line-up prior to starting his or her shift.

4. Guests will be acknowledged and given a pleasant greeting when met be an associate. Always maintain positive eye contact and use proper vocabulary.

5. Guests' requests will be fulfilled or responded to within 15 minutes.

6. Telephones are to be answered within three rings using the proper greeting, department name, and associate name.

7. Each associate will wear the proper uniform, including nametag, and Hospitality Ventures Values Card.

8. Associates will be knowledgeable of all hotel services and hours of operation in order to answer guest inquiries. Always recommend the hotel's food and beverage and retail outlets prior to outside facilities.

9. Associates will practice teamwork, know their department's service standards, and be certified in their positions within 30 days of employment.

10. Associates will know procedures for emergency situations and will notify supervisors immediately of hazardous situations. Protection of the assets of Hospitality Ventures is the responsibility of every associate.

Watts v. Hospitality
Int Discl/RFP  0175

# SECTION 3: EMPLOYMENT

## 3A. EQUAL EMPLOYMENT, ACCOMMODATION, AND DIVERSITY

### A.1 EQUAL EMPLOYMENT OPPORTUNITY

Hospitality Ventures is committed to the practice of equal employment opportunity. Its associates and applicants for employment will not be subjected to unlawful discrimination in regard to the terms or conditions of employment on the basis of race, color, religion, gender, national origin, sexual orientation, age, disability, marital status, veterans status or any status protected by applicable law.

Terms and conditions shall include, but are not limited to, recruitment, selection, promotion, educational support, transfer, social and recreational programs, compensation, benefits, training and development, discipline, and termination.

### A.2 DISABILITY ACCOMMODATION

It is the intent of Hospitality Ventures to comply with the Americans with Disabilities Act (ADA). The Company will not discriminate against any qualified associate or job applicant with respect to any terms, privileges, or conditions of employment because of a physical or mental disability. The Company will also reasonably accommodate all associates or applicants with disabilities who are otherwise qualified to safely perform the essential duties of the job unless any such accommodations would impose an undue hardship on the Company.

Applicants and associates are assured that all information regarding a disability shall be kept confidential except that:

Supervisors and managers may be informed regarding restrictions on work or duties of disabled associates and any accommodations that have been made.

If the condition requires emergency treatment, first aid and safety personnel may be informed.

Government officials investigating compliance with federal laws may be informed.

All associates with responsibilities that may require knowledge of disabilities will be advised that they are to treat the knowledge with confidentiality.

### A.3 RELIGIOUS ACCOMMODATION

Hospitality Ventures recognizes that certain associates' religious practices, beliefs, and observations may require special consideration. Therefore, it is the policy of Hospitality Ventures to offer reasonable accommodation of applicants' and associates' religious practices, beliefs and observations in accordance with applicable federal, state, and local laws.

Watts v. Hospitality
Int Discl/RFP   0176

## A.4   DIVERSITY

Hospitality Ventures is committed to identifying, selecting, and promoting the best individuals from within our changing workforce. Hospitality Ventures strives to distinguish itself as a hotel company with an unmatched appreciation for the diversity of gender, race, heritage, religion, age, and other characteristics, which make up its guests, associates, shareholders, and business partners.

Hospitality Ventures is committed to ensure that it conducts business in a way that values and reflects the diversity of men and women who work in and patronize its properties.

# 3B. HIRING AND RECRUITMENT

## B.1   EMPLOYMENT AT WILL

Your employment with Hospitality Ventures is considered "at-will". "At-will-employment" gives the employer or the associate (employee) the right to end the relationship at any time. There is no guarantee of employment for any specific period of time and employment can be terminated for any or no reason, with or without cause, and with or without notice. Associates also have the right under the employment-at-will rule to resign their employment at any time.

## B.2   VERIFICATION OF EMPLOYMENT ELIGIBILITY

*U.S. PROPERTIES ONLY*

In accordance with the Immigration Reform and Control Act of 1986, it is Hospitality Ventures' practice to hire only those individuals who are authorized to work in the United States. Pursuant to this law, all individuals who are offered employment will be required to submit documentary proof of identity and employment authorization. Associates will also be required to complete and sign Immigration and Naturalization Service (Form I-9).

If you are authorized to work in the United States for a limited period of time, before the expiration of that period you will be required to submit proof of your employment authorization and sign another Form I-9 in order to remain employed by the Company.

# 3C. PERSONNEL RECORDS

Accurate personnel records are required for the benefit of both the associate and the Company. It is the associate's responsibility to keep Hospitality Ventures informed of current address, telephone number, insurance beneficiaries, name changes, number of dependents and individuals to notify in case of emergency. For example, Hospitality Ventures may rely on the associate's address for communications by mail, the telephone number in case of an emergency, and changes in marital status for tax withholding and Hospitality Ventures benefits.

## 3D. PROMOTIONS, LATERAL MOVES, TRANSFERS

Hospitality Ventures strives to fill open and newly created positions from within the Company through associate promotions, transfers, and lateral moves. We encourage our associates to apply or "post" for positions and welcome the opportunity to evaluate their qualifications as internal candidates for these positions.

### D.1   JOB POSTINGS

Hospitality Ventures will make information regarding Company-wide job opportunities available to associates. Please note that Hospitality Ventures reserves the right to fill positions from outside the Company when we believe such action is appropriate. We reserve the right not to post executive level positions.

### D.2   ELIGIBILITY / INTERNAL APPLICATIONS

Associates, who have been employed for at least 90 days and are interested in applying (posting) for positions, should contact their Human Resources Representative(s). Internal applications require pre-approval by your current Department Head.

To be considered for an open position, you must meet the minimum requirements of the position with or without reasonable accommodation. Your present performance, past performance ratings, specialized background, and skill are considered when evaluating your candidacy for the position. However, we must consider all applicants, and we will choose the person we determine to be best suited for the position.

If you apply for a position and are not chosen, we encourage you to continue applying when appropriate opportunities occur. A different Internal Transfer Application should be submitted for each separate position for which you wish to apply.

# 3E. ASSOCIATE CLASSIFICATION, ORIENTATION AND INTRODUCTORY PERIOD

## E.1 CLASSIFICATION OF ASSOCIATES

1(a)    Full Time Associates

Full time associates are employed to work on a regular basis for at least 24 hours per week. They are eligible for all benefits available through work at Hospitality Ventures, so long as they meet the applicable requirements, such as length of service.

1(b)    Part Time Associates

Part time associates are employed to work on a regular basis for fewer than 24 hours per week. Part time associates working less than 24 hours per week are not entitled to Company benefits.

1(c)    Temporary Associates

Temporary Associates are hired with the understanding that their employment will not continue beyond a stated date or beyond completion of a specified project or projects.

**All associates of Hospitality Ventures, whether full time,
part time or temporary, are employed at-will.**

## E.2 ORIENTATION PERIOD

The first 90 days of employment is known as the orientation period. This period is established to benefit both the associate and the Company. It is a period of adjustment and adaptation, both personally and in terms of learning the job requirements and work rules. If during this period you are unable to adapt successfully to the requirements of the position, the department, or the Company, your employment may be terminated immediately. Your supervisor may offer advice and counseling when a problem becomes apparent, however, your supervisor is not required to do so. You may be given advance notice, but that also is not required.

If you decide at any time during this orientation period that you would be happier employed elsewhere, you are free to resign at any time, just as the Company is free to end your employment at any time.

The completion of the orientation period is not cause for automatic wage increase, transfer, promotion, job reclassification, or continued employment, and it does not affect the right of you or the Company to end employment at any time for any reason.

Watts v. Hospitality
Int Discl/RFP   0179

### E.3 PERFORMANCE AND EVALUATION

After you have completed your introductory period, we will communicate our evaluation of your performance through a performance review. At this review, you will be given the opportunity to express your personal views concerning training, orientation, and assignment as well as ask any questions you might have. Your supervisor will detail any performance improvements required and explain what he or she and you may expect in the future.

The introductory review is intended to document your progress over a relatively short period and generally will not result in a wage increase.

Your performance will be scheduled for review annually based on date of hire, most recent promotion, or change of job title. However, you may request a performance evaluation at any point during your employment.

A place for your comments and signature is located on the Performance Review Form. All performance evaluations will become an addition to your permanent personnel file.

## 3F. ATTENDANCE RESPONSIBILITIES

### F.1 ATTENDANCE AND PUNCTUALITY

We are all expected to report for work on time. A good attendance record is extremely important to the Company and is obviously a requirement for continued employment. Our service is seriously affected if you or your fellow associates are absent or late. Additionally, a good attendance record is a valuable asset to you because it is one of the factors considered in the selection of associates for recognition, development reports affecting pay, transfers, and promotion. If you are going to be late, you must contact your supervisor, or if unavailable, the manager on duty, at least one hour before your shift. If you are going to be absent from a scheduled shift, you must contact your supervisor, or if unavailable, the manager on duty, two hours before the beginning of the shift.

You must recognize that we do not staff to cover for absences, and any absence negatively affects team and hotel performance. The Company generally reviews attendance on a rolling six-month period.

Absenteeism or tardiness that is not excused or excessive in the judgement of the Company is grounds for disciplinary action up to and including termination. Any associate failing to show for work or call in for three consecutive days will be removed from the payroll as a voluntary termination.

Watts v. Hospitality
Int Discl/RFP  0180

## F.2 UNEXCUSED ABSENCE

Examples of an unexcused absence include:

1. A tardiness of two hours or more;

2. A one-shift absence or partial-shift absence (e.g. leaving early);

3. Personal illness or injury, which includes doctor's appointments (subject to Hospitality Ventures' Leave of Absence procedures discussed in this handbook);

4. Illness, injury, or personal obligation within your family (subject to Hospitality Ventures' Leave of Absence procedures discussed in this handbook);

5. Transportation problems;

6. Other personal obligations of a compelling nature requiring you to be absent;

7. Unreported absences (no reporting/no call-in);

8. Any other occasion when an associate is not at work when required

## F.3 EXCUSED ABSENCE

Examples of an excused absence include:

1. Jury duty or witness subpoena from a court (must notify supervisor in advance);

2. Vacation (scheduled and approved);

3. Military service (must notify in advance);

4. Death in immediate family (must notify as soon as possible);

5. Approved training;

6. Any approved Family and Medical Leave absence.

Watts v. Hospitality
Int Discl/RFP 0181

# SECTION 4: **BENEFITS REQUIRED BY LAW**

## 4A. UNEMPLOYMENT COMPENSATION

Hospitality Ventures pays 100% of the State and Federal Unemployment Insurance premiums for each associate. This benefit is designed to pay unemployment compensation to associates who lose their job for reasons other than misconduct or voluntary resignation.

## 4B. SOCIAL SECURITY

For each associate, Hospitality Ventures pay matching funds to the Social Security Administration under the Federal Insurance Contributions Act (FICA).

## 4C. WORKERS COMPENSATION

Workers Compensation is provided, and the cost is paid by the Company for all its' associates. In the event of an on-the-job injury or illness, even though you might consider it insignificant, it must be immediately reported to your Department Head or the Personnel Representative. Only in this way can necessary medical attention be obtained. We are also required by federal law to maintain accurate records of all work-related injuries and illnesses. Therefore, your prompt reporting of any incident is critical to both you and the Company.

# SECTION 5: VOLUNTARY BENEFITS, ASSOCIATE BENEFITS GENERAL

## 5A. BENEFITS ELIGIBILITY

For benefit purposes:

Full Time Associates. Associates regularly scheduled to work 24 or more hours per week are considered full time associates and are eligible for all Company-provided benefits. Full-time associates are not guaranteed by the Company to be scheduled 24 or more hours each week.

Part Time Associates. Associates working less than 24 hours per week are considered part time associates. Part time associates are not eligible for Company-provided benefits, except those benefits required by federal or state law.

**NOTE: The foregoing classifications do not constitute a guarantee that any associate's employment will continue.**

## 5B. INSURANCE

All full time associates are eligible to participate in Hospitality Ventures' Medical Insurance Plan.

Your benefits book will explain in detail these and other insurance benefits that Hospitality Ventures offers.

## 5C. VACATION AND ILLNESS

### C.1   VACATION

Full time associates are eligible for vacation every year on their anniversary date. Vacation is earned annually on an anniversary date to anniversary date basis. Upon separation from the Company, you will be paid any earned and unused vacation pay.

### C.2   REQUESTING TIME OFF

To request time off (e.g., vacation, holidays, personal days), a request form must be completed, approved and signed by your supervisor, and returned to a Payroll Representative.

Watts v. Hospitality
Int Discl/RFP   0183

## 5D. LEAVE OF ABSENCE

It is the policy of Hospitality Ventures to grant a leave of absence to associates, whenever possible, for justifiable reasons such as personal emergencies. All leaves must be requested in writing and approved, in advance whenever possible. At a minimum, the associate's Department Head, Human Resources Representative, and General Manager must approve all leaves. No open-ended leaves are approved.

### D.1    FAMILY AND MEDICAL LEAVE

#### Eligibility Requirements

If you have at least one (1) year of service, have worked at least 1,250 hours during the 12 months immediately prior to the date requested for leave, and are employed at a work-site which employs 50 or more associates within 75 miles of your work-site, you will be eligible for an unpaid leave of absence in the event of:

1. the birth of a child;
2. the placement of a child for adoption or foster care;
3. the care of a parent, spouse or child with a serious health condition; or
4. your own serious health condition.

#### Requests for FMLA Leave

All requests for a Family or Medical Leave of absence (or extensions) must be submitted on a "Leave of Absence Request" form for final approval. If the need for the leave is foreseeable, you must provide at least 30 days advance notice.

#### Medical Certification

If your leave is due to your own serious health condition or is to care for a child, spouse, or parent who has a serious health condition, your request must be accompanied by a "Medical Certification" which may be obtained from the personnel's department. Absent extenuating circumstances, failure to provide the "Medical Certification" within 15 days of your request for leave will result in denial of your leave and any time off will be deemed an unexcused absence.

If your leave exceeds 30 days, or you ask for an extension of your leave, you may be required to provide additional medical certification of your inability to work.

The Company may require you to obtain a second or third option. If a second or third option is requested, the Company will pay the cost of the examination.

#### Scheduling Of Leave

If the leave is for the care of a child after birth or adoption, you must complete the leave within one (1) year of the birth or adoption.

Watts v. Hospitality
Int Discl/RFP  0184

Intermittent leave or reduced schedule will be granted if it is medically necessary due to your own serious health condition or to care for a spouse, parent or child with a serious health condition. Intermittent or reduced leave for the birth of a child or placement of a child for adoption or foster care may be granted at the Company's discretion. You may be temporarily transferred to an alternative position with equivalent pay and benefits, which better accommodated a reduced or intermittent schedule. In addition, intermittent leave, reduced schedules, or leaves that are foreseeable, must be scheduled in a manner that will minimize disruption to operations.

## Maximum Duration of FMLA Leave

Your leave will be counted as part of your entitlement to family and medical leave under the FMLA. You are entitled to a maximum of up to 12 weeks family or medical leave during any 12-month period. Other FMLA leave (i.e. family or medical leave, disability leave, occupational disability leave, or family leave) taken during any 12-month period will be included in computing the maximum amount of leave available. The 12-month period is a "rolling" 12-period measured backward from the date an associate uses any FMLA leave.

Leave for birth or placement of a child for adoption or foster care may be limited to a combined total of 12 workweeks if both spouses are employed by the Company.

State laws affecting family and medical leave will be applied as applicable.

## Use of Unpaid Leave

You may utilize any unused vacation during your leave. You may utilize paid sick leave if the leave pertains to your own serious health condition.

## Outside Employment

You may not be employed with any employer other than the Company during your leave of absence. Outside employment during your leave will result in immediate termination.

## Continuation of Health Insurance

The Company will continue its normal contribution toward your health insurance premium for a maximum of 12 weeks during FMLA leaves taken during any 12-month period. You are required to continue to make your normal premium contribution during the entire leave of absence. Any insurance payments for which you are responsible must be made directly to your hotel by the 15th of each month in which a premium is due.

If you elect not to return to work after the expiration of your leave, you may be required to reimburse the Company for health insurance premiums paid by the Company during your leave.

# SECTION 6: **COMPENSATION**

## 6A. COMPENSATION IS CONFIDENTIAL

Hospitality Ventures' goal is to remain a competitive employer in the hospitality industry and specifically in those locations in which we operate. Wage and salary information is considered personal and confidential. As such, this information must not be discussed or disclosed except on a "need to know" basis with associates whose positions require knowledge of this information.

## 6B. PAY PERIODS

| PAY PERIOD / PAY DAY EXAMPLE | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| Week 1 |  |  |  |  |  |  | Start of Pay Period |
| Week 2 |  |  |  |  |  |  |  |
| Week 3 |  |  |  | - |  | End of Pay Period |  |
| Week 4 |  |  |  |  |  | Pay Day |  |

- Hospitality Ventures Associates are paid on a biweekly basis.

- The two week pay period begins on a Friday and ends fourteen days later, on the following Thursday.

- Paychecks and direct deposit are distributed on a one-week (seven-day) lag.

- Should a payday fall on a recognized holiday, check/direct deposits will be distributed on the last business day before the holiday. As such, any change in payday will be announced in advance.

- It is not the practice of the Company to offer salary advances.

- Associates whose pay periods are regulated by either state law or a collective bargaining agreement will be paid accordingly.

### Other Benefits Cease Accruing

You are not eligible for holiday pay during your leave of absence. In addition, you will not be eligible to accrue vacation or other accrued benefits until you return to work. You will not accrue length of service while you are on leave of absence in excess of 30 days. However, your leave of absence will not be deemed a break in your length of service.

### Reinstatement

When you are able to return to work, you should give the Company at least two (2) weeks notice. This is important so that your return to work is properly scheduled.

The Company will reinstate you to your former or equivalent position upon your return from family leave. However, the Company cannot guarantee reinstatement to your former or equivalent position if you are deemed a key associate (i.e. a salaried associate and among the highest paid ten percent of all associates within a 75 mile radius) and reinstatement would cause substantial and grievous economic hardship.

### D.2    MILITARY LEAVE

If you enter the military service, you are eligible for an unpaid military leave of absence. Present your supervisor with a copy of your service papers as soon as you receive them.

You will be reinstated upon return in accordance with applicable law. Associates on military leave are not entitled to holiday pay or insurance benefits.

## 5E. OTHER VOLUNTARY BENEFITS

In addition to our insurance plans and time-off programs, Hospitality Ventures may offer an array of other competitive and valuable benefits including:

- Voluntary Life Insurance
- Voluntary Accidental Death and Dismemberment
- Short Term Disability
- Hospitality Ventures Benefit Card

Further explanations of these benefits are found in Hospitality Ventures' Benefits Guidebook.

## 6C. PAYROLL DEDUCTIONS

Each pay day, the Company is required to withhold federal income taxes based upon the associate's earnings for the current pay period and their designated exemptions. Filing status and exemption status may be changed by obtaining a W4 (Federal) and G4 (State) form from the Human Resource department. The form should be completed and forwarded to the payroll department.

The Company is also required to deduct state, county, and city income tax in areas where such a tax is mandatory. The area is based upon the associate's zip code. Therefore, it is very important that the payroll department has the correct address of the associate including zip code. The Company is also obligated to take deductions from your pay for Social Security and Medicare. The deduction together with a matching sum paid by the Company is forwarded to the federal government to meet the cost of social welfare programs.

The Company is also required to deduct any court ordered deductions such as garnishments, tax levies, and child support payments. These deductions will be based upon the court order.

Voluntary deductions for other benefits begin when the election of the benefit takes effect. If for some reason the associate does not work a particular pay period, the benefit will go into arrears, and the amount in arrears will be deducted the next time that the associate works and receives pay. If an associate is going on leave of absence, the associate needs to coordinate with both the HR Department and Payroll concerning benefits. Any change in benefits must be coordinated through the HR Department. The HR Department will communicate changes in benefits to the Payroll Department.

## 6D. TIP REPORTING

Federal law requires the Company to notify the Internal Revenue Service when tipped associates have not reported tips equal to at least eight percent (8%) of their gross receipts. If associates collectively in any given restaurant or lounge do not report at least eight percent (8%) of sales as tips, the law requires the employer to allocate the difference between the eight percent and the actual tips reported by the associates in the restaurant or lounge. The amount will also be reported as allocated tip income to the Internal Revenue Service and to directly tipped associates on their W-2 forms.

To avoid having tips allocated directly, you should accurately report all tips through the time clock system.

This requirement does not apply to associates whose only gratuity is distributed as a portion of a function service charge.

Watts v. Hospitality
Int Discl/RFP  0188

## 6E. OVERTIME

Hospitality Ventures pays "Non-Exempt" associates at the rate of time and one-half of their regular rate for all hours worked in excess of forty (40) hours during the regularly scheduled workweek.

"Non-Exempt" associates are those who work in job classifications which are paid hourly and which are not supervisory, administrative, or sales oriented. The workweek is established as seven (7) consecutive periods of twenty-four (24) hours each. The normal workweek begins at 12:01 a.m. on Friday and ends at 12:00 midnight the following Thursday. Only hours actually worked will be included in determining overtime eligibility. The Company complies with state laws that regulate the payment of overtime.

It is Company policy that the performance of unauthorized overtime will subject the associate to disciplinary action. Therefore, if you have not been scheduled by your supervisor to work an extended shift, you must punch out at the conclusion of your regularly scheduled shift or receive approval of your supervisor or the manager on duty to incur overtime.

## 6F. TIME RECORDS

Our Company uses an automated time card system to assist our accounting department in keeping an accurate record of your time. Your wages are calculated based on the times recorded by this system, so accuracy is important. If there is some problem with your time card, contact your supervisor. You are responsible for clocking yourself in and should clock-in only yourself (no associate may clock-in or out for any other associate). You must not clock in earlier than 5 minutes before the start of your scheduled shift or clock out more than 5 minutes after your scheduled shift unless authorized by your supervisor. You must clock in and out for meal breaks.

## 10I. GIFTS AND GRATUITIES

Associates are prohibited from accepting or soliciting any benefit, gift, or gratuity from a vendor, guests, or customer. This prohibition in no way prevents accepting gratuities from customers and guests for services provided by associates in classifications normally described as tipped positions.

## 10J. INFORMATION SECURITY

We expect you to be proud of your Company and talk about it with your family, friends, and business contacts. However, do not discuss any information concerning the Company that has not been released to the public. We are in a very competitive industry, and the Company has many creative and innovative firsts to its credit. We are also in a position to have publicly acclaimed individuals as guests at our properties whose presence may or may not have been announced. Respect the confidentiality of our business by not discussing any matter not released for public consumption.

## 10K. COMPANY DRIVERS AND VEHICLES

Only those associates authorized by Hospitality Ventures are permitted to operate Company vehicles.

1. Under no circumstances is an authorized driver, or any other associate, ever allowed to operate a Company vehicle while under the influence of drugs or alcohol.
2. Associates, including authorized drivers, are not permitted to drive the automobiles of guests, except at those properties that offer valet parking.
3. All associates, prior to and during their tenure as authorized drivers, are subject to satisfactory verification of their motor vehicle records.
4. Any associate operating a Company-owned vehicle is required to wear a seat belt.

## 10L. MEAL PERIODS

A thirty (30) minute, unpaid meal period is permitted each hourly-rated associate and will be scheduled approximately midway through your shift.

Meal periods may not be at the same time for all departments and may vary depending on workloads. It is, therefore, necessary to check departmental scheduling to determine your appropriate meal period.

## 10M. STAFF DINING ROOM

When possible, a staff dining room will be provided for associates. Socializing is encouraged during lunch and breaks; however, voices must be kept at a level as not to disrupt other associates or guests. The dining room is maintained for associates and must be kept clean at all times. Food and beverage items are not permitted outside the cafeteria. Exceptions, for medical and other legitimate reason, will be discretionary.

## 10N. POSTING SCHEDULES

Your work schedule will be posted by your supervisor in a designated area. Our schedules may be hectic at times, but they are made to fit the pattern of business. You are expected to be at your workstation at the start of your regular shift. Since schedules may change, it is your responsibility to check your schedule daily.

## 10O. SHIFT SCHEDULES

Our hotels operate twenty-four fours a day, seven days per week, which requires certain job positions to be scheduled on a shift basis. Due to the nature of the hospitality industry, your shift or the total number of hours worked each week may fluctuate dependent on business needs. Generally, shift schedules are posted in advance, and it is the associate's responsibility to be aware of their next scheduled shift. Schedule changes require supervisor approval. This includes exchanging shifts or off-days with fellow associates.

# SECTION 11: ENVIRONMENT, HEALTH & SAFETY

## 11A. WORK AREAS

You must stay in your work area as defined by your supervisor. Do not enter other areas of the property unless your position calls for such action, or as instructed by your supervisor. Work areas are to be kept clear of unnecessary materials or personal items.

Radios and tape players are permitted only with permission from your Department head and must always be kept at a volume that cannot be heard outside the space in which the device is located. For safety reasons, headphones are prohibited.

## 11B. ENERGY CONSUMPTION

- Turn off lights in unused rooms.
- Close all doors when walking in or out of the building.
- Report all water leak and drips.
- Check all faucets to ensure that they are shut off before leaving a guestroom.

## 11C. SANITATION

- It is extremely important that the cleanliness of all areas of the hotel be maintained constantly and in compliance with federal, state, county, city, and hotel health and sanitation regulations.
- All food and beverage food handlers must have appropriate food handler certifications as called for above.
- Associates must wash hands before returning to work from using the restroom.
- Associates must be conscious about removing litter from work areas and public areas of the hotel.
- Associates should be conscious about cross contamination between different meats and cooked and uncooked food.

## 11D. SAFETY

Associates are expected to put safety first in the performance of duties, for the sake of all associates and guests.

To help enhance the safety efforts at the hotel, you may be asked to volunteer to be a part of the property's safety committee. The mission of the safety committee is to supplement the Company and property specific safety programs by making suggestions for improved safeguards and procedures. You may also be asked to help analyze problem areas at the hotel and provide input into what suggestions would work best.

Please note the following guidelines:

- Be aware of your surroundings. Keep in mind that although many portions of the hotel appear similar to residential surroundings, the hazards are different. Lack of attention to the surroundings could result in an injure to you, a fellow associate, or a guest.
- Report any accidents to your supervisor no matter how slight it seems.
- Clean up spills immediately. At a minimum, place a wet floor sign and station yourself at the spill until assistance arrives. Report frayed carpets, ice, or water conditions.
- Learn and follow your location's emergency instructions for fires, weather emergencies, or other situations. The guests are going to look to you for instructions and guidance on what to do. It is important to remain calm and not to panic.
- Report unsafe or potentially unsafe conditions to your supervisor.
- If a guest is injured or ill contact your supervisor for assistance at once.
- Learn and practice safe lifting practices. Learn the "safety strike zone" and the location of mechanical lifting aids for your location. Never attempt to lift an object that you do not feel you can lift properly.
- Keep walkways free of debris and items blocking the aisle-way.
- Horseplay and running are not permitted on hotel property.
- Wear the appropriate safety equipment at all times. If you need safety equipment, see your supervisor.
- Do not operate equipment that you have not been trained to operate. Do not attempt to repair equipment unless you are authorized to do so by the Chief Engineer. If a piece of equipment is locked out, do not remove the lock and tag or attempt to use the equipment.
- No smoking, except in approved areas.
- Report equipment or counter tops with exposed sharp edges.
- Report and exposed, frayed, melted or damaged wiring.
- Do not bring unauthorized visitors or children into the building.
- Review Material Safety Data Sheets on chemicals before using them.

Watts v. Hospitality
Int Discl/RFP  0193

- Use step stools and ladders when objects are out of your reach. Do not use buckets, shelves, or other similar means.
- Do not pick up broken glass with your hands. Use a brush or broom.
- Do not use your hands to push trash down into a trash container.
- Wear cut resistant gloves when cleaning slicing tools and equipment. Take particular care when wearing rings of any kind, as they may be hazardous in the performance of some job duties. Long chains or pendants should not be worn as they present a safety hazard.
- Follow proper procedures for dealing with blood and contaminated fluids.

## 11E. FIRE SAFETY AND PREVENTION

A hotel fire is one of the most serious potential emergencies that a hotel can face. The best way to deal with this is to prevent the fire from occurring. The following are some of the means to enhance the fire prevention at the hotel:

Obey all "No-Smoking" signs. Smoke only is designated areas.

Keep work areas clean. The work area should be free of oily rags, paper, and other combustible materials.

Know your role and follow your location's emergency instructions when an emergency occurs. Participate in drills conducted at your property.

Know the location of the properties fire-fighting equipment. You are not expected to use any equipment except a fire extinguisher and should only use one if you have been trained to use it, have already sounded the alarm, and are certain the extinguisher will put out the fire.

Note where your property's emergency instructions are located. If you are a room attendant, the instructions should be posted on your cart. Other departments should have their instructions posted.

### E.1   WHAT TO DO IN THE EVENT OF A FIRE

- If you see or suspect a fire, sound the alarm immediately. Call the front desk with the details of the emergency.
- If you must evacuate, go to your assigned meeting point and inform your supervisor that you are outside and safe.
- Do not enter a smoke filled area. Do not let a fire get between you and the only means of escape.
- Remain calm. The guests expect this from you and you will help them calm by staying so yourself.
- Do not use the elevators in case of a fire.
- Learn your department's specific instructions for this and other emergencies.

## 11F. TRAINING

The Company believes in the importance of ensuring that each associate has the skills necessary to competently perform his or her assigned responsibilities. Your supervisor is the best source to lead you through a departmental orientation program. In addition, you may invited to attend departmental / Company meetings and training sessions, and are encouraged to pursue self-enrichment training where each associate has the opportunity to participate.

## 11G. COMMUNICATIONS

### G.1  KEEPING INFORMED

We want you to know what is going on in the world of the Company. Remember that facts are a much better source of information than rumors or gossip. You may be asked to attend mandatory associate meetings, with pay for this purpose. Memos and bulletins will be posted with announcements of importance to you. In addition, there are official channels of communication, and you are always free to ask questions or pass on suggestions to your Department Head or General Manager.

### G.2  DEPARTMENT MEETINGS

Department meetings may be held to give you an opportunity to express your opinion about what is going on in your area and to make known problems or complaints you might have. These meetings are in no way intended to circumvent the complaint resolution procedures explained elsewhere in this Handbook.

Additionally, meetings may be held to keep you informed of various events going on in the Company and to keep you current on new associate benefits and practices.

### G.3  BULLETIN BOARDS

Announcement of upcoming hotel events, benefits, information and/or general news may be found on the bulletin boards located in associate areas. Make it a daily habit to read the bulletin board in order to keep on top of things. Permission to post any materials must be obtained in advance by your General Manager.

Watts v. Hospitality
Int Discl/RFP  0195

SECTION 12: **PLEDGES**

## 12A. HOSPITALITY VENTURES' PLEDGE TO ITS ASSOCIATES

- We realize the importance of our associates and the responsibility they each hold in their hands. We will make each associate aware of his or her importance, and they will feel valued.

- We will provide a quality product and a caring environment in which our associates enjoy working every day.

- We will centralize our policies and support while giving the hotels the freedom to execute guest service and day to day decision making.

- We will reward our associates in a timely manner and provide compensation systems linked to how we measure our success.

- We will provide our associates with the tools and recourses necessary to do their job successfully and make them experts in their field.

- We will provide a work environment that is supportive, exhibits mutual respect and one that is free of any type of harassment.

## 12B. MY PLEDGE TO HOSPITALITY VENTURES

- I realize that I play a major role in the success of Hospitality Ventures. Through my efforts in Guest Service and striving towards Operational Excellence, I will help Hospitality Ventures become the premier leader in the hospitality industry.

- I want to be the best I can be. I want to receive the training I need in order to develop the skills necessary to provide the highest level of service possible. I will learn the skills I need and I will become an expert in my field.

- I will do whatever it takes to make a guest happy. I am empowered to provide 100% Guest Satisfaction.

- I will live Hospitality Ventures' Six Principles every day. In addition, I will make every effort to deliver on the Six Guest Expectations. Every action I take, every decision I make, every conversation I have will reflect these principles and the cultures of Hospitality Ventures.

- I understand that other care about me and want me to succeed. Just as important, I care about myself and want to be the best that I can be. I make this pledge because I want to be a part of the success of Hospitality Ventures.

Watts v. Hospitality
Int Discl/RFP  0196

SECTION 13:

# ASSOCIATE HANDBOOK
# ACKNOWLEDGEMENT FORM

I have received a copy of Hospitality Ventures' Associate Handbook. I agree to fully and completely read and abide by the rules of conduct and other personnel policies set forth in ht Associate Handbook which includes, but is not limited to, the following Hospitality Ventures policies:

- Policy Against Harassment, including Sexual Harassment
- Policy Against Retaliation
- Software Policy
- Internet Policy
- E-mail Policy

I understand that Hospitality Ventures' Associate Handbook is presented as a guide for associates, supervisors and management, and contains descriptions and explanation of rules, procedures and benefits available to associates at the time of my employment. Except as otherwise expressly stated, such rules, procedures and benefits may be changed, amend, or modified by Hospitality Ventures at any time. I understand that nothing in this Associate Handbook or the Acknowledgment form shall be construed to create a contractual obligation, express or implied, on the part of Hospitality Ventures pertaining to any portion of this Handbook or any aspect of any employment.

I further understand that as a matter of Hospitality Ventures policy, every aspect of my employment relationship with Hospitality Ventures is on an at-will basis, meaning that I or Hospitality Ventures may terminate my employment at any time, for any reason, with or without cause. As part of this at-will policy, I understand that Hospitality Ventures expressly reserves its inherent authority to manage and control the business enterprise and to exercise its sole discretion to determine all issues pertaining to promotion, job assignment, demotion, transfer and discipline.

I understand that nothing contained in Hospitality Ventures' Associate Handbook or this Acknowledgment Form shall be construed to modify, change or vary the at-will nature of my employment relationship with Hospitality Ventures or create any contract pertaining to my employment, including employment for a specified period of time. Further, I understand and agree that no one other than the Chief Executive Officer, Hospitality Ventures, may modify or change the at-will nature of my employment relationship. Any such modifications must be in writing and signed by the Chief Executive Officer, Hospitality Ventures, and me to be effective.

_____           _____        _____
Associate Name (Please Print)     Associate Signature            Date

_____           _____        _____
HR Designee Name (Please Print)   HR Designee Signature          Date

Watts v. Hospitality
Int Discl/RFP  0197

SECTION 13: # ASSOCIATE HANDBOOK
# ACKNOWLEDGEMENT FORM

I have received a copy of Hospitality Ventures' Associate Handbook. I agree to fully and completely read and abide by the rules of conduct and other personnel policies set forth in ht Associate Handbook which includes, but is not limited to, the following Hospitality Ventures policies:

- Policy Against Harassment, including Sexual Harassment
- Policy Against Retaliation
- Software Policy
- Internet Policy
- E-mail Policy

I understand that Hospitality Ventures' Associate Handbook is presented as a guide for associates, supervisors and management, and contains descriptions and explanation of rules, procedures and benefits available to associates at the time of my employment. Except as otherwise expressly stated, such rules, procedures and benefits may be changed, amend, or modified by Hospitality Ventures at any time. I understand that nothing in this Associate Handbook or the Acknowledgment form shall be construed to create a contractual obligation, express or implied, on the part of Hospitality Ventures pertaining to any portion of this Handbook or any aspect of any employment.

I further understand that as a matter of Hospitality Ventures policy, every aspect of my employment relationship with Hospitality Ventures is on an at-will basis, meaning that I or Hospitality Ventures may terminate my employment at any time, for any reason, with or without cause. As part of this at-will policy, I understand that Hospitality Ventures expressly reserves its inherent authority to manage and control the business enterprise and to exercise its sole discretion to determine all issues pertaining to promotion, job assignment, demotion, transfer and discipline.

I understand that nothing contained in Hospitality Ventures' Associate Handbook or this Acknowledgment Form shall be construed to modify, change or vary the at-will nature of my employment relationship with Hospitality Ventures or create any contract pertaining to my employment, including employment for a specified period of time. Further, I understand and agree that no one other than the Chief Executive Officer, Hospitality Ventures, may modify or change the at-will nature of my employment relationship. Any such modifications must be in writing and signed by the Chief Executive Officer, Hospitality Ventures, and me to be effective.

| | | |
|---|---|---|
| Heather Watts | _Associate Signature_ 6/04 | |
| Associate Name (Please Print) | Associate Signature | Date |
| Jeanne Antonello | | |
| HR Designee Name (Please Print) | HR Designee Signature | Date |

DEFENDANT'S
EXHIBIT
4

MV 00029

45

# HOSPITALITY VENTURES MANAGEMENT, INC.

## ASSOCIATE HANDBOOK FOR HOTEL PERSONNEL

### Updated June 2002

This handbook supersedes
all previous associate handbooks
distributed by Hospitality Ventures Management, Inc.

DEFENDANT'S
EXHIBIT
5

MV 00083

## SECTION 1: **INTRODUCTION**

This Associate Handbook has been designed as a guide for new and existing Hotel Associates.

Each associate will receive a copy of the Associate Handbook. You will be asked to sign the enclosed Associate Acknowledgement Form indicating that you have read and understand its contents.

While you are expected to comply with its contents, all information you need during the course of your employment may not be contained in this handbook. It is not a legal document nor is it inclusive of all the rules, regulations, procedures, or policies that apply to associated of Hospitality Ventures Management, Inc.

From time to time, policies, procedures, and/or practices may be altered to meet the needs of the Company, its collective or individual associates, and/or to comply with legal requirements.

As well, this information is subject to changes, which supersede, modify, or eliminate the policies in this Handbook. While we will strive to announce changes, this may not always be feasible. Consequently, some changes may be made without notice. Hospitality Ventures (hereafter referred to as "Hospitality Ventures Management, Inc.," "Hospitality Ventures", or "The Company") reserves the right to interpret, alter, suspend, or terminate this guideline in its entirety or any portion thereof at any time.

Many of Hospitality Ventures' voluntary benefits outlined in this handbook are mere summaries of the actual benefits provided to associates. Details about these benefits are provided in Hospitality Venture's Benefits Guide and other documents available to you.

Regarding any associates who are currently covered under a Collective Bargaining Agreement, the Agreement will prevail in any instances of significant difference between this Handbook and the Agreement.

Additionally, you should be aware that because Hospitality Ventures has properties in many states, the laws of the state in which you work will apply to your employment. Hospitality Ventures may present associates with a supplemental associate handbook or other materials that will apply to the laws of the state in which you work.

Your employment with Hospitality Ventures is at-will. As such, this Handbook is not intended to create an expressed or implied contract of employment or other legally enforceable promise between you and the Company, and you may not rely upon it as such.

In spite of any statement contained in the Handbook or any other document or statement issued by Hospitality Ventures Management, Inc. or any of its representatives, you have the right to end your employment with the Company at any time and the Company reserves a similar right. Nothing stated in this Handbook shall be construed as impairing or altering such rights of you or the Company in any way.

# HOSPITALITY VENTURES MANAGEMENT, INC.

**To:**      Hospitality Ventures Associates

**From:**    Robert Cole

**Subject:** Welcome

It is my sincere pleasure to welcome you to the Hospitality Ventures team. You have joined Hospitality Ventures at a time of unprecedented change and great opportunity in the hospitality industry.

Hospitality Ventures is driven by the need to find the perfect balance between quality, associate satisfaction, guest satisfaction, and business success. Hospitality Ventures' management team believes emphatically in the correlation among the four.

Our management strategy is driven by the relentless pursuit of Operational Excellence with an emphasis on innovation and continuous improvement, which ultimately leads to exceeding our stakeholders' expectations. Without an intense drive to be the best in the industry, Hospitality Ventures would simply reach status quo. We do not intend to fall short of our goals.

I know you possess the drive and capabilities to play a significant role in Hospitality Ventures' growth and vision. I wish you every success in your career with Hospitality Ventures. Welcome aboard!

Sincerely,


Robert Cole
Chief Executive Officer

SECTION 2: **COMPANY OVERVIEW**

## 2A. HOSPITALITY VENTURES' HISTORY

MV 00086

## 2B. MISSION STATEMENT

Our Mission is to exceed the defined expectations of our associates, our guests, and our
shareowners, without compromising the balance of satisfaction between them. We will value
the importance of each of these three stakeholders and recognize that their satisfaction is
directly correlated.

## 2C. VISION STATEMENT

Guided by our principles, our vision is to become the premier owner and operator of hotels
and a recognized leader in the entire hospitality industry.

## 2D. GUIDING PRINCIPLES

- Deliver Heroic Service

- Keep All Promises

- Build Strong Relationships

- Work With Passion

- Keep It Fun

- Continuously Improve

MV 00087

## 2E. TEN STANDARDS OF SERVICE

**While we all know our core business is to serve our guests, the following Ten Standards of Service are just some examples of what is expected of each Hospitality Ventures Associate.**

1. Each associate will know the Hospitality Vision Statement and understand the importance of always aligning his or her individual and departmental activities to it.

2. Each associate will know the Guest Satisfaction Guarantee. An associate who receives a complaint is empowered to resolve the complaint and to follow up within 30 minutes to ensure the problem has been resolved to the guest's satisfaction.

3. Each associate will participate in a line-up prior to starting his or her shift.

4. Guests will be acknowledged and given a pleasant greeting when met be an associate. Always maintain positive eye contact and use proper vocabulary.

5. Guests' requests will be fulfilled or responded to within 15 minutes.

6. Telephones are to be answered within three rings using the proper greeting, department name, and associate name.

7. Each associate will wear the proper uniform, including nametag, and Hospitality Ventures Values Card.

8. Associates will be knowledgeable of all hotel services and hours of operation in order to answer guest inquiries. Always recommend the hotel's food and beverage and retail outlets prior to outside facilities.

9. Associates will practice teamwork, know their department's service standards, and be certified in their positions within 30 days of employment.

10. Associates will know procedures for emergency situations and will notify supervisors immediately of hazardous situations. Protection of the assets of Hospitality Ventures is the responsibility of every associate.

MV 00088

# SECTION 3: **EMPLOYMENT**

## 3A. EQUAL EMPLOYMENT, ACCOMMODATION, AND DIVERSITY

### A.1    EQUAL EMPLOYMENT OPPORTUNITY

Hospitality Ventures is committed to the practice of equal employment opportunity. Its associates and applicants for employment will not be subjected to unlawful discrimination in regard to the terms or conditions of employment on the basis of race, color, religion, gender, national origin, sexual orientation, age, disability, marital status, veterans status or any status protected by applicable law.

Terms and conditions shall include, but are not limited to, recruitment, selection, promotion, educational support, transfer, social and recreational programs, compensation, benefits, training and development, discipline, and termination.

### A.2    DISABILITY ACCOMMODATION

It is the intent of Hospitality Ventures to comply with the Americans with Disabilities Act (ADA). The Company will not discriminate against any qualified associate or job applicant with respect to any terms, privileges, or conditions of employment because of a physical or mental disability. The Company will also reasonably accommodate all associates or applicants with disabilities who are otherwise qualified to safely perform the essential duties of the job unless any such accommodations would impose an undue hardship on the Company.

Applicants and associates are assured that all information regarding a disability shall be kept confidential except that:

Supervisors and managers may be informed regarding restrictions on work or duties of disabled associates and any accommodations that have been made.

If the condition requires emergency treatment, first aid and safety personnel may be informed.

Government officials investigating compliance with federal laws may be informed.

All associates with responsibilities that may require knowledge of disabilities will be advised that they are to treat the knowledge with confidentiality.

### A.3    RELIGIOUS ACCOMMODATION

Hospitality Ventures recognizes that certain associates' religious practices, beliefs, and observations may require special consideration. Therefore, it is the policy of Hospitality Ventures to offer reasonable accommodation of applicants' and associates' religious practices, beliefs and observations in accordance with applicable federal, state, and local laws.

MV 00089

6

## A.4   DIVERSITY

Hospitality Ventures is committed to identifying, selecting, and promoting the best individuals from within our changing workforce. Hospitality Ventures strives to distinguish itself as a hotel company with an unmatched appreciation for the diversity of gender, race, heritage, religion, age, and other characteristics, which make up its guests, associates, shareholders, and business partners.

Hospitality Ventures is committed to ensure that it conducts business in a way that values and reflects the diversity of men and women who work in and patronize its properties.

# 3B. HIRING AND RECRUITMENT

## B.1   EMPLOYMENT AT WILL

Your employment with Hospitality Ventures is considered "at-will". "At-will-employment" gives the employer or the associate (employee) the right to end the relationship at any time. There is no guarantee of employment for any specific period of time and employment can be terminated for any or no reason, with or without cause, and with or without notice. Associates also have the right under the employment-at-will rule to resign their employment at any time.

## B.2   VERIFICATION OF EMPLOYMENT ELIGIBILITY

*U.S. PROPERTIES ONLY*

In accordance with the Immigration Reform and Control Act of 1986, it is Hospitality Ventures' practice to hire only those individuals who are authorized to work in the United States. Pursuant to this law, all individuals who are offered employment will be required to submit documentary proof of identity and employment authorization. Associates will also be required to complete and sign Immigration and Naturalization Service (Form I-9).

If you are authorized to work in the United States for a limited period of time, before the expiration of that period you will be required to submit proof of your employment authorization and sign another Form I-9 in order to remain employed by the Company.

# 3C. PERSONNEL RECORDS

Accurate personnel records are required for the benefit of both the associate and the Company. It is the associate's responsibility to keep Hospitality Ventures informed of current address, telephone number, insurance beneficiaries, name changes, number of dependents and individuals to notify in case of emergency. For example, Hospitality Ventures may rely on the associate's address for communications by mail, the telephone number in case of an emergency, and changes in marital status for tax withholding and Hospitality Ventures benefits.

## 3D. PROMOTIONS, LATERAL MOVES, TRANSFERS

Hospitality Ventures strives to fill open and newly created positions from within the Company through associate promotions, transfers, and lateral moves. We encourage our associates to apply or "post" for positions and welcome the opportunity to evaluate their qualifications as internal candidates for these positions.

### D.1    JOB POSTINGS

Hospitality Ventures will make information regarding Company-wide job opportunities available to associates. Please note that Hospitality Ventures reserves the right to fill positions from outside the Company when we believe such action is appropriate. We reserve the right not to post executive level positions.

### D.2    ELIGIBILITY / INTERNAL APPLICATIONS

Associates, who have been employed for at least 90 days and are interested in applying (posting) for positions, should contact their Human Resources Representative(s). Internal applications require pre-approval by your current Department Head.

To be considered for an open position, you must meet the minimum requirements of the position with or without reasonable accommodation. Your present performance, past performance ratings, specialized background, and skill are considered when evaluating your candidacy for the position. However, we must consider all applicants, and we will choose the person we determine to be best suited for the position.

If you apply for a position and are not chosen, we encourage you to continue applying when appropriate opportunities occur. A different Internal Transfer Application should be submitted for each separate position for which you wish to apply.

# 3E. ASSOCIATE CLASSIFICATION, ORIENTATION AND INTRODUCTORY PERIOD

## E.1  CLASSIFICATION OF ASSOCIATES

1(a)  Full Time Associates

Full time associates are employed to work on a regular basis for at least 24 hours per week. They are eligible for all benefits available through work at Hospitality Ventures, so long as they meet the applicable requirements, such as length of service.

1(b)  Part Time Associates

Part time associates are employed to work on a regular basis for fewer than 24 hours per week. Part time associates working less than 24 hours per week are not entitled to Company benefits.

1(c)  Temporary Associates

Temporary Associates are hired with the understanding that their employment will not continue beyond a stated date or beyond completion of a specified project or projects.

**All associates of Hospitality Ventures, whether full time,
part time or temporary, are employed at-will.**

## E.2  ORIENTATION PERIOD

The first 90 days of employment is known as the orientation period. This period is established to benefit both the associate and the Company. It is a period of adjustment and adaptation, both personally and in terms of learning the job requirements and work rules. If during this period you are unable to adapt successfully to the requirements of the position, the department, or the Company, your employment may be terminated immediately. Your supervisor may offer advice and counseling when a problem becomes apparent, however, your supervisor is not required to do so. You may be given advance notice, but that also is not required.

If you decide at any time during this orientation period that you would be happier employed elsewhere, you are free to resign at any time, just as the Company is free to end your employment at any time.

The completion of the orientation period is not cause for automatic wage increase, transfer, promotion, job reclassification, or continued employment, and it does not affect the right of you or the Company to end employment at any time for any reason.

MV 00092

9

## E.3   PERFORMANCE AND EVALUATION

After you have completed your introductory period, we will communicate our evaluation of your performance through a performance review. At this review, you will be given the opportunity to express your personal views concerning training, orientation, and assignment as well as ask any questions you might have. Your supervisor will detail any performance improvements required and explain what he or she and you may expect in the future.

The introductory review is intended to document your progress over a relatively short period and generally will not result in a wage increase.

Your performance will be scheduled for review annually based on date of hire, most recent promotion, or change of job title. However, you may request a performance evaluation at any point during your employment.

A place for your comments and signature is located on the Performance Review Form. All performance evaluations will become an addition to your permanent personnel file.

# 3F. ATTENDANCE RESPONSIBILITIES

## F.1   ATTENDANCE AND PUNCTUALITY

We are all expected to report for work on time. A good attendance record is extremely important to the Company and is obviously a requirement for continued employment. Our service is seriously affected if you or your fellow associates are absent or late. Additionally, a good attendance record is a valuable asset to you because it is one of the factors considered in the selection of associates for recognition, development reports affecting pay, transfers, and promotion. If you are going to be late, you must contact your supervisor, or if unavailable, the manager on duty, at least one hour before your shift. If you are going to be absent from a scheduled shift, you must contact your supervisor, or if unavailable, the manager on duty, two hours before the beginning of the shift.

You must recognize that we do not staff to cover for absences, and any absence negatively affects team and hotel performance. The Company generally reviews attendance on a rolling six-month period.

Absenteeism or tardiness that is not excused or excessive in the judgement of the Company is grounds for disciplinary action up to and including termination. Any associate failing to show for work or call in for three consecutive days will be removed from the payroll as a voluntary termination.

## F.2    UNEXCUSED ABSENCE

Examples of an unexcused absence include:

1. A tardiness of two hours or more;

2. A one-shift absence or partial-shift absence (e.g. leaving early);

3. Personal illness or injury, which includes doctor's appointments (subject to Hospitality Ventures' Leave of Absence procedures discussed in this handbook);

4. Illness, injury, or personal obligation within your family (subject to Hospitality Ventures' Leave of Absence procedures discussed in this handbook);

5. Transportation problems;

6. Other personal obligations of a compelling nature requiring you to be absent;

7. Unreported absences (no reporting/no call-in);

8. Any other occasion when an associate is not at work when required

## F.3    EXCUSED ABSENCE

Examples of an excused absence include:

1. Jury duty or witness subpoena from a court (must notify supervisor in advance);

2. Vacation (scheduled and approved);

3. Military service (must notify in advance);

4. Death in immediate family (must notify as soon as possible);

5. Approved training;

6. Any approved Family and Medical Leave absence.

# SECTION 4: **BENEFITS REQUIRED BY LAW**

## 4A. UNEMPLOYMENT COMPENSATION

Hospitality Ventures pays 100% of the State and Federal Unemployment Insurance premiums for each associate. This benefit is designed to pay unemployment compensation to associates who lose their job for reasons other than misconduct or voluntary resignation.

## 4B. SOCIAL SECURITY

For each associate, Hospitality Ventures pay matching funds to the Social Security Administration under the Federal Insurance Contributions Act (FICA).

## 4C. WORKERS COMPENSATION

Workers Compensation is provided, and the cost is paid by the Company for all its' associates. In the event of an on-the-job injury or illness, even though you might consider it insignificant, it must be immediately reported to your Department Head or the Personnel Representative. Only in this way can necessary medical attention be obtained. We are also required by federal law to maintain accurate records of all work-related injuries and illnesses. Therefore, your prompt reporting of any incident is critical to both you and the Company.

## SECTION 5: **VOLUNTARY BENEFITS, ASSOCIATE BENEFITS GENERAL**

### 5A. BENEFITS ELIGIBILITY

For benefit purposes:

Full Time Associates. Associates regularly scheduled to work 24 or more hours per week are considered full time associates and are eligible for all Company-provided benefits. Full-time associates are not guaranteed by the Company to be scheduled 24 or more hours each week.

Part Time Associates. Associates working less than 24 hours per week are considered part time associates. Part time associates are not eligible for Company-provided benefits, except those benefits required by federal or state law.

**NOTE: The foregoing classifications do not constitute a guarantee that any associate's employment will continue.**

### 5B. INSURANCE

All full time associates are eligible to participate in Hospitality Ventures' Medical Insurance Plan.

Your benefits book will explain in detail these and other insurance benefits that Hospitality Ventures offers.

### 5C. VACATION AND ILLNESS

#### C.1    VACATION

Full time associates are eligible for vacation every year on their anniversary date. Vacation is earned annually on an anniversary date to anniversary date basis. Upon separation from the Company, you will be paid any earned and unused vacation pay.

#### C.2    REQUESTING TIME OFF

To request time off (e.g., vacation, holidays, personal days), a request form must be completed, approved and signed by your supervisor, and returned to a Payroll Representative.

MV 00096

## 5D. LEAVE OF ABSENCE

It is the policy of Hospitality Ventures to grant a leave of absence to associates, whenever possible, for justifiable reasons such as personal emergencies. All leaves must be requested in writing and approved, in advance whenever possible. At a minimum, the associate's Department Head, Human Resources Representative, and General Manager must approve all leaves. No open-ended leaves are approved.

### D.1  FAMILY AND MEDICAL LEAVE

**Eligibility Requirements**

If you have at least one (1) year of service, have worked at least 1,250 hours during the 12 months immediately prior to the date requested for leave, and are employed at a work-site which employs 50 or more associates within 75 miles of your work-site, you will be eligible for an unpaid leave of absence in the event of:

1. the birth of a child;
2. the placement of a child for adoption or foster care;
3. the care of a parent, spouse or child with a serious health condition; or
4. your own serious health condition.

**Requests for FMLA Leave**

All requests for a Family or Medical Leave of absence (or extensions) must be submitted on a "Leave of Absence Request" form for final approval. If the need for the leave is foreseeable, you must provide at least 30 days advance notice.

**Medical Certification**

If your leave is due to your own serious health condition or is to care for a child, spouse, or parent who has a serious health condition, your request must be accompanied by a "Medical Certification" which may be obtained from the personnel's department. Absent extenuating circumstances, failure to provide the "Medical Certification" within 15 days of your request for leave will result in denial of your leave and any time off will be deemed an unexcused absence.

If your leave exceeds 30 days, or you ask for an extension of your leave, you may be required to provide additional medical certification of your inability to work.

The Company may require you to obtain a second or third option. If a second or third option is requested, the Company will pay the cost of the examination.

**Scheduling Of Leave**

If the leave is for the care of a child after birth or adoption, you must complete the leave within one (1) year of the birth or adoption.

MV 00097

14

Intermittent leave or reduced schedule will be granted if it is medically necessary due to your own serious health condition or to care for a spouse, parent or child with a serious health condition. Intermittent or reduced leave for the birth of a child or placement of a child for adoption or foster care may be granted at the Company's discretion. You may be temporarily transferred to an alternative position with equivalent pay and benefits, which better accommodated a reduced or intermittent schedule. In addition, intermittent leave, reduced schedules, or leaves that are foreseeable, must be scheduled in a manner that will minimize disruption to operations.

## Maximum Duration of FMLA Leave

Your leave will be counted as part of your entitlement to family and medical leave under the FMLA. You are entitled to a maximum of up to 12 weeks family or medical leave during any 12-month period. Other FMLA leave (i.e. family or medical leave, disability leave, occupational disability leave, or family leave) taken during any 12-month period will be included in computing the maximum amount of leave available. The 12-month period is a "rolling" 12-period measured backward from the date an associate uses any FMLA leave.

Leave for birth or placement of a child for adoption or foster care may be limited to a combined total of 12 workweeks if both spouses are employed by the Company.

State laws affecting family and medical leave will be applied as applicable.

## Use of Unpaid Leave

You may utilize any unused vacation during your leave. You may utilize paid sick leave if the leave pertains to your own serious health condition.

## Outside Employment

You may not be employed with any employer other than the Company during your leave of absence. Outside employment during your leave will result in immediate termination.

## Continuation of Health Insurance

The Company will continue its normal contribution toward your health insurance premium for a maximum of 12 weeks during FMLA leaves taken during any 12-month period. You are required to continue to make your normal premium contribution during the entire leave of absence. Any insurance payments for which you are responsible must be made directly to your hotel by the 15th of each month in which a premium is due.

If you elect not to return to work after the expiration of your leave, you may be required to reimburse the Company for health insurance premiums paid by the Company during your leave.

**Other Benefits Cease Accruing**

You are not eligible for holiday pay during your leave of absence. In addition, you will not be eligible to accrue vacation or other accrued benefits until you return to work. You will not accrue length of service while you are on leave of absence in excess of 30 days. However, your leave of absence will not be deemed a break in your length of service.

**Reinstatement**

When you are able to return to work, you should give the Company at least two (2) weeks notice. This is important so that your return to work is properly scheduled.

The Company will reinstate you to your former or equivalent position upon your return from family leave. However, the Company cannot guarantee reinstatement to your former or equivalent position if you are deemed a key associate (i.e. a salaried associate and among the highest paid ten percent of all associates within a 75 mile radius) and reinstatement would cause substantial and grievous economic hardship.

## D.2    MILITARY LEAVE

If you enter the military service, you are eligible for an unpaid military leave of absence. Present your supervisor with a copy of your service papers as soon as you receive them.

You will be reinstated upon return in accordance with applicable law. Associates on military leave are not entitled to holiday pay or insurance benefits.

# 5E. OTHER VOLUNTARY BENEFITS

In addition to our insurance plans and time-off programs, Hospitality Ventures may offer an array of other competitive and valuable benefits including:

- Voluntary Life Insurance
- Voluntary Accidental Death and Dismemberment
- Short Term Disability
- Hospitality Ventures Benefit Card

Further explanations of these benefits are found in Hospitality Ventures' Benefits Guidebook.

# SECTION 6: **COMPENSATION**

## 6A. COMPENSATION IS CONFIDENTIAL

Hospitality Ventures' goal is to remain a competitive employer in the hospitality industry and specifically in those locations in which we operate. Wage and salary information is considered personal and confidential. As such, this information must not be discussed or disclosed except on a "need to know" basis with associates whose positions require knowledge of this information.

## 6B. PAY PERIODS

| PAY PERIOD / PAY DAY EXAMPLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
| Week 1 | | | | | | | Start of Pay Period |
| Week 2 | | | | | | | |
| Week 3 | | | | | | End of Pay Period | |
| Week 4 | | | | | | Pay Day | |

- Hospitality Ventures Associates are paid on a biweekly basis.
- The two week pay period begins on a Friday and ends fourteen days later, on the following Thursday.
- Paychecks and direct deposit are distributed on a one-week (seven-day) lag.
- Should a payday fall on a recognized holiday, check/direct deposits will be distributed on the last business day before the holiday. As such, any change in payday will be announced in advance.
- It is not the practice of the Company to offer salary advances.
- Associates whose pay periods are regulated by either state law or a collective bargaining agreement will be paid accordingly.

MV 00100

## 6C. PAYROLL DEDUCTIONS

Each pay day, the Company is required to withhold federal income taxes based upon the associate's earnings for the current pay period and their designated exemptions. Filing status and exemption status may be changed by obtaining a W4 (Federal) and G4 (State) form from the Human Resource department. The form should be completed and forwarded to the payroll department.

The Company is also required to deduct state, county, and city income tax in areas where such a tax is mandatory. The area is based upon the associate's zip code. Therefore, it is very important that the payroll department has the correct address of the associate including zip code. The Company is also obligated to take deductions from your pay for Social Security and Medicare. The deduction together with a matching sum paid by the Company is forwarded to the federal government to meet the cost of social welfare programs.

The Company is also required to deduct any court ordered deductions such as garnishments, tax levies, and child support payments. These deductions will be based upon the court order.

Voluntary deductions for other benefits begin when the election of the benefit takes effect. If for some reason the associate does not work a particular pay period, the benefit will go into arrears, and the amount in arrears will be deducted the next time that the associate works and receives pay. If an associate is going on leave of absence, the associate needs to coordinate with both the HR Department and Payroll concerning benefits. Any change in benefits must be coordinated through the HR Department. The HR Department will communicate changes in benefits to the Payroll Department.

## 6D. TIP REPORTING

Federal law requires the Company to notify the Internal Revenue Service when tipped associates have not reported tips equal to at least eight percent (8%) of their gross receipts. If associates collectively in any given restaurant or lounge do not report at least eight percent (8%) of sales as tips, the law requires the employer to allocate the difference between the eight percent and the actual tips reported by the associates in the restaurant or lounge. The amount will also be reported as allocated tip income to the Internal Revenue Service and to directly tipped associates on their W-2 forms.

To avoid having tips allocated directly, you should accurately report all tips through the time clock system.

This requirement does not apply to associates whose only gratuity is distributed as a portion of a function service charge.

MV 00101

## 6E. OVERTIME

Hospitality Ventures pays "Non-Exempt" associates at the rate of time and one-half of their regular rate for all hours worked in excess of forty (40) hours during the regularly scheduled workweek.

"Non-Exempt" associates are those who work in job classifications which are paid hourly and which are not supervisory, administrative, or sales oriented. The workweek is established as seven (7) consecutive periods of twenty-four (24) hours each. The normal workweek begins at 12:01 a.m. on Friday and ends at 12:00 midnight the following Thursday. Only hours actually worked will be included in determining overtime eligibility. The Company complies with state laws that regulate the payment of overtime.

It is Company policy that the performance of unauthorized overtime will subject the associate to disciplinary action. Therefore, if you have not been scheduled by your supervisor to work an extended shift, you must punch out at the conclusion of your regularly scheduled shift or receive approval of your supervisor or the manager on duty to incur overtime.

## 6F. TIME RECORDS

Our Company uses an automated time card system to assist our accounting department in keeping an accurate record of your time. Your wages are calculated based on the times recorded by this system, so accuracy is important. If there is some problem with your time card, contact your supervisor. You are responsible for clocking yourself in and should clock-in only yourself (no associate may clock-in or out for any other associate). You must not clock in earlier than 5 minutes before the start of your scheduled shift or clock out more than 5 minutes after your scheduled shift unless authorized by your supervisor. You must clock in and out for meal breaks.

MV 00102

# SECTION 7: **DISCIPLINARY ACTION, TERMINATION**

As an associate of the Company, you are required to abide by Hospitality Ventures' policies, procedures, and standards of conduct. Failure to do so may result in disciplinary action up to and including termination. Examples of disciplinary action may include verbal warning, written warning, performance probation, or suspension.

The Company's normal practice is to help you identify problems and to improve your performance and behavior. Hospitality Ventures reserves the right to determine the appropriate course of disciplinary action.

You will be given a copy of all warnings and the opportunity to write any comments you may have. Copies are maintained in your employment file.

Disciplinary action may be taken for repeated violations of a specific nature, such as inappropriate conduct, time and attendance or work performance standards.

Suspension Pending Investigation: Under certain circumstances, an associate may be suspended pending investigation. Should an investigation determine that no violation has occurred, there will be no loss of wages or benefits during the time of suspension.

However, should the investigation conclude that a violation has occurred, the period of suspension, in part or whole, may be applied as disciplinary action, and the suspension will be unpaid.

Should the violation prove serious enough to result in termination, the termination will be effective as of the last day worked.

You will be given an opportunity to review all warnings and the opportunity to write any comments you may have. Copies are maintained in your employment file.

MV 00103

# SECTION 8: **SEPARATION FROM EMPLOYMENT**

## 8A. SEPARATION PROCESSING

Associates leaving the Company may be requested to participate in an exit interview and out-processing with a Human Resources Representative. Paychecks are available on the next regularly scheduled payday following termination, except as otherwise provided by state law. At the time of receiving a final paycheck, all Company property including, but not limited to, cash banks, keys, identification cards, name tags and uniforms, must be returned.

## 8B. RESIGNATION

As a matter of courtesy, associates who decide to leave the Company are asked to give at least a two-week written notice.

## 8C. REDUCTION IN WORK FORCE

When an associate's position is eliminated and no other suitable positions are available, the termination is classified as a layoff. Displaced associates recalled within sixty days will retain the seniority and benefits to which they were previously eligible prior to the layoff.

The separation period will not be considered in determining eligibility for benefits based on service, such as vacation accrual, personal day accrual, etc., nor will any other service-based benefit be make retro active to cover the period of separation.

## 8D. TERMINATION

Associates who are terminated will no longer receive pay or benefits after their termination date.

## 8E. REHIRE / NO-REHIRE POLICY

Associates who decide to leave the Company will be given either a "Rehire" or a "No-Rehire" status. The Company reserves the right to assign the rehire eligibility.

## 8F. POST-EMPLOYMENT REFERENCES

Generally, the only associate information provided by the Company is employment start date, position, and status. Company associates are not authorized to provide post-employment references.

# SECTION 9: **ASSOCIATE CONDUCT & RESPONSIBILITIES**

## 9A. STANDARDS OF PROFESSIONALISM

Hospitality Ventures' success is measured by how well our customers or guests respond to the service we provide. Your behavior is the most lasting impression the guest will have and the first recollection that will influence a decision for repeat business. You must constantly be aware that in dealing with our guests, you are creating an impression. Make the most of this opportunity.

The Company will not tolerate rude, discourteous, or any other conduct less than professional. Such actions will be sufficient cause for disciplinary action up to and including termination.

There are certain patterns of personal conduct that are dictated by common sense, but as a reminder, the following are some suggestions to keep in mind:

### COURTESY
Courtesy and kindness are fundamental to our relationships with guests, vendors, customers, and fellow associates. Personal courtesy and kindness always helps in the performance of any task.

### ENTHUSIASM
A whole-hearted, positive attitude that spells success often contributes to a warm response from those we meet during our daily activities.

A pleasant smile is a MUST! It will prove to be a terrific asset!

### ORGANIZATION
An orderly approach toward your work improves accuracy and saves you time. From the work area to the performance of your daily activities, neatness and organization reflects positively on each associate.

### COOPERATION
While you may be assigned to a particular department, every associate is a vital part of the Hospitality Ventures team. Teamwork is essential to any company. Here at Hospitality Ventures, meeting the needs of our customers, whether internal or external is the foundation to Hospitality Ventures' commitment to operational excellence.

## 9B. TELEPHONE COURTESY

Telephone courtesy is of prime importance in establishing Hospitality Ventures' professional image with guests and other callers. Standards of telephone courtesy at Hospitality Ventures are as follows:

- Answer all calls within three rings.
- Be ready to talk as soon as you pick up the receiver.
- Answer calls on another associate's desk or area when unoccupied.
- Answer all calls with "Thank you for holding" or "Good morning/afternoon/evening," and "May I help you?"
- Always go back to acknowledge a waiting party every 30-45 seconds. Offer your help or take a message.
- When putting someone on hold to answer another line, always give the second caller an explanation that you are on another call and allow the second caller time to acknowledge and agree to hold before doing so.
- Return all telephone messages promptly (within one hour if possible) upon return to your work area.
- Put a smile in your voice. Be helpful and pleasant.
- To be of maximum help to our guests, speak distinctly and directly into the receiver.
- Always keep writing materials near the telephone and take careful notes, in particular, the caller's name, telephone number, and the nature of the call.

Associates will minimize placing or receiving personal telephone calls during working hours. It is recognized that family needs sometimes require such calls. Excessive personal telephone use will not be permitted and constitutes a basis for disciplinary action up to and including termination. All personal telephone call expense abuses will be charged to the associate.

MV 00106

## 9C. PERSONAL APPEARANCE STANDARDS

Work attire is considered inappropriate when clothes are offensive or in poor taste relative to a business environment. If you are unsure as to what constitutes as appropriate appearance or attire, check with your General Manager.

It is each associate's responsibility to always adhere to appearance standards set forth by his or her manager.

Remember – YOU benefit from good appearance – it boosts your poise and self-confidence.

### C.1   APPEARANCE AND DRESS

As an associate of the Company, you are expected to take pride and care in your personal appearance, dress, and general grooming. Cleanliness and caring for your personal hygiene is a requirement. All associates are asked to be conservative in their appearance. Moustaches, beards, and goatees are acceptable if they are full, neatly trimmed, and grown during a vacation or non-working period.

1. Clothes and uniforms should be clean, freshly pressed, and well coordinated.

2. If not ordinarily a part of your uniform, non-business casual wear such as, but not limited to, worn jeans, overly tight fitting clothing, tank tops, T-shirts, short shorts, cut-off shorts, sheer tops, bare-backed dresses, or midriffs tops are NOT permitted.

3. Hair, fingernails, make-up, and jewelry should be conservative. Hair should be clean, of appropriate length, and well kept. Long hair must be pushed close to the head or pulled away from the face and securely fastened. No extreme braids or extreme hair ornaments will be permitted. Jewelry should be appropriate with the uniform. Excessive jewelry is not allowed.

4. Hats are not permitted unless they are part of a uniform. This would include, but is not limited to, bandanas and caps. Exceptions for this must be cleared by your General Manager.

5. If you work in a guest contact area, your supervisor will specify the type of shoes you wear. They must be kept shined and in good repair at all times. Those working the back of the house should wear shoes that are safe for their type of work. Sandals, flip-flops, tennis hoes, clogs, platform shoes, moccasins, slippers, or other similar footwear are NOT acceptable unless specifically approved by your supervisor.

6. Unless dictated by your uniform, appropriate hosiery is required.

7. Uniform jackets must be zipped or buttoned at all times.

8. Associates are expected to practice good oral hygiene.

9. Perfume or cologne may be worn only in moderation.

While this list may not be all-inclusive, the Company reserves the right to determine what is considered appropriate.

MV 00107

24

## C.2   UNIFORMS

Depending upon your position, the Company may require you to wear a uniform. Uniforms will not be worn outside your hotel property except when traveling to and from work. You may have to wear other personal items with your uniform, such as a tie. Your Department Head will advise what you will need to wear as well as any optional accessories that are acceptable. All items must be clean and in good repair.

# 9D. ASSOCIATE RELATIONSHIPS

The Company has no desire to intrude into the private lives of its associates. However, associates should be aware of the Company's commitment to provide a working environment free from sexual harassment due to perceived conflict of interest, and that the Company may face potential liability because any consensual social relationship between associates could ultimately change and result in allegations which would require an investigation and possible disciplinary action.

Accordingly, associates are prohibited from dating direct subordinates and from maintaining or entering into any other off-duty consensual relationships with another Company associate which could have potential conflicts of interest.

It is Hospitality Ventures' general practice to employ family members and relatives only in those positions where one family member does not directly supervise another. Any exception to this will need the approval of the Vice President, Human Resources.

The Company recognizes that mutual associate participation in a variety of off-duty activities may not be subject to the above potential disadvantages and fall outside the intent of this Policy.

Any associate who is uncertain about or has a question regarding dating or other off-duty social relationships or activities should consult his or her immediate supervisor.

If sexual harassment difficulties arise, this will be addressed through the Company's sexual harassment policy.

# 9E. POLICY AGAINST HARASSMENT

Hospitality Ventures is committed to maintaining a working environment free of harassment and has established a Zero Tolerance policy to accomplish this goal. Harassment in the workplace can be evidenced by an associate subjected to unwelcome conduct, of any nature, which is based upon protected status and which affects tangible job benefits or interferes with an associate's ability to perform his or her job or that which creates an intimidating, hostile, or offensive working environment. Hospitality Ventures has established a Zero Tolerance policy against harassment of any associate by anyone, including but not limited to managers, supervisors, coworkers, vendors, and guests, on the basis of the associate's gender, color, race, age, national origin, disability, religion, marital status, veterans status, sexual orientation, or other protected status.

MV 00108

25

**Sexual Harassment**

Sexual Harassment, while not commonly thought of as discrimination, constitutes illegal discrimination. Sexual harassment can be evidenced by sexual advances, requests for sexual favors, or other unwelcome conduct whereby:

- Submission to the sexual conduct is explicitly or implicitly made a condition of continued employment or other such terms or conditions of employment;
- Employment decisions affecting an individual are based upon his or her submission to or rejection of such conduct; or
- The conduct has the purpose or effect of unreasonably interfering with the associate's work performance or creating an intimidating, hostile, or offensive work environment.

Sexual harassment can be evidenced by unwelcome conduct which is sexual in nature, directed at an associate because of his or her gender, and has an adverse effect on a term, condition, or privilege of employment, such as promotions, pay rates, continued employment, work performance evaluations, etc. Sexual harassment also includes changing an associate's job conditions, including position held, pay rate, and advancement prospects, as a result of the associate's refusal to submit to sexual demands or advances. Other examples of conduct that may be regarded as sexual harassment are unwelcome physical conduct, explicit or implicit propositions, requests, demands, or other pressure for sexual favors, or the display of sexually explicit or offensive printed or visual materials in the workplace.

All complaints about harassment will be taken seriously and a prompt investigation will be undertaken. The specific procedure for reporting harassment is covered in the next section of this handbook (9F. Associate Issue Resolution). All investigations will be conducted as confidentially as possible and appropriate action designed to remedy the situation will be taken.

# 9F. ASSOCIATE ISSUE RESOLUTION

Work related issues such as scheduling, availability of supplies, time off requests, etc., are best addressed by going to your immediate supervisor. Most problems can be solved at this level. However, if you believe that you have not received a satisfactory response, you may contact the next appropriate level of management up to the Regional Vice President of Operations.

Hospitality Ventures recognizes that associates may not always be comfortable or in a position to discuss concerns with their immediate supervisor. These issues might include employment opportunity, employment discrimination, harassment, reasonable accommodation, or retaliation as described herein. You are encouraged to bring these concerns to the attention of your Human Resources Representative or your General Manager, Regional Operations Manager or Vice President of Operations. Issues not resolved to the associate's satisfaction at this level will be forwarded to and addressed by the Vice President, Human Resources, Hospitality Ventures.

Should the situation warrant further discussion, associates are encouraged to contact the Vice President, Human Resources, in Hospitality Ventures' corporate office at 404-467-9299.

## 9G. POLICY AGAINST RETALIATION

In furtherance of Hospitality Ventures' Zero Tolerance of discrimination and harassment, it is also Company policy that no associate shall be subjected to retaliation for reporting (internally or externally) or expressing opposition to any incident of discriminatory harassment or for cooperating, assisting, or otherwise participating in the investigation of any unlawful discrimination or discriminatory harassment. Retaliatory action against an associate under such circumstances is subject to the identical policy and procedures concerning discrimination and sexual harassment including discipline up to and including termination.

Any associate who believes he or she has been subjected to retaliation should immediately report the conduct to your human resources representative or your hotel's General Manager. All reports of retaliation will be investigated fully and promptly, and to the extent reasonably possible, on a confidential basis. If a non-associate is involved, the Company will take whatever corrective action is appropriate given the circumstances.

For the purposes of this policy, retaliation can include but is not limited to termination of employment, demotion, discipline, transfer, change of schedule or job duties, or reduction in pay or benefits.

## 9H. DRUG AND ALCOHOL ABUSE

Hospitality Ventures has a firm commitment to its associates and the community to provide a healthy and sage environment in which to work and live. Alcohol and drug use constitutes a potential danger to the security and welfare of our guests and our fellow associates, and exposes Hospitality Ventures to the risk of property loss or damage.

As such, it is important to clarify Hospitality Ventures' position and rules regarding the use of drugs and alcohol by associates. This applies equally to illicit drugs, alcohol and any prescription or over-the-counter drug that may impair any part of any associate's mind or physical body.

In order to succeed in a competitive market, Hospitality Ventures must provide the best quality of service to our guests. To do this, every associate's job must be performed to the best of his/her ability with a clear mind. Drug or alcohol impairment would make this achievement impossible. Safety is seriously compromised when all associates are not acting with a clear mind while doing their assigned jobs. Impaired associates make mistakes that cause injury to guests or to other associates or damage to property.

MV 00110

Therefore, all associates are required to abide by the following rules:

- You shall not report to work under the influence of any substance, including but not limited to illicit drugs or alcohol, which prevents you from performing your job duties.
- You shall not possess, sell, trade or use any illicit drugs during working hours or while on Hospitality Ventures' property.
- You shall not possess or use alcohol while on Hospitality Ventures property unless you reside on property and are on non-working time or you are visiting another associate who resides on property during non-working hours.
- Prescription drugs may not be used without a valid prescription from a health care provider and must be taken only according to the health care provider's instructions. Over-the-counter medications also may not be abused and must be taken only according to the manufacturer's directions.

Hospitality Ventures intends to cooperate in requests for criminal prosecution of associates who are involved in the sale or distribution of illegal drugs on Company property.

## 9I. SMOKING

To maintain a safe and comfortable working and guest environment, and to ensure compliance with applicable laws, smoking and use of tobacco products is strictly regulated.

Associates are not allowed to smoke or use tobacco products, whether on or off duty, in any work area, guestroom, corridor, lobby, or any other area where they may be viewed by the guests of the Company. The use of chewable and/or smokeless tobacco is also prohibited in these areas.

Smoking must be done in designated areas only, and only during an authorized break.

## 9J. WEAPONS AND FIREARMS

Weapons of any kind, on any Hospitality Ventures' property, are absolutely prohibited at all times. This prohibition extends to Company owned vehicles.

Weapon is defined as any firearm, article, or device intended or designed to cause personal injury or death. This definition applies to licensed or otherwise legal weapons, as well as illegal weapons and both concealed and unconcealed weapons. Hospitality Ventures reserves the right to determine what constitutes a weapon.

This prohibition applies to all associates, contractors, vendors, and consultants of Hospitality Ventures. This prohibition extends to any person in any non-Hospitality Ventures facility while in the course and scope of Hospitality Ventures employment.

MV 00111

Exceptions: On duty law enforcement officers and other government personnel authorized by law to carry weapons; armored car personnel; associates or non-associates who have been pre-authorized by the Vice President of Operations, Hospitality Ventures.

Any violation of this procedure by an associate will lead to disciplinary action up to and including termination. Furthermore, Hospitality Ventures will assist as necessary with prosecution whenever a violation of this procedure involves a criminal offense.

# 9K. USE OF COMPUTING & COMMUNICATIONS RESOURCES

## K.1 HOSPITALITY VENTURES' SOFTWARE POLICY

Unauthorized duplication of copyrighted computer software violates the law and is contrary to Hospitality Ventures' standards of conduct.

We are being required to establish and maintain a policy as it relates to Software Code of Ethics and have a signed contractual agreement to allow two (2) inspections per year at all offices and property locations to confirm the absence of software copyright infringement. It is imperative that all associates understand the significance of protecting their PC stations against unauthorized software duplication.

This is not a simple employer request, it is the Law. The Law states: "...illegal duplication of computer software may constitute criminal copyright infringement which is punishable by a fine of up to \$250,000 and imprisonment for up to five years".

### Hospitality Ventures' Policy on Software Licensing is as follows:

- Use or copying of any software product in violation of the applicable license agreement is strictly prohibited.
- All computers purchased and used by Hospitality Ventures are being supplied with licensed copies of software programs.
- Any associate found copying software other than for backup purposes is subject to termination.
- Any associate who gives software to any other person is subject to termination.
- Knowledge of a policy violation must be reported to the Company.
- Associates may NOT install personal software on a Company owned computer.
- All software MUST be installed by a member of the IT staff to ensure its compatibility as well as to verify the license agreement.
- Any associate who installs software without the consent of the IT staff may be subject to disciplinary action.
- Third Party Screensavers are not allowed to be installed on any Company owned computers due to their potential conflict with system stability and support.

MV 00112

## K.2   HOSPITALITY VENTURES' INTERNET POLICY

Internet service has been provided to all associates to facilitate the efficiency of informational data gathering. Entertainment purposes during business hours were not our intent.

It is our obligation to inform you that we have access to the names of specific locations on the Internet that EACH and EVERY computer on our network accesses. Again, you are using the Company connection to the web; it is our right to monitor every web site you visit.

### Our Policy on Using the Internet is as follows:

- The Internet should be used for business purposes only.

- Internet users are to refrain from displaying or distributing material (text, audio, or video) which is obscene or harassing. Displaying or distributing such information will be considered a violation of our policy, which specifically prohibits the distribution of obscene materials and harassment.

- Users are to refrain from making public to users any obscene materials or direct links to obscene locations elsewhere on the Internet through the worldwide web, e-mail, or any other systems.

- Users are to refrain from deliberately performing any act that will impair the operation of any facet of our computing resources. Such acts include injecting computer viruses and sending excessively large mailings, downloading of non-business related documents and programs, batch programs, "junk mail" (including chain letters), etc.

- User who are found using the Internet for purposes other than business, such as for recreation, entertainment, engaging in chat rooms, personal and extracurricular work during business hours will be considered in violation of our Internet policy and may be subject to suspension of Internet access or even termination of employment.

- Newsgroups and chat areas are often controversial due to their sometimes-explicit nature. Be aware that offensive materials may be found. Under no circumstance should a reply be sent to offensive messages, nor shall they be copied or forwarded.

- Test all down loaded files for viruses. Copyright and licensing laws must be observed prior to using downloaded files.

## K.3   HOSPITALITY VENTURES' E-MAIL POLICY

"While most large companies now use e-mail, many don't have an official e-mail policy. In the absence of a policy, employees often feel a false sense of security, particularly because many e-mail accounts are password protected. Passwords do offer some protection, but not from system administrators, who can usually access almost anyone's e-mail. This comes as news to many employees who mistakenly believe that communication with colleagues is private. In fact, in a number of cases, casual e-mail messages that criticized the company have landed on the boss's desk. The result? The employees were fired. In the ensuing lawsuit, the courts have backed up the companies' actions." –Internet Law Update, 1996

MV 00113

"Employers should take whatever steps are necessary to avoid giving employees the incorrect impression that they have a reasonable expectation of privacy." -Technology Law Bulletin

**Our Policy on E-mail Usage is as follows:**

- E-mail should only be used for business purposes.
- E-mail messages are considered Company property when using Company purchased e-mail software.
- Solicitation is not allowed on the e-mail system.
- E-mail messages may not be offensive, discriminatory, or intended to frighten, intimidate, abuse or harass another person.
- E-mail messages which contain offensive graphics, offensive or discriminatory jokes, crude and foul dialogue are considered in violation of our policy and may be applicable to penalties under our sexual harassment policies.
- Forwarding of chain letter e-mails is strictly prohibited and will result in a 30-day suspension of the e-mail system.
- We may monitor e-mail for business purposes, and associates have no right to privacy in any messages.
- Deletion of a message does not protect privacy.
- We reserve the right to monitor and access all e-mail messages.
- Knowledge of a policy violation must be reported to the Company.
- Discipline or termination may result from violation of the policy.
- Treat your e-mail system at work as you should your business telephone. Strictly limit your communications with family and friends. Do not send a message if you would be uncomfortable having a coworker or your employer read it.

## 9L. MISREPRESENTATION

Hospitality Ventures is proud of its reputation for integrity and for the good business ethics of its associates.

Any associate who deliberately makes any untruthful or misleading statement, omission, or falsification so as to jeopardize the reputation or legal position of the Company, may be subject to termination.

Hospitality Ventures' stationery is to be used for authorized business only. It may not be used for personal letters or other non-Company use.

MV 00114

## 9M. PERSONAL PAGERS AND CELLULAR TELEPHONES

Personal pagers and cellular telephones are not allowed while on duty unless authorized by the General Manager. If you receive an emergency telephone call or visit, your manager or Department Head will inform you immediately.

## 9N. HOTEL SECURITY

You have a responsibility to observe and maintain established regulations ensuring the security of the hotel, your associates, and the guests. The following information is not all encompassing, but observing these measures will assist in maintaining a more secure environment:

- Report any suspicious activity to your supervisor.
- Never reveal the room number of a guest.
- Keys issued to you in the course of employment are hotel property. This includes hard keys and card keys.
- If a guest approaches and asks to have a room opened because they have lost a key, send them to the front desk. Do not open the door for the guest. Explain to the guest that it is for their own safety and security to have them go to the front desk.
- If a room attendant, only open the room that you are cleaning. Opening multiple room doors creates a favorable environment for theft of guest property, hotel property or allows someone to enter the room and wait to harm you.
- If issued keys, keep them on your person at all times while on hotel property. Hotel keys should not be taken off property.
- Do not leave room lists or other means of identifying the rooms' occupants out in the open for the public to view.
- Close all doors that you find propped open.
- If you have a cash bank as part of your job, do not leave it unattended.
- Do not display or count cash out in the open.
- Do not leave personal items in unsecured areas.
- Direct media and the press to the General Manager.
- Surrender money in the event of a robbery.

MV 00115

## 9O.  OFF-DUTY HOURS

In order to keep all facilities available for our guests and to prevent awkward situations from occurring, you are requested not to socialize on the property during your non-working hours.  This includes, but is not limited to, guests' rooms, restaurant, cocktail lounge, health club, and swimming pool areas.  In addition, an associate is not to enter the property more than fifteen minutes prior to the start of a shift and must vacate the property within fifteen minutes of the close of the shift.  While on duty, you are requested not to socialize or visit with guests, or outside visitors except in the performance of your duties.

## 9P.  CHILDREN AND VISITORS

Under no circumstances or at any time will visiting family members or friends of any associate be allowed in non-public areas of the Hotel.  Likewise, friends and family members visiting associates during working hours are discouraged.  Any exception must be pre-approved by the General Manager.

If a child of an associate is brought on Hospitality Ventures' property, the associate must hold the Company harmless in the event of an injury or accident while on the premises.

MV 00116

## 9Q. STANDARDS OF CONDUCT

Hospitality Ventures, like any other business maintains certain rules of standard. These are important and require full cooperation of all associates. Failure to adhere to Hospitality Ventures' Standards of Conduct may result in disciplinary action from a warning or other disciplinary action to a dismissal may follow.

Explanations are provided to help illustrate the following rules on conduct, but are not intended to limit or restrict the rules to just the examples provided.

**The following examples illustrate violations of Hospitality Ventures' Standards of Conduct. This list is not considered inclusive.**

1. Discourtesy to a guest, including using vulgarity or failing to give a high degree of service to any guest, soliciting any gratuities from a guest, or commenting in any way as to the amount of gratuity given;

2. Failure to comply with Hospitality Ventures' search and inspection procedures;

3. Supplying false or misleading information when applying for employment, or at any time during your employment;

4. Altering or falsifying work or time records, guest checks, or gift certificates;

5. Theft or misappropriation of guest, associate, or Company property. This includes the addition of tips to guest check and failure to report lost and found articles;

6. Possessing dangerous or deadly firearms on Company premises, while off Company premises in the performance of Company duties, or while attending Company-sponsored functions;

7. Immoral or indecent conduct; soliciting persons for immoral purposes, or the aiding and abetting of such conduct;

8. Unauthorized use, possession, or sale of intoxicants or drugs on our premises or reporting to work while under the influence of intoxicants or drugs;

9. Disrespectful conduct, gambling, or fighting on Company premises, including but not limited to coercion, intimidation or threats of any kind;

10. Vandalizing property belonging to Hospitality Ventures, guests or fellow associates;

11. Loitering or sleeping on the job;

12. Excessive, continuous, or unexplained cash shortages or other irregularities;

13. The unauthorized release or dissemination of Hospitality Ventures propriety information;

14. Fraudulently collecting Unemployment or Workers Compensation benefits related to employment at Hospitality Ventures;

15. Violating any federal, state, or local laws or encouraging others to violate such laws while on Company premises;

16. Insubordination;

MV 00117

34

17. Conduct hazardous to fellow associates and guests, including that which is detrimental to the Company;

18. Walking off the job or work assignment during or after a shift without proper relief or authorization. Leaving Company property without permission is considered a voluntary resignation due to job abandonment;

19. Absence from work without notification;

20. Being in an unauthorized area, such as a guest's room while off the clock. Being on property while off the clock without proper authorization (there is a 15-minute time limit allowed to be on Company premises in designated areas before and after a scheduled work shift);

21. Failure to conform to safety, security, and emergency procedures, including failure to report all accidents to a supervisor immediately;

22. Unauthorized distribution of literature or posting of notices, signs, or written communications on Company premises;

23. Dining, smoking, snacking, or gum chewing at any time other than during your meal or break periods or in any unauthorized area;

24. Fund raising, selling lottery tickets or merchandise, any other type of solicitation on Company premises, unless in designated non-work areas with prior approval from the General Manger;

25. Unauthorized use of Company telephones or guest facilities, or unauthorized social contact with guests;

26. Making, publishing, or distributing false, vicious, or malicious statement regarding Hospitality Ventures, its guests and associates, or any other establishment or individual associated with the conducting of Company business;

27. Failure to perform job assignments satisfactorily, safely, and efficiently;

28. Discussing Company or guest matters with unauthorized personnel or in public areas where the conversation may be overheard;

29. Engaging in horseplay

30. Working overtime without prior authorization;

31. Using Company property or resources for personal use without prior authorization by the General Manager;

32. Failure to adhere to Company vehicle/driver procedures;

33. Failure to adhere to Hospitality Ventures software policy;

34. Violation of the Company's EEO Policy prohibiting discrimination against any associate based on race, age, color, creed, sex, religion, disability, national origin, or any other protected status. Harassment of any associate, including slurs, provocative conduct, offensive jokes or stories, or any other act, makes the working environment unpleasant for fellow associates;

35. Harassment of any associate including slurs, provocative conduct, offensive jokes or stories, or any other act that makes the working environment unpleasant for fellow associates.

MV 00118

# SECTION 10: **HOSPITALITY VENTURES OPERATING PROCEDURES**

## 10A. SEARCH AND INSPECTION

In order to safeguard the property of our associates, guests, and the Company, and to help prevent the possession, sales, and use of illegal drugs or other materials on the premises, the Company reserves the right to question and search associates and all other packages, brief cases, purses or any other items carried to or from the Company property. In addition, the Company reserves the right to search any associates office, desk, files, locker, or any other area or article on Company property.

Inspections may be conducted at any time at the discretion of the Company. Associates who refuse to cooperate in an inspection as well as associates who after inspection are believed to be in the possession of stolen property, illegal drugs or other unlawful items, or otherwise engaging in unlawful activity, may be subject to disciplinary action up to and including termination.

## 10B. LOCKERS

Hospitality Ventures will provide lockers to hotel associates when available. Associates are advised and cautioned against leaving valuable items in lockers. The lockers are provided to give storage space to associates primarily for their personal items. Money, jewelry, and other valuables should not be stored in lockers.

With the exception of personal uniforms, associates are not permitted to store Company or guest property in lockers. In addition, the storage of items and/or materials considered illegal and/or in violation of Hospitality Ventures' policies and procedures, is strictly prohibited. Possession of any such items and/or materials can result in termination of employment.

Management reserves the right to inspect lockers, anytime on a random, select, or periodic basis, to ensure the safety and health of our associates and the locker facilities.

## 10C. POSITION TOWARDS UNIONS

The Company has an open door policy under which all associates have the right to deal directly with their supervisors or managers with reference to all working conditions. We do not believe it is in your or the Company's best interest to have an outside third party or union involvement in our working relationships. When management and associates work toward common goals, unions are not necessary. We recognize and accept our obligation to provide associates with good working conditions, good wages and benefits, fair treatment, and personal respect.

It is our belief that a union would not benefit our associates and is therefore our intention as permitted by law, to oppose by lawful means any union which may seek to organize associates.

MV 00119

## 10D. DISTRIBUTION AND SOLICITATION

Hospitality Ventures prohibits the solicitation and/or distribution of materials and literature to its associates on Company property. In certain circumstances, Hospitality Ventures may sponsor certain initiatives for the benefit of associates. In these circumstances, these events must have the prior approval of the General Manager as well as their Regional Management.

Soliciting associates during work hours is prohibited. Working hours shall not be construed as to apply to break period and meal times, or other specified periods during the work day when associates are not properly engaged in performing their work tasks. Distribution by associates of literature during working hours in work areas is prohibited. This section shall not be construed to prohibit the distribution of literature in non-work areas.

## 10E. COMPANY PROPERTY

You must safeguard all Company property. It is the responsibility of each associate to report any misuse, theft, or other misappropriation or distribution of Company property to his or her supervisor.

## 10F. LOST AND FOUND

Any items found on Company property must be turned in to the Housekeeping Department for sage keeping until the articles are restored their rightful owner. The Executive Housekeeper, or such other person as designated by your General Manager, is the only person to log or release lost and found articles.

## 10G. CASH BANK OVERAGES AND SHORTAGES

Cashiers are responsible for their issued banks. If there is an overage or shortage you may be removed from cash handling jobs or, depending on the circumstances, be subject to disciplinary action.

## 10H. CHECK CASHING

Cashing of associate's personal checks is not allowed

MV 00120

## 10I. GIFTS AND GRATUITIES

Associates are prohibited from accepting or soliciting any benefit, gift, or gratuity from a vendor, guests, or customer. This prohibition in no way prevents accepting gratuities from customers and guests for services provided by associates in classifications normally described as tipped positions.

## 10J. INFORMATION SECURITY

We expect you to be proud of your Company and talk about it with your family, friends, and business contacts. However, do not discuss any information concerning the Company that has not been released to the public. We are in a very competitive industry, and the Company has many creative and innovative firsts to its credit. We are also in a position to have publicly acclaimed individuals as guests at our properties whose presence may or may not have been announced. Respect the confidentiality of our business by not discussing any matter not released for public consumption.

## 10K. COMPANY DRIVERS AND VEHICLES

Only those associates authorized by Hospitality Ventures are permitted to operate Company vehicles.

1. Under no circumstances is an authorized driver, or any other associate, ever allowed to operate a Company vehicle while under the influence of drugs or alcohol.

2. Associates, including authorized drivers, are not permitted to drive the automobiles of guests, except at those properties that offer valet parking.

3. All associates, prior to and during their tenure as authorized drivers, are subject to satisfactory verification of their motor vehicle records.

4. Any associate operating a Company-owned vehicle is required to wear a seat belt.

## 10L. MEAL PERIODS

A thirty (30) minute, unpaid meal period is permitted each hourly-rated associate and will be scheduled approximately midway through your shift.

Meal periods may not be at the same time for all departments and may vary depending on workloads. It is, therefore, necessary to check departmental scheduling to determine your appropriate meal period.

MV 00121

## 10M. STAFF DINING ROOM

When possible, a staff dining room will be provided for associates. Socializing is encouraged during lunch and breaks; however, voices must be kept at a level as not to disrupt other associates or guests. The dining room is maintained for associates and must be kept clean at all times. Food and beverage items are not permitted outside the cafeteria. Exceptions, for medical and other legitimate reason, will be discretionary.

## 10N. POSTING SCHEDULES

Your work schedule will be posted by your supervisor in a designated area. Our schedules may be hectic at times, but they are made to fit the pattern of business. You are expected to be at your workstation at the start of your regular shift. Since schedules may change, it is your responsibility to check your schedule daily.

## 10O. SHIFT SCHEDULES

Our hotels operate twenty-four fours a day, seven days per week, which requires certain job positions to be scheduled on a shift basis. Due to the nature of the hospitality industry, your shift or the total number of hours worked each week may fluctuate dependent on business needs. Generally, shift schedules are posted in advance, and it is the associate's responsibility to be aware of their next scheduled shift. Schedule changes require supervisor approval. This includes exchanging shifts or off-days with fellow associates.

MV 00122

# SECTION 11: **ENVIRONMENT, HEALTH & SAFETY**

## 11A. WORK AREAS

You must stay in your work area as defined by your supervisor. Do not enter other areas of the property unless your position calls for such action, or as instructed by your supervisor. Work areas are to be kept clear of unnecessary materials or personal items.

Radios and tape players are permitted only with permission from your Department head and must always be kept at a volume that cannot be heard outside the space in which the device is located. For safety reasons, headphones are prohibited.

## 11B. ENERGY CONSUMPTION

- Turn off lights in unused rooms.
- Close all doors when walking in or out of the building.
- Report all water leak and drips.
- Check all faucets to ensure that they are shut off before leaving a guestroom.

## 11C. SANITATION

- It is extremely important that the cleanliness of all areas of the hotel be maintained constantly and in compliance with federal, state, county, city, and hotel health and sanitation regulations.
- All food and beverage food handlers must have appropriate food handler certifications as called for above.
- Associates must wash hands before returning to work from using the restroom.
- Associates must be conscious about removing litter from work areas and public areas of the hotel.
- Associates should be conscious about cross contamination between different meats and cooked and uncooked food.

MV 00123

## 11D. SAFETY

Associates are expected to put safety first in the performance of duties, for the sake of all associates and guests.

To help enhance the safety efforts at the hotel, you may be asked to volunteer to be a part of the property's safety committee. The mission of the safety committee is to supplement the Company and property specific safety programs by making suggestions for improved safeguards and procedures. You may also be asked to help analyze problem areas at the hotel and provide input into what suggestions would work best.

Please note the following guidelines:

- Be aware of your surroundings. Keep in mind that although many portions of the hotel appear similar to residential surroundings, the hazards are different. Lack of attention to the surroundings could result in an injure to you, a fellow associate, or a guest.
- Report any accidents to your supervisor no matter how slight it seems.
- Clean up spills immediately. At a minimum, place a wet floor sign and station yourself at the spill until assistance arrives. Report frayed carpets, ice, or water conditions.
- Learn and follow your location's emergency instructions for fires, weather emergencies, or other situations. The guests are going to look to you for instructions and guidance on what to do. It is important to remain calm and not to panic.
- Report unsafe or potentially unsafe conditions to your supervisor.
- If a guest is injured or ill contact your supervisor for assistance at once.
- Learn and practice safe lifting practices. Learn the "safety strike zone" and the location of mechanical lifting aids for your location. Never attempt to lift an object that you do not feel you can lift properly.
- Keep walkways free of debris and items blocking the aisle-way.
- Horseplay and running are not permitted on hotel property.
- Wear the appropriate safety equipment at all times. If you need safety equipment, see your supervisor.
- Do not operate equipment that you have not been trained to operate. Do not attempt to repair equipment unless you are authorized to do so by the Chief Engineer. If a piece of equipment is locked out, do not remove the lock and tag or attempt to use the equipment.
- No smoking, except in approved areas.
- Report equipment or counter tops with exposed sharp edges.
- Report and exposed, frayed, melted or damaged wiring.
- Do not bring unauthorized visitors or children into the building.
- Review Material Safety Data Sheets on chemicals before using them.

MV 00124

- Use step stools and ladders when objects are out of your reach.  Do not use buckets, shelves, or other similar means.
- Do not pick up broken glass with your hands.  Use a brush or broom.
- Do not use your hands to push trash down into a trash container.
- Wear cut resistant gloves when cleaning slicing tools and equipment.  Take particular care when wearing rings of any kind, as they may be hazardous in the performance of some job duties.  Long chains or pendants should not be worn as they present a safety hazard.
- Follow proper procedures for dealing with blood and contaminated fluids.

## 11E.  FIRE SAFETY AND PREVENTION

A hotel fire is one of the most serious potential emergencies that a hotel can face.  The best way to deal with this is to prevent the fire from occurring.  The following are some of the means to enhance the fire prevention at the hotel:

Obey all "No-Smoking" signs.  Smoke only is designated areas.

Keep work areas clean.  The work area should be free of oily rags, paper, and other combustible materials.

Know your role and follow your location's emergency instructions when an emergency occurs.  Participate in drills conducted at your property.

Know the location of the properties fire-fighting equipment.  You are not expected to use any equipment except a fire extinguisher and should only use one if you have been trained to use it, have already sounded the alarm, and are certain the extinguisher will put out the fire.

Note where your property's emergency instructions are located.  If you are a room attendant, the instructions should be posted on your cart.  Other departments should have their instructions posted.

### E.1    WHAT TO DO IN THE EVENT OF A FIRE

- If you see or suspect a fire, sound the alarm immediately.  Call the front desk with the details of the emergency.
- If you must evacuate, go to your assigned meeting point and inform your supervisor that you are outside and safe.
- Do not enter a smoke filled area.  Do not let a fire get between you and the only means of escape.
- Remain calm.  The guests expect this from you and you will help them calm by staying so yourself.
- Do not use the elevators in case of a fire.
- Learn your department's specific instructions for this and other emergencies.

MV 00125

42

# 11F. TRAINING

The Company believes in the importance of ensuring that each associate has the skills necessary to competently perform his or her assigned responsibilities. Your supervisor is the best source to lead you through a departmental orientation program. In addition, you may invited to attend departmental / Company meetings and training sessions, and are encouraged to pursue self-enrichment training where each associate has the opportunity to participate.

# 11G. COMMUNICATIONS

## G.1    KEEPING INFORMED

We want you to know what is going on in the world of the Company. Remember that facts are a much better source of information than rumors or gossip. You may be asked to attend mandatory associate meetings, with pay for this purpose. Memos and bulletins will be posted with announcements of importance to you. In addition, there are official channels of communication, and you are always free to ask questions or pass on suggestions to your Department Head or General Manager.

## G.2    DEPARTMENT MEETINGS

Department meetings may be held to give you an opportunity to express your opinion about what is going on in your area and to make known problems or complaints you might have. These meetings are in no way intended to circumvent the complaint resolution procedures explained elsewhere in this Handbook.

Additionally, meetings may be held to keep you informed of various events going on in the Company and to keep you current on new associate benefits and practices.

## G.3    BULLETIN BOARDS

Announcement of upcoming hotel events, benefits, information and/or general news may be found on the bulletin boards located in associate areas. Make it a daily habit to read the bulletin board in order to keep on top of things. Permission to post any materials must be obtained in advance by your General Manager.

MV 00126

## SECTION 12: **PLEDGES**

## **12A. HOSPITALITY VENTURES' PLEDGE TO ITS ASSOCIATES**

- We realize the importance of our associates and the responsibility they each hold in their hands. We will make each associate aware of his or her importance, and they will feel valued.
- We will provide a quality product and a caring environment in which our associates enjoy working every day.
- We will centralize our policies and support while giving the hotels the freedom to execute guest service and day to day decision making.
- We will reward our associates in a timely manner and provide compensation systems linked to how we measure our success.
- We will provide our associates with the tools and recourses necessary to do their job successfully and make them experts in their field.
- We will provide a work environment that is supportive, exhibits mutual respect and one that is free of any type of harassment.

## **12B. MY PLEDGE TO HOSPITALITY VENTURES**

- I realize that I play a major role in the success of Hospitality Ventures. Through my efforts in Guest Service and striving towards Operational Excellence, I will help Hospitality Ventures become the premier leader in the hospitality industry.
- I want to be the best I can be. I want to receive the training I need in order to develop the skills necessary to provide the highest level of service possible. I will learn the skills I need and I will become an expert in my field.
- I will do whatever it takes to make a guest happy. I am empowered to provide 100% Guest Satisfaction.
- I will live Hospitality Ventures' Six Principles every day. In addition, I will make every effort to deliver on the Six Guest Expectations. Every action I take, every decision I make, every conversation I have will reflect these principles and the cultures of Hospitality Ventures.
- I understand that other care about me and want me to succeed. Just as important, I care about myself and want to be the best that I can be. I make this pledge because I want to be a part of the success of Hospitality Ventures.

MV 00127

SECTION 13:    # ASSOCIATE HANDBOOK ACKNOWLEDGEMENT FORM

I have received a copy of Hospitality Ventures' Associate Handbook. I agree to fully and completely read and abide by the rules of conduct and other personnel policies set forth in ht Associate Handbook which includes, but is not limited to, the following Hospitality Ventures policies:

- Policy Against Harassment, including Sexual Harassment
- Policy Against Retaliation
- Software Policy
- Internet Policy
- E-mail Policy

I understand that Hospitality Ventures' Associate Handbook is presented as a guide for associates, supervisors and management, and contains descriptions and explanation of rules, procedures and benefits available to associates at the time of my employment. Except as otherwise expressly stated, such rules, procedures and benefits may be changed, amend, or modified by Hospitality Ventures at any time. I understand that nothing in this Associate Handbook or the Acknowledgment form shall be construed to create a contractual obligation, express or implied, on the part of Hospitality Ventures pertaining to any portion of this Handbook or any aspect of any employment.

I further understand that as a matter of Hospitality Ventures policy, every aspect of my employment relationship with Hospitality Ventures is on an at-will basis, meaning that I or Hospitality Ventures may terminate my employment at any time, for any reason, with or without cause. As part of this at-will policy, I understand that Hospitality Ventures expressly reserves its inherent authority to manage and control the business enterprise and to exercise its sole discretion to determine all issues pertaining to promotion, job assignment, demotion, transfer and discipline.

I understand that nothing contained in Hospitality Ventures' Associate Handbook or this Acknowledgment Form shall be construed to modify, change or vary the at-will nature of my employment relationship with Hospitality Ventures or create any contract pertaining to my employment, including employment for a specified period of time. Further, I understand and agree that no one other than the Chief Executive Officer, Hospitality Ventures, may modify or change the at-will nature of my employment relationship. Any such modifications must be in writing and signed by the Chief Executive Officer, Hospitality Ventures, and me to be effective.

_____          _____  _____

Associate Name (Please Print)                 Associate Signature              Date


_____          _____

HR Designee Name (Please Print)              HR Designee Signature          Date


MV 00128

45

IN THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA RECEIVED
NORTHERN DIVISION

HEATHER WATTS )
                                        )         2005 DEC 27 P 2 15

   Plaintiff, )

v. )        CV-2006-
                                      )
                                      )   2:O6CV1149-MEF
HOSPITALITY VENTURES, LLC, )   **JURY TRIAL DEMANDED**

   Defendant. )

## COMPLAINT

     Pursuant to Rule 38, Fed. R. Civ. P., plaintiff demands a jury trial as to each issue so triable.

## INTRODUCTION

1.  This is an action to recover damages, interest and liquidated damages, equitable relief and attorneys' fees and costs, on behalf of a woman whose employment was terminated during her federally protected maternity leave, in willful disregard of her federal rights under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. (FMLA) and under Title VII, 42 USC 2000e, et seq., more specifically sex discrimination and pregnancy discrimination. Plaintiff has exhausted her remedies by filing the appropriate charge with the EEOC, and has been granted a right to sue. (Letter attached. Exhibit A)

DEFENDANT'S
EXHIBIT
6

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this controversy pursuant to 29 USC § 2617 and 28 USC § 1331 and Title VII 42 USC 2000e, et seq.

3. Plaintiff Heather Watts is a female citizen of the United States and a resident of the State of Alabama; and she was employed by Hospitality Ventures, LLC, d/b/a Fairfield Inn of Montgomery, for a period from June 2004 until November 2, 2005.

4. Mrs. Watts received a personnel handbook informing her of her right to maternity leave and FMLA, within the meaning of 29 USC § 2611 (2)(A) and discussed and was granted a leave of absence by company officials.

5. Hospitality Ventures was Mrs. Watts' employer and it was an "employer" within the meaning of 29 USC §2611 (4)(A) at all times relevant to this action.

6. The unlawful employment practices described herein were committed within the State of Alabama and venue lies in this court pursuant to 28 USC § 1391(b).

## FACTS

7. Heather Watts began her employment at Hospitality Ventures, LLC, in 2004.

8. In the spring of 2005, Mrs. Watts became pregnant with her second child. She worked throughout her pregnancy, but received approval from Roger Miller, vice president of sales and marketing, and from General Manager Todd Epplin to take unpaid maternity leave, starting Aug. 11. She requested the leave in writing and was not due to return to work until Nov. 9.

9. Mrs. Watts helped train an intern to take over her job while she was on FMLA/maternity leave. Although Mrs. Watts was on leave, her employer, Hospitality Ventures, continued to give her assignments, and to pay her for seven hours of work per week.

10. Epplin's successor, Tami Dominguez attempted to call Mrs. Watts back to work for three days a week during her approved leave. Mrs. Watts' baby was ill, and she was unable to work those hours during her leave. However, she continued to work on a company marketing program at home.

11. On Nov. 2, 2005, Mrs. Watts affirmed that she would be returning to her job fulltime on Nov. 9. Ms. Dominguez called Mrs. Watts back and stated that the company was not going to give her the option, that she could resign or be fired.

12. Mrs. Watts received her final check on Nov. 3 and was ordered to clean out her office.

13. Ms. Dominguez does not have custody of her own child. Other company officials had expressed concern over Mrs. Watts' ability to obtain child care. This was the only expressed reason for terminating Mrs. Watts, whose sales record had turned around company revenues, earned her praise and quarterly bonuses.

14. The person hired to replace Mrs. Watts is unmarried, and followed the same schedule Mrs. Watts had.

15. Mrs. Watts was told her medical coverage had been canceled three days prior to her termination.

## CLAIMS

### TITLE VII -- SEX DISCRIMINATION

16. On information and belief, Defendant selected Plaintiff for termination based on a sex-based discriminatory concern that the existence of her child would cause her to sacrifice her job duties to the Defendant. Such concerns were not expressed to male employees with small children, nor a cause for their termination.

17. Defendant's actions, based on impermissible discriminatory beliefs, was a willful violation of Title VII protections against sex discrimination, committed with malicious and reckless indifference and plaintiff suffered lost wages and benefits of employment.

### FMLA

18. Defendant represented to Plaintiff before, during and after her leave was granted, and, in fact, after termination, that Plaintiff was eligible for 12 weeks' leave under the Family Medical Leave Act.

19. Nevertheless, Defendant did willfully violate the FMLA leave statute by firing Plaintiff while she was under the protection of the statute.

20. On information and belief, Hospitality Ventures, LLC selected Heather Watts for termination and discharged her from her employment because of her taking FMLA/maternity leave; and /or in order to interfere with, restrain or deny the exercise of her right of restoration to the position of employment she held when her protected leave commenced, or to be restored to an equivalent

position with equivalent employment benefits, pay and other terms and conditions of employment.

21. Defendant's actions constituted a willful, malicious and reckless violation of plaintiff's rights under the FMLA and Title VII, 26 USC § 2003, et seq.

22. As a result of Defendant's willful violation of her rights, Heather Watts suffered lost wages and benefits of employment.

## BREACH OF CONTRACT OF GOOD FAITH

## & FAIR DEALING

23. Defendant did into an oral contract with Plaintiff to grant her FMLA leave or its equivalent, terminating her seven days before the agreement expired.

24. Defendant knowingly and willingly violated the agreement by continuing to pressure Plaintiff to work while on leave and by terminating her when she was unable to forego her bargained-for leave and return to work early.

25. Defendant's actions constitute a willful, malicious and reckless breach of contract, and, as a result, Plaintiff suffered lost wages and benefits of employment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter a judgment that the defendant's conduct constituted a willful, malicious and reckless violation of her rights under the FMLA and Title VII, sex discrimination/pregnancy statutes.

b. Order the defendant to reinstate her into her former position of
employment or an equivalent position, with all seniority and other benefits
which would have accrued absent this violation of her rights;

c. Enter a judgment pursuant to 29 USC §2617 (a)(1)(A), for damages equal
to all wages and employment benefits lost as a result of the defendant's
conduct, the interest on all such amounts calculated at the prevailing rate,
and an additional amount as liquidated damages equal to the sum of the
wages, benefits and interest combined; and for back pay, front pay and all
actual and punitive damages for violation of 42 USC 2000e, et seq.

d. Order the defendant to pay reasonable attorneys' fees, expert witness fees,
and other costs incurred in prosecuting this action.

Respectfully submitted,

Priscilla Black Duncan (DUN033)
Attorney for the Plaintiff

P.B. Duncan & Associates, LLC
472 S. Lawrence, Suite 204
Montgomery AL 36104
(334) 264-9679
(334) 264-9643 FAX

Defendant's Address:
Hospitality Ventures, LLC
C/o
Morris Manning & Martin LLP
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta GA 30326

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Heather G. Watts 6976 Eastern Shore Road Montgomery, AL 36117 | From: Birmingham District Office - 420 Ridge Park Place 1130 22nd Street, South Birmingham, AL 35205 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|
| EEOC Charge No. | EEOC Representative | Telephone No. |
| 130-2006-01283 | Murry A. Gosa, Intake Supervisor | (205) 212-2119 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

|  | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
|  | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
|  | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
|  | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
|  | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
|  | While reasonable efforts were made to locate you, we were not able to do so. |
|  | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| X | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
|  | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
|  | Other (briefly state) |

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

9-26-06

Bernice Williams-Kimbrough, District Director

*(Date Mailed)*

cc:    Daniel S. Fellner, Attorney
Morris, Manning & Martin
1600 Atlanta Financial Center
3343 Peachtree Road N.E.
Atlanta, GA 30326-1044

Priscilla Duncan
Attorney at Law
P.O. Box 1603
Montgomery, AL 36102

00412326 MONT

**HV Investors LLC**
**DBA Montgomery Ventures LLC**
3340 PeachTree Road
100 Tower Place Suite 605
Atlanta, GA 30326

MONT        080030  01520914

WATTS, HEATHER G
6976 EASTERN SHORE ROAD
MONTGOMERY        AL 36117

DEFENDANT'S
EXHIBIT
7

ATT: HEATHER WARD

# HVMI
## Quarterly Incentive Compensation Plan
### For Hotel Sales Department

#### Purpose

The purpose of the Incentive Compensation Plan (the "Plan") is to reward hotel sales departments for exceeding budgeted revenues. The Plan provides individuals accountable for direct sales, marketing activities, and account relationships of each hotel operated by Hospitality Ventures Management, Inc. (the "Company") the opportunity for incentive compensation based upon the achievement of specific performance objectives.

#### Definitions

For the purpose of this plan, Budgeted Room Revenue means the Total Hotel Budgeted Room Revenue generated by all market segments for an entire quarter or three month period.

#### Eligibility

a.      In order to be eligible to participate in the Plan, a person must be employed with the Company in the position of Director of Marketing, Director of Sales, Senior Sales Manager, or Outside Sales Manager for at least two full calendar months.

b.      Any eligible participant who is within a probationary period due to performance will not be eligible for any award. Furthermore, if an associate is not following or adhering to sales production or sales quote targets or goals, he or she will also be ineligible for any bonus for that particular time period.

c.      Total hotel room revenue budget acts as a "gatekeeper". No bonus of any amount can be paid unless the hotel achieves its total room revenue budget for the quarter.

#### Payment

a.      Each eligible participant's incentive compensation will be paid within 45 days after the end of the quarter and on the hotels normal payroll run.

b.      Incentive compensation paid under this Plan will be treated as gross wages and the usual payroll deductions will be taken.

c.      If employment of an eligible participant terminates during a quarter, no incentive compensation will be paid for that quarter.

DEFENDANT'S
EXHIBIT
8

MV 00025

Quarterly Incentive Compensation Formula

*DIRECTOR OF SALES & MARKETING*

| MEASUREMENT | % of Quarterly Salary |
|---|---|
| Meeting & Exceeding Budgeted Hotel Room Revenue ($^1$) | 25 % |
| Meeting & Exceeding Sales / Marketing Dept. Total Room Revenue Budget | 10 % |
| Meeting or Exceeding budgeted RevPAR Index | 5% |
| **Total % of Quarterly Salary** | **40 %** |

Miscellaneous

a. This Plan is not a contract for employment and does not limit the right of HVMI to terminate a participant's employment for any reason.

b. This Plan may be terminated or modified at any time without cause or advance notice. However, neither action will serve to take away a bonus, to which a participant might otherwise be entitled prior to termination or modification of the plan, except that the causes for forfeiture of bonus would continue to apply.

c. All provisions of this Plan are subject to reconfirmation or change each year before becoming effective for each subsequent quarter.

($^1$) There will be no quarterly payout of any type unless the hotel achieves at least 100% of budgeted hotel room revenue.

Susan Fleming   12/18/03

MV 00026

Heather Watts
DOSM
2005 1st Quarter Bonus Tracking Results
Submitted 4/4/2005


1)  Total Hotel RM Rev Budget (Jan/Feb/Mar) = $446,799

Succeeded by $53,718

   Total Hotel RM Rev Actual (Jan/Feb/Mar) = $500,517


2) Total Hotel Sales Dept. RM Rev Budget (Jan/Feb/Mar) = $147,504

Succeeded by $21,401

   Total Hotel Sales Dept. RM Rev Actual (Jan/Feb/Mar) $168,905


3) Hotel RevPar Index Budget (Jan/Feb/Mar) 112.26

Succeeded by 12.47

  Hotel RevPar Index Actual (Jan/Feb/Mar) $124.73


Payout Equals:
Annual Salary divided by 4 to get Quarterly Salary = $8,750
   1)  Hotel RM Rev Actual $8,750 x 25% = $2,187.50
   2)  Hotel Sales Dept. Rm Rev $8,750 x 10% = $875.00
   3)  Hotel RevPar Index $8,750 x 5% = $437.50

   Total Payout $3,500

DEFENDANT'S
EXHIBIT
9

Watts v. Hospitality
Int Discl/RFP  0005

## 2005 Sales / Marketing Department - BONUS TRACKING FORM
### (Budget vs. Actual)

HOTEL: ___ Fairfield Inn - MONTGOMERY
Sales/Marketing Associate: ___ Heather Watts
Market Segments Represented: ___ LNR/Groups/Gov
Date Report Submitted: ___ 4/4/2005
Prepared by: ___ Heather Watts, DOSM

| DOS | TOT HOTEL RM. REV BUDGET | TOT HOTEL RM. REV ACTUAL | DIFF | TOT HOTEL SALES DEPT RM. REV BUDGET | TOT HOTEL SALES DEPT RM. REV ACTUAL | DIFF | HOTEL REVPAR INDEX BUDGET | HOTEL REVPAR INDEX ACTUAL | DIFF |
|---|---|---|---|---|---|---|---|---|---|
| January | 126720 | 132262 | 5542 | 46373 | 47401 | 1028 | 30.73 | 32.08 | 1.35 |
| February | 148958 | 160962 | 12004 | 46670 | 46257 | -413 | 40 | 42.37 | 2.37 |
| March | 171121 | 207293 | 36172 | 54461 | 75247 | 20786 | 41.53 | 50.28 | 8.75 |
| 1st QTR TOTALS | 446799 | 500517 | 53718 | 147504 | 168905 | 21401 | 112.26 | 124.73 | 12.47 |
| April | 183695 | | -183695 | 58068 | | -58068 | 44.73 | | 44.73 |
| May | 180682 | | -180682 | 59137 | | -59137 | 42.54 | | 42.54 |
| June | 176937 | | -176937 | 50434 | | -50434 | 43.05 | | 43.05 |
| 2nd QTR TOTALS | 541314 | 0 | -541314 | 167639 | 0 | -167639 | 130.32 | 0 | -130.32 |
| July | 183606 | | -183606 | 60399 | | -60399 | 43.26 | | 43.26 |
| August | 175764 | | -175764 | 40460 | | -40460 | 41.43 | | 41.43 |
| September | 155868 | | -155868 | 51759 | | -51759 | 38 | | -38 |
| 3rd QTR TOTALS | 515238 | 0 | -515238 | 152618 | 0 | -152618 | 122.69 | 0 | -122.69 |
| October | 178252 | | -178252 | 57839 | | -57839 | 42.02 | | -42.02 |
| November | 156687 | | -156687 | 5641 | | -5641 | 38.11 | | -38.11 |
| December | 115022 | | -115022 | 32999 | | -32999 | 27.08 | | -27.08 |
| 4th QTR TOTALS | 449861 | 0 | -449861 | 146479 | 0 | -146479 | 107.21 | 0 | -107.21 |
| ANNUAL TOTALS | | | -1452695 | | | -445335 | | | -347.75 |

DOS

## 2005 Sales / Marketing Department - BONUS TRACKING FORM
### (Budget vs. Actual)

HOTEL: _____ Fairfield Inn - MONTGOMERY
Sales/Marketing Associate: _____ Heather Watts
Market Segments Represented: _____ LNR/Groups/Gov
Date Report Submitted: _____ 3/3/2005
Prepared by: __ Heather Watts, DOSM

| DOS | TOT HOTEL RM. REV BUDGET | TOT HOTEL RM. REV ACTUAL | DIFF | TOT HOTEL SALES DEPT RM. REV BUDGET | TOT HOTEL SALES DEPT RM. REV ACTUAL | DIFF | HOTEL REVPAR INDEX BUDGET | HOTEL REVPAR INDEX ACTUAL | DIFF |
|---|---|---|---|---|---|---|---|---|---|
| January | 126720 | 132262 | 5542 | 46373 | 47401 | 1028 | 30.73 | 32.08 | 1.35 |
| February | 148958 | 160962 | 12004 | 46670 | 46257 | -413 | 40 | 42.37 | 2.37 |
| March | 171121 | | -171121 | 54461 | | -54461 | 41.53 | | -41.53 |
| 1st QTR TOTALS | 446799 | 293224 | -153575 | 147504 | 93658 | -53846 | 112.26 | 74.45 | -37.81 |
| April | 183695 | | -183695 | 58068 | | -58068 | 44.73 | | -44.73 |
| May | 180682 | | -180682 | 59137 | | -59137 | 42.54 | | -42.54 |
| June | 176937 | | -176937 | 50434 | | -50434 | 43.05 | | -43.05 |
| 2nd QTR TOTALS | 541314 | 0 | -541314 | 167639 | 0 | -167639 | 130.32 | 0 | -130.32 |
| July | 183606 | | -183606 | 60399 | | -60399 | 43.26 | | -43.26 |
| August | 175764 | | -175764 | 40460 | | -40460 | 41.43 | | -41.43 |
| September | 155868 | | -155868 | 51759 | | -51759 | 38 | | -38 |
| 3rd QTR TOTALS | 515238 | 0 | -515238 | 152618 | 0 | -152618 | 122.69 | 0 | -122.69 |
| October | 178252 | | -178252 | 57839 | | -57839 | 42.02 | | -42.02 |
| November | 156587 | | -156587 | 55641 | | -55641 | 38.11 | | -38.11 |
| December | 115022 | | -115022 | 32999 | | -32999 | 27.08 | | -27.08 |
| 4th QTR TOTALS | 449861 | 0 | -449861 | 146479 | 0 | -146479 | 107.21 | 0 | -107.21 |
| ANNUAL TOTALS | | | -1659988 | | | -520562 | | | -398.03 |

Watts v. Hospitality
Int Discl/RFP   0007

# Daily Report

Monday 1/31/2005

Company: Montgomery Ventures, LLC                Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | 12,812.10 | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 0.00 | 15,048 | 47,353 | -32,305 | 0 | 15,048 |
| 12 - Corporate Rate | 1,838.00 | 42,707 30% | 648 | 42,058 | 58,469 | -15,763 |
| 16 - Government | 1,682.00 | 18,130 | 10,551 | 7,579 | 10,488 | 7,642 |
| 17 - Local Corporate | 0.00 | -49 | 35,637 | -35,686 | 8,850 | -8,899 |
| 20 - Regular Weekend Rate | 0.00 | 256 | 742 | -486 | 0 | 256 |
| 25 - Other Discounts | 1,572.53 | 36,505 | 12,421 | 24,084 | 20,228 | 16,277 |
| 28 - Marriott Employee Rate | 35.00 | 3,360 | 1,573 | 1,787 | 1,610 | 1,750 |
| 32 - Local Promotion | 0.00 | 0 | 7,066 | -7,066 | 0 | 0 |
| Room Revenue Group | 2,015.00 | 16,459 | 0 | 16,459 | 27,075 | -10,616 |
| Room Revenue Allowances and | 0.00 | -154 | 0 | -154 | 0 | -154 |
| Total Room Revenue | 7,142.53 | 132,262 | 115,992 | 16,271 | 126,720 | 5,542 |
| | | 47,401 | | | 46,373 | |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Distance Telephone | 161.94 | -695 | 789 | -1,484 | 592 | -1,287 |
| Pay Phone Commissions | 0.00 | 0 | 225 | -225 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | 161.94 | -695 | 1,014 | -1,708 | 592 | -1,287 |
| Other Revenue | | | | | | |
| No-Show Revenue | 4.00 | 0 | 982 | -982 | 1,267 | -1,267 |
| Guest Laundry | 0.00 | 0 | 7 | -7 | 260 | -260 |
| Guest Paid Outs | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 24.97 | 1,025 | 1,201 | -176 | 1,231 | -206 |
| Vending Machine Commissions | 0.00 | 0 | 0 | 0 | 189 | -189 |
| Miscellaneous Revenue | 68.94 | 63 | 0 | 63 | 0 | 63 |
| Total Other Revenue | 97.91 | 1,089 | 2,190 | -1,102 | 2,947 | -1,858 |
| Sales Tax | | | | | | |
| State Sales Tax | 283.58 | 5,226 | 4,616 | 610 | 0 | 5,226 |
| County Sales Tax | 603.11 | 11,120 | 9,792 | 1,328 | 0 | 11,120 |
| Total Sales Tax | 886.69 | 16,346 | 14,409 | 1,937 | 0 | 16,346 |
| **Total Revenue** | **8,289.07** | **149,002** | **133,604** | **15,398** | **130,259** | **18,743** |
| | | | | | | |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 7 | 0 | 7 | 0 | 7 |
| Room State Sales Tax | 285.70 | 5,290 | 4,640 | 651 | 5,069 | 221 |
| Room Sales Tax Variance | 2.12 | 64 | 23 | 41 | 5,069 | -5,004 |
| City Lodging Tax | 589.26 | 10,912 | 9,569 | 1,342 | 10,454 | 457 |
| City Sales Tax Variance | -13.85 | -208 | -223 | 15 | 10,454 | -10,663 |

Watts v. Hospitality
Int Discl/RFP   0008

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 1,044.03 | 31,726.20 | 33,792.82 | -2,066.62 | 0.00 | 31,726.20 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 1,028.32 | 85,239.14 | 70,038.21 | 15,200.93 | 0.00 | 85,239.14 |
| American Express | 348.73 | 26,892.60 | 20,417.23 | 6,475.37 | 0.00 | 26,892.60 |
| Discover | 331.90 | 4,871.07 | 3,698.94 | 1,172.13 | 0.00 | 4,871.07 |
| Diners Club | 0.00 | 738.05 | 1,060.42 | -322.37 | 0.00 | 738.05 |
| Total Credit Card Receivable | 1,708.95 | 117,740.86 | 95,214.80 | 22,526.06 | 0.00 | 117,740.86 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 365.78 | -365.78 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 365.78 | -365.78 | 0.00 | 0.00 |
| Petty Cash Expense Item | 27.40 | 1,806 | 1,334 | 473 | 0 | 1,806 |
| **Total Cash & Credit Cards** | 2,780.38 | 151,273.42 | 130,706.97 | 20,566.45 | 0.00 | 151,273.42 |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 7,142.53 | 132,262 | 115,992 | 16,271 | 126,720 | 5,542 |
| Telephone Revenue | 161.94 | -695 | 1,014 | -1,708 | 592 | -1,287 |
| Other Revenue | 97.91 | 1,089 | 2,190 | -1,102 | 2,947 | -1,858 |
| Tax Collections | 886.69 | 16,346 | 14,409 | 1,937 | 0 | 16,346 |
| Total Receipts | 8,289.07 | 149,002 | 133,604 | 15,398 | 130,259 | 18,743 |
| | | | | | | |
| Total All Receipts | 8,289.07 | | | | | |
| Plus: AR Beginning Balance | 35,817.87 | | | | | |
| Less Payments | 2,780.38 | | | | | |
| Net Ending Balance | 41,326.56 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 11,847.67 | | | | | |
| City Ledger | 30,599.55 | | | | | |
| Advance Deposits | -1,120.66 | | | | | |
| **Total A/R** | 41,326.56 | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP 0009

DAILY REPORT

Monday 1/31/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 1,044.03 | 31,726.20 | 33,792.82 | -2,066.62 | 0.00 | 31,726.20 |
| Total Paid-Outs | 0.00 | 0.00 | 365.78 | -365.78 | 0.00 | 0.00 |
| Estimated Deposit | 1,044.03 | 31,726.20 | 33,427.04 | -1,700.84 | 0.00 | 31,726.20 |
| Actual Cash Deposit | 1,044.03 | 31,542.91 | 32,093.47 | -550.56 | 0.00 | 31,542.91 |
| Cash Over/Short - Petty Cash | 0.00 | -183.29 | -1,333.57 | 1,150.28 | 0.00 | -183.29 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 87.22% | 56.32% | 54.62% | 1.70% | 54.57% | 1.75% |
| Occupancy with Comp Rooms | 87.97% | 57.31% | 55.01% | 2.30% | 54.57% | 2.74% |
| Average Daily Rate | 61.57 | 56.96 | 51.51 | 5.45 | 56.32 | 0.64 |
| Average Daily Rate with Comp | 61.05 | 55.97 | 51.14 | 4.83 | 56.32 | -0.35 |
| Revenue Per Available Room | 53.70 | 32.08 | 28.13 | 3.95 | 30.73 | 1.34 |
| 10 - Rooms Sold Weekday Rate | 0 | 245 | 866 | -621 | 870 | -625 |
| 12 - Rooms Sold Corporate | 28 | 567 | 14 | 553 | 0 | 567 |
| 16 - Room Sold Government | 26 | 323 | 165 | 158 | 184 | 139 |
| 17 - Local Corporate | 0 | 9 | 740 | -731 | 150 | -141 |
| 20 - Rooms Sold Weekend Rate | 0 | 0 | 24 | -24 | 0 | 0 |
| 25 - Rooms Sold Other Discount | 30 | 874 | 250 | 624 | 525 | 349 |
| 28 - Rooms Sold Employee Rate | 1 | 102 | 47 | 55 | 46 | 56 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 146 | -146 | 0 | 0 |
| Room Sold Group | 31 | 202 | 0 | 202 | 475 | -273 |
| Total Rooms Sold | 116 | 2,322 | 2,252 | 70 | 2,250 | 72 |
| Complimentary Rooms | 1 | 41 | 16 | 25 | 0 | 41 |
| Total Rooms Occupied | 117 | 2,363 | 2,268 | 95 | 2,250 | 113 |
| Out of Order Rooms | | 0 | 267 | -267 | 0 | 0 |
| No Show Rooms | | 0 | 27 | -27 | 0 | 0 |
| Walk-Ins | | 0 | 628 | -628 | 0 | 0 |
| Unexpected Departures | | 0 | 113 | -113 | 0 | 0 |

Watts v. Hospitality
Int Discl/RFP  0010

**DAILY RESULTS**

Monday 2/28/2005

Company: Montgomery Ventures, LLC                                        Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 0.00 | 10,727 | 56,369 | -45,642 | 0 | 10,727 |
| 12 - Corporate Rate | 1,744.00 | 57,337 | 339 | 56,998 | 67,14 | -9,805 |
| 16 - Government | 780.00 | 20,420 | 10,399 | 10,021 | 15,282 | 5,139 |
| 17 - Local Corporate | 0.00 | 2,115 | 59,742 | -57,627 | 8,850 | -6,735 |
| 20 - Regular Weekend Rate | 0.00 | 899 | 1,972 | -1,073 | 0 | 899 |
| 25 - Other Discounts | 940.00 | 45,546 | 18,991 | 26,555 | 32,331 | 13,215 |
| 28 - Marriott Employee Rate | 35.00 | 1,915 | 1,564 | 351 | 2,815 | -900 |
| 32 - Local Promotion | 0.00 | 0 | 7,770 | -7,770 | 0 | 0 |
| Room Revenue Group | 4,095.00 | 22,002 | 637 | 21,365 | 22,538 | -536 |
| Room Revenue Allowances and | 0.00 | 0 | 0 | 0 | 0 | 0 |
| **Total Room Revenue** | 7,594.00 | 160,962 | 157,784 | 3,178 | 148,958 | 12,004 |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 88 | 97 | -9 | 0 | 88 |
| Long Distance Telephone | 157.30 | 2,544 | 3,887 | -1,342 | 693 | 1,851 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| **Total Telephone Revenue** | 157.30 | 2,632 | 3,983 | -1,351 | 693 | 1,939 |
| Other Revenue | | | | | | |
| No-Show Revenue | 59.00 | 428 | 1,660 | -1,232 | 1,490 | -1,062 |
| Guest Laundry | 8.32 | 8 | 69 | -61 | 305 | -297 |
| Guest Paid Outs | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 55.97 | 720 | 1,659 | -939 | 1,442 | -722 |
| Vending Machine Commissions | 0.00 | 135 | 132 | 3 | 222 | -87 |
| Miscellaneous Revenue | 0.00 | 136 | -8 | 144 | 0 | 136 |
| **Total Other Revenue** | 123.29 | 1,427 | 3,512 | -2,084 | 3,459 | -2,032 |
| Sales Tax | | | | | | |
| State Sales Tax | 301.40 | 6,191 | 6,331 | -141 | 0 | 6,191 |
| County Sales Tax | 641.05 | 13,160 | 13,465 | -304 | 0 | 13,160 |
| **Total Sales Tax** | 942.45 | 19,351 | 19,796 | -445 | 0 | 19,351 |
| **Total Revenue** | 8,817.04 | 184,372 | 185,074 | -703 | 153,110 | 31,262 |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Room State Sales Tax | 303.76 | 6,438 | 6,311 | 127 | 5,958 | 480 |
| Room Sales Tax Variance | 2.36 | 248 | -20 | 268 | 5,958 | -5,710 |
| City Lodging Tax | 626.51 | 13,279 | 13,017 | 262 | 12,289 | 990 |
| City Sales Tax Variance | -14.55 | 119 | -448 | 567 | 12,289 | -12,170 |

Watts v. Hospitality
Int Discl/RFP  0011

**Daily Report**
Monday 2/28/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 279.00 | 32,407.77 | 47,059.56 | -14,651.79 | 0.00 | 32,407.77 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 891.06 | 104,872.15 | 103,952.55 | 919.60 | 0.00 | 104,872.15 |
| American Express | -191.28 | 32,674.91 | 32,249.30 | 425.61 | 0.00 | 32,674.91 |
| Discover | 55.13 | 4,698.36 | 3,997.98 | 700.38 | 0.00 | 4,698.36 |
| Diners Club | 0.00 | 1,743.22 | 793.11 | 950.11 | 0.00 | 1,743.22 |
| Total Credit Card Receivable | 754.91 | 143,988.64 | 140,992.94 | 2,995.70 | 0.00 | 143,988.64 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 406.72 | -406.72 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 406.72 | -406.72 | 0.00 | 0.00 |
| | | | | | | |
| Petty Cash Expense Item | 52.90 | 1,260 | 922 | 338 | 0 | 1,260 |
| | | | | | | |
| **Total Cash & Credit Cards** | | 1,086.81 177,656.61 | 189,381.69 | -11,725.08 | 0.00 | 177,656.61 |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 7,594.00 | 160,962 | 157,784 | 3,178 | 148,958 | 12,004 |
| Telephone Revenue | 157.30 | 2,632 | 3,983 | -1,351 | 693 | 1,939 |
| Other Revenue | 123.29 | 1,427 | 3,512 | -2,084 | 3,459 | -2,032 |
| Tax Collections | 942.45 | 19,351 | 19,796 | -445 | 0 | 19,351 |
| Total Receipts | 8,817.04 | 184,372 | 185,074 | -703 | 153,110 | 31,262 |
| | | | | | | |
| Total All Receipts | 8,817.04 | | | | | |
| Plus: AR Beginning Balance | 40,311.55 | | | | | |
| Less Payments | 1,086.81 | | | | | |
| Net Ending Balance | 48,041.78 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 17,922.53 | | | | | |
| City Ledger | 32,582.99 | | | | | |
| Advance Deposits | -2,463.74 | | | | | |
| **Total A/R** | 48,041.78 | | | | | |
| | | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP  0012

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 279.00 | 32,407.77 | 47,059.56 | -14,651.79 | 0.00 | 32,407.77 |
| Total Paid-Outs | 0.00 | 0.00 | 406.72 | -406.72 | 0.00 | 0.00 |
| | | | | | | |
| Estimated Deposit | 279.00 | 32,407.77 | 46,652.84 | -14,245.07 | 0.00 | 32,407.77 |
| Actual Cash Deposit | 278.00 | 32,438.80 | 45,490.76 | -13,051.96 | 0.00 | 32,438.80 |
| | | | | | | |
| Cash Over/Short - Petty Cash | -1.00 | 31.03 | -1,162.08 | 1,193.11 | 0.00 | 31.03 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 91.73% | 72.96% | 81.36% | -8.40% | 71.15% | 1.81% |
| Occupancy with Comp Rooms | 93.98% | 74.14% | 82.30% | -8.16% | 71.15% | 2.99% |
| Average Daily Rate | 62.25 | 59.24 | 52.07 | 7.17 | 56.22 | 3.02 |
| Average Daily Rate with Comp | 60.75 | 58.30 | 51.48 | 6.82 | 56.22 | 2.08 |
| Revenue Per Available Room | 57.10 | 43.22 | 42.37 | 0.85 | 40.00 | 3.22 |
| | | | | | | |
| 10 - Rooms Sold Weekday Rate | 0 | 50 | 984 | -934 | 1,015 | -965 |
| 12 - Rooms Sold Corporate | 28 | 864 | 12 | 852 | 0 | 864 |
| 16 - Room Sold Government | 12 | 350 | 243 | 107 | 268 | 82 |
| 17 - Local Corporate | 0 | 0 | 1,139 | -1,139 | 150 | -150 |
| 20 - Rooms Sold Weekend Rate | 0 | 0 | 18 | -18 | 0 | 0 |
| 25 - Rooms Sold Other Discount | 18 | 969 | 384 | 585 | 754 | 215 |
| 28 - Rooms Sold Employee Rate | 1 | 62 | 57 | 5 | 80 | -18 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 193 | -193 | 0 | 0 |
| Room Sold Group | 63 | 422 | 0 | 422 | 382 | 40 |
| | | | | | | |
| Total Rooms Sold | 122 | 2,717 | 3,030 | -313 | 2,650 | 67 |
| | | | | | | |
| Complimentary Rooms | 3 | 44 | 35 | 9 | 0 | 44 |
| | | | | | | |
| Total Rooms Occupied | 125 | 2,761 | 3,065 | -304 | 2,650 | 111 |
| | | | | | | |
| Out of Order Rooms | | 0 | 24 | -24 | 0 | 0 |
| No Show Rooms | | 0 | 19 | -19 | 0 | 0 |
| Walk-Ins | | 0 | 241 | -241 | 0 | 0 |
| Unexpected Departures | | 0 | 85 | -85 | 0 | 0 |

Watts v. Hospitality
Int Discl/RFP  0013
Watts v. Hospitality

Daily Report
Thursday 3/31/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 4,560.20 | 14,216 | 81,903 | -67,687 | 0 | 14,216 |
| 12 - Corporate Rate | 2,395.00 | 48,843 | 488 | 48,354 | 80,662 | -31,819 |
| 16 - Government | 531.00 | 27,831 | 10,426 | 17,405 | 14,100 | 13,731 |
| 17 - Local Corporate | 236.00 | 619 | 38,339 | -37,720 | 11,800 | -11,181 |
| 20 - Regular Weekend Rate | -20.00 | 4,521 | 128 | 4,393 | 0 | 4,521 |
| 25 - Other Discounts | 0.00 | 60,063 | 21,997 | 38,066 | 31,931 | 28,132 |
| 28 - Marriott Employee Rate | 0.00 | 3,822 | 1,531 | 2,291 | 2,164 | 1,658 |
| 32 - Local Promotion | 0.00 | 730 | 5,217 | -4,487 | 0 | 730 |
| Room Revenue Group | 0.00 | 46,797 | 0 | 46,797 | 30,562 | 16,235 |
| Room Revenue Allowances and | 0.00 | -148 | 0 | -148 | 0 | -148 |
| Total Room Revenue | 7,702.20 | 207,293 | 160,028 | 47,265 | 171,219 | 36,074 |
| | | | | | | |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 0 | 422 | -422 | 0 | 0 |
| Long Distance Telephone | -1,421.76 | 350 | -1,786 | 2,136 | 789 | -439 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | -1,421.76 | 350 | -1,363 | 1,713 | 789 | -439 |
| Other Revenue | | | | | | |
| No-Show Revenue | -177.00 | -535 | 1,575 | -2,110 | 1,712 | -2,247 |
| Guest Laundry | 0.00 | 245 | 11 | 234 | 347 | -102 |
| Guest Paid Outs | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 0.00 | 557 | 1,792 | -1,235 | 1,641 | -1,084 |
| Vending Machine Commissions | 0.00 | 195 | 144 | 52 | 252 | -57 |
| Miscellaneous Revenue | 0.00 | 83 | -35 | 118 | 0 | 83 |
| Total Other Revenue | -177.00 | 545 | 3,486 | -2,941 | 3,952 | -3,407 |
| | | | | | | |
| Sales Tax | | | | | | |
| State Sales Tax | 301.01 | 8,155 | 6,413 | 1,743 | 0 | 8,155 |
| County Sales Tax | 640.18 | 17,379 | 13,669 | 3,710 | 0 | 17,379 |
| Total Sales Tax | 941.19 | 25,534 | 20,082 | 5,453 | 0 | 25,534 |
| **Total Revenue** | **7,044.63** | **233,723** | **182,233** | **51,490** | **175,960** | **57,763** |
| | | | | | | |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| Room State Sales Tax | 308.09 | 8,292 | 6,401 | 1,891 | 6,849 | 1,443 |
| Room Sales Tax Variance | 7.08 | 136 | -12 | 148 | 6,849 | -6,712 |
| | | | | | | |
| City Lodging Tax | 635.43 | 17,102 | 13,202 | 3,899 | 14,126 | 2,976 |
| City Sales Tax Variance | -4.75 | -277 | -467 | 190 | 14,126 | -14,403 |

Run on 4/4/2005 at 2:23:01 PM

Watts v. Hospitality
Int Discl/RFP   0014

Company: Montgomery Ventures, LLC      Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 592.99 | 25,907.47 | 26,676.90 | -769.43 | 0.00 | 25,907.47 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 5,653.49 | 100,411.68 | 99,767.06 | 644.62 | 0.00 | 100,411.68 |
| American Express | 855.05 | 33,326.28 | 39,983.56 | -6,657.28 | 0.00 | 33,326.28 |
| Discover | 0.00 | 5,392.96 | 6,095.62 | -702.66 | 0.00 | 5,392.96 |
| Diners Club | 77.63 | 62,722.01 | 4,269.78 | 58,452.23 | 0.00 | 62,722.01 |
| Total Credit Card Receivable | 6,586.17 | 201,852.93 | 150,116.02 | 51,736.91 | 0.00 | 201,852.93 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 369.01 | -369.01 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 369.01 | -369.01 | 0.00 | 0.00 |
| | | | | | | |
| Petty Cash Expense Item | 103.44 | 786 | 1,051 | -265 | 0 | 786 |
| | | | | | | |
| **Total Cash & Credit Cards** | | 7,282.60 228,546.13 | 178,212.71 | 50,333.42 | 0.00 | 228,546.13 |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 7,702.20 | 207,293 | 160,028 | 47,265 | 171,219 | 36,074 |
| Telephone Revenue | -1,421.76 | 350 | -1,363 | 1,713 | 789 | -439 |
| Other Revenue | -177.00 | 545 | 3,486 | -2,941 | 3,952 | -3,407 |
| Tax Collections | 941.19 | 25,534 | 20,082 | 5,453 | 0 | 25,534 |
| Total Receipts | 7,044.63 | 233,723 | 182,233 | 51,490 | 175,960 | 57,763 |
| | | | | | | |
| Total All Receipts | 7,044.63 | | | | | |
| Plus: AR Beginning Balance | 53,456.45 | | | | | |
| Less Payments | 7,282.60 | | | | | |
| Net Ending Balance | 53,218.48 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 19,531.14 | | | | | |
| City Ledger | 35,683.34 | | | | | |
| Advance Deposits | -1,996.00 | | | | | |
| **Total A/R** | 53,218.48 | | | | | |
| | | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP   0015

Company: Montgomery Ventures, LLC                                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 592.99 | 25,907.47 | 26,676.90 | -769.43 | 0.00 | 25,907.47 |
| Total Paid-Outs | 0.00 | 0.00 | 369.01 | -369.01 | 0.00 | 0.00 |
| Estimated Deposit | 592.99 | 25,907.47 | 26,307.89 | -400.42 | 0.00 | 25,907.47 |
| Actual Cash Deposit | 546.44 | 25,485.17 | 25,306.17 | 179.00 | 0.00 | 25,485.17 |
| Cash Over/Short - Petty Cash | -46.55 | -422.30 | -1,001.72 | 579.42 | 0.00 | -422.30 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 94.74% | 83.51% | 71.04% | 12.47% | 71.53% | 11.98% |
| Occupancy with Comp Rooms | 95.49% | 84.74% | 71.70% | 13.04% | 71.53% | 13.21% |
| Average Daily Rate | 61.13 | 60.21 | 54.64 | 5.57 | 58.06 | 2.15 |
| Average Daily Rate with Comp | 60.65 | 59.33 | 54.14 | 5.19 | 58.06 | 1.27 |
| Revenue Per Available Room | 57.91 | 50.28 | 38.81 | 11.46 | 41.53 | 8.75 |
| 10 - Rooms Sold Weekday Rate | 0 | 65 | 1,398 | -1,333 | 1,095 | -1,030 |
| 12 - Rooms Sold Corporate | 39 | 758 | 8 | 750 | 0 | 758 |
| 16 - Room Sold Government | 18 | 329 | 178 | 151 | 247 | 82 |
| 17 - Local Corporate | 0 | 0 | 665 | -665 | 200 | -200 |
| 20 - Rooms Sold Weekend Rate | 0 | 0 | 94 | -94 | 0 | 0 |
| 25 - Rooms Sold Other Discount | 56 | 1,343 | 427 | 916 | 827 | 516 |
| 28 - Rooms Sold Employee Rate | 4 | 52 | 41 | 11 | 62 | -10 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 118 | -118 | 0 | 0 |
| Room Sold Group | 9 | 896 | 0 | 896 | 518 | 378 |
| Total Rooms Sold | 126 | 3,443 | 2,929 | 514 | 2,949 | 494 |
| Complimentary Rooms | 1 | 51 | 27 | 24 | 0 | 51 |
| Total Rooms Occupied | 127 | 3,494 | 2,956 | 538 | 2,949 | 545 |
| Out of Order Rooms | | 0 | 64 | -64 | 0 | 0 |
| No Show Rooms | | 0 | 39 | -39 | 0 | 0 |
| Walk-Ins | | 0 | 449 | -449 | 0 | 0 |
| Unexpected Departures | | 0 | 161 | -161 | 0 | 0 |

Watts v. Hospitality
Int Discl/RFP   0016

Heather Watts
DOSM
2005 2nd Quarter Bonus Tracking Results
Submitted 7/7/05

1) Total Hotel RM Rev Budget (Apr/May/Jun) = $525,617

  Succeeded by $ $26,145

  Total Hotel RM Actual (Apr/May/Jun) = $ $551,762

2) Total Hotel Sales Dept. RM Rev Budget (Apr/May/Jun) = $167,639

  Succeeded by $ $33,490

  Total Hotel Sales Dept. RM Rev Actual (Apr/May/Jun) = $201,129

3) Hotel RevPar Index Budget (Apr/May/Jun) = 130.32

  Succeeded by 6.51

  Hotel RevPar Index Actual (Apr/May/Jun) = 136.83

**Payout Equals:**
Annual Salary divided by 4 to get Quarterly Salary = $9,500
  1) Hotel RM Rev Actual $ $9,500 x 25% = $2,375
  2) Hotel Sales Dept. Rm Rev $9,500 x 10% = $950.00
  3) Hotel RevPar Index $9,500 x 5% = $475.00

Total Payout $ 3,800





DEFENDANT'S
EXHIBIT
_10_

Watts v. Hospitality
Int Discl/RFP  0017

DOS

## 2005 Sales / Marketing Department - BONUS TRACKING FORM
### (Budget vs. Actual)

HOTEL:            Fairfield Inn - MONTGOMERY
Sales/Marketing Associate:               Heather Watts
Market Segments Represented:             LNR/Groups/Gov
Date Report Submitted:               7/7/2005
Prepared by:      Heather Watts, DOSM

| | TOT HOTEL RM. REV BUDGET | TOT HOTEL RM. REV ACTUAL | DIFF | TOT HOTEL SALES DEPT RM. REV BUDGET | TOT HOTEL SALES DEPT RM. REV ACTUAL | DIFF | HOTEL REVPAR INDEX BUDGET | HOTEL REVPAR INDEX ACTUAL | DIFF |
|---|---|---|---|---|---|---|---|---|---|
| January | 126720 | 132262 | 5542 | 46373 | 47401 | 1028 | 30.73 | 32.08 | 1.35 |
| February | 148958 | 160962 | 12004 | 46670 | 46257 | -413 | 40 | 42.37 | 2.37 |
| March | 171121 | 207293 | 36172 | 54461 | 75247 | 20786 | 41.53 | 50.28 | 8.75 |
| 1st QTR TOTALS | 446799 | 500517 | 53718 | 147504 | 168905 | 21401 | 112.26 | 124.73 | 12.47 |
| April | 178457 | 181712 | 3255 | 58068 | 63208 | 5140 | 44.73 | 45.54 | 0.81 |
| May | 175379 | 178954 | 3575 | 59137 | 54229 | -4908 | 42.54 | 43.4 | 0.86 |
| June | 171781 | 191096 | 19315 | 50434 | 83692 | 33258 | 43.05 | 47.89 | 4.84 |
| 2nd QTR TOTALS | 525617 | 551762 | 26145 | 167639 | 201129 | 33490 | 130.32 | 136.83 | 6.51 |
| July | 183606 | | -183606 | 60399 | | -60399 | 43.26 | | -43.26 |
| August | 175764 | | -175764 | 40460 | | -40460 | 41.43 | | -41.43 |
| September | 155868 | | -155868 | 51759 | | -51759 | 38 | | -38 |
| 3rd QTR TOTALS | 515238 | 0 | -515238 | 152618 | 0 | -152618 | 122.69 | 0 | -122.69 |
| October | 178252 | | -178252 | 57839 | | -57839 | 42.02 | | -42.02 |
| November | 156587 | | -156587 | 55641 | | -55641 | 38.11 | | -38.11 |
| December | 115022 | | -115022 | 32999 | | -32999 | 27.08 | | -27.08 |
| 4th QTR TOTALS | 449861 | 0 | -449861 | 146479 | 0 | -146479 | 107.21 | 0 | -107.21 |
| ANNUAL TOTALS | | | -885236 | | | -244206 | | | -210.92 |

Watts v. Hospitality
Int Discl/RFP  0018

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 0.00 | 4,223 | 41,596 | -37,373 | 0 | 4,223 |
| 12 - Corporate Rate | 1,157.00 | 56,616 | 962 | 55,654 | 73,792 | -17,176 |
| 16 - Government | 65.00 | 34,197 | 14,604 | 19,593 | 15,577 | 18,620 |
| 17 - Local Corporate | 0.00 | 930 | 57,397 | -56,467 | 11,800 | -10,870 |
| 20 - Regular Weekend Rate | 0.00 | 4,445 | 1,426 | 3,019 | 0 | 4,445 |
| 25 - Other Discounts | 2,406.75 | 41,157 | 18,983 | 22,174 | 44,202 | -3,045 |
| 28 - Marriott Employee Rate | 175.00 | 1,238 | 2,485 | -1,247 | 3,352 | -2,114 |
| 32 - Local Promotion | 0.00 | -276 | 34,059 | -34,335 | 0 | -276 |
| Room Revenue Group | 59.00 | 48,565 | 0 | 48,565 | 23,058 | 25,507 |
| Room Revenue Allowances and | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Room Revenue | 3,862.75 | 191,096 | 171,512 | 19,508 | 171,701 | 19,315 |
| | | | | | | |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 33 | 291 | -257 | 0 | 33 |
| Long Distance Telephone | 23.05 | 615 | 302 | 313 | 775 | -160 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | 23.05 | 648 | 593 | 55 | 775 | -127 |
| Other Revenue | | | | | | |
| No-Show Revenue | 69.00 | -62 | 359 | -421 | 1,718 | -1,780 |
| Guest Laundry | 0.00 | 390 | 84 | 306 | 341 | 49 |
| Guest Paid Outs | 0.00 | 0 | -66 | 66 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 64 | -64 | 0 | 0 |
| Pay Television | 0.00 | 0 | 1,335 | -1,335 | 1,611 | -1,611 |
| Vending Machine Commissions | 0.00 | 259 | 0 | 259 | 248 | 11 |
| Miscellaneous Revenue | 55.13 | -255 | -109 | -146 | 0 | -255 |
| Total Other Revenue | 124.13 | 333 | 1,668 | -1,335 | 3,918 | -3,585 |
| | | | | | | |
| Sales Tax | | | | | | |
| State Sales Tax | 157.27 | 7,607 | 7,239 | 368 | 0 | 7,607 |
| County Sales Tax | 334.45 | 16,178 | 15,720 | 459 | 0 | 16,178 |
| Total Sales Tax | 491.72 | 23,785 | 22,959 | 827 | 0 | 23,785 |
| **Total Revenue** | **4,501.65** | **215,862** | **196,731** | **19,130** | **176,474** | **39,388** |
| | | | | | | |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| Room State Sales Tax | 154.51 | 7,644 | 6,860 | 783 | 6,871 | 773 |
| Room Sales Tax Variance | -2.76 | 37 | -378 | 415 | 6,871 | -6,834 |
| | | | | | | |
| City Lodging Tax | 318.68 | 15,765 | 14,150 | 1,616 | 14,172 | 1,593 |
| City Sales Tax Variance | -15.77 | -413 | -1,570 | 1,157 | 14,172 | -14,585 |

Watts V. Hospitality
Int Discl/RFP  0019

Company: Montgomery Ventures, LLC                     Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 333.67 | 25,217.38 | 19,048.42 | 6,168.96 | 0.00 | 25,217.38 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 3,508.99 | 152,681.49 | 126,243.08 | 26,438.41 | 0.00 | 152,681.49 |
| American Express | 2,165.75 | 26,288.70 | 33,393.72 | -7,105.02 | 0.00 | 26,288.70 |
| Discover | 219.39 | 9,426.41 | 6,593.72 | 2,832.69 | 0.00 | 9,426.41 |
| Diners Club | 0.00 | 2,069.21 | 3,948.77 | -1,879.56 | 0.00 | 2,069.21 |
| Total Credit Card Receivable | 5,894.13 | 190,465.81 | 170,179.29 | 20,286.52 | 0.00 | 190,465.81 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 302.85 | -302.85 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 302.85 | -302.85 | 0.00 | 0.00 |
| Petty Cash Expense Item | 61.24 | 993 | 1,554 | -561 | 0 | 993 |
| **Total Cash & Credit Cards** | **6,289.04** | **216,676.04** | **191,084.89** | **25,591.15** | **0.00** | **216,676.04** |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 3,862.75 | 191,096 | 171,512 | 19,583 | 171,781 | 19,315 |
| Telephone Revenue | 23.05 | 648 | 593 | 55 | 775 | -127 |
| Other Revenue | 124.13 | 333 | 1,668 | -1,335 | 3,918 | -3,585 |
| Tax Collections | 491.72 | 23,785 | 22,959 | 827 | 0 | 23,785 |
| Total Receipts | 4,501.65 | 215,862 | 196,731 | 19,130 | 176,474 | 39,388 |
| | | | | | | |
| Total All Receipts | 4,501.65 | | | | | |
| Plus: AR Beginning Balance | 59,134.55 | | | | | |
| Less Payments | 6,289.04 | | | | | |
| Net Ending Balance | 57,347.16 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | - 12,030.84 | | | | | |
| City Ledger | 45,316.32 | | | | | |
| Advance Deposits | 0.00 | | | | | |
| **Total A/R** | **57,347.16** | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP  0020

Thursday 6/30/2005

·Company: Montgomery Ventures, LLC

Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Cash Reconciliation** | | | | | | |
| Total Cash Received | 333.67 | 25,217.38 | 19,048.42 | 6,168.96 | 0.00 | 25,217.38 |
| Total Paid-Outs | 0.00 | 0.00 | 302.85 | -302.85 | 0.00 | 0.00 |
| Estimated Deposit | 333.67 | 25,217.38 | 18,745.57 | 6,471.81 | 0.00 | 25,217.38 |
| Actual Cash Deposit | 342.62 | 24,902.92 | 18,577.31 | 6,325.61 | 0.00 | 24,902.92 |
| Cash Over/Short - Petty Cash | 8.95 | -314.46 | -168.26 | -146.20 | 0.00 | -314.46 |
| **Statistics** | | | | | | |
| **Room Statistics** | | | | | | |
| Occupancy | 54.14% | 79.92% | 77.37% | 2.55% | 73.91% | 6.01% |
| Occupancy with Comp Rooms | 54.89% | 81.38% | 79.22% | 2.16% | 73.91% | 7.47% |
| Average Daily Rate | 53.65 | 59.92 | 55.56 | 4.36 | 58.25 | 1.68 |
| Average Daily Rate with Comp | 52.91 | 58.85 | 54.26 | 4.59 | 58.25 | 0.60 |
| Revenue Per Available Room | 29.04 | 47.89 | 42.99 | 4.91 | 43.05 | 4.84 |
| 10 - Rooms Sold Weekday Rate | 0 | 0 | 640 | -640 | 1,003 | -1,003 |
| 12 - Rooms Sold Corporate | 17 | 823 | 17 | 806 | 0 | 823 |
| 16 - Room Sold Government | 1 | 353 | 242 | 111 | 255 | 98 |
| 17 - Local Corporate | 0 | 0 | 1,126 | -1,126 | 200 | -200 |
| 20 - Rooms Sold Weekend Rate | 0 | 59 | 12 | 47 | 0 | 59 |
| 25 - Rooms Sold Other Discount | 48 | 1,057 | 389 | 668 | 1,017 | 40 |
| 28 - Rooms Sold Employee Rate | 5 | 50 | 89 | -39 | 96 | -46 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 572 | -572 | 0 | 0 |
| Room Sold Group | 1 | 847 | 0 | 847 | 378 | 469 |
| Total Rooms Sold | 72 | 3,189 | 3,087 | 102 | 2,949 | 240 |
| Complimentary Rooms | 1 | 58 | 74 | -16 | 0 | 58 |
| Total Rooms Occupied | 73 | 3,247 | 3,161 | 86 | 2,949 | 298 |
| Out of Order Rooms | | 0 | 43 | -43 | 0 | 0 |
| No Show Rooms | | 0 | 18 | -18 | 0 | 0 |
| Walk-Ins | | 0 | 256 | -256 | 0 | 0 |
| Unexpected Departures | | 0 | 73 | -73 | 0 | 0 |

Run on 7/7/2005 at 10:29:30 AM

Watts v. Hospitality
Int Discl/RFP 0021
Watts v. Hospitality

Saturday 4/30/2005

| Company: Montgomery Ventures, LLC | | | | Property: Fairfield Inn by Marriott - Montgomery, AL | |
|---|---|---|---|---|---|
| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 0.00 | 1,074 | 58,602 | -57,529 | 0 | 1,074 |
| 12 - Corporate Rate | 2,648.00 | | 1,743 | 70,944 | 66,435 | 6,252 |
| 16 - Government | 325.00 | 25,635 | 15,207 | 10,428 | 15,962 | 9,673 |
| 17 - Local Corporate | 0.00 | 1,990 | 79,854 | -77,856 | 10,326 | -8,327 |
| 20 - Regular Weekend Rate | 0.00 | 1,590 | 397 | 1,193 | 0 | 1,590 |
| 25 - Other Discounts | 3,784.87 | 49,522 | 23,675 | 25,847 | 50,519 | -997 |
| 28 - Marriott Employee Rate | 105.00 | 3,287 | 1,754 | 1,533 | 3,435 | -148 |
| 32 - Local Promotion | 0.00 | 2,048 | 7,213 | -5,165 | 0 | 2,048 |
| Room Revenue Group | 520.00 | 21,038 | 0 | 21,038 | 31,781 | -10,743 |
| Room Revenue Allowances and | 0.00 | 2,833 | 0 | 2,833 | 0 | 2,833 |
| Total Room Revenue | 7,382.87 | 181,712 | 188,447 | -6,734 | 178,457 | 3,255 |
| | | 63,208 | (+)5,140 | | | |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 0 | 619 | -619 | 0 | 0 |
| Long Distance Telephone | -193.81 | 433 | 684 | -251 | 778 | -345 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | -193.81 | 433 | 1,303 | -870 | 778 | -345 |
| Other Revenue | | | | | | |
| No-Show Revenue | 0.00 | 121 | 1,389 | -1,268 | 1,785 | -1,664 |
| Guest Laundry | 0.00 | 98 | 179 | -81 | 342 | -244 |
| Guest Paid Outs | 0.00 | 233 | 0 | 233 | 0 | 233 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 0.00 | 0 | 1,854 | -1,854 | 1,618 | -1,618 |
| Vending Machine Commissions | 0.00 | 179 | 272 | -93 | 249 | -70 |
| Miscellaneous Revenue | 0.00 | 274 | -6 | 279 | 0 | 274 |
| Total Other Revenue | 0.00 | 905 | 3,689 | -2,784 | 3,994 | -3,089 |
| Sales Tax | | | | | | |
| State Sales Tax | 292.64 | 7,206 | 7,547 | -342 | 0 | 7,206 |
| County Sales Tax | 622.38 | 15,358 | 16,045 | -687 | 0 | 15,358 |
| Total Sales Tax | 915.02 | 22,564 | 23,592 | -1,028 | 0 | 22,564 |
| **Total Revenue** | **8,104.08** | **205,615** | **217,031** | **-11,416** | **183,229** | **22,386** |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Room State Sales Tax | 295.31 | 7,268 | 7,538 | -269 | 7,138 | 130 |
| Room Sales Tax Variance | 2.67 | 63 | -9 | 72 | 7,138 | -7,075 |
| City Lodging Tax | 609.09 | 14,991 | 15,547 | -556 | 14,723 | 269 |
| City Sales Tax Variance | -13.29 | -367 | -498 | 131 | 14,723 | -15,090 |

Run on 7/7/2005 at 10:26:46 AM

**Daily Report**
Saturday 4/30/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 197.01 | 31,659.53 | 26,784.83 | 4,874.70 | 0.00 | 31,659.53 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 3,637.45 | 116,977.83 | 145,600.57 | -28,622.74 | 0.00 | 116,977.83 |
| American Express | 736.92 | 36,230.57 | 28,537.11 | 7,693.46 | 0.00 | 36,230.57 |
| Discover | 138.38 | 4,579.07 | 4,385.70 | 193.37 | 0.00 | 4,579.07 |
| Diners Club | 0.00 | 1,231.95 | 2,161.12 | -929.17 | 0.00 | 1,231.95 |
| Total Credit Card Receivable | 4,512.75 | 159,019.42 | 180,684.50 | -21,665.08 | 0.00 | 159,019.42 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 232.86 | 668.14 | -435.28 | 0.00 | 232.86 |
| Total Paid Outs | 0.00 | 232.86 | 668.14 | -435.28 | 0.00 | 232.86 |
| Petty Cash Expense Item | 0.00 | 1,396 | 1,770 | -373 | 0 | 1,396 |
| **Total Cash & Credit Cards** | 4,709.76 | 192,308.00 | 209,907.10 | -17,599.10 | 0.00 | 192,308.00 |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 7,382.87 | 181,712 | 188,447 | -6,734 | 178,457 | 3,255 |
| Telephone Revenue | -193.81 | 433 | 1,303 | -870 | 778 | -345 |
| Other Revenue | 0.00 | 905 | 3,689 | -2,784 | 3,994 | -3,089 |
| Tax Collections | 915.02 | 22,564 | 23,592 | -1,028 | 0 | 22,564 |
| Total Receipts | 8,104.08 | 205,615 | 217,031 | -11,416 | 183,229 | 22,386 |
| | | | | | | |
| Total All Receipts | 8,104.08 | | | | | |
| Plus: AR Beginning Balance | 63,130.75 | | | | | |
| Less Payments | 4,709.76 | | | | | |
| Net Ending Balance | 66,525.07 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 29,232.70 | | | | | |
| City Ledger | 37,228.37 | | | | | |
| Advance Deposits | 64.00 | | | | | |
| **Total A/R** | 66,525.07 | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP  0023

Saturday 4/30/2005

Company: Montgomery Ventures, LLC                              Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 197.01 | 31,659.53 | 26,784.83 | 4,874.70 | 0.00 | 31,659.53 |
| Total Paid-Outs | 0.00 | 232.86 | 668.14 | -435.28 | 0.00 | 232.86 |
| Estimated Deposit | 197.01 | 31,426.67 | 26,116.69 | 5,309.98 | 0.00 | 31,426.67 |
| Actual Cash Deposit | 197.01 | 31,352.58 | 21,692.76 | 9,659.82 | 0.00 | 31,352.58 |
| Cash Over/Short - Petty Cash | 0.00 | -74.09 | -4,423.93 | 4,349.84 | 0.00 | -74.09 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 97.74% | 77.34% | 86.04% | -8.70% | 76.41% | 0.93% |
| Occupancy with Comp Rooms | 99.25% | 78.55% | 86.39% | -7.84% | 76.41% | 2.14% |
| Average Daily Rate | 56.79 | 58.88 | 54.89 | 3.99 | 58.53 | 0.35 |
| Average Daily Rate with Comp | 55.93 | 57.98 | 54.67 | 3.31 | 58.53 | -0.55 |
| Revenue Per Available Room | 55.51 | 45.54 | 47.23 | -1.69 | 44.72 | 0.82 |
| 10 - Rooms Sold Weekday Rate | 0 | 35 | 988 | -953 | 924 | -889 |
| 12 - Rooms Sold Corporate | 40 | 1,058 | 14 | 1,044 | 0 | 1,058 |
| 16 - Room Sold Government | 5 | 371 | 235 | 136 | 262 | 109 |
| 17 - Local Corporate | 0 | 0 | 1,521 | -1,521 | 175 | -175 |
| 20 - Rooms Sold Weekend Rate | 0 | 56 | 6 | 50 | 0 | 56 |
| 25 - Rooms Sold Other Discount | 74 | 1,102 | 459 | 643 | 1,069 | 33 |
| 28 - Rooms Sold Employee Rate | 3 | 63 | 52 | 11 | 98 | -35 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 158 | -158 | 0 | 0 |
| Room Sold Group | 8 | 401 | 0 | 401 | 521 | -120 |
| Total Rooms Sold | 130 | 3,086 | 3,433 | -347 | 3,049 | 37 |
| Complimentary Rooms | 2 | 48 | 14 | 34 | 0 | 48 |
| Total Rooms Occupied | 132 | 3,134 | 3,447 | -313 | 3,049 | 85 |
| Out of Order Rooms | | 0 | 85 | -85 | 0 | 0 |
| No Show Rooms | | 0 | 35 | -35 | 0 | 0 |
| Walk-Ins | | 0 | 297 | -297 | 0 | 0 |
| Unexpected Departures | | 0 | 127 | -127 | 0 | 0 |

Watts v. Hospitality
Int Discl/RFP   0024
Watts v. Hospitality

Tuesday 5/31/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 0.00 | 2,000 | 62,916 | -60,917 | 0 | 2,000 |
| 12 - Corporate Rate | 2,732.00 | 84,064 | 744 | 83,319 | 82,485 | 1,579 |
| 16 - Government | 520.00 | 17,270 | 14,616 | 2,661 | 15,680 | 1,588 |
| 17 - Local Corporate | 0.00 | 219 | 33,914 | -33,696 | 10,325 | -10,106 |
| 20 - Regular Weekend Rate | 0.00 | 460 | 4,229 | -3,769 | 0 | 460 |
| 25 - Other Discounts | 1,745.00 | 53,576 | 27,211 | 26,365 | 31,506 | 22,070 |
| 28 - Marriott Employee Rate | 210.00 | 1,439 | 1,711 | -272 | 2,251 | -812 |
| 32 - Local Promotion | 0.00 | 0 | 29,082 | -29,082 | 0 | 0 |
| Room Revenue Group | 0.00 | 19,920 | 1,371 | 18,549 | 33,123 | -13,203 |
| Room Revenue Allowances and | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Room Revenue | 5,207.00 | 178,964 | 175,794 | 3,160 | 175,379 | 3,575 |
| | | | | | | |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 41 | 858 | -818 | 0 | 41 |
| Long Distance Telephone | 285.41 | 518 | 1,067 | -549 | 800 | -282 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | 285.41 | 559 | 1,925 | -1,366 | 800 | -241 |
| Other Revenue | | | | | | |
| No-Show Revenue | 0.00 | 903 | 477 | 426 | 1,754 | -851 |
| Guest Laundry | 4.68 | 140 | 64 | 76 | 352 | -212 |
| Guest Paid Outs | 0.00 | 0 | 281 | -281 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 0.00 | 0 | 2,071 | -2,071 | 1,663 | -1,663 |
| Vending Machine Commissions | 0.00 | 0 | 207 | -207 | 256 | -256 |
| Miscellaneous Revenue | 0.00 | 61 | -590 | 651 | 0 | 61 |
| Total Other Revenue | 4.68 | 1,104 | 2,510 | -1,406 | 4,025 | -2,921 |
| | | | | | | |
| Sales Tax | | | | | | |
| State Sales Tax | 210.28 | 7,190 | 7,046 | 144 | 0 | 7,190 |
| County Sales Tax | 447.21 | 15,073 | 15,024 | 50 | 0 | 15,073 |
| Total Sales Tax | 657.49 | 22,263 | 22,070 | 193 | 0 | 22,263 |
| **Total Revenue** | 6,154.58 | 202,880 | 202,299 | 581 | 180,204 | 22,676 |
| | | | | | | |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Room State Sales Tax | 208.28 | 7,158 | 7,032 | 126 | 7,015 | 143 |
| Room Sales Tax Variance | -2.00 | -31 | -14 | -17 | 7,015 | -7,047 |
| City Lodging Tax | 429.58 | 14,764 | 14,503 | 261 | 14,469 | 295 |
| City Sales Tax Variance | -17.63 | -310 | -521 | 211 | 14,469 | -14,778 |

Company: Montgomery Ventures, LLC                                          Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 243.02 | 26,028.40 | 29,241.29 | -3,212.89 | 0.00 | 26,028.40 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 1,233.08 | 112,569.64 | 121,931.86 | -9,362.22 | 0.00 | 112,569.64 |
| American Express | 0.00 | 45,553.53 | 42,384.35 | 3,169.18 | 0.00 | 45,553.53 |
| Discover | 105.76 | 9,999.74 | 5,118.20 | 4,881.54 | 0.00 | 9,999.74 |
| Diners Club | 0.00 | 15,077.73 | 8,331.05 | 6,746.68 | 0.00 | 15,077.73 |
| Total Credit Card Receivable | 1,338.84 | 183,200.64 | 177,765.46 | 5,435.18 | 0.00 | 183,200.64 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 446.75 | -446.75 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 446.75 | -446.75 | 0.00 | 0.00 |
| | | | | | | |
| Petty Cash Expense Item | 0.00 | 2,015 | 1,850 | 165 | 0 | 2,015 |
| | | | | | | |
| **Total Cash & Credit Cards** | | 1,581.86 211,243.81 | 209,303.20 | 1,940.61 | 0.00 | 211,243.81 |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 5,207.00 | 178,954 | 175,794 | 3,160 | 175,379 | 3,575 |
| Telephone Revenue | 285.41 | 559 | 1,925 | -1,366 | 800 | -241 |
| Other Revenue | 4.68 | 1,104 | 2,510 | -1,406 | 4,025 | -2,921 |
| Tax Collections | 657.49 | 22,263 | 22,070 | 193 | 0 | 22,263 |
| Total Receipts | 6,154.58 | 202,880 | 202,299 | 581 | 180,204 | 22,676 |
| | | | | | | |
| Total All Receipts | 6,154.58 | | | | | |
| Plus: AR Beginning Balance | 53,588.67 | | | | | |
| Less Payments | 1,581.86 | | | | | |
| Net Ending Balance | 58,161.39 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 12,543.45 | | | | | |
| City Ledger | 45,710.33 | | | | | |
| Advance Deposits | -92.39 | | | | | |
| **Total A/R** | 58,161.39 | | | | | |
| | | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts & Hospitality
Int Discl/RFP 0026

Company: Montgomery Ventures, LLC        Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 243.02 | 26,028.40 | 29,241.29 | -3,212.89 | 0.00 | 26,028.40 |
| Total Paid-Outs | 0.00 | 0.00 | 446.75 | -446.75 | 0.00 | 0.00 |
| | | | | | | |
| Estimated Deposit | 243.02 | 26,028.40 | 28,794.54 | -2,766.14 | 0.00 | 26,028.40 |
| Actual Cash Deposit | 245.38 | 25,679.23 | 27,009.48 | -1,330.25 | 0.00 | 25,679.23 |
| | | | | | | |
| Cash Over/Short - Petty Cash | 2.36 | -349.17 | -1,785.06 | 1,435.89 | 0.00 | -349.17 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 67.67% | 73.37% | 75.96% | -2.59% | 71.54% | 1.83% |
| Occupancy with Comp Rooms | 68.42% | 74.58% | 78.66% | -4.08% | 71.54% | 3.04% |
| Average Daily Rate | 57.86 | 59.16 | 56.13 | 3.03 | 59.46 | -0.30 |
| Average Daily Rate with Comp | 57.22 | 58.20 | 54.21 | 3.99 | 59.46 | -1.26 |
| Revenue Per Available Room | 39.15 | 43.40 | 42.64 | 0.77 | 42.54 | 0.87 |
| | | | | | | |
| 10 - Rooms Sold Weekday Rate | 0 | 0 | 1,004 | -1,004 | 1,021 | -1,021 |
| 12 - Rooms Sold Corporate | 41 | 1,250 | 14 | 1,236 | 0 | 1,250 |
| 16 - Room Sold Government | 8 | 226 | 215 | 11 | 257 | -31 |
| 17 - Local Corporate | 0 | 0 | 755 | -755 | 175 | -175 |
| 20 - Rooms Sold Weekend Rate | 0 | 0 | 23 | -23 | 0 | 0 |
| 25 - Rooms Sold Other Discount | 35 | 1,147 | 501 | 646 | 889 | 258 |
| 28 - Rooms Sold Employee Rate | 6 | 50 | 53 | -3 | 64 | -14 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 523 | -523 | 0 | 0 |
| Room Sold Group | 0 | 352 | 44 | 308 | 543 | -191 |
| | | | | | | |
| Total Rooms Sold | 90 | 3,025 | 3,132 | -107 | 2,950 | 75 |
| | | | | | | |
| Complimentary Rooms | 1 | 50 | 111 | -61 | 0 | 50 |
| | | | | | | |
| Total Rooms Occupied | 91 | 3,075 | 3,243 | -168 | 2,950 | 125 |
| | | | | | | |
| Out of Order Rooms | | 0 | 35 | -35 | 0 | 0 |
| No Show Rooms | | 0 | 16 | -16 | 0 | 0 |
| Walk-Ins | | 0 | 294 | -294 | 0 | 0 |
| Unexpected Departures | | 0 | 182 | -182 | 0 | 0 |

Watts v. Hospitality
Int Discl/RFP 0027

Heather Watts
DOSM
2005 3rd Quarter Bonus Tracking Results
Submitted 10/11/05

1) Total Hotel RM Rev Budget (July/Aug/Sept) = $515,238

**Succeeded by $116,351**

Total Hotel RM Actual (July/Aug/Sept) = $631,589


2) Total Hotel Sales Dept. RM Rev Budget (July/Aug/Sept) = $152,618

**Succeeded by $ 199,853**

Total Hotel Sales Dept. RM Rev Actual  (July/Aug/Sept) = $ 352,471


3) Hotel RevPar Index Budget (July/Aug/Sept) =  122.69

**Succeeded by 32.34**

Hotel RevPar Index Actual  (July/Aug/Sept) = 155.03


**Payout Equals:**
Annual Salary divided by four to get quarterly salary= $9,500
1) Hotel RM Rev Actual = $9,500 x 25% = $2,375
2) Hotel Sales Dept. RM Rev $9,500 x 10% = $950.00
3) Hotel RevPar Index $9,500 x 5% = $475.00

Total Payout $3,800





DEFENDANT'S
EXHIBIT
11

Watts v. Hospitality
Int Discl/RFP  0032

DOS

## 2005 Sales / Marketing Department - BONUS TRACKING FORM
### (Budget vs. Actual)

HOTEL:    Fairfield Inn - MONTGOMERY
Sales/Marketing Associate:    Heather Watts
Market Segments Represented:    LNR/Corporate-Gov-Group
Date Report Submitted:    11-Oct
Prepared by: __ Heather Watts,DOSM

| | TOT HOTEL RM. REV BUDGET | TOT HOTEL RM. REV ACTUAL | DIFF | TOT HOTEL SALES DEPT RM. REV BUDGET | TOT HOTEL SALES DEPT RM. REV ACTUAL | DIFF | HOTEL REVPAR INDEX BUDGET | HOTEL REVPAR INDEX ACTUAL | DIFF |
|---|---|---|---|---|---|---|---|---|---|
| January | 126720 | 132262 | 5542 | 46373 | 47401 | 1028 | 30.73 | 32.08 | 1.35 |
| February | 148958 | 160962 | 12004 | 46670 | 46257 | -413 | 40 | 42.37 | 2.37 |
| March | 171121 | 207293 | 36172 | 54461 | 75247 | 20786 | 41.53 | 50.28 | 8.75 |
| 1st QTR TOTALS | 446799 | 500517 | 53718 | 147504 | 168905 | 21401 | 112.26 | 124.73 | 12.47 |
| April | 178457 | 181712 | 3255 | 58068 | 63208 | 5140 | 44.73 | 45.54 | 0.81 |
| May | 175379 | 178954 | 3575 | 59137 | 54229 | -4908 | 42.54 | 43.4 | 0.86 |
| June | 171781 | 191096 | 19315 | 50434 | 83692 | 33258 | 43.05 | 47.89 | 4.84 |
| 2nd QTR TOTALS | 525617 | 551762 | 26145 | 167639 | 201129 | 33490 | 130.32 | 136.83 | 6.51 |
| July | 183606 | 205128 | 21522 | 60399 | 98362 | 37963 | 43.26 | 49.75 | 6.49 |
| August | 175764 | 198232 | 22468 | 40460 | 104004 | 63544 | 41.43 | 48.08 | 6.65 |
| September | 155868 | 228229 | 72361 | 51759 | 150105 | 98346 | 38 | 57.2 | 19.2 |
| 3rd QTR TOTALS | 515238 | 631589 | 116351 | 152618 | 352471 | 199853 | 122.69 | 155.03 | 32.34 |
| October | 178252 | | -178252 | 38086 | | -38086 | 42.02 | | -42.02 |
| November | 156587 | | -156587 | 34950 | | -34950 | 38.11 | | -38.11 |
| December | 115022 | | -115022 | 23243 | | -23243 | 27.08 | | -27.08 |
| 4th QTR TOTALS | 449861 | | -449861 | 96279 | | -96279 | 107.21 | | -107.21 |
| ANNUAL TOTALS | | 0 | -253647 | | 0 | 158465 | | 0 | -55.89 |

Watts v. Hospitality
Int Discl/RFP  0033

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 0.00 | 2,845 | 60,397 | -57,552 | 0 | 2,845 |
| 12 - Corporate Rate | 731.00 | 58,447 | 728 | 57,719 | 72,576 | -14,129 |
| 16 - Government | 910.00 | 32,276 | 13,924 | 18,352 | 14,889 | 17,387 |
| 17 - Local Corporate | 0.00 | 5,006 | 48,600 | -43,594 | 8,850 | -3,844 |
| 20 - Regular Weekend Rate | 0.00 | 14,810 | 0 | 14,810 | 0 | 14,810 |
| 25 - Other Discounts | 891.58 | 29,723 | 18,376 | 11,347 | 41,118 | -11,395 |
| 28 - Marriott Employee Rate | 0.00 | 1,218 | 7,006 | -5,789 | 4,271 | -3,054 |
| 32 - Local Promotion | 0.00 | -177 | 25,462 | -25,639 | 0 | -177 |
| Room Revenue Group | 3,380.00 | 61,080 | 0 | 61,080 | 36,661 | 24,419 |
| Room Revenue Allowances and | -100.00 | -100 | 0 | -100 | 0 | -100 |
| Total Room Revenue | 5,812.58 | 205,128 | 174,493 | 30,635 | 178,365 | 26,762 |
| | | | | | | |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | 0.00 | 143 | 234 | -91 | 0 | 143 |
| Long Distance Telephone | -480.84 | 1,264 | -19 | 1,283 | 779 | 485 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | -480.84 | 1,407 | 215 | 1,192 | 779 | 628 |
| Other Revenue | | | | | | |
| No-Show Revenue | 0.00 | 183 | 753 | -570 | 1,784 | -1,601 |
| Guest Laundry | 0.00 | 926 | 0 | 926 | 343 | 583 |
| Guest Paid Outs | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 103 | -103 | 0 | 0 |
| Pay Television | 0.00 | 0 | 1,539 | -1,539 | 1,620 | -1,620 |
| Vending Machine Commissions | 0.00 | 213 | 193 | 20 | 249 | -36 |
| Miscellaneous Revenue | 0.00 | -352 | 66 | -417 | 0 | -352 |
| Total Other Revenue | 0.00 | 971 | 2,654 | -1,683 | 3,996 | -3,025 |
| | | | | | | |
| Sales Tax | | | | | | |
| State Sales Tax | 233.90 | 8,147 | 7,093 | 1,054 | 0 | 8,147 |
| County Sales Tax | 497.48 | 17,298 | 15,088 | 2,210 | 0 | 17,298 |
| Total Sales Tax | 731.38 | 25,445 | 22,181 | 3,264 | 0 | 25,445 |
| **Total Revenue** | **6,063.12** | **232,951** | **199,543** | **33,408** | **183,140** | **49,811** |
| | | | | | | |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 0.00 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| Room State Sales Tax | 232.50 | 8,205 | 6,980 | 1,225 | 7,135 | 1,070 |
| Room Sales Tax Variance | -1.40 | 58 | -113 | 171 | 7,135 | -7,076 |
| | | | | | | |
| City Lodging Tax | 479.54 | 16,923 | 14,396 | 2,527 | 14,715 | 2,208 |
| City Sales Tax Variance | -17.94 | -375 | -692 | 317 | 14,715 | -15,090 |

Watts v. Hospitality
Int Discl/RFP  0034

Sunday 7/31/2005

Company: Montgomery Ventures, LLC                        Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 816.93 | 27,570.45 | 44,310.41 | -16,739.96 | 0.00 | 27,570.45 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 3,887.11 | 138,063.76 | 115,438.13 | 22,625.63 | 0.00 | 138,063.76 |
| American Express | 376.90 | 21,985.19 | 32,102.05 | -10,116.86 | 0.00 | 21,985.19 |
| Discover | 964.19 | 4,466.19 | 7,145.86 | -2,679.67 | 0.00 | 4,466.19 |
| Diners Club | 0.00 | 5,218.47 | 2,669.49 | 2,548.98 | 0.00 | 5,218.47 |
| Total Credit Card Receivable | 5,228.20 | 169,733.61 | 157,355.53 | 12,378.08 | 0.00 | 169,733.61 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 271.68 | -271.68 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 271.68 | -271.68 | 0.00 | 0.00 |
| | | | | | | |
| Petty Cash Expense Item | 0.00 | 1,517 | 2,765 | -1,248 | 0 | 1,517 |
| | | | | | | |
| **Total Cash & Credit Cards** | **6,045.13** | **198,821.09** | **204,702.29** | **-5,881.20** | **0.00** | **198,821.09** |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 5,812.58 | 205,128 | 174,493 | 30,635 | 178,365 | 26,762 |
| Telephone Revenue | -480.84 | 1,407 | 215 | 1,192 | 779 | 628 |
| Other Revenue | 0.00 | 971 | 2,654 | -1,683 | 3,996 | -3,025 |
| Tax Collections | 731.38 | 25,445 | 22,181 | 3,264 | 0 | 25,445 |
| Total Receipts | 6,063.12 | 232,951 | 199,543 | 33,408 | 183,140 | 49,811 |
| | | | | | | |
| Total All Receipts | 6,063.12 | | | | | |
| Plus: AR Beginning Balance | 91,459.11 | | | | | |
| Less Payments | 6,045.13 | | | | | |
| Net Ending Balance | 91,477.10 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 49,101.77 | | | | | |
| City Ledger | 42,707.23 | | | | | |
| Advance Deposits | -331.90 | | | | | |
| **Total A/R** | **91,477.10** | | | | | |
| | | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP 0035

Sunday 7/31/2005

Company: Montgomery Ventures, LLC                              Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 816.93 | 27,570.45 | 44,310.41 | -16,739.96 | 0.00 | 27,570.45 |
| Total Paid-Outs | 0.00 | 0.00 | 271.68 | -271.68 | 0.00 | 0.00 |
| Estimated Deposit | 816.93 | 27,570.45 | 44,038.73 | -16,468.28 | 0.00 | 27,570.45 |
| Actual Cash Deposit | 759.24 | 27,100.67 | 42,414.82 | -15,314.15 | 0.00 | 27,100.67 |
| Cash Over/Short - Petty Cash | -57.69 | -469.78 | -1,623.91 | 1,154.13 | 0.00 | -469.78 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 70.68% | 82.46% | 77.01% | 5.45% | 74.05% | 8.41% |
| Occupancy with Comp Rooms | 72.18% | 84.45% | 78.10% | 6.35% | 74.05% | 10.40% |
| Average Daily Rate | 61.84 | 60.33 | 54.96 | 5.37 | 58.42 | 1.91 |
| Average Daily Rate with Comp | 60.55 | 58.91 | 54.19 | 4.72 | 58.42 | 0.49 |
| Revenue Per Available Room | 43.70 | 49.75 | 42.32 | 7.43 | 43.26 | 6.49 |
| 10 - Rooms Sold Weekday Rate | 0 | 38 | 967 | -929 | 1,071 | -1,033 |
| 12 - Rooms Sold Corporate | 11 | 740 | 12 | 728 | 0 | 740 |
| 16 - Room Sold Government | 14 | 303 | 184 | 119 | 244 | 59 |
| 17 - Local Corporate | 0 | 0 | 915 | -915 | 150 | -150 |
| 20 - Rooms Sold Weekend Rate | 0 | 0 | 54 | -54 | 0 | 0 |
| 25 - Rooms Sold Other Discount | 17 | 912 | 358 | 554 | 865 | 47 |
| 28 - Rooms Sold Employee Rate | 0 | 65 | 225 | -160 | 122 | -57 |
| 32- Rooms Sold Local Promotion | 0 | 0 | 460 | -460 | 0 | 0 |
| Room Sold Group | 52 | 1,342 | 0 | 1,342 | 601 | 741 |
| Total Rooms Sold | 94 | 3,400 | 3,175 | 225 | 3,053 | 347 |
| Complimentary Rooms | 2 | 82 | 45 | 37 | 0 | 82 |
| Total Rooms Occupied | 96 | 3,482 | 3,220 | 262 | 3,053 | 429 |
| Out of Order Rooms | | 0 | 19 | -19 | 0 | 0 |
| No Show Rooms | | 0 | 2 | -2 | 0 | 0 |
| Walk-Ins | | 0 | 0 | 0 | 0 | 0 |
| Unexpected Departures | | 0 | 0 | 0 | 0 | 0 |

Watts v. Hospitality
Int Discl/RFP  0036

Wednesday 8/31/2005

Company: Montgomery Ventures, LLC

Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Room Revenue | | | | | | |
| 10 - Regular Weekday Rate | 2,974.00 | 26,724 | 40,121 | -13,397 | 0 | 26,724 |
| 12 - Corporate Rate | 0.00 | 28,941 | 783 | 28,158 | 67,648 | -38,707 |
| 16 - Government | 975.00 | 20,153 | 15,889 | 4,264 | 18,861 | 1,292 |
| 17 - Local Corporate | 53.00 | 8,433 | 35,406 | -26,973 | 8,850 | -417 |
| 20 - Regular Weekend Rate | 0.00 | 1,964 | 477 | 1,488 | 0 | 1,964 |
| 25 - Other Discounts | 863.00 | 29,503 | 12,171 | 17,332 | 57,306 | -27,803 |
| 28 - Marriott Employee Rate | 105.00 | 2,590 | 4,240 | -1,650 | 5,411 | -2,821 |
| 32 - Local Promotion | 514.00 | 6,297 | 52,524 | -46,227 | 0 | 6,297 |
| Room Revenue Group | 2,145.00 | 75,418 | 70 | 75,348 | 12,749 | 62,668 |
| Room Revenue Allowances and | -224.00 | -1,789 | 0 | -1,789 | 0 | -1,789 |
| Total Room Revenue | 7,405.00 | 198,232 | 161,681 | 36,551 | 170,825 | 27,407 |
| Telephone Revenue | | | | | | |
| Local Telephone Revenue | -67.42 | -3,647 | -1,117 | -2,530 | 0 | -3,647 |
| Long Distance Telephone | 0.00 | 957 | 1,786 | -829 | 728 | 229 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | -67.42 | -2,690 | 669 | -3,358 | 728 | -3,418 |
| Other Revenue | | | | | | |
| No-Show Revenue | 445.20 | 1,230 | -288 | 1,518 | 1,708 | -478 |
| Guest Laundry | -5.63 | 424 | 74 | 351 | 320 | 104 |
| Guest Paid Outs | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 0.00 | 0 | 2,093 | -2,093 | 1,514 | -1,514 |
| Vending Machine Commissions | 0.00 | 197 | 0 | 197 | 233 | -36 |
| Miscellaneous Revenue | 100.00 | 252 | -77 | 329 | 0 | 252 |
| Total Other Revenue | 539.57 | 2,103 | 1,801 | 302 | 3,775 | -1,672 |
| Sales Tax | | | | | | |
| State Sales Tax | 314.00 | 7,960 | 6,460 | 1,501 | 0 | 7,960 |
| County Sales Tax | 667.83 | 16,956 | 13,745 | 3,211 | 0 | 16,956 |
| Total Sales Tax | 981.83 | 24,917 | 20,205 | 4,712 | 0 | 24,917 |
| **Total Revenue** | **8,858.98** | **222,562** | **184,356** | **38,207** | **175,328** | **47,234** |
| **Sales Tax Reconciliation** | | | | | | |
| Tax Exempt Revenue | | | | | | |
| State Tax Exempt Room Revenue | 377.99 | 378 | 0 | 378 | 0 | 378 |
| Room State Sales Tax | 281.08 | 7,914 | 6,467 | 1,447 | 6,833 | 1,081 |
| Room Sales Tax Variance | -32.92 | -46 | 7 | -54 | 6,833 | -6,879 |
| City Lodging Tax | 610.91 | 16,354 | 13,339 | 3,015 | 14,093 | 2,261 |
| City Sales Tax Variance | -56.92 | -602 | -406 | -196 | 14,093 | -14,695 |

Watts v. Hospitality
Int Discl/RFP 0037

Wednesday 8/31/2005

Company: Montgomery Ventures, LLC

Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| **Cash** | | | | | | |
| Cash Receipt per Audit Report | 0.00 | 21,433.11 | 25,712.45 | -4,279.34 | 0.00 | 21,433.11 |
| **Credit Cards** | | | | | | |
| Mastercard/Visa | 2,269.31 | 201,933.42 | 102,028.28 | 99,905.14 | 0.00 | 201,933.42 |
| American Express | 997.58 | 26,757.61 | 35,730.61 | -8,973.00 | 0.00 | 26,757.61 |
| Discover | 986.70 | 5,052.66 | 4,804.31 | 248.35 | 0.00 | 5,052.66 |
| Diners Club | -588.42 | 0.00 | 1,697.94 | -1,697.94 | 0.00 | 0.00 |
| Total Credit Card Receivable | 3,665.17 | 233,743.69 | 144,261.14 | 89,482.55 | 0.00 | 233,743.69 |
| **Paid Outs** | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 275.66 | -275.66 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 275.66 | -275.66 | 0.00 | 0.00 |
| Petty Cash Expense Item | 0.00 | 1,853 | 2,019 | -166 | 0 | 1,853 |
| **Total Cash & Credit Cards** | **3,665.17** | **257,029.85** | **172,268.72** | **84,761.13** | **0.00** | **257,029.85** |
| **Summary** | | | | | | |
| **Revenue Summary** | | | | | | |
| Room Revenue | 7,405.00 | 198,232 | 161,681 | 36,551 | 170,825 | 27,407 |
| Telephone Revenue | -67.42 | -2,690 | 669 | -3,358 | 728 | -3,418 |
| Other Revenue | 539.57 | 2,103 | 1,801 | 302 | 3,775 | -1,672 |
| Tax Collections | 981.83 | 24,917 | 20,205 | 4,712 | 0 | 24,917 |
| Total Receipts | 8,858.98 | 222,562 | 184,356 | 38,207 | 175,328 | 47,234 |
| Total All Receipts | 8,858.98 | | | | | |
| Plus: AR Beginning Balance | 51,815.60 | | | | | |
| Less Payments | 3,665.17 | | | | | |
| Net Ending Balance | 57,009.41 | | | | | |
| **Account Receivable** | | | | | | |
| Guest Ledger | 17,927.06 | | | | | |
| City Ledger | 39,082.35 | | | | | |
| Advance Deposits | 0.00 | | | | | |
| **Total A/R** | **57,009.41** | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| **Accounts Receivable Aging** | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP 0038

Wednesday 8/31/2005

Company: Montgomery Ventures, LLC                                          Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Cash Reconciliation** | | | | | | |
| Total Cash Received | 0.00 | 21,433.11 | 25,712.45 | -4,279.34 | 0.00 | 21,433.11 |
| Total Paid-Outs | 0.00 | 0.00 | 275.66 | -275.66 | 0.00 | 0.00 |
| Estimated Deposit | 0.00 | 21,433.11 | 25,436.79 | -4,003.68 | 0.00 | 21,433.11 |
| Actual Cash Deposit | 0.00 | 20,829.52 | 25,430.89 | -4,601.37 | 0.00 | 20,829.52 |
| Cash Over/Short - Petty Cash | 0.00 | -603.59 | -5.90 | -597.69 | 0.00 | -603.59 |
| **Statistics** | | | | | | |
| **Room Statistics** | | | | | | |
| Occupancy | 90.98% | 78.75% | 71.91% | 6.84% | 69.19% | 9.56% |
| Occupancy with Comp Rooms | 93.98% | 79.92% | 73.08% | 6.84% | 69.19% | 10.73% |
| Average Daily Rate | 61.20 | 61.05 | 54.53 | 6.52 | 59.88 | 1.17 |
| Average Daily Rate with Comp | 59.24 | 60.16 | 53.66 | 6.50 | 59.88 | 0.28 |
| Revenue Per Available Room | 55.68 | 48.08 | 39.21 | 8.87 | 41.43 | 6.65 |
| 10 - Rooms Sold Weekday Rate | 44 | 400 | 639 | -239 | 998 | -598 |
| 12 - Rooms Sold Corporate | 0 | 416 | 11 | 405 | 0 | 416 |
| 16 - Room Sold Government | 15 | 301 | 322 | -21 | 309 | -8 |
| 17 - Local Corporate | 1 | 121 | 572 | -451 | 150 | -29 |
| 20 - Rooms Sold Weekend Rate | 0 | 6 | 68 | -62 | 0 | 6 |
| 25 - Rooms Sold Other Discount | 15 | 615 | 251 | 364 | 1,032 | -417 |
| 28 - Rooms Sold Employee Rate | 3 | 73 | 226 | -153 | 155 | -82 |
| 32- Rooms Sold Local Promotion | 10 | 113 | 876 | -763 | 0 | 113 |
| Room Sold Group | 33 | 1,202 | 0 | 1,202 | 209 | 993 |
| Total Rooms Sold | 121 | 3,247 | 2,965 | 282 | 2,853 | 394 |
| Complimentary Rooms | 4 | 48 | 48 | 0 | 0 | 48 |
| Total Rooms Occupied | 125 | 3,295 | 3,013 | 282 | 2,853 | 442 |
| Out of Order Rooms | 4 | 91 | 1 | 90 | 0 | 91 |
| No Show Rooms | 4 | 16 | 0 | 16 | 0 | 16 |
| Walk-Ins | 2 | 174 | 0 | 174 | 0 | 174 |
| Unexpected Departures | 7 | 78 | 0 | 78 | 0 | 78 |

Watts v. Hospitality
Int Discl/RFP    0039

# Daily Report

Friday 9/30/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott – Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| *Room Revenue* | | | | | | |
| 10 - Regular Weekday Rate | 6,114.00 | 61,318 | 117,473 | -56,155 | 0 | 61,318 |
| 12 - Corporate Rate | 0.00 | 0 | 969 | -969 | 49,014 | -49,014 |
| 16 - Government | 1,040.00 | 63,660 | 11,570 | 52,090 | 12,654 | 51,006 |
| 17 - Local Corporate | 0.00 | 3,145 | 30,185 | -27,040 | 8,850 | -5,705 |
| 20 - Regular Weekend Rate | 0.00 | 0 | 1,755 | -1,755 | 0 | 0 |
| 25 - Other Discounts | 171.00 | 8,407 | 14,680 | -6,273 | 47,217 | -38,810 |
| 28 - Marriott Employee Rate | 35.00 | 1,511 | 2,059 | -548 | 3,630 | -2,119 |
| 32 - Local Promotion | 108.00 | 8,846 | 14,561 | -5,716 | 0 | 8,846 |
| Room Revenue Group | 1,495.00 | 83,300 | 0 | 83,300 | 30,256 | 53,044 |
| Room Revenue Allowances and | -55.00 | -1,958 | 0 | -1,958 | 0 | -1,958 |
| Total Room Revenue | 8,908.00 | 228,229 | 193,253 | 34,976 | 151,621 | 76,607 |
| *Telephone Revenue* | | | | | | |
| Local Telephone Revenue | 0.00 | -79 | 85 | -164 | 0 | -79 |
| Long Distance Telephone | 0.00 | 0 | -895 | 895 | 615 | -615 |
| Pay Phone Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Operator Commissions | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Total Telephone Revenue | 0.00 | -79 | -810 | 731 | 615 | -694 |
| *Other Revenue* | | | | | | |
| No-Show Revenue | 0.00 | 2,571 | 1,787 | 784 | 1,516 | 1,055 |
| Guest Laundry | 0.00 | 430 | 113 | 317 | 271 | 159 |
| Guest Paid Outs | 0.00 | 23 | 0 | 23 | 0 | 23 |
| Guest Resales | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Long Term Stay | 0.00 | 0 | 0 | 0 | 0 | 0 |
| Pay Television | 0.00 | 0 | 1,524 | -1,524 | 1,280 | -1,280 |
| Vending Machine Commissions | 0.00 | 0 | 0 | 0 | 197 | -197 |
| Miscellaneous Revenue | 0.00 | -128 | 994 | -1,122 | 0 | -128 |
| Total Other Revenue | 0.00 | 2,896 | 4,419 | -1,523 | 3,264 | -368 |
| *Sales Tax* | | | | | | |
| State Sales Tax | 356.32 | 8,394 | 7,922 | 472 | 0 | 8,394 |
| County Sales Tax | 757.74 | 17,845 | 16,857 | 987 | 0 | 17,845 |
| Total Sales Tax | 1,114.06 | 26,239 | 24,780 | 1,459 | 0 | 26,239 |
| **Total Revenue** | 10,022.06 | 257,284 | 221,641 | 35,643 | 155,500 | 101,784 |
| **Sales Tax Reconciliation** | | | | | | |
| *Tax Exempt Revenue* | | | | | | |
| State Tax Exempt Room Revenue | 21,745.00 | 21,745 | 399 | 21,346 | 0 | 21,745 |
| Room State Sales Tax | -513.48 | 8,259 | 7,714 | 545 | 6,065 | 2,194 |
| Room Sales Tax Variance | -869.80 | -135 | -208 | 74 | 6,065 | -6,199 |
| City Lodging Tax | 734.91 | 18,829 | 15,943 | 2,886 | 12,509 | 6,320 |
| City Sales Tax Variance | -22.83 | 984 | -914 | 1,898 | 12,509 | -11,525 |

Watts v. Hospitality
Int Discl/RFP  0040

# Daily Report

Friday 9/30/2005

Company: Montgomery Ventures, LLC | Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Cash | | | | | | |
| Cash Receipt per Audit Report | 1,423.96 | 11,938.49 | 22,511.54 | -10,573.05 | 0.00 | 11,938.49 |
| | | | | | | |
| Credit Cards | | | | | | |
| Mastercard/Visa | 49,563.19 | 185,225.55 | 153,158.67 | 32,066.88 | 0.00 | 185,225.55 |
| American Express | 2,145.51 | 29,318.53 | 41,060.52 | -11,741.99 | 0.00 | 29,318.53 |
| Discover | 150.76 | 3,443.77 | 8,786.54 | -5,342.77 | 0.00 | 3,443.77 |
| Diners Club | 77.63 | 77.63 | 2,678.91 | -2,601.28 | 0.00 | 77.63 |
| Total Credit Card Receivable | 51,937.09 | 218,065.48 | 205,684.64 | 12,380.84 | 0.00 | 218,065.48 |
| | | | | | | |
| Paid Outs | | | | | | |
| Guest Paid Out | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Paid Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Petty Cash Expense Item | 211.26 | 2,735 | 3,435 | -700 | 0 | 2,735 |
| **Total Cash & Credit Cards** | **53,572.31** | **232,738.96** | **231,631.01** | **1,107.95** | **0.00** | **232,738.96** |
| | | | | | | |
| **Summary** | | | | | | |
| Revenue Summary | | | | | | |
| Room Revenue | 8,908.00 | 228,229 | 193,253 | 34,976 | 151,621 | 76,607 |
| Telephone Revenue | 0.00 | -79 | -810 | 731 | 615 | -694 |
| Other Revenue | 0.00 | 2,896 | 4,419 | -1,523 | 3,264 | -368 |
| Tax Collections | 1,114.06 | 26,239 | 24,780 | 1,459 | 0 | 26,239 |
| Total Receipts | 10,022.06 | 257,284 | 221,641 | 35,643 | 155,500 | 101,784 |
| | | | | | | |
| Total All Receipts | 10,022.06 | | | | | |
| Plus: AR Beginning Balance | 125,104.99 | | | | | |
| Less Payments | 53,572.31 | | | | | |
| Net Ending Balance | 81,554.74 | | | | | |
| | | | | | | |
| Account Receivable | | | | | | |
| Guest Ledger | 16,790.94 | | | | | |
| City Ledger | 64,763.80 | | | | | |
| Advance Deposits | 0.00 | | | | | |
| **Total A/R** | **81,554.74** | | | | | |
| Out of Balance Amount | 0.00 | | | | | |
| | | | | | | |
| Accounts Receivable Aging | | | | | | |
| Current | 0.00 | | | | | |
| 30+ | 0.00 | | | | | |
| 60+ | 0.00 | | | | | |
| 90+ | 0.00 | | | | | |
| Over 120 | 0.00 | | | | | |
| Total A/R Aging | 0.00 | | | | | |

Watts v. Hospitality
Int Discl/RFP 0041

# Daily Report

Friday 9/30/2005

Company: Montgomery Ventures, LLC                    Property: Fairfield Inn by Marriott - Montgomery, AL

| Description | Today's Amount | PTD | PTD Last Year | Variance PTD Last Year vs This Year | PTD Budget | Variance PTD Budget vs Actual PTD |
|---|---|---|---|---|---|---|
| Cash Reconciliation | | | | | | |
| Total Cash Received | 1,423.96 | 11,938.49 | 22,511.54 | -10,573.05 | 0.00 | 11,938.49 |
| Total Paid-Outs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Estimated Deposit | 1,423.96 | 11,938.49 | 22,511.54 | -10,573.05 | 0.00 | 11,938.49 |
| Actual Cash Deposit | 1,423.96 | 11,979.52 | 22,488.67 | -10,509.15 | 0.00 | 11,979.52 |
| Cash Over/Short - Petty Cash | 0.00 | 41.03 | -22.87 | 63.90 | 0.00 | 41.03 |
| Statistics | | | | | | |
| Room Statistics | | | | | | |
| Occupancy | 91.73% | 89.30% | 79.52% | 9.78% | 60.81% | 28.49% |
| Occupancy with Comp Rooms | 93.23% | 90.58% | 81.25% | 9.33% | 60.81% | 29.77% |
| Average Daily Rate | 73.02 | 64.06 | 60.91 | 3.15 | 62.49 | 1.56 |
| Average Daily Rate with Comp | 71.84 | 63.15 | 59.61 | 3.54 | 62.49 | 0.66 |
| Revenue Per Available Room | 66.98 | 57.20 | 48.43 | 8.77 | 38.00 | 19.20 |
| 10 - Rooms Sold Weekday Rate | 70 | 847 | 1,716 | -869 | 742 | 105 |
| 12 - Rooms Sold Corporate | 0 | 0 | 17 | -17 | 0 | 0 |
| 16 - Room Sold Government | 15 | 979 | 208 | 771 | 207 | 772 |
| 17 - Local Corporate | 0 | 55 | 599 | -544 | 150 | -95 |
| 20 - Rooms Sold Weekend Rate | 0 | 0 | 21 | -21 | · 0 | 0 |
| 25 - Rooms Sold Other Discount | 11 | 197 | 271 | -74 | 727 | -530 |
| 28 - Rooms Sold Employee Rate | 1 | 43 | 66 | -23 | 104 | -61 |
| 32- Rooms Sold Local Promotion | 2 | 160 | 275 | -115 | 0 | 160 |
| Room Sold Group | 23 | 1,282 | 0 | 1,282 | 496 | 786 |
| Total Rooms Sold | 122 | 3,563 | 3,173 | 390 | 2,426 | 1,137 |
| Complimentary Rooms | 2 | 51 | 69 | -18 | 0 | 51 |
| Total Rooms Occupied | 124 | 3,614 | 3,242 | 372 | 2,426 | 1,188 |
| Out of Order Rooms | 6 | 148 | 14 | 134 | 0 | 148 |
| No Show Rooms | | 31 | 25 | 6 | 0 | 31 |
| Walk-Ins | 27 | 221 | 49 | 172 | 0 | 221 |
| Unexpected Departures | 3 | 143 | 29 | 114 | 0 | 143 |

Watts v. Hospitality
Int Discl/RFP  0042

11/28/2005  20:56    3342448077              WATTS                           PAGE  82

BEN 254-DC            ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS          Claimant's SSN XXXXX1193
Revised 11/02           UNEMPLOYMENT COMPENSATION DIVISION               Claim Date 111305   Claim Type 01
Electronic Form                DOCTOR'S CERTIFICATE                      Date Mailed 111705

                                                                        NOTE TO CLAIMANT: SIGN AND DATE
                                                                        THIS FORM TO AUTHORIZE THE
                                                                        RELEASE OF THIS INFORMATION.
                                                                        THIS FORM MUST BE COMPLETED BY
                                                                        YOUR DOCTOR AND RECEIVED BY
         HEATHER G WATTS                                                 MAIL OR FAX AT THE ADDRESS
         6976 EASTERN SHORE RD                                          BELOW NO LATER THAN 113005.
         MONTGOMERY AL 36117                                            FAILURE TO RETURN THIS
                                                                        COMPLETED FORM AS INSTRUCTED
                                                                        COULD RESULT IN A DENIAL OF
                                                                        BENEFITS.

CLAIMANT'S SIGNATURE: _____         DATE: 11/22/05

(NOTE TO DOCTOR):
The above claimant has applied for unemployment benefits effective 111305 and states his/her usual occupation is
MARKETING MANAGER. The following information from you is necessary to determine his/her ability to work. This
certificate is furnished to the claimant as a convenience for the purpose of assisting the Alabama Unemployment
Compensation Agency in making a decision on his/her claim for unemployment. This agency assumes no responsibility for
payment of your professional services. Please complete the following information in its entirety.
1. Dates and Treatment: From 12/15/2004 To 09/27/2005 For pregnancy, delivery, and
post partum recovery + checkup.

2. Is this individual able to perform the duties of his/her usual occupation? Yes ☒  No ☐
   If "No," did you advise this individual that continuing to perform the duties of his/her usual occupation would aggravate
   His/her injury or illness?  Yes ☐  No ☐

3. If this individual is able to perform the duties of his/her usual occupation, on what date did this individual become able?
   09/24/2005

4. If unable to perform the duties of his/her usual occupation, is he/she able to perform any type of work?  Yes ☐  No ☐
   If "Yes," please explain any limitations (including the dates affected):
   From _____/_____/_____ To _____/_____/_____

5. If treatment is for pregnancy, enter expected date of confinement: 08/12/05 – 09/23/05
REMARKS (If appropriate):
Pt. is to be in post partum recovery for 6 weeks. Pt. will have a 6 week
post partum checkup at the end of her 6 week recovery time.

Signature of Physician _____        Phone Number (834) 279-9333

Date Completed 11/22/05 Address: 495 Taylor Road Montgomery Al 3617

RETURN COMPLETED FORM TO:
MONTGOMERY UC CALL CENTER                  FAX NUMBER: (334) 956-7352
ATTN: PATSY
P.O. BOX 211239
MONTGOMERY AL 36121-1739



DEFENDANT'S
EXHIBIT
12

Watts v. Hospitality
Int Discl/RFP  0083

## Taylor Road Baptist MDO and Kindergarten
### 2005-2006

| Student Name: | Watts, Tanner | | Kindergarten  168⁰⁰ |
|---|---|---|---|

**Date Enrolled:**

| Description of Payment | Amount Paid | Check Number | Date Received | |
|---|---|---|---|---|
| Registration Fee | | | | |
| Supply Fee | 25⁰⁰ | 1783 | 10/6/05 | 10/13/05 |
| August Tuition | | | | |
| September Tuition | | | | |
| October Tuition | 168⁰⁰ (Nov.) | 1783 | 10/6/05 | 10/13/05 |
| November Tuition | | | | |
| December Tuition | 168⁰⁰ | 3064 | 12/8/05 | 12/15/05 |
| January Tuition | 168⁰⁰ | 3074 | 1/10/06 | 1/12/06 |
| February Tuition | | | | |
| March Tuition | Mother works at Taylor Road – | | | |
| April Tuition | Childcare is a part of employee | | | |
| May Tuition | | | | |
| D.I | 38⁰⁰ | 1900 | 11/2/05 | 12/1/05 |
| Jale rin (06.) | 55.50 | 3079 | 1/18/06 | 1/31/06 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2005 - TG   $25 –
= Oct 168 –
    Nov 168
    Dec 168 –



DEFENDANT'S
EXHIBIT
13

Watts v. Hospitality
Int Discl/RFP   0202

Taylor Road Baptist Church Weekday Preschool (Fall)

Ministry Registration  341.

| Registration Fee | 50°° |
| Supply Fee | |
| Blue Slip | |

Oct. 17¹ᵗ Start date

Child's Name __Baby Watts__                                     Sex _____

Name child is known by: _____  Date of Birth __Due Aug 19¹ᵗ__

Address __1471 Eastern Shore Rd__ Zip code __36117__ Home Phone __244-8077__

Father's Name __Mickey V Watts__                    Phone(Cell- __201-8234__

Father's Employer __Guilford Capital__              Phone __286-6914__

Mother's Name __Heather G Watts__                   Phone(Cell - __354-2619__

Mother's Employer __Marriott__                       Phone __270-0007__

Child's Doctor __Dr. E. Dieble__                     Phone __272-1799__

Where do you attend church? __Eastmont Baptist__     Members? Yes _X_ No___

Please share any family or health situations you feel are necessary for us to know

_____

Does your child have any allergies? _____

Who is authorized to pick up your child in case of an emergency and the parent cannot be reached?

Name __Ginny Hancock__           Phone __288-2460__   Relationship to child __Grandmother__

Name __Rouse Godfrey__           Phone __402-1940__   Relationship to child __Grandfather__

Name _____     Phone _____  Relationship to child_____

---

I agree to pay the registration fee of $50.00 (September - May) or $25.00 (June - August)
I also agree to pay the $25.00 supply fee
I am registering my child for the following

Early Bird (7:30 - 9:00 a.m.) ?
Mother's Day Out (9:00 - 1:00 p.m.) ✗
Extended Session (1:00 - 2:30 p.m.) ✗

M M M     (T) W W W     Th Th Th

I understand fully that payments are due on the 1st of each month and are considered late as of the 10th. A $15.00 late charge (per child) will be added when payments are late. I understand that my child will not be able to continue attending the program if payments are not made by the tenth day of the month.

I understand that tuition is required if my child attends all or part of a month and that at least two weeks' written notice is required before withdrawing a child from the program. (You will be billed for two weeks if you stop coming).

I have read and agree to abide by all policies of the Weekday Preschool Ministry Program as listed in the Weekday Preschool Ministry's Handbook. I also agree to use my own insurance policy for coverage should any be needed.

_Parent or Guardian_ _____  Date __2/9/05__

DEFENDANT'S EXHIBIT: 14

Taylor Road Baptist MDO and Kindergarten
2005-2006

| Student Name: | Watts, Tanner | | 168<br>Kindergarten |
|---|---|---|---|
| **Date Enrolled:** | | | |
| **Description of Payment** | **Amount Paid** | **Check Number** | **Date Received** |
| Registration Fee | | | |
| Supply Fee | 25 | 1783 | 10/6/05 |
| August Tuition | | | |
| September Tuition | | | |
| October Tuition | 168 (Nov.) | 1773 | |
| November Tuition | | | |
| December Tuition | 168 | 2304 | 12/8/05 |
| January Tuition | 168 | 3074 | 1/10/06 | 1/12/06 |
| February Tuition | 112 | 3284 | 2/9/06 | 2/13/06 |
| March Tuition | | | |
| April Tuition | | | |
| May Tuition | | | |
| D.I. | 3.50 | 1930 | 11/10/05 |
| Late fee (Dec.) | 55.50 | 3279 | 1/18/06 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Jan 05 - ✓

Keri    Baby Room    119                    05

| | M | T | W | T | DOB |
|---|---|---|---|---|---|
| Fore, Jacob | EXE | EXE | EXE | EXE | 1/6/05 |
| Harrelson, Katie | XE | XE | XE | | 3/22/05 |
| Walker, Millie | EXE | EXE | EXE | | 2/17/05 |
| Marcum, Zaina | | X | | X | 6/ /05 |
| | 233 | 232 | 233 | 121 | |

Oct    Watts                EXE    EXE    EXE    EXE

Nov.   Mullens (1)           EXE    EXE    EXE    EXE
       Mullens (2)           EXE    EXE    EXE    EXE

Jan    Gant                  EXE    EXE    EXE    EXE

Watts Taylor
& Robby

| | | | Prepared By | Initials | Date |
|---|---|---|---|---|---|
| CAMBRIDGE SB244 | | | Approved By | | |

| | DATE 2005 | | | RECEIPT # | CHARGES | PAYMENTS & DISC. | BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | 7/21/05 | Sewn Pmt + Suppl | | | 50 — | | 50 — |
| 2 | 7/22/05 | Fall Pmt + Suppl | | | 28 — | | 28 — |
| 3 | 7/23/05 | Sun + Bevl ck# 1354   2.6.05 | | | | 100 — | 15 — |
| 4 | 7/23/05 | Fall Pmt + Suppl 1386   2-7-05 | | | | 28 — | 100 — |
| 5 | 7/25/05 | Ann'l ck# 1387    4.6.05 | | | 25 — | 25 — | 25 — |
| 6 | 11/30 | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |

8-24 mos
9-18

**Mother's Day Out**
**At Taylor Road Baptist Church**

Summer 2006
MDO - 2006-2007

Pd. 1/18/06  55



**Child Registration Form**

Child's Name: Tanner Grant Watts _____ (circle one) Male / Female

Name child is known by: Tanner _____ Date of Birth: 8/12/05

Address: 6976 Eastern Shore Road _____ Home Phone: 244-8017

Father's Name: Mickey V. Watts _____ Cell Phone: 201-8234

Father's Employer: Guilford Capital _____ Phone: 286-6914

Mother's Name: Heather G. Watts _____ Cell Phone: 354-2619

Mother's Employer: Ellis & Godfrey Real Estate _____ Phone: 354-2619

Child's Doctor: Dr. Elizabeth Diebel _____ Phone: _____

Where do you attend church? Taylor Road Baptist Church _____ Members? Yes __ No ✓

Please share any family or health situations you feel are necessary for us to know:

_____

Does your child have any allergies? None _____

Who is authorized to pick up your child in case of an emergency and the parent cannot be reached?

Name Rouse Godfrey _____ Phone 462-1940 Relationship to child Grandfather

Name Ginny Hancock _____ Phone 288-2495 x250 Relationship to child Grandmother

Name _____ Phone _____ Relationship to child _____

---

I agree to pay the registration fee of $50.00 (August – May) or $15.00 (June – July).
I also agree to pay the $25.00 supply fee.
I am registering my child for the following:

| | | | | |
|---|---|---|---|---|
| Early Bird (7:30-9:00am) | __Mon | __Tue | __Wed | __Thur |
| Mother's Day Out (9:00am-1:00pm) | __Mon | __Tue | __Wed | __Thur |
| Extended Session (1:00-2:30pm) | __Mon | __Tue | __Wed | __Thur |

I understand fully that payments are due on the 1st of each month and are considered late as of the 10th. A $15.00 late charge (per child) will be added when payments are late. I understand that my child will not be able to continue attending the program if payments are not made by the 10th day of the month.

I understand that tuition is required if my child attends all or part of a month and that at least two weeks' written notice is required before withdrawing a child from the program. (You will be billed for two weeks if you stop coming).

I have read and agree to abide by all policies of the Mother's Day Out Program at Taylor Road Baptist Church as listed in the handbook. I also agree to use my own insurance policy for coverage should any be needed.

Signature of Parent of Guardian _____ Date 1/15/06

9-18 MDS.

| Student Name | Monday Early | MDO | Ext | Tuesday Early | MDO | Ext | Wednesday Early | MDO | Ext | Thursday Early | MDO | Ext | REG PAID | SUPPLY FEE PAID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ulrich, Allie Grace | ✓ | ✓ | | ✓ | ✓ | | ✓ | | | ✓ | ✓ | | | |
| Campbell, Corey | | ✓ | | ✓ | ✓ | | ✓ | ✓ | | ✓ | | | | |
| Bond, John David | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | | |
| Scott, Collier Ann | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Wells, Tatum | ✓ | ✓ | | ✓ | | ✓ | ✓ | | | | | | | |
| Imbie, Lauralie | ✓ | ✓ | | ✓ | ✓ | | ✓ | ✓ | | | | | | |
| Carver, Chloe Anne | ✓ | ✓ | | ✓ | | | | ✓ | | | | | | |
| Littler, Anna Mary | ✓ | | | | | | ✓ | | | | | | | |
| Merrill, Kate | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Kennedy, Anna | | | ✓ | ✓ | | | | | ✓ | ✓ | ✓ | | | ✓ |
| Jernigan, Ella | | ✓ | ✓ | | | | | | | | ✓ | | | |
| | | | | | | | | | | | | | | |
| Whiting, | | | | | | | | | | | | | | |
| Davidson, Joey | | ✓ | | | ✓ | | | ✓ | | | ✓ | | | |
| McGuire, Madeline | | | | | | | | | | | | | | |
| DeTraylo, Sofia | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Vance, Caroline | | | | | | | | | | | | | | |
| Vance, Cooper | | | | | | | | | | | | | | |

# Taylor Road Baptist Church
# Weekday Preschool Ministry

Mother's Day Out and Early Bird are child care programs designed and initiated by our church to provide some free time for mothers of children age six weeks to five years (3rd grade during the summer months). The program will operate:

| | | |
|---|---|---|
| Early Bird | 7:30am - 9:00am | Monday- Thursday |
| Mother's Day Out | 9:00am - 1:00pm | Monday - Thursday |
| K3 Kindergarten | 9:00am - 1:00pm | Tuesday, Wednesday, Thursday |
| K4 Kindergarten | 9:00am - 1:00pm | Tuesday, Wednesday, Thursday |
| Extended Care | 1:00pm - 2:30pm | Monday - Thursday |

Children in the Mother's Day Out program will have special Bible based learning units with activities planned specifically for them. We will also offer Kindergarten classes for threes and fours implementing the A BEKA text (a Bible-based phonics program)and an After School Program. These classes will be offered on a first-come, first-served basis and will require a different rate of tuition and fees.

We are excited about your interest and involvement in this ministry of our church. Thank you for sharing with us your most precious gift from God, your child.

Taylor Road Baptist Church



# Policies



### Registration:
1. Registration applications may be obtained from the Mother's Day Out office or the church office. Children are not considered registered until the registration fee is paid.
2. All children MUST have an Alabama Certificate of Immunization (Blue Certificate). This is due at time of enrollment.

### Withdrawal:
1. At least two weeks written notice is required before withdrawing a child from Mother's Day Out or Extended Day. If notice is not given, you are responsible for two weeks of tuition.
2. All Registration fees are non- refundable.

### Tuition and Fees:
1. Tuition is listed in the chart. Your child's age at the beginning of the session according to the classroom determines the cost. Promotions are only at the beginning of each session.
2. Tuition and rates will be reviewed for changes yearly.
3. "Drop-ins" are subject to the approval of the Director. (Please call in advance to see if there is room for your child). Call Lynn, 271-0845. Drop-in rate is listed on tuition schedule.
4. Returned check fee of $20.00 will be charged when applicable.
5. A late fee of $15.00 (per child) will be assessed if your check is not in the MDO office by the 10th of the month.

### Lunch/Snacks
1. Each child should bring a lunch including a drink.
2. Baby food should be in new (unopened) baby food jars and a spoon should be provided.
3. Small objects and foods that may cause choking, such as hard candy, nuts, and popcorn are not allowed. Also, grapes should be cut in half and hotdogs should be diced to prevent lodging in the throat.
4. Lunches should be ready to eat, as microwave services will be unavailable.
5. Snacks will be provided each morning and afternoon. Children will be given juice and animal crackers or goldfish. Parents should notify the teacher about restrictions in child's diet.
6. No "red" colored drinks, please.

### General Do's and Don'ts:
1. Sign your child in (using first and last name). If a substitute teacher is there, please inform her of any allergies your child may have. Sign your child out daily for security reasons. We can not stress enough how important this is.
2. Help your child to attend regularly, except when he/she is ill.
3. Confer with the teacher about your child, but refrain from discussing the child in his presence. Please do not engage the teacher in "extended" conversation during class hours.
4. Know your child's teacher, work with her concerning any problems that may arise. If there are any special instructions for your child, please provide them in writing for the teacher.
5. Please do not allow children to bring gum, play guns, personal toys or money.
6. Dress your child comfortably in play clothes and shoes. Shoes are required. Remember to send a jacket when the cooler weather arrives.
7. Open-toe sandals are NOT permitted, due to increased chances of tripping and other accidents.
8. All children need to furnish a complete change of clothing in case needed. All items brought by the child should be labeled with the child's name.
9. During the summer program, apply sunscreen to your child on water play days. Send a towel and bathing suit (or wear suit and a change of clothes).

## Arrival and Departure

1. All parents should use the Preschool drive through entrance.
2. Only children enrolled in the Early Bird care may come before 8:55am. Mother's Day Out children may arrive at 8:55am. Kindergarten and MDO children should be picked up by 1:00pm. Early arrivals and late departures place unnecessary responsibility on the teacher and therefore cannot be accepted.
3. There will be a late charge any time children are picked up late. The fee will be $5.00 per child for the first 5 minutes and $5.00 for every five minutes thereafter..(from Extended Care and MDO). Time will be based on the clock in the hallway. This payment will be due at the time of the late pick up.
4. In case of emergency you should call the church office and speak to the director. Please limit these calls to emergencies only. If information needs to be discussed with the director or teacher, it is best to do so in person or in writing.
5. Children will not be released to anyone but the person(s) designated on your enrollment form without the written consent of the parent.

## Closings

1. We observe and are closed for the following holidays: King/Lee Day, President's Day, Columbus Day, AEA/Spring Break (1 week), Good Friday, Memorial Day, Fourth of July, Labor Day, Veteran's Day, Thanksgiving (Mon-Fri.), and Christmas holidays (2 weeks).
2. We are closed any time Montgomery Public Schools are closed due to severe weather, including teacher in-service days.
3. We are also closed the week of Vacation Bible School at Taylor Road Baptist Church, tentatively in June.
4. There is also a three-day break between each change of sessions.
5. Note: No tuition exemptions are given for the months where holidays are included. (Our rates our based on a year round budget.)

## Illness

1. In order to insure a healthy environment for our children and teachers, we ask that parents take the responsibility for making sure their children are in good health before attending Mother's Day Out. When in doubt, please apply the "Golden Rule."
2. Children who are sick (fever, sore throat, diarrhea, discolored runny nose, pink eye or any other contagious illness) or who were sick the previous night should be kept at home. Children should be fever free for 24 hours before attending any program.
3. Children who become ill during any of the programs will be isolated and the parents will be called.

## Discipline

1. Any child who does not demonstrate the ability to abide by rules of good conduct is subject to dismissal from the program.
2. No corporal punishment is used: we believe in positive role modeling, separating the child, oral reprimand, and time out.

 

# Monthly Tuition Rates

## Early Bird

7:30am-9:00 am

Number of Days Attending per Week

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| 10.00 | 20.00 | 30.00 | 40.00 |



## Mother's Day Out

9:00 am - 1:00 pm

| Age | Number of Days Attending per Week | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 6wk-9mos. | 52.00 | 104.00 | 156.00 | 208.00 |
| 9-18 mos | 49.00 | 98.00 | 147.00 | 196.00 |
| 18-24 mos | 44.00 | 88.00 | 132.00 | 176.00 |
| 2 yrs old | 38.00 | 76.00 | 114.00 | 152.00 |
| 3,4,&5 yrs old | 35.00 | 70.00 | 105.00 | 140.00 |

## Extended Care

1:00pm-2:30pm

Number of Days Attending Per Week

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| 15.00 | 30.00 | 45.00 | 60.00 |

## Drop In Rate

9:00 am - 1:00 pm

| Age | 6wk-9mos | 9-18 mos | 18-24mos | 2 yrs | 3,4,5yr |
|---|---|---|---|---|---|
| Cost | 15.00 | 14.00 | 13.00 | 12.00 | 11.00 |

## Taylor Road Christian Kindergarten

| K3 | 140.00 | (T,W,Th) |
|---|---|---|
| K4 | 140.00 | (T,W,Th) |




**Current!**



# COLONIAL BANK.

Benefits Enrollment    **Current Benefits**

## Current Benefits

Name   Mickey Watts

Program   Colonial Benefits Program

Please show me the benefits as of   [ 01/01/2007 and later          ]    ( Go )

### Benefit Selections

| Plan | Option | Coverage Start Date | Coverage | Cost 1 | Cost 2 | Cost 3 |
|------|--------|--------------------|----------|--------|--------|--------|
| Medical / Dental - Blue Cross Blue Shield | Employee Plus Two or More | 01/01/2007 | | 224.00 | 0.00 | 0.00 |
| Vision - Vision | EE and Family | 09/24/2006 | | 9.55 | 0.00 | 0.00 |
| Short Term Disability - Short Term Disability | Waive | 01/01/2007 | | 0.00 | 0.00 | 0.00 |
| Long Term Disability - Long Term Disability | 60% Monthly Earnings | 10/01/2006 | 3333.00 | 0.00 | 0.00 | 0.00 |
| GTL - Group Term Life | 1x Salary | 10/01/2006 | 50000.00 | 0.00 | 0.00 | 0.00 |
| | | | Total | 233.55 | 0.00 | 0.00 |

### Covered Dependents

**Monthly**

| Plan | Option | Coverage Start Date | Dependent | Relationship | Social Security Number |
|------|--------|--------------------|-----------|-------------|----------------------|
| Medical / Dental - Blue Cross Blue Shield | Employee Plus Two or More | 01/01/2007 | Heather Watts | Spouse | 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 |
| | | 01/01/2007 | Taylor Watts | Natural Child | 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 |
| | | 01/01/2007 | Tanner Watts | Natural Child | 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 |
| Vision - Vision | EE and Family | 09/24/2006 | Heather Watts | Spouse | 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 |
| | | 09/24/2006 | Taylor Watts | Natural Child | 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 |
| | | 09/24/2006 | Tanner Watts | Natural Child | 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 |

### Beneficiaries

( Add Beneficiaries )

Benefits Enrollment  |  Current Benefits  |  Diagnostics  |  Home  |  Logout  |  Preferences

Copyright (c) 2006, Colonial Bancgroup
About this Page                                                        Privacy Statement

```
DEFENDANT'S
EXHIBIT
15
```

Watts v. Hospitality
Int Discl/RFP  0201

To help protect your privacy, links to images, sounds, or other external content in this message have been blocked. Click here to unblock content.

**Watts, HEATHER**

| | | |
|---|---|---|
| **From:** | 'Marriott Conference Centers Reservations' [reservations@conferencecenters.com] | **Sent:** Wed 10/12/2005 10:52 AM |
| **To:** | Watts, HEATHER | |
| **Cc:** | | |
| **Subject:** | Marriott Stone Mountain Inn Reservation Confirmation #83660588 | |
| **Attachments:** | | |



### Marriott Stone Mountain Inn >>

**Confirmation number:**
**83660588**

1058 Robert E. Lee Drive
Stone Mountain, Georgia 30083
USA
Phone: 1-770-469-3311
Fax: 1-770-876-5009

Maps & Transportation >>
Restaurants & Lounges >>
Area Information >>

**Dear HEATHER WATTS,**
We are delighted to confirm your reservation with Marriott Conference Centers. Below is a summary of your booking and room information. We look forward to making your stay as unique, as comfortable and as memorable as possible.

Your Reservation
**Confirmation #: 83660588**

**Check-in:**
Fri, Nov 25, 2005 [4:00pm]

**Check-out:**
Sun, Nov 27, 2005 [12:00pm]

Questions about this reservation?
Contact us >>

**Guarantee method:**
Credit card guarantee
Discover Card

**Marriott Rewards number:**
None

Not a member? Earn points for each stay. Join today >>

Your Room

**Number of rooms:** 1
**Room type:** DELUXE OVERSIZED RM-1 KING OR

**Guests in room:** 2
**Guest 1:** HEATHER WATTS

Rate Information

You can modify or cancel this reservation online or call us at 1-800-228-9290 in the US and Canada. Elsewhere, call our worldwide reservation telephone numbers.

**Cancellation policy:**
CANCELLATION PERMITTED
- UP TO 3 DAYS BEFORE ARRIVAL
CANCELLATION FEE
1 NIGHTS ROOM CXL FEE - TOTAL
49.00 USD
- AS FIRST NIGHT PAYMENT

**You have requested:**
1 KING BED, Not Available
NON-SMOKING ROOM, Not Available
EARLY CHECK-IN, Request Noted

Special request fees may apply.

**Modify or Cancel Online >>**
Or call 1-800-228-9290 in the US and Canada. View our worldwide reservation numbers.

**Marriott Rewards**
Not a member? Earn points for each stay. Join today >>
Join Marriott Rewards. Receive double points >>

**Remember**
Golf tee times, spa treatments, and restaurants fill up quickly. Get the experience you deserve. Please, call ahead.

**Marriott's Look No Further℠**
**Best Rate Guarantee >>**
Rest easy. You received the best possible rate on your Marriott room. Guaranteed.

**Partner Offers**
Special deals on auto rentals from Hertz >>

Make another reservation >>

**Find a Flight on Marriott.com**
Book your flight with people you know? Marriott! >>

**Find Your Favorite Car Rental Company on Marriott.com**
Find more rental car choices with Marriott! >>

Watts v. Hospitality
Int Discl/RFP  0126

**DEFENDANT'S EXHIBIT**
16

$70 SAME per Night Rest Assured

Find & Reserve : Specials & Packages : Destinations : Events & Meetings : Marriott Rewards

**Find & Reserve**
Hotel Search Options
Hotel Directory
New Hotels
Look Up Reservations
Telephone Reservations
Marriott's Look No Further Guarantee

**Modify Search**
Check-in date
Nov, 2005  25
Check-out date
Nov, 2005  27
Number of rooms
1
Guests per room
1
Marriott Rewards number

Use Marriott Rewards points (sign in required)
How to use points

**Update Special Rate**
Proof of eligibility required
AAA
Marriott senior discount
Government & military
Corporate/promotional code
Group code

Find

## Select Rates – Step 2 of 6
**Marriott Stone Mountain Inn**
Stone Mountain, GA | More hotel information >>

**Check-in:** November 25, 2005 (Friday)
**Check-out:** November 27, 2005 (Sunday)
**Number of rooms:** 1
**Guests per room:** 1

Same

Sort by:  Price | Room Type

**QUALITY ROOM >>**
119.00 (USD) per night     rate rules    Reserve a Room

HOLIDAY RATE*DELUXE ROOM (1 KING OR 2 DOUBLES)*$8 STONE MT PARK GATE FEE NOT INCLUDED*

**STUDIO 1 KING BED >>**
139.00 (USD) per night     rate rules    Reserve a Room

LEISURE RATE*DELUXE RM(1 KING OR 2 DOUBLES)*MAX 5 PPL*$8 STONE MOUNTAIN PARK GATE FEE NOT INCLUDED *

**STUDIO 1 KING BED >>**
154.00 (USD) per night     rate rules    Reserve a Room

Stay for Breakfast-for up to 2 adults and children 12 and under Studio (1 king bed)

**QUALITY ROOM >>**
199.00 (USD) per night     rate rules    Reserve a Room

PURE MAGIC - GETAWAY FOR THE HOLIDAYS PACKAGE DELUXE ROOM (1 KING OR 2 DOUBLE BEDS)

**QUALITY ROOM >>**
199.00 (USD) per night     rate rules    Reserve a Room

ROMANCING THE STONE*STUDIO KING(1 KING BED) *CHAMPAGNE,STRAWBERRYDINNER & BFAST BUFFET,& 2 DRINK COUPONS* GATE FEE NOT INCLUDED*

**QUALITY ROOM >>**
199.00 (USD) per night     rate rules    Reserve a Room

STONE MT ESCAPE FAMILY*DELUXE RM(1 KING OR 2 DBLS) *BREAKFAST & TWO DAY PARK ATTRACTION TICKETS FOR 4*$8 PARK GATE FEE NOT INCL

You get the best rate, guaranteed >>
We protect your privac security >>
We're BBBOnLine cert >>
Currency calculator >:
To make reservations phone, call 1-800-228 in the USA and Canad: any of our worldwide reservation numbers)
Need to reserve more If so, complete this reservation and click c "Reserve Another Roo button at the end of yc confirmation screen.

https://marriott.com/reservation/rateListMenu.mi

Find & Reserve ┊ Specials & Packages ┊ Destinations ┊ Events & Meetings ┊ Marriott Rewards

**Find & Reserve**

Hotel Search Options

Hotel Directory

New Hotels

Look Up Reservations

Telephone Reservations

Marriott's Look No Further
Guarantee

## Look up reservations — Cancel Reservation

Your reservation has been canceled. An email with this information
has been sent to **HEATHER.G.WATTS@MARRIOTT.COM.**

**Confirmation number:** 83660588

**Cancellation number: 56339412**

---

International Sites ┊ Travel Agents ┊ Corporate Information │ Careers ┊ Help ┊ Contact Us ┊ Site Map

© 1996 - 2005 Marriott International, Inc. All rights reserved. Marriott proprietary information.            Terms of Use ┊ Internet Privacy State

Watts v. Hospitality

Int Discl/RFP  0129

b. Employer's identification number    65-0693249
c. Employer's name, address, and ZIP code

OASIS OUTSOURCING II INC
4400 N. CONGRESS AVE. # 250
WEST PALM BEACH, FL 33407

1 OF 1

e. Employee's name, address, and ZIP code

HEATHER G WATTS
6976 EASTERN SHORE RD
MONTGOMERY, AL 36117-7612

| 13 State | Employer's state I.D. No. | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|---|
| AL | 367807 | 7538.44 | 292.52 |

Form W-2 Wage and Tax Statement 2003    Department of the Treasury-Internal Revenue Service

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 7538.44 | 461 |
| 3 Social security wages | 4 Social security tax withheld |
| 7538.44 | 467.38 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7538.44 | 109 |
| 7 Social security tips | 8 Allocated tips |
| | |
| 9 Advance EIC payment | 10 Dependent care benefits |
| | |
| 11 Nonqualified plans | 13 Statutory employee / Retirement plan / Third-party sick pay |
| 14 Other | |

12a See instructions for Box 12  $
12b  $
12c  $
12d  $
12e  $

Copy 2 for State, City
or Local Tax
Departments

d. Employee's soc. sec. no
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

| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|
| | | |

OMB # 1545-0008    Copy 2 To Be Filed With Employee's STATE, CITY, or LOCAL Tax Departments

---

b. Employer's identification number    65-0693249
c. Employer's name, address, and ZIP code

OASIS OUTSOURCING II INC
4400 N. CONGRESS AVE. # 250
WEST PALM BEACH, FL 33407

a. Employee's name, address, and ZIP code

000171438   162>•••••••••AUTO•• ALL FOR AADC 360
HEATHER G WATTS
6976 EASTERN SHORE RD
MONTGOMERY, AL 36117-7612

| 16 State | Employer's state I.D. No. | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|---|
| AL | 367807 | 7538.44 | 292.52 |

Form W-2 Wage and Tax Statement 2003    Department of the Treasury-Internal Revenue Service

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 7538.44 | 461 |
| 3 Social security wages | 4 Social security tax withheld |
| 7538.44 | 467. |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 7538.44 | 109.31 |
| 7 Social security tips | 8 Allocated tips |
| | |
| 9 Advance EIC payment | 10 Dependent care benefits |
| | |
| 11 Nonqualified plans | 13 Statutory employee / Retirement plan / Third-party sick pay |
| 14 Other | |

12a See instructions for Box 12  $
12b  $
12c  $
12d  $
12e  $

Copy 2 for State, City
or Local Tax
Departments

d. Employee's soc. sec. no
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

| 18 Local income tax | 19 Local income tax | 20 Locality name |
|---|---|---|
| | | |

OMB # 1545-0008    Copy 2 To Be Filed With Employee's STATE, CITY, or LOCAL Tax Departments



DEFENDANT'S
EXHIBIT
17

Watts v. Hospitality
Int Discl/RFP  0048
Watts v. Hospitality

**Form W-2 Wage and Tax Statement 2003**        Copy 2 to Be Filed With Employee's STATE, CITY or LOCAL Income Tax Return

c Employer's name, address, and ZIP code

MARRIOTT INTL ADMIN SRVS, INC. AGENT FOR
RESIDENCE INN BY MARRIOTT,INC.
10400 FERNHOOD RD                    756
BETHESDA                    MD 20817

MI048188        A#5723447

e Employee's name, address, and ZIP code

HEATHER    GODFREY-WATTS
6976 EASTERN SHORE RD
MONTGOMERY         AL 36117

| 13 Statutory employee | Retirement Plan | | | |
|---|---|---|---|---|
| 15 State | Employer's state I.D. No | 16 State wages, tips, etc. | 17 State income tax | |
| AL | 348972 | 38048.71 | 1435.72 | |

Third Party Sick Pay [ ]

b Employer's identification number
52-1953955

d Employee's social security number
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

12 See instructions for Box 12
D—                  900.00

18 Local wages, tips, etc.

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury-Internal Revenue Service OMB# 1545-0008

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 38048.71 | 5920.20 |
| 3 Social security wages | 4 Social security tax withheld |
| 38948.71 | 2414.82 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 38948.71 | 564.75 |
| 7 Social security tips | 8 Allocated tips |
| 0.00 | 0.00 |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 0.00 | 0.00 |
| 11 Nonqualified plans | |
| 0.00 | |
| 14 Other | |
| 19 Local income tax | 20 Locality name |

---

**Form W-2 Wage and Tax Statement 2003**        Copy C for Employee's Records (See notice on back at Copy B)

c Employer's name, address, and ZIP code

MARRIOTT INTL ADMIN SRVS, INC. AGENT FOR
RESIDENCE INN BY MARRIOTT,INC.
10400 FERNHOOD RD                    756
BETHESDA                    MD 20817

MI048188        A#5723447

e Employee's name, address, and ZIP code

HEATHER    GODFREY-WATTS
6976 EASTERN SHORE RD
MONTGOMERY         AL 36117

| 13 Statutory employee | Retirement Plan | | | |
|---|---|---|---|---|
| 15 State | Employer's state I.D. No | 16 State wages, tips, etc. | 17 State income tax | |
| AL | 348972 | 38048.71 | 1435.72 | |

Third Party Sick Pay [ ]

b Employer's identification number
52-1953955

d Employee's social security number
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

12 See instructions for Box 12
D—                  900.00

18 Local wages, tips, etc.

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury-Internal Revenue Service OMB# 1545-0008

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 38048.71 | 5920.20 |
| 3 Social security wages | 4 Social security tax withheld |
| 38948.71 | 2414.82 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 38948.71 | 564.75 |
| 7 Social security tips | 8 Allocated tips |
| 0.00 | 0.00 |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 0.00 | 0.00 |
| 11 Nonqualified plans | |
| 0.00 | |
| 14 Other | |
| 19 Local income tax | 20 Locality name |

Department of the Treasury – Internal Revenue Service

**Form 1040** **U.S. Individual Income Tax Return** **2003** | (99) IRS Use Only – Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2003, or other tax year beginning _____, 2003, ending _____ 20____ | OMB No. 1545-0074

| Label (See instructions page 19.) | Your first name and initial | Last name | Your social security number |
|---|---|---|---|
| | Mickey V | Watts | |
| | If a joint return, spouse's first name and initial | Last name | Spouse's social security no. |
| Use the IRS label. Otherwise, please print or type. | Heather | Godfrey-Watts | 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 |
| | Home address (number and street). If you have a P.O. box, see page 19. | Apt. no. | ▲ **Important!** ▲ |
| | 6976 Eastern Shore Road | | You must enter your SSN(s) above. |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 19. | | |
| | Montgomery, AL 36117 | | |

**Presidential Election Campaign** (see page 19.)

Note. Checking "Yes" will not change your tax or reduce your refund.

Do you, or your spouse if filing a joint return, want $3 to go to this fund? ►  You [ ] Yes [ ] No   Spouse [ ] Yes [ ] No

**Filing Status**

Check only one box.

1 [ ] Single
2 [X] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ►
4 [ ] Head of household (with qualifying person). (See page 20.) If qualifying person is a child but not your dependent, enter this child's name here. ►
5 [ ] Qualifying widow(er) with dependent child (See page 20.)

**Exemptions**

6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a

b [X] Spouse

| c Dependents: | | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) √ if qualifying child for child tax credit (see page 21) |
|---|---|---|---|---|
| (1) First name | Last name | | | |
| Taylor | Watts | | Daughter | [X] |

If more than five dependents, see page 21.

| | |
|---|---|
| No. of boxes checked on 6a and 6b | 2 |
| No. of children on 6c who: | |
| • lived with you | 1 |
| • did not live with you due to divorce or separation (see page 21) | 0 |
| Dependents on 6c not entered above | 0 |
| Add numbers entered on lines above ► | 3 |

d Total number of exemptions claimed .........................................

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

**ROLLOVER**
Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ................................... | **7** | 81,877. |
| 8a | Taxable interest. Attach Schedule B if required ...................... | **8a** | 17. |
| b | Tax-exempt interest. Do not include on line 8a .......... | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required ................ | **9a** | |
| b | Qualified dividends (see page 23) ...................... | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 23) ......... | **10** | 151. |
| 11 | Alimony received ................................................ | **11** | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ................. | **12** | |
| 13a | Capital gain or (loss). Attach Schedule D if required. If not required, check here ► [ ] | **13a** | |
| b | If box 13a is checked, enter post-May 5 capital gain distributions | 13b | |
| 14 | Other gains or (losses). Attach Form 4797 ........................ | **14** | |
| 15a | IRA distributions .......... | 15a | b Taxable amount (see page 25) | **15b** | |
| 16a | Pensions and annuities | 16a | 1,239. | b Taxable amount (see page 25) | **16b** | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E ... | **17** | 250. |
| 18 | Farm income or (loss). Attach Schedule F ............................ | **18** | |
| 19 | Unemployment compensation ........................................ | **19** | |
| 20a | Social security benefits . | 20a | b Taxable amount (see page 27) | **20b** | |
| 21 | Other income. List type and amount (see page 27) .................. | **21** | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ► | **22** | 82,295. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses (see page 29) ................. | 23 | |
| 24 | IRA deduction (see page 29) ........................ | 24 | |
| 25 | Student loan interest deduction (see page 31) .......... | 25 | 980. |
| 26 | Tuition and fees deduction (see page 32) ........... | 26 | |
| 27 | Moving expenses. Attach Form 3903 ............... | 27 | |
| 28 | One-half of self-employment tax. Attach Schedule SE ... | 28 | |
| 29 | Self-employed health insurance deduction (see page 33) ... | 29 | |
| 30 | Self-employed SEP, SIMPLE, and qualified plans ...... | 30 | |
| 31 | Penalty on early withdrawal of savings ............... | 31 | |
| 32a | Alimony paid b Recipient's SSN ► | 32a | |
| 33 | Add lines 23 through 32a ..................................... | **33** | 980. |
| 34 | Subtract line 33 from line 22. This is your **adjusted gross income** .............. ► | **34** | 81,315. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 77.

GRA  310401  Form Forge 2003-W

03/10/2004 09:45:06PM

**Form 1040** (2003)

Watts v. Hospitality

Int Discl/RFP  0050

Form 1040 (2003) Mickey V Watts and Heather Godfrey-Watts | Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | · 35 | Amount from line 34 (adjusted gross income) | **35** | 81,315. |
| **Standard Deduction for –** | 36a | Check if: ☐ You were born before January 2, 1939, ☐ Blind; Total boxes ☐ Spouse was born before January 2, 1939, ☐ Blind. checked ► 36a | 0 | |
| | b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see page 34 and check here ► 36b ☐ | | |
| ● People who checked any box on line 36a or 36b or who can be claimed as dependent, see page 34. | 37 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | **37** | 9,500. |
| | 38 | Subtract line 37 from line 35 | **38** | 71,815. |
| | 39 | If line 35 is $104,625 or less, multiply $3,050 by the total number of exemptions claimed on line 6d. If line 35 is over $104,625, see the worksheet on page 35 | **39** | 9,150. |
| ● All others: | 40 | Taxable income. Subtract line 39 from line 38. If line 39 is more than line 38, enter -0- | **40** | 62,665. |
| Single or Married filing separately, $4,750 | 41 | Tax (see page 36). Check if any tax is from   a ☐ Form(s) 8814   b ☐ Form 4972 | **41** | 9,289. |
| | 42 | Alternative minimum tax (see page 38). Attach Form 6251 | **42** | |
| Married filing jointly or Qualifying widow(er), $9,500 | 43 | Add lines 41 and 42 ► | **43** | 9,289. |
| | 44 | Foreign tax credit. Attach Form 1116 if required | 44 | |
| | 45 | Credit for child & dependent care expenses. Attach Form 2441 | 45 | 120. |
| | 46 | Credit for the elderly or the disabled. Attach Schedule R | 46 | |
| Head of household, $7,000 | 47 | Education credits. Attach Form 8863 | 47 | |
| | 48 | Retirement savings contributions credit. Attach Form 8880 | 48 | |
| | 49 | Child tax credit (see page 40) | 49 | 600. |
| | 50 | Adoption credit. Attach Form 8839 | 50 | |
| | 51 | Credits from:   a ☐ Form 8396   b ☐ Form 8859 | 51 | |
| | 52 | Other credits. Check applicable box(es):   a ☐ Form 3800 b ☐ Form 8801   c ☐ Specify | 52 | |
| | 53 | Add lines 44 through 52. These are your   total credits | **53** | 720. |
| | 54 | Subtract line 53 from line 43. If line 53 is more than line 43, enter -0- ► | **54** | 8,569. |
| **Other Taxes** | 55 | Self-employment tax. Attach Schedule SE | **55** | |
| | 56 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | **56** | |
| | 57 | Tax on qualified plans, including IRAs, & other tax-favored accts. Attach Form 5329 if required | **57** | |
| | 58 | Advance earned income credit payments from Form(s) W-2 | **58** | |
| | 59 | Household employment taxes. Attach Schedule H | **59** | |
| | 60 | Add lines 54 through 59. This is your   total tax ► | **60** | 8,569. |
| **Payments** | 61 | Federal income tax withheld from Forms W-2 and 1099 | 61 | 9,527. |
| If you have a qualifying child, attach Schedule EIC. | 62 | 2003 estimated tax payments & amt. applied from 2002 return | 62 | |
| | 63 | Earned income credit (EIC)   ... NO | 63 | |
| | 64 | Excess social security and tier.1 RRTA tax withheld(see page 56) | 64 | |
| | 65 | Additional child tax credit. Attach Form 8812 | 65 | |
| | 66 | Amount paid with request for extension to file (see page 56) | 66 | |
| | 67 | Other pmts from:   a ☐ Form 2439   b ☐ Form 4136   c ☐ Form 8885 | 67 | |
| | 68 | Add lines 61 through 67. These are your   total payments ► | **68** | 9,527. |
| **Refund** | 69 | If line 68 is more than line 60, subtract line 60 from line 68. This is the amount you   overpaid | **69** | 958. |
| Direct deposit? See page 56. and fill in 70b, 70c, and 70d. | 70a | Amount of line 69 you want   refunded to you ► | **70a** | 958. |
| | ► b | Routing no. 062000080 ► c Type: ☒ Checking ☐ Savings | | |
| | ► d | Account no. 50400135 | | |
| | 71 | Amt. of line 69 you want   applied to your 2004 estimated tax ► 71 | | |
| **Amount You Owe** | 72 | Amount you owe. Subtract line 68 from line 60. For details on how to pay, see page 57 ... ► | **72** | 0. |
| | 73 | Estimated tax penalty. (see page 58) | 73 | |

| | | | |
|---|---|---|---|
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see page 58)? ☐ Yes. Complete the following. ☐ No | | |
| | Designee's name ► | Phone no. ► | Personal identification number (PIN) ► |

**Sign Here**
Joint return? See page 20. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation Asset Manager | Daytime phone number 334-288-3992 |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation Director of Sales | |

**Paid Preparer's Use Only**

| Preparer's signature ► | | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, & ZIP code ► | | | EIN | |
| | | | Phone no. | |

GRA  310402   Form Forge 2003-W

Form **1040** (2003)

03/10/2004 09:50:52PM

Watts v. Hospitality
Int Discl/RFP  0051

**SCHEDULE E**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service    (99)    ► Attach to Form 1040 or Form 1041.

## Supplemental Income and Loss

(From rental real estate, royalties, partnerships,
S corporations, estates, trusts, REMICs, etc.)

► See Instructions for Schedule E (Form 1040).

OMB No. 1545-0074

**2003**

Attachment
Sequence No.  **13**

Name(s) shown on return

Mickey V Watts and Heather Godfrey-Watts

Your social security no.

**Part I**  Income or Loss From Rental Real Estate and Royalties    Note. If you are in the business of renting personal property,
use Schedule C or C-EZ (see page E-3). Report farm rental income or loss from    Form 4835 on page 2, line 40.

| 1 Show the kind and location of each   rental real estate property: | | | | 2 For each rental real estate prop. listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of: ● 14 days  or ● 10% of the total days rented at fair rental value? (See page E-3.) | | Yes | No |
|---|---|---|---|---|---|---|---|
| A | Residence used in filming Big Fish Movie 6976 Eastern Shore Road Mont Alabama | | | | A | | X |
| B | | | | | B | | |
| C | | | | | C | | |

| | | | Properties | | Totals |
|---|---|---|---|---|---|
| **Income:** | | A | B | C | (Add columns A, B, and C.) |
| 3 Rents received  . . . . . . . . . . . . . . . . . | 3 | 250. | | | 3 | 250. |
| 4 Royalties received  . . . . . . . . . . . . . . | 4 | | | | 4 | 0. |
| **Expenses:** | | | | | | |
| 5 Advertising  . . . . . . . . . . . . . . . . . . . . . | 5 | | | | | |
| 6 Auto and travel (see page E-4)  . . . . . . | 6 | | | | | |
| 7 Cleaning and maintenance  . . . . . . . . . | 7 | | | | | |
| 8 Commissions . . . . . . . . . . . . . . . . . . . . | 8 | | | | | |
| 9 Insurance  . . . . . . . . . . . . . . . . . . . . . . | 9 | | | | | |
| 10 Legal and other professional fees  . . . . . | 10 | | | | | |
| 11 Management fees  . . . . . . . . . . . . . . . . | 11 | | | | | |
| 12 Mortgage interest paid to banks, etc. (see page E-4)  . . . . . . . . . . . . . . . . . | 12 | | | | 12 | 0. |
| 13 Other interest . . . . . . . . . . . . . . . . . . . . | 13 | | | | | |
| 14 Repairs  . . . . . . . . . . . . . . . . . . . . . . . | 14 | | | | | |
| 15 Supplies . . . . . . . . . . . . . . . . . . . . . . . | 15 | | | | | |
| 16 Taxes  . . . . . . . . . . . . . . . . . . . . . . . . | 16 | | | | | |
| 17 Utilities  . . . . . . . . . . . . . . . . . . . . . . . | 17 | | | | | |
| 18 Other (list)  ► | 18 | | | | | |
| 19 Add lines 5 through 18  . . . . . . . . . . . . | 19 | 0. | 0. | 0. | 19 | 0. |
| 20 Depreciation expense or depletion (see page E-4)  . . . . . . . . . . . . . . . . . . | 20 | | | | 20 | 0. |
| 21 Total expenses. Add lines 19 and 20  . . . | 21 | 0. | 0. | 0. | | |
| 22 Income or (loss) from rental real estate or royalty properties. Subtract line 21 from line 3 (rents) or line 4 (royalties). If the result is a (loss), see page E-4 to find out if you must file   Form 6198 . . . . | 22 | 250. | 0. | 0. | | |
| 23 Deductible rental real estate loss. Caution.  Your rental real estate loss on line 22 may be limited. See page E-4 to find out if you must file   Form 8582. Real estate professionals must complete line 43 on page 2  . . . . . . . . . . . . . . . . . | 23 | ( 0. )| ( 0. )| ( 0. ) | | |
| 24 Income.  Add positive amounts shown on line 22.   Do not  include any losses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 24 | 250. |
| 25 Losses.  Add royalty losses from line 22 and rental real estate losses from line 23. Enter total losses here  . . . . . . . . | | | | | 25 | ( 0.) |
| 26 Total rental real estate and royalty income or (loss).   Combine lines 24 and 25. Enter the result here. If Parts II, III, IV, and line 40 on page 2 do not apply to you, also enter this amount on Form 1040, line 17. Otherwise, include this amount in the total on line 41 on page 2   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 26 | 250. |

For Paperwork Reduction Act Notice, see Form 1040 instructions.

Schedule E (Form 1040) 2003

3E1    GRA Form Forge 2003-W

03/10/2004  09:45:06PM

Watts v. Hospitality
Int Discl/RFP  0052

Form **2441**

## Child and Dependent Care Expenses

OMB No. 1545-0068

**2003**

Department of the Treasury
Internal Revenue Service    (99)

► Attach to Form 1040.

► See separate instructions.

Attachment
Sequence No. **21**

Name(s) shown on Form 1040

Mickey  V Watts and Heather Godfrey-Watts

Your social security number

Before you begin:    You need to understand the following terms. See    Definitions   on page 1 of the instructions.

● Dependent Care Benefits    ● Qualifying Person(s)    ● Qualified Expenses    ● Earned Income

**Part I**    Persons or Organizations Who Provided the Care –    You must complete this part.
(If you need more space, use the bottom of page 2.)

| 1 | (a) Care provider's name | (b) Address (number, street, apt. no., city, state, and ZIP code) | (c) Identifying number (SSN or EIN) | (d) Amount paid (see instructions) |
|---|---|---|---|---|
| | Peggy Ann Peacock | 7297 Old Mitylene Road Montgomery, Alabama 36117 | | 1,765. |
| | Aldersgate's | 6610 Vaughn Road Montgomery, Alabama 36116 | | 3,928. |

Did you receive dependent care benefits?

— No ——► Complete only Part II below.

— Yes ——► Complete Part III on page 2 next.

Caution:  If the care was provided in your home, you may owe employment taxes. See the instructions for Form 1040, line 59.

**Part II**    Credit for Child and Dependent Care Expenses

2    Information about your    qualifying person(s).    If you have more than two qualifying persons, see the instructions.

| (a) Qualifying person's name | | (b) Qualifying person's social security number | (c) Qualified expenses   you incurred and paid in 2003 for the person listed in column (a) |
|---|---|---|---|
| First | Last | | |
| Taylor M | Watts | | 600. |
| | | | |

3    Add the amounts in column (c) of line 2.   Do not   enter more than $3,000 for one qualifying person
or $6,000 for two or more persons. If you completed Part III, enter the amount from line 26    . . . . . . . . .    | **3** | 600. |

4    Enter your  earned income    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    | **4** | 36,290. |

5    If married filing a joint return, enter your spouse's earned income (if your spouse was a student
or was disabled, see the instructions);   all others,  enter the amount from line 4    . . . . . . . . . . . . .    | **5** | 45,587. |

6    Enter the  smallest  of line 3, 4, or 5  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    | **6** | 600. |

7    Enter the amount from Form 1040, line 35    . . . . . . . . . . . . . . .    | 7 |    81,315.

8    Enter on line 8 the decimal amount shown below that applies to the amount on line 7

| If line 7 is – | | | If line 7 is – | | | |
|---|---|---|---|---|---|---|
| Over | But not over | Decimal amount is | Over | But not over | Decimal amount is | |
| $0 - 15,000 | | .35 | $29,000 - 31,000 | | .27 | |
| 15,000 - 17,000 | | .34 | 31,000 - 33,000 | | .26 | |
| 17,000 - 19,000 | | .33 | 33,000 - 35,000 | | .25 | |
| 19,000 - 21,000 | | .32 | 35,000 - 37,000 | | .24 | **8**   x .20 |
| 21,000 - 23,000 | | .31 | 37,000 - 39,000 | | .23 | |
| 23,000 - 25,000 | | .30 | 39,000 - 41,000 | | .22 | |
| 25,000 - 27,000 | | .29 | 41,000 - 43,000 | | .21 | |
| 27,000 - 29,000 | | .28 | 43,000 - No limit | | .20 | |

9    Multiply line 6 by the decimal amount on line 8. If you paid 2002 expenses in 2003, see
the instructions.   · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·    | **9** | 120. |

10    Enter the amount from Form 1040, line 43, minus any amount on Form 1040, line 44    . . . . . . . . . . . . .    | **10** | 9,289. |

11    Credit for child and dependent care expenses.    Enter the  smaller  of line 9 or line 10
here and on Form 1040, line 45    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    | **11** | 120. |

For Paperwork Reduction Act Notice, see the instructions.

Form **2441** (2003)

324411    GRA Form Forge 2003-W

03/10/2004 09:45:06PM

Watts v. Hospitality
Int Discl/RFP  0053

Tax year Jan. 1 - Dec. 31, 2003 or other tax year beginning _____, ending _____

Your first name & initial (if joint return, also give spouse's first name & initial)    Last name
Mickey V Watts and Heather   Godfrey-Wa

Present home address (number and street or P.O. Box number)
6976 Eastern Shore Road

.ty, town or post office, state, and ZIP code
Montgomery AL 36117

Your SSN .                    Spouse's SSN  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

FN (For office use only)

**Filing Status and Exemptions**
Check only one box.

1  $1,500 Single
2  X  $3,000 Married filing joint return (even if only one spouse had income)
3  $1,500 Married filing sep. return. Complete line 5 with spouse's name & SSN
4  $3,000 Head of family (with qualifying person). (See instr.) Complete line 5.

5  Name _____
Soc. Sec. No. _____
Relationship _____

**Income and Adjustments**

| | | A – Alabama tax withheld | | B – Income |
|---|---|---|---|---|
| 6 | Wages, salaries, tips, etc. (list each employer and address separately): | | | |
| a | Guilford Capital Corporation Montg | 6a 1,459 00 | 6a | 36,290 00 |
| b | Marriott International Bethesda MD | 6b 1,436 00 | 6b | 38,049 00 |
| c | Oasis Outsourcing II Inc West Palm | 6c 293 00 | 6c | 7,538 00 |
| d | | 6d 00 | 6d | |
| 7 | Interest and dividend income (also attach Schedule B if over $1,500) | | 7 | 17 00 |
| 8 | Other income (from page 2, Part I, line 9) | | 8 | 500 00 |
| 9 | Total income. Add amounts in the income column for line 6a through line 8 | | 9 | 82,394 00 |
| 10 | Total adjustments to income (from page 2, Part II, line 8) | | 10 | 00 |
| 11 | Adjusted gross income. Subtract line 10 from line 9 | | 11 | 82,394 00 |

**Deductions**
You Must Attach page 2 of Federal Form 1040, page 1 of 1040A, page 1 of 1040EZ, or a copy of your Telefile Sch. if claiming a *eduction on e 13.

| | | | |
|---|---|---|---|
| 12 | Check box a, if you itemize deductions, and enter amount from Schedule A, line 26. Box a or b MUST be checked. Check box b, if you do not itemize deds., and enter standard deduction (see instr.) ▶ a X Itemized Deductions ▶ b Standard Deductions ▶ | 12 | 12,007 00 |
| 13 | Federal tax liability deduction (complete Part V, page 2). DO NOT ENTER FEDERAL TAX WITHHELD FROM YOUR FORM W-2(S) | 13 | 8,169 00 |
| 14 | Personal exemption (from line 1, 2, 3, or 4) | 14 | 3,000 00 |
| 15 | Dependent exemption (from page 2, Part III, line 2) | 15 | 300 00 |
| 16 | Total deductions. Add lines 12, 13, 14, and 15 | 16 | 23,476 00 |

**Tax**
Staple your W-2, W-2G, and/or 1099 here.

| | | | |
|---|---|---|---|
| 17 | Taxable income. Subtract line 16 from line 11 | 17 | 58,918 00 |
| 18 | Income Tax due. Enter here and check if from X Tax Table or Form NOL-85A | 18 | 2,868 00 |
| 19 | Less credits from: Sch. CR and/or Sch. OC and/or Enterprise Zone Act (see instr.) | 19 | 00 |
| 20a | Net tax due Alabama. Subtract line 19 from line 18 | 20a | 2,868 00 |
| b | Consumer Use Tax (use worksheet in the instructions) | 20b | 00 |
| 21 | You may make a voluntary contribution to any a AL Democratic Party $1 $2 X none | 21a | 00 |
| | of the following: Alabama Election Campaign b AL Republican Party $1 $2 X none | 21b | 00 |
| | Fund, or Neighbors Helping Neighbors Fund. c Neighbors Helping Neighbors $ | 21c | 00 |
| 22 | Total tax liability and voluntary contribution. Add lines 20a, 20b, 21a, 21b, and 21c | 22 | 2,868 00 |

**Payments**

| | | | |
|---|---|---|---|
| 23 | Alabama income tax withheld (from Forms W-2, W-2G, and/or 1099) | 23 3,188 00 | |
| 24 | Amount paid with extension (attach Form 4868A) | 24 00 | |
| 25 | 2003 estimated tax payments (see instructions) | 25 00 | |
| 26 | Total payments. Add lines 23 through 25 | 26 | 3,188 00 |

**AMOUNT YOU OWE**

27  If line 22 is larger than line 26, subtract line 26 from line 22, and enter    AMOUNT YOU OWE.    CN
Place payment, along with Form 40V, loose in the mailing envelope. (FORM 40V MUST ACCOMPANY PAYMENT.)
If paying by credit card do not include Form 40V and check here ▶                  00
28  Estimated tax penalty. Also include on line 27 (see instructions)    28    00

**OVERPAID**

29  If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount    OVERPAID ▶ 29  320 00
30  Amount of line 29 to be applied to your 2004 estimated tax ▶ 30    00

**Donation Check-offs**

31  You may donate all or part of your overpayment. (Enter $1, $5, $10, $25, none, or other amt. in the appropriate boxes).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| a | Senior Services Trust Fund ▶ | 00 | f | AL Indian Children's Scholarship Fund ▶ | 00 | | PLEASE |
| b | AL Arts Development Fund ▶ | 00 | g | Penny Trust Fund ▶ | 00 | | ● Verify your social security number |
| c | AL Nongame Wildlife Fund ▶ | 00 | h | Foster Care Trust Fund ▶ | 00 | | ● Recheck your math |
| d | Child Abuse Trust Fund ▶ | 00 | i | Mental Health ▶ | 00 | | ● Sign return on page 2 |
| e | AL Veterans Program ▶ | 00 | j | AL Breast & Cervical Cancer Program ▶ | 00 | | ● Attach W-2 form(s) |
| | | | k | AL 4-H Club ▶ | 00 | | |

32  Total. Add line 30 and lines 31a, b, c, d, e, f, g, h, i, j and k    32    0 00

**REFUND**

33  REFUNDED TO YOU  Subtract line 32 from line 29. CAUTION: You must sign this return on page 2.) ▶ 33  320 00

3  AL1  Form Forge 2003-W          03/10/2004  09:50:52PM          AL400000

Watts v. Hospitality
Int Discl/RFP  0054

| PART I | | | | | |
|---|---|---|---|---|---|
| | 1 | Alimony received | 1 | | 00 |
| | 2 | Business income or (loss) (attach Federal Schedule C or C-EZ) | 2 | | 00 |
| | 3 | Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. (attach Schedule D) | 3 | | 00 |
| | 4a | Total IRA distributions   4a    | 00   4b   Taxable amount (see instructions) | 4b | | 00 |
| Other | 5a | Total pensions and annuities   5a   1,239 | 00   5b   Taxable amount (see instructions) | 5b | | 00 |
| come | 6 | Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E) | 6 | 250 | 00 |
| (see instructions) | 7 | Farm income or (loss) (attach Federal Schedule F) | 7 | | 00 |
| | 8 | Other income (state nature and source – see inst.) Big Fish Movie filming of home | 8 | 250 | 00 |
| | 9 | **Total other income.** Add lines 1 through 8. Enter here and also on page 1, line 8 ► | 9 | 500 | 00 |

| PART II | | | | | |
|---|---|---|---|---|---|
| | 1a | Your IRA deduction | 1a | | 00 |
| | b | Spouse's IRA deduction | 1b | | 00 |
| | 2 | Payments to a Keogh retirement plan and self-employment SEP deduction | 2 | | 00 |
| | 3 | Penalty on early withdrawal of savings | 3 | | 00 |
| Adjustments | 4 | Alimony paid Recipient's last name    SSN ► | | | |
| to Income | | Address    City   State   ZIP | 4 | | 00 |
| (see instructions) | 5 | Adoption expenses | 5 | | 00 |
| | 6 | Moving Expenses (Attach Fed. Fm. 3903) to City   State   ZIP | 6 | | 00 |
| | 7 | Self-employed health insurance deduction | 7 | | 00 |
| | 8 | **Total adjustments.** Add lines 1 through 7. Enter here and also on page 1, line 10 ► | 8 | 0 | 00 |

| PART III | | | | | | |
|---|---|---|---|---|---|---|
| | 1a | **Dependents:** | | (2) Dependent's social | (3) Dependent's relationship to you. | (4) Did you pro-vide more than one-half dep. support? |
| | | (1) First name    Last name | | | | |
| Dependents | | Taylor    Watts | | | Daughter | Yes |
| Do not include yourself or your spouse | | | | | | |
| | b | Total number of dependents claimed above | | | | 1 |
| (See instructions) | 2 | Amount allowed. (Multiply $300 by total number of dependents claimed on line 1b.) Enter amount here and on page 1, line 15 ► | | | 2 | 300 00 |

| PART IV | | | | |
|---|---|---|---|---|
| | 1 | Residency   [X] Full Year   If you were a part-year resident of Alabama during 2003, indicate your period of residence: Check only 1 box   [ ] Part Year   From   2003 -   2003. Total mos. 0 | | |
| | 2 | Did you file an Alabama income tax return for year 2002?   [X] Yes   [ ] No | | |
| General Information | 3 | If no, state reason. | | |
| | 4 | Give name and address of present employer(s). Yours   Guilford Capital Corporation 2600 Ea Montgomery AL 36116   Your Spouse's   Wingate Inn 2060 Eastern Blvd Montgo | | |
| All Taxpayers Must Complete This Section. | 5 | Enter Federal Adjusted Gross Income $ 81,315 and Federal Taxable Income $ 62,665 as reported on your 2003 Federal Individual Income Tax Return. | | |
| | 6 | Do you have income which is reported on your Federal return, but not reported on your AL return (other than your state tax refund)?   [ ] Yes [X] No | | |
| | | If yes, enter source(s) and amount(s) below: (other than state income tax refund) | | |
| | | Source   Amount | | 00 |
| | | Source   Amount | | 00 |

| PART V | | | | |
|---|---|---|---|---|
| | 1 | Enter the Federal Income Liability as shown on your 2003 Federal return. | 1 | 8,569 00 |
| | 2 | Enter your 2003 Federal Advance Child Tax Credit | 2 | 400 00 |
| | 3 | Subtract line 2 from line 1, enter here and on line 13, page 1, Form 40 | 3 | 8,169 00 |

**Sign Here**
Keep a copy of this return for your records.

[ ] I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Daytime telephone no. 334-288-3992 | Your occupation Asset Manager |
|---|---|---|---|
| Spouse's signature (If joint return, BOTH must sign) | Date | Daytime telephone no. 334-387-4125 | Spouse's occupation Director of Sales |

**Paid Preparer's Use Only**

| Preparer's signature | Date | Check if self-employed [ ] | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed) and address   SELF-PREPARED | | E.I. No. | |
| | | ZIP Code | |

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below.

**WHERE TO FILE FORM 40**

If you are not making a payment, mail your return to:
Alabama Department of Revenue
P.O. Box 154
Montgomery, AL 36135-0001

If you are making a payment, mail your return, Form 40V, and pymt. to:
Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140-0001

Mail only your 2003 Form 40 to one of the above addresses. Prior years returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P.O. Box 327464, Montgomery, AL 36132-7464.

3   AL2   Form Forge 2003-W

Watts v. Hospitality

Int Discl/RFP   0055

SCHEDULE
**A, B, & CR**
(FORM 40)

ALABAMA DEPARTMENT OF REVENUE
## Schedule A -- Itemized Deductions
(Schedules B and CR are on page 2)

ATTACH TO FORM 40 – SEE INSTRUCTIONS FOR SCHEDULE A

**2003**

Name(s) as shown on Form 40

Mickey V Watts and Heather Godfrey-Watts

Your social security number

The itemized deductions you may claim for the year 2003 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule.    PART-YEAR RESIDENTS:    A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | CAUTION:  Do not include expenses reimbursed or paid by others. | | | | |
| **Medical and Dental Expenses** (See instructions) | 1 | Medical and dental expenses  . . . . . . . . . . . . . . . . . . . . | 1 | | 00 | |
| | 2 | Enter amount from Form 40, line 11  .  [2] | | 00 | | |
| | 3 | Multiply the amount on line 2 by 4% (.04). Enter the result  . . . . . | 3 | | 00 | |
| | 4 | Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- | | | ► | 4 | | | 00 |
| **Taxes You Paid** (See instructions) | 5 | Real estate taxes  . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 315 | 00 | |
| | 6 | FICA Tax (Social Security & Medicare) & Federal Self-Employment Tax  . . . . | 6 | 6,389 | 00 | |
| | 7 | Railroad Retirement (Tier 1 only)  . . . . . . . . . . . . . . . . . . . . | 7 | | 00 | |
| | 8 | Other taxes. (List – include personal prop. taxes.)    ► | 8 | | 00 | |
| | 9 | Add the amounts on lines 5 through 8. Enter the total here  . . . . . . . . . . . . . . . . . . | | | ► | 9 | | | 6,704 | 00 |
| **Interest You Paid** (See instructions) | 10a | Home mortg. interest & points reported to you on Fed. Form 1098 | 10a | 4,798 | 00 | |
| | b | Home mortgage interest not reported to you on Fed. Form 1098. (If paid to an individual, show that person's name & address)► | 10b | | 00 | |
| **NOTE: Personal interest is not deductible.** | 11 | Points not reported to you on Form 1098  . . . . . . . . . . . . . . . | 11 | | 00 | |
| | 12 | Investment interest. (Attach Form 4952A)  . . . . . . . . . . . . . . | 12 | | 00 | |
| | 13 | Add the amounts on lines 10a through 12. Enter the total here  . . . . . . . . . . . . . . | | | ► | 13 | | | 4,798 | 00 |
| | | CAUTION:  If you made a charitable contribution and received a benefit in return, see instructions. | | | | |
| **Gifts to Charity** (See instructions) | 14 | Contributions by cash or check  . . . . . . . . . . . . . . . . . . . . . | 14 | 505 | 00 | |
| | 15 | Other than cash/check.    (You MUST attach Fed. Form 8283 if over $500.) | 15 | | 00 | |
| | 16 | Carryover from prior year  . . . . . . . . . . . . . . . . . . . . . . . | 16 | | 00 | |
| | 17 | Add the amounts on lines 14 through 16. Enter the total here  . . . . . . . . . . . . . . | | | ► | 17 | | | 505 | 00 |
| **Casualty and Theft Loss** (Attach Fm. 4684) | 18a | Enter the amount from Federal Form 4684, line 16 (See instructions) | 18a | | 00 | |
| | b | Enter 10% of your adjusted gross income (Form 40, line 11)  . . . . | 18b | | 00 | |
| | c | Subtract line 18b from line 18a. If zero or less, enter -0-  . . . . . . . . . . . . . . | | | ► | 18c | | | | 00 |
| **Job Expenses & Most Other Miscellaneous Deductions** (See instructions) | 19 | Unreimbursed employee expenses – job travel, union dues, job education, etc. You MUST attach Federal Form 2106 if required.► | 19 | | 00 | |
| | 20 | Other expenses  (investment, tax preparation, safe deposit box, etc.). List type & amt.    ► | 20 | | 00 | |
| | 21 | Add the amounts on lines 19 and 20. Enter the total  . . . . . . . . . . | 21 | | 00 | |
| | 22 | Multiply amount on Form 40, line 11 by 2% (.02). Enter result here | 22 | | 00 | |
| | 23 | Subtract line 22 from line 21. Enter the result. If zero or less, enter -0-  . . . . . . . . . . | | | ► | 23 | | | | 00 |
| **Other Miscellaneous Deductions** | 24 | Other (from list in the instructions). List type and amount.    ► | | | | |
| | | | | | ► | 24 | | | | 00 |
| **Qualified Long-Term Care Ins. Premiums** | | CAUTION:  Do not include medical premiums. | | | | |
| | 25 | Enter amount here  . . . . . . . . . . . . . . . . . . . . . . . . . . | | | ► | 25 | | | | 00 |
| **Total Itemized Deductions** | 26 | Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12  . . . . . . . . . . . . . . . . . . . . . . . . . . | | | ► | 26 | | | 12,007 | 00 |

Schedule A (Form 40) 2003

03/10/2004  09:50:52PM

Declaration Control Number (DCN)

| 0 | 0 | - | | - | | - | 4 |

**FORM**
**AL8453OL**

**ALABAMA DEPARTMENT OF REVENUE**
**Individual Income Tax Declaration for On-Line Filing**

**2003**

For the year January 1 - December 31, 2003

**Label**
Use Alabama label. Otherwise, please type or print.

Your first name and initial: Mickey V

Last name: Watts

Your social security number

If a joint return, spouse's first name and initial: Heather

Last name: Godfrey-Watts

Spouse's soc. sec. no. if joint return: 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

Home address (number and street). If a P.O. Box, see instructions.
6976 Eastern Shore Road

Apt. no.

Telephone number (optional): (334) 288-3992

City, town or post office, state, and ZIP code
Montgomery    AL    36117

FN (For official use only)

**Part I**
**Tax Return Information**
(Whole dollars only.)

| | | |
|---|---|---|
| 1 Alabama taxable income (Form 40, line 17) | 1 | 58,918 |
| 2 Total tax liability (Form 40, line 22) | 2 | 2,868 |
| 3 Total tax payment (Form 40, line 26) | 3 | 3,188 |
| 4 Refund (Form 40, line 33) | 4 | 320 |
| 5 Amount you owe (Form 40, line 27) | 5 | |

**Part II**
**Direct Deposit**

1 Routing number: 062000080

2 Account number: 50400135

3 Type of account:  ☒ Checking   ☐ Savings

**Part III**
**Declaration of Taxpayer**
(Sign only after Part I is completed.)

Under penalties of perjury, I declare that I have compared the information contained on my return with the information I have provided to my on-line service provider (OLSP), identified by the above declaration control number, and that the amounts described in Part I above agree with the amounts shown on the corresponding lines of my 2003 Alabama individual income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my OLSP any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

**Sign Here**

Your signature                Date

Spouse's signature. If a joint rtn., BOTH must sign.          Date  3/19/04

---

## Please complete and retain
## with your income tax records.

NOTE: Retain for three years from the due date of the return or three years from the date the return was transmitted, whichever is later.

The Alabama Department of Revenue has installed a new Voice Refund Inquiry System for refund inquiries. The telephone number is · · (334) 353-2540, and is available 24 hours a day. Please have a copy of your return available when calling.

## DO NOT MAIL!! RETAIN IN YOUR FILE.

Form Forge 2003-W

03/10/2004 09:56:47PM

Watts v. Hospitality
Int Discl/RFP  0057

WATTS, HEATHER G                    SSN: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 ID:01520914  End:10/30/2005 Chk:11/04/2005 Bill    Unit:MONT        Chk No:00412326

MONTGOMERY VENTURES, LLC

| EARNINGS | Rate | Hours | This Period | Year to Date | ACCRUALS | Current Balance |
|----------|------|-------|-------------|--------------|----------|-----------------|
| SAL | .00 | .00 | 3,292.31 | 25,061.53 | VAC | 40.00 |
| BNS | .00 | .00 | 1,800.00 | 14,600.00 | TAX INFO M 01 AL 00 | |
| GROSS PAY | | $ | 4,092.31 | 39,661.53 | | |

| DEDUCTIONS | Statutory | | | |
|------------|-----------|---|---|---|
| FICA | | | 308.47 | 2,993.12 |
| FEDERAL | | | 60.46 | 4,803.33 |
| STATE WH AL | | | 152.65 | 1,344.84 |

| DEDUCTIONS | Voluntary | | | |
|------------|-----------|---|---|---|
| 125INS | | | 60.00* | 1,320.00 |
| EFT2 | | | | 520.23 |
| EFT1 | | | | 9,884.05 |
| NET PAY | | $ | 2,922.73 | 4,032.31 |

* Excluded from federal taxable wages
Your federal taxable wages this period are $ 4,032.31

STATEMENT OF EARNINGS & DEDUCTIONS. DETACH AND RETAIN FOR YOUR RECORDS

For Check/Earnings detail visit our secure
website at https://www.paymaxxcentral.com.
Your secret PIN number is 261645161

CompuPay
Innovation Pays

DEFENDANT'S
EXHIBIT
18

Watts v. Hospitality
Int Discl/REP  0028

## W-2 Wage and Tax Statement — 2005

OMB No. 1545-0008

Department of the Treasury—Internal Revenue Service

a To Be Filed With Employee's FEDERAL Tax Return. This information is being furnished to the Internal Revenue Service

| Box | Description | Amount |
|---|---|---|
| 1 | Wages, tips, other compensation | 39262.88 |
| 2 | Federal income tax withheld | 4852.39 |
| 3 | Social security wages | 39262.88 |
| 4 | Social security tax withheld | 2434.30 |
| 5 | Medicare wages and tips | 39262.88 |
| 6 | Medicare tax withheld | 569.31 |
| 7 | Social security tips | |
| 8 | Allocated tips | |
| 9 | Advance EIC payment | |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 12a | | |
| 14 | Other | S125   1380.00 |
| b | Employer identification number | 04-3688587 |
| d | Employee's social security number | 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 |

Employer's name, address, and ZIP code:
MONTGOMERY VENTURES, LLC
3340 PEACHTREE RD
SUITE 605
ATLANTA   GA 30326

Employee's name, address, and ZIP code:
HEATHER G WATTS
406 EASTERN SHORE ROAD
MONTGOMERY   AL 36117

| 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|
| 39262.88 | 1371.92 | | | |

State: AL

---

## W-2 Wage and Tax Statement — 2005

OMB No. 1545-0008

For EMPLOYER'S RECORDS. (See Notice to Employee on back of Copy B).

| Box | Description | Amount |
|---|---|---|
| 1 | Wages, tips, other compensation | 39262.88 |
| 2 | Federal income tax withheld | 4852.39 |
| 3 | Social security wages | 39262.88 |
| 4 | Social security tax withheld | 2434.30 |
| 5 | Medicare wages and tips | 39262.88 |
| 6 | Medicare tax withheld | 569.31 |
| 7 | Social security tips | |
| 8 | Allocated tips | |
| 9 | Advance EIC payment | |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 14 | Other | S125   1380.00 |
| b | Employer identification number | 04-3688587 |
| d | Employee's social security number | 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 |

Employer:
MONTGOMERY VENTURES, LLC
3340 PEACHTREE RD
SUITE 605
ATLANTA   GA 30326

Employee:
HEATHER G WATTS
406 EASTERN SHORE ROAD
MONTGOMERY   AL 36117

| 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. |
|---|---|---|
| 39262.88 | 1371.92 | |

State: AL

Watts v. Hospitality
Int Discl/RFP  0058

RM 1099-G

STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION AGENCY
MONTGOMERY, ALABAMA 36131

# IMPORTANT TAX DOCUMENT

HEATHER G WATTS
6976 EASTERN SHORE RD
MONTGOMERY, AL 36117-7612

| Payer's Name, Street, City, State, and ZIP Code | | | | |
|---|---|---|---|---|
| STATE OF ALABAMA<br>DEPARTMENT OF INDUSTRIAL RELATIONS<br>UNEMPLOYMENT COMPENSATION AGENCY<br>649 MONROE STREET<br>MONTGOMERY, AL 36131 | | | | Certain<br>Government<br>Payments |
| | Recipient's Identification Number<br>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 | 1 Unemployment Compensation<br>- 1,320.00 | OMB No. 1545-0120<br>2005 | Copy B<br>For Recipient |
| Recipient's Name (first, middle, last) & Address<br><br>HEATHER G WATTS<br>6976 EASTERN SHORE RD<br>MONTGOMERY, AL 36117-7612 | | 4 Federal Income Tax Withheld<br>132.00 | 5 ATAA Payments | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | | FEIN: 630674968 | | |
| Account Number (optional) | | | | |

Form 1099-G                    Department of the Treasury · Internal Revenue Service

### Instructions to Recipient

**Box 1** – Shows the total unemployment compensation paid to you this year by the payer. This amount is taxable income to you. For more information, see the instructions for your Federal income tax return.

**Box 4**– Shows the total amount of withholding you requested on unemployment compensation paid to you this year by the payer.

**Box 5**– Shows the total amount of ATAA paid to this year by the payer.

Watts v. Hospitality
Int Discl/RFP 0059

Form **1040A**
Department of the Treasury - Internal Revenue Service
**U.S. Individual Income Tax Return** 2005 IRS Use Only - Do not write or staple in this space.

OMB No. 1545-0074

| Label | | |
|---|---|---|
| L A B E L | Your first name and initial **Mickey V** | Last name **Watts** |

Your social security number

| Use the IRS label. Otherwise, please print or type. | H E R E | If a joint return, spouse's first name and initial **Heather** | Last name **Godfrey-Watts** |

Spouse's social security number **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**

Home address (number and street). If you have a P.O. box, see instructions. **6976 Eastern Shore Road** Apt. no.

You must enter
▲ your SSN(s) above. ▲

City, town or post office, state, and ZIP code. If you have a foreign address, see instructions. **Montgoemry, AL 36117**

Checking a box below will not change your tax or refund.

**Presidential Election Campaign** ► Check here if you, or your spouse if filing a joint return, want $3 to go to this fund?. . . . . ► ☐ You ☐ Spouse

**Filing status**
Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ►

4 ☐ Head of household (with qualifying person). (See instructions)
If the qualifying person is a child but not your dependent, enter this child's name here. ►
5 ☐ Qualifying widow(er) with dependent child (See instructions)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a
b ☒ Spouse

Boxes checked on 6a and 6b **2**

c Dependents:

If more than six dependents. See instructions.

| (1) First name Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) Check if qualifying child for child tax credit (see instr.) |
|---|---|---|---|
| Taylor Morgen Watts | | Daughter | ☒ |
| Tanner Watts | | Son | ☒ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

No. of children on 6c who:
• lived with you **2**
• did not live with you due to divorce or separation (see instructions) **0**
Dependents on 6c not entered above **0**

d Total number of exemptions claimed.

Add numbers on lines above ► **4**

**Income**

Attach Form(s) W-2 here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment.

7 Wages, salaries, tips, etc. Attach Form(s) W-2. | 7 | 78,060.
8a Taxable interest. Attach Schedule 1 if required. | 8a | 3,653.
b Tax-exempt interest. Do not include on line 8a. | 8b |
9a Ordinary dividends. Attach Schedule 1 if required. | 9a |
b Qualified dividends (See instructions) | 9b |
10 Capital gain distributions (See instructions) | 10 |
11a IRA distributions. 11a | 11b Taxable amount (See instructions) | 11b |
12a Pensions and annuities. 12a | 12b Taxable amount (See instructions) | 12b |
13 Unemployment compensation and Alaska Permanent Fund dividends. | 13 | 1,320.
14a Social security benefits. 14a | 14b Taxable amount (See instructions) | 14b |

15 Add lines 7 through 14b (far right column). This is your total income. | ► 15 | 83,033.

**Adjusted gross income**

16 Educator expenses (See instructions) | 16 |
17 IRA deduction. (See instructions) | 17 | 720.
18 Student loan interest deduction. (See instructions) | 18 | 794.
19 Tuition and fees deduction. (See instructions) | 19 |
20 Add lines 16 through 19. These are your total adjustments. | 20 | 1,514.

21 Subtract line 20 from line 15. This is your adjusted gross income. | ► 21 | 81,519.

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.
UYA
Form 1040A (2005)

02/14/2006 09:14:34PM

Watts v. Hospitality
Int Discl/RFP 0060

| | 22 | Enter the amount from line 21 (adjusted gross income). | | | | | 22 | 81,519. |
|---|---|---|---|---|---|---|---|---|

**Tax, credits, and payments**

| 23a | Check { } | You were born before January 2, 1941, ☐ | Blind } Total boxes |
|---|---|---|---|

if: { } Spouse was born before January 2, 1941, ☐  Blind } checked ▶ 23a | 0

b If you are married filing separately and your spouse itemizes deductions, see instructions and check here ▶ 23b ☐

**Standard Deduction for -**

● People who checked any box on line 23a or 23b or who can be claimed as a dependent, See inst.

● All others:

Single or Married filing separately, $5,000

Married filing jointly or Qualifying widow(er), $10,000

Head of household, $7,300

| 24 | Enter your standard deduction (See left margin). | | | | •24 | 10,000. |
|---|---|---|---|---|---|---|
| 25 | Subtract line 24 from line 22. If line 24 is more than line 22, enter -0-. | | | | 25 | 71,519. |
| 26 | If line 22 is over $109,475, or you provided housing to a person displaced by Hurricane Katrina, see instructions. Otherwise, multiply $3,200 by the total number of exemptions claimed on line 6d. | | | | 26 | 12,800. |
| 27 | Subtract line 26 from line 25. If line 26 is more than line 25, enter -0-. This is your **taxable income.** | | | | ▶ 27 | 58,719. |
| 28 | Tax, including any alternative minimum tax. (See instructions). | | | | 28 | 8,079. |
| 29 | Credit for child and dependent care expenses. Attach Schedule 2. | | 29 | 1,200. | | |
| 30 | Credit for the elderly or the disabled. Attach Schedule 3. | | 30 | | | |
| 31 | Education credits. Attach Form 8863. | | 31 | | | |
| 32 | Retirement savings contributions credit. Attach Form 8880. | | 32 | | | |
| 33 | Child tax credit. (See instructions). Attach Form 8901 if required. | | 33 | 2,000. | | |
| 34 | Adoption credit. Attach Form 8839. | | 34 | | | |
| 35 | Add lines 29 through 34. These are your **total credits.** | | | | 35 | 3,200. |
| 36 | Subtract line 35 from line 28. If line 35 is more than line 28, enter -0-. | | | | 36 | 4,879. |
| 37 | Advance earned income credit payments from Form(s) W-2. | | | | 37 | |
| 38 | Add lines 36 and 37. This is your **total tax.** | | | | ▶ 38 | 4,879. |
| 39 | Federal income tax withheld from Forms W-2 and 1099. | | 39 | 8,285. | | |
| 40 | 2005 estimated tax payments and amount applied from 2004 return. | | 40 | | | |

If you have a qualifying child, attach Schedule EIC.

| 41a | Earned income credit (EIC). | | 41a | | | |
|---|---|---|---|---|---|---|
| b | Nontaxable combat pay election. 41b | | | | | |
| 42 | Additional child tax credit. Attach Form 8812. | | 42 | | | |
| 43 | Add lines 39, 40, 41a, and 42. These are your total payments. | | | | ▶ 43 | 8,285. |

**Refund**

Direct Deposit?

See instructions and fill in 45b, 45c, and 45d.

| 44 | If line 43 is more than line 38, subtract line 38 from line 43. This is the amount you **overpaid.** | | | | 44 | 3,406. |
|---|---|---|---|---|---|---|
| 45a | Amount of line 44 you want **refunded to you.** | | | | ▶ 45a | 3,406. |
| ▶ b | Routing number | 062000080 | ▶ c Type: | ☒ Checking | ☐ Savings | |
| ▶ d | Account number | 50400135 | | | | |
| 46 | Amount of line 44 you want **applied to your 2006 estimated tax.** | | 46 | | | |

**Amount you owe**

| 47 | **Amount you owe.** Subtract line 43 from line 38. For details on how to pay, see instructions. | | | | ▶ 47 | |
|---|---|---|---|---|---|---|
| 48 | Estimated tax penalty. (See instructions) | | 48 | | | |

**Third party designee**

Do you want to allow another person to discuss this return with the IRS? (see instructions)   ☐ Yes. Complete the following.   ☐ No

| Designee's name ▶ | | Phone no. ▶ | | Personal identification number (PIN) ▶ | |
|---|---|---|---|---|---|

**Sign here**

Joint Return? (See instructions)

Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and accurately list all amounts and sources of income I received during the tax year. Declaration of preparer (other than the taxpayer) is based on all information of which the preparer has any knowledge.

| Your signature | Date | Your occupation Asset Manager | Daytime phone number 334-354-2619 |
|---|---|---|---|
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation Director of Sales | |

**Paid preparer's use only**

| Preparer's signature | | Date | | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | | | | EIN | |
| | | | | Phone no. | |

UYA

02/14/2006 09:14:34 PM

Form **1040A** (2005)

Watts v. Hospitality
Int Discl/RFP 0061

**Schedule 1**
(Form 1040A)

Department of the Treasury - Internal Revenue Service

**Interest and Ordinary Dividends for Form 1040A Filers**

**2005**

OMB No. 1545-0074

Name(s) shown on Form 1040A

Mickey V Watts and Heather  Godfrey-Watts

Your social security number

**Part I**

**Interest**

(See the instructions for Form 1040A, line 8a.)

Note. If you received a Form 1099-INT, Form 1099-OID, or substitute statement from a brokerage firm, enter the firm's name and the total interest shown on that form.

1    List name of payer. If any interest is from a seller-financed mortgage and the buyer used the property as a personal residence, see the instructions and list this interest first. Also, show that buyer's social security number and address.

| | Amount |
|---|---|
| Regions Bank | 1 | 3,653. |
| | |
| | |

| | | |
|---|---|---|
| 2 | Add the amounts on line 1. | 2 | 3,653. |
| 3 | Excludable interest on series EE and I U.S. savings bonds issued after 1989. Attach Form 8815. | 3 | |
| 4 | Subtract line 3 from line 2. Enter the result here and on Form 1040A, line 8a. | 4 | 3,653. |

**Part II**

**Ordinary dividends**

(See the instructions for Form 1040A, line 9a.)

Note. If you received a Form 1099-DIV or substitute statement from a brokerage firm, enter the firm's name and the ordinary dividends shown on that form.

5    List name of payer.

| | Amount |
|---|---|
| | 5 | |

| | | |
|---|---|---|
| 6 | Add the amounts on line 5. Enter the total here and on Form 1040A, line 9a. | 6 | |

For Paperwork Reduction Act Notice, see Form 1040A Instructions.

UYA

Schedule 1 (Form 1040A) 2005

02/14/2006 09:14:34PM

Watts v. Hospitality
Int Discl/RFP   0062

**Schedule 2**
(Form 1040A)

Department of the Treasury - Internal Revenue Service

**Child and Dependent Care**
**Expenses for Form 1040A Filers**

**2005**

OMB No. 1545-0074

Name(s) shown on Form 1040A

Mickey V Watts and Heather Godfrey-Watts

Your social security number

*fore you begin:* You need to understand the following terms. See **Definitions** on page 1 of the separate instructions.

| ● Dependent Care Benefits | ● Qualifying Person(s) | ● Qualified Expenses |
|---|---|---|

**Part I**

Persons or organizations who provided the care

You must complete this part.

| (a) Care provider's name | (b) Address (number, street, apt. no., city, state, and ZIP code) | (c) Identifying number (SSN or EIN) | (d) Amount paid (see instructions) |
|---|---|---|---|
| 1 Green Gate Schoo | 3265 McGhee Road Montgomery, Al 36111 | ; | 2,813. |
| Taylor Road Baptist | 1685 Taylor Road Montgomery, Alabama 36117 | | 2,572. |

(If you need more space, use the bottom of page 2.)

Did you receive dependent care benefits?
— No ——→ Complete only Part II below.
— Yes ——→ Complete Part III on page 2 next.

**Caution.** If the care was provided in your home, you may owe employment taxes. If you do, you must use Form 1040. See **Schedule H** and its instructions for details.

**Part II**

Credit for child and dependent care expenses

2 Information about your **qualifying person(s).** If you have more than two qualifying persons, see the instructions.

| (a) Qualifying person's name | | (b) Qualifying person's social security number | (c) Qualified expenses you incurred and paid in 2005 for the person listed in column (a) |
|---|---|---|---|
| First | Last | | |
| Taylor Morgen | Watts | | 3,000. |
| Tanner | Watts | | 3,200. |

3 Add the amounts in column (c) of line 2. **Do not** enter more than $3,000 for one qualifying person or $6,000 for two or more persons. If you completed Part III, enter the amount from line 26. | 3 | 6,000.

4 Enter your **earned income.** See the instructions. | 4 | 38,797.

5 If married filing jointly, enter your spouse's earned income (if your spouse was a student or was disabled, see the instructions); all others, enter the amount from line 4. | 5 | 39,263.

6 Enter the **smallest** of line 3, 4, or 5. | 6 | 6,000.

7 Enter the amount from Form 1040A, line 22. | 7 | 81,519.

8 Enter on line 8 the decimal amount shown below that applies to the amount on line 7.

| If line 7 is: | | | If line 7 is: | | | | |
|---|---|---|---|---|---|---|---|
| Over | But not over | Decimal amount is | Over | But not over | Decimal amount is | | |
| $0-15,000 | | .35 | $29,000-31,000 | | .27 | | |
| 15,000-17,000 | | .34 | 31,000-33,000 | | .26 | | |
| 17,000-19,000 | | .33 | 33,000-35,000 | | .25 | | |
| 19,000-21,000 | | .32 | 35,000-37,000 | | .24 | | |
| 21,000-23,000 | | .31 | 37,000-39,000 | | .23 | | |
| 23,000-25,000 | | .30 | 39,000-41,000 | | .22 | | |
| 25,000-27,000 | | .29 | 41,000-43,000 | | .21 | | |
| 27,000-29,000 | | .28 | 43,000-No limit | | .20 | 8 | X    .20 |

9 Multiply **line 6** by the decimal amount on line 8. If you paid 2004 expenses in 2005, see the instructions. | 9 | 1,200.

10 Enter the amount from Form 1040A, line 28. | 10 | 8,079.

11 **Credit for child and dependent care expenses.** Enter the **smaller** of line 9 or line 10 here and on Form 1040A, line 29. | 11 | 1,200.

aperwork Reduction Act Notice, see instructions.

Schedule 2 (Form 1040A) 2005

02/14/2006 09:14:34PM

Watts v. Hospitality
Int Discl/RFP  0063

Form 1040 (2004)  Mickey V Watts and Heather  Godfrey-Watts

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | 37 | Amount from line 36 (adjusted gross income) | | 37 | 66,578. |
| **Standard Deduction for -** | 38a | Check if: You were born before January 2, 1940, ☐ Blind. Spouse was born before January 2, 1940, ☐ Blind. } Total boxes checked ▶ 38a | 0 | | |
| | b | If your spouse itemizes on a separate return or you were a dual-status alien, see instructions and check here ▶ 38b ☐ | | | |
| • People who checked any box on line 38a or 38b or who can be claimed as a dependent, See instructions. | 39 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 39 | 9,700. |
| | 40 | Subtract line 39 from line 37 | | 40 | 56,878. |
| | 41 | If line 37 is $107,025 or less, multiply $3,100 by the total number of exemptions claimed on line 6d. If line 37 is over $107,025, see instructions | | 41 | 9,300. |
| | 42 | Taxable income. Subtract line 41 from line 40. If line 41 is more than line 40, enter -0- | | 42 | 47,578. |
| • All others: | 43 | Tax (see instructions). Check if any tax is from: a ☐ Form(s) 8814  b ☐ Form 4972 | | 43 | 6,421. |
| Single or Married filing separately, $4,850 | 44 | Alternative minimum tax (see instructions). Attach Form 6251 | | 44 | |
| | 45 | Add lines 43 and 44 ▶ | | 45 | 6,421. |
| Married filing jointly or Qualifying widow(er), $9,700 | 46 | Foreign tax credit. Attach Form 1116 if required | 46 | | |
| | 47 | Credit for child and dependent care expenses. Attach Form 2441 | 47 | 160. | |
| | 48 | Credit for the elderly or the disabled. Attach Schedule R | 48 | | |
| Head of household, $7,150 | 49 | Education credits. Attach Form 8863 | 49 | | |
| | 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | | |
| | 51 | Child tax credit (see instructions) | 51 | 1,000. | |
| | 52 | Adoption credit. Attach Form 8839 | 52 | | |
| | 53 | Credits from: a ☐ Form 8396  b ☐ Form 8859 | 53 | | |
| | 54 | Other credits. Check applicable box(es):  a ☐ Form 3800  b ☐ Form 8801  c ☐ Specify | 54 | | |
| | 55 | Add lines 46 through 54. These are your total credits | | 55 | 1,160. |
| | 56 | Subtract line 55 from line 45. If line 55 is more than line 45, enter -0- ▶ | | 56 | 5,261. |
| **Other Taxes** | 57 | Self-employment tax. Attach Schedule SE | | 57 | |
| | 58 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | | 58 | |
| | 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | | 59 | |
| | 60 | Advance earned income credit payments from Form(s) W-2 | | 60 | |
| | 61 | Household employment taxes. Attach Schedule H | | 61 | |
| | 62 | Add lines 56 through 61. This is your total tax ▶ | | 62 | 5,261. |
| **Payments** | 63 | Federal income tax withheld from Forms W-2 and 1099 | 63 | 5,583. | |
| | 64 | 2004 estimated tax payments and amount applied from 2003 return | 64 | | |
| If you have a qualifying child, attach Schedule EIC. | 65a | Earned income credit (EIC)  . . . NO | 65a | | |
| | b | Nontaxable combat pay election ▶ | 65b | | |
| | 66 | Excess social security and tier 1 RRTA tax withheld | 66 | | |
| | 67 | Additional child tax credit. Attach Form 8812 | 67 | | |
| | 68 | Amount paid with request for extension to file (see instructions) | 68 | | |
| | 69 | Other payments from: a ☐ Form 2439  b ☐ Form 4136 c ☐ Form 8885 | 69 | | |
| | 70 | Add lines 63, 64, 65a, and 66 through 69. These are your total payments | | 70 | 5,583. |
| **Refund** | 71 | If line 70 is more than line 62, subtract line 62 from line 70. This is the amount you overpaid | | 71 | 322. |
| Direct deposit? See instructions and fill in 72b, 72c, and 72d. | 72a | Amount of line 71 you want refunded to you ▶ | | 72a | 322. |
| | b | Routing number 062000080  c Type: ☒ Checking  ☐ Savings | | | |
| | d | Account number 50400135 | | | |
| | 73 | Amount of line 71 you want applied to your 2005 estimated tax | 73 | | |
| **Amount You Owe** | 74 | Amount you owe. Subtract line 70 from line 62. For details on how to pay, see instructions ▶ | | 74 | 0. |
| | 75 | Estimated tax penalty (see instructions) | 75 | | |

**Third Party Designee**  Do you want to allow another person to discuss this return with the IRS (see instructions)?  ☐ Yes. Complete the following.  ☐ No

| Designee's name ▶ | Phone no. ▶ | Personal identification number (PIN) ▶ |
|---|---|---|

**Sign Here**  Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions.
Keep a copy for your records.

| Your signature | Date | Your occupation  Asset Manager | Daytime phone number  334-354-2619 |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation  Director of Sales | |

**Paid Preparer's Use Only**

| Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code ▶ | | EIN | |
| | | Phone no. | |

UYA

Form **1040** (2004)

Watts v. Hospitality

Int Discl/RFP  0064

SCHEDULES
# A,B,&CR
(FORM 40)

ALABAMA DEPARTMENT OF REVENUE
## Schedule A - Itemized Deductions
(Schedules B and CR are on Page 2)

**2005**

ATTACH TO FORM 40 - SEE INSTRUCTIONS FOR SCHEDULE A

Name(s) as shown on Form 40
Mickey V Watts and Heather  Godfrey-Watts

Your social security number

The itemized deductions you may claim for the year 2005 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. PART-YEAR RESIDENTS: A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

CAUTION: Do not include expenses reimbursed or paid by others.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Medical and Dental Expenses** (See instructions) | 1 | Medical and dental expenses . . . . . . . . . . | 1 | | 0 0 | | | | |
| | 2 | Enter amount from Form 40, line 11. . 2 | | 0 0 | | | | | |
| | 3 | Multiply the amount on line 2 by 4% (.04). Enter the result . . . . . | 3 | | 0 0 | | | | |
| | 4 | Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- . . . . . . | | | | 4 | ● | | 0 0 |
| **Taxes You Paid** (See instructions) | 5 | Real estate taxes . . . . . . . . . . . . . . . . | 5 | 3 3 9 | 0 0 | | | | |
| | 6 | FICA tax (Social Security and Medicare) and Federal Self-Employment Tax | 6 | 6,032 | 0 0 | | | | |
| | 7 | Railroad Retirement (Tier 1 only) . . . . . . . . . . . . . . . | 7 | | 0 0 | | | | |
| | 8 | Other taxes. (List - include personal property taxes.). ▶ _____ | 8 | | 0 0 | | | | |
| | 9 | Add the amounts on lines 5 through 8. Enter the total here . . . . . . . . . . | | | | 9 | ● | 6,371 | 0 0 |
| **Interest You Paid** (See instructions) | 10a | Home mortgage interest and points reported to you on Federal Form 1098. | 10a | 3,653 | 0 0 | | | | |
| | b | Home mortgage interest not reported to you on Federal Form 1098. (If paid to an individual, show person's name and address.) ▶ _____ | 10b | | 0 0 | | | | |
| NOTE: Personal interest is not deductible. | 11 | Points not reported to you on Form 1098 . . . . . . . . . . . . . | 11 | | 0 0 | | | | |
| | 12 | Investment interest. (Attach Form 4952A) . . . . . . . . . . . . | 12 | | 0 0 | | | | |
| | 13 | Add the amounts on lines 10a through 12. Enter the total here . . . . . . . . . . | | | | 13 | ● | 3,653 | 0 0 |
| | | CAUTION: If you made a charitable contribution and received a benefit in return, see instructions. | | | | | | | |
| **Gifts to Charity** (See Instructions) | 14 | Contributions by cash or check . . . . . . . . . . . . . . . . | 14 | 600 | 0 0 | | | | |
| | 15 | Other than cash/check. (You MUST attach Federal Form 8283 if over $500.) | 15 | | 0 0 | | | | |
| | 16 | Carryover from prior year. . . . . . . . . . . . . . . . . | 16 | | 0 0 | | | | |
| | 17 | Add the amounts on lines 14 through 16. Enter the total here . . . . . . . . . | | | | 17 | ● | 600 | 0 0 |
| **Casualty and Theft Loss** (Attach Form 4684) | 18a | Enter the amount from Federal Form 4684, line 16 (See Instructions) | 18a | | 0 0 | | | | |
| | b | Enter 10% of your Adjusted Gross Income (Form 40, line 11). . . . | 18b | | 0 0 | | | | |
| | c | Subtract line 18b from line 18a. If zero or less, enter -0- . . . . . . . . . . | | | | 18c | ● | | 0 0 |
| **Job Expenses and Most Other Miscellaneous Deductions** (See Instructions) | 19 | Unreimbursed employee expenses - job travel, union dues, job education, etc. (You MUST attach Federal Form 2106 if required.) ▶ _____ | 19 | | 0 0 | | | | |
| | 20 | Other expenses (investment, tax preparation, safe deposit box, etc.). ▶ _____ | 20 | | 0 0 | | | | |
| | 21 | Add the amounts on lines 19 and 20. Enter the total . . . . . . . . | 21 | | 0 0 | | | | |
| | 22 | Multiply the amount on Form 40, line 11 by 2% (.02). Enter the result here . | 22 | | 0 0 | | | | |
| | 23 | Subtract line 22 from line 21. Enter the result. If zero or less, enter -0- . . . . . . . . . | | | | 23 | ● | | 0 0 |
| **Other Miscellaneous Deductions** | 24 | Other (from list in the instructions). List type and amount. ▶ _____ | | | | 24 | ● | | 0 0 |
| **Qualified Long-Term Care Ins. Premiums** | | CAUTION: Do not include medical premiums. | | | | | | | |
| | 25 | Enter amount here . . . . . . . . . . . . . . . . . . . . . . . | | | | 25 | ● | | 0 0 |
| **Total Itemized Deductions** | 26 | Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12 . . . . . . . . . . . . . . . | | | | 26 | ● | 10,624 | 0 0 |

AL (1064)

Schedule A (Form 40) 2005

04/16/2006 10:32:11PM

Watts v. Hospitality
Int Discl/RFP  0065

Schedules A, B, &CR (Form 40) 2005                                                                    Page 2

Name(s) as shown on Form 40 (Do not enter name and social security number if shown on Page 1) | Your social security number

Mickey V Watts and Heather   Godfrey-Watts

## SCHEDULE B - Interest And Dividend Income

If you received more than $1500 of interest and dividend income, you must complete Schedule B.

INTEREST INCOME. All interest received should be itemized on Schedule B. List all interest received on bank deposits, notes, mortgages, bonds, and other evidences of indebtedness, including bonds of the United States, and any state or territory and the political subdivisions thereof. All interest received is taxable except: (a) interest on obligations of the United States or its possessions; or (b) interest on obligations of the State of Alabama or any county, municipality, or other political subdivisions

thereof. Interest on bonds of other states is subject to Alabama Income Tax. Interest from savings and loan associations is also taxable.

Enter the amount of all exempt interest in column A headed "Exempt Interest." Taxable interest should be entered in column B.

DIVIDENDS. All dividends including liquidating dividends received are taxable. Gain or loss on liquidating dividends should be reported on Schedule D. Dividends from savings and loan associations are taxable. Dividends from tax-option corporations (Subchapter S) are taxable when actually received.

| List Payers and Amounts | | A Exempt Interest | | B Taxable Interest and Dividends |
|---|---|---|---|---|
| 1 | Regions Bank | | 00 | 3,653 00 |
| I N T E R E S T | | | 00 | 00 |
| | | | 00 | 00 |
| | | | 00 | 00 |
| | | 1 | 00 | 1 00 |
| | | | 00 | 00 |
| | | | 00 | 00 |
| | | | 00 | 00 |
| | | | 00 | 00 |
| 2 | | | | 00 |
| D I V I D E N D S | | | | 00 |
| | | | | 00 |
| | | | | 00 |
| | | | 2 | 00 |
| | | | | 00 |
| | | | | 00 |
| | | | | 00 |
| | | | | 00 |
| 3 | TOTAL TAXABLE INTEREST AND DIVIDENDS Enter here and on Form 40, page 1, line 7 . . . . . . . . . . . . . . . . . . . . ● | 3 | | 3,653 00 |

## SCHEDULE CR - Credit For Taxes Paid To Other States

This credit is available to those residents of Alabama who are being taxed by Alabama and another state (or territory of the United States) in the same tax year. The income earned in the other state must be reported on the Alabama return to claim this credit. Residents of Alabama for only a part of the year can claim this credit only if the returns filed with Alabama and the

other state cover the same periods. This credit is available for the year for which the income is taxed by the other state. If you are claiming credit for taxes paid to more than one other state, you must make a separate computation for each state using Schedule CR worksheet.

PLEASE NOTE: You may need to fill out the worksheet in the instructions before completing this schedule. This credit will NOT be allowed unless you file a nonresident income tax return with the other state and attach a copy of that 2005 return to your Alabama return.

| | | | | |
|---|---|---|---|---|
| 1 | 2005 taxable income as shown on the _____ state return . . . . . 1 (name of state) | | 00 | If more than one "other" state use Schedule CR worksheet. If using the worksheet, line 5 (below will equal worksheet Part 5, line 21. |
| 2 | Tax due the other state using Alabama tax rates . . . . . . . . . . . . . . . 2 | | 00 | |
| 3 | Tax due the other state as shown on that state's return or Form W-2G . . . . . . . . . . . 3 | | 00 | |
| 4 | Tax due Alabama from Form 40, page 1, line 18 . . . . . . . . . . . . . . . . . . 4 | | 00 | |
| 5 | CREDIT ALLOWABLE. Enter the amount from line 2, 3, 4, or the amount from the worksheet in the instructions, whichever is smallest. If you have no other credits, enter amount from line 5 to Form 40, page 1, line 19. If you have other credits, enter the amount from line 5 to Schedule OC, Part A, line 1, and complete. . . . . . . . . . ● 5 | | | 00 |

AL (1064)                                                                 Schedules B & CR (Form 40) 2005

04/16/2006  10:32:11PM

Watts v. Hospitality
Int Discl/RFP  0066

☐ CORRECTED (if checked)

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| ASPECT FOUNDATION, INC.<br>530 BUSH STREET, SUITE 500A<br>N FRANCISCO CA 94108<br><br>(805)564-8330 | | $<br><br>2 Royalties<br>$<br><br>3 Other Income<br>$ | **2006**<br><br>Form 1099MISC ▾ | |
| | | | 4 Federal income tax withheld<br>$ | Copy B<br>For Recipient |
| PAYER'S federal identification number<br>94-3040365 | RECIPIENT'S identification number<br>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 | 5 Fishing Boat Proceeds<br><br>$ | 6 Medical & health care payments<br><br>$ | |
| RECIPIENT'S name, street address, city, state, and ZIP code<br><br>HEATHER WATTS<br>6976 EASTERN SHORE ROAD<br>MONTGOMERY, AL 36117 | | 7 Nonemployee compensation<br>$      3200.00 | 8 Substitute payments in lieu of dividends or interest<br>$ | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br><br>$ | |
| | | 11 ░░░░░░░░░ | 12 ░░░░░░░░░ | |
| Account number (see instructions)<br><br>HE009 | | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br><br>$ | 15b Section 409A income<br><br>$ | 16 State tax withheld<br>$ | 17 State/Payer's state number | 18 State income<br>$ |

Form 1099-MISC                    (keep for your records)                    Department of the Treasury – Internal Revenue Service

## Instructions to Recipients

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**Amounts shown** may be subject to self-employment (SE) tax. If your net income from self-employment is $400 or more, you must file a return and compute your SE tax on Schedule SE (Form 1040). See Pub.334, Tax Guide for Small Business, for more information. If no income or social security and Medicare taxes were withheld and you are still receiving these payments, see Form 1040-ES, Estimated Tax for Individuals. Individuals must report as explained below.
Corporations, fiduciaries, or partnerships report the amounts on the proper line of your tax return.

**Boxes 1 and 2.** Report rents from real estate on Schedule E (Form 1040). If you provided significant services to the tenant, sold real estate as a business, or rented personal property as a business, report on Schedule C or C-EZ (Form 1040). For royalties on timber, coal, and iron ore, see Pub. 544, Sales and Other Dispositions of Assets.

**Box 3.** Generally, report this amount on the 'Other income' line of Form 1040 and identify the payment. The amount shown may be payments received as the beneficiary of a deceased employee, prizes, awards, taxable damages, Indian gaming profits, or other taxable income. See Pub.525, Taxable and Nontaxable Income. If it is trade or business income, report this amount on Schedule C, C-EZ, or F (Form 1040).

**Box 4.** Shows backup withholding or withholding on Indian gaming profits. Generally, a payer must backup withhold at a 28% rate if you did not furnish your taxpayer identification number. See Form W-9, Request for Taxpayer Identification Number and rtification, for more information. Report this amount on your .ome tax return as tax withheld.

**Box 5.** An amount in this box means the fishing boat operator considers you self-employed. Report this amount on Schedule C or C-EZ (Form 1040). See Pub. 595, Tax Highlights for Commercial Fishermen.

**Box 6.** For individuals, report on Schedule C or C-EZ (Form 1040).

**Box 7.** Shows nonemployee compensation. If you are in the trade or business of catching fish, box 7 may show cash you received for the sale of fish. If payments in this box are SE income, report this amount on Schedule C, C-EZ, or F (Form 1040), and complete Schedule SE (Form 1040). You received this form instead of Form W-2 because the payer did not consider you an employee and did not withhold income tax or social security and Medicare taxes. Contact the payer if you believe this form is incorrect or has been issued in error. If you believe you are an employee, report this amount on line 7 of Form 1040 and call the IRS for information on how to report any social security and Medicare taxes.

**Box 8.** Shows substitute payments in lieu of dividends or tax-exempt interest received by your broker on your behalf as a result of a loan of your securities. Report on the 'Other income' line of Form 1040.

**Box 9.** If checked, $5,000 or more of sales of consumer products was paid to you on a buy-sell, deposit-commission, or other basis. A dollar amount does not have to be shown. Generally, report any income from your sale of these products on Schedule C or C-EZ (Form 1040).

**Box 10.** Report this amount on line 8 of Schedule F (Form 1040).

**Box 13.** Shows your total compensation of excess golden parachute payments subject to a 20% excise tax. See the Form 1040 instructions for where to report.

**Box 14.** Shows gross proceeds paid to an attorney in connection with legal services. Report only the taxable part as income on your return.

**Box 15a.** Shows current year deferrals as a nonemployee under a nonqualified deferred compensation (NQDC) plan that is subject to the requirements of section 409A. Any earnings on current and prior year deferrals are also reported.

**Box 15b.** Shows income as a nonemployee under a NQDC plan that does not meet the requirements of section 409A. This amount is also included in box 7 as nonemployee compensation. Any amount included in box 15a that is currently taxable is also included in this box. This income is also subject to a substantial additional tax to be reported on Form 1040. See 'Total Tax' in the Form 1040 instructions.

**Boxes 16-18.** Shows state or local income tax withheld from payments.



*Watts v. Hospitality*<br>Int Discl/RFP  0067

| a Control number | | OMB No. 1545-0008 | This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | |
|---|---|---|---|---|
| 49 | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0895970 | 5129.63 | |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| TAYLOR ROAD BAPTIST CHURCH | 5129.63 | 318.03 |
| 1685 TAYLOR RD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL 36117-3440 | 5129.63 | 74.38 |

| | 7 Social security tips | 8 Allocated tips |
|---|---|---|

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| HEATHER WATTS | | |
| 6976 EASTERN SHORE RD | 13 Statutory employee / Retirement plan / Third-party sick pay | 12b |
| MONTGOMERY AL 36117-7612 | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 203582-2 | 5129.63 | 54.00 | | | |

**W-2** Wage and Tax Statement

**2006**

Department of the Treasury—Internal Revenue Service

Safe, accurate, FAST! Use

Form Copy C For EMPLOYEE'S RECORDS. (See Notice to Employee on back of Copy B or Copy 2 to be Filed With Employee's State, City or Local Income Tax Return

Ⓐ Printed on Recycled Paper

RM  1099-G

STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION AGENCY
MONTGOMERY, ALABAMA   36131

# IMPORTANT TAX DOCUMENT

HEATHER G WATTS
6976 EASTERN SHORE RD
MONTGOMERY, AL   36117-7612

| Payer's Name, Street, City, State, and ZIP Code | | | | |
|---|---|---|---|---|
| STATE OF ALABAMA<br>DEPARTMENT OF INDUSTRIAL RELATIONS<br>UNEMPLOYMENT COMPENSATION AGENCY<br>649 MONROE STREET<br>MONTGOMERY, AL 36131 | | | | Certain<br>Government<br>Payments |
| | Recipient's Identification Number<br>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 | 1 Unemployment Compensation<br>4,400.00 | OMB No. 1545-0120<br>2006 | Copy B<br>For Recipient |
| Recipient's Name (first, middle, last) & Address<br><br>HEATHER G WATTS<br>6976 EASTERN SHORE RD<br>MONTGOMERY, AL   36117-7612 | | 4 Federal Income Tax Withheld<br>441.00<br><br>FEIN: 630674968 | 5 ATAA Payments | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Account Number (optional) | | | | |

Form    1099-G

Department of the Treasury - Internal Revenue Service

### Instructions to Recipient

Box 1 – Shows the total unemployment compensation paid to you this year by the payer. This amount is taxable income to you. For more information, see the instructions for your Federal income tax return.

Box 4 – Shows the total amount of withholding you requested on unemployment compensation paid to you this year by the payer.

Box 5 – Shows the total amount of ATAA paid to this year by the payer.

Watts v. Hospitality
Int Discl/RFP  0069

Form **1040**   Department of the Treasury - Internal Revenue Service   **2006**
U.S. Individual Income Tax Return                IRS Use Only - Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2006, or other tax year beginning _____ , 2006, ending _____ , 20 ___    OMB No. 1545-0074

| Label | | |
|---|---|---|
| (See instructions) | Your first name and initial | Last name |
| | Mickey V | Watts |

**Label** (See instructions) **Use the IRS label.** Otherwise, please print or type.

Your first name and initial: Mickey V   Last name: Watts

If a joint return, spouse's first name and initial: Heather   Last name: Godfrey-Watts   Spouse's social security number: 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

Home address (number and street). If you have a P.O. box, see instructions.    Apt. no.
6976 Eastern Shore Road

▲ You must enter your SSN(s) above. ▲

City, town or post office, state, and ZIP code. If you have a foreign address, see instructions.
Montgomery , AL 36117

Checking a box below will not change your tax or refund.

**Presidential Election Campaign** ► Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see instructions) ► ☐ You ☐ Spouse

**Filing Status** Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ►
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ►
5 ☐ Qualifying widow(er) with dependent child (See instructions)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a . . . . . . . . . }
b ☒ Spouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Boxes checked on 6a and 6b: **2**

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✗ if qualifying child for child tax credit |
|---|---|---|---|
| Taylor   Watts | | aughter | ☒ |
| Tanner   Watts | | son | ☒ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions.

No. of children on 6c who:
• lived with you **2**
• did not live with you due to divorce or separation (see instructions) **0**
Dependents on 6c not entered above **0**

d Total number of exemptions claimed . . . . . . . . . . . . . . . . . . . . . . . . .   Add numbers on lines above ► **4**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . . . . . | **7** | 47,020. |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . . . . . . | **8a** | |
| b | Tax-exempt interest. Do not include on line 8a . . . . . . | 8b | | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . . . . . . | **9a** | |
| b | Qualified dividends (see instructions) . . . . . . . . . . | 9b | | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) . . . . . | **10** | |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . . . . | **12** | 3,133. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here . . . ► ☐ | **13** | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . . . . . . . . . | **14** | |
| 15a | IRA distributions . . . . . | 15a | | b Taxable amount (see instructions) | **15b** | |
| 16a | Pensions and annuities . . | 16a | 3,650. | b Taxable amount (see instructions) | **16b** | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E . . . | **17** | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . . . . . . . . | **18** | |
| 19 | Unemployment compensation . . . . . . . . REPAID . . . . . . . . . 450 . . . . | **19** | 5,710. |
| 20a | Social security benefits . . | 20a | | b Taxable amount (see instructions) | **20b** | |
| 21 | Other income. List type and amount (see instructions). . . . . . . . . . . . . . . | **21** | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ► | **22** | 55,863. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | Archer MSA deduction. Attach Form 8853 . . . . . . . . . . | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ . | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 . . . . . | 25 | |
| 26 | Moving expenses. Attach Form 3903 . . . . . . . . . . | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE . . . . . | 27 | 222. |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . . . . . . | 28 | |
| 29 | Self-employed health insurance deduction (see instructions) . . | 29 | |
| 30 | Penalty on early withdrawal of savings . . . . . . . . . . . | 30 | |
| 31a | Alimony paid   b Recipient's SSN ► _____ | 31a | |
| 32 | IRA deduction (see instructions) . . . . . . . . . . . . . | 32 | 540. |
| 33 | Student loan interest deduction (see instructions) . . . . . . | 33 | 724. |
| 34 | Jury duty pay you gave to your employer . . . . . . . . . . | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 . . | 35 | |
| 36 | Add lines 23 through 31a and 32 through 35 . . . . . . . . . . . . . . . . . . . . | **36** | 1,486. |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . . . . . . . ► | **37** | 54,377. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.
UYA

Form **1040** (2006)

Form 1040 (2006) **Mickey V Watts and Heather Godfrey-Watts**                                        Page **2**

| Tax and Credits | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . . . . . . | 38 | 54,377. |
|---|---|---|---|---|

| | 39a | Check { You were born before January 2, 1942, ☐ Blind. } Total boxes<br>if: { Spouse was born before January 2, 1942, ☐ Blind. } checked ▶ 39a ☐ | | 0 |
|---|---|---|---|---|

**Standard Deduction for—**

- People who checked any box on line 39a or 39b or who can be claimed as a dependent, See instr.
- All others:

Single or Married filing separately, $5,150

Married filing jointly or Qualifying widow(er), $10,300

Head of household, $7,550

| | b | If your spouse itemizes on a separate return or you were a dual-status alien, see instructions and check here ▶ 39b ☐ | | |
|---|---|---|---|---|
| | 40 | Itemized deductions (from Schedule A) or your **standard deduction** (see left margin) . . . . | 40 | 10,300. |
| | 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . . . . . . . | 41 | 44,077. |
| | 42 | If line 38 is over $112,875, or you provided housing to a person displaced by Hurricane Katrina, see instructions. Otherwise, multiply $3,300 by the total number of exemptions claimed on line 6d . | 42 | 13,200. |
| | 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . . | 43 | 30,877. |
| | 44 | **Tax** (see instructions). Check if any tax is from: a ☐ Form(s) 8814   b ☐ Form 4972 . . . | 44 | 3,876. |
| | 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 . . . . . . . . . | 45 | |
| | 46 | Add lines 44 and 45 . . . . . . . . . . . . . . . . . . . . . ▶ | 46 | 3,876. |
| | 47 | Foreign tax credit. Attach Form 1116 if required . . . . . . | 47 | | |
| | 48 | Credit for child and dependent care expenses. Attach Form 2441 . . | 48 | 174. | |
| | 49 | Credit for the elderly or the disabled. Attach Schedule R . . . . | 49 | | |
| | 50 | Education credits. Attach Form 8863 . . . . . . . . . | 50 | | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 . . . | 51 | | |
| | 52 | Residential energy credits. Attach Form 5695 . . . . . . . | 52 | | |
| | 53 | Child tax credit (see instructions). Attach Form 8901 if required . . | 53 | 2,000. | |
| | 54 | Credits from: a ☐ Form 8396 b ☐ Form 8839 c ☐ Form 8859 | 54 | | |
| | 55 | Other credits: a ☐ Form 3800 b ☐ Form 8801<br>c ☐ Form _____ | 55 | | |
| | 56 | Add lines 47 through 55. These are your **total credits** . . . . . . . . . . . | 56 | 2,174. |
| | 57 | Subtract line 56 from line 46. If line 56 is more than line 46, enter -0- . . . . . . . ▶ | 57 | 1,702. |

| Other Taxes | 58 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . . . | 58 | 443. |
|---|---|---|---|---|
| | 59 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 . . | 59 | |
| | 60 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required . . | 60 | |
| | 61 | Advance earned income credit payments from Form(s) W-2, box 9 . . . . . . . . . | 61 | |
| | 62 | Household employment taxes. Attach Schedule H . . . . . . . . . . . . . | 62 | |
| | 63 | Add lines 57 through 62. This is your **total tax** . . . . . . . . . . . . . ▶ | 63 | 2,145. |

| Payments | 64 | Federal income tax withheld from Forms W-2 and 1099 . . . . . | 64 | 3,656. | |
|---|---|---|---|---|---|

If you have a qualifying child, attach Schedule EIC.

| | 65 | 2006 estimated tax payments and amount applied from 2005 return . . | 65 | | |
|---|---|---|---|---|---|
| | 66a | Earned income credit (EIC) NO. . . . . . . . . . . | 66a | | |
| | b | Nontaxable combat pay election ▶ | 66b | | |
| | 67 | Excess social security and tier 1 RRTA tax withheld (see instr.) . . | 67 | | |
| | 68 | Additional child tax credit. Attach Form 8812 . . . . . . . | 68 | | |
| | 69 | Amount paid with request for extension to file (see instructions) . . | 69 | | |
| | 70 | Payments from: a ☐ Form 2439 b ☐ Form 4136 c ☐ Form 8885 . . | 70 | | |
| | 71 | Credit for federal telephone excise tax paid. Attach Form 8913 if required . | 71 | 0. | |
| | 72 | Add lines 64, 65, 66a, and 67 through 71. These are your **total payments** . . . . . . ▶ | 72 | 3,656. |

| Refund | 73 | If line 72 is more than line 63, subtract line 63 from line 72. This is the amount you **overpaid** | 73 | 1,511. |
|---|---|---|---|---|

Direct deposit? See instructions and fill in 74b, 74c, and 74d, or Form 8888.

| | 74a | Amount of line 73 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | 74a | 1,511. |
|---|---|---|---|---|
| | ▶ b | Routing number 062001319 | ▶ c Type: ☒ Checking ☐ Savings | |
| | ▶ d | Account number 8045007112 | | |
| | 75 | Amount of line 73 you want **applied to your 2007 estimated tax** ▶ | 75 | |

| Amount You Owe | 76 | **Amount you owe.** Subtract line 72 from line 63. For details on how to pay, see instructions ▶ | 76 | 0. |
|---|---|---|---|---|
| | 77 | Estimated tax penalty (see instructions) . . . . . . . | 77 | | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ Yes. Complete the following. ☐ No

| Designee's name ▶ | Phone no. ▶ | Personal identification number (PIN) ▶ |
|---|---|---|

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

| Your signature | Date | Your occupation<br>Portfolio Manager | Daytime phone number<br>334-244-8077 |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation<br>Housewife | |

**Paid Preparer's Use Only**

| Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | ▶ | EIN | |
| | | Phone no. | |

UYA                                                                                              Form **1040** (2006)

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service

# Profit or Loss From Business
(Sole Proprietorship)

▶ Partnerships, joint ventures, etc., must file Form 1065 or 1065-B.

▶ Attach to Form 1040, 1040NR or 1041.    ▶ See Instructions for Schedule C (Form 1040).

OMB No. 1545-0074

## 2006

Attachment
Sequence No. 09

| Name of proprietor | Social security number (SSN) |
|---|---|
| Heather Godfrey-Watts | 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 |

| A | Principal business or profession, including product or service (see the instructions) | B Enter code from instructions |
|---|---|---|
| | Non-profit International Corrdinator | ▶ 813000 |

| C | Business name. If no separate business name, leave blank. | D Employer ID number (EIN), if any |
|---|---|---|
| | Aspect Foundation | 94-3040365 |

E  Business address (including suite or room no.) ▶ 530 Bush Street, Suite 500A
   City, town or post office, state, and ZIP code    San Francisco, CA 94108

F  Accounting method:  (1) ☒ Cash   (2) ☐ Accrual   (3) ☐ Other (specify) ▶ _____

G  Did you "materially participate" in the operation of this business during 2006? If "No," see instructions for limit on losses . . . . . ☒ Yes ☐ No

H  If you started or acquired this business during 2006, check here . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

## Part I   Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. Caution. If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see instructions and check here . . . . . . . . . ▶ ☐ | 1 | 3,200. |
| 2 | Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 3,200. |
| 4 | Cost of goods sold (from line 42 on page 2) . . . . . . . . . . . . . . . . . . . . . | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 . . . . . . . . . . . . . . . . . . . . . . | 5 | 3,200. |
| 6 | Other income, including Federal and state gasoline or fuel tax credit or refund (see instructions) . . . . . . | 6 | |
| 7 | Gross income. Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . . . . . ▶ | 7 | 3,200. |

## Part II   Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising . . . . . . . . | 8 | | 18 | Office expense . . . . . . . | 18 | |
| 9 | Car and truck expenses (see instructions) . . . . . . . . | 9 | 67. | 19 | Pension and profit-sharing plans | 19 | |
| | | | | 20 | Rent or lease (see instructions): | | |
| 10 | Commissions and fees . . . . | 10 | | a | Vehicles, machinery, and equipment | 20a | |
| 11 | Contract labor (see instructions) | 11 | | b | Other business property . . . . | 20b | |
| 12 | Depletion . . . . . . . . . | 12 | | 21 | Repairs and maintenance . . . . | 21 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) . . . . . . . . | 13 | | 22 | Supplies (not included in Part III) . . | 22 | |
| | | | | 23 | Taxes and licenses . . . . . . | 23 | |
| | | | | 24 | Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19) . . . . | 14 | | a | Travel . . . . . . . . . . | 24a | |
| | | | | b | Deductible meals and entertainment (see instructions) | 24b | |
| 15 | Insurance (other than health) . . | 15 | | 25 | Utilities . . . . . . . . . | 25 | |
| 16 | Interest: | | | 26 | Wages (less employment credits) . . | 26 | |
| a | Mortgage (paid to banks, etc.) . | 16a | | 27 | Other expenses (from line 48 on page 2) . . . . . . . . . . . | 27 | |
| b | Other . . . . . . . . . . | 16b | | | | | |
| 17 | Legal and professional services. . . . . . . . . . | 17 | | | | | |

| | | | |
|---|---|---|---|
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27 in columns . . . . . ▶ | 28 | 67. |
| 29 | Tentative profit (loss). Subtract line 28 from line 7 . . . . . . . . . . . . . . . . . . . . . | 29 | 3,133. |
| 30 | Expenses for business use of your home. Attach Form 8829. . . . . . . . . . . . . . . . . | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on Form 1040, line 12, and also on Schedule SE, line 2 or Form 1040NR, line 13 (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3. } | 31 | 3,133. |
| | • If a loss, you must go to line 32. | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | • If you checked 32a, enter the loss on Form 1040, line 12, and also on Schedule SE, line 2 or Form 1040NR, line 13 (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3. } | 32a ☐ All investment is at risk. 32b ☐ Some investment is not at risk. | |
| | • If you checked 32b, you must attach Form 6198. Your loss may be limited. | | |

For Paperwork Reduction Act Notice, see instructions.
UYA

Schedule C (Form 1040) 2006

Schedule C (Form 1040) 2006    Heather Godfrey-Watts    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    Page 2

| **Part III** | Cost of Goods Sold (see instructions) | | |
|---|---|---|---|

33  Method(s) used to
value closing inventory:    a ☐ Cost    b ☐ Lower of cost or market    c ☐ Other (attach explanation)

34  Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☐ No

| | | | |
|---|---|---|---|
| 35 | Inventory at beginning of year. If different from last year's closing inventory, attach explanation . . . . . . . | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use . . . . . . . . . . . . . . . . . . . . . . . | 36 | |
| 37 | Cost of labor. Do not include any amounts paid to yourself . . . . . . . . . . . . . . . . . . . . . | 37 | |
| 38 | Materials and supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 | |
| 39 | Other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | |
| 40 | Add lines 35 through 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | |
| 41 | Inventory at end of year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 | |
| 42 | **Cost of goods sold.** Subtract line 41 from line 40. Enter the result here and on page 1, line 4 . . . . . . | 42 | 0. |

| **Part IV** | **Information on Your Vehicle.** Complete this part only if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file Form 4562. |
|---|---|

43  When did you place your vehicle in service for business purposes? (month, day, year)    ▶ 07/07/2006

44  Of the total number of miles you drove your vehicle during 2006, enter the number of miles you used your vehicle for:

a  Business 150    b  Commuting (see instructions) 0    c  Other 0

45  Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . . . . . . . . . . . . ☒ Yes    ☐ No

46  Was your vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . . . . . . . . ☒ Yes    ☐ No

47a  Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes    ☐ No

b  If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☒ No

| **Part V** | Other Expenses. List below business expenses not included on lines 8-26 or line 30. |
|---|---|

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| 48 | Total other expenses. Enter here and on page 1, line 27 . . . . . . . . . . . . . . . . . . . . . . . | 48 | 0. |
|---|---|---|---|

UYA    Schedule C (Form 1040) 2006

Watts v. Hospitality
Int Discl/RFP  0073

| SCHEDULE SE | | OMB No. 1545-0074 |
|---|---|---|
| **(Form 1040)** | **Self-Employment Tax** | **2006** |
| Department of the Treasury<br>Internal Revenue Service (99) | ▶ Attach to Form 1040.  ▶ See Instructions for Schedule SE (Form 1040). | Attachment<br>Sequence No.  17 |

| Name of person with self-employment income (as shown on Form 1040)<br>Heather Godfrey-Watts | Social security number of person<br>with self-employment income ▶ | ' 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 |
|---|---|---|

### Who Must File Schedule SE

You must file Schedule SE if:

- You had net earnings from self-employment from **other than** church employee income (line 4 of Short Schedule SE or line 4c of Long Schedule SE) of $400 or more **or**
- You had church employee income of $108.28 or more. Income from services you performed as a minister or a member of a religious order is **not** church employee income (see instructions).

**Note.** Even if you had a loss or a small amount of income from self-employment, it may be to your benefit to file Schedule SE and use either "optional method" in Part II of Long Schedule SE (see instructions).

**Exception.** If your only self-employment income was from earnings as a minister, member of a religious order, or Christian Science practitioner **and** you filed Form 4361 and received IRS approval not to be taxed on those earnings, **do not** file Schedule SE. Instead, write "Exempt-Form 4361" on Form 1040, line 58.

### May I Use Short Schedule SE or Must I Use Long Schedule SE?
**Note.** Use this flowchart **only** if you must file Schedule SE. If unsure, see Who Must File Schedule SE, above.



### Section A - Short Schedule SE. Caution. Read above to see if you can use Short Schedule SE.

| | | | |
|---|---|---|---|
| 1 | Net farm profit or (loss) from Schedule F, line 36, and farm partnerships, Schedule K-1 (Form 1065), box 14, code A . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | |
| 2 | Net profit or (loss) from Schedule C, line 31; Schedule C-EZ, line 3; Schedule K-1 (Form 1065), box 14, code A (other than farming); **and** Schedule K-1 (Form 1065-B), box 9, code J1. Ministers members of religious orders, see instructions for amounts to report on this line. See instructions for other income to report . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 3,133. |
| 3 | Combine lines 1 and 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 3,133. |
| 4 | **Net earnings from self-employment.** Multiply line 3 by 92.35% (.9235). If less than $400, **do not** file this schedule; you do not owe self-employment tax . . . . . . . . . . . . . . . . . . ▶ | 4 | 2,893. |
| 5 | **Self-employment tax.** If the amount on line 4 is:<br>• **$94,200 or less,** multiply line 4 by 15.3% (.153). Enter the result here and on **Form 1040, line 58.**<br>• **More than $94,200,** multiply line 4 by 2.9% (.029). Then, add $11,680.80 to the result. Enter the total here and on **Form 1040, line 58.** | 5 | 443. |
| 6 | Deduction for one-half of self-employment tax. Multiply line 5 by 50% (.5). Enter the result here and on **Form 1040, line 27** . . . . . . | 6 |   222. | |

**For Paperwork Reduction Act Notice, see instructions.**
UYA

Schedule SE (Form 1040) 2006

Watts v. Hospitality
Int Discl/RFP  0074
Watts: Hospitality

Form **2441**

Department of the Treasury
Internal Revenue Service

**Child and Dependent Care Expenses**

▶ Attach to Form 1040or Form 1040NR

▶ See separate instructions.

OMB No. 1545-0074

**2006**

Attachment
Sequence No. 21

Name(s) shown on return

Mickey V Watts and Heather Godfrey-Watts

Your social security number

*Before you begin:* You need to understand the following terms. See **Definitions** in the instructions.

● Dependent Care Benefits          ● Qualifying Person(s)          ● Qualified Expenses

**Part I**  Persons or Organizations Who Provided the Care - You **must** complete this part.
(If you need more space, use the bottom of page 2.)

| 1 | (a) Care provider's name | (b) Address (number, street, apt. no., city, state, and ZIP code) | (c) Identifying number (SSN or EIN) | (d) Amount paid (see instructions) |
|---|---|---|---|---|
| | Taylor Road Baptist | 1685 Taylor Road Montgomery, Alabama 36117 | ^ | 868. |

Did you receive dependent care benefits?

— No ────▶ Complete only Part II below.

— Yes ────▶ Complete Part III on page 2 next.

**Caution.** If the care was provided in your home, you may owe employment taxes. See the instructions for Form 1040, line 62, or Form 1040NR, line 57.

**Part II**  Credit for Child and Dependent Care Expenses

2    Information about your **qualifying person(s).** If you have more than two qualifying persons, see the instructions.

| (a) Qualifying person's name | | (b) Qualifying person's social security number | (c) Qualified expenses you incurred and paid in 2006 for the person listed in column (a) |
|---|---|---|---|
| First | Last | | |
| Taylor | Watts | | 434. |
| Tanner | Watts | | 434. |

| 3 | Add the amounts in column (c) of line 2. **Do not** enter more than $3,000 for one qualifying person or $6,000 for two or more persons. If you completed Part III, enter the amount from line 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 868. |
|---|---|---|---|
| 4 | Enter your **earned income.** See instructions. . . . . . . . . . . . . . . . . . . . . . . . | 4 | 41,890. |
| 5 | If married filing jointly, enter your spouse's earned income (if your spouse was a student or was disabled, see the instructions); **all others,** enter the amount from line 4. . . . . . . | 5 | 8,041. |
| 6 | Enter the **smallest** of line 3, 4, or 5. . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 868. |
| 7 | Enter the amount from Form 1040, line 38, or Form 1040NR, line 36. | 7 | 54,377. | | |

8    Enter on line 8 the decimal amount shown below that applies to the amount on line 7

| If line 7 is: | | | If line 7 is: | | | | |
|---|---|---|---|---|---|---|---|
| Over | But not over | Decimal amount is | Over | But not over | Decimal amount is | | |
| $0-15,000 | | .35 | $29,000-31,000 | | .27 | | |
| 15,000-17,000 | | .34 | 31,000-33,000 | | .26 | | |
| 17,000-19,000 | | .33 | 33,000-35,000 | | .25 | | |
| 19,000-21,000 | | .32 | 35,000-37,000 | | .24 | 8 | X. .20 |
| 21,000-23,000 | | .31 | 37,000-39,000 | | .23 | | |
| 23,000-25,000 | | .30 | 39,000-41,000 | | .22 | | |
| 25,000-27,000 | | .29 | 41,000-43,000 | | .21 | | |
| 27,000-29,000 | | .28 | 43,000-No limit | | .20 | | |

| 9 | Multiply line 6 by the decimal amount on line 8. If you paid 2005 expenses in 2006, see the instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 174. |
|---|---|---|---|
| 10 | Enter the amount from Form 1040, line 46, minus any amount on Form 1040, line 47, or Form 1040NR, line 43, minus any amount on Form 1040NR, line 44. . . . . . . . . . | 10 | 3,876. |
| 11 | **Credit for child and dependent care expenses.** Enter the **smaller** of line 9 or line 10 here and on Form 1040, line 48, or Form 1040NR, line 45. . . . . . . . . . . . . . . . | 11 | 174. |

For Paperwork Reduction Act Notice, see the instructions.
UYA

Form **2441** (2006)

Declaration Control Number (DCN)

| 0 0 | — | | — | | — | 7 |

**FORM**
## AL8453OL

ALABAMA DEPARTMENT OF REVENUE

Individual Income Tax Declaration for On-Line Filing          **2006**

For the year January 1 - December 31, 2006

**Label**
Use Alabama label. Otherwise, please type or print.

**L A B E L    H E R E**

Your first name and initial  **Mickey    V**     Last name  **Watts**

If a joint return, spouse's first name and initial  **Heather**     Last name  **Godfrey-Watts**

Home address (number and street). If a P. O. Box, see instructions.  **6976 Eastern Shore Road**     Apt. no.

City, town or post office, state, and ZIP code  **Montgomery          AL    36117**

Your social security number

Spouse's soc. sec. no. if joint return  **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**

Telephone number (optional)  **(334) 244-8077**

FN(For official use only)

---

**Part I**
**Tax Return Information**
(Whole dollars only.)

| | | | |
|---|---|---|---:|
| 1 | Alabama taxable income (Form 40, line 17) . . . . . . . . . . . . . . . . . . . . . | 1 | 24,918. |
| 2 | Total tax liability (Form 40, line 22). . . . . . . . . . . . . . . . . . . . . . . . | 2 | 1,168. |
| 3 | Total tax payment (Form 40, line 26). . . . . . . . . . . . . . . . . . . . . . . | 3 | 1,440. |
| 4 | Refund (Form 40, line 33). . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 272. |
| 5 | Amount you owe (Form 40, line 27) . . . . . . . . . . . . . . . . . . . . . | 5 | |

---

**Part II**
**Direct Deposit**

1  Routing number:  **062001319**

2  Account number:  **8045007112**

3  Type of account:  ☒ Checking     ☐ Savings

---

**Part III**
**Declaration of Taxpayer**
(Sign only after Part I is completed.)

Under penalties of perjury, I declare that I have compared the information contained on my return with the information I have provided to my on-line service provider (OLSP), identified by the above declaration control number, and that the amounts described in Part I above agree with the amounts shown on the corresponding lines of my 2006 Alabama individual income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my OLSP any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

**Sign Here** ▶

| Your signature | Date | Spouse's signature. If a joint return, BOTH must sign. | Date |

AL (1064)

---

<div style="border:1px solid">

### Please complete and retain
### with your income tax records.

*NOTE: Retain for three years from the due date of the return or three years from the date the return was transmitted, whichever is later.*

There are two automated ways to check the status of your refund.

1. Check our Web site. Go to www.revenue.alabama.gov, then click on "Individual" and "Where's My Refund."

or

2. Call our Voice Refund Inquiry System for refund inquiries. The telephone number is **(334) 353-2540**, and is available 24 hours a day. Please have a copy of your return available when calling.

</div>

# DO NOT MAIL TO ALABAMA DEPT. OF REVENUE

FORM **40** Alabama **2006** Individual Income Tax Return
RESIDENTS AND PART-YEAR RESIDENTS

For the year Jan. 1 - Dec. 31, 2006, or other tax year: Beginning: ● Ending: ●

| Your social security number | Spouse's SSN if joint return |
|---|---|
| ● | ● 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 |

Your first name: ● Mickey  Initial: V  Last name: Watts

Spouse's first name: ● Heather  Initial:  Last name: Godfrey-Watts

Present home address (number and street or P. O. Box number): ● 6976 Eastern Shore Road

City, town or post office: ● Montgomery  State: AL  ZIP code: 36117

USE BLACK INK TO COMPLETE RETURN

**Filing Status and Exemptions** Check only one box.

1 ● ☐ $1,500 Single
2 ● ☒ $3,000 Married filing joint return (even if only one spouse had income)
3 ● ☐ $1,500 Married filing separate return. Complete line 5 with spouse's name and soc. sec. no.
4 ● ☐ $3,000 Head of family (with qualifying person). (See instructions.) Complete line 5.

5 Name ●
Soc. Sec. No. ●
Relationship ●

| | | A - Alabama tax withheld | | B - Income | |
|---|---|---|---|---|---|
| 6 | Wages, salaries, tips, etc. (list each employer and address separately): | | | | |
| | a Guilford Capital Corporation Montgom | 6a ● | 795 00 | 6a | 13,281 00 |
| | b Colonial Bank Montgomery AL 36117 | 6b ● | 591 00 | 6b | 17,521 00 |
| | c Taylor Road Baptist Church Montgomer | 6c ● | 54 00 | 6c | 5,130 00 |
| | d | 6d ● | 00 | 6d | 00 |

**Income and Adjustments**

| | | | | |
|---|---|---|---|---|
| 7 | Interest and dividend income (also attach Schedule B if over $1,500) | 7 | ● | 00 |
| 8 | Other income (from page 2, Part I, line 9) | 8 | ● | 3,133 00 |
| 9 | Total income. Add amounts in the income column for line 6a through line 8 | 9 | ● | 39,065 00 |
| 10 | Total adjustments to income (from page 2, Part II, line 8) | 10 | ● | 540 00 |
| 11 | Adjusted gross income. Subtract line 10 from line 9 | 11 | ● | 38,525 00 |

**Deductions**

You Must Attach page 2 of Federal Form 1040, Federal Form 1040A, Federal Form 1040NR, or page 1 of 1040EZ if claiming a deduction on line 13.

| | | Box a or b MUST be checked | | |
|---|---|---|---|---|
| 12 | Check box a, if you itemize deductions, and enter amount from Schedule A, line 26. Check box b, if you do not itemize deductions, and enter standard deduction (see instr.) | | | |
| | ● a ☒ Itemized Deductions ● b ☐ Standard Deduction | 12 ● | | 8,305 00 |
| 13 | Federal tax deduction (see instructions) DO NOT ENTER THE FEDERAL TAX WITHHELD FROM YOUR FORM W-2(S) | 13 ● | | 1,702 00 |
| 14 | Personal exemption (from line 1, 2, 3, or 4) | 14 ● | | 3,000 00 |
| 15 | Dependent exemption (from page 2, Part III, line 2) | 15 ● | | 600 00 |
| 16 | Total deductions. Add lines 12, 13, 14, and 15 | 16 ● | | 13,607 00 |
| 17 | Taxable income. Subtract line 16 from line 11 | 17 ● | | 24,918 00 |

**Tax** Do not Staple Form(s) W-2, W-2g 1099, and/or 40V to this form.

| | | | | |
|---|---|---|---|---|
| 18 | Income Tax due. Enter amount from tax table or check if from ● ☐ Form NOL-85A | 18 ● | | 1,168 00 |
| 19 | Less credits from: ● ☐ Schedule CR and / or ● ☐ Schedule OC | 19 ● | | 00 |
| 20a | Net tax due Alabama. Subtract line 19 from line 18 | 20a ● | | 1,168 00 |
| b | Consumer Use Tax (use worksheet in the instructions) | 20b ● | | 00 |
| 21 | Alabama Election Campaign Fund. You may make a voluntary contribution to the following: | | | |
| | a Alabama Democratic Party ☐ $1 ☐ $2 ☒ none | 21a ● | | 00 |
| | b Alabama Republican Party ☐ $1 ☐ $2 ☒ none | 21b ● | | 00 |
| 22 | Total tax liability and voluntary contributions. Add lines 20a, 20b, 21a, 21b | 22 ● | | 1,168 00 |

**Payments**

| | | | | |
|---|---|---|---|---|
| 23 | Alabama income tax withheld (from Forms W-2, W-2G, and/or 1099) | 23 ● | 1,440 00 | |
| 24 | Amount paid with extension (attach Form 4868A) | 24 ● | 00 | |
| 25 | 2006 estimated tax payments (see instructions) | 25 ● | 00 | |
| 26 | Total payments. Add lines 23 through 25 | 26 ● | | 1,440 00 |

**AMOUNT YOU OWE**

| | | | | |
|---|---|---|---|---|
| 27 | If line 22 is larger than line 26, subtract line 26 from line 22, and enter AMOUNT YOU OWE. Place payment, along with Form 40V, loose in the mailing envelope. (FORM 40V MUST ACCOMPANY PAYMENT.) | 27 ● | | 00 |
| 28 | Estimated tax penalty. Also include on line 27 (see instructions) | 28 ● | 00 | |

**OVERPAID**

| | | | | |
|---|---|---|---|---|
| 29 | If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount OVERPAID | 29 ● | | 272 00 |
| 30 | Amount of line 29 to be applied to your 2007 estimated tax | 30 ● | 00 | |

**Donation Check-offs**

| | | | | |
|---|---|---|---|---|
| 31 | Total Donation Check-offs from Schedule DC, line 2 | 31 ● | 00 | |
| 32 | Total. Add line 30 and lines 31 | 32 ● | | 0 00 |

**REFUND**

| | | | | |
|---|---|---|---|---|
| 33 | REFUNDED TO YOU. (CAUTION: You must sign your return on Page 2.) Subtract line 32 from line 29. For Direct Deposit, check here ● ☒ and complete Part V, Page 2 | 33 ● | | 272 00 |

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below.

**WHERE TO FILE FORM 40**
▶ If you are not making a payment, mail your return to:
Alabama Department of Revenue
P. O. Box 154
Montgomery, AL 36135-0001

If you are making a payment, mail your return, Form 40V, and payment to:
Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140-0001

Mail only your 2006 Form 40 to one of the above addresses. Prior year returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P. O. Box 327464, Montgomery, AL 36132-7464.

AL (1064)

Watts v. Hospitality
Int Discl/RFP 0077

**Form 40 (2006)**  Mickey V Watts and Heather Godfrey-Watts    Page 2

**PART I**

| | | | | | |
|---|---|---|---|---|---|
| 1 | Alimony received | | | 1 | 00 |
| 2 | Business income or (loss) *(attach Federal Schedule C or C-EZ)* | | | 2 | 3,133 00 |
| 3 | Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. *(attach Schedule D)* | | | 3 | 00 |
| 4a | Total IRA distributions | 4a | 00 | 4b Taxable amount *(see instructions)* | 4b | 00 |
| 5a | Total pensions and annuities | 5a | 3,650 00 | 5b Taxable amount *(see instructions)* | 5b | 00 |
| 6 | Rents, royalties, partnerships, estates, trusts, etc. *(attach Schedule E)* | | | 6 | 00 |
| 7 | Farm income or (loss) *(attach Federal Schedule F)* | | | 7 | 00 |
| 8 | Other income *(state nature and source)* | | | 8 | 00 |
| 9 | **Total other income.** Add lines 1 through 8. Enter here and also on page 1, line 8. | | | 9 | 3,133 00 |

**Other Income** *(see instructions)*

**PART II**

| | | | | |
|---|---|---|---|---|
| 1a | Your IRA deduction | | 1a | 00 |
| b | Spouse's IRA deduction | | 1b | 540 00 |
| 2 | Payments to a Keogh retirement plan and self-employment SEP deduction | | 2 | 00 |
| 3 | Penalty on early withdrawal of savings | | 3 | 00 |
| 4 | Alimony paid. Recipient's last name _____ Social security no. _____  Address _____ City _____ State _____ ZIP _____ | | 4 | 00 |
| 5 | Adoption expenses | | 5 | 00 |
| 6 | Moving Expenses (Attach Federal Form 3903) to City _____ State _____ ZIP _____ | | 6 | 00 |
| 7 | Self-employed health insurance deduction | | 7 | 00 |
| 8 | **Total adjustments.** Add lines 1 through 7. Enter here and also on page 1, line 10 | | 8 | 540 00 |

**Adjustments to Income** *(see instructions)*

**PART III**

**Dependents**

Do not include yourself or your spouse

*(see instructions)*

| 1a Dependents: (1) First name | Last name | (2) Dependent's social security number. | (3) Dependent's relationship to you. | (4) Did you provide more than one-half dependent's support? |
|---|---|---|---|---|
| Taylor | Watts | | Daughter | Yes |
| Tanner | Watts | | Son | Yes |
| | | | | |

b  Total number of dependents claimed above    • 2

| 2 | Amount allowed. *(Multiply $300 by the total number of dependents claimed on line 1b.)* Enter amount here and on page 1, line 15. | 2 | 600 00 |
|---|---|---|---|

**PART IV**

**General Information**

**All Taxpayers Must Complete This Section.**

1 Residency  • ☒ Full Year  If you were a part-year resident of Alabama during 2006, indicate your period of residence:
  Check only one box  • ☐ Part Year  From _____ 2006 through _____ 2006. Total months _____

2 Did you file an Alabama income tax return for the year 2005?  ☒ Yes  ☐ No

3 If no, state reason.

4 Give name and address of present employer(s). Yours  Colonial Bank   100 Colonial Bank Blvd
  Montgomery  AL  36  Your Spouse's  Taylor Road Baptist Church 1685 Taylor Ro

5 Enter the Federal Adjusted Gross Income • $  54,377  and Federal Taxable Income • $  30,877  as reported on your 2006 Federal Individual Income Tax Return.

6 Do you have income which is reported on your Federal return, but not reported on your Alabama return (other than your state tax refund)?  ☒ Yes  ☐ No
  If yes, enter source(s) and amount(s) below: *(other than state income tax refund)*
  Source  Unemployment  Amount • 5,710 00
  Source  Amount • 00

7 Do you have income included in this return from a grantor trust?  ☐ Yes  ☒ No

**PART V**

**Direct Deposit**

For Direct Deposit of your refund, complete 1, 2, and 3 below. *(See instructions to see if you qualify.)*

1 Routing Number:  062001319   2  Type: ☒ Checking ☐ Savings

3 Account Number:  8045007112

**Sign Here In Black Ink**

Keep a copy of this return for your records.

• ☐ I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Daytime telephone number 334-676-5271 | Your occupation Portfolio Manager |
|---|---|---|---|
| Spouse's signature (if joint return, BOTH must sign) | Date | Daytime telephone number 334-244-8077 | Spouse's occupation Housewife |

**Paid Preparer's Use Only**

| Preparer's signature | Date | Check if self-employed ☐ | Preparer's SSN or PTIN • |
|---|---|---|---|
| Firm's name (or yours if self-employed) SELF-PREPARED | | Daytime telephone number | E.I. No. |
| Address | | | ZIP Code |

AL (1064)

SCHEDULES
**A, B, CR, & DC**
(FORM 40)



ALABAMA DEPARTMENT OF REVENUE
Schedule A - Itemized Deductions

**2006**

(Schedules B, CR and DC are on Page 2)
ATTACH TO FORM 40 - SEE INSTRUCTIONS FOR SCHEDULE A

Name(s) as shown on Form 40
Mickey V Watts and Heather Godfrey-Watts

Your social security number

The itemized deductions you may claim for the year 2006 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. **PART-YEAR RESIDENTS:** A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** (See instructions) | CAUTION: Do not include expenses reimbursed or paid by others. | | | |
| | 1 Medical and dental expenses | 1 | 00 | |
| | 2 Enter amount from Form 40, line 11.. 2 | 00 | | |
| | 3 Multiply the amount on line 2 by 4% (.04). Enter the result | 3 | 00 | |
| | 4 Subtract line 3 from line 1. Enter the result. If zero or less, enter -0- | | | 4 ● 00 |
| **Taxes You Paid** (See Instructions) | 5 Real estate taxes | 5 | 350 00 | |
| | 6 FICA Tax (Social Security and Medicare) and Federal Self-Employment Tax | 6 | 3,618 00 | |
| | 7 Railroad Retirement (Tier 1 only) | 7 | 00 | |
| | 8 Other taxes. (List - include personal property taxes.) ▶ | 8 | 00 | |
| | 9 Add the amounts on lines 5 through 8. Enter the total here | | | 9 ● 3,968 00 |
| **Interest You Paid** (See Instructions) NOTE: Personal interest is not deductible. | 10a Home mortgage interest and points reported to you on Federal Form 1098. | 10a | 4,212 00 | |
| | b Home mortgage interest not reported to you on Federal Form 1098. (If paid to an individual, show person's name and address.) ▶ | 10b | 00 | |
| | 11 Points not reported to you on Form 1098 | 11 | 00 | |
| | 12 Investment interest. (Attach Form 4952A) | 12 | 00 | |
| | 13 Add the amounts on lines 10a through 12. Enter the total here | | | 13 ● 4,212 00 |
| **Gifts to Charity** (See Instructions) | CAUTION: If you made a charitable contribution and received a benefit in return, see instructions. | | | |
| | 14 Contributions by cash or check | 14 | 125 00 | |
| | 15 Other than cash/check. (You MUST attach Federal Form 8283 if over $500.) | 15 | 00 | |
| | 16 Carryover from prior year | 16 | 00 | |
| | 17 Add the amounts on lines 14 through 16. Enter the total here | | | 17 ● 125 00 |
| **Casualty and Theft Loss** (Attach Form 4684) | 18a Enter the amount from Federal Form 4684, line 16 (See Instructions) | 18a | 00 | |
| | b Enter 10% of your Adjusted Gross Income (Form 40, line 11) | 18b | 00 | |
| | c Subtract line 18b from line 18a. If zero or less, enter -0- | | | 18c ● 00 |
| **Job Expenses and Most Other Miscellaneous Deductions** (See Instructions) | 19 Unreimbursed employee expenses - job travel, union dues, job education, etc. (You MUST attach Federal Form 2106 if required. See inst.) ▶ | 19 | 00 | |
| | 20 Other expenses (investment, tax preparation, safe deposit box, etc.). ▶ | 20 | 00 | |
| | 21 Add the amounts on lines 19 and 20. Enter the total | 21 | 00 | |
| | 22 Multiply the amount on Form 40, line 11 by 2% (.02). Enter the result here | 22 | 00 | |
| | 23 Subtract line 22 from line 21. Enter the result. If zero or less, enter -0- | | | 23 ● 00 |
| **Other Miscellaneous Deductions** | 24 Other (from list in the instructions). List type and amount. ▶ | | | 24 ● 00 |
| **Qualified Long-Term Care Ins. Premiums** | CAUTION: Do not include medical premiums. | | | |
| | 25 Enter amount here | | | 25 ● 00 |
| **Total Itemized Deductions** | 26 Add the amounts on lines 4, 9, 13, 17, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12 | | | 26 ● 8,305 00 |

Schedule A (Form 40) 2006

AL (1084)

Watts v. Hospitality
Int Discl/RFP 0079

Form 1040 (2006)  Mickey V Watts and Heather Godfrey-Watts

| | | | | | 2 |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Tax and Credits** | 38 | Amount from line 37 (adjusted gross income) . . . . . . . . . . . . . . . . | | 38 | 54,377. |
| | 39a | Check { You were born before January 2, 1942, ☐ Blind. } Total boxes<br>if: { ☐ Spouse was born before January 2, 1942, ☐ Blind. } checked ▶ 39a | 0 | | |
| **Standard Deduction for -** | b | If your spouse itemizes on a separate return or you were a dual-status alien, see instructions and check here ▶ 39b ☐ | | | |
| ● People who checked any box on line 39a or 39b or who can be claimed as a dependent, See instr. | 40 | Itemized deductions (from Schedule A) or your **standard deduction** (see left margin) . . . . . | | 40 | 10,300. |
| | 41 | Subtract line 40 from line 38 . . . . . . . . . . . . . . . . . . . . . . . . | | 41 | 44,077. |
| | 42 | If line 38 is over $112,875, or you provided housing to a person displaced by Hurricane Katrina,<br>see instructions. Otherwise, multiply $3,300 by the total number of exemptions claimed on line 6d . | | 42 | 13,200. |
| ● All others: | 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- . . . . . | | 43 | 30,877. |
| Single or Married filing separately, $5,150 | 44 | **Tax** (see instructions). Check if any tax is from: a ☐ Form(s) 8814   b ☐ Form 4972 . . . . . . ▶ | | 44 | 3,876. |
| | 45 | Alternative minimum tax (see instructions). Attach Form 6251 . . . . . . . . . . . . . | | 45 | |
| Married filing jointly or Qualifying widow(er), $10,300 | 46 | Add lines 44 and 45 . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | 46 | 3,876. |
| | 47 | Foreign tax credit. Attach Form 1116 if required . . . . . . . . . | 47 | | |
| Head of household, $7,550 | 48 | Credit for child and dependent care expenses. Attach Form 2441 . . | 48 | 174. | |
| | 49 | Credit for the elderly or the disabled. Attach Schedule R . . . . . | 49 | | |
| | 50 | Education credits. Attach Form 8863 . . . . . . . . . . . | 50 | | |
| | 51 | Retirement savings contributions credit. Attach Form 8880 . . . . | 51 | | |
| | 52 | Residential energy credits. Attach Form 5695 . . . . . . . . | 52 | | |
| | 53 | Child tax credit (see instructions). Attach Form 8901 if required . . | 53 | 2,000. | |
| | 54 | Credits from: a ☐ Form 8396 b ☐ Form 8839 c ☐ Form 8859 | 54 | | |
| | 55 | Other credits: a ☐ Form 3800 b ☐ Form 8801 | 55 | | |
| | | c ☐ Form _____ | | | |
| | 56 | Add lines 47 through 55. These are your **total credits** . . . . . . . . . . . . . . . | | 56 | 2,174. |
| | 57 | Subtract line 56 from line 46. If line 56 is more than line 46, enter -0- . . . . . . . . . . ▶ | | 57 | 1,702. |
| **Other Taxes** | 58 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . . . . . . . . | | 58 | 443. |
| | 59 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 . . . . | | 59 | |
| | 60 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required . . . . | | 60 | |
| | 61 | Advance earned income credit payments from Form(s) W-2, box 9 . . . . . . . . . . . . . | | 61 | |
| | 62 | Household employment taxes. Attach Schedule H . . . . . . . . . . . . . . . . . . | | 62 | |
| | 63 | Add lines 57 through 62. This is your **total tax** . . . . . . . . . . . . . . . . . ▶ | | 63 | 2,145. |
| **Payments** | 64 | Federal income tax withheld from Forms W-2 and 1099 . . . . . | 64 | 3,656. | |
| | 65 | 2006 estimated tax payments and amount applied from 2005 return . . | 65 | | |
| If you have a qualifying child, attach Schedule EIC. | 66a | Earned income credit (EIC)  NO. . . . . . . . . . . . . . . | 66a | | |
| | b | Nontaxable combat pay election ▶ 66b | | | |
| | 67 | Excess social security and tier 1 RRTA tax withheld (see instr.) . . | 67 | | |
| | 68 | Additional child tax credit. Attach Form 8812 . . . . . . . . | 68 | | |
| | 69 | Amount paid with request for extension to file (see instructions) . . | 69 | | |
| | 70 | Payments from: a ☐ Form 2439 b ☐ Form 4136 c ☐ Form 8885 . . | 70 | | |
| | 71 | Credit for federal telephone excise tax paid. Attach Form 8913 if required | 71 | 0. | |
| | 72 | Add lines 64, 65, 66a, and 67 through 71. These are your **total payments** . . . . . . . . . ▶ | | 72 | 3,656. |
| **Refund** | 73 | If line 72 is more than line 63, subtract line 63 from line 72. This is the amount you **overpaid** | | 73 | 1,511. |
| Direct deposit? See instructions and fill in 74b, 74c, and 74d. | 74a | Amount of line 73 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | | 74a | 1,511. |
| | ▶ b | Routing number  062001319 | ▶ c Type: ☒ Checking ☐ Savings | | |
| | ▶ d | Account number  8045007112 | | | |
| | 75 | Amount of line 73 you want **applied to your 2007 estimated tax** ▶ | 75 | | |
| **Amount You Owe** | 76 | **Amount you owe.** Subtract line 72 from line 63. For details on how to pay, see instructions . . ▶ | | 76 | 0. |
| | 77 | Estimated tax penalty (see instructions) . . . . . . . . . . | 77 | | |

**Third Party Designee**   Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ **Yes. Complete the following.** ☐ **No**

| Designee's name ▶ | Phone no. ▶ | Personal identification number (PIN) ▶ |
|---|---|---|

**Sign Here**   Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Joint return? See instructions Keep a copy for your records. | Your signature | Date | Your occupation<br>Portfolio Manager | Daytime phone number<br>334-244-8077 |
|---|---|---|---|---|
| | Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation<br>Housewife | |

**Paid Preparer's Use Only**

| Preparer's signature ▶ | | Date | | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | ▶ | | | EIN | |
| | | | | Phone no. | |

UYA

Form **1040** (2006)

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 11/13/2005    Check Date: 11/18/2005
PPD: B112    Bank: MONT
Chk Num: 00412360
Gross Amount: 981.35
Total Taxes: 146.63
Total Deductions: 60.00
Net Amount: 774.72


--- Earnings ---

Earn Type      Rate       Hours        Gross      Unit         Dept
---------------------------------------------------------------------
MGR          0.0000       8.00         0.00       MONT        080030
SAL          0.0000       0.00       146.15       MONT        080030
VAC         20.8800      40.00       835.20       MONT        080030


--- Deductions Statutory ---

Ded Code      Ded Amount      State Tax Code      Local Tax Code
---------------------------------------------------------------------
FICA            70.49
FIT             49.06
SIT             27.08           AL                   AL


--- Deductions Voluntary ---

 Ded Code      Ded Amount
--------------------------------
 125INS          60.00
```

DEFENDANT'S
EXHIBIT
20

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 10/30/2005    Check Date: 11/04/2005
PPD: B111    Bank: MONT
Chk Num: 00412326
Gross Amount: 4092.31
Total Taxes: 1109.58
Total Deductions: 60.00
Net Amount: 2922.73
```

--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|--------|-------|---------|------|--------|
| MGR | 0.0000 | 16.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 292.31 | MONT | 080030 |
| BNS | 0.0000 | 0.00 | 3800.00 | MONT | 080030 |

--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 308.47 | | |
| FIT | 648.46 | | |
| SIT | 152.65 | AL | AL |

--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|
| 125INS | 60.00 |
| EFT2 | 0.00 |
| EFT1 | 0.00 |

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 10/16/2005    Check Date: 10/21/2005
PPD: B102    Bank: MONT
Chk Num: A0400018
Gross Amount: 292.31
Total Taxes: 19.81
Total Deductions: 272.50
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate     Hours      Gross     Unit      Dept
-----------------------------------------------------------
MGR          0.0000    16.00       0.00     MONT     080030
SAL          0.0000     0.00     292.31     MONT     080030


--- Deductions Statutory ---

Ded Code     Ded Amount    State Tax Code    Local Tax Code
-----------------------------------------------------------
FICA           17.76
SIT             2.05          AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
--------------------------------
 125INS         60.00
 EFT2           10.63
 EFT1          201.87
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 10/02/2005    Check Date: 10/07/2005
PPD: B101    Bank: MONT
Chk Num: A0400017
Gross Amount: 292.31
Total Taxes: 19.82
Total Deductions: 272.49
Net Amount: 0.00


--- Earnings ---

Earn Type      Rate      Hours       Gross      Unit        Dept
-----------------------------------------------------------------
MGR          0.0000     16.00        0.00      MONT        080030
SAL          0.0000      0.00      292.31      MONT        080030


--- Deductions Statutory ---

Ded Code      Ded Amount     State Tax Code    Local Tax Code
-------------------------------------------------------------
FICA           17.77
SIT             2.05            AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
----------------------------------
125INS          60.00
EFT2            10.62
EFT1           201.87
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 09/18/2005    Check Date: 09/23/2005
PPD: B092    Bank: MONT
Chk Num: A0400016
Gross Amount: 657.69
Total Taxes: 76.65
Total Deductions: 581.04
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit       Dept
----------------------------------------------------------------
MGR          0.0000     36.00        0.00     MONT       080030
SAL          0.0000      0.00      657.69     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount    State Tax Code    Local Tax Code
----------------------------------------------------------------
FICA           45.73
FIT            16.69
SIT            14.23          AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
--------------------------------
125INS         60.00
EFT2           26.05
EFT1          494.99
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 09/04/2005    Check Date: 09/09/2005
PPD: B091    Bank: MONT
Chk Num: A0400015
Gross Amount: 292.31
Total Taxes: 13.62
Total Deductions: 278.69
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate       Hours       Gross     Unit        Dept
---------------------------------------------------------------
MGR         0.0000      16.00        0.00     MONT       080030
SAL         0.0000       0.00      292.31     MONT       080030


--- Deductions Statutory ---

Ded Code      Ded Amount      State Tax Code     Local Tax Code
---------------------------------------------------------------
FICA           13.17
SIT             0.45             AL                  AL


--- Deductions Voluntary ---

Ded Code      Ded Amount
------------------------------
125INS          120.00
EFT2              7.93
EFT1            150.76
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 09/07/2005    Check Date: 09/09/2005
PPD: B093M    Bank: MONT
Chk Num: 00000175
Gross Amount: 657.69
Total Taxes: 124.63
Total Deductions: 0.00
Net Amount: 533.06


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
-----------------------------------------------------------------
SAL          0.0000      0.00     657.69     MONT       080030
MGR          0.0000     36.00       0.00     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code     Local Tax Code
-----------------------------------------------------------------
FICA            50.32
FIT             52.87
SIT             21.44         AL                 AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
--------------------------------
 125INS          0.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 08/07/2005    Check Date: 08/12/2005
PPD: B081    Bank: MONT
Chk Num: A0400013
Gross Amount: 1461.54
Total Taxes: 272.43
Total Deductions: 1189.11
Net Amount: 0.00
```

```
--- Earnings ---

Earn Type    Rate      Hours      Gross     Unit      Dept
-------------------------------------------------------------
MGR          0.0000    80.00       0.00     MONT      080030
SAL          0.0000     0.00    1461.54     MONT      080030
```

```
--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
-------------------------------------------------------------
FICA           107.23
FIT            117.54
SIT             47.66         AL                AL
```

```
--- Deductions Voluntary ---

Ded Code     Ded Amount
--------------------------------
125INS          60.00
EFT2            56.46
EFT1          1072.65
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 07/24/2005    Check Date: 07/29/2005
PPD: B073    Bank: MONT
Chk Num: A0000012
Gross Amount: 5261.54
Total Taxes: 1547.58
Total Deductions: 3713.96
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate       Hours       Gross     Unit        Dept
--------------------------------------------------------------------
MGR         0.0000       80.00        0.00     MONT       080030
SAL         0.0000        0.00     1461.54     MONT       080030
BNS         0.0000        0.00     3800.00     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
--------------------------------------------------------------------
FICA          397.91
FIT           953.82
SIT           195.85           AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
----------------------------------
125INS          60.00
EFT2           182.70
EFT1          3471.26
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G        SSN: 416021193     ID: 01520914
PPD Date: 07/10/2005     Check Date: 07/15/2005
PPD: B072     Bank: MONT
Chk Num: A0000011
Gross Amount: 1461.54
Total Taxes: 272.42
Total Deductions: 1189.12
Net Amount: 0.00


--- Earnings ---

Earn Type      Rate       Hours       Gross     Unit        Dept
-----------------------------------------------------------------
MGR          0.0000       80.00        0.00     MONT        080030
SAL          0.0000        0.00     1461.54     MONT        080030


--- Deductions Statutory ---

Ded Code      Ded Amount      State Tax Code    Local Tax Code
-----------------------------------------------------------------
FICA           107.22
FIT            117.54
SIT             47.66          AL                AL


--- Deductions Voluntary ---

Ded Code      Ded Amount
--------------------------------
125INS           60.00
EFT2             56.46
EFT1           1072.66
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 06/26/2005    Check Date: 07/01/2005
PPD: B071    Bank: MONT
Chk Num: A0000010
Gross Amount: 1461.54
Total Taxes: 272.41
Total Deductions: 1189.13
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit      Dept
----------------------------------------------------------------
MGR          0.0000     80.00        0.00     MONT      080030
SAL          0.0000      0.00     1461.54     MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
----------------------------------------------------------------
FICA           107.21
FIT            117.54
SIT             47.66          AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
----------------------------------------
125INS          60.00
EFT2            56.46
EFT1          1072.67
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 06/12/2005    Check Date: 06/17/2005
PPD: B062    Bank: MONT
Chk Num: A0000009
Gross Amount: 1461.54
Total Taxes: 272.43
Total Deductions: 1189.11
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate       Hours       Gross     Unit       Dept
-------------------------------------------------------------------
MGR          0.0000      80.00        0.00     MONT       080030
SAL          0.0000       0.00     1461.54     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount      State Tax Code    Local Tax Code
-------------------------------------------------------------------
FICA           107.23
FIT            117.54
SIT             47.66          AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
--------------------------------
125INS          60.00
EFT2            56.46
EFT1          1072.65
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 05/29/2005    Check Date: 06/03/2005
PPD: B061    Bank: MONT
Chk Num: A0000008
Gross Amount: 1461.54
Total Taxes: 272.41
Total Deductions: 1189.13
Net Amount: 0.00


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit       Dept
------------------------------------------------------------------
MGR          0.0000     80.00        0.00     MONT      080030
SAL          0.0000      0.00     1461.54     MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
------------------------------------------------------------------
FICA            107.21
FIT             117.54
SIT              47.66          AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
-------------------------------
125INS           60.00
EFT2             56.46
EFT1           1072.67
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 05/15/2005   Check Date: 05/20/2005
PPD: B052    Bank: MONT
Chk Num: 00011977
Gross Amount: 1461.54
Total Taxes: 272.42
Total Deductions: 60.00
Net Amount: 1129.12
```

--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|--------|-------|---------|------|--------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1461.54 | MONT | 080030 |

--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 107.22 | | |
| FIT | 117.54 | | |
| SIT | 47.66 | AL | AL |

--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|
| 125INS | 60.00 |

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193   ID: 01520914
PPD Date: 05/01/2005   Check Date: 05/06/2005
PPD: B051    Bank: MONT
Chk Num: 00011945
Gross Amount: 1461.54
Total Taxes: 272.42
Total Deductions: 60.00
Net Amount: 1129.12


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
-----------------------------------------------------------------
MGR          0.0000     80.00       0.00     MONT       080030
SAL          0.0000      0.00    1461.54     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
-----------------------------------------------------------------
FICA           107.22
FIT            117.54
SIT             47.66          AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
--------------------------------
 125INS         60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193     ID: 01520914
PPD Date: 04/17/2005    Check Date: 04/22/2005
PPD: B042    Bank: MONT
Chk Num: 00011915
Gross Amount: 4961.54
Total Taxes: 1429.84
Total Deductions: 60.00
Net Amount: 3471.70
```

--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|--------|-------|---------|------|--------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1461.54 | MONT | 080030 |
| BNS | 0.0000 | 0.00 | 3500.00 | MONT | 080030 |

--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 374.97 | | |
| FIT | 869.82 | | |
| SIT | 185.05 | AL | AL |

--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|
| 125INS | 60.00 |

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 04/03/2005    Check Date: 04/08/2005
PPD: B041    Bank: MONT
Chk Num: 00011885
Gross Amount: 1346.15
Total Taxes: 241.37
Total Deductions: 60.00
Net Amount: 1044.78


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit       Dept
--------------------------------------------------------------
MGR         0.0000     80.00        0.00     MONT       080030
SAL         0.0000      0.00     1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
------------------------------------------------------------
FICA           98.38
FIT           100.23
SIT            42.76         AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
--------------------------------
 125INS         60.00
```

PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G    SSN: 416021193    ID: 01520914
PPD Date: 03/20/2005    Check Date: 03/25/2005
PPD: B032    Bank: MONT
Chk Num: 00011857
Gross Amount: 1346.15
Total Taxes: 241.38
Total Deductions: 60.00
Net Amount: 1044.77


--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|--------|-------|---------|------|--------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1346.15 | MONT | 080030 |


--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 98.39 | | |
| FIT | 100.23 | | |
| SIT | 42.76 | AL | AL |


--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|
| 125INS | 60.00 |

MV 00061

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 03/06/2005    Check Date: 03/11/2005
PPD: B031    Bank: MONT
Chk Num: 00011828
Gross Amount: 1346.15
Total Taxes: 241.38
Total Deductions: 60.00
Net Amount: 1044.77


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
------------------------------------------------------------
MGR          0.0000     80.00       0.00     MONT       080030
SAL          0.0000      0.00    1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount    State Tax Code    Local Tax Code
-----------------------------------------------------------
FICA           98.39
FIT           100.23
SIT            42.76        AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
-------------------------------
 125INS         60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name : WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 02/20/2005    Check Date: 02/25/2005
PPD: B022    Bank: MONT
Chk Num: 00011799
Gross Amount: 1346.15
Total Taxes: 241.39
Total Deductions: 60.00
Net Amount: 1044.76


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit        Dept
-----------------------------------------------------------------
MGR          0.0000     80.00        0.00     MONT        080030
SAL          0.0000      0.00     1346.15     MONT        080030


--- Deductions Statutory ---

Ded Code     Ded Amount    State Tax Code    Local Tax Code
-----------------------------------------------------------------
FICA            98.40
FIT            100.23
SIT             42.76          AL                 AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
--------------------------------
 125INS          60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 01/23/2005    Check Date: 01/28/2005
PPD: B012    Bank: MONT
Chk Num: 00011741
Gross Amount: 4846.15
Total Taxes: 1384.54
Total Deductions: 60.00
Net Amount: 3401.61


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit        Dept
--------------------------------------------------------------------
MGR          0.0000     80.00        0.00     MONT      080030
SAL          0.0000      0.00     1346.15     MONT      080030
BNS          0.0000      0.00     3500.00     MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code     Local Tax Code
--------------------------------------------------------------------
FICA           366.14
FIT            837.51
SIT            180.89          AL                 AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
--------------------------------
 125INS         60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 01/09/2005    Check Date: 01/14/2005
PPD: B011    Bank: MONT
Chk Num: 00011717
Gross Amount: 1346.15
Total Taxes: 241.38
Total Deductions: 60.00
Net Amount: 1044.77


--- Earnings ---

Earn Type    Rate      Hours       Gross    Unit        Dept
----------------------------------------------------------------
MGR          0.0000    80.00        0.00    MONT       080030
SAL          0.0000     0.00     1346.15    MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount    State Tax Code    Local Tax Code
----------------------------------------------------------------
FICA            98.39
FIT            100.23
SIT             42.76        AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
---------------------------------
 125INS          60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 12/26/2004    Check Date: 12/31/2004
PPD: B123    Bank: MONT
Chk Num: 00011692
Gross Amount: 1346.15
Total Taxes: 242.47
Total Deductions: 60.00
Net Amount: 1043.68


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
------------------------------------------------------------------
MGR           0.0000    80.00       0.00     MONT       080030
SAL           0.0000     0.00    1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
------------------------------------------------------------------
FICA            98.39
FIT            101.38
SIT             42.70         AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
---------------------------------
 125INS          60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G     SSN: 416021193   ID: 01520914
PPD Date: 12/12/2004    Check Date: 12/17/2004
PPD: B122    Bank: MONT
Chk Num: 00011667
Gross Amount: 1346.15
Total Taxes: 242.47
Total Deductions: 60.00
Net Amount: 1043.68


--- Earnings ---

Earn Type    Rate     Hours     Gross     Unit       Dept
-----------------------------------------------------------------
MGR          0.0000   80.00      0.00     MONT       080030
SAL          0.0000    0.00   1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code    Ded Amount    State Tax Code    Local Tax Code
-----------------------------------------------------------------
FICA           98.39
FIT           101.38
SIT            42.70        AL                AL


--- Deductions Voluntary ---

 Ded Code    Ded Amount
---------------------------------
 125INS         60.00
```

PayDetail: Check Lookup by Employee
PayMaxx, Inc.

Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 11/28/2004    Check Date: 12/03/2004
PPD: B121    Bank: MONT
Chk Num: 00011642
Gross Amount: 1346.15
Total Taxes: 242.47
Total Deductions: 60.00
Net Amount: 1043.68

--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|--------|-------|---------|------|--------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1346.15 | MONT | 080030 |

--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 98.39 | | |
| FIT | 101.38 | | |
| SIT | 42.70 | AL | AL |

--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|
| 125INS | 60.00 |

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 11/14/2004    Check Date: 11/19/2004
PPD: B112    Bank: MONT
Chk Num: 00011615
Gross Amount: 1346.15
Total Taxes: 242.46
Total Deductions: 60.00
Net Amount: 1043.69


--- Earnings ---

Earn Type     Rate      Hours       Gross     Unit        Dept
-----------------------------------------------------------------
MGR          0.0000     80.00        0.00     MONT       080030
SAL          0.0000      0.00     1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code    Ded Amount    State Tax Code    Local Tax Code
-----------------------------------------------------------------
FICA           98.38
FIT           101.38
SIT            42.70        AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
-------------------------------
 125INS         60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 10/31/2004    Check Date: 11/05/2004
PPD: B111    Bank: MONT
Chk Num: 00011589
Gross Amount: 1346.15
Total Taxes: 242.47
Total Deductions: 60.00
Net Amount: 1043.68


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit        Dept
-----------------------------------------------------------------
MGR         0.0000     80.00       0.00     MONT       080030
SAL         0.0000      0.00    1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code      Ded Amount     State Tax Code    Local Tax Code
-----------------------------------------------------------------
FICA            98.39
FIT            101.38
SIT             42.70          AL                AL


--- Deductions Voluntary ---

Ded Code      Ded Amount
-------------------------------------
125INS          60.00
```

MV 00071

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G       SSN: 416021193    ID: 01520914
PPD Date: 10/17/2004    Check Date: 10/22/2004
PPD: B102    Bank: MONT
Chk Num: 00011562
Gross Amount: 1346.15
Total Taxes: 242.47
Total Deductions: 60.00
Net Amount: 1043.68


--- Earnings ---

Earn Type     Rate      Hours      Gross      Unit       Dept
-----------------------------------------------------------------
MGR         0.0000      80.00       0.00      MONT       080030
SAL         0.0000       0.00    1346.15      MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount      State Tax Code     Local Tax Code
-----------------------------------------------------------------
FICA            98.39
FIT            101.38
SIT             42.70          AL                 AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
-----------------------------------
 125INS          60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 10/03/2004    Check Date: 10/08/2004
PPD: B101    Bank: MONT
Chk Num: 00011535
Gross Amount: 1346.15
Total Taxes: 242.48
Total Deductions: 60.00
Net Amount: 1043.67
```

--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|------|-------|-------|------|------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1346.15 | MONT | 080030 |

--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|-----------|----------------|----------------|
| FICA | 98.40 | | |
| FIT | 101.38 | | |
| SIT | 42.70 | AL | AL |

--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|-----------|
| 125INS | 60.00 |

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193     ID: 01520914
PPD Date: 09/19/2004    Check Date: 09/24/2004
PPD: B092    Bank: MONT
Chk Num: 00011509
Gross Amount: 1346.15
Total Taxes: 226.33
Total Deductions: 120.00
Net Amount: 999.82


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
------------------------------------------------------------------
MGR          0.0000     80.00       0.00     MONT      080030
SAL          0.0000      0.00    1346.15     MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
------------------------------------------------------------------
FICA           93.80
FIT            92.38
SIT            40.15          AL                AL


--- Deductions Voluntary ---

Ded Code     Ded Amount
--------------------------------
125INS          60.00
125INS          60.00
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 09/05/2004    Check Date: 09/10/2004
PPD: B091    Bank: MONT
Chk Num: 00011483
Gross Amount: 1346.15
Total Taxes: 258.61
Total Deductions: 0.00
Net Amount: 1087.54


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit      Dept
-------------------------------------------------------------
MGR          0.0000     80.00       0.00     MONT      080030
SAL          0.0000      0.00    1346.15     MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code    Local Tax Code
-------------------------------------------------------------
FICA           102.98
FIT            110.38
SIT             45.25           AL                AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
-------------------------------
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.


Name: WATTS, HEATHER G      SSN: 416021193   ID: 01520914
PPD Date: 08/22/2004   Check Date: 08/27/2004
PPD: B082     Bank: MONT
Chk Num: 0GO11457
Gross Amount: 1346.15
Total Taxes: 258.61
Total Deductions: 0.00
Net Amount: 1087.54


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
----------------------------------------------------------------
MGR          0.0000     80.00       0.00     MONT      080030
SAL          0.0000      0.00    1346.15     MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code     Local Tax Code
----------------------------------------------------------------
FICA           102.98
FIT            110.38
SIT             45.25           AL                 AL


--- Deductions Voluntary ---

 Ded Code      Ded Amount
--------------------------------
```

MV 00076

PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 08/08/2004    Check Date: 08/13/2004
PPD: B081    Bank: MONT
Chk Num: 00011430
Gross Amount: 1346.15
Total Taxes: 258.61
Total Deductions: 0.00
Net Amount: 1087.54

--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|------|-------|-------|------|------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1346.15 | MONT | 080030 |

--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 102.98 | | |
| FIT | 110.38 | | |
| SIT | 45.25 | AL | AL |

--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|

PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 07/25/2004    Check Date: 07/30/2004
PPD: B073    Bank: MONT
Chk Num: 00011402
Gross Amount: 1346.15
Total Taxes: 258.61
Total Deductions: 0.00
Net Amount: 1087.54


--- Earnings ---

| Earn Type | Rate | Hours | Gross | Unit | Dept |
|-----------|--------|-------|---------|------|--------|
| MGR | 0.0000 | 80.00 | 0.00 | MONT | 080030 |
| SAL | 0.0000 | 0.00 | 1346.15 | MONT | 080030 |


--- Deductions Statutory ---

| Ded Code | Ded Amount | State Tax Code | Local Tax Code |
|----------|------------|----------------|----------------|
| FICA | 102.98 | | |
| FIT | 110.38 | | |
| SIT | 45.25 | AL | AL |


--- Deductions Voluntary ---

| Ded Code | Ded Amount |
|----------|------------|

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G      SSN: 416021193    ID: 01520914
PPD Date: 07/11/2004    Check Date: 07/16/2004
PPD: B072    Bank: MONT
Chk Num: 00011375
Gross Amount: 1346.15
Total Taxes: 258.61
Total Deductions: 0.00
Net Amount: 1087.54


--- Earnings ---

Earn Type    Rate     Hours      Gross     Unit        Dept
--------------------------------------------------------------
MGR         0.0000    80.00       0.00     MONT       080030
SAL         0.0000     0.00    1346.15     MONT       080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code     Local Tax Code
--------------------------------------------------------------
FICA           102.98
FIT            110.38
SIT             45.25          AL                 AL


--- Deductions Voluntary ---

  Ded Code      Ded Amount
---------------------------------
```

```
PayDetail: Check Lookup by Employee.
PayMaxx, Inc.

Name: WATTS, HEATHER G     SSN: 416021193    ID: 01520914
PPD Date: 06/27/2004    Check Date: 07/02/2004
PPD: B071    Bank: MONT
Chk Num: 00011349
Gross Amount: 383.65
Total Taxes: 36.24
Total Deductions: 0.00
Net Amount: 347.41


--- Earnings ---

Earn Type     Rate      Hours      Gross     Unit       Dept
-----------------------------------------------------------------
SAL          0.0000     0.00      383.65     MONT      080030
MGR          0.0000    22.80       0.00      MONT      080030


--- Deductions Statutory ---

Ded Code     Ded Amount     State Tax Code     Local Tax Code
-----------------------------------------------------------------
FICA          29.35
SIT            6.89           AL                  AL


--- Deductions Voluntary ---

 Ded Code     Ded Amount
-----------------------------------
```

MV 00080

**From:** Roger A Miller
**Sent:** 11/29/2004
**To:** Mickey and Heathe
**Cc:** Fairfield Inn Montgomery; Robert Cole; Rob Flanders
**Bcc:**
**Subject:** November 29th e mail

Heather; Thanks for your reply; I know you will get back on track and increase your ""Hard Core"" sales activities and meaningful ""Other Sales"" activities.With the increase in Montgomery room inventory for 2005,we need you to be extremely focused and results oriented. As far as working from home in the morning, I have no problems with it although Todd is the one who will make the final decision. The bottom line is production of ""Hard Core"" sales activities resulting in definite bookings. In addition you must be an excellent communicator and very thorough in sales follow up/administration. The key is to be out on appointments/sales calls. While you do have to schedule time for ""Other Sales"" and ""Administration"" your true ""ROI"" is in production of ""Hard Core"" activities and consistent bookings. You should not be spending too much time in your hotel office or home office.This is simply not cost effective for the Montgomery Fairfield Inn or Hospitality Ventures. If there are any questions pertaining to the above please contact me. I'm looking forward to your hard work and continued success throughout 2005. Thanks for a great effort and results in 2004. Take care.

DEFENDANT'S
EXHIBIT

_21_

**From:** Mickey and Heathe
**Sent:** 04/07/2005
**To:** 'Roger A Miller'
**Cc:**
**Bcc:**
**Subject:** Heather Watts

Roger,

After our conversation yesterday evening, I have taken in to consideration my new job offers and also considered what it would take to make me comfortable in staying in my current position at Fairfield Inn. I have come up with the following for considerations:

Agree to schedule request & increased salary:

Starting June 1st until Maternity Leave:

Monday-Thursday 8:30-2:00 p.m.

Friday- Usual 7 hours for the day -based on the needs of the hotel

Increase salary $3,000 year-effective immediately $38,000 & still be on the current bonus program

$55.76 wk/ $115.52 bi wk/ $231.04 month

** In return willing to give flexibility on Monday-Thursday to return to hotel late afternoons if needed for group/tour bus arrival to assist with check-in/welcome reception- focus-needs of hotel

** In return willing to arrive early morning if needed for group/tour bus - focus- needs of hotel



DEFENDANT'S
EXHIBIT
22

MV1001613

** As currently- ""on call"" with hotel if needed for any sales assistance and guest relations

Maternity leave 8-12 weeks

* Plan to work up to day of delivery unless other wise told by doctor's orders.

Please review and let me know your comments and feelings. Thanks for your time.

Heather Watts

## watts167@bellsouth.net

| From: | Roger A Miller [rmiller@hospitalityventures.com] |
| It: | Thursday, April 07, 2005 12:05 PM |
| To: | Mickey and Heathe |
| Cc: | Robert Cole; Todd Epplin; David Price; Ron Disbrow |
| Subject: | Request For Schedule Adjustment And Salary Increase |

Heather; Thank you for taking time to express your feelings yesterday and forwarding the above "Subject" request. Without question your sales skills, booking results and genuine concern for the success and well being of the Montgomery Fairfield Inn has made a big difference in the revenue and RevPar index increases of the hotel. For that we thank you and are grateful.

Based on your past years hotel revenue/RevPAR increases, we do feel that an annual increase of $3,000 is in line.(Effective upon agreement/signature of this e mail.) Next salary review would be April 10-14 2006. This increase/e mail is not a contract for employement.Present/future employment will be based on consistent meeting/exceeding of all budgeted room revenue and sales dept"Hard Core", "Other Sales" and "Administrative" production goals and implementation of job description duties.

*Current bonus program remains in effect.

Due to your success and above mentioned efforts/results we must maintain your current 35 hour work week schedule as outlined in your job description signed July 5,2004. With increased bookings/revenue, follow up sales pro work involved, increased competition in our market and ever changing market/economic conditions,35 hours is the minimum needed to succeed. Any less would not be in the best interest of the clients, fellow associates, management, lenders and investors. We appreciate your flexibility Monday-Thursday to return to the hotel in off hours to accommodate special groups and that can be included in the 35 hours weekly as long as your General Manager previously approves.

Heather, Hospitality Ventures views and values all of our management personnel as long rm investments. The above response to your request supports those views and values while pporting our financial commitment to the owners, investors and lenders.

Hopefully you will understand and be in agreement with the above. If so, please print, sign and fax to my attention by 3:00pm cts tomorrow.(Friday April 8,2005)If you are not in agreement than we will accept your resignation submitted Wednesday April 6,2005.Due to potential conflict of interest with current job offers discussed yesterday we would expect you to end your employment with us by tomorrow, Friday April 8,2005. All of us at HV hope and trust you will remain a vital, productive member of the Montgomery Fairfield Inn management team for many years to come. Take care.

Have a super day.

DEFENDANT'S
EXHIBIT
23

1

Watts v. Hospitality
Int Discl/RFP  0030

Fairfield Inn Montgomery
Todd Epplin
5601 Carmichael Road
Montgomery, Alabama 36117

June 6, 2005

Todd,

Please accept this letter as my official notice of request for Maternity Leave. I am planning on taken 6-8 weeks depending on my delivery and health of my child. I will give you official notice of my return after my 6 week postpartum appointment. I will not be out more than my allotted time of 12 weeks under the FMLA.

I plan on working up to the day of delivery and or orders from my doctor.

If you have any questions, please let me know.

Sincerely,

Heather Watts

DEFENDANT'S
EXHIBIT
24

Watts v. Hospitality
Int Discl/RFP   0081

**From:** Watts, HEATHER
**Sent:** 07/20/2005
**To:** Megean Carter/CVB
**Cc:**
**Bcc:**
**Subject:** Fairfield Inn Montgomery

---

Megean,

Good Morning! I just wanted to send you my ""new information"". I will be on Maternity Leave (I guess when my water breaks..haha) for about 8-12 weeks. However I will still work from home some and will have access to email. Tandi Mitchell has been hired has my Intern Sales Manager for all inside sales.
Please share new info with everyone.

Thanks!

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117
334-270-0007 hotel phone/fax
334-354-2619 cell phone
334-244-8077 home fax
www.marriott.com/mgmfi

Eager to assist with corporate, group or special events.



DEFENDANT'S
EXHIBIT

**ⓘ** This message was sent with high importance.

## Watts, HEATHER

| | | | |
|---|---|---|---|
| **From:** | Watts, HEATHER | | **Sent:** Tue 8/16/2005 10:45 PM |
| **To:** | Epplin, Todd | | |
| **Cc:** | | | |
| **Subject:** | From Heather 8 16 05 | | |
| **Attachments:** | | | |

Hey Todd!

Hope all is going well . I talk to Tandi daily and she seem to have everything under control. I heard that Tammy is there as well! Tell her hello and please be sure to give her my contact information if she needs anything.

Baby Tanner and I are doing great! Did you hear how big he is (9 lb 1 oz) ...all the girls at the hotel was right! I am unable to drive for 2 weeks and Tanner is not suppose to be in large crowds for 6 weeks- until his immune system is built up. I hope you got the pictures. I am sending some with Tandi this week to share.

When you can, please mail my last pay stub to my home or send with Tandi (6976 Eastern Shore Road Montgomery Al 36117) Also can you let me know about the last expense report.

So are you leaving this week? I know you are going to enjoy your travels! Take care!

Please tell everyone hello and I hope to be able to visit soon.

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
**www.marriott.com/mgmfi**

**EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!**



DEFENDANT'S
EXHIBIT
26

Watts v. Hospitality
Int Discl/RFP  0089

## Watts, HEATHER

**From:**       Watts, HEATHER                                             **Sent:** Sun 8/21/2005 2:11 PM
**To:**         Miller, Roger
**Cc:**
**Subject:**    Heather MGMFI!
**Attachments:**

Roger,
  Hello! I just wanted to let you know that all is well with me, baby & family. Just a very exciting and adjusting time for us all.

  I have been keeping in touch with Tandi almost daily and seems that all is going well.

  I will call you this week just to touch base.

Take care!

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!



DEFENDANT'S
EXHIBIT
27

Watts v. Hospitality
Int Discl/RFP  0090

**From:** Watts, HEATHER
**Sent:** 08/29/2005
**To:** FFI, Montgomery GM
**Cc:** Miller, Roger
**Bcc:**
**Subject:** RE: Heather MGMFI

Thanks Tammy! I will call you in the morning after 9am if that is ok. This evening is
very busy for me.

I checked on the hotel alot this weekend and worked with JoAnn on the availability -
about closing hotel etc since you were out of town. Hurricanes make us all a little
nervous and I just wanted to insure all was well.

Please let me know how things are going with Tandi. She has lots of responsibility while
I am gone and I want to make sure she is doing what is expected. I do speak to her every
other day but am concerned that she is calling in to the staff to have things done instead
of being there physically. I could be wrong, I am just going by what Carrie said that she
did not see her at all last week and Jennifer says she does call.

I know I am on maternity leave, but I am willing to do what needs to be done. I have
worked so hard over the year to drive business and I don't want to fail. I truly believe in
our property!!

Thanks again, I will talk to you soon.

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

---

From: FFI, Montgomery GM
Sent: Mon 8/29/2005 4:16 PM
To: Amrita Parekh; Watts, HEATHER

DEFENDANT'S
EXHIBIT
28

Cc: 'HVMIAP'
Subject: RE: Heather MGMFl

Heather:

Please contact me at your earliest so we can discuss your hours. I have spoken with
Roger and understand there was information not passed onto me. Lets discuss this.

Tammy

_____

From: Amrita Parekh [mailto:amrita@hospitalityventures.com]
Sent: Mon 8/29/2005 2:38 PM
To: Watts, HEATHER
Cc: 'HVMIAP'; FFI, Montgomery GM
Subject: RE: Heather MGMFI


Charlene told me that she had checked with Tammy and that you had no hours
for that payroll

Amrita Parekh, C.P.A
Hospitality Ventures Mgmt, Inc
Controller
100 Tower Place
3340 Peachtree Rd, Suite 605
Atlanta, GA 30326
(404)467-9299 Ext 203
(404)467-1962-Fax

-----Original Message-----
From: Watts, HEATHER [mailto:Heather.G.Watts@marriott.com]
Sent: Monday, August 29, 2005 2:33 PM
To: Parekh, Amrita
Subject: Heather MGMFI
Importance: High

Amrita,
I am missing a paystub for payroll week ending 8/21/05. Can you please
check on?
Thanks

Heather G Watts

Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

MV1001687

## Watts, HEATHER

| | | | |
|---|---|---|---|
| **From:** | Watts, HEATHER | **Sent:** | Mon 8/29/2005 5:34 PM |
| **To:** | Miller, Roger | | |
| **Cc:** | | | |
| **Subject:** | Heater Maternity Leave | | |
| **Attachments:** | | | |

Roger,

I meant to tell you on the phone today that my 6 week follow-up doctor appt. is not until Sept. 27th. Hopefully all will go well and I will be released to return to work. If all goes well I will be back on Oct. 3rd or 10th. And if sooner if I can.

We just have one major issue and that is child care- we have been on a waiting list since January at 3 different schools. We have not been guaranteed a spot. So we are waiting on an opening. I may have to work with you on my return hours since I can only find a Mother's Day Out program for Tanner. There is a good one that has an opening 3 days a week (tues/wed/thurs) from 8 a.m. -2:30 p.m. And possible they will have an opening for Monday soon. The school is closed on Friday's.

We have had many struggles with Taylor in finding the right school. And Taylor's K-3 program does not have an opening in their nursery.

Good quality, dependable, licensed and affordable childcare is very limited in Montgomery. We are searching all our possible resources. I will keep you posted.

Heather G Watts
**Director of Sales & Marketing**
**Fairfield Inn by Marriott**
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
**www.marriott.com/mgmfi**

**EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!**
**CALL FOR GROUP DISCOUNT!!**



Watts v. Hospitality

Int Discl/RFP  0097

**From:** Roger A Miller
**Sent:** 09/22/2005
**To:** Mickey and Heathe
**Cc:** ffi.pwmpt.gm@marriott.com; Curtis Reitz; Robert Cole
**Bcc:**
**Subject:** FW: MGMFI Sales Goals

---

Heather; I'm forwarding this to Tammy for her review/input. The above was submitted based on a 3 day/8 hour work week. As indicated during our telephone conversation today we need the 3 days to return to 5 as soon as possible. Based on the submission of other HV ""Directors Of Sales/Marketing"" weekly goals the average ""HC"" activities totals were 27-29. These represent a 5 day work week however. This would leave 14 ""HC"" remaining for the 4th and 5th day to be picked up. In order to hit 27 ""HC"" per week you have to average 5.4 per day. Based on this I feel your 3 day ""HC"" activity goal should be 16. This is just 3 more than indicated on the attached. I suggest adding 1 to ""Appointments"", 1 to ""Client Lunch"" and 1 to ""Marketing Plan Franchise Activities"". I would like the both of you to review, discuss and let me know by tomorrow afternoon if that meets with your approval. If not please forward where you want the 3 to go. Thanks. Have a great afternoon.

-----Original Message-----
From: Watts, HEATHER [mailto:Heather.G.Watts@marriott.com]
Sent: Thursday, September 22, 2005 1:41 PM
To: Miller, Roger
Subject: MGMFI Sales Goals


Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

---

Attachment: ..\email\RMEM000104^MGMFI Sales Pro Goals.xls



DEFENDANT'S
EXHIBIT
30

CONFIDENTIAL

MV1001753

**From:** Roger A Miller
**Sent:** 09/22/2005
**To:** Mickey and Heathe
**Cc:** ffi.pwmpt.gm@marriott.com; Tammy Dominguez; Robert Cole
**Bcc:**
**Subject:** RE: MGMFI Sales Goals

---

Heather; You are correct. 35 hours (7 per day x 5 days) The attached goals will represent
3 days of work. As you add the other two days Tammy and you will determine where the
goals will be increased. Thanks. Have a great evening.

-----Original Message-----
From: Mickey and Heathe [mailto:watts167@charter.net]
Sent: Thursday, September 22, 2005 5:59 PM
To: 'Roger A Miller'
Subject: RE: MGMFI Sales Goals
Importance: High


I will! But I only work a 35 hour week when full time- 7 hour days. This
is what I was hired upon.
Please let me know if you feel the same
Thanks

-----Original Message-----
From: Roger A Miller [mailto:rmiller@hospitalityventures.com]
Sent: Thursday, September 22, 2005 1:47 PM
To: Mickey and Heathe
Cc: ffi.pwmpt.gm@marriott.com; Curtis Reitz; Robert Cole
Subject: FW: MGMFI Sales Goals

Heather; I'm forwarding this to Tammy for her review/input. The above was
submitted based on a 3 day/8 hour work week. As indicated during our
telephone conversation today we need the 3 days to return to 5 as soon as
possible. Based on the submission of other HV ""Directors Of Sales/Marketing""
weekly goals the average ""HC"" activities totals were 27-29.These represent a
5 day work week however. This would leave 14 ""HC"" remaining for the 4th and
5th day to be picked up. In order to hit 27 ""HC"" per week you have to
average 5.4 per day. Based on this I feel your 3 day ""HC"" activity goal
should be 16. This is just 3 more than indicated on the attached. I suggest
adding 1 to ""Appointments"", 1 to ""Client Lunch"" and 1 to ""Marketing Plan
Franchise Activities"". I would like the both of you to review, discuss and
let me know by tomorrow afternoon if that meets with your approval. If not
please forward where you want the 3 to go. Thanks. Have a great afternoon.



**DEFENDANT'S EXHIBIT**
_31_

-----Original Message-----
From: Watts, HEATHER [mailto:Heather.G.Watts@marriott.com]
Sent: Thursday, September 22, 2005 1:41 PM
To: Miller, Roger
Subject: MGMFI Sales Goals


Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi <http://www.marriott.com/mgmfi>

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

MV1001855

**Watts, HEATHER**

| | | |
|---|---|---|
| **From:** | Watts, HEATHER | **Sent:** Fri 9/23/2005 11:48 AM |
| **To:** | FFI, Montgomery GM; Rmiller | |
| **Cc:** | | |
| **Subject:** | RE: REVISED SALES GOALS | |
| **Attachments:** | | |

Tammy,

    Good morning! Please note that I have not discussed anything with Tandi. And it was (is) not my intention at all to come across to her in a negative way. I would never upset her knowing the volume of business she brings to the hotel. Tandi & I are very close and at lot of her decisions to put business at FFI is because of our professional relationship we have. My only questioning to her was the communication expectations as described in her job description. When I came in and did not see the group binder being used, rooms that have not been released and the frustration with the front desk and housekeeping- I only want to know what happened when things are so clearly defined. I am not sure what paper work Todd is referring to but I can provided you with my paperwork that was signed by Roger, Todd and myself. Overall I did not want to create any more work for others at the hotel during my absence.

    I will do my best to give you a call this afternoon to discuss my schedule.

Thanks

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi

**EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!**
**CALL FOR GROUP DISCOUNT!!**

---

**From:** FFI, Montgomery GM
**Sent:** Thu 9/22/2005 10:04 PM
**To:** Watts, HEATHER; Rmiller
**Subject:** RE: REVISED SALES GOALS

DEFENDANT'S
EXHIBIT
32

Heather,

Please Do Not contact Tandi. I have been looking at the paperwork I received from Todd about what Tandi was going to be doing and it says nothing about Tandi working in the hotel. I does say that she will be coming to the hotel 1 day (we agreed to Thurs.) to check on things and answer any questions we may have. As far as the front desk having to enter groups for Tandi, I see no real issue with this since we have 2 of them working in the morning. The issue that the frontdesk is referring to about the groups is right after Hurrican Katrina and we were all wearing multiple hats at that point. Tandi was working on alot of groups, groups were canceling and she was re filling the space that came available. There were a couple of days the front desk was doing alot of bouncing with groups being cancelled and new groups filling those spaces. My feeling on this is if she had had to come to the hotel to deal with entering the groups, we would not have been able to fill all of those rooms back up after they had been cancelled. Tandi has done a great job in your absence and I feel the issues the front desk are having with her are not a reflection of the work she has done, I will address and explain to them what I have just explained to you. But this is something I should deal with not you so DO NOT contact Tandi in regards to her work performance. I WILL speak with her myself.

I also need to talk about your schedule as well. You had mentioned that you were going to be working 1 1/2 days in the hotel and 1 1/2 days at home. It is my understanding you are to be working 3 full 7 hour shifts in the hotel not at home. We need to discuss this further. If you will not be working 3-7 hour shift in the hotel the company will not be paying you for 3 days, we will pay you for the time you actually work in the hotel. If you are

Int Discl/RFP 0101

not able to come back 3 full days we need to consider were to go from here. At this point I am not willing to say Tandi is done on Sept. 30th unless you are going to be working the 3 days in the hotel.

Please call me at some point on Friday so we can discuss this email. I will be available after 10:30 am.

Thank you and have a great night.

Tammy

---

**From:** Watts, HEATHER
**Sent:** Thu 9/22/2005 6:48 PM
**To:** FFI, Montgomery GM; Miller, Roger
**Subject:** REVISED SALES GOALS

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

Int Discl/RFP 0102

# SALES DEPARTMENT "SALES PRO" ACTIVITY REPORT

TRACKING REPORT

MGMFI

## "A" - HARD CORE ACTIVITIES

| Goals (Name) | Appoints (Qualifed Accts) | Sales Calls (Qualifed Accts) | Site Inspects | Client Lunch / Entmt. | Bids / Proposals | Mtg Plan Franchise Activities | Weekly Total | % to Total |
|---|---|---|---|---|---|---|---|---|
| Heather | 2 | 4 | 1 | 3 | 3 | 3 | 16 | 37% |
| TOTALS: | 2 | 4 | 1 | 3 | 3 | 3 | 16 | |

## "B" - OTHER SALES ACTIVITIES

| | % to Total | Follow-Up Call | Inquiry / Incoming Call | Telephone (Qualifed Acct) or Solicitation | Mtg Room Rental | Outside Sales Cold Calls | E-blast Solicitation | Weekly Total |
|---|---|---|---|---|---|---|---|---|
| | 40% | 5 | 4 | 5 | 3 | 2 | 4 | 20 |

## "C" - ADMINISTRATION

| | General Admin. | GM / DOS Meeting | Sales Staff Meetings | Reports Weekly / Monthly | Weekly Total | % to Total |
|---|---|---|---|---|---|---|
| Heather | 3 | 1 | 2 | 1 | | 15% |

### DEFINITE FUTURE BOOKINGS

| HOTEL | | Guest Rooms | Banquet Food | Banquet Beverage | | | Weekly Total |
|---|---|---|---|---|---|---|---|
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| TOTALS: | | | | | | | $ |

3 days

TOTALS ACTIVITIES  30%

Watts v. Hospitality
Int Discl/RFP  0104

| 30% | 10% ACH | 10% ACH | 10% ACH | 15% ACH | % to Total | 15 |
|---|---|---|---|---|---|---|

This message was se_____

## Watts, HEATHER

| | | |
|---|---|---|
| **From:** | Watts, HEATHER | **Sent:** Tue 9/27/2005 3:08 PM |
| **To:** | FFI, Montgomery GM | |
| **Cc:** | Miller, Roger | |
| **Subject:** | Heather Maternity Leave | |
| **Attachments:** | | |

Tammy,

After our discussion on Friday, there has been some change that I would like to request in my schedule.

Over the weekend Tanner become ill with "another " ear infection. He has now on his second round of antibiotics at being just 6 weeks old. They are scheduling him to see a specialist and recheck his hearing. *His doctor is requesting that I keep him out of daycare as long as possible.* With this being said, I would like to take my full maternity leave of 12 weeks that began on Aug. 10th. This would allow Tanner time to heal and increase his antibodies before going to daycare.

My *original plan* was to come back between 8-10 weeks-per my discussion with Roger. I will keep you posted weekly if I am able to come back sooner. I am still willing to do all I can at home as in the original plan with Todd and Roger. I can still do my 7+ hours a week: work on the marketing plan and continue to work directly with Tandi and maintain Sales Pro. I will continue my communication with you, the front desk and Tandi as needed throughout the week.

I have asked Tandi if she was still able to work with our original plan and me return the first week of November. She stated that yes, she would get with you. Her agreement is good within one week of my notice of my return.

My intentions is to return to my job after my maternity leave as we discussed. Please feel free to call me and I will be happy to discuss further if needed.

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
**www.marriott.com/mgmfi**

**EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!**



DEFENDANT'S
EXHIBIT
33

Watts v. Hospitality
Int Discl/RFP  0108

## watts167@bellsouth.net

**From:** watts167@bellsouth.net
**Sent:** Thursday, November 03, 2005 8:50 AM
**To:** 'Roger A Miller'
**Subject:** FW: Heather
**Importance:** High

Roger,
I tried to log onto Sales Pro this morning to enter a group that Tandi sent over yesterday and was denied access – I guess this answers my question about my job.
Heather

---

**From:** watts167@bellsouth.net [mailto:watts167@bellsouth.net]
**Sent:** Wednesday, November 02, 2005 9:38 PM
**To:** 'Roger A Miller'
**Subject:** Heather
**Importance:** High

Roger,
Good evening. My last conversation with Tammy this afternoon at 4p.m. (11/2/05) she stated that she was "now" no longer going to given me an option to return to my 35 hours a week upon my return from Maternity Leave on Nov. 9th or my request to let her know by Friday, Nov. 4th if I can return to my full-time status. She stated that I can either accept this as a termination today or can give her a two week notice when I turn in the files (and now the laptop) she requested on Friday. (11/4/05) Tammy stated that I was not to come in on Wednesday, Nov. 9th. I requested that I want to have something in writing so that I clearly understand and that I am on the same page as her, you and Robert.

Also, I requested from our prior conversation this morning that I needed more time then by 5pm today to let her know if I would be returning to my 35 hours on Nov. 9th. I told her that I would call my church and family members see if I could get some help. It was my understanding that she was going to be able to work with me and my schedule (just last week from our in-house meeting) in hopes that I could have full-time childcare by January. And the reason I have not spoken to you about this because you told me several weeks ago that you were no longer by boss that I needed to speak directly to Tammy.

I have not heard from Tammy this evening, I know she is traveling but can you confirm that I no longer have a job at the Fairfield Inn Montgomery. That what is stated above is true?

Thanks
Heather Watts

11/3/2005

**DEFENDANT'S EXHIBIT**
34

Watts v. Hospitality
Int Discl/RFP  0167

Received
11:25am
11/3/05
from
Carrie

Heather,

In this envelope you will find.

Cobra paperwork, if you elect to enroll.
Money for the expenses (for the donation for Carrie's Grandbaby)
Paycheck/with Bonus

You can clean any personal items out of your office under management supervision.
Your expense check that is in the system to be paid will be mail by next week.

Your final paycheck with your 40 hours vacation + 8 hours will be here next payroll.

Please feel free to contact me at the hotel or my cell.

Sincerely,
Dominguez
Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott

**DEFENDANT'S
EXHIBIT
35**

Watts v. Hospitality
Int Discl/RFP   0165

**watts167@bellsouth.net**

| | |
|---|---|
| **From:** | Dominguez, Tammy [Tammy.P.Dominguez@marriott.com] |
| **Sent:** | Monday, November 07, 2005 9:25 AM |
| **To:** | watts167@bellsouth.net |
| **Cc:** | rmiller@hospitalityventures.com; rcole@hospitalityventures.com; creitz@hospitalityventures.com; ron_disbrow@hilton.com |
| **Subject:** | FW: Heather |
| **Importance:** | High |



Dear
eather.doc (22 K)

        Heather:

Please read the attached letter.
I want to make sure you have plenty of time to make a decision, so I will give you until
the 10th rather than the 8th.  You may not have received this email as of yet because I
have been sending it to you heather.g.watts@marriott.com email.  Please respond ASAP.

Regards,

Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, AL 36117
C-207-807-1950
O-334-270-0007

---

From: Dominguez, Tammy
Sent: Sun 11/6/2005 12:42 PM
To: Watts, HEATHER
Cc: rmiller@hospitalityventures.com; ron_disbrow@hilton.com;
rcole@hospitalityventures.com; creitz@hospitalityventures.com
Subject: RE: Heather

Heather:

Please read and respond to the attached document.

Regards,

Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, AL 36117
C-207-807-1950
O-334-270-0007

1

DEFENDANT'S
EXHIBIT
36

Dear Heather,

I am sorry we could not finish our phone call yesterday. I wanted to send you this letter so that you may have a chance to consider what we were discussing at your own convience.

At this time we are prepared to offer you a position on the front desk for the 3-11 shift or the night audit 11-7 shift. Both positions will require a 35 hour a week commitment. Either one of these positions would be available starting November 9.

It is our intention to get you back to work. We would be able to pay you at your current rate of pay and your insurance benefits will remain the same.

Unfortunately at this time this is the only current positions we have available. If another position becomes available you will have the opportunity to be considered for it.

We will need to know what your decision will be by 11/8/2005 or we will have to consider that you have decided to resign from employment at our hotel.

If you have any questions please feel free to contact me to discuss.

Sincerely,

Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott
5801 Carmichael Road
Montgomery, AL 36117
334-270-0007

Watts v. Hospitality
Int Discl/RFP 0162

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 130-2006-01288 |
| | | and EEOC |

| | | | | |
|---|---|---|---|---|
| Name *(Indicate Mr., Ms., Mrs.)* | | | | Date of Birth |
| Heather G. Watts    *State or local Agency, if any* | | | | 6-21-72 |
| Street Address    6976 Eastern Shore Road    Montgomery, AL 36117    *City, State and ZIP Code* | | | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| Hospitality Ventures, LLC | 500 | 404-467-9299 |
| Street Address    3340 Peachtree Rd, Ste 605    *City, State and ZIP Code*    Atlanta, GA 30326 | | |
| Name | No. Employees, Members | Phone No. with Area Code |
| Marriott Fairfield Tnn/Montgomery Ventures LLC | 50 | 334-270-0007 |
| Street Address    5601 Carmichael Rd. Montgomery, AL 36117    *City, State and ZIP Code* | | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest            Latest
11-30-05

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

PREGNANCY/FMLA
SEE ATTACHED AFFIDAVIT
Disparate Treatment

RECEIVED
EEOC

DEC 1 9 2005

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 12/8/05<br>*Date*    *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*    12/8/05 |

**DEFENDANT'S EXHIBIT**
37

MV 00136

*130, 2006 01283*

## AFFIDAVIT OF HEATHER WATTS

STATE OF ALABAMA               )
COUNTY OF MONTGOMERY )

*BIRMINGHAM DISTRICT OFFICE*

Personally appeared affiant, HEATHER WATTS, who being duly sworn, says:

1.  This affidavit is given on the basis of the affiant having knowledge pertaining to sex/pregnancy discrimination and termination November 2, 2005.

2.  My address is: 6976 Eastern Shore Road, Montgomery AL 36117 and my phone number (334) 244-8077.

3.  I was employed at the Marriott Fairfield Inn from June 2004 as director of sales and marketing. General Manager Todd Epplin was told me the hotel had not made budget for 12-18 months before I was hired. From the first quarter, I brought in enough business to make the hotel profitable. I started at $35,000 per year and was earning $38,000 when I left, plus bonuses of $3,800 per quarter.

4.  When I first became pregnant, Roger Miller, vice president of sales and marketing at Hospitality Ventures, my employer, told me that I could take maternity leave. We worked on hiring an intern, Tandi Mitchell, to take over my job duties when I went on leave. Mr. Epplin agreed with Miller that I could be on maternity leave and gave Tandi and me training time up until the time I left. We talked about the length of my leave for several months.

5.  My child was born on August 12, and I took unpaid maternity leave, starting Aug. 11. I never had received a company handbook, but I had requested the leave in writing. No one contested my right to FMLA/maternity leave. I took leave starting on August 11, 2005, and was not due to return to work until November 9.

*130. 2006·01283*

6. My employer, however, continued to give me assignments during this period, paying me for seven hours a week. Tammy Dominguez, the new hotel manager, had tried to get me to come back to work three days a week at the hotel during my maternity leave, but my newborn developed an ear infection, and I was not able to work those hours during my maternity leave.

7. Typically, more than half of my work had been performed at home and outside the hotel, because of the nature of my job.

8. I was working on a marketing plan for the hotel while I was on maternity leave. Ms. Dominguez was asked on Wednesday October 19, to bring in all my work on the plan and to copy all of it, in her presence. Yet, when Roger Miller came to town to discuss the plan the following week, I was not invited to meet with him. I began to feel uneasy about my job status.

9. On Nov. 2, one week before I was to return from maternity leave, I was called by Ms. Dominguez, and asked if I was going to be able to return to my job fulltime, 35 hours a week. I said yes. She repeated the question, saying "I need to know by 5 p.m.," and I said yes.

10. She called back and said the company was not going to give me that option to come back, that I could resign today or she was terminating me.

11. I went to the hotel at 11:15 a.m. Nov. 3 and got my final check and an order to clean out my office. At 11:46, Ms. Dominguez, she called me again and questioned whether I had called the hotel and asked about FMLA. I said no. She began stating that she "made a mistake," and she could not terminate me due to FMLA. She said I should come in on Nov. 9, my original day back and prepare to work my 35 hours.

RECE...
DEC 1 ... 2006
BIRMINGHAM DISTRICT OFFICE

MV 00138

*130. 2006.61283*

12. However I had been required to turnover my laptop and all sales files. The company locked me out of the SalesPro computer database. There was no doubt, that I was fired.

13. Ms. Dominguez does not have custody of her own child. Other company officials had expressed concern over my ability to get child care. This was the only expressed reason for terminating me.

14. The intern who is now assigned to do some of my work, works outside the hotel all but one day a week.

15. I also was told by corporate officials in Atlanta that my medical coverage had been canceled October 30, three days before I was terminated.

16. The company attempted to deny me unemployment benefits, but my employer was overruled.

Affiant

RECEIVED

DEC 1 2 2005

BIRMINGHAM DISTRICT OFFICE

STATE OF ALABAMA }
MONTGOMERY COUNTY }

Before me the undersigned, a Notary Public in and for said County and State, this day personally appeared affiant, who is known to me, and who being first duly sworn deposes and says that the matters and things alleged in the foregoing affidavit are true as therein averred.

Affiant

Sworn and subscribed before me this 8th day of December, 2005.

Notary Public
My commission expires ___9-16-07___

**Minard v. ITC Deltacom Communications, Inc.**
447 F.3d 352
C.A.5 (La.),2006.
Apr 18, 2006 (Approx. 6 pages)

447 F.3d 352, 87 Empl. Prac. Dec. P 42,343, 152 Lab.Cas. P 35,123, 11 Wage & Hour
Cas.2d (BNA) 609, 32 NDLR P 641

**Briefs and Other Related Documents**

United States Court of Appeals,
Fifth Circuit.
Melissa C. MINARD, Plaintiff-Appellant,
v.
ITC DELTACOM COMMUNICATIONS, INC., Defendant-Appellee.
No. 04-30230.
April 18, 2006.

**Background:** Terminated employee sued former employer under the Family and Medical
Leave Act (FMLA). Employer moved for summary judgment. The United States District
Court for the Middle District of Louisiana, Frank J. Polozola, Chief Judge, granted
motion. Employee appealed.

**Holdings:** The Court of Appeals, Dennis, Circuit Judge, held that:
(1) threshold requirement that employer have at least 50 employees under FMLA was not
jurisdictional limitation, and
(2) triable issues existed regarding whether employee relied to her detriment on
employer's misrepresentation that she was an "eligible employee" under the FMLA.

Reversed and remanded.

West Headnotes

[1] KeyCite this headnote

231H Labor and Employment
231HVI Time Off; Leave
231Hk343 Employers Affected
231Hk345 k. Number of Employees. Most Cited Cases

Provision of Family and Medical Leave Act (FMLA) defining an "eligible employee"
under the Act as one whose employer has at least 50 employees at or within 75 miles of
employee's worksite is a substantive element of plaintiff's claim for relief, not a limitation
on the federal court's subject-matter jurisdiction. Family and Medical Leave Act of 1993,

§ 101(2)(B)(ii), 29 U.S.C.A. § 2611(2)(B)(ii).

[2] KeyCite this headnote

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497 Employees and Employment Discrimination, Actions Involving
          170Ak2497.1 k. In General. Most Cited Cases

Genuine issue of material fact regarding whether employee relied to her detriment on
employer's misrepresentation that she was an "eligible employee" under the FMLA, by
taking FMLA leave to have surgery, precluded summary judgment on employee's
equitable estoppel claim. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A.
§ 2601 et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

*352 Bryant Hollingsworth Graves (argued), Law Office of Bryant H. Graves, Baton
Rouge, LA, for Minard.

Richard J.R. Raleigh, Jr. (argued), John Anthony Wilmer, Wilmer & Lee, Huntsville, AL,
Leslie Ellen Ayres, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for Defendant-
Appellee.

Appeal from the United States District Court for the Middle District of Louisiana.

Before KING, Chief Judge, and JOLLY and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:
As the Supreme Court said in its recent pertinent decision in *353 *Arbaugh v. Y & H
Corp.,* --- U.S. ----, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006): "This case concerns the
distinction between two sometimes confused or conflated concepts: federal-court
'subject-matter' jurisdiction over a controversy; and the essential ingredients of a federal
claim for relief." [FN1] Specifically, we are here called upon to decide whether the
Family Medical Leave Act ("the FMLA" or "the Act") definition of an "eligible
employee" (as not including those "at a worksite" having "less than 50 employees if the
total number of employees ... within 75 miles of that worksite is less than 50") is a limit
on the federal courts' subject matter jurisdiction or instead is an essential ingredient of an
FMLA claim for relief. The Supreme Court's holding in *Arbaugh* that Title VII's
limitation of the definition of "employer" to include only those having "fifteen or more
employees," was an element of a Title VII claim for relief, and thus non-jurisdictional,
compels the same answer here: that is, the employee-numerosity requirement is an
element of the claim, not a limit upon the federal-court's subject-matter jurisdiction.
Consequently, we reverse the district court's dismissal of the plaintiff's FMLA claim for
lack of subject matter jurisdiction and remand the case to the district court for further
proceedings upon whether the employer should be equitably estopped to pursue a "non-
eligible employee" coverage defense, *viz.,* whether the employer's erroneous
representation to the employee that she was an "eligible employee" under the FMLA was

made with reason to believe that she would rely upon it and whether she reasonably relied on it to her detriment.

FN1. *Id.* at 1238.

The Family and Medical Leave Act of 1993 entitles eligible employees to take up to 12 work weeks of unpaid leave annually for any of several reasons, including a serious health condition that makes the employee unable to perform the functions of the position of such employee. [FN2] Subject to exceptions not applicable to this case, any eligible employee who takes leave under § 2612 shall be entitled on return from such leave to be restored to the position of employment held when the leave commenced, or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. [FN3]

FN2. 29 U.S.C. § 2612(a)(1)(d).

FN3. *Id.* § 2614.

The Act defines "eligible employee" as "an employee who has been employed (i) for at least 12 months by the employer ... and; (ii) for at least 1,250 hours of service with such employer during the previous 12-month period," *excluding any employee* who is employed at a worksite at which, or within 75 miles of which, the employer employs less than 50 employees. [FN4] An "employer" is defined as any person "engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." [FN5]

FN4. 29 U.S.C. § 2611(2).

FN5. *Id.* § 2611(4).

The enforcement section of the Act provides that any employer who interferes with or discriminates against the exercise of an employee's rights shall be liable to any eligible employee affected for damages as specified by the Act and for such equitable relief as may be appropriate, including employment, reinstatement, and promotion. [FN6] This

section also expressly creates \*354 a right of action and provides for federal and state court subject-matter jurisdiction:

FN6. *Id.* § 2617(a)(1).

An action to recover the damages or equitable relief prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of (A) the employees; or (B) the employees and other employees similarly situated. [FN7]

FN7. 29 U.S.C. § 2617(a)(2).

### Background

The plaintiff-appellant, Melissa Minard, was employed by the defendant-appellee, ITC Deltacom Communications, at its Baton Rouge Field Sales Office. In May 2002, Ms. Minard requested leave pursuant to the Family Medical Leave Act to undergo surgery to treat a serious medial condition. IRC granted Ms. Minard's request for FMLA leave in a written memorandum entitled "Request for Family or Medical Leave," which specifically stated that she was an "eligible employee" under the Family and Medical Leave Act and that she had "a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period." [FN8] The memorandum also informed Ms. Minard that her requested leave would be counted against her annual FMLA entitlement. [FN9] Ms. Minard took the granted leave, but on the day she was scheduled to return to work, ITC terminated her employment rather than restoring her to her former or an equivalent position as required by the Act. After its issuance of the memorandum, and after Ms. Minard had taken leave and undergone surgery, ITC discovered that Ms. Minard was not an eligible employee under the Act at the pertinent time because when she requested leave IRC employed less than 50 employees at or within 75 miles of the worksite at which she was employed. Ms. Minard filed suit under the FMLA on February 26, 2003. ITC answered that Minard was not an "eligible employee" under the FMLA. Ms. Minard amended her complaint to contend, in the alternative, that ITC is equitably estopped to deny that she was an eligible employee under the FMLA when she requested leave, because she relied to her detriment upon IRC's representation that she was at that time an eligible employee under the Act and therefore entitled to reinstatement upon returning from her medical leave.

FN8. R. at 166

FN9. *Id.*

ITC moved for summary judgment, on the ground that the district court lacked subject matter jurisdiction because on the date Ms. Minard requested leave it employed less than 50 employees within 75 miles of the worksite where she was employed. Ms. Minard opposed the motion with evidence attempting to show that the prescribed workforce exceeded 50 employees at that time and, alternatively, that she had relied to her detriment upon ITC's representation that she was an eligible employee under the FMLA and entitled to the requested leave and subsequent reinstatement.

The district court granted ITC's motion for summary judgment. Without giving reasons the court's terse written ruling stated:

The Court finds that the defendant is not an employer within the meaning of the Family and Medical Leave Act of 1993 and that the Act does not apply under the facts of this case. Likewise, the Court finds that the doctrine of equitable *355 estoppel does not apply. [FN10]

> FN10. 2 R. 237.

Although the order states that the district court found that ITC was not an "employer" under the Act, we conclude that the court meant that Ms. Minard was not an "eligible employee" under the act. The parties' arguments and summary judgment evidence related to whether the court lacked subject matter jurisdiction because ITC employed less than 50 employees within the prescribed worksite radius. Thus, we interpret the district court's ruling as implicitly determining that it lacked subject matter jurisdiction because Ms. Minard was not an eligible employee due to there being less than 50 employees within a 75 mile radius of her worksite on the day she requested leave.

### Standard of Review

We review *de novo* a district court's grant of summary judgment, applying the same standard applicable to the district court's ruling on the motion. [FN11] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN12]

> FN11. *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.2003).

> FN12. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Jurisdiction

The Supreme Court, in *Arbaugh v. Y & H Corporation, dba Moonlight Café,* --- U.S. ----, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) recently clarified the distinction between the requirements for federal subject matter jurisdiction and the elements of a federal claim for relief. *Arbaugh* involved an action under Title VII of the Civil Rights Act of 1964, which makes it unlawful "for an employer ... to discriminate," inter alia, on the basis of sex. [FN13] The Act's jurisdictional provision empowers federal courts to adjudicate civil actions "brought under" Title VII. [FN14] In a provision defining 13 terms used in Title VII, [FN15] Congress limited the definition of "employer" to include only those having "fifteen or more employees." [FN16] The question presented was whether the numerical qualification contained in Title VII's definition of "employer" affected federal-court subject-matter jurisdiction or, instead, delineated a substantive ingredient of a Title VII claim for relief.

FN13. *Id.* at 1238 (quoting 42 U.S.C. § 2000e-2(a)(1)).

FN14. 42 U.S.C. § 2000e-5(f)(3).

FN15. 42 U.S.C. § 2000e.

FN16. *Id.* § 2000e(b).

The case was tried to a jury, which returned a verdict for the plaintiff on her sexual harassment claim in the total amount of $40,000. After final judgment was entered on the verdict, the employer for the first time challenged the court's subject matter jurisdiction on the ground that it had fewer than 15 employees and therefore was not subject to suit under Title VII. Although recognizing that it was "unfair and a waste of judicial resources," the trial court granted the motion to dismiss because it believed that the 15-or-more employee requirement was jurisdictional.

The Supreme Court rejected that categorization and held that "the numerical threshold does not circumscribe federal-*356 court subject-matter jurisdiction." [FN17] Instead, the Court explained, "the employee-numerosity requirement relates to the substantive adequacy of Arbaugh's Title VII claim, and therefore could not be raised defensively late in the lawsuit, *i.e.,* after Y & H had failed to assert the objection prior to the close of trial on the merits." [FN18]

FN17. *Arbaugh,* 126 S.Ct. at 1238.

FN18. *Id.* at 1239.

After analyzing Title VII, the basic statutory grants of federal-court subject-matter jurisdiction, and its principal decisions dealing with the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, the Supreme Court summed up its reasons and recognized a bright-line rule, as follows:
[N]either § 1331, nor Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3) (authorizing jurisdiction over actions "brought under" Title VII), specifies any threshold ingredient akin to 28 U.S.C. § 1332's monetary floor. Instead, the 15-employee threshold appears in a separate provision that "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Given the "unfair [ness]" and "waste of judicial resources," *App. to Pet. for Cert.* 47, entailed in tying the employee-numerosity requirement to subject-matter jurisdiction, we think it the sounder course to refrain from constricting § 1331 or Title VII's jurisdictional provision, 42 U.S.C. § 2000e-5(f)(3), and to leave the ball in Congress' court. If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. *See Da Silva,* 229 F.3d, at 361 ("Whether a disputed matter concerns jurisdiction or the merits (or occasionally both) is sometimes a close question."). But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character. [FN19]

FN19. *Id.* at 1245 (footnote omitted).

Applying that "readily administrable bright line" to the case, the Court held that the threshold number of employees for application of Title VII is an "element of a plaintiff's claim for relief, not a jurisdictional issue." [FN20]

FN20. *Id.* at 1245.

[1] In light of the Supreme Court's decision in *Arbaugh,* we conclude that the definition section of the FMLA, [FN21] which defines 13 terms used in the statute, including the term "eligible employee," is a substantive ingredient of a plaintiff's claim for relief, not a jurisdictional limitation. Accordingly, § 2611(2)(B)(ii)--which excludes from the term "eligible employee" "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50"-- does not circumscribe federal-court subject-matter jurisdiction. This 50- employee threshold appears in the definitions section, separate from the jurisdictional section, and does not

speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.
[FN22] Given the unfairness and \*357 the waste of judicial resources entailed in tying the
employee-numerosity requirement to subject-matter jurisdiction, we have been instructed
to refrain from our own constrictions upon jurisdictional provisions resembling Title
VII's, such as the FMLA's § 2617(2)B(ii), and "to leave the ball in Congress's court."
[FN23] "When Congress does not rank a statutory limitation on coverage as jurisdictional
[as it chose not to do in § 2617(2) B(ii)], courts should treat the restriction as
nonjurisdictional in character." [FN24] Applying the Supreme Court's *Arbaugh* bright
line rule here, we conclude that the threshold number of employees for application of the
FMLA is an element of a plaintiff's claim for relief, not a jurisdictional limitation.

> FN21. 29 U.S.C. § 2611

> FN22. *See Arbaugh,* 126 S.Ct. at 1245 (stating "Instead, the 15- employee
> threshold appears in a separate provision that 'does not speak in
> jurisdictional terms or refer in any way to the jurisdiction of the district
> courts.' ") (quoting *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 394,
> 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)).

> FN23. *Arbaugh,* 126 S.Ct. at 1245.

> FN24. *Id.*

Since Arbaugh was decided on February 22, 2006, two other Circuits have recognized
and applied its bright line to conclude that limiting or qualifying language in a federal
statute other than Title VII, separate from its jurisdictional section, that does not speak in
jurisdictional terms or refer to the jurisdiction of the federal courts, places no constriction
upon the statute's clearly designated jurisdictional provision. [FN25] Subsequent to
Arbaugh, a third Circuit applied *Arbaugh* and held that Title VII's employee-numerosity
requirement is an element of the plaintiff's claim, rather than a jurisdictional limitation.
[FN26]

> FN25. See *Partington v. American Intern'l Specialty Lines Ins. Co.,* 2006
> WL 802500 (4th Cir.2006)(applying *Arbaugh* and holding failure of a
> plaintiff to qualify as a "person purchasing" under the Securities Act of
> 1933 was not a jurisdictional limitation); *Fernandez v. Centerplate/NBSE,
> Inc.,* 441 F.3d 1006 (D.C.Cir.2006) (applying *Arbaugh* and holding

employee's failure to prove element of Fair Labor Standards Act claim does not require dismissal for lack of subject-matter jurisdiction).

FN26. *Faulkner v. Woods Transportation, Inc.,* 2006 WL 869709 (11th Cir.2006),

For these reasons, we conclude that *Arbaugh* has clearly rejected the conflicting view of the Courts of Appeals relied upon by ITC that employee-numerosity requirements in the FMLA and other statutes are jurisdictional rather than simply an element of a plaintiff's claim for relief. [FN27] Moreover, in *Arbaugh* itself, the Court abrogated decisions by the Fifth and Sixth Circuits treating the Title VII employee-numerosity requirements as jurisdictional, [FN28] while approving of appeals courts decisions reaching the opposite conclusion with respect to the Americans with Disabilities Act as well as Title VII. [FN29]

FN27. *Viz., Douglas v. E.G. Baldwin & Associates, Inc.,* 150 F.3d 604 (6th Cir.1998)(FMLA's definition of "employer" based on number of employees is jurisdictional); *Wascura v. Carver,* 169 F.3d 683, 685 (11th Cir.1999)(FMLA's employer definition is jurisdictional and does not include public officials); *Dolese v. Office Depot, Inc.* 231 F.3d 202, 203 (5th Cir.2000)(affirmed dismissal of FMLA claim because employee had not been employed "for at least 12 months by the employer with respect to whom leave is requested" and thus was not an "eligible employee" for purposes of the FMLA). *N.B.,* it is not clear in *Dolese* whether the court considered the 12 months' employment requirement to limit jurisdiction or the claim for relief or both.

FN28. Discussing both *Arbaugh v. Y & H Corp.,* 380 F.3d 219, 223- 25 (5th Cir.2004)(Title VII's employee-numerosity requirement is jurisdictional), and *Armbruster v. Quinn,* 711 F.2d 1332, 1335 (6th

Cir.1983) (same).

FN29. *See Arbaugh,* 126 S.Ct. at 1241-42 (approving, *inter alia, Da Silva v. Kinsho International Corp.,* 229 F.3d 358, 361-66 (2d Cir.2000) (Title VII's employee-numerosity requirement is not jurisdictional); *Nesbit v. Gears Unlimited, Inc.,* 347 F.3d 72, 76-83 (3d Cir.2003) (same); *EEOC v. St. Francis Xavier Parochial School,* 117 F.3d 621, 623-24 (D.C.Cir.1997)

(Americans with Disabilities Act's employee-numerosity requirement, 42 U.S.C. § 12111(5)(A), resembling Title VII's requirement, is not jurisdictional)).

### *358 *Equitable Estoppel*

[2] Because the district court granted ITC's motion for summary judgment on the erroneous ground that the court lacked subject-matter jurisdiction, its assumption that "[l]ikewise, ... the doctrine of equitable estoppel does not apply" must be rejected as having been based on the same legal error. Therefore, because we have subject-matter jurisdiction, we must address the equitable estoppel question, which Ms. Minard put at issue in her amended pleadings and opposition to ITC's motion for summary judgment. After considering the arguments of the parties in light of the record, we conclude that whether ITC should be equitably estopped to assert a "non-eligible employee" coverage defense against Ms. Minard depends upon the resolution of contested issues of material fact, requiring that we remand the case to the district court for further proceedings. The Supreme Court has recognized that, under federal law, "[e]stoppel is an equitable doctrine invoked to avoid injustice in particular cases." [FN30] In *Heckler,* the Court quoted and adopted the elements of estoppel set forth in § 894(1) of the Restatement (Second) of Torts, as follows:

FN30. *Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

"If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled...
(b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired." Restatement (Second) of Torts § 894(1) (1979). [FN31]

FN31. Citing also Restatement (Second) of Agency § 8B (1958)

The Court explained that the party claiming the estoppel must have relied on its adversary's conduct " 'in such a manner as to change his position for the worse.' " [FN32] And, according to the Court, that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading. [FN33]

FN32. *Heckler,* 467 U.S. at 59, n. 9, 104 S.Ct. 2218 (quoting 3 J.
POMEROY, EQUITY JURISPRUDENCE § 805, p. 192 (S. Symons ed.,
1941)); *see also* 3 EQUITY JURISPRUDENCE § 812.

FN33. *Heckler* at 59, n. 10, 104 S.Ct. 2218 (citing *Wilber National Bank v.
United States,* 294 U.S. 120, 124-25, 55 S.Ct. 362, 79 L.Ed. 798 (1935))
(also quoting 3 EQUITY JURISPRUDENCE § 810 at 219) for the
proposition that

The truth concerning these material facts must be unknown to the other
party claiming the benefit of the estoppel, not only at the time of the
conduct which amounts to a representation or concealment, but also at the
time when that conduct is acted upon by him. If, at the time when he
acted, such party had knowledge of the truth, or had the means by which
with reasonable diligence he could acquire the knowledge so that it would

be negligence on his part to remain ignorant by not using those means, he
cannot claim to have been misled by relying upon the representation or
concealment. (Footnote omitted).

The RESTATEMENT, while requiring a "definite misrepresentation," does not require
any intent to deceive by the party to *359 be estopped. [FN34] In the Comment section,
the RESTATEMENT makes clear that estoppel is appropriate even where "the one
making the representation believes that his statement is true," and, moreover, "it is
immaterial whether the person making the representation exercised due care in making
the statement." [FN35] In adopting the Restatement's estoppel principles, the Supreme
Court evidently intended that they should be read and applied in light of the
Restatement's explanatory provisions.

FN34. RESTATEMENT (SECOND) OF TORTS at § 894(1).

FN35. Restatement (Second) of Torts, § 894(1), cmt. b.

Accordingly, an employer who without intent to deceive makes a definite but erroneous
representation to his employee that she is an "eligible employee" and entitled to leave
under FMLA, and has reason to believe that the employee will rely upon it, may be

estopped to assert a defense of non-coverage, if the employee reasonably relies on that representation and takes action thereon to her detriment. [FN36]

> FN36. *See Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 724-25 (2d Cir.2001) (affirming the district court's decision to estop an employer from asserting an affirmative defense challenging an employee's FMLA eligibility when the employer's unintentional misleading behavior caused the employee to justifiably and detrimentally rely on the FMLA leave); *see also Woodford v. Community Action of Greene County, Inc.,* 268 F.3d 51, 57 (2d Cir.2001) (authorizing equitable estoppel where an employer initially provided notice of eligibility for leave and later seeks to challenge it); *Dormeyer v. Comerica Bank-Illinois,* 223 F.3d 579, 582 (7th Cir.2000) (recognizing, in dicta, a district court's ability to equitably estop employers from asserting an affirmative defense contesting an employee's entitlement to FMLA leave in situations where the employer's words or conduct has misled the employee into relying on the leave); *see also, Duty v. Norton-Alcoa Proppants,* 293 F.3d 481 (8th Cir.2002)(affirming a district court's application of equitable estoppel in an FMLA case and collecting authorities).

Applying the Restatement principles of equitable estoppel adopted as federal law by the Supreme Court in *Heckler,* we conclude that ITC unintentionally made a definite misrepresentation to Ms. Minard that she was an "eligible employee" under FMLA at the time she requested leave; that she reasonably relied upon that misrepresentation in taking leave and undergoing surgery for the protection of her health. ITC strongly challenges, however, whether Ms. Minard so relied to her detriment, contending that she would have been forced to undergo her surgery at that time regardless of whether she had been informed that she was entitled to FMLA leave or whether ITC had granted it. Ms. Minard, on the other hand, argues that she can demonstrate that there were other medical alternatives available to her that would have enabled her to be treated safely without undergoing surgery at that particular time; and that she would have followed such an alternate course if ITC had correctly informed her that she was not then an "eligible employee" under the Act. Thus, there is a genuine dispute between the parties as to material issues of fact, requiring that we reverse the district court's summary judgment, and remand the case to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

C.A.5 (La.),2006.

Minard v. ITC Deltacom Communications, Inc.

447 F.3d 352, 87 Empl. Prac. Dec. P 42,343, 152 Lab.Cas. P 35,123, 11 Wage & Hour Cas.2d (BNA) 609, 32 NDLR P 641

**Briefs and Other Related Documents (Back to top)**

• <u>04-30230 </u>(Docket) (Mar. 12, 2004)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.