IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                    )
                                  )
    Plaintiff,                )
                                  )
v.                                )     CASE NO. 2:06CV1149-MEF
                                  )
Hospitality Ventures, LLC,        )
                                  )
    Defendant.                )

## MOTION FOR SUMMARY JUDGMENT

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal Rule of Civil Procedure 56(b), files its Motion for Summary Judgment on the grounds that:

1.    Plaintiff Heather Watts admits that on November 2, 2005, her employer terminated her employment because she refused to return to work forty (40) hours per week. Nonetheless, Plaintiff claims that this termination:

(a)  discriminated against her on the basis of her pregnancy and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII");

(b)  violated the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA");

(c)  breached an employment contract with her; and

(d)  breached an implied covenant of good faith and fair dealing.

2.    Plaintiff's claims under Title VII and the FMLA fail because only an "employer" can be liable under Title VII and the FMLA, and Hospitality Ventures, LLC was not an "employer" because it did not employ the minimum number of employees required by each statute.

3.    Plaintiff's Title VII claims also fail because:

(a)  Plaintiff cannot state a _prima_ _facie_ case of pregnancy discrimination because she was not a member of the protected class when her employment terminated, and she cannot identify any non-pregnant employee that her employer treated more favorably;

(b)  Plaintiff cannot state a _prima_ _facie_ case of sex discrimination under Title VII because she cannot identify any male employee that her employer treated more favorably, and she admits she was replaced by females; and

(c)  Plaintiff cannot rebut her employer's legitimate non-discriminatory reason for terminating her employment -- she refused to return to work forty (40) hours per week.

4.    Plaintiff's claim for breach of contract against Hospitality Ventures, LLC fails because:

(a)  Plaintiff could not have entered a contract with Hospitality Ventures, LLC because it did not exist when she claims to have entered the alleged contract;

1742242 v03

(b) Plaintiff could not have entered a contract with Hospitality Ventures, LLC because the person whom she claims entered the alleged contract on behalf of Hospitality Ventures, LLC was not employed by Hospitality Ventures, LLC; and

(c) Plaintiff was employed on an at-will basis, and an at-will employee cannot maintain a breach of contract claim based upon termination of her employment.

5. Plaintiff's claim for breach of an implied covenant of good faith and fair dealing fails because:

(a) Such a claim exists only based upon insurance contracts, and Plaintiff does not allege such a breach in relation to an insurance contract; and

(b) No such claim exists for termination of an at-will employment relationship.

6. In support of this Motion for Summary Judgment, Hospitality Ventures, LLC relies on its Brief in Support and Exhibits 1-13 to that Brief, filed concurrently herewith.

WHEREFORE, Hospitality Ventures, LLC respectfully requests that the Court grant its Motion for Summary Judgment and dismiss this case.

1742242 v03

This 12th day of September, 2007.

                             Respectfully submitted,

                             Jeffrey A. Lee
                             Maynard, Cooper & Gale, P.C.
                             1901 Sixth Avenue North
                             2400 AmSouth/Harbert Plaza
                             Birmingham, Alabama 35203-2618
                             Telephone: (205) 254-1987
                             Fax: (205) 254-1999

                              s/ Daniel S. Fellner_____
                             R. Jason D'Cruz
                             Admitted Pro Hac Vice
                             Daniel S. Fellner
                             Admitted Pro Hac Vice
                             Morris, Manning & Martin, LLP
                             1600 Atlanta Financial Center
                             3343 Peachtree Road, N.E.
                             Atlanta, Georgia 30326-1044
                             Telephone: (404) 233-7000
                             Fax: (404) 365-9532


                             Attorneys for Hospitality Ventures,
                             LLC

1742242 v03

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )        CASE NO. 2:06CV1149-MEF
                                  )
Hospitality Ventures, LLC,        )
                                  )
        Defendant.                )

### CERTIFICATE OF SERVICE

I certify that this day I electronically filed the foregoing MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will notify the following of such filing:

Priscilla Black Duncan
P.B. Duncan & Associates
472 S. Lawrence, Suite 204
Montgomery, AL  36104
helzphar@mindspring.com

Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226
akhaynes@haynes-haynes.com

This 12th day of September, 2007.


            s/ Daniel S. Fellner
Attorney for Hospitality Ventures, LLC

1742242 v03

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )      CASE NO. 2:06CV1149-MEF
                                  )
Hospitality Ventures, LLC,        )
                                  )
        Defendant.                )

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal Rule of Civil Procedure 56(b), files its Brief in Support of Motion for Summary Judgment.[1]

## I.    INTRODUCTION

Plaintiff admits that her employer terminated her employment after she refused to return to work forty (40) hours per week. Nonetheless, Plaintiff alleges that by terminating her employment, her employer: 1) discriminated against her on the basis of her pregnancy and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); 2) violated the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); and 3) breached her employment contract and an implied covenant of good faith and fair dealing.

---

[1] On March 26, 2007, Hospitality Ventures filed its Motion for Partial Summary Judgment only on Plaintiff's claim under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), because she was not an "eligible employee" under the FMLA, and therefore cannot maintain a claim under the FMLA. Hospitality Ventures now moves for summary judgment on all of Plaintiff's claims.

1                                    1727723

All of Plaintiff's claims fail as a matter of law because:

- Only an "employer" can be liable under Title VII and the FMLA, and Hospitality Ventures, LLC was not an "employer" because it did not employ the minimum number of employees required by each statute;

- Plaintiff cannot state a <u>prima</u> <u>facie</u> case under Title VII because she was not a member of the protected class, she cannot identify any male or non-pregnant employee that her employer treated more favorably, and she admits she was replaced by females;

- Plaintiff cannot rebut her employer's legitimate non-discriminatory reason for terminating her employment -- she refused to return to work forty (40) hours per week;

- Plaintiff could not have entered a contract with Hospitality Ventures, LLC because: a) it did not exist when she claims to have entered the alleged contract, and b) the person with whom she claims to have entered the alleged contract was not employed by Hospitality Ventures, LLC;

- Plaintiff was employed on an at-will basis, and she cannot maintain a breach of contract claim based upon an at-will employment relationship; and

- No claim for breach of covenant of good faith and fair dealing exists: a) except based upon an insurance

> contract; and b) based upon termination of an at-will employment relationship.

No genuine issues of material fact exist for resolution. Consequently, the Court should grant this Motion for Summary Judgment and dismiss all of Plaintiff's claims.

## II.  STATEMENT OF FACTS

### A.  Plaintiff Began Working At the Hotel

On June 24, 2004, Plaintiff commenced employment as the Director of Sales and Marketing at the Fairfield Inn by Marriott located at 5601 Carmichael Road, Montgomery, Alabama, 36117 (the "Hotel"). (Pl. Dep. at 74:19-75:11 (attached as Exhibit 1)). The Hotel's General Manager, Todd Epplin, supervised Plaintiff. (Pl. Dep. at 70:1-4, 88:9-14). At the start of Plaintiff's employment with the Hotel, Roger Miller, Vice President of Hospitality Ventures Management, Inc. ("HVMI"), also supervised her. (Pl. Dep. at 70:1-4). HVMI provides management, consulting, sales and marketing, guest satisfaction, and operations assistance to the Hotel. (Miller Dep. at 24:3-15 (attached as Exhibit 2)).

On April 7, 2005, Plaintiff sent an e-mail to Miller requesting:

- A raise;

- A reduction in her hours of work from thirty-five (35) to twenty-nine (29) per week; and

- A maternity leave of eight (8) to twelve (12) weeks.

(Pl. Dep. at 256:16-259:22, DX 22 (attached as Exhibit 3)).  Later
that same day, Miller sent an e-mail response:

- Granting Plaintiff's request for a raise; and

- Refusing to reduce her hours of work.

(Pl. Dep. at 264:12-265:5, DX 23 (attached as Exhibit 4)).
Specifically, Miller stated that "we must maintain your current 35-
hour work schedule . . . 35 hours is the minimum needed to
succeed." (Pl. Dep. at 264:18-265:5, DX 23). Miller did not
respond to Plaintiff's request for maternity leave. (Pl. Dep. at
264:12-15, DX 23). Also, Miller stated that "[t]his increase/e-
mail is not a contract for employment." (Pl. Dep. at 264:6-8, DX
23).

## B.    Plaintiff Took a Maternity Leave

On June 6, 2005, Plaintiff sent Epplin a letter requesting a
maternity leave. (Pl. Dep. at 151:23-152:12, 266:10-21, DX 24
(attached as Exhibit 5)). According to Plaintiff, the Hotel never
responded to this request for a maternity leave. (Pl. Dep. at
266:11-20). Plaintiff admits this letter did not set a duration
for her employment, and either she or the Hotel could terminate her
employment at any time. (Id. at 141:4-13, 153:11-154:19).

On August 11, 2005, Plaintiff commenced a maternity leave, and
gave birth the following day. (Id. at 11:7-8, 346:9-11, 368:2-3;
Pl. Aff. at ¶5 (attached as Exhibit 6)). By September 24, 2005,
Plaintiff fully recovered from giving birth, and was released to

1727723

return to work by her health care provider.  (Pl. Dep. at 216:22-
220:9, DX 12 (attached as Exhibit 7)).  Nonetheless, Plaintiff
requested to extend her maternity leave to twelve (12) weeks, and
the Hotel granted that request.  (Pl. Dep. at 294:13-297:12, 367:5-
9, DX 33 (attached as Exhibit 8)).

**C.    Plaintiff Terminated for Refusing to Return to Work Forty (40)**
**Hours Per Week**

During Plaintiff's maternity leave, the Hotel hired a new
General Manager, Tammy Dominguez.  (Pl. Dep. at 88:15-20; 349:1-6).
Miller told Plaintiff that he was no longer her supervisor, and she
reported to Dominguez.  (Id. at 298:4-11, 305:8-16, 306:15-22, DX
34 (attached as Exhibit 9)).  On November 2, 2005, Dominguez asked
Plaintiff whether she would return to work full-time on November 9,
2005.  (Pl. Dep. at 327:16-328:4).  According to Plaintiff, on
November 2, 2005:

- Dominguez told Plaintiff that she would have to work
  forty (40) hours per week at the Hotel (Id. at 99:1-4);

- Plaintiff told Dominguez that she would work only thirty-
  five (35) hours per week, and she would not work all of
  her hours at the Hotel (Id. at 96:20-97:8, 98:16-101:14);
  and

- Dominguez terminated Plaintiff's employment because she
  refused to work forty (40) hours per week at the Hotel.
  (Id. at 365:18-366:9).

Plaintiff cannot identify any similarly situated non-pregnant or male employee who the Hotel treated more favorably than her. (Id. at 156:14-157:4). According to Plaintiff, the Hotel replaced her with two (2) females. (Id. at 179:18-180:6).

**D.    Plaintiff Rejected the Hotel's Two Offers of Other Employment**

On November 6, 2005, Dominguez offered Plaintiff the opportunity to return to work at the Hotel on November 9, 2005, in either of two (2) available positions. (Id. at 317:10-321:5, DX 36 (attached as Exhibit 10)). Both positions required Plaintiff to work only thirty-five (35) hours per week for the same pay and benefits she previously received. (Pl. Dep. at 320:19-321:3, DX 36). Plaintiff admits she never responded to or accepted this offer. (Pl. Dep. at 321:4-5).

**E.    Hospitality Ventures, LLC is Not Plaintiff's Employer, and Did Not Own or Operate the Hotel**

**1.    Hospitality Ventures, LLC Never Employed Plaintiff, and Has Not Existed Since 2005**

On May 16, 2001, Hospitality Ventures, LLC was formed in Delaware. (Affidavit of Carol Twardoch ("Twardoch Aff.") at ¶ 2 (attached as Exhibit 11)). On June 1, 2005, the Delaware Secretary of State cancelled Hospitality Ventures, LLC, and that entity ceased to exist. (Id. at ¶ 3). From 2003 until the present, Hospitality Ventures, LLC has not had any employees, and did not employ or pay Plaintiff, Epplin, Dominguez, or Miller. (Id. at ¶¶ 5-6). In addition, Hospitality Ventures, LLC has never owned or operated the Hotel. (Id. at ¶ 9).

1727723

From July 29, 2002, to the present, Montgomery Ventures, LLC owned the Hotel. (Id.). From June 24, 2004, through November 9, 2005, all of the employees who worked at the Hotel -- including Plaintiff, Epplin, and Dominguez -- were employed and paid by Montgomery Ventures, LLC. (Affidavit of Karen Kish ("Kish Aff.") at ¶¶ 2-3 (attached as Exhibit 12)).

From 2003 to the present, HVMI employed Miller. (Miller Dep. at 6:11-7:11). From January 1, 2003, to the present, Hospitality Ventures, LLC has not owned or operated HVMI. (Twardoch Aff. at ¶ 7). From January 1, 2003, to the present, HVMI has not owned or operated Hospitality Ventures, LLC. (Twardoch Aff. at ¶ 8).

## 2. Hospitality Ventures, LLC Repeatedly Alerted Plaintiff to Her Error

Out of an abundance of caution, and in an effort to move this dispute forward, on January 23, 2007, Hospitality Ventures, LLC:

- Notified Plaintiff that she named the wrong entity as a defendant in this lawsuit;

- Provided her payroll records demonstrating that Montgomery Ventures, LLC paid Plaintiff and all other Hotel employees throughout her entire employment and, therefore, was the proper defendant; and

- Requested that she amend her Complaint to correct this error.

(Exhibit 13). Plaintiff initially agreed to amend her Complaint to correct her error, but later refused to do so. (Exhibits 14 and

1727723

15).  On March 26, 2007, Hospitality Ventures, LLC filed its Motion for Partial Summary Judgment, and alerted Plaintiff and the Court that if Plaintiff continued to pursue her claims against Hospitality Ventures, LLC, it would file a Motion for Summary Judgment because it is not an "employer" under Title VII or the FMLA, and could not have entered into any alleged contract with Plaintiff.  (Brief in Support of Motion for Partial Summary Judgment at n. 1).  On May 24, 2007, the Court entered an Order allowing Plaintiff until July 27, 2007, to conduct discovery on whether Hospitality Ventures, LLC is an employer under the FMLA.

### 3.    Time to Amend Pleadings Passed

On April 12, 2007, the Court entered a Uniform Scheduling Order.  Section 4 of that Order required that "Any motions to amend the pleadings and to add parties shall be filed on or before June 26, 2007."  Plaintiff has not moved to amend the pleadings or to add parties.

### III. ARGUMENT AND CITATION OF AUTHORITY

### A.    Standard of Review

Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b) "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Prewett v. State of Alabama Dep't of Veterans Affairs</u>, 419 F. Supp. 2d 1338, 1342 (M.D. Al. 2006) (Judge Fuller)

1727723

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "If the party seeking summary judgment meets the initial burden of demonstrating that there is no genuine issue of material fact, the burden then shifts to the non-moving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence."  Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  The non-moving party may not rest upon the mere allegations of her pleadings; to avoid summary judgment, her response must set forth specific facts showing that there is a genuine issue for trial.  FED.R.CIV.P. 56(e).

## B.   Not an "Employer" under Title VII or FMLA

Only an "employer" can be liable for a violation of the FMLA or Title VII, of which the Pregnancy Discrimination Act is a part. Faulkner v. Woods Transp., Inc., 174 Fed. Appx. 525, 528 (11th Cir. 2006) (Title VII); Wascura v. Carver, 169 F.3d 683, 685 (11th Cir. 1999) (FMLA).  Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. § 2000e(b).  To be an employer under the FMLA, an entity must, in part, employ "50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 U.S.C. § 2611(4)(A)(i).

1727723

From 2003 to the present, Hospitality Ventures, LLC had no employees. (Twardoch Aff. at ¶5). Thus, Hospitality Ventures, LLC was not an "employer" under Title VII or the FMLA, and the Court should grant Hospitality Ventures, LLC summary judgment on Plaintiff's claims under Title VII and the FMLA. 42 U.S.C. § 2000e(b); 29 U.S.C. § 2611(4)(A)(i); Faulkner, 174 Fed. Appx. at 528; Wascura, 169 F.3d at 685.

## C. Title VII Claim Fails[2]

### 1. No Prima Facie Case

#### a) No Pregnancy Discrimination

The Pregnancy Discrimination Act amended Title VII to prohibit discrimination "on the basis of pregnancy, childbirth, or related medical conditions". 42 U.S.C. § 2000e(k). To establish a prima facie case of pregnancy discrimination, a plaintiff must establish, in part, that she was a member of the protected class, and she suffered from differential application of work or disciplinary rules. Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1312 (11th Cir. 1994); Ferrell v. Masland Carpets, Inc., 97 F. Supp. 2d 1114, 1125 (S.D. Ala. 2000). "To remain a member of the protected class after giving birth, a woman who is not pregnant at or very near the time when an adverse employment action is taken against her must demonstrate that the effects of her pregnancy continued to

---

[2] Pretermitting whether Hospitality Ventures, LLC is an "employer" under Title VII, Plaintiff's Title VII claims also fail for the reasons stated herein.

exist at the time she was subject to the action, either in actual fact or in the thoughts and actions of those responsible." Nance v. Buffalo's Cafe of Griffin, Inc., No. 1:03-cv-2887-WSD, 2005 U.S. Dist. LEXIS 20432, at *44-47 (N.D. Ga. Feb. 7), adopted in part, 2005 U.S. Dist. LEXIS 20429 (N.D. Ga. Mar. 30, 2005); Sura v. Stearns Bank, N.A., No. 01-1344(PAM/RLE), 2002 U.S. Dist. LEXIS 25376, at *14-16 (D. Minn. Dec. 18, 2002). When plaintiffs fail to identify a similarly situated employee outside the protected class who was treated more favorably, courts grant summary judgment for failing to establish a prima facie case. Armstrong, 33 F.3d at 1318; Ferrell, 97 F. Supp. 2d at 1124-25.

On August 12, 2005, Plaintiff gave birth. (Pl. Dep. at 11:7-8, 346:9-11, 368:2-3). By September 24, 2005, Plaintiff fully recovered from giving birth, and her health care provider released her to return to work. (Id. at 216:22-220:9, DX 13). Plaintiff admits that she has no evidence that the Hotel treated any non-pregnant employee more favorably than her. (Pl. Dep. at 156:14-157:4). Consequently, Plaintiff cannot establish a prima facie case of pregnancy discrimination because on November 2, 2005, she was not a member of the protected class when the Hotel terminated her employment, and she cannot identify any similarly situated employee outside the protected class who the Hotel treated more favorably. Therefore, the Court should grant summary judgment. Armstrong, 33 F.3d at 1318; Nance, 2005 U.S. Dist. LEXIS 20432, at

1727723

*44-47; <u>Sura</u>, 2002 U.S. Dist. LEXIS 25376, at *14-16; <u>Ferrell</u>, 97 F. Supp. 2d at 1126-27.

b) **No Sex Discrimination**

To establish a <u>prima facie</u> case of discriminatory termination based upon sex, the plaintiff must show, in part, that she was replaced by someone outside of her protected group, or identify someone outside her protected group who her employer treated more favorably. <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984). Plaintiff admits that she has no evidence that the Hotel treated any male employee more favorably than her, and that the Hotel replaced her with two (2) females. (Pl. Dep. at 156:14-157:4, 179:18-180:6). Consequently, Plaintiff cannot establish a <u>prima facie</u> case of sex discrimination, and the Court should grant summary judgment on such claim. <u>Nix</u>, 738 F.2d at 1185.

2. **Legitimate Non-Discriminatory Reason for Discharge; No Pretext**

Assuming, <u>arguendo</u>, that Plaintiff could establish a <u>prima facie</u> case of sex or pregnancy discrimination, the Hotel must come forward with a legitimate non-discriminatory reason for its actions that negate the inference of discrimination. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-803 (1973). Once the Hotel satisfies this minimal burden, Plaintiff must produce evidence that the Hotel's proffered non-discriminatory reason is a pretext for discrimination. <u>Id.</u> at 804. To survive summary judgment,

1727723

Plaintiff must present "evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of [the Hotel's] legitimate, non-discriminatory reasons." Evans v. McClain of Georgia, Inc., 131 F.3d 957, 964-65 (11th Cir. 1997). An employer may legitimately terminate an employee for refusing to perform her job. Armstrong, 33 F.3d at 1314.

Plaintiff admits the Hotel terminated her employment because she refused to return to work the hours her employer required. (Pl. Dep. at 96:20-97:8; 98:16-101:14; DX 34). This is a legitimate, non-discriminatory reason for terminating her employment. Armstrong, 33 F.3d at 1314. Plaintiff is unable to offer any evidence to establish that this reason is pretextual. Accordingly, summary judgment is appropriate on Plaintiff's discrimination claim. Evans, 131 F.3d at 964-65; Armstrong, 33 F.3d at 1314.

**D.    No Contract and No Claim Based Upon Covenant of Good Faith and Fair Dealing**

Plaintiff claims that her June 6, 2005, letter to Epplin formed a contract with Hospitality Ventures, LLC entitling her to take a maternity leave. (Pl. Dep. at 142:4-144:2, 151:23-152:12). Plaintiff claims Hospitality Ventures, LLC breached that contract, and an implied covenant of good faith and fair dealing. (Complaint at p. 5; Pl. Dep. at 151:23-152:12). Plaintiff's claim fails because: 1) no contract existed with Hospitality Ventures, LLC; 2) she cannot maintain a breach of contract claim based upon an at-

will employment relationship; and 3) there can be no claim for breach of an implied covenant of good faith and fair dealing: a) except based upon an insurance contract; and b) based upon termination of an at-will employment relationship.

**1.  No Contract with Hospitality Ventures, LLC**

The plaintiff in a breach of contract claim has the burden of proving that there was a valid contract between the parties. Jackson v. Cintas Corp., 391 F.Supp.2d 1075, 1102 (M.D. Ala. 2005). When an entity created in another jurisdiction ceases to exist under that jurisdiction's laws, it ceases to exist in Alabama. Fitts v. National Life Ass'n, 30 So. 374, 374 (Ala. 1901).  A Delaware limited liability company ceases to exist as a legal entity upon cancellation.  Del. Code Ann. tit. 6, § 18-201(b).

On June 1, 2005, the Delaware Secretary of State cancelled Hospitality Ventures, LLC.  (Twardoch Aff. at ¶ 3).  Thus, on June 6, 2005, Hospitality Ventures, LLC did not exist in Alabama, and could not have entered a contract with Plaintiff.  Del. Code Ann. tit. 6, § 18-201(b); Fitts, 30 So. at 374.  Assuming, arguendo, that Plaintiff's letter to Epplin formed a contract, it could not have been with Hospitality Ventures, LLC because Hospitality Ventures, LLC never employed Epplin.  (Twardoch Aff. at ¶¶ 5-6; Kish Aff. at ¶¶ 3).  Consequently, the Court should grant summary judgment on Plaintiff's claim because she cannot prove she had a

1727723

valid contract with Hospitality Ventures, LLC. <u>Jackson</u>, 391 F.Supp.2d at 1102.

### 2.  No Claim Based Upon At-Will Employment

Under Alabama law, an employment relationship with no specified duration is terminable at-will. <u>Chastain v. Kelly-Springfield Tire Co</u>., 733 F.2d 1479, 1482-84 (11th Cir. 1984). There can be no claim for breach of contract based upon terminating an at-will employment relationship because no enforceable contract exists. <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant v. Burlington Northern Santa Fe RR</u>, 210 F. Supp.2d 1263, 1294-1295 (N.D. Ala. 2002). Plaintiff admits that her June 6, 2005, letter did not specify a duration for her employment. (Pl. Dep. at 141:4-13, 153:11-154:19). Consequently, the Hotel employed Plaintiff on an at-will basis, she cannot maintain a breach of contract claim based upon the termination of her employment, and the Court should grant Hospitality Ventures, LLC summary judgment on Plaintiff's breach of contract claim. <u>Chastain</u>, 733 F.2d at 1482-84; <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant</u>, 210 F. Supp.2d at 1294-1295.

### 3.  No Covenant of Good Faith and Fair Dealing

Alabama law does not recognize a claim for breach of an implied covenant of good faith and fair dealing outside insurance contracts. <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant</u>, 210 F. Supp.2d at 1295. In addition, there can be no breach of an implied covenant of good faith and fair dealing based upon termination of

1727723

an at-will employment relationship. <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant</u>, 210 F. Supp.2d at 1295.

Here, Plaintiff does not claim breach of an insurance contract, so any claim by Plaintiff for a breach of an implied covenant of good faith and fair dealing must fail. <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant</u>, 210 F. Supp.2d at 1295. Plaintiff's claim also fails because it is based upon the termination of an at-will employment relationship. <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant</u>, 210 F. Supp.2d at 1295. Accordingly, the Court should grant Hospitality Ventures, LLC summary judgment on Plaintiff's claim for breach of an implied covenant of good faith and fair dealing. <u>Jackson</u>, 391 F.Supp.2d at 1102; <u>Wyant</u>, 210 F. Supp.2d at 1295.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant Hospitality Ventures' Motion for Summary Judgment on all of Plaintiff's claims and dismiss this case.

1727723

This 12th day of September, 2007.

Respectfully submitted,

Jeffrey A. Lee
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
Telephone:  (205) 254-1987
Fax:  (205) 254-1999


 s/ Daniel S. Fellner_____
R. Jason D'Cruz
Admitted Pro Hac Vice
Daniel S. Fellner
Admitted Pro Hac Vice
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
Telephone:  (404) 233-7000
Fax:  (404) 365-9532

Attorneys for Hospitality Ventures,
LLC

1727723

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HEATHER WATTS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: 2:06CV1149-MEF |
| | ) |
| HOSPITALITY VENTURES, LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I certify that this day I electronically filed the foregoing BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will notify the following of such filing:

Priscilla Black Duncan
P.B. Duncan & Associates
472 S. Lawrence, Suite 204
Montgomery, AL  36104
helzphar@mindspring.com

Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226
akhaynes@haynes-haynes.com

This 12th day of September, 2007.


_____
s/ Daniel S. Fellner
Attorney for Hospitality Ventures, LLC

1727723

# EXHIBIT "1"

ORIGINAL

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5      HEATHER WATTS,

6              Plaintiff,

7      vs.                        CASE NO. 2:06CV1149-MEF

8      HOSPITALITY VENTURES, LLC,

9              Defendant.

10

11

12

13              * * * * * * * * * *

14          DEPOSITION OF HEATHER GODFREY WATTS,

15      taken pursuant to stipulation and agreement

16      before Heather Barnett, Court Reporter and

17      Commissioner for the State of Alabama at Large,

18      in the Law Offices of Maynard, Cooper & Gale,

19      100 North Union Street, Suite 650 RSA Tower,

20      Montgomery, Alabama, commencing at approximately

21      10:32 a.m., on Thursday, July 19, 2007, and

22      continuing on Friday, July 20, 2007.

23              * * * * * * * * * *

```
1    A.    December 28th, 2001.

2    Q.    Where was she born?

3    A.    Here in Montgomery.

4    Q.    And Tanner was also born in Montgomery,

5          Alabama?

6    A.    Yes, sir.

7    Q.    Tanner's date of birth?

8    A.    August the 12th, 2005.

9    Q.    Do you have any relatives that live in

10         Alabama?

11   A.    A lot of relatives that live in Alabama.

12   Q.    Did you grow up in Montgomery?

13   A.    Yes, sir.

14   Q.    Do your parents live in Montgomery still?

15   A.    Well, they live in Wetumpka, which is just

16         right outside of Montgomery, but yes.

17   Q.    And what are your parents' names?

18   A.    My patients are divorced, so I have a

19         stepfather and a mother.  So they are Sam and

20         Ginny Hancock, and they're the ones that live

21         in Wetumpka.

22   Q.    Okay.  And your father?

23   A.    He lives here in Montgomery.  And it's Rouse,
```

70

```
1   Q.   Did anybody at -- did anybody explain to you
2        who was going to be your supervisor?
3   A.   It was my understanding that it was Roger and
4        the general manager.
5   Q.   So you reported to both?
6   A.   Mainly to Roger on a weekly basis.
7   Q.   What else do you remember about that job
8        offer?
9   A.   Can I have a moment to think about it?
10  Q.   Sure.
11  A.   It's been a while.
12  Q.   Absolutely.
13  A.   It had a start date on it.
14  Q.   What was that supposed to be?
15  A.   I would have to pull it and see.  I don't
16       recall.  It was very -- within the next week
17       or so of the -- of the interview, so there
18       was a start date on there.  And then I did
19       get in -- I asked for in writing about the
20       insurance, so that came on a separate
21       e-mail, because it was not included in the
22       offer from Roger, but Rob Flanders sent me an
23       e-mail about the insurance.
```

1          this position is it dealt with a group --

2          it's like the economy hotel.  It was your in

3          and out, your groups.  So it's a lot -- and

4          being in the Montgomery market and knowing

5          the market and knowing the events that take

6          place and knowing the product that they had

7          at the time, that was one of my reasons.

8              It was a lot -- it's a more presentable

9          property to sell for.  I don't want to say it

10         was easy, but it was -- it was challenging

11         but it was a property that -- a product that

12         I enjoyed selling for.  Prior to coming on,

13         when I would do the three, I really enjoyed

14         the Fairfield Inn product.  So that was one

15         of the strong reasons, too.

16    Q.   Okay.  So now have you told me every reason

17         that you --

18    A.   Yes.

19    Q.   When did you begin working at Fairfield Inn?

20    A.   The exact date, I would have to pull, but in

21         June, late June.  I want to say around the

22         24th, if I recall.

23    Q.   Okay.  2004?

1   A.   Correct.

2   Q.   Do you remember the Fairfield Inn's address,

3        street address?

4   A.   56 -- I think it's 5604.

5   Q.   What road?

6   A.   I'm sorry.  Carmichael Road.

7   Q.   In Montgomery, right?

8   A.   Montgomery, 36117.

9   Q.   Okay.  And what was your title when you

10       started working at the Fairfield Inn?

11  A.   Director of sales and marketing.

12  Q.   Did you ever have another title at the

13       Fairfield Inn?

14  A.   No.

15  Q.   What did you do in the role of director of

16       sales and marketing?

17  A.   There's a long list of things.

18  Q.   Let's hear it.

19  A.   The first and foremost was to know the staff,

20       to realize that they're part of your team;

21       because if I didn't have a strong front desk

22       or housekeeping or even a general manager,

23       sales department that I could work with and,

1   A.   I do not recall.

2   Q.   Were there any other changes in your pay plan

3        at that time?

4   A.   Besides quarterly changes of bonuses, no.

5   Q.   Just the fluctuation in the bonus amount?

6   A.   Correct.

7   Q.   But the bonus plan didn't change?

8   A.   No.

9   Q.   When you started working with Fairfield Inn,

10       who was your supervisor?

11  A.   Roger Miller.

12  Q.   Anyone else?

13  A.   When the general manager was there, it was

14       Todd Epplin.

15  Q.   During your employment, did you have any

16       other supervisors at Fairfield Inn?

17  A.   While I was on maternity leave, Tammy -- and

18       I'm not sure if I'll pronounce her last

19       name. Dominguez? There was a change of

20       general manager during the maternity leave.

21  Q.   So other than Roger Miller, Todd Epplin,

22       Tammy Dominguez, did you have any other

23       supervisors while you were at the Fairfield

| 1 | | my hours of when I could work and when I |
| 2 | | could not. |
| 3 | Q. | So you said you were going to return |
| 4 | | full-time? |
| 5 | A. | Correct. |
| 6 | Q. | When you say -- I'm sorry.  I asked that |
| 7 | | question -- I was about to ask that question |
| 8 | | hopefully.  Did you tell Tammy Dominguez when |
| 9 | | you would be able to return full-time? |
| 10 | A. | We had already settled that. |
| 11 | Q. | When was that? |
| 12 | A. | November the 9th.  So I didn't know there was |
| 13 | | ever any question. |
| 14 | Q. | You were going to return full-time.  And what |
| 15 | | did full-time mean? |
| 16 | A. | To me, it meant 35 hours.  At the time, she |
| 17 | | did not know that I had a job description |
| 18 | | with 35 hours and she was referencing to 40 |
| 19 | | hours a week. |
| 20 | Q. | And what else -- you told Tammy that you |
| 21 | | would come back 35 hours, and what happened? |
| 22 | A. | She said to me -- well, that's where the |
| 23 | | confusion was, that she was referring to 40 |

1    hours.  And I told her, I said, no, that I am

2    35 hours.  And she said, Well, I'm now the

3    general manager, and I expect you to be here

4    from eight to six.  And I stated to her that

5    I would be back, but I would have to find

6    some other child care option since you're

7    wanting me there later.  And she said, Could

8    you let me know by 5 p.m. today?

9        And I told her I didn't feel that was

10   fair to let her know on such short notice.  I

11   did have family that could, you know, after

12   hours be there; but I tried to explain to her

13   that I had a job agreement from prior to

14   being hired or right at being hired, that I

15   was only 35 hours a week.  And she cut me off

16   pretty shortly.  And she said she would have

17   to call me back, which she did.

18   Q.   She called you back?

19   A.   Yes, she did.

20   Q.   Okay.  How long was it before she cut you

21        off?

22   A.   How long were we --

23   Q.   How long was your conversation before Tammy

1          cut --

2    A.    Less than a minute.

3    Q.    Did she explain why she would have to call

4          you back?

5    A.    She said she needed to talk to Roger.

6    Q.    How long was it before -- I'm sorry.  This

7          minute and a half conversation --

8    A.    Minute conversation.

9    Q.    I'm sorry?

10   A.    It was only about a minute.

11   Q.    It was only about a minute?

12   A.    Correct.

13   Q.    What else transpired during this one-minute

14         conversation between you and Tammy?

15   A.    Nothing.

16   Q.    So just to make sure that I have everything

17         that happened during this conversation, Tammy

18         called you and asked you if you were going to

19         be returning full-time.  You said that you

20         would.  And you were expecting to return on

21         November 9th?

22   A.    Correct.

23   Q.    Who brought up the issue of hours?

1    A.    She did.

2    Q.    She said that she wanted you full-time means

3          8 a.m. to 6 p.m.?

4    A.    Correct.  In her hotel.  She said that.

5    Q.    Why did she say that?

6    A.    I have no idea.

7    Q.    Okay.  Did you ask her what that meant?

8    A.    I did.

9    Q.    What did she say?

10   A.    She said that she was the new general

11         manager, and she expected her sales managers

12         to be in the hotel from eight to six.  And I

13         tried to explain to her what my definition of

14         a sales manager or -- excuse me -- a director

15         of sales and marketing does and that sales

16         managers don't work inside the hotel.

17   Q.    What did you explain?

18   A.    I explained to her my job description of what

19         Roger expected from me and what I did and

20         what Todd expected.

21   Q.    Did you ask her -- did you tell her where you

22         wanted to work?

23   A.    Where I wanted to work or when?

1    Q.    Sure.  I mean, she said that she expected you

2          to be in the hotel.  What did you tell her

3          where you wanted to work instead of being in

4          the hotel?

5    A.    I asked her how she wanted me to sell the

6          hotel from inside the hotel, and she said on

7          the phone.  And I said, Well, that's not

8          meeting the needs of your hotel and your

9          clients; you have to be outside the hotel

10         and, you know, build a rapport with people.

11         And she said that she just -- and it ended by

12         her just saying that she does things

13         differently.

14   Q.    So, what else happened during this one-minute

15         conversation?

16   A.    Nothing.

17   Q.    How long was it between the time that Tammy

18         ended the conversation and the time that she

19         called you back?

20   A.    Within 15 minutes.

21   Q.    She called you back?

22   A.    Correct, on a cell phone.

23   Q.    Okay.  Tell me everything that happened

```
 1              during that conversation.
 2     A.       She told me that -- again that her and Roger
 3              were not giving me the option to come back,
 4              that I was not going to dictate to them my
 5              hours of when I could work and could not
 6              work.
 7     Q.       So, in the first conversation, she told you
 8              she expected you to work 40 hours --
 9     A.       Correct.
10     Q.       -- at the hotel?
11     A.       Correct.
12     Q.       And you told her that you were only going to
13              work 35?
14     A.       Correct.
15     Q.       And some of it was going to be at the hotel,
16              and some of it was going to be outside the
17              hotel?
18     A.       I just explained to her my pattern in the
19              past of what -- how I -- how the business --
20              how I was doing the position prior to
21              maternity leave.
22     Q.       Okay.
23     A.       And up to this conversation with Tammy, my
```

```
 1            I'm sorry?

 2     A.     I said I just feel confused.  I'm just trying

 3            to understand exactly what you're asking me.

 4     Q.     Absolutely.  If I can, I will try to help to

 5            clarify with you.  What was the contract of

 6            your employment?  What I'm trying to get is,

 7            what are the terms and conditions -- what

 8            were the terms of this contract?

 9     A.     That I had a job working for them.

10     Q.     Okay.  For how long?

11     A.     There was no date on it.

12     Q.     No duration?

13     A.     Not that I recall.

14     Q.     And what were you supposed to get as part of

15            this contract?

16     A.     Employment.

17     Q.     Okay.  And what?

18     A.     Wages, compensation.

19     Q.     Okay.  Anything specific?

20     A.     Can we take a break, please?

21     Q.     No.  I want to finish this line of

22            questioning first.

23     A.     I just --
```

1    Q.    I don't want you to get your answers from

2          your lawyer.

3    A.    Could you repeat the question again, please?

4    Q.    What I'm trying to understand is in your

5          complaint, in your allegations against the

6          company, your claims against the company,

7          you're saying that there was this contract

8          and that the company breached whatever

9          contract that was.  What I'm just trying to

10         find out is, what was that contract about?

11   A.    My FMLA leave.

12   Q.    So it was for you to take FMLA leave?

13   A.    Correct.  I was asked to put something in

14         writing when I told them I was pregnant with

15         Todd Epplin, so I did.  I put it in writing.

16   Q.    All right.

17   A.    Okay.  I mis -- I thought you were talking

18         about my job description and contract.  I'm

19         sorry for the confusion.

20   Q.    All right.  So you put something in writing

21         to Todd Epplin about your FMLA leave?

22   A.    He asked me to.

23   Q.    When was this?

1    A.    In June.

2    Q.    2005?

3    A.    Uh-huh.  And I believe Roger and I verbally

4          talked about it, about my maternity leave, so

5          I did put everything in writing to them.

6    Q.    So you verbally discussed your leave with

7          Roger Miller?

8    A.    Uh-huh.

9    Q.    And Todd Epplin asked you to put something in

10         writing to him?

11   A.    Yes.

12   Q.    What was it that you put in writing to him?

13   A.    A letter.

14   Q.    Just a letter saying what?

15   A.    That I was requesting my maternity leave

16         under FMLA.

17   Q.    All right.  And you said that you had some

18         contract with Fairfield Inn about your

19         maternity leave.  All right.  I'm just trying

20         to understand, was that the contract, that

21         letter that you wrote to Todd?

22   A.    Yes.

23   Q.    Was there anything else that was part of this

144

```
 1            contract?

 2    A.    No.

 3    Q.    Just that.  And your discussion with Roger,

 4           was that part of the contract?

 5    A.    Yes.

 6    Q.    What was the contract supposed to be?  What

 7           were you entitled to?  What was the company

 8           supposed to do; what were you supposed to do?

 9    A.    I was requesting my maternity leave for a max

10           of 12 weeks under FMLA.

11    Q.    All right.  What were you supposed to do in

12           order to get that contract?  Were you

13           supposed to do anything for that contract?

14    A.    What do you mean?

15    Q.    I don't know.  I'm trying to figure out what

16           were the terms of the contract again.  You

17           were asking for maternity leave for up to 12

18           weeks?

19    A.    Uh-huh.

20    Q.    And in exchange for that, were you supposed

21           to do anything?  Was the company supposed to

22           do anything?  I'm just trying to understand

23           here.
```

```
1     A.   I don't know.

2     Q.   You don't know?

3     A.   Are you talking about after the maternity

4          leave?

5     Q.   No.  I'm talking about you sent Todd this

6          letter, right?

7     A.   Correct.

8     Q.   And that's when you had your contract with

9          the Fairfield Inn about you taking this

10         maternity leave, right?

11    A.   I guess you're throwing me off by using the

12         word "contract."

13    Q.   Okay.

14    A.   Because one minute you're saying it's a

15         contract; the next minute you're saying it's

16         a letter.  So can you please tell me which

17         one you're talking about?

18    Q.   Sure.  Well, you said that the letter was the

19         contract.

20    A.   You said contract.  I don't believe I --

21    Q.   Okay.

22    A.   I referred to it as a letter.

23    Q.   I want to be clear.  You've got a claim in
```

1       your complaint that says that the Fairfield

2       Inn breached a contract with you about your

3       maternity leave.

4  A.  Correct.

5  Q.  I'm trying to understand what that contract

6       is and what it's based upon.  You said it's

7       based upon --

8  A.  It's based upon --

9  Q.  -- a letter.

10  A.  -- the letter.

11  Q.  And anything else?

12  A.  No.

13  Q.  So that's why I keep calling it a contract.

14       You said that the letter was the contract.

15  A.  But then one minute you're saying letter.  I

16       just want to make sure that the letter and

17       the contract you're referring to is the same

18       thing.

19  Q.  Okay.  That's fair.

20  A.  Okay.

21  Q.  Yes.  When I say contract, I'm talking about

22       the letter that you gave to Todd Epplin about

23       you taking maternity leave.

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

```
 1    A.    And I guess what I -- besides the breach of

 2          contract, there was a job description signed

 3          that -- I look at that as a contract, so

 4          that's where some of the confusion is.  So I

 5          do apologize.  So we're just strictly talking

 6          about -- not my job description contract,

 7          we're talking about the FMLA right now,

 8          correct?

 9    Q.    Correct.

10    A.    Okay.

11    Q.    I appreciate you clarifying that for me.  The

12          contract that we're talking about, the one

13          where you sent to Todd about your taking

14          maternity leave.

15    A.    Correct.

16    Q.    Did that contract allow you to quit working

17          at the Fairfield Inn the very next day?

18    A.    Did it allow me to?

19    Q.    Sure.  Could you have?

20    A.    If I went into labor.

21    Q.    Could you have quit the very next day?

22    A.    Yes.

23    Q.    Could you have quit the next week?
```

1    A.    Yes.

2    Q.    Could you have quit the next month?

3    A.    Yes.

4    Q.    Could you have quit right before you gave

5          birth to Tanner August of 2005?

6    A.    Yes, but that wasn't my -- yes, but that was

7          not my intention.

8    Q.    Could you have quit while you were on leave?

9    A.    Yes, I could have.

10   Q.    Did the contract allow the Fairfield Inn to

11         terminate your employment the very next day?

12   A.    I don't understand.

13   Q.    Could they have terminated your employment

14         the very next day?

15   A.    If they wanted to.

16   Q.    What about the next week?

17   A.    I guess so.

18   Q.    The next month?

19   A.    I guess so.  But, again, since they did not

20         contest to it or respond to it in any way, I

21         felt that I was protected by it.  And the

22         e-mails --

23   Q.    Did you -- I'm sorry.  Go ahead.

1    Q.    Did you do anything different that you

2          otherwise would not have done based upon

3          your -- based upon this letter that you gave

4          to Todd?

5    A.    Would I have done it differently?

6    Q.    No.  Did you do anything different?

7    A.    No.  If you can explain different.  What do

8          you mean?

9    Q.    Well, did you do anything that you otherwise

10         would not have done based upon your

11         communications with the company about you

12         taking maternity leave?

13   A.    No.

14   Q.    All right.  Let's back up.  We talked

15         previously about a claim for sex

16         discrimination.  And I just wanted to get an

17         idea from you.  Are there any non-pregnant

18         employees that you believe were treated more

19         favorably than you?

20   A.    In what terms are you speaking?

21   Q.    Any terms.

22   A.    No.

23   Q.    Okay.  Are there any male employees you

| | | |
|---|---|---|
| 1 | | believe were treated more favorably than you? |
| 2 | A. | There were no male employees besides Todd. |
| 3 | Q. | So I guess the answer there is no. |
| 4 | A. | Correct. |
| 5 | Q. | Okay.  Do you know how many employees were |
| 6 | | employed at the Fairfield Inn during each |
| 7 | | week in 2004? |
| 8 | A. | Each week? |
| 9 | Q. | Yes. |
| 10 | A. | I wasn't in charge of operations.  I can give |
| 11 | | a general idea. |
| 12 | Q. | If you gave that general idea, would it just |
| 13 | | be guessing? |
| 14 | A. | Yes. |
| 15 | Q. | Go ahead and guess, but -- |
| 16 | A. | Because it's on shifts.  I mean, again, I'm |
| 17 | | not -- I wasn't in charge of scheduling, and |
| 18 | | my schedule had nothing to do with their |
| 19 | | schedule.  It's two different departments. |
| 20 | Q. | So you really didn't know how many employees |
| 21 | | were working at the Fairfield Inn in 2004? |
| 22 | A. | I can give you an estimate. |
| 23 | Q. | Okay.  What is that estimate?  Each week, I |

```
 1              with that company to take care of their

 2              lodging needs; and she would get paid a

 3              commission of their room nights.

 4      Q.      So she would send business or book some

 5              rooms --

 6      A.      Correct.

 7      Q.      -- or bookings of rooms over to particular

 8              hotels, and you had happened to be a

 9              beneficiary of some of that, right?

10      A.      Right.

11      Q.      Before you arrived at the Fairfield Inn, did

12              Hotel Solutions book rooms at the Fairfield

13              Inn?

14      A.      Yes.

15      Q.      How much?

16      A.      Without pulling sales documents, I don't -- I

17              really don't recall.  I don't know.

18      Q.      Okay.  Who do you believe replaced you at the

19              Fairfield Inn?

20      A.      Tandi and Tammy.

21      Q.      And Tammy?

22      A.      Uh-huh.

23      Q.      Dominguez?
```

1    A.    Uh-huh.

2    Q.    Tandi Mitchell and Tammy Dominguez?

3    A.    Yes.  I know it's --

4    Q.    Anyone else?

5    A.    I know there were some others hired later on;

6          but immediately, those were the only two.

7    Q.    When did they replace you?

8    A.    When did they fire me?

9    Q.    No.  When did they -- you said that those

10         people replaced you, Tandi and Tammy.  When

11         did they replace you?  Immediately?  Sometime

12         thereafter?

13   A.    Tandi was the intern during my maternity

14         leave, so she was already working with me

15         during the maternity leave.

16   Q.    When -- after your employment at Fairfield

17         Inn terminated, did Tandi immediately stop

18         working for Hotel Solutions and start working

19         for Fairfield; or how did that work?  Did she

20         continue at Hotel Solutions?

21   A.    It's my understanding that she stayed under

22         the agreement that was already in writing

23         that we put together -- Roger, Todd and I and

1    A.    Yes.

2    Q.    And your bonus that you earned for the second

3          quarter of 2005, you earned $3800?

4    A.    Correct.

5    Q.    Take a look at Defendant's Exhibit #11 and

6          let me know when you're ready to answer

7          questions about it.

8    A.    Okay.

9    Q.    You ready?

10   A.    I'm sorry.  Yes.

11   Q.    Okay.  What is Defendant's Exhibit #11?

12   A.    It is the third quarter bonus tracking

13         results that I submitted on October 11th,

14         2005.

15   Q.    Okay.  Is that your signature on the first

16         page of Defendant's Exhibit #11?

17   A.    Yes, it is.

18   Q.    And by this, did you calculate that your

19         total bonus that you earned for the third

20         quarter of 2005 was $3800?

21   A.    Yes, I did.

22   Q.    Okay.  I'm handing you what's been marked as

23         Defendant's Exhibit #12.

| | | |
|---|---|---|
| 1 | A. | Uh-huh. |
| 2 | Q. | Can you take a moment and let me know when |
| 3 | | you're ready to answer questions about that? |
| 4 | A. | I'm ready. |
| 5 | Q. | Okay.  What is Defendant's Exhibit #12? |
| 6 | A. | It is the Alabama Department of Industrial |
| 7 | | Relations Unemployment Compensation |
| 8 | | Division.  It's a doctor's certificate. |
| 9 | Q. | Okay.  Who does it relate to? |
| 10 | A. | Me. |
| 11 | Q. | Did you sign that? |
| 12 | A. | Yes, I did. |
| 13 | Q. | Okay.  Is this in relation to your claim for |
| 14 | | unemployment benefits after your termination |
| 15 | | from Fairfield Inn? |
| 16 | A. | Yes.  It was requested by them that it be |
| 17 | | completed. |
| 18 | Q. | Okay.  Do you see that number one under the |
| 19 | | first paragraph there in the middle of the |
| 20 | | page?  It says dates and treatment? |
| 21 | A. | It's kind of scratchy, but yes. |
| 22 | Q. | Okay.  What was the dates and treatment |
| 23 | | from-and-to dates? |

1    A.    Not being the original, what I perceive it to

2          be is 12/15/2004 --

3    Q.    To --

4    A.    September 27th, 2005.

5    Q.    And what was the condition that you were

6          receiving treatment for during that period?

7    A.    Pregnancy, delivery, and postpartum recovery

8          and checkup.

9    Q.    Is that accurate?

10   A.    Yes.

11   Q.    Could you skip down to number three.  Could

12         you read what the question is for number

13         three?

14   A.    Is this individual -- I'm sorry.  If this

15         individual is -- is this the master?

16   Q.    That's the best -- that's what you produced

17         to us.  I'm sorry.  I think what it is -- and

18         you tell me -- if this individual is able to

19         perform the duties of his/her usual

20         occupation, on what date did this individual

21         become able?

22   A.    Okay.

23   Q.    Is that right?

1    A.   Correct.

2    Q.   And what date does it say that you became

3         able to return to your usual occupation?

4    A.   September 24th, 2005.

5    Q.   Is that right?

6    A.   That's what the doctor said.

7    Q.   Okay.  Could you skip down to number five.

8         Could you read number five for us?

9    A.   I guess PT they're abbreviating for

10        patient -- is to be --

11   Q.   No.  I meant the question.  I'm sorry.

12   A.   I'm sorry.

13   Q.   We'll get to that in just a second.

14   A.   Number five?

15   Q.   Yeah.

16   A.   If treatment is for pregnancy, enter expected

17        date of confinement.  Did I read that

18        correct?

19   Q.   I think you did.

20   A.   Okay.

21   Q.   And what are the dates of expected

22        confinement?

23   A.   August the 12th, 2005, through September

1      23rd, 2005.

2    Q.   Okay.  Was that the expected period that you

3         were basically getting postpartum treatment

4         after your pregnancy, after you delivered

5         Tanner?

6    A.   Uh-huh.  I wouldn't say treatment.  It's

7         recovery.

8    Q.   Recovery, then.

9    A.   Thank you.

10   Q.   I'm handing you Defendant's Exhibit #13.  I

11        knew I wanted to do something else first.

12        Tell you what.  Before we look at Defendant's

13        Exhibit #13, let's look at Defendant's #14.

14             I'm now handing you what's been marked

15        as Defendant's Exhibit #14.  Can you take a

16        look at that and let me know what it is?

17   A.   #14?

18   Q.   Yes, please.

19   A.   It is the ministry registration for Taylor

20        Road Baptist Church where Tanner was

21        enrolled.

22   Q.   Okay.  And I will let you know that we had

23        sent a subpoena over to Taylor Road Baptist

1    ready to answer some questions.

2    A.    Okay.

3    Q.    Okay.  What is Defendant's Exhibit #22?

4    A.    It looks like an e-mail.  I mean, it -- to

5          me, it looks like somebody has typed or

6          copied an e-mail.  This doesn't look like

7          something I typed.

8    Q.    Aside from the formatting issues, does this

9          look like an e-mail that you sent to Roger

10         Miller or the text of an e-mail that you sent

11         to Roger Miller?

12   A.    Yes.

13              MR. FELLNER:  Could we go off the

14                  record for just one second?

15                      (Off-the-record discussion)

16   Q.    Ms. Watts, I'm not sure exactly where we

17         left, but let's start from the top about

18         Defendant's Exhibit #22.  Have you had an

19         opportunity to review Defendant's Exhibit

20         #22?

21   A.    Yes, I have.

22   Q.    What is Defendant's Exhibit #22?

23   A.    It is a -- excuse me -- an e-mail that I sent

```
1              to Roger.

2      Q.     Okay.  What's the date on Defendant's

3              Exhibit #22?

4      A.     April 7th of 2005.

5      Q.     Can you read the first paragraph?

6      A.     After our conversation yesterday, I have

7              taken into consideration my new job offers

8              and I also consider what it would take to

9              make me comfortable in staying in my current

10             position at Fairfield Inn.

11     Q.     That's enough.  You mentioned you've taken

12             into consideration your new job offers.  What

13             new job offers were you referring to?

14     A.     As again, when I told you we had the

15             hotel/motel associations, I was approached to

16             take another job.

17     Q.     Was that the one at the Holiday Inn East?

18     A.     Yes.

19     Q.     Any other -- well, it said new job offers,

20             though.

21     A.     It should just say new job offer.

22     Q.     Okay.  So it was one job offer?

23     A.     Correct.
```

1    Q.    And from this paragraph, what I gather -- you

2          tell me if I'm wrong about this.

3    A.    Uh-huh.

4    Q.    What I gather is that you communicated to

5          Roger Miller that somebody had approached you

6          about employment elsewhere, and you were

7          making a pitch to him about what you wanted

8          in order to stay?

9    A.    I'm not sure if it happened exactly like

10         that.  I did turn in a notice to Todd.

11   Q.    You turned in a notice of resignation?

12   A.    Yes, I did.

13   Q.    So you resigned.  When did you resign?

14   A.    During this April time.  And Todd is like,

15         No, no, no, we can work this out; what will

16         it take to get you stay; I need you.  And we

17         communicated that to Roger.  And this is

18         where this came from.

19   Q.    What was it that you were asking for in order

20         to stay?

21   A.    Basically, more money.  I was offered.

22   Q.    And it seems that -- you see where it says

23         starting June 1st until maternity leave?

1    A.   Uh-huh.

2    Q.   What were you asking for then?

3    A.   To work as best that I could being pregnant.

4    Q.   How many hours a week does this add up to,
5        about?

6    A.   I would have to get a calculator.

7    Q.   We can add this up real quick.  I'm going to
8        assume no lunch for Monday through Thursday.

9    A.   I mean, I never took, really, much of a
10       lunch.  I'm just a go-go person.  I may take
11       15 or 20 minutes just to refresh.  No.

12   Q.   All right.  So, from Monday through Thursday,
13       from 8:30 a.m. to 2:00 p.m., is that what you
14       proposing?

15   A.   I was proposing, yes.

16   Q.   That's about five and a half hours a day,
17       right?

18   A.   8:30 -- yes.

19   Q.   Okay.  And for Friday, you were proposing
20       seven hours for a day, right?

21   A.   Yes.  Which I guess that's about, what, 29
22       hours?

23   Q.   29 hours.  Okay.  You were also -- below

1     description duties.

2  Q.  Okay.  So in this e-mail, do you think that

3      Roger agreed to your request for a $3,000

4      raise?

5  A.  He did.

6  Q.  And does he say anything about whether this

7      is a contract for employment in this e-mail?

8  A.  He says it's not.

9  Q.  Did you have any different understanding

10     based on that?

11 A.  No.

12 Q.  Can you look at Defendant's Exhibit #23 and

13     tell me where in Defendant's Exhibit #23, it

14     says anything about maternity leave?

15 A.  It doesn't.

16 Q.  Okay.  You see the paragraph --

17 A.  But note that this in April.

18 Q.  Right.  Do you see the paragraph that begins,

19     Due to your success?  It's right there.

20 A.  Yes.

21 Q.  Could you read that first sentence there?

22 A.  Due to your success and above-mentioned

23     efforts, results, we must maintain your

265

```
 1            current 35-hour work schedule as outlined in

 2            your job description, which was signed on

 3            July 5th, 2004.

 4       Q.   Okay.  And read the next sentence as well.

 5       A.   With increased -- can I have a piece of

 6            paper?  I'm sorry.

 7       Q.   Sure.

 8       A.   I'm sorry.  Where were we?

 9       Q.   With increased.  It's at the end of the

10            second line there.

11       A.   I lost it.  Okay.  I'm sorry.

12                 With increased bookings revenue, follow

13            up Sales Pro work involved, increased

14            competition in our market and ever-changing

15            market economic conditions, 35 hours is

16            minimum needed to succeed.

17       Q.   Okay.  So remember in Defendant's Exhibit

18            #22, you were asking for 29 hours a week

19            approximately?

20       A.   Yes.

21       Q.   And Roger's response about that was in

22            Defendant's Exhibit #23, right?

23       A.   Yes.
```

1    Q.   And he rejected that, right?

2    A.   Right.

3    Q.   And he told you, you had to work a minimum of

4         35 hours a week.

5    A.   Which I agreed to do after this e-mail.

6    Q.   Okay.  Did you communicate that to Roger at

7         any point?

8    A.   There should be.  I was asked to -- on here,

9         I believe, to give a response; and I did.

10   Q.   All right.  I've just handed you what's been

11       marked as Defendant's Exhibit #24.  Could you

12       take a moment to read that and let me know

13       when you're ready to answer questions.

14   A.   I'm ready.

15   Q.   What is Defendant's Exhibit #24?

16   A.   It is a letter that I wrote to Todd about my

17       maternity leave that he asked me to write to

18       him.

19   Q.   Is this the letter contract that you were

20       discussing earlier today?

21   A.   Yes.

22   Q.   What does it say about you taking a leave of

23       absence?

1       yes.

2    Q.   Well, you had actually proposed it earlier,

3       hadn't you?

4    A.   Right.

5    Q.   And that was going to be one and a half days

6       at the hotel and one and a half days at home?

7    A.   Correct.

8    Q.   But that was rejected.

9    A.   Correct.

10   Q.   Because they wanted you to work all three

11      days at the hotel, right?

12   A.   Correct.

13   Q.   Okay.  I'm handing you what's been marked as

14      Defendant's Exhibit #33.  Take at a moment to

15      review that and let me know when you're ready

16      to answer some questions.

17   A.   Okay.

18   Q.   What is Defendant's Exhibit #33?

19   A.   It was a letter to -- or excuse me -- an

20      e-mail to Tammy.

21   Q.   From who?

22   A.   From me.

23   Q.   When did you send this?

```
1    A.    On September 27th.

2    Q.    2005?

3    A.    Correct.

4    Q.    And you say, Tammy, after our discussion on

5          Friday, there has been some change that I

6          would like to request in my schedule.  And

7          then the change is -- and I'm paraphrasing

8          here, but you tell me if I'm misunderstanding

9          it, but the change is that Tanner got another

10         ear infection.

11   A.    Correct.

12   Q.    And the doctor recommended that you keep him

13         out of day care.

14   A.    Uh-huh.

15   Q.    And you were requesting to extend your leave

16         of absence for 12 weeks?

17   A.    Up to 12.

18   Q.    Up to 12 weeks.  So rather than coming back

19         earlier, as you were previously discussing in

20         the couple of e-mails past that we just

21         reviewed, you now want to delay it out 12

22         weeks?

23   A.    I was requesting.
```

1   Q.   You see that -- I guess it's the third full

2        paragraph that says, My original plan?

3   A.   Uh-huh.

4   Q.   It says, My original plan was to come back

5        between eight to ten weeks per my discussion

6        with Roger?

7   A.   Uh-huh.

8   Q.   Was that your original plan, to come back in

9        eight to ten weeks?

10  A.   My goal was to get back as soon as I was

11       able.

12  Q.   Okay.  The next sentence says, I will keep

13       you posted weekly if I am able to come back

14       sooner.

15  A.   Correct.

16  Q.   You were going to try and come back sooner if

17       possible?

18  A.   If possible, yes.

19  Q.   I'm still willing to do all I can at home as

20       in the original plan with Todd and Roger.  I

21       can still do my seven-plus hours a week,

22       continue to work on the marketing plan, and

23       continue to work directly with Tandi and

```
 1              maintain Sales Pro.  Do you see all that?

 2    A.    Uh-huh.

 3    Q.    Was that what your plan was at that point in

 4          time?

 5    A.    That was also my original plan.

 6    Q.    Wait a minute.  The original plan says to

 7          come back between eight to ten weeks.

 8    A.    Right.

 9    Q.    Okay.  That was the original plan, right?

10    A.    I'm sorry.  I thought that's what your

11          question was.

12    Q.    Okay.  The original plan was to come back

13          eight to ten weeks.

14    A.    Correct.

15    Q.    Then at this point, you wanted to change it

16          to come back at 12 weeks now?

17    A.    Right.

18    Q.    Okay.  But you still wanted to do your seven

19          hours a week at home?

20    A.    Correct.

21    Q.    And you would try to come back sooner if

22          possible.

23    A.    Correct.  But please note that, again, I felt
```

1    that I was -- or I was under the assumption

2    that I was under FMLA and that I was

3    protected up to my 12 weeks.

4    Q.   Okay.  Handing you what has been marked as

5         Defendant's Exhibit #34.  Take a moment to

6         read that and let me know when you're ready

7         to answer some questions.

8    A.   Okay.

9    Q.   What is Defendant's Exhibit #34?

10   A.   It is an e-mail on November 2nd, 2005, that I

11        sent to Roger.

12   Q.   It's actually a string of e-mails, isn't it?

13   A.   Well, yes.  I didn't see the top.  Yes.

14   Q.   The first e-mail is an e-mail that you sent

15        to Roger Miller on November 2nd, 2005; and

16        then the second e-mail is an e-mail that you

17        sent to Roger Miller on November 3rd, 2005,

18        right?

19   A.   Correct.

20   Q.   And in that first e-mail, you say, Roger,

21        good evening.  My last conversation with

22        Tammy this afternoon at 4 p.m. 11/2/05, she

23        stated she was now no longer going to give me

```
 1              week in our in-house meeting, in hopes that I

 2              could have full-time -- full-time child care

 3              in January.  Meaning --

 4    Q.    By January.

 5    A.    By January.  Meaning that my grandmother

 6              would not have to care for the children in

 7              the afternoons and on Friday.

 8    Q.    This e-mail indicates that you don't have

 9              full-time child care, right?

10    A.    That would cover a 40-hour week.

11    Q.    Okay.  And continue on with the next

12              sentence.

13    A.    And the reason I have not spoken to you about

14              this, because you told me several weeks ago

15              that you were no longer my boss and I needed

16              to speak directly to Tammy.

17    Q.    Do you remember earlier today, we reviewed

18              another document about you working from

19              home?

20    A.    Uh-huh.

21    Q.    An e-mail between you and Roger Miller?

22    A.    Yes.

23    Q.    And what did Roger Miller say in that e-mail?
```

1    A.   I don't recall.

2    Q.   Did he say that he was okay with you working

3         from home?

4    A.   Yes.

5    Q.   But who had to make the decision?

6    A.   Todd Epplin.

7    Q.   Who is Todd Epplin?

8    A.   He was the general manager.

9    Q.   So he told you that -- Roger Miller told you,

10       when you asked Roger whether you could work

11       from home, he didn't mind; but you had to get

12       it approved by the general manager of the

13       property, right?

14    A.   Right.

15    Q.   Okay.  And in this last sentence that you

16       just read, you said that you hadn't spoken to

17       him about any of these issues because he told

18       you that you had to work this out with Tammy,

19       right?

20    A.   Right.

21    Q.   And that Tammy was your boss, right?

22    A.   Right.

23    Q.   And Tammy, according to you, told you that

1    Q.   Okay.  And who was Carrie?

2    A.   Carrie Farrell.  She was the housekeeping

3         supervisor.  And -- if I have his name

4         correct, and it was Ron -- is it --

5    Q.   Disbrow?

6    A.   Disbrow.  Yes.  He was there.  That's who I

7         turned the laptop in to, which I requested to

8         receive something in writing that that was

9         actually turned in.

10   Q.   I'm handing you what's been marked as

11        Defendant's Exhibit #36.  Take a moment to

12        read that, and let me know when you're ready

13        to answer some questions.

14   A.   Can we not for the record read what this

15        says?  I mean, this is --

16   Q.   I don't need to.

17                      (Witness review document)

18   A.   Okay.

19   Q.   What is Defendant's Exhibit #36?

20   A.   It is an e-mail from Tammy on November the

21        7th, 2005.

22   Q.   To whom?

23   A.   To me.

1    Q.    What does the e-mail say?

2    A.    It says, Please read the attached letter.  I

3          want to make sure you have plenty of time to

4          make a decision, so --

5              I'm sorry.  There's a string of e-mails.

6          I guess I should have read the first one.

7              The first one was on -- that's weird

8          that the dates are backwards.  I don't know

9          if you noticed that.  November 6th is one of

10         them, and then the next one is November 7th.

11   Q.    Right.

12   A.    Okay.  I see it now.

13             The one on November 6th says, Please

14         read and respond the attached document.  That

15         was sent from Tammy to me.

16   Q.    Okay.  And then the second e-mail says what?

17   A.    Please -- again, it was on November the 7th.

18         It said, Please read the attached letter.  I

19         want to make sure you have plenty of time to

20         make a decision, so I will give you until the

21         10th rather than the 8th.  You may not have

22         received this e-mail as of yet because I'm

23         sending it to you -- which later on in that

```
 1              time, I did have a Marriott e-mail address;

 2              and that's what she's referring to.

 3        Q.    And is this -- the page 2 of Defendant's

 4              Exhibit #36, is that the attachment to --

 5        A.    Yes.

 6        Q.    -- that e-mail?

 7        A.    Yes.

 8        Q.    Okay.  What does that attachment say?  And

 9              you can summarize it if you want.

10        A.    I'll be happy to read it.  It says, I'm sorry

11              we could not finish our phone call

12              yesterday.  I wanted to send you this letter

13              so that you may have a chance to consider

14              what we were discussing at our -- excuse

15              me -- discussing at your own convenience.  At

16              this time, we are prepared to offer you a

17              position at the front desk from 3 to 11 shift

18              or the night audit position from 11 to 7.

19              Both positions will require a 35-hour week

20              commitment.  Either week -- either one of

21              these positions will be available starting

22              November --

23                   And it's a little blurry to me.  It
```

1      likes like the 9th.

2          It is our intention to get you back to

3      work.  We would be able to pay you at your

4      current rate of pay and your insurance

5      benefits will remain the same.

6      Unfortunately, at this time, this is the only

7      current position we have available.  If any

8      other position comes available, we will have

9      the opportunity to be considered -- you will

10     have the opportunity to be considered for

11     it.  We need to know your decision by

12     November the 8th or we will have to consider

13     that you have decided to resign from

14     employment at our hotel.  If you have any

15     questions please contact me to discuss.

16  Q.  So in this letter, Tammy offered you two

17     different positions at the company, right?

18  A.  Correct.

19  Q.  Both of them were 35 hours a week?

20  A.  Correct.

21  Q.  And both of them were going to be at your

22     same rate of pay?

23  A.  Correct.

```
 1    Q.   And your insurance was going to remain the
 2         same?
 3    A.   Correct.
 4    Q.   Did you ever respond to this?
 5    A.   No, I did not.
 6    Q.   Why not?
 7    A.   Because the prior conversation that she's
 8         referring to, it was on the 6th.  She called
 9         my home or called my cell phone and asked me
10         if I had called the hotel and asked about
11         FMLA, and I said no.  She said that she did
12         not realize that I was under FMLA and that
13         she had made a mistake, so she was offering
14         me these other positions.
15    Q.   Okay.  And she offered you the positions,
16         right?
17    A.   Correct.
18    Q.   Did you ever respond about the offer?
19    A.   No.
20    Q.   Why not?
21    A.   I didn't need to.  She already fired me.
22    Q.   But here she offered you a job.
23    A.   Yeah.  But she fired from my director of
```

```
 1     A.    Yes, it is.

 2     Q.    Okay.  And what are pages 2 through 4 of

 3           Defendant's Exhibit #37?

 4     A.    Are you talking about 137, 138, 139?

 5     Q.    Yes.

 6     A.    It's the -- my actual affidavit.

 7     Q.    This is the affidavit that you signed, right?

 8     A.    Correct.

 9     Q.    We had looked at a different copy of this

10           earlier today, right?

11     A.    Correct.

12     Q.    Okay.  Would you turn to paragraph nine?

13     A.    Number nine?

14     Q.    Yes.

15     A.    Okay.

16     Q.    See it says, On November 2nd, one week before

17           I was to return from maternity leave, I was

18           called by Ms. Dominguez --

19               Is that Tammy Dominguez?

20     A.    Yes.

21     Q.    -- and asked if I was going to be able to

22           return to my job full-time 35 hours a week.

23               Is that what she asked you?
```

1    A.    In the first conversation, yes.

2    Q.    Okay.  And I said yes.

3          Is that what you said?

4    A.    Uh-huh.

5    Q.    She repeated the question, saying I need to

6          know by 5 p.m.; and I said yes.

7          Is that right?

8    A.    Yes.

9    Q.    Okay.  Where in here, in this affidavit, does

10         it say anything about returning to 40 hours a

11         week?

12   A.    It doesn't.  It was just a verbal

13         conversation that we had during the time.

14   Q.    Okay.  But that sounds kind of important to

15         you, the difference between 35 and 40 hours,

16         right?

17   A.    Not necessarily.  It was, was I going to

18         return to my job.

19   Q.    Well, earlier you made a big deal that there

20         was a typo in that other document about 40

21         hours versus 35.

22   A.    Correct.  Correct.

23   Q.    How come there's nothing in here about 40

346

1    Q.   And what was her offer to you at that time?

2    A.   Either to resign or an option to turn in a

3         notice.  I mean, either to be terminated or

4         an option to give a notice.

5    Q.   I think you said resign or be fired?

6    A.   Okay.

7    Q.   Were those her words?

8    A.   Yes.

9    Q.   Okay.  Now, your -- the birth of your child

10        took place what date?

11   A.   August the 12th, 2005.

12   Q.   Okay.  And in anticipating that birth, did

13        you recruit and train an intern to take your

14        position at the hotel?

15   A.   Yes.

16   Q.   And at any time during your employment at the

17        Fairfield Inn, did you -- did anyone say, no,

18        we're not going to give you maternity leave?

19   A.   No.

20   Q.   Did anyone say, no, you're not qualified for

21        FMLA?

22   A.   No.

23   Q.   And your -- the agreement with Tandi

349

```
1    Q.   And do you know about what time Tammy

2         Dominguez was hired?

3    A.   I don't know when it actually became

4         official, because there was -- Todd was still

5         on vacation and she was taking over, but I

6         would estimate middle of September.

7    Q.   Okay.  After she was hired, was anyone -- did

8         she hire anyone who had a child?

9    A.   No.

10   Q.   Did she hire anyone who was married?

11   A.   Not that I know of.

12   Q.   Did she hire anyone who was pregnant?

13   A.   Not that I know of.

14   Q.   Okay.  After you left -- or after you were

15        fired, who took over your job?

16   A.   Tandi Mitchell, the intern that I had

17        originally hired.

18   Q.   And was she a mother?

19   A.   No.

20   Q.   And was she married?

21   A.   No.

22   Q.   And how long did Tandi Mitchell take that

23        job?
```

1    approve all leaves.

2  Q. Okay.  Now, was your --

3  A. It's not -- there was another sentence.  It

4    says, No open-ended leaves are approved.

5  Q. And your request for leave, was that put into

6    writing?

7  A. Yes.

8  Q. And was it approved?

9  A. It was not contested.

10  Q. It was not contested.  You never got anything

11    formally saying you had it?

12  A. No.  Just from e-mails about -- from Roger

13    about while you're gone on maternity leave.

14    So there was communication about it, yes.

15  Q. Okay.  So there is a policy, therefore,

16    regarding maternity leave?

17  A. Yes.

18  Q. All right.  The second sentence in this

19    second paragraph, back to the position

20    statement, says that the company terminated

21    Ms. Watts' employment because she refused to

22    work full-time after her leave of absence.

23    Is that true?

1    A.    Yes.

2    Q.    You refused to return to work?

3    A.    Oh, no.  I'm sorry.  I misunderstood the

4          question.

5    Q.    They did terminate you, but did you --

6    A.    Yes, they did terminate me.  Yes.

7    Q.    Did you refuse to return to work full-time?

8    A.    No.  I told them that I would be willing to

9          return to my 35 hours a week.

10   Q.    Okay.  Now, on page 2, item B, the second

11         sentence -- excuse me -- the first sentence,

12         On November 2nd, 2005, Montgomery Ventures'

13         general manager, Tammy Dominguez, told

14         Ms. Watts that the company needed her to

15         return to the director of sales and marketing

16         position full-time on November 9th.

17   A.    Correct.

18   Q.    And that -- had that been your plan all

19         along?

20   A.    Yes.

21   Q.    Ms. Watts, can you read the next sentence,

22         please?

23   A.    Ms. Watts replied that she could not return

```
 1           to work full-time because she did not have

 2           child care arrangements that would allow her

 3           to work full-time.

 4    Q.    Is that true?

 5    A.    No.  It also states here that the company

 6           permitted me to extend my maternity leave as

 7           requested, under A.

 8    Q.    Yes.  Is that true?

 9    A.    Yes.

10    Q.    Okay.  Ms. Watts, I want you to look at an

11           e-mail marked as Plaintiff's Exhibit #4.

12    A.    Uh-huh.

13    Q.    Do you recognize this e-mail?

14    A.    Yes, I do.

15    Q.    Okay.  And who is it from?

16    A.    Again, it's a string of e-mails, and the

17           first one is from Roger Miller.

18    Q.    And he says -- what's the date of this,

19           first?

20    A.    August the 2nd.

21    Q.    So this is -- this is before your pregnancy

22           or your -- before your delivery; is that

23           correct?
```

1   A.   Correct.

2   Q.   And remind us again.  What date was that?

3   A.   August the 12th.

4   Q.   Okay.  So you're about ten days away from

5        delivering a baby?

6   A.   Yes.

7   Q.   And he's writing you about business?

8   A.   Yes.

9   Q.   Okay.  And he says what?

10  A.   Heather, thanks for all your time and

11       effort.  I know you have not felt well and

12       are pushing it.  Please take care of

13       yourself.  We appreciate your dedication and

14       hard work.  I talked to Tandi today and will

15       stay in touch, accessible to her at all

16       times.  Take care.

17  Q.   And that was in response to your e-mail

18       below; is that correct?

19  A.   Correct.

20  Q.   Stating that -- what were your plans there?

21  A.   I sent it to general manager the same day of

22       August the 2nd, to Todd; said, I am planning

23       in coming for a while this morning.  I'm at

# EXHIBIT "2"

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5    HEATHER WATTS,

6              Plaintiff,

7    vs.                    CASE NO. 2:06CV1149-MEF

8    HOSPITALITY VENTURES, LLC,

9              Defendant.

10

11

12

13          * * * * * * * * * *

14          DEPOSITION OF ROGER ALAN MILLER, taken

15   pursuant to stipulation and agreement before

16   Heather Barnett, Court Reporter and Commissioner

17   for the State of Alabama at Large, in the Law

18   Offices of Maynard, Cooper & Gale, 100 North

19   Union Street, Suit 650 RSA Tower, Montgomery,

20   Alabama, on Friday, July 20, 2007, commencing at

21   approximately 11:07 a.m.

22          * * * * * * * * * * *

23

1                    MR. FELLNER:  Priscilla, I apologize

2                         for interrupting.  Just to be

3                         clear, I want to designate the

4                         portion of the transcript that has

5                         just his social security number.

6                         That is confidential.  Okay.

7                         Sorry.

8                    MS. DUNCAN:  It would be anyway, but --

9      Q.   You've -- what is your job title, please?

10     A.   Vice president of sales and marketing.

11     Q.   And what company do you work for?

12     A.   Hospitality Ventures Management, Inc.

13     Q.   Is that also known as Hospitality Ventures,

14          or is there another company with the same

15          name?

16     A.   No.

17     Q.   You're Hospitality Ventures, Inc., is that --

18     A.   Management, Inc.

19     Q.   Management, Inc.  Okay.  And what is

20          Hospitality Ventures, LLC?

21     A.   I have no idea.

22     Q.   Is that not -- is that -- you say you are

23          unfamiliar with Hospitality Ventures, LLC?

1    A.    The legal name, yes.

2    Q.    When did you start working for them?

3              MR. FELLNER:  Object to the form of the

4                   question.

5    Q.    For Hospitality Ventures.

6    A.    Four years ago.

7    Q.    Four years ago.  And that was 2003?

8    A.    Yes, ma'am.

9    Q.    And was it Hospitality Ventures Management,

10         Inc., at that time?

11    A.    To the best of my recollection.

12    Q.    Okay.  So you're not familiar with the name

13         Hospitality Ventures, LLC?

14    A.    No.

15    Q.    Well, both of these documents, Defendant's

16         Exhibit #3 and #5, indicate they were updated

17         in 2002.  Do you -- to your knowledge, is

18         there any difference between these companies?

19    A.    Not to my knowledge.

20    Q.    And is it your testimony that there is no

21         other company known as Hospitality Ventures

22         in your -- with relationship to your company?

23              MR. FELLNER:  Object to the form of the

1                    question.

2    A.   Repeat the question, please.

3    Q.   What services does Hospitality Ventures

4         perform for Fairfield Inn?

5              MR. FELLNER:  Same objection.

6    A.   Hospitality management, consulting.

7    Q.   Well, can you break that down a little bit

8         and tell us what kind of --

9    A.   Providing -- providing resources, support and

10        tools in all facets of the hospitality

11        business.

12   Q.   All right.  I got that.  Tell me what kind of

13        resources and tools we're talking about here.

14   A.   Management, sales and marketing, guest

15        satisfaction, operations.

16   Q.   Tell me about operations.  What does the

17        operations consist of?

18   A.   I don't know.

19   Q.   You're vice president of the company and you

20        don't know what operations is?

21   A.   I'm vice president of sales and marketing.

22   Q.   Right.

23   A.   And that is what I know.

# EXHIBIT "3"

**From:** Mickey and Heathe
**Sent:** 04/07/2005
**To:** 'Roger A Miller'
**Cc:**
**Bcc:**
**Subject:** Heather Watts

---

Roger,

After our conversation yesterday evening, I have taken in to consideration my new job offers and also considered what it would take to make me comfortable in staying in my current position at Fairfield Inn. I have come up with the following for considerations:

Agree to schedule request & increased salary:

Starting June 1st until Maternity Leave:

Monday-Thursday 8:30-2:00 p.m.

Friday- Usual 7 hours for the day -based on the needs of the hotel

Increase salary $3,000 year-effective immediately $38,000 & still be on the current bonus program

$55.76 wk/ $115.52 bi wk/ $231.04 month

** In return willing to give flexibility on Monday-Thursday to return to hotel late afternoons if needed for group/tour bus arrival to assist with check-in/welcome reception-focus-needs of hotel

** In return willing to arrive early morning if needed for group/tour bus - focus- needs of hotel



DEFENDANT'S
EXHIBIT
22

MV1001613

** As currently- ""on call"" with hotel if needed for any sales assistance and guest relations

Maternity leave 8-12 weeks

* Plan to work up to day of delivery unless other wise told by doctor's orders.

Please review and let me know your comments and feelings. Thanks for your time.

Heather Watts

# EXHIBIT "4"

From:               Roger A Miller [rmiller@hospitalityventures.com]
t:                  Thursday, April 07, 2005 12:05 PM
                    Mickey and Heathe
Cc:                 Robert Cole; Todd Epplin; David Price; Ron Disbrow
Subject:            Request For Schedule Adjustment And Salary Increase


Heather; Thank you for taking time to express your feelings yesterday and forwarding the
above "Subject" request. Without question your sales skills, booking results and genuine
concern for the success and well being of the Montgomery Fairfield Inn has made a big
difference in the revenue and RevPar index increases of the hotel. For that we thank you
and are grateful.
Based on your past years hotel revenue/RevPAR increases, we do feel that an annual
increase of $3,000 is in line.(Effective upon agreement/signature of this e mail.) Next
salary review would be April 10-14 2006. This increase/e mail is not a contract for
employement.Present/future employment will be based on consistent meeting/exceeding of all
budgeted room revenue and sales dept"Hard Core", "Other Sales" and "Administrative"
production goals and implementation of job description duties.
*Current bonus program remains in effect.
Due to your success and above mentioned efforts/results we must maintain your current 35
hour work week schedule as outlined in your job description signed July 5,2004. With
increased bookings/revenue, follow up sales pro work involved, increased competition in
our market and ever changing market/economic conditions,35 hours is the minimum needed to
succeed. Any less would not be in the best interest of the clients, fellow associates,
management, lenders and investors. We appreciate your flexibility Monday-Thursday to
return to the hotel in off hours to accommodate special groups and that can be included in
the 35 hours weekly as long as your General Manager previously approves.
Heather, Hospitality Ventures views and values all of our management personnel as long
term investments. The above response to your request supports those views and values while
    porting our financial commitment to the owners," investors and lenders.
hopefully you will understand and be in agreement with the above. If so, please print,
sign and fax to my attention by 3:00pm cts tomorrow.(Friday April 8,2005)If you are not in
agreement than we will accept your resignation submitted Wednesday April 6,2005.Due to
potential conflict of interest with current job offers discussed yesterday we would expect
you to end your employment with us by tomorrow, Friday April 8,2005. All of us at HV hope
and trust you will remain a vital, productive member of the Montgomery Fairfield Inn
management team for many years to come. Take care.
Have a super day.



DEFENDANT'S
EXHIBIT
23

1

Watts v. Hospitality
Int Discl/RFP   0030

# EXHIBIT "5"

Fairfield Inn Montgomery
Todd Epplin
5601 Carmichael Road
Montgomery, Alabama 36117

June 6, 2005

Todd,

Please accept this letter as my official notice of request for Maternity Leave. I am
planning on taken 6-8 weeks depending on my delivery and health of my child. I will
give you official notice of my return after my 6 week postpartum appointment. I will not
be out more than my allotted time of 12 weeks under the FMLA.

I plan on working up to the day of delivery and or orders from my doctor.

If you have any questions, please let me know.

Sincerely,

Heather Watts

DEFENDANT'S
EXHIBIT
24

Watts v. Hospitality
Int Discl/RFP  0081

**EXHIBIT "6"**

## AFFIDAVIT OF HEATHER WATTS

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY )

Personally appeared affiant, HEATHER WATTS, who being duly sworn, says:

1. This affidavit is given on the basis of the affiant having knowledge pertaining to sex/pregnancy discrimination and termination November 2, 2005.

2. My address is: 6976 Eastern Shore Road, Montgomery AL 36117 and my phone number (334) 244-8077.

3. I was employed at the Marriott Fairfield Inn from June 2004 as director of sales and marketing. General Manager Todd Epplin was told me the hotel had not made budget for 12-18 months before I was hired. From the first quarter, I brought in enough business to make the hotel profitable. I started at $35,000 per year and was earning $38,000 when I left, plus bonuses of $3,800 per quarter.

4. When I first became pregnant, Roger Miller, vice president of sales and marketing at Hospitality Ventures, my employer, told me that I could take maternity leave. We worked on hiring an intern, Tandi Mitchell, to take over my job duties when I went on leave. Mr. Epplin agreed with Miller that I could be on maternity leave and gave Tandi and me training time up until the time I left. We talked about the length of my leave for several months.

5. My child was born on August 12, and I took unpaid maternity leave, starting Aug. 11. I never had received a company handbook, but I had requested the leave in writing. No one contested my right to FMLA/maternity leave. I took leave starting on August 11, 2005, and was not due to return to work until November 9.

6. My employer, however, continued to give me assignments during this period, paying me for seven hours a week. Tammy Dominguez, the new hotel manager, had tried to get me to come back to work three days a week at the hotel during my maternity leave, but my newborn developed an ear infection, and I was not able to work those hours during my maternity leave.

7. Typically, more than half of my work had been performed at home and outside the hotel, because of the nature of my job.

8. I was working on a marketing plan for the hotel while I was on maternity leave. Ms. Dominguez was asked on Wednesday October 19, to bring in all my work on the plan and to copy all of it, in her presence. Yet, when Roger Miller came to town to discuss the plan the following week, I was not invited to meet with him. I began to feel uneasy about my job status.

9. On Nov. 2, one week before I was to return from maternity leave, I was called by Ms. Dominguez, and asked if I was going to be able to return to my job fulltime, 35 hours a week. I said yes. She repeated the question, saying "I need to know by 5 p.m.," and I said yes.

10. She called back and said the company was not going to give me that option to come back, that I could resign today or she was terminating me.

11. I went to the hotel at 11:15 a.m. Nov. 3 and got my final check and an order to clean out my office. At 11:46, Ms. Dominguez, she called me again and questioned whether I had called the hotel and asked about FMLA. I said no. She began stating that she "made a mistake," and she could not terminate me due to FMLA. She said I should come in on Nov. 9, my original day back and prepare to work my 35 hours.

RECEIVED

DEC 1 ? 2006

BIRMINGHAM DISTRICT OFFICE

MV 00138

12. However I had been required to turnover my laptop and all sales files. The company locked me out of the SalesPro computer database. There was no doubt, that I was fired.

13. Ms. Dominguez does not have custody of her own child. Other company officials had expressed concern over my ability to get child care. This was the only expressed reason for terminating me.

14. The intern who is now assigned to do some of my work, works outside the hotel all but one day a week.

15. I also was told by corporate officials in Atlanta that my medical coverage had been canceled October 30, three days before I was terminated.

16. The company attempted to deny me unemployment benefits, but my employer was overruled.

Affiant

RECEIVED

DEC 1 2 2005

BIRMINGHAM DISTRICT OFFICE

STATE OF ALABAMA }
MONTGOMERY COUNTY }

Before me the undersigned, a Notary Public in and for said County and State, this day personally appeared affiant, who is known to me, and who being first duly sworn deposes and says that the matters and things alleged in the foregoing affidavit are true as therein averred.

Affiant

Sworn and subscribed before me this 8th day of December, 2005.

Notary Public
My commission expires _____ 9-16-07

# EXHIBIT "7"

BEN 254-DC
Revised 11/02
Electronic Form

**ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS**
*UNEMPLOYMENT COMPENSATION DIVISION*
**DOCTOR'S CERTIFICATE**

Claimant's SSN XXXXX1193
Claim Date 111305    Claim Type 01
Date Mailed 111705

*NOTE TO CLAIMANT:* SIGN AND DATE THIS FORM TO AUTHORIZE THE RELEASE OF THIS INFORMATION. THIS FORM MUST BE COMPLETED BY YOUR DOCTOR AND RECEIVED BY MAIL OR FAX AT THE ADDRESS BELOW NO LATER THAN 113005. FAILURE TO RETURN THIS COMPLETED FORM AS INSTRUCTED COULD RESULT IN A DENIAL OF BENEFITS.

HEATHER G WATTS
6976 EASTERN SHORE RD
MONTGOMERY AL 36117

CLAIMANT'S SIGNATURE: _____   DATE: 11/22/05

**(NOTE TO DOCTOR):**
The above claimant has applied for unemployment benefits effective 111305 and states his/her usual occupation is **MARKETING MANAGER**. The following information from you is necessary to determine his/her ability to work. This certificate is furnished to the claimant as a convenience for the purpose of assisting the Alabama Unemployment Compensation Agency In making a decision on his/her claim for unemployment. This agency assumes no responsibility for payment of your professional services. Please complete the following information in its entirety.

1. Dates and Treatment: From 12 / 15 /2004 To 09 /27 /2005 For pregnancy, delivery, and postpartum recovery+checkup.

2. Is this individual able to perform the duties of his/her usual occupation? Yes ☒  No ☐
If "No," did you advise this individual that continuing to perform the duties of his/her usual occupation would aggravate His/her injury or illness? Yes ☐  No ☐

3. If this individual is able to perform the duties of his/her usual occupation, on what date did this individual become able? 09/24/2005

4. If unable to perform the duties of his/her usual occupation, is he/she able to perform any type of work? Yes ☐  No ☐
If "Yes," please explain any limitations (including the dates affected):
From ___/___/___  To ___/___/___

5. If treatment is for pregnancy, enter expected date of confinement: 08/12/05 - 09/23/05

**REMARKS** (If appropriate): Pt. is to be in postpartum recovery for 6 weeks. Pt. will have a 6 week postpartum checkup at the end of her 6 week recovery time.

Signature of Physician _____   Phone Number (334) 279-9333

Date Completed 11/22/05   Address: 495 Taylor Road Montgomery AL 3617

**RETURN COMPLETED FORM TO:**
MONTGOMERY UC CALL CENTER
ATTN: PATSY
P.O. BOX 211239
MONTGOMERY AL 36121-1239

**FAX NUMBER: (334) 956-7352**

DEFENDANT'S EXHIBIT 12

Watts v. Hospitality
Int Discl/RFP 0083

# EXHIBIT "8"

This message was se _ _ _ _ _ _ _ _ _

**Watts, HEATHER**

| | | |
|---|---|---|
| **From:** | Watts, HEATHER | **Sent:** Tue 9/27/2005 3:08 PM |
| **To:** | FFI, Montgomery GM | |
| **Cc:** | Miller, Roger | |
| **Subject:** | Heather Maternity Leave | |
| **Attachments:** | | |

Tammy,

After our discussion on Friday, there has been some change that I would like to request in my schedule.

Over the weekend Tanner become ill with "another " ear infection. He has now on his second round of antibiotics at being just 6 weeks old. They are scheduling him to see a specialist and recheck his hearing. *His doctor is requesting that I keep him out of daycare as long as possible.* With this being said, I would like to take my full maternity leave of 12 weeks that began on Aug. 10th. This would allow Tanner time to heal and increase his antibodies before going to daycare.

My *original plan* was to come back between 8-10 weeks-per my discussion with Roger. I will keep you posted weekly if I am able to come back sooner. I am still willing to do all I can at home as in the original plan with Todd and Roger. I can still do my 7+ hours a week: work on the marketing plan and continue to work directly with Tandi and maintain Sales Pro. I will continue my communication with you, the front desk and Tandi as needed throughout the week.

I have asked Tandi if she was still able to work with our original plan and me return the first week of November. She stated that yes, she would get with you. Her agreement is good within one week of my notice of my return.

My intentions is to return to my job after my maternity leave as we discussed. Please feel free to call me and I will be happy to discuss further if needed.

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
**www.marriott.com/mgmfi**

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!



DEFENDANT'S
EXHIBIT
33

# EXHIBIT "9"

## watts167@bellsouth.net

**From:** watts167@bellsouth.net
**Sent:** Thursday, November 03, 2005 8:50 AM
**To:** 'Roger A Miller'
**Subject:** FW: Heather
**Importance:** High

Roger,
 I tried to log onto Sales Pro this morning to enter a group that Tandi sent over yesterday and was denied access – I guess this answers my question about my job.
Heather

---

**From:** watts167@bellsouth.net [mailto:watts167@bellsouth.net]
**Sent:** Wednesday, November 02, 2005 9:38 PM
**To:** 'Roger A Miller'
**Subject:** Heather
**Importance:** High

Roger,
  Good evening. My last conversation with Tammy this afternoon at 4p.m. (11/2/05) she stated that she was "now" no longer going to given me an option to return to my 35 hours a week upon my return from Maternity Leave on Nov. 9th or my request to let her know by Friday, Nov. 4th if I can return to my full-time status.   She stated that I can either accept this as a termination today or can give her a two week notice when I turn in the files (and now the laptop) she requested on Friday. (11/4/05)  Tammy stated that I was not to come in on Wednesday, Nov. 9th. I requested that I want to have something in writing so that I clearly understand and that I am on the same page as her, you and Robert.

  Also, I requested from our prior conversation this morning that I needed more time then by 5pm today to let her know if I would be returning to my 35 hours on Nov. 9th.  I told her that I would call my church and family members see if I could get some help. It was my understanding that she was going to be able to work with me and my schedule (just last week from our in-house meeting)  in hopes that I could have full-time childcare by January. And the reason I have not spoken to you about this because you told me several weeks ago that you were no longer by boss that I needed to speak directly to Tammy.

  I have not heard from Tammy this evening, I know she is traveling but can you confirm that I no longer have a job at the Fairfield Inn Montgomery.  That what is stated above is true?


Thanks
Heather Watts

11/3/2005


DEFENDANT'S
EXHIBIT
34

Watts v. Hospitality
Int Discl/RFP  0167

# EXHIBIT "10"

watts167@bellsouth.net

| | |
|---|---|
| **From:** | Dominguez, Tammy [Tammy.P.Dominguez@marriott.com] |
| **Sent:** | Monday, November 07, 2005 9:25 AM |
| **To:** | watts167@bellsouth.net |
| **Cc:** | rmiller@hospitalityventures.com; rcole@hospitalityventures.com; creitz@hospitalityventures.com; ron_disbrow@hilton.com |
| **Subject:** | FW: Heather |
| **Importance:** | High |



Dear

eather.doc (22 K)

       Heather:

Please read the attached letter.
I want to make sure you have plenty of time to make a decision, so I will give you until
the 10th rather than the 8th.  You may not have received this email as of yet because I
have been sending it to you heather.g.watts@marriott.com email.  Please respond ASAP.

Regards,

Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, AL 36117
C-207-807-1950
O-334-270-0007


From: Dominguez, Tammy
Sent: Sun 11/6/2005 12:42 PM
To: Watts, HEATHER
Cc: rmiller@hospitalityventures.com; ron_disbrow@hilton.com;
rcole@hospitalityventures.com; creitz@hospitalityventures.com
Subject: RE: Heather


Heather:

Please read and respond to the attached document.


Regards,


Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, AL 36117
C-207-807-1950
O-334-270-0007

1

**DEFENDANT'S
EXHIBIT**
36

Watts v. Hospitality
Int Discl/RFP  0161

Dear Heather,

I am sorry we could not finish our phone call yesterday. I wanted to send you this letter so that you may have a chance to consider what we were discussing at your own convienece.

At this time we are prepared to offer you a position on the front desk for the 3-11 shift or the night audit 11-7 shift. Both positions will require a 35 hour a week commitment. Either one of these positions would be available starting November 9.

It is our intention to get you back to work. We would be able to pay you at your current rate of pay and your insurance benefits will remain the same.

Unfortunately at this time this is the only current positions we have available. If another position becomes available you will have the opportunity to be considered for it.

We will need to know what your decision will be by 11/8/2005 or we will have to consider that you have decided to resign from employment at our hotel.

If you have any questions please feel free to contact me to discuss.


Sincerely,

Tammy Pratt Dominguez
General Manager
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, AL 36117
334-270-0007

AFFIDAVIT OF CAROL TWARDOCH

STATE OF GEORGIA      )
                      )
COUNTY OF FULTON      )

Personally appeared before the undersigned officer duly authorized by law to administer oaths, Carol Twardoch, who after first being duly sworn states, on oath:

I understand that this Affidavit will be submitted in the civil action styled, Heather Watts v. Hospitality Ventures, LLC, Civil Action No. 2:06CV1149-MEF, pending in the United States District Court for the Middle District of Alabama.

I am over twenty-one (21) years of age and am competent to testify to the matters contained herein. This Affidavit is based upon my personal knowledge.

1.    I am employed by Hospitality Ventures Management, Inc. ("HVMI"). I am responsible for overseeing the corporate records for Hospitality Ventures, LLC; HVMI; and Montgomery Ventures, LLC.

2.    On May 16, 2001, Hospitality Ventures, LLC was formed in Delaware. Attached as Exhibit A is a true and correct copy of Hospitality Ventures, LLC's certificate of formation from the Delaware Secretary of State.

3.    On June 1, 2005, the Delaware Secretary of State cancelled Hospitality Ventures, LLC and Hospitality Ventures, LLC ceased to exist. Attached as Exhibit B is a true and correct copy

1                    **Error! Unknown document property name.**

of Hospitality Ventures, LLC's certificate of cancellation from the Delaware Secretary of state.

4. Since June 1, 2005, there has been no entity named Hospitality Ventures, LLC affiliated with or related to the Fair field Inn by Marriott hotel located at 5601 Carmichael Road, Montgomery, Alabama, 36117 (the "Hotel").

5. From 2003 until the present, Hospitality Ventures, LLC has not had any employees.

6. Hospitality Ventures, LLC never employed or paid Heather Watts, Todd Epplin, Tammy Dominguez, or Roger Miller.

7. From January 1, 2003, to the present, Hospitality Ventures, LLC has not owned or operated HVMI.

8. From January 1, 2003, to the present, HVMI has not owned or operated Hospitality Ventures, LLC.

9. Hospitality Ventures, LLC has never owned or operated the Hotel. Attached Exhibit C is the Hotel's current Franchise Agreement with Marriott International, Inc., which shows that since July 29, 2002, Montgomery Ventures, LLC has owned the Hotel.

FURTHER AFFIANT SAYETH NOT.

_____
CAROL TWARDOCH

Signed and sworn before me this 10ᵗʰ day of September, 2007.

_____
Notary Public
My commission expires:
(NOTARY SEAL)

KAREN L. KISH
NOTARY PUBLIC, CHEROKEE COUNTY, GEORGIA
MY COMMISSION EXPIRES DECEMBER 6, 2008

2                              Error! Unknown document property name.

**Exhibit A to Twardoch Affidavit**

# Delaware

PAGE 1

### *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS ON FILE OF "HOSPITALITY VENTURES, LLC"
AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE SIXTEENTH DAY OF MAY,
A.D. 2001, AT 9 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID LIMITED LIABILITY COMPANY, "HOSPITALITY VENTURES,
LLC".



3388228    8100H

070793024

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 5824945

DATE: 07-09-07

MV 00567

**Exhibit B to Twardoch Affidavit**

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT THE CERTIFICATE OF FORMATION OF "HOSPITALITY VENTURES, LLC", WAS RECEIVED AND FILED IN THIS OFFICE THE SIXTEENTH DAY OF MAY, A.D. 2001.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID LIMITED LIABILITY COMPANY IS NO LONGER IN EXISTENCE AND GOOD STANDING UNDER THE LAWS OF THE STATE OF DELAWARE HAVING BECOME CANCELLED THE FIRST DAY OF JUNE, A.D. 2005, BY REASON OF ITS NEGLECT, REFUSAL, OR FAILURE TO PAY IT'S ANNUAL TAXES.



3388228    8420

070793024

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 5824944

DATE: 07-09-07

MV 00568

**Exhibit C to Twardoch Affidavit**

Executed Version

# FAIRFIELD INN
# RELICENSING

## FRANCHISE AGREEMENT

between

## MARRIOTT INTERNATIONAL, INC.
Franchisor

and

## MONTGOMERY VENTURES, LLC
Franchisee

Location:    5601 Carmichael Road
Montgomery, Alabama 36117

Dated as of: July 29, 2002

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02



CONFIDENTIAL

MV 00505

# FAIRFIELD INN

## FRANCHISE AGREEMENT

RECITALS...................................................................................................1

I.      GRANT...........................................................................................2

II.     TERM.............................................................................................3

III.    FEES..............................................................................................3

IV.     FAIRFIELD FRANCHISE ASSOCIATION.................................5

V.      MANAGEMENT, STAFFING AND TRAINING...........................5

VI.     OPERATION OF THE HOTEL.......................................................7

VII.    FURNISHING AND MAINTAINING THE HOTEL.......................8

VIII.   RESERVATION AND PROPERTY MANAGEMENT SYSTEMS......9

IX.     ADVERTISING AND MARKETING..............................................11

X.      PROPRIETARY MARKS AND INTELLECTUAL PROPERTY.......13

XI.     SYSTEM STANDARDS MANUAL...............................................15

XII.    CONFIDENTIAL INFORMATION...............................................16

XIII.   ACCOUNTING AND RECORDS..................................................16

XIV.    INSURANCE.................................................................................17

XV.     TRANSFERABILITY OF INTEREST...........................................19

XVI.    SECURITY OFFERINGS..............................................................25

XVII.   DEFAULT AND TERMINATION.................................................26

XVIII.  OBLIGATIONS UPON TERMINATION.......................................28

XIX.    CONDEMNATION AND CASUALTY..........................................30

XX.     TAXES, PERMITS AND INDEBTEDNESS...................................31

XXI.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION.......31

XXII.   APPROVALS AND WAIVERS.....................................................32

XXIII.  WARRANTY OF FRANCHISEE...................................................33

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

i



XXIV. NOTICES ................................................................................................................ 33

XXV.  ENTIRE AGREEMENT ........................................................................................ 34

XXVI. CONSTRUCTION AND SEVERABILITY .......................................................... 34

XXVII. APPLICABLE LAW AND CURRENCY REQUIREMENT ................................ 35

XXVIII. WAIVER OF JURY TRIAL ................................................................................... 36

XXIX. FRANCHISEE ACKNOWLEDGMENTS ............................................................. 36

ATTACHMENT A     FRANCHISE INFORMATION ...................................................... 38

ATTACHMENT B     FORM OF GUARANTY ............................................................... 39

ATTACHMENT C     FORM OF MANAGER ACKNOWLEDGMENT ........................... 42

PROPERTY IMPROVEMENT PLAN ADDENDUM .................................................... 45

EXHIBIT A TO ADDENDUM ........................................................................................ 48

61799v4 - Montgomery, AL
5R003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 483S4v7 (03/31/2002)
7/18/02

ii



CONFIDENTIAL

MV 00507

FAIRFIELD INN
FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into effective as of the 29th day of July, 2002 ("Effective Date"), between Marriott International, Inc., a Delaware corporation ("Franchisor"), and Montgomery Ventures, LLC, a Georgia limited liability company ("Franchisee").

WITNESSETH:

WHEREAS, Franchisor has developed and owns a concept and system (hereinafter "System") for the establishment and operation of economy hotels under the names "Fairfield Inn" and "Fairfield Inn & Suites" which offer guests exceptional quality and service (all references herein to the "System" shall be to the Fairfield Inn system in the United States and Canada, which System includes both Fairfield Inn and Fairfield Inn & Suites hotels; all references herein to "Fairfield Inn franchisees" include both Fairfield Inn and Fairfield Inn & Suites franchisees in the United States and Canada);

WHEREAS, the distinguishing characteristics of the System, all of which may be changed, improved or further developed by Franchisor, include, without limitation:

     1.    the trade names, trademarks and service marks "Fairfield Inn," "Fairfield Inn & Suites" and such other trade names, trademarks and service marks as are now or as may hereafter be designated by Franchisor in writing as part of the System ("Proprietary Marks");

     2.    design & construction criteria documents for each of Fairfield Inn and Fairfield Inn & Suites hotels;

     3.    high standards of cleanliness, quality and service as prescribed in the Fairfield Inn System Standards Manual ("Manual");

     4.    management training;

     5.    advertising, marketing and promotional programs;

     6.    the Fairfield Inn Reservation System; and

     7.    the Fairfield Inn Property Management System;

WHEREAS, Franchisor and Fairfield Inn by Marriott Limited Partnership ("Existing Franchisee") are parties to a Fairfield Inn franchise agreement dated November 30, 2001 ("Existing Franchise Agreement") for the operation of the Hotel (defined below);

WHEREAS, immediately prior to its execution of this Agreement Franchisee purchased the Hotel from Existing Franchisee pursuant that certain Purchase and Sale Agreement dated June 12, 2002, for that purpose.

WHEREAS, Franchisee is the owner of the Hotel and Franchisee desires to operate the Hotel under Franchisor's System at the location specified herein and to obtain a franchise from Franchisor for that purpose:

61799v4 – Montgomery, AL
58903v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02



CONFIDENTIAL

MV 00508

WHEREAS, in order to enhance public acceptance of, and demand for, all Fairfield Inn and Fairfield Inn & Suites hotels, Franchisee understands and acknowledges the importance of complying strictly to Franchisor's standards and specifications in (i) completing in a timely manner the renovations, upgrading and/or remodeling requirements (the "Property Improvement Plan") set forth in the Property Improvement Plan Addendum (the "Addendum") attached hereto, and (ii) operating the Hotel to be franchised hereunder; and

WHEREAS, Franchisor is relying upon the business skill, financial capacity and character of Franchisee and its principals, and the guarantee by the principals of Franchisee's obligations, if applicable, as attached to this Agreement.

NOW, THEREFORE, the parties, in consideration of the premises and the undertakings and commitments of each party to the other party set forth herein, agree as follows:

I.        GRANT

A.        As a condition precedent to the effectiveness of this Agreement, Existing Franchisee shall have executed and delivered the Termination Agreement of even date in form and substance agreeable to Franchisor. Subject to the foregoing condition, Franchisor hereby grants to Franchisee, upon the terms and conditions herein contained, a nonexclusive right and franchise, and Franchisee undertakes the obligation, to operate a Fairfield Inn hotel in accordance with Franchisor's standards and specifications at, and only at, the location specified in Attachment A hereto ("Approved Location") and to use solely in connection therewith Franchisor's System as it may be changed, improved and further developed. Franchisor reserves the right to revise, modify, amend or change the System, or any part thereof. Such revisions, modifications, amendments, or changes may include new or different systems, programs, specifications, standards, controls, and other distinguishing elements or characteristics that Franchisor may make mandatory. Franchisee specifically acknowledges that certain modifications or additions to the System may require Franchisee to contribute to the cost of such modifications or additions on a fair and consistent basis with other participating System hotels or other hotels, as determined by Franchisor.  The grant of this franchise is subject to Franchisee's satisfying the requirements set forth in the Addendum to this Agreement.

B.        Subject to the termination of the Existing Franchise Agreement, the "Effective Date" shall be the date first set forth above.  Franchisee acknowledges and agrees further that if Franchisee fails to comply with the requirements of the Property Improvement Plan set forth in the Addendum attached hereto in strict compliance with the standards and specifications of Franchisor, then in such event, (i) Franchisor is not obligated to authorize Franchisee to operate the Hotel as a Fairfield Inn hotel, and (ii) this Agreement shall, upon notice by Franchisor to Franchisee, be terminated, except for those obligations of Franchisee that, by their terms, survive termination of this Agreement. For purposes of this Agreement, the terms "Hotel" and "Franchised Business" shall refer to (i) the hotel and all land used in connection with the hotel located or to be located at the Approved Location; (ii) all improvements, structures, facilities, entry and exit rights, parking, pools, and appurtenances (including without limitation the hotel building, public facilities, and all operating systems therein); and (iii) all FF&E (as defined herein), supplies, goods, and other items installed in such improvements.

C.        Franchisee acknowledges and agrees that (i) this franchise relates solely to the Approved Location; (ii) this Agreement does not entitle Franchisee to any protected territory, territorial rights or exclusivity; and (iii) this franchise and Franchisee's rights hereunder are granted only for the number of guest rooms specified in Attachment A hereto.  Franchisee shall not expand or change the number of guest rooms in the Hotel without the prior written consent of Franchisor.

61799v4 – Montgomery, AL
58003v1 — 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

2



CONFIDENTIAL

MV 00509

D.      Franchisee further acknowledges and agrees that Franchisor, its subsidiaries, affiliates and partners (the "Marriott Companies") have and retain the right to develop, promote, construct, own, lease, acquire and/or operate, or authorize or otherwise license or franchise others to develop, promote, construct, own, lease, acquire and/or operate other lodging products operating under the trade name "Fairfield Inn," including other Fairfield Inn and Fairfield Inn & Suites hotels, as well as any other lodging products or concepts, including but not limited to those operated under the trade names Marriott Vacation Club International; Horizons by Marriott Vacation Club; Marriott Hotels, Resorts and Suites; Renaissance Hotels, Resorts and Suites; Courtyard by Marriott; Fairfield Suites; Residence Inn by Marriott; SpringHill Suites by Marriott; TownePlace Suites by Marriott; Ritz-Carlton; Marriott Conference Centers; or any other lodging product; vacation, timesharing or interval ownership facilities; restaurants; or other business operation. Franchisee further acknowledges, accepts and agrees that the Marriott Companies may exercise such right without notice to Franchisee, and Franchisee covenants that it shall not take any action, including any cause of action in a court of law or equity, that may interfere with the exercise of such right by any of the Marriott Companies.

E.      Franchisee hereby represents and warrants to Franchisor that Franchisee is the sole owner of the Hotel.

F.      Franchisee acknowledges and agrees to be bound by all ancillary agreements between Existing Franchisee and Franchisor, including, but not limited to, any licensing agreements, cost sharing agreements, cluster revenue agreements, and any other agreements relating to the Existing Franchise Agreement. Franchisee agrees to execute any separate acknowledgements or amendments to such agreements signifying Franchisee's willingness to be bound by such agreements as Franchisor may reasonably request.

II.     TERM

Except as otherwise provided in this Agreement, the term of this franchise shall begin on the Effective Date and shall expire on the date that is ten (10) years after the Effective Date.

III.    FEES

A.      Franchisor acknowledges having received from Franchisee a transfer fee of Twenty-Six Thousand Six Hundred Dollars ($26,600) which fee was paid by Franchisee to Franchisor in consideration for the administrative and other expenses incurred by Franchisor in processing Franchisee's application (the "Transfer Fee"). Franchisee shall have no right to expand the number of rooms at the Hotel beyond the number set forth in Attachment A to this Agreement. If Franchisee proposes to expand the number of rooms, Franchisee must pay to Franchisor, along with its request for approval of expansion, a fee equal to the then-current application fee per guest room for each proposed additional guest room. The additional application fee will be refundable only if the request for approval is disapproved by Franchisor, which approval or disapproval will be at the sole discretion of Franchisor. The amount refunded will be the additional application fee less a processing charge. The additional application fee shall be non-refundable upon Franchisor's approval of the proposed expansion.

B.      Franchisee shall pay to Franchisor or its affiliates, on invoice, a charge in an amount specified by Franchisor for the following: (i) training conducted by Franchisor (plus tuition, supplies, in-session meals, travel, room and board expenses), (ii) orientation of Franchisee's executives (except travel expenses), (iii) training by Franchisor of Franchisee's employees at the Hotel, (iv) the purchase, staging, programming, installation and interfacing, and upgrading of hardware and Software (as defined herein) for the property management and reservation systems, (v) the Software and license fees

61799v4 – Montgomery, AL.
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

3



CONFIDENTIAL

MV 00510

for Franchisor's property management and reservation systems and electronic mail, (vi) charges in connection with the opening authorization process and the cost of manuals provided by Franchisor, and and (vii) any goods or services purchased, leased or licensed by Franchisee from Franchisor or an affiliate of Franchisor and any optional or mandatory programs of Franchisor or its affiliates in which Franchisee participates. To the extent hardware, software or training related thereto is provided by or purchased or licensed from a third party(ies), the amount of the charges shall account for the cost of any such third-party hardware, software and related license(s) and training.

C.     In further consideration of the franchise granted herein, Franchisee shall pay to Franchisor a continuing royalty fee per Accounting Period (as defined herein) during the term of this Agreement in an amount equal to four and one-half percent (4.5%) of Franchisee's gross room revenues (as defined herein).

D.     Franchisee shall also remit to Franchisor for each Accounting Period an amount equal to two and one-half percent (2.5%) of Franchisee's gross room revenues as a contribution to the marketing fund which shall be maintained and administered by Franchisor for the System as provided in Section IX. hereof. Franchisor warrants and represents that each System hotel operated by Franchisor shall make contributions to the marketing fund at the same percentage of gross room revenues required of franchisees within the System. Franchisor may periodically increase the marketing fund contributions for all hotels in the System including the Hotel, provided the total marketing fund contribution required of Franchisee in any fiscal year shall not exceed three and one-half percent (3.5%) of Franchisee's gross room revenues.

E.     Franchisee shall also remit the reservation system fees to Franchisor for each Accounting Period, including: (i) the percentage reservation fee; (ii) the transaction reservation fee; and (iii) the communication support fee. Reservation system fees shall be subject to increase or decrease by Franchisor; provided, however, any increase or decrease shall apply equally to all hotels in the System including Fairfield Inn and Fairfield Inn & Suites hotels operated by Franchisor or any subsidiary of Franchisor. Franchisor reserves the right to modify or change the reservation system and the basis for computing reservation system fees, provided the fees are computed on a fair and consistent basis for all System hotels.

F.     Additionally, Franchisee shall remit the property management system fee to Franchisor for each Accounting Period, which fee shall be used by Franchisor to maintain Software for the property management system, including enhancements, additions, substitutions, modifications and upgrades, and to maintain a Help Desk to provide telephone assistance on property management operations for all System hotels (so long as such Help Desk is maintained by Franchisor) plus access and related fees for each Accounting Period for E-mail and cc:Mail. The amount charged shall be subject to increase or decrease by Franchisor; provided, however, any increase or decrease shall apply on a fair and consistent basis to all hotels in the System including Fairfield Inn and Fairfield Inn & Suites hotels operated by Franchisor or a subsidiary of Franchisor.

G.     All payments required in Paragraphs III.C., III.D., and III.E.(i) shall be paid to Franchisor by the fifteenth (15th) day following the end of each Accounting Period on the gross room revenues during the preceding Accounting Period, and shall be submitted to Franchisor together with any reports required under Section XIII. of this Agreement. All payments required in Paragraphs III.E.(ii) and III.F. shall be paid to Franchisor pursuant to the timing set forth in the invoice forwarded to Franchisee, which shall not be less than ten (10) days after Franchisee's receipt of the invoice. Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue. If any payment is overdue, Franchisee shall pay to Franchisor, in addition to the overdue amount, a late charge on such

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

4

**CONFIDENTIAL**



MV 00511

amount from the date it was due until paid, at one and one-half percent (1.5%) per Accounting Period or the maximum rate permitted by law, whichever is less. Entitlement to such late charge shall be in addition to any other remedies Franchisor may have.

H.    "Gross Room Revenues" as used herein shall include all gross revenues attributable to or payable for rental of guest rooms, including all credit transactions, whether or not collected, proceeds from any business interruption insurance applicable to loss of revenues due to the non-availability of guest rooms and for guaranteed no-show revenue, that is collected; but excluding any sales or room taxes collected by Franchisee for transmittal to the appropriate taxing authority. Gross room revenues shall be accounted for in accordance with the Uniform System of Accounting for Hotels, Ninth Revised Edition, 1996, as published by the Hotel Association of New York City, Inc., or any later edition or revision that Franchisor approves or designates.

I.    "Accounting Period" as used herein refers to Franchisor's fiscal accounting and reporting period. Franchisor's fiscal year begins on the Saturday closest to January 1 and ends on the Friday closest to December 31, and is comprised of thirteen (13) four (4)-week Accounting Periods or twelve (12) four (4)-week Accounting Periods and one (1) five (5)-week Accounting Period, depending upon the calendar year. Notwithstanding the foregoing, with Franchisor's prior consent, Franchisee may use its own fiscal accounting period for purposes of computing and payment of all fees due under Paragraphs III.C., D. and E(i).

IV.    FAIRFIELD FRANCHISE ASSOCIATION

If Franchisor should, during the term of this Agreement, sanction the formation of a Fairfield Franchise Association (hereinafter "FFA") or such successor association as may be sanctioned by Franchisor to serve as an advisory council to Franchisor with respect to advertising, marketing, reservations, and other matters relating to Fairfield Inn and Fairfield Inn & Suites hotels, all franchisees of Fairfield Inn and Fairfield Inn & Suites hotels and Franchisor shall be members of FFA. In such event, Franchisee shall pay to FFA all dues and assessments authorized by FFA and shall otherwise maintain its membership in FFA in good standing ("good standing" means FFA dues and assessments are current, Franchisor has authorized Franchisee to open and operate the Hotel as a Fairfield Inn hotel and Franchisee is not in default hereunder). Such fees shall be consistently applied to all Fairfield Inn franchisees. On all matters on which members of FFA are authorized to vote under the bylaws of FFA, each franchisee member in good standing shall be entitled to one (1) vote for each System hotel it has in operation; and Franchisor shall be entitled to one (1) vote for each System hotel operated by Franchisor or its affiliates for parties who are not franchisees.

V.    MANAGEMENT, STAFFING AND TRAINING

A.    Franchisee shall at all times be responsible for oversight of the Franchised Business. The operator of the Hotel, either Franchisee or a third-party management company, shall be subject to the prior approval of Franchisor. Except as may be otherwise approved in writing by Franchisor, the Hotel will be operated by the entity (Franchisee or an approved management company) identified in Attachment A hereto, provided that, in the case of a third-party management company, Franchisor's approval of such operator shall be effective only upon the execution by Franchisee and such management company of a Manager Acknowledgment substantially identical to the form set forth at Attachment C attached hereto.

1.    In order to be approved by Franchisor as the operator of the Hotel, Franchisee or a proposed management company must be deemed by Franchisor, in its sole discretion,

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

5



CONFIDENTIAL    MV 00512

qualified to manage the Hotel. Franchisor may refuse to approve, as operator of the Hotel, Franchisee or any proposed management company that, in Franchisor's sole discretion, is inexperienced or unqualified in managerial skills or operational capacity or capability, or is otherwise unable to adhere fully to the obligations and requirements of this Agreement. Franchisor may also withhold its approval if the proposed management company does not provide Franchisor with all information that Franchisor may reasonably request. It is understood that Confidential Information (as defined herein) is, in the normal course of business, imparted to System franchisees and managers, and Franchisor will be under no obligation to approve a proposed management company or replacement management company that is a franchisor or owner, or is affiliated with or manages hotels exclusively for the franchisor or owner, of a hotel trade name that is competitive with Franchisor, irrespective of the number of hotels operating under such trade name. In the event there is a change in the control of the then current management company for any reason whatsoever, or if there is a material adverse change to the financial status or operational capacity of the management company, Franchisee shall promptly notify Franchisor of any such change, and such management company shall be subject to reapproval in accordance with the provisions of this Paragraph V.A.1. If the then-current management company becomes, is acquired by, or merges with or into a Competitor (as defined below at Paragraph XV.D. of this Agreement), or a Competitor obtains control over such management company, Franchisee shall promptly notify Franchisor of any such change and Franchisor shall have the right to require Franchisee to terminate such management company's relationship with the Hotel.

2.    When Franchisor has approved in principle the management company nominated by Franchisee, Franchisee shall have the right to negotiate and execute a management agreement with such management company for the management and operation of the Hotel, subject to the terms, conditions, and obligations of this Agreement. Prior to the management agreement becoming effective and prior to the assumption of any rights thereunder by a management company, the management company and Franchisee must execute a Manager Acknowledgment substantially identical to the form set forth at Attachment C attached hereto. Franchisor shall have the right to review the management agreement to ensure that it is consistent with the terms and conditions of this Agreement and the Manager Acknowledgment.

B.    Franchisee shall, as prescribed in the Manual, employ qualified personnel sufficient to staff all positions at the Hotel. All personnel employed by Franchisee as General Manager or an Assistant Hotel Manager shall, prior to assuming their duties at the Hotel, attend and successfully (as defined by Franchisor) complete Franchisor's management training program. All subsequent personnel employed by Franchisee in the positions of General Manager and Assistant Hotel Manager also must successfully complete Franchisor's management training program within ninety (90) days after commencement of such employment. Franchisee must inform Franchisor when a change in such management personnel occurs. Franchisee is not required to employ an Assistant Hotel Manager if and so long as the Hotel has fewer than one hundred ten (110) guest rooms. Franchisor may periodically make available other required or optional training courses to Franchisee's personnel, as well as other programs, conferences, seminars and materials, and Franchisee shall insure that such personnel as Franchisor may direct shall satisfactorily complete any required training within the time specified. Franchisor may conduct training, as determined by Franchisor, for all departments at the Hotel, and Franchisee shall pay such training fees as specified by the Franchisor for such training. Franchisee shall provide complimentary accommodations at the Hotel for Franchisor's trainers during the training. All training shall be provided at such times and locations and for such duration as Franchisor may designate. Prior to Franchisee or Franchisee's employees attending any required or optional training program, Franchisee shall pay to Franchisor the applicable tuition fee as specified in the Manual or otherwise in writing by Franchisor. Franchisee also shall be responsible for Franchisee's employees' travel expenses and room, board and wages during any training. Franchisor reserves the right to require, as a condition of

61799v4 - Montgomery, AL.
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

6



CONFIDENTIAL

MV 00513

providing training, that personnel employed by Franchisee execute confidentiality agreements prepared by Franchisor.

        C.     Franchisee's General Manager (and Assistant Hotel Manager for System hotels over 109 rooms) shall devote full time to the management and operation of the Hotel. Franchisee covenants and agrees that the Hotel shall not, under any circumstance, be managed by a person or persons who have not successfully completed, within ninety (90) days of employment in such capacity, Franchisor's management training program.

        D.     Franchisee shall cause all employees of Franchisee, while working at the Hotel, to wear uniforms as specified in the Manual; to present a neat and clean appearance; and render competent and courteous service to guests of the Hotel.

        E.     Neither party will initiate personal contact to employ any person, without prior written consent of the other party, who is at that time employed by the other party or another System franchisee.

        F.     If the Hotel is not operated by Franchisee, but is operated by a management company approved by Franchisor, (i) the provisions of Paragraphs V.B., V.C., V.D. and V.E. relating to Franchisee's general manager and other employees, shall apply equally to the general managers and other employees of the management company, and (ii) Franchisor shall have the right to communicate directly with the management company or managers at the Hotel as to matters relating to the Franchised Business.

VI.        OPERATION OF THE HOTEL

        A.     Franchisee understands and acknowledges that each and every standard, specification and procedure of the System is essential in order to maintain the exceptional quality and guest service of Fairfield Inn and Fairfield Inn & Suites hotels and enhance public acceptance of, and demand for, Fairfield Inn and Fairfield Inn & Suites hotels. Franchisee shall conduct the Franchised Business in strict conformity with the standards, specifications and procedures set forth in the Manual (as described below at Section XI.), which standards, specifications and procedures shall be consistently applied to all Fairfield Inn and Fairfield Inn & Suites hotels; provided, however, if the market area or the physical peculiarities of a hotel in the System warrant, in the reasonable judgment of Franchisor, a deviation from such provisions, then in such event Franchisor may allow such deviation. Franchisee shall not deviate from the requirements of the Manual, as it may be modified by Franchisor, and shall not otherwise operate in a manner that reflects adversely on the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's rights therein, or interferes with or impairs the use of the property as a System hotel.

        B.     Franchisee shall use the Hotel premises solely for the operation of the Franchised Business and refrain from using or suffering the use of the premises for any other purpose or activity at any time. Franchisee shall not provide, or allow others to provide, any food or beverage service or any other guest service at the Hotel except as prescribed in the Manual.

        C.     Franchisee shall ensure that no part of the Hotel or the System, without limitation, is used to further or promote (i) any lodging business (including any other hotel operated by Franchisee or in which Franchisee or a principal of Franchisee holds an interest) operated under a trade name or trademark not owned by Franchisor or its affiliates, including without limitation advertising or promotion of hotels, vacation or time-sharing facilities (or any similar product sold on a fractional or other basis with use rights on a weekly or other periodic basis), conference centers or other lodging

61799v4 -- Montgomery, Al.
58003v1 -- 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

7



CONFIDENTIAL

MV 00514

products, or (ii) except as expressly permitted in the Manual, any business or concession at the Hotel including, but not limited to, car rental agencies, airline counters or gift shop (if the gift shop is not operated by Franchisee), unless the Franchisee first obtains the prior written consent of Franchisor, which consent may be withheld at Franchisor's sole discretion. Franchisee shall use every reasonable means to encourage the use of System hotels everywhere by the traveling public; provided, however, nothing herein shall prohibit, and Franchisee agrees to participate in, any program specified by Franchisor for referring prospective customers to other hotels when the customers cannot be accommodated by Franchisee's Hotel or any other System hotel. Nothing herein shall prohibit Franchisee or an affiliate of Franchisee from developing, operating or promoting other hotels or lodging facilities so long as Franchisee satisfies the provisions of Paragraphs VI.A., B. and C. of this Agreement.

        D.    Franchisee shall honor at the Hotel all credit cards specified in the Manual. Franchisee also agrees to participate in all customer surveys and guest satisfaction audits and offer all guest services, which may include complimentary services, as Franchisor may prescribe for System hotels including, without limitation, programs and services for senior citizens, children and frequent guests. Additionally, Franchisee shall participate in travel agent programs, any complaint resolution and other programs as Franchisor may reasonably establish for the System, which programs may include, without limitation, providing complimentary rooms or refunds to guests.

        E.    Franchisor shall administer a quality assurance program for the System that may include conducting periodic inspections of the Hotel and guest satisfaction audits and surveys to ensure compliance with System standards. Any such program to survey guests will be as set forth in the Manual, and such program may be modified by Franchisor. Franchisee's failure to maintain acceptable results in Franchisor's quality assurance program will be a material default, giving Franchisor the right to terminate this Agreement pursuant to Section XVII. below. Franchisee hereby grants to Franchisor and its representatives the right to enter upon the premises of the Hotel at all reasonable times, with or without prior notice, for the purpose of conducting inspections. Franchisee shall (i) provide lodging, if available, without charge to Franchisor's agents during such time as may reasonably be necessary to complete the inspections, (ii) cooperate fully with Franchisor's agents during the inspections, and (iii) take all steps reasonably necessary to correct any deficiencies detected within the time specified by Franchisor. Franchisee shall provide all information requested by Franchisor for the purpose of Franchisor's conducting guest satisfaction audits and surveys.

VII.        FURNISHING AND MAINTAINING THE HOTEL

        A.    Franchisee shall, at Franchisee's expense, purchase or lease and install at the Hotel all fixtures, equipment, furnishings, furniture, a telephone system, facsimile machine, copier, signs, computer terminals and hardware and related equipment for the property management system, reservation system and all other items ("FF&E") specified by Franchisor for the System. Franchisee also shall install and maintain, or arrange to have installed and maintained at the Hotel, all coin-operated vending machines specified by Franchisor for the System. Franchisee shall refrain from installing or permitting to be installed at the Hotel, without Franchisor's prior written consent, any FF&E, electronic or video games, vending machines or any other items not previously approved by Franchisor. The size, form, color scheme, content (except for prices to be charged) and location of all signs, advertisements and graphic materials displayed in any public area or guest rooms at the Hotel shall be as prescribed in the Manual or otherwise approved in writing by Franchisor. Franchisee shall obtain and display at the Hotel, in accordance with applicable laws and regulations, in prominent locations approved by Franchisor, one or more illuminated exterior signs meeting Franchisor's standards and specifications and purchased from a source previously approved by Franchisor.

61799v4 - Montgomery, AL
58003v1 - 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

8



CONFIDENTIAL

MV 00515

B. Franchisee shall use only such FF&E, supplies and other goods and services at the Hotel that conform to Franchisor's standards and specifications. Franchisor may specify for System hotels a particular model or brand of FF&E that may be available from only one manufacturer or supplier. Additionally, Franchisor may, in its discretion, specify that certain food products, FF&E, communication systems, supplies and other goods and services be purchased only from Franchisor or sources designated or approved by Franchisor. If Franchisee wishes to obtain any FF&E, supplies or other goods and services for which Franchisor has established a standard or specification from a source that Franchisor has not previously approved as meeting its standards and specifications, Franchisee shall submit a written request to Franchisor and provide such other information and samples as are necessary for Franchisor to determine whether the item and source meet Franchisor's then-current criteria. Provided that Franchisee complies with Franchisor's processes and procedures regarding approval of alternate or additional manufacturers or suppliers, Franchisor shall respond to such requests within a reasonable period of time. Franchisee shall not purchase any FF&E and other capital items for the Hotel unless such purchase is from a source designated as "approved" by Franchisor or unless Franchisor has approved in writing that the item proposed by Franchisee meets Franchisor's standards and specifications. Franchisor may modify its standards and specifications in its sole discretion. Franchisor reserves the right, at its option, to revoke its approval as to future purchases if the source or the item fails to continue to meet Franchisor's standards and specifications.

C. Franchisee shall maintain the Hotel, including, without limitation, all signs (interior and exterior), parking areas, entrance ways, landscaping, and all other facilities and appurtenances in first-class condition. In connection therewith, Franchisee shall make, at Franchisee's sole cost and expense, all additions, alterations, repairs and replacements of signs and other FF&E as Franchisor may reasonably direct; and Franchisee shall not make any material alterations to the Hotel without first obtaining the prior written consent of Franchisor.

D. At the fifteenth (15th) anniversary of the date of the Hotel first opened as a Fairfield Inn (which date the parties agree was October 17, 1988), Franchisor shall have the right to require by written notice that Franchisee upgrade the Hotel at Franchisee's sole cost and expense to conform to the building decor and trade dress and FF&E required under Franchisor's then-current System standards, (which standards shall be applied consistently throughout the System for Fairfield Inn and Fairfield Inn & Suites hotels, as applicable, of similar age), including, without limitation, such FF&E replacements, remodeling, redecoration and modifications to existing improvements as may be necessary to do so. Upgrades to the Hotel required by Franchisor pursuant to this Paragraph VII.D. shall be reasonable, considering the then-current System standards and requirements and the current structural design of the Hotel. Franchisee shall complete within the time specified by Franchisor upgrading and/or remodeling of the Hotel as required by Franchisor pursuant to this Paragraph VII.D., and Franchisee acknowledges that its failure to do so, except for delays that may be caused by the occurrence of event(s) constituting force majeure, shall constitute a material default for which this Agreement may be terminated as provided in Paragraph XVII.B.

VIII.    RESERVATION AND PROPERTY MANAGEMENT SYSTEMS

A. As long as Franchisee is in compliance with all material terms of this Agreement, Franchisor shall make available to the Hotel the reservation system provided by Franchisor for all Fairfield Inn and Fairfield Inn & Suites hotels, which system may be modified or changed by Franchisor. Franchisee acknowledges that offering the public a single, efficient reservation service is essential to the goodwill, reputation and success of the System. Franchisee shall participate during the term of this Agreement in the reservation system, and observe all terms and conditions of participation as determined by Franchisor. Franchisee shall be solely responsible for notifying the reservation system office (or such

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

9



CONFIDENTIAL

MV 00516

other office as Franchisor may designate in writing) of any changes in Franchisee's room rates. Franchisee shall in no event charge any guest a rate higher than the rate specified to the guest by the reservation system center at the time the guest's reservation was made. Such rate shall be the rate most recently provided to the reservation system office, according to the records of such office, by Franchisee prior to the guest's having made such reservation.

B.    Franchisee, at its expense, shall purchase, install and maintain at the Hotel all equipment necessary for participation in the reservation system provided by Franchisor, including any future enhancements, additions, substitutions or other modifications specified by Franchisor. Franchisee, at its expense, shall purchase, install and maintain at the Hotel all computer software and accompanying documentation, (including all future enhancements, upgrades, additions, substitutions, and other modifications thereof) provided to Franchisee by or through Franchisor and/or third parties designated by Franchisor for use by System hotels ("Software"). Franchisee shall also be responsible for telephone line charges for connecting Franchisee's reservation equipment to the system, for the cost of supplies used in the operation of the equipment and for all other related expenses.

C.    In the event Franchisee fails to pay, when due, royalties, marketing fund contributions, reservation system fees or other sums related to the Franchised Business owed to Franchisor or its affiliates or is otherwise in material default under this Agreement, Franchisor may, if such default is not cured within the applicable cure period pursuant to Section XVII. of this Agreement, after written notice to Franchisee, suspend the Hotel from the reservation system for so long as Franchisee remains in default. Franchisee waives all claims against Franchisor arising from Franchisee's suspension from the reservation system pursuant to this paragraph.

D.    Franchisor has developed (or may engage a third party to develop) for all System hotels a property management system ("PMS") and shall provide (or cause a third party vendor to provide) to Franchisee specifications and all required applications Software for PMS, which may include a designated supplier(s) for hardware and/or Software. Franchisee shall, at its expense, purchase, install, maintain and use PMS hardware and install and use all required Software.

E.    As part of the reservations system and PMS, Franchisee shall use, at Franchisee's sole cost and expense, the communication system(s) specified or otherwise approved in writing by Franchisor for System hotels.

F.    All Software, and all electronic access to Franchisor systems and data, provided to Franchisee in connection with the System (collectively, "Electronic Systems") shall at all times remain the sole property of Franchisor or any third-party licensors, as applicable. Franchisee shall at all times treat the Electronic Systems as confidential. Franchisee shall not at any time, without Franchisor's or such third party's prior written consent (which may be withheld in Franchisor's or such third party's sole discretion), copy, modify, reverse engineer, or otherwise duplicate the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person. Franchisee will use the Electronic Systems for the exclusive purpose of operating the Hotel in accordance with this Agreement. Franchisee will take reasonable measures to ensure that only authorized employees of the Franchisee at the Hotel have access to the Electronic Systems, and only for permitted purposes hereunder. Such measures shall be subject to review and inspection by Franchisor. Franchisee will not attempt to modify, delete or circumvent any measures used by Franchisor to safeguard the Electronic Systems, the Intellectual Property (as defined herein), or any other systems, data, or property of Franchisor or its licensors. If Electronic Systems are provided by third party licensors, Franchisee will comply with the accompanying terms and conditions provided by such licensors. Franchisor reserves the right to suspend Franchisee's access to any Electronic System in order to protect Franchisor's Intellectual Property or other systems,

61799v4 - Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

10



data or property of Franchisor or its licensors. Franchisor shall not be liable for any damage arising out of or in connection with the use or failure of any Electronic Systems, including, but not limited to, corruption of data, and Franchisee hereby waives any right to or claim of any exemplary, incidental, indirect, special, consequential, or other similar damages (including without limitation, loss of profits) in connection with the use or failure of Electronic Systems, even if Franchisor has been advised of the possibility of same. Franchisor shall use reasonable efforts, to the extent legally permissible, to pass through to Franchisee any warranties or other similar protections provided to Franchisor by Franchisor's licensors with respect to Electronic Systems. Otherwise, except as expressly set forth in this Agreement, Franchisor provides the Electronic Systems AS IS and without warranties of any kind, express or implied, including the implied warranties of merchantability or fitness for a particular purpose.

IX.        ADVERTISING AND MARKETING

A.        Franchisee shall be responsible at its own expense for providing local advertising, marketing, promotional and public relations programs and activities for the Hotel, all in accordance with the Manual or otherwise approved in writing by Franchisor. All advertising by Franchisee in any medium shall be conducted in a dignified manner and shall conform to such standards and requirements as Franchisor may prescribe. Franchisee shall submit to Franchisor (through the mail, return receipt requested), for its prior approval, samples of all advertising and promotional plans and materials and public relations programs that Franchisee desires to use, including, without limitation, any materials in digital, electronic, or computerized form, or in any form of media now or hereafter developed (e.g., materials to be made available through a computer or telecommunications network such as the Internet), that have not been either provided or previously approved by Franchisor. Any advertising, marketing or sales concepts, programs or materials proposed or developed by Franchisee for the Hotel and approved by Franchisor may be used by other System hotels without any compensation to Franchisee.

B.        Recognizing the value of marketing and advertising to all System hotels, Franchisee agrees that Franchisor or its designee shall administer a marketing fund ("Fund") for the System as follows:

1.        Except as set forth at Paragraph B.3. below, the Fund shall be used on behalf of the System for advertising and marketing, including, without limitation, any and all costs associated with developing, preparing, producing, directing, administering, conducting, maintaining and disseminating advertising, marketing, promotional and public relations materials, programs, campaigns, sales and marketing seminars and training programs and activities of every kind and nature, through media now existing or hereafter developed, including producing and disseminating a Fairfield Inn and Fairfield Inn & Suites Directory, conducting marketing research and administering and maintaining guest programs (except for complimentary guest services to be provided by the Hotel pursuant to Paragraph VI.E. hereof), customer surveys and guest satisfaction audits, advertising/public relations agency fees and expenses, production and media costs, and administering and maintaining any part of frequent traveler programs. All sums paid by Franchisee, other Fairfield Inn franchisees and Franchisor to the Fund, plus any interest or other income earned from such contributions, shall be maintained in a separate account from the other funds of Franchisor and shall be used to defray any of Franchisor's reasonable administrative costs and overhead Franchisor incurs in directing and administering the Fund including, without limitation, the cost of collecting and accounting for the Fund. Franchisor has the right to make loans to the Fund, and is entitled to receive interest on those loans. The actual advertising and marketing program activities that will be supported by the Fund may change and shall be determined by Franchisor.

2.        Franchisor or its designee shall direct all advertising, promotional and public relations programs using Franchisor's sole discretion over the concepts, materials and media used

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

11



**CONFIDENTIAL**

in such programs and activities and the placement and allocation thereof. Franchisee acknowledges that, with respect to advertising, the Fund is intended to maximize general public recognition, acceptance and use of the System and that Franchisor and its designees undertake no obligation in administering the Fund to make expenditures that are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Fund.

      3.    Franchisor shall have the right, in its sole discretion, to use up to twenty percent (20%) of the Fund to develop and enhance or improve the computer systems designated by Franchisor for use by the Fairfield Inn System. Such portion of the Fund shall be accounted for separately, and it shall be known as the "Technology Fund." If implemented, the Technology Fund may be used by Franchisor to pay any costs or other expenses associated with the acquisition, design, development, modification, improvement, replacement, installation, implementation, training efforts and/or ongoing usage, maintenance or support of and for any automated systems (whether software, service or hardware) used at or for the benefit of the hotels in the System. If Franchisor determines, in its sole discretion, that any such costs or other expenses shall not be paid from the Technology Fund, then such costs and expenses shall remain the sole obligation of Franchisee outside the Fund.

      4.    The parties anticipate that all contributions to the Fund shall be expended during the taxable year within which the contributions are made.

      5.    The Fund is not an asset of Franchisor. An accounting of the operation of the Fund shall be prepared annually and shall be available to Franchisee.

      6.    Franchisor reserves the right to terminate the Fund and establish other reasonable methods for advertising and marketing Fairfield Inn and Fairfield Inn & Suites hotels. The Fund shall not be terminated, however, until all monies in the Fund have been expended for the purposes described in this Paragraph IX.B.

      7.    When collateral materials are produced, all Fairfield Inn and Fairfield Inn & Suites hotels will receive an equitable portion of the materials. Should the Hotel require an additional amount of any collateral material, the Hotel shall pay for the costs of such additional material.

      C.    [Intentionally omitted.]

      D.    Franchisee agrees to list the Hotel in the Fairfield Inn Directory for so long as one is produced by Franchisor, and Franchisee shall furnish to Franchisor such information as Franchisor may request for that purpose. Franchisee shall have sole discretion in determining any rates for the Hotel that appear in each Directory. Franchisor shall have no liability for the failure of any hotel to honor any Directory rates. Franchisee agrees to not charge higher rates than those Franchisee causes to be published in the Directory and to comply with such requirements with respect to the Directory as may be specified in the Manual.

      E.    Franchisor may establish and coordinate cooperative advertising, marketing and sales programs, customer satisfaction programs, frequent traveler programs, travel agency programs and other programs or activities among System hotels (including the Hotel). These programs or activities may be on a local, regional or national basis or based on the market orientation of System hotels, and they may include participation by other lodging products of the Marriott Companies. Franchisee shall participate in such programs and activities as Franchisor may prescribe, and such programs and activities may (at Franchisor's option) be paid for partially or wholly by the Fund or outside the Fund on a pro rata or other fair and consistent basis by the participants.

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02



CONFIDENTIAL

MV 00519

      F.     Franchisee is responsible for setting its own prices and rates. Franchisor may, recommend or suggest prices or rates for the products and services offered by Franchisee, including in connection with Franchisee's participation in various sales or revenue management programs, account management programs, and/or other consulting services or promotions offered by Franchisor and its affiliates. Franchisor's recommendations or suggestions concerning prices or rates are not mandatory, and Franchisee is ultimately responsible for determining the prices or rates at which it offers its goods and services. Franchisee, however, shall honor any price to which it commits in connection with its participation in such programs or promotions. Nothing contained in this Agreement or any other agreements required for participation in any such programs shall be deemed a representation or warranty by Franchisor that the use of such suggested or recommended prices or rates will produce, increase or optimize Franchisee's profits.

X.        PROPRIETARY MARKS AND INTELLECTUAL PROPERTY

      A.     Franchisor represents with respect to the Proprietary Marks that:

      1.     Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks or has a license to grant Franchisee's use thereof;

      2.     Franchisor will take all steps reasonably necessary to preserve and protect the ownership and validity of such Proprietary Marks; and

      3.     Franchisor will use reasonable efforts to assure that all Fairfield Inn franchisees use the Proprietary Marks only in accordance with the System and standards and specifications attendant thereto.

      B.     With respect to Franchisee's use of the Intellectual Property (as defined herein below) pursuant to this Agreement:

      1.     Franchisee shall use the Intellectual Property only in the manner authorized and permitted by Franchisor;

      2.     Franchisee shall use the Intellectual Property only for the operation of the Hotel franchised hereunder at the Approved Location;

      3.     During the term of this Agreement, Franchisee shall identify itself as the owner of the Hotel in conjunction with any use of the Proprietary Marks, including, but not limited to, invoices, order forms, receipts, business cards and contracts, as well as in a notice of such content and form and at such conspicuous locations at the Hotel as Franchisor shall designate in the Manual;

      4.     Franchisee's right to use the Intellectual Property is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights;

      5.     Franchisee shall not use the Intellectual Property to incur any obligation or indebtedness on behalf of Franchisor;

      6.     Franchisee shall not use the name "Fairfield," "Fairfield Inn" or "Marriott" or any of the Proprietary Marks as part of its corporate or legal name or in connection with any other business activity or venture;

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

13



**CONFIDENTIAL**

MV 00520

7.    Franchisee shall comply with Franchisor's instructions in filing and maintaining any required trade name or fictitious name registrations and shall execute any documents deemed necessary by Franchisor to protect the Proprietary Marks or maintain their validity and enforceability (Franchisor shall pay any required filing or similar governmental fee incurred by Franchisee resulting from its compliance with Franchisor's instructions pursuant to this sub-paragraph); and

8.    In the event that litigation involving the Proprietary Marks is instituted or threatened against Franchisee, Franchisee shall promptly notify Franchisor in writing and shall cooperate fully in defending or settling such litigation; Franchisor shall take reasonable actions to defend or settle such litigation and shall indemnify and hold Franchisee harmless against any and all claims that Franchisee's use of the Proprietary Marks, in accordance with the terms of this Agreement, infringes upon the rights of any other party, as well as the costs, including reasonable attorneys' fees, of defending against such claims.

C.    Franchisee understands and acknowledges that:

1.    Franchisor is the owner (or licensee as set forth above at Paragraph X.A.1.) of all right, title, and interest in and to the Intellectual Property and the goodwill associated therewith and symbolized by the Proprietary Marks;

2.    the Proprietary Marks are valid and serve to identify the System and those who are franchised under the System;

3.    any and all Intellectual Property is subject to change, addition and deletion, and if any such action is taken by Franchisor, Franchisee shall bear the cost of conforming the Hotel and the Franchised Business to any such change, addition or deletion;

4.    Franchisee shall not directly or indirectly contest the validity of the ownership of the Intellectual Property;

5.    Franchisee's use of the Intellectual Property and the System pursuant to this Agreement, including without limitation, any addition or modification to the System proposed by Franchisee and adopted by Franchisor, shall not give Franchisee any ownership interest or other interest in or to the Intellectual Property or the System, except the nonexclusive license granted herein;

6.    any and all goodwill arising from Franchisee's use of the Intellectual Property and the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the franchise granted herein, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Intellectual Property;

7.    the right and license of the Intellectual Property granted hereunder to Franchisee is nonexclusive, and Franchisor thus may itself use and grant licenses to others to use the Intellectual Property; and establish, develop, and license other systems, that use the Intellectual Property and the System, without offering or providing Franchisee any rights in, to, or under such other systems; and

8.    the Intellectual Property will be used for marketing of Franchisor's and its affiliates' lodging products and business operations only and will not be used in any combined sales or marketing activities by Franchisee with any other products, concepts, brands, or services without the prior

61799v4 – Montgomery, AL.
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

14



CONFIDENTIAL

MV 00521

written approval of Franchisor, which approval may be granted or withheld in Franchisor's sole discretion; any such unapproved combined sales and marketing effort by Franchisee will constitute a default under this Agreement.

D.    "Intellectual Property" means:    (i) all Software; including the data and information processed or stored thereby; (ii) the Manual and all brochures, directives and other information issued by or on behalf of Franchisor for use in the operation of the Hotel or any other hotel in the System; (iii) customer information, customer lists and Guest Profile Data (as defined below); (iv) all Proprietary Marks; and (v) all Confidential Information, and all other information, materials, and copyrightable or patentable subject matter developed, acquired, licensed or used by Franchisor or any of its affiliates in the operation of the Hotel or in any other hotel in the System. The foregoing shall apply regardless of the form or medium involved (e.g., paper, electronic, tape, tangible or intangible). "Guest Profile Data" means each personal guest profile and information regarding guest preferences, including, without limitation, any information derived from or contained in any frequent traveler program.

XI.       SYSTEM STANDARDS MANUAL

A.    Franchisor has provided to Franchisee on loan a current copy of the Manual (which may be in multiple volumes). The Manual may be in hard paper copy or it may be made available to Franchisee in digital, electronic or computerized form or in some other form now existing or hereafter developed that would allow Franchisee to view the contents thereof. If the Manual (or any changes thereto) is provided in a form other than paper copy, Franchisee shall pay any and all costs to retrieve, review, use or access the Manual. The Manual contains, among other matters, minimum standards and requirements for constructing, equipping, furnishing, staffing, supplying, maintaining, refurbishing and marketing the Hotel and management, training, operational and quality standards, procedures and techniques. Franchisee shall conduct the Franchised Business in strict compliance with the Manual as it may be modified by Franchisor. The provisions of the Manual shall be consistently applied by Franchisor to all Fairfield Inn and Fairfield Inn & Suites hotels, as applicable; provided, however, if the market area or the physical peculiarities of a Fairfield Inn or Fairfield Inn & Suites hotel warrant, in the reasonable judgment of Franchisor, a deviation from such provisions, then in such event Franchisor may allow such deviation.

B.    Franchisee shall at all times treat the Manual, all revisions thereto, and any other manuals created for or approved for use in the operation of the Hotel, and the information contained therein as confidential, and shall use all reasonable efforts to maintain such information as confidential. Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

C.    The Manual shall at all times remain the sole property of Franchisor.

D.    Franchisor may in its sole discretion revise in any way whatsoever the contents of said Manual. Franchisor shall provide to Franchisee a copy of all revisions and additions to the Manual, and Franchisee expressly agrees to comply with each new or changed standard. At Franchisor's sole option, such versions and additions may be provided via hard paper copy or made available to Franchisee in digital, electronic or computerized form or in some other form now existing or hereafter developed that would allow Franchisee to view the contents thereof.

E.    Franchisee shall at all times ensure that Franchisee's copy of said Manual is kept current and up-to-date, and in the event of any dispute as to the contents of said Manual, the terms of the

61799v4—Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

15



**CONFIDENTIAL**

**MV 00522**

master copy of the Manual maintained by Franchisor at Franchisor's home office shall be controlling. Franchisee shall maintain the Manual in a safe and secure location, shall take all reasonable measures to prevent unauthorized access thereto, whether any attempted unauthorized access takes the form of physical access or access via computer or telecommunications networks or otherwise and shall report the theft or loss of the Manual, or any portion thereof, immediately to Franchisor. At a minimum, Franchisee shall, in the case of computer and telecommunications networks, use the latest available firewall and similar technology to prevent unauthorized access.

XII.        CONFIDENTIAL INFORMATION

Franchisee shall not, during the term of this Agreement or thereafter, without Franchisor's prior written consent, which consent may be granted or withheld in Franchisor's sole discretion, copy, duplicate, record, reproduce, in whole or in part, or otherwise transmit or make available to any unauthorized Person any of the following information (collectively, "Confidential Information"): the Manual, any other manuals or documents created for or approved for use in the System or in the design, construction or operation of the Hotel, any Software and Guest Profile Data and accompanying documentation developed for the System or elements thereof, or any other confidential information, knowledge, trade secrets, business information or know-how obtained through the use of any part of the System or concerning the System or the operation of the Hotel, which may be communicated or provided to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation of the Hotel under this Agreement or its access to the System. Franchisee may divulge such Confidential Information only to such of Franchisee's employees or agents as must have access to it in order to operate the Hotel; all other Persons shall be deemed "unauthorized" for purposes of this Agreement. Franchisee shall maintain the Confidential Information in a safe and secure location and shall immediately report to Franchisor the theft or loss of all or any part of the Confidential Information. The contents of the Manual, all Software, and all other information, knowledge, know-how or other data that Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement.

XIII.        ACCOUNTING AND RECORDS

A.        Beginning on the Effective Date and throughout the remainder of the term of this Agreement, Franchisee shall maintain and preserve, for at least five (5) years from the dates of their preparation, full, complete and accurate books, records and accounts in accordance with generally accepted accounting principles consistently applied and in the form and manner prescribed in the Manual or otherwise in writing. Franchisee's obligation to preserve such books, records and accounts shall survive the termination hereof.

B.        Franchisee shall, at Franchisee's expense, submit to Franchisor by the fifteenth (15th) day of each Accounting Period after the Effective Date, including the first partial Accounting Period if the Effective Date is on other than the first day of an Accounting Period, a statement covering the immediately preceding Accounting Period in the form prescribed by Franchisor, accurately reflecting all gross room revenues, the source and amounts of all other revenues generated at the Hotel, room occupancy and rates, reservations data, and such other data or information as Franchisor may require. Additionally, Franchisor's property management system may poll the Hotel's room revenue results daily.

C.        Upon the request of Franchisor, Franchisee shall, at Franchisee's expense, submit to Franchisor an unaudited quarterly and/or annual profit and loss statement for the Hotel (in the form prescribed by Franchisor) and a balance sheet within thirty (30) days of the end of each fiscal quarter and/or fiscal year during the term hereof. Each statement shall be signed by Franchisee attesting that it is true and correct.

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

16



CONFIDENTIAL

MV 00523

D.    Franchisee shall, at its expense, submit to Franchisor, for review and audit, such other forms, periodic and other reports, records, information and data relating to Franchisee, the Hotel and the Hotel's marketing, sales and guests as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified in the Manual or otherwise in writing. Franchisor shall have the right to access the Hotel's PMS and reservations system directly to obtain marketing, sales and guest information, and Franchisee shall take all actions necessary to provide such access.

E.    Franchisor or its designated agent shall have the right at all reasonable times, and upon reasonable notice to Franchisee, to examine and copy, at its expense, all books, records, accounts and tax returns of Franchisee related to the operation of the Hotel during the preceding five (5) years. Franchisor also shall have the right, at any time, and upon reasonable notice to Franchisee, to have an independent audit made of these books, accounts and records of Franchisee related to the operation of the Hotel. Franchisee shall provide lodging, if available, without charge to Franchisor's agents during the time as may reasonably be necessary to complete such audits and to render such other assistance as may reasonably be requested. If an inspection should reveal that payments have been understated in any report to Franchisor, Franchisee shall immediately pay to Franchisor upon demand, the amount understated plus interest from the date such amount was due and paid. The rate of interest shall be one and one-half percent (1½%) per Accounting Period or the maximum rate permitted by law, whichever is less. If an inspection discloses an understatement of three percent (3%) or more for the period being inspected, Franchisee shall, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, without limitation, reasonable accounting and attorneys' fees). The foregoing remedies shall be in addition to any other remedies Franchisor may have. If an inspection should reveal that Franchisee has made overpayments to Franchisor, the amount of any such overpayment, without interest, shall be credited against future payments due and payable to Franchisor by Franchisee hereunder.

F.    Upon the request of Franchisor: (i) Franchisee, if a natural person or persons, shall submit to Franchisor a list of all owners of this franchise and the interest held by each; (ii) Franchisee, if a partnership, shall submit to Franchisor a list of all partners and the interest in Franchisee held by each; (iii) Franchisee, if a corporation, shall submit to Franchisor a list of all shareholders and the interest in Franchisee held by each; provided, however if Franchisee's shares are publicly traded, the list of shareholders required shall include only those who own five percent (5%) or more of the shares outstanding; or (iv) Franchisee, if a limited liability company, shall submit to Franchisor a list of all members of the limited liability company and the interest in Franchisee held by each.

XIV.    INSURANCE

A.    Franchisee, at its expense, shall at all times during the term of this Agreement procure and maintain such insurance as may be required by the terms of any lease or mortgage on the premises where the Hotel is located, and in any event no less than the following:

1.    Property Insurance

a.    Property insurance (or builder's risk insurance during any period of construction) on the Hotel building(s) and contents against loss or damage by fire, lightning, windstorm, and all other risks covered by the usual all-risks policy form, all in an amount not less than ninety percent (90%) of the replacement cost thereof.

b.    Boiler and machinery insurance against loss or damage from explosion of boilers or pressure vessels to the extent applicable to the Hotel.

61799v4 – Montgomery, AL.
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

17



MV 00524

c.    Business interruption insurance covering at least twelve (12) months' loss of profits and necessary continuing expenses for interruptions caused by any occurrence covered by the insurance referred to in a. and b. immediately above. Such business interruption insurance shall name Franchisor as an additional insured as its interests may appear.

d.    If the Hotel is located in whole or in part within an area identified by the federal government as having a special flood hazard, flood insurance in an amount not less than the maximum coverage available under the National Flood Insurance Program and excess flood coverage with reasonable limits including business interruption coverage in an amount not less than that set forth in Paragraph XIV.A.1.c. above.

e.    If the Hotel is located in an "earthquake prone zone" as determined by the U.S Geological Survey, earthquake insurance in an amount not less than the probable maximum loss less any applicable deductibles, including business interruption coverage in an amount not less than that set forth in Paragraph XIV.A.1.c. above, all as determined by a recognized earthquake engineering firm.

2.    Workers' Compensation insurance in statutory amounts on all employees of the Hotel and Employer's Liability Insurance in amounts not less than $1,000,000 per accident/disease.

3.    Comprehensive or Commercial General Liability Insurance for any claims or losses arising or resulting or pertaining to the Hotel or its operation, with combined single limits of $1,000,000 per each occurrence for bodily injury and property damage. If the General Liability coverages are provided by a Commercial General Liability policy form, the General Aggregate Limit shall be not less than $2,000,000, and it shall apply in total to the Hotel only by specific endorsement. Such insurance shall be on an occurrence policy form and shall include premises and operations, independent contractors, blanket contractual, products and completed operations, advertising injury, employees as additional insureds, broad form property damage, personal injury, incidental medical malpractice, severability of interests, innkeeper's and safe deposit box liability, and explosion, collapse and underground coverage during any construction.

4.    Business Auto Liability including owned, non-owned and hired vehicles for combined single limits of bodily injury and property damage of not less than $1,000,000 each occurrence.

5.    Umbrella Excess Liability on a following form in amounts not less than $9,000,000 in excess of the liability insurance required under Paragraphs XIV.A.2. through 4. immediately above. Franchisor shall have the right to require Franchisee to increase the amount of coverage if the height of the Hotel is greater than five stories above ground or if, in Franchisor's reasonable judgment, such an increase is appropriate, and any such increase is applied consistently throughout the System.

B.    The following general insurance requirements will be satisfied by Franchisee.

1.    All insurance under Paragraph XIV.A.3. through 5. shall by endorsement specifically name Franchisor and its employees and agents as unrestricted additional insureds.

2.    Any deductibles within the insurance policy or policies required hereunder (excluding deductibles for high hazard risks in high hazard geological zones, such as

61799v4 - Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

18



CONFIDENTIAL

MV 00525

earthquake or windstorm, which shall be as required by the insurance carrier) shall not exceed $25,000, or such higher amount as may be approved in writing in advance by Franchisor.

      3.    All insurance purchased in compliance herewith shall be placed with insurance companies reasonably acceptable to Franchisor and licensed, authorized or registered to do business in the state where the Hotel is located. Such licensing requirement shall not apply to those insurers providing Umbrella Excess Liability above $5,000,000 under Paragraph XIV.A.5.

      4.    All insurance required hereunder shall be specifically endorsed to provide that the coverages will be primary and that any insurance carried by any additional insured shall be excess and non-contributory.

      5.    All insurance required hereunder shall contain an endorsement whereby the policies shall not be canceled, non-renewed, or materially changed without at least thirty (30) days prior written notice to Franchisor.

      6.    All insurance required hereunder may be effected under policies of blanket insurance that cover other properties of Franchisee and its affiliates so long as such blanket insurance fulfills the requirements herein.

      7.    Franchisee shall deliver to Franchisor (Attention: Insurance Department), a certificate of insurance (or certified copy of such insurance policy if requested by Franchisor) evidencing the coverages required herein and setting forth deductibles and the amount thereof, if any. Renewal certificates of insurance (or certified copies of such insurance policy if requested by Franchisor) shall be delivered to Franchisor not less than ten (10) days prior to their respective inception dates.

      8.    Franchisee's obligation to maintain the insurance hereunder shall not relieve Franchisee of liability under the indemnity provisions set forth in Section XXI. of this Agreement.

      9.    All insurance shall be satisfactory to Franchisor in accordance with standards and specifications set forth in the Manual or otherwise in writing. Should Franchisee for any reason fail to procure or maintain the insurance required by this Agreement, as revised for all franchisees by the Manual or otherwise in writing, Franchisor shall have the right and authority (without however any obligation to do so) to immediately procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon demand.

XV.      TRANSFERABILITY OF INTEREST

      A.    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on the business skill, financial capacity, and character of Franchisee and its general partners, controlling shareholders or controlling individuals. Franchisee shall retain fee ownership of the Hotel except as may be otherwise approved by Franchisor in writing. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this franchise, or any individual, partnership, corporation, or other legal entity that directly or indirectly owns or controls any interest (other than interests of limited partners) in this franchise or in Franchisee, shall sell, assign (collaterally or otherwise) transfer, convey, mortgage, grant a security interest or otherwise encumber (each, a "Transfer") any direct or indirect interest in this franchise (including any ownership interest in Franchisee or any controlling

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

19

CONFIDENTIAL

MV 00526



(greater than 15%) interest in any entity that controls Franchisee, but excluding interests of limited partners, if any) and no Transfer of this Agreement, the Franchised Business, or a substantial portion of the assets (including building and real estate) of the Franchised Business shall occur without the prior written consent of Franchisor. Except as otherwise provided in this Section XV and Section XVI., any Transfer addressed in the immediately preceding sentence, by operation of law, sale of stock or otherwise, not having the prior written consent of Franchisor shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement pursuant to Paragraph XVII.B.4. of this Agreement and seek injunctive relief as well as monetary damages. Notwithstanding anything to the contrary in this Agreement, Franchisor shall have the right to withhold its consent to any Transfer of any interest in this Agreement, Franchisee or any entity that controls Franchisee if Franchisee is in default hereunder.

      B.    Except as prohibited under Paragraph XX.F., Franchisor shall not require approval of the Transfer of all or any part of the assets of the Franchised Business (excluding this franchise, this Agreement, and any stock, partnership or other interests in Franchisee) to banks or other lending institutions that are not a Competitor (as defined herein) or an affiliate of a Competitor for purposes of any refinancing or as collateral securing a loan made directly to or for the benefit of the Franchised Business.

      C.    Subject to Paragraph XV.D hereof, Franchisor shall not unreasonably withhold its consent to a Transfer of any interest in this franchise, Franchisee, this Agreement, the Franchised Business, or in a substantial portion of the assets (including building and real estate) of the Franchised Business; provided, however, if a Transfer, alone or together with other previous, simultaneous or proposed Transfers, would result in the Transfer of a controlling interest (as reasonably determined by Franchisor) in this franchise, Franchisee, the entity that controls Franchisee, this Agreement, or the Franchised Business, or substantially all of the assets (including building and real estate) of the Franchised Business, Franchisor may, in its sole discretion, require any or all of the following as a condition of its approval:

      1.    Franchisee shall satisfy all of Franchisee's accrued monetary obligations to Franchisor, its subsidiaries and affiliates, and shall execute a general release in a form prescribed by Franchisor of any and all claims against Franchisor, its subsidiaries and affiliates, and their respective officers, directors, agents and employees;

      2.    Franchisee shall provide Franchisor with a true and complete copy of the purchase and sale agreement or similar document covering the transaction;

      3.    the proposed transferee shall submit to Franchisor an application, in the form prescribed by Franchisor, for a new franchise agreement to replace this Agreement for its unexpired term, and shall pay to Franchisor a transfer fee (which fee shall be refunded, less Ten Thousand Dollars ($10,000) to cover Franchisor's cost of processing the application, in the event the application is disapproved). The amount of the transfer fee shall be equal to the amount of the application fee then being charged by Franchisor per room for System franchises for new development multiplied by the number of rooms in the Hotel or the minimum amount per hotel then being charged by Franchisor for System franchises for new development, whichever amount is greater. If, prior to the submission of an application, Franchisee desires Franchisor to review the Hotel to determine the renovations necessary to bring the Hotel into good repair and to conform the Hotel to Franchisor's then current standards to transfer, Franchisor may charge its then current Property Improvement Plan ("PIP") fee (currently, Five Thousand Dollars ($5,000)) to cover Franchisor's costs associated with such PIP and consent review under this Paragraph XV.C. If Franchisor enters into a new franchise agreement with the transferee for this Hotel within six (6) months after the PIP and a full transfer fee has been paid to Franchisor in

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

20



CONFIDENTIAL

MV 00527

connection therewith, the PIP fee paid to Franchisor will be refunded or credited against other amounts due from Franchisee to Franchisor at the time of the transfer; Franchisor reserves the right to reject an application for a Transfer if (i) Franchisor, in its sole discretion, deems the transferee's proposed debt service to be too great to permit the transferee to operate the Hotel successfully under the System or (ii) the proposed transferee or any of its affiliated entities (other than those holding interests as limited partners only) is a Competitor (as defined in Paragraph XV.D. hereof). In all events, the transferee will be required to certify in writing that (a) Franchisor did not endorse, recommend, or otherwise concur with the terms of the Transfer, (b) Franchisor did not comment upon any financial projections submitted by Franchisee to the transferee, or (c) Franchisor did not participate in the decision of the price to be paid, which decision was made without any intervention, support or participation by Franchisor;

          4.     transferee shall demonstrate to Franchisor's sole satisfaction that the transferee and its shareholders or general partners, as appropriate, meet Franchisor's managerial and business standards and have the aptitude and ability to conduct the Franchised Business (as may be evidenced by prior related business experience or otherwise); possess good moral character, business reputation and credit rating; and have adequate financial resources and capital to operate the Franchised Business;

          5.     Franchisor and the transferee will, upon approval of transferee's application, enter into a new franchise agreement for the unexpired term of this Agreement, which shall require transferee to upgrade the Hotel to conform to Franchisor's then-current System standards and requirements, and which new franchise agreement shall contain the standard terms (except for duration) then being issued for new franchised hotels under the System; the date of the transferee's new franchise agreement shall be the Effective Date of this Agreement;

          6.     transferee's General Manager (and Assistant Hotel Manager for System hotels having more than 109 rooms) shall, prior to assuming management of the Hotel, successfully (as defined by Franchisor) complete the management training program then being offered by Franchisor; and

          7.     if transferee is a real estate investment trust or other form of publicly-held entity, Franchisor may, in its sole discretion, require transferee to establish and maintain a reserve to support the cost of future repairs and replacements of furniture, furnishings and equipment at the Hotel; transferee shall deposit into such reserve each month throughout the term of the new franchise agreement (or throughout the then unexpired term of this Agreement) an amount equal to five percent (5%) of gross rooms revenues or such other amount as reasonably determined by Franchisor.

          D.     Notwithstanding anything to the contrary in this Agreement, no Transfer of the Hotel, an interest in the Hotel, an interest in Franchisee or an interest in an entity that controls Franchisee shall be made to any person or entity that owns, has an interest in, or is an affiliate, principal or director of a person or entity that owns or has an interest in a hotel brand, trade name, system or chain (a "Brand") that is comprised of at least (i) twenty (20) full-service or (ii) fifty (50) limited-service hotels (a "Competitor"). For the purposes of defining "Competitor" herein, "full-service" hotels are those hotels that typically offer at least three (3) meals per day and have an average of three thousand (3,000) square feet or more of meeting space per hotel in the hotel Brand, and "limited-service" hotels are all hotels that are not "full-service" hotels. A person or entity shall not be deemed to be a Competitor if such person or entity has an interest in such Brand merely as a franchisee or as a mere passive investor that has no control or influence over the business decisions concerning the Brand at issue, such as limited partners in a partnership or as a non-controlling mere stockholder in a corporation. If a Competitor offers, or receives an offer from Franchisee or an affiliate of Franchisee, to purchase or lease the Hotel, or to acquire Franchisee's interest in this Agreement, or to purchase or merge with or into Franchisee or any

61799v4 – Montgomery, AL
S8003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

21



**CONFIDENTIAL**

MV 00528

affiliate of Franchisee, or to purchase an interest in either, and Franchisee or any such affiliate (or such Competitor, as the case may be) wishes to accept such offer, Franchisee shall give written notice thereof to Franchisor, stating the name and full identity of the prospective purchaser or tenant, as the case may be, including the names and addresses of the owners of the capital stock, partnership interests or other proprietary interests of such prospective purchaser or tenant, the price or rental and all terms and conditions of such proposed transaction, together with all other information with respect thereto that is requested by Franchisor and reasonably available to Franchisee. Within thirty days after receipt by Franchisor of such written notice from Franchisee, Franchisor shall elect by written notice to Franchisee one of the immediately following four alternatives:

        1.     If the proposed transaction is a sale or lease of the Hotel for cash consideration, Franchisor (or its designee) shall have the right to purchase or lease the Hotel premises and related property at the same price or rental and upon the same terms and conditions (other than any terms relating to the Brand of the Hotel) as those set forth in such offer from (or to) a Competitor. In such event, Franchisee and Franchisor (or its designee) shall promptly enter into an agreement for sale or lease at the price or rental and on terms consistent with such offer.

        2.     If the proposed transaction is a purchase or lease of all or a portion of the ownership interests or assets (which includes the Hotel) of Franchisee or any affiliate of Franchisee, or a merger with or into Franchisee or any such affiliate, or the acquisition of Franchisee's interest in this Agreement, or any sale or lease of the Hotel involving non-cash consideration, Franchisor (or its designee) shall have the right to purchase or lease the Hotel premises and related property at the purchase or lease price pursuant to terms consistent with such offer (other than the non-cash nature of the consideration and any provision relating to the Brand of the Hotel) as agreed to by the parties. If the parties are unable to agree as to purchase or lease price and terms within fifteen (15) days of Franchisor's election, the purchase or lease price of the Hotel premises and related property shall be determined as follows. Franchisor and Franchisee each shall, at its own expense and within thirty (30) days thereafter, obtain an appraisal of the fair market value of the Hotel from a nationally recognized appraiser of hotel properties comparable to such Hotel. In determining the fair market value, the appraisers shall be instructed to assume that the Hotel is not subject to a management agreement but is subject to the existing Franchise Agreement. If, after receiving the appraisals, the parties agree on the fair market value of the Hotel, such agreed fair market value shall constitute the purchase or lease price hereunder. If, after receiving such appraisals, the parties are not able within ten (10) days to agree on such fair market value, the purchase or lease price shall be determined by "baseball arbitration" in Washington, D.C. in accordance with the Arbitration Rules for the Real Estate Industry of the American Arbitration Association then in effect ("AAA Rules") as modified by this Agreement. The parties shall jointly select a third party to act as the sole arbitrator (the "Arbitrator") to determine the fair market value of the Hotel, and such Arbitrator shall be a person having at least ten (10) years' recent professional experience as to the subject matter in question and shall be qualified to act as an Arbitrator in accordance with the AAA Rules. If the parties do not agree on an Arbitrator with such qualifications within fifteen (15) days after the expiration of such ten (10) day period referred to above, the Arbitrator shall be appointed by the American Arbitration Association in Washington, D.C. in accordance with the AAA Rules.

        (i)     The Arbitrator shall be instructed and obligated to decide, within thirty (30) days after appointment, whether the appraisal submitted by Franchisor or the appraisal submitted by Franchisee most accurately reflects the fair market value of the Hotel based upon the appraisals submitted and such information as is normally relied upon by an appraiser of hotels and real estate. Each party agrees to fully cooperate and provide all information requested by the Arbitrator related to the determination of fair market value hereunder.

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

22

CONFIDENTIAL



MV 00529

(ii)    The Arbitrator's choice of appraisal shall be in writing, shall constitute the purchase price hereunder, and shall be final, conclusive and binding on the parties as an "award" under the AAA Rules, and may be enforced by a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration. Franchisor (or its designee) shall have the right, at any time within thirty (30) days of being notified in writing of the decision of the Arbitrator as aforesaid, to either (a) purchase the Hotel premises and related property at the valuation fixed by the Arbitrator, or (b) terminate this Agreement pursuant to Paragraph XV.D.3 below.

3.    To terminate this Agreement, in which event Franchisee shall be obligated to pay Franchisor liquidated damages pursuant to a termination occurring with Special Circumstances as set forth at Paragraph XVIII.E.

4.    To consent to such Transfer, which consent shall be on such terms and conditions as Franchisor may require, in its sole discretion.

Notwithstanding anything to the contrary set forth in this Paragraph XV.D, if a Competitor proposes to acquire all of the interests of an affiliate of Franchisee, and such affiliate does not, directly or indirectly, own, lease or operate any hotels operating under a trade name owned by a Marriott Company, then in such event, with respect to such transaction, Franchisor shall not have any right of first refusal to purchase the Hotel or right to terminate this Agreement as provided above in this Paragraph XV.D.

This Paragraph XV.D. shall survive termination of this Agreement for any reason if, prior to such termination, any event specified in Paragraphs XV.D., XV.E. or XV.F. occurs, as a result of which Franchisor has exercised (or has the right to exercise) the right of first refusal provided herein. In addition, this Paragraph XV.D. shall survive termination of the Agreement in accordance with Paragraph XV.H. hereof.

E.    If a Competitor attempts to acquire the Hotel or Franchisee by foreclosure, judicial or legal process, such as execution and levy, or by any other means, Franchisor shall have the right to purchase the Hotel upon written notice to Franchisee. If the parties are unable to agree as to a purchase price and terms within thirty days of Franchisor's notice, the fair market value of the Hotel premises and related property shall be determined by arbitration pursuant to the procedure set forth in Paragraph XV.D.2. This provision shall survive the termination of this Agreement under Paragraph XVII.A in connection with the Competitor's actions under this Paragraph XV.E.

F.    If Franchisee or any of its affiliates becomes a Competitor, Franchisee shall so notify Franchisor providing the data required pursuant to Paragraph XV.D., or if Franchisor otherwise determines that Franchisee or any of its affiliates has become a Competitor, Franchisor shall so notify Franchisee and assert that Franchisor has the rights set forth above at Paragraph XV.D. Provided Franchisor has received sufficient pricing and other data to allow an informed decision, Franchisor shall make its election thereunder within thirty days of Franchisor's receipt of such notice from Franchisee or within thirty days of Franchisor's giving notice to Franchisee in which Franchisor asserts that Franchisee or any of its affiliates has become a Competitor.

G.    Franchisee acknowledges that Franchisor's rights under Paragraphs XV.D., XV.E. and XV.F. of this Agreement are real estate rights in the Hotel. Franchisor is entitled to file a record of such interest in and among the appropriate real estate records of the jurisdiction in which the Hotel is located, and Franchisee shall cooperate as requested by Franchisor in such filing. Franchisee acknowledges and agrees that damages are not an adequate remedy in the event that Franchisee breaches its obligations under such Paragraphs XV.D., XV.E. or XV.F. of this Agreement, and Franchisor shall be

61799v4 — Montgomery, AL
58003v1 — 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (02/31/2002)
7/18/02

23



**CONFIDENTIAL**

MV 00530

entitled to injunctive relief to prevent or remedy such breach. Such recording shall indicate that Franchisor's rights in real estate under Paragraphs XV.D., XV.E. and XV.F. of this Agreement shall be subordinate to the interests of bona fide lenders who are not Competitors or affiliates of Competitors and who record a security interest in the Hotel. If Franchisee Transfers the Hotel other than to a Competitor or if a controlling portion of the ownership interests of Franchisee or any entity that controls Franchisee is Transferred to an entity other than a Competitor and this Agreement is terminated, or if for any other reason Franchisor's rights under Paragraphs XV.D., XV.E. and XV.F. terminate, at the request of Franchisee or the transferee, Franchisor shall execute and deliver an instrument in recordable form to terminate the record of its interest in and among the appropriate real estate records of the jurisdiction in which the Hotel is located.

       H.     Except for termination of this Agreement pursuant to Paragraph XV.D.3. above, Franchisee agrees that Franchisor's rights under Paragraphs XV.D., XV.E. and XV.F. above shall survive early termination of this Agreement (as opposed to expiration of this Agreement as set forth in Section II hereof) and shall bind Franchisee and its affiliates, if:

           1.     a Competitor, prior to or within six months after termination of this Agreement, offers (or receives an offer from an affiliate of Franchisee) to purchase or lease the Hotel or to purchase Franchisee or an affiliate of Franchisee or to purchase an interest in or merge with or into either Franchisee or such affiliate, and

           2.     either

               a.     this Agreement is terminated pursuant to Paragraphs XVII.A., XVII.B.1. or 4., or pursuant to Paragraph XVII.C., or pursuant to Paragraph XVII.D. below based upon Franchisee's failure to pay any indebtedness to Franchisor or any Marriott Company when due and payable or a violation of Section X. above, or

               b.     this Agreement is terminated pursuant to Paragraph XVII.A. below and an affiliate, principal or director of Franchisee obtains possession of the Hotel, or such affiliate, principal or director is the party filing the suit or seeking the execution or foreclosure referenced in Paragraph XVII.A. of this Agreement.

In addition, Franchisor's rights under Paragraphs XV.D., XV.E. and XV.F. above shall survive any purported early termination of this Agreement (as opposed to expiration of this Agreement as set forth in Section II hereof) by Franchisee, and shall bind Franchisee and its affiliates, if a Competitor, prior to or within six months after such purported termination, offers (or receives an offer from Franchisee or an affiliate of Franchisee) to purchase or lease the Hotel or to purchase Franchisee or an affiliate of Franchisee, or to purchase an interest in or merge with or into either Franchisee or such affiliate.

       I.     Subject to Paragraph XV.D. hereof, in the event of the death or mental incompetency of Franchisee or any shareholder or partner of Franchisee, the interest of such person may be Transferred in accordance with and subject to the terms of Paragraph XV.C. hereof, provided that (i) any such Transfer shall be made within six (6) months of the date of death or mental incompetency and (ii) the obligations of Franchisee under this Agreement are satisfied pending the Transfer, including adequate provision for management of the Hotel.

       J.     Subject to Paragraph XV.D. hereof, provided the Franchisee has executed a guarantee substantially identical to the form of guarantee attached to this Agreement and provides to Franchisor documentation evidencing the Transfer by which the transferee expressly assumes the

61799v4 – Montgomery, AL.
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

24



CONFIDENTIAL

obligations of Franchisee under the Agreement, then in such event, the Franchisee will have the right to Transfer, without payment of the transfer fee, this Agreement to an entity controlled by Franchisee.

K.    Subject to Paragraph XV.D. hereof, and subject to Franchisee's giving prior written notice to Franchisor, any individual holding an interest in Franchisee shall have the right to Transfer his/her interest in Franchisee or a portion thereof to a member of the immediate family of such individual or to an entity in which such individual and/or a member of his/her immediate family has and retains the controlling interest; provided, however, if the transferor is Transferring a controlling interest in Franchisee, then in such event, Franchisor shall have the right to require a guarantee as provided in the immediately preceding Paragraph XV.J.

L.    If Franchisee is neither a natural person nor a publicly held corporation, the stock of which is traded on a nationally recognized stock exchange (with no individual holding 5% or more of the outstanding stock), Franchisee represents that its equity is directly and (if applicable) indirectly owned as shown on Attachment A. This Section XV will be applied by looking through or disregarding direct, indirect and intervening ownership interests in Franchisee to the extent deemed appropriate by Franchisor in order to ascertain the ultimate beneficial ownership and/or control of Franchisee's equity. Such ultimate or beneficial interests are referred to in this Section XV. as "equity interest." The transfer, creation or elimination of an equity interest, by operation of law, sale of stock or otherwise, will be a material breach of this Agreement unless specifically authorized herein.

M.    Franchisor shall have the right to Transfer this Agreement to any person or legal entity without prior notice to, or consent of, Franchisee, provided the transferee assumes Franchisor's obligations to Franchisee under this Agreement. Franchisee hereby acknowledges and agrees that any such Transfer shall constitute a release and novation of Franchisor with respect to this Agreement.

XVI.    SECURITY OFFERINGS

A.    Publicly-traded security interests in Franchisee previously registered under federal securities law may be Transferred without Franchisor's consent if (i) the Transfer is exempt from registration under federal and state securities law, and (ii) the Transfer will not result in a Transfer of control (as reasonably determined by Franchisor) in Franchisee. Any Transfer of security interests in Franchisee that will result in a Transfer of control requires Franchisor's prior written consent, which shall be conditioned upon satisfaction of the requirements of Paragraph XV.C., and additionally, upon satisfaction of the requirements of Paragraph XVI.B. below if the Transfer is not exempt under federal and state securities law.

B.    In connection with any federal or state registration of Franchisee's securities or any private offering of Franchisee's securities, Franchisee shall:

1.    submit to Franchisor at least thirty (30) days before the effective date of the registration or private offering a copy of the proposed prospectus and all supporting and related materials and releases together with a nonrefundable fee of $2,000 to reimburse Franchisor for its expense in reviewing the proposed offering;

2.    fully and unconditionally indemnify and hold harmless Franchisor in connection with the offering;

3.    state clearly in the prospectus and supporting materials and releases that Franchisor is not, in any way, participating in or endorsing the offering;

61799v4 -- Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

25



**CONFIDENTIAL**

MV 00532

4.    use the Proprietary Marks of Franchisor in the prospectus and in any related or supporting materials only as directed by Franchisor;

5.    provide in the appropriate agreements and other documents related to the offering for establishment of a capital replacement reserve fund escrowing a percentage of gross sales, as reasonably determined by Franchisor, to assure Franchisee's ability to continue to meet System standards and the periodic upgrade requirements set forth in the Franchise Agreement; and

6.    refrain from filing, publishing, issuing or releasing the prospectus or any supporting or related materials without having received the prior written approval of Franchisor.

C.    Franchisor's review of any security offering of Franchisee shall be limited solely to the subject of the relationship between Franchisee and Franchisor, and its approval shall not constitute an endorsement or ratification of the offering, either express or implied.

XVII.    DEFAULT AND TERMINATION

A.    Franchisee shall be deemed to be in material default under this Agreement, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder without affording Franchisee any opportunity to cure the default, effective immediately upon Franchisee's receipt or first refusal of delivery of notice by Franchisor, (i) if Franchisee shall become insolvent or make a general assignment for the benefit of creditors, or (ii) if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and consented to by Franchisee, or (iii) if Franchisee is adjudicated bankrupt, or (iv) if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or (v) if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction, or (vi) if proceedings for a compromise with creditors under any state or federal law is instituted by, against or consented to by Franchisee, or (vii) if a final judgment remains unsatisfied or of record for ninety (90) days or longer (unless supersedeas bond is filed), or (viii) if execution is levied against the Hotel or other real or personal property at the Hotel, or (ix) suit to foreclose any lien or mortgage against the Hotel or any property, real or personal, appurtenant thereto is initiated against Franchisee, or (x) if the real or personal property of the Hotel shall be sold after being levied upon by any sheriff, marshal, or constable; provided, however, Franchisee shall be granted one hundred twenty (120) days to obtain dismissal of any involuntary receivership, bankruptcy or other insolvency proceeding before Franchisor will take any action regarding termination so long as no other default by Franchisee then occurs under this Agreement.

B.    Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, upon the occurrence of any of the events in the immediately following subparagraphs (i) with respect to the following subparagraphs 1, 2, 3 and 5 only, without affording Franchisee any opportunity to cure the default, effective immediately upon Franchisee's receipt of notice (or refusal of delivery), or (ii) with respect to the following subparagraphs 4, 6 and 7 only, effective upon expiration of the cure period established by Franchisor in the notice to Franchisee if such default is then uncured.

1.    If Franchisee ceases to do business at the Hotel, or ceases to operate the Hotel under the Proprietary Marks and System or loses ownership or possession or the right to possession of the Hotel or otherwise forfeits the right to conduct the Franchised Business at the Approved Location, except as otherwise provided in Section XIX.;

61799v4—Montgomery, AL
58603v1—2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

26



CONFIDENTIAL

MV 00533

2.     if a threat or danger to public health or safety results from the upgrading, remodeling, maintenance or operation of the Hotel franchised hereunder, and an immediate shutdown of the Hotel is reasonably determined by Franchisor to be essential to avoid substantial liability or loss of goodwill; provided, however, Franchisor and Franchisee shall reinstate this Agreement if, within six (6) months after termination under this Paragraph XVII.B.2., the threat or danger to public health or safety is eliminated and Franchisor reasonably determines that reopening the Hotel would not cause a substantial loss of goodwill;

3.     if Franchisee or a principal thereof who controls Franchisee is convicted of a felony or any other crime or offense that is likely, in the reasonable opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

4.     if Franchisee or any partner or shareholder in Franchisee purports to Transfer any rights or obligations under this Agreement or any interest in Franchisee, the Franchised Business or the Hotel to any third party without Franchisor's prior written consent, contrary to the terms of Sections XV. or XVI. of this Agreement;

5.     if Franchisee intentionally discloses or divulges the contents of the Manual or other trade secret or Confidential Information contrary to Sections VI., XI. or XII. hereof;

6.     if Franchisee fails to complete (except for reasons constituting force majeure), within the time reasonably specified by Franchisor, upgrading and/or remodeling of the Hotel as required by Franchisor pursuant to Paragraph VII.D.; [or]

7.     if Franchisee fails to commence or satisfy the Property Improvement Plan requirements set forth in the Addendum attached hereto within the time set forth at Attachment A or to complete any work required in the Addendum by such other date as is specified in the Addendum [; or

C.     Franchisee shall be deemed to be in default under this Agreement if Franchisee or any of its affiliates becomes a Competitor (as defined at Paragraph XV.D. above) or becomes affiliated with a Competitor, and, in such event, Franchisor shall have the rights provided in this Agreement at Paragraph XV.D. above.

D.     Franchisee shall be in material default under this Agreement for any failure to comply with any of the requirements imposed by this Agreement, as it may be supplemented by the Manual, or to carry out the terms of this Agreement in good faith. Except as provided in Paragraphs XVII.A., XVII.B. and XVII.C. of this Agreement and for non-payment of any amounts due to Franchisor or its affiliates, Franchisee shall have thirty (30) days or such longer period as specified herein after its receipt from Franchisor (or first refusal of delivery) of a written notice of default, within which to remedy any default and provide evidence thereof to Franchisor. If Franchisee is delinquent in payment of any amounts due to Franchisor and its affiliates, Franchisee shall have ten (10) business days after receipt of a written notice of non-payment within which to cure such monetary default. If any such default is not cured within that time, or such longer period as applicable law may require (or such longer period as Franchisor may, in its reasonable discretion, deem necessary to permit Franchisee to cure any non-monetary default provided Franchisee immediately commences, diligently and in good faith pursues, and cures, such default), Franchisor shall have the right to terminate this Agreement upon notice to Franchisee.

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

27



**CONFIDENTIAL**

MV 00534

XVIII.        OBLIGATIONS UPON TERMINATION

Upon termination or expiration, this Agreement and all rights granted hereunder to Franchisee shall forthwith terminate, and Franchisee shall comply with all of the obligations applicable to the Approved Location as set forth in this Section XVIII.

A.        Franchisee shall immediately cease operation of the Hotel as a System hotel and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

B.        Franchisee shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, the names "Fairfield," "Fairfield Inn" and "Marriott" and all variations thereof and all other Proprietary Marks of Franchisor, any other identifying characteristics and marks of the System, and all Intellectual Property. Franchisee shall forthwith remove from its place of business, and discontinue using for any purpose, any and all signs, fixtures, furniture, furnishings, equipment, advertising materials, stationery, supplies, forms or other articles that display the Proprietary Marks or any distinctive features or designs associated with the System. Any signs containing the Proprietary Marks that Franchisee is unable to remove within one day of expiration or termination of this Agreement shall be completely covered by Franchisee until the time of their removal, and, in all events, removal of such signs shall occur within seventy-two hours of termination of this Agreement and the franchise granted hereby.

C.        Franchisee shall, at its expense, immediately make such modifications or alterations (except structural changes) as may be necessary to distinguish the Hotel so clearly from its former appearance and other hotels operated under the System as to prevent any possibility of confusion therewith by the public, and to prevent the operation of any business at the location of the Hotel by Franchisee or others in derogation of this Paragraph XVIII.C. (including, without limitation, removal of all distinctive physical features identifying System hotels, removal of all distinctive signs and emblems, and changing of telephone numbers and other directory listings). Franchisee shall, at Franchisee's expense, make such specific additional changes as Franchisor may reasonably request for this purpose. Until all modifications and alterations required by this Paragraph XVIII.C. are completed, Franchisee shall (i) maintain a conspicuous sign at the registration desk in a form specified by Franchisor stating that the Hotel is no longer a Fairfield Inn hotel, as applicable, and associated with the System, and (ii) until Franchisee has changed telephone numbers, advise all customers and prospective customers telephoning the Hotel that the Hotel is no longer associated with the System. Franchisee expressly acknowledges that its failure to make such alterations will cause irreparable injury to Franchisor.

D.        Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration that contains the names "Fairfield," "Fairfield Inn," "Marriott" or any variation thereof and any Proprietary Mark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

E.        Franchisee has agreed to operate the Hotel as a Fairfield Inn hotel in compliance with this Agreement for the full Term of this Agreement. If Franchisee should fail to do so, Franchisee acknowledges that Franchisor would be damaged in several ways, including but not limited to: loss of future franchise fees, loss of marketing fees used to market the System, loss of System representation in the area served by the Hotel, confusion of national account and individual customer, disadvantage in competing for national accounts and other types of bookings for the System, and injury to the good will in the Proprietary Marks. Franchisee further acknowledges that if this Agreement is terminated in

61799v4 -- Montgomery, AL
58003v1 -- 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

28



CONFIDENTIAL

connection with (i) the termination of five or more additional Franchise or License Agreements between Franchisor and Franchisee, or the respective affiliates of either, within a twelve-month period that includes the termination date of this Agreement; or (ii) the Hotel is Transferred to a Competitor, or any other event specified in Paragraphs XV.D., XV.E. or XV.F. occurs, as a result of which Franchisor has the right of first refusal provided in Paragraph XV.D., and Franchisor's right of first refusal under such Paragraph XV.D. of this Agreement is not effectuated for any reason (the immediately preceding clauses (i) or (ii) are referred to herein individually as "Special Circumstances"), Franchisor will suffer greater damage, at a minimum, with respect to confusion of national account and individual customer, disadvantage in competing for national accounts and other types of bookings for the System, and injury to the good will in the Proprietary Marks. Franchisee acknowledges that it is difficult to estimate the revenues of the Hotel over a period of years and that elements of Franchisor's damages not directly calculated from the Hotel's revenues are inherently difficult to calculate although such damages are real and meaningful to Franchisor and the System. Franchisor's damages in the event of termination would not be easily ascertained, would be difficult to estimate accurately, and the proofs thereof would be burdensome and costly, and Franchisor and Franchisee agree that liquidated damages (as calculated below) are not a penalty and represent a reasonable estimate of just and fair compensation of Franchisor of the damages that it would suffer. In the event this Agreement is terminated, such termination shall not affect the obligations of Franchisee hereunder to take action or abstain from taking action after the termination hereof as required by this Section XVIII. In the event of such termination, (a) Franchisor shall be entitled to recover from Franchisee, and Franchisee shall be obligated to promptly pay to Franchisor, all payments that have then accrued to Franchisor, its subsidiaries or affiliates pursuant to other provisions of this Agreement up to the date of such termination, and (b) if such termination is due to Franchisee's default hereunder, Franchisee shall promptly pay to Franchisor liquidated damages in an amount equal to the sum of (i) the average of the monthly contribution to the marketing fund under Paragraph III.D. of this Agreement theretofore payable to Franchisor over the immediately preceding two (2) years, plus (ii) the average of the monthly royalty fee under Paragraph III.C. of this Agreement theretofore payable to Franchisor over the immediately preceding two (2) years, times (iii) the lesser of thirty-six (36) months or one-half (½) the number of months that remain in the term of this Agreement. If the Hotel has not been operating as a Fairfield Inn for at least two (2) years, the average monthly royalty fee and contribution to the marketing fund for the previous twelve (12) months for all hotels operated in the System in the United States shall be multiplied by the lesser of thirty-six (36) months or one-half (½) the number of months that remain in the term of this Agreement to arrive at the amount of liquidated damages. If an early termination due to default hereunder by Franchisee occurs with Special Circumstances, Franchisee shall pay to Franchisor an amount equal to 150% of the amount of liquidated damages that would otherwise be payable hereunder. In addition to such liquidated damages, Franchisor shall have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums plus interest (calculated pursuant to Paragraph XIII.E. of this Agreement) on all amounts due pursuant to this Paragraph XVIII.E. from the date of such termination until paid. The legal remedies hereunder shall not preclude Franchisor from any equitable remedies to which it may be entitled under applicable law. Franchisee's obligation to pay Franchisor liquidated damages, if applicable, and other sums pursuant to this Paragraph XVIII.E. shall survive termination of this Agreement.

F.      Franchisee shall promptly pay all sums owing to Franchisor, its subsidiaries and affiliates. In the event of termination for any default of Franchisee, such sums shall include any payment to Franchisor required under Paragraph XVIII.E. and all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in obtaining (i) injunctive or other relief for the enforcement of any provisions of this Agreement or (ii) contested termination of this Agreement.

G.      Franchisee shall immediately turn over to Franchisor all Intellectual Property except for Proprietary Marks, which must be removed as set forth in this Article XVIII above (all of

61790v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

29



CONFIDENTIAL

MV 00536

which are acknowledged to be the Franchisor's Property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement and any correspondence between the parties, and any other documents that Franchisee reasonably needs for compliance with any provision of law.

     H.    Franchisor shall have the right, but not the duty, to be exercised by notice of intent to do so within thirty (30) days after termination or expiration, to purchase any and all signs, advertising materials, supplies and inventory and any other item bearing Franchisor's Proprietary Marks, at Franchisee's cost. With respect to any purchase by Franchisor as provided herein, Franchisor shall have the right to set off all amounts due from Franchisee under this Agreement.

     I.    The obligations of Franchisee set forth in this Section XVIII. shall survive termination of this Agreement.

XIX.    CONDEMNATION AND CASUALTY

     A.    Franchisee shall, at the earliest possible time, give Franchisor notice of any proposed taking by eminent domain. If the Hotel is condemned, or such a substantial portion of the Hotel is condemned to render impractical the continued operation of the Hotel in accordance with the System, this Agreement shall terminate upon notice by Franchisor or Franchisee to the other party, and Franchisor shall share in the condemnation award to the extent such award includes an allocation for its lost royalty income. If a non-substantial condemnation shall occur, then in such event, Franchisee shall promptly make whatever repairs and restoration may be necessary to make the Hotel conform substantially to its former condition, character and appearance, according to plans and specifications approved by Franchisor, and the resumption of normal operation of the Hotel shall not be unreasonably delayed.

     B.    If the Hotel is damaged or destroyed by fire or other cause and such damage or destruction necessitates the closing of the Hotel for a period in excess of ninety (90) days, Franchisee shall have the right to terminate this Agreement if it elects not to repair or rebuild the Hotel upon written notice to Franchisor given within ninety (90) days of such closing of the Hotel; provided, however, if subsequent to such notice and prior to the date on which the term of this Agreement would otherwise have ended pursuant to Section II of this Agreement if such notice of termination had not been given (the "Term Expiration Date"), Franchisee, any of its members if it is a limited liability company or any of its affiliated companies or any company controlled by a controlling stockholder of Franchisee if Franchisee is a corporation, or any of its general partners or any entity in which Franchisee or any of its general partners (the "Franchise Entity") has a greater than fifteen percent interest in or operates a hotel at the Approved Location (the "Other Hotel"), which Other Hotel is not operated pursuant to a license or franchise from one of the Marriott Companies, then in such event, Franchisee shall be obligated to promptly pay to Franchisor an amount equal to the liquidated damages set forth at Paragraph XVIII.E. of this Agreement, and the time element for calculating the amount of liquidated damages shall be the lesser of (a) thirty-six (36) months or (b) one-half (1/2) the number of months then existing between (i) the date upon which the Other Hotel is first operated by or for the Franchisee Entity and (ii) the Term Expiration Date. Franchisee's obligation set forth herein shall survive termination of this Agreement pursuant to this Paragraph XIX.B. In the event the Hotel does not close for more than ninety (90) days due to a casualty or Franchisee does not elect to terminate this Agreement in accordance with the provisions of this Paragraph XIX.B., the Hotel shall be promptly renovated and reopened within a reasonable time in accordance with the System and pursuant to plans and specifications approved by Franchisor in accordance with Section VII. of this Agreement and the Addendum attached hereto (to the extent Franchisor determines that such Addendum applies to reinstatement of the Hotel after the casualty).

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

30



**CONFIDENTIAL**        MV 00537

## XX.    TAXES, COMPLIANCE WITH LAWS, AND INDEBTEDNESS

A.    Franchisee shall promptly pay when due, all taxes levied or assessed by any federal, state or local tax authority, and any and all other indebtedness incurred by Franchisee in the conduct of the Franchised Business. Franchisee shall pay to Franchisor an amount equal to any tax, including any sales, gross receipts or similar tax imposed as a result of the operation of the Hotel and calculated based on payments required hereunder, unless the tax is credited against income tax otherwise payable by Franchisor.

B.    In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity of the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by creditor, to occur against the premises of the Hotel or any improvement thereon.

C.    Franchisee shall comply with all federal, state, and local laws, rules and regulations, and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the Franchised Business including, without limitation, licenses to do business, fictitious name registration and sales tax permits, health and sanitation permits and ratings and fire clearances. Copies of all inspection reports, warnings, certificates and ratings, issued by any governmental entity during the term of this Agreement in connection with the Hotel that indicate a failure to meet or maintain governmental standards or less than full compliance with any applicable law, rule or regulation, shall be forwarded to Franchisor by Franchisee within five (5) days of Franchisee's receipt thereof.

D.    Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, that may adversely affect the operation or financial condition of the Franchised Business.

E.    Franchisee recognizes that Franchisee's failure or repeated delay in making prompt payment in accordance with the terms of any agreements, leases, invoices or statements for any purchases or leases will be detrimental to the reputation and credit standing of Franchisee, Franchisor and other Fairfield Inn franchisees. Franchisee shall pay when due all such amounts owed in connection with operating the Hotel.

F.    Franchisee shall not incur or replace any indebtedness that is secured by a lien on or mortgage of the Hotel or pledge of the stock, partnership, membership or other ownership interests in Franchisee unless the following conditions are met: (1) the terms of such indebtedness are commercially reasonable, (2) commencing on the third anniversary of the Opening Date, the debt coverage ratio is equal to or greater than 1.3, and (3) the lender is not a Competitor or an affiliate of a Competitor. The debt coverage ratio shall be the ratio of (a) cash available for the payment of the annual debt service payments (interest and principal) based on the cash flow from the Hotel (after deduction for any management fee and reserve required under such management agreement or as a condition to such financing) for the twelve (12) months immediately preceding the written commitment for such indebtedness, to (b) the amount of such annual debt service payments.

## XXI.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.    Nothing in this Agreement creates a fiduciary relationship between the parties hereto. Franchisee is an independent contractor, and nothing in this Agreement is intended to constitute

61799v4 – Montgomery, AL
58003v1 -- 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

31



**CONFIDENTIAL**

MV 00538

either party an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose whatsoever.

        B.     During the term of the Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor and as an authorized user of the Proprietary Marks. Franchisee shall take such affirmative action as may be necessary to do so, including, without limitation, exhibiting notices of that fact at the Hotel as required under Paragraph X.B.3. hereof.

        C.     Nothing in this Agreement authorizes either party to make any contract, agreement, warranty or representation on the other's behalf, or to incur any debt or other obligation in the other's name.

        D.     Franchisor does not exercise any direction or control over the employment policies or employment decisions of Franchisee. All employees of Franchisee are solely employees of Franchisee, not Franchisor. Franchisee is not Franchisor's agent for any purpose in regard to Franchisee's employees or otherwise.

        E.     Franchisee shall and hereby does indemnify and shall defend and save harmless Franchisor, its affiliates, their officers and employees, and their respective successors and assigns, from and against all losses, costs, liabilities, damages, claims and expenses, of every kind and description, including allegations of negligence by Franchisor, its employees and agents and including reasonable attorneys' fees, arising out of or resulting from the upgrading, operation, alteration, remodeling, repair or use of the Franchised Business or the Hotel premises or of any other business conducted on or in connection with the Franchised Business by the Franchisee, or because of any act or omission of the Franchisee or anyone associated with, employed by, or affiliated with Franchisee. Franchisee shall promptly give written notice to Franchisor of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing. Franchisor shall in any event have the right, through counsel of its choice at Franchisee's expense, to control the defense or response to any such action if it could affect the interests of Franchisor, and such undertaking by Franchisor shall not, in any manner or form, diminish Franchisee's obligations to Franchisor hereunder. Under no circumstances shall Franchisor be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnification and against Franchisee, and the failure of Franchisor to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by Franchisor from Franchisee. The obligations of Franchisee under this Paragraph XXI.E. shall survive the termination or expiration of this Agreement.

XXII.     APPROVALS AND WAIVERS

        A.     Approvals and consents by either party will not be effective unless evidenced by writing signed by such party. Either party's consent, wherever required, may be withheld if any default by the other party exists under this Agreement.

        B.     Except as otherwise provided in any written agreement executed by Franchisor and Franchisee, Franchisor makes no warranties or guarantees upon which Franchisee may rely. Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent or suggestion to Franchisee in connection with this Agreement or by reason of any delay or denial of any request therefor.

        C.     No failure of a party to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by the other party with any obligation or condition hereunder, and no custom

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

32



CONFIDENTIAL

MV 00539

or practice of the parties at variance with the terms hereof, shall constitute a waiver of such party's right thereafter to demand exact compliance with any of the terms herein. Waiver by a party of any particular default by the other party shall not affect or impair such party's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of a party to exercise any power or right arising out of any breach or default by the other party of any of the terms, provisions, or covenants hereof, affect or impair such party's right to exercise the same.

XXIII.    WARRANTY OF FRANCHISEE

Franchisor entered into this Agreement in reliance upon the statements and information submitted to Franchisor by Franchisee in connection with this Agreement. Franchisee represents and warrants that all such statements and information submitted by Franchisee in connection with this Agreement are true, correct and complete in all material respects. Franchisee agrees to promptly advise Franchisor of any material changes in the information or statements submitted.

XXIV.    NOTICES

A.    Any and all notices required or permitted under this Agreement shall be in writing and shall be delivered personally or by a nationally-recognized overnight delivery service (such as Airborne Express or Federal Express) or by certified mail, return receipt requested, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| Notices to FRANCHISOR: | Marriott International, Inc.<br>Franchise Attorney<br>Law Department 52/923.25<br>10400 Fernwood Road<br>Bethesda, MD 20817 |
| with copy to: | Marriott International, Inc.<br>Department 51/944.52<br>Lodging Franchising<br>10400 Fernwood Road<br>Bethesda, MD 20817 |
| Notices to FRANCHISEE: | Montgomery Ventures, LLC<br>3340 Peachtree Road<br>100 Tower Place<br>Suite 605<br>Atlanta, GA 30326<br>Attn:    Robert S. Cole |
| with copy to: | Morris, Manning & Martin, LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road, NE<br>Atlanta, GA 30326<br>Attn:    Thomas Gryboski |

61799v4 -- Montgomery, AL<br>58003v1 -- 2002 Fairfield Inn Form of Relicensing Franchise Agreement<br>Based on Master 48354v7 (03/31/2002)<br>7/18/02

33



CONFIDENTIAL

MV 00540

Any notice shall be deemed to have been given at the date and time of (i) receipt or first refusal of delivery if sent via certified mail or delivered by hand, (ii) one (1) day after posting if sent via overnight commercial delivery service.

B. Notwithstanding Paragraph XXIV.A. above, Franchisor may provide Franchisee with routine information, the Manual and other System requirements and programs, such as the quality assurance program, by regular mail or by e-mail, the internet, an extranet, or other electronic means.

XXV.     ENTIRE AGREEMENT

This Agreement, including the attachments, exhibits and addenda hereto, and any execution copies thereof, and the agreements and documents referred to herein and agreements executed simultaneously herewith, contain the entire agreement between the parties hereto as it relates to the Approved Location. This is a fully integrated agreement. No agreement of any kind relating to the matters covered by this Agreement shall be binding upon either party unless and until the same has been made in a written, non-electronic instrument that has been duly executed by the non-electronic signature of all interested parties. This Agreement may not be amended or modified by conduct manifesting assent, or by electronic signature, and each party is hereby put on notice that any individual purporting to amend or modify this Agreement by conduct manifesting assent or by electronic signature is not authorized to do so. In entering this Agreement, Franchisee represents and warrants that it did not rely on and Franchisor and Franchisor's representatives have not made, any promises, representations or agreements relating to franchising this Approved Location except as expressly contained in this Agreement.

XXVI.     CONSTRUCTION AND SEVERABILITY

A. Unless otherwise specified, the term "Franchisee" as used in this Agreement shall include the entity identified in the preamble to this Agreement.

B. Except as expressly provided to the contrary herein, each section, part, term and/or provision of this Agreement shall be considered severable; and if, for any reason any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other sections, parts, terms and provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms or provisions shall be deemed not to be a part of this Agreement.

C. Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies under or by reason of this Agreement upon any person or legal entity other than Franchisor or Franchisee and such of their respective successors and assigns subject to the prior approvals set forth in Section XV. hereof.

D. Franchisee and Franchisor expressly agree to be bound by any promise or covenant imposing the maximum duty permitted by law that is subsumed within the terms of any provision hereof, as though it were separately articulated in and made part of this Agreement, that may result from striking any of the provisions hereof and portion or portions that a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor or Franchisee, as applicable, is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

34



CONFIDENTIAL          MV 00541

E.    All captions in the Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

F.    All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable, and all acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all the parties hereto on behalf of Franchisee.

G.    This Agreement may be executed in duplicate, and each copy so executed shall be deemed an original.

H.    When this Agreement provides that Franchisor may take or refrain from taking any action or exercise discretion, such as rights of approval, to modify the System, or to make determinations, Franchisor may do so from time to time.

I.    <u>Reasonable Business Judgment</u>. Except where Franchisor has reserved "sole discretion" or as otherwise indicated in this Agreement, Franchisor agrees to use "Reasonable Business Judgment" when discharging its obligations or exercising its rights or discretion under this Agreement, including with respect to any consents and approvals and the administration of its relationship with Franchisee. "Reasonable Business Judgment" means that Franchisor's action or inaction has a business basis that is intended to benefit the System or the profitability of the System as a whole, including Franchisor, regardless of whether some individual hotels may be unfavorably affected; or to increase the value of the Marks; or to increase or enhance overall hotel guest or franchisee or owner satisfaction; or to minimize possible brand inconsistencies or customer confusion. In the event that such obligation or exercise of discretion is unrelated to the System, standards, brand or other subjects described above, Reasonable Business Judgment shall mean that Franchisor has a business basis and has not acted in bad faith. Franchisee shall have the burden of establishing that Franchisor failed to exercise Reasonable Business Judgment, and neither the fact that Franchisor benefited economically from an action nor the existence of other "reasonable" alternatives will, by themselves, establish such failure. To the extent that any implied covenant, such as the implied covenant of good faith and fair dealing, is applied to this Agreement, Franchisor and Franchisee intend that Franchisor shall not have violated such implied covenant if Franchisor has exercised Reasonable Business Judgment.

XXVII.    APPLICABLE LAW AND CURRENCY REQUIREMENT

A.    This Agreement takes effect upon its acceptance and execution by Franchisor in the State of Maryland, and shall be interpreted and construed under the laws thereof, which laws shall prevail in the event of any conflict of law.

B.    No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

C.    Nothing herein contained shall bar either party's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

D.    All fees and payments required by this Agreement shall be paid in U.S.A. currency.

61799v4 – Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

35



CONFIDENTIAL

MV 00542

XXVIII.    WAIVER OF JURY TRIAL

In any litigation between the parties founded upon or arising from this Agreement, the parties hereby waive their respective rights to a jury trial, and the parties hereby stipulate that any such trial shall occur without jury.

XXIX.    FRANCHISEE ACKNOWLEDGMENTS

A.    FRANCHISEE ACKNOWLEDGES THAT IT DID NOT RELY ON ANY PROMISES, REPRESENTATIONS OR AGREEMENTS ABOUT THE FRANCHISOR OR THE FRANCHISE NOT EXPRESSLY CONTAINED IN THIS AGREEMENT AND IN THE DISCLOSURE DOCUMENT REFERRED TO IN XXIX.C. BELOW IN MAKING ITS DECISION TO SIGN THIS AGREEMENT. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE NOT MADE ANY PROMISES, REPRESENTATIONS OR AGREEMENTS, ORAL OR WRITTEN, EXCEPT AS EXPRESSLY CONTAINED IN THIS AGREEMENT AND IN THE DISCLOSURE DOCUMENT REFERRED TO IN XXIX.C. BELOW.

B.    FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS FRANCHISED HEREUNDER, AND RECOGNIZES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS AND THAT ITS SUCCESS WILL BE LARGELY DEPENDENT UPON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESSMAN. FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.

C.    FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE RECEIVED A COPY OF THIS AGREEMENT, THE ATTACHMENTS HERETO, IF ANY, AND AGREEMENTS RELATING THERETO, IF ANY, AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. FRANCHISEE FURTHER ACKNOWLEDGES THAT FRANCHISEE HAS RECEIVED THE DISCLOSURE DOCUMENT REQUIRED BY THE TRADE REGULATION RULE OF THE FEDERAL TRADE COMMISSION ENTITLED DISCLOSURE REQUIREMENTS AND PROHIBITIONS CONCERNING FRANCHISING AND BUSINESS OPPORTUNITY VENTURES AT THE EARLIER OF (i) AT LEAST TEN (10) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED, OR (ii) THE DATE OF THE FIRST MEETING BETWEEN FRANCHISOR AND FRANCHISEE FOR THE PURPOSE OF DISCUSSING A PROSPECTIVE FRANCHISE.

D.    FRANCHISEE ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THIS AGREEMENT, THE ATTACHMENTS HERETO, IF ANY, AND THAT FRANCHISEE HAS HAD AMPLE TIME AND OPPORTUNITY TO CONSULT WITH ADVISORS OF FRANCHISEE'S OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT.

E.    ALL OF THE OBLIGATIONS OF FRANCHISOR HEREUNDER ARE TO FRANCHISEE ONLY; NO OTHER PERSON OR ENTITY IS ENTITLED TO RELY ON, ENFORCE, OR OBTAIN RELIEF FOR BREACH OF SUCH OBLIGATIONS EITHER DIRECTLY OR BY SUBROGATION.

61799v4 - Montgomery, AL
58003v1 – 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

36



CONFIDENTIAL                MV 00543

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed and delivered this Agreement in duplicate as of the Effective Date.

FRANCHISOR

ATTEST:

MARRIOTT INTERNATIONAL, INC.

Assistant Secretary

By _____ (SEAL)
Vice President, Owner and Franchise Services

FRANCHISEE

ATTEST:

MONTGOMERY VENTURES, LLC,
a Georgia limited liability company

(Assistant) Secretary

By: _____ (SEAL)
Robert S. Cole
President

61799v4 — Montgomery, AL
58003v1 — 2002 Fairfield Inn Form of Relicensing Franchise Agreement
Based on Master 48354v7 (03/31/2002)
7/18/02

37

**CONFIDENTIAL**

MV 00544

AFFIDAVIT OF KAREN KISH

STATE OF GEORGIA     )
                     )
COUNTY OF FULTON     )

Personally appeared before the undersigned officer duly authorized by law to administer oaths, Karen Kish, who after first being duly sworn states, on oath:

I understand that this Affidavit will be submitted in the civil action styled, Heather Watts v. Hospitality Ventures, LLC, Civil Action No. 2:06CV1149-MEF, pending in the United States District Court for the Middle District of Alabama.

I am over twenty-one (21) years of age and am competent to testify to the matters contained herein. This Affidavit is based upon my personal knowledge.

1.    I am employed by Hospitality Ventures Management, Inc. I am responsible for overseeing, preparing, and maintaining payroll records for Hospitality Ventures, LLC; Montgomery Ventures, LLC; and all of their affiliated entities.

2.    From June 24, 2004, through November 9, 2005, all of the employees who worked at the Fairfield Inn by Marriott, located at 5601 Carmichael Road, Montgomery, Alabama, 36117 (the "Hotel") -- including Heather Watts, Todd Epplin, and Tammy Dominguez -- were employed and paid by Montgomery Ventures, LLC.

3.    The attached Exhibit A is a true and correct redacted copy of Montgomery Ventures' payroll records for the end of

1743565

calendar year 2004. The employees' personal information, such as Social Security numbers, addresses, telephone numbers, compensation, deductions, and withholding information has been redacted from Exhibit A.

4.    The attached Exhibit B is a true and correct copy of Montgomery Ventures' payroll records for the end of calendar year 2005. The employees' personal information, such as Social Security numbers, addresses, telephone numbers, compensation, deductions, and withholding information has been redacted from Exhibit B.

5.    Exhibits A and B show that during calendar years 2004 and 2005, Montgomery Ventures paid and employed Todd Epplin and Heather Watts.

6.    Exhibit B shows that during calendar year 2005, Montgomery Ventures paid and employed Tammy Dominguez.

7.    Hospitality Ventures, LLC never employed or paid Heather Watts, Todd Epplin, Tammy Dominguez or Roger Miller.


FURTHER AFFIANT SAYETH NOT.

_Karen L Kish_
Karen Kish

Signed and sworn before me this 16th day of September, 2007.

_Carol A Twardock_
Notary Public

My commission expires: 5/4/08

(NOTARY SEAL)

1743565

**Exhibit A to Kish Affidavit**

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE 1    Paymaxx, Inc.
                                                                                                              12/27/04   10:20

ID:01521015 SSN:
ANTONELLO, JEANNE C

```
                              ----Dates----                    YTD----|Earnings: Hrs----YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                         |Bday:          |Gross:
Unit:MONT    Dept:010015 |Hire:11082004  |FedTxb:
Phone:           Stat:A  |Term:          |FICA:
Claim: S FIT: 1 SIT: 1   |Rehr:          |FIT:
Tax Modules:AL    AL Add |Full:11082004  |SIT:
Bank:MONT Freq:26 H 12.0000 |Paid:12312004 |CITY:
                         |Lras:          |SDI:
                         |FIT:   0.0000  |Deduc:
                         |SIT:   0.0000  |Ncash:
```

ID:01520894 SSN:
BEAMON, JERMEY Q

```
                              ----Dates----                    YTD----|Earnings: Hrs----YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                         |Bday:06022004  |Gross:
Unit:MONT    Dept:020027 |Hire:06022004  |FedTxb:
Phone:           Stat:T  |Term:12012004  |FICA:
Claim: S FIT: 1 SIT: 1   |Rehr:          |FIT:
Tax Modules:AL    AL Add |Full:06022004  |SIT:
Bank:MONT Freq:26 H  6.5000 |Paid:11192004 |CITY:
                         |Lras:06022004  |SDI:
                         |FIT:   0.0000  |Deduc:
                         |SIT:   0.0000  |Ncash:
```

ID:01520022 SSN:
BENEFIELD, ANNETTE

```
                              ----Dates----                    YTD----|Earnings: Hrs----YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                         |Bday:          |Gross:
Unit:MONT    Dept:070015 |Hire:07292002  |FedTxb:
Phone:           Stat:A  |Term:          |FICA:
Claim: S FIT: 0 SIT: 0   |Rehr:          |FIT:
Tax Modules:AL    AL Add |Full:07292002  |SIT:
Bank:MONT Freq:26 H  8.2500 |Paid:12312002 |CITY:
                         |Lras:07292002  |SDI:
                         |FIT:   0.0000  |Deduc:
                         |SIT:   0.0000  |Ncash:
```

ID:01520748 SSN:
BENEFIELD, DIANA L

```
                              ----Dates----                    YTD----|Earnings: Hrs----YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                         |Bday:01242004  |Gross:
Unit:MONT    Dept:020026 |Hire:01242004  |FedTxb:
Phone:           Stat:T  |Term:03202004  |FICA:
Claim: S FIT: 0 SIT: 0   |Rehr:          |FIT:
Tax Modules:AL    AL Add |Full:01242004  |SIT:
Bank:MONT Freq:26 H  5.5000 |Paid:03262004 |CITY:
                         |Lras:01242004  |SDI:
                         |FIT:   0.0000  |Deduc:
                         |SIT:   0.0000  |Ncash:
```

CONFIDENTIAL

MV 00583

MV 00584

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE    2        Paymaxx, Inc.
                                                                                                                    12/27/04    10:20

---

ID:01520895 SSN:
CLARK, MICHELLE F

Unit:MONT        Dept:020026
Phone:
Claim: S   FIT: 0   SIT: 0
Tax Modules:AL              AL Add
Bank:MONT   Freq:26 H        6.5000

-----Dates-----
Bday:
Hire:05312004
Term:09232004
Rehr:
Full:05312004
Paid:10142004
Lras:05312004
FIT:    0.0000
SIT:    0.0000

Gross:
FdTxb:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----   Earnings: Hrs--YTD--Amt--|Deductions:--YTD--   -----YTD-----Target------Taken

---

ID:01520750 SSN:
CLARK, NICOLE B

Unit:MONT        Dept:020026
Phone:
Claim: S   FIT: 3   SIT: 0
Tax Modules:AL              AL Add
Bank:MONT   Freq:26 H        5.5000

-----Dates-----
Bday:
Hire:01262004
Term:02132004
Rehr:
Full:01262004
Paid:02272004
Lras:01262004
FIT:    0.0000
SIT:    0.0000

Gross:
FdTxb:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----   Earnings: Hrs--YTD--Amt--|Deductions:--YTD--   -----YTD-----Target------Taken

---

ID:01520013 SSN:
CROLEY, CARLON

Unit:MONT        Dept:020026
Phone:
Claim: S   FIT: 0   SIT: 0
Tax Modules:AL              AL Add
Bank:MONT   Freq:26 H        7.4500

-----Dates-----
Bday:
Hire:07292002
Term:02222004
Rehr:
Full:07292002
Paid:02132004
Lras:07292002
FIT:    0.0000
SIT:    0.0000

Gross:
FdTxb:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----   Earnings: Hrs--YTD--Amt--|Deductions:--YTD--   -----YTD-----Target------Taken

---

ID:01520749 SSN:
DARDEN, KAMEISHA K

Unit:MONT        Dept:020026
Phone:
Claim: S   FIT: 3   SIT: 3
Tax Modules:AL              AL Add
Bank:MONT   Freq:26 H        5.5000

-----Dates-----
Bday:
Hire:01262004
Term:02042004
Rehr:
Full:01262004
Paid:02132004
Lras:01262004
FIT:    0.0000
SIT:    0.0000

Gross:
FdTxb:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----   Earnings: Hrs--YTD--Amt--|Deductions:--YTD--   -----YTD-----Target------Taken

---

CONFIDENTIAL

CORP MONTGOMERY VENTURES, LLC    RPT - Condensed Employee Master    PAGE 3    Paymaxx, Inc. 12/27/04 10:20

---

**ID:01520296 SSN:**
DAVIS, LIONEL S

Unit:MONT   Dept:010018
Phone:   S FIT: 3   SIT: 0   Stat:A
Claim:   AL Add
Tax Modules:AL
Bank:MONT Freq:26 H   7.5000

Dates — Bday: / Hire:12022002 / Term:05142003 / Renr:05142004 / Full: / Paid:12312004 / Lras:12022002 / FIT: 0.0000 / SIT: 0.0000

Gross: FCTxb: FGTxb: FICA: FIT: SIT: CITY: SDI: Deduc: Ncash:

—YTD— Earnings: Hrs—YTD—Amt— Deductions: —YTD—Target—Taken

---

**ID:01520679 SSN:**
EDWARDS, DEBRA A

Unit:MONT   Dept:020026
Phone:   S FIT: 3   SIT: 3   Stat:T
Claim:   AL Add
Tax Modules:AL
Bank:MONT Freq:26 H   6.5000

Dates — Bday: / Hire:10182003 / Term:01062004 / Renr: / Full:10182003 / Paid:01162004 / Lras:10182003 / FIT: 0.0000 / SIT: 0.0000

Gross: FCTxb: FGTxb: FICA: FIT: SIT: CITY: SDI: Deduc: Ncash:

—YTD— Earnings: Hrs—YTD—Amt— Deductions: —YTD—Target—Taken

---

**ID:01520883 SSN:**
EFFLIN, TODD B

Unit:MONT   Dept:050001
Phone:   S FIT: 2   SIT: 2   Stat:A
Claim:   AL Add
Tax Modules:AL
Bank:MONT Freq:26 S   2307.69

Dates — Bday: / Hire:05172004 / Term: / Renr: / Full:05172004 / Paid:12312004 / Lras:05172004 / FIT: 0.0000 / SIT: 0.0000

Gross: FCTxb: FGTxb: FICA: FIT: SIT: CITY: SDI: Deduc: Ncash:

—YTD— Earnings: Hrs—YTD—Amt— Deductions: —YTD—Target—Taken

---

**ID:01520727 SSN:**
FLEMING, SUSAN

Unit:MONT   Dept:080032
Phone:   S FIT: 0   SIT: 0   Stat:T
Claim:   AL Add
Tax Modules:AL
Bank:MONT Freq:26 S   1500.00

Dates — Bday: / Hire:12082003 / Term:05142004 / Renr: / Full:12082003 / Paid:05212004 / Lras:12082003 / FIT: 0.0000 / SIT: 0.0000

Gross: FCTxb: FGTxb: FICA: FIT: SIT: CITY: SDI: Deduc: Ncash:

—YTD— Earnings: Hrs—YTD—Amt— Deductions: —YTD—Target—Taken

CONFIDENTIAL

MV 00585

CORP MONTGOMERY VENTURES, LLC                          RPT - Condensed Employee Master                          PAGE    4    Paymaxx, Inc.
                                                                                                                          12/27/04  10:20

```
ID:01521016 SSN:                  --Dates--        |Gross:   |--YTD--|Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
FREDERICK, WILLIAMS L            Bday:              |FcTxb:   |
                                 Hire:11112004      |FdTxb:   |
                                 Term:              |FICA:    |
                                 Rehr:              |FIT:     |
Unit:MONT        Dept:010018     Full:11112004      |SIT:     |
Phone:                  Stat:A   Paid:12312004      |CITY:    |
Claim: S FIT: 1 SIT: 1           Lras:              |SDI:     |
Tax Modules:AL  AL Add           FIT:    0.0000     |Deduc:   |
Bank:MONT Freq:26 H  7.5000      SIT:    0.0000     |Ncash:   |
```

```
ID:01520728 SSN:                  --Dates--        |Gross:   |--YTD--|Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
GARRISON, NIKI N                 Bday:              |FcTxb:   |
                                 Hire:12132003      |FdTxb:   |
                                 Term:06152004      |FICA:    |
                                 Rehr:              |FIT:     |
Unit:MONT        Dept:010012     Full:12132003      |SIT:     |
Phone:                  Stat:T   Paid:06042004      |CITY:    |
Claim: S FIT: 0 SIT: 0           Lras:12132003      |SDI:     |
Tax Modules:AL  AL Add           FIT:    0.0000     |Deduc:   |
Bank:MONT Freq:26 H  7.0000      SIT:    0.0000     |Ncash:   |
```

```
ID:01520755 SSN:                  --Dates--        |Gross:   |--YTD--|Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
GEARRING, MARY E                 Bday:              |FcTxb:   |
                                 Hire:02042004      |FdTxb:   |
                                 Term:02222004      |FICA:    |
                                 Rehr:              |FIT:     |
Unit:MONT        Dept:020026     Full:02042004      |SIT:     |
Phone:                  Stat:T   Paid:02132004      |CITY:    |
Claim: S FIT: 5 SIT: 0           Lras:02042004      |SDI:     |
Tax Modules:AL  AL Add           FIT:    0.0000     |Deduc:   |
Bank:MONT Freq:26 H  6.0000      SIT:    0.0000     |Ncash:   |
```

```
ID:01520014 SSN:                  --Dates--        |Gross:   |--YTD--|Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HARRIS, MARGARET R               Bday:              |FcTxb:   |
                                 Hire:07292002      |FdTxb:   |
                                 Term:              |FICA:    |
                                 Rehr:              |FIT:     |
Unit:MONT        Dept:020026     Full:07292002      |SIT:     |
Phone:                  Stat:A   Paid:12312004      |CITY:    |
Claim: M FIT: 0 SIT: 2           Lras:07292002      |SDI:     |
Tax Modules:AL  AL Add           FIT:    0.0000     |Deduc:   |
Bank:MONT Freq:26 H  8.2400      SIT:    0.0000     |Ncash:   |
```

CONFIDENTIAL

MV 00586

CORP MONTGOMERY VENTURES, LLC                RPT - Condensed Employee Master                    PAGE    5     Paymaxx, Inc.
                                                                                                            12/29/04    10:20

```
ID:01520015 SSN:           -------Dates-------    |Gross:  YTD----|-Earnings: Hrs--YTD--Amt-|-Deductions:------YTD-----Target------Taken|
HARRIS, RUBY L             |Bday:                 |FCTxb:
                           |Hire:07292002         |FdTxb:
                           |Term:                 |FICA:
                           |Rehr:                 |FIT:
Unit:MONT      Dept:020026 |Full:07292002         |SIT:
Phone:              Stat:A |Paid:12312004         |CITY:
Claim: S FIT: 0 SIT: 0     |Lras:07292002         |SDI:
Tax Modules:AL   AL Add    |                      |Deduc:
Bank:MONT Freq:26 H 8.3500 |FIT:    0.0000 SIT:    0.0000|Ncash:

ID:01520677 SSN:           -------Dates-------    |Gross:  YTD----|-Earnings: Hrs--YTD--Amt-|-Deductions:------YTD-----Target------Taken|
HAYES, KIMBERLY R          |Bday:                 |FCTxb:
                           |Hire:10102003         |FdTxb:
                           |Term:06282004         |FICA:
                           |Rehr:                 |FIT:
Unit:MONT      Dept:010018 |Full:10102003         |SIT:
Phone:              Stat:T |Paid:06182004         |CITY:
Claim: S FIT: 1 SIT: 1     |Lras:10102003         |SDI:
Tax Modules:AL   AL Add    |                      |Deduc:
Bank:MONT Freq:26 H 7.5000 |FIT:    0.0000 SIT:    0.0000|Ncash:

ID:01520780 SSN:           -------Dates-------    |Gross:  YTD----|-Earnings: Hrs--YTD--Amt-|-Deductions:------YTD-----Target------Taken|
HEFLIN, DEBROAH L          |Bday:                 |FCTxb:
                           |Hire:03022004         |FdTxb:
                           |Term:03082004         |FICA:
                           |Rehr:                 |FIT:
Unit:MONT      Dept:010012 |Full:03022004         |SIT:
Phone:              Stat:T |Paid:03122004         |CITY:
Claim: S FIT: 4 SIT: 0     |Lras:03022004         |SDI:
Tax Modules:AL   AL Add    |                      |Deduc:
Bank:MONT Freq:26 H 7.0000 |FIT:    0.0000 SIT:    0.0000|Ncash:

ID:01520962 SSN:           -------Dates-------    |Gross:  YTD----|-Earnings: Hrs--YTD--Amt-|-Deductions:------YTD-----Target------Taken|
HOLLEY, JULIUS R           |Bday:                 |FCTxb:
                           |Hire:08182004         |FdTxb:
                           |Term:                 |FICA:
                           |Rehr:                 |FIT:
Unit:MONT      Dept:020027 |Full:08182004         |SIT:
Phone:              Stat:A |Paid:12312004         |CITY:
Claim: S FIT: 0 SIT: 0     |Lras:08182004         |SDI:
Tax Modules:AL   AL Add    |                      |Deduc:
Bank:MONT Freq:26 H 6.5000 |FIT:    0.0000 SIT:    0.0000|Ncash:
```

**CONFIDENTIAL**

MV 00587

CORP MONTGOMERY VENTURES, LLC                RPT - Condensed Employee Master                PAGE   6     Paymaxx, Inc.
                                                                                                        12/27/04   10:20

```
ID:01520021 SSN:
NOLLEY, LESLIE
                           |------Dates------|Gross:              |-----YTD-----|Earnings: Hrs---YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                           |Bday:            |FCtxp:
                           |Hire:07292002    |PdTxp:
Unit:MONT     Dept:060041  |Term:            |FICA:
Phone:          Stat:A     |Rehr:            |FIT:
Claim: S FIT: 0 SIT: 0     |Full:07292002    |SIT:
Tax Modules:AL    AL Add   |Paid:12312004    |CITY:
Bank:MONT Freq:26 H 7.3500 |Lras:07232002    |SDI:
                           |FIT: 0.0000      |Deduc:
                           |SIT: 0.0000      |Ncash:

ID:01520521 SSN:
HOUGHTON, BERTHA L
                           |------Dates------|Gross:              |-----YTD-----|Earnings: Hrs---YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                           |Bday:            |FCtxp:                             BNS
                           |Hire:07182003    |PdTxp:                             HOL
Unit:MONT     Dept:020025  |Term:            |FICA:                              OVT
Phone:          Stat:A     |Rehr:            |FIT:                               REG
Claim: S FIT: 0 SIT: 0     |Full:12312004    |SIT:                               RETR
Tax Modules:AL    AL Add   |Paid:12312004    |CITY:
Bank:MONT Freq:26 H 6.6300 |Lras:07182003    |SDI:
                           |FIT: 0.0000      |Deduc:
                           |SIT: 0.0000      |Ncash:

ID:01520949 SSN:
JOHNSON, ANNIE R
                           |------Dates------|Gross:              |-----YTD-----|Earnings: Hrs---YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                           |Bday:            |FCtxp:
                           |Hire:08012004    |PdTxp:
Unit:MONT     Dept:020026  |Term:            |FICA:
Phone:          Stat:A     |Rehr:            |FIT:
Claim: S FIT: 2 SIT: 2     |Full:08012004    |SIT:
Tax Modules:AL    AL Add   |Paid:12032004    |CITY:
Bank:MONT Freq:26 H 6.5000 |Lras:08012004    |SDI:
                           |FIT: 0.0000      |Deduc:
                           |SIT: 0.0000      |Ncash:

ID:01520676 SSN:
KENNER-PERRY, KORRENNA S
                           |------Dates------|Gross:              |-----YTD-----|Earnings: Hrs---YTD---Amt-|Deductions:-----YTD-----Target-----Taken|
                           |Bday:            |FCtxp:
                           |Hire:10102003    |PdTxp:
Unit:MONT     Dept:010012  |Term:01122004    |FICA:
Phone:          Stat:T     |Rehr:            |FIT:
Claim: M FIT: 2 SIT: 0     |Full:10102003    |SIT:
Tax Modules:AL    AL Add   |Paid:01302004    |CITY:
Bank:MONT Freq:26 H 7.0000 |Lras:10102003    |SDI:
                           |FIT: 0.0000      |Deduc:
                           |SIT: 0.0000      |Ncash:
```

CONFIDENTIAL

MV 00588

CORP MONTGOMERY VENTURES, LLC                RPT - Condensed Employee Master                PAGE  7        Paymaxx, Inc.
                                                                                                          12/27/04  10:20

---

ID:01520813 SSN:
LEE, JACQUELYN B

| | |
|---|---|
| Unit:MONT          Dept:020026 | |
| Phone:                   Stat:T | |
| Claim: S FIT: 3 SIT: 0 | |
| Tax Modules:AL              AL Add | |
| Bank:MONT Freq:26 H    6.0000 | |

-----Dates-----
Bday:
Hire:03242004
Term:10112004
Renr:10122004
Full:03242004
Paid:10222004
Lras:03242004
FIT:   0.0000
SIT:   0.0000

Gross:
FCTxp:
FGTxp:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----|Earnings: Hrs---YTD---Amt--|Deductions:------------|----YTD----Target------Taken|

---

ID:0152077, SSN:
LEE, MARY M

| | |
|---|---|
| Unit:MONT          Dept:020026 | |
| Phone:                   Stat:A | |
| Claim: S FIT: 3 SIT: 0 | |
| Tax Modules:AL              AL Add | |
| Bank:MONT Freq:26 H    6.5000 | |

-----Dates-----
Bday:
Hire:02142004
Term:
Renr:
Full:02142004
Paid:12312004
Lras:02142004
FIT:   0.0000
SIT:   0.0000

Gross:
FCTxp:
FGTxp:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----|Earnings: Hrs---YTD---Amt--|Deductions:------------|----YTD----Target------Taken|

---

ID:01520004 SSN:
LOVE, JENNIFER

| | |
|---|---|
| Unit:MONT          Dept:010012 | |
| Phone:                   Stat:A | |
| Claim: S FIT: 0 SIT: 0 | |
| Tax Modules:AL              AL Add | |
| Bank:MONT Freq:26 H    8.1000 | |

-----Dates-----
Bday:
Hire:072292002
Term:
Renr:
Full:07292002
Paid:12312004
Lras:07292002
FIT:   0.0000
SIT:   0.0000

Gross:
FCTxp:
FGTxp:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----|Earnings: Hrs---YTD---Amt--|Deductions:------------|----YTD----Target------Taken|

---

ID:01520229 SSN:
MARABLE. TODD E

| | |
|---|---|
| Unit:MONT          Dept:060040 | |
| Phone:                   Stat:A | |
| Claim: M FIT: 0 SIT: 0 | |
| Tax Modules:AL              AL Add | |
| Bank:MONT Freq:26 H   13.0000 | |

-----Dates-----
Bday:
Hire:08172002
Term:
Renr:
Full:04282003
Paid:12312004
Lras:08172002
FIT:   0.0000
SIT:   0.0000

Gross:
FCTxp:
FGTxp:
FICA:
SIT:
CITY:
SDI:
Deduc:
Ncash:

-----YTD-----|Earnings: Hrs---YTD---Amt--|Deductions:------------|----YTD----Target------Taken|

CONFIDENTIAL

MV 00589

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE    8        Paymaxx, Inc.
                                                                                                               12/27/04    10:20

```
ID:01520627 SSN:              ----Dates----        |         |-----YTD-----|Earnings: Hrs----YTD----Amt--|Deductions:------------YTD------------Target------Taken|
MASTERS, RONDA L              Bday:                 |Gross: |
                              Hire:09162003         |FCTxb: |
                              Term:05072004         |FdTxb: |
                              Rehr:                 |FICA:  |
Unit:MONT      Dept:050001    Pull:09162003         |FIT:   |
Phone:                SIT:0   Paid:09162004         |SIT:   |
Claim: S FIT: 0 SIT: 0        Lras:09162003         |CITY:  |
Tax Mobiles:AL    AL Add                            |SDI:   |
Bank:MONT Freq:26 S  2000.00  FIT:  0.0000          |Deduc: |
                              SIT:  0.0000          |Ncash: |

ID:01520950 SSN:              ----Dates----        |         |-----YTD-----|Earnings: Hrs----YTD----Amt--|Deductions:------------YTD------------Target------Taken|
MCBRIDE, NAKIA C              Bday:                 |Gross: |
                              Hire:08012004         |FCTxb: |
                              Term:09232004         |FdTxb: |
                              Rehr:                 |FICA:  |
Unit:MONT      Dept:020026    Pull:08012004         |FIT:   |
Phone:                SIT:2   Paid:08132004         |SIT:   |
Claim: S FIT: 2 SIT: 2        Lras:08012004         |CITY:  |
Tax Mobiles:AL    AL Add                            |SDI:   |
Bank:MONT Freq:26 H  6.5000   FIT:  0.0000          |Deduc: |
                              SIT:  0.0000          |Ncash: |

ID:01520795 SSN:              ----Dates----        |         |-----YTD-----|Earnings: Hrs----YTD----Amt--|Deductions:------------YTD------------Target------Taken|
MCBRIDE, TAMEKA L             Bday:                 |Gross: |
                              Hire:03062004         |FCTxb: |
                              Term:04192004         |FdTxb: |
                              Rehr:                 |FICA:  |
Unit:MONT      Dept:020026    Pull:03062004         |FIT:   |
Phone:                SIT:0   Paid:04232004         |SIT:   |
Claim: S FIT: 0 SIT: 0        Lras:03062004         |CITY:  |
Tax Mobiles:AL    AL Add                            |SDI:   |
Bank:MONT Freq:26 H  6.0000   FIT:  0.0000          |Deduc: |
                              SIT:  0.0000          |Ncash: |

ID:01520794 SSN:              ----Dates----        |         |-----YTD-----|Earnings: Hrs----YTD----Amt--|Deductions:------------YTD------------Target------Taken|
MILLER, GERALDINE S           Bday:                 |Gross: |
                              Hire:03062004         |FCTxb: |
                              Term:                 |FdTxb: |
                              Rehr:                 |FICA:  |
Unit:MONT      Dept:020026    Pull:03062004         |FIT:   |
Phone:                SIT:A   Paid:12312004         |SIT:   |
Claim: S FIT: 6 SIT: 3        Lras:03062004         |CITY:  |
Tax Mobiles:AL    AL Add                            |SDI:   |
Bank:MONT Freq:26 H  6.5000   FIT:  0.0000          |Deduc: |
                              SIT:  0.0000          |Ncash: |
```

CONFIDENTIAL

MV 00590

```
CORP MONTGOMERY VENTURES, LLC          RPT - Condensed Employee Master          PAGE   9       Paymaxx, Inc.
                                                                                              12/27/04    10:20

ID:01520782 SSN:              -----Dates-----|-----YTD-----|Earnings: Hrs--YTD--Amt-|Deductions:-----YTD----Amt----Target------Taken|
MITCHELL, TOINETTE L          Bday:           |Gross:       |BNS                     |
                              Hire:05012003   |FdTxb:       |HOL
                              Term:06012004   |FdTxb:       |REG
                              Rehr:           |FICA:        |RETR
Unit:MONT      Dept:010012    Full:08112003   |FIT:
Phone:         Stat:T         Paid:07022004   |SIT:
Claim:M FIT: 1 SIT: 1         Lras:05012003   |CITY:
Tax Modules:AL    AL Add      ------------    |SDI:
Bank:MONT Freq:26 H  7.0000   FIT: 0.0000     |Deduc:
                              SIT: 0.0000     |Ncash:

ID:01521025 SSN:              -----Dates-----|-----YTD-----|Earnings: Hrs--YTD--Amt-|Deductions:-----YTD----Amt----Target------Taken|
MOORE, SABRINA D              Bday:           |Gross:       |REG
                              Hire:11152004   |FdTxb:       |
                              Term:           |FdTxb:       |
                              Rehr:           |FICA:
Unit:MONT      Dept:020026    Full:11152004   |FIT:
Phone:         Stat:A         Paid:12312004   |SIT:
Claim:S FIT: 2 SIT: 2         Lras:           |CITY:
Tax Modules:AL    AL Add      ------------    |SDI:
Bank:MONT Freq:26 H  6.5000   FIT: 0.0000     |Deduc:
                              SIT: 0.0000     |Ncash:

ID:01520829 SSN:              -----Dates-----|-----YTD-----|Earnings: Hrs--YTD--Amt-|Deductions:-----YTD----Amt----Target------Taken|
MORRIS, TASHA R               Bday:           |Gross:       |BNS
                              Hire:04062004   |FdTxb:       |HOL
                              Term:           |FdTxb:       |OVT
                              Rehr:           |FICA:        |REG
Unit:MONT      Dept:010012    Full:04062004   |FIT:
Phone:         Stat:A         Paid:12312004   |SIT:
Claim:S FIT:99 SIT:99         Lras:04062004   |CITY:
Tax Modules:AL    AL Add      ------------    |SDI:
Bank:MONT Freq:26 H  7.5000   FIT: 0.0000     |Deduc:
                              SIT: 0.0000     |Ncash:

ID:01520982 SSN:              -----Dates-----|-----YTD-----|Earnings: Hrs--YTD--Amt-|Deductions:-----YTD----Amt----Target------Taken|
NELSON, CYNTHA L              Bday:           |Gross:       |HOL
                              Hire:09202004   |FdTxb:       |OTH
                              Term:           |FdTxb:       |OVT
                              Rehr:           |FICA:        |REG
Unit:MONT      Dept:020026    Full:09202004   |FIT:
Phone:         Stat:A         Paid:12312004   |SIT:
Claim:S FIT: 1 SIT: 0         Lras:09202004   |CITY:
Tax Modules:AL    AL Add      ------------    |SDI:
Bank:MONT Freq:26 H  6.5000   FIT: 0.0000     |Deduc:
                              SIT: 0.0000     |Ncash:
```

CONFIDENTIAL

MV 00591

CORP MONTGOMERY VENTURES, LLC                    RP1 - Condensed Employee Master                    PAGE    10    Paymaxx, Inc.
                                                                                                                              12/27/04    10:20

---

ID:01520747 SSN:
NETTLES, MARY J

|---Dates---|Gross:|---YTD----|Earnings: Hrs--YTD--Amt-|Deductions:--------|---YTD----Target------Taken|
Bday:                Gross:
Hire:01262004        FCTxD:
Term:02222004        FDTxD:
Rehr:                FICA:
Full:01262004        FIT:
Paid:02132004        SIT:
Lras:01262004        CITY:
                     SDI:
Unit:MONT    Dept:020026    FIT:   0.0000    Deduc:
Phone:    S  FTT: 0  SIT:T   SIT:   0.0000    Ncash:
Claim:
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H  5.5000

---

ID:01520932 SSN:
NIXON, DEMARQUES H

|---Dates---|Gross:|---YTD----|Earnings: Hrs--YTD--Amt-|Deductions:--------|---YTD----Target------Taken|
Bday:                Gross:
Hire:07052004        FCTxD:
Term:09232004        FDTxD:
Rehr:                FICA:
Full:07052004        FIT:
Paid:08272004        SIT:
Lras:07052004        CITY:
                     SDI:
Unit:MONT    Dept:020027    FIT:   0.0000    Deduc:
Phone:    S  FTT: 0  SIT:T   SIT:   0.0000    Ncash:
Claim:
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H  6.5000

---

ID:01520011 SSN:
OWENS, TERESA

|---Dates---|Gross:|---YTD----|Earnings: Hrs--YTD--Amt-|Deductions:--------|---YTD----Target------Taken|
Bday:                Gross:
Hire:07292002        FCTxD:
Term:                FDTxD:
Rehr:                FICA:
Full:07292002        FIT:
Paid:12312004        SIT:
Lras:07292002        CITY:
                     SDI:
Unit:MONT    Dept:020020    FIT:   0.0000    Deduc:
Phone:    S  FTT: 1  SIT:A   SIT:   0.0000    Ncash:
Claim:
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H  8.8400

---

ID:01520438 SSN:
PALMER, JOANN ANN PALMER

|---Dates---|Gross:|---YTD----|Earnings: Hrs--YTD--Amt-|Deductions:--------|---YTD----Target------Taken|
Bday:                Gross:
Hire:05012003        FCTxD:
Term:                FDTxD:
Rehr:                FICA:
Full:                FIT:
Paid:12312004        SIT:
Lras:05012003        CITY:
                     SDI:
Unit:MONT    Dept:010012    FIT:   0.0000    Deduc:
Phone:    S  FTT: 7  SIT:A   SIT:   0.0000    Ncash:
Claim:
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H  7.8500

CONFIDENTIAL

MV 00592

```
CORP MONTGOMERY VENTURES, LLC              RPT - Condensed Employee Master           PAGE  11      Paymaxx, Inc.
                                                                                                   12/27/04  10:20

ID:01520896 SSN:              |-----Dates-----|          -YTD--  |Earnings: Hrs--YTD--Amt--|Deductions:------YTD------Target------Taken|
REESE, SANDRA E               |Bday:           |Gross:           |
                              |Hire:06072004   |FdTxb:           |
                              |Term:11112004   |FdTxb:           |
                              |Rehf:           |FICA:            |
Unit:MONT       Dept:020026   |Full:06072004   |FIT:             |
Phone:                        |Paid:08272004   |SIT:             |
Claim: S FIT: 3 SIT: 3        |Lras:06072004   |CITY:            |
Tax Modules:AL    AL Add      |                |SDI:             |
Bank:MONT Freq:26 H  6.5000   |FIT:   0.0000   |Deduc:           |
                              |SIT:   0.0000   |Ncash:           |

ID:01521014 SSN:              |-----Dates-----|          -YTD--  |Earnings: Hrs--YTD--Amt--|Deductions:------YTD------Target------Taken|
RIVERS, LELA S                |Bday:           |Gross:           |
                              |Hire:10222004   |FdTxb:           |
                              |Term:           |FdTxb:           |
                              |Rehf:           |FICA:            |
Unit:MONT       Dept:010012   |Full:10222004   |FIT:             |
Phone:            Stat:A      |Paid:12312004   |SIT:             |
Claim: M FIT: 3 SIT: 0        |Lras:           |CITY:            |
Tax Modules:AL    AL Add      |                |SDI:             |
Bank:MONT Freq:26 H  7.5000   |FIT:   0.0000   |Deduc:           |
                              |SIT:   0.0000   |Ncash:           |

ID:01520017 SSN:              |-----Dates-----|          -YTD--  |Earnings: Hrs--YTD--Amt--|Deductions:------YTD------Target------Taken|
ROGERS, NELLIE                |Bday:           |Gross:           |
                              |Hire:07292002   |FdTxb:           |
                              |Term:           |FdTxb:           |
                              |Rehf:           |FICA:            |
Unit:MONT       Dept:020026   |Full:07292002   |FIT:             |
Phone:            Stat:A      |Paid:12312004   |SIT:             |
Claim: S FIT: 0 SIT: 0        |Lras:07292002   |CITY:            |
Tax Modules:AL    AL Add      |                |SDI:             |
Bank:MONT Freq:26 H  7.4800   |FIT:   0.0000   |Deduc:           |
                              |SIT:   0.0000   |Ncash:           |

ID:01520915 SSN:              |-----Dates-----|          -YTD--  |Earnings: Hrs--YTD--Amt--|Deductions:------YTD------Target------Taken|
SHACKELFORD, SHIRLEY  A       |Bday:           |Gross:           |
                              |Hire:06142004   |FdTxb:           |
                              |Term:12282004   |FdTxb:           |
                              |Rehf:           |FICA:            |
Unit:MONT       Dept:020026   |Full:06142004   |FIT:             |
Phone:            Stat:T      |Paid:09242004   |SIT:             |
Claim: S FIT: 5 SIT: 4        |Lras:06142004   |CITY:            |
Tax Modules:AL    AL Add      |                |SDI:             |
Bank:MONT Freq:26 H  6.5000   |FIT:   0.0000   |Deduc:           |
                              |SIT:   0.0000   |Ncash:           |
```

CONFIDENTIAL

MV 00593

CORP MONTGOMERY VENTURES, LLC

RPT - Condensed Employee Master

PAGE 12    Paymaxx, Inc.    12/27/04    10:20

ID:01520990 SSN:
SMITH, MARQUITA S

|  | --------Dates------- | Gross: | YTD------ | Earnings: Hrs--YTD--Amt- | Deductions: | YTD-----Target-----Taken |
|---|---|---|---|---|---|---|
| | Bday: | Gross: | | | | |
| | Hire:10072004 | FcTxb: | | | | |
| Dept:020026 | Term:12012004 | FdTxb: | | | | |
| Stat:T | Rehi: | FICA: | | | | |
| | Full:11072004 | FIT: | | | | |
| | Paid:12032004 | SIT: | | | | |
| Claim: S FIT: 4 SIT: 4 | Lras:10072004 | CITY: | | | | |
| Tax Modules:AL | | SDI: | | | | |
| AL Add | FIT: 0.0000 | Deduc: | | | | |
| Bank:MONT Freq:26 H 6.2500 | SIT: 0.0000 | Ncash: | | | | |

Unit:MONT
Phone:

ID:01520023 SSN:
STALLINGS, MARY

|  | --------Dates------- | Gross: | YTD------ | Earnings: Hrs--YTD--Amt- | Deductions: | YTD-----Target-----Taken |
|---|---|---|---|---|---|---|
| | Bday: | Gross: | | | | |
| | Hire:07292002 | FcTxb: | | | | |
| Dept:020025 | Term: | FdTxb: | | | | |
| Stat:A | Rehi: | FICA: | | | | |
| | Full:07292002 | FIT: | | | | |
| | Paid:12212004 | SIT: | | | | |
| Claim: S FIT: 3 SIT: 0 | Lras:07292002 | CITY: | | | | |
| Tax Modules:AL | | SDI: | | | | |
| AL Add | FIT: 0.0000 | Deduc: | | | | |
| Bank:MONT Freq:26 H 8.5400 | SIT: 0.0000 | Ncash: | | | | |

Unit:MONT
Phone:

ID:01520917 SSN:
STOKES, BRIAN N

|  | --------Dates------- | Gross: | YTD------ | Earnings: Hrs--YTD--Amt- | Deductions: | YTD-----Target-----Taken |
|---|---|---|---|---|---|---|
| | Bday: | Gross: | | | | |
| | Hire:06242004 | FcTxb: | | | | |
| Dept:010012 | Term:08012004 | FdTxb: | | | | |
| Stat:T | Rehi: | FICA: | | | | |
| | Full:06242004 | FIT: | | | | |
| | Paid:07302004 | SIT: | | | | |
| Claim: S FIT: 0 SIT: 0 | Lras:06242004 | CITY: | | | | |
| Tax Modules:AL | | SDI: | | | | |
| AL Add | FIT: 0.0000 | Deduc: | | | | |
| Bank:MONT Freq:26 H 7.0000 | SIT: 0.0000 | Ncash: | | | | |

Unit:MONT
Phone:

ID:01520770 SSN:
STONE, BRENDA L

|  | --------Dates------- | Gross: | YTD------ | Earnings: Hrs--YTD--Amt- | Deductions: | YTD-----Target-----Taken |
|---|---|---|---|---|---|---|
| | Bday: | Gross: | | | | |
| | Hire:02192004 | FcTxb: | | | | |
| Dept:020026 | Term:06202004 | FdTxb: | | | | |
| Stat:T | Rehi: | FICA: | | | | |
| | Full:02192004 | FIT: | | | | |
| | Paid:06182004 | SIT: | | | | |
| Claim: S FIT: 0 SIT: 0 | Lras:02192004 | CITY: | | | | |
| Tax Modules:AL | | SDI: | | | | |
| AL Add | FIT: 0.0000 | Deduc: | | | | |
| Bank:MONT Freq:26 H 6.0000 | SIT: 0.0000 | Ncash: | | | | |

Unit:MONT
Phone:

CONFIDENTIAL

MV 00594

CORP MONTGOMERY VENTURES, LLC                RPT - Condensed Employee Master                PAGE   13        Paymaxx, Inc.
                                                                                                            12/27/04    10:20

ID:01520018 SSN:                    |----Dates----|--YTD----|--Earnings: Hrs---YTD--Amt-|Deductions:--|-------YTD----Target------Taken|
THOMAS, OLA                         |Bday:t       |Gross:
                                    |Hire:07292002|FCTxb:
                                    |Term:11112004|FdTxb:
Unit:MONT       Dept:020026         |Rehr:        |FICA:
Phone:               Stat:T         |Full:07292002|FIT:
Claim: S FIT: 0 SIT: 0              |Paid:06182004|SIT:
Tax Modules:AL   AL Add             |Lras:07292002|CITY:
Bank:MONT Freq:26 H   6.7500        |             |SDI:
                                    |FIT:  0.0000 |Deduc:
                                    |SIT:  0.0000 |Ncash:

ID:01520729 SSN:                    |----Dates----|--YTD----|--Earnings: Hrs---YTD--Amt-|Deductions:--|-------YTD----Target------Taken|
TINDALL, HENRY P                    |Bday:        |Gross:
                                    |Hire:12012003|FCTxb:
                                    |Term:06292004|FdTxb:
Unit:MONT       Dept:060040         |Rehr:        |FICA:
Phone:               Stat:T         |Full:06182004|FIT:
Claim: S FIT: 0 SIT: 0              |Paid:06182004|SIT:
Tax Modules:AL   AL Add             |Lras:12012003|CITY:
Bank:MONT Freq:26 H  13.0000        |             |SDI:
                                    |FIT:  0.0000 |Deduc:
                                    |SIT:  0.0000 |Ncash:

ID:01520879 SSN:                    |----Dates----|--YTD----|--Earnings: Hrs---YTD--Amt-|Deductions:--|-------YTD----Target------Taken|
TURNER, TERRI D                     |Bday:        |Gross:
                                    |Hire:05222004|FCTxb:
                                    |Term:        |FdTxb:
Unit:MONT       Dept:010012         |Rehr:        |FICA:
Phone:               Stat:A         |Full:05222004|FIT:
Claim: S FIT: 0 SIT: 0              |Paid:12312004|SIT:
Tax Modules:AL   AL Add             |Lras:10182004|CITY:
Bank:MONT Freq:26 H   7.5000        |             |SDI:
                                    |FIT:  0.0000 |Deduc:
                                    |SIT:  0.0000 |Ncash:

ID:01520914 SSN:                    |----Dates----|--YTD----|--Earnings: Hrs---YTD--Amt-|Deductions:--|-------YTD----Target------Taken|
WATTS, HEATHER G                    |Bday:        |Gross:
                                    |Hire:06242004|FCTxb:
                                    |Term:        |FdTxb:
Unit:MONT       Dept:080030         |Rehr:        |FICA:
Phone:               Stat:A         |Full:06242004|FIT:
Claim: M FIT: 1 SIT: 0              |Paid:12312004|SIT:
Tax Modules:AL   AL Add             |Lras:06242004|CITY:
Bank:MONT Freq:26 S  1346.15        |             |SDI:
                                    |FIT:  0.0000 |Deduc:
                                    |SIT:  0.0000 |Ncash:

CONFIDENTIAL

MV 00595

CORP MONTGOMERY VENTURES, LLC                RPT - Condensed Employee Master                PAGE  14        Paymaxx, Inc.
                                                                                                          12/21/04   10:20

```
ID:01520020 SSN:              |------Dates------|---YTD----|Earnings: Hrs---YTD---Amt-|Deductions:|------YTD----Target----Taken|
WHITE, BETTY .H               |Bday:             |Gross:    |
                              |Hire:07292002     |FcTxb:    |
                              |Term:             |FdTxb:    |
Unit:MONT    Dept:020026      |Rehr:             |FICA:     |
Phone:                        |Full:07292002     |SIT:      |
Claim: S FIT: 3 SIT: 3        |Paid:12312004     |CITY:     |
Tax Modules:AL    AL Add      |Lras:07292002     |SDI:      |
Bank:MONT Freq:26 H   7.1900  |FIT:    0.0000    |Deduc:    |
                              |SIT:    0.0000    |NCash:    |

ID:01520752 SSN:              |------Dates------|---YTD----|Earnings: Hrs---YTD---Amt-|Deductions:|------YTD----Target----Taken|
WHITE, ROBERTA D              |Bday:01262004     |Gross:    |
                              |Hire:01262004     |FcTxb:    |
                              |Term:             |FdTxb:    |
Unit:MONT    Dept:020026      |Rehr:             |FICA:     |
Phone:                        |Full:01262004     |FIT:      |
Claim: S FIT: 3 SIT: 3        |Paid:12312004     |SIT:      |
Tax Modules:AL                |Lras:01262004     |CITY:     |
Bank:MONT Freq:26 H   6.5000  |FIT:    0.0000    |SDI:      |
                              |SIT:    0.0000    |Deduc:    |
                              |                  |NCash:    |

ID:01520678 SSN:              |------Dates------|---YTD----|Earnings: Hrs---YTD---Amt-|Deductions:|------YTD----Target----Taken|
WILKINS, SONYA R              |Bday:             |Gross:    |
                              |Hire:10182003     |FcTxb:    |
                              |Term:01292004     |FdTxb:    |
Unit:MONT    Dept:020026      |Rehr:             |FICA:     |
Phone:                        |Full:10182003     |FIT:      |
Claim: S FIT: 3 SIT: 2        |Paid:02132004     |SIT:      |
Tax Modules:AL    AL Add      |Lras:10182003     |CITY:     |
Bank:MONT Freq:26 H   6.5000  |FIT:    0.0000    |SDI:      |
                              |SIT:    0.0000    |Deduc:    |
                              |                  |NCash:    |

ID:01520769 SSN:              |------Dates------|---YTD----|Earnings: Hrs---YTD---Amt-|Deductions:|------YTD----Target----Taken|
WILLIAMS, DORIS A             |Bday:             |Gross:    |
                              |Hire:02192004     |FcTxb:    |
                              |Term:03222004     |FdTxb:    |
Unit:MONT    Dept:020026      |Rehr:             |FICA:     |
Phone:                        |Full:02192004     |FIT:      |
Claim: S FIT: 0 SIT: 0        |Paid:03262004     |SIT:      |
Tax Modules:AL                |Lras:02192004     |CITY:     |
Bank:MONT Freq:26 H   6.0000  |FIT:    0.0000    |SDI:      |
                              |SIT:    0.0000    |Deduc:    |
                              |                  |NCash:    |
```

CONFIDENTIAL

MV 00596

```
CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE  15    Paymaxx, Inc.
                                                                                                               12/27/04   10:20

ID:01520878 SSN:                 |-----Dates------|  |Gross:         -----YTD------|Earnings: Hrs--YTD----Amt-|Deductions:-------------------YTD-----Target-------Taken|
WILLIAMS, TIFFANI W              |Bday:            |  |FdTxb:
                                 |Hire:05202004    |  |FcTxb:
                                 |Term:11112004    |  |FdTxp:
                                 |Rehr:            |  |FICA:
                                 |Full:05202004    |  |FIT:
Unit:MONT        Dept:010012     |Paid:11052004    |  |SIT:
Phone:                  Stat:T   |Lras:05202004    |  |CITY:
Claim: S FIT: 0 SIT: 0           |                 |  |SDI:
Tax Modules:AL      AL Add FIT:   0.0000  |Deduc:
Bank:MONT Freq:26 H    7.2500  SIT:   0.0000  |Ncash:

ID:01520838 SSN:                 |-----Dates------|  |Gross:         -----YTD------|Earnings: Hrs--YTD----Amt-|Deductions:-------------------YTD-----Target-------Taken|
WILSON, KEONIA J                 |Bday:            |  |FcTxb:
                                 |Hire:04132004    |  |FdTxp:
                                 |Term:05172004    |  |FICA:
                                 |Rehr:            |  |FIT:
                                 |Full:04132004    |  |SIT:
Unit:MONT        Dept:010012     |Paid:05072004    |  |CITY:
Phone:                  Stat:T   |Lras:04132004    |  |SDI:
Claim: S FIT: 2 SIT: 0           |                 |  |Deduc:
Tax Modules:AL      AL Add FIT:   0.0000  |Ncash:
Bank:MONT Freq:26 H    6.0000  SIT:   0.0000
```

CONFIDENTIAL

MV 00597

**Exhibit B to Kish Affidavit**

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE    1    Paymaxx, Inc.
                                                                                                          12/27/05    12:56

```
ID:01521015 SSN:                  --Dates--------        |Gross:        -----YTD----|--Earnings: Hrs--YTD--Amt--|Deductions:-------YTD------Amt--Deductions:-------YTD-----Target------Taken|
ANTONELLO, JEANNE C               Bday:                  |FCTxb:
                                  Hire:11082004          |FdTxb:
                                  Term:                  |FICA:
                                  Rehr:                  |FIT:
Unit:MONT          Dept:050006    Full:11082004          |SIT:
Phone:                  Stat:A    Paid:08122005          |CCTy:
Claim: S FIT: 1 SIT: 1            Lras:                  |SDI:
Tax Modules:AL       AL Add       ------                |Deduc:
Bank:MONT Freq:26 H  12.0000      FIT:   0.0000          |Ncash:
                                  SIT:   0.0000

ID:01521250 SSN:                  --Dates--------        |Gross:        -----YTD----|--Earnings: Hrs--YTD--Amt--|Deductions:-------YTD-----Target------Taken|
BAXTER, ALVIN T                   Bday:                  |FCTxb:
                                  Hire:07182005          |FdTxb:
                                  Term:10102005          |FICA:
                                  Rehr:                  |FIT:
Unit:MONT          Dept:010012    Full:07182005          |SIT:
Phone:                  Stat:T    Paid:10212005          |CCTy:
Claim: S FIT: 0 SIT: 0            Lras:                  |SDI:
Tax Modules:AL       AL Add       ------                |Deduc:
Bank:MONT Freq:26 H  7.5000       FIT:   0.0000          |Ncash:
                                  SIT:   0.0000

ID:01520022 SSN:                  --Dates--------        |Gross:        -----YTD----|--Earnings: Hrs--YTD--Amt--|Deductions:-------YTD-----Target------Taken|
BENEFIELD, ANNETTE                Bday:                  |FCTxb:
                                  Hire:07292002          |FdTxb:
                                  Term:                  |FICA:
                                  Rehr:                  |FIT:
Unit:MONT          Dept:020025    Full:07292002          |SIT:
Phone:                  Stat:A    Paid:09302005          |CCTy:
Claim: S FIT: 0 SIT: 0            Lras:09022005          |SDI:
Tax Modules:AL       AL Add       ------                |Deduc:
Bank:MONT Freq:26 H  8.4200       FIT:   0.0000          |Ncash:
                                  SIT:   0.0000

ID:01521301 SSN:                  --Dates--------        |Gross:        -----YTD----|--Earnings: Hrs--YTD--Amt--|Deductions:-------YTD-----Target------Taken|
BOONE, SYLVIA B                   Bday:                  |FCTxb:
                                  Hire:09122005          |FdTxb:
                                  Term:                  |FICA:
                                  Rehr:                  |FIT:
Unit:MONT          Dept:020026    Full:09122005          |SIT:
Phone:                  Stat:A    Paid:12302005          |CCTy:
Claim: S FIT: 0 SIT: 0            Lras:                  |SDI:
Tax Modules:AL       AL Add       ------                |Deduc:
Bank:MONT Freq:26 H  6.5000       FIT:   0.0000          |Ncash:
                                  SIT:   0.0000
```

CONFIDENTIAL

MV 00598

CORP MONTGOMERY VENTURES, LLC          RPT - Condensed Employee Master          PAGE   2     Paymaxx, Inc.
                                                                                            12/27/05   12:56

ID:01521091 SSN:
CECIL, ROSARIO E
```
                              ----Dates----|         -YTD---|Earnings: Hrs--YTD--Amt--|Deductions:---YTD----Target----Taken|
                              Bday:         |Gross:
                              Hire:02142005 |FcTxb:
                              Term:03202005 |FdTxb:
Unit:MONT      Dept:020026    Rehr:         |FICA:
Phone:              Stat:T    Full:02142005 |FIT:
Claim:M FIT: 0 SIT: 0         Paid:02252005 |SIT:
Tax Modules:AL      AL Add    Lras:         |CITY:
Bank:MONT Freq:26 H  6.5000                 |SDI:
                              FIT:  0.0000  |Deduc:
                              SIT:  0.0000  |Ncash:
```

ID:01521329 SSN:
DAVIS, BILLY D
```
                              ----Dates----|         -YTD---|Earnings: Hrs--YTD--Amt--|Deductions:---YTD----Target----Taken|
                              Bday:         |Gross:
                              Hire:10022005 |FcTxb:
                              Term:         |FdTxb:
Unit:MONT      Dept:060042    Rehr:         |FICA:
Phone:              Stat:A    Full:10022005 |FIT:
Claim:S FIT: 8 SIT: 8         Paid:12302005 |SIT:
Tax Modules:AL      AL Add    Lras:         |CITY:
Bank:MONT Freq:26 H 10.0000                 |SDI:
                              FIT:  5.00    |Deduc:
                              SIT:  0.0000  |Ncash:
```

ID:01520296 SSN:
DAVIS, LIONEL S
```
                              ----Dates----|         -YTD---|Earnings: Hrs--YTD--Amt--|Deductions:---YTD----Target----Taken|
                              Bday:         |Gross:
                              Hire:12022002 |FcTxb:
                              Term:07132005 |FdTxb:
Unit:MONT      Dept:010018    Rehr:05172004 |FICA:
Phone:              Stat:T    Full:         |FIT:
Claim:S FIT: 3 SIT: 0         Paid:06172005 |SIT:
Tax Modules:AL      AL Add    Lras:05022005 |CITY:
Bank:MONT Freq:26 H  9.0000                 |SDI:
                              FIT:  0.0000  |Deduc:
                              SIT:  0.0000  |Ncash:
```

ID:01521328 SSN:
DOMINGUEZ, TAMMY P
```
                              ----Dates----|         -YTD---|Earnings: Hrs--YTD--Amt--|Deductions:---YTD----Target----Taken|
                              Bday:         |Gross:
                              Hire:10032005 |FcTxb:
                              Term:         |FdTxb:
Unit:MONT      Dept:050001    Rehr:         |FICA:
Phone:              Stat:A    Full:10032005 |FIT:
Claim:S FIT:99 SIT:99         Paid:12302005 |SIT:
Tax Modules:AL      AL Add    Lras:10032005 |CITY:
Bank:MONT Freq:26 S 2115.38                 |SDI:
                              FIT:  0.0000  |Deduc:
                              SIT:  0.0000  |Ncash:
```

CONFIDENTIAL

MV 00599

CORP MONTGOMERY VENTURES, LLC    RPT - Condensed Employee Master    PAGE 3    Paymaxx, Inc.    12/27/05  12:56

```
ID:01521196 SSN:                 |---Dates---|   |---YTD---|Gross:   |Earnings: Hrs---YTD---Amt-|Deductions:|---YTD----Target----Taken|
BILZEY, JULLUAN L                Bday:          |FCtxb:        |REG
                                 Hire:05022005|FdTxb:
                                 Term:11102005|FICA:
Unit:MONT        Dept:020027     Rehr:          |FIT:
Phone:              Stat:T       Full:05022005|STT:
Claim: S FIT: 4 SIT: 4           Paid:06032005|CITY:
Tax Modules:AL    AL Add         Lras:          |SDI:
Bank:MONT Freq:26 H  6.5000      FIT: 0.0000 |Deduc:
                                 SIT: 0.0000 |Ncash:

ID:01520083 SSN:                 |---Dates---|   |---YTD---|Gross:   |Earnings: Hrs---YTD---Amt-|Deductions:|---YTD----Target----Taken|
EPPLIN, TODD B                   Bday:          |FCtxb:        |BNS
                                 Hire:05172004|FdTxb:        |MGR
                                 Term:08312005|FICA:        |SAL
                                 Rehr:          |FIT:         |VAC
Unit:MONT        Dept:050001     Full:05172004|STT:
Phone:              Stat:T       Paid:12302005|CITY:
Claim: S FIT: 6 SIT: 6           Lras:05172004|SDI:
Tax Modules:AL    AL Add         FIT: 0.0000 |Deduc:
Bank:MONT Freq:26 S 2307.69      SIT: 0.0000 |Ncash:

ID:01520598 SSN:                 |---Dates---|   |---YTD---|Gross:   |Earnings: Hrs---YTD---Amt-|Deductions:|---YTD----Target----Taken|
FERRELL, PATRICIA A              Bday:          |FCtxb:        |BNS
                                 Hire:01172005|FdTxb:        |HOL
                                 Term:          |FICA:        |INCN
Unit:MONT        Dept:020020     Full:01172005|FIT:         |MGR
Phone:              Stat:A       Paid:12302005|STT:         |SAL
Claim: S FIT: 1 SIT: 1           Lras:          |CITY:
Tax Modules:AL    AL Add         FIT: 0.0000 |SDI:
Bank:MONT Freq:26 S  900.00      SIT: 0.0000 |Deduc:
                                              |Ncash:

ID:01521016 SSN:                 |---Dates---|   |---YTD---|Gross:   |Earnings: Hrs---YTD---Amt-|Deductions:|---YTD----Target----Taken|
FREDERICK, WILLIAMS L            Bday:          |FCtxb:        |BNS
                                 Hire:11122004|FdTxb:        |REG
                                 Term:03202005|FICA:
Unit:MONT        Dept:010018     Full:11122004|FIT:
Phone:              Stat:T       Paid:01142005|STT:
Claim: S FIT: 1 SIT: 1           Lras:          |CITY:
Tax Modules:AL    AL Add         FIT: 0.0000 |SDI:
Bank:MONT Freq:26 H  7.5000      SIT: 0.0000 |Deduc:
                                              |Ncash:
```

CONFIDENTIAL

MV 00600

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE   4      Paymaxx, Inc.
                                                                                                              12/27/05   12:56

---

ID:01521152 SSN:
GREEN, LESSLIE M

|Earnings: Hrs---YTD---Amt-|Deductions:-------YTD------Target-----Taken|
|BNS
|HOL
|REG
|RETR

Unit:MONT    Dept:020026
Phone:
Claim: S FIT: 2 SIT: Stat:A
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H    6.5000

|----Dates----|      |-----YTD------
|Bday:04112005|Gross:
|Hire:04112005|FdTxb:
|Term:        |FdTxb:
|Rehr:        |FICA:
|Full:04112005|FIT:
|Paid:12302005|SIT:
|Lras:        |CTY:
|             |SDI:
|FIT:  0.0000 |Deduc:
|SIT:  0.0000 |Ncash:

---

ID:01521222 SSN:
HALL, SHEILA C

|Earnings: Hrs---YTD---Amt-|Deductions:-------YTD------Target-----Taken|
|HOL
|OVT
|REG
|RETR

Unit:MONT    Dept:060042
Phone:
Claim: S FIT: 6 SIT: Stat:A
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H    9.0000

|----Dates----|      |-----YTD------
|Bday:06102005|Gross:
|Hire:06102005|FcTxb:
|Term:        |FdTxb:
|Rehr:        |FICA:
|Full:06102005|FIT:
|Paid:12302005|SIT:
|Lras:10312005|CTY:
|             |SDI:
|FIT:  0.0000 |Deduc:
|SIT:  0.0000 |Ncash:

---

ID:01521197 SSN:
HAMILTON, LATCHANDA F

|Earnings: Hrs---YTD---Amt-|Deductions:-------YTD------Target-----Taken|
|REG

Unit:MONT    Dept:020026
Phone:
Claim: S FIT: 0 SIT:0 Stat:T
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H    6.5000

|----Dates----|      |-----YTD------
|Bday:05022005|Gross:
|Hire:05022005|FcTxb:
|Term:07132005|FdTxb:
|Rehr:        |FICA:
|Full:05022005|FIT:
|Paid:05202005|SIT:
|Lras:        |CTY:
|             |SDI:
|FIT:  0.0000 |Deduc:
|SIT:  0.0000 |Ncash:

---

ID:01521204 SSN:
HAMILTON, FELICIA

|Earnings: Hrs---YTD---Amt-|Deductions:-------YTD------Target-----Taken|
|HOL
|OVT
|REG

Unit:MONT    Dept:020026
Phone:
Claim: S FIT: 3 SIT: Stat:A
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H    6.5000

|----Dates----|      |-----YTD------
|Bday:05152005|Gross:
|Hire:05152005|FcTxb:
|Term:        |FdTxb:
|Rehr:        |FICA:
|Full:05152005|FIT:
|Paid:12302005|SIT:
|Lras:        |CTY:
|             |SDI:
|FIT:  0.0000 |Deduc:
|SIT:  0.0000 |Ncash:

---

CONFIDENTIAL

MV 00601

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE 5    Paymaxx, Inc.
                                                                                                            12/27/05  12:56

```
ID:01521392  SSN:                    ----Dates----          ----YTD----  |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HAMMONTREE, MAUREEN M                 Bday:11182005   Gross:               |REG
                                      Hire:11182005   FCTxb:
                                      Term:           FdTxb:
                                      Rehr:           FICA:
Unit:MONT     Dept:060042             Full:11182005   SIT:
Phone:  S  Frm:  4  SIT:A   Stat:A    Paid:12302005   CITY:
Claim: S  Frm:  4  SIT:  4            Lras:           SDI:
Tax Modules:AL    AL Add              -----------     Deduc:
Bank:MONT Freq:26 H   9.0000          FIT:   0.0000   NCash:
                                      SIT:   0.0000
```

```
ID:01520014  SSN:                    ----Dates----          ----YTD----  |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HARRIS, MARGARET R                    Bday:07292002   Gross:               |BNS
                                      Hire:07292002   FCTxb:               |HOL
                                      Term:           FdTxb:               |OVT
                                      Rehr:           FICA:                |REG
Unit:MONT     Dept:020026             Full:07292002   FIT:                 |RETR
Phone:  Frm:  0  SIT:O   Stat:A       Paid:12302005   SIT:                 |VAC
Claim: M  FIT:  0  SIT: 2             Lras:09032005   CITY:
Tax Modules:AL                        -----------     SDI:
Bank:MONT Freq:26 H   8.4900          FIT:   0.0000   Deduc:
                                      SIT:   0.0000   NCash:
```

```
ID:01520015  SSN:                    ----Dates----          ----YTD----  |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HARRIS, RUBY L                        Bday:07292002   Gross:               |BNS
                                      Hire:07292002   FCTxb:               |HOL
                                      Term:           FdTxb:               |OVT
                                      Rehr:           FICA:                |REG
Unit:MONT     Dept:020026             Full:07292002   FIT:                 |VAC
Phone:  S  FIT:  0  SIT:O   Stat:A    Paid:12302005   SIT:
Claim: S  FIT:  0  SIT:  0            Lras:09032005   CITY:
Tax Modules:AL    AL Add              -----------     SDI:
Bank:MONT Freq:26 H   8.6000          FIT:   0.0000   Deduc:
                                      SIT:   0.0000   NCash:
```

```
ID:01520962  SSN:                    ----Dates----          ----YTD----  |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HOLLEY, JULIUS R                      Bday:08182004   Gross:               |IU
                                      Hire:08182004   FCTxb:               |HNON
                                      Term:11102005   FdTxb:               |OVT
                                      Rehr:           FICA:                |REG
Unit:MONT     Dept:020027             Full:08182004   FIT:
Phone:  S  FIT:  0  SIT:O   Stat:T    Paid:05062005   SIT:
Claim: S  FIT:  0  SIT:  0            Lras:08182004   CITY:
Tax Modules:AL    AL Add              -----------     SDI:
Bank:MONT Freq:26 H   6.5000          FIT:   0.0000   Deduc:
                                      SIT:   0.0000   NCash:
```

CONFIDENTIAL

MV 00602

CORP MONTGOMERY VENTURES, LLC               RPT - Condensed Employee Master               PAGE   6     Paymaxx, Inc.
                                                                                                      12/27/05   12:56

```
ID:01520021 SSN:                    ----Dates----    |----YTD----   |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HOLLEY, LESLIE                      Bday:             |Gross:        |BNS
                                    Hire:07292002     |FCTxb:        |HOL
                                    Term:             |FGTxb:        |INCN
Unit:MONT      Dept:060041          Rehr:             |FICA:         |OVT
Phone:                   Stat:A     Full:07292002     |FIT:          |REG
Claim: S FIT: 0 SIT: 0              Paid:06172005     |SIT:          |RETR
Tax Modules:AL     AL Add           Lras:07292002     |CITY:         |VAC
Bank:MONT Freq:26 H  7.5500         FIT:   0.0000     |SDI:          |
                                    SIT:   0.0000     |Deduc:        |
                                                      |Ncash:        |

ID:01521137 SSN:                    ----Dates----    |----YTD----   |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HORNE, ALANDAS                      Bday:03252005     |Gross:        |BNS
                                    Hire:03252005     |FCTxb:        |HOL
                                    Term:             |FGTxb:        |INCN
Unit:MONT      Dept:020027          Rehr:             |FICA:         |OVT
Phone: S FIT: 2 SIT: 2   Stat:A     Full:03252005     |FIT:          |REG
Claim: S FIT: 2 SIT: 2              Paid:12302005     |SIT:          |
Tax Modules:AL     AL Add           Lras:             |CITY:         |
Bank:MONT Freq:26 H  6.5000         FIT:   0.0000     |SDI:          |
                                    SIT:   0.0000     |Deduc:        |
                                                      |Ncash:        |

ID:01520521 SSN:                    ----Dates----    |----YTD----   |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
HOUGHTON, BERTHA L                  Bday:             |Gross:        |HOL
                                    Hire:07182003     |FCTxb:        |REG
                                    Term:11102005     |FGTxb:        |VAC
Unit:MONT      Dept:020025          Rehr:             |FICA:         |
Phone: S FIT: 0 SIT: 0   Stat:T     Full:             |FIT:          |
Claim: S FIT: 0 SIT: 0              Paid:01142005     |SIT:          |
Tax Modules:AL     AL Add           Lras:07182003     |CITY:         |
Bank:MONT Freq:26 H  6.6300         FIT:   0.0000     |SDI:          |
                                    SIT:   0.0000     |Deduc:        |
                                                      |Ncash:        |

ID:01521205 SSN:                    ----Dates----    |----YTD----   |Earnings: Hrs--YTD--Amt-|Deductions:----------YTD----Target------Taken|
JOHNSON, CHERLYNTHIA A              Bday:             |Gross:        |REG
                                    Hire:05162005     |FCTxb:        |
                                    Term:             |FGTxb:        |
Unit:MONT      Dept:020026          Rehr:             |FICA:         |
Phone: S FIT: 2 SIT: 2   Stat:A     Full:05162005     |FIT:          |
Claim: S FIT: 2 SIT: 2              Paid:07012005     |SIT:          |
Tax Modules:AL     AL Add           Lras:             |CITY:         |
Bank:MONT Freq:26 H  6.5000         FIT:   0.0000     |SDI:          |
                                    SIT:   0.0000     |Deduc:        |
                                                      |Ncash:        |
```

CONFIDENTIAL

MV 00603

CORP MONTGOMERY VENTURES, LLC              RPT - Condensed Employee Master              PAGE 7          Paymaxx, Inc.
                                                                                                       12/27/05   12:56

ID:01521202 SSN:
JOHNSON, SHONDIA E

Unit:MONT        Dept:010012
Phone:                Stat:T
Claim: S FIT: 1 SIT: T
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H   7.5000

---Dates---
Bday:
Hire:05162005
Term:07132005
Rehr:
Full:
Paid:06172005
Lras:
FIT: 0.0000   SIT: 0.0000

---YTD---  690 or
Gross: FCTxD: FDTxD: FICA: FIT: SIT: CITY: SDI: Deduc: NCash:

Earnings: Hrs---YTD--Amt-  Deductions: ---YTD----Target-----Taken
REG

ID:01521283 SSN:
JONES, GABRILLA M

Unit:MONT        Dept:020027
Phone:                Stat:A
Claim: S FIT: 1 SIT: A
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H   7.0000

---Dates---
Bday:
Hire:08222005
Term:
Rehr:
Full:08222005
Paid:12302005
Lras:10312005
FIT: 0.0000   SIT: 0.0000

---YTD---
Gross: FCTxD: FDTxD: FICA: FIT: SIT: CITY: SDI: Deduc: NCash:

Earnings: Hrs---YTD--Amt-  Deductions: ---YTD----Target-----Taken
HOL
OVT
REG

ID:01521201 SSN:
JONES, MICHELLE D

Unit:MONT        Dept:010012
Phone:                Stat:A
Claim: S FIT: 0 SIT: 0
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H   7.5000

---Dates---
Bday:
Hire:05162005
Term:
Rehr:
Full:
Paid:12302005
Lras:
FIT: 0.0000   SIT: 0.0000

---YTD---
Gross: FCTxD: FDTxD: FICA: FIT: SIT: CITY: SDI: Deduc: NCash:

Earnings: Hrs---YTD--Amt-  Deductions: ---YTD----Target-----Taken
BNS
HOL
OVT
REG
RETR

ID:01521087 SSN:
KNIGHT, GLORIA L

Unit:MONT        Dept:020026
Phone:                Stat:A
Claim: M FIT: 2 SIT: 2
Tax Modules:AL        AL Add
Bank:MONT Freq:26 H   6.5000

---Dates---
Bday:
Hire:02142005
Term:
Rehr:
Full:02142005
Paid:12302005
Lras:
FIT: 0.0000   SIT: 0.0000

---YTD---
Gross: FCTxD: FDTxD: FICA: FIT: SIT: CITY: SDI: Deduc: NCash:

Earnings: Hrs---YTD--Amt-  Deductions: ---YTD----Target-----Taken
BNS
HOL
REG

CONFIDENTIAL

MV 00604

CORP MONTGOMERY VENTURES, LLC     RPT - Condensed Employee Master     PAGE   8     Paymaxx, Inc<br>
12/27/05   12:56

```
ID:01521086 SSN:                |---Dates------|          -YTD-------|Earnings: Hrs---YTD--Amt-|Deductions:--------------YTD----Target------Taken|
LANE, LOWELL G                  |Bday:          |Gross:               |BNS
                                |Hire:02072005  |FGTxb:               |HOL
                                |Term:          |FGTxb:               |MGR
Unit:MONT        Dept:060040    |Rehr:          |FICA:                |SAL
Phone:              Stat:A      |Full:02072005  |FIT:
Claim: M FIT: 1 SIT: 1          |Paid:12302005  |SIT:
Tax Modules:AL      AL Add      |Lras:          |CITY:
Bank:MONT Freq:26  S  900.00    |               |SDI:
                                |FIT:  0.0000   |Deduc:
                                |SIT:  0.0000   |Ncash:

ID:01520771 SSN:                |---Dates------|          -YTD-------|Earnings: Hrs---YTD--Amt-|Deductions:--------------YTD----Target------Taken|
LEE, MARY M                     |Bday:          |Gross:               |BNS
                                |Hire:02142004  |FGTxb:               |HOL
                                |Term:          |FGTxb:               |OVT
Unit:MONT        Dept:020026    |Rehr:          |FICA:                |REG
Phone:              Stat:A      |Full:02142004  |FIT:                 |VAC
Claim: S FIT: 3 SIT: 0          |Paid:12302005  |SIT:
Tax Modules:AL      AL Add      |Lras:09032005  |CITY:
Bank:MONT Freq:26  H  6.6300    |               |SDI:
                                |FIT:  0.0000   |Deduc:
                                |SIT:  0.0000   |Ncash:

ID:01520004 SSN:                |---Dates------|          -YTD-------|Earnings: Hrs---YTD--Amt-|Deductions:--------------YTD----Target------Taken|
LOVE, JENNIFER                  |Bday:          |Gross:               |ADJ
                                |Hire:07292002  |FGTxb:               |BNS
                                |Term:          |FGTxb:               |HOL
Unit:MONT        Dept:010012    |Rehr:          |FICA:                |INCN
Phone:              Stat:A      |Full:07292002  |FIT:                 |OVT
Claim: S FIT: 0 SIT: 0          |Paid:12302005  |SIT:                 |REG
Tax Modules:AL      AL Add      |Lras:09032005  |CITY:                |VAC
Bank:MONT Freq:26  H  8.3400    |               |SDI:
                                |FIT:  0.0000   |Deduc:
                                |SIT:  0.0000   |Ncash:

ID:01520229 SSN:                |---Dates------|          -YTD-------|Earnings: Hrs---YTD--Amt-|Deductions:--------------YTD----Target------Taken|
MARABLE, TODD E                 |Bday:          |Gross:               |REG
                                |Hire:08120002  |FGTxb:
                                |Term:          |FGTxb:
Unit:MONT        Dept:060040    |Rehr:          |FICA:
Phone: M FIT: 0 SIT: 0          |Full:04282003  |FIT:
Claim: M FIT: 0 SIT: 0          |Paid:02112005  |SIT:
Tax Modules:AL      AL Add      |Lras:08120002  |CITY:
Bank:MONT Freq:26  H  13.0000   |               |SDI:
                                |FIT:  0.0000   |Deduc:
                                |SIT:  0.0000   |Ncash:
```

CONFIDENTIAL

MV 00605

CORP MONTGOMERY VENTURES, LLC

RPT - Condensed Employee Master

PAGE    9

Paymaxx, Inc.
12/27/05    12:56

---

**ID:01521351 SSN:**
MARSHALL, BESSIE L

Unit:MONT         Dept:020026
Phone:         Stat:A
Claim: S FIT: 2 SIT: 2
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H    6.5000

```
----Dates----      |          ----YTD---- |Earnings: Hrs---YTD--Amt-|Deductions:----------YTD----Target----Taken|
Bday:              |Gross:               |HOL                      |
Hire:10102005      |FctXb:               |REG                      |
Term:              |FdTxb:               |                         |
Rehr:              |FICA:                |                         |
Full:10102005      |FIT:                 |                         |
Paid:12302005      |SIT:                 |                         |
Lras:              |CITY:                |                         |
                   |SDI:                 |                         |
FIT:  0.0000       |Deduc:               |                         |
SIT:  0.0000       |Ncash:               |                         |
```

---

**ID:01521088 SSN:**
MCDOWELL, JESSICA L

Unit:MONT         Dept:010012
Phone:         Stat:T
Claim: S FIT: 0 SIT: 0
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H    7.5000

```
----Dates----      |          ----YTD---- |Earnings: Hrs---YTD--Amt-|Deductions:----------YTD----Target----Taken|
Bday:              |Gross:               |BNS                      |
Hire:02072005      |FctXb:               |INCN                     |
Term:05232005      |FdTxb:               |OVT                      |
Rehr:              |FICA:                |REG                      |
Full:02072005      |FIT:                 |RETR                     |
Paid:05202005      |SIT:                 |                         |
Lras:              |CITY:                |                         |
                   |SDI:                 |                         |
FIT:  0.0000       |Deduc:               |                         |
SIT:  0.0000       |Ncash:               |                         |
```

---

**ID:01520794 SSN:**
MILLER, GERALDINE S

Unit:MONT         Dept:020026
Phone:         Stat:A
Claim: S FIT: 6 SIT: 3
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H    6.6300

```
----Dates----      |          ----YTD---- |Earnings: Hrs---YTD--Amt-|Deductions:----------YTD----Target----Taken|
Bday:              |Gross:               |BNS                      |
Hire:03062004      |FctXb:               |HOL                      |
Term:              |FdTxb:               |OVT                      |
Rehr:              |FICA:                |REG                      |
Full:03062004      |FIT:                 |RETR                     |
Paid:12302005      |SIT:                 |VAC                      |
Lras:09032005      |CITY:                |                         |
                   |SDI:                 |                         |
FIT:  0.0000       |Deduc:               |                         |
SIT:  0.0000       |Ncash:               |                         |
```

---

**ID:01521284 SSN:**
MITCHELL, LASAUNDRA M

Unit:MONT         Dept:010012
Phone:         Stat:T
Claim: M FIT: 2 SIT: 2
Tax Modules:AL    AL Add
Bank:MONT Freq:26 H    7.5000

```
----Dates----      |          ----YTD---- |Earnings: Hrs---YTD--Amt-|Deductions:----------YTD----Target----Taken|
Bday:              |Gross:               |REG                      |
Hire:08222005      |FctXb:               |                         |
Term:11102005      |FdTxb:               |                         |
Rehr:              |FICA:                |                         |
Full:              |FIT:                 |                         |
Paid:09232005      |SIT:                 |                         |
Lras:              |CITY:                |                         |
                   |SDI:                 |                         |
FIT:  0.0000       |Deduc:               |                         |
SIT:  0.0000       |Ncash:               |                         |
```

CONFIDENTIAL

MV 00606

CORP MONTGOMERY VENTURES, LLC                RPT - Condensed Employee Master                PAGE   10        Paymaxx, Inc.
                                                                                                            12/27/05   12:56

```
ID:01521025 SSN:              |------Dates------|          -YTD-|Earnings: Hrs--YTD--Amt-|Deductions:------YTD------Target------Taken|
MOORE, SABRINA D              |Bday:             Gross:         |BNS
                              |Hire:11152004  FCTxb:           |HOL
                              |Term:          FdTxb:           |REG
                              |Rehr:           FICA:           |
Unit:MONT        Dept:020026  |Full:11152004    FIT:           |
Phone:             Stat:A     |Paid:12302005    SIT:           |
Claim: S FIT: 2  SIT:A        |Lras:            CITY:          |
Tax Modules:AL                |-----            SDI:           |
Bank:MONT Freq:26  H   6.5000 |FIT:  0.0000   Deduc:          |
                              |SIT:  0.0000   Ncash:          |
----------------------------------------------------------------------------------------------------------------------------------
ID:01520829 SSN:              |------Dates------|          -YTD-|Earnings: Hrs--YTD--Amt-|Deductions:------YTD------Target------Taken|
MORRIS, TASHA R               |Bday:             Gross:         |BNS
                              |Hire:04062004  FCTxb:           |HOL
                              |Term:03222005  FdTxb:           |OVT
                              |Rehr:           FICA:           |REG
Unit:MONT        Dept:010012  |Full:04062004    FIT:           |RETR
Phone:           SIT:99 Stat:T|Paid:02112005    SIT:           |
Claim: S FIT:99  SIT:99       |Lras:04062004    CITY:          |
Tax Modules:AL          AL Add|-----            SDI:           |
Bank:MONT Freq:26  H   7.5000 |FIT:  0.0000   Deduc:          |
                              |SIT:  0.0000   Ncash:          |
----------------------------------------------------------------------------------------------------------------------------------
ID:01520992 SSN:              |------Dates------|          -YTD-|Earnings: Hrs--YTD--Amt-|Deductions:------YTD------Target------Taken|
NELSON, COETHA L              |Bday:             Gross:         |BNS
                              |Hire:09202004  FCTxb:           |HOL
                              |Term:          FdTxb:           |REG
                              |Rehr:           FICA:           |
Unit:MONT        Dept:020026  |Full:09202004    FIT:           |
Phone:             Stat:A     |Paid:12302005    SIT:           |
Claim: S FIT: 1  SIT:A        |Lras:09032005    CITY:          |
Tax Modules:AL          AL Add|-----            SDI:           |
Bank:MONT Freq:26  H   6.6300 |FIT:  0.0000   Deduc:          |
                              |SIT:  0.0000   Ncash:          |
----------------------------------------------------------------------------------------------------------------------------------
ID:01520011 SSN:              |------Dates------|          -YTD-|Earnings: Hrs--YTD--Amt-|Deductions:------YTD------Target------Taken|
OWENS, TERESA                 |Bday:             Gross:         |BNS
                              |Hire:07292002  FCTxb:           |HOL
                              |Term:07132005  FdTxb:           |OVT
                              |Rehr:           FICA:           |REG
Unit:MONT        Dept:020026  |Full:07292002    FIT:           |VAC
Phone:           SIT: 1 Stat:T|Paid:05202005    SIT:           |
Claim: S FIT: 1  SIT:T        |Lras:07292002    CITY:          |
Tax Modules:AL          AL Add|-----            SDI:           |
Bank:MONT Freq:26  H   8.8400 |FIT:  0.0000   Deduc:          |
                              |SIT:  0.0000   Ncash:          |
----------------------------------------------------------------------------------------------------------------------------------
```

CONFIDENTIAL

MV 00607

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE  11        Paymaxx, Inc.
                                                                                                                  12/27/05  12:56

```
ID:01520438  SSN:              |----Dates----|          |----YTD----|Gross:      |Earnings: Hrs--YTD--Amt-|Deductions:------|---YTD----Target----Taken|
PALMER, JOANN ANN PALMER       |Bday:                   |            FGTXbd:      |BNS                     |
                               |Hire:05012003           |            FICA:        |HOL                     |
Unit:MONT        Dept:010012   |Term:                   |            FIT:          |OVT                     |
Phone:           Stat:A        |Renr:                   |            SIT:          |REG                     |
Claim: S  FIT: 7  SIT: 0       |Full:                   |            CITY:         |VAC                     |
Tax Modules:AL        AL Add   |Paid:12302005           |            SDI:          |
Bank:MONT Freq:26 H   8.0800   |Lras:09032005           |            Deduc:        |
                               |FIT:    0.0000  SIT:    0.0000            Ncash:   |

ID:01521172  SSN:              |----Dates----|          |----YTD----|Gross:      |Earnings: Hrs--YTD--Amt-|Deductions:------|---YTD----Target----Taken|
PINKARD, BEVERLY J             |Bday:                   |            FGTXbd:      |
                               |Hire:04262005           |            FICA:        |
Unit:MONT        Dept:020026   |Term:07132005           |            FIT:          |
Phone:           Stat:T        |Renr:                   |            SIT:          |
Claim: S  FIT: 2  SIT: 2       |Full:04262005           |            CITY:         |
Tax Modules:AL        AL Add   |Paid:05202005           |            SDI:          |
Bank:MONT Freq:26 H   6.5000   |Lras:                   |            Deduc:        |
                               |FIT:    0.0000  SIT:    0.0000            Ncash:   |

ID:01521203  SSN:              |----Dates----|          |----YTD----|Gross:      |Earnings: Hrs--YTD--Amt-|Deductions:------|---YTD----Target----Taken|
POUNCY, BRITTANY S             |Bday:                   |            FGTXbd:      |BNS                     |
                               |Hire:05162005           |            FICA:        |OVT                     |
Unit:MONT        Dept:010012   |Term:11102005           |            FIT:          |REG                     |
Phone:           Stat:T        |Renr:                   |            SIT:          |RETR                    |
Claim: S  FIT: 0  SIT: 0       |Full:05162005           |            CITY:         |
Tax Modules:AL        AL Add   |Paid:09092005           |            SDI:          |
Bank:MONT Freq:26 H   7.5000   |Lras:                   |            Deduc:        |
                               |FIT:    0.0000  SIT:    0.0000            Ncash:   |

ID:01521206  SSN:              |----Dates----|          |----YTD----|Gross:      |Earnings: Hrs--YTD--Amt-|Deductions:------|---YTD----Target----Taken|
REESE, ELOISE A                |Bday:                   |            FGTXbd:      |HOL                     |
                               |Hire:05152005           |            FICA:        |REG                     |
Unit:MONT        Dept:020026   |Term:11102005           |            FIT:          |
Phone:           Stat:T        |Renr:                   |            SIT:          |
Claim: S  FIT: 6  SIT: 4       |Full:05152005           |            CITY:         |
Tax Modules:AL        AL Add   |Paid:10072005           |            SDI:          |
Bank:MONT Freq:26 H   6.5000   |Lras:                   |            Deduc:        |
                               |FIT:    0.0000  SIT:    0.0000            Ncash:   |
```

CONFIDENTIAL

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE  12        Paymaxx, Inc.
                                                                                                                   12/27/05    12:56

```
ID:01521014 SSN:                 -----Dates-----        -----YTD-----   |Earnings: Hrs---YTD---Amt-|Deductions:---------YTD-----Target-----Taken|
RIVERS, LELA S                   Bday:              Gross:               |BNS
                                 Hire:10222004      FGtxd:               |HOL
Unit:MONT          Dept:010012   Term:07132005      FDtxd:               |OVT
Phone:                           Rehr:              FICA:                |REG
Claim: M FIT: 3 SIT: 0   Stat:T  Full:10222004      FIT:                 |RETR
Tax Modules:AL                   Paid:07152005      SIT:
Bank:MONT Freq:26 H   4  .5000 AL Add  Lras:        CITY:
                                 FIT:   0.0000      SDI:
                                 SIT:   0.0000      Deduc:
                                                    Ncash:

ID:01520017 SSN:                 -----Dates-----        -----YTD-----   |Earnings: Hrs---YTD---Amt-|Deductions:---------YTD-----Target-----Taken|
ROGERS, NELLIE                   Bday:              Gross:               |BNS
                                 Hire:07292002      FGtxd:               |HOL
Unit:MONT          Dept:020026   Term:              FDtxd:               |REG
Phone:                 Stat:A    Rehr:              FICA:                |RETR
Claim: S FIT: 0 SIT: 0           Full:07292002      FIT:                 |VAC
Tax Modules:AL                   Paid:12302005      SIT:
Bank:MONT Freq:26 H   7 .6300 AL Add  Lras:09032005 CITY:
                                 FIT:   0.0000      SDI:
                                 SIT:   0.0000      Deduc:
                                                    Ncash:

ID:01521302 SSN:                 -----Dates-----        -----YTD-----   |Earnings: Hrs---YTD---Amt-|Deductions:---------YTD-----Target-----Taken|
ROSTICK, NEFRATERRI R            Bday:              Gross:               |REG
                                 Hire:09032005      FGtxd:               |RETR
Unit:MONT          Dept:010018   Term:              FDtxd:
Phone:                 Stat:A    Rehr:              FICA:
Claim: S FIT: 0 SIT: 0           Full:09032005      FIT:
Tax Modules:AL                   Paid:12302005      SIT:
Bank:MONT Freq:26 H  10 .0000 AL Add  Lras:         CITY:
                                 FIT:   0.0000      SDI:
                                 SIT:   0.0000      Deduc:
                                                    Ncash:

ID:01521384 SSN:                 -----Dates-----        -----YTD-----   |Earnings: Hrs---YTD---Amt-|Deductions:---------YTD-----Target-----Taken|
RUSH, NIKKI .                    Bday:              Gross:               |OVT
                                 Hire:11102005      FGtxd:               |REG
Unit:MONT          Dept:010012   Term:              FDtxd:
Phone:                 Stat:A    Rehr:              FICA:
Claim: S FIT: 4 SIT: 0           Full:11102005      FIT:
Tax Modules:AL                   Paid:12302005      SIT:
Bank:MONT Freq:26 H   7 .2500 AL Add  Lras:         CITY:
                                 FIT:   0.0000      SDI:
                                 SIT:   0.0000      Deduc:
                                                    Ncash:
```

CONFIDENTIAL

MV 00609

CORE MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE  13    Paymaxx, Inc.
                                                                                                              12/27/05    12:56

ID:01521151 SSN:
SHABAZZ, RASHIDA K

| | --Dates------ | | --YTD------ | |Earnings: Hrs---YTD--Amt-|-Deductions:------|------YTD----Target-----Taken| |
Bday: | Gross: | | BNS |
Hire:04042005| FcTxo: | | HOL |
Term: | FdTxp: | | OVT |
Rehr: | FICA: | | REG |
Full: | FIT: |
Paid:12022005| SIT: |
Lras:05202005| CITY: |
| SDI: |
Unit:MONT        Dept:010018        FIT:  0.0000 |Deduc: |
Phone:           Stat:A            SIT:  0.0000 |Ncash: |
Claim: S  FIT: 1  SIT: 1
Tax Modules:AL       AL Add
Bank:MONT Freq:26 H   10.0000

ID:01520023 SSN:
STALLINGS, MARY

| | --Dates------ | | --YTD------ | |Earnings: Hrs---YTD--Amt-|-Deductions:------|------YTD----Target-----Taken| |
Bday: | Gross: | | HOL |
Hire:07292002| FcTxo: | | REG |
Term: | FdTxp: |
Rehr: | FICA: |
Full:07232002| FIT: |
Paid:12302005| SIT: |
Lras:07292002| CITY: |
| SDI: |
Unit:MONT        Dept:020025        FIT:  0.0000 |Deduc: |
Phone:           Stat:A            SIT:  0.0000 |Ncash: |
Claim: S  FIT: 3  SIT: 0
Tax Modules:AL       AL Add
Bank:MONT Freq:26 H    8.5400

ID:01521385 SSN:
STATEN, CHAVON E

| | --Dates------ | | --YTD------ | |Earnings: Hrs---YTD--Amt-|-Deductions:------|------YTD----Target-----Taken| |
Bday: | Gross: | | OVT |
Hire:11102005| FcTxo: | | REG |
Term: | FdTxp: | | RETR |
Rehr: | FICA: |
Full:11102005| FIT: |
Paid:12302005| SIT: |
Lras: | CITY: |
| SDI: |
Unit:MONT        Dept:010018        FIT:  0.0000 |Deduc: |
Phone:           Stat:A            SIT:  0.0000 |Ncash: |
Claim: S  FIT: 0  SIT: 0
Tax Modules:AL       AL Add
Bank:MONT Freq:26 H   10.0000

ID:01520603 SSN:
TAYLOR, PATRICIA A

| | --Dates------ | | --YTD------ | |Earnings: Hrs---YTD--Amt-|-Deductions:------|------YTD----Target-----Taken| |
Bday: | Gross: | | REG |
Hire:01102005| FcTxo: |
Term:07132005| FdTxp: |
Rehr: | FICA: |
Full:01102005| FIT: |
Paid:05202005| SIT: |
Lras: | CITY: |
| SDI: |
Unit:MONT        Dept:020026        FIT:  0.0000 |Deduc: |
Phone:           Stat:T            SIT:  0.0000 |Ncash: |
Claim: S  FIT: 3  SIT: 3
Tax Modules:AL       AL Add
Bank:MONT Freq:26 H    6.5000

CONFIDENTIAL

MV 00610

```
CORP MONTGOMERY VENTURES, LLC              RPT - Condensed Employee Master                    PAGE   14      Paymaxx, Inc
                                                                                                            12/27/05    12:56

ID:01521277 SSN:          |----Dates----|          ----YTD----|Earnings: Hrs--YTD--Amt-|Deductions:---------YTD------Target------Taken|
THOMAS, MICHAEL   A       |Bday:          |Gross:              |OTH                     |
                          |Hire:08102005 |FGTXb:              |REG                     |
                          |Term:          |FGTXb:              |
                          |Rehr:          |FICA:               |
Unit:MONT     Dept:060044 |Full:          |FIT:                |
Phone:          Stat:A    |Paid:12162005 |SIT:                |
Claim: M FIT: 1 SIT:A     |Lras:          |CITY:               |
Tax Modules:AL   AL Add   |              |SDI:                |
Bank:MONT Freq:26 H 10.0000|FIT: 0.0000 |Deduc:              |
                          |SIT: 0.0000 |Ncash:              |

ID:01520879 SSN:          |----Dates----|          ----YTD----|Earnings: Hrs--YTD--Amt-|Deductions:---------YTD------Target------Taken|
TURNER, TERRI D           |Bday:05222004 |Gross:              |BNS                     |
                          |Hire:          |FGTXb:              |HOL                     |
                          |Term:          |FGTXb:              |INCNN                   |
                          |Rehr:          |FICA:               |OVT                     |
Unit:MONT     Dept:010012 |Full:05222004 |FIT:                |REG                     |
Phone: S FIT: 0 SIT:A Stat:A|Paid:12302005 |SIT:              |RETR                    |
Claim:                    |Lras:09032005 |CITY:               |VAC                     |
Tax Modules:AL            |              |SDI:                |
Bank:MONT Freq:26 H 8.3200|FIT: 0.0000 |Deduc:              |
                          |SIT: 0.0000 |Ncash:              |

ID:01520914 SSN:          |----Dates----|          ----YTD----|Earnings: Hrs--YTD--Amt-|Deductions:---------YTD------Target------Taken|
WATTS, HEATHER G          |Bday:06211972 |Gross: 40642.88     |BNS                     |EFT1           14600.00
                          |Hire:06212004 |FGTXb: 39262.88     |MGR   1424.00  25207.68 |EFT2              25000080
                  AL 36117|Term:12012005 |FGTXb: 39262.88     |SRL            835.20   |           C 50400135
                          |Rehr:          |FICA: 3003.61       |VAC                     |             S 105395520.23
Unit:MONT     Dept:080030 |Full:06242004 |FIT: 4852.39        |           40.00        |125INS   60.00   S 1059579
Phone: M FIT: 1 SIT:A Stat:T|Paid:11182005 |SIT: 1371.92     |                        |           1380.00
Claim:                    |Lras:06242004 |CITY:               |
Tax Modules:AL   AL Add   |              |SDI:                |                        |                        062001186
Bank:MONT Freq:26 S 1461.54|FIT: 0.0000 |Deduc:11784.28     |
                          |SIT: 0.0000 |Ncash:              |

ID:01520020 SSN:          |----Dates----|          ----YTD----|Earnings: Hrs--YTD--Amt-|Deductions:---------YTD------Target------Taken|
WHITE, BETTY H            |Bday:          |Gross:              |BNS                     |
                          |Hire:07292002 |FGTXb:              |HOL                     |
                          |Term:          |FGTXb:              |INCNN                   |
                          |Rehr:          |FICA:               |OVT                     |
Unit:MONT     Dept:0701.5 |Full:07292002 |FIT:                |REG                     |
Phone: S FIT: 3 SIT:A Stat:A|Paid:12302005 |SIT:              |
Claim:                    |Lras:10312005 |CITY:               |
Tax Modules:AL   AL Add   |              |SDI:                |
Bank:MONT Freq:26 H 8.5000|FIT: 0.0000 |Deduc:              |
                          |SIT: 0.0000 |Ncash:              |
```

CONFIDENTIAL

MV 00611

```
CORP MONTGOMERY VENTURES, LLC          RPT - Condensed Employee Master          PAGE  15    Paymaxx, Inc.
                                                                                            12/27/05  12:56

ID:01520752 SSN:          |-----Dates-----|-----YTD--|Earnings: Hrs--YTD--Amt-|Deductions:--------YTD-----Target------Taken|
WHITE, ROBERTA D          |Bday:           |Gross:    |BNS                     |
                          |Hire:01262004   |FCTxb:    |HOL                     |
                          |Term:           |FdTxb:    |OVT                     |
                          |Rehr:           |FICA:     |REG                     |
Unit:MONT    Dept:020026  |Full:01262004   |FIT:      |VAC                     |
Phone:           Stat:A   |Paid:11302005   |SIT:      |                        |
Claim: S FIT: 6 SIT: 6    |Lras:09032005   |CITY:     |                        |
Tax Modules:AL   AL Add   |               |SDI:      |                        |
Bank:MONT Freq:26 H 6.6300|FIT: 0.0000 SIT:|Deduc:    |                        |
                          |     0.0000     |Ncash:    |                        |

ID:01520940 SSN:          |-----Dates-----|-----YTD--|Earnings: Hrs--YTD--Amt-|Deductions:--------YTD-----Target------Taken|
WHITEFIELD, SAMANTHA L    |Bday:           |Gross:    |REG                     |
                          |Hire:01252005   |FCTxb:    |                        |
                          |Term:           |FdTxb:    |                        |
                          |Rehr:           |FICA:     |                        |
Unit:MONT    Dept:070115  |Full:01252005   |FIT:      |                        |
Phone:           Stat:A   |Paid:03252005   |SIT:      |                        |
Claim: 0 SIT: 0           |Lras:           |CITY:     |                        |
Tax Modules:AL   AL Add   |               |SDI:      |                        |
Bank:MONT Freq:26 H 7.0000|FIT: 0.0000 SIT:|Deduc:    |                        |
                          |     0.0000     |Ncash:    |                        |

ID:01521126 SSN:          |-----Dates-----|-----YTD--|Earnings: Hrs--YTD--Amt-|Deductions:--------YTD-----Target------Taken|
WILLIAMS, JACOB M         |Bday:           |Gross:    |REG                     |
                          |Hire:03032005   |FCTxb:    |                        |
                          |Term:05022005   |FdTxb:    |                        |
                          |Rehr:           |FICA:     |                        |
Unit:MONT    Dept:010018  |Full:03032005   |FIT:      |                        |
Phone:           Stat:I   |Paid:03252005   |SIT:      |                        |
Claim: S FIT: 0 SIT: 0    |Lras:           |CITY:     |                        |
Tax Modules:AL   AL Add   |               |SDI:      |                        |
Bank:MONT Freq:26 H 8.0000|FIT: 0.0000 SIT:|Deduc:    |                        |
                          |     0.0000     |Ncash:    |                        |

ID:01520933 SSN:          |-----Dates-----|-----YTD--|Earnings: Hrs--YTD--Amt-|Deductions:--------YTD-----Target------Taken|
WOOD, STEPHANIE E         |Bday:           |Gross:    |REG                     |
                          |Hire:01282005   |FCTxb:    |                        |
                          |Term:03202005   |FdTxb:    |                        |
                          |Rehr:           |FICA:     |                        |
Unit:MONT    Dept:010018  |Full:         |FIT:      |                        |
Phone:           Stat:T   |Paid:03112005   |SIT:      |                        |
Claim: S FIT: 3 SIT: T    |Lras:           |CITY:     |                        |
Tax Modules:AL   AL Add   |               |SDI:      |                        |
Bank:MONT Freq:26 H 8.5000|FIT: 0.0000 SIT:|Deduc:    |                        |
                          |     0.0000     |Ncash:    |                        |
```

CONFIDENTIAL

MV 00612

CORP MONTGOMERY VENTURES, LLC                    RPT - Condensed Employee Master                    PAGE  16        Paymaxx, Inc.
                                                                                                                12/27/05   12:56

ID:01521383 SSN:
WRIGHT, KIM A

|----Dates----|------YTD------|  |Earnings: Hrs---YTD---Amt-|Deductions:-------------------YTD------Target-------Taken|
|Bday:         |Gross:        |  |OVT                       |
|Hire::1102005 |FcTxD:        |  |REG                       |
|Team:         |FdTxb:        |  |
|Renr:         |FICA:         |  |
Unit:MONT        Dept:050006   |Full::1102005 |FIT:          |  |
Phone:            Stat:A       |Paid:12302005 |SIT:          |  |
Claim: S FIT: 1  SIT: 1        |Lras:         |CITY:         |  |
Tax Modules:AL  FIT: AL Acq    |              |SDI:          |  |
Bank:MONT Freq:26 H  12.0000   |FIT:  0.0000  |Deduc:        |  |
                               |SIT:  0.0000  |Ncash:        |  |

CONFIDENTIAL

MV 00613

MORRIS, MANNING & MARTIN, LLP
ATTORNEYS AT LAW

January 23, 2007

Daniel S. Fellner
404-504-5476
dfellner@mmmlaw.com
www.mmmlaw.com

## VIA E-MAIL HELZPHAR@MINDSPRING.COM AND U.S. MAIL

Priscilla Black Duncan, Esq.
P.B. Duncan & Associates, LLC
472 S. Lawrence Street
Suite 204
Montgomery, Alabama 36104

Re:    Heather Watts v. Hospitality Ventures, LLC
       U.S. District Court, Middle District of Alabama
       Case No. 2:06-CV-1149-MEF

Dear Ms. Duncan:

I write to follow-up on our conversation yesterday, and to confirm that Plaintiff consented to extending the deadline for Hospitality Ventures, LLC ("Hospitality Ventures") to answer or otherwise respond to Plaintiff's Complaint through and including February 16, 2007. Tomorrow, we will file the attached Consent Motion for Extension of Time.

Plaintiff named the wrong entity as the Defendant in this lawsuit. Plaintiff worked at the Fairfield Inn in Montgomery, Alabama, which is owned by Montgomery Ventures, LLC ("Montgomery Ventures"), not Hospitality Ventures. The attached copy of Montgomery Ventures' 2005 end-of-year payroll shows that Montgomery Ventures paid and employed Plaintiff. Accordingly, we request that Plaintiff amend her Complaint to: 1) remove Hospitality Ventures as the Defendant; and 2) name Montgomery Ventures as the Defendant.

We also request that Plaintiff amend her Complaint to dismiss her claim under the Family and Medical Leave Act ("FMLA"). To be an "eligible employee" under the FMLA, an employee must have been employed at a worksite where 50 or more employees were employed within 75 miles of that worksite. 29 U.S.C. §2611(2)(B)(ii); 29 CFR §825.110(a). The attached payroll shows that during 2005, Montgomery Ventures never employed more than 45 employees. In addition, Montgomery Ventures does not own or operate any other facilities in Alabama. Because Montgomery Ventures did not employ 50 or more employees within 75 miles of Plaintiff's former worksite, Plaintiff was not an "eligible employee" under the FMLA, and she cannot maintain an FMLA claim against Montgomery Ventures. 29 U.S.C. §2611(2)(B)(ii); 29 CFR §825.110(a). If Plaintiff does not dismiss her FMLA claim, Defendant will move for summary judgment on Plaintiff's FMLA claim, and for an award of attorneys' fees incurred in preparing such a motion.

We request that Plaintiff make these amendments, and serve her Amended Complaint, by February 6, 2007.

Please call if you have any questions.

Sincerely,

Daniel S. Fellner

Attachments

cc:    Jason D'Cruz, Esq.
       Jeffrey Lee, Esq.

## Daniel S. Fellner

**From:**    Priscilla Duncan [helzphar@mindspring.com]
**Sent:**     Monday, February 05, 2007 3:14 PM
**To:**        Daniel S. Fellner
**Subject:** Watts v. Hospitality Ventures

I will amend the pleadings later this week, however after discussing the matter with my client, and reviewing our evidence, it appears Hospitality Ventures published the personnel manual and gave direction with Ms. Watts, including setting her bonus plan.

The fact that the parent company operates under a local name in each venue is not, without further discovery, adequate in my mind to dismissing the case.

You may also want to review Minard v. ITC Delta Communications 2006 WL 1000572 (5th Cir. April 18, 2006) for a discussion of the FMLA's definition of an "eligible employee" as not being a limit on the federal courts' subject matter jurisdiction, following Arbaugh that an employer may be estopped from asserting an employee was ineligible for FMLA leave is the employer represented to employee that she was elibile and she relied upon that representation to her detriment.

 See also, equitable estoppel.

Call me if you wish to discuss the case.

,

Priscilla Duncan
helzphar@mindspring.com
EarthLink Revolves Around You.

## Daniel S. Fellner

**From:** Priscilla Duncan [helzphar@mindspring.com]
**Sent:** Monday, February 12, 2007 1:33 PM
**To:** Daniel S. Fellner
**Subject:** RE: FW: Watts v. Hospitality Ventures

At this point, it doesn't appear that we will amend the complaint. Alicia Haynes is filing her Notice of Appearance today. You're answer for Hospitality Ventures is the only one that plays a factor at this time.

----- Original Message -----
**From:** Daniel S. Fellner
**To:** helzphar@mindspring.com
**Cc:** Jeff Lee
**Sent:** 2/12/2007 11:54:57 AM
**Subject:** FW: Watts v. Hospitality Ventures

Priscilla,

I have not heard from you. Is it okay  for us  to sign your name to this and file it?

Please call if you have any questions.

Dan Fellner
Employment Law Group
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
p: (404) 504-5476
f: (404) 365-9532

For information on Morris, Manning & Martin, LLP, please visit our Web site at http://www.mmmlaw.com.
This e-mail message and its attachments are for the sole use of the designated recipient(s).  They may contain confidential information, legally privileged information or other information subject to legal restrictions.  If you are not a designated recipient of this message, please do not read, copy, use or disclose this message or its attachments, notify the sender by replying to this message and delete or destroy all copies of this message and attachments in all media.  Thank you.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Daniel S. Fellner
**Sent:** Friday, February 09, 2007 4:57 PM
**To:** 'helzphar@mindspring.com'
**Cc:** 'Jeff Lee'
**Subject:** RE: Watts v. Hospitality Ventures

Priscilla,

This e-mail is to follow-up on our discussion this afternoon.  Attached is the Joint Motion for Extension of Time we discussed.  Please let us know whether Plaintiff approves, and whether we may sign your name to this and file it with the Court.

Please call if you have any questions.

Dan Fellner
Employment Law Group
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
p: (404) 504-5476
f: (404) 365-9532

For information on Morris, Manning & Martin, LLP, please visit our Web site at http://www.mmmlaw.com.
This e-mail message and its attachments are for the sole use of the designated recipient(s).  They may contain confidential information, legally privileged information or other information subject to legal restrictions.  If you are not a designated recipient of this message, please do not read, copy, use or disclose this message or its attachments, notify the sender by replying to this message and delete or destroy all copies of this message and attachments in all media.  Thank you.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Priscilla Duncan [mailto:helzphar@mindspring.com]
**Sent:** Monday, February 05, 2007 3:14 PM
**To:** Daniel S. Fellner
**Subject:** Watts v. Hospitality Ventures

I will amend the pleadings later this week, however after discussing the matter with my client, and reviewing our evidence, it appears Hospitality Ventures published the personnel manual and gave direction with Ms. Watts, including setting her bonus plan.

The fact that the parent company operates under a local name in each venue is not, without further discovery, adequate in my mind to dismissing the case.

You may also want to review Minard v. ITC Delta Communications 2006 WL 1000572 (5th Cir. April 18, 2006) for a discussion of the FMLA's definition of an "eligible employee" as not being a limit on the federal courts' subject matter jurisdiction, following Arbaugh that an employer may be estopped from asserting an employee was ineligible for FMLA leave is the employer represented to employee that she was elibile and she relied upon that representation to her detriment.

 See also, equitable estoppel.

Call me if you wish to discuss the case.

,

Priscilla Duncan

helzphar@mindspring.com
EarthLink Revolves Around You.