IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                        )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        CASE NO. 2:06CV1149-MEF
                                      )
Hospitality Ventures, LLC,            )
                                      )
        Defendant.                    )

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal
Rule of Civil Procedure 56(b) and the Court's September 21, 2007,
Order, files this Reply in Support of its Motion for Summary
Judgment.

## I.    INTRODUCTION

Plaintiff's Response alleges that her termination was unfair,
hoping this will distract the Court from her inability to prove her
Title VII and FMLA claims.  Each of Plaintiff's claims, however,
contains numerous legal defects, and the Court should grant
Hospitality Ventures, LLC's Motion for Summary Judgment and dismiss
all of her claims.

1753006 v11

## II.  ARGUMENT AND CITATION OF AUTHORITY

**A.  Not an "Employer" under Title VII or FMLA[1]**

**1.  Not an "Employer" Under Title VII**

**a)  Plaintiff Does Not Contest "Employer" Status**

Only an "employer" can be liable for a violation of Title VII, of which the Pregnancy Discrimination Act ("PDA") is a part. Faulkner v. Woods Transp., Inc., 174 Fed. Appx. 525, 528 (11th Cir. 2006).  Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

Hospitality Ventures, LLC presented undisputed evidence demonstrating that it was not an "employer" under Title VII because, from 2003 to the present, it had no employees.  (Brief at 6-7, 9-10).  In her Response, Plaintiff does not contest this contention.  (Response, passim.).  Thus, it is undisputed that

---

[1] On January 23, 2007, before Hospitality Ventures, LLC filed its Answer, it notified Plaintiff that she named the wrong entity as a defendant and provided her records identifying the proper entity. Nonetheless, Plaintiff refused to amend her Complaint to correct her error.  On March 26, 2007, Hospitality Ventures, LLC filed its Motion for Partial Summary Judgment, and alerted Plaintiff and the Court that if Plaintiff continued to pursue her claims against Hospitality Ventures, LLC, it would file a Motion for Summary Judgment because it is not an "employer" under Title VII or the FMLA.  On April 12, 2007, the Court entered a Uniform Scheduling Order in which it required that "[a]ny motions to amend the pleadings and to add parties shall be filed on or before June 26, 2007."  Plaintiff did not move to amend the pleadings or to add parties.  (Brief in Support of Mot. for S.J. at 7-8).

Hospitality Ventures, LLC was not an "employer" under Title VII, and summary judgment is appropriate. 42 U.S.C. § 2000e(b); FED.R.CIV.P. 56(e); Faulkner, 174 Fed. Appx. at 528.

### b)    Not an Integrated or Joint Employer

Throughout her Response, Plaintiff attempted to confuse Hospitality Ventures, LLC with the separate entity Hospitality Ventures Management, Inc. ("HVMI"). (Response, passim.). Plaintiff may be doing this in an attempt to argue that Hospitality Ventures, LLC and HVMI are an integrated or joint employer. To determine whether separate business entities should be treated as an integrated or joint employer under Title VII, a court focuses on four factors: (1) interrelation of operations, (2) degree of control an entity has over the adverse employment decision on which the lawsuit is based, (3) common management, and (4) common ownership or financial control, such as whether one entity owns or has an interest in the other. McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 931-33 (11th Cir. 1987).

Here, Plaintiff has not established any of these factors. First, there is no interrelation of operations because since January 1, 2003, Hospitality Ventures, LLC has not owned or operated HVMI, and vice versa. (Twardoch Aff. at ¶¶ 7-9). Second, Hospitality Ventures, LLC had no control over the adverse employment decisions on which this lawsuit is based because it had no employees through which it could exercise any such control, and

1753006 v11

it has never owned or operated HVMI or the Hotel at which Plaintiff worked. (Id. at ¶¶ 7-9). Third, since 2003, Hospitality Ventures, LLC has not had any employees, so it could not have common management with HVMI. (Id. at ¶¶ 5-6). Fourth, Plaintiff has produced no evidence showing any link between the ownership of Hospitality Ventures, LLC and HVMI. (Response, passim.). Moreover, assuming, arguendo, that Hospitality Ventures, LLC and HVMI could be an integrated or joint employer, Plaintiff still has not provided any evidence demonstrating that they had enough employees to be an "employer" under Title VII. (Id.). Consequently, Hospitality Ventures, LLC is not an integrated or joint employer with HVMI, and cannot be liable under Title VII. McKenzie, 834 F.2d at 931-33.

### 2. Not an "Employer" Under the FMLA

Only an "employer" can be liable for a violation of the FMLA. Wascura v. Carver, 169 F.3d 683, 685 (11th Cir. 1999). Under the FMLA,

> The term "employer"
> (i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
> (ii) includes-
>     (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer;

29 U.S.C. § 2611(4)(A)(i)-(ii).

1753006 v11

Plaintiff argues that Hospitality Ventures, LLC is liable for violating the FMLA because it employed her. (Response at 18-19). To determine whether an individual is employed by an entity under the FMLA, the Eleventh Circuit considers: "(1) whether or not the employment took place on the premises of the alleged employer; (2) how much control the alleged employer exerted on the employees; and (3) whether or not the alleged employer had the power to fire, hire, or modify the employment condition of the employees." Morrison, 383 F.3d at 1255. Here, Hospitality Ventures, LLC did not employ Plaintiff under the FMLA because it: (1) did not own or operate the Hotel where Plaintiff worked; (2) had no control over Plaintiff because she allegedly reported to employees of Montgomery Ventures, LLC and HVMI, not Hospitality Ventures, LLC; and (3) did not have the power to fire, hire, or modify Plaintiff's employment conditions because it did not supervise or compensate her. (Twardoch Aff. at ¶¶ 5-9; Kish Aff. at ¶¶ 2-3; Miller Dep. at 6:9-12). Therefore, summary judgment is appropriate because Hospitality Ventures, LLC did not employ Plaintiff under the FMLA.[2] Morrison, 383 F.3d at 1255.

---

[2] Under Title VII, an individual must receive compensation from an entity to be deemed its "employee." Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1243 (11th Cir. 1998). Hospitality Ventures, LLC did not employ Plaintiff under Title VII because she received compensation only from Montgomery Ventures, LLC, and not from Hospitality Ventures, LLC. (Exhibits 11 and 12 to Motion for Summary Judgment). Therefore, summary judgment is

Pretermitting whether Hospitality Ventures, LLC employed Plaintiff, she does not contest that Hospitality Ventures, LLC did not have the fifty (50) employees necessary for it to be an "employer" under the FMLA. 29 U.S.C. § 2611(4)(A)(i); (Response, passim.). Thus, it is undisputed that Hospitality Ventures, LLC was not an "employer" under the FMLA, and summary judgment is appropriate on Plaintiff's FMLA claim. 29 U.S.C. § 2611(4)(A)(i); Wascura, 169 F.3d at 685. Also, the FMLA uses the same test as Title VII to determine whether entities are integrated or joint employers. Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1257 (11th Cir. 2004); McKenzie, 834 F.2d at 931-33. Thus, to the extent Plaintiff may be arguing that Hospitality Ventures, LLC and HVMI are an integrated or joint employer under the FMLA, this theory fails for the same reasons discussed in Section II.A.1.(b). Morrison, 383 F.3d at 1255.

Plaintiff also argues that Hospitality Ventures, LLC is liable for violating the FMLA because 29 U.S.C. § 2611(4)(A)(ii) and Darby v. Bratch, 287 F.3d 673, 681 (8th Cir. 2002), allow for a person to be individually liable for a violation of the FMLA. (Response at 18-19). Here, Plaintiff sued only an entity -- Hospitality Ventures, LLC. Thus, whether an individual may be liable for a

---

appropriate on Plaintiff's Title VII claim. Llampallas, 163 F.3d at 1243.

1753006 v11

violation of the FMLA is irrelevant, and summary judgment is appropriate. 29 U.S.C. § 2611(4)(A)(i); Wascura, 169 F.3d at 685.

**B.   Title VII**

    **1.   No Prima Facie Case**

        **a)   Not Protected By the PDA at Time of Termination**

The PDA protects only "women affected by pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Thus, after a female employee gives birth and is medically able to return to work, the PDA does not protect her while she extends her maternity leave to care for her new child. 29 C.F.R. §1604.11, Appendix A at Question 18(A) (EEOC's Questions and Answers on the Pregnancy Discrimination Act); Piantanida v. Wyman Center, Inc., 116 F.3d 340, 342 (8th Cir. 1997); Barnes v. Hewlett-Packard Co., 846 F.Supp. 442, 444 (D. Md. 1994). The PDA ceases to apply because caring for a new child is separate from pregnancy, and is a gender-neutral function which can be performed by individuals who were recently pregnant as well as males and females who have never been pregnant. Piantanida, 116 F.3d at 342; Barnes, 846 F.Supp. at 444.

Hospitality Ventures, LLC presented evidence demonstrating that by September 24, 2005, Plaintiff gave birth and fully recovered from her pregnancy, childbirth, and any related medical conditions. (Brief at 11). Plaintiff did not contest these facts. (Response, passim.). Rather, Plaintiff argued -- without citing

any statutory or case law in support[3] -- that the PDA continued to protect her after September 24, 2005, because only a pregnant woman could take such a maternity leave.   (Response at 12-13).   The EEOC's Questions and Answers on the Pregnancy Discrimination Act, <u>Piantanida</u>, and <u>Barnes</u> specifically reject this argument. Accordingly, Plaintiff cannot establish a <u>prima facie</u> case of pregnancy discrimination because she was not a member of the protected class when the Hotel terminated her employment.   42 U.S.C. § 2000e(k); 29 C.F.R. §1604.11, Appendix A at Question 18(A); <u>Piantanida</u>, 116 F.3d at 342; <u>Barnes</u>, 846 F.Supp. at 444.

### b) No Similarly Situated Comparator Treated More Favorably

To state a <u>prima facie</u> case of pregnancy or sex discrimination, a plaintiff must demonstrate, in part, that she was replaced by someone outside of her protected group, or identify someone outside her protected group who her employer treated more favorably.  <u>Armstrong v. Flowers Hospital, Inc.</u>, 33 F.3d 1308, 1312 (11th Cir. 1994); <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d

---

[3]Plaintiff states that she could not locate or access the cases Hospitality Ventures, LLC cited, <u>Nance v. Buffalo's Cafe of Griffin, Inc.</u>, No. 1:03-cv-2887-WSD, 2005 U.S. Dist. LEXIS 20432, at *44-47 (N.D. Ga. Feb. 7), <u>adopted in part</u>, 2005 U.S. Dist. LEXIS 20429 (N.D. Ga. Mar. 30, 2005); <u>Sura v. Stearns Bank, N.A.</u>, No. 01-1344(PAM/RLE), 2002 U.S. Dist. LEXIS 25376, at *14-16 (D. Minn. Dec. 18, 2002).   (Response at 12).   Although these cases are available from the electronic database cited and PACER, copies are attached to this Reply as Exhibits A, B, and C.

1181, 1185 (11th Cir. 1984); <u>Ferrell v. Masland Carpets, Inc.</u>, 97 F. Supp. 2d 1114, 1125 (S.D. Ala. 2000).

Plaintiff testified that the Hotel did not treat any non-pregnant or male employees more favorably than her, and she admits in her Response that she cannot identify such a comparator. (Pl. Dep. at 156:14-157:4, Response at 15). Plaintiff also testified that the Hotel replaced her with two (2) females. (Pl. Dep. at 156:14-157:4, 179:18-180:6). Although these facts defeat her claim, Plaintiff alleges, without any evidentiary support, that the Hotel allowed other unspecified employees to work fewer or different hours. (Response at 13). Therefore, the undisputed evidence demonstrates that the Hotel did not treat any non-pregnant or male employees more favorably than her, and summary judgment is appropriate. <u>Armstrong</u>, 33 F.3d at 1318; <u>Nix</u>, 738 F.2d at 1185; <u>Ferrell</u>, 97 F. Supp. 2d at 1124-25.

### c) Plaintiff Cannot Avoid Her Obligation to Demonstrate All Elements of Her <u>Prima Facie</u> Case

Plaintiff claims that <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079 (11th Cir. 2004), <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997), and <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 182 (1st Cir. 1989), excuse her from having to identify a similarly situated comparator outside her protected class if she provides "other evidence of discrimination". (Response at 14-15). Neither <u>Holifield</u> nor <u>Mack</u> excuse a plaintiff from her obligation to

1753006 v11

identify a similarly situated comparator.  _Holifield_, 115 F.3d at 1563-66; _Mack_, 871 F.2d at 182.   Rather, _Holifield_ and _Mack_ affirmed summary judgment for the employers because the plaintiffs failed to prove their _prima facie_ cases by not identifying a similarly situated employee outside their protected classes who their employers treated more favorably.  _Holifield_, 115 F.3d at 1556-57, 1563-66; _Mack_, 871 F.2d at 182.

   Although _Wilson_ found the plaintiff failed to meet her _prima facie_ case because she did not identify a comparator outside her protected class who was treated more favorably, it continued its analysis to find that the plaintiff offered no other evidence of discrimination.  _Wilson_ cited _Holifield_ and _Mack_ as authorizing this additional analysis despite the plaintiff's failure to prove a _prima facie_ case.  As explained above, _Holifield_ and _Mack_ do not allow a plaintiff to avoid her obligation to demonstrate a _prima facie_ case.  Accordingly, _Wilson_, _Holifield_, and _Mack_ do not excuse Plaintiff's obligation to demonstrate a _prima facie_ case and her failure to do so here defeats her claim.  _Wilson_, 376 F.3d at 1088-89; _Holifield_, 115 F.3d at 1556-57, 1563-66; _Mack_, 871 F.2d at 182.

   Assuming, _arguendo_, that the existence of "other evidence of discrimination" could warrant the extraordinary measure of excusing a plaintiff from proving all elements of her _prima facie_ case, the only "other evidence" that Plaintiff identifies is that Dominguez allegedly required her to work different hours and at the Hotel

10                                    1753006 v11

when she returned.   (Response at 15).   Plaintiff provides no evidence to connect this requirement to either her pregnancy or her sex, and no explanation of why her employer could not lawfully require her to perform that work.   (Response, passim.).   Courts do not sit as super-personnel departments re-evaluating the propriety of an employer's business decisions, and employers have wide latitude to make such decisions for any reason they see fit.   Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001); Nix, 738 F.2d at 1185.   Therefore, summary judgment is appropriate because Plaintiff cannot satisfy all elements of her prima facie case, and she has not identified any "other evidence of discrimination" to relieve her of this fundamental obligation. Wilson, 376 F.3d at 1088-89; Holifield, 115 F.3d at 1556-57, 1563-66; Mack, 871 F.2d at 182.

### 2.   No Evidence of Pretext

After the Hotel articulates a legitimate, non-discriminatory reason for terminating Plaintiff's employment, to survive summary judgment Plaintiff must present "evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of" that reason.   Evans v. McClain of Georgia, Inc., 131 F.3d 957, 964-65 (11th Cir. 1997).   Plaintiff argues that the Hotel's terminating her employment for refusing to work the required hours is a pretext for discrimination because: a) she claims in a new affidavit that she did not refuse to work the required forty (40) hours per week;

b) Dominguez allegedly told the Alabama Department of Industrial Relations that Plaintiff's employment terminated for a different reason -- because she was unable to obtain adequate child care; and c) her claims should be analyzed under a mixed motive analysis. (Response at 15-18).  These arguments fail to demonstrate pretext.

### a)   Plaintiff's Affidavit Contradicts Her Deposition Testimony, and Cannot Create an Issue of Fact

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins and Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984); Lambert v. Independent Life and Accident Ins. Co., 994 F.Supp. 1385, 1389 (M.D.Al. 1998). Such subsequent contradictory testimony in an affidavit is a sham and should be stricken.  Lambert, 994 F.Supp. at 1389.

At her deposition, Plaintiff testified that she told Dominguez that she would work only thirty-five (35) hours:

> Q.   So, in the first conversation, [Dominguez] told you that she expected you to work 40 hours --
>
> A.   Correct.
>
> Q.   -- at the hotel?
>
> A.   Correct.
>
> Q.   And you told her that you were only going to work 35?

A.    Correct.

(Pl. Dep. at 100:7-14).  Plaintiff attempts to create an issue of fact by offering an affidavit with directly contrary testimony, claiming that "I never told Ms. Dominguez I would not work 40 hours a week."  (Pl. Aff. at ¶ 13).  In addition, at her deposition Plaintiff did not mention Dominguez's alleged statement to the Alabama Department of Industrial Relations, although Plaintiff testified that she had no other facts to support her claims.  (Pl. Dep. at 344:13-16, passim.).  Plaintiff does not supply any explanation for why her affidavit directly contradicts her previous deposition testimony on these points.  (Pl. Aff., passim; Response, passim.).  Consequently, to the extent Plaintiff's affidavit denies that she told Dominguez that she would work only thirty-five (35) hours and asserts that Dominguez made any statements to the Alabama Department of Industrial Relations about the reason Plaintiff's employment terminated, the affidavit is a sham, cannot create a genuine issue of material fact, and should be stricken.  Van T. Junkins, 736 F.2d at 657; Lambert, 994 F.Supp. at 1389.

> b)    **Reason for Termination Remains Consistent --**
>       **Plaintiff Refused to Work as Required**

When an employer provides a general explanation for a termination, its later statement which offers more detail about the reason for termination "is insufficient to show pretext."  Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1332 (11th Cir. 1998)

(finding no pretext where the employer initially stated it terminated the plaintiff because he was the least qualified, and later elaborated that the plaintiff was "slow, resistant to change, error-prone, and had disciplinary problems"); <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1377 (11th Cir. 1996)(finding no pretext where the employer initially stated that it terminated the plaintiff for poor performance, and later stated it terminated him because of specific examples of poor performance).

Plaintiff claims that the reason for her termination -- her refusal to work at the location and the hours required -- is a pretext for discrimination because Dominguez allegedly also stated that Plaintiff's employment terminated because she was unable to obtain adequate child care. (Response at 15). Assuming, <u>arguendo</u>, that Dominguez made such a statement, it merely explains the reason why Plaintiff refused to work as required. Moreover, on at least two (2) occasions, Plaintiff admitted she could not work as required because she did not have adequate child care. On November 2, 2005, Plaintiff sent an e-mail to Miller stating that:

> I requested from our prior conversation this morning that I needed more time then [sic] by 5pm today to let [Dominguez] know if I would be returning to my 35 hours on Nov. 9th. I told her that I would call my church and family members [to] see if I could get some help. **It was my understanding that she was going to be able to work with me and my schedule** (just last week from our in-house meeting) **in hopes that I could have full-time childcare by January**.

(Pl. Dep. at 298:10-305:3, DX 34)(emphasis added).  On November 28, 2005, Plaintiff stated to the Alabama Department of Industrial Relations that when Dominguez asked whether Plaintiff would be able to return to work full-time:

> **I told [Dominguez] I would try to get child care arranged by then.  I had it covered for 26 hours.**  She called me back at 5 and I asked her if she could give me until the end of the week to cover the other 9 hours of child care (I only worked 35hrs) . . .

(Exhibit D)(emphasis added).  Thus, Dominguez's alleged statement, if made, is insufficient to show pretext because it merely offers more -- and true -- detail about the reason for Plaintiff's termination.  Standard, 161 F.3d at 1332; Mayfield, 101 F.3d at 1377.

### c)   Plaintiff's Cases Inapposite

Plaintiff argues that Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000), Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194-95 (11th Cir. 2004), and Wilson, 376 F.3d at 1088-89, allow a trier of fact to find the Hotel's reason for terminating her employment is a pretext for discrimination. (Response at 16-18).

Reeves held that after the plaintiff states her prima facie case, the trier of fact can infer that the employer discriminated only if the plaintiff can supply evidence that the employer's stated reason for its action is false.  Reeves, 530 U.S. at 147-48.

As explained above in Section II.B.2., Plaintiff supplied no evidence showing that the Hotel's reason for terminating her employment was false.  Accordingly, <u>Reeves</u> does not permit a trier of fact to infer discrimination.  <u>Reeves</u>, 530 U.S. at 147-48.

In <u>Cleveland</u>, the employer claimed it terminated the plaintiff for four (4) separate reasons, and the plaintiff provided evidence that each of those reasons was false.  <u>Cleveland</u>, 369 F.3d at 1192, 1194-95.  The separate reasons and the evidence of falsity allowed a finding that the employer's reasons were a pretext for discrimination.  <u>Id.</u> at 1194-95.  In <u>Wilson</u>, the employer claimed it selected a more qualified male for a promotion instead of the plaintiff, but the decision maker testified that the plaintiff was the more qualified candidate.  <u>Wilson</u>, 376 F.3d at 1090-91.  Consequently, <u>Wilson</u> held that the plaintiff's <u>prima facie</u> case and evidence that the employer's reason was false created an issue of fact about whether the employer discriminated against the plaintiff.  <u>Id.</u> at 1091.

As explained in Section II.B.2. above, the Hotel has offered only one reason for terminating Plaintiff's employment, and Plaintiff offered no evidence that this reason is false.  Indeed, Plaintiff's own communications demonstrate this reason is true.  Thus, <u>Cleveland</u> and <u>Wilson</u> are factually distinct, and do not permit finding pretext here.

### d)     No Mixed Motive; Only Legitimate Reasons Motivated Termination

Plaintiff asserts her claim survives summary judgment because Dominguez's statements regarding the reason for her termination "establish a mixed motive" for her termination.  (Response at 17). A defendant may prevail on a mixed motive analysis if it offers proof that it terminated the plaintiff only for a legitimate reason and the plaintiff fails to provide evidence that the employer considered a prohibited factor.  Pulliam v. Tallapoosa County Jail, 185 F.3d 1182, 1186 (11th Cir. 1999).  Here, the Hotel asserted that it terminated Plaintiff's employment only for a legitimate reason -- Plaintiff refused to work as the Hotel required because she did not have adequate child care that allowed her to perform that work.  (Pl. Dep. at 96:20-97:8, 98:16-101:14, 298:10-305:3, 365:18-366:9, DX 34; Exhibit D).  Plaintiff's discrimination claim fails under a mixed motive analysis because she provided no evidence that the Hotel considered her sex or pregnancy when it terminated her employment.  Pulliam, 185 F.3d at 1186.

### C.     Plaintiff's Remaining FMLA Arguments Not Relevant

Plaintiff argues Hospitality Ventures, LLC retaliated against her in violation of the FMLA.  (Response at 19-23).  Plaintiff asserted only an interference claim under the FMLA, and not a retaliation claim.  (Complaint, passim.).

17

In addition, Plaintiff argues that Hospitality Ventures, LLC should be equitably estopped from arguing that she was not an "eligible employee" under the FMLA. (Response at 23-29). Hospitality Ventures, LLC briefed this issue in its Reply in Support of its Motion for Partial Summary Judgment and Supplemental Reply in Support of its Motion for Partial Summary Judgment. The Court Ordered Plaintiff to complete her briefing of this issue by August 24, 2007. Accordingly, Plaintiff's arguments on this point are irrelevant to the instant Motion for Summary Judgment, and should be rejected as untimely for the Motion for Partial Summary Judgment.[4]

**D.    Claim for Breach of Contract of Good Faith and Fair Dealing Should be Dismissed with Prejudice**

After the defendant files its answer or a motion for summary judgment, a plaintiff may dismiss her action only by: i) order of the Court; or ii) filing a stipulation of dismissal signed by all parties. FED.R.CIV.P. 41(a). After Hospitality Ventures, LLC filed its Answer, Motion for Partial Summary Judgment, and Motion for Summary Judgment, Plaintiff voluntarily moved to dismiss her claim for breach of contract of good faith and fair dealing. (Response

---

[4] Out of an abundance of caution, and to the extent that the Court determines such issues are relevant to resolution of the instant Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 10(c), Hospitality Ventures, LLC adopts by reference its Brief in Support of its Motion for Partial Summary Judgment, Reply in Support of its Motion for Partial Summary Judgment, and Supplemental Reply in Support of its Motion for Partial Summary Judgment.

at 29).  Plaintiff did not file a stipulation of dismissal signed by all parties as required by Rule 41(a), and did not specify whether her requested dismissal was with or without prejudice. (<u>Id.</u>).  At this late stage of the case, Hospitality Ventures, LLC will stipulate to such a dismissal only if it is with prejudice, and requests that if the Court grants Plaintiff's request, such a dismissal should be with prejudice.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Hospitality Ventures, LLC's Motion for Summary Judgment on all of Plaintiff's claims and dismiss this case.

1753006 v11

This 12th day of October, 2007.

                        Respectfully submitted,

                        Jeffrey A. Lee
                        Maynard, Cooper & Gale, P.C.
                        1901 Sixth Avenue North
                        2400 AmSouth/Harbert Plaza
                        Birmingham, Alabama 35203-2618
                        Telephone: (205) 254-1987
                        Fax: (205) 254-1999

                         s/ Daniel S. Fellner_____
                        R. Jason D'Cruz
                        Admitted Pro Hac Vice
                        Daniel S. Fellner
                        Admitted Pro Hac Vice
                        Morris, Manning & Martin, LLP
                        1600 Atlanta Financial Center
                        3343 Peachtree Road, N.E.
                        Atlanta, Georgia 30326-1044
                        Telephone: (404) 233-7000
                        Fax: (404) 365-9532

                        Attorneys for Hospitality Ventures,
                        LLC

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HEATHER WATTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 2:06CV1149-MEF |
| | ) | |
| HOSPITALITY VENTURES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I certify that this day I electronically filed the foregoing REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will notify the following of such filing:

Priscilla Black Duncan
P.B. Duncan & Associates
472 S. Lawrence, Suite 204
Montgomery, AL  36104
helzphar@mindspring.com

Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226
akhaynes@haynes-haynes.com

This 12th day of October, 2007.

_____
s/ Daniel S. Fellner
Attorney for Hospitality Ventures, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHELLE NANCE,                          :
                                         :
            Plaintiff,                   :
                                         :          CIVIL ACTION
      v.                                 :
                                         :          NO. 1:03-CV-2887-WSD
BUFFALO'S CAFÉ OF GRIFFIN,               :
INC.,                                    :
                                         :
            Defendant.                   :
                                         :


## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

### I.
### Introduction

Plaintiff, Michelle Nance, commenced this civil action on
September 23, 2003, charging Defendant, Buffalo's Café of
Griffin, Inc., with sex and pregnancy discrimination in violation
of Title VII of the Civil Rights Act of 1964, as amended, 42
U.S.C. §§ 2000e, et seq., and with violations of the Family
Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654.  This matter
is now before the Court on Defendant's motion for summary
judgment as to all of Plaintiffs' claims. [Doc. No. 39].  For the
reasons stated herein, this Court recommends that Defendant's
motion for summary judgment be **GRANTED in part** and **DENIED in
part**.

## II.
## Factual Background[1]

When evaluating the merits of a motion for summary judgment, the Court must view the evidence and factual inferences in a light most favorable to the non-moving party. <u>Frederick v. Sprint/United Mgt. Co.</u>, 246 F.3d 1305, 1309 (11th Cir. 2001); <u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 920 (11th Cir. 1993). Applying the above legal standard, the Court derives the following facts from the parties' statements of facts and from the record as a whole:[2]

### A.    Plaintiff and Her Employer

Defendant is owned and operated by Phillip Hembree. (Deposition of Phillip Hembree ("Hembree Dep.") at 40). On March 27, 1999, Defendant entered into an agreement with Professional Employee Management, Inc., a/k/a PEM (now part of Oasis Outsourcing, Inc. ("Oasis"), to handle the administrative functions of the business, including, but not limited to, payroll, workers' compensation insurance, administration of benefits, administration of coverage and benefits under the Comprehensive Omnibus Budget Reconciliation Act ("COBRA"), and

---

[1]  The Court has duly noted Defendant's Responses and Objection to Plaintiff's Statement of Undisputed Material Facts ("Pl. SMF"). [Doc. No. 53].

[2] Unless otherwise noted, this overview is derived from those facts in Defendant's statement of material facts ("Def. SMF") that are not disputed by Plaintiff.

the determination of employee eligibility for and tracking of family medical leave.

Plaintiff was hired by Defendant in September, 1999. (Deposition of Plaintiff ("Pl. Dep.") at 154). From September 27, 1999, until mid-December, 2001, Plaintiff worked as a full-time, salaried assistant manager at Defendant's restaurant, Buffalo's Café. Plaintiff worked 40-50 hours a week, including evenings and weekends, as an assistant manager. As a salaried manager, Defendant was eligible for insurance benefits while hourly employees were not. In addition to paying 100% of Plaintiff's health and dental insurance premiums and providing life insurance, Defendant also paid for her disability insurance as well.

As an assistant manager, Plaintiff had the authority to discipline, hire, and fire employees. (Pl. Dep. at 171-172). Overall, Plaintiff was never disciplined during the time she worked at Buffalo's Café. (Pl. Dep. at 129). Although Defendant no longer possessed any records pertaining to Plaintiff's work performance reviews, Hembree testified that Plaintiff ranged from being a shining star to a fair employee. (Hembree Dep. at 74).

B.    **Facts Relating to Plaintiff's Pregnancy and FMLA Leave**

1.    **Plaintiff's Pregnancy and work schedule**

In late October or early November, 2001, Plaintiff learned that she was pregnant. (Pl. Dep. at 192-193). In mid-December, 2001, Plaintiff approached Defendant's General Manager, Jeff

3

Hughes, and Hembree to inform them of her pregnancy and her concerns about working on her feet so much due to a recent miscarriage in August, 2001. Plaintiff asked them if she could spread her twenty-one vacation days over twenty-one weeks in order to work four days a week, instead of five days a week.

In response to Plaintiff's request, Hembree reclassified Plaintiff from a salaried Assistant Manager to an hourly manager, earning $13.00 per hour for all hours worked. (Hembree Dep. at 161-164)(Pl. Dep. at 209). Plaintiff's regular rate of $13.00 per hour was calculated by dividing her weekly salary by 45 hours (Plaintiff's average weekly hours) and rounding up to the nearest whole dollar amount. Plaintiff testified that her change to an hourly manager resulted in a reduction of her hours from 40-50 hours per week to approximately 25-28 hours per week. (Pl. Dep. at 218). While working as an hourly manager, Plaintiff retained the benefits that only salaried employees received.

On or about April 24, 2002, Plaintiff informed Hembree that her doctor did not want her to be on her feet for more than six hours at a time. Plaintiff testified that her doctor's instructions had no effect on her work schedule. (Pl. Dep. at 229). Plaintiff further testified that she asked Hembree if she could work more days a week with fewer hours per day, but that Hembree refused to accommodate her request. (Pl. Dep. at 231-233). On May 28, 2002, Plaintiff's obstetrician instructed

4

Plaintiff to get off her feet as much as possible. Nevertheless, Plaintiff refused to stop work.

### 2.   **Buffalo Cafe's FMLA policy**

Buffalo Cafe's FMLA policy contains the following provisions:

- Employees employed for at least twelve (12) months (and for at least 1,250 hours during the preceding 12-month period), may be eligible for FMLA leave.

- If the requested leave is for the birth of a child, the employee has the option of using vacation time.

- Eligible employees may take up to twelve weeks of leave during a twelve-month period as specified under herein under FMLA.

- If the requested leave is for the birth of a child, the employee must submit an application for leave at least thirty (30) days before the leave is to begin.

- An eligible employee for FMLA leave will be restored to her former position or to an equivalent position.

(Pl. Exs. 2 and 3).

Plaintiff's request for FMLA leave was administered by Oasis. (Hembree Dep. at 79-80). Oasis provides that an employee "is considered to be provisionally eligible for FMLA if he or she meets all the qualifications for FMLA that Oasis can determine." Doc. No. 39](Ex. D at 2). The final determination of FMLA eligibility will only be possible after receipt of the doctor-completed "Certification of Health Care Provider" ("Certification"). [Doc. No. 39](Ex. D at 2).

5

The Oasis' FMLA policy sets forth the following relevant provisions:

- Provisional eligibility for FMLA leave depends on whether the employer is a covered employer, whether the employee has worked a total of twelve months for Buffalo's Café or Oasis, and whether the employee has worked at least 1,250 hours in the twelve months immediately preceding the start of leave.

- If an employee is provisionally eligible for FMLA leave and Oasis has received the application for leave of absence, Oasis will notify the employee that he or she is provisionally eligible for FMLA leave and advise the employee of the requirement to return a completed Certification.

- If the employee has not returned a completed Certification within fifteen days after receiving the "provisional eligibility" letter Oasis will advise the employee via letter ("No Certification Received") that it has not received the Certification and that, if it is not returned, the employee's leave will be non-FMLA.

- If the Certification has not been returned six business days after receipt of the No Certification Received letter, Oasis will again advise the employee via letter ("second due date") that, if it is not returned, the employee's status will be non-FMLA.

- If the Certification has not been eleven days after receipt of the second due date letter, the employee will be considered on non-FMLA leave, meaning that her job is no longer protected and that her benefits will be "COBRA'd".

- At the completion of ten weeks following the start of FMLA leave (assuming receipt of the Certification), Oasis will advise the employee that she has two weeks remaining before protection ends. [Doc. No. 39](Ex. D at 10).

- assuming receipt of the Certification, The FMLA leave starting date "is the later of the date on which the employee actually went on leave OR the

6

date of the first notification letter" indicating provisional eligibility. [Doc. No. 39](Ex. D at 10).

- At the completion of twelve weeks following the start of FMLA leave (assuming receipt of the Certification), Oasis will advise the employee that her FMLA leave has ended, that her job and benefits are not protected, and that benefits will be "COBRA'd", with the employer directed to reevaluate the employee's absence.

[Doc. No. 39](Ex. D at 2-10).

3.  **Facts Surrounding Plaintiff's Request for FMLA Leave and Attempt to Return to Work Following FMLA LEAVE**

Plaintiff contacted Oasis before taking her medical leave due to her pregnancy. (Pl. Dep. at 244-245). On June 6, 2002, Kathy Pryzbyla, Oasis Human Resource Administrator, sent Plaintiff a letter indicating that Plaintiff was provisionally eligible for FMLA leave and requiring Plaintiff to have a Certification completed by a health care provider and returned to Oasis on or before June 21, 2002. [Doc. No. 39](Ex. C). Upon Plaintiff's failure to return the Certification in a timely manner, Pryzbyla sent Plaintiff a letter dated July 2, 2002, advising Plaintiff that she had until July 16, 2002, to return the completed Certification or lose the protection rights of the FMLA. [Doc. No. 39](Ex. C). Subsequently, Pryzbyla sent Plaintiff a letter dated July 26, 2002, indicating that Plaintiff had failed to return a completed Certification and advising Plaintiff that she "will now be placed on a non-FMLA medical leave. [Doc. No. 39](Ex. C).

Plaintiff testified, however, that she returned the necessary paperwork, including the Certification, in a timely fashion. (Pl. Dep. at 245-248). Preetha John, an Oasis Human Resource Specialist, testified that Oasis did, in fact, receive the completed Certification from Plaintiff at some unspecified date. (Deposition of Preetha John ("John Dep." at 71).

According to an internal Oasis document prepared by Pryzbyla, Plaintiff's authorized FMLA leave ran from June 6, 2002 through September 9, 2002. [Doc. No. 39](Ex. C). However, notes taken by John reflect that Plaintiff's FMLA starting date was July 8, 2002. [Doc. No. 39](Ex. C). Plaintiff's testimony indicates that her last day of work at Buffalo's Café occurred on either July 7 or 8, 2002, several days before the birth of her child on July 17, 2002. (Pl. Dep. at 241). Plaintiff's physician released Plaintiff to work either in August or September.

Before September 9, 2002, Plaintiff contacted Hembree regarding her desire to return to work. (Pl. Dep. at 266-67). As of September 9, 2002, Plaintiff was ready and physically able to return to work. (Pl. Dep. at 285). On September 9, 2002, Plaintiff met with Hembree and Christopher Pergakis, the General Manager of Buffalo's Café at that time, to discuss her return to work. According to Hembree, Plaintiff informed him at the meeting that she was only available to work 9:00 a.m. to 5:00 p.m. Monday through Friday in order to accommodate her child-care

8

needs.  (Hembree Dep. at 92). Plaintiff testified, however, that she merely proposed a work schedule where she would work during the days from Monday through Saturday.  (Pl. Dep. at 277).

Hembree did not accept Plaintiff's proposal because the hours she had requested did not fit into the regular shifts for assistant managers.  Instead, Hembree asked Plaintiff to work out her child-care issues.  Plaintiff testified that she would have worked any schedule. (Pl. Dep. at 278).  Plaintiff, however, did not communicate to Hembree or Pergakis during the September 9, 2002, meeting, that she would work any schedule, if necessary. (Pl. Dep. at 279).  At no time during the September 9, 2002, meeting did Hembree inform Plaintiff that she would be terminated unless she returned to work on a regular schedule as an assistant manager.  (Hembree Dep. at 94-95).  Hembree did not consider Plaintiff to have abandoned her position as of September 9, 2002. (Hembree Dep. at 233).

On September 9, 2002, Pryzbyla was terminated by Oasis as part of a reduction in force.  Before leaving her employment, Pryzbyla prepared a letter to Plaintiff indicating that Plaintiff had been notified on August 30, 2002, that her FMLA leave was ending on September 9, 2002. [Doc. No. 39](Ex. C).  Pryzbyla's letter further notified Plaintiff that as of September 9, 2002, her leave was not protected under the FMLA.  [Doc. No. 39](Ex. C).  In addition, Defendant removed Plaintiff from its payroll and terminated her insurance benefits in early September, 2002.

(Affidavit of Phillip Hembree ("Hembree Aff.") at ¶ 5)(John Dep. at 55).

On or about September 11, 2002, Plaintiff called Hembree to inquire whether she could come back as a server instead of an assistant manager. Hembree rejected Plaintiff's proposal. Following her telephone conversation with Hembree, Plaintiff contacted John in the Oasis' Human Resources department to ask what Defendant's obligations were under the FMLA. While admitting her scheduling difficulties to John, Plaintiff also indicated that she was working on resolving her child-care issues and that she was willing to do anything she could to return to work full-time and would work any schedule. (Pl. Dep. at 281-283). A couple of days later, Plaintiff telephoned Hembree and left a message that she was trying to work out her child-care issues. (Hembree Dep. at 175-176).

On or about September 17, 2002, Plaintiff received a COBRA notification from Oasis, and, based on that correspondence, believed that her employment had been terminated. Plaintiff testified that she never gave Defendant a definitive date as to when she would be able to return to a full-time schedule as a salaried assistant manager. (Pl. Dep. at 300). Defendant did not complete the final paperwork for Plaintiff's separation from employment until January, 2003, after receiving correspondence from Plaintiff's attorney.

10

C.   **Additional Facts Relating to Plaintiff's Pregnancy Discrimination Claims**

Plaintiff testified that, for a period of six months in 2001, she filled in for Buffalo Cafe's General Manager, Jeff Hughes, while he worked at another restaurant owned by Hembree. (Pl. Dep. at 160-161).  On June 3, 2002, Pergakis was hired by Defendant to work at Buffalo's Café.  (Hembree Dep. at 107). Hughes vacated his position as General Manager in the summer of 2002, and on August 1, 2002, Hembree promoted Pergakis to Hughes' position as General Manager at Buffalo's Café.  Plaintiff was not considered for the position.

Hembree considered Pergakis to be more qualified than Plaintiff for the General Manager position because of Pergakis' prior work experiences and Plaintiff's penchant for being a follower. (Hembree Dep. at 137-139).  Hembree further testified that Plaintiff had previously communicated to him her lack of interest in the position because it was too stressful and involved too many hours and too much work.  (Hembree Dep. at 137).  Plaintiff testified, however, that she was never told about the General Manager position and that she was upset about not receiving the promotion.  (Pl. Dep. at 240).

Hembree admitted that he had an extra-marital affair with Heather Worthan, who, at the time the affair began in late 2001 or early 2002, was twenty-one years old and an employee at the Buffalo's Café.  (Hembree Dep. at 9, 107-110, 149, 210).  Hembree

11

further testified that Worthan worked as a server and then as an hourly assistant manager at the restaurant. (Hembree Dep. at 109). In late July, 2002, while Plaintiff was out on leave, Hembree promoted Worthan to the position of salaried Assistant Manager with benefits. (Hembree Dep. at 107-108). At the time Hembree promoted Worthan to the Assistant Manager position, he was still romantically involved with her. (Hembree Dep. at 110).

### III.
### The Standard of Review on Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The substantive law applicable to the case determines which facts are material. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of showing the court "the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which

AO 72A
(Rev.8/82)

it believes demonstrate the absence of a genuine issue of material fact" and "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986); Four Parcels, 941 F.2d at 1437-38.  If the moving party fails to discharge this initial burden, then the motion must be denied.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)).  Once this burden is met, the non-moving party must then "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

**IV.**
**Discussion**

A.    **Plaintiff's FMLA Claims**

  1.    **The Law in General**

The FMLA provides eligible employees with "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A).  In addition, an employee returning from covered FMLA leave is entitled to be restored to her former position or "to an equivalent position with equivalent employment benefits, pay, and

13

AO 72A
(Rev.8/82)

other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A)-(B).

If an employer grants paid benefits to its employees, the FMLA provides that "[a]n eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave . . . for any part of the twelve-week period of [FMLA] leave." 29 U.S.C. § 2612(d)(2)(B). Section 825.207(f) of the FMLA's accompanying regulations clarifies the Act's substitution language by providing that "[i]f neither the employee nor the employer elects to substitute paid leave for unpaid FMLA leave . . . ., the employee will remain entitled to all the paid leave which is earned or accrued under the term's of the employer's plan. 29 C.F.R. § 825.207(f). In other words, "an employee who has an FMLA-qualifying condition may take both 12 weeks of unpaid leave under the Act, plus any paid leave his employer provides unless the employee chooses, or the employer requires, that the two leave entitlements run concurrently." <u>Strickland</u>, 239 F.3d at 1205.

While not clearly delineated by the FMLA, courts have used the labels "interference" and "retaliation" to describe the two types of claims that may be brought under 29 U.S.C. § 2615(a) of the FMLA. <u>Strickland</u>, 239 F.3d at 1206 n.9. First, in an "interference" claim, an employee asserts that the employer has interfered with her rights by refusing to provide an FMLA benefit

14

to which the employee was entitled.  <u>See</u> 29 U.S.C. § 2615(a)(1).
Second, in a retaliation claim, the employee asserts that her
employer discriminated her because she engaged in activity
protected under the FMLA.  <u>See</u> 29 U.S.C. § 2615(a)(2).  Although
Plaintiff must show discriminatory intent for the second type of
claim, no proof of intent is necessary for interference claims
brought under § 2615(a)(1).   <u>Strickland</u>, 239 F.3d at 1207.   In
this case, Plaintiff alleges both interference and retaliation
claims under the FMLA.

## 2. <u>Plaintiff's Interference Claim under 29 U.S.C. § 2615(a)(1)</u>

It is unlawful "for any employer to interfere with,
restrain, or deny the exercise of or the attempt to exercise, any
right provided" by the FMLA.  29 U.S.C. § 2615(a)(1).  To state
a claim of interference with a substantive FMLA right, an
employee must demonstrate by a preponderance of the evidence that
she was entitled to the benefit denied.  <u>Strickland</u>, 239 F.3d at
1206-07 (citing <u>O'Connor v. PCA Family Health Plan, Inc.</u>, 200
F.3d 1349, 1353-54 (11th Cir. 2000)).

Among the substantive rights granted to eligible employees
are the right to "12 workweeks of leave during any 12-month
period" and the right to be restored to her former position or
"to an equivalent position with equivalent employment benefits,
pay, and other terms and conditions of employment."  29 U.S.C. §§
2612(a)(1) and 2614(a)(1)(A)-(B).   "An employer can deny the

15

right to reinstatement, however, if it can demonstrate that it would have discharged the employee had he not been on FMLA leave." Strickland, 239 F.3d at 1208 (citing O'Connor, 200 F.3d at 1354).

In support of its summary judgment motion, Defendant contends that Plaintiff's twelve weeks of FMLA leave expired on July 25, 2002, due to Plaintiff's placement on "intermittent" or "reduced schedule" FMLA leave beginning on December 16, 2001. Defendant further contends that its failure to notify Plaintiff that her "intermittent" or "reduced schedule" leave counted as FMLA leave does not preclude it from counting that time against her FMLA leave entitlement. Defendant asserts, therefore, that it did not interfere with Plaintiff's right to reinstatement because Plaintiff failed to return to work at the expiration of her twelve-week FMLA leave, which occurred well before September 9, 2002. Alternatively, Defendant contends that, even if Plaintiff's twelve-week FMLA leave entitlement extended through September 9, 2002, Plaintiff imposed limitations on her return to work during the September 9, 2002, meeting with Hembree and Pergakis which negate any claim that Defendant interfered with Plaintiff's FMLA right of reinstatement.

Plaintiff responds that she and Defendant never agreed to treat her reduced work schedule from December 16, 2001, through July, 2002 as part of her authorized FMLA leave. Plaintiff further responds that Oasis' FMLA business records, policies, and

16

correspondence confirm that her protected FMLA leave extended at least through September 9, 2002.  As such, Plaintiff contends that she had been willing to return to work on September 9, 2002, but that Defendant unlawfully interfered with her FMLA rights by refusing to reinstate her.

The FMLA permits an employee with a serious health condition rendering her unable to perform her job to take FMLA leave "intermittently or on a reduced leave schedule when medically necessary."  29 U.S.C. § 2612(b)(1); see 29 C.F.R. § 825.203(a) (defining "intermittent leave as leave taken in separate blocks of time due to a single qualifying reason" and a "reduced leave schedule" as a reduction in "an employee's usual number of working hours per workweek, or hours per workday.").  In connection with the serious health condition of pregnancy, however, FMLA leave "shall not be taken by an employee intermittently or on a reduced schedule unless the employee and the employer agree otherwise."  29 U.S.C § 2612(b)(1).

In the instant case, Defendant contends that Plaintiff agreed to an intermittent or reduced schedule from December 16, 2001, through early July, 2002, when Plaintiff went on full time maternity leave.  Based on this purported placement into intermittent or reduced schedule leave for several months, Defendant contends that Plaintiff's twelve weeks of FMLA leave expired on July 25, 2002, shortly after Plaintiff went on full-

17

time maternity leave and gave birth to her baby. (See John Aff. at ¶ 11).

The record reflects that Defendant did not provide Plaintiff with notice that her reduced schedule taken from December 16, 2001, through July, 2002 would constitute FMLA leave. Citing McGregor v. Autozone, 180 F.3d 1305 (11th Cir. 1999), however, Defendant contends that its failure to provide Plaintiff with such notice does not preclude it from now counting that time against her FMLA leave entitlement. In McGregor, the Eleventh Circuit Court of Appeals considered the validity of 29 C.F.R. § 825.208(a), which required employers to notify an employee that an absence is being counted as FMLA leave before the employer can count the leave against the twelve-week FMLA entitlement. McGregor, 180 F.3d at 1307-08. The Eleventh Circuit struck down the regulation as invalid because it improperly converted the Act's minimum of federally-mandated leave into an entitlement to an additional 12 weeks of leave unless the employer specifically and prospectively notifies the employee that she is using her FMLA leave. Id. at 1308.

McGregor, however, is inapposite to the instant case. While abrogating the notice requirement in § 825.208(a), the Eleventh Circuit in McGregor did not address § 2612(b)(1), which precludes the taking of intermittent or reduced schedule leave absent an agreement between the employee and the employer. Accordingly, the McGregor decision does not control with respect to the issue

18

presented to this Court -- whether there is an issue of fact as to whether the parties agreed pursuant to § 2612(b)(1) to consider Plaintiff's reclassification after December 16, 2001, as intermittent or reduced-schedule FMLA leave. In the absence of any controlling authority, this Court must consider whether it appears without dispute that the parties agreed, pursuant to § 2612(b)(1), to place Plaintiff on intermittent or reduced schedule leave from December 16, 2001, until Plaintiff was placed on full-time leave in July, 2002.

The record reflects that in mid-December of 2001, Plaintiff asked Hembree about whether she could spread her twenty-one vacation days over twenty-one weeks in order to work four days a week, instead of five days a week. In connection with this request, Plaintiff gave no formal notice of her desire to have her vacation days substituted for unpaid FMLA leave. Rather than agree to Plaintiff's proposal, Hembree reclassified Plaintiff from a salaried Assistant Manager to an hourly manager, earning $13.00 per hour for all hours worked. (Hembree Dep. at 161-164)(Pl. Dep. at 209). Defendant relies on Hembree's testimony to submit that Plaintiff agreed to this reclassification. (Hembree Dep. at 161-166).

When construing the facts in favor of Plaintiff, however, Hembree's testimony suggests only that Plaintiff agreed to a reduced work schedule as an hourly manager at Hembree's insistence. Indeed, Plaintiff's contradictory testimony reflects

19

AO 72A
(Rev.8/82)

her understanding that Hembree unilaterally reclassified Plaintiff as an hourly employee after rejecting Plaintiff's proposal regarding vacation days. (Pl. Dep. at 211-213). The record is devoid of any agreement between Plaintiff and Defendant concerning whether Plaintiff would use her FMLA leave on an intermittent or reduced schedule basis following the December 16, 2001, reclassification through July, 2002. At a minimum, genuine issues of material fact exist as to the presence of an agreement to have a reduced schedule apply to her FMLA leave entitlement.

Moreover, Oasis' FMLA policy and business records contradict any claim that Plaintiff's reduced schedule was applied against her FMLA leave entitlement. Rather, such evidence reflects that Defendant did not consider Plaintiff to be on FMLA leave until the summer of 2002. Oasis' FMLA policy provides instructions for mailing a notification letter to an employee advising her of her provisional eligibility for FMLA leave and of the deadlines for providing medical certification. [Doc. No. 39](Ex. D at 4). Further provisions in Oasis' FMLA policy set forth when subsequent notices are to be mailed to an employee. [Doc. No. 39](Ex. D at 4). If medical certification is received at any time on employee's leave, the whole leave will be considered FMLA leave. [Doc. No. 39](Ex. D at 4).

In this case, correspondence from Pryzbyla to Plaintiff, dated June 6, 2002, shows that Defendant considered Plaintiff provisionally eligible for FMLA leave on that date and required

Plaintiff to have a Certification completed by a health care provider and returned to Oasis on or before June 21, 2002. [Doc. No. 39](Ex. C).    Plaintiff testified that she returned the necessary paperwork, including the Certification, in a timely fashion. (Pl. Dep. at 245-248).    Further, Oasis Human Resource Administrator John testified that Oasis did, in fact, receive the completed Certification from Plaintiff at some unspecified date. (John Dep. at 71).    Finally, correspondence from Pryzbyla to Plaintiff, dated September 9, 2002, states that Plaintiff was notified on August 30, 2002, that her FMLA leave was ending on September 9, 2002, and that Plaintiff's leave was not protected under the FMLA as of that date.  [Doc. No. 39](Ex. C).

The Court finds, therefore, that genuine issues of material fact preclude any undisputed finding that Plaintiff was placed on intermittent or reduced-schedule FMLA leave following the December 16, 2001, reclassification and until through July, 2002. Thus, taking Plaintiff's evidence in the light most favorable to her, no time for intermittent or reduced schedule leave will be considered in determining Plaintiff's FMLA leave period and whether Defendant unlawfully interfered with her right to be reinstated to work on or about December 9, 2002.

Further, a review of Oasis' internal documents reveals issues of fact as to the exact time frame of Plaintiff's twelve-week FMLA period.    According to an internal Oasis document prepared by Pryzbyla, Plaintiff's authorized FMLA leave ran from

21

June 6, 2002 through September 9, 2002. [Doc. No. 39](Ex. C). It appears that Pryzbyla based her starting date for Plaintiff's FMLA leave on the date that she mailed the first notification letter indicating provisional eligibility. The September 9, 2002, ending date for Plaintiff's FMLA leave also is supported by Pryzbyla's letter of September 9, 2002, notifying Plaintiff that her FMLA leave was ending on September 9, 2002. [Doc. No. 39](Ex. C).

Notes taken by John, however, reflect that Plaintiff's FMLA starting date occurred on July 8, 2002. [Doc. No. 39](Ex. C). Plaintiff testified that her last day of work at Buffalo's Café was either July 7 or 8, 2002, several days before the birth of her child on July 17, 2002. (Pl. Dep. at 241). Oasis' FMLA policy provides that when the Certification has been received, the FMLA leave starting date "is the later of the date on which the employee actually went on leave OR the date of the first notification letter" indicating provisional eligibility. [Doc. No. 39](Ex. D at 10). Assuming that Plaintiff's first day of FMLA leave occurred on July 8 or 9, 2002, –- after her last day of work -- instead of June 6, 2002 , her twelve-week FMLA period would then have extended until the beginning of October, 2002.

Genuine issues of material fact exist, therefore, as to whether Plaintiff's FMLA leave expired on September 9, 2002, or in the beginning of October, 2002. Plaintiff has presented evidence that from September 9, 2002, through September 11, 2002,

she told Hembree and Oasis representative John that she wanted to return to work.  Plaintiff was physically able to report to work on September 9, 2002, and, in fact, met with Hembree and Pergakis on September 9, 2002, to discuss her return to work.  Plaintiff's testimony indicates that while she proposed a specific work schedule to accommodate her child-care needs, she would work any schedule if necessary.   Instead of accepting Plaintiff's proposal, Hembree instructed Plaintiff to work out her child-care issues.

Two days later, Hembree rejected Plaintiff's proposal to return as a server instead of an assistant manager.  That same day, Plaintiff communicated to John that she was working on resolving her child-care issues and that she was willing to do anything she could to return to work, full-time, and would work any schedule.  (Pl. Dep. at 281-283).  On or about September 17, 2002, Plaintiff received a COBRA notification from Oasis, and, based on that correspondence, believed that her employment had been terminated.

The FMLA obligated Defendant to restore Plaintiff to either her former or an equivalent position upon her return from FMLA leave, which may have occurred as early as September 9, 2002, or as late as the beginning of October, 2002.  See 29 C.F.R. § 825.309.  Since Plaintiff was not restored to her former or equivalent position, either on September 9, 2002, or thereafter, genuine issues of material fact exist as to whether Defendant

23

interfered with Plaintiff's rights under the FMLA. Accordingly, Defendant is not entitled to summary judgment with respect to Plaintiff's interference claim.

### 3.   **Plaintiff's Retaliation Claim under 29 U.S.C. § 2615(a)(2)**

#### a.   **The Law in General**

To succeed on an FMLA retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207 (citing King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999)) (bracketed material added). "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" Strickland, 239 F.3d at 1207 (quoting King, 166 F.3d at 891). Intent may be shown through either direct or circumstantial evidence. Id. at 1207; Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 798 (11th Cir. 2000).

Plaintiff has presented no direct evidence of retaliatory discrimination. Rather, Plaintiff seeks to establish her FMLA retaliation claim solely through circumstantial evidence. In such a case, the courts apply the same burden-shifting and prima facie framework as that used in the Title VII context. Thus, Plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and

24

(3) the decision was causally related to the protected activity.

Strickland, 239 F.3d at 1207 (citing Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000)).

Defendant does not dispute that Plaintiff has satisfied the first two elements of her prima facie case -- protected activity and adverse action.[3]  With respect to the third prong of the prima facie test, Defendant asserts that Plaintiff cannot establish a causal connection between her protected activity -- the taking of FMLA leave -- and her termination, because she was terminated only after Plaintiff's FMLA leave period had expired and after Plaintiff had failed to provide a definitive date for her return to work.  Citing Johnson v. Morehouse College, 199 F.Supp.2d 1345 (N.D. Ga. 2002), Defendant contends that even if it miscalculated the period of Plaintiff's FMLA leave, leading erroneously to her discharge in violation of the FMLA, such a

---

[3]With regard to protected activity, FMLA retaliation claims, in general, are based upon 29 U.S.C. § 2615(a)(2), which provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).  This language would suggest that the phrase "statutorily protected activity" in the prima facie case should encompass conduct in which a plaintiff opposes an unlawful practice prohibited by the FMLA prior to suffering adverse action.  See Wu v. Southeast-Atlantic Beverage Corp., 321 F.Supp.2d 1317, 1340 (N.D. Ga. 2004)(rejecting FMLA retaliation claim because plaintiff did not complain "about any practice prohibited by the FMLA before his demotion" upon his return from sick leave).  In this case, Plaintiff appears to make no allegation that she opposed any unlawful practice by Defendant before being discharged.  Rather, Plaintiff alleges that she was discharged after she took FMLA leave and then sought reinstatement. Nevertheless, as noted above, Defendant did not contest the "statutorily protected activity" prong of the prima facie case, and this Court will not, therefore, address this issue.

miscalculation and discharge cannot support a retaliation claim. Plaintiff responds that she was terminated from her employment on September 9, 2002, the last day of her approved FMLA leave, and that a reasonable fact finder could conclude that she was terminated because she availed herself of her rights under the FMLA.

To establish the causal connection element, Plaintiff "need only show that the protected activity and the adverse action are not completely unrelated." Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998) (quoting Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994)). At a minimum, however, Plaintiff "must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Brungert v. Bellsouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) . Temporal proximity "between the protected activity and the adverse employment decision does not, standing alone, establish" the causal link. Strickland, 239 F.3d at 1207 n.10. However, close temporal proximity, coupled with the decision maker's awareness of the protected activity may be sufficient to establish the requisite causal connection. Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).

In Johnson, relied upon by Defendant, District Judge Julie E. Carnes of this Court considered an issue similar to the one before this Court --whether a causal connection existed between

26

an employee's taking of FMLA leave and her subsequent termination. Johnson, 199 F.Supp.2d at 1359-62. The plaintiff, Vicki Johnson, brought FMLA interference and retaliation claims against her former employer, Morehouse College, Inc. ("Morehouse"), after she was terminated following an extended maternity leave. Id. at 1347-51. Johnson claimed that Morehouse unlawfully retaliated against her for exercising her FMLA rights and by failing to restore her to the same position that she had held before her FMLA leave commenced. Id. at 1359. In response, Morehouse claimed that it terminated Johnson because she failed to return to work after her FMLA leave expired. Id. at 1359.

Judge Carnes agreed with Morehouse, finding that Johnson had been given her full twelve weeks of FMLA leave and had failed to return to work thereafter. Id. at 1360-61. Judge Carnes concluded that the FMLA does not forbid an employer from terminating an employee who refuses to come back to work as long as the employee has been given the requisite FMLA leave period. Id. at 1360. Because Johnson was fired more than two months after her FMLA leave had expired, the court found no causal connection between her "protected conduct" and her termination. Id. at 1362. The court further recognized that, while a mistake in the calculation of an employee's FMLA leave may subject an employer to liability for interference, it does not, standing alone, support a retaliation claim. Johnson, 199 F.Supp.2d at 1361.

27

In considering whether Plaintiff can establish the requisite causal connection, this Court initially notes that this case is factually distinguishable from <u>Johnson</u>.  In contrast to the plaintiff in <u>Johnson</u>, Plaintiff communicated her desire to return to work with Defendant before the expiration of her FMLA period. Indeed, fact issues exist as to whether Plaintiff's FMLA leave expired on September 9, 2002, or in the beginning of October, 2002.  Nevertheless, even assuming that Plaintiff's FMLA leave was to expire on September 9, 2002, Plaintiff sought to return to work on that day.  Further, while Plaintiff may not have given Defendant a definitive date as to her return to work, she effectively communicated her desire to be reinstated at Buffalo's Café.

This Court finds that, at a minimum, a fact issue exists as to whether Plaintiff's protected FMLA activities – the taking of FMLA leave and subsequent request for restoration –- are wholly unrelated to her termination from employment.  Plaintiff met with Hembree on September 9, 2002, to discuss her return to work, but Hembree rejected Plaintiff's proposal to work a specific work schedule.  Two days later, Plaintiff further communicated to John that she would work any schedule if necessary.  Rather than expressly offering Plaintiff the opportunity to return to her former position or else face termination, the record reflects that Defendant removed Plaintiff from its payroll and terminated her insurance benefits in early September, 2002.  (Hembree Aff.

at ¶ 5)(John Dep. at 55). Further, only eight days after seeking to return to work, Plaintiff received a COBRA notification on or about September 17, 2002, leading Plaintiff to reasonably conclude that her employment had been terminated.

While issues of fact may exist as to exactly when and why Plaintiff was terminated from Buffalo's Café, the process of her termination began shortly after she sought to return to work after taking FMLA leave. This Court concludes, therefore, that Plaintiff has demonstrated, at a minimum, a fact issue as to causation. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163-64 (11th Cir. 1993) (finding causation with time span of three weeks); Donnellon v. Fruehauf Corp., 794 F.2d 598, 600 (11th Cir. 1986) (finding causation with time interval of one month between plaintiff's filing EEOC charge and termination). Plaintiff, therefore, can establish the third element of her prima face case of retaliation under the FMLA.

Once a prima facie case is demonstrated, Defendant is required to come forward with a legitimate nondiscriminatory reason for its actions. Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994). Defendant contends that Plaintiff refused to meet the scheduling demands of her position when discussing her return to work and that she gave no indication of when she would be able to return. These reasons satisfies Defendant's burden of producing a legitimate non-retaliatory reason for its action. Turnes, 36 F.3d at 1060-61.

29

Once the defendant has carried its burden of showing a legitimate nondiscriminatory reason for its actions, a plaintiff must "be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reason[] offered by the defendant [was] not its true reason[], but [was] pretext for discrimination.'" Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000) (quoting Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973)). A plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." Burdine, 450 U.S. at 256.

In contending that Defendant's proffered reasons were pretextual, Plaintiff cites her own testimony to show that she was ready and willing to return to work but that Hembree had failed to place her on any work schedule. Indeed, Plaintiff's testimony indicates that while she proposed a specific work schedule to Hembree to accommodate her child-care needs, she would work any schedule if necessary. Instead of accepting Plaintiff's proposal, Hembree instructed Plaintiff to work out

30

her child-care issues.  The record further reflect that Plaintiff informed John two days later that she would work any schedule. (Pl. Dep. at 281-283).  Plaintiff's testimony undermines the credibility of Defendant's proffered reason that she would not meet its scheduling demands.  Her testimony further suggests that Defendant's proffered reasons were not the real reason for her termination.

At a minimum, the Court finds that genuine issues of material fact exist as to whether Defendant's proffered reasons were merely a pretext to discriminate against Plaintiff by terminating her for taking FMLA leave and then seeking reinstatement.  Accordingly, summary judgment with respect to Plaintiff's retaliation claim should be **DENIED**.

**B.**   **Plaintiff's Title VII Claims**

    **1.**   **The Law in General**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In an employment discrimination disparate treatment action, the plaintiff has the burden of persuading the factfinder that the defendant intentionally discriminated against her.  <u>Burdine</u>, 450 U.S. at 252-53 (1981).

31

Where, as in this case, the plaintiff does not have direct evidence of discriminatory intent,[4] she may present circumstantial evidence from which an inference of intentional discrimination may be drawn. <u>Armstrong v. Flowers Hosp., Inc.</u>, 33 F.3d 1308, 1313 (11th Cir. 1994). When relying upon circumstantial evidence, the allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of establishing a prima facie case of discrimination; (2) once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken against the employee; and (3) if the defendant succeeds, the burden then shifts back to the plaintiff to raise a genuine factual question as to whether defendant's stated reason was a mere pretext. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024 (11th Cir. 2000); <u>Richardson v. Leeds Police Dept.</u>, 71 F.3d 801, 805-06 (11th Cir. 1995).

---

[4]In her Statement of Undisputed Material Facts, Plaintiff references alleged comments made by Hembree to Plaintiff about her pregnancy. [Doc. No. 50](Pl. SMF at ¶ 17). Plaintiff suggests in a footnote that these comments "arguably" constitute direct evidence of discrimination. [Doc. No. 50](Pl. SMF at ¶ 17 n.1) However, Plaintiff does not argue in her brief that any of Hembree's comments constitute direct evidence of discrimination, and this Court does not find any of them to amount to such.

AO 72A
(Rev.8/82)

### 2.    __Plaintiff's Pregnancy Discrimination Claim__

The Pregnancy Discrimination ("PDA"), codified at 42 U.S.C. § 2000e(k), provides as follows:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

Pregnancy claims utilize the same type of analysis as other Title VII claims. __Armindo v. Padlocker, Inc.__, 209 F.3d 1319, 1320 (11th Cir. 2000) (citing __Armstrong__, 33 F.3d at 1312-13; __Maddox v. Grandview Care Ctr., Inc.__, 780 F.2d 987, 989 (11th Cir. 1986)).

Courts in the Eleventh Circuit engage in a comparator-type analysis in order to determine whether Plaintiff can establish a prima facie case of intentional discrimination based on pregnancy -- in other words, Plaintiff must point to a similarly-situated non-pregnant employee who was treated more favorably than she. The PDA does not, however, require that employers afford preferential treatment to pregnant employees. In order to establish a prima facie case of pregnancy discrimination, Plaintiff must show: (1) she belonged to a protected group; (2) she was qualified for the position or benefit sought; (3) she

33

suffered an adverse employment action; and (4) she suffered from a differential application of work or disciplinary rules. <u>Spivey v. Beverly Enterprises, Inc.</u>, 196 F.3d 1309, 1312 (11th Cir. 1999); <u>Armstrong</u>, 33 F.3d at 1314.  To show that she suffered a differential application of a work rule, a plaintiff must proffer evidence that she was subjected to less favorable treatment in the application of the work rule than similarly-situated employees.  <u>Spivey</u>, 196 F.3d at 1312; <u>Armstrong</u>, 33 F.3d at 1314.[5]

### a.    Termination

Plaintiff claims that Defendant discriminated against her by terminating her from employment after she gave birth and after she attempted to return to work following her maternity leave. Defendant asserts that Plaintiff cannot establish her prima facie case.  First, Defendant contends that Plaintiff was no longer a

---

[5]In its summary judgment motion, Defendant argues that Plaintiff cannot establish a pregnancy discrimination claim based on changes made to her hours and wages. [Doc. No. 39](Brief at 5).  Defendant further argues that it had legitimate, non-discriminatory reasons for changing Plaintiff's schedule and compensation after Plaintiff informed Hembree of her pregnancy in December, 2001. [Doc. No. 39](Brief at 10).  Finally, Defendant argues that Plaintiff cannot establish that its non-discriminatory reasons were a pretext for discrimination with regard to changes to her hours and wages.  [Doc. No. 39](Brief at 14-15).  In her response brief, however, Plaintiff failed to make any arguments in opposition to Defendant's arguments for summary judgment on these claims.  This Court concludes, therefore, that Plaintiff's discrimination claim as to her hours and wages has been abandoned, and summary judgment should be **GRANTED** in favor of Defendant regarding same. <u>Bute v. Schuller Int'l Inc.</u>, 998 F. Supp. 1473, 1477 (N.D.Ga. 1998); <u>McKenna v. Clayton County, State of Georgia</u>, 657 F. Supp. 221, 226 (N.D.Ga. 1987).

member of a protected class at the time she sought to return to work since she was not then pregnant.  This Court agrees.

The personal attribute of pregnancy is not "immutable."  See Sura v. Stearns Bank, N.A., 2002 WL 31898167 at *5 (D. Minn. Dec. 18, 2002).  "While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions.'" Solomen v. Redwood Advisory Co., 183 F.Supp.2d 748, 753 (E.D. Pa. 2002).  Generally, "a woman's status as a new parent, standing alone, is insufficient to establish membership in the protected class for pregnancy discrimination." Sura, 2002 WL 31898167 at *5 (citing Piantanida v. Wyman Ctr., Inc., 116 F.3d 340, 342 (8th Cir. 1997).  To remain a member of the protected class after birth, "a woman who is not pregnant at or very near the time when an adverse employment action is taken against her 'must demonstrate that the effects of her pregnancy continued to exist at the time she was (subject to the action), either in actual fact or in the thoughts and actions of those responsible.'" Sura, 2002 WL 31898167 at *5 (citing Solomen, 183 F.Supp.2d at 754).

In this case, the undisputed record reflects that Plaintiff's physician released Plaintiff to return to work in August and September of 2002.  The parties' disagreement about Plaintiff's reinstatement to her former position centered on Plaintiff's changed circumstances as a new parent, not on her

35

pregnancy or childbirth. Furthermore, the work schedule Plaintiff proposed in connection with her reinstatement as an assistant manager does not constitute a "medical condition" related to childbirth or her pregnancy. Neither Title VII nor the PDA extend protection to formerly-pregnant employees who are seeking to adjust to their roles as new parents. See Piantanida, 116 F.3d at 342. Accordingly, because Plaintiff was no longer pregnant when she was terminated, and because she has failed to demonstrate how the decision to terminate her from employment at the Buffalo's Café was related to her pregnancy, childbirth, or any pregnancy-related medical condition, she cannot establish that she falls within the class of persons protected by the PDA.

Plaintiff also cannot satisfy the fourth prong of her prima facie case: She cannot show that she suffered from a differential application of a work or disciplinary rule.[6]  While complaining about how rudely Hembree treated her and other pregnant employees, Plaintiff has failed to identify any similarly-situated non-pregnant employees who were afforded more favorable

---

[6]Contrary to Defendant's arguments, this Court finds that Plaintiff has demonstrated the second and third prongs of her prima facie case. It is undisputed that Plaintiff sought to return to her former position as assistant manager, albeit with adjusted hours. Plaintiff's testimony reflects that she would have worked any schedule for Defendant and that she had previously carried out the functions of her job. (Pl. Dep. at 169-172, 278, 281-283). Accordingly, the Court finds that Plaintiff was "qualified" for the assistant manager position she sought to be reinstated to after her FMLA leave. Further, Plaintiff was discharged. Accordingly, Plaintiff has also demonstrated that she suffered an adverse employment action.

treatment.[7]  <u>See</u> <u>Spivey</u>, 196 F.3d at 1312; <u>Armstrong</u>, 33 F.3d at

1314.  Plaintiff has submitted no evidence that any similarly-

situated non-pregnant employees out on leave, FMLA or otherwise,

were treated differently after failing to appear for work at the

expiration of the designated medical leave period.  Because

Plaintiff has failed to satisfy the first and fourth prongs of

her prima facie case, it is recommended that summary judgment be

**GRANTED** as to her discriminatory termination claim under the PDA.

> **b.    Failure to Promote**

Plaintiff complains about Hembree's decision to promote

Pergakis to the position of General Manager on August 1, 2002,

while Plaintiff was out on FMLA leave.  Plaintiff claims that she

was denied that promotion to General Manager due to her

pregnancy.  Defendant contends that Plaintiff cannot establish

either the second or the fourth elements of her prima facie case

-- that she was qualified for the General Manager position or

that a comparable non-protected person, Pergakis, received more

favorable treatment.

---

[7]In connection with her discriminatory termination claim, Plaintiff cites the fact that Hembree promoted a woman with whom he was romantically involved to the assistant manager position in late July, 2002.  Plaintiff points to this evidence as proof that Defendant's reasons for dismissing her were a pretext for discrimination.  However, as discussed above, Plaintiff has failed to demonstrate her prima facie case under the PDA, and this Court need not reach the issue of pretext.  Moreover,  while favoritism toward for a paramour may be unfair, it does not amount to sex discrimination under Title VII.  <u>Womack v. Runyon</u>, 147 F.3d 1298, 1300 (11th Cir. 1998).

37

In contesting whether Plaintiff could establish a prima facie case as to her failure-to-promote claim, the parties utilized the disparate treatment framework set forth above in Spivey and Armstrong applicable to PDA discrimination claims. Generally, in Title VII claims involving the failure to promote, however, courts apply a different prima facie test.  In such a situation, a plaintiff must show that (1) she belonged to a protected group; (2) she was qualified and applied for the position; (3) that despite her qualifications she was rejected; and (4) after the rejection the employer filled the position with someone outside of the plaintiff's protected class.  McDonnell Douglas, 411 U.S. at 802; Schoenfeld v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999); Wright v. Southland Corp., 187 F.3d 1287, 1290-91 n.2. (11th Cir. 1999).  The above test, based on McDonnell Douglas, is the test that will be applied in this case.

Both the disparate treatment analysis set forth in Spivey and the general Title VII failure-to-promote test require a plaintiff to be qualified for the position sought.  "Qualified" refers to basic or minimal qualifications rather than optimal performance.  See, e.g., Carter v. Three Springs Residential Treatment, 132 F.3d 635, 643-44 (11th Cir. 1998) (discussing that a plaintiff must show he was minimally qualified for the position); Eastland v. Tennessee Valley Authority, 704 F.2d 613, 625 (11th Cir. 1983); Louis v. Encore Computer Corp., 949 F. Supp. 836, 840 (S.D. Fla. 1996).  On the issue of qualification,

AO 72A
(Rev.8/82)

Defendant contends that Plaintiff was not qualified for the General Manager position because it required both evening and weekend work, both of which Plaintiff informed Defendant that she could not do.  Plaintiff responds that she was well qualified for the position, having previously filled in for Hughes, the departing General Manager, for a period of six months in his absence.

According to Hembree and Pergakis, the General Manager position is not a 9:00 a.m. to 5:00 p.m. job and, instead, requires the manager to work from 7:00 a.m. to closing. (Hembree Aff. at ¶ 4)(Pergakis Aff. at ¶ 3).  In arguing against Plaintiff's qualifications for the General Manager position, Defendant points to the September 9, 2002, meeting with Hembree where Plaintiff informed him that she was only available to work 9:00 to 5:00 Monday through Friday in order to accommodate her child-care needs. (Hembree Dep. at 92).  Plaintiff's testimony, however, reflects that this work schedule was only a proposal and that she would have worked any schedule. (Pl. Dep. at 277-278).  In addition, Plaintiff's meeting with Hembree occurred well after the General Manager position was awarded to Pergakis on August 1, 2002.  Thus, at the time of Pergakis' promotion, Hembree was unaware of any proposed limitations on Plaintiff's work schedule.

The undisputed record reflects that from September 27, 1999, until mid-December, 2001, Plaintiff worked as a full-time, salaried assistant manager at Defendant's restaurant, Buffalo's

Café.  As an assistant manager, Plaintiff had the authority to discipline, hire and fire employees.  (Pl. Dep. at 171-172). Plaintiff testified that, for a period of six months in 2001, she filled in for Buffalo Cafe's General Manager, Jeff Hughes, while he worked at another restaurant owned by Hembree.  (Pl. Dep. at 160-161).  When viewing the totality of the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has demonstrated that she was at least minimally qualified for the General Manager position in August, 2002, even though she was on full-time maternity leave.  The Court, therefore, concludes that Plaintiff has established the "qualification" prong of her her prima facie case.

Other than contesting whether Plaintiff was qualified for the General Manager position, Defendant does not challenge any other element of Plaintiff's prima facie case in connection with her failure-to-promote claim.  Accordingly, because Defendant has failed to point out the lack of evidence as to those remaining elements, Plaintiff will be taken to have established, for purposes of this motion, her prima facie case based on Defendant's failure to promote her to the General Manager position.  See Celotex, 477 U.S. at 323.

Once a prima facie case is established, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for not selecting Plaintiff.  In promoting Pergakis over Plaintiff, Defendant cites Plaintiff's

40

lack of experience and the fact that Pergakis had the requisite qualifications to take over the position right away. (Hembree Dep. at 137-139). These reasons satisfy Defendant's burden of production on this issue, which is "exceedingly light." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060-61 (11th Cir. 1994)..

After the employer presents a nondiscriminatory reason for its action, in order to avoid summary judgment, the plaintiff must present evidence that the reasons offered by the defendant were mere pretext or unworthy of credence. McDonnell Douglas, 411 U.S. at 804; Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). "The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (citation and internal quotation marks omitted).

In contending that Defendant's proffered discriminatory reasons were pretextual, Plaintiff simply states that she was well-qualified for the General Manager position, having previously filled in for Hughes, the departing General Manager, for a period of six months. Although comparative qualifications are relevant in determining whether an employer engaged in unlawful discrimination, a plaintiff "cannot . . . establish pretext by simply showing that [he] is more qualified than" his

41

comparator. <u>Cofield v. Goldkist</u>, 267 F.3d. 1264, 1268 (11th Cir. 2001) (bracketed material added); <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1254 (11th Cir. 2000). "[D]isparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." <u>Id.</u> at 1254 (citing <u>Deines v. Texas Dep't of Protective & Regulatory Svcs.</u>, 164 F.3d 277, 280 (5th Cir. 1999)).

The undisputed record reflects that Pergakis was hired by Defendant on June 3, 2002, to work at the restaurant. (Hembree Dep. at 107). Before working at Buffalo's Café, Pergakis worked at Ruby Tuesday's, Chili's and Appleby's. (Hembree Dep. at 138). Based on Pergakis' prior work experiences and because Plaintiff was perceived to be a follower, Hembree considered Pergakis to be more qualified than Plaintiff for the General Manager position. (Hembree Dep. at 137-139).

Comparing the relative qualifications of Plaintiff and Pergakis, this Court finds no disparity in qualifications so apparent as to virtually jump off the page and slap the Court in the face. Consequently, this Court cannot find any disparity between the respective qualifications of Plaintiff and Pergakis that would suggest that Pergakis' promotion to the General Manager position over Plaintiff on August 1, 2002, was the result of discriminatory animus or pretext. It is, therefore,

AO 72A
(Rev.8/82)

recommended that summary judgment be **GRANTED** as to Plaintiff's failure to promote claim.

### V.
### Conclusion

In summary, it is recommended that Defendant's motion for summary judgment [Doc. No. 39] be **DENIED** as to Plaintiff's interference and retaliation claims under the FMLA. It is further recommended that summary judgment be **GRANTED** as to Plaintiff's remaining claims.

**SO REPORTED AND RECOMMENDED,** this <u>7th</u> day of February, 2005.


<u>S/ E. Clayton Scofield III</u>
E. Clayton Scofield III
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHELLE NANCE,

                        **Plaintiff,**

    **v.**                                  **1:03-cv-2887-WSD**

**BUFFALO'S CAFÉ OF GRIFFIN, INC.,**

                        **Defendant.**

## <u>ORDER</u>

       This is an employment discrimination action filed by Plaintiff Michelle Nance ("Plaintiff") against her former employer, Defendant Buffalo's Café of Griffin, Inc. ("Defendant"). It is before the Court on the Magistrate Judge's Report and Recommendation [56] on Defendant's Motion for Summary Judgment [39]. In accordance with 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the Court has conducted a careful, *de novo* review of the portions of the Magistrate Judge's Report and Recommendation to which either party has objected. The Court has reviewed the remainder of the Magistrate Judge's Report and Recommendation for plain error. <u>United States v. Slay</u>, 714 F.2d 1093, 1095 (11th Cir. 1983).

## I.    BACKGROUND

### A.    Factual Background

The Magistrate Judge's Report and Recommendation includes a detailed discussion of the relevant facts, both in its Factual Background section and throughout the opinion.  Except as discussed in Section II(B), <u>infra</u>, neither party objected to the Magistrate Judge's findings of fact and, finding no plain error, the Court adopts them as set out in the Report and Recommendation.

### B.    Procedural History

Plaintiff filed her Complaint on September 23, 2003, alleging Defendant failed to promote her and discharged her because of her sex and her pregnancy in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e <u>et seq.</u> ("Title VII").  (Compl. [1] ¶¶ 17-28.)  Plaintiff also alleges Defendant interfered with her right to reinstatement under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 <u>et seq.</u> ("FMLA"), and retaliated against her for the exercise of her rights under the Act.  (Compl. ¶¶ 29-34.)  The parties completed discovery and, on July 15, 2004, Defendant filed its Motion for Summary Judgment and Memorandum of Law in Support ("Mot. for Summ. J.") [39].  Plaintiff filed her response in opposition to Defendant's motion on August 12, 2004 ("Resp. to Mot.

for Summ. J.") [51], and Defendant replied on August 30, 2004 ("Reply in Supp.

of Mot. for Summ. J.") [52].

On February 7, 2005, the Magistrate Judge issued his Report and

Recommendation [56], recommending the Court grant summary judgment on

Plaintiff's Title VII claims and deny summary judgment on Plaintiff's claims for

interference and retaliation under the FMLA.  (R&R at 43.)  Plaintiff filed her

objections to the Report and Recommendation ("Pl.'s Objections to R&R") [57]

on February 10, 2005.  Defendant did not respond to Plaintiff's objections, but

filed its own objections to the Report and Recommendation on February 21, 2005

("Def.'s Objections to R&R") [58].  Plaintiff responded to Defendant's objections

on March 3, 2005 ("Resp. to Def.'s Objections to R&R") [60].  On March 17,

2005, Defendant moved for leave to file a reply brief in support of its objections or,

in the alternative, for oral argument [61].[1]

---

[1]  Defendant argues a reply brief is necessary to address certain of the
allegations made by Plaintiff in her response to Defendant's objections.  (Mot. for
Leave to File Reply at 2-3.)  Defendant's proposed reply brief is attached to its
motion.  (Id.)  For cause shown, Defendant's Motion for Leave is GRANTED and
the Court will consider Defendant's Reply Brief in Support of Its Objections to the
Report and Recommendation.  Defendant's alternative request for oral argument is
DENIED AS MOOT.

## II.     DISCUSSION

### A.     The Magistrate Judge's Report and Recommendation

Defendant moved for summary judgment on Plaintiff's Title VII claims on the grounds that Plaintiff cannot establish a prima facie case of sex or pregnancy discrimination with respect to her discharge or non-promotion (Mot. for Summ. J. at 3-9), and, in the alternative, cannot establish Defendant's legitimate, non-discriminatory reasons for its employment actions were a pretext for unlawful discrimination (Id. at 11-17).  Defendant also moved for summary judgment on Plaintiff's FMLA claims for interference and retaliation, arguing (i) it did not unlawfully interfere with Plaintiff's right to reinstatement because she did not return to work before the expiration of her twelve weeks of leave under the FMLA (Mot. for Summ. J. at 17-21); and (ii) Plaintiff cannot establish a prima facie case of retaliation or demonstrate Defendant's legitimate, non-retaliatory reasons for its employment actions were a pretext for unlawful retaliation (Id. at 21-24).

The Magistrate Judge recommended that summary judgment be granted on Plaintiff's Title VII claims for failure to promote and discharge, finding (1) Plaintiff cannot establish a prima facie case of sex or pregnancy discrimination with respect to her discharge (R&R at 34-37); and (2) there is insufficient evidence from which a

-4-

reasonable juror could conclude Defendant's legitimate, non-discriminatory reason for promoting another employee instead of Plaintiff was a pretext for unlawful discrimination (id. at 37-43).[2][3]  The Magistrate Judge recommended the Court deny summary judgment on Plaintiff's claims for interference and retaliation under the FMLA.  (Id. at 15-31.)  With respect to Plaintiff's interference claim, the Magistrate Judge found summary judgment inappropriate because genuine issues of material fact exist regarding whether Plaintiff's rights to FMLA leave and to reinstatement to her previous position or its equivalent expired on or before September 9, 2002, and because Plaintiff was not restored to her previous position or its equivalent, either on September 9, 2002, or thereafter.  (Id. at 20-23.)  The Magistrate Judge determined summary judgment on Plaintiff's retaliation claim is unwarranted because Plaintiff (i) established a prima facie case of retaliation (id. at

---

[2]  Neither party objects to the Magistrate Judge's recommendation that summary judgment be granted on Plaintiff's Title VII claims for failure to promote and discharge and, finding no plain error, this recommendation is adopted by the Court.

[3]  Plaintiff initially asserted a Title VII claim based on changes made to her hours and wages.  Based on Plaintiff's failure to respond to Defendant's arguments in favor of summary judgment on this claim, the Magistrate Judge found this claim was abandoned and recommended summary judgment be granted in favor of Defendant with respect to this claim.  (R&R at 34 n.5.)  Neither party objects to this recommendation and, finding no plain error, it is adopted by the Court.

24-29), and (ii) presented sufficient evidence from which a reasonable juror could conclude Defendant's legitimate, non-retaliatory reason for Plaintiff's discharge was a pretext for unlawful retaliation (id. at 30-31).

### B.    Plaintiff's Objections to the Report and Recommendation

Plaintiff does not object to the legal conclusions reached by the Magistrate Judge.  (Pl.'s Objections to R&R at 1.)  She objects only to identify two allegedly incorrect factual findings set out in the Report and Recommendation:  (1) the Magistrate Judge's use of "December 9, 2002," instead of "September 9, 2002," in referring to the date on which Plaintiff's FMLA leave allegedly ended (R&R at 21); and (2) his statement concerning Plaintiff's discharge and its alleged implication that Plaintiff concedes her FMLA leave expired on September 9, 2002, as opposed to some later date (id. at 26).  Defendant did not respond to these objections.  Having reviewed Plaintiff's objections and the relevant portions of the Report and Recommendation, the Court agrees the statements identified by Plaintiff were scrivener's errors and did not reflect the factual record in this matter.  Accordingly, Plaintiff's objections are SUSTAINED and the Court shall not consider these statements in reviewing the Report and Recommendation.

**C.    Defendant's Objections to the Report and Recommendation**

Defendant objects to the Magistrate Judge's recommendation that its motion for summary judgment be denied with respect to Plaintiff's claims for interference and retaliation under the FMLA.  The FMLA guarantees eligible employees the right to twelve weeks of leave during any twelve-month period because of a serious health condition that makes the employee unable to perform the functions of the employee's position.  29 U.S.C. § 2612(a)(1).  The Act also provides that an eligible employee who returns to work prior to the expiration of her FMLA leave must be restored to the same position she held at the time her leave began, or to an equivalent position.  29 U.S.C. § 1614(a)(1).  "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."  Strickland v. Water Works, 239 F.3d 1199, 1206 (11th Cir. 2001).  Plaintiff here asserts both an interference and a retaliation claim.

-7-

1.     *Plaintiff's Interference Claim*

It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by the FMLA."  29 U.S.C. § 2615(a)(1).  "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."  Strickland, 239 F.3d at 1206.  Plaintiff alleges Defendant violated the FMLA by failing to restore her to her previous Assistant Manager position or its equivalent.  Thus, to avoid summary judgment, Plaintiff must submit evidence from which a reasonable juror could conclude she was entitled to additional leave or to reinstatement in early September 2002 and that Defendant denied her these rights.

Defendant argues that Plaintiff's interference claim fails because her FMLA leave, along with her right to reinstatement, terminated sometime before her attempt to return to work in September 2002.  (Mot. for Summ. J. at 19-21.)  Plaintiff disagrees, alleging Defendant incorrectly calculates the date on which her FMLA leave expired.  (Resp. to Mot. for Summ. J. at 13-19.)   The expiration-date calculation depends in large part on whether and to what extent Plaintiff's work schedule as an hourly manager from December 18, 2001, through July 8, 2002,

-8-

resulted in the accumulation of time which is properly included in her twelve (12) weeks of leave under the FMLA.

The Magistrate Judge recommended denying summary judgment on Plaintiff's interference claim on the ground that, as a matter of law, Plaintiff's alleged reduced work schedule between December 18, 2001, and July 8, 2002, resulted in leave which cannot be included in Plaintiff's 12-week FMLA leave entitlement.  (R&R at 18-24.)  Relying on 29 U.S.C. § 2612(b)(1), the Magistrate Judge found that the FMLA precludes the taking of intermittent or reduced schedule leave absent an agreement between the employee and the employer.[4]

_____

[4]  Section 2612 provides an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.

> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(R&R at 18-19.)  The Magistrate Judge further found that, because genuine issues

of material fact exist regarding whether Plaintiff's reclassification as an hourly

manager with reduced hours was by agreement or was unilaterally imposed by

Defendant, this alleged reduced schedule leave cannot be included in Plaintiff's

FMLA-leave calculation.  (Id. at 19-20.)

Defendant objects to the Magistrate Judge's recommendation, arguing 29

U.S.C. § 2612(b)(1) does not apply to intermittent leave taken by a pregnant

employee in advance of giving birth.[5]  Having reviewed Defendant's arguments and

the language of 29 U.S.C. § 2612(b)(1), the Court agrees this statutory prohibition

---

29 U.S.C. § 2612(a)(1).  Subsection (b)(1) of this section -- the prohibition relied
on by the Magistrate Judge -- states that "[l]eave under subparagraph (A) or (B)
. . . shall not be taken by an employee intermittently or on a reduced leave schedule
unless the employee and the employer of the employee agree otherwise."  29
U.S.C. § 1612(b)(1).

[5] Plaintiff does not respond to this argument.  Instead, Plaintiff argues the
actual date of expiration of her FMLA leave does not matter because Defendant in
its Answer and responses to discovery admitted *in judicio* that Plaintiff's FMLA
leave ended no sooner than September 9, 2002.  (Resp. to Def.'s Objections to
R&R at 1-7.)  Having reviewed Defendant's statements relied on by Plaintiff, the
Court finds they are insufficient to constitute admissions *in judicio* and otherwise
are not admissions on which this Court will rely in deciding this motion.

on intermittent or reduced schedule leave does not apply here.[6]  However, the

inapplicability of this prohibition does not end the inquiry.  The Court still must

determine whether and to what extent Plaintiff's December 2001-July 2002 reduced

work schedule should be included in calculating her FMLA leave, and whether its

inclusion results in Plaintiff's 12-week leave entitlement expiring before September

9, 2002.[7]

     Having reviewed the arguments of the parties and the evidence of record, the

Court finds that at this stage of the litigation it cannot determine with the requisite

---

[6]  The agreement requirement of 29 U.S.C. § 1612(b)(1) applies only to leave
for the birth of a son or daughter or the placement of a son or daughter with the
employee for adoption or foster care, a point the subsection's next sentence makes
clear:  "[L]eave under subparagraph (C) or (D) of subsection (a)(1) of this section
may be taken intermittently or on a reduced leave schedule when medically
necessary."  29 U.S.C. § 1612(b)(1).

[7]  That Defendant failed to notify Plaintiff that her alleged reduced schedule
leave may be designated as FMLA leave also does not preclude this leave from
being included in the 12-week calculation.  See McGregor v. Autozone, Inc., 180
F.3d 1305, 1309 (11th Cir. 1999) (holding Department of Labor regulation
"manifestly contrary to the statute" because it "converts the statute's minimum of
federally-mandated unpaid leave into an entitlement to an additional 12 weeks of
leave unless the employer specifically and prospectively notifies the employee that
she is using her FMLA leave"); Johnson, 199 F. Supp. 2d at 1356-57 ("An
employer may indeed construe as FMLA leave any leave that an employee is taking
as a result of a qualifying event, without express notice to the employee.") (citing
McGregor, 180 F.3d at 1308).

certainty whether and to what extent this time should be included.  The Act

provides that a pregnant employee may take leave because of a "serious health

condition" that makes the employee unable to perform the functions of the position

of such employee.  29 U.S.C. § 2612(a)(1)(D); <u>see also</u> 29 C.F.R. § 825.203(c)(1)

("A pregnant employee may take leave intermittently for prenatal examinations or

for her own condition, such as for periods of severe morning sickness.").

Although this leave "may be taken intermittently or on a reduced leave schedule

when medically necessary," 29 U.S.C. § 2612(b)(1), "[a]n employee may not be

required to take more leave than necessary to address the circumstance that

precipitated the need for leave . . . ." 29 C.F.R. § 825.204(e).

　　In this case, the parties dispute the implementation of and the need for

Plaintiff's reduced schedule leave.  Plaintiff testified that before becoming pregnant

in November 2001 she typically worked five days a week for approximately eight

hours a day.  (Pl. Dep. at 207.)  In mid-December 2001, Plaintiff asked Phillip

Hembree ("Hembree"), the owner and operator of Defendant, whether she could

spread her twenty-one accrued, paid vacation days over twenty-one weeks to allow

her to work four days a week instead of five.  Plaintiff previously had suffered a

miscarriage, and testified she requested to use her vacation so that she could

reduce the time she was on her feet during the first few months of her pregnancy.

(Pl. Dep. at 210-11, 219.)  There is, however, no evidence Plaintiff's doctor

required her to reduce her schedule during these first months.  In fact, Plaintiff

testified that the only reason she requested this reduction was because she believed

her vacation would cover these days off and thus she would not suffer any

reduction in income.  (Pl. Dep. at 227).  Hembree rejected Plaintiff's proposal and

unilaterally reclassified Plaintiff as an hourly manager.  After her reclassification,

Plaintiff's scheduled hours were reduced significantly.  Plaintiff opposed the

reclassification and the concomitant reduction in her hours.  In the months that

followed, she complained to Hembree about the reduction in hours and informed

him she was capable of working more often.  (Pl. Dep. at 232-33.)  Defendant

seeks to designate this reclassification and reduction as intermittent or reduced

schedule leave for a serious health condition under the FMLA.

Viewing the record as a whole, and in the light most favorable to Plaintiff,

there are genuine issues of material fact regarding whether Plaintiff's reduced-

schedule status beginning in December 2001 was medically necessary.  Even

assuming her reduced schedule leave was medically necessary in December 2001,

or became medically necessary in April 2002,[8] there are genuine issues of material

fact regarding whether Defendant required Plaintiff to take more leave than

necessary for her condition and, if so, what portion, if any, of her reduction in

hours can fairly be characterized as necessary FMLA leave. Because of these

issues of material fact, the Court is unable to calculate with the requisite certainty

the amount of Plaintiff's reduced schedule status which can properly be designated

as FMLA leave. As a result, the Court cannot conclude that, as a matter of law,

Plaintiff was not entitled to and was not denied reinstatement to her previous

Assistant Manager position or its equivalent when she tried to return to work in

early September 2002, and summary judgment on Plaintiff's interference claim is

not appropriate.[9]

─────────────────

[8] In late April 2002, Plaintiff's doctor required that she refrain from working on her feet for more than six hours at a time. Plaintiff testified she informed Hembree of this restriction and that it had no effect on her work schedule.

[9] Defendant also argued, in the alternative, that its September 2002 failure to reinstate Plaintiff to her previous position or its equivalent did not violate the FMLA because Defendant offered to reinstate Plaintiff to her previous position and she rejected this offer. (Reply in Supp. of Mot. for Summ. J. at 6-7.) The Magistrate Judge acknowledged this alternative argument but, in light of the factual dispute regarding the expiration of Plaintiff's FMLA leave and the September 2002 communications between her and Defendant's representatives, ultimately rejected it. (R&R at 16-23.) Defendant does not object to the Magistrate Judge's rejection of this argument or otherwise raise the argument in challenging the Report and

2.    *Plaintiff's Retaliation Claim*

Plaintiff alleges she was retaliatorily discharged for taking FMLA leave and for seeking reinstatement to her previous position as Assistant Manager.  The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter . . . ."  29 U.S.C. § 2615(a)(2).  "Unlike an interference claim, a plaintiff who asserts a retaliation claim must prove that the employer acted with the requisite intent to retaliate."  Johnson v. Morehouse College, 199 F. Supp. 2d 1345, 1359 (N.D.Ga. 2001).

Applying the McDonnell Douglas burden-shifting and prima facie framework used in the Title VII context, the Magistrate Judge recommended that the Court deny summary judgment on this claim.  The Magistrate Judge found Plaintiff could establish a prima facie case of retaliation because Defendant did not contest two of the three elements of a prima facie case, and that a fact issue exists as to the third element -- namely, whether there is a causal connection between Plaintiff's protected activity and her discharge.  (R&R at 24-29.)  The Magistrate Judge

_____

Recommendation.

-15-

further found Plaintiff presented evidence from which a reasonable juror could

conclude Defendant's legitimate, non-retaliatory reasons for Plaintiff's discharge --

that she refused to meet the scheduling demands of her position when discussing

her return to work and did not indicate when, if ever, she would be able to return --

were a pretext for unlawful retaliation.  (Id. at 29-31.)  Defendant does not challenge

the Magistrate Judge's recommendation with respect to Plaintiff's prima facie case

or its legitimate, non-retaliatory reasons for her discharge.  It does argue the

Magistrate Judge erred in holding Plaintiff's evidence of pretext was sufficient to

create a genuine issue of material fact.  (Def.'s Objections to R&R at 9-13.)

        The Court agrees.  Plaintiff testified that she informed Hembree in early

September 2002 that she was ready and physically able to return to work.  (Pl. Dep.

at 266-67, 285.)  On September 9, 2002, she met with Hembree and other restaurant

personnel to discuss her return.  Plaintiff informed Hembree that, because of child-

care issues, she was available only Monday through Saturday during the day and

would need her schedule to accommodate her child-care issues.  (Pl. Dep. at 277.)

Hembree did not accept this arrangement because the hours Plaintiff had requested

did not fit into the regular shifts for Assistant Managers.  Hembree also rejected

subsequent proposals from Plaintiff to work part-time in a different capacity --

hourly manager, food server, etc.  Following the rejection of the alternatives

Plaintiff urged, she was discharged.[10]  Defendant's evidence demonstrates Plaintiff

was discharged because she was unwilling to meet the scheduling demands of the

Assistant Manager position and because she did not indicate when, if ever, she was

willing to return on a full-time basis.

Although Plaintiff testified she would have come back to work full-time as

Assistant Manager if asked to do so, she concedes she did not inform Hembree,

prior to her discharge, of her willingness to return to work as an Assistant Manager

on a full-time schedule.  (Pl. Dep. at 278.)  Instead, she claims that on September

11, 2002, she had a conversation with Preetha John ("John"), an employee of a

company hired by Defendant to administer its FMLA leave policy, in which Plaintiff

allegedly informed John she was willing to return to work in any position on any

schedule, including evening and weekend shifts.  (Resp. to Def.'s Objections to

R&R at 8.)  Plaintiff does not submit any evidence that John informed Hembree of

Plaintiff's willingness to return to work for any shift before Plaintiff's discharge.  In

fact, the record evidence indicates John did <u>not</u> inform Hembree of her September

---

[10]  Because Plaintiff never returned to work, the effective date of her discharge was September 9, 2002.

-17-

11, 2002 conversation with Plaintiff until January 2003, well after Hembree made the

decision to discharge Plaintiff because she was not willing to work a regular

Assistant Manager's schedule.  (<u>See</u> John Dep. at 56-57.)  Based on the record

before the Court, no reasonable juror could conclude Defendant's legitimate, non-

retaliatory reasons for Plaintiff's discharge were a pretext for unlawful retaliation.

Accordingly, summary judgment on Plaintiff's claim for retaliation is warranted.[11] [12]

---

[11]  Defendant also argues that the Magistrate Judge employed an incorrect legal standard in evaluating Plaintiff's evidence of pretext.  Specifically, Defendant argues that to survive summary judgment, Plaintiff must "present significant probative evidence establishing that each and every reason proffered by [Defendant] is a lie <u>and</u> that Defendant was actually motivated by her use of her FMLA leave and not the proffered reason."  (Def.'s Objections to R&R at 9.) This argument is without merit.  In fact, the first case cited by Defendant in support of its argument directly undermines it.  In <u>Arrington v. Cobb County</u>, 139 F.3d 865 (11th Cir. 1998), the court stated that "[a]s this court has repeatedly held, a Title VII plaintiff may defeat a motion for summary judgment by undermining the credibility of a defendant's explanation for its actions."  139 F.3d at 875.  The court expressly rejected the district court's ruling that, in addition to undermining the credibility of the defendant's explanation, the plaintiff was required to submit evidence the defendant was motivated by its discriminatory intent.  <u>Id.</u>

[12]  The Court's denial of summary judgment with respect to Plaintiff's interference claim is not inconsistent with its grant of summary judgment with respect to her retaliation claim.  This is so because the intent necessary to demonstrate retaliation is not required to show interference with a right under the FMLA:

> [I]n a dispute concerning the amount of an FMLA leave that an
> employee can take, an employer who has fired an employee for

**III.    CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Leave to File a

Reply to Plaintiff's Response to Defendant's Objections to the Report and

Recommendation or, in the Alternative, Request for Oral Argument [61] is

**GRANTED IN PART** and **DENIED IN PART**.  Defendant's request for leave

to file its reply brief is **GRANTED** and the Clerk of Court is **DIRECTED** to file

Defendant's reply brief and docket it as if filed on March 17, 2005.  Defendant's

request for oral argument is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the Magistrate Judge's Report and

Recommendation [56] is **ADOPTED IN PART** and Defendant's Motion for

Summary Judgment [39] is **GRANTED IN PART** and **DENIED IN PART**.  The

---

exceeding her FMLA leave, and who later turns out to be wrong in his
calculations, may be held liable on an interference claim for denying
the exercise of a right provided by the FMLA. . . . The employer's
liability, however, depends totally on whether he calculated correctly
the FMLA leave to which the employee was entitled.  Such an
employer is not subject to the "retaliation" prohibitions of the statute
by virtue of his miscalculation, alone.

Johnson, 199 F. Supp. 2d at 1361.

-19-

Court **ADOPTS** the Magistrate Judge's Report and Recommendation with respect

to Plaintiff's Title VII claims, and Defendant's motion for summary judgment on

these claims is **GRANTED**.  The Court **DECLINES TO ADOPT** the Magistrate

Judge's Report and Recommendation with respect to Plaintiff's FMLA claims.

For the reasons set out above in Section II(C)(1) and (2), <u>supra</u>, Defendant's

motion for summary judgment on Plaintiff's claim for interference under the FMLA

is **DENIED** and its motion for summary judgment on Plaintiff's claim for

retaliation under the FMLA is **GRANTED**.

      **SO ORDERED**, this 30th day of March, 2005.


                                  _____

                                  WILLIAM S. DUFFEY, JR.

                                  UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Victoria L. Sura,                                     Civil File No. 01-1344 (PAM/RLE)

                    Plaintiff,

v.                                                    **MEMORANDUM AND ORDER**

Stearns Bank, N.A.,
a Minnesota corporation, and
Jan Hanson, individually,

                    Defendants.

---

Plaintiff alleges that Defendants improperly restructured her job following her return from maternity leave. Accordingly, Plaintiff has filed discrimination and retaliation claims against Defendants under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.01 et seq., and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.[1] Plaintiff has also filed claims against the individually-named Defendant for aiding and abetting discrimination under the MHRA and tortiously interfering with her employment. This matter is before the Court on Defendants' Motion for Summary Judgment. For the

---

[1] Plaintiff fails to address her FMLA discrimination claim in her opposition to Defendants' Motion for Summary Judgment. Because "claims under the FMLA do not depend on discrimination," Rankin v. Seagate Techs., Inc., 246 F.3d 1145, 1148 (8th Cir. 2001) (quoting Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 712 (7th Cir. 1997)), the Court dismisses this claim without further comment.

DEC 1 8 2002
FILED_____
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD_____
DEPUTY CLERK_____

reasons that follow, the Court grants the Motion in part and denies it in part.

**BACKGROUND**

Defendant Stearns Bank, N.A. ("the Bank") is an independently-owned Bank headquartered in St. Cloud. Defendant Jan Hanson is the Bank's marketing director and the daughter of the Bank's CEO. In the late 1990's, the Bank experienced exceptional growth in its commercial loan department and, as a result of its flourishing business, created several new jobs, including a position for a Business Production Coordinator. Plaintiff Victoria Sura was hired for this position in April 1999. Although Sura had no banking experience, the Bank's management, including Hanson, decided to pay Sura $50,000 a year. The specific details of Sura's job are sketchy at best, but it seems that she was responsible for preparing certain reports about the Bank's commercial loans.

According to the Bank, the sluggishness of the economy in 2000 forced it to reassess the status and quality of its loans. Thus, the Bank's focus shifted from increasing loan volume to improving the quality of its assets. As a part of this shift in emphasis, the Bank eliminated or restructured eighteen positions in loan-related departments. (Mjaanes Aff. Ex. H.) This case arises from the restructuring of Sura's job to an administrative position paying only $36,000 a year.

The parties disagree about whether tensions existed between Sura and Hanson unrelated to the economic downturn of 2000. However, any problems that existed prior to the spring of 2000 were not particularly serious. Indeed, in May 2000, Hanson rated Sura's

performance as "outstanding," and recommended that Sura receive a merit increase in her salary. (Sura Dep. at 116; Egan Aff. Ex. 2; Mjaanes Aff. Ex. X.)

The weight of Sura's Complaint rests on the Bank's alleged mistreatment of her after she became pregnant. In April 2000, Sura informed Hanson that she was pregnant, and on August 16, 2000, Sura officially made her request for eight weeks of maternity leave. (Mjaanes Aff. Ex. Q; Egan Aff. Ex. 6.) At the time that she requested the leave, Sura's due date was November 1, 2000. On September 8, 2000, Hanson called Sura into her office and reprimanded her for discussing the transfer of her duties during her maternity leave with other employees. Hanson had specifically instructed Sura not to have any such discussions until Hanson had reviewed the extent of Sura's duties.

Uncomfortable with this incident, Sura complained to Lee Erickson, the Bank's Director of Human Resources. According to Erickson, Sura expressed concern about taking maternity leave in light of the work environment that she felt Hanson had created. (Erickson Dep. at 35.) Sura also complained to Rick Pankow, the Bank's Chief Financial Officer, and asked for his advice. Pankow testified that Sura was anxious about the timing of Hanson's reprimand in light of her upcoming maternity leave. (Pankow Dep. 22-23.) Defendants, however, ascribe much importance to the testimony of both Pankow and Erickson that Sura did not explicitly complain of discrimination to them. (Erickson Dep. 36, 38-40; Pankow Dep. 54-55.) Additionally, Sura testified that she did not conclude that she had been discriminated against until early January 2001. (Sura Dep. at 190.)

3

Hanson took a vacation sometime in mid-September. When she returned in late September, she, Sura, and Erickson met to allow a full airing of the tensions created by the incidents on September 8. At this meeting, Hanson apologized to Sura, explaining that she did not hold grudges. (Mjaanes Aff. Ex. I at 4.) Hanson and Sura then began to discuss the changing nature of Sura's job, in light of the new economic climate and the Bank's refocused interest in the quality rather than the quantity of its commercial loans, and Hanson presented Sura with a new draft job description. (Hanson Dep. at 94; Egan Aff. Ex. 10.) Hanson cut the discussion short, however, and decided that they would talk more after Sura returned from maternity leave.

That night, Sura experienced contractions and was hospitalized briefly. Her doctors placed her on bed rest until she gave birth to her child on October 20, 2000. Because of her unexpected hospitalization, Sura revised her leave request at least twice. The end result was that Sura took FMLA leave until December 17, 2000, and vacation time until January 2, 2001. (Egan Aff. Ex. 15.)

According to Pankow, Hanson groused about the amount of leave that Sura was taking. (Pankow Dep. at 33-34, 48-49, 75-76.) Hanson allegedly made similar complaints about two other employees and the maternity time that they were taking. (Id. at 49-50.) Pankow also claims that Hanson told him that she was going to cut Sura's salary and change Sura's job functions to force her to quit. (Pankow Dep. at 41.) In any event, on November 29, 2000, the Bank revised its sick leave policy and drastically reduced the amount of sick

4

leave allotted to its employees. (Egan Aff. Ex. 16.)

In early December 2000, Sura met with Hanson and another employee, Lynn Roos, to discuss Sura's return to work following her leave. During this meeting, Hanson commented that Sura had been gone for a whole quarter and that this was a long time to be gone. At some point, Roos left the meeting, and Sura avers that Hanson said, "During our last meeting [in late September], I had said that I was a person that did not hold grudges. Well, I lied. I do hold grudges." (Sura Dep. at 213.) Sura also claims that Hanson said that she did not know what she was going to do with Sura and asked if Sura was going to be able to make the necessary adjustments when she returned to work. (Id. at 282.)

In late December 2000, Hanson discussed lowering Sura's salary and changing her job functions with Erickson. On December 27, 2000, Sura learned that she was receiving a $250 bonus for the year, half what she had received in 1999. On January 4, 2001, two days after Sura had returned from her leave, Hanson and Sura met yet again. At this time, Hanson advised Sura that the Bank was restructuring her position effective February 1, 2001, and cutting her salary to $36,000 a year. (Egan Aff. Ex. 22.)

On January 8, 2001, Sura asked to see the formal job description for the restructured position that she was supposed to assume. Sura alleges that the job description was the same as that provided to her by Hanson in the late September meeting. (Egan Aff. Ex. 23.) This is notable, Sura argues, because in the late September meeting, Hanson did not mention that Sura's salary would be cut in any way. Sura resigned on February 1, 2001. (Mjaanes Aff.

Ex. J.) In July 2001, Sura filed the instant action against the Bank and Hanson, claiming that the Bank discriminated against her on the basis of her pregnancy, retaliated against her for complaining about Hanson to Erickson and Pankow, and retaliated against her for taking FMLA leave. Sura also claims that Hanson aided and abetted the Bank's discrimination and retaliation against her. Finally, Sura claims that Hanson tortiously interfered with her employment at the Bank.

## DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is only proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). Nevertheless, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

The moving party bears the burden of showing that no genuine issues of material fact exist. Enter. Bank, 92 F.3d at 747. Once the moving party has carried its burden, the

nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Because discrimination cases often turn on inferences rather than on direct evidence, courts are more deferential to the nonmoving party alleging discrimination. Webb v. Garelick Mfg. Co., 94 F.3d 484, 486 (8th Cir. 1996). Nevertheless, "if the [nonmoving party alleging discrimination] fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." Weber v. Am. Express Co., 994 F.2d 513, 515-16 (8th Cir. 1993).

### B.    Pregnancy Discrimination

Sura first claims that the Bank discriminated against her because she was pregnant. Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), establishes that it is unlawful for an employer to discriminate against an individual "on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. §§ 2000e-2(a)(1), 2000e(k). Similarly, the MHRA provides that it is unlawful for an employer to discriminate against an individual "affected by pregnancy, childbirth, or disabilities related to pregnancy or childbirth." Minn. Stat. § 363.03, subd. 1(5). Courts evaluate pregnancy discrimination

7

claims under the same framework as other intentional sex discrimination cases under Title VII or the MHRA.  Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998) (applying the same analysis to pregnancy discrimination claims under Title VII and the MHRA).  In order to succeed on her pregnancy discrimination claims, Sura must show that she was "treated differently because of her pregnancy" or a pregnancy-related condition. Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 435 (8th Cir. 1998) (citation omitted).

Sura may establish this discrimination under Title VII through direct or indirect evidence.  If she adduces direct evidence of her Title VII claim, then pursuant to Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), "the burden rests with the employer to convince the trier of fact that it is more likely than not that the [employment] decision [at issue] would have been the same absent consideration of the illegitimate factor." Id. at 276.[2]

Although Sura contends that she has direct evidence of pregnancy discrimination, the Court disagrees.

> The direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision.

Erikson, 271 F.3d at 724.  In short, direct evidence only exists if no inference is necessary

_____

[2] Sura's MHRA claim is not subject to analysis under the Price Waterhouse framework. Accordingly, Sura's MHRA claim must be analyzed under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 725 n.2 (8th Cir. 2001) ( citing Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 624-27 (Minn. 1988)).

to show that the employer was acting in a discriminatory manner.  See id. at 725 (citing Browning v. President Riverboat Casino-Mo, Inc., 193 F.3d 631, 635 (8th Cir. 1998)).  Sura claims that the fact that Hanson expressed concern over the length of her leave coupled with Pankow's testimony that Hanson wanted to force Sura to quit by reducing her salary is direct evidence of pregnancy discrimination.  Hanson's comments, however, do not directly manifest discriminatory animus aimed at Sura because of her pregnancy.  It is just as possible that Hanson was discriminating against Sura because she was taking an extended leave. Because both pregnant and nonpregnant employees might take extended leaves, an inferential leap is required to see Hanson's comments as evidence that she was discriminating against Sura on the basis of Sura's pregnancy or a pregnancy-related condition.

Thus, the Court examines Sura's discrimination claim under the indirect evidence framework of McDonnell Douglas.  Sura must, in other words, first establish a prima facie case of discrimination.  "The threshold of proof necessary to establish a prima facie case is minimal."  Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1022 (8th Cir. 1998).  If Sura meets this minimal burden, then Defendants are required to produce a legitimate, nondiscriminatory reason for their actions.  If Defendants produce such a reason, the burden shifts back to Sura to show that Defendant's articulated justification is a mere pretext for illegal discrimination.  McDonnell Douglas, 411 U.S. at 802-05.  Significantly, the ultimate burden of persuasion remains at all times with Sura.  Mohr v. Dustrol, Inc., 306 F.3d 636, 640 (8th Cir. 2002).

9

To establish a prima facie case of pregnancy discrimination, Sura must show that: (1) she was a member of a protected group; (2) she was qualified for her position; and (3) an adverse employment action was taken against her under circumstances giving rise to an inference of discrimination. Bergstrom-Ek, 153 F.3d at 857. There is no question that Sura was qualified for her position and she suffered an adverse employment action. Accordingly, the dispute in this case centers on whether Sura was, at the time of the alleged discrimination, a member of a protected group and whether she was discharged or suffered from some other adverse employment action under circumstances giving rise to an inference of discrimination.

The Court finds that Sura cannot clear the hurdle of showing that she was a member of a protected class at the time of the alleged discrimination. As other courts have noted, pregnancy "differs from most other protected personal attributes in that it is not immutable. While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions.'" Solomen v. Redwood Advisory Co., 183 F. Supp. 2d 748, 753 (E.D. Pa. 2002). Generally, a woman's status as a new parent, standing alone, is insufficient to establish membership in the protected class for pregnancy discrimination. See Piantanida v. Wyman Ctr., Inc., 116 F.3d 340, 342 (8th Cir. 1997). Rather, a woman who is not pregnant at or very near the time when an adverse employment action is taken against her "must demonstrate that the effects of her pregnancy continued to exist at the time she was [subject to the action], either in actual fact or in the thoughts and actions of those responsible." Solomen, 183 F.

Supp. 2d at 754.

Sura maintains that she suffered from an adverse employment action as early as her meeting with Hanson in September 2000. Sura intimates that she suffered some sort of adverse employment consequence when Hanson presented her with a draft job description at this meeting. Because Sura was pregnant in September 2000, she argues that she has stated a claim for pregnancy discrimination.

The Court disagrees. "An adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 691 (8th Cir. 2001); Spears v. Missouri Dept. of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000) (stating that only decisions that result in demotion, reduction in pay, or other tangible job consequences are adverse employment actions). In this case, Sura's salary was not reduced until February 2001, and she has marshaled no argument or factual support for the contention that her responsibilities were significantly reduced when Hanson provided her with the draft job description in September 2000. Because Sura suffered no tangible job consequence until February 2001, she could not have been discriminated against until that time. By February 2001, Sura's child was nearly three and a half months old, and Sura's maternity leave had ended a month and a half earlier. Under these circumstances, the Court declines to find that Sura remained affected by pregnancy or a pregnancy-related medical condition. Accordingly, Sura does not fall within the class of persons protected by the PDA or those provisions of the MHRA

11

prohibiting pregnancy discrimination. The Court therefore dismisses Sura's pregnancy discrimination claims.

### C.    Retaliation

Sura next argues that the Bank retaliated against her for complaining to Erickson and Pankow about Hanson's behavior on September 8, 2000, and for taking FMLA leave. Sura's retaliation claims under Title VII, the MHRA, and the FMLA are analyzed using the same framework. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (stating that McDonnell Douglas analysis applies in FMLA retaliation cases); Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 483-84 (8th Cir. 1997); Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986) (stating that analysis for MHRA claims is equivalent to analysis for Title VII claims). Sura admits that she has no direct evidence of retaliation. Accordingly, her retaliation claims must be analyzed using the ubiquitous burden-shifting framework of McDonnell Douglas. See Smith, 302 F.3d at 832; Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 713 (8th Cir. 2000). To establish a prima facie case of retaliation, Sura must establish that: (1) she engaged in a protected activity; (2) her employer subsequently took adverse employment action against her; and (3) the adverse action was causally linked to her engagement in the protected activity. Smith, 302 F.3d at 832; Buettner, 216 F.3d at 713.

1.    **Title VII and the MHRA**

Defendants essentially concede, as they must, that Sura suffered from an adverse employment action–her salary was dramatically reduced. With regard to her retaliation claims under Title VII and the MHRA, however, Defendants maintain that Sura cannot show that she engaged in any protected activity. To be a protected activity, an employee must oppose or report conduct that the employee reasonably and in good faith believes relates to an unlawful, discriminatory act or policy of the employer. Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000); Buettner, 216 F.3d at 714. In other words, the employee must demonstrate that she or he had a subjective good faith belief that the conduct reported was discriminatory and that it was objectively reasonable to have this belief. Here, Defendants argue that Sura's admission that she did not believe she was being discriminated against until January 2001, is inimical to her assertion that she had a good faith belief that the conduct she reported to Erickson and Pankow was discriminatory.

Attempting to avoid the trenchant logic of this argument, Sura cites O'Neal v. Ferguson Constr. Co., 237 F.3d 1248 (10th Cir. 2001). O'Neal, however, does nothing to support Sura's claim. Beyond stating the uncontroversial conclusion that an informal complaint may be a protected activity for the purposes of retaliation claims, the court in O'Neal merely found that a letter from the plaintiff's attorney to the defendant characterizing the plaintiff's reassignment to a supply warehouse as retaliatory was entitled to protected status. Id. at 1255. Unlike the plaintiff in O'Neal, Sura did not characterize Hanson's

13

actions as discriminatory. To the contrary, Sura has admitted that she did not think that Hanson had discriminated against her until January 2001. Under these circumstances, the Court finds that Sura's Title VII and MHRA retaliation claims fail as a matter of law.

### 2.   FMLA

Sura, however, states a colorable retaliation claim under the FMLA. Not only did she suffer from an adverse employment action, but by exercising her rights under the FMLA, she engaged in a protected activity. To establish a prima facie case of FMLA retaliation, then, Sura must establish a causal connection between the two.

According to Defendants, Sura merely has weak temporal evidence to support her FMLA retaliation claim. Defendants point out that, standing alone, only a very close temporal proximity between the protected activity and an adverse employment action will suffice to show causality. Smith, 302 F.3d at 832; Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (stating that a gap in time "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint") (citation omitted). In this case, Defendants contend that, because Sura requested her FMLA leave in August 2000 but was not affected by an adverse employment action until February 2001, the temporal interval is too great to support a finding of causation.

At the outset, the Court finds that Sura has adduced more than temporal evidence that she was retaliated against for taking FMLA leave. Specifically, Hanson told Sura that she held grudges. Additionally, Pankow testified that Hanson was disconcerted by the length of

14

Sura's leave. Finally, Hanson was concerned that Sura might not be able to handle her return from leave. This testimonial evidence, paired with the fact that Sura was informed that her salary was being reduced only two days after returning from her leave and her salary was actually reduced less than a month after her return from leave, suffices to create a genuine issue of material fact as to whether the Bank retaliated against her for exercising her rights under the FMLA.

Pursuant to <u>McDonnell Douglas</u>, then, the Bank must produce evidence that a legitimate nondiscriminatory reason for the adverse employment action exists. The Bank has met this burden by coming forward with a reason other than retaliation for Sura's reduction in salary–the economic downturn of 2000 and the Bank's refocused attention on commercial loan quality rather than quantity. Accordingly, the burden shifts back to Sura to establish that this proffered nondiscriminatory reason is false and is a mere pretext for retaliation. Sura easily meets this burden. She has produced Pankow's testimony that Hanson admitted she was planning on reducing Sura's salary in an effort to force Sura to quit. In light of Hanson's other statements, this admission could lead a reasonable juror to find that the Bank's proffered nondiscriminatory justification for lowering Sura's salary is pretextual. Accordingly, Sura's claim for retaliation under the FMLA survives summary judgment.

**D.    Aiding and Abetting Discrimination**

Sura claims that Hanson individually violated the MHRA by aiding and abetting the Bank's discrimination and retaliation against her. The MHRA provides that "[i]t is an unfair

discriminatory practice for any person . . . [i]ntentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter." Minn. Stat. § 363.03, subd. 6. Because the Court finds that Sura's discrimination and retaliation claims under the MHRA fail as a matter of law, Sura's aiding and abetting claim must also fail.

### E.    Tortious Interference

Lastly, Sura claims that Hanson tortiously interfered with her employment at the Bank. In Minnesota, an at-will employee may maintain a tortious interference with contract claim against a third party who wrongfully causes the termination of the employee's job. Nordling v. N. States Power Co., 478 N.W.2d 498, 505 (Minn. 1991). To succeed on such a claim, the plaintiff must show that: (1) a contract existed; (2) the alleged wrongdoer knew of this contract; (3) the alleged wrongdoer intentionally procured the breach of the contract; (4) the alleged wrongdoer's actions were without justification; and (5) the plaintiff has suffered damages. See Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994). In the employment context, however,

> a company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility or a deliberate intent to harm the plaintiff employee.

Nordling, 478 N.W.2d at 507.

Here, there is no doubt that Sura had an employment relationship with the Bank and

16

that Hanson knew of this relationship. It is also clear that Sura has suffered damages as a result of the Bank's adverse employment action against her.[3] Thus, determining whether summary judgment is appropriate on Sura's tortious interference claim hinges on whether Hanson's actions were justified or, in other words, on whether Hanson acted out of malice or bad faith.

The Court finds that Sura has adduced evidence of comments made by Hanson that, if believed by a jury, could suffice to demonstrate that Hanson harbored ill-will towards Sura. Specifically, Sura has produced Pankow's testimony that Hanson considered Sura's leave too long and wanted to force Sura to quit by lowering her salary. Accordingly, Sura has created a genuine issue of material fact as to whether Hanson was acting out of malice or ill-will, and thus, her tortious interference claim survives summary judgment.

**CONCLUSION**

For the foregoing reasons, and upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Clerk Doc. No. 15) is **GRANTED in part and DENIED in part** as follows:

1. Counts I, II, IV, V, and VI of the Complaint are **dismissed with prejudice**;

2. Count III of the Complaint, insofar as it states a claim for discrimination under

---

[3] Although Sura was not "terminated" from the Bank, she maintains that the Bank's actions altered the conditions of her employment substantially enough that a reasonable person would have deemed continued employment at the Bank intolerable. Because the Bank does not counter this argument, the Court accepts it for the purposes of this Motion.

the FMLA, is **dismissed with prejudice**;

3.    To the extent that it states a claim for retaliation under the FMLA, Plaintiff

may proceed to trial on Count III of the Complaint; and

4.    Plaintiff may proceed to trial on Count VII of the Complaint.

Dated: _December 18_, 2002

Paul A. Magnuson
United States District Court Judge

18

# Fact Finding

**Claimant Name** WATTS,HEATHER G    **Claimant SSN** 416021193    **Claim Date** 11/13/05

Tabs: Statements | Discharge-Emp | Discharge-Clmt | Quit | Absent/Tardy | Summary | Attempts

## Statements

**BEN241 Status:** ○ Timely Received  ○ Timely Mailed, Late Received  ○ Mailed Late  ● Not Received

Left message on: __/__/__    ▾ to return call no later than __/__/__ ▾ or decision will be made based on available information.

**Separation resulted from:** ○ Voluntary Quit  ● Discharge  ○ No Work Available  ○ Other

**Claimant's Statement:**

11/20/05--COMPLETED 254DC RECD AND ATTACHED IN PV
11/28/05 7:50am--I WAS ON A MEDICAL LOA DUE TO THE BIRTH OF MY SON. AFTER HIS BIRTH, HE WAS SICK AND I HAD TO EXTEND MY LEAVE. I WAS ALSO WORKING ONE DAY A WEEK FROM HOME. ON 11/02/05, TAMMY DIMINGO, GEN MGR., CALLED ME AND TOLD ME THEY NEEDED TO KNOW BY 5 THAT DAY IF I COULD COME BACK TO WORK FULL TIME. I TOLD HER I WOULD TRY TO GET CHILD CARE ARRANGED BY THEN. I HAD IT COVERED FOR 26 HOURS. SHE CALLED ME BACK AT 5 AND I ASKED HER IF SHE COULD GIVE ME UNTIL THE END OF THE WEEK TO COVER THE OTHER 9 HOURS OF CHILD CARE (I ONLY WORKED 35 HRS) AND SHE TOLD ME THEN THAT THEY HAD DECIDED NOT TO GIVE ME THE OPTION OF COMING BACK TO WORK, TO TURN IN MY COMPUTER AND CLEAN OUT MY OFFICE. I WAS STILL UNDER FMLA. I HAVE HIRED A LAWYER. NO PREV WARNS

**Employer's Statement:**    **Phone Number:** (404)467-9299

11/28/05 7:45am--LEFT 48 HR VM FOR AVITA PRICE CONTROLLER. DID CLMT HAVE DR EXCUSES. DID SHE CALL IN ACCORDING TO POLICY/TO WHOM/WHEN. WHO DISC/WHEN. WAS ANY OTHER LOA AVAILABLE/REQUESTED. PREV WARN/SUSP. POLICY. DUE 11/30/05 7:45am--EMR FTR WITH REQUESTED INFORMATION

**Person Interviewed:** ____    **Title:** ____    **Date:** __/__/__

**Interviewer:** PATSY PEOPLES    **Date:** 12/01/2005

[Print]  [Save]  [Cancel]

CERTIFIED AND TRUE COPY OF ALA. DEPT OF INDUSTRIAL RELATIONS RECORDS.

SEP 05 2007

DANIEL J. DORITY
CUSTODIAN OF RECORDS