IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )     CASE NO. 2:06CV1149-MEF
                                  )
Hospitality Ventures, LLC,        )
                                  )
        Defendant.                )

**RESPONSE TO PLAINTIFF'S MOTION TO
STRIKE AND FOR PROTECTIVE ORDER**

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal Rule of Civil Procedure 37, files this Response to Plaintiff's Motion to Strike Undisclosed Witnesses in their Entirety and Plaintiff's Motion for Protective order Pursuant to FRCP 37 to Exclude any Testimony or Reference to the Testimony of Karen Kish and Carol Twardoch ("Motion to Strike").

## I.    INTRODUCTION

Plaintiff asks the Court to strike the affidavits of Kish and Twardoch filed in support of Hospitality Ventures, LLC's Motion for Summary Judgment, and issue a protective order because she claims she was not aware of Kish and Twardoch.  At the time Hospitality Ventures, LLC filed the affidavits from Kish and Twardoch, however, Plaintiff had already been aware of Kish and her testimony for more than five (5) months, and Twardoch for more than three (3) months.

1                                                          1784561

Nonetheless, Plaintiff never sought to depose Kish or Twardoch. The Court should deny Plaintiff's Motion to Strike.

## II.    STATEMENT OF FACTS

**A.    Plaintiff was Aware of Kish and Twardoch for Several Months Before Affidavits Filed**

In her Motion to Strike, Plaintiff does not allege that she was unaware that Kish and Twardoch were potential witnesses in this case. (Docket Entry ("DE") No. 38, passim.). As explained below, for several months Plaintiff has been aware of both Kish and Twardoch, but Plaintiff elected not to conduct discovery about them.

**1.    Since March 26, 2007, Plaintiff Knew Kish was a Witness**

On March 26, 2007, eleven (11) days before Hospitality Ventures, LLC served its Initial Disclosures, it filed and served its Motion for Partial Summary Judgment. (DE No. 13). An Affidavit of Karen Kish was attached to that Motion as Exhibit 5 (the "First Kish Affidavit"). (Id. at Exhibit 5). In the First Kish Affidavit, Kish testified about the payroll records for Hospitality Ventures, LLC; Montgomery Ventures, LLC; and all of their affiliated entities. (Id., passim.). Kish's evidence demonstrates that Montgomery Ventures, LLC -- not Hospitality

Ventures, LLC -- owned and operated the hotel at which Plaintiff worked, and employed Plaintiff.[1]  (See Id.).

**2.    On June 7, 2007, Plaintiff Produced Documents Identifying Twardoch as a Potential Witness**

On June 7, 2007, Plaintiff produced to Hospitality Ventures, LLC copies of e-mails that she sent to and received from Twardoch (f/k/a Carol Tedesco) during Plaintiff's employment at the Hotel. (Exhibit 2).  Before receiving those e-mails, Hospitality Ventures, LLC's counsel did not believe that Twardoch had discoverable information that it might use to support its defenses.  (Fellner Declaration ("Fellner Decl.") at ¶ 5 (attached as Exhibit 3)).  On July 13, 2007, Hospitality Ventures, LLC produced to Plaintiff copies of e-mails between Plaintiff and Twardoch.  (Exhibit 4).

On July 20, 2007, Plaintiff deposed Roger Miller, Vice President of Hospitality Ventures Management, Inc. ("HVMI"). (Exhibit 5).  Plaintiff claims that Miller supervised her at the Hotel.  (Exhibit 6 at  70:1-4).  At his deposition, Miller testified:

> **Q. [by Plaintiff's counsel].** And who is Carol Twardoch?
>
> **A. [by Miller].** Company admin.  I don't know her exact title.  I know what she calls herself.
>
> **Q.**  What?  What does she call herself?

---

[1] On October 10, 2007, Hospitality Ventures, LLC amended its Initial Disclosures during the discovery period to identify Kish. (Exhibit 1).

1784561

A.    Mother ship.

Q.    Mother ship?

A.    Yeah.

Q.    And why would she say that?

A.    She's very valuable in all assets.

**Q.    Oh.  Maybe I should be talking to her.**

(Exhibit 5 at 96:6-14)(emphasis added).[2]

### 3.    On September 12, 2007, Affidavits of Kish and Twardoch Filed

On September 12, 2007, Hospitality Ventures, LLC filed its Motion for Summary Judgment. (DE No. 34). A second Affidavit from Kish (the "Second Kish Affidavit") and Twardoch's Affidavit were attached to that Motion for Summary Judgment as Exhibits 11 and 12, respectively. (Id. at Exhibits 11 and 12). Thus, at the time Hospitality Ventures, LLC filed its Motion for Summary Judgment, Plaintiff had been aware of Kish for more than five (5) months, and Twardoch for more than three (3) months. (DE No. 13 at Exhibit 5; Exhibits 2, 4-5).

### B.    Kish's and Twardoch's Testimony Based on Personal Knowledge

Kish testified that the Second Kish Affidavit is based on her personal knowledge. (DE No. 34 at Exhibit 11, ¶ 1). In the Second Kish Affidavit, Kish stated, "I am employed by Hospitality Ventures

---

[2] On October 10, 2007, Hospitality Ventures, LLC amended its Initial Disclosures during the discovery period to identify Twardoch. (Exhibit 1).

Management, Inc. I am responsible for overseeing, preparing, and maintaining payroll records for Hospitality Ventures, LLC; Montgomery Ventures, LLC; and all of their affiliated entities." (Id.). Kish testified in the Second Kish Affidavit about the payroll records for Hospitality Ventures, LLC; Montgomery Ventures, LLC; and all of their affiliated entities. (Id., passim.).

Twardoch testified that her Affidavit is based on her personal knowledge. (DE No. 34 at Exhibit 12, ¶ 1). Twardoch stated in her Affidavit that, "I am employed by Hospitality Ventures Management, Inc. ("HVMI"). I am responsible for overseeing the corporate records for Hospitality Ventures, LLC; HVMI; and Montgomery Ventures, LLC." (Id. at ¶ 1). Twardoch testified about Hospitality Ventures, LLC's corporate records. (Id., passim.).

**C.  Hospitality Ventures, LLC Supplemented its Initial Disclosures**

On April 6, 2007, Hospitality Ventures, LLC served its Initial Disclosures. (Exhibit 7). Hospitality Ventures, LLC inadvertently omitted Kish from its Initial Disclosures as a result of an honest mistake. (Fellner Decl. at ¶ 4). Hospitality Ventures, LLC omitted Twardoch from its Initial Disclosures because at the time it filed those Initial Disclosures, its counsel did not believe Twardoch had discoverable information that it might use to support its defenses. (Id.).

More than five (5) months later, on September 24, 2007, Plaintiff's counsel sent an e-mail requesting a copy of Hospitality

Ventures, LLC's Initial Disclosures. (Exhibit 8). Accordingly, Hospitality Ventures, LLC provided Plaintiff another copy of its Initial Disclosures. (Exhibit 9). On September 25, 2007, Plaintiff's counsel sent an e-mail stating that before September 24, 2007, they had not received Hospitality Ventures, LLC's Initial Disclosures. (Exhibit 8). On October 10, 2007, Hospitality Ventures, LLC served Amended Initial Disclosures identifying both Kish and Twardoch. (Exhibit 1). Plaintiff has never asked to depose Kish or Twardoch. (Fellner Decl. at ¶ 6).

## D. Plaintiff Violated Court's Order

On June 29, 2007, Chief Magistrate Judge Coody entered an Order requiring the parties to communicate with each other to attempt to resolve discovery disputes before filing any discovery motions. (DE No. 27 at p. 3). Specifically, Chief Magistrate Judge Coody Ordered:

> In the future if either party fails to *communicate* with the other party in a good faith effort to resolve discovery disputes, the court will not hesitate to impose appropriate sanctions under FED.R.CIV.P. 37 or the court's inherent authority.

(Id.). Before filing this Motion, Plaintiff and her lawyers did not call, write, consult, or otherwise communicate with Hospitality Ventures, LLC to attempt to resolve these disputes. (Fellner Decl. at ¶ 7).

1784561

### III. ARGUMENT AND CITATION OF AUTHORITY

District Courts have broad discretion to control discovery, and to deny discovery motions, including motions to strike and for protective orders. <u>Prieto v. Malgor</u>, 361 F.3d 1313, 1318 (11th Cir. 2004); <u>Harris v. Chapman</u>, 97 F.3d 499, 506(11th Cir. 1996).

### A. Omissions Harmless and Substantially Justified

Parties must make certain Initial Disclosures, including the names of "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . ." FED.R.CIV.P. 26(a)(1). A party must supplement its Initial Disclosures with additional information only if such "information has not otherwise been made known to the other parties during the discovery process or in writing." FED.R.CIV.P. 26(e)(1).

Where a party's failure to disclose an individual in its Initial Disclosures is substantially justified, or the omission is harmless, the party may use such individual's testimony to support a motion. FED.R.CIV.P. 37(c)(1). A party's failure to disclose is harmless where it resulted from an honest mistake and the other party had sufficient knowledge of the omitted information. <u>Burney v. Rheem Mfg. Co., Inc.</u>, 196 F.R.D. 659, 692 (M.D. Al. 2000); <u>Hosea v. Langley</u>, No. Civ. A. 04-0605-WS-C, 2006 WL 314454, at *4-6 (S.D.Al. Feb. 8, 2006) (denying motion to strike affidavits from witnesses not identified in initial disclosures because they were disclosed during discovery and opposing party did not conduct any

1784561

discovery about them) (attached as Exhibit 10).  An omission can be an honest mistake where there is no evidence of an attempt to deceive the opposing party.  Dixon v. Race Motion Pictures, Inc., No. 2:05cv326-SRW WO, 2006 U.S. Dist. LEXIS 80805, at *2-3 (M.D. Ala. Nov. 3, 2006) (attached as Exhibit 11).  A party has sufficient knowledge of an individual omitted from its opponent's initial disclosures if the party was aware that the individual could be a witness.  Id.  A party's failure to disclose information is substantially justified if parties reasonably could disagree as to whether disclosure was required.  Burney, 196 F.R.D. at 692.

**1.  Harmless Omission of Kish**

Hospitality Ventures, LLC inadvertently omitted Kish from its Initial Disclosures.  (Fellner Decl. at ¶ 4).  There was no attempt to conceal Kish or deceive Plaintiff.  In fact, on March 26, 2007, eleven (11) days before Hospitality Ventures, LLC served its Initial Disclosures, Hospitality Ventures, LLC disclosed to Plaintiff that Kish supported its defense and her precise testimony.  (DE No. 13 at Exhibit 5).  Nonetheless, Plaintiff never asked to depose Kish.  (Fellner Decl. at ¶ 6).  Consequently, Hospitality Ventures, LLC's omission of Kish from its Initial Disclosures was harmless because it was the result of an honest mistake and Plaintiff had sufficient knowledge of Kish.  Therefore, Plaintiff's Motion to Strike the Second Kish Affidavit should be

denied.  Burney, 196 F.R.D. at 692; Hosea, 2006 WL 314454, at *4-6;

Dixon, 2006 U.S. Dist. LEXIS 80805, at *2.

**2.    Substantially Justified Omission of Twardoch**

Hospitality Ventures, LLC omitted Twardoch from its Initial

Disclosures because at the time it served those Initial

Disclosures, counsel for Hospitality Ventures, LLC did not believe

Twardoch had discoverable information that it might use to support

its defenses.  (Fellner Decl. at ¶ 5).  Accordingly, Hospitality

Ventures, LLC's omission of Twardoch from its Initial Disclosures

was substantially justified because on April 6, 2007, it reasonably

was not required to disclose Twardoch in its Initial Disclosures.

Burney, 196 F.R.D. at 692.

Also, Hospitality Ventures, LLC's omission of Twardoch from

its Initial Disclosures was harmless.  Plaintiff had sufficient

knowledge of Twardoch because:

- On June 7, 2007, Plaintiff produced documents referencing Twardoch (Exhibit 2);

- On July 13, 2007, Hospitality Ventures, LLC produced documents referencing Twardoch (Exhibit 4); and

- On July 20, 2007, Plaintiff's counsel stated that, "[m]aybe I should be talking to [Twardoch]." (Exhibit 5 at 96:6-14).

Burney, 196 F.R.D. at 692; Hosea, 2006 WL 314454, at *4-6.

Assuming, arguendo, that Hospitality Ventures, LLC had any

obligation to disclose Twardoch in its Initial Disclosures, such an omission resulted from, at most, an honest mistake. (See Fellner Decl. at ¶ 5). Consequently, Hospitality Ventures, LLC's omission of Twardoch from its Initial Disclosures was substantially justified and harmless, and Plaintiff's Motion to Strike Twardoch's affidavit should be denied. Burney, 196 F.R.D. at 692; Hosea, 2006 WL 314454, at *4-6; Dixon, 2006 U.S. Dist. LEXIS 80805, at *2.

   **3.    No Harm**

   Plaintiff also alleges that the omission of Kish and Twardoch harmed her because: a) she had reason to rely on Hospitality Ventures, LLC's Initial Disclosures; b) she formed her discovery strategy based upon Hospitality Ventures, LLC's Initial Disclosures (discovery began on March 23, 2007); and c) it hampered her ability to prepare her response to the Motion for Summary Judgment (which was due to be filed on October 5, 2007). (Mot. to Strike at ¶¶ 6, 14-15). Interestingly, however, Plaintiff admits she did not receive Hospitality Ventures, LLC's Initial Disclosures until September 24, 2007. (Exhibit 8). Accordingly, Plaintiff could not have: a) relied on Hospitality Ventures, LLC's Initial Disclosures; b) formed her discovery strategy based upon Hospitality Ventures, LLC's Initial Disclosures; or c) been hampered preparing her response to the Motion for Summary Judgment. (See Id.). Plaintiff has never sought to depose Kish or Twardoch although she knew about Kish for more than five (5) months, and Twardoch for more than

three (3) months, before Hospitality Ventures, LLC filed its Motion for Summary Judgment. (Fellner Decl. at ¶ 6). Accordingly, any difficulty Plaintiff had preparing a response to that Motion for Summary Judgment resulted solely from her own failure to prosecute her case. Therefore, Plaintiff's Motion to Strike should be denied.

**B.   No Obligation to Supplement, but Hospitality Ventures, LLC Supplemented**

A party must supplement its Initial Disclosures with additional information only if such "information has not otherwise been made known to the other parties during the discovery process or in writing." FED.R.CIV.P. 26(e)(1). As explained in Section III.A. above, Plaintiff knew of both Kish and Twardoch during the discovery process. Consequently, Hospitality Ventures, LLC had no duty to supplement its Initial Disclosures to identify Kish or Twardoch. FED.R.CIV.P. 26(e)(1). Nonetheless, on October 10, 2007, Hospitality Ventures, LLC served Amended Initial Disclosures during the discovery period identifying both Kish and Twardoch. (Exhibit 10).

**C.   Kish's and Twardoch's Testimony Admissible at Summary Judgment**

Plaintiff argues that the Court should strike the Second Kish Affidavit and Twardoch's affidavit because they do not state in their affidavits: a) how they can testify as to the corporate structures of Hospitality Ventures, LLC; HVMI; or Montgomery

11

Ventures, LLC; b) what their positions or titles are; c) in what capacities they are employed; d) when they became employed by HVMI; and e) that they have management authority. (Mot. to Strike at ¶¶ 1, 7). Significantly, Plaintiff cites no law to support her allegations. (Id.).

Federal Rule of Civil Procedure 56 requires that affidavits submitted in support of a summary judgment motion:

> shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein.

FED.R.CIV.P. 56(e). When an affiant testifies that the statements in her affidavit are based on personal knowledge, a district court must "accept such statements as true, unless the context demonstrate[s] otherwise." Martin v. Rumsfeld, 137 Fed. Appx. 324, 325 (11th Cir. 2005). If an affiant asserts that her affidavit is based on her personal knowledge and the context does not demonstrate otherwise, she does not need to provide the entire foundation for her testimony to be admissible at summary judgment. King v. ADT Sec. Services, Civil No. 06-0519-WS-C, 2007 WL 2713212, at *2 (S.D. Al. Sep. 17, 2007) (attached as Exhibit 12).

Both Kish and Twardoch assert that their affidavits are based on personal knowledge, and the context does not demonstrate otherwise. (DE No. 34 at Exhibit 11 at ¶ 1, Exhibit 12 at ¶1). Accordingly, the Court should accept the Second Kish Affidavit and

Twardoch's affidavit as true.  <u>Martin</u>, 137 Fed. Appx. at 325.  In addition, Kish's and Twardoch's assertions that their affidavits are based on personal knowledge dispose of any need to provide the entire foundation for their testimony.  <u>King</u>, 2007 WL 2713212, at *2.  Nonetheless, Kish and Twardoch both provide adequate foundations for their testimony:

- Kish testified that she is employed by HVMI, and oversees, prepares, and maintains payroll records for Hospitality Ventures, LLC; Montgomery Ventures, LLC; and all of their affiliated entities.  (DE No. 34 at Exhibit 11, ¶ 1).  Kish testified in the Second Kish Affidavit about the payroll records for Hospitality Ventures, LLC; Montgomery Ventures, LLC; and all of their affiliated entities.  (<u>Id.</u>, <u>passim</u>.).

- Twardoch testified that she is employed by HVMI, and she oversees the corporate records for Hospitality Ventures, LLC; HVMI; and Montgomery Ventures, LLC.  (DE No. 34 at Exhibit 12, ¶ 1).  Twardoch testified in her affidavit about Hospitality Ventures, LLC's corporate records. (<u>Id.</u>, <u>passim</u>.).

Thus, the Second Kish Affidavit and Twardoch's Affidavit are admissible in their entirety because they are based on personal knowledge, set forth facts admissible in evidence, and provide an

adequate foundation for the testimony stated therein. FED.R.CIV.P. 56(e); Martin, 137 Fed. Appx. at 325; King, 2007 WL 2713212, at *2.

**D.    Plaintiff's Cases Do Not Warrant the Relief She Seeks**

Two (2) of the cases cited by Plaintiff warrant denying her Motion. In Hosea, 2006 WL 314454 at *5-6, and Poulin v. Greer, 18 F.3d 979, 983-84 (1st Cir. 1994), the courts refused to strike the testimony of witnesses because the defendants were aware of the witnesses during discovery but elected not to pursue discovery about them. Hosea, 2006 WL 314454, at *5-6; Poulin v. Greer, 18 F.3d at 983-84. (Mot. to Strike at ¶¶ 12 and 16). Here, it is undisputed that Plaintiff was aware of both Kish and Twardoch during the discovery period, but Plaintiff did not pursue discovery about them. Accordingly, the Court should deny Plaintiff's Motion. Hosea, 2006 WL 314454, at *5-6; Poulin v. Greer, 18 F.3d at 983-84.

The remaining cases that Plaintiff cites do not warrant granting the relief she seeks:

- In Hosea, 2006 WL 314454, at n.13, Hermeling v. Montgomery Ward & Co., Inc., 851 F.Supp. 1369, 1376 (D.Minn. 1994), Tallarico v. Trans World Airlines, Inc., 881 F.2d 566, 572 (8th Cir. 1989), and Taylor v. Medtronics, Inc., 861 F.2d 980, 985-87 (6th Cir. 1988), the courts struck the testimony of witnesses because they were not disclosed until after discovery closed. Here,

14

during the discovery period Plaintiff was aware of both Kish and Twardoch;

- In U.S. v. Kahn, 2005 WL 3801810, *1 (M.D.Fla. Nov. 18, 2005), the defendant failed to make any Initial Disclosures, so the court ordered that the defendant could not use any evidence or witness not disclosed in the plaintiff's Initial Disclosures. Here, Hospitality Ventures, LLC made Initial Disclosures;

- In Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 284 (8th Cir. 1995), the court affirmed limiting the scope of an expert witness's testimony at trial to his opinions disclosed during discovery. Here, expert witnesses are not at issue, and Kish's and Twardoch's testimony were disclosed during discovery; and

- In Centagon, Inc. v. Bd. of Dirs. of 1212 Lake Shore Drive Condominium Ass'n, No. 00 C 1110, 2002 WL 356483, at *4-5 (N.D.Ill. Mar.5, 2002), the court denied the defendants' motion to strike as untimely because the defendants filed it after the court entered a judgment against the defendants. The court did not decide the merits of the motion. Here, no judgment has been entered.

(Mot. to Strike at ¶¶ 9-10, 12-13, 15).

15

**E.    Court Should Sanction Plaintiff and Deny Protective Order**

**1.    Plaintiff's Failure to Consult Before Filing her Motion Warrants Sanctions and Denial of her Motion**

Federal Rule of Civil Procedure 26(c) requires that before filing a motion for protective order, a party must confer with the opposing party in a good faith attempt to resolve the dispute. FED.R.CIV.P. 26(c).  Also, the movant must file a certification that it consulted with the opposing party before filing the motion.  Id. On June 29, 2007, the Court ordered the parties to communicate with each other to attempt to resolve discovery disputes before filing a discovery motion.  (DE No. 27 at p. 3).  Plaintiff did not consult or communicate with Hospitality Ventures, LLC before filing this motion seeking a protective order, and did not file the required certificate of consultation.  (Fellner Decl. at ¶ 7; DE No. 38, passim.).  Accordingly, the Court should deny Plaintiff's motion and sanction her for violating both Rule 26(c) and this Court's June 29, 2007, Order.

**2.    Protective Order Not Warranted**

Plaintiff requests a protective order excluding the testimony of: a) Kish and Twardoch; and b) "any other witness not so disclosed by the defendant."  (Mot. to Strike at 6).  Although Plaintiff does not specify what she means by "any other witness not so disclosed by the defendant," presumably this means any witness

1784561

not identified on Hospitality Ventures, LLC's Initial Disclosures[3]. Plaintiff cites no law to support her allegations. (Mot. to Strike at 6).

To obtain a protective order under Federal Rule of Civil Procedure 26, a movant must show good cause why the court should protect them "from annoyance, embarrassment, oppression, or undue burden or expense." FED.R.CIV.P. 26(c). Plaintiff made no argument, and cited no law, to demonstrate that she meets this standard. (Mot. to Strike, passim.). The Court should refuse to exclude the testimony of Kish and Twardoch for the same reasons that it should deny her request to strike the Second Kish Affidavit and Twardoch's Affidavit. (See Section III.A., above). In addition, the Court should deny Plaintiff's motion for a protective order excluding the testimony of witnesses not identified in Hospitality Ventures, LLC's Initial Disclosures because such an order would prohibit Hospitality Ventures, LLC from presenting, but allow Plaintiff to present, testimony from numerous witnesses including, but not limited to, individuals who:

- Plaintiff identified in her Initial Disclosures; and

- Became known to Hospitality Ventures, LLC during discovery but Hospitality Ventures, LLC was not obligated

---

[3] If Plaintiff later clarifies that she sought different or additional relief not discussed herein, or to the extent that the Court interprets that Plaintiff requested different relief, Hospitality Ventures, LLC requests the opportunity to respond.

1784561

to identify in a supplement to its Initial Disclosures because those persons became "known to [Plaintiff] during the discovery process or in writing" FED.R.CIV.P. 26(e)(1).

Also, Plaintiff's motion for a protective order excluding Kish's testimony is overbroad and should be denied because such an order would exclude the First Kish Affidavit. For all these reasons, Plaintiff's motion for a protective order should be denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion to Strike.

18

1784561

This 7th day of November, 2007.

                     Respectfully submitted,

                     Jeffrey A. Lee
                     Maynard, Cooper & Gale, P.C.
                     1901 Sixth Avenue North
                     2400 AmSouth/Harbert Plaza
                     Birmingham, Alabama 35203-2618
                     Telephone:  (205) 254-1987
                     Fax:  (205) 254-1999

                      s/ Daniel S. Fellner_____
                     R. Jason D'Cruz
                     Admitted Pro Hac Vice
                     Daniel S. Fellner
                     Admitted Pro Hac Vice
                     Morris, Manning & Martin, LLP
                     1600 Atlanta Financial Center
                     3343 Peachtree Road, N.E.
                     Atlanta, Georgia 30326-1044
                     Telephone:  (404) 233-7000
                     Fax:  (404) 365-9532

                     Attorneys for Hospitality Ventures,
                     LLC

                     1784561

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HEATHER WATTS,                    )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )  Case No.: 2:06CV1149-MEF
                                  )
HOSPITALITY VENTURES, LLC,        )
                                  )
            Defendant.            )
                                  )

**CERTIFICATE OF SERVICE**

I certify that this day I electronically filed the foregoing RESPONSE TO PLAINTIFF'S MOTION TO STRIKE AND FOR PROTECTIVE ORDER with the Clerk of the Court using the CM/ECF system, which will notify the following of such filing:

> Priscilla Black Duncan
> P.B. Duncan & Associates
> 472 S. Lawrence, Suite 204
> Montgomery, AL  36104
> helzphar@mindspring.com
>
> Alicia K. Haynes
> Haynes & Haynes, P.C.
> 1600 Woodmere Drive
> Birmingham, Alabama 35226
> akhaynes@haynes-haynes.com

This 7th day of November, 2007.

                        s/ Daniel S. Fellner
                  Attorney for Hospitality Ventures, LLC

1784561

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Heather Watts, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06CV1149-MEF |
| | ) | |
| Hospitality Ventures, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## HOSPITALITY VENTURES, LLC's AMENDED INITIAL DISCLOSURES

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal Rule of Civil Procedure 26(a)(1), amends its Initial Disclosures.

1) Please provide (i) the name and, if known, (ii) the address and telephone number of each individual likely to have discoverable information that Hospitality Ventures may use to support its claims or defenses, unless solely for impeachment, and (iii) identifying the subjects of the information.

Response:

| Name | Address and Telephone Number. | Subjects of Information |
|---|---|---|
| Heather Watts | Current contact information unknown. | Knowledge of Plaintiff's employment, leave of absence, and termination. |
| Tammy Dominguez | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment, leave of absence, and termination. |
| Tandi Mitchell | Current contact information unknown. | Knowledge of Plaintiff's employment. |

| Name | Address and Telephone Number. | Subjects of Information |
|------|-------------------------------|-------------------------|
| Todd Epplin | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment. |
| Roger Miller | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment, leave of absence, and termination. |
| Karen Kish | May be contacted through Defendant's counsel. | Knowledge of payroll and employees for Montgomery Ventures, LLC. |
| Carol Twardoch | May be contacted through Defendant's counsel. | Knowledge of Hospitality Ventures, LLC's corporate records and its lack of employees and operations. |

2)    Please provide a copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of Hospitality Ventures, and that Hospitality Ventures may use to support its claims or defenses unless solely for impeachment.

Response:

　　　See Attachment A.

3)    Please provide a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Response:

　　　Not applicable.

4)    Please provide for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be interest in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Response:

Not applicable.

This 10th day of October, 2007.

Respectfully submitted,

Jeffrey A. Lee
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2618
Telephone:  (205) 254-1987
Fax:  (205) 254-1999

_____
R. Jason D'Cruz
Admitted Pro Hac Vice
Daniel S. Fellner
Admitted Pro Hac Vice
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
Telephone:  (404) 233-7000
Fax:  (404) 365-9532

Attorneys for Hospitality Ventures, LLC

1782667 v01

## ATTACHMENT A

To date, Hospitality Ventures has identified the following documents and electronically stored information which are relevant to this case, but reserves the right to supplement this list at a later date:

Plaintiff's personnel file;

Plaintiff's electronic mailbox at the Fairfield Inn Montgomery, Alabama;

Selected messages from the electronic mailbox of Roger Miller; and

All documents previously produced by Defendant in discovery.

1782667 v01

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                      )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        CASE NO. 2:06CV1149-MEF
                                    )
Hospitality Ventures, LLC,          )
                                    )
        Defendant.                  )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served by e-mail and U.S. Mail the foregoing "Hospitality Ventures, LLC's Initial Disclosures" upon the following persons:

Priscilla Black Duncan
P.B. Duncan & Associates
472 S. Lawrence, Suite 204
Montgomery, AL  36104
helzphar@mindspring.com

Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226
akhaynes@haynes-haynes.com

This 10th day of October, 2007.

_____
Attorney for Hospitality Ventures,
LLC

1782667 v01

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHEAST DIVISION

| | | |
|---|---|---|
| HEATHER WATTS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **CIVIL ACTION NO.:** |
| | ) | **2:06-cv-1149-MEF** |
| HOSPITALITY VENTURES, LLC, | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST REQUEST FOR PRODUCTION

COMES NOW, the Plaintiff, Heather Watts, by and through her attorney, and hereby objects and responds to Defendant's First Request for Production as follows:

### GENERAL OBJECTIONS

Plaintiff objects to each and every discovery request on each of the following grounds:

1.    Plaintiff's objections to Defendant's First Request for Production of Documents are made without waiver of, or prejudice to, any additional objections Plaintiff may make.

2.    All objections are hereby expressly preserved, as is the right to move for a protective order.

3.    Plaintiff reserves all objections as to admissibility at trial of any information provided.

4.    Plaintiff objects to each and every Request to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial and Defendant has made no showing that it has substantial need for the materials in the preparation of his case and that it is without undo hardship, to obtain the substantial equivalent of materials by other means.  Plaintiff further objects to each and every Request to the extent that the information called for, if any, is privileged and is not discoverable under Rule 26(b)(3), Federal Rules of Civil Procedure.

5.    Plaintiff objects to each and every Request to the extent that the information called for, if any, is protected from discovery by the attorney-client privilege.

6.    Plaintiff reserves the right to supplement its responses to Defendant's First Request for Production to Plaintiff upon completion of discovery.

2

## REQUESTS

1. All Documents that reference, concern, or relate to the controversies which are the subjects of this action.

**RESPONSE:** Plaintiff has produced responsive documents attached as 0001-0224.

2. All Documents that reference, concern, or relate to whether Hospitality Ventures, LLC was Your employer.

**RESPONSE:** Plaintiff has produced responsive documents attached as 0001-0047. Additionally, see documents attached as 0085-0197.

3. All Documents that reference, concern, or relate to who employed you from June 1, 2004, to November 30, 2005.

**RESPONSE:** See response to Request 2 above. Additionally, see documents attached as 0081-0084.

4. For the period from January 1, 2003, to the present, all Documents that reference, concern, or relate to Your pay stubs and all other payroll records received from any source.

**RESPONSE:** Plaintiff has no documents responsive to this request.

5. Your federal and state tax returns, including all schedules and/or attachments, for calendar years 2003, 2004, 2005, 2006 and 2007.

**RESPONSE:** Plaintiff has produced responsive documents attached as 0048-0080.

6. All Documents that reference, concern, or relate to Your leave of absence which began on August 11, 2005.

**RESPONSE:** Plaintiff has produced responsive documents attached 0081-0084.

3

7.     All Documents that reference, concern, or related to the work You continued to perform during your leave of absence as alleged in Paragraph 9 of Your Complaint.

**RESPONSE:**     Plaintiff has produced responsive documents attached as 0085-0129.

8.     All Documents including, but not limited to, any diaries or e-mails, that reference, concern, or relate to Your employment with Hospitality Ventures, LLC; Montgomery Ventures, LLC; and/or any related entity.

**RESPONSE:**     See response to Request 7 above.  Additionally, see documents attached as 0130-0169.

9.     All Documents You identified in response to Hospitality Ventures' First Interrogatories to Plaintiff.

**RESPONSE:**

10.     All Documents consulted, referred to, or used in any way in connection with the preparation of Your responses to Hospitality Ventures' First Interrogatories to Plaintiff.

**RESPONSE:**

11.     All Documents that reference, concern, or related to the termination of Your employment with Hospitality Ventures, LLC; Montgomery Ventures, LLC; and/or any related entity.

**RESPONSE:**     Plaintiff has produced responsive documents attached as 0161-0169.

12.     All Documents that reference, concern, or relate to the personnel handbook you claim to have received as alleged in Paragraph 4 of Your Complaint.

**RESPONSE:**     Plaintiff has produced responsive documents attached as 0170-0197.

4

13.   All Documents that reference, concern, or relate to the charge of discrimination You filed with the EEOC concerning Hospitality Ventures, LLC; Montgomery Ventures, LLC; and/or any related entity.

**RESPONSE:**   Plaintiff is in the process of obtaining a copy of her EEOC file and will supplement her responses upon receipt.

14.   All Documents that reference, concern, or related to Your claim for damages.

**RESPONSE:**   Plaintiff has produced responsive documents attached as 0198-0201.

15.   All Documents that reference, concern, or related to any agreement between You and Your attorneys pertaining to Your payment of attorneys' fees and costs for this action.

**RESPONSE:**   Plaintiff adopts each and every general objection as if set forth herein. Plaintiff objects to Request No. 15 as this request is protected from discovery by the attorney-client privilege and work product doctrine.

16.   For the period from January 1, 2005, to the present, all Documents that reference, concern, or related to Your attempts or efforts to obtain employment. For purposes of this Request, the term "employment" shall mean any arrangement, whether employment, consulting, or otherwise, where You provide, provided, or would provide services to any person or entity in return for any remuneration or the promise of remuneration.

**RESPONSE:**   Plaintiff has conducted internet employment searches on Al.com and monster.com. She has also searched the newspaper for employment.

17.   For the period from August 11, 2005, to February 28, 2006, a certified copy of any and all Documents that reference, concern, or related to any medical treatment or health care provided to or received by Tanner Watts.

**RESPONSE:**   Plaintiff's child is not a party to this action and Plaintiff does not wish to produce her child's medical records. Plaintiff has been advised by her

attorney that producing her child's medical records will involve further discovery in the way of subpoenas to her child's doctor. As such, Plaintiff is refusing to answer this Request based on her child's privacy.

18.    For the period of August 11, 2005, to February 28, 2006, a certified copy of any and all Documents that reference, concern, or related to any medical treatment or health care provided to or received by You.

**RESPONSE:**    Plaintiff is in the process of obtaining copies of her medical records and will supplement her responses upon receipt.

19.    For the period from January 1, 2005, to February 28, 2006, all Documents that reference, concern, or related to Your child care arrangements and/or Your attempts to obtain child care including, but not limited to, applications, bills, payments, registration forms, contracts, and/or deposits.

**RESPONSE:**    Plaintiff has produced responsive documents attached as 0198-0201.

20.    All Documents that reference, concern, or related to the alleged oral contract referred to in Paragraphs 23-25 of Your Complaint.

**RESPONSE:**    Plaintiff has no documents responsive to this request.

21.    All Documents You provided to or received from any employee or agent of Hospitality Ventures, LLC; Montgomery Ventures, LLC; and/or any related entity.

**RESPONSE:**    See response to Request 1, 6, 7, 8 11, and 12 above. Additionally, see documents attached as 0205-0224.

22.    All Documents You provided to or received from Hospitality Ventures, LLC; Montgomery Ventures, LLC; and/or any related entity.

**RESPONSE:**    Plaintiff has no documents responsive to this request.

23.    All records of any conversation between You and any current or former employee or agent of Hospitality Ventures, LLC; Montgomery Ventures, LLC; and/or

6

any related entity.

**RESPONSE:**    Plaintiff has a cassette tape which she will duplicate and upon completion will supplement her responses upon receipt.

24.    All Documents provided to, reviewed by, or generated by any expert retained or consulted by You or Your counsel.

**RESPONSE:**    Plaintiff has no documents responsive to this request.

Respectfully submitted,

Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama  35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com
ASB-8327-E23A

7

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing has been served upon the following, by placing a copy of same in the U.S. Mail, properly addressed and postage prepaid on this the _____ 7th _____ day of _____ June _____, 2007.

Daniel S. Fellner
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326

Jeffrey Allen Lee
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL 35203-2618

R. Jason D'cruz
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326

_____
OF COUNSEL

8

## watts167@bellsouth.net

**From:** Roger A Miller [rmiller@hospitalityventures.com]

**Sent:** Monday, November 08, 2004 11:18 AM

**To:** Mickey and Heathe; Fairfield Inn Montgomery

**Cc:** Robert Cole; Rob Flanders

**Subject:** FW: MONTGOMERY - SALES PRO - MASTER

Todd/Heather; Attached are your %s of "Hard core"/27%,"Other Sales"/64% and "Administration"/9% activities for last week. While your total activities were 13, I realize 2-3 days were spent on completion of 2005 Marketing/Sales Plan and fixing "Fosse" error with Marsha regarding groups. I was pleased that you spent time blitzing an office park and building profiles in "Sales Pro" to follow up. This will pay off big during the follow up process. Congratulations on a respectable booking week of $8455. (Majority in November) Continued focus is to remain on booking Jan-April group business ,as do date only small amounts are "Definite". I know this is no surprise and the majority of your bookings happen 30-60 days out. Have a good week. I look for increased sales activity production now that your "Fosse" Training and the 2005 Marketing Plan are done. Have a great week.
-----Original Message-----
**From:** Carol Tedesco [mailto:ctedesco@hospitalityventures.com]
**Sent:** Wednesday, October 13, 2004 4:06 PM
**To:** Roger Miller
**Subject:** MONTGOMERY - SALES PRO - MASTER


Carol A. Tedesco
Executive Assistant
Hospitality Ventures Mgmt., Inc.
100 Tower Place
3340 Peachtree Road, NE
Suite 605
Atlanta, GA   30326
(404) 467-9299
(404) 467-1962 - FAX
ctedesco@hospitalityventures.com

11/5/2005

Watts v. Hospitality
Int Discl/RFP   0142

**watts167@bellsouth.net**

---

**From:**    Roger A Miller [rmiller@hospitalityventures.com]

**Sent:**    Wednesday, November 24, 2004 9:09 AM

**To:**    Mickey and Heathe

**Cc:**    Fairfield Inn Montgomery; Robert Cole; Rob Flanders

**Subject:** FW: MONTGOMERY - SALES PRO - MASTER

---

Heather; Attached is your activity breakdown for last week. You and I have have talked several times regarding the lap top challenges and ways to work with this. I have e mailed Todd asking him to set 1 hour each morning and 1 & half hours each afternoon aside for your usage. ( 8:45am-9:45am) (Last 1 & half hours of your work day) Last week you produced 20 activities; 15% "Hard Core"/ 65% "Other Sales Activities"/ 20% "Administration". I know this weeks priorities were on a lot of in house items and I understand the majority of the results. Going forward , you need to strive for August/September production results. With all the new product entering the Montgomery market, your focus on quality/quantity "Hard Core" activities and their results will be critical to your hotels overall success. If efforts are shorted and results lacking, you and Todd are in for a long year. I know with strong communication and team work you both will be very successful in all areas.

Calendar; Fairly well filled out considering a holiday weekend. Work hard on scheduling items in "Hard Core" area or "Other Sales Activities" leading to "Hard Core" activities.(Example/Telemarketing-Prospecting for next weeks outside sales calls or appointments.)

Traces; Make sure "Objective" section of trace is consistently filled out. "Marketing Plan/Franchise Activity" and "Alabama State Council On The Arts" as examples from last week. You normally are one of the best in the company in doing this. In reviewing the number of traces in your system I was surprised to see only 12 from now through Dec 30th. There should be many more based on the amount of accounts and overall responsibilities of your position. Please review this and carefully/strategically plan an aggressive December and January. (Re; Focus/Dec Planning memo sent earlier this week.)

Group Pace Definite-Revenue; November looks great/$37,878.Nice job.December and first quarter needs consistent hard work and efforts by all.Dec/$1,534- Jan/$4,734-February/$4,324 and March/$2,941. I know your December and forward efforts will improve these numbers.

Heather; In short, you and Todd need to work hard on having you focus 100% on targeted sales/marketing efforts. Your immediate market will become very competitive throughout the first 4-5 months of the year and if group/LNR accounts are not obtained in early 2005, they will become extremely difficult to obtain later in the year. Thanks for all your hard work and efforts in the past and future. Have a great Thanksgiving. Take care.

-----Original Message-----

**From:** Carol Tedesco [mailto:ctedesco@hospitalityventures.com]

**Sent:** Wednesday, October 13, 2004 4:06 PM

**To:** Roger Miller

**Subject:** MONTGOMERY - SALES PRO - MASTER

Carol A. Tedesco
Executive Assistant
Hospitality Ventures Mgmt., Inc.
100 Tower Place
3340 Peachtree Road, NE
Suite 605
Atlanta, GA   30326
(404) 467-9299
(404) 467-1962 - FAX
ctedesco@hospitalityventures.com

11/5/2005

Watts v. Hospitality
Int Discl/RFP   0143

```
-----Original Message-----
From: Roger M. Miller (mailto:Roger@hospitalityventures.com)
Sent: Friday, January 07, 2005 12:43 PM
To: Carol Tedesco
Subject: 2005 Sales productivity Tracking Sheets
```

Carol; When you get a chance could you develop these for 2005/ Jan-Dec. Just like 4th quarter. Thanks.

Watts v. Hospitality
Int Discl/RFP  0151

**watts167@bellsouth.net**

| | |
|---|---|
| From: | Roger A Miller [rmiller@hospitalityventures.com] |
| Sent: | Tuesday, April 26, 2005 7:38 AM |
| To: | Mickey and Heathe; tepplin872@aol.com |
| Cc: | Robert Cole |
| Subject: | FW: MONTGOMERY - SALES PRO - MASTER - 2005 |



RAM -
OMERY - SALES

        Heather; Congratulations on another good booking week.($19,284) Hotel
Solutions has really kicked into gear again.($17,160)This is great. Also a nice corporate
booking for July. Impressive "Activity's" included; Faukner University, Crackle
Barrel,2005 Chamber Directory, Jay Smith and cold calls near Eastchase. Booking pace
continues to look great and growing consistently. I know you continue to have allot of
booking/arrival follow up work. Look forward to working with you on Thursday and Friday.
Thanks for all your efforts. Have a great week. Take care.

-----Original Message-----
From: Carol Tedesco [mailto:ctedesco@hospitalityventures.com]
Sent: Friday, January 07, 2005 4:09 PM
To: 'Roger A Miller'
Subject: MONTGOMERY - SALES PRO - MASTER - 2005



Carol A. Tedesco
Executive Assistant
Hospitality Ventures Mgmt., Inc.
100 Tower Place
3340 Peachtree Road, NE
Suite 605
Atlanta, GA    30326
(404) 467-9299
(404) 467-1962 - FAX
ctedesco@hospitalityventures.com


-----Original Message-----
From: Carol Tedesco [mailto:ctedesco@hospitalityventures.com]
Sent: Friday, January 07, 2005 3:35 PM
To: 'Roger A Miller'
Subject: RE: 2005 Sales productivity Tracking Sheets

Are THESE what you mean?

Carol A. Tedesco
Executive Assistant
Hospitality Ventures Mgmt., Inc.
100 Tower Place
3340 Peachtree Road, NE
Suite 605
Atlanta, GA    30326
(404) 467-9299
(404) 467-1962 - FAX
ctedesco@hospitalityventures.com

1

Watts v. Hospitality
Int Discl/RFP  0152

| From: | Roger A Miller [rmiller@hospitalityventures.com] |
|---|---|
| Sent: | Monday, May 23, 2005 9:23 AM |
| To: | Hans Brosbol; Rick Reed; Ron Disbrow; Joani Beckwith; David Price; Juliet Lopez; Robert.lockwood@marriott.com; Kathy Berglind; Kathe Lopez; tina@crosslanddesign.com; Tammy Pratt Dominguez; ffisales@marriott.com; tepplin872@aol.com; Mickey and Heathe |
| Cc: | Robert Cole; Carol Tedesco |
| Subject: | April/YTD Star Summary |

Ladies/Gentleman; Congratulations on a good April monthly Star and YTD numbers.

Houston/ April RevPar 118.6-YTD RevPar 115.4. Nashville/ April RevPar 108.3-YTD RevPar 108.1. Montgomery/ April RevPar 107.2-YTD RevPar 110.4.
Mahwah/ April RevPar 101.1- YTD RevPar 110.1. Portland/ April RevPar 93.6-YTD RevPar 124.4. Charlotte/ April Revpar 90.8- YTD RevPar 93.2 (Under full renovation. Incredible results.) Mt. Arlington/ April RevPar 83.1-YTD RevPar 82.7.(Current staff ramping up fast to 100 RevPar index. Has run near or at 100 multiple times in last 8 weeks.) Keep up the great work. Continue to concentrate on all applicable "Hotelligence" report comp set accounts, "Hard Core" scheduling/results and weekly sales pro calendar development. These three items at a minimum will continue to grow your monthly and annual RevPar index results. Thanks.

1

Watts v. Hospitality
Int Discl/RFP  0154

⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Watts, HEATHER**

| | |
|---|---|
| **From:** | Roger A Miller [rmiller@hospitalityventures.com] |
| **To:** | Watts, HEATHER; tepplin872@aol.com |
| **Cc:** | Robert Cole |
| **Subject:** | FW: MONTGOMERY - SALES PRO - MASTER - 2005 |
| **Attachments:** | 🗋 RAM - MONTGOMERY - SALES PRO - ACTIVITY MASTER - 2005.xls(110KB) |

**Sent:** Tue 7/26/2005 6:07 PM

Heather; Congratulations on a good booking week/$17,587.I was pleased to see Hotel Solutions and the other 3-4 bookings. You had a total of 17 sales activities;5"HC"& 4 "Other Sales" I'm aware that there were many training and administration duties needing completion last week and was appreciative to see all that got accomplished. I was happy to read that the front desk staff was happy about Tandi and several of the communications/administration items implemented and fine-tuned. Great job. "Results" items noteworthy were; New Military Group Lead, Southern Poverty Law Center and the two Marriott Group Sales transactions. Thanks for sending in your 2006 football rates to MARSHA. Have a great week. Stay healthy. I know any day the baby will arrive. Take care.

-----Original Message-----
From: Carol Tedesco [mailto:ctedesco@hospitalityventures.com]
Sent: Friday, January 07, 2005 4:09 PM
To: 'Roger A Miller'
Subject: MONTGOMERY - SALES PRO - MASTER - 2005

Carol A. Tedesco
Executive Assistant
Hospitality Ventures Mgmt., Inc.
100 Tower Place
3340 Peachtree Road, NE
Suite 605
Atlanta, GA  30326
(404) 467-9299
(404) 467-1962 - FAX
ctedesco@hospitalityventures.com

-----Original Message-----
From: Carol Tedesco [mailto:ctedesco@hospitalityventures.com]
Sent: Friday, January 07, 2005 3:35 PM
To: 'Roger A Miller'
Subject: RE: 2005 Sales productivity Tracking Sheets

Are THESE what you mean?

Carol A. Tedesco
Executive Assistant
Hospitality Ventures Mgmt., Inc.
100 Tower Place

Watts v. Hospitality
Int Discl/RFP  0156

## watts167@bellsouth.net

| | |
|---|---|
| **From:** | watts167@bellsouth.net |
| **Sent:** | Tuesday, November 08, 2005 2:13 PM |
| **To:** | 'Amrita Parekh'; 'Carol Twardoch' |
| **Cc:** | 'rcole@hospitalityventures.com'; 'Roger A Miller'; 'Dominguez, Tammy' |

**Subject:** MGMFI-Hostility Ventures is required by law to answer my questions!

Amrita,
  If more time is needed to answer my question I understand.  I would just appreciate someone to confirm my messages.  I am still unable to dial out on my cell phone- I can be reached at home....thanks
334 244 8077

**From:** watts167@bellsouth.net [mailto:watts167@bellsouth.net]
**Sent:** Monday, November 07, 2005 6:30 PM
**To:** 'Amrita Parekh'
**Cc:** 'rcole@hospitalityventures.com'; 'Roger A Miller'; 'Dominguez, Tammy'
**Subject:** FW: Can you call me...Heather??
**Importance:** High

Amrita,
  I did not hear from you today! I have contacted BCBS about the COBRA (as you told me to do last Thursday 11/3/05) and they stated that I have to talk directly to you/HV about my questions:

  1)  How much is the COBRA for family coverage?  I have to know this before I elect to enroll.  I realize I have 63 days per BCBS to have all paper work filed.

  2)  What is the start date for COBRA?  BCBS has not received any paper work from you/HV as of today.   I gave BCBS my termination date as of 11/2/05 per Tammy
       and 11/3/05 when I received the COBRA papers with my paycheck and letter from Tammy stating "if I elect to enroll".

Please let me know.  I will not be home much tomorrow incase you try call.  I would appreciate a response at your convenience,

Thanks
Heather Watts
334 244 8077-home

**From:** watts167@bellsouth.net [mailto:watts167@bellsouth.net]
**Sent:** Monday, November 07, 2005 10:48 AM
**To:** 'Amrita Parekh'
**Subject:** FW: Can you call me...Heather??

It you don't have time to call – can you email me back explaining the insurance per our conversation last Thursday.  I will then email you my question-
Thanks
Heather

**From:** watts167@bellsouth.net [mailto:watts167@bellsouth.net]
**Sent:** Monday, November 07, 2005 10:16 AM
**To:** 'Amrita Parekh'
**Subject:** Can you call me...Heather??

11/8/2005

Watts v. Hospitality
Int Discl/RFP   0168

Amrita,
   At your convenience (hopefully before noon today ) can you call me at home *334 244 8077*. My cell phone battery is not working and I can't dial long distance from home. I have a question about the COBRA.


Thanks
Heather Watts

Watts v. Hospitality
Int Discl/RFP   0169

DECLARATION OF DANIEL S. FELLNER

STATE OF GEORGIA      )
                      )
COUNTY OF FULTON      )

I, Daniel S. Fellner, pursuant to 28 U.S.C. §1746, declare:

1.    I am an attorney with the law firm of Morris, Manning & Martin LLP in Atlanta, Georgia.  I am over the age of eighteen (18) years, suffer from no legal disability, and am competent to make this Declaration based upon my personal knowledge of the facts stated herein.

2.    I understand that this Declaration will be submitted in the civil action styled Heather Watts v. Hospitality Ventures, LLC, Civil Action No. 2:06CV1149-MEF, pending in the United States District Court for the Middle District of Alabama (the "Lawsuit").

3.    I am one of the attorneys who represents Hospitality Ventures, LLC in the Lawsuit.  I have personally been involved in Hospitality Ventures, LLC's defense of the Lawsuit.

4.    I prepared Hospitality Ventures, LLC's Federal Rule of Civil Procedure 26 Initial Disclosures in the Lawsuit.  I inadvertently omitted Karen Kish from those Initial Disclosures as a result of an honest mistake.

5.    On June 7, 2007, Plaintiff produced to Hospitality Ventures, LLC copies of e-mails that she sent to and received from Carol Twardoch (f/k/a Carol Tedesco) during Plaintiff's employment at the hotel.  Before receiving those e-mails, counsel for

1816033

Hospitality Ventures, LLC did not believe that Twardoch had discoverable information that it might use to support its defenses.

6.    Plaintiff has never asked to depose Kish and Twardoch in the Lawsuit.

7.    Before Plaintiff filed her Motion to Strike Undisclosed Witnesses in their Entirety and Plaintiff's Motion for Protective order Pursuant to FRCP 37 to Exclude any Testimony or Reference to the Testimony of Karen Kish and Carol Twardoch, Plaintiff did not call, write, consult, or otherwise communicate with Hospitality Ventures, LLC to attempt to resolve the disputes therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of November, 2007.

__s/ Daniel S. Fellner__
Daniel S. Fellner

1816033

# MORRIS, MANNING & MARTIN, LLP
ATTORNEYS AT LAW

July 13, 2007

**Daniel S. Fellner**
404-504-5476
dsf@mmmlaw.com
www.mmmlaw.com

Alicia K. Haynes, Esq.
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226

Re:     Heather Watts v. Hospitality Ventures, LLC
        U.S. District Court, Middle District of Alabama
        Case No. 2:06-CV-1149-MEF

Dear Alicia:

Enclosed are:

- A compact disc containing documents MV 1000001 through MV 1001914;

- Documents MV 00027 and MV 00028; and

- Documents MV 00178 through MV 00455.

Please call if you have any questions.

Sincerely,

Daniel S. Fellner

Enclosures

Cc w/encl.:     Jeff Lee, Esq.
                Priscilla Black Duncan, Esq.

Atlanta
404.233.7000

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1044
Fax: 404.365.9532

With offices in

Washington, D.C.
Charlotte, North Carolina

1702857 v01

**From:** Roger A Miller
**Sent:** 07/08/2005
**To:** IS.Security.Services@marriott.com
**Cc:** ctwardoch@hospitalityventures.com; Mickey and Heathe; tepplin872@aol.com; Robert Cole; Dprice@Hospitalityventures. Com
**Bcc:**
**Subject:** RE: Request for AD / Email Access for Heather Watts

Dear Security Services; Please forward this request to Hospitality Ventures designated ""Approving Manager"".Ms. Carol Tedesco- ctwardoch@hospitalityventures.com Heathers ""Add Outlook"" is approved however Carol is the only one authorized to ""X"" . Thank you for your assistance.

-----Original Message-----
From: IS.Security.Services@marriott.com
[mailto:IS.Security.Services@marriott.com]
Sent: Friday, July 08, 2005 11:47 AM
To: rmiller@hospitalityventures.com
Subject: Request for AD / Email Access for Heather Watts

The following request form was submitted on 7/8/2005

Your prompt attention to this email is requested. Please carefully review the information below to approve or deny the ADD_OUTLOOK; request.

Upon receipt of your approval by IS Security Services, please allow 3-5 business days to process the id and notify the requestor via email.

Please note that a period maintenance fee will be accessed for each mailbox on the Marriott network.

PLEASE REPLY TO THIS EMAIL then approve or deny the request.

The Approval Section is located at the bottom of this email.

****************************************************

REQUEST DETAILS

Request Type: ADD_OUTLOOK

-----------------------------------------------

MV1001654

REQUESTOR INFORMATION

Requestor's Name: Heather G Watts

Requestor's Title: Director of Sales and Marketing

Requestor's Phone: 334-270-0007

Requestor's Email: watts167@charter.net

Requestor's Email Confirmed: watts167@charter.net

-----------------------------------------------

USER INFORMATION

User's Name: Heather G Watts

User's Title: Director of Sales and Marketing

User Type: Franchise Employee

User's Phone: 334-270-0007

User's DOB: 06/21

User's DUD: 43/2.A5

User SSN:

User Hire Date: 06/2004

User EID: hgwat391

-----------------------------------------------

USER PROPERTY/LOCATION INFORMATION

Location/Property Name: On-Property Associate

Brand: Fairfield Inn

MARSHA code MGMFI

MV1001655

If other MARSHA code

MARSHA Code:

Property/Location Name:

Address:

City,State Zip: ,

-----------------------------------------------

USER NEW OUTLOOK E-MAIL ACCOUNT INFORMATION

Mailbox Type: Personal Outlook Account (Example: john.doe@marriott.com)

Generic Mailbox: heather watts

Comments:

-----------------------------------------------

APPROVING MANAGER/SYSTEMS MANAGER INFORMATION

Name: Roger Miller

Manager's Phone: 404-467-9299

Manager's Email: rmiller@hospitalityventures.com

Manager's Email Confirmed: rmiller@hospitalityventures.com

-----------------------------------------------

APPROVAL SECTION

REMINDER: PLEASE REPLY TO THIS EMAIL then approve or deny the request.

Place an X next to the correct option. If denying a request, please state
in the email the reason for denial.

APPROVE _____

DENIED _____

Reason for Denial:

If you have any questions, please contact IS Security Services at
(240)632-6000.

MV1001657

**From:** Watts, HEATHER
**Sent:** 07/20/2005
**To:** Carol Tedesco/Hospitality Ventures
**Cc:**
**Bcc:**
**Subject:** From Heather MGMFI

---

Look Carol !
IT WORKS!! I HAVE EMAIL...I AM DOING THE HAPPY DANCE!~
I just wanted to make sure you have my ""new"" information.
Take Care-you are the best!

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117
334-270-0007 hotel phone/fax
334-354-2619 cell phone
334-244-8077 home fax
www.marriott.com/mgmfi

Eager to assist with corporate, group or special events.

**From:** Watts, HEATHER
**Sent:** 08/11/2005
**To:** Carol Twardoch
**Cc:**
**Bcc:**
**Subject:** RE: need your HOME address

---

6976 Eastern Shore Road
Montgomery, Alabama 36117

I am emailing Roger now- I am going to the hospital today at 3pm instead of tomorrow!

Heather G Watts
Director of Sales & Marketing
Fairfield Inn by Marriott
5601 Carmichael Road
Montgomery, Alabama 36117\
Hotel Phone & Fax: 334-270-0007
Cell Phone: 334-354-2619
Home Fax: 334-244-8077
www.marriott.com/mgmfi

EAGER TO ASSIST WITH CORPORATE, GROUP AND SPECIAL EVENTS!
CALL FOR GROUP DISCOUNT!!

———

From: Carol Twardoch [mailto:ctwardoch@hospitalityventures.com]
Sent: Wed 8/10/2005 2:56 PM
To: Watts, HEATHER
Cc: Roger Miller
Subject: need your HOME address

Preparing to send out (next week) the disc for the Sales & Marketing 2006 Timeline
Process....Roger suggested I send it to you at home, so while you were on Maternity
Leave, you would be able to do it.

Thanks and Best,

Carol A. Twardoch

Director of Communications

Hospitality Ventures Mgmt., Inc.

100 Tower Place

3340 Peachtree Road, NE

Suite 605

Atlanta, GA 30326

(404) 467-9299

(404) 467-1962 - FAX

ctwardoch@hospitalityventures.com

www.hospitalityventures.com

---

Attachment: ..\email\HWEM0000447^image001.gif

MV1000890

**From:** Carol Twardoch
**Sent:** 08/15/2005
**To:** Fairfield Sales; Berglind, Kathy (F); 'David Price'; 'Joani Beckwith'; Watts,
HEATHER; creitz@hospitalityventures.com; TINA CROSSLAND
**Cc:** Roger Miller; rcole@hospitalityventures.com; FFI, Portland Maine Mall GM (F);
CY, Mount Arlington NJ GM (F); 'Ron Disbrow'; FFI, Montgomery AL GM (F); 'Kathe
Lopez'
**Bcc:**
**Subject:** 2006 SALES & MARKETING TIMELINE PROCESS

Dear DOS' –

Yes, it's that time of year once again. Time to start the 2006 Sales & Marketing
budgeting process. I have sent all our DOS today, via FEDEX 2nd DAY – a disc with all
the appropriate forms to help you set up your marketing budgets for next year. I have also
included the cover sheet with all the "DUE DATES" for each exercise. You should
receive this package on Wednesday.

As always, should you have any questions about filling out these forms, please don't
hesitate to contact Roger Miller. He's always happy to support you and answer any
questions you may have.

Have a terrific week!!!

My Best,

Carol A. Twardoch

Director of Communications

Hospitality Ventures Mgmt., Inc.

100 Tower Place

3340 Peachtree Road, NE

Suite 605

Atlanta, GA 30326

(404) 467-9299

(404) 467-1962 - FAX

ctwardoch@hospitalityventures.com

www.hospitalityventures.com

Attachment: ..\email\HWEM0000003^image001.gif

**From:** Mickey and Heathe
**Sent:** 09/26/2005
**To:** Watts, HEATHER
**Cc:**
**Bcc:**
**Subject:** FW: PROPERTY VISIT - April 2005

──────────────────────────────────────────────────

────────

From: Carol Twardoch [mailto:ctwardoch@hospitalityventures.com]
Sent: Tuesday, May 03, 2005 9:20 AM
To: 'Mickey and Heathe'
Cc: Fairfield Inn Montgomery; TEpplin872@aol.com; rcole@hospitalityventures.com;
'Roger A Miller'
Subject: PROPERTY VISIT - April 2005

Hi Heather –

Attached are Roger's trip notes from his visit to your property last week. Please print out
and follow-up on the specific items listed. If you have any questions, or need any support,
don't hesitate to call on Roger. He's always happy to help.

Best,

Carol A. Twardoch

Director of Communications

Hospitality Ventures Mgmt., Inc.

100 Tower Place

CONFIDENTIAL

3340 Peachtree Road, NE

Suite 605

Atlanta, GA 30326

(404) 467-9299

(404) 467-1962 - FAX

ctwardoch@hospitalityventures.com

www.hospitalityventures.com

---

1 Attachment

Attachment: ..\email\HWEM0000334^image001.gif
Attachment: ..\email\HWEM0000335^RAM - MONTGOMER.doc

MV1000556

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HEATHER WATTS,

          Plaintiff,

vs.                              CASE NO. 2:06CV1149-MEF

HOSPITALITY VENTURES, LLC,

          Defendant.




          * * * * * * * * * *

          DEPOSITION OF ROGER ALAN MILLER, taken

pursuant to stipulation and agreement before

Heather Barnett, Court Reporter and Commissioner

for the State of Alabama at Large, in the Law

Offices of Maynard, Cooper & Gale, 100 North

Union Street, Suit 650 RSA Tower, Montgomery,

Alabama, on Friday, July 20, 2007, commencing at

approximately 11:07 a.m.

          * * * * * * * * * *

1                    APPEARANCES

2    FOR THE PLAINTIFF:

3    Ms. Priscilla Black Duncan
     P.B. DUNCAN & ASSOCIATES, LLC
4    Attorneys at Law
     472 South Lawrence Street
5    Suite 204
     Montgomery, Alabama  36104

6
     FOR THE DEFENDANT:

7
     Mr. Daniel S. Fellner
8    MORRIS, MANNING & MARTIN, LLP
     Attorneys at Law
9    1600 Atlanta Financial Center
     3343 Peachtree Road, NE
10   Atlanta, Georgia  30326-1044

11   ALSO PRESENT:

12   Ms. Heather Watts
     Mr. Austin McCarthy

13

14            * * * * * * * * * *

15            EXAMINATION INDEX

16   ROGER ALAN MILLER
        BY MS. DUNCAN                4

17

18            * * * * * * * * * *

19              STIPULATIONS

20        It is hereby stipulated and agreed by

21   and between counsel representing the parties that

22   the deposition of ROGER ALAN MILLER is taken

23   pursuant to the Federal Rules of Civil Procedure

1    Q.   And who was that person?

2    A.   I believe I have asked Carol Twardoch, when I

3         first started, to reconfirm.  We were using

4         the same schedule as we do with Impac Hotel

5         Group.

6    Q.   And who is Carol Twardoch?

7    A.   Company admin.  I don't know her exact title.

8         I know what she calls herself.

9    Q.   What?  What does she call herself?

10   A.   Mother ship.

11   Q.   Mother ship?

12   A.   Yeah.

13   Q.   And why would she say that?

14   A.   She's very valuable in all assets.

15   Q.   Oh.  Maybe I should be talking to her.  I'm

16        going to show you Defendant's Exhibit #1,

17        which is the affidavit of Heather Watts that

18        was submitted through the EEOC.

19             MR. FELLNER:  Hold on.  I'm going to

20                  object to this.  This is not the

21                  affidavit that was submitted to

22                  EEOC.  It's in the exhibits.  If

23                  we're going to talk about the

ORIGINAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                     NORTHERN DIVISION

 4

 5   HEATHER WATTS,

 6          Plaintiff,

 7   vs.                    CASE NO. 2:06CV1149-MEF

 8   HOSPITALITY VENTURES, LLC,

 9          Defendant.

10

11

12

13            * * * * * * * * * * *

14         DEPOSITION OF HEATHER GODFREY WATTS,

15   taken pursuant to stipulation and agreement

16   before Heather Barnett, Court Reporter and

17   Commissioner for the State of Alabama at Large,

18   in the Law Offices of Maynard, Cooper & Gale,

19   100 North Union Street, Suite 650 RSA Tower,

20   Montgomery, Alabama, commencing at approximately

21   10:32 a.m., on Thursday, July 19, 2007, and

22   continuing on Friday, July 20, 2007.

23            * * * * * * * * * * *
```

1  Q.  Did anybody at -- did anybody explain to you

2      who was going to be your supervisor?

3  A.  It was my understanding that it was Roger and

4      the general manager.

5  Q.  So you reported to both?

6  A.  Mainly to Roger on a weekly basis.

7  Q.  What else do you remember about that job

8      offer?

9  A.  Can I have a moment to think about it?

10 Q.  Sure.

11 A.  It's been a while.

12 Q.  Absolutely.

13 A.  It had a start date on it.

14 Q.  What was that supposed to be?

15 A.  I would have to pull it and see.  I don't

16     recall.  It was very -- within the next week

17     or so of the -- of the interview, so there

18     was a start date on there.  And then I did

19     get in -- I asked for in writing about the

20     insurance, so that came on a separate

21     e-mail, because it was not included in the

22     offer from Roger, but Rob Flanders sent me an

23     e-mail about the insurance.


**MORRIS, MANNING & MARTIN, LLP**
ATTORNEYS AT LAW

April 6, 2007

**Daniel S. Fellner**
404-504-5476
dsf@mmmlaw.com
www.mmmlaw.com

**VIA U.S. Mail**

Priscilla Black Duncan, Esq.
P.B. Duncan & Associates, LLC
472 S. Lawrence Street
Suite 204
Montgomery, Alabama 36104

Re:   Heather Watts v. Hospitality Ventures, LLC
        U.S. District Court, Middle District of Alabama
        Case No. 2:06-CV-1149-MEF

Dear Priscilla:

Enclosed are Hospitality Ventures, LLC's Initial Disclosures.

Please call if you have any questions.

Sincerely,

Daniel S. Fellner
Enclosure
cc:    Jason D'Cruz, Esq.
        Jeffrey Lee, Esq.
        Alicia Haynes, Esq.

1646683 v01

Buckhead Office | 1600 Atlanta Financial Center          With offices in    Charlotte, N.C.
(404) 233-7000 | 3343 Peachtree Road, N. E.                                  Washington, DC
                     Atlanta, Georgia 30326
                     Fax: (404) 365-9532

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,               )
                             )
        Plaintiff,           )
                             )
v.                           )    CASE NO. 2:06CV1149-MEF
                             )
Hospitality Ventures, LLC,   )
                             )
        Defendant.           )

## HOSPITALITY VENTURES, LLC's INITIAL DISCLOSURES

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal Rule of Civil Procedure 26(a)(1), makes the following Initial Disclosures.

1) Please provide (i) the name and, if known, (ii) the address and telephone number of each individual likely to have discoverable information that Hospitality Ventures may use to support its claims or defenses, unless solely for impeachment, and (iii) identifying the subjects of the information.

Response:

| Name | Address and Telephone Number. | Subjects of Information |
|------|-------------------------------|-------------------------|
| Heather Watts | Current contact information unknown. | Knowledge of Plaintiff's employment, leave of absence, and termination. |
| Tammy Dominguez | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment, leave of absence, and termination. |

1612147 v06

| Name | Address and Telephone Number. | Subjects of Information |
|------|-------------------------------|-------------------------|
| Tandi Mitchell | Current contact information unknown. | Knowledge of Plaintiff's employment. |
| Todd Epplin | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment. |
| Roger Miller | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment, leave of absence, and termination. |

   2)   Please provide a copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of Hospitality Ventures, and that Hospitality Ventures may use to support its claims or defenses unless solely for impeachment.

Response:

   See Attachment A.

   3)   Please provide a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Response:

   Not applicable.

   4)   Please provide for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be interest in the action or to indemnify or reimburse for payments made to satisfy the judgment.

1612147 v06

Response:

    Not applicable.

    This 6th day of April, 2007.

                   Respectfully submitted,

                   Jeffrey A. Lee
                   Maynard, Cooper & Gale, P.C.
                   1901 Sixth Avenue North
                   2400 AmSouth/Harbert Plaza
                   Birmingham, Alabama 35203-2618
                   Telephone:  (205) 254-1987
                   Fax:  (205) 254-1999

                   R. Jason D'Cruz
                   Admitted Pro Hac Vice
                   Daniel S. Fellner
                   Admitted Pro Hac Vice
                   Morris, Manning & Martin, LLP
                   1600 Atlanta Financial Center
                   3343 Peachtree Road, N.E.
                   Atlanta, Georgia 30326-1044
                   Telephone:  (404) 233-7000
                   Fax:  (404) 365-9532

                   Attorneys for Hospitality Ventures,
                   LLC

1612147 v06

ATTACHMENT A

To date, Hospitality Ventures has identified the following documents and electronically stored information which are relevant to this case, but reserves the right to supplement this list at a later date:

Plaintiff's personnel file;

Plaintiff's electronic mailbox at the Fairfield Inn Montgomery, Alabama; and

Selected messages from the electronic mailbox of Roger Miller.

-4-

1612147 v06

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )    CASE NO. 2:06CV1149-MEF
                                  )
Hospitality Ventures, LLC,        )
                                  )
        Defendant.                )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served by U.S. Mail the foregoing "Hospitality Ventures, LLC's Initial Disclosures" upon the following persons:

Priscilla Black Duncan
P.B. Duncan & Associates
472 S. Lawrence, Suite 204
Montgomery, AL  36104

Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226

This 6th day of April, 2007.

_____
Attorney for Hospitality Ventures,
LLC

- 5 -

**From:**  Jenny Connell [jlconnell@haynes-haynes.com]

**Sent:**  Tuesday, September 25, 2007 2:45 PM

**To:**  Daniel S. Fellner

**Cc:**  Alicia Haynes; helzphar@mindspring.com

**Subject:** RE: Watts v. Hospitality Ventures

Thank you for e-mailing.

No one ever received this.

*Jenny Connell*, Paralegal

Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
Phone: (205) 879-0377
Facsimile: (205) 879-3572
E-mail: jlconnell@haynes-haynes.com
Website: www.haynes-haynes.com

PLEASE NOTE:

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Daniel S. Fellner [mailto:dsf@mmmlaw.com]
**Sent:** Monday, September 24, 2007 4:06 PM
**To:** Jenny Connell
**Cc:** Alicia Haynes; helzphar@mindspring.com
**Subject:** RE: Watts v. Hospitality Ventures

On April 6, 2007, we served the attached Initial Disclosures.

Please call if you have any questions.

Dan Fellner
Employment Law Group
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE

Atlanta, Georgia 30326
p: (404) 504-5476
f: (404) 365-9532

For information on Morris, Manning & Martin, LLP, please visit our Web site at http://www.mmmlaw.com. This e-mail message and its attachments are for the sole use of the designated recipient(s). They may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not a designated recipient of this message, please do not read, copy, use or disclose this message or its attachments, notify the sender by replying to this message and delete or destroy all copies of this message and attachments in all media. Thank you.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Jenny Connell [mailto:jlconnell@haynes-haynes.com]
**Sent:** Monday, September 24, 2007 11:19 AM
**To:** Daniel S. Fellner
**Cc:** Alicia Haynes; helzphar@mindspring.com
**Subject:** Watts v. Hospitality Ventures
**Importance:** High

Mr. Fellner,

In reviewing our file, it appears that defendant never provided us with Rule 26 disclosures. Could you please provide these to us as soon as possible.

Thanks,

*Jenny Connell*, Paralegal
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
Phone: (205) 879-0377
Facsimile: (205) 879-3572
E-mail: jlconnell@haynes-haynes.com
Website: www.haynes-haynes.com

PLEASE NOTE:

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

| From: | Daniel S. Fellner |
|-------|-------------------|
| Sent: | Monday, September 24, 2007 5:06 PM |
| To: | 'Jenny Connell' |
| Cc: | Alicia Haynes; helzphar@mindspring.com |
| Subject: | RE: Watts v. Hospitality Ventures |
| Attachments: | HV-Watts-Defendant's Initial Disclosures.pdf |

On April 6, 2007, we served the attached Initial Disclosures.

Please call if you have any questions.

Dan Fellner
Employment Law Group
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
p: (404) 504-5476
f: (404) 365-9532

For information on Morris, Manning & Martin, LLP, please visit our Web site at http://www.mmmlaw.com. This e-mail message and its attachments are for the sole use of the designated recipient(s). They may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not a designated recipient of this message, please do not read, copy, use or disclose this message or its attachments, notify the sender by replying to this message and delete or destroy all copies of this message and attachments in all media. Thank you.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Jenny Connell [mailto:jlconnell@haynes-haynes.com]
**Sent:** Monday, September 24, 2007 11:19 AM
**To:** Daniel S. Fellner
**Cc:** Alicia Haynes; helzphar@mindspring.com
**Subject:** Watts v. Hospitality Ventures
**Importance:** High

Mr. Fellner,

In reviewing our file, it appears that defendant never provided us with Rule 26 disclosures. Could you please provide these to us as soon as possible.

Thanks,

*Jenny Connell*, Paralegal

Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
Phone: (205) 879-0377
Facsimile: (205) 879-3572
E-mail: jlconnell@haynes-haynes.com
Website: www.haynes-haynes.com

PLEASE NOTE:

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Heather Watts, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06CV1149-MEF |
| | ) | |
| Hospitality Ventures, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## HOSPITALITY VENTURES, LLC's INITIAL DISCLOSURES

NOW COMES Hospitality Ventures, LLC and, pursuant to Federal Rule of Civil Procedure 26(a)(1), makes the following Initial Disclosures.

1)    Please provide (i) the name and,  if known, (ii) the address and telephone number of each individual likely to have discoverable information that Hospitality Ventures may use to support its claims or defenses, unless solely for impeachment, and (iii) identifying the subjects of the information.

Response:

| Name | Address and Telephone Number. | Subjects of Information |
|---|---|---|
| Heather Watts | Current contact information unknown. | Knowledge of Plaintiff's employment, leave of absence, and termination. |
| Tammy Dominguez | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment, leave of absence, and termination. |

| Name | Address and Telephone Number. | Subjects of Information |
|------|-------------------------------|-------------------------|
| Tandi Mitchell | Current contact information unknown. | Knowledge of Plaintiff's employment. |
| Todd Epplin | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment. |
| Roger Miller | May be contacted through Defendant's counsel. | Knowledge of Plaintiff's employment, leave of absence, and termination. |

2)    Please provide a copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of Hospitality Ventures, and that Hospitality Ventures may use to support its claims or defenses unless solely for impeachment.

Response:

See Attachment A.

3)    Please provide a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Response:

Not applicable.

4)    Please provide for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be interest in the action or to indemnify or reimburse for payments made to satisfy the judgment.

<u>Response</u>:

    Not applicable.

    This 6th day of April, 2007.

                    Respectfully submitted,

                    Jeffrey A. Lee
                    Maynard, Cooper & Gale, P.C.
                    1901 Sixth Avenue North
                    2400 AmSouth/Harbert Plaza
                    Birmingham, Alabama 35203-2618
                    Telephone:  (205) 254-1987
                    Fax:  (205) 254-1999

                    R. Jason D'Cruz
                    Admitted Pro Hac Vice
                    Daniel S. Fellner
                    Admitted Pro Hac Vice
                    Morris, Manning & Martin, LLP
                    1600 Atlanta Financial Center
                    3343 Peachtree Road, N.E.
                    Atlanta, Georgia 30326-1044
                    Telephone:  (404) 233-7000
                    Fax:  (404) 365-9532

                    Attorneys for Hospitality Ventures, LLC

1612147 v06

## ATTACHMENT A

To date, Hospitality Ventures has identified the following documents and electronically stored information which are relevant to this case, but reserves the right to supplement this list at a later date:

Plaintiff's personnel file;

Plaintiff's electronic mailbox at the Fairfield Inn Montgomery, Alabama; and

Selected messages from the electronic mailbox of Roger Miller.

1612147 v06

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Heather Watts,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )       CASE NO. 2:06CV1149-MEF
                                        )
Hospitality Ventures, LLC,              )
                                        )
        Defendant.                      )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served by U.S. Mail the

foregoing "Hospitality Ventures, LLC's Initial Disclosures" upon

the following persons:

        Priscilla Black Duncan
        P.B. Duncan & Associates
        472 S. Lawrence, Suite 204
        Montgomery, AL  36104

        Alicia K. Haynes
        Haynes & Haynes, P.C.
        1600 Woodmere Drive
        Birmingham, Alabama 35226

This 6th day of April, 2007.

                        Attorney for Hospitality Ventures,
                        LLC

- 5 -

1612147 v06

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

Hosea v. Langley
S.D.Ala.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Alabama, Northern
Division.
Mollie HOSEA, et al., Plaintiffs,
v.
Jesse LANGLEY, et al., Defendants.
**No. Civ.A. 04-0605-WS-C.**

Feb. 8, 2006.

Charles Clyde Tatum, Jr., Jasper, AL, Roderick D.
Graham, Birmingham, AL, for Plaintiffs.
Kendrick E. Webb, Webb & Eley, P.C.,
Montgomery, AL, Woodford W. Dinning, Jr., Lloyd
& Dinning, L.L.C., Demopolis, AL, Clyce Daryl
Drinkard, Wilson & Drinkard, Grove Hill, AL, for
Defendants.

ORDER
STEELE, J.
**\*1** This matter is before the Court on the following
motions: the Motion for Summary Judgment filed by
defendants Rogers and Fuller (doc. 92); the Motion
for Summary Judgment filed by defendants Langley,
Reese, Jones and Lawrence (doc. 81); Defendants'
Joint Motion to Strike Declarations (doc. 110); Joint
Motion to Strike Plaintiffs' Exhibit C (doc. 112);
Joint Motion to Strike Plaintiffs' Exhibit F (doc. 113);
and Joint Motion to Strike Mollie Hosea Declaration
(doc. 114). The Motions have been briefed and are
now ripe for disposition.

I. Overview of the Case.

This multiparty action, involving three plaintiffs and
nine remaining defendants, was filed in this District
Court on September 20, 2004.FN1The plaintiffs are
three sisters, Mollie Hosea, Fleta Mae Hosea and
Floyd Ann Hosea (collectively, the "Hoseas" or
"plaintiffs"), who range in age from 72 to 84. (M.
Hosea Dep., at 8, 10; Sheriff's Defendants' Exh. O-
R.) FN2The Hoseas, who are African-American,
resided on family property (the "Property") in Dixons
Mill, which is located in Marengo County, Alabama,
until they were evicted pursuant to a state court order
in January 2002. Eight months later, in September

2002, plaintiffs returned to the Property, where they
allege that deputies from the Marengo County
Sheriff's Department detained them while other
individuals burned, destroyed, and stole the Hoseas'
personal property.FN3 Presently, plaintiffs apparently
continue to reside on the Property, from which they
were ejected four years ago, in contravention of court
orders and without the permission of the current
owners. (See doc. 111, at Exh. D; M. Hosea Dep., at
139-40, 152, 154.)

FN1. Plaintiffs' claims against two other
defendants, William E. Goodwin and Nedra
E. Goodwin, were dismissed on December
12, 2005 pursuant to a stipulation of
dismissal entered into between the
Goodwins and plaintiffs. (See doc. 107.)

FN2. Mollie Hosea testified in her
deposition that her date of birth was July 1,
1942 (M. Hosea Dep., at 8), but arrest and
court records reflect that her actual date of
birth was July 1, 1933. (Sheriff's
Defendants' Exh. O, P.)

FN3. According to the Complaint,
defendants stole substantial personal
property belonging to the Hoseas, including
"280 cows, 200 ducks, 200 chickens, 30
donkeys, 140 goats, 8 hogs, two roll[s] of
hog wire, five wash pots, 6 cars, gas fryer,
trimmer, hoes, syrup grinder and pan, iron
wheels, tractor dipper, air compressor,
barbecue pit, two antique machines, three
iron bed[s], three dresser[s], four armoires,
six big post bed[s], clothes, and riding lawn
mower."(Complaint, ¶ 18.) The Hoseas
allege that this personal property was valued
in excess of $750,000. (Id., ¶¶ 41, 46.)

This lawsuit arises from those events. Named
defendants include Marengo County Sheriff Jessie
Langley and Deputies Tommie Reese, Bryant Jones
and Lee Lawrence (collectively, "Sheriff's
Defendants"), as well as Leroy Rogers, Larry Fuller,
Jimmy McDonald, Mike E. Ledkins and Judy
Ledkins (collectively, "defendants"). Count I of the
Complaint alleges that defendants deprived plaintiffs
of liberty and property, under color of law and
without due process, in violation of 42 U.S.C. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

1983, including deprivation of plaintiffs' rights to "[f]reedom from illegal seizure of [their] property," "[f]reedom from illegal detentions," "[f]reedom from humiliation and intimidation and harassment," freedom from deprivation of liberty and property without due process of law, "[e]qual protection of the law,""[f]reedom from invasion of privacy," and the right to "[e]arn a living without illegal interference."(Complaint, ¶ 22.) Count II alleges that defendants entered into a conspiracy to deny plaintiffs' constitutional rights, including the right "to own, inherit and hold property," the right "to fair and equitable trial," the right "not to be deprived of liberty and property without due process of law, guaranteed by the 5th and 14th Amendments,""the rights reserved or retained under the 9th and 10th Amendment[s]," and the right "to equal protection of the laws guaranteed under the 14th Amendment" (Complaint, ¶ 28), all in violation of 42 U.S.C. § § 1983 and 1985. Count III charges defendants with denying plaintiffs' right to peaceful ownership of their land because of their race, in violation of 42 U.S.C. § 1982. Count IV maintains that in January 2002 defendants entered into an agreement or mutual understanding to interfere with plaintiffs' liberty and to deny them equal protection of the laws, in violation of 42 U.S.C. § § 1983 and 1985. Finally, Counts V and VI are apparently duplicative state-law causes of action charging defendants with conversion and theft of plaintiffs' personal property.

*2 All 11 originally named defendants filed motions to dismiss on various overlapping grounds, including statute of limitations, sovereign immunity, res judicata, and insufficiency of pleading under Rule 8(a)(2). On February 10, 2005, the undersigned entered an Order (doc. 39) denying those motions, with one exception. The Sheriff's Defendants' motion was granted in part, such that plaintiffs' state law claims (Counts V and VI) against those defendants were dismissed on sovereign immunity grounds and their federal claims (Counts I-IV) against those defendants in their official capacities were dismissed on Eleventh Amendment immunity grounds. Pursuant to the February 10 Order, the Hoseas' only surviving claims against the Sheriff's Defendants are Counts I through IV in those defendants' individual capacities.

At the close of discovery, eight of the 11 defendants filed motions for summary judgment.[FN4] In briefing these motions, defendants submitted written objections to no fewer than seven of plaintiffs' exhibits. Because any evaluation of the merits arguments necessarily hinges on the type and nature

of facts in the record, and because the motions to strike call into question which facts are properly before the Court, resolution of these motions to strike is the appropriate analytical starting point. Only after the dust from those motions has settled can the Court ascertain the contents of the record and weigh the parties' competing Rule 56 arguments.

> FN4. Shortly thereafter, plaintiffs stipulated to the dismissal of all claims against two of those defendants, the Goodwins, leaving only six defendants' Rule 56 motions still in play. Three other named defendants, Jimmy McDonald, Mike Ledkins, and Judy Ledkins, all of whom are represented by counsel, elected not to file dispositive motions or otherwise to participate in the summary judgment process.

II. Motions to Strike.

Defendants' Motions to Strike (docs.110, 112, 113, 114) challenge the propriety of four categories of exhibits submitted by plaintiffs. First, defendants submit that several witness declarations should be stricken because, *inter alia,* plaintiffs never identified such witnesses in their initial disclosures or in any amendments to same. Second, defendants assert that photographs appended to plaintiffs' brief must be stricken because no foundation or other indicia of authenticity has been presented. Third, defendants challenge the propriety of a newspaper article designated by plaintiffs as an exhibit. Fourth, defendants request that the declaration of Mollie Hosea be stricken because it contradicts her previous sworn testimony and suffers from minor technical defects. Plaintiffs have filed an omnibus Opposition (doc. 116) to these various Motions to Strike.[FN5]

> FN5. The parties have felled more trees and spilled more ink in litigating the Motions to Strike than many litigants in federal court devote to dispositive motions altogether. In total, the parties have submitted 43 pages of briefing and more than a dozen exhibits, just in reference to the Motions to Strike. It is regrettable that counsel have opted to spend so extensively of their clients' resources, and to tie up so much of the Court's time, quarreling in a veritable battle royale over collateral matters that likely could have been obviated at an earlier date and/or resolved informally without judicial involvement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

*A. Declarations of Ford, B. Figgers, J. Figgers, and Grayson.*

As part of their submission in opposition to the Rule 56 motions, the Hoseas proffered the Declarations of Phil Ford, Bertha Figgers, Jimmy Figgers and Clyde Grayson. (*See* doc. 104, Exh. A, B, D, E.) Ford and the Figgerses offer averments as to their first-hand observations of the pillaging of the Hoseas' property at the scene, while Grayson primarily declares his knowledge of various items of personal property owned by the Hoseas prior to the events at issue.

*1. Procedural Posture.*

**\*3** In their first Joint Motion to Strike (doc. 110), defendants argue that none of these declarations are permissible because plaintiffs did not disclose these witnesses in accordance with the Federal Rules of Civil Procedure. The record confirms that Plaintiffs' Initial Disclosures dated April 22, 2005 did not mention any of these four individuals as prospective witnesses. (Doc. 111, at Exh. A.) In response to interrogatories propounded by defendants Rogers and Fuller on May 23, 2005, requesting identification of any and all persons with knowledge about Rogers' and Fuller's actions giving rise to plaintiffs' claims against them, plaintiffs did not provide a single name. (*Id.* at Exh. C, D.) [FN6]

> [FN6.] Defense counsel admits, however, that in answers to interrogatories posed by the Goodwin defendants, plaintiffs identified both "Phil Forbes" and "Jimmy Figures" as prospective witnesses. (*Id.* at 6, 7 & Exh. K.) Unfortunately, despite furnishing the Court with 11 exhibits in support of their Motion to Strike, defendants neglected to submit those interrogatory responses; therefore, the Court does not know the precise date that such information was produced to defendants. Likewise, defendants muddy the waters by protesting that "[n]one of these four persons were ever disclosed in answers to any Interrogatories" (doc. 111, at 9) when they know this not to be true. That Ford's and Jimmy Figgers' last names may have been slightly misspelled in discovery responses cannot logically support a conclusion that these witnesses were never disclosed in discovery responses.

But it would be unfair and incorrect to suggest that plaintiffs never notified defendants of the existence of any of these witnesses during the discovery process. The operative Rule 16(b) Scheduling Order (doc. 49) set a discovery deadline of October 5, 2005. During the deposition of Fleta Mae Hosea on September 19, 2005, she mentioned the name "Phil Ford." The Sheriff's Defendants' counsel promptly asked, "Is he a witness in this case?" to which plaintiff's counsel responded, "Yeah." (*Id.* at Exh. E.) [FN7] In a letter to plaintiffs' counsel dated September 23, 2005, the Sheriff's Defendants' counsel requested contact information for "Phil Forbes (or Ford)" and "Jimmy Figures," among others, so that he could take their depositions.(*Id.* at Exh. F.) When plaintiffs failed to respond, the Sheriff's Defendants' attorney sent another letter to plaintiffs' counsel on September 27, 2005, reiterating his request and proposing that the depositions of Ford and Jimmy Figgers be taken on October 3, 2005. (*Id.* at Exh. G.) Again, plaintiffs did not respond. Rather than filing a motion to compel or independently investigating the whereabouts of these witnesses, defendants appear simply to have abandoned the issue and not to have taken any follow-up measures prior to the close of discovery.

> [FN7.] As if this indication was not sufficient to place defendants on notice of Ford's potential significance as a witness, Mollie Hosea testified on September 28, 2005 that Ford was the only person other than Sheriff's Deputies and Michael Ledkins who was present when plaintiffs were evicted from their home, and that Ford transported plaintiffs to his sister's home thereafter. (M. Hosea Dep., at 22, 24.) Mollie's deposition testimony also placed Ford squarely in the center of the drama at the time of the burning on September 24, 2002, and plaintiffs' arrest of September 18, 2002. (*Id.* at 65, 69-72, 159.)Given the recurrence of Ford's name in discovery at virtually every significant factual juncture, it is disingenuous for defendants to suggest that they lacked timely notice of his status as a prospective witness for plaintiffs.

In the late evening hours of October 2, 2005, plaintiffs' counsel faxed Amended Initial Disclosures to defense counsel.[FN8] These Amended Disclosures identified some 23 individuals likely to have discoverable information, including all 11 named

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

defendants, as well as Clyde Grayson (with the notation "he has first hand knowledge of property owned by the defendant") and Jimmy Figgers (with the explanation "he knows about the property owned by the plaintiff. He also saw the burn, destruction and taking of the property.").(*Id.* at Exh. H.) Neither Bertha Figgers nor Phil Ford was mentioned in the Amended Disclosures. Rather than taking immediate action to arrange for depositions of these witnesses, or to petition the Court for a short extension of the discovery deadline to enable them to do so, defense counsel simply adopted a defeatist approach, announcing on October 3, 2005 (before discovery had even closed) that "we have been precluded from discovery concerning those witnesses, and will object to any testimony from them."(*Id.* at Exh. I.) [FN9]

> **FN8.** Defense counsel suggests that the certificate of service accompanying the Amended Disclosures evinces impropriety by plaintiffs' counsel. In particular, defense counsel points out that the certificate is dated June 6, 2005, but that this date has been stricken and replaced with a handwritten date of October 2, 2005. Based on this fact, defense counsel speculates that plaintiffs' counsel may have withheld the Amended Disclosures for four months before serving them. (*See* doc. 111, at 5.) The Court cannot so find on the basis of such a frail showing. As counsel are well aware, certificates of service may list inaccurate dates for myriad innocuous reasons. Had defense counsel wished to pursue this matter, they could have filed an appropriate discovery motion, as to which Magistrate Judge Cassady could have held a hearing to determine what happened. Having failed to do so, defense counsel cannot rely on speculation and innuendo to attribute nefarious intent to their counterpart attorneys.

> **FN9.** From the October 3 letter, it appears that defendants' decision not to seek additional time to depose these witnesses was prompted by strategic considerations. In particular, defendants knew that plaintiffs' counsel desired an extension of the discovery deadline to facilitate the depositions of the defendants. It would have been incongruous for defense counsel in one breath to ask for an extension of the discovery deadline to allow them to depose

plaintiffs' newly named witnesses, while in the next breath opposing plaintiffs' request for extension to depose defendants. So defense counsel chose to remain silent. Whatever the wisdom of that strategy may have been, it lends a hollow ring to defense counsel's present cries of unfairness.

**\*4** In the early afternoon of October 4, 2005, plaintiffs faxed revised amended disclosures to defense counsel, this time adding the name Phil Ford and providing addresses for Clyde Grayson, Jimmy Figgers and Ford, as well as for other named witnesses. (*Id.* at Exh. J.) Again, defendants' response was not to attempt to work with plaintiffs to set deposition dates as expeditiously as possible, nor was it to petition the Magistrate Judge for an extension of discovery to enable them to do so; instead, defendants simply adopted the absolutist position that "[w]e intend to object to any use of the witnesses you list."(*Id.* at Exh. K.) Of course, defendants have now done just that, by objecting to plaintiffs' use of declarations by witnesses Ford, Jimmy Figgers and Grayson (all of whom defendants were aware of prior to the close of discovery), as well as plaintiffs' use of a declaration by witness Bertha Figgers (who apparently had never been identified by plaintiffs as a potential witness prior to the submission of her declaration) [FN10]

> **FN10.** From a timing standpoint, defendants chose to sit on their objections, never presenting them for judicial resolution until the midst of summary judgment. These proceedings could have been streamlined considerably had defendants articulated timely discovery objections to Judge Cassady, instead of unleashing them *en masse* in the heart of the summary judgment briefing process.

### 2. Legal Standard.

Under Rule 26(a)(1)(A), Fed.R.Civ.P., a litigant in federal court must provide initial disclosures including "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information."*Id.* The Rule 16(b) Scheduling Order (doc. 49) obligated the parties to exchange initial disclosures on or before April 22, 2005. By rule, the disclosure obligation is continuing, such that

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

a party must supplement its disclosures "at appropriate intervals ... if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."Rule 26(e)(1), Fed.R.Civ.P.[FN11] Magistrate Judge Cassady ordered the parties to make Rule 26(e) supplementation " 'at appropriate intervals' and 'seasonably', but not later than November 4, 2005."(Scheduling Order, ¶ 7.) If a party without substantial justification fails to disclose required information, then that party "is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."Rule 37(c)(1); *see also Cooper v. Southern Co.,* 390 F.3d 695, 728 (11th Cir.2004) ("it was within the sound discretion of the trial judge to sanction plaintiffs for their failure to disclose by enforcing the unambiguous terms of Rule 37(c)"). In evaluating whether the failure to disclose a witness is harmless, the Eleventh Circuit considers "(1) the importance of the testimony; (2) the reason for the appellant's failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify."*Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.,* 389 F.3d 1339, 1353 (11th Cir.2004).

> FN11. A parallel supplementation obligation extends to responses to interrogatories, such that a party must seasonably amend such responses "if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."Rule 26(e)(2), Fed.R.Civ.P.

*3. Discussion.*

**\*5** By any yardstick, the chain of events described by the parties relative to disclosure of witnesses is contrary to both the letter and spirit of the Federal Rules of Civil Procedure. But counsel for both sides share fault for this debacle. With respect to plaintiffs' counsel, it is evident that they knew they intended to rely on testimony from Phil Ford, Jimmy Figgers, Bertha Figgers and Clyde Grayson long before they identified these witnesses to defendants via amended disclosures. It is also apparent that plaintiffs' counsel possessed or reasonably could have obtained contact information for these witnesses substantially before

such information was furnished to defendants. Discovery in federal court is not a game of hide the ball, and plaintiffs' tactics of ignoring defendants' written inquiries and sending eleventh-hour faxes to provide information that could and should have been furnished weeks or months beforehand are not acceptable. That said, as to several of these witnesses, defense counsel failed to take steps reasonably available to them to secure depositions or statements in a timely manner. Rather than being proactive in attempting to obtain the requisite discovery, defense counsel was content to express indignation at plaintiffs' course of conduct, then sit back and do nothing until these declarations were filed. A witness-by-witness analysis will readily illustrate these failings.

With respect to Phil Ford, defendants knew about his status as a plaintiffs' witness well before the close of discovery. At Fleta Mae Hosea's deposition on September 19, 2005, the deponent identified Ford by name and plaintiffs' counsel orally confirmed on the record that Ford was a plaintiffs' witness.[FN12] Sometime prior to that date, plaintiffs had identified "Phil Forbes" as a witness in response to written discovery from the Goodwin defendants. Clearly, then, by no later than several weeks before the close of discovery, defendants were on notice that plaintiffs intended to use Ford as a witness. Yet defendants did not attempt to locate Ford, although he apparently lives on the Property. Instead, defense counsel sent two letters to plaintiffs' counsel requesting Ford's address and, when no response was forthcoming, did nothing else. Defendants likely could have located Ford themselves with a modicum of effort. They could have called plaintiffs' counsel in good faith to conference about the issue. They could have filed a motion to compel to force plaintiffs to divulge Ford's address and telephone number. Instead, they simply bided their time until the sunset of discovery in hopes of excluding Ford's testimony. The Court finds that, while plaintiffs did not disclose Ford's identity and whereabouts as expeditiously as they should have, this omission was harmless because (a) plaintiffs did reveal Ford's identity weeks before the close of discovery, and (b) defendants failed to avail themselves of procedural and investigative tools reasonably available to them to arrange for Ford's deposition prior to the close of discovery despite ample time for them to do so. Under these circumstances, Ford's declaration will not be stricken pursuant to Rule 37(c)(1).

> FN12. In light of this clear record supported

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

by their own Exhibit E to document 111, defendants' position that Ford "was not disclosed as a potential witness until the afternoon of October 4, 2005" is demonstrably incorrect and misleading. (Doc. 117, at 5.) To the extent that defendants would claim that Ford could not be classified as a potential plaintiffs' witness until his name was listed in amended disclosures, that argument is defeated by the plain language of Rule 26(e)(1), which requires supplementation only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."*Id.* Here, Ford's identity and witness status had plainly been made known to defendants during the discovery process. As such, the date of his inclusion in the Amended Disclosures is of no legal significance.

**\*6** The situation with respect to Jimmy Figgers is similar. Plaintiffs identified him (although apparently with a slight misspelling of his last name as "Figures") in response to the Goodwin interrogatories weeks, or longer, before the close of discovery. Jimmy Figgers' name was also disclosed (with the same misspelling in the transcript) at Fleta Mae Hosea's deposition on September 19, 2005. Defendants knew he was a plaintiff's witness and requested his address from plaintiffs' counsel on multiple occasions before the close of discovery. Again, when plaintiffs failed to respond with contact information, defendants abandoned the issue. While defendants would make much of the misspelling of "Figures" rather than "Figgers" in those discovery responses, they offer no indication that this mere scrivener's error had any detrimental impact on their ability to track down or depose Figgers, in large part because it appears they never even attempted to find him. Once again, the Court finds that plaintiffs' disclosure shortcomings with respect to Jimmy Figgers are harmless for the same reasons as those concerning Ford. The Jimmy Figgers Declaration will not be stricken.

Clyde Grayson is situated slightly differently than Ford or Jimmy Figgers because his name was not identified in any discovery responses or in any deposition. The first time defendants had notice of Grayson's status as a witness was on October 2, 2005, when plaintiffs' counsel faxed the Amended Disclosures. Although plaintiffs' unexplained delay in furnishing Grayson's name to defendants is

inexcusable, defendants' response was equally deficient. Rather than trying to line up a last-minute deposition for Grayson, requesting a brief extension of the discovery deadline to facilitate that deposition, or otherwise working with plaintiffs' counsel to resolve the issue constructively, defense counsel's only response was a brusque vow to object to Grayson's testimony. Again, there were vehicles readily available that would have permitted defendants to depose Grayson, notwithstanding the late date of his disclosure. For strategic reasons, defendants chose not to pursue them. That choice renders the delayed disclosure of Grayson's name harmless, and overcomes defendants' attempt to strike Grayson's declaration pursuant to Rule 37(c)(1).

Last but not least is Bertha Figgers. The evidence is uncontradicted that plaintiffs never disclosed Bertha Figgers' name (in any spelling configuration) or their intention to call on her as a witness at any time prior to the close of discovery. Indeed, the record before the Court reveals that the earliest notice defendants ever received that plaintiffs might rely on her as a witness was when plaintiffs electronically filed her declaration in opposition to defendants' Motions for Summary Judgment on December 1, 2005. Plaintiffs have offered no reasonable explanation for their failure to disclose Bertha Figgers' identity at an earlier date, and defendants will plainly be prejudiced by plaintiffs' utilization of a surprise witness on summary judgment.[FN13] Because plaintiffs never disclosed Bertha Figgers as a prospective witness at any time prior to submitting her summary judgment declaration in December 2005, nearly two months after the close of discovery, and because this omission lacked substantial justification and was not harmless, Bertha Figgers' Declaration (doc. 104, Exh. B) is stricken pursuant to Rule 37(c)(1).

> FN13. At most, plaintiffs weakly argue that they did not need to disclose Bertha Figgers' name because she was already known to defendant Michael Ledkins because she had conversed with him about goats at one point, and she was already known to the Sheriff's Defendants because she had a conversation with them at the scene of the burning of plaintiffs' property. (Doc. 116, at ¶ 14.) Nothing in Rule 26(a)(1)(A) states that a party need not identify a prospective witness if the other party has spoken with that witness. Nothing in Rule 33 says that a party can omit information responsive to an interrogatory if the party thinks the other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 7
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

side might have some knowledge of that information. The point is that plaintiffs were obliged to inform defendants of witnesses whom they believed had discoverable information on which plaintiffs intended to rely to support their claims. Plaintiffs knew that Bertha Figgers had such information, yet they neglected to identify her to defendants until nearly 60 days after discovery ended. That plaintiffs contend this witness had conversed with various defendants at some time in no way excuses them from complying with their discovery obligations.

**\*7** Two final issues must be addressed before leaving the topic of the plaintiffs' witnesses' declarations. First, defendants object that the declarations of Jimmy Figgers and Grayson must be stricken because each states that it was executed "on this the ____ day of August, 2005" without having the date filled in. (Doc. 111, at 10.) In the absence of binding authority or an explicit statutory mandate to the contrary, which defendants have not cited, the Court will not strike these declarations for such a trifling technical defect, where the declarations clearly are in substantial compliance with 28 U.S.C. § 1746.[FN14] Second, defendants urge the Court to strike statements in the declaration of Phil Ford that "I believe that waste played a part in this matter." (Doc. 111, at 9.) The Court has scoured Ford's Declaration in vain for any such statement, so this objection is baseless.

> FN14. On its face, the statute requires that declarations be dated. Defendants characterize the blank date on the Figgers and Grayson declarations as a fatal defect under § 1746. The more enlightened view espoused in the case law, and the view embraced by the undersigned here, is that substantial compliance with § 1746 is all that is required, and that enumeration of the month and year is sufficient to constitute substantial compliance. *See, e.g., Pieszak v. Glendale Adventist Medical Center, 112 F.Supp.2d 970, 999 (C.D.Cal.2000).* Defendants cite *Leasehold Expense Recovery, Inc. v. Mothers' Work, Inc.,* 331 F.3d 452, 458 (5th Cir.2003), in support of their position; however, they furnish an inaccurate citation for that case, which in any event is not inconsistent with the foregoing.

In short, then, the maelstrom of briefing over the status of four witness declarations submitted by plaintiffs stems from two countervailing, equally culpable forces: (a) plaintiffs' failure to adhere to the Federal Rules of Civil Procedure with regard to disclosure of witnesses, and (b) defendants' apparent desire to ensnare plaintiffs in a trap instead of working constructively to resolve discovery issues when they arose. For the reasons set forth *supra,* the Joint Motion to Strike (doc. 110) is granted in part and denied in part. The Joint Motion is granted as to the Declaration of Bertha Figgers (doc. 104, Exh. B), and that Declaration is stricken pursuant to Rule 37(c)(1), Fed.R.Civ.P. The Joint Motion is denied as to the other three declarations, inasmuch as plaintiffs' disclosure deficiencies relating to Phil Ford, Jimmy Figgers and Clyde Grayson were all harmless. Those declarations will be considered on summary judgment, and those three witnesses will not be barred on untimely disclosure grounds from testifying on plaintiffs' behalf. [FN15]

> FN15. In reaching this conclusion, the undersigned lends no credence to plaintiffs' counsel's position that their disclosure lapses should be forgiven as the product of plaintiffs' "feeble minds" and their resulting difficulty in recalling names, dates and events. (Doc. 116, ¶ 10.) The acuity of plaintiffs' memory is not the issue; rather, defendants' objection focuses on the fact that plaintiffs' *counsel* at some point determined that Ford, Jimmy Figgers, Bertha Figgers and Clyde Grayson would make good witnesses, but did not immediately disclose their identities to defense counsel. Plaintiffs' counsel's attempts to shift their own failings in this regard to the "feeble minds" of their clients are ill-advised, at best.

### B. Photographs.

Defendants' second Joint Motion to Strike (doc. 112) takes issue with plaintiffs' Exhibit C, a composite exhibit consisting of nine photographs labeled as "Pictures of Burning of Hoseas' Property." The photographs do not appear to have been referenced in plaintiffs' opposition to defendants' summary judgment motions, but were appended to that submission without comment. The exhibit itself consists of photocopies of pictures ranging in quality from grainy and splotchy to indistinguishable. At best, it is possible to discern one image of a cow, one

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

image of a chicken, and several photos showing buildings or the ruins of what once may have been buildings, some with smoke wafting upwards.[FN16]

> FN16. Plaintiffs could have arranged for high-quality color scanning of the subject photographs to render them easier to view when filed electronically. Alternatively, pursuant to this District Court's Administrative Procedure for Filing, Signing and Verifying Documents by Electronic Means, plaintiffs could have requested leave to file Exhibit C via conventional means, thereby giving the Court the benefit of clear, unblemished iterations of these images. Plaintiffs having elected not to adopt either of these procedures, the instant Motion to Strike relates to virtually indistinguishable photocopied photos that, in their present form, are of minimal utility in explicating the events animating this lawsuit.

Notwithstanding the largely unilluminating nature of Exhibit C, defendants move to strike it on the grounds that "there has been no foundation laid" and "no evidence presented as to the authenticity of the photographs or as to when or where the pictures were taken."(Motion to Strike (doc. 112), at 1.)[FN17] Generally, courts ruling on Rule 56 motions may consider only admissible evidence. *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n. 10 (11th Cir.2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted); *Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir.2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.")."Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial."*U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.,* 296 F.Supp.2d 1322, 1327 n. 2 (S.D.Ala.2003). In opposition to the Motion to Strike, plaintiffs do not proffer affidavits, declarations or other materials purporting to authenticate the photographs; instead, they merely represent to the Court that they "clearly ha[ve] witnesses who can authenticate the photograph[s] at trial, and ha[ve] personal knowledge of the events portrayed in the photographs."(Doc. 116, at ¶ 7.)

> FN17. For reasons that are not clear, defendants have appended as Exhibit A to their Joint Motion to Strike a copy of Plaintiffs' Amended Initial Disclosures. The Motion does not explain the relevance, if any, of the Amended Initial Disclosures to the relief requested therein. As such, this Exhibit A appears redundant, unnecessary and unhelpful to resolving defendants' objection, and serves merely to clutter the already overburdened court file.

**\*8** Much as the Court is loath to "take a party's word for it" on evidentiary issues, and much as the Court is dismayed at plaintiffs' meager showing to bolster the legitimacy and admissibility of the challenged photos, it appears highly likely that plaintiffs will be able to reduce Exhibit C to admissible form at trial with appropriate authentication testimony. Accordingly, and without ruling on the admissibility of Exhibit C or any constituent part thereof at trial, the Court overrules defendants' objection to Exhibit C, and denies the Joint Motion to Strike (doc. 112) relating to same.[FN18]

> FN18. In so doing, the undersigned attaches no particular value or significance to Exhibit C for summary judgment purposes. To the contrary, given the murky, low-quality reproduction of the photographs, and plaintiffs' failure to refer to them in their memorandum of law, this Motion to Strike appears to be much ado about nothing. The Court has no evidence before it to bolster plaintiffs' naked assertion that "one of the photographs shows one of the defendants in the act of burning their property."(Doc. 116, at ¶ 9.) After poring over Exhibit C intently, the Court has been unable to discern any visual evidence of one of the defendants caught in the act of torching plaintiffs' belongings, much less the identity of any such defendant. The only visible persons in the photographic composite at Exhibit C appear to be milling around the area or observing the scene, not actively setting buildings ablaze. Thus, while the Court will consider Exhibit C on summary judgment, its probative value is vanishingly low given the inscrutable nature of the photos and the lack of any evidentiary showing by plaintiffs that might function as an exposition of what they depict.

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

### C. Newspaper Article.

As their third Joint Motion to Strike (doc. 113), defendants take aim at Plaintiffs' Exhibit F, an undated newspaper article from *The Democrat-Reporter* describing plaintiffs' arrest for trespassing on September 18 (presumably of the year 2002), defendant Michael Ledkins' efforts to tear down plaintiffs' sheds, mobile homes and other buildings on September 24, and the like. Defendants balk that the article is "hearsay and therefore is inadmissable." (Joint Motion (doc. 113), at 1.) In response, plaintiffs explain that they "have witnesses who will testify at trial from their personal knowledge of the events recounted in the newspaper articles [*sic* ]" and that plaintiffs themselves "can testify about the events in the newspaper article."(Doc. 116, at ¶ 4.)

The legal standard applicable to the request to strike Exhibit F is identical to that for Exhibit C, to-wit: whether that evidence can be reduced to admissible form at trial. *See, e.g., Church of Scientology Flag Service Organization, Inc. v. City of Clearwater,* 2 F.3d 1514, 1530 & n. 11 (11th Cir.1993) (opining that non-movant appropriately submitted newspaper articles in opposition to motion for summary judgment, even if such articles would have been inadmissible at trial, where material facts set forth in articles could be produced in admissible form at trial); *Wilson v. Moore,* 270 F.Supp.2d 1328, 1341 n. 11 (N.D.Fla.2003) (considering newspaper articles on summary judgment where facts recounted in articles likely be proven with admissible evidence at trial). Contrary to defendants' insistence that Exhibit F's hearsay status automatically excises it from the ambit of summary judgment consideration (doc. 113, at 1; doc. 117, at 2), the law is clear that "inadmissible hearsay may sometimes be considered by a court when ruling on a summary judgment motion," provided that such hearsay is reducible to admissible form at trial. *Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1135 (11th Cir.1996); *see also McMillian v. Johnson,* 88 F.3d 1573, 1584-85 (11th Cir.1996); *Hill v. Manning,* 236 F.Supp.2d 1292, 1297 (M.D.Ala.2002) ("Upon a motion for summary judgment, the district court may consider a hearsay statement if the statement could be reduced to admissible form at trial.").[FN19]

FN19. In arguing otherwise, defendants rely on *Club Car, Inc. v. Club Car (Quebec) Import, Inc.,* 362 F.3d 775 (11th Cir.2004). But *Club Car* did not announce a blanket prohibition on consideration of hearsay on

summary judgment, nor did it alter the principles set forth *supra;* instead, that case is cited only for the unremarkable proposition that "[i]nadmissible hearsay generally cannot be considered on a motion for summary judgment."*Id.* at 783.As the foregoing authorities make clear, "generally" does not mean "always."

Here, there has been no argument from defendants that the events recounted in the newspaper article could not be proven through admissible evidence at trial. In fact, given that many facts articulated in Exhibit F are set forth in quotes from plaintiffs, it appears that plaintiffs themselves can testify in admissible form as to numerous facts and events recited in Exhibit F. Plaintiffs have expressly represented to the Court that they and other witnesses will testify at trial from their personal knowledge concerning events set forth in the article. (*See* doc. 116, at ¶ 4.) Defendants have not rebutted these contentions in any meaningful way; rather, they appear to rest their argument exclusively on a perceived technical defect in Exhibit F (*e.g.,* its presentation of what is likely admissible evidence in inadmissible form). In light of the foregoing, the Court is of the opinion that the defect identified by defendants does not bar this exhibit, as the contents of Exhibit F should be readily reducible to admissible form at trial. On that basis, defendants' objection to Exhibit F is overruled and the Joint Motion to Strike Exhibit F (doc. 113) is denied.[FN20]

FN20. In reaching this conclusion, two caveats are in order. First, the undersigned does not reach, and expresses no opinion concerning, the question of whether Exhibit F itself might be admissible at trial. Second, this ruling in no way endorses plaintiffs' minimal showing in opposition to the Motion to Strike. Once again, plaintiffs substitute conclusory reassurances for sound evidentiary submissions. A far more appropriate mode of responding to the Motion would have been to present declarations from witnesses either adopting portions of Exhibit F or articulating their ability to testify from personal knowledge concerning events described in Exhibit F. The Court denies the Motion to Strike in spite of this weakness in plaintiffs' response.

### D. Declaration of Plaintiff Mollie Hosea.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*9** In their fourth and final Motion to Strike (doc. 114), defendants contend that the Declaration of Mollie Hosea attached to plaintiffs' brief as Exhibit P should be stricken as a sham because it conflicts with her sworn testimony.[FN21] Despite being given an opportunity to do so, plaintiffs have eschewed presentation of any argument or evidence in opposition to this Motion. They have therefore waived the right to be heard on this issue.

> FN21. Defendants also object to two purported technical shortcomings in the form of the Declaration. These objections may be dispatched quickly. Defendants protest that Exhibit P flunks the date requirement of 28 U.S.C. § 1746 because it states only that the declarant executed it on "the ____ day of August, 2005." For the reasons set forth in Section II.A.3., *supra*, this objection is meritless. *See, e.g., Pieszak,* 112 F.Supp.2d at 999 (Section 1746 requires only substantial compliance, and enumeration of month and year is sufficient to satisfy date requirement). Furthermore, defendants harp on the Declaration's failure to "aver that she is competent to testify on the matters stated therein."(Doc. 114, at 5.) This objection borders on frivolity. Mollie Hosea's competency to testify as to the events of September 2002, and the nature and ultimate disposition of plaintiffs' property, is clear from her deposition transcript, during which defense counsel collectively grilled her for hours (spanning more than 200 pages of transcript) concerning this precise subject matter. If defendants harbored legitimate doubts as to Mollie's competence to testify about these events, they could have pinpointed sections of her deposition transcript evincing such incompetence. They have not done so. Besides, careful review of Exhibit P, taken in context, implicitly demonstrates Mollie's competence. *See generally Markel v. Board of Regents of University of Wisconsin System,* 276 F.3d 906, 912 (7th Cir.2002) (equating competence and personal knowledge requirements of Rule 56(e)); *Jacobs v. City of Port Neches* 7 F.Supp.2d 829, 833 (E.D.Tex.1998) ("a filing signed by the nonmovant and reciting that the statements made therein are true and correct under the penalty of perjury constitutes competent summary judgment controverting

proof"). Neither Rule 56(e) nor any other authority cited by defendants requires that a declarant expressly aver her competence to testify (as opposed to simply "showing" it in some way), much less prescribes a verbatim mandatory script for competency averments. Absent a legal showing (that defendants have not made) obliging it to do so, the Court declines to confer talismanic significance on the absence of the word "competent" in a declaration. Defendants have not suggested, and cannot credibly suggest, that Mollie Hosea is incompetent to testify about the matters set forth in Exhibit P (*e.g.,* events she observed, property she once owned, personal knowledge of what became of that property). Instead, they seek to strike her Declaration by relying on a perceived technical omission that in no way impugns its integrity, veracity or reliability under Rule 56(e). Exhibit P will not be stricken on the basis of such an ill-conceived objection.

It is well established that a litigant cannot manufacture a genuine issue of fact by submitting a "sham affidavit" that contradicts her deposition testimony. *See, e.g., McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1240 n. 7 (11th Cir.2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."); *Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657 (11th Cir.1984) (affiant cannot create genuine issue of fact by contradicting, without explanation, prior clear testimony).[FN22] Defendants contend that four separate aspects of Exhibit P contradict, without explanation, Mollie Hosea's sworn deposition testimony and therefore must be struck under the *Van T. Junkins* rule.

> FN22. But compare *Stewart v. Board of Comm'rs of Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1270 (D.Kan.2002) (considering information in affidavits that served to clarify, explain or correct prior misstatements, as affidavits were not a "sham" with respect to such information); *Brassfield v. Jack McLendon Furniture,* 953 F.Supp. 1424, 1430 (M.D.Ala.1996) (noting that "sham affidavit" rule bars only affidavit statements that are "inherently inconsistent" with earlier deposition testimony).

Not Reported in F.Supp.2d                                                                                                      Page 11
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

In paragraph 4 of Exhibit P, Mollie avers that "Marengo County Sheriff Deputies prevented my sisters and myself from interfering with the burning and taking of our property."(Exh. P, at ¶ 4.) Defendants contend that excerpts from pages 70 and 74 of her deposition contradict this averment. They do not. In those excerpts, she never denied that Sheriff's Deputies prevented her from halting the burning and taking of her property, nor was she asked in those excerpts "to relate everything that occurred at the time of the alleged burning," as defense counsel now characterizes its line of questioning. (Doc. 114, at 2.)[FN23] The Court perceives no inherent inconsistency between the quoted section of Mollie Hosea's Declaration, and the excerpted portion of her deposition, as the two blocks of testimony coexist peacefully. This paragraph is not a sham and will not be stricken.

> **FN23.** The Complaint specifically alleges that "[w]hen the plaintiff [*sic* ] return to recover their personal property in or around September 19, 2002, the Marengo County Sheriff Department detained the plaintiffs, while the other defendants buried [*sic* ] and destroyed the personal property of the plaintiffs."(Complaint, ¶ 18.) Notwithstanding this specific allegation (and others like it) in the Complaint, defense counsel chose not to ask Mollie point-blank in her deposition whether that event had in fact occurred. There may well have been a sound strategic basis for that omission; however, by failing to ask such a question, defense counsel never secured direct testimony from Mollie as to whether the Sheriff's Deputies did or did not detain her while her property was being burned and destroyed. Having opted not to pin Mollie down on this point, defense counsel cannot fault her Declaration as contradicting phantom deposition testimony on that topic.

In her second (misnumbered) Paragraph 4 of her Declaration, Mollie states that "[w]hen we tried to stop the burning and taking of our property, we were taken to jail by the Marengo Sheriff Department. When we got out of jail, all of livestock, antiques and personal property were gone. Our house and mobile homes were destroyed. The only thing that we had left was the clothes on our back."(Exh. P, at ¶ 4 (second).) Defendants contend that this statement is rendered a sham by this passage from her deposition:

"Q: So when you were arrested, nothing had been burned down?
"A: No, sir. But they had done stripped the place."

(M. Hosea Dep., at 117-18.) According to defendants, this testimony shows that plaintiffs' personal property was taken *before* the arrest. Defendants reinforce this point by reference to various portions of the transcript in which she testified in detail that numerous items had been taken (*e.g.,* livestock, riding lawnmower, hog wire, wash pots, gas fryer, cars trimmers, hoes, syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, antique machines, iron beds, dressers, armoires, big post beds, clothes) in January 2002, long before the September 18 arrest. (*Id.* at 172-74, 195-97.)

**\*10** To the extent that the cited portion of the Declaration conflicts with Mollie's deposition testimony, without explanation, it may properly be disregarded.[FN24]But the Court perceives no inherent conflict between the two sets of testimony for two reasons. First, even accepting the deposition testimony that many items of the Hoseas' property were stolen in January 2002, there is no inherent contradiction with Mollie's Declaration that all of their property was gone when they were released from jail in September 2002.[FN25] To say that plaintiffs had no property in September 2002 is not to say that it was all stolen or destroyed in September 2002, or that none of it had been taken or destroyed in January 2002. Second, defendants' argument would overlook clear deposition testimony from Mollie that plaintiffs had substantial remaining personal property (including beds, skids, quilts, stove, pots, pans, pictures, and money) in the family house at the time of their arrest. (M. Hosea Dep., at 180-84.) Even if the Declaration were properly construed as stating that the Hoseas' personal property was taken and destroyed while they were in jail, that assertion would not be at odds with Mollie's deposition testimony because she testified that plaintiffs still had personal property in the house at the time they went to jail. Once jailed, defendants seek to apply the "sham affidavit" rule far too broadly.

> **FN24.** Curiously, defendants' Motion does not specifically object to the statement in Paragraph 4 that the Hoseas were taken to jail "when [they] tried to stop the burning and taking of [their] property."(M. Hosea Decl., ¶ 4.) But Mollie testified in her deposition that plaintiffs' trip to jail

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

preceded the burning of their property. That being the case, plaintiffs could not have been arrested for trying to stop a burning that had not yet commenced. Likewise, Mollie's deposition is clear that she and her sisters were not actively trying to thwart the theft of their property when they were arrested for trespass on September 18, 2002. Those aspects of Paragraph 4 will accordingly be disregarded on summary judgment as irreconcilable with the declarant's sworn deposition testimony, and the Motion is granted in that respect.

FN25. This portion of defendants' Motion appears predicated on an inference drawn from the Declaration, rather than its actual words. Defendants seem to assume that the Declaration states that all of plaintiffs' personal property was stolen and destroyed while they were in jail. It says no such thing. To the contrary, it says only that as of the time the Hoseas were released from jail in September 2002, their property was gone. That statement can be easily reconciled with testimony that certain items were taken in January 2002, without the inherent contradiction that defines a sham affidavit.

Defendants' third and fourth "sham affidavit" arguments fare much better. Paragraph 2 of the Declaration states, in part, as follows: "After Tommie Reese told us to get off the property, we asked if we could they [ sic ] get our personal property. Tommie Reese responded that it was too late.... Tommie Reese further told them [ sic ] that if we return, we would be arrested for trespass."(Exh. P, at ¶ 2.) However, when defense counsel specifically inquired during Mollie's deposition as to what Reese told plaintiffs, she reported nothing of this exchange. The following excerpt is critical:
"Q: ... [D]id Chief Deputy Reese tell you you had to leave, that you weren't allowed on that land?
"A: Couldn't stay there no more in that house and shoved us out the door and put the locks on the door.

"Q: Was anything else said by Chief Deputy Reese?
"A: Just locked the door."

(M. Hosea Dep., at 24-25.) Mollie's deposition testimony that defendant Deputy Reese told them only they could not stay in that house cannot be harmonized with her Declaration that Deputy Reese

also told them it was "too late" to remove their personal belongings and that they would be arrested for trespass if they returned. Defense counsel specifically asked the witness to tell him "exactly what happened step by step"(*Id.* at 22), and whether Deputy Reese had said anything else when locking them out of the house. She responded negatively. Having done so, she cannot now backtrack and offer, without explanation for the discrepancy, a Declaration ascribing several other statements to Deputy Reese at that time. That portion of the Declaration clearly violates the "sham affidavit" rule and will not be considered for purposes of ruling on the pending summary judgment motions. The Court therefore strikes the second, third and fifth sentences of Paragraph 2 of the Declaration of Mollie Hosea pursuant to *Van T. Junkins* and its progeny.[FN26]

FN26. Defendants also request that the following sentence from Paragraph 2 be stricken: "Tommie Reese and the other deputies made us leave our home without our personal property."(Exh. P, at ¶ 2.) There is no inconsistency between that statement and Mollie's deposition; to the contrary, her deposition testimony on this point was that Reese and the other deputies physically "shoved" plaintiffs out of their home and placed a new lock on it so that they could not re-enter. (M. Hosea Dep., at 19-25.) The deputies' alleged acts of shoving them out of their home and locking their door are readily harmonized with the Declaration's statement that the deputies made plaintiffs leave without their personal belongings. There being no inherent inconsistency, this statement will not be stricken.

**\*11** Finally, Paragraph 5 of the Declaration alleges that the Hoseas had 200 ducks and 30 donkeys. (Exh. P, at ¶ 5.) Yet in her deposition the witness testified that the Hoseas had "[a]bout thirty or sixty head" of ducks, and eight "donkeys." (M. Hosea Dep., at 38, 42.) [FN27]No explanation being offered for the significant numerical discrepancy, the Court will not accept the Declaration testimony on this point pursuant to "sham affidavit" principles.

FN27. Evidently, these were not "donkeys" in the conventional sense. Rather, the type of "donkey" claimed by the Hoseas is "a big ole tall bird with a red-orange knot on its

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

head," which plaintiffs had purchased in a set of eight for a total of $15 several years earlier. (M. Hosea Dep., at 41-43.)

For all of the foregoing reasons, defendants' fourth Joint Motion to Strike (doc. 114) is granted in part and denied in part. The Motion is granted as to the following sections of the Declaration of Mollie Hosea: (a) the second, third and fifth sentences of Paragraph 2; (b) the reference in the second Paragraph 4 to plaintiffs being arrested for trying to stop the burning and taking of their property; and (c) the references to 200 ducks and 30 donkeys in Paragraph 5. Those portions of plaintiffs' Exhibit P (doc. 105) are stricken pursuant to the "sham affidavit" rule. In all other respects, the Joint Motion to Strike (doc. 114) is denied.

### III. Factual Background.[FN28]

> **FN28.** The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir.2004); *Johnson v. Governor of State of Fla.,* 405 F.3d 1214, 1217 (11th Cir.2005) (on summary judgment, court must view record and draw all reasonable inferences in light most favorable to nonmoving party). Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

Having completed the myriad preliminaries raised by the parties, the Court can finally move on to address the merits of the two pending Motions for Summary Judgment.

### A. Sale of Plaintiffs' Property and the Unlawful Detainer Action.

In the 1990s, plaintiffs lived on and owned certain real property (the "Property") in Dixons Mill, Marengo County, Alabama. Although all three Hosea sisters lived there, the Property was actually owned by Fleta Mae Hosea and Floyd Ann Hosea, as Mollie Hosea had conveyed her interest to Floyd Ann. (M. Hosea Dep., at 11-12.) In January 1995, the Marengo County Circuit Court entered a judgment against

Fleta Mae and Floyd Ann in Civil Action No. CV-93-132.[FN29] When the Hoseas did not pay the judgment, the judgment creditors initiated appropriate legal action to levy on the Property to satisfy such judgment.

> **FN29.** This judgment was entered in favor of Barbara J. Baugh, Aaron B.J. Baugh, Thomas Johnson Baugh, Emma Elizabeth Baugh Drinkard and John Patrick Baugh (collectively, the "Baughs"), none of whom are litigants in the instant dispute. Although its precise subject matter is not germane to these proceedings, the *Baugh* lawsuit apparently related to allegations that the Hoseas had been cutting timber from the Baughs' property and that a member of the Hosea family had placed a mobile home on Baugh land.

On or about July 6, 2000, the Marengo County Sheriff's Department arranged for publication of a Notice of Publication concerning the Property in the *Democrat Reporter* for four consecutive weeks. (Langley Decl., ¶ 3 & Exh. A.) This Notice listed the Property's legal description, and announced that the Sheriff would sell such Property at public auction at the Marengo County Courthouse on August 8, 2000. (*Id.*) The Sheriff's sale of this real property was carried out, apparently without protest or dissent by the Hoseas, to satisfy the outstanding judgment. Defendant Michael Ledkins ("Ledkins") and former defendant William Goodwin ("Goodwin") attended the Sheriff's sale. (Ledkins Aff., ¶ 2; Goodwin Aff., ¶ 4.) At that sale, Ledkins and his wife, defendant Judy Ledkins ("Ms.Ledkins"), purchased a portion of the Property, including the 40-acre tract on which plaintiffs actually resided, for the sum of $129,310.34. (Ledkins Aff., ¶¶ 2-3; Langley Decl., ¶ 7 & Exh. 2.) [FN30] Goodwin and his wife, ex-defendant Nedra Goodwin, purchased the remaining real property of the Hoseas being sold at the Sheriff's sale, acquiring approximately 168 acres (which did not include any land where the plaintiffs' residences were located) for the sum of $120,689.66. (Goodwin Aff., ¶¶ 5, 6 & Exh. 1; Ledkins Aff., ¶ 3; Langley Decl., ¶ 7.) [FN31]

> **FN30.** The record shows a discrepancy as to the purchase price paid by the Ledkins for this parcel. In his Affidavit, Ledkins avers that he paid $120,310.34 for the land. (Ledkins Aff., ¶ 2.) But the Sheriff's Deed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                  Page 14
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

reflects a purchase price of $129,310.34. (*Id.* at Exh. 1.) It appears that the latter figure is correct, so that the sum of the Ledkins' and the Goodwins' purchases would total exactly $250,000; however, the observed discrepancy is immaterial for purposes of the instant Rule 56 motions.

FN31. Defendants maintain that the funds raised in the Sheriff's sale exceeded the outstanding judgment in the *Baugh* matter, and that Langley refunded the resulting overpayment of $14,409.72 to Floyd Ann and Fleta Mae Hosea via letter dated August 21, 2000. (Doc. 83, Exh. H.) This exhibit has not been authenticated, nor does Langley assert in his Declaration that he in fact conveyed that letter and check to the Hoseas. The letter lacked any mailing address, so it is unclear when, where and how it was delivered to its intended recipients. Moreover, plaintiffs contend (without record support) that they "never received a check for the excess money."(Doc. 105, at 1.) At most, plaintiffs' counsel cites "Fleta's depo" for this proposition. Such a reference is unacceptable for three reasons: (1) it is the responsibility of counsel, not this Court, to provide appropriate pinpoint citations to the record; (2) plaintiffs' counsel failed to include Fleta Mae Hosea's deposition in their exhibits; and (3) the portions of Fleta Mae's deposition transcript accompanying the Sheriff's Defendants' submissions do not touch on any alleged overpayment. In spite of those omissions on both sides, the Court need not definitively resolve the question of whether plaintiffs were reimbursed for any overpayment on the *Baugh* judgment, as such question is not material to the issues presented on summary judgment.

**\*12** Despite the August 2000 Sheriff's sale, plaintiffs refused to leave the Property, including particularly the family house and other buildings on the land that the Ledkins defendants had purchased. Ultimately, Ledkins filed an unlawful detainer action against the Hoseas, among others, in Marengo County District Court in an effort to eject them from the Property. (Ledkins Aff., ¶ ¶ 4, 5.) FN32 After a default judgment was entered against the Hoseas, the state court entered an order of ejection/eviction on November 27, 2001, at which time it decreed that the Hoseas "are unlawfully detaining real property of" Ledkins,

"[t]hat said Defendants are hereby ordered to immediately vacate said real property," and that the Marengo County Sheriff is "authorized to restore the real property in question to [Ledkins] by removing the person and the property of the above set forth defendants from his premises."(Doc. 83, at Exh. I; *see also* Langley Decl., at ¶ 5.) FN33 Plaintiffs were well aware of the existence of the November 27 Order and its requirement that they vacate the Property immediately. (Fleta Mae Hosea Dep., at 15.)

FN32. That case was styled *Michael E. Ledkins v. Phil Ford, et al.,* Case No. DV-2001-056.Named defendants were the Hoseas, as well as Phil Ford and Debra Allen, neither of whom is a party in this action.

FN33. Several defense witnesses allege that the date of this Order was November 7, 2001. (*See* Langley Decl., ¶ 5; Reese Decl., ¶ 3.; Jordan Decl., ¶ 3.) That is obviously an error, as the Order is dated November 27, 2001 in four separate places, two of them hand-written and two of them stamped. (*See* doc. 83, at Exh. I; doc. 109, at Exh. T.) In any event, the discrepancy is not material.

*B. Plaintiffs' Ejection from the Property in January 2002.*

Sometime after the November 27 Order was entered, Ledkins advised Sheriff Langley "that the Hoseas had not vacated his property and requested that [Langley] carry out the Order of the District Court and evict the Hoseas."(Langley Decl., ¶ 6.) In January 2002, the situation came to a head. It is undisputed that, approximately one week ahead of time, Deputy Keith Jordan went to the Property, bearing a copy of the November 27 Order for plaintiffs' reference, and informed the Hoseas that they had been ordered to vacate the promises and that officers would physically escort them off the Property on January 25, 2002 if they did not leave and take their personal belongings with them before then. (Jordan Decl., ¶ ¶ 2, 4; Fleta Mae Hosea Dep., at 16-17.) In response, Fleta Mae Hosea testified, "I told them I'm going to stay there.... I told him I was staying."(*Id.* at 17.)FN34 One of the Hoseas advised Deputy Jordan that he had best not come alone to evict them "or they would hurt [him]." (Jordan Decl., ¶ 5.)

FN34. Fleta Mae's testimony acknowledging

Not Reported in F.Supp.2d                                                                                       Page 15
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

Deputy Jordan's warning visit a week before plaintiffs' eviction was contradicted by Mollie, who denied that any deputy had cautioned plaintiffs that they would be evicted if they did not vacate the premises. (M. Hosea Dep., at 20-21.) However lenient the Rule 56 standard may be, it does not entitle plaintiffs to pick and choose between conflicting versions of the facts that different co-plaintiffs may have given to cobble together a version most favorable to them. *See generally Evans v. Stephens,* 407 F.3d 1272, 1278 (11th Cir.2005) ("When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant. Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version.*" ). On that basis, the Court will credit Fleta Mae's admission that Deputy Jordan had visited the Property to give them a warning, notwithstanding Mollie's denial of same.

Notwithstanding Deputy Jordan's warning and their actual knowledge of the November 27 Order, the Hoseas refused to leave. Accordingly, on January 25, 2002, defendant Sheriff Langley deployed a sizeable contingent of deputies to the Property to eject the Hoseas. (Langley Decl., ¶ 7.) Defendant Chief Deputy Tommie Reese, defendant Deputy Bryant Jones, defendant Deputy Lee Lawrence, and at least two other deputies traveled to the Property on that date to remove the Hoseas. (Reese Decl., ¶ 4; Jones Decl., ¶ 3; Lawrence Decl., ¶ 3.) [FN35] Deputy Reese knocked on the door and, when Mollie Hosea answered, "shoved" her outside. (M. Hosea Dep., at 19.) Plaintiffs never refused to leave the Property that day. (*Id.* at 21.) [FN36] That said, Floyd Ann Hosea went to the back of the house and retrieved her deceased son's shotgun. (*Id.* at 19; Fleta Mae Hosea Dep., at 20, 82.) Deputy Reese twisted Floyd Ann around, threw her on the floor, extracted the firearm from her grasp, and placed it in a Sheriff's Department vehicle. (M. Hosea Dep., at 19-20.) Having been forced out of their house, plaintiffs watched through the windows as Deputy Reese "was going throwing the mattress and everything, tearing up the house."(*Id.* at 20.) According to Mollie, Deputy Reese's conduct meant that "we couldn't go back in there. We left our

money and stuff, you know, in the dressers and things."(*Id.*) Deputy Reese would not allow plaintiffs back in the house. (Fleta Mae Hosea Dep., at 20.) The net effect was that plaintiffs were forced to leave their home without their personal property. (M. Hosea Decl., ¶ 2.) [FN37]

FN35. By one account, the entire Marengo County Sheriff's Department, excepting Sheriff Langley, was present on the Property that day. (M. Hosea Dep., at 24, 168-70.)

FN36. Defendants have submitted evidence contradicting plaintiffs' stance on this point, including Deputy Reese's declaration that the Hoseas informed the deputies that "they were not leaving because this was their 'Daddy's land'," that the Hoseas refused to comply with the deputies' instructions to leave, and that one of the Hoseas attempted to strike Deputy Reese. (Reese Decl., ¶¶ 5, 7-8.) For Rule 56 purposes, though, plaintiffs' evidence is credited.

FN37. Defendants offer evidence that Deputy Reese informed the Hoseas at the time of their eviction that they would be permitted to remove their personal property from the home upon request to the Sheriff's Department. (Reese Decl., ¶ 12.) Defendants further assert that several deputies "pleaded" with the Hoseas to take their belongings. (Reese Decl., ¶ 6; Jones Decl., ¶ 5; Lawrence Decl., ¶ 5.) However, Mollie Hosea's narrative is clear that Deputy Reese said nothing to them except that they could no longer stay in the house, after which he threw them out and locked the door. (M. Hosea Dep., at 23-25.) Because the record must be construed in the light most favorable to plaintiffs for Rule 56 purposes, the Court does not credit Deputy Reese's statements that he "pleaded" with them to take their belongings with them or that he invited plaintiffs to return to collect their personal property with Sheriff's Department supervision.

**\*13** Plaintiffs were not arrested on January 25, 2002. (Reese Decl., ¶ 11; M. Hosea Dep., at 25.) Rather, after Deputy Reese and his colleagues removed plaintiffs from the house, Deputy Reese placed on a new lock on the residence to keep the Hoseas from reoccupying it, and told plaintiffs that they could not

Not Reported in F.Supp.2d                                                                                                    Page 16
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

stay there anymore. (Reese Decl., ¶ 9; Jordan Decl., ¶ 9; M. Hosea Dep., at 22, 130.) So plaintiffs left their home and their associated personal property, and apparently began living with nearby relatives. (M. Hosea Dep., at 110.) [FN38]

> **FN38.** Plaintiffs characterize Sheriff Langley's Declaration as establishing "that the Sheriff's Department intended to take possession of the plaintiff's personal property on the date of the eviction, and to detain the Hoseas' property."(Doc. 105, at 7.) The Declaration says no such thing. Instead, Sheriff Langley avers merely that he instructed Deputy Reese to advise plaintiffs that they could obtain their items of personal property upon request. (*See* Langley Decl., ¶ 7.) That the Sheriff's Department may have put a new lock on the house and offered to allow the Hoseas in upon request to remove their belongings is a far cry from the Sheriff's Department obtaining possession of such belongings. The Court therefore cannot credit plaintiffs' unsupported hypothesis that "the Sheriff's Defendants took possession and control of the Hoseas' property," and that they therefore had "a duty of care to make sure nothing happen [*sic* ] to the property."(Doc. 105, at 22.)

### C. The Late January / Early February Destruction of Plaintiffs' Property.

At the time they were evicted, the Hoseas left the following items of personal property on the Property: livestock (including 280 cows, 30-60 ducks, 200 chickens, 8 donkeys, 140 goats and 8 hogs), two rolls of hog wire, five wash pots, six cars, a gas fryer, trimmers, hoes, a syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, two antique machines, three iron beds, three dressers, four armoires, six big post beds, clothes, and a riding lawn mower, among other things (such as quilts, clothes, pots, pans and money). (M. Hosea Decl., ¶ 5; Ford Decl., ¶ 10; J. Figgers Decl., ¶ 8; Grayson Decl., ¶ ¶ 3-4; M. Hosea Dep., at 180-84.) [FN39]

> **FN39.** In an effort to discredit plaintiffs' evidence, defendants proffer testimony from Deputy Reese that he saw only "two to four chickens and a dog left on the property on January 25, 2005 [*sic* ]." (Reese Decl., ¶

14.) However, Deputy Reese does not testify that he canvassed the entire 40 acres where plaintiffs' residence was situated in search of farm animals. More to the point, defendants cannot prevail on summary judgment by offering facts that contradict plaintiffs' account; instead, plaintiffs' version must be credited. The Court therefore ascribes no weight for Rule 56 purposes to Deputy Reese's allegation that there was no livestock on the property on January 25, 2002 other than a couple of chickens and a dog.

Approximately one week after plaintiffs were evicted, the Hoseas' niece, Iris Johnson, received a phone call indicating that people were breaking into the house and taking or destroying their possessions. (M. Hosea Dep., at 26-27.) The Hoseas immediately traveled to the Property, where they observed defendant Ledkins and his son with two pickup trucks and trailers filled with personal property (*e.g.,* claw tubs, clothes, watches, rings, antique heaters, lanterns, churns, fabric, etc.) taken from the house. (*Id.* at 27-29, 45-46.)When Fleta Mae Hosea demanded that Ledkins "put her mama and daddy's whatnots and things back in the house," Ledkins physically pushed her aside. (*Id.* at 28, 48.) [FN40]For her part, Mollie Hosea "went to hollering and praying." (*Id.* at 48.)Defendants Rogers and Fuller were also present, helping Ledkins load the trucks with plaintiffs' belongings. (*Id.* at 47, 150-51.)It is undisputed that no representatives of the Marengo County Sheriff's Department were on the scene when these events occurred. (*Id.* at 47-48, 170-71; Reese Decl., ¶ ¶ 20-22; Jones Decl., ¶ ¶ 15-17; Lawrence Decl., ¶ ¶ 15-17.) [FN41]Ledkins and his son finally departed with the trucks and trailers laden with the Hoseas' personal belongings. (M. Hosea Dep., at 48-49.) Eventually, Rogers and Fuller left too. (*Id.*)

> **FN40.** Deposition testimony reflected that the Hoseas' father had died in 1942, and that their mother had passed away in 1958. (*Id.* at 31-32.)

> **FN41.** Plaintiffs conjecture that the Sheriff's Defendants might have conspired with the other defendants in a nefarious plot to strip plaintiffs' personal property. Indeed, they suggest that Ledkins and Fuller "could have been putting the property in storage for the Sheriff to get upon request."(Doc. 105, at 13.) Such unsupported innuendo and idle

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

speculation cannot be credited on summary judgment.

As of late January / early February 2002, the vast majority of plaintiffs' personal property about which they complain in this litigation had already been removed from the Property. Mollie Hosea testified that the livestock were all gone from the Property by early February 2002, and that she does not know what became of those hundreds of animals. (M. Hosea Dep., at 49-50, 111-12, 114; *see also* Fleta Mae Hosea Dep., at 61-62.) [FN42]Moreover, by early February 2002, the following additional items of the Hoseas' property had already been taken: wash pots, hog wire, riding lawn mower, cars, gas fryer, trimmers, hoes, syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, two antique machines, three iron beds, three dressers, four armoires, six big post beds, and clothes. (M. Hosea Dep., at 172-74.) Plaintiffs do not know what happened to their personal property. (*Id.* at 200-01.)

> FN42. The following excerpt from Mollie Hosea's deposition is instructive:
> "Q: And when you went back that next week when the trucks were there, you said that all the animals were gone?
> "A: Everything was gone."
> (M. Hosea Dep., at 111.)

**\*14** There is no evidence that plaintiffs reported the disappearance of their personal property or the conduct of Ledkins, Rogers and Fuller to the Marengo County Sheriff's Department or any other law enforcement authorities in late January or early February 2002.

### D. Events of September 2002.

Plaintiffs never returned to the Property until approximately late August or early September 2002. (M. Hosea Dep., at 133-34.) Eventually, however, the Hoseas came back to the Property and resumed living there in dwellings ancillary to the three-bedroom wooden family house from which they had been evicted. (*Id.* at 51-52, 66-67.)Plaintiffs knew that their actions were directly contrary to Deputy Reese's directives in January 2002 that they could not live there any more. (*Id.* at 131, 136.)Mollie lived in a custom-made home on the Property, and Fleta Mae lived in a trailer on the Property. (*Id.* at 61-62, 131; Fleta Mae Hosea Dep., at 166-68.) Presumably, both structures contained personal property belonging to

plaintiffs.

On or about September 18, 2002, the Sheriff's Department received a complaint from Ledkins that the Hoseas were trespassing on the Property, blocking his road, and beating on his house. (Langley Decl., ¶ 9; Reese Decl., ¶ 15.) Deputies Wayne Leonard and Don Lewis were dispatched to investigate the matter. (Langley Decl., ¶ 10; Reese Decl., ¶ 16.) Deputy Leonard informed plaintiffs that they were trespassing on Ledkins' land, but plaintiffs insisted that the Property belonged to them. (M. Hosea Dep., at 87-88.) [FN43]When plaintiffs refused to leave, they were arrested at 9:20 a.m., taken to the Marengo County Detention Center, charged with Criminal Trespass in the Third Degree, and released on $300 bond. (Leonard Decl., ¶¶ 4-5; Plaintiffs' Exh. F; M. Hosea Dep., at 52, 86-87, 163; Fleta Mae Hosea Dep., at 35, 161; Defendants' Exh. O.) [FN44] The arrest reports reflect that plaintiffs neither resisted arrest nor were armed. (*See* Defendants' Exh. O.) Ledkins was present at the time of plaintiffs' arrest. (M. Hosea Dep., at 118, 159.) [FN45]When Deputy Leonard took plaintiffs to jail, he told them "don't come back on the place no more."(Fleta Mae Hosea Dep., at 62.) Once again, however, plaintiffs chose to disregard these instructions.

> FN43. Plaintiffs' brief characterizes their presence on the property that day as being with the intent "to stop the taking of their personal property."(Doc. 105, at 9.) This slant on the facts is unsupported by the record. Plaintiffs cite no evidence that supports this construction of the facts, and the Court's own review of the record divulges no evidence that any of plaintiffs' personal items were being actively removed on September 18, 2002, or that they returned to the property on that date to waylay such activities. At most, two plaintiffs' witnesses speculate that the Hoseas returned to their homestead that day to get their personal belongings. (Ford Decl., ¶ 4; J. Figgers Decl., ¶ 3.) No basis for personal knowledge appears in such statements, which are evidently the result of guesswork by Ford and Figgers; therefore, their testimony will not be credited on that point. The only credible evidence is that plaintiffs returned to the property in September 2002 not to prevent others from carting away their personal items or to remove the items themselves, but because they intended to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

start living there again, in defiance of both the court order and the Sheriff's Department's instructions. (M. Hosea Dep., at 51-52.) As such, this unsupported, conclusory framing of the facts will not be considered on summary judgment.

FN44. Although not particularly relevant to these proceedings, the record reflects that the Hoseas were found guilty of Criminal Trespass in the Third Degree in Marengo County District Court on March 14, 2003, and ordered to vacate the property within 30 days. (Defendants' Exh. P, Q, R.) All three Hoseas have appealed their convictions to Circuit Court, where their cases evidently remain pending today. (Defendants' Exh. J, K, L, S.)

FN45. Prior to plaintiffs' arrest, Ledkins had warned them that they were trespassing on his land and that they were going to be arrested if they did not leave. (M. Hosea Dep., at 162.) Mollie Hosea responded by telling Ledkins that it was not his land, but that the land belonged to plaintiffs' deceased father. (*Id.* at 161-63.)When the Hoseas rejected his warning, Ledkins called the Sheriff's Department and informed them of the situation, culminating in plaintiffs' arrest. (*Id.* at 163.)

On or about September 24, 2002,[FN46] plaintiffs came back on the Property, where they witnessed the burning of several buildings by Ledkins. As they arrived, plaintiffs saw Deputy Reese engaged in a conversation with Phil Ford, with Ford arguing that the buildings should not be burned and Deputy Reese threatening to remove Ford from the Property. (M. Hosea Dep., at 65, 69-71; Ford Decl., ¶ 7.)[FN47] Deputy Reese also threatened to jail Ford when he continued to protest the burning, and eventually placed Ford in his patrol car until the conclusion of the incident. (Ford Decl., ¶ 7.) Deputies Jones and Lawrence were also present, and together with Deputy Reese told anyone who attempted to interfere in the burning to cease doing so, on penalty of being jailed. (*Id.,* ¶¶ 6, 8.) Deputy Reese specifically told the Hoseas that the deputies were present "to prevent them from interfering with the burning and destroying of the Hoseas' property."(J. Figgers Decl., ¶ 3.) Plaintiffs also saw defendant Jimmy McDonald operating a bulldozer on the Property to level some of the structures. (M. Hosea Dep., at 65, 72, 147.) The bulldozer destroyed the Hoseas' hog pens and chicken pens, with the animals still inside. (J. Figgers Decl., ¶ 5.) Deputy Reese informed Ledkins and McDonald, "Y'all go on and do what you got to do."(M. Hosea Dep., at 72.) As plaintiffs and Deputy Reese (and other assembled onlookers) watched, Ledkins, Fuller, Rogers and Goodwin poured gasoline on the buildings and set them ablaze.(*Id.* at 73; Ford Decl., ¶ 8; J. Figgers Decl., ¶ 4.) Ledkins burned down the family wooden house, as well as a smaller house, a barn, several "junk houses" and multiple trailers on the Property. (Fleta Mae Hosea Dep., at 57-58, 60; M. Hosea Dep., at 63-64.)[FN48]McDonald assisted with the burning. (M. Hosea Dep., at 144.)

FN46. The record is in a state of disarray as to the exact date of this occurrence. Plaintiffs pegged the burning of their buildings as happening at various times from January 2002 to late August 2002 to several dates in September 2002. (*See, e.g.,* Fleta Mae Hosea Dep., at 45; M. Hosea Dep., at 53, 64, 76-77, 177-78.) Mollie Hosea candidly conceded, "I can't get that date straight," when asked for at least the sixth time during her deposition when the exact date of the burning was. (M. Hosea Dep., at 156.) Ultimately, Mollie stated with apparent exasperation in response to at least the eighth round of questioning about dates, "They burnt them in September. That's all I can say."(*Id.* at 178.)Despite the obvious confusion, nothing had been burned when plaintiffs were jailed for trespass on September 18, and the burning(s) occurred sometime after plaintiffs were released from jail. (M. Hosea Dep., at 117-19, 202.) Plaintiffs' counsel having selected September 24, 2002 as the date of the burnings (*see* doc. 105, at 4), and that date having as much evidentiary support in the record as any other (*see* Plaintiffs' Exh. C, Ford Decl., ¶ 5), the Court will treat that date as correct for purposes of this Order, but recognizes the divergent evidence as to the precise date of these events.

FN47. For his part, Deputy Reese denies having been present or having any knowledge of activities on the Property relating to the burning of homes and the destruction of property. (Reese Decl., ¶¶ 19-22.) On summary judgment, of course, the Court reviews the evidence in the light most favorable to plaintiffs; therefore,

Not Reported in F.Supp.2d                                                                                Page 19
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

Deputy Reese's protestations will not be credited for Rule 56 purposes. Deputies Jones' and Lawrence's averments that they were not present at the time of the burning are disregarded for the same reasons. (Jones Decl., ¶ ¶ 14-17; Lawrence Decl., ¶ ¶ 14-17.)

FN48. Plaintiffs' counsel incorrectly argues that defendants burned a mobile home belonging to Fleta Mae Hosea, as well as a custom-made mobile home belonging to Mollie Hosea. (Doc. 105, at 4.) Plaintiffs' testimony is to the contrary. Indeed, Fleta Mae testified that her trailer was neither burned nor even touched. (Fleta Mae Hosea Dep., at 166-68.) Likewise, Mollie denied that her custom-made home was burned, and testified that she continues to live in it today. (M. Hosea Dep., at 62, 64, 115-16.) Plaintiffs' counsel's assertions are not credited to the extent that they contradict their clients' sworn testimony.

**\*15** The burning attracted more than 100 spectators, with Mollie Hosea likening the event to being "like somebody done got killed." (M. Hosea Dep., at 106-07.) Eventually, the fire department was summoned to the scene. (*Id.* at 167-68.)Defendant Leroy Rogers was also at the Property at the time of the burning, where he collected some of the Hoseas' personal belongings and assisted with the burning and destruction. (*Id.* at 197-98; M. Hosea Decl., ¶ 6.) When plaintiffs accosted Rogers, he told them that he could take their clothing and lawn equipment if he wanted to. (M. Hosea Dep., at 198-99.) Rogers told Figgers that he had taken personal property off the site at that time. (Figgers Decl., ¶ 7.) Indeed, when Mollie Hosea saw plaintiffs' personal property in Rogers' yard and home, Rogers explained that he had been told to take whatever he wanted from the Property. (M. Hosea Decl., ¶ 6.) That same day, Ledkins loaded the Hoseas' goats onto his truck and, when the truck was full, proceeded to shoot and kill the remaining goats. (Ford Decl., ¶ 9.) Ledkins admitted to Figgers that he had shot and killed plaintiffs' goats. (Figgers Decl., ¶ 6.) [FN49]

FN49. It is unclear how the testimony regarding the taking and killing of plaintiffs' livestock on September 24, 2002 can be squared with Mollie's testimony that all of the livestock were gone by early February 2002. No party has made any attempt to explain or address this glaring discrepancy.

Plaintiffs' evidence is that the removal of their personal property was not confined to two discrete instances in January 2002 and September 2002. Rather, Phil Ford asserts that he personally witnessed Ledkins, Fuller and Rogers removing plaintiffs' property at various intervals spanning from January 2002 through November 2005. (Ford Decl., ¶ 3.)

### IV. Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."*Fed.R.Civ.P. 56(c)*. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."*Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.*Id.*"If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."*Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted)."In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."*Tipton v. Bergrohr GMBH-Siegen,* 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir.2004).

### V. Analysis of Sheriff's Defendants' Motion for Summary Judgment.[FN50]

FN50. The Sheriff's Defendants' Motion for Summary Judgment (doc. 81) incorporates a nearly 11-page Narrative Statement of Undisputed Facts. Their 23-page

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 20
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

Memorandum of Law (doc. 82) includes no recitation of facts. A party may not circumvent the 30-page briefing limitation set forth in Local Rule 7.1(b) by disaggregating the fact and law portions of its brief into two different filings. The proper approach for Sheriff's Defendants would have been either (a) to submit a consolidated memorandum (addressing both facts and law) of 30 pages or less, or (b) to request an enlargement of the LR 7.1(b) page limitation. Either way, the suggested determinations of fact and conclusions of law would properly be submitted as a separate document, distinct from the brief, pursuant to LR 7.2(a). In its discretion, the Court will consider the Sheriff's Defendants' summary judgment submissions in their current form, notwithstanding their nonconformity with the Local Rules.

**\*16** As discussed *supra,* the Order (doc. 39) dated February 10, 2005 resulted in the dismissal of all state law claims against the Sheriff's Defendants, in both their individual and their official capacities, as well as the dismissal of all federal claims (Counts I through IV) against them in their official capacities. Thus, the only remaining causes of action against the Sheriff's Defendants are individual-capacity claims as follows: (i) a claim under 42 U.S.C. § 1983 that the Sheriff's Defendants deprived plaintiffs of their constitutional rights, including specifically their "freedom from illegal seizure of [their] property," "freedom from illegal detentions," "enjoyment of life, liberty and property and freedom from their deprivation without due process of the law," "equal protection of the law," and the like (Count I); (ii) a claim under § 1983 and § 1985 that the defendants conspired to violate plaintiffs' constitutional rights, including their right to own property, their right to a fair trial, their right not to be deprived of property without due process of law, their right to equal protection, and their rights under the Ninth and Tenth Amendments (Count II); (iii) a claim under 42 U.S.C. § 1982 that "plaintiffs were denied the peaceful ownership of their land by the defendants because plaintiffs are of African-American descent and race" (Count III); and (iv) a claim of conspiracy to violate civil rights, pursuant to § § 1983 and 1985, that appears largely redundant of Count II (Count IV).

The Sheriff's Defendants' Motion for Summary Judgment identifies a plethora of potential grounds for relief, including a statute of limitations defense, a ripeness defense, a lack of standing defense, qualified

immunity, a lack of evidence of race discrimination, a lack of evidence of a constitutional deprivation of any stripe, and quasi-judicial immunity. The Court will assess these defenses in turn.

### A. Statute of Limitations.

This is not the first time that the Sheriff's Defendants have invoked a limitations defense; indeed, this ground was covered extensively in connection with their Motion to Dismiss (doc. 5). The February 10 Order (doc. 39) explained in detail that Counts I through IV were subject to a two-year limitations period, that the Complaint was filed on September 20, 2004, that the Complaint identified wrongs occurring on September 19, 2002, and that equitable tolling warranted a finding that the Complaint was timely filed, inasmuch as the courthouse was inoperative from September 16, 2004 through September 19, 2004 due to Hurricane Ivan.

The Sheriff's Defendants now refine their statute of limitations defense to assert that the Complaint should be dismissed insofar as it relies on "any facts alleged to have occurred prior to September 18, 2002," the date of plaintiffs' arrest. (Doc. 82, at 2-3.) In particular, the Sheriff's Defendants request dismissal of plaintiffs' claims on limitations grounds to the extent that they rely on the events of January 2002, when the Sheriff's Defendants evicted plaintiffs from the Property, and when most of plaintiffs' personal property was taken. Plaintiffs respond that they are entitled to the benefit of Alabama's continuous tort doctrine, and that a reasonable jury could find in any event that there was no intent to dispossess the Hoseas of their property until after September 18, 2002.

### 1. Continuous Tort Doctrine.

**\*17** Plaintiffs correctly observe that Alabama courts have recognized a continuous tort theory for tolling otherwise applicable limitations periods. *See, e.g., LaBauve v. Olin Corp.,* 231 F.R.D. 632, 655-57 (S.D.Ala.2005).*"*When a tort is deemed continuous, the limitations period runs from the last date the plaintiff was exposed to damages."*Haynie v. Howmedica Osteonics Corp.,* 137 F.Supp.2d 1292, 1294 (S.D.Ala.2000); *see also Reichert v. City of Mobile,* 776 So.2d 761, 766 (Ala.2000) (continuous torts toll running of statutory limitations period). Under Alabama law, a continuous tort occurs when a defendant engages in "repeated tortious conduct

Not Reported in F.Supp.2d                                            Page 21
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

which has repeatedly and continuously injured a plaintiff."*Moon v. Harco Drugs, Inc.,* 435 So.2d 218, 220 (Ala.1983). Where a continuous tort exists, the result is analogous to continuing trespass, such that "the repeated actions of the defendants combined to create a single cause of action in tort."*Id.* at 221.The ultimate effect of a continuous tort is to extend the statute of limitations by compressing a protracted course of conduct into a single cause of action. *Id.* However, the continuous tort doctrine is not available where a single act is followed by multiple consequences, but rather requires "repetitive acts or ongoing wrongdoing." *Payton v. Monsanto Co.,* 801 So.2d 829, 835 & n. 2 (Ala.2001).

The first insurmountable hurdle encountered by plaintiffs is that "when a Section 1983 action accrues is a question of federal law."*Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir.1987) (explaining that only the length of the limitations period, and closely related questions of tolling and application, are governed by state law); *see also Uboh v. Reno,* 141 F.3d 1000, 1002 (11th Cir.1998) (in § 1983 context, "[t]he question of when the limitations period begins to run, however, is one of federal law"); *Kelly v. Serna,* 87 F.3d 1235, 1238-39 (11th Cir.1996) ("Accrual of a cause of action under 42 U.S.C. § 1983 is a question of federal law."). Plaintiffs identify no authority and offer no explanation for how Alabama's continuous tort doctrine has any impact on the accrual of plaintiffs' federal causes of action under §§ 1982, 1983 and 1985.

Even if Alabama's continuous tort doctrine was relevant in § 1983 cases, the record demonstrates that it does not apply here. Plaintiffs accuse the Sheriff's Defendants of several discrete incidents of wrongdoing, including the following: (i) ejecting them from the family house in January 2002; (ii) arresting plaintiffs in September 2002; and (iii) being present for the burning of plaintiffs' buildings and personal belongings in September 2002.[FN51]These circumstances are not akin to those in which Alabama courts have recognized a continuous tort, such as "when an employer exposes its employee on a continuing basis to harmful substances and conditions,""when there is a single sustained method pursued in executing one general scheme" or "when a landowner seeks damages for the contamination of a well or stream."*Moon,* 435 So.2d at 220-21. Rather than being a case of repetitive acts or ongoing wrongdoing causing continuous, cumulative injury, this is a case in which defendants are accused of discrete misdeeds causing discrete injuries. The continuous tort doctrine has no application here. *See,*

*e.g., Payton,* 801 So.2d at 835 & n. 2;*Hawthorne Land Co. v. Occidental Chemical Corp.,* 431 F.3d 221, 230 (5th Cir.2005) (for continuous tort doctrine to be triggered, "the conduct, and not just the damage, must be continuous"); *Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir.2002) (finding that alleged paramour of former U.S. president could not avail herself of continuous tort doctrine for tort claims against former First Lady predicated on discrete acts of disclosing private information and organizing break-ins); *In re Casini,* 307 B.R. 800, 814 (Bkrtcy.D.N.J.2004) ("A continuous tort argument is more appropriate for claims that are inherently and cumulatively wrongful, rather than discrete wrongful acts."); *Simpson v. Burrows,* 90 F.Supp.2d 1108, 1125 (D.Or.2000) ( "where the evidence is that a plaintiff was harmed by each act in a series, the continuing tort theory does not apply").

> FN51. The Court is cognizant that Phil Ford avers that defendants Ledkins, Rogers and Fuller continuously hauled away plaintiffs' property from January 2002 through November 2005. (Ford Decl., ¶ 3.) While that evidence might support a continuous tort theory against those three defendants, it has no bearing on the proper limitations period for the Sheriff's Defendants, whose alleged involvement was confined to those three discrete incidents.

**\*18** For all of these reasons, the continuous tort doctrine cannot save plaintiffs' federal causes of action against the Sheriff's Defendants to the extent they rely on pre-September 2002 events.

### 2. Lack of Intent to Dispossess Prior to September 2002.

Plaintiffs next argue that their claims are not time-barred because "[a] reasonable jury could conclude that the intent to dispossess Hoseas of their property did not take place until after September 18, 2002."(Doc. 105, at 12.) This argument misses the point. In § 1983 cases, the statute of limitations begins to run when "the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury."*Chappell v. Rich,* 340 F.3d 1279, 1283 (11th Cir.2003). Surely, as of early February 2002, plaintiffs knew that they had been ejected from the Property, that their livestock and personal property had been removed, that the Sheriff's Defendants had

Not Reported in F.Supp.2d                                                                    Page 22
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

performed the ejection, and that Ledkins and others had removed the personal belongings. As a result, the limitations clock begins ticking no later than February 2002. Plaintiffs cite no authority (and the Court is aware of none) standing for the proposition that the limitations period in § 1983 actions is computed by reference to the defendants' state of mind rather than the date of the alleged constitutional deprivation. This contention is unavailing.[FN52]

> **FN52.** To the extent that plaintiffs would invoke the so-called "discovery rule," their argument must fail. It is true that the limitations period in § 1983 actions does not begin to run until facts which support the claim are or should be apparent to a person with reasonably prudent regard for his rights, and that § 1983 actions do not accrue until the plaintiff knows or should know both that he has been injured and the identity of the person(s) responsible. *See Mullinax, 817 F.2d at 716;Ashcroft v. Randel, 391 F.Supp.2d 1214, 1219-20 (N.D.Ga.2005)* ("The statute of limitations clock begins to run when the facts which support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."). But plaintiffs have not come forward with any evidence suggesting any discontinuity or delay between the occurrence of the alleged wrongful acts in January and early February 2002, and plaintiffs' recognition that they had been injured and that defendants were responsible. Indeed, plaintiffs witnessed the alleged wrongful acts firsthand, so any suggestion of lack of awareness would flirt with frivolity. The discovery rule cannot expand the scope of plaintiffs' federal claims against the Sheriff's Defendants beyond the two-year period.

### 3. Certain Aspects of Plaintiffs' Claims Are Time-Barred.

Based on the foregoing, it is clear that plaintiffs' federal claims are untimely as against the Sheriff's Defendants to the extent they rely on events prior to September 2002. As such, while the ejection of the Hoseas from the Property in January 2002 and the disappearance of their livestock and other personal property a week later may be helpful background facts, those events are not themselves actionable under 42 U.S.C. § § 1982, 1983 or 1985 because

they occurred outside the relevant two-year limitations period governing Counts I through IV of the Complaint. Because the Complaint was not filed timely as to those occurrences, plaintiffs cannot predicate their federal causes of action on the Sheriff's Defendants' act of evicting plaintiffs from the Property in January 2002. To the extent that Counts I through IV rest on events predating September 2002, they are time-barred and are properly dismissed against the Sheriff's Defendants.

Of course, this result is not, in and of itself, fatal to the Complaint. Counts I through IV do not purport to rest exclusively on events predating September 2002; to the contrary, the September 2002 arrest and subsequent burning lie at the heart of those causes of action. To the extent that Counts I through IV rest on events occurring in or after September 2002, they are not time-barred and will be considered on the merits.[FN53]

> **FN53.** This rationale has no bearing on the state law claims found at Counts V and VI, which are no longer pending against the Sheriff's Defendants but remain in play as to all other defendants. Counts V and VI are subject to a much lengthier, six-year limitations period. *See*Ala.Code § 6-2-34(3) (assigning a six-year limitations period to actions for detention or conversion of personal property); *Crowe v. City of Athens, 733 So.2d 447, 450-51 (Ala.Civ.App.1999)* (recognizing and applying six-year limitations period to conversion claim). Therefore, the January and February 2002 events are germane to, and will be considered in connection with, plaintiffs' state-law claims against defendants Ledkins, Ms. Ledkins, Rogers, Fuller and McDonald.

### B. Ripeness/Standing Objections.

The Sheriff's Defendants' next ground for attacking plaintiffs' claims is that they are not ripe, pursuant to *Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)*, and that even if they were ripe, the claims of Fleta Mae and Mollie Hosea are barred for lack of standing. These loosely related threshold contentions may be resolved quickly.[FN54]

> **FN54.** Plaintiffs do not aid their cause by submitting an opposition brief that ignores the ripeness and standing issues. It is not the

Not Reported in F.Supp.2d                                                                                                                    Page 23
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

responsibility of this Court to formulate plaintiffs' summary judgment arguments for them. *See Lyes v. City of Riviera Beach, Fla.,* 126 F.3d 1380, 1388 (11th Cir.1997) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments ....") (citation omitted).

*1. Application of* Heck v. Humphrey.

**\*19** The Sheriff's Defendants invoke *Heck* for the proposition that plaintiffs' claims for damages that relate to their arrests must be dismissed for want of subject matter jurisdiction. The *Heck* Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ..., or called into question by a federal court's issuance of a writ of habeas corpus."512 U.S. at 486-87. The problem with this argument is that plaintiffs are not seeking damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid.[FN55]Plaintiffs do not seek damages for their trespass convictions, and they were never imprisoned. Thus, *Heck* is innapposite.

> [FN55.] This infirmity can come as no surprise to the Sheriff's Defendants. After all, the Court previously gave short shrift to their invocation of *Heck* in their motion to dismiss, reasoning that *Heck*"has no application here, inasmuch as plaintiffs do not seek recovery based on an allegedly unconstitutional conviction or imprisonment."(Order (doc. 39) dated February 10, 2005, at 23 n.28.) Nothing has changed in the interim, and the February 10 Order's reasoning on this point holds with continuing force today.

Nonetheless, the movants persist that "[a] monetary recovery by the Hoseas on their federal civil claims in this litigation would necessarily call into question their criminal trespass convictions."(Doc. 82, at 4.) [FN56] The Court disagrees. Under the particular

circumstances presented here, plaintiffs' claims challenging the propriety of their arrest have no bearing on the legitimacy or validity of any outstanding criminal judgment against them; therefore, defendants' invocation of *Heck* is misplaced and unavailing. *See Heck,* 512 U.S. at 487 ("But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed...."). Indeed, the Eleventh Circuit has held that "[b]ecause an illegal search or arrest may be followed by a valid conviction ... a successful § 1983 action for Fourth Amendment search and seizure violations does not necessarily imply the invalidity of a conviction. As a result, *Heck* does not generally bar such claims."*Hughes v. Lott,* 350 F.3d 1157, 1160-61 (11th Cir.2003); *see also Shelley v. Wilson,* 2005 WL 2596872 (3d Cir. Oct.14, 2005) (district court erred in finding false arrest claims barred under *Heck* );*Laurino v. Tate,* 220 F.3d 1213 (10th Cir.2000) (proof that police lacked probable cause to arrest does not necessarily imply invalidity of conviction).[FN57] The *Hughes* rationale is compelling, directly applicable to these circumstances, and unrebutted by Sheriff's Defendants. Accordingly, the Court declines the Sheriff's Defendants' invitation to expand dramatically the breadth and scope of *Heck,* and denies that aspect of their Motion for Summary Judgment.

> [FN56.] The Sheriff's Defendants' reasoning is opaque. Plaintiffs allege that the Sheriff's Defendants, among other things, deprived them of their property without due process of law by standing idly by as their belongings were ransacked and destroyed, and that they also improperly detained plaintiffs. If plaintiffs were to succeed on these claims, the impact (direct or indirect) on their trespass convictions would be nonexistent. The Sheriff's Defendants protest that a successful challenge to plaintiffs' arrests would necessarily undermine the validity of their criminal convictions. But they never explain how. Clearly, not every attack on the manner and implementation of an arrest casts a shadow on the ensuing criminal judgment. *See Wells v. Cramer,* 2005 WL 3196630, *2 (11th Cir. Nov.30, 2005)* (plaintiff's claims that officers used excessive force in arresting him were not barred by *Heck,* inasmuch as

Not Reported in F.Supp.2d                                                                                                    Page 24
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

he could prevail on such claims without necessarily implying invalidity of underlying conviction). The Sheriff's Defendants' reliance on innuendo and speculation, rather than drawing a tangible nexus between the arrest-related claims and the convictions, is fatal to their *Heck* defense.

FN57. Of course, there may be circumstances where a § 1983 claim related to an arrest would implicate *Heck* principles. For example, if a plaintiff convicted of resisting arrest alleges unreasonable seizure in a § 1983 action, success on that claim could negate an element of the offense of resisting arrest. Therefore, *Hughes* properly cautions that "the court must look to both the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted." 350 F.3d at 1161 n. 2. Such an analysis here reveals no discernable linkage between the Hoseas' § 1983 claims and their trespass convictions; indeed, a plaintiffs' judgment on those claims would not appear to compel, imply or even support an inference that they were not actually trespassing on September 18, 2002.

*2. Standing of Plaintiffs Fleta Mae and Mollie Hosea.*

Next, the Sheriff's Defendants argue that plaintiff Fleta Mae Hosea has failed to make an adequate showing of standing. Under long-established law, a plaintiff has standing under the Constitution only if, *inter alia,* she has suffered an injury in fact that is concrete and particularized, and actual or imminent. *See, e.g., Sierra Club v. Johnson, --- F.3d ----, 2006 WL 146230, *5 (11th Cir. Jan.20, 2006).* According to the Sheriff's Defendants, Fleta Mae cannot meet her minimum burden of showing an injury in fact because she did not own any of the property allegedly destroyed by defendants.

**\*20** This assertion seizes on isolated passages from Fleta Mae's deposition, ignoring testimony to the contrary and countervailing inferences in the summary judgment record. To be sure, at various junctures, Fleta Mae testified that she did not own any of the cows or goats, and that nothing that belonged to her was burned. (Fleta Mae Dep., at 67-68, 155, 167-68.) Considered in context, however, the testimony of Fleta Mae and her sister Mollie makes clear that most of the personal property on the Property was owned jointly by the three sisters (with

or without other family members). For instance, when asked who owned the goats, ducks and chickens, Fleta Mae testified that the "family" owned them. (*Id.* at 68, 155.)The record certainly supports an inference that Fleta Mae was part of that "family" and that she therefore had an ownership interest in that livestock.[FN58]

FN58. This interpretation of the evidence is corroborated by Mollie Hosea, who explained that the family "just kind of shared" the ducks. (M. Hosea Dep., at 40-41.)

What, then, of Fleta Mae's statements during her deposition that "I ain't owned nothing" and "Wasn't nothing of mine burned" (*Id.* at 155, 168)? On the record presented here, a reasonable factfinder could wave these statements away as the product of plaintiffs' unconventional notions toward ownership. Several deposition excerpts suggest that plaintiffs distinguish between items they own themselves and items they own jointly with others, stating that they did not own the latter category when they in fact meant that they owned the items jointly with others. For example, when asked about goats, Fleta Mae testified "I didn't own none," moments after responding to the question "Who owned the goats?" by saying "Family did. All of them." (*Id.* at 68.)This construction of the evidence is bolstered by a very instructive passage from Mollie's deposition:
"Q: So what was left on September 19th, 2002, before this house was burned was an old family house where nobody was living in but in it, it contained quilts, stoves, pots, pans, and money?
"A: Yes.
"Q: Who owned the beds?
"A: That's the family house. We don't own nothing when you in a family outfit.

(M. Hosea Dep., at 182.) Thus, a reasonable view of the record is that Fleta Mae's statements that nothing of hers was burned and destroyed actually meant that she lacked sole ownership of anything that was burned and destroyed. There is ample evidence in the record from which a reasonable factfinder could conclude that Fleta Mae possessed, at a minimum, joint ownership over the damaged and destroyed personal property at issue in this litigation.[FN59]For example, along with Floyd Ann, Fleta Mae co-owned the Property prior to the Sheriff's sale; therefore, it defies logic to suggest that none of the personal property on the Property belonged to her other than the contents of a single trailer. In short, Fleta Mae has

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

standing to pursue her claims, and the Sheriff's Defendants' attempt to dismiss her claims for want of standing must fail. The same reasoning obviates the Sheriff's Defendants' related claim that Mollie Hosea lacks standing because "she did not have an interest in the personal property allegedly stolen or burned."(Doc. 82, at 7.) As set forth above, the record supports an inference otherwise, based on principles of joint ownership, and the Court readily concludes that she has met the minimal threshold of showing an injury in fact for standing purposes.

FN59. Support for this reading of the testimony may be found in Fleta Mae's own deposition. Even as she denied owning any cows, when asked "[w]hat personal property do you claim that you lost as a result of what happened ... on January 25, 2002," Fleta Mae answered, "They got all the cows." (Fleta Mae Dep., at 61.) Rather than following up on the apparent inconsistencies between Fleta Mae's testimony as to what she personally owned, and rather than trying to ferret out whether her answers were the product of confusion over the concepts of sole ownership versus joint ownership, defense counsel chose not to explore the matter further, but simply pressed the portions of the record that supported their position while ignoring the others. Such tactics are unavailing on summary judgment.

*C. Qualified Immunity.*

**\*21** The Sheriff's Defendants also contend that they are entitled to qualified immunity as to plaintiffs' claims under 42 U.S.C. § 1983. Where, as here, government officials are sued in their individual capacity for money damages based on alleged civil rights violations, they may posit an affirmative defense of qualified immunity. *See Swint v. City of Wadley, Ala.,* 51 F.3d 988, 994 (11th Cir.1995). The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."*Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). To assess their qualified immunity defense,

the Court must examine whether the Sheriff's Defendants can establish that they were performing discretionary functions, and, if so, whether plaintiffs can show that the Sheriff's Defendants' conduct violated clearly established rights of which a reasonable person would have known.

*1. The "Discretionary Function" Element.*

"[I]n order to receive qualified immunity, the public actor must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."*Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir.2004); *see also Harris v. Coweta County, Ga.,* 433 F.3d 807, 811 (11th Cir.2005). This burden rests with the public official, and failure to satisfy it negates the qualified immunity defense. *See Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1264 (11th Cir.2004) (explaining that if defendants cannot show that they were engaged in a discretionary function, they are ineligible for qualified immunity). In assessing whether an official was engaged in a discretionary function, "[w]e ask whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."*Id.* at 1265.

Initially, the Sheriff's Defendants shrug off their burden of showing a discretionary function, offering only a conclusory footnote that it "is an exceedingly low hurdle to clear and is easily surmounted in the instant case," without explaining why. (Doc. 82, at 7 n. 3.) In their reply brief, however, they expound on this point by arguing that because their actions were taken to enforce a court-ordered eviction, they were clearly performing official duties as Sheriff and Deputy Sheriffs, such that their conduct lies within the ambit of a discretionary function. (*See* doc. 108, at 6.) FN60 The undersigned agrees. Plaintiffs' claims against the Sheriff's Defendants center on allegations that those defendants wrongfully arrested plaintiffs on September 18, 2002, and stood idly by several days later as other defendants burned and took plaintiffs' property. The wrongful acts and omissions that plaintiffs attribute to the Sheriff's Defendants unquestionably relate to ordinary law enforcement functions, the performance of their official duties, and actions within the scope of their authority.FN61On that basis, the Court readily concludes that the Sheriff's Defendants have satisfied their burden of demonstrating that they were engaged in discretionary functions at all times material hereto.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN60. Plaintiffs contest this point, insisting that the Sheriff's Defendants were engaged in "operational functions of government" as to which qualified immunity does not apply. (Doc. 105, at 8.) Plaintiffs are mistaken. The only case they cite in support of their position, *Lenz v. Winburn,* 51 F.3d 1540 (11th Cir.1995), does not recognize a distinction between discretionary functions and operational tasks, nor has the Court's research identified any meaningful difference in that regard. To the contrary, the Eleventh Circuit has made clear that, while the law often distinguishes between discretionary functions and ministerial tasks, "[i]n the qualified immunity context, ... we appear to have abandoned this 'discretionary function/ministerial task' dichotomy.... [F]or purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function." *Holloman,* 370 F.3d at 1265.

FN61. For example, arrests lie within law enforcement officers' discretionary functions, as a matter of law. *See, e.g., Crosby v. Monroe County,* 394 F.3d 1328, 1332 (11th Cir.2004) (deputy who arrested plaintiff was engaged in discretionary function because making arrests fell within his official responsibilities); *Burdeshaw v. Snell,* 365 F.Supp.2d 1194, 1198 (M.D.Ala.2005) ("An on-duty police officer making an arrest is performing a discretionary function."). The same rationale applies to the deputies' alleged crowd-control activities during the destruction of plaintiffs' property, as the duty of managing and containing large groups of potentially unruly spectators is a classic example of a traditional law enforcement function.

*2. The "Clearly Established" Element.*

**\*22** "Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." *Crosby v. Monroe County,* 394 F.3d 1328, 1332 (11th Cir.2004); *Holloman,* 370 F.3d at 1267 (to satisfy its burden, plaintiff must demonstrate that reasonable jury could interpret record evidence as showing that defendant

violated a clearly established constitutional right). In this context, courts examine whether the defendant's conduct "violated a clearly established constitutional right" of which a "reasonable government official would have been aware." *Chesser v. Sparks,* 248 F.3d 1117, 1122 (11th Cir.2001); *see also Bennett v. Hendrix,* 423 F.3d 1247 (11th Cir.2005) (official performing discretionary function is barred from qualified immunity if evidence in light most favorable to plaintiff shows that official's conduct violated clearly established constitutional right). To resolve this issue, a court must first ask whether, taken in the light most favorable to the plaintiff, the evidence shows that the official's conduct violated a constitutional right. *See Harris,* 433 F.3d at 811. If that question is answered negatively, then the analysis ends and qualified immunity applies. *Id.* If, however, the question is answered affirmatively, then the court reaches the follow-up query of "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Id.* An affirmative answer to this question precludes qualified immunity, while a negative answer clinches qualified immunity.[FN62]

FN62. The Eleventh Circuit counsels that "[a] constitutional right is clearly established if controlling precedent has recognized the right in a concrete and factually defined context." *Chesser,* 248 F.3d at 1122 (citation omitted); *see also Akins v. Fulton County, Ga.,* 420 F.3d 1293, 1305 (11th Cir.2005) ("A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent.").

The § 1983 causes of action in the Complaint identify a plethora of constitutional and non-constitutional rights that plaintiffs claim were infringed by defendants. Count I alleges that the Sheriff's Defendants violated plaintiffs' rights to "[f]reedom from illegal seizure of her property," "[f]reedom from illegal detentions," "[f]reedom from humiliation and intimidation and harassment," freedom from deprivation of liberty and property without due process of law, "[e]qual protection of the law," "[f]reedom from invasion of privacy," and the right to "[e]arn a living without illegal interference" (Complaint, ¶ 22). Count II contends that defendants' conspired to deprive plaintiffs of various rights, including the right "to own, inherit and hold property," the right "to fair and equitable trial," the right "not to be deprived of liberty and property

Not Reported in F.Supp.2d                                                                         Page 27
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

without due process of law,""the rights reserved or retained under the 9th and 10th Amendment," and the right "to equal protection of the laws" (Complaint, ¶ 28). Count IV does not allege any additional constitutional violations, but instead rests on due process and equal protection theories of wrongdoing.

Although the Complaint identifies a wide-ranging palette of constitutional deprivations, plaintiffs disregard most of them in endeavoring to establish that the Sheriff's Defendants' acts and omissions violated clearly established constitutional rights of which reasonable government officials would have been aware. In fact, plaintiffs' brief identifies but a single constitutional right allegedly violated by the Sheriff's Defendants that they claim meets the "clearly established" requirement and overcomes the qualified immunity defense. (*See* doc. 105, at 6-10.) Specifically, plaintiffs contend that they had a clearly established Fourth Amendment right to freedom from unreasonable seizure of their personal property, and that the Sheriff's Defendants violated that right via the following conduct: (i) ejecting the plaintiffs from the Property in January 2002, (ii) refusing to allow plaintiffs to remove their personal property at the time of the ejection even though the applicable court order purportedly "instructed them to eject the plaintiffs with their personal property," (iii) informing plaintiffs that it was too late to get their personal property, and that they would be arrested if they returned,[FN63] (iv) arresting plaintiffs for trespass when they returned to the Property on September 18, 2002, (v) being present on September 24, 2002 when other defendants were burning, taking and destroying plaintiffs' property, and (vi) telling plaintiffs and others not to interfere with the destruction of plaintiffs' property on September 24, 2002. (Doc. 105, at 9-10.)[FN64]

> FN63. Items (i) through (iii) are time-barred pursuant to the analysis set forth in Section V.A., *supra*, and therefore are not properly considered in the qualified immunity analysis.

> FN64. Plaintiffs liken these facts to *Soldal v. Cook County, Ill.,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), in which the Supreme Court held that plaintiffs sufficiently stated a cause of action under § 1983 for deprivation of their Fourth Amendment rights where deputy sheriffs and mobile home park officials dispossessed plaintiffs of their mobile home by physically tearing it from the foundation and towing it to another lot, all without an eviction order. Although *Soldal* generally supports the premise that a property owner's Fourth Amendment rights are violated when law enforcement interferes with his possessory interests in his property, it is readily distinguishable here based on the abandonment issue discussed *infra,* as well as on the fact that, unlike in *Soldal,* a valid eviction order was entered in this case.

**\*23** The Sheriff's Defendants endeavor to rebut plaintiffs' showing in two respects. First, they vigorously deny that the Fourth Amendment has any place in the qualified immunity analysis because, they maintain, "the Hoseas advance no claims under the Fourth Amendment."(Doc. 82, at 2; *see also* doc. 108, at 1.) This contention is baseless. The Jurisdiction paragraph of the Complaint specifically invokes the "First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments."(Complaint, at 1 (emphasis added).) Count I specifically alleges that "[e]ach of the defendants separately and in concert deprived plaintiff of plaintiff's right to ... [f]reedom from illegal seizure of her property."(*Id.,* ¶ 22(a).) No magic language is required to assert a Fourth Amendment basis for § 1983 relief, and plaintiffs' pleading is clearly sufficient in this respect.

Second, the Sheriff's Defendants assert that there can be no violation of plaintiffs' Fourth Amendment rights because the record demonstrates that they had abandoned their personal property. (*See* doc. 108, at 8-9.) The law is clear at both the federal and state levels that a person enjoys no Fourth Amendment protection for personal property that she has abandoned. *See, e.g., Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) ("There can be nothing unlawful in the Government's appropriation of ... abandoned property"); *United States v. Richards,* 638 F.2d 765, 770 (5th Cir.1981) ("a defendant cannot challenge the search or seizure of abandoned property").[FN65] This question thus becomes the focal point of the qualified immunity analysis. If the Hoseas' personal property is classified as "abandoned" at the time of its alleged wrongful seizure, then plaintiffs lack a protectable Fourth Amendment interest in that property and the Sheriff's Defendants are entitled to qualified immunity on the § 1983 claims. If not, then the analysis must proceed to whether a reasonable government official should have known that plaintiffs enjoyed a clearly established Fourth Amendment right as to the items of personal property in dispute here.

Case 2:06-cv-01149-MEF-CSC    Document 42-12    Filed 11/07/2007    Page 28 of 42

Not Reported in F.Supp.2d                                                                    Page 28
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

FN65. *See also United States v. Stevenson, 396 F.3d 538, 546* (4th Cir.2005) ("When a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it."); *United States v. Robinson, 390 F.3d 853, 873-74* (6th Cir.2004) ("If property has been 'abandoned' in this sense, the Fourth Amendment is not violated through the search or seizure of this property."); *United States v. James, 353 F.3d 606, 615-16* (8th Cir.2003) (warrantless search of abandoned property implicates no Fourth Amendment concerns); *United States v. Gulledge, 469 F.2d 713, 715* (5th Cir.1972) ("It is clear that the personal right to Fourth Amendment protection of property against search and seizure is lost when that property is abandoned."); *Martin v. State, --- So.2d ----, 2003 WL 21246587, *6 (Ala.Crim.App. May 30, 2003)* (individual has no Fourth Amendment protection if he abandoned premises before objected-to search); *Thompson v. State, 680 So.2d 1014, 1016 (Ala.Crim.App.1996)* ("When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have," such that warrantless seizure of such property is not unreasonable under Fourth Amendment).

How then does one ascertain whether property is properly deemed "abandoned"? Two distinctly different methodologies present themselves, neither of which have been briefed or otherwise addressed in the parties' voluminous summary judgment submissions. The first possibility would be to navigate the esoteric and enigmatic seas of Alabama's law of ejectment, in an effort to ascertain whether the Hoseas continued to possess legal title to their personal property in the wake of the November 27, 2001 court order ejecting them from the homestead. Under Alabama law, "[e]jectment is a favored action for the trial of title to land." *Muller v. Seeds, --- So.2d ----, 2005 WL 1594842, *2 (Ala. July 8, 2005).*FN66 Perhaps fortunately for all concerned, federal appeals courts have unequivocally renounced this technique for analyzing abandonment in the Fourth Amendment context, decreeing that "arcane concepts of property law do not control an individual's ability to claim Fourth Amendment protection." *United States v.*

*Ramos, 12 F.3d 1019, 1023* (11th Cir.1994); *see also United States v. Edwards, 441 F.2d 749, 753* (5th Cir.1971) (explaining that subtle distinctions of private property law cannot be imported into the law of constitutional search and seizure, and that Fourth Amendment should be applied with a common-sense approach, not in hypertechnical manner); *United States v. Fulani, 368 F.3d 351, 354* (3rd Cir.2004) (Fourth Amendment abandonment analysis does not consider a plaintiff's property interest, but instead focuses on his reasonable expectation of privacy); *United States v. Thomas, 864 F.2d 843, 845 (D.C.Cir.1989)* ("it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object"). Accordingly, this Court need not and will not explore whether, as a matter of Alabama law, the Hoseas had a continuing property interest in the personal property at the time of its alleged seizure.FN67

FN66. To prevail on an ejectment action under Alabama law, a plaintiff shows legal title to the property, a right to immediate possession, and proof of a demand for and refusal to deliver possession.*Id.* at *2. "It is well settled that a plaintiff in an ejectment action can only recover when he has legal title to the property, the possession of which is sought to be recovered."*Thomas v. Benefield, 494 So.2d 452, 453 (Ala.Civ.App.1986); see also Enterprise Lodge No. 352 of Knights of Pythias, Inc. v. First Baptist Church (Colored) of Evergreen, 288 Ala.592, 264 So.2d 153, 154 (Ala.1972)* (plaintiff cannot recover in an ejectment action unless it held legal title when the suit was commenced and on to the time of trial); *Williams v. Kitchens, 261 Ala. 340, 74 So.2d 457, 463 (Ala.1954)* (indicating that right and title to houses constituting permanent attachments to real property may be adjudicated in ejectment actions). Alabama litigants may utilize an action in the nature of ejectment "not only as an efficient means for the adjudication of the right to possession, but also as a favored action for the trial of the legal title to land, that action being similar in nature to both an action in trespass and an action to quiet title."*MacMillan Bloedell, Inc. v. Ezell, 475 So.2d 493, 497 (Ala.1985).*

FN67. That legal question will presumably

Not Reported in F.Supp.2d                                                                                                    Page 29
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

figure prominently in any analysis of plaintiffs' state-law claims for conversion and theft (Counts V and VI) against defendants Ledkins, Ms. Ledkins, Rogers, Fuller and McDonald.

*24 In lieu of Alabama's law of ejectment, the Court aligns its compass with those precedents declaring that the Fourth Amendment abandonment inquiry turns on whether an individual has maintained a reasonable expectation of privacy in the items searched or seized at the time of such search or seizure. In that regard, "[t]he test of whether a defendant abandoned property is whether the defendant voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Edwards,* 644 F.2d 1, 2 (5th Cir.1981) (citation omitted); *see also United States v. Lehder-Rivas,* 955 F.2d 1510, 1522 (11th Cir.1992) (same); *United States v. McKennon,* 814 F.2d 1539, 1546 (11th Cir.1987) ("Whether an abandonment has occurred is a question of intent which can be inferred from words, acts and other objective facts."). This determination must be made by reference to objective standards. *See Thompson,* 680 So.2d at 1016;*Thomas,* 864 F.2d at 846.

The undisputed, objective facts in the summary judgment record demonstrate that as of September 2002 the Hoseas no longer maintained any reasonable expectation of privacy in the personal property at issue.[FN68]Plaintiffs' real property (*e.g.,* the land and buildings where the personal property at issue was stored) was sold to Ledkins in August 2000, more than two years before the seizure took place. Despite notice of the sale of the Property to pay off the *Baugh* judgment, the Hoseas neither left the land nor made arrangements to remove their personal property. When the Hoseas refused to leave, Ledkins filed an unlawful detainer action in state court in 2001, seeking an order evicting plaintiffs from the Property. Despite notice of the unlawful detainer action, the Hoseas elected not to appear or to defend against Ledkins' claims. Ultimately, a default judgment was entered against the Hoseas. In November 2001, some ten months before the alleged seizure occurred, Marengo County District Judge Wade Drinkard entered an Order directing the Hoseas "to immediately vacate said real property of the Plaintiff, Michael E. Ledkins," and authorizing the Sheriff's Department "to restore the real property in question to [Ledkins] by removing the person and the property of the [Hoseas] from his premises."(Doc. 104, at Exh.

I.) The Hoseas received actual notice of Judge Drinkard's Order shortly after it was entered, but opted not to comply or to remove their personal belongings from what was now the Ledkins' real property.[FN69]Two months later, in January 2002, Deputy Keith Jordan paid the Hoseas a-visit, providing them with a copy of Judge Drinkard's Order and cautioning them that Sheriff's Deputies would escort them from the Property if they did not leave and take their personal belongings with them. Rather than making arrangements to pack and move their personal property, the Hoseas informed Deputy Jordan that they were not leaving and imparted a thinly veiled threat that he should not attempt to evict them by himself.

> FN68. To the extent that the Hoseas are seeking to recover against the Sheriff's Defendants under 42 U.S.C. § 1983 for a seizure of property occurring in January 2002 or February 2002, those claims are time-barred for the reasons explained in Section V.A.3., *supra.*For that reason, the qualified immunity analysis hinges on the alleged seizure of September 2002, and not on that of seven or eight months earlier.

> FN69. Nor did the Hoseas submit any court filings seeking amendment, alteration or vacatur of Judge Drinkard's Order. By all appearances, plaintiffs simply ignored it.

*25 Virtually the entire Marengo County Sheriff's Department visited the property on January 25, 2002 for the purpose of evicting plaintiffs.[FN70]The Hoseas were removed from the wooden family residence at that time, and the locks were changed, with all of the Hoseas' personal property in the house being left behind.[FN71]There is no evidence that the Hoseas ever sought to recover their personal property during the eight months following their eviction. Indeed, the Hoseas have offered no evidence that they ever contacted Sheriff Langley or any other public official after January 25, 2002 to request access to the family residence to remove their personal property. They have similarly come forward with no testimony or evidence that they ever approached the new owner to request permission to remove their personal property. They initiated no legal action to recover such property. And they did not pursue any self-help remedies to collect and remove their personal belongings. Instead, the Hoseas simply left those items on the property for eight months, without ever lifting a finger to try to recover them or making

Not Reported in F.Supp.2d                                                                                          Page 30
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

inquiries of law enforcement officers, judicial authorities or the new owner as to whether they would be permitted to do so. The Hoseas offer no facts that they *ever* intended to retrieve those articles of personal property from the house and surrounding environs, much less that they ever took any steps to initiate such a recovery. These facts trace out a classic case of abandonment for Fourth Amendment purposes. In that regard, the case of *In re Kerlo,* 311 B.R. 256 (Bkrtcy.C.D.Cal.2004), is instructive. In *Kerlo,* a debtor filed a bankruptcy petition, after which a court ordered the debtor to surrender her residential property to the trustee in vacant condition. Yet the debtor refused to leave, prompting the trustee to seek a writ of ejectment and a writ of possession. The bankruptcy court entered such writs, prompting the debtor to complain that her Fourth Amendment rights were being violated because she still had personal property at the residence. The *Kerlo* court explained that, in the wake of the order requiring her to surrender the residence to the trustee, the debtor no longer had a legitimate expectation of privacy with respect to the residence. Because of that, the court reasoned, "any personal items left on the Property constitute abandoned property for the purposes of the Fourth Amendment," such that removal of such personal items by the trustee could not implicate debtor's Fourth Amendment rights. *Id.* at 266-67.The Court finds the *Kerlo* reasoning persuasive on the question of abandonment.[FN72]

FN70. Judge Drinkard's Order plainly conferred upon them the authority to do just that. More generally, under Alabama law, "[i]n the execution of the writ of possession, it is the generally accepted rule that the defendant and all the members of his family, together with his servants, employés and his tenants at will or sufferance, may be removed from the premises."*Slaughter v. Tatum,* 218 Ala. 564, 119 So. 651, 651 (Ala.1928).

FN71. Plaintiffs emphatically assert that the Sheriff's Deputies' conduct violated Judge Drinkard's Order because that Order instructed them to remove the Hoseas' personal property. (*See* doc. 105, at 7-9.) This contention is mistaken. Judge Drinkard's Order did not order the Sheriff to remove plaintiffs' personal property, but instead merely authorized them to do so. More generally, plaintiffs can impute no wrongdoing to the Sheriff's Defendants for failing to move plaintiffs' personal property for them. As one court has observed, "[a] writ of possession for realty does not constitute the sheriff a furniture mover. The writ has been obeyed when the person or persons designated by the writ have been placed in peaceful possession of the premises. The disposition of personalty found on the premises is not the duty of the officer."*Kelton v. Vandervort,* 707 S.W.2d 517, 520 (Tenn.App.1985).

FN72.*See also United States v. Diggs,* 649 F.2d 731 (9th Cir.1981) (defendant abandoned personal property where he left his motel room owing considerable back rent, mailed key to motel management, at no time attempted to retrieve property left in room, and where search was performed more than two months later); *United States v. De Parias,* 805 F.2d 1447, 1458 (11th Cir.1986) (defendant's constitutional rights were not implicated by seizure of his clothing in apartment, where he had previously abandoned the property); *Lehder-Rivas,* 955 F.2d at 1522 (defendant abandoned suitcase that he had promised to retrieve for more than a year, such that he had no constitutional interest in its search or seizure); *Martin,* 2003 WL 21246587, at *7 (defendant abandoned footlocker and contents when he left them in patrol car upon resigning as state trooper, then moved out of state); *People v. Taylor,* 253 Mich.App. 399, 655 N.W.2d 291, 297-98 (Mich.App.2002) (defendant had no reasonable expectation of privacy in house entitling him to Fourth Amendment protection where external appearance and condition of house gave rise to reasonable inference of abandonment); *Commonwealth v. Lanigan,* 12 Mass.App.Ct. 913, 423 N.E.2d 800, 801-02 (Mass.App.Ct.1981) (trial judge properly found no legitimate expectation of privacy where defendant had previously abandoned apartment, which had been padlocked by police and from which defendant had fled the state to avoid capture); *Graves v. State,* 489 S.W.2d 74, 85 (Tenn.Crim.App.1972) (defendant lost expectation of privacy by leaving apartment without notice, without paying rent, and without removing personal articles).

The Hoseas may or may not have retained an

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

ownership interest in their personal belongings, as a matter of Alabama law. Regardless of whether they maintained such an interest, however, the record overwhelmingly establishes that the Hoseas no longer held a reasonable expectation of privacy with regard to those items as of September 2002, and that they had voluntarily relinquished and abandoned their interest in that personal property.[FN73]Although they had known for more than a year that they would have to leave the family home, and although they received escalating warnings of their impending eviction, the Hoseas made no attempt to move their property prior to January 25, 2002. After the January 25, 2002 eviction, plaintiffs never initiated inquiries or endeavors to retrieve their property. The Hoseas could not reasonably have expected Ledkins to maintain and store their personal property for them indefinitely, waiting for them to make arrangements to pick it up. To hold that they continued to hold a reasonable expectation of privacy in these circumstances would be to excise the doctrine of abandonment from Fourth Amendment jurisprudence. This the Court will not do.

> FN73. In reaching this conclusion, the Court is cognizant of the strand of authorities holding that "abandonment of an item as a result of illegal police conduct is not a voluntary abandonment for Fourth Amendment purposes."*Atwell v. State,* 594 So.2d 202, 209 (Ala.Crim.App.1991); *see also Ford v. State,* 680 So.2d 948, 951 & n. 1 (Ala.Crim.App.1995) (observing that abandoned property does not fall outside Fourth Amendment protection if the abandonment was product of unlawful police conduct). There is no evidence, however, that the Sheriff's Defendants' eviction of plaintiffs on January 25, 2002 pursuant to Judge Drinkard's Order was unlawful. Even if it were, the abandonment at issue here was not the result of the Hoseas' eviction, but instead followed from the Hoseas' ensuing failure to undertake to retrieve their personal belongings for eight months post-eviction.

**\*26** For all of the foregoing reasons, and considering the record in the light most favorable to plaintiffs, the Sheriff's Defendants' conduct did not violate the Hoseas' Fourth Amendment rights because the Hoseas had no reasonable expectation of privacy in the personal property seized. That being the case, and plaintiffs having identified no other viable bases for satisfying their burden of showing a violation of a clearly established constitutional right, the Court concludes that the Sheriff's Deputies are entitled to qualified immunity as to plaintiffs' claims under 42 U.S.C. § 1983. [FN74]

> FN74. Even if plaintiffs had made an adequate showing that the Sheriff's Defendants' conduct violated their Fourth Amendment rights, which they did not, they could overcome the qualified immunity defense only by also showing that "at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law."*Harris,* 433 F.3d at 811. Plaintiffs have come forward with no evidence or argument that might enable them to satisfy this aspect of their qualified immunity burden. Stated differently, even if plaintiffs did have a protectable Fourth Amendment right in their personal property that they had left in and around the family homestead to accumulate dust for the previous eight months, plaintiffs have made no showing that every objectively reasonable law enforcement agent would have recognized their continuing Fourth Amendment interest in that property. Therefore, it is the Court's assessment that plaintiffs can meet neither the "constitutional violation" nor the "clearly established" prongs of their burden to defeat the qualified immunity defense.

Plaintiffs' attempts to rebuff the qualified immunity defense are not resuscitated by their conclusory comment that "[o]n September 24, 2002, the law was clearly established that the defendants [*sic* ] action violated the plaintiffs [*sic* ] due process rights."(Doc. 105, at 10.) Simply including a solitary, throwaway reference to the words "due process" in the qualified immunity section of their brief falls far short of satisfying plaintiffs' burden of showing a violation of a clearly established constitutional right. Besides, it defies logic and common sense to suggest that there was a clearly established constitutional right for the Hoseas to receive *more* process before their personal property was removed or destroyed. When legal proceedings were initiated in state court to evict them from the Property, plaintiffs disregarded them, and a default judgment was entered. Not only did plaintiffs decline to participate in those proceedings, but they defied the court order directing them to vacate the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 32
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

premises immediately. When a Sheriff's Deputy notified them that they would be evicted pursuant to Judge Drinkard's Order, plaintiffs obstinately planted their feet and warned the deputy not to try to evict them himself. Following their eviction, plaintiffs abandoned their personal belongings and did not undertake any efforts to retrieve such property for eight months. Upon review of these facts, the obvious question is this: What additional process was due before plaintiffs' personal property could be removed? Plaintiffs do not answer, elaborate or explain their position, much less delineate the relevance of due process concepts in the "clearly established" analysis.[FN75] For all of these reasons, the Court finds that the Hoseas have failed to show that the Sheriff's Defendants' conduct in September 2002 violated clearly established constitutional rights to procedural due process.

FN75. At best, plaintiffs theorize that the Sheriff's Defendants "violated the plaintiff [*sic*] due process rights by preventing the plaintiffs from taking action to get their personal property, and restraining them while their property was being taken, burned and destroyed. Also, when the Sheriff's Defendants took possession and control of the Hoseas' property, they had a duty of care to make sure nothing happen [*sic*] to the property."(Doc. 105, at 22.) All three of these accusations are factually unsupported by the record. There is no evidence that the Sheriff's Defendants prevented the Hoseas from recovering their personal property; to the contrary, there is no indication in the record that Hoseas ever attempted such a recovery. Second, there is no evidence of the Sheriff's Defendants "restraining" the Hoseas while their property was taken, burned and destroyed. The Hoseas point to no evidence that any of them engaged in any conduct in September 2002 to stop the ransacking of their property, much less that Sheriff's Defendants "restrained" them from doing so. Third, although plaintiffs accuse the Sheriff's Defendants of taking possession and control of plaintiffs' personal property, there is no evidence that they did so. Merely because the Sheriff's Defendants changed the lock on the family residence does not mean that those defendants assumed possession and control of its contents. Because the Hoseas' due process theory is founded on facts not in the record, they

cannot credibly challenge defendants' qualified immunity defense on due process grounds.

Finally, the Court recognizes that in other portions of their Complaint and brief, the Hoseas trumpet constitutional theories of recovery against the Sheriff's Defendants on the basis of alleged equal protection violations, takings without just compensation, Ninth Amendment violations, Tenth Amendment violations and Fourteenth Amendment violations. However, plaintiffs elected not to rely on any of these arguments in opposing the qualified immunity defense. Instead, plaintiffs' counsel made a strategic decision to focus their qualified immunity argument on the Fourth Amendment aspect. Having made such a decision, plaintiffs must now lie in the bed they have made. This Court will not wield plaintiffs' burden for them by launching a *sua sponte* investigation into whether any other possible bases exist for plaintiffs to defeat the qualified immunity defense, or whether any in the laundry list of rights cited by the Hoseas could be deemed both violated and clearly established in the context of the facts of this case. *See, e.g., Lyes,* 126 F.3d at 1388 (explaining that "the onus is on the parties to formulate arguments" in Rule 56 proceedings); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1326 (11th Cir.2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir.1999) (noting that a claim may be considered abandoned when it is included in complaint, but plaintiff fails to argue it to district court); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,* 182 F.3d 888, 892 (Fed.Cir.1999) (discussing "unremarkable proposition that assertions made in the pleadings ..., but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion"); *Laborers' Int'l Union of North America v. Caruso,* 197 F.3d 1195, 1197 (7th Cir.1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions.").

**\*27** For all of the foregoing reasons, the Court concludes that the Sheriff's Defendants are entitled to qualified immunity on plaintiffs' § 1983 causes of action. Those claims are hereby dismissed.[FN76]

FN76. This determination applies with equal force to plaintiffs' substantive § 1983 claim

Not Reported in F.Supp.2d                                                                   Page 33
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

set forth at Count I and their § 1983 conspiracy claims delineated in Counts II and IV of the Complaint. *See, e.g., Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 793 (11th Cir.1992) (concluding that governmental defendants were entitled to qualified immunity as to plaintiff's § 1983 conspiracy claim).

### D. Plaintiffs' Claims Under 42 U.S.C. § § 1982 and 1985.

Plaintiffs' remaining causes of action against the Sheriff's Defendants sound under 42 U.S.C. § § 1982 and 1985. The Court will address them in reverse order.

### 1. Conspiracy Claim under 42 U.S.C. § 1985.

Count IV of the Complaint charges defendants with conspiring to violate the Hoseas' civil rights in violation of 42 U.S.C. § 1985. The only subsection of § 1985 which could possibly apply here is § 1985(3), which outlaws, *inter alia,* conspiracies to deprive a person or class of persons of equal protection of the laws. The Sheriff's Defendants first argue that this claim is subject to qualified immunity, just as the § 1983 claims were. (*See* doc. 82, at 21-22; doc. 108, at 6.) This contention is ill-conceived, as binding precedent precludes application of qualified immunity in the § 1985(3) context. As the Eleventh Circuit explained, "[w]e have squarely held that qualified immunity is not available as a defense to a § 1985(3) claim, *see Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 794 (11 th Cir.1992), and are not swayed by the defendants' argument that *Burrell* is no longer legally viable." *Johnson v. City of Fort Lauderdale, Fla.,* 126 F.3d 1372, 1379 (11th Cir.1997); *see Young v. SouthTrust Bank, N.A.,* 51 F.Supp.2d 1274, 1285 (M.D.Ala.1999) ("Under the law of this circuit, the doctrine of qualified immunity is not applicable in cases brought under Section 1985(3)."). Clearly, then, qualified immunity can afford the Sheriff's Defendants no relief on the § 1985(3) claim.

In the absence of qualified immunity, the Sheriff's Defendants' fallback position on the § 1985(3) cause of action is that the record does not show that they reached an understanding with any of the private defendants, and even if it did, there is no evidence that the purpose of the conspiracy was to deprive the Hoseas of equal protection of the laws.[FN77] "The elements of a cause of action under section 1985(3)

are (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Trawinski v. United Technologies,* 313 F.3d 1295, 1299 (11th Cir.2002); *see also Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627-28 (11th Cir.1992) (same). In outlining these prerequisites, the Eleventh Circuit has reasoned that "[t]he purpose of § 1985 was to stifle the serious class-based deprivation of constitutional rights by private parties, not to serve as a general federal tort law, and, as such, a claim under § 1985(3) requires the proof of invidious discriminatory intent as well as the violation of a serious constitutional right protected not just from official, but also from private encroachment." *Trawinski,* 313 F.3d at 1299. With respect to the discriminatory intent element, a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Lucero,* 954 F.2d at 628.

> FN77. The Sheriff's Defendants also seek refuge under the shelter of the intracorporate conspiracy doctrine, which provides that employees within the same public entity cannot, as a matter of law, conspire among themselves in a manner violative of § 1985(3), inasmuch as all of their activities within the course of their employment are attributable to the public entity itself. *See, e.g., Denney v. City of Albany,* 247 F.3d 1172, 1190-91 (11th Cir.2001); *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1037-38 (11th Cir.2000); *Dickerson v. Alachua County Com'n,* 200 F.3d 761, 768 (11th Cir.2000) (construing intracorporate conspiracy doctrine to find that "the County jail and its employees are considered to constitute a single legal entity that cannot conspire with itself"). Had the Hoseas alleged merely that the Sheriff's Defendants conspired *with each other* to violate their equal protection laws, then this argument might hold some allure. But a fair reading of the Complaint is that plaintiffs charge the Sheriff's Defendants of conspiring with Ledkins, McDonald, Rogers and Fuller to engage in the deprivations at issue. Thus, the

Not Reported in F.Supp.2d                                                                 Page 34
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

intracorporate conspiracy doctrine has no relevance here.

**\*28** The Hoseas' theory of relief under § 1985(3) is never articulated in the pleadings and briefs, and is therefore difficult to discern. Evidently, the Hoseas contend that the Sheriff's Defendants conspired with Ledkins, McDonald, Rogers and Fuller to spirit away plaintiffs' personal belongings, for future allocation among themselves. Plaintiffs allege that "[t]he Sheriff Department was involved in the taking and burning of the plaintiffs' property," and that there must have been "an understanding between the Sheriff's Department and the other defendants, when the Sheriff Deputies appeared to prevent any interfere [*sic* ] with the taking of the plaintiffs' property."(Doc. 105, at 17.) To bolster such allegations, plaintiffs point to evidence that "the Sheriff Deputies stated that they were present to prevent anyone from interfering with the taking of the property by the defendant," presumably meaning Ledkins, Rogers, Fuller and McDonald. (*Id.* at 26.)Plaintiffs speculate that Ledkins "could have been putting the property in storage for the Sheriff," but proffer no evidence in support of such a theory. (*Id.* at 13.)Plaintiffs contend that there must be "a genuine issue of material fact as to whether the [Sheriff's D]efendants took the property," inasmuch as those defendants deny it; however, plaintiffs identify no countervailing evidence to cast doubt on the Sheriff's Defendants' denials. (*Id.*)

When the fog is dispelled and the record is studied in the light most favorable to the Hoseas, this is the evidence of a conspiracy between the Sheriff's Defendants and the private defendants. On September 24, 2002, the private defendants removed and destroyed various items of personal property of the Hoseas. Several Sheriff's Deputies were on the scene, along with dozens of spectators. The Deputies indicated that they were there to prevent onlookers from interfering with the activities of the private defendants. When certain of the spectators objected, the Deputies stated that they would be taken to jail if they did not desist. The record is devoid of other evidence supporting the existence of the purported conspiracy.

This showing is far too slender a reed to create a genuine issue of material fact as to the existence of a conspiracy between the Sheriff's Defendants and the private defendants. The Hoseas do "not have to produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy."*Rowe v. City of Fort Lauderdale,*

279 F.3d 1271, 1283 (11th Cir.2002). Nonetheless, it is incumbent on them to "show some evidence of agreement between the defendants."*Id. at 1284;see also Bailey v. Bd. of County Comm'rs of Alachua County, Fla.,* 956 F.2d 1112, 1122 (11th Cir.1992) ( "The linchpin for conspiracy is agreement, which presupposes communication."); *Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at Auburn University,* 267 F.Supp.2d 1139, 1146-47 (M.D.Ala.2003) (conspiracy claim under § 1985(3) requires plaintiff to show agreement between members, and while evidence may be circumstantial, there must be some indication that defendants were acting in concert pursuant to an agreement to act against plaintiff's rights). The Eleventh Circuit has cautioned that a conspiracy claim cannot withstand Rule 56 scrutiny on the basis of a mere scintilla of evidence. *See Rowe, 279 F.3d at 1284.* Here, plaintiffs have shown no evidence of an agreement or understanding or willful participation between the Sheriff's Defendants and the private defendants. There is no evidence of any communication between or among the two sets of defendants, other than Ledkins complaining to the Sheriff's Department in January 2002 that the Hoseas were still on the Property and in September 2002 that the Hoseas were trespassing. There is no evidence that the Sheriff's Defendants' presence at the scene on September 24, 2002 was prompted by anything other than a desire to maintain order at a potentially volatile event that was teeming with onlookers and that might reasonably be expected to inflame emotions. And there is certainly no evidence that the Sheriff's Deputies received or were promised any of the "loot" procured by the private defendants. No reasonable inference could be drawn from the record that the private defendants and Sheriff's Defendants were collaborating or cooperating on a nefarious plot to strip the Hoseas of their property. Nor does the mere presence of Sheriff's Deputies at the scene of the alleged wrongdoing give rise to an inference of agreement or willful participation on their part. Simply put, the Hoseas ask the Court to allow their conspiracy claims to reach a jury on the basis of conjecture, surmise, and guesswork. But all the speculation in the world cannot obscure the fact that plaintiffs have no evidence of the requisite "understanding" or "willful participation" necessary to establish liability on a § 1985(3) conspiracy claim.<sup>FN78</sup>

FN78. The Court recognizes that plaintiffs' difficulties in proving their case stem at least in part from their failure to depose defendants or defense witnesses, and their

Not Reported in F.Supp.2d                                                                                    Page 35
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

limited use of paper discovery techniques. The Court further recognizes that Magistrate Judge Cassady rejected the Hoseas' attempts to enlarge the discovery window to enable them to take additional discovery. (*See* doc. 101.) However, the pending summary judgment motions must be evaluated on the basis of the record actually furnished by the parties, not an uncharted, undeveloped record that might be theoretically possible.

**\*29** Even if the Hoseas had made an adequate showing of a conspiracy, which they have not, their § 1985(3) claim would still fail because there is no evidence of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Lucero, 954 F.2d at 628.* Plaintiffs protest that "[t]he Sheriff has not evicted white persons and taken their personal property."(Doc. 105, at 23.) But where is the evidence to support such a blanket statement?[FN79] During discovery, plaintiffs certainly could have inquired of the Sheriff's Defendants whether they had evicted white citizens who were similarly situated to the Hoseas. Because they did not ask the question, one can only guess as to whether the Hoseas were subjected to differential treatment by the Sheriff's Defendants. Of course, guesswork cannot defeat a motion for summary judgment. Plaintiffs point to no facts that the Sheriff's Defendants have ever declined to enforce a writ of ejectment entered against white citizens in Marengo County. Plaintiffs point to no facts that Sheriff's Deputies have intervened to prevent the taking or destruction of long-abandoned property of white citizens of Marengo County.[FN80] At most, the Hoseas weakly assert that they were treated differently than Ledkins, and that because Ledkins is white there is sufficient evidence of an invidiously discriminatory purpose to allow them to reach a jury. (*See* Doc. 105, at 23-25.) But Ledkins was not similarly situated to plaintiffs; therefore, the analogy falls flat. Unlike Ledkins, the plaintiffs had been ordered by the Marengo County District Court to vacate the premises. Unlike Ledkins, the plaintiffs had openly defied that court order, as well as instructions from law enforcement to leave and not come back. Unlike Ledkins, the plaintiffs had abandoned personal property on their former homestead for eight months after their eviction, without ever requesting access to it. Unlike Ledkins, the Hoseas were trespassers on land that an Alabama court had ruled no longer belonged to them. Simply put, no inference of discriminatory intent can be drawn by comparing Ledkins' experience at the hands of the Sheriff's Defendants to that of the Hoseas.[FN81]

FN79. It is no answer to point to the Declaration of Phil Ford, who avers that he has "never heard of a white person being put off his or her property," and thus that he believes "that race played a part." (Ford Decl., ¶ 12.) One witness's hypothesis and conjecture is not a substitute for credible, creditable summary judgment evidence. And what Ford may or may not have "heard of" is not evidence that the Sheriff's Defendants treated the Hoseas differently than similarly situated white citizens of Marengo County.

FN80. Plaintiffs also overlook the fact that two of the four Sheriff's Defendants (and several of the private defendants) whom they accuse of racial discrimination are themselves African-American, including both Chief Deputy Reese (whom plaintiffs place at the center of the contested events) and Deputy Jones. (M. Hosea Dep., at 23; Fleta Mae Hosea Dep., at 51.)

FN81. Nor is the Hoseas' cause furthered by a particularly elusive bit of reasoning set forth in their opposition brief. Plaintiffs argue: "In this case, one of the party [*sic* ] is lying. If the jury concludes that the defendants are lying about not taking and burning the Hoseas' property, the jury can make a rational infer [*sic* ] that the defendants are lying to hide an improper motive in taking the property."(Doc. 105, at 20.) This contention is unpersuasive on at least two levels. First, plaintiffs have proffered no evidence that the Sheriff's Defendants did take and burn the Hoseas' property. One cannot prevail on summary judgment simply by branding the other side untruthful. Second, plaintiffs take a vast logical leap in suggesting that if the Sheriff's Defendants were lying about taking and burning plaintiffs' property, that lie is itself evidence of a racially discriminatory motive. This is a *non sequitur.*If the Sheriff's Defendants did lie about the taking and burning of plaintiffs' property, the lie might show an intent to conceal their wrongful appropriation or destruction of private property, but the lie itself could not reasonably raise an inference of racial animus.

Not Reported in F.Supp.2d                                                                    Page 36
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

In light of the foregoing, the undersigned concludes that plaintiffs' claim in Count IV that defendants conspired to violate the Hoseas' civil rights, in violation of 42 U.S.C. § 1985(3), is due to be dismissed as to the Sheriff's Defendants because the record shows neither the existence of a conspiracy involving those defendants nor any basis for finding that any such conspiracy was motivated by invidious class-based discriminatory intent.

*2. Discrimination Claims under 42 U.S.C. § 1982.*

In Count III of the Complaint, plaintiffs allege that defendants "were denied the peaceful ownership of their land by the defendants because plaintiffs are of African-American descent and race," in violation of 42 U.S.C. § 1982. (Complaint, ¶ 33.)[FN82]A plaintiff cannot succeed in a § 1982 claim without showing racial animus, intentional discrimination, and deprivation of the plaintiff's rights because of race. *See, e.g., Brown v. Philip Morris Inc., 250 F.3d 789, 797* (3rd Cir.2001); *Daniels v. Dillard's, Inc., 373 F.3d 885, 887* (8th Cir.2004) (plaintiff in § 1982 claim must show membership in protected class, discriminatory intent, and interference with rights or benefits connected with ownership of property); *McCoy v. Homestead Studio Suites Hotels, 390 F.Supp.2d 577, 584 (S.D.Tex.2005)* (Section 1982 claim requires showing that defendants had intent to discriminate on the basis of race); *Lawrence v. Courtyards at Deerwood Ass'n, Inc., 318 F.Supp.2d 1133, 1150 (S.D.Fla.2004)* (*prima facie* showing under § 1982 is that plaintiff belongs to racial minority, that defendant intended to discriminate on basis of race, and that discrimination concerned activities addressed in § 1982, such as right to buy and sell property).

FN82. That statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property."42 U.S.C. § 1982.

*30 The Hoseas' § 1982 claims against the Sheriff's Defendants fail for the same reason that their § 1985(3) causes of action do, to-wit: The record is devoid of evidence that any of the complained-of activities by the Sheriff's Defendants (or any defendants, for that matter) were motivated by race-based animus. Without evidence that the Sheriff's Defendants acted with a racially discriminatory

purpose, the § 1982 cause of action articulated in Count III cannot proceed against the Sheriff's Defendants, and that claim is therefore dismissed.[FN83]

FN83. With this ruling, all claims against the Sheriff's Defendants in their individual capacity have been dismissed with prejudice. For that reason, the undersigned need not reach the Sheriff's Defendants' alternative defense of quasi-judicial immunity. Consideration of that defense is not necessary to grant the Sheriff's Defendants the full measure of relief requested in their Motion for Summary Judgment.

VI. Analysis of Rogers/Fuller Motion for Summary Judgment.

Having addressed the Sheriff's Defendants' dispositive motion, the Court now turns to the Motion for Summary Judgment (doc. 92) submitted by defendants Rogers and Fuller. This very short Motion proffers a straightforward basis for dismissal, namely, that "there is not one shred of evidence that Rogers and Fullers were involved in the events" being litigated here. (Doc. 93, at 2.) Movants elaborate that: (a) they were not involved in the unlawful detainer/eviction proceedings; (b) they had nothing to do with plaintiffs' arrest for trespass or their ensuing criminal prosecution; (c) they did not participate in any conspiracy; (d) being African-American, they did not take any action against the Hoseas that was motivated by race discrimination; (e) plaintiffs have no evidence that Rogers took part in the conversion or theft of plaintiffs' property; and (f) Fuller has denied any such involvement.

*A. The State Law Claims.*

Rogers and Fuller face an insurmountable obstacle in seeking summary judgment on Counts V and VI, the two state law causes of action alleging conversion and theft of plaintiffs' personal property. Notwithstanding their earnest denials, there is ample evidence in the record from which a reasonable factfinder could conclude that Rogers and Fuller actually did convert and steal plaintiffs' property. Several examples will demonstrate the point. First, Rogers and Fuller candidly admit that, in response to discovery, plaintiffs stated that they had personal knowledge of Fuller taking their personal property, and that Fuller had told them he could take whatever

he wanted. (*See* doc. 93, at 2.) [FN84] Second, Phil Ford avers that both Rogers and Fuller were present during the burning and taking of plaintiffs' property on September 24, 2002, and that he personally witnessed them pouring gasoline on mobile homes containing the Hoseas' personal belongings. (Ford Decl., ¶ ¶ 6, 8.) Third, Jimmy Figgers avers that Rogers boasted that he (Rogers) had removed property from the land that had formerly belonged to the Hoseas. (J. Figgers Decl., ¶ 7.) Fourth, Mollie Hosea stated in her declaration that she saw some of plaintiffs' personal property in Rogers' home and yard, and that when she confronted him about it, Rogers responded that he had been told to take whatever he wanted from the land that had formerly belonged to the Hoseas. (M. Hosea Decl., ¶ 6.) Fifth, Mollie testified that Rogers and Fuller assisted Ledkins in loading truckloads of plaintiffs' personal property in January 2002. (M. Hosea Dep., at 47-49, 150-51.) This and other record evidence plainly creates a genuine issue of material fact as to whether Rogers and Fuller may be liable to plaintiffs for conversion and theft. *See generally SouthTrust Bank v. Donely,* --- So.2d ----, 2005 WL 1655003, *4 (Ala. July 15, 2005) (conversion requires proof of a wrongful taking, illegal assumption of ownership, illegal use or misuse of another's property, or wrongful detention or interference with another's property); *Riscorp, Inc. v. Norman,* 915 So.2d 1142, 1153 (Ala.2005) (same). Accordingly, Rogers' and Fuller's Motion for Summary Judgment is denied as to the state-law causes of action against them, as set forth in Counts V and VI of the Complaint. [FN85]

FN84. In a remarkable bout of candor, Rogers and Fuller present this interrogatory response as the centerpiece of the "undisputed facts" section of their brief, without offering any inkling as to how Fuller might overcome it on summary judgment. Simply proffering a denial from Fuller as to the veracity of that interrogatory response is inadequate to negate it. Rather, Fuller's denial that he was in possession of plaintiffs' personal property merely creates a genuine issue of material fact, which must be resolved at trial. At the Rule 56 stage, this Court cannot weigh credibility as between plaintiffs' contention that Fuller did take and possess their personal property, and Fuller's denial of same. Resolution of such disputed facts is the *raison d'etre* of jury trials, and this Court cannot pretermit the process in the manner requested by Fuller.

FN85. Rogers and Fullers opted not to advance the argument that Counts V and VI fail, as a matter of law, because the Hoseas lacked either legal title in the property at issue or a cognizable possessory interest in same. *See, e.g., Ex parte Anderson,* 867 So.2d 1125, 1129-32 (Ala.2003) (observing that, in general, Alabama tort of conversion requires both general or specific title to the property and a possessory interest in the property, although in certain limited circumstances a possessory interest may itself be sufficient); *River of Life Christian Center v. River of Life Int'l, Inc.,* 894 So.2d 730, 732 (Ala.Civ.App.2004) (gist of conversion action is wrongful exercise of dominion over property in exclusion or defiance of plaintiff's rights, where plaintiff has general or special title to property, or immediate right to possession). Rogers and Fuller not having argued or briefed the question of the Hoseas' continuing title or possessory rights, if any, in the personal property at issue in this litigation, the Court will not *sua sponte* embark on such a potentially thorny foray into Alabama law.

### B. The Federal Claims.

**\*31** The federal claims against Rogers and Fuller rest on a different footing. Considering first the § 1983 causes of action, it is clear that Rogers and Fuller cannot invoke qualified immunity as a basis for dismissal of those claims in the manner that the Sheriff's Defendants did. *See Swann v. Southern Health Partners, Inc.,* 388 F.3d 834, 837 (11th Cir.2004) (private entity is not entitled to assert qualified immunity defense to § 1983 claims); *Hinson v. Edmond,* 192 F.3d 1342, 1345 (11th Cir.1999) (no qualified immunity defense for privately employed prison physician; *Burrell,* 970 F.2d at 796 ("Private defendants who allegedly conspired with public officials to deprive another of her constitutional rights therefore are not entitled to qualified immunity under section 1983."). It is equally clear, however, that the Hoseas' § 1983 claims against Fuller and Rogers (including both substantive and conspiracy variants) cannot survive summary judgment in the absence of an adequate showing of conspiracy. After all, "section 1983 does not afford a remedy against a private person unless it is shown to have conspired with one or more state actors." *Rowe,* 279 F.3d at 1285; *see also Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th

Not Reported in F.Supp.2d                                                                                           Page 38
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

Cir.1990) ("private defendants can be held liable in a § 1983 action if they act in concert with the state officials in depriving a plaintiff of constitutional rights"). If a § 1983 conspiracy claim against a private actor fails for want of evidence of conspiracy, then the substantive § 1983 claims against him necessarily fail as well. *See Rowe,* 279 F.3d at 1285. Fuller and Rogers maintain, with no elaboration, that there is no evidence of a conspiracy between themselves and any state actor.

Under applicable precedents, "[t]he plaintiff attempting to prove such a conspiracy must show that the parties 'reached an understanding' to deny the plaintiff his or her rights."*Bendiburg,* 909 F.2d at 468 (citation omitted); *see also Rowe,* 279 F.3d at 1283 (*prima facie* case of § 1983 conspiracy must show that defendants reached understanding to violate plaintiff's rights). As mentioned *supra,* no "smoking gun" is required to establish the requisite "understanding" or "willful participation," but there must be more than a scintilla of evidence of an agreement. *See Rowe,* 279 F.3d at 1283-84;*see also Bailey,* 956 F.2d at 1122 (11th Cir.1992) ("The linchpin for conspiracy is agreement, which presupposes communication."). To satisfy their burden, plaintiffs offer no evidence that Rogers and Fuller ever communicated, much less agreed with, the Sheriff's Defendants about anything. In fact, the *only* evidence to which plaintiffs point in support of the alleged conspiracy is the presence of several Sheriff's Deputies during the burning and taking of plaintiffs' property on September 24, 2002, and the Deputies' admonitions to the assembled onlookers not to interfere in the activities of Ledkins, Rogers, Fuller, and McDonald. As already stated in Section V.D.1., *supra,* such evidence is insufficient to enable a jury reasonably to find the existence of a conspiracy to violate the Hoseas' constitutional rights. Simply put, the record is devoid of evidence of the necessary "willful participation" or "understanding" as between Rogers and Fuller, on the one hand, and the Sheriff's Defendants, on the other. For that reason, the Court finds that the § 1983 conspiracy claims set forth in Counts II and IV of the Complaint are properly dismissed as to Rogers and Fuller. And, pursuant to *Rowe,* the lack of evidence of a conspiracy is likewise fatal to plaintiffs' substantive § 1983 claims in Counts I and II against those defendants.

**\*32** The same reasoning informs the resolution of the § 1985(3) conspiracy cause of action set forth in Count IV of the Complaint. In the absence of genuine issues of material fact as to the existence of a conspiracy to deprive the Hoseas of equal protection

of the laws, plaintiffs cannot reach a jury as to that claim. Moreover, the total lack of evidence of a racial motivation for any of defendants' actions vis a vis the Hoseas and their property precludes plaintiffs' § 1982 claim set forth in Count III from moving forward as to Rogers and Fuller (who are themselves African-American).[FN86]

> **FN86.** In their brief, Rogers and Fuller maintain that there is "not one shred of evidence that Rogers or Fuller ... took any action that deprived the Plaintiffs of any rights in property that was motivated by racial discrimination."(Doc. 93, at 3.) Thus, plaintiffs were squarely on notice that defendants were challenging the racial component to their federal causes of action, such that it was incumbent upon them to present evidence of racial bias in their opposition memoranda.

The foregoing analysis establishes that defendants Rogers and Fuller are entitled to summary judgment on all of plaintiffs' federal causes of action. Accordingly, Rogers' and Fuller's Motion for Summary Judgment is granted as to Counts I through IV of the Complaint, but denied as to Counts V and VI.

### VII. Status of Remaining Claims Against Remaining Defendants.

The foregoing resolution of the summary judgment motions filed by the Sheriff's Defendants and defendants Rogers and Fuller raises significant questions about the status and future path of this litigation, and in particular the continuing propriety of a federal forum for this dispute. All claims against the Sheriff's Defendants have been dismissed. The federal claims against Fuller and Rogers have been dismissed. Thus, in the absence of further judicial action, the only remaining claims are Counts V and VI (state law claims) against Fuller and Rogers, and Counts I through VI (state and federal claims) against defendants Ledkins, Ms. Ledkins and McDonald. Because the Court is of the opinion that proceeding to trial in federal court on these causes of action would be grossly inefficient and would transform trial of the lingering federal claims into a mere charade, judicial intervention is warranted.

*A. Federal Claims as to Defendants Ledkins, Ms.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 39
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
(Cite as: Not Reported in F.Supp.2d)

*Ledkins and McDonald.*

For reasons that are not obvious, counsel for defendants Ledkins, Ms. Ledkins and McDonald decided against filing a dispositive motion. Indeed, they did not even attempt to ride the coattails of their fellow defendants by filing a notice that they joined in other defendants' Rule 56 filings. This is so despite the fact that the § 1983, § 1985(3) and § 1982 claims against them proceed on exactly the same theories and suffer from exactly the same infirmities as those against Rogers and Fuller. Even though plaintiffs were on notice that certain defendants were contesting the existence of a § 1983 or § 1985 conspiracy, the summary judgment record includes no evidence creating a genuine issue of material fact as to whether there was willful participation or understanding as between the private defendants and the Sheriff's Defendants to violate plaintiffs' constitutional rights. Even though plaintiffs were on notice that certain defendants disputed whether any evidence might support the equal protection / race discrimination allegations animating the § 1982 and § 1985(3) causes of action, the record is devoid of evidence of racial animus and intentional discrimination.

*33 Under the circumstances, the Court perceives two options for handling the federal causes of action as to Ledkins, Ms. Ledkins and McDonald. First, the Court could reflexively declare that those federal claims will proceed to trial because those three defendants neglected to move for summary judgment in accordance with the applicable Rule 16(b) Scheduling Order. While perhaps having the virtue of expedience in the short term, this myopic approach would reap an inefficient, improvident outcome by burdening the litigants, the Court, the jury, and the judicial system with a trial on federal claims for which plaintiffs have been unable to marshal sufficient evidence in response to dispositive motions filed by other defendants. The Hoseas' summary judgment responses demonstrate that they cannot establish either a conspiracy or a racial motivation as to any of their federal causes of action. If they cannot do so now, after having the benefit of the discovery process and in the face of direct challenges from other defendants, then there is no reasonable probability that they will be able to do so at trial. To ignore that inevitability and to set a trial on those federal claims because three defendants failed to file Rule 56 motions would be to condemn all involved to a futile endeavor trying federal claims that have been dismissed as wanting with respect to identically situated defendants.

Second, the Court could unilaterally grant summary judgment to Ledkins, Ms. Ledkins and McDonald on Counts I through IV, notwithstanding their failure to request such relief via motion, on the same grounds on which it dismissed Counts I through IV as against Rogers and Fuller. In general, federal courts are loath to make a party's arguments for it or to dismiss claims of their own accord without affording plaintiffs an adequate advance opportunity to be heard. Nonetheless, a district court may award summary judgment *sua sponte* so long as the party adversely affected has received adequate notice to submit evidence and arguments on the issue in question. See *Flood v. Young Woman's Christian Ass'n of Brunswick, Georgia, Inc.,* 398 F.3d 1261, 1267 (11th Cir.2005) ("district court may enter summary judgment *sua sponte* if the parties are given adequate notice that they must present all of their evidence"); *Artistic Entertainment, Inc. v. City of Warner Robins,* 331 F.3d 1196, 1201 n. 10 (11th Cir.2003) ("Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show no material dispute of fact exists...."); *Burton v. City of Belle Glade,* 178 F.3d 1175, 1204 (11th Cir.1999) (similar). Thus, entry of summary judgment on the Court's own motion is appropriate if (1) the legal issue has been fully developed, and (2) the evidentiary record is complete. See *Artistic,* 331 F.3d at 1202. This is just such a case. The Court finds that the legal issue of the viability of Counts I through IV has been fully developed, that the evidentiary record is complete, and that the Hoseas have had a full opportunity to present all of their evidence and legal arguments in support of the existence of a conspiracy between the Sheriff's Defendants and the private defendants, and in support of the alleged invidious discriminatory intent animating defendants' deprivation of plaintiffs' rights.[FN87] Accordingly, this is one of the rare cases where *sua sponte* summary judgment is authorized and appropriate.

FN87. In this regard, the Court emphasizes that Counts I through IV against Ledkins, Ms. Ledkins and McDonald are legally and factually indistinguishable from Counts I through IV against Rogers and Fuller. Both require a showing of a conspiracy between the private defendants and Sheriff's Defendants to deprive the Hoseas of their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

constitutional rights. Both require a showing of discriminatory intent in carrying out the deprivation. Rogers and Fuller, who are identically situated to the other private defendants for purposes of Counts I through IV, specifically sought summary judgment on grounds of no conspiracy and no race discrimination, thereby placing plaintiffs on notice of their need to shoot all the arrows in their quiver on those points. In presenting evidence and argument on Counts I through IV with respect to Rogers and Fuller, the Hoseas necessarily presented their evidence and argument on Counts I through IV with respect to Ledkins, Ms. Ledkins and McDonald.

**\*34** In responding to the other defendants' Rule 56 motions, plaintiffs have been unable to show an understanding or willful participation by the private defendants and Sheriff's Defendants in a scheme to relieve plaintiffs of their personal property in an unconstitutional manner. That shortcoming defeats the § 1983 and § 1985(3) claims against Ledkins, Ms. Ledkins and McDonald. Additionally, plaintiffs have been unable to offer evidence that the deprivation of Hoseas' property was motivated by invidious class-based discrimination, as necessary to sustain plaintiffs' § 1982 and § 1985(3) claims against Ledkins, Ms. Ledkins and McDonald. In light of these demonstrated inadequacies in Counts I through IV, and pursuant to the Court's conclusion that plaintiffs have had adequate notice and fair opportunity to present all arguments and evidence deemed appropriate in support of Counts I through IV, the Court *sua sponte* enters summary judgment in favor of defendants Ledkins, Ms. Ledkins and McDonald as to the federal causes of action set forth at Counts I through IV.[FN88]

FN88. In so doing, the Court expresses no opinion as to the viability of plaintiffs' state-law claims against these defendants for conversion and theft of the Hoseas' personal property. Certainly, plaintiffs have proffered substantial evidence that Ledkins and McDonald were present and heavily involved in the removal and destruction of plaintiffs' belongings on September 24, 2002. That evidence would seem to create genuine issues of material fact as to those two defendants' potential liability on Counts V and VI. Because Ms. Ledkins never asked for summary judgment on the state law

claims, plaintiffs had no occasion to present any evidence they might have to support her involvement in the conversion and theft. Without giving plaintiffs advance notice that this claim was at issue for Rule 56 purposes, it would be inappropriate to enter summary judgment in Ms. Ledkins' favor on this basis.

*B. Jurisdictional Status of Litigation.*

In light of this development, all federal causes of action have been dismissed as to all defendants. The only remaining claims are the Alabama claims of conversion and theft, against defendants Rogers, Fuller, Ledkins, Ms. Ledkins and McDonald. The dismissal of all federal claims has important jurisdictional implications in this case, where subject matter jurisdiction was predicated exclusively on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

Once all triable claims within a federal court's original jurisdiction have been dismissed, the decision of whether to continue to exercise supplemental jurisdiction over the state law claims rests in the Court's discretion. *See* 28 U.S.C. § 1367(c)(2); *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1185 (11th Cir.2003) (in deciding how to exercise § 1367(c) discretion, court should consider principles of economy, convenience, fairness, and comity); *Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1569 (11th Cir.1994) (similar).[FN89] The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."*Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1088-89 (11th Cir.2004).

FN89. Judges in this District have routinely declined supplemental jurisdiction in such circumstances. *See, e.g., Powers v. CSX Transportation, Inc.,* 188 F.Supp.2d 857, 869 (S.D.Ala.2002) (Vollmer, J.) (remanding supplemental state law claims after dismissing federal claims on summary judgment); *Bowens v. City of Atmore,* 171 F.Supp.2d 1244, 1260 (S.D.Ala.2001) (Butler, J.) ("Because all federal claims have been dismissed prior to trial, because state court should be the final arbiter of plaintiffs' tort claims, and because no countervailing considerations outweigh these circumstances, the plaintiffs' state law

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)
**(Cite as: Not Reported in F.Supp.2d)**

claims ... will be dismissed without prejudice."); *Kvalheim v. Checkfree Corp.,*2000 U.S. Dist. LEXIS 1959, *13 (S.D.Ala. Feb. 17, 2000) (Vollmer, J.) (after granting summary judgment on federal FCRA claim, declining to exercise supplemental jurisdiction to resolve state law invasion of privacy claim); *LeFlore v. Sea Breeze Nursing Home and Rehabilitation Center, Inc.,*2000 U.S. Dist. LEXIS 8872, *18-19 (S.D. Ala. Jan. 21, 2000) (Howard, J.) (similar); *White v. QMS, Inc.,*1999 U.S. Dist. LEXIS 20503, *13 (S.D.Ala. Dec. 1, 1999) (Howard, J.) (similar); *Brewer v. City of Daphne,* 111 F.Supp.2d 1299, 1320 (S.D.Ala.1999) (Steele, M.J.) (upon dismissing federal claim on summary judgment, "[t]he Court declines supplemental jurisdiction of the remaining claim for wrongful death under state law in light of the insubstantial nature of the federal claims"); *Banks v. Debellis,*1998 U.S. Dist. LEXIS 9632, *8-9 (S.D.Ala. Apr. 22, 1998) (Cassady, M.J.) (recommending dismissal of supplemental state law claims based on considerations of judicial economy, convenience, fairness and comity); *see also Reynolds v. Golden Corral Corp.,* 106 F.Supp.2d 1243, 1255 (M.D.Ala.1999) (declining supplemental jurisdiction over state law claims after granting summary judgment on federal claims).

This approach is buttressed by the bedrock notion that state courts should generally be the final arbiters of state law claims, particularly when federal claims are dismissed before trial. Indeed, the Supreme Court has declared that:

"Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."

**\*35** *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Mergens v. Dreyfoss,* 166 F.3d 1114, 1119 (11th Cir.1999) (noting that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims") (citation omitted); *Baggett v. First National Bank of Gainesville,* 117 F.3d 1342, 1353 (11th

Cir.1997) (indicating that state courts should be final arbiters of state law and that when federal law claims are dismissed prior to trial, remaining state law claims are best resolved by state courts under considerations of judicial economy, fairness, convenience and comity); *Eubanks v. Gerwen,* 40 F.3d 1157, 1162 (11th Cir.1994) (suggesting that because federal claims were dismissed at summary judgment stage, district court should consider whether interests of comity warrant dismissing state law claim without prejudice).

The only remaining claims for trial are state law claims for conversion and theft. To resolve those claims, the Court would need to apply and interpret Alabama law concerning, *inter alia,* private property rights in order to ascertain whether the Hoseas had any right of ownership in the personal property at issue in this case as of September 24, 2002. The Court would need to consider such potentially esoteric questions of Alabama law as whether Judge Drinkard's Order of November 27, 2001, the Hoseas' ensuing refusal to leave, and their failure to make any attempt to retrieve their personal items for a period of eight months following their eviction had any impact on plaintiffs' property rights under state law. Considerations of comity, fairness, and judicial economy strongly militate in favor of having Alabama courts, rather than federal courts, apply Alabama state law to resolve these issues. Those considerations are not outweighed by any incremental convenience benefit to the parties in continuing to litigate in this forum. Accordingly, because the federal claims for trial have been dismissed, and after careful consideration of the factors identified in *Shotz,* the Court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses those claims without prejudice. *See Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.").[FN90]

FN90. This case originated in federal court; therefore, the Court will dismiss the state law claims, rather than remanding them to state court. *Cf. Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1123 (11th Cir.2005) ("Because this

case was originally filed in state court and removed to federal court pursuant to 28 U.S.C. § 1441, if the district court declines to continue to exercise supplemental jurisdiction, Cook's remaining claim should be remanded to state court."). This dismissal in no way prejudices plaintiffs, inasmuch as their claims in Counts V and VI are subject to a six-year limitations period. *See* Ala.Code § 6-2-34(3) (assigning a six-year limitations period to actions for detention or conversion of personal property).

### VIII. Conclusion.

For all of the foregoing reasons, it is ordered as follows:

1. Defendants' Joint Motion to Strike (doc. 110) is granted in part and denied in part. The Joint Motion is granted as to the Declaration of Bertha Figgers (doc. 104, Exh. B), and that Declaration is stricken pursuant to Rule 37(c)(1), Fed.R.Civ.P. The Joint Motion is denied as to the declarations of Phil Ford, Jimmy Figgers and Clyde Grayson.

**\*36** 2. Defendants' Joint Motion to Strike (doc. 112) Plaintiff's Exhibit C (photographs) is denied.

3. Defendants' Joint Motion to Strike (doc. 113) Plaintiff's Exhibit F (newspaper article) is denied.

4. Defendants' fourth Joint Motion to Strike (doc. 114) is granted in part and denied in part. The Motion is granted as to the following sections of the Declaration of Mollie Hosea: (a) the second, third and fifth sentences of Paragraph 2; (b) the reference in the second Paragraph 4 to plaintiffs being arrested for trying to stop the burning and taking of their property; and (c) the references to 200 ducks and 30 donkeys in Paragraph 5. Those portions of plaintiffs' Exhibit P (doc. 105) are stricken pursuant to the "sham affidavit" rule. In all other respects, the Joint Motion is denied.

5. The Motion for Summary Judgment filed by defendants Langley, Reese, Jones and Lawrence (doc. 81) is granted, and Counts I through IV of the Complaint are dismissed with prejudice as to those defendants.

6. The Motion for Summary Judgment filed by defendants Rogers and Fuller (doc. 92) is granted in part and denied in part. The Motion is granted as to Counts I through IV of the Complaint, and those claims are dismissed with prejudice as to Rogers and Fuller. The Motion is denied as to Counts V and VI.

7. The Court *sua sponte* enters summary judgment in favor of defendants Ledkins, Ms. Ledkins and McDonald as to Counts I through IV of the Complaint, and those claims are dismissed with

prejudice as to those defendants.

8. All remaining claims in this action are state law claims (Counts V and VI) as to non-diverse defendants Rogers, Fuller, Ledkins, Ms. Ledkins and McDonald. The Court declines to exercise supplemental jurisdiction over those causes of action and dismisses them without prejudice to enable plaintiffs to refile those claims in Alabama state court.

9. Because these rulings dispose of all claims against all defendants in this matter, the Clerk's Office is directed to close this file. A separate judgment will enter.

DONE and ORDERED this 7th day of February, 2006.

S.D.Ala.,2006.
Hosea v. Langley
Not Reported in F.Supp.2d, 2006 WL 314454 (S.D.Ala.)

END OF DOCUMENT

**LexisNexis®** *Total Research System*

Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator

Dossier | History | 🖨

Service: **Get by LEXSEE®**
Citation: **2006 us dist lexis 80805**

*2006 U.S. Dist. LEXIS 80805, \**

⤓ View Available Briefs and Other Documents Related to this Case

SHARON DIXON, Plaintiff, v. RAVE MOTION PICTURES, INC., et al., Defendants.

CIVIL ACTION NO. 2:05cv326-SRW WO

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

2006 U.S. Dist. LEXIS 80805

November 3, 2006, Decided

**PRIOR HISTORY:** Dixon v. Rave Motion Pictures, Inc., 2006 U.S. Dist. LEXIS 77803 (M.D. Ala., Oct. 24, 2006)

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee filed an action against defendants, the former employer and others. Before the trial, the employer filed a motion to exclude witnesses.

**OVERVIEW:** The court found that the motion was moot as to nine witnesses because the employee's counsel represented that he did not intend to call those witnesses at trial. The motion was denied as to one witness whose name was not placed on a list of 12 witnesses. The employee's initial disclosure indicated that the employee intended to call any other current and/or former supervisor or co-employee of two of the named defendants and the excluded individual fell within that category. The excluded individual worked for the employer, and omission of his name from the list was harmless and did not warrant the sanction of exclusion under Fed. R. Civ. P. 37(c)(1). The court granted the motion to exclude in reference to a second individual who was mentioned briefly in the employee's deposition. The second individual was not listed in the employee's disclosures or answers to interrogatories, and the substance of the second individual's testimony was not known to defendants. That individual was excluded from testifying.

**OUTCOME:** The court found that the motion to exclude testimony from a number of witnesses was moot. The court denied the motion to exclude the testimony of one of defendants' employees. The court granted the motion to exclude testimony from a second individual.

**CORE TERMS:** disclosure, hotline, deposition, former employee, proposed testimony, telephone number, interrogatories, supervisor, omission, harmless

### ⤲Available Briefs and Other Documents Related to this Case:

U.S. District Court Motion(s)

**COUNSEL: [\*1]** For Sharon Dixon, Plaintiff: Jimmy Douglas Jacobs ⌄✓ , Law Office of Jimmy Jacobs, Montgomery, AL.

For Rave Motion Pictures, Inc., Rave Motion Pictures Montgomery, LLC, Marc R. Bryant, Defendants:

Stephen E. Whitehead ✓, Lloyd, Gray & Whitehead, P.C., Birmingham, AL.

**JUDGES:** Susan Russ Walker, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Susan Russ Walker

**OPINION**

## ORDER ON MOTION

Upon consideration of defendant's motion to exclude witnesses (Doc. # 66), and for good cause, it is

ORDERED that the motion be and hereby is GRANTED in part and DENIED in part as follows:

1. The motion is DENIED as moot as to James, L. Chillous, O. Chillous, Dorch, Douglas, Stovall, Clark, McQueen, Russell, Tillman, and Sackie based on plaintiff's counsel's representation that he does not intend to call these witnesses to testify at trial.

2. The motion is DENIED as to Kenya Harris. Harris is not clearly a subject of the motion to exclude, as his name is not on the list of 12 witnesses whom defendants contend should be precluded from testifying at trial. *See* Motion at 3, 6, 9 (list of 12 witnesses for whom defendants seek exclusion **[*2]** of testimony); 5 (requesting exclusion of the "previously undisclosed twelve (12) witnesses"). [1] In addition, plaintiff's initial disclosure listed as potential witnesses:

> [a]ny other current and/or former supervisor or co-employee of defendant Marc Bryant; and/or, any current or former employee of defendants Rave Motion Pictures who has information related to plaintiff's claims or defendant's defenses. These individuals, whose names or addresses are available to the defendants, have knowledge of the work performance of the plaintiff, her peers and supervisors, and the wrongful treatment complained of by the plaintiff.

> It is undisputed that Harris is both a former and current employee of defendant Rave Motion Pictures. The details of Harris' possible testimony apparently became known to plaintiff when a copy of a hotline complaint from Harris [2] was produced to plaintiff by the defendants on May 25, 2006, well after plaintiff's initial disclosures and responses to interrogatories were served on October 31, 2005 and November 11, 2005, respectively. *See* plaintiff's response to motion to strike (Doc. # 62 at 2). Although plaintiff arguably should have supplemented her **[*3]** disclosures with Harris' name thereafter, nothing in the record suggests that her failure to do so was other than an honest oversight, as opposed to an overt attempt to deceive the defendants, who obviously were already aware of Harris and his complaint. *See Stallworth v. E-Z Serve Convenience Stores,* 199 F.R.D. 366, 369 (M.D. Ala. 2001); *Burney v. Rheem Mfg. Co., Inc.,* 196 F.R.D. 659, 692 (M.D. Ala. 2000). Indeed, despite thorough knowledge of Harris' likely testimony from both his hotline complaint and his summary judgment affidavit, defendants admitted during the pretrial conference that they have never even sought to interview Harris, although he remains a Rave employee to this day. Accordingly, the court cannot conclude that defendants were deprived, by plaintiff's failure to name Harris specifically in a supplement to its disclosures, of a meaningful opportunity to investigate Harris' allegations. [3] Plaintiff's omission of Harris' name is harmless, and it should not give rise to the sanction of exclusion under Fed.R. Civ. P. 37(c)(1). [4]

## FOOTNOTES

1 Harris is mentioned in this motion, but defendants' references to him (pages 3, 6, and 18 and 7) do not request any relief relating to his proposed testimony. At most, on page 6, n. 18, defendants indicate that "Ms. Dixon also failed to disclose the identity of proposes [sic] witnesses Tammy Thomas and Kenya Harris," and, on page 7, defendants allege without further argument that "Ms. Dixon's last minute disclosure of Ms. [sic] Harris's and Ms. Thomas's identities has harmed the Defendants." **[\*4]**

2 The hotline complaint, which is attached as Exhibit B to plaintiff's response to the motion to strike, does not identify the complainant by name. However, the complaint contains ample identifying information for all parties in this case to know, or to learn quickly with minimal investigation, the identity of the caller.

3 The court notes that the hotline complaint itself proposes "Follow-up Contact" on September 20, 2004.

4 However, the court has given defendants leave to use documents from Harris' personnel file to impeach Harris at trial, whether or not those were previously disclosed to plaintiff.

3. The motion is GRANTED as to DeWayne Jackson. Jackson was mentioned briefly in plaintiff's deposition (page 186), but he is not a current or former employee of defendants, and his name was not listed in plaintiff's disclosures or answers to interrogatories. The substance of Jackson's proposed testimony is not known to defendants, other than the fact that plaintiff spoke to Jackson, as her pastor, about her employment situation. Jackson's address and telephone number were not **[\*5]** timely provided to the defendant. 5 Plaintiff has not shown sufficient knowledge by the defendants of Jackson's whereabouts or his testimony to establish that her omission was harmless and to preclude exclusion of this witness' testimony under Fed.R. Civ. P. 37(c)(1). Accordingly, Jackson may not be called to testify at trial.

## FOOTNOTES

5 The address of Jackson's church was mentioned in plaintiff's deposition, but not his private address nor any telephone number. Jackson was not discussed as a possible witness in the deposition.

DONE, this 3rd day of November, 2006.

/s/ Susan Russ Walker

UNITED STATES MAGISTRATE JUDGE

Service: **Get by LEXSEE®**
Citation: **2006 us dist lexis 80805**
View: Full
Date/Time: Tuesday, November 6, 2007 - 12:19 PM EST

\* Signal Legend:
● - Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
I - Citation information available
\* Click on any *Shepard's* signal to *Shepardize*® that case.

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 LexisNexis®

About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

King v. ADT Sec. Services
S.D.Ala.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Alabama,Southern
Division.
Mytasha KING, Plaintiff,
v.
ADT SECURITY SERVICES, Defendant.
**Civil No. 06-0519-WS-C.**

Sept. 17, 2007.

Ronnie L. Williams, Mobile, AL, for Plaintiff.
John Richard Carrigan, Christopher A. Mixon,
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
Birmingham, AL, for Defendant.

WILLIAM H. STEELE, United States District
Judge.
**\*1** This matter comes before the Court on Defend-
ant's Motion for Summary Judgment (doc. 19) and
its Motion to Strike Portions of the Declaration of
Mytasha King (doc. 32). Both Motions are ripe for
disposition.[FN1]

> FN1. As an initial matter, defendant's sum-
> mary judgment submissions are not in
> compliance with Local Rule 5.5(c), which
> provides as follows: "If discovery materi-
> als are germane to any motion or response,
> only the relevant portions of the material
> shall be filed with the motion or
> response." *Id.* Rather than submitting just
> the relevant portions, ADT has submitted
> all or substantially all of the plaintiff's
> 196-page deposition transcript, Mary Anne
> Back's 91-page deposition transcript,
> Brandy Lee's 50-page deposition tran-
> script, and Becky Kickliter's 148-page de-
> position transcript. In addition to violating
> Local Rule 5.5(c), this practice clogs the
> court file with superfluous materials and
> forces the Court to wade through immateri-
> al documents to locate the specific pages
> on which movant relies. Further, plaintiff's

> submissions run afoul of Paragraph 13(c)
> of the Rule 16(b) Scheduling Order (doc.
> 16), which provides that if a party's exhib-
> its in support of or in opposition to a mo-
> tion exceed 50 pages in the aggregate,
> courtesy hard copies must be delivered to
> chambers.

**I. Nature and Scope of Action.**

On September 1, 2006, plaintiff Mytasha King
("King"), who was at that time proceeding *pro se,*
filed a perfunctory six-paragraph Complaint (doc.
1) against defendant ADT Security Services
("ADT").[FN2] The first paragraph read, in its en-
tirety, "Title VII of 1981 in retaliation."The second
and third paragraphs merely recited the parties' re-
spective names and addresses. The fourth paragraph
gets to the meat of King's claims, alleging that,
while working for ADT as a sales representative,
she had applied for the position of human resource
coordinator (the "HR job") in December 2005, that
she met the qualifications for that position, that she
was not interviewed for the job, and that a white fe-
male was selected in lieu of King. That paragraph
further recites King's belief that she was
"discriminated against because of [her] race, black,
in violation with [ *sic* ] Title VII of the Civil Rights
Act of 1964, as amended."(Doc. 1, ¶ 4.) As further
grounds for this claim, King alleges that all six em-
ployees on ADT's administrative team are white,
and that ADT provided a pretextual reason for its
failure to hire King for the HR job. No other incid-
ents or allegations of discrimination are set forth in
paragraph 4. The fifth paragraph states only that
"ADT Security Services issued an unfavorable de-
cision on February 2, 2006."( *Id.,* ¶ 5.) The sixth and
final paragraph is an *ad damnum* clause claiming
various forms of compensatory and punitive relief.

> FN2. Although the Complaint was nomin-
> ally filed *pro se,* King testified in her de-
> position that she received assistance from
> an attorney (not her present counsel of re-
> cord) in preparing the pleading. Indeed,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff's testimony is that in drafting her Complaint, she "just typed exactly what [the unnamed attorney] told [her] to put down."(King Dep., at 131.) Clearly, then, the Complaint was prepared with the assistance of an attorney.

On its face, then, the Complaint consists of a single, straightforward Title VII claim of race discrimination against ADT for failure to hire King to the position of human resource coordinator in February 2006.

Two months after the Complaint was filed, plaintiff's counsel filed a Notice of Appearance (doc. 12) contemporaneously with the parties' Report of Rule 26(f) Planning Meeting (doc. 13). In the Rule 26(f) Report, plaintiff's counsel expanded on the Complaint in a narrative statement alleging that King's claims were for race discrimination and retaliation under both Title VII and 42 U.S.C. § 1981; and that she had been subjected to race discrimination when she was removed from her inside sales position in favor of a white female. (Doc. 13, at 12.) Plaintiff's counsel acknowledged that these allegations exceeded the boundaries of the Complaint by including in the Rule 26(f) Report the following footnote: "Plaintiff's initial complaint was filed *Pro Se.*Now having obtained counsel, Plaintiff intends to seek leave to amend her complaint within the period allowed by this joint Report of Parties."(*Id.* at 1-2 n. 1.) However, plaintiff never sought leave of court to amend her complaint and never filed any proposed amendment.[FN3]As a result, the operative pleading in this action is the Complaint filed by King without counsel of record at the outset of this litigation. The scope of her claims in this litigation will therefore be evaluated by reference to that initial Complaint, notwithstanding plaintiff's unfulfilled intention of amending the pleading at some future time. Having elected not to amend the Complaint to expand her claims and theories of relief, plaintiff is constrained to conduct this litigation in accordance with that pleading.

    FN3. This is so despite the fact that the Rule 16(b) Scheduling Order (doc. 16) set

a cutoff date for motions for leave to amend pleadings of February 1, 2007, fully two and a half months after the filing of the Rule 26(f) Report. Plaintiff neither complied with the February 1 deadline nor requested an enlargement of same to provide her with additional time to submit a proposed amended pleading.

**II. Motion to Strike.**

**\*2** At the close of summary judgment briefing, ADT filed a lengthy Motion to Strike (doc. 32), in which it sought to excise eight portions of the Declaration of Mytasha King (doc. 28) submitted in opposition to the Motion for Summary Judgment. Because any summary judgment evaluation necessarily hinges on the type and nature of facts in the record, and because the Motion to Strike calls into question which facts are properly before the Court, resolution of that Motion is the appropriate analytical starting point.

Defendant's objections to the King Declaration are governed by Rule 56(e), Fed.R.Civ.P., which provides that "[s]upporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence."*Id.; see also* Corwin v. Walt Disney Co., 475 F.3d 1239, 1249 (11th Cir.2007) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge.") (citation omitted). While it is not necessary that all evidence offered on summary judgment be submitted in admissible form, that evidence cannot be considered at the Rule 56 stage unless it can be reduced to admissible form at trial. *See* Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir.2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *see generally* Corwin, 475 F.3d at 1249 ("[e]vidence inadmissible at trial cannot be used to avoid summary judgment") (citation omitted); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc., 296 F.Supp.2d 1322, 1327 n. 2 (S.D . Ala.2003)* ("Documents must generally be properly authentic-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

ated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.”).“When an affidavit contains inadmissible evidence, the court may strike the inadmissible portions of the affidavit and consider the rest.”*HomeBingo Network, Inc. v. Chayevsky, 428 F.Supp.2d 1232, 1240 (S.D.Ala.2006)* (citation omitted). Armed with these general principles, the Court will consider ADT's eight-pronged attack on the King Declaration.

First, defendant objects to King's statement that “[i]t was well known amongst everyone throughout the office that Ms. Lee was not performing well ... as an outside sales rep.” (King Decl., ¶ 5.) Courts have routinely excluded such “common knowledge” averments from consideration at the Rule 56 stage. *See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2nd Cir.1997)* (rejecting plaintiff's testimony of alleged violations that were “common knowledge” for want of personal knowledge).[FN4] As such, this passage of the King Declaration will be **stricken.**

> FN4. *See also Leonard v. Dixie Well Service & Supply, Inc., 828 F.2d 291, 295 (5th Cir.1987)* (testimony that certain facts were “common knowledge” among shop employees “fails as hearsay”); *Stevens v. Mohave County, 2006 WL 3499932 (D.Ariz. Dec. 5, 2006)* (affidavit stating witness's understanding via “common knowledge” is insufficient under Rule 56(e)); *Doss v. Martinez, 2001 WL 493166, *5 (N.D.Tex. May 4, 2001)* (plaintiff's statement that co-worker's insubordination is common knowledge is inadmissible hearsay and cannot be considered on summary judgment).

Second, ADT asks the Court to strike King's statement that “all white employees who applied for the vacancy were either given an interview for the position, or provided a reason as to why they would not be considered for the position.”(King Decl., ¶ 7.) According to defendant, this allegation must be stricken because King has not provided sufficient foundation to demonstrate her personal knowledge. Defendant overstates the evidentiary threshold at the summary judgment stage. For King's statement to be considered on summary judgment, she does not have to present in painstaking detail the foundation for her personal knowledge; to the contrary, her mere assertion that the statement is based on personal knowledge suffices unless the context demonstrates otherwise. *See HomeBingo, 428 F.Supp.2d at 1238* (“when an affiant avers that his statements are based on personal knowledge, a district court is bound to accept [such] statements as true, unless the context demonstrate[s] otherwise”) (citing *Martin v. Rumsfeld, 2005 WL 1526465, *2 (11th Cir. June 29, 2005)*).[FN5] At the outset of her Declaration, King specifically represented that the statements therein were based on her personal knowledge. (King Decl., ¶ 1.) Nothing in the context of the challenged statement demonstrates that she lacks personal knowledge of whether white applicants were given interviews or told why they would not be considered. Accordingly, the Motion to Strike is **denied** as to paragraph 7.

> FN5. Were the law otherwise, no declaration or affidavit could be considered on summary judgment unless it expressly provided the factual predicate of each and every allegation set forth therein, demonstrating the affiant's personal knowledge. The resulting proliferation of voluminous, cumbersome summary judgment affidavits would multiply litigation expenses, burden courts with burgeoning evidentiary submissions, and transform the summary judgment proceeding into a gauntlet of evidentiary mini-trials, all in derogation of the purposes of Rule 56(e), Fed.R.Civ.P.

**\*3** Third, ADT invokes the “sham affidavit” rule in seeking to strike the reference in paragraph 8 of the King Declaration to plaintiff being moved into an outside sales position in October 2005. According to defendant, this statement contradicts King's prior sworn testimony that she was moved into outside sales in August 2005, not October. “Under the law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."*Mc-Cormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n. 7 (11th Cir.2003). The problem with defendant's reliance on that rule here is that there is no obvious discrepancy between King's Declaration and her deposition testimony on this point. During her deposition, King testified that she switched to outside sales "in probably August, maybe, of 05."(King Dep., at 69.) When asked again about the timing, she said that she "believed" it occurred at "about that time." (*Id* . at 144, 177.)There is no inherent inconsistency in King testifying that she was transferred in "probably August, maybe" and "about that time," then to clarify her response in her Declaration by averring that these events occurred in October 2005. In that regard, the Eleventh Circuit has recently cautioned that the sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case."*Allen v. Board of Public Educ. for Bibb County*, --- F.3d ----, *8, 2007 WL 2332506 (11th Cir. Aug. 17, 2007) (citation and internal quotations omitted). For that reason, and to avoid depriving the trier of fact of the opportunity to discern which witnesses are telling the truth and when, this Circuit "require [s] the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit."*Id.* (citation omitted). For any lesser variation in testimony, the proper approach is to test that inconsistency through cross-examination at trial and allow the jury to weigh it in determining the witness's credibility. There being nothing more than a *possible* inconsistency, and certainly much less than an *inherent* inconsistency, between paragraph 8 of the King Declaration and her halting, uncertain deposition testimony on this point, the sham affidavit rule has no application, and the Motion to Strike is **denied** as to this passage.[FN6]

FN6.*See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir.1984) (explaining that a nonmovant may create a genuine issue of material fact by submitting affidavit clarify-

ing testimony given in his deposition); *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir.2002) (observing that a nonmovant "may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits"); *Messick v. Horizon Industries Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995) (stating that, even under the "sham affidavit" doctrine, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony").

Defendant's fourth challenge to King's Declaration points to paragraph 14, in which King asserted that the announced qualifications of the HR job were made more rigorous after she filed her EEOC Charge. Defendant's objection is that plaintiff has not shown a sufficient foundation to establish personal knowledge as to those announced qualifications at different points in time. As noted *supra*, however, an affiant's statement that her averments are based on personal knowledge must be accepted for summary judgment purposes unless the context demonstrates otherwise. Nothing in the context of King's Declaration demonstrates that she could not have had personal knowledge of what qualifications ADT had announced for the HR job prior to or after filing her EEOC Charge.[FN7]Therefore, defendant's objection is **overruled**.

FN7. The crux of ADT's argument here appears to be that King could not have known what the qualifications were for the position before filing her EEOC Charge in March 2006 because she did not know about the January 2006 posting. But plaintiff did testify in her deposition that when she applied for that position in December 2005 the qualifications listed on the ADT website were less stringent than those on the job posting documentation that defense counsel showed her at her deposition. (King Dep., at 75-76.) Those facts provide ample foundation for the statement in King's Declaration and support a reasonable inference that the job de-

Slip Copy
Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

scription was changed after the EEOC Charge was filed.

**\*4** Fifth, defendant interposes another personal knowledge objection to King's statements in paragraphs 16 and 17 of her Declaration that the January 2006 vacancy for the HR job was never posted. This objection is meritless, inasmuch as the foundation for this averment is clearly presented on the face of the Declaration. Specifically, plaintiff states, "When I heard that the initial selectee had left the company, I kept checking the company's website so that I could submit another application," but that she never saw reference to the vacancy at the designated online location for job postings. (King Decl., ¶ 16.) Whatever defects this averment may have, it certainly does not fail at the Rule 56 stage for want of personal knowledge, which is the only objection interposed here.FN8 Likewise, defendant's assertion that King could not have personal knowledge that Lee had not applied for the initial human resource coordinator vacancy, or that she was the only applicant for the second vacancy, ignores the fact that King has specifically alleged that she has personal knowledge, and nothing in the context of these statements demonstrates otherwise. The Motion to Strike is **denied** as to paragraphs 16 and 17 of the King Declaration.FN9

> FN8. ADT suggests that King could not have personal knowledge of whether the vacancy was posted unless she worked in ADT's human resources department and had direct responsibility for posting job announcements. This argument borders on absurdity. Clearly, one can gain personal knowledge of whether a job posting was or was not made by repeatedly checking the forum for such a posting, irrespective of whether that person is vested with responsibility for making the posting herself. Moreover, as defendant has not propounded a "sham affidavit" objection to this portion of the Declaration, the deposition excerpt reproduced in the Motion to Strike is unavailing.

> FN9. Nor is defendant's cause advanced by its citation to authorities for the proposition that bald conclusions, opinion and hearsay without specific facts are not admissible on summary judgment. Had the King Declaration merely stated, "ADT refused to hire me for the HR job because I am black," that line of authorities would be applicable. But defendant attempts to use these principles to strike down averments of specific facts (*e.g.,* "the new vacancy was never advertised or posted," "Ms. Lee did not even apply for the initial vacancy"). There is nothing conclusory about these statements; rather, they are just the kind of specific, particularized facts that a plaintiff is expected to present in opposition to a motion for summary judgment. As such, the authorities cited on pages 7 and 8 of the Motion to Strike are unhelpful.

Sixth, ADT objects that King's characterization in paragraph 18 of her Declaration of her communication with Becky Kickliter about the human resource coordinator vacancy amounts to mere "self-serving speculation that contradicts her deposition testimony ." (Motion to Strike, at 8.) With respect to the personal knowledge requirement, King has properly alleged personal knowledge and there are myriad ways that she could have personal knowledge that Kickliter was aware of her previous application for the HR job.FN10 Again, the Court declines defendant's invitation to impose onerous foundation requirements on a summary judgment declaration where the declarant has adequately alleged personal knowledge and nothing therein is to the contrary. Nor is there any inherent inconsistency between King's statement in her Declaration that she had applied for the HR job previously and her deposition testimony that she had not submitted a signed job bid form. Indeed, King's deposition testimony and Declaration render it absolutely clear that she believed her application to have been complete without regard to the job bid form. And finally, ADT misconstrues the last sentence of paragraph 18 (which reads "Kickliter told me that the position had been filled already, despite not being posted a

second time") as an averment that Kickliter in-
formed King that the position had not been posted a
second time. Although the text is somewhat am-
biguously phrased, by far the most reasonable con-
struction is that King is stating (a) that Kickliter
told her the position had been filled; and (b) King's
observation that the position had been filled despite
not being posted the second time. Construed in that
eminently reasonable manner, there is no inconsist-
ency that would require the striking of the last sen-
tence of paragraph 18. Once again, defendant's ob-
jections are **overruled** .

> FN10. In fact, King goes on in her Declaration
> to reveal that she had had several
> conversations with Kickliter concerning
> that position. (King Decl., ¶ 19.) Those
> conversations would represent an obvious
> source of personal knowledge for King that
> Kickliter was aware of her application.

**\*5** ADT's seventh objection to the King Declaration
is that paragraph 19 "is self-serving speculation that
contradicts her deposition testimony, and contains
inadmissible hearsay personal know-
ledge."(Motion to Strike, at 9.) In paragraph 19,
King states that Kickliter and Mary Anne Back
"were aware of [her] interest in the position be-
cause of [her] previous application and several con-
versations [she] had with them regarding the posi-
tion."(King Decl., ¶ 19.) In her deposition, King
unequivocally testified that she had not informed
either Kickliter or Back that she had applied for the
HR job. (King Dep., at 84-85.) The problem,
however, is that defense counsel never clearly
asked whether, and plaintiff never clearly stated
that, she had never talked with Back or Kickliter
about her interest in working as a human resource
coordinator at any time. At most, plaintiff's depos-
ition testimony reflects that she never told Kickliter
or Back that she had actually applied. It is of course
possible to have a conversation with someone re-
garding a position (as alleged in the Declaration)
without telling that person that one has applied for
that position (which the deposition transcript con-
firms that King did not do). Because the allegedly
conflicting portions of the deposition and Declara-

tion can be reconciled, this testimony falls short of
the sort of inherent inconsistency required to strike
the Declaration on a "sham affidavit" theory. Nor is
it availing for defendant to object to paragraph 19's
recitation of the events of a lunch meeting among
Back, Kickliter and Amanda Phillips. While that
statement may be hearsay (inasmuch as King was
not present at the meeting), there is no blanket pro-
hibition on hearsay at the summary judgment stage
where, as here, it appears that such testimony can
be reduced to admissible form at trial (presumably
by plaintiff calling Kickliter to testify to substan-
tially the same facts she testified to on pages 72
through 78 of her deposition concerning the lunch
meeting, which are summarized in paragraph 19 of
the King Declaration). Defendant's objections to
paragraph 19 are **overruled.**

Eighth and finally, ADT interposes objections to
paragraph 20 of the King Declaration as lacking
foundation concerning plaintiff's personal know-
ledge and offering hearsay regarding what Back
may have said. To the extent that defendant reiter-
ates its foundation argument, the Court rejects it for
the same reasons that it has rejected analogous ob-
jections directed at other portions of the Declara-
tion. To the extent that defendant objects to hearsay
regarding what Back may have told King, all indic-
ations are that plaintiff can reduce that hearsay to
admissible form at trial by calling Back as a wit-
ness. Besides, it appears that Back's statements to
plaintiff are not hearsay pursuant to Rule
801(d)(2)(D), Fed.R.Evid. The Motion to Strike is
denied as to this paragraph.

### III. Background Facts.FN11

> FN11. The Court is mindful of its obliga-
> tion under Rule 56 to construe the record,
> including all evidence and factual infer-
> ences, in the light most favorable to the
> nonmoving party. *See Skop v. City of At-
> lanta, GA, 485 F.3d 1130, 1136 (11th
> Cir.2007).* Thus, plaintiff's evidence is
> taken as true and all justifiable inferences
> are drawn in her favor.

Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

### A. King's Employment at ADT.

**\*6** Construed in the light most favorable to
plaintiff, the record facts are these: King began
working for ADT's office in Mobile, Alabama as a
residential resale representative on February 17,
2004. (King Decl., ¶ 1.) [FN12] In this capacity, her
job functions entailed contacting prospective cus-
tomers who already had security equipment in their
homes (because, for example, they were former
ADT customers or had moved into a house with
pre-installed security equipment) to purchase secur-
ity services from ADT. (King Dep., at 39-40; Back
Dep., at 13.) ADT's residential resale staff at its
Mobile office included two "inside" resale repres-
entatives (one of whom was King) and four or five
"outside" resale representatives. (King Dep., at
55-56.) The difference is that "inside" staff worked
in the office and made sales calls by telephone,
while "outside" staff were field representatives who
went door to door on sales calls. (*Id.* at 41, 56; King
Decl., ¶ 2.) In this arrangement, King and the other
inside resale representative had an assigned office,
desks and computers, while the outside resale rep-
resentatives used vacant cubicles in the "bullpen"
area of the office on an as-needed basis. (King
Dep., at 64-66.)

> FN12. At present, King remains employed
> by ADT at its Mobile, Alabama office as a
> residential resale representative.
> (Courseault Decl., ¶ 3.)

King's direct supervisor, Mary Anne Back, testified
that King did a "very good job" in inside sales.
(Back Dep., at 48.) [FN13] It is undisputed that King
has "a very good sales record" at ADT. (*Id.* at
86.) Moreover, King voluntarily took on additional
responsibilities training new sales representatives,
and Back told her that she was doing a good job.
(King Decl., ¶ 3; King Dep., at 68-69.)

> FN13. Rather than providing copies of of-
> ficial deposition transcripts in her sum-
> mary judgment briefing, plaintiff filed
> what appear to be unformatted text file
> versions of the transcripts. Although the

Court will consider these documents in the
manner that they were provided, plaintiff is
reminded that discovery materials should
be filed in their official, certified form.
Uncertified, draft transcripts should not be
filed in any proceeding in this District
Court, and are subject to being stricken.

### B. The Transfer of King to Outside Sales.

In October 2005, Back announced that King was
being moved from inside sales to outside sales in
order to allow Brandy Lee, a white female who was
struggling in outside sales, to move to inside sales
in an effort to improve Lee's performance. (King
Decl., ¶ 8.) King had never expressed interest in
switching to outside sales and had never had prior
conversations with Back on that topic. (*Id.*) [FN14] In
connection with her involuntary transfer to outside
sales, King experienced no reduction in compensa-
tion, but she was ousted from her office. (King
Dep., at 69; Back Dep., at 72 .) ADT's stated reason
for not allowing King to retain her office, desk and
telephone was that those accoutrements were fur-
nished only to inside sales representatives, and that
because of their duties were in the field, no outside
sales representatives were given assigned offices,
desks and telephones. (Back Dep., at 72.)

> FN14. In its summary judgment briefs,
> ADT argues that Back made this switch
> because King approached Back and
> "requested to go into telmar rotation going
> to outside sales."(Back Dep., at 45, 73.)
> For Rule 56 purposes, however, the evid-
> ence is taken in the light most favorable to
> the nonmovant. For that reason, the Court
> cannot adopt defendant's position that King
> was transferred at her request, when
> plaintiff's evidence is that King never
> made such a request. The conflicting evid-
> ence is construed in plaintiff's favor.

Notwithstanding this explanation, King complained
about the move the very next morning by calling
Audrey Courseault, ADT's Human Resources Man-
ager for the Southeast Region. (King Dep., at 146;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Courseault Decl., ¶ 2.) King's complaint to Courseault was that Back was requiring her to move out of her office. (King Decl., ¶ 11.) Plaintiff offers no evidence that she told Courseault that she believed Back's conduct was racially motivated in any respect. Shortly after Courseault communicated the substance of the complaint to Back, Back met with King and assured her that ADT was not trying to discriminate against her but that Lee was being moved into inside sales in an attempt to help Lee improve her performance. (King Dep., at 147-48.) Back explained to King that the office, phone, computer and desk were part of the inside sales position, and that no outside representatives had such perquisites. (Back Dep., at 74.) King did not protest further, but moved to outside sales with no further ado and without ever asking to return to inside sales. (King Dep., at 148; Back Dep., at 69.) The inside sales position was eventually eliminated by the company.

### C. The December 2005 Hiring Decision.

**\*7** Also in or around October 2005, the Mobile office's human resource coordinator position became vacant when the incumbent resigned. (King Dep., at 71; King Decl., ¶¶ 6, 8.) ADT made a general announcement that it would be hiring for the position. (King Dep., at 73.) King informed Back that she was interested in applying. (King Decl., ¶ 6; Back Dep., at 61.) <u>FN15</u> Back advised King to apply online via the CareerLine feature of ADT's intranet website. (King Decl., ¶ 6; Kickliter Decl., ¶¶ 9-10.) So King logged onto the CareerLine system, located the human resource coordinator position, and completed the online form, after which she received a message that her application had been sent successfully. (King Dep., at 74-75.) ADT records reflect that King submitted her materials on December 9, 2005. (*Id.* at 78 & Exh. 7 .)

> <u>FN15.</u> King's interest in the position is perhaps surprising, given that it would have been accompanied by a substantial pay cut. The sales representative job that King held as of October 2005 was compensated on a commission-only basis; however, King has

consistently earned between $31,000 and $37,000 per year in that job. (King Dep., at 43, 66; Courseault Decl., ¶¶ 4-6 & Exh. A-C; Back Dep., at 29.) By contrast, the HR job paid a flat $12.00 hourly wage, which equates to a shade below $25,000 per year, assuming full-time work and no unpaid time off. (*Id.,* ¶ 19; Lee Dep., at 35, 39.) It thus appears highly unlikely that King has incurred any lost wages arising from her non-selection for that position.

In order to apply for a posted position within ADT, an employee must, in addition to filling out the online application, complete and submit a form called a "Job Bid Worksheet." (Courseault Decl., ¶ 13; Back Dep., at 53; Kickliter Dep., at 38-39, 42.) This "bid form" (as it is sometimes called) must be signed by the employee's current manager to confirm the employee's good standing. (Courseault Decl., ¶ 13; Back Dep., at 53; Kickliter Dep., at 38-39, 42.) <u>FN16</u> This requirement is so integral to the job application process that an employee's application is not deemed complete unless and until she has submitted a signed bid form. (Courseault Decl., ¶ 14.) The uncontroverted evidence is that, "[i]n the event that the employee does not submit the completed form, he or she is not considered an applicant for the position," even if that person has completed every other step in the application process.(*Id.*) The ADT manager who made the hiring decision for the HR vacancy in December 2005 was Becky Kickliter, who testified, "If I never received the job bid, then I wouldn't interview [a candidate].... I wouldn't know to consider that person."(Kickliter Dep., at 39-40.) Kickliter stressed that she must have a job bid form as a precondition to considering someone for a particular job.(*Id.* at 68-69.)Employees were apprised of the need to submit a bid form by a page on the ADT CareerLine site labeled "Human Resources Ground Rules," which clearly stated that "[e]mployees interested in applying for a position must fill out an *Employee Bid Form.*" (Courseault Decl., ¶ 13 & Exh. D.) <u>FN17</u>

> <u>FN16.</u> Blank bid forms are available from

the CareerLine website and can be completed online, then printed out by the employee or her manager. (Kickliter Dep., at 42-43.) As one ADT manager explains, "the person that's interested in applying prints the job bid. It's right there in front of them."(Kickliter Dep., at 43.) More precisely, there is a direct link to the job bid form on the CareerLine screen. (Back Dep., at 88.)

FN17. Those Ground Rules outline the proper procedures concerning bid forms, including (a) the requirement that the employee's immediate supervisor sign the form to ensure that the employee is in good standing and that the supervisor is aware of the request; and (b) the requirement that the bid form be submitted to the contact person listed in the posting announcement. (Id.) The Ground Rules also provide that, in order to be eligible to apply for a posted position, "[e]mployees must have at least six months in their current position."(Id.)

King never completed and submitted a bid form for the HR job. (King Dep., at 85-86; Kickliter Dep., at 33, 109, 113.) Indeed, King never approached her direct supervisor, Back, and asked her to sign such a form. (Back Dep., at 61-62.) In filling the vacancy for the HR job, Kickliter interviewed each and every internal applicant who had submitted a job bid form. (Kickliter Dep., at 46-48.) FN18 Without a signed bid form from King, however, Kickliter could not and did not interview or otherwise consider her for that position.(Id. at 125-26.)Plaintiff has proffered no evidence that ADT ever considered any internal applicant for a posted position if that applicant had failed to submit a job bid form, nor has she proffered evidence that ADT ever sought out internal applicants who failed to submit a job bid form to remind them of the necessity that they do so. FN19

FN18. Kickliter's recollection was that there were at least three internal candidates for the human resource coordinator va-

cancy in December 2005, not counting King. (Kickliter Dep., at 25-27.) Brandy Lee did not apply for that job at that time, and was not considered for the position.(Id. at 33; Back Dep., at 62.)

FN19. For her part, Back testified that it was not unusual for employees to express interest in a posted position, then fail to follow up by submitting a job bid form for their supervisor's signature. (Back Dep., at 79-80.) Accordingly, Back saw no cause for concern when King indicated she was interested in the human resource coordinator job, then failed to bring her a job bid form. (Id.) Also, when asked why she had never reminded King to bring her a bid form, Back testified, "[I]t's part of the protocol. It's clearly stated on there what the applicant has to do to apply for the job."(Id. at 85.)Plaintiff has offered no evidence that Back ever specifically reminded any other employee to submit a job bid form if they wished to apply for a posted vacancy, so there is no indication of disparate treatment in that regard.

**\*8** Kickliter ultimately selected and hired an external candidate named Valerie Saunders, a black female, to fill the human resource coordinator position. (Id. at 25, 32, 62, 107.)

### D. The January 2006 Hiring Decision.

Unfortunately, Saunders voluntarily resigned from ADT because of personal issues on or about January 17, 2006, just two weeks after she arrived. (Kickliter Dep., at 60-61, 108 & Exh. 1.) As a result, the human resource coordinator position again was vacant and needed to be filled. King learned from others in the office that "the new girl" had left, so she was aware of the vacancy. (King Dep., at 93-94.) Although the evidence on this point is hotly contested, plaintiff's evidence is that the position was never formally posted on ADT's CareerLine site and that there was only a single applicant for the vacancy. (King Decl., ¶¶ 16-17.) However,

Slip Copy                                                                                                    Page 10

Slip Copy, 2007 WL 2713212 (S.D.Ala.)

**(Cite as: Slip Copy)**

King admits that she did not contact Back or Kickliter at any time during January 2006 to profess a desire to apply for the job or to inquire as to when or if the position would be posted. (King Dep., at 84, 95-96.) Indeed, she made no inquiries of any kind about the position until February 1, 2006, when she sent a one-line email message to Kickliter (with a copy to Back) that read in its entirety, "I wanted to know if you were still hiring for the Human Resource position? What is the status on that position?"(King Dep., at 88-90 & Exh. 9.) Plaintiff conceded in her deposition that the February 1 email marked "the first time that [she] had asked either [Back] or [Kickliter] anything about the position" that came open in January 2006. (King Dep., at 90.)

By that time, it was too late. The position had already been filled. Kickliter promptly apprised King of that fact. (*Id.* at Exh. 9.) The person selected to fill the HR job in January 2006 was a current employee named Brandy Lee. (Kickliter Dep., at 63).FN20 Lee was a white female who had begun working for ADT's Mobile office as an outside sales representative in May 2005. (King Decl., ¶ 4; Lee Dep., at 12-13; Back Dep., at 52.) By all accounts, Lee did not thrive in sales, but instead "struggled along" and "had difficulties." (Back Dep., at 36; Lee Dep., at 13.) In October 2005, Back had moved Lee into inside sales in an attempt to help her succeed. (King Decl., ¶ 8; Back Dep., at 41-43.) In that capacity, Lee had continued to perform "not very well." (Back Dep ., at 58-59.) Despite this history, and in contrast to King's silence, Lee approached Back after Saunders' abrupt departure and expressed interest in applying for the HR job. (*Id.* at 58.)Although it was not Back's decision whether ADT would hire Lee as human resource coordinator, Back told Lee that she should pursue it if she was interested. (*Id.* at 58-60.)

> FN20. It is uncontested that neither Kickliter nor Back (nor any other ADT manager) solicited Lee's application for the human resource coordinator job. (Lee Dep., at 23.) Lee learned of the vacancy just as King did, simply by virtue of her aware-

ness that "the lady that was there before had left.... [I]t was just knowing somebody who's not there anymore, not seeing them."(*Id.* at 22-23.)Thus, there is no indication that Lee was privy to any secret, inside information about the vacancy or the application process that was concealed from King or other potential applicants.

Lee knew that she needed to obtain clearance from Back before she applied for the HR job because under ADT's system, "you are supposed to go through your manager and get permission first. You are supposed to do a job bid worksheet."(Lee Dep., at 25.) Lee was aware of this requirement, not because Back or Kickliter alerted her to it, but because that information was "online inside ADT." (*Id.*) Accordingly, there is no reason to believe that any ADT decisionmaker took any special steps to apprise Lee of the bid form requirement, or that the information available to Lee and King concerning the vacancy diverged in any respect. In deference to the job bid requirement, Lee went online, printed out and completed the job bid worksheet, and gave it to Back, who signed it. (Lee Dep., at 27.) The bid form was then turned in to Kickliter. (Kickliter Dep., at 63.) King never submitted a completed bid form for the January 2006 vacancy. (*Id.*)

**\*9** Kickliter testified that she selected Lee for the human resource coordinator job in January 2006 because of Lee's qualifications, which included human resource experience (to-wit: managing 16 employees at the Baldwin County Mental Health Center). (Kickliter Dep., at 63-64; Lee Dep., at 30-31.) FN21In Kickliter's view, Lee's sales performance or, more precisely, her failure to meet quotas as a sales representative, was not pertinent to her suitability to the administrative function and would not preclude her consideration for the HR job. (Kickliter Dep., at 67, 116-18.) As Kickliter put it, "sales is different position than an administrative position ... [a]nd a lot of the administrators probably wouldn't be a good salesperson."(*Id.* at 117.)Furthermore, Back's testimony was that she had never disciplined Lee for her sales work "outside of the normal coaching and performance

improvements that we normally write up," and that Lee had not missed her quota more than three or four times. (Back Dep., at 70-71.) [FN22] Back further testified that she had never been able to identify any specific root cause for Lee's travails as a salesperson, in terms of things she was doing or not doing.(*Id.* at 37-40.)

> FN21. The record reflects that, prior to Kickliter making this decision, she attended a lunch with Back and Amanda Phillips, an ADT manager whom Lee classifies as "a friend of [hers]" who first suggested that Lee apply for a sales job at ADT in May 2005. (Lee Dep., at 14-15; Kickliter Dep., at 73.) At that lunch, Back informed Kickliter that Lee was interested in applying for the human resource job and that Back would give Kickliter the job bid form. (Kickliter Dep., at 73-74.) There was no testimony that Back or Phillips pressured Kickliter to hire Lee over King, or that King was ever mentioned during this meeting.

> FN22. Despite her fine performance, even King had received coaching forms and performance improvement plans on occasion when her sales production fell below 70% of quota. (King Dep., at Exh. 17 & 18.) As such, there was nothing unusual or untoward about ADT taking similar measures with respect to Lee.

### E. The EEOC Charge of Discrimination.

On March 23, 2006, King filed a Charge of Discrimination with the Birmingham District Office of the Equal Employment Opportunity Commission. (King Dep., at Exh. 13.) The Charge sounded exclusively in race discrimination, and the "retaliation" box was left unchecked. In the body of the Charge, King stated that she had applied for the HR job on December 9, 2005; that she was never interviewed despite meeting the qualifications; and that a white female was selected on February 2, 2006.(*Id.*) King stated that she believed she was a victim of race discrimination, and concluded that "[t]he employer [*sic* ] pre-textual reason for its failure to appoint me to the position, and appointing the white applicant discriminates against me because of my race, black."(*Id.*) Nowhere in the EEOC Charge did King make any reference to being forced out of her office in October 2005, to her complaint to Courseault, or to any allegation of retaliation. On May 10, 2006, the EEOC informed King that its investigation failed to disclose evidence that her race was a factor in the challenged personnel decision. (King Dep., at Exh. 14.) This lawsuit followed.

### IV. Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."*Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.*Id.*"If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."*Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted)."In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."*Tipton v. Bergrohr GMBH-Siegen,* 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted)."Summary judgment is justified only for those cases devoid of any need for factual determinations."*Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013, 1016 (11th Cir.1987) (citation omitted).

**\*10** The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir.2004).* Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

### V. Analysis.

#### A. The McDonnell Douglas *Burden-Shifting Framework.*

Absent direct evidence of discrimination,[FN23] King must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).* Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and retaliation.[FN24] If she does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n, 431 F.3d 788, 794 (11th Cir.2005).* At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action].... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1457 (11th Cir.1997)* (citations omitted). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir.2006)* (quotation omitted). The ultimate burden of persuasion remains with the plaintiff. *See E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1273 (11th Cir.2002).* Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articu-

lated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir.2000)* (en banc ).

> FN23. Both parties' briefs rely exclusively on a *McDonnell Douglas* inferential analysis. As there is no indication in the record of any direct evidence that ADT acted with a discriminatory or retaliatory motive, the Court will rely exclusively on the inferential mode of analysis, just as the parties have done.

> FN24. King's burden of establishing a *prima facie* case is not heavy. *See Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir.2001)* ( "the *prima facie* requirement is not an onerous one").

Here, King complains of race discrimination and retaliation by ADT in hiring/transfer decisions. To establish a *prima facie* case of discriminatory denial of promotion or failure to hire, a plaintiff must show that (i) she belongs to a protected class; (ii) she was qualified and applied for a position the employer was trying to fill; (iii) she was denied the position; and (iv) others who were not members of the protected class were hired, or the employer continued to seek applicants with the plaintiff's qualifications. *See Vessels v. Atlanta Independent School System, 408 F.3d 763, 768 (11th Cir.2005); Underwood, 431 F.3d at 794;Wilson, 376 F.3d at 1089.*FN25"A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class." *Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir.2005); see also Underwood, 431 F.3d at 794* (finding that Title VII plaintiff in failure-to-hire context must show that successful applicant was not within his protected class)."Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant ." *Morris, 402 F.3d at 1082.*

FN25. This formulation of the *prima facie* test differs from that relied on by defendant, who frames the fourth element as being that "other equally or less qualified employees who are not members of the protected minority were promoted."(Defendant's Brief (doc. 20), at 17.) That is an incorrect statement of the law in this Circuit, which has unequivocally rejected the notion that a plaintiff must address relative qualifications as part of her *prima facie* case. *See Walker v. Mortham,* 158 F.3d 1177, 1193 (11th Cir.1998) ("we hold that district court in this case erred in imposing as part of the *prima facie* case a requirement that each plaintiff establish that the successful applicant for his or her coveted position was less than or equally qualified to hold the position"). The Court therefore declines to impose a relative-qualifications requirement on King as part of her *prima facie* burden.

**\*11** With respect to King's retaliation claims, Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."42 U.S.C. § 2000e-3(a); *see Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 586 (11th Cir.2000) ( "Retaliation is a separate violation of Title VII.").FN26 In the absence of direct evidence, Title VII retaliation claims turn on the same *McDonnell Douglas* burden-shifting analysis as do other Title VII claims. *See Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1155 (11th Cir.2002). Thus, a plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse action. *See Stavropoulos v. Firestone,* 361 F.3d 610, 616 (11th Cir.2004); *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311

(11th Cir.2002). If a plaintiff makes a *prima facie* showing, then the employer must articulate a legitimate, non-retaliatory reason for the challenged decision. *See Brochu,* 304 F.3d at 1155;*Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir.2001). If the employer produces legitimate reasons for the adverse employment action, then the plaintiff must show that these stated reasons are pretextual. *See Brochu,* 304 F.3d at 1155. Of course, the ultimate burden rests on the plaintiff to show that the employer's stated reason is a pretext for unlawful retaliation. *See Pennington,* 261 F.3d at 1266. Construing the Complaint liberally, plaintiff's discrimination and retaliation claims also sound in 42 U .S.C. § 1981; however, the substantive analysis for those claims is no different than it is for parallel Title VII claims. Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts, and extends to the employment context. *See Jackson v. BellSouth Telecommunications,* 372 F.3d 1250, 1270 (11th Cir.2004).Section 1981 also includes a cause of action for retaliation. *See generally Andrews v. Lakeshore Rehabilitation Hosp.,* 140 F.3d 1405, 1412 (11th Cir.1998).FN27 Although § 1981 claims do not share the exhaustion requirement of their Title VII counterparts,FN28 their elements are identical in a disparate treatment case. Indeed, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework ."*Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998); *see also Cooper v. Southern Co.,* 390 F.3d 695, 724 n. 16 (11th Cir.2004) ("The *McDonnell Douglas* framework for establishing a *prima facie* case is used in intentional discrimination cases brought under either Title VII or Section 1981."); *Sanders v. City of Montgomery,* 319 F.Supp.2d 1296, 1311 (M.D.Ala.2004) ("The legal analysis of claims of race discrimination pursuant to either Section 1981 and Title VII is the same."). This Court therefore relies on the traditional Title VII framework to analyze plaintiff's § 1981 claims, just as it does in evaluating her Title VII theories of recovery.

FN26.*See also Sullivan v. National R.R. Passenger Corp.,* 170 F.3d 1056, 1059

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(11th Cir.1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed"); *Taylor v. Runyon,* 175 F.3d 861, 869 (11th Cir.1999) (similar).

FN27. The Eleventh Circuit has recognized that "whether the elements of Title VII and § 1981 retaliation claims are the same is an 'open question' in this Circuit."*Bass v. Board of County Comm'rs, Orange County, Fla.,* 256 F.3d 1095, 1120 n. 10 (11th Cir.2001). Where, as here, the parties have relied on the Title VII framework for § 1981 retaliation claims, the Eleventh Circuit has done the same. *See Everson v. Coca-Cola Co.,* 2007 WL 2088839, *1 (11th Cir. July 23, 2007.)This Court will follow suit.

FN28.*See, e.g., Garrett v. Tandy Corp.,* 295 F.3d 94, 108 (1st Cir.2002) (explaining that "section 1981 is not blunted by devices such as Title VII, such as agency exhaustion"); *Caldwell v. Nat'l Brewing Co.,* 443 F.2d 1044, 1046 (5th Cir.1971) (holding that a plaintiff alleging discriminatory employment practices with regard to race "has an independent remedy under § 1981 without respect to exhaustion under Title VII"); *Sanders v. City of Montgomery,* 319 F.Supp.2d 1296, 1311 (M.D.Ala.2004) ( "Unlike their counterparts brought pursuant to Title VII, claims of race discrimination pursuant to Section 1981 do not require timely exhaustion of administrative remedies with the EEOC prior to suit.").

### B. Plaintiff's Discrimination Claims Related to the Office Move.

**\*12** In her summary judgment brief, King advances a claim of "race discrimination in her involuntary removal from her Inside Sales position," and states that she "is complaining of forced removal from her office where she performed Inside Sales responsibilities."(Plaintiff's Brief (doc. 27), at 13-14.)

Before even reaching a *McDonnell Douglas* analysis on this theory of liability, defendant asserts that any discrimination claim relating to King's reassignment is not part of this action because it was never properly joined via the pleadings, as required by Rule 8, Fed.R.Civ.P. Plaintiff's only rejoinder is that her *pro se* Complaint should be given a liberal construction and that the Rule 26(f) Report lent "more clarity to King's claims at an early stage of the litigation so that Defendant is hard pressed to claim any prejudice in defending this action."(Plaintiff's Brief, at 1-2.)

Neither side furnishes any citations to authority applying Rule 8 to similar circumstances; however, the text of the rule requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."Rule 8(a)(2). To satisfy the liberal pleading standard of Rule 8(a), the complaint must put the defendant "on notice as to the claim being asserted against him and the grounds on which it rests."Hamilton v. Allen-Bradley Co., 244 F.3d 819, 823 (11th Cir.2001) (internal quotes omitted); *see also Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (Rule 8 requires a statement that "give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests") (citation omitted); *Watts v. Florida Int'l University,* --- F.3d ----, 2007 WL 2331029, *5 (11th Cir. Aug. 17, 2007) (complaint must contain enough factual matter to suggest required elements of claims). King's Complaint does not satisfy even this low threshold. Although the Complaint mentions Title VII and 1981, the *only* supporting facts stated are that King was passed over for the HR job in February 2006. Nothing in the text of the Complaint could place ADT on notice that plaintiff was bringing a claim of race discrimination concerning King's involuntary reassignment out of her office and into outside sales in October 2005. King fails to offer any explanation for how ADT could possibly have known from reviewing the Complaint that she was suing it for moving her to outside sales and giving her office to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a white co-worker.

Apparently conceding that ADT could not have known from the Complaint that her office reassignment claim was joined in this action, King would have the Court excuse this Rule 8(a)(2) noncompliance because she filed the Complaint before retaining counsel and because her mention of the claim in the Rule 26(f) Report negates any unfair surprise. Both arguments are conclusively defeated by *Coon v. Georgia Pacific Corp., 829 F.2d 1563 (11th Cir.1987),* which is markedly similar to the case at bar. In *Coon,* the plaintiff filed a *pro se* complaint averring generally that her employer had acted in a discriminatory manner, referencing only a single alleged discriminatory act (denial of a promotion). Although she never attempted to amend the complaint, in a pretrial stipulation the plaintiff proffered eight specific instances of discrimination for which she sought to hold the defendant liable. The Eleventh Circuit found that the district court properly limited the plaintiff to her promotion claim. As an initial matter, the *Coon* panel determined that the plaintiff was not entitled to the benefit of the liberal rules governing *pro se* pleadings, inasmuch as she had "admitted that counsel had helped to draft" her complaint. *Coon, 829 F.2d at 1569, n. 6.* Moreover, the appeals court concluded that the complaint violated Rule 8(a)(2) by omitting reference to the eight specific claims, notwithstanding her subsequent references to them in a pretrial filing. The court explained that "the inclusion of claims in the pretrial stipulation, the mention of them in discovery and the filing of motions concerning those claims were not a substitute for the factual allegations of a complaint under Federal Rule of Civil Procedure 8(a)." *Id. at 1568.*

**\*13** Thus, *Coon* teaches that King is not entitled to the relaxed standards of *pro se* pleadings because she had assistance of counsel in drafting her Complaint; indeed, her testimony is that she simply "typed exactly what [the lawyer assisting her] told [her] to put down" in her Complaint. (King Dep., at 130.) FN29 Accordingly, the sufficiency of the Complaint will not be evaluated as a *pro se* filing. Moreover, it is clear from *Coon* that King's mere

mention of additional proposed claims in the Rule 26(f) Report is not a substitute for a proper amendment of the pleadings. FN30

> FN29. Even if this were not so, plaintiff did retain counsel (albeit not the lawyer who dictated the Complaint language to her) well before the deadline for amending pleadings and her counsel never requested leave to amend the Complaint. A party represented by counsel cannot claim sanctuary in the wide latitude afforded *pro se* litigants in drafting pleadings, where counsel was retained with ample opportunity to amend the complaint to correct any flaws well in advance of the requisite cutoff date.

> FN30. King's counsel was plainly aware that amendment of the pleadings would be necessary if these newly asserted claims were to be pursued, else he would not have included a footnote in the Rule 26(f) Report that "Plaintiff intends to seek leave to amend her complaint within the period allowed by this joint Report of Parties."(Doc. 13, at 1-2 n. 1.)

Even if the Complaint were properly evaluated under the liberal standards applied to *pro se* filings, it still falls short. As a general rule, *pro se* pleadings are held to less stringent standards than other pleadings. *See, e.g., Erickson, 127 S.Ct. at 2200* ("a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers"); *Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir.2007)* (noting that "we are to give liberal construction to the pleadings of *pro se* litigants"). But a filer's *pro se* status does not excuse her from compliance with the Federal Rules of Civil Procedure. *See Albra, 490 F.3d at 829* (notwithstanding liberal construction of *pro se* filers' pleadings, "we nevertheless have required them to conform to procedural rules") (citation omitted); *Hales v. City of Montgomery, 347 F.Supp.2d 1167, 1171 (M.D.Ala.2004)* ("Notwithstanding a more liberal construction, however, the *pro se* plaintiff's complaint must meet

the minimum requirements of presenting a viable claim."); *Delgado v. Federal Bureau of Prisons, 727 F.Supp. 24, 27 (D.D.C .1989)* ("even a *pro se* complaint must outline all of the elements of the claim and is subject to dismissal if the pleading fails reasonably to inform the adverse party of the asserted cause of action"). Nor does a plaintiff's *pro se* status trump the defendant's right to be placed on notice, via a proper pleading, of a short and plain statement of the claims brought against it. King did not comply with this requirement; therefore, her attempt to circumvent the pleading rules to inject a new claim into this litigation via a report of parties' planning meeting and a summary judgment brief cannot succeed. *See Coon, 829 F.2d at 1568-69;Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir.2004)* ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").[FN31]

> FN31. Besides, plaintiff's sworn deposition testimony makes clear that she omitted the office removal claim from her Complaint not because she did not know how to frame her pleading from a technical standpoint, but because it never occurred to her to bring such a claim. King testified that she failed to mention the office assignment in her Complaint because "I didn't think about that, that one, you know, that time. I didn't think to put that in.... That the incident about the Human Resource Coordinator position, that's what I was you know, complaining about."(King Dep., at 192 .) Thus, it is undisputed that plaintiff never intended to complain about the office reassignment when she filed the Complaint. The rules governing *pro se* pleadings do not allow a pleading (nominally filed *pro se,* but ghostwritten by an attorney) to be construed as encompassing causes of action that the pleader never raised and never meant to raise.

For all of the foregoing reasons, defendant's Motion for Summary Judgment is **granted** with respect to plaintiff's race discrimination claims under Title

VII and § 1981 predicated on her "forced removal from her office where she performed Inside Sales responsibilities."(Plaintiff's Brief, at 14.)

### C. Discrimination and Retaliation Claims Relating to the December 2005 Hiring Decision.

**\*14** Next, defendant seeks judgment as a matter of law on plaintiff's race discrimination and retaliation claims arising from the December 2005 hiring of Valerie Saunders as human resource coordinator. However, it does not appear that King is positing any causes of action of any stripe relating to the hiring of Saunders. Three separate documents buttress this conclusion. First, the Complaint references only the hiring of a white female in February 2006. (Doc. 1, ¶ 4.) Saunders is black and was hired in December 2005. Second, plaintiff's narrative statement of claims in the Rule 26(f) Report is silent about the Saunders hiring, but complains only about the selection of Brandy Lee for the HR job. (Doc. 13, at 1-2.) Third, nothing in plaintiff's brief opposing summary judgment references claims of race discrimination or retaliation arising from Saunders' hiring; to the contrary, the brief is framed solely in terms of a race discrimination claim relating to King's office move and reassignment to outside sales, and a race discrimination and retaliation claim pertaining to the hiring of Lee for the HR job in January 2006. (Doc. 27.)

To the extent, however, that King does intend to bring race discrimination or retaliation claims pertaining to the Saunders hiring decision in December 2005, those causes of action fail as a matter of law. King cannot establish a *prima facie* case of race discrimination because the candidate hired to fill the position is of the same protected class as plaintiff. *See, e.g., Vessels, 408 F.3d at 768* (listing as one element of *prima facie* case of race discrimination that "the position was filled with an individual outside the protected class"). Even assuming that King could establish a *prima facie* case of retaliation, ADT has articulated a legitimate, non-retaliatory reason for not selecting King, to-wit: that she did not comply with the posted, neutral requirements for application by submitting a com-

pleted job bid form, as clearly directed by the company's CareerLine website. Plaintiff having made no showing that this stated reason for her non-selection was a pretext for unlawful retaliation, any retaliation claims related to the Saunders hiring decision cannot withstand Rule 56 scrutiny.

### D. Plaintiff's Discrimination and Retaliation Claims Relating to the January 2006 Hiring Decision.

Finally, the Court turns to plaintiff's claims of race discrimination and retaliation arising from ADT's hiring of Brandy Lee for the HR job in January 2006.FN32

> FN32. It is unclear precisely what form King intends for this claim to take. Her Complaint couches the hiring of Lee as a claim of race discrimination under Title VII, and also makes passing reference to § 1981 and retaliation. Plaintiff's summary judgment brief argues this claim both from the standpoint of retaliation and race discrimination, adopting a substantively identical analysis for each, without delineating whether she intends to posture that claim under Title VII or § 1981, or both. In an abundance of caution, and despite the vagueness of plaintiff's filings, the Court will construe this claim as one for both race discrimination and retaliation, brought pursuant to both Title VII and § 1981.

#### 1. Race Discrimination.

Defendant contends that plaintiff cannot make a *prima facie* showing of race discrimination because she cannot show that she applied for the position or that the successful applicant was equally or less qualified. As noted *supra*, the Eleventh Circuit has held that relative qualifications are not to be considered in an analysis of the *McDonnell Douglas prima facie* framework. *See* Walker v. Mortham, 158 F.3d 1177, 1193 (11th Cir.1998). Accordingly, the Court does not adopt defendant's contention that King has failed to make a *prima facie* showing because she has not established that Lee is equally or

less qualified than she.

**\*15** With respect to ADT's other argument, in the failure to promote/hire context, it is generally true that one element of the *prima facie* case is that the plaintiff must have actually applied for the job. *See* Vessels, 408 F.3d at 768 (listing as second element of *prima facie* case that plaintiff "was qualified for and applied for a position that the employer was seeking to fill"). Defendant's position is that, unlike Lee, King never applied for the January 2006 vacancy because she never submitted a completed job bid form. It is undisputed that (a) a job bid form was an essential component of an application by any internal candidate for any posted job; (b) ADT did not hire internal candidates for posted positions if they failed to submit a bid form; (c) King never submitted a job bid form for the HR job, either in December 2005 or January 2006; and (d) ADT's decisionmaker (Kickliter) had no knowledge that King was applying for the position in January 2006 and could not consider her for the opening without a bid form. The factual wrinkle for summary judgment purposes, however, is King's testimony that the January 2006 vacancy for the HR job was never posted on the company's CareerLine. At this stage, King's sharply contested evidence on this point must be accepted as true.FN33 Circuit authority provides that "where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position-only that the employer had some reason to consider him for the post."*Vessels,* 408 F.3d at 768.

> FN33. In attempting to refute plaintiff's evidence, defendant does not offer computer records or logs establishing the dates that the position was posted, screenshots of the posting, the identities of the applicants, the dates of their applications, or other objective indicia that a formal posting occurred. Instead, ADT merely offers general testimony that the job was posted, which cannot rebut King's assertions otherwise for summary judgment purposes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the undersigned's view, King has not come forward with sufficient evidence to show that ADT had any reason to consider her for the January 2006 HR job vacancy. That vacancy was in a different department than King was working in, and paid less than King's job did. She had not submitted a complete application in December 2005, when the position had come open previously. When King learned that the incumbent had resigned in January 2006, she did not go to Back, to Kickliter or to any other manager to ask about the job or to express interest in applying. Indeed, King's only evidence that Kickliter should have known to consider her was that (a) three months earlier, in October 2005, King had asked Back about the job when it had come open previously, but had never followed up with a bid form; (b) King had filled out the computer portion of the application on December 9, 2005 in connection with the prior vacancy, so Kickliter and Back must have been aware that she was interested; and (c) King had "several conversations ... with them regarding the position" at unspecified times and with unspecified content, although she never told either Back or Kickliter that she had applied. (King Decl., ¶ 19; King Dep., at 84-85.)

This is not sufficient to meet even plaintiff's light *prima facie* burden of showing that ADT had some reason to consider her for the January 2006 vacancy. Plaintiff's idle expression of interest to Back three months earlier certainly did not put Back on notice that King wanted the job in January 2006, especially when King had never followed up with Back in December by giving her the necessary job bid form. It is uncontroverted that Back interpreted King's failure to follow up as an indication that she had decided not to go forward with the application process, and that Back thought nothing of it. Nor does King's submission of a partial, incomplete application for a prior vacancy in December 2005 suffice to place ADT on notice that King wanted to apply for a new vacancy in January 2006. King offers no evidence that Kickliter or Back had ever received that partial application in December. Moreover, since King failed to follow clear, unequivocal instructions in order to complete her application in December 2005, ADT had no reason to

believe that she wanted to go through with her application then, much less that she was interested in trying again in January 2006. Nor does King preserve this claim with her vague reference to "several conversations" with Back and Kickliter regarding the HR job. King does not allege that she ever specifically told Back or Kickliter at any time that she had applied for that job in December 2005, or that she wanted to apply for that job in January 2006. To the contrary, King admits that she never told Back or Kickliter that she had tried to apply in December. King also admits that she never asked Back or Kickliter about the HR job opening of January 2006 at any time until February 1, at which time the position had already been filled. For all of these reasons, the Court finds that King cannot establish a *prima facie* case of race discrimination in connection with the January 2006 because she did not apply for the HR job and ADT had no reason to consider her for that position.

**\*16** Even if plaintiff could make a *prima facie* showing of race discrimination, the Court finds that ADT has established a legitimate nondiscriminatory reason for its non-selection of King, and that King has failed to adduce sufficient evidence to create genuine issue of material fact as to whether that stated reason is pretext for race discrimination. In particular, ADT presents substantial evidence that it did not hire King for the January 2006 vacancy because she did not submit a bid form for the position.[FN34] Defendant's evidence is that without a bid form, Kickliter would neither interview a candidate nor otherwise consider her for an opening. King never submitted a bid form for the January 2006 HR job vacancy, so she was not considered. Defendant's evidence on this front is more than adequate to satisfy its burden of production.

> FN34. In the alternative, defendant asserts that "assuming King had applied for the January 2006 opening, Lee was more qualified because of her higher education level and previous experience in a supervisory position handling human resources related issues."(Defendant's Brief (doc. 20), at 21.) The problem with this line of argu-

ment is that defendant offers no evidence that ADT's decisionmaker, Kickliter, deemed Lee more qualified than King for the January 2006 vacancy. To the contrary, there is no evidence that Kickliter ever compared the relative qualifications of King and Lee, or that Kickliter ever considered King for the January 2006 vacancy at all. Kickliter's deposition testimony was clear that she would never consider an applicant who had not submitted a bid form, and that she never received a bid form from King. (Kickliter Dep., at 39-40, 109-10.) Thus, ADT would have the Court find as a legitimate nondiscriminatory reason for the challenged personnel decision that King was less qualified than Lee, even though there is no evidence that anyone at ADT actually held that view or compared their relative qualifications at any time. That defense counsel may feel that Lee was more qualified than King for that vacancy is not evidence that can be weighed on summary judgment; indeed, mere contentions not backed by evidence are manifestly insufficient to satisfy a defendant's burden of production. *See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 & n. 9, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)* ("an articulation not admitted into evidence will not suffice" and "the defendant cannot meet its burden merely ... by argument of counsel"); *IMPACT v. Firestone, 893 F.2d 1189, 1193 (11th Cir.1990)* (reversing lower court's finding that defendants satisfied burden of production where they merely contended that person believed to be most qualified was hired, without offering any proof by any person who made the employment decision that such was the case); *see also Steger v. General Elec. Co., 318 F.3d 1066, 1076 (11th Cir.2003)* (applying IMPACT to reject defendant's mere general statement that employment decision was based on hiring of best quali-

fied applicant).

The summary judgment record would not allow a reasonable factfinder to conclude that this stated reason for not hiring King is a pretext for unlawful discrimination. It is uncontroverted that the successful applicant, Brandy Lee, did submit the required bid form. It is further uncontroverted that Kickliter has never interviewed or otherwise considered an internal candidate for a posted position without a signed bid form. More generally, the undisputed evidence reflects that King did not submit a bid form for the January 2006 vacancy, even though she was afforded the same opportunities and access to information about the job as Lee was. Significantly, there is no evidence that ADT officials furnished Lee with inside information about the job vacancy. There is no evidence that Lee's awareness about the job opening was any greater than King's. There is no evidence that ADT misled or deceived King in any way to prevent her from applying, or that King ever asked any ADT official about applying for the vacancy in January 2006. There is no evidence that ADT coached Lee to fill out the job bid form, or that it suppressed or concealed that requirement from King; to the contrary, the job bid requirement was prominently recited on the Career-Line website which both King and Lee consulted in reference to the HR job.

Notwithstanding the foregoing, plaintiff attempts to show pretext in two respects. First, plaintiff protests that she "knew nothing about" the bid form rule. (Plaintiff's Brief, at 24.) In that regard, King attempts to deflect the blame to Back and other ADT officials for not telling her that a job bid worksheet was required. (King Decl., ¶¶ 6-7.) But plaintiff does not and cannot dispute that the bid form requirement was clearly stated in the "Ground Rules" on the company's intranet website where employees apply for posted positions. (Courseault Decl., ¶ 13 & Exh. D.) Lee was aware of the requirement from having read the website. (Lee Dep., at 25.) King could have done the same. Plaintiff has no evidence that ADT ever reminded anyone of the bid form requirement, so their failure to furnish her with such a reminder does not undermine the company's uni-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

form, across-the-board application of that require-
ment to exclude King from consideration for the
HR job. King cannot fault defendant for her own
failure to read and abide by the Ground Rules, so
this attempt at showing pretext fails.[FN35]

> [FN35.] Equally unavailing is plaintiff's mis-
> leading and unfair characterization of the
> facts as being that "King was not con-
> sidered for the position because Back
> failed to sign off on a job bid form re-
> quired for internal job transfers or
> changes."(Plaintiff's Brief, at 20.) There is
> no evidence that plaintiff ever asked Back
> to sign such a form. Thus, the stumbling
> block to plaintiff's application for the HR
> job was not that Back refused to sign the
> form, but was instead that King failed to
> present the form to Back pursuant to the
> Ground Rules.

**\*17** Plaintiff's second method of attempting to show
pretext is to argue that ADT "ignored the rules re-
lating to time on the job, good standing and good
performance when considering Lee's application for
the vacancy.... A reasonable fact-finder could con-
clude that the Defendant ... bent or ignored the rules
in favor of Lee, to the detriment of
King."(Plaintiff's Brief, at 25.) Inspection of the re-
cord reveals otherwise. With respect to the time on
the job requirement, the Ground Rules for internal
candidates to apply for posted positions clearly
state that "[e]mployees must have at least six
months in their current position" to be eligible.
(Courseault Decl., ¶ 12 & Exh. D.) Having arrived
at ADT in May 2005, Lee had been working there
for eight months when she applied for the HR job
in January 2006. (Lee Dep., at 12.) Thus, contrary
to plaintiff's argument, there was no bending or ig-
noring of this rule with respect to Lee.[FN36]

> [FN36.] To support her position, King points
> to a passage from the ADT handbook stat-
> ing that an employee is "generally required
> to remain in [her] position for at least
> twelve (12) months before transferring to
> another position."(King Decl., at Exh. A.)

However, she comes forward with no evid-
ence that this general handbook language
trumps the specific six-month rule set forth
in the Ground Rules, or indeed that it has
any application whatsoever to the applica-
tions of internal candidates for posted va-
cancies on CareerLine. Both logic and
common sense suggest that specific rules
governing online applications by internal
candidates for posted positions should en-
joy primacy over more general rules re-
cited in an employee handbook. Plaintiff
has presented no evidence to the contrary,
but instead simply seizes on the more ad-
vantageous handbook language without
any showing that such language applies to
CareerLine applications.

Nor can plaintiff show pretext by asserting that
Back's signature on Lee's bid form amounted to
"falsely certifying that Lee was in good standing
and met all company rules and polices [*sic* ] re-
quired for moving to a new position."(Plaintiff's
Brief, at 21.) There is no evidence that Lee was not
an employee in good standing. To be sure, the re-
cord reflects that Lee was not a model salesperson,
or even a successful one; however, Back's uncon-
troverted testimony was that Lee had never been
disciplined any fashion outside of the normal
coaching and performance improvements (which
even King had received from time to time), and that
Lee had never missed her quota more than three or
four times. (Back Dep., at 70-71.) Moreover, Back's
testimony was that while Lee had not achieved
great results as a sales person, there was "nothing in
particular that she was, you know, really falling
down or not doing."(*Id.* at 39.)Thus, the record
does not support plaintiff's contention that Back's
written certification that Lee was an employee in
good standing was in any way false or a violation
of ADT rules.

Plaintiff's final attempt to show pretext is to argue
that Lee's suboptimal performance in inside sales
should have disqualified her for the HR job. King
points to no evidence other than her own subjective
belief that this factor should have guided the com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pany's decision. Again, the uncontroverted record evidence is that Lee had never been disciplined for poor performance and that Lee was doing all the things required of sales representatives, just not getting results. That Lee (like King) had been coached from time to time for missing quotas in no way barred her from consideration for a posted job. Besides, Kickliter's testimony was that performance in sales was not indicative of likely performance in the HR job, so Lee's difficulties in meeting quotas were not viewed by the decisionmaker as fatal to her application. (Kickliter Dep., at 67, 116-18.)

For all of the foregoing reasons, plaintiff has failed to make a sufficient showing that defendant's stated reason for not hiring her into the HR job in January 2006 is a pretext for race discrimination. As such, there are no genuine issues of material fact on plaintiff's Title VII and § 1981 claims relating to the January 2006 non-selection of King for the human resource coordinator job, and defendant is entitled to summary judgment.

*2. Retaliation.*

**\*18** Plaintiff also brings a separate Title VII and § 1981 retaliation claim predicated on the January 2006 hiring decision. The legal analysis is somewhat different here, in the sense that the elements of a *prima facie* case are different, and defendant has the additional defense (with respect to the Title VII retaliation claim) that King failed to present the retaliation cause of action to the EEOC. However, the Court need not delve into the minutiae of these issues. Plaintiff concedes that the pretext analysis is identical for both her race discrimination claims and her retaliation claims arising from the January 2006 hiring decision. (Plaintiff's Brief, at 26.) As such, assuming that plaintiff could establish protected activity and the other elements of a *prima facie* case of retaliation, and assuming that some aspect of the retaliation claim could survive defendant's exhaustion challenge based on the EEOC Charge, that cause of action would still fail under precisely the same pretext analysis delineated *supra* with respect to the race discrimination claim. By plaintiff's own argument, if she cannot establish a genuine is-

sue of fact on pretext as to the race discrimination claims, then she cannot do so as to the retaliation claims either. The Court has already found that defendant is entitled to summary judgment on the race discrimination claims for want of evidence of pretext. That same defect is fatal as to plaintiff's retaliation claims, as pleaded under § 1981 and Title VII, and requires entry of summary judgment in defendant's favor on that cause of action.FN37

> FN37. At the conclusion of her brief, plaintiff argues that there are material facts as to whether defendant "followed its own personnel procedures when awarding the promotions in 2000" and whether defendant is "being truthful in the stated reason for the difference in salary given to Plaintiff then [*sic* ] that given to her white co-workers."(Plaintiff's Brief, at 26-27.) These allegations have no bearing on the instant action, and will not be considered.

**VI. Conclusion.**

Notwithstanding all the ink spilled by the parties and this Court, this is a very simple case. Plaintiff was passed over for a human resource coordinator job that she wanted. The uncontroverted evidence is that in applying for the position, King neglected to submit the mandatory job bid form, which was clearly recited in written instructions furnished by the company. Her failure to submit a job bid form meant that, from the company's standpoint, she had never applied for the vacancy; therefore, she was not considered for it. Plaintiff has come forward with no evidence that this stated reason for not hiring King into the HR job was pretextual, or that her non-selection was actually motivated by invidious race discrimination or retaliation for statutorily protected activity. For all of these reasons, defendant's Motion for Summary Judgment (doc. 19) is due to be, and the same hereby is, **granted.**There being no genuine issue of material fact, plaintiff's Complaint is **dismissed with prejudice.**A separate judgment will enter. The Motion to Strike (doc. 32) is **granted in part,** and **denied in part,** as set forth *supra.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2713212 (S.D.Ala.)
**(Cite as: Slip Copy)**

S.D.Ala.,2007.
King v. ADT Sec. Services
Slip Copy, 2007 WL 2713212 (S.D.Ala.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.